UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

JULIAN VARGAS, ET AL,          ) CASE NO: 2:19-CV-08108-DMG-MRWx
                               )
               Plaintiffs,     )              CIVIL
                               )
       vs.                     )        Los Angeles, California
                               )
QUEST DIAGNOSTICS CLINICAL     )         Monday, May 3, 2021
LABORATORIES, INC, ET AL,      )
                               )
               Defendants.     )
_____)


STATUS CONFERENCE

BEFORE THE HONORABLE MICHAEL R. WILNER,
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:              SEE PAGE 2


Court Reporter:        Recorded; Zoom

Courtroom Deputy:      Veronica Piper

Transcribed by:        Exceptional Reporting Services, Inc.
                       P.O. Box 8365
                       Corpus Christi, TX 78468
                       361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES**</u>:


For Plaintiffs:                    JONATHAN D. MILLER, ESQ.
                                   ALISON M. BERNAL, ESQ.
                                   Nye Peabody Stirling Hale & Miller
                                   33 West Mission Street
                                   Suite 201
                                   Santa Barbara, CA 93101

                                   BENJAMIN J. SWEET, ESQ.
                                   Nye Stirling Hale & Miller, LLP
                                   1145 Bower Hill Road
                                   Suite 104
                                   Pittsburgh, PA 15243

For Defendants:                    DAVID H. RAIZMAN, ESQ.
                                   AMBER L. ROLLER, ESQ.
                                   Ogletree Deakins Nash Smoak & Stewart
                                   400 South Hope Street
                                   Suite 1200
                                   Los Angeles, CA 90071

<u>**Los Angeles, California; Monday, May 3, 2021**</u>

<u>**(Remote appearances)**</u>

<u>**(Call to Order)**</u>

**THE COURT:** All right. Good morning. This is Judge Wilner. This is a video hearing with the lawyers on *Vargas versus Quest Diagnostics*, CV 19-8108-DMG(MRWx).

A number of folks on. Who's going to be taking the lead for the plaintiffs today?

**MR. MILLER:** Good morning, Your Honor, I will. Jonathan Miller.

**THE COURT:** Mr. Miller. Hi.

And who's taking the lead for the defense?

**MR. RAIZMAN:** Your Honor, if it pleases the Court, I will on the motions that the defendants are proposing, as well as the apex deposition issue that we are moving on. And if Ms. Roller is able to join, which I believe she will shortly, she would take the lead on our prospective motions.

**THE COURT:** Okay. Well, I don't know what any of that means but that's fine.

All right. So I received -- this is a case where I had some involvement about a year or so ago as I recall. There were some discovery issues and because I think, if I recall correctly, one of the issues was Quest's involvement in what used to be the COVID outbreak -- oh, wait, it still is. There were some discovery issues that came up if I recall correctly.

1          And then I haven't heard from you folks for too long

2    and then I received a couple of competing emails laying out a

3    bunch of issues in discovery.  I don't think I've seen a motion

4    on this.  I took a quick look at the docket.  I see you have

5    class cert deadlines coming up and I'm not sure when the

6    discovery cutoff is.

7          I'm happy to chat with you folks this morning.  I am

8    sure you took a look at my posted procedures in which I make it

9    reasonably clear and I'm not likely to give you an order on

10   anything in the absence of a properly filed motion because I

11   don't know enough about what's going on or what's about to go

12   on or whatever these issues are to speak intelligently about

13   it.  And certainly issues of privilege or discovery conduct or

14   misconduct require a fairly detailed set of briefs for me to

15   come up with an answer.  And of course, the fee shifting rules

16   of Federal Rule 37(a)(5) have to come into play unless someone

17   gets through one of the statutory exemptions.  But if you want

18   to talk about these issues, we can.  And if I can help you

19   either diffuse problems or head off problems, I'll make the

20   effort to do it and you have me for some amount of time this

21   morning.

22         Mr. Miller, you folks, as the kids would say, you

23   folks started it, you sent the first (glitch in audio) and then

24   Mr. Raizman, I'll hear from you and perhaps your colleague.

25         Mr. Miller?

1          **MR. MILLER:**  Thank you very much, Your Honor.

2      And just as a preliminary matter, we're very comfortable

3  just putting this record before the Court.  We acknowledge that

4  it's a rather lengthy record with some history to it and it may

5  be most efficient to handle it that way.  But at the same time

6  it's probably helpful to at least catch up --

7          **THE COURT:**  What does that mean?  You want to file a

8  motion?

9          **MR. MILLER:**  We do intend to --

10         **THE COURT:**  Okay.

11         **MR. MILLER:**  -- file a motion just because the

12  history goes back all the way to January of last year laying

13  out the discovery issues and the meet and confer efforts to

14  disputes and we think it will be helpful for the Court to have

15  the entire record before it in reaching decisions on these

16  issues.  But at the same time we're happy to go through it with

17  you this morning, Your Honor, if it's your preference and

18  address where we are and (glitch in audio) the large (glitch in

19  audio) have been.

20         **THE COURT:**  I have -- Mr. Miller, I have no idea

21  about anything that's going on here so to ask me my preference,

22  my preference is that you folks figure out your discovery

23  issues without judicial intervention as required by Rule 16, 26

24  and 37.  That's my preference.  If you can't, then you tee it

25  up for a motion and I rule on the motion and I go one way or

1    the other and maybe you recoup your expenses and maybe you pay

2    the Ogletree firm's expenses.  That's how it works.  So my

3    preference is not to go through that at all.

4           Now, you asked for a hearing with me.  And if you

5    want to put something in front of me then say it but don't ask

6    me what I want to do, sir.

7           **MR. MILLER:**  Understood, Your Honor, and I apologize.

8           **THE COURT:**  Do you want to present something to me

9    today?

10          **MR. MILLER:**  I'm happy to present to you today, Your

11   Honor.  Yes, I think it's helpful (glitch in audio) on this

12   case and I'm happy to provide it so let me start there.

13          We don't wish to be here, Your Honor.  We've taken

14   extensive efforts to try to meet and confer and I'll highlight

15   those briefly for you, Your Honor.

16          **THE COURT:**  No, no, no.  I don't want the details of

17   your meet and confer, sir.  That's the exact problem.  I can't

18   take that in real time.  What's the problem?

19          **MR. MILLER:**  The problem, Your Honor, is that we

20   sought discovery starting back in January of last year where we

21   informally produced requests for production, attempted to meet

22   and confer on them with the defendants for four months;

23   couldn't get to a resolution on them, formally served them in

24   May of last year.  They subsequently then sought a stay before

25   the discovery was due.  We came back from that stay under the

1    guise of COVID where the defendants then while the stay was

2    going on --

3              **THE COURT:**  Under the guise of COVID?

4         **MR. MILLER:**  Your Honor, we --

5              **THE COURT:**  We didn't have COVID?

6         **MR. MILLER:**  Your Honor, I'm still working remotely

7    so I understand very well that we have COVID.  But while the

8    (glitch in audio) was in place, Defendants took efforts to try

9    to moot Plaintiff's claims.  So it is important to understand

10   that this case involves efforts to try to moot Plaintiff's

11   claim while the stay was in place.  And then when we came

12   back --

13             **THE COURT:**  Mr. Miller, third time.  What is the

14   problem that you want me to get involved in?  Can I ask you

15   that question?

16        **MR. MILLER:**  Yes, Your Honor, let me state it very

17   succinctly.

18             We have 30(b)(6) witnesses who are not answering the

19   questions or not adequately prepared.  We have documents being

20   produced that are critical to these 30(b)(6) depositions after

21   they have been presented, and we have several objections in the

22   deposition process that are not appropriate and lead to

23   instructions that are not appropriate.  And it's impeding our

24   ability to meet our timeline for class certification; it's

25   impeding our ability to meet our burden of proof in proving the

1   underlying --

2              **THE COURT:**  When were these depositions, Mr. Miller?

3              **MR. MILLER:**  They began on April 8th, Your Honor --

4              **THE COURT:**  Okay.

5              **MR. MILLER:**  -- by stipulations filed before Judge

6   Gee.

7              **THE COURT:**  I understand.  All right.

8              Okay.  So what do you want me to do?

9              **MR. MILLER:**  I'd like you to order that Quest produce

10  for four more hours as we've requested, adequate for 30(b)(6)

11  individuals who are prepared.  That they pay the cost --

12             **THE COURT:**  I'm sorry, sir, I'm sorry, sir, I wasn't

13  clear.  What do you want me to do today?

14             **MR. MILLER:**  Your Honor, we (glitch in audio) ask for

15  this conference before proceeding with the motion so we came to

16  you to (indisc.) it out to get your --

17             **THE COURT:**  I'm sorry, your connection's not great;

18  you're garbled.  Start over.

19             **MR. MILLER:**  Your Honor, we reviewed your local rules

20  that suggest that if we have a dispute, we bring it to you

21  first and foremost before pursuing a (glitch in audio) motion

22  and so that's what we understood we were supposed to do and

23  that's why we're here today.

24             **THE COURT:**  Okay.  I don't think that's what my

25  procedure says you're supposed to do.  I think it's the exact

1   opposite of that.  I think my procedure says you can do it if

2   it would lead to a discussion that might resolve this but I'm

3   not going to order anything in the absence of a motion.  It's

4   just not there.  I'm supposed to take your word that these

5   folks engaged in terrible conduct?

6           **MR. MILLER:**  No, Your Honor.  Again, we're happy to

7   put all this before you.  We've been trying to get to informal

8   resolution.  Even before coming to you, we attempted to meet

9   and confer on multiple days to try to get to agreement.

10          **THE COURT:**  How am I supposed to informally resolve

11  an issue attorney-client privilege?

12          **MR. MILLER:**  Your rules specifically say you're not

13  going to resolve privilege issues at this conference, I

14  understand that, but separate and apart from the privilege --

15          **THE COURT:**  But you put it in the email to me.

16          **MR. MILLER:**  Just to flag that it is an issue, Your

17  Honor.  We understand that that's an issue but we --

18          **THE COURT:**  Okay, it's flagged, now what?  Now what

19  do I do, Mr. Miller?  What do I do about --

20          Well, okay.  So you're telling me that they produced

21  records relevant to a 30(b)(6) deposition after the 30(b)(6)

22  deposition; is that correct?

23          **MR. MILLER:**  Yes, Your Honor.

24          **THE COURT:**  Okay.  Mr. Raizman, did that happen?

25          **MR. RAIZMAN:**  Yes, to some degree, Your Honor, it

1   happened.  And just to cut to the chase, we offered to

2   reproduce witnesses on particular documents because frankly --

3   and this is an issue you can't decide today; it's a red

4   herring.  Identical copies of some of those documents were

5   produced before, very similar copies of documents on the same

6   subject were before them, and no witnesses were asked during

7   the depositions about the very same topics reflected on many

8   documents they already had.  So the idea of a blanket four

9   hours for four different witnesses is not -- is something that

10  Your Honor is going to have to order us to do but we've already

11  offered to reproduce witnesses on particular documents, on

12  particular issues because we think, frankly, given the examples

13  they gave in their meet and confer letter, that this is a

14  nonissue and we're talking about maybe one or two documents.

15          **THE COURT:**  So why were they produced late?

16          **MR. RAIZMAN:**  Your Honor, this was a massive

17  production and a massive production effort.  We -- I have the

18  numbers here.  When we did the electronic search, we came up

19  with 121,890 documents covering about 550,000 pages.  As a

20  result of that we were forced to go outside, hire contractors.

21  As Your Honor may likely be aware, that involves an education

22  effort, educate them about the issues in the case and then an

23  extensive quality check issue for Defense Counsel to make sure

24  that this effort was working effectively and efficiently.

25          So for example, one of the documents that was

1   produced late that they mentioned was a document that was

2   marked privileged by the outside contractors.  And when we saw

3   it, in preparing for depositions, it wasn't privileged.  And we

4   immediately, pursuant to our Rule 26 Continuing Production

5   Obligations, produced the document.  But as to the coverage of

6   the issues in that document, no witness --

7             **THE COURT:**  So was it produced -- I understand it

8   didn't all go out at once and that you supplemented it.  Was it

9   produced before or after the depositions?

10            **MR. RAIZMAN:**  That particular document was produced

11  after some of the depositions and not others but it was

12  produced before the deposition of the 30(b)(6) witness who was

13  supposed to testify on that subject.

14            I want to put this in context, if I can, Your Honor.

15            We produced almost 42,000 pages to date.  On March

16  5th, a full month before the first deposition, we had produced

17  82 percent of the documents.

18            By March 26th, 13 days before the first deposition,

19  we had produced 94.2 percent of the documents.

20            What happened is we were preparing witnesses for the

21  deposition.  We learned of the potential for other documents to

22  go and find that had not turned up and we found them.  And

23  rather than go back and look at them to see if they'd been

24  produced before, we just produced them if they were responsive.

25  So the vast majority of that 4.8 percent that was post-

1  deposition, were duplicative or largely duplicative; and/or

2  there were so many documents in this case, Your Honor, they

3  didn't even take advantage of the subject matter with respect

4  to the other documents which touched the same subject.

5          And again, I fear that I'm entering into territory

6  that's not appropriate for today's discussions, Your Honor, but

7  they spent hours not asking questions of 30(b)(6) witnesses

8  about documents when the witnesses were saying, If you show me

9  a document I might be able to answer the question.

10         **THE COURT:**  I know how to read a transcript and I

11 know reasonably well how to read a lawyer's questions and a

12 witness' answer.  And if that's what I need to do and see how

13 people spent their time, I can do that.  That's -- you know,

14 you'll get your answer from me some day.

15         All right.  Mr. Miller, what's your coaching issue?

16 I saw that in your email.

17         **MR. MILLER:**  Yeah, there were innumerable objections

18 throughout the 30(b)(6) depositions.  The big objections to

19 form.  And as soon as -- and say, "Answer if you know."  And as

20 soon as Counsel would say that the witness would say, "I don't

21 know" or "I don't recall."  And it all led into the idea that

22 these were inadequately prepared 30(b)(6) witnesses but there

23 were several instances of that type of coaching, you know,

24 vague objections to form which there's been case law of course

25 that those were not permitted in the way that they were doing

1   them.  He would say, "Objection to form," you know, or "it's

2   privileged" or "Answer if you know."  And it would go on.  I

3   mean, we had like -- Your Honor, there was over 50 examples in

4   the first deposition and over 70 examples in the second

5   30(b)(6) deposition and --

6           **THE COURT:**  Mr. Raizman, didn't you tell your people

7   ahead of time, answer if they know and if they don't know tell

8   them you don't know.

9           **MR. RAIZMAN:**  Absolutely, Your Honor.

10          **THE COURT:**  So why did you have to do that 70 times

11  in a deposition?

12          **MR. RAIZMAN:**  This is not accurate and it's badly

13  takes out of context what happened in the deposition.

14          **THE COURT:**  Okay well I'll count how many times.

15          **MR. RAIZMAN:**  Okay.

16          **THE COURT:**  When I get the full transcript -- maybe

17  I'll get -- were these video recorded?

18          **MR. MILLER:**  Yes, they were, Your Honor, and we will

19  be submitting them.

20          **THE COURT:**  We'll see how much of that I can stomach.

21  The last deposition review lasted about 45 seconds when I did

22  one of those.  The video was crystal clear, crystal clear.

23          Okay.  And well, I'm not going to rule on anything

24  but I'm now fascinated to find out what the attorney-client

25  privilege issue is on three fingers swipe.  What's the issue,

14

1   Mr. Miller?

2       **MR. MILLER:**  Thank you, Your Honor.

3       While the case was stayed in August of 2020, Quest

4   began implementing the three-finger swipe in support of their

5   second affirmative defense of mootness.  This is a kiosk

6   accessibility case.  These are self-serviced kiosks that Quest

7   implemented in their 2200 patient service centers across the

8   country that the blind clients that we represent through the

9   American Council of the Blind deems inaccessible.  So they --

10   to try to have costs savings and increase the amount of

11   individual patients Quest could service and reduce

12   administrative lifts on floor bottoms (s/l) is they put in

13   these self-service kiosks was how you check in when you go to a

14   patient service center.  We contend of course that they were

15   not outfitted with voice over technology, headphone jacks or

16   tactile keyboards that would allow blind patients to

17   independently access these kiosks to check in, so that they're

18   forced to wait, to not be able to independently put their

19   private information and so on and so forth.

20       During the pendency of the stay, Quest went to a

21   model where they tried to implement a three-finger swipe.  The

22   three-finger swipe purportedly works by having an audio message

23   when a blind user walks into a patient service center that they

24   have to wait to hear that says, Go to three-finger swipe kiosks

25   and you can check in.

1          When we attempted to ask -- it's important to our

2  burden of proof to show whether or not that's a reasonable

3  accommodation, whether or not that solves the accessibility

4  issues that we are contending are here and look at the contours

5  of what's going to later be a mootness argument in support of

6  the defendants' second affirmative defense.

7          When we asked questions in depositions of the

8  30(b)(6) witnesses, including Mr. Carr, who was designated on

9  the three-finger swipe, we were -- he was routinely instructed

10  that that information was protected by attorney-client

11  privilege, that it was at either the direction or consultation

12  with counsel and that he could not testify to the factors that

13  were considered, whether other reasonable alternatives were

14  considered as part of the request that we made for aids or

15  auxiliary services in the case on behalf of our clients (glitch

16  in audio) I should say --

17          **THE COURT:**  How is the company's decision-making

18  process relevant to the reasonableness of implementing this

19  procedure?

20          **MR. MILLER:**  Because prior to the implementation of

21  the procedure and prior to the lawsuit, Your Honor, American

22  Council of the Blind wrote to Quest Diagnostic Services in 2018

23  highlighting the issues and suggesting what the proper

24  solutions would be, suggesting what the appropriate vendors

25  would be.  And we have to demonstrate as part of our burden of

16

1   proof under the ADA what the reasonableness of the aids and

2   auxiliary services was, whether it was appropriate against

3   other alternatives.  That's part of what we're seeking to prove

4   here is that, for example, Quest could have just turned on the

5   iPad features that have accessibility for free.  They could

6   have for a low cost put in a headphone jack and a tactile

7   keyboard that would have made these fully independent and

8   usable by blind patients.  They instead chose not to do so and

9   chose other alternatives that we deem are insufficient and

10  unreasonable.  And of course when courts look at whether a

11  claim can be mooted, they look at the contours of the mootness,

12  the parameters around all the things that were considered to

13  try to moot every portion of the claim.  So we need to

14  understand how the decision was made and what the contours were

15  and what was considered against other reasonable alternatives

16  for accessibility.

17          Let me add to that, Your Honor, that part of our

18  argument is that Quest was requested under the applicable law

19  to give primary consideration to the individual with

20  disabilities requests.  Our individual client, as well as ACB

21  requested specific accommodations prior to suit.  And we have a

22  right to know whether consideration was given to those before

23  they suggested their own solution because that's a basis for

24  liability in and of itself.  And we have the ability to

25  establish under the law that they were required to document the

1  reasons that they could not do so in writing if they believed

2  it would have posed an undue burden or hardship.  And again,

3  that could be a predicate basis for liability under the law.

4  So we do have a right to explore how they got the three-finger

5  swipe, whether or not it effectively moots the claim, whether

6  they gave primary consideration to the claims of our clients

7  and the suggestions of our clients to try to make these more

8  independently usable and accessible.  So it is important.

9        **THE COURT:**  Well you claim you have a right to

10  explore but actually not on the reasonableness and the

11  accommodation which was what you told me at the outset.

12        **MR. MILLER:**  No on both.  On the reasonableness of

13  the accommodation, Your Honor, but also for the further --

14        **THE COURT:**  The reasonableness of the accommodation

15  is just an objective issue.  You're talking about something

16  subjective and process oriented here.

17        **MR. MILLER:**  Correct, Your Honor.

18        **THE COURT:**  Okay.  So it's not on the reasonableness,

19  it's on other things that you tell me are something in your

20  claim.  All right.  Well, you're going to have to brief that,

21  that's pretty obvious.

22        Mr. Raizman, what's the basis for the privilege

23  assertion here on --

24        **MR. RAIZMAN:**  Your Honor --

25        **THE COURT:**  -- the three-finger swipe.

1          **MR. RAIZMAN:**  Apologize, Your Honor.

2          To put it in context, the lawsuit was filed in

3    September of 2019.  We had a mediation, early mediation in this

4    matter March 2020 where we --

5          **THE COURT:**  Is this really going to put this in

6    context or are the two of you just unable to answer a judge's

7    direct question?

8          **MR. RAIZMAN:**  I'll --

9          **THE COURT:**  What's the basis for the privilege

10   assertion?

11         **MR. RAIZMAN:**  The basis for the privilege is that all

12   of this activity for the three-finger swipe which was completed

13   by March 2020 before we ever asked for a stay, and going into a

14   mediation which we presented this opportunity to Counsel, we

15   had done all of this work at the direction of Counsel because

16   we were in a lawsuit.  So while I think there's some

17   superficial appeal to why they want this information, Your

18   Honor is dead-on.  It's the under the law it's the

19   effectiveness of the communication that's at issue which is an

20   objective truth which can be evaluated by the device and how it

21   operates in *Sitchu* (phonetic) and we can judge it in that case.

22         **THE COURT:**  So is Mr. Miller just wrong to say that

23   he has a right to explore the process by which this was

24   implemented?

25         **MR. RAIZMAN:**  Ordinarily, I don't make relevance

1  objections, Your Honor, at depositions.  We've allowed him to

2  explore lots of things with respect to the original device's

3  implementation and go through all of that process.  We think

4  that's also irrelevant and that comes up slightly in the

5  context of their desire to depose our chairman, president, and

6  CEO.  But more significantly for today and for the privilege

7  discussion, it's not relevant.

8          There is this Rehab Act regulation.  When they

9  amended their complaint in June of 2020, they added a Rehab Act

10  claim.  It has a regulation that alters what would otherwise

11  apply to a Title 3 entity like Quest.  It has a primary --

12  there's a regulation that's read in this that you have to give

13  primary consideration to the requested individuals for

14  auxiliaries and services.

15          I would argue that that regulation has no application

16  to an entity like Quest that has 250,000 visitors a day, some

17  percentage of which Plaintiffs will argue have visual

18  impairments, and that there's no effective way for Quest to

19  meet such an obligation imposed by the regulators.  So to the

20  extent there's a regulation out there that requires that,

21  that's fine.  But they can also argue that we didn't.  That

22  they made these considerations and this is the device we came

23  up with and we didn't do that.

24          So the privilege is a result, frankly, and

25  oftentimes, as is the case, not necessarily convenient for the

20

1  defense but important to protect the privilege.  All of this

2  happened at the direction of Counsel during a pending lawsuit.

3         **THE COURT:**  Okay.  Well no idea what that means.  Not

4  up to speed on this one, don't know what you people are

5  fighting about.

6         All right.  Before I give you a schedule or talk

7  about relief from Rule 37, now let me take up the many items on

8  the defense list.

9         And I would -- there we go.

10        Oh, let's take up number 2-A on Mr. Raizman's list.

11        All right.  So there's an issue about taking

12  depositions of people who are in this class or people who are

13  represented by the American Council in this class.  And the

14  question is whether these depositions go for one hour or two

15  hours, or whether Quest is entitled to take up to seven hours

16  of testimony from each witness.

17        What's the basis for that, Mr. Raizman?

18        **MR. RAIZMAN:**  Excuse me, Your Honor, I'm trying to

19  adjust my camera.

20        The basis is the rule that allows seven hours for a

21  deposition.  These witnesses are not being taken as putative

22  class members.  ACB, the American Council of the Blind is a

23  party plaintiff in this case.  It has standing.  It's not

24  claimed its own damages, it has not claimed its own injury; it

25  claims everything through its members.  And the specific

1   members whose depositions we want to take are the ones that

2   have been identified either in the complaint itself -- I'm

3   sorry -- the amended complaint or in discovery responses as

4   having said they experienced some level of difficulty --

5           **THE COURT:** So Mr. Raizman, what's your favorite

6   color?

7           **MR. RAIZMAN:** Understood, Your Honor, it's blue.

8           **THE COURT:** Okay. What's your basis for saying that

9   you're entitled, "entitled", to take a seven-hour deposition of

10   any of these people?

11           **MR. RAIZMAN:** Your Honor, that's a red herring,

12   frankly. We're not looking to take seven hours; we're just --

13   they've imposed unilaterally a one-hour limit.

14           **THE COURT:** That's your -- the second time you've

15   said "herrings" today. You put that in an email to me.

16           **MR. RAIZMAN:** Your Honor, we don't want to be limited

17   in advance of a deposition. We've asked for no such limit from

18   the other side. We've taken the depositions to date

19   expeditiously and we plan to do so. If they believe that we

20   are burdening the witnesses in some way, they should either

21   make a motion or make some reasonable basis. They're cutting

22   off questioning at one hour, now at two hours arbitrarily

23   before the deposition starts without regard to what those

24   witnesses experience.

25           **THE COURT:** In the email that you sent to me, did you

22

1    -- because I can't tell from how it was presented.  Is this

2    your statement or Mr. Miller's statement that Quest maintains

3    that it's entitled to seven hours of the deposition.  Who said

4    that?

5              **MR. RAIZMAN:**  That's me, Your Honor.

6              **THE COURT:**  Okay.  Third time and then we're maybe

7    done with this call.

8              What is the basis for you telling me that you're

9    entitled to take a seven hour deposition of any witness in a

10   federal civil case?

11             **MR. RAIZMAN:**  The Federal Rule 30, Your Honor.

12             **THE COURT:**  Okay.  That's a mis -- I'm not ordering

13   anything but this is where I can add value.  Federal Rule 30

14   does not entitle you to a seven-hour deposition.  Federal Rule

15   30 does not say you can have a human being in a chair and ask

16   questions for seven hours including like, what does it say on

17   this page of the yellow pages?  It says, because I've got it in

18   front of me, the deposition is limited to one day of seven

19   hours.  You can't do that.  You can't have someone sit there

20   for more than seven hours because it's inhumane.  That is not

21   an entitlement for a lawyer at a major firm to say, I get these

22   people for as long as I want.  You get them for as long as it's

23   appropriate to ask relevant and necessary questions and that's

24   it.

25             And Mr. Miller, if you're setting time deadlines and

1   swinging it around and saying, You get 60 minutes and that's

2   it, or 90 minutes or 120 minutes, that's as close to misconduct

3   as I can get on this record already.

4           I don't think you folks are playing nice with

5   discovery at all.  And I can very easily see a situation where

6   I have to split the difference or write a long decision, ship

7   it up to Judge Gee if she needs to see it, and impose a heck of

8   a lot of fees and it won't have you folks writing checks back

9   and forth to each other and just cancelling it out; they're

10  going to go to the Court's Attorney Admissions Fund.  We'll use

11  it for a better purpose here.  I can easily see both sides

12  forfeiting a lot of money at the other side's rate, benefiting

13  some of the charitable purposes that this Court has.  I don't

14  understand what you folks are doing and how you're taking your

15  positions here but I can tell you right now -- and I don't like

16  doing this to lawyers at all -- I want to be productive.  This

17  is an important case for both sides.  I do get that.  But if

18  you folks can't manage to accomplish the basic tasks of turning

19  paper over and asking and answering questions, you've got a

20  problem.

21          Now one solution may be for me to rule on your

22  motions.  The other solution may be to have you folks put masks

23  on, bring your clients and your court reporter and your

24  videographer into the federal courthouse, walk through a metal

25  detector and do this remotely -- or at least excuse me -- not

24

1   remotely -- socially distanced in my courtroom so that I can

2   sit there and see how you're handling this in real time or have

3   my staff present.  You want me to take action here?  I may.

4   And I do that not an insignificant amount of time for lawyers

5   who don't know how to handle themselves professionally.

6          Now, if we have issues with respect to responses to

7   discovery and discovery requests and things like that, that's

8   fine.  If there's a problem with a cancellation of a deposition

9   -- you really want me to get involved in this in this level of

10  detail?  That's the highest and best use of your time and mine?

11         **MR. RAIZMAN:**  No, Your Honor, we don't.  We stand

12  accused of some horrible conduct that I think's unacceptable.

13  I think we're wrongly accused but we showed -- we wanted to

14  show the Court if this was going to be discussed today that

15  there are many, many issues on the other side with respect to

16  such conduct.  I apologize, Your Honor, for doing that, that's

17  clearly not the intent of your rule and I'm sorry we did that.

18         **THE COURT:**  Mr. Miller, did you cancel Ms. McCauley's

19  (phonetic) deposition one business day ahead of it?

20         **MR. MILLER:**  Yes, Your Honor, we did.

21         **THE COURT:**  Why?

22         **MR. MILLER:**  Because when we initially set the

23  deposition we told Defense Counsel that we would only go

24  forward if necessary.  By that point in time we had had

25  multiple depositions where people were testifying that they

1   didn't know and didn't recall, and we couldn't get the

2   substantive answers.

3          We felt we needed to meet and confer on the issue.

4   We tried to set the meet and confer on a Wednesday, a Thursday,

5   a Friday of the preceding week, and Mr. Raizman indicated he

6   was unavailable.  So we withdrew the deposition and offered to

7   meet and confer on Monday, he was still unavailable.  We met

8   and conferred on Tuesday and we did so, Your Honor, at our

9   expense with a court reporter present which Plaintiffs paid for

10  because we wanted the Court to have a clear record.

11         We don't like being here, Your Honor.

12         We informally served discovery all the way back in

13  January of last year, for four months tried to meet and confer.

14         These absent class members that they seek to depose,

15  we're voluntarily producing these individuals.  The woman today

16  is Lyons (phonetic) is being deposed, and cares for an elderly

17  woman with Alzheimer's and we're still producing her for

18  several hours so we're not trying to be difficult.

19         Our basis is based on the Supreme Court holding that

20  individual participation of absent class members is not

21  required for injunctive relief but we're still voluntarily

22  producing the individuals that are being requested without

23  subpoenas.  So we're trying to reach --

24         **THE COURT:**  For injunctive relief or damages?

25         **MR. MILLER:**  For injunctive relief, Your Honor.

1        So we cited --

2        **THE COURT:**  Do you have a damage claim?

3        **MR. MILLER:**  Under the California subclass, specific

4   -- but as it relates to the ACB members, Your Honor, they're

5   represented in a national class seeking injunctive relief.  And

6   so we cited the Hunt versus Washington State Apple Advertising

7   Commission case for the idea that individual participation is

8   not required when associations seek prospective injunctive

9   relief for its members.

10       But we nevertheless voluntarily produced these

11  people, Your Honor, without subpoena and we've made efforts to

12  try to turn over the documents that ACB has in their

13  possession.  So we're not trying to hide the ball.

14       We very much respect the rules, Your Honor.  I think

15  the record will show that we've tried very hard to meet and

16  confer without your intervention on innumerable occasions.

17       **THE COURT:**  Mr. Raizman, is he right?

18       **MR. RAIZMAN:**  About which part, Your Honor, I

19  apologize.  He said a lot of things.

20       **THE COURT:**  He'll do that.  You do too.

21       On the issue of absent members of a class in a case

22  of this sort.

23       **MR. RAIZMAN:**  Now, again, we're not taking them in

24  any respect with respect to their class membership, although I

25  will note that two of the -- at least two of the witnesses we

1   deposed or seek to depose are Californians who are a member of

2   that damages subclass and whose depositions have all been

3   unilaterally limited by Counsel.  But in any event, no --

4           **THE COURT:**  So some are not Californians and don't

5   have a damage claim?

6           **MR. RAIZMAN:**  That's right.

7           **THE COURT:**  Okay.

8           **MR. RAIZMAN:**  That's right.  But they're not limited,

9   Your Honor, no, that's not correct.

10          I don't want to say that it's a firmly established

11  issue of law but when -- particularly here, for example, where

12  they're arguing we're supposed to give primary consideration to

13  the requests of the individuals, it's quite useful to

14  understand what the individuals based on -- on whose basis a

15  party plaintiff is claiming associational standing, what those

16  members want.  And frankly the depositions have yielded a lot

17  of different primary considerations to be given to them.  So I

18  think it's entirely relevant, it's directly relevant, it's

19  especially important to class certification issues.  And

20  there's be no other way for us to take the deposition, if you

21  will, of ACB who is a party plaintiff in the case.

22          **THE COURT:**  Well I can't wait to read that motion.

23          All right.  Let's get to the apex deposition.  So

24  Quest has a CEO.

25          Mr. Miller, you want to talk to him or her.  Who's

1  the CEO?

2          **MR. MILLER:**  Steve Rusckowski, Your Honor.

3          **THE COURT:**  Got it.

4          And what's the basis for questioning Mr. Rusckowski?

5  I misspelled that name so.

6          **MR. MILLER:**  Yeah.  The main basis, Your Honor, is

7  that the process by which these kiosks got implemented was

8  through a capital expenditure.  There was a document that

9  delineated what the capital expenditure was.  All the factors

10  that were considered, reportedly, put into this capital

11  expenditure by Quest, there's all these delineated items.

12          And Mr. Garrison (phonetic) was supposed to be the

13  individual to testify about that, how the CapEx was agreed

14  upon, what was considered.  The CapEx wasn't even produced

15  until after his deposition.  So the actual -- and he kept

16  saying, "Well I would refer you to the final CapEx."  We didn't

17  even have it until after his deposition.

18          We then questioned Mr. Carr, who was the second

19  30(b)(6) deponent about it.  He said all those decisions were

20  made above them up the ladder.  And there's an approval email

21  by Mr. Rusckowski.  And we asked:

22          "Was that by Mr. Rusckowski?"

23          "Yes."

24          "What factors did Mr. Rusckowski consider in

25          approving the capital expenditure?  Did he take into

1        account accessibility?  Did he take into account

2        whether these were independently accessible?"

3        "I can't speak to that.  I don't know what

4        Mr. Rusckowski considered."

5        **THE COURT:**  And the reason that the decision-making

6   process is relevant here is what?

7        **MR. MILLER:**  It's relevant to what considerations

8   they gave in making sure -- whether or not these kiosks are

9   independently useful --

10       **THE COURT:**  Sorry, sorry.  What element of your

11  causes of action is this relevant to?

12       **MR. MILLER:**  It's twofold.  One, as Mr. Raizman

13  already admitted, we're suing under the Rehabilitation Act.  So

14  as time goes on, whether they gave primary consideration to the

15  requests of our clients in approving and continuing to maintain

16  these kiosks is relevant to proving the 504 claim.  Mr. Raizman

17  conceded that there is a regulation that specifically says

18  Quest has to give primary consideration to the individuals with

19  disabilities' requests in deciding what they implement.

20       Secondarily, as we move through the accessibility

21  claim, they had an obligation to provide reasonable aids or

22  auxiliary services.  And whether they considered those

23  reasonable aids or auxiliary services that were available; for

24  example, a headphone jack, a tactile keyboard, implementing the

25  Apple IOS software on vision accessibility that's free is all

1    relevant to meeting our burden to show whether they implemented

2    reasonable aids or auxiliary services as part of this process,

3    or whether the kiosk is as we think, completely inaccessible.

4    That's what we're contending in the case but we have a right to

5    prove that it's --

6         **THE COURT:**  I'm sorry.  Again, is it your position

7    that the act of consideration and the substance of their

8    consideration is relevant to the Court's determination of

9    reasonableness?

10        **MR. MILLER:**  Yes.  And let me highlight another fact

11   that's critical.

12           In December of 2018 before this lawsuit was

13   initiated, the American Council of the Blind wrote

14   Mr. Rusckowski a direct letter.  It was directly addressed to

15   him and it was before the lawsuit.  And in that letter it was

16   requested that certain modifications be made to these kiosks to

17   make them accessible.  Again, at that point the Rehab Act

18   requires under the regulations that primary consideration be

19   given to the requests of an 8,000 member organization to make

20   these accessible.  And whether or not he did so and whether or

21   not he considered that and what was done in response is at

22   issue.  And the only person that responded to ACB was Quest's

23   lawyer.  Again, this is prelitigation.  So we have an issue of

24   who's going to give the testimony?  Is it going to be

25   privileged and we can't depose the lawyer on these discussions

1   on what was considered?  Is it Mr. Rusckowski to whom the

2   letter was addressed?  We believe the appropriate request is to

3   the individual who made the decision.

4          **THE COURT:**  Okay.  And how long was your -- how long

5   did you intend to question the CEO?

6          **MR. MILLER:**  We offered to do it in a deposition not

7   exceeding four hours.

8          **THE COURT:**  Four hours, got it.

9          **MR. MILLER:**  As a starting point in the meet and

10  confer process.  And we offered to do it remotely.

11         **THE COURT:**  Okay.  All right.  And the basis for the

12  company's resistance to the apex deposition, Mr. Raizman?

13         **MR. RAIZMAN:**  Everything, Your Honor, including the

14  relevance which we didn't even put in our half of the joint

15  stipulation that we sent to Counsel last week.  It's not

16  relevant.  What primary consideration could a company give

17  before it rolls out new technology or a new device?  But we

18  don't even argue relevance, Your Honor.  Just under basic

19  principles of seeking such a deposition like this, they've come

20  nowhere near exhausting multiple layers of approvals that lie

21  between the deponent and the people and Steve Rusckowski,

22  including by the way, at the time --

23         **THE COURT:**  So who did your 30(b)(6) witness -- this

24  was a 30(b)(6) witness topic, correct?

25         **MR. RAIZMAN:**  It was one of 46 topics, Your Honor,

1   yes.

2           **THE COURT:**  You know, if I can get a straight answer

3   from you, Mr. Raizman, without the commentary, this would go a

4   lot easier.

5           **MR. RAIZMAN:**  Apologize, Your Honor.

6           **THE COURT:**  Okay.  Mr. Miller just has to build to

7   the big finish.  I can't get an answer until I hear five

8   preliminary sentences.  You just have to add a comment on

9   everything.  What time is it, Mr. Raizman?

10          **MR. RAIZMAN:**  It's 11:10, Your Honor.

11          **THE COURT:**  Thank you.

12          Was this a topic in the 30(b)(6) notice?

13          **MR. RAIZMAN:**  Again, I'm sorry, Your Honor, but I

14  don't -- the "this" in your question and the "this" as

15  Mr. Miller described it are really different things.  But the

16  approval of the e-check in --

17          **THE COURT:**  I'm trying to find out if it was a topic

18  that was noticed.  And if it was a topic that was noticed I'm

19  trying to find out what your witness said.  And your witness

20  said something above me and if you're trying to tell me --

21  because I really can't follow what either of you are saying.

22  But if you're trying to tell me that it went from whoever was

23  the warm body in the chair right to the CEO, I got it.  And I

24  know the law on apex depositions.  But if he or she actually

25  said it was that person, then I need to figure this out because

1   I'm not clear at all about how this is relevant to an element

2   of a cause of action.  And I'm really kind of baffled that

3   disability rights lawyers can't give me a straight answer on

4   this.  I'll look for that on page one of your briefs.

5          Oh, by the way, there's going to be some page limits

6   coming here, folks, because I'm not going to take your

7   ramblings on any of these issues.  This is -- this is a

8   disaster.

9          **MR. RAIZMAN:**  Your Honor, the 30(b)(6) topic was --

10  there's a couple that might be relevant.  "The reasons why you

11  decided to outfit your patient service centers with e-check in

12  kiosks," that was a topic and that's --

13         **THE COURT:**  That seems to be remarkably clear,

14  perhaps surprisingly.

15         **MR. RAIZMAN:**  Right.  And answers were given.  And if

16  Your Honor ever has to read the transcript you'll see answers

17  were given over and over again.  But the question of whether

18  Mr. Rusckowski, whether one person among 11 papered approvals,

19  did something and why he did it was not something within the

20  witness' answer.  We --

21         **THE COURT:**  I'm trying to figure out what the

22  witness' answer was and where the witness pointed and whether

23  that was sufficient to satisfy the burden of figuring out who

24  the primary decision-maker was.

25         **MR. RAIZMAN:**  I believe the answer the witness gave

34

1   -- or the question was whether Mr. Ruscowski gave approval to

2   -- gave ultimate approval, I believe was in the question, to

3   this and the answer was "yes."  And then the question was "why"

4   and I believe the answer was "I don't know."

5          **THE COURT:**  Okay.  For which Mr. Miller wants four

6   hours of the CEO's time.

7          **MR. RAIZMAN:**  We've offered to answer an

8   interrogatory directed to that question.  We've offered to

9   produce other witnesses, we've suggested other witnesses, Your

10  Honor, who -- including one of the cosponsors, still hasn't

11  been deposed -- of the project that is a co-sponsor of the

12  project.

13         **THE COURT:**  Okay.  All right.  Let's talk scheduling

14  because I can't wait to hear this.

15         Mr. Miller, what motions do you presently intend to

16  file in this case?

17         **MR. MILLER:**  We would intend to file, Your Honor, a

18  motion to compel the further depositions of the 30(b)(6)

19  witnesses on topics that we asked for, specifically on the

20  areas that we can delineate for the Court, really didn't get

21  substantive responses that go to our burden of proof.  So it

22  would be a motion to compel both the 30(b)(6) and the requests

23  for production that weren't appropriately produced.

24         **THE COURT:**  Requests for production of documents that

25  wasn't accurately produced?  I don't -- what do those words

1    mean?

2          **MR. MILLER:**  So Your Honor, we would simply seek a

3    motion to compel further responses from the 30(b)(6) witnesses

4    as we've delineated on the issues, including the issue of

5    privilege that we'd queue up for the Court, the issue of --

6          I'm sorry, Your Honor, bear with me.  I have a long

7    outline; I apologize to the Court.

8          **(Pause)**

9          So again, we would seek a motion to compel, Your

10   Honor, asking that Quest produce the additional 30(b)(6)

11   witnesses that are properly prepared and able to answer

12   questions on how Quest made its decisions on e-check in kiosks

13   and ultimately its decisions on the three-finger swipe.  That

14   would be a key portion of our -- in that motion but also

15   discuss the issues of privilege and the appropriateness around

16   the issues of privilege.  So that's the primary focus of our

17   motion, Your Honor.

18         **THE COURT:**  Okay.  So you want more 30(b)(6)

19   depositions on topics where you didn't get substantive

20   responses.

21         **MR. MILLER:**  Correct, Your Honor.

22         **THE COURT:**  Okay.  Will you be able to explain and

23   list and itemize that or is it just going to be just I want

24   more?

25         **MR. MILLER:**  Absolutely I can itemize it.  We are

1  very -- again, I have in front of me a 19-page outline with

2  specifics.  I just don't want to burden the Court today with

3  that.  But I'm happy to show you specifically where we asked

4  for items where we were told that they didn't know or didn't

5  recall or they punted and suggested other people had knowledge.

6  That's what we want word in this case.

7           THE COURT:  Okay.  And the privilege issue is a

8  separate component to that.

9           MR. MILLER:  It's at least related to the designee on

10  three-finger swipe.  So yes, they're claiming privilege on

11  three-finger swipe.  They --

12           THE COURT:  But your contention to me is people were

13  not prepared, knowledgeable enough to answer on a variety of

14  topics, correct?

15           MR. MILLER:  That's right, correct.

16           THE COURT:  And separately, they might have been

17  prepared to give a substantive response but they were

18  instructed not to on the basis of a privilege.

19           MR. MILLER:  Correct.

20           THE COURT:  Okay.  I think those are separate issues

21  and I think intuitively I want to look at it separately.  So

22  here's what I'm going to do.

23           I'm going to relieve you, Mr. Miller, of the

24  obligation of filing a joint stipulation under Rule 37.  You

25  don't have to.

1        **MR. MILLER:**  Thank you, Your Honor.

2        **THE COURT:**  Okay.  What you do have to do is abide by

3   page limits that I set.  And you get 10 pages on your 30(b)(6)

4   issue, you get 10 pages on the privilege.

5        Now, I understand you've got a lot of things you want

6   to say and a lot of facts you want to present to me and a lot

7   of, the witness didn't say this on this question.  Put that in

8   an appendix.

9        **MR. MILLER:**  Will do.

10        **THE COURT:**  Put it in a chart, not in your brief.

11   Your brief is 10 pages of what you think you're entitled to and

12   why you didn't get it.

13        **MR. MILLER:**  Thank you, Your Honor, we'll do so.

14        **MR. RAIZMAN:**  Your Honor?

15        **THE COURT:**  Mr. Raizman?

16        **MR. RAIZMAN:**  We offered during the meet and confer

17   last week to look at such a list and produce the witness.  We'd

18   like to see the detailed list so that we can avoid this motion

19   practice and produce a witness.  We asked for specific topics

20   related to specific documents.  All we heard was four hours

21   with these three witnesses.

22        **THE COURT:**  Okay.  Well you get 10 pages in response

23   and after you see his motion you can decide what to do.

24   Rule 37 pretty clearly says that after the motion is filed if

25   you provide the discovery, you lose unless you were

38

1   substantially justified or there are circumstances which would

2   make a fee award unjust in which case I might go the other way.

3   So if you want to tell me that Mr. Miller didn't engage in a

4   fair and appropriate meet and confer and didn't tell you what

5   the basis of the motion was before he filed it, I'll read that.

6   There's very little I enjoy more than reading where there's

7   meet and confer letters, emails, submit-a-grams, nasty-grams.

8   I love reconstructing that because when I do that, I do that

9   with a red pen in my hand.  I'm old school.  And the red pen

10  tells me where the fees go.

11          By the way, Mr. Miller, do you have individual

12  clients?

13          **MR. MILLER:**  We do.  Julian Vargas and Anne West are

14  the individual plaintiffs in this case.

15          **THE COURT:**  Were they involved with some of these

16  litigation decisions?

17          **MR. MILLER:**  Of course, Your Honor.

18          **THE COURT:**  Really?

19          **MR. MILLER:**  They testified.  Mr. Vargas testified in

20  deposition just the other week that he has been supervising the

21  entirety of the litigation.

22          **THE COURT:**  Oh, okay.  Because an adverse fee award

23  is in the Court's discretion as to whether it's paid by the

24  lawyer, the client, or both.  37(a)(5).

25          **MR. MILLER:**  We understand, Your Honor, but we

1    believe that the record will be transparent to the Court.  And

2    we're sorry that we have burdened you today with it.

3            The other thing, Your Honor, is we've asked to put it

4    over -- just so the Court knows -- the class cert briefing

5    schedule for 45 days so we could try to more informally resolve

6    these issues.  And we were supposed to have an answer to that

7    today and we're still waiting to try to get agreement.  I mean,

8    it would be our preference, Your Honor, to continue to work on

9    these issues and get them resolved --

10           **THE COURT:**  So you're supposed to get an answer from

11   Quest.

12           **MR. MILLER:**  Correct, Your Honor.

13           **THE COURT:**  As to whether you can make that request

14   to Judge Gee.

15           **MR. MILLER:**  Correct, Your Honor.

16           **THE COURT:**  Because Judge Gee just gave you new dates

17   last month, right?

18           **MR. MILLER:**  We understand that that was right on the

19   eve of taking the depositions and so we took the depositions,

20   ran into these issues, and we just want to get it resolved,

21   Your Honor, that's the whole point.  We have the burden of

22   proof, we're just trying to meet our burden for the represented

23   class.

24           **THE COURT:**  Got it, okay.

25           All right.  So two motions from Plaintiffs; one on

1    the alleged inadequacy of 30(b)(6) witnesses to respond

2    substantively and perhaps a separate motion regarding the

3    invocation of attorney-client privilege, correct?

4          **MR. MILLER:**  Yes, Your Honor.

5          **THE COURT:**  Good.  And anything else on your side you

6    intend to file?

7          **MR. MILLER:**  No, Your Honor.

8          **THE COURT:**  Or are considering filing?  You don't

9    have to.  I'm not ordering you; I'm not giving you a deadline;

10   I'm not giving you a date.  I'm trying to give you a last clear

11   chance to get out of it.  And if you're telling me you want to

12   keep negotiating with the other side based on our comments

13   today -- and again, I don't enjoy doing this to lawyers at all,

14   I really don't.  And if you can figure something out, you let

15   me know and you don't have to file anything and we can figure

16   out what Judge Gee wants to do.

17         **MR. MILLER:**  Ahh --

18         **THE COURT:**  All right.  Go ahead, sir.

19         **MR. MILLER:**  I'm sorry, Your Honor.  Our only last

20   request is that Quest has already moved for a protective order

21   on Mr. Rusckowski's deposition.  These issues are -- in

22   totality, I think the Court would see these issues in totality

23   and decide which way to go.

24         My only request would be that we try to align if we

25   have to make motions.  We're going to try to take your comments

1   and even get back with Opposing Counsel and see if we can solve

2   some of these issues before filing our motion and hopefully we

3   can avoid it.  We take seriously the Court's suggestions and we

4   appreciate them.

5           **THE COURT:**  Good.  Nicely handled.

6           Well you told me that they filed the motion.  When

7   was that?

8           **MR. MILLER:**  Last week, Your Honor.  Hang on, I'll

9   pull it up.

10          **MR. RAIZMAN:**  Excuse me, Mr. Miller.  I can answer

11  that.

12          On Thursday we sent them the -- our half of the joint

13  stipulation, Your Honor.

14          **MR. MILLER:**  Sorry.  Thank you, Your Honor.

15          **THE COURT:**  Yeah, I'm looking at the docket; I don't

16  see anything filed.

17          All right.  So all right, I got it.

18          All right.  Mr. Raizman, for Quest, what motions are

19  you envisioning?

20          **MR. RAIZMAN:**  Well based on our conversation today,

21  we're certainly going to move ahead with the protective order

22  on the apex deposition, Your Honor.

23          **THE COURT:**  Okay.

24          **MR. RAIZMAN:**  I am hopeful that Your Honor's guidance

25  on time limits for depositions will allow us to reach an

42

1   agreement but if we're unable to, we'll seek a motion on that

2   question, the limitation on deposition length.

3          **THE COURT:**  Okay.  So I'm sorry.  Apex and time

4   limits on individual witnesses.  What else?

5          **MR. RAIZMAN:**  And discovery from ACB members.  That's

6   also been denied.

7          **MR. MILLER:**  Motion for --

8          **THE COURT:**  Like substantive --

9          **MR. RAIZMAN:**  Correct.  That go to the bases for

10  their claims if they were individual plaintiffs but instead are

11  claiming through the association.

12         **THE COURT:**  And that's different than the actual time

13  limits for the witnesses who've been -- have agreed to be

14  deposed.

15         **MR. RAIZMAN:**  Correct.

16         **THE COURT:**  Okay.  All right.  I'm going to relieve

17  you of the joint filing obligation under Rule 37 and I'm going

18  to impose page limits.  Each of those motions, you get five

19  pages.  Type concisely.

20         **MR. RAIZMAN:**  Your Honor, may I -- I apologize, Your

21  Honor.  May I seek clarification on that as it applies to the

22  apex -- the motion for protective order on Mr. Rusckowski?

23         **THE COURT:**  Five pages.

24         **MR. RAIZMAN:**  All right.  So we withdraw the joint

25  stipulation and just file it as a motion --

1         **THE COURT:**  How long was your half of the joint

2    stipulation -- of the joint submission?  It's not really a

3    stipulation, is that?  That's the biggest misnomer in our local

4    rules.  Stipulation.  You haven't agreed to anything; you've

5    agreed to disagree.  I hate that word.

6         How long was your half of the joint submission?

7         **MR. RAIZMAN:**  Your Honor, this is not a question I'm

8    looking forward to answering; I'm looking at it right now.

9    It's more than five pages, Your Honor.

10        **THE COURT:**  Is it more than 10?

11        **MR. RAIZMAN:**  Yes, Your Honor.  It's 20 pages.  This

12   is our chairman, Your Honor.

13        **THE COURT:**  I'm sorry, it was a bad connection.  I

14   thought I heard you say that you were 20 pages on apex

15   discovery.  Yeah, okay, I'll stop.  Ten pages on that one, the

16   others are five.  I won't make your -- okay, given that that

17   one has gone further along, I'll give you relief.

18        And guess what?  Mr. Miller gets 10 pages instead of

19   five on that one.  Fair is fair.

20        **MR. MILLER:**  Thank you, Your Honor.

21        **THE COURT:**  And given that they have the burden of

22   taking the deposition anyway.

23        Go ahead.

24        **MR. RAIZMAN:**  Your Honor, I apologize.

25        Just for clarity.  So we abandon the joint

44

1   stipulation process and instead affirmatively file a motion?

2            **THE COURT:**  Yes.

3            **MR. RAIZMAN:**  Thank you.

4            **THE COURT:**  So they get more time.

5            The apex one, 10 pages each side.

6            Separate motions regarding the propriety of discovery

7   from individual members of the ACB, five pages.

8            And the applicability of time limits on depositions

9   five pages each side.

10           **MR. RAIZMAN:**  Understood, Your Honor.

11           **THE COURT:**  Was there anything else that the company

12  wanted to bring up?

13           **MR. RAIZMAN:**  Not today, Your Honor.

14           **THE COURT:**  Okay.  Are -- Mr. Raizman, where are you

15  located?

16           **MR. RAIZMAN:**  Right now I'm downtown, Your Honor.

17           **THE COURT:**  Are you --

18           **MR. RAIZMAN:**  On Hope street.

19           **THE COURT:**  You're a Los Angeles practitioner?

20           **MR. RAIZMAN:**  Yes, I am.

21           **THE COURT:**  Mr. Miller, where do you practice?

22           **MR. MILLER:**  I'm in Santa Barbara, Your Honor.

23           **THE COURT:**  In the Central District?

24           **MR. MILLER:**  Yes, Your Honor.

25           **THE COURT:**  Okay.  I really hate doing this but I

45

1    think it's necessary given what I've read.

2         You're both personally directed to go to the Court's

3    Website and under the Attorneys' tab, you've both find the

4    Civility and Professionalism Guideline.  And in the Civility

5    and Professionalism Guideline, you'll both go to the Deposition

6    section.  And I'm going to put you on your honor and word.  You

7    don't have to file anything with me; I'm not going to do that.

8    But you have to read the section about Conduct at Depositions.

9    Because both sides have made allegations that the other side

10   was asserting improper objections or coaching.  And I'll tell

11   you right now, the Federal Rules and this Court's Guidelines

12   couldn't be clearer.  Don't.

13         Now, neither of you have said, I want to put a

14   depositions transcript in front of you, Judge Wilner, so you

15   can see misconduct by the other side.  Probably a good move by

16   both of you because I don't think I'd be in a great mood when I

17   reviewed those based on what I've heard but it's really clear.

18   Any objection you have is reserved for the time of trial, for

19   pretrial consideration by your trial judge, except for

20   legitimate privileged invocations and I think the reality is if

21   a question is just so chaotic the people don't understand it.

22   It's just fairness to a human being sitting in a room with

23   lawyers to get the right question.  But everything else, any

24   other objection is reserved and you don't need to do it.  And

25   if there really was a whiff of coaching or leaning or

46

1   reminding, even though in the era of COVID we're doing this

2   by zoom and you don't have the same access to a client as you

3   might ordinarily have, but that's just unacceptable, especially

4   of lawyers of this caliber.  So read the guidance that this

5   Court has put out there.  And if I need to rule on it, I will;

6   that's my job.  And we'll see what I write and we'll see what

7   the Daily Journal has to say about it.  And I really don't want

8   to do that to either of you; I really don't.  This case is far

9   too important but I need to see some things changing here

10  folks.

11          **MR. MILLER:**  Understood, Your Honor, thank you.

12          **MR. RAIZMAN:**  Thank you, Your Honor, fully

13  understood.

14          **THE COURT:**  You're quite welcome.  And I apologize

15  that this is as uncomfortable as it's come out; but third time,

16  I don't like doing this with really good lawyers and my

17  recollection is you are.

18          Is there anything else that I could try and help you

19  with today with respect to the mess that this case has become?

20  Oh, hi, Ms. Roller.

21          **MR. MILLER:**  No, thank you from the plaintiffs, Your

22  Honor.  It's been instructive and we appreciate it.

23          **THE COURT:**  Okay.  Well phrased there, Mr. Miller.

24  Good.

25          Mr. Raizman, anything else from your side?

47

 1          **MR. RAIZMAN:**  Nothing further, Your Honor.  Thanks

 2   for your time.

 3          **THE COURT:**  Do you want to shove Ms. Roller into the

 4   middle of this or do you want to --

 5          **MR. RAIZMAN:**  I'm going to tell her to hang up now.

 6          **MS. ROLLER:**  I've been here, Your Honor.  I just

 7   wasn't on camera and I was on mute so I've been here for most

 8   of this.

 9          **THE COURT:**  Fair enough.  I was focused on some other

10   parts of the screen.  Thank you very much.

11          All right.  In that case I'll wait to see whatever

12   comes in.  If you need me to get back involved on something a

13   little bit more discreet, we can.

14          I may take a look at papers and bring you folks in

15   before any notice date because once I read it and have a way to

16   understand what's going on, I can be much more focused and

17   perhaps much more productive and perhaps rule on something.

18   But we'll see what if anything comes in or whether you folks

19   can perhaps grind your teeth and work something out.

20          All right.  There'll be no order to follow but I'll

21   ask Ms. Piper to note that we held a conference and discussed

22   page limits and we'll go from there.

23          All right.  Have a great day, everybody,  Thank you.

24      **(Attorneys thank the Court)**

25      **(Proceeding adjourned)**

48

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                          **May 6, 2021**

        Signed                                                            Dated


*TONI HUDSON, TRANSCRIBER*