OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
DAVID RAIZMAN, CA Bar No. 129407
david.raizman@ogletree.com
AMBER L. ROLLER, CA Bar No. 273354
amber.roller@ogletree.com
J. NICHOLAS MARFORI, CA Bar No. 311765
nicholas.marfori@ogletree.com
400 South Hope Street, Suite 1200
Los Angeles, California 90071
Telephone: 213-239-9800
Facsimile: 213-239-9045

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIAN VARGAS, ANNE WEST and AMERICAN COUNCIL OF THE BLIND, individually on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 2:19-cv-08108 DMG (MRWx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Filed concurrently with Notice of Motion and Motion for Summary Judgment; Statement of Uncontroverted Facts and Conclusions of Law; Appendix of Evidence; [Proposed] Order; and [Proposed] Judgment]<br><br>Date: October 8, 2021<br>Time: 2:00 p.m.<br>Place: Courtroom 8C<br><br>Complaint Filed: September 18, 2019<br>Trial Date: January 11, 2022<br>District Judge: Hon. Dolly M. Gee<br>Courtroom 8C, First St.<br>Magistrate Judge: Hon. Michael R. Wilner<br>Courtroom 550, Roybal |

48300399_7.docx

Case No. 2:19-cv-08108 DMG (MRWx)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ................................................................ 1

II.  FACTUAL BACKGROUND ............................................ 4

  A.   Quest's Patient Service Centers and Check-in Methods ............... 4

  B.   Quest's Transition From Paper to Electronic Check-in ............... 4

  C.   The Kiosks and the Iterative Process ............................. 6

  D.   ACB And Quest Discuss Improvements To The Kiosks, And The Intervening Vargas/West Lawsuit ................. 7

  E.   Three Finger Swipe Is Implemented, Providing Independent Access To Blind Users Of The Kiosk ............ 8

III. LEGAL ARGUMENT ..................................................... 9

  A.   Summary Judgment Standard ...................................... 9

  B.   Title III Obligates Quest To Provide "Auxiliary Aids and Services" That Permit Its Disabled Customers Access To Its Services, Which It Has, Not To Create Entirely Different Goods Or Services. .......................... 10

  C.   In Communicating Visual Material, Quest Need Only Provide Effective Communication (Not Equal Communication) Of The Very Basic PSC Check-in Process, Which It Clearly Does ....................... 13

    1.   "Effective Communication" is the Standard under Title III of the ADA and Requires Effective (not Identical or Equal) Communication ................. 13

    2.   The "Effective Communication" Mandate Hinges On The Nature, Length and Complexity Of The Communication; The Kiosk's Communication Could Not Be More Basic, Short, And Simple ............. 14

    3.   Quest Has No Obligation Under the Rehabiliatation Act to Provide "Primary Consideration" To The "Effective Communication" Requests Of Its Disabled Patients ............................... 16

      (a)   There Is No Dispute That "Primary Consideration" Has No Application To Plaintiffs' Title III Claim. ...................... 16

      (b)   The Rehabilitation Act, Despite Lengthy, Explicit Regulations That Include An "Auxiliary Aid and Service" Regulation,

i

Case No. 2:19-cv-08108 DMG (MRWx)
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

48300399_7.docx

Nowhere Includes a "Primary Consideration" Requirement.................................................. 17

(c)  There Are Multiple Additional Reasons Why "Primary Consideration" Does Not Apply Under The Rehabilitation Act And Does Not Apply In These Circumstances................................ 17

D.  Vargas' Unruh and Disabled Person Act Claims Fail For The Same Reasons His ADA Claim Fails And Because He Cannot Establish The Intentional Discrimination Necessary To Prove An Unruh Act Claim that Is Not Based on An Incorporated ADA Claim And The DPA Imposes No Different Obligations Than Title III.. ..................... 20

E.  Plaintiffs Vargas and ACB Lack Standing To Pursue Their Claims ............................................... 21

1.  Occasional, Speculative and Marginal Additional Wait Time Does Not Constitute "Concrete and Particularized" Injury. ......................................... 22

2.  Plaintiffs Cannot Identify Any Imminent, Future Injury They Will Suffer Without An Injunction............... 23

3.  TFS Renders Moot Plaintiffs' Claims................................ 24

IV.  CONCLUSION.......................................................... 25

48300399_7.docx

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) ............................................................................................ 25

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .............................................................................. 9, 10, 23

*Anderson v. Ross Stores, Inc.*,
No. C 99-4056 CRB, 2000 WL 1585269 (N.D. Cal. Oct. 10, 2000) ..... ........ 22, 23

*Auer v. Robbins*,
519 U.S. 452 (1997) ........................................................................................ 19

*Bird v. Lewis & Clark College*,
303 F.3d 1015 (9th Cir. 2002) ........................................................................ 19

*Bonnette v. D.C. Ct. of Appeals*,
796 F. Supp. 2d 164 (D.D.C. 2011) ................................................................ 18

*Boyer v. Five Guys Enterprises, LLC*,
2018 WL 4680007 (C.D. Cal. 2018) ............................................................... 12

*Camarillo v. Carrols Corp.*,
518 F.3d 153 (2d Cir. 2008) ........................................................................... 11

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......................................................................................... 9

*Chapman v. Pier I Imports (U.S.), Inc.*,
631 F.3d 939 (9th Cir. 2001) .......................................................................... 22

*Christensen v. Harris County*,
529 U.S. 576 (2000) ........................................................................................ 18

*Connolly v. Pension Benefit Guaranty Corp.*,
673 F.2d 1110 (9th Cir. 1982) ........................................................................ 25

*Dicarlo v. Walgreens Boot Alliance, Inc.*,
2016 WL 482982 (S.D.N.Y. 2016) ................................................................. 12

*Dobard v. San Francisco Bay Area Rapid Transit Dist.*,
1993 WL 372256 (N.D. Cal. Sept. 7, 1993) ................................................... 12

*Durand v. Fairview Health Servs.*,
902 F.3d 836 (8th Cir. 2018) .......................................................................... 14

*Duvall v. Cty. of Kitsap*,
260 F.3d 1124 (9th Cir. 2001) ........................................................................ 20

48300399_7.docx

*Flynn v. Distinctive Home Care, Inc.*,
  812 F.3d 422 (5th Cir. 2016) ............................................................................ 18

*Frankeberger v. Starwood Hotels & Resorts Worldwide, Inc.*,
  No. C09–1827RSL 2010 WL 2217871 (W.D. Wash. June 1, 2010) ............. 23, 24

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ........................................................................................ 23

*Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc.*,
  603 F.3d 666 (9th Cir. 2010) ........................................................................... 10

*Greater Los Angeles Agency on Deafness et al. v. Cable News Network, Inc.*,
  742 F.3d 414 (9th Cir. 2014) ........................................................................... 22

*Kennedy v. U.S. Citizenship & Immigration Servs.*,
  871 F. Supp. 2d 996 (N.D. Cal. 2012) ............................................................... 9

*Kirola v. City & Cty. of San Francisco*,
  860 F.3d 1164 (9th Cir. 2017) ......................................................................... 16

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019) .................................................................................... 19

*Kokkonen v. Guardian Life Ins. Co. of America*,
  511 U.S. 375 (1994) ........................................................................................ 25

*Krottner v. Starbucks Corp.*,
  628 F.3d 1139 (9th Cir. 2010) ......................................................................... 22

*Langer v. Encantado II, LLC*,
  No. 14CV2281-MMA JLB, 2015 WL 1499182 (S.D. Cal. Apr. 1,
  2015), *aff'd*, 677 F. App'x 360 (9th Cir. 2017) ................................................ 26

*Lentini v. Calif. Center for the Arts*,
  370 F.3d 837 (9th Cir. 2004) ........................................................................... 21

*Lewis v. Casey*,
  518 U.S. 343 (1996) ........................................................................................ 22

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .................................................................................... 22, 23

*Martin-Trigona v. Shiff*,
  702 F.2d 380 (2d Cir. 1983) ............................................................................ 26

*McCullum v. Orlando Reg'l Healthcare Sys.*,
  768 F.3d 1135 (11th Cir. 2014) ....................................................................... 13

*McNeil v. Time Ins. Co.*,
  205 F.3d 179 (5th Cir. 2000) ........................................................................... 12

*Molski v. Kahn Winery*,
  405 F. Supp. 2d 1160 (C.D. Cal. 2005) ....................................................... 24, 25

iv

Case No. 2:19-cv-08108 DMG (MRWx)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

48300399_7.docx

*Nat'l Fed'n of the Blind v. Target Corp.*,
452 F. Supp. 2d 946 (N.D. Cal. 2006) ................................................................ 11

*Nidds v. Schindler Elevator Corp.*,
113 F.3d 912 (9th Cir. 1996) .............................................................................. 10

*O'Connor v. Scottsdale Healthcare Corp.*,
871 F. Supp. 2d 900 (D. Ariz. 2012) ........................................................... 23, 24

*Oliver v. Ralphs Grocery Co.*,
654 F.3d 903 (9th Cir. 2011) .............................................................................. 26

*Oregon Environmental Council v. Kunzman*,
714 F.2d 901 (9th Cir.1983) ............................................................................... 26

*Parr v. L & L Drive-Inn Rest.*,
96 F. Supp. 2d 1065 (D. Haw. 2000) .................................................................. 26

*Pierce v. City of Salem*,
No. CIV. 06-1715-ST, 2008 WL 4415407 (D. Or. Sept. 19, 2008) .................... 20

*Sierra Club v. Trump*,
929 F.3d 670 (9th Cir. 2019) .............................................................................. 18

*Skaff v. Meridien North America Beverly Hills, LLC*,
506 F.3d 832 (2007) ..................................................................................... 23, 24

*Smith v. Barton*,
914 F.2d 1330 (9th Cir. 1990) ............................................................................ 10

*Southeastern Community College v. Davis*,
442 U.S. 397 (1979) ............................................................................................ 18

*Spokeo v. Robins*,
136 S. Ct. 136 S. Ct. 1540, 1547 (2016) .............................................................. 3

*Sullivan v. Doctor's Assocs. LLC*,
No.1:19-cv-719-GHW, 2020 WL 2319295 (S.D.N.Y. May 8, 2020) .................. 12

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ............................................................................................ 25

*Thurston v. FCA US LLC*,
Case No. 5:17-cv-02183-JFW-SP, 2018 WL 700939 (C.D. Cal. Jan.
26, 2018) ...................................................................................................... 23, 24

*United States v. Concentrated Phosphate Exp. Ass'n*,
393 U.S. 199 (1968) ............................................................................................ 26

*West v. Moe's Franchisor, LLC*,
2015 WL 8484567 (S.D.N.Y. 2015) .............................................................. 12, 14

*Weyer v. Twentieth Century Fox Film Corp.*,
198 F.3d 1104 (9th Cir. 2000) ....................................................................... 10, 11

48300399_7.docx

**California Cases**

*Belton v. Comcast Cable Holdings, LLC,*
   151 Cal. App. 4th 1224 (2007) ...................................................................21

*Munson v. Del Taco, Inc.,*
   46 Cal. 4th, 661 (2009) ...............................................................................21

**Federal Statutes**

42 U.S.C.
   § 12181(b)(2)(A)(iii) ...................................................................................13
   § 12182(b)(2)(a)(ii) ........................................................................................5

Fed. R. Civ. P. 12(h)(3) .....................................................................................26

Fed. R. Civ. P. 56 ................................................................................................9

**California Statutes**

Cal. Civ. Code
   § 51(b)..........................................................................................................21
   § 51(f) ....................................................................................................17, 21
   § 54.2(b)........................................................................................................21
   § 54.3 ...........................................................................................................21

**Federal Regulations and Guidance Authorities**

28 C.F.R. § 35.160(b)(2) ..............................................................................17, 20

28 C.F.R. § 36.211(b) .......................................................................................16

28 C.F.R. § 36.303 ............................................................................................13

28 C.F.R. § 36.303(c) .....................................................................................1, 13

28 C.F.R. § 36.307 ......................................................................................10, 11

36 C.F.R. Pt. 1191, Appendix B & D ..................................................................5

45 C.F.R. Pt. 84 .................................................................................................17

45 C.F.R. § 84.52(d) ..........................................................................................17

Dept. of Justice, "Guidance on ADA Regulations," App. C to 28 C.F.R.
   Pt. 36, § 36.201(a) (1991)........................................................................1, 12

Dept. of Justice, "Guidance on Revisions to ADA Regulation on
   Nondiscrimination on the Basis of Disability By Public
   Accommodations and Commercial Facilities," App. A 28 C.F.R. Pt.
   36, § 36.303 .................................................................................................13

Dept. of Justice « Effective Communication » (2014), reprinted at
   https://www.ada.gov/effective-comm.pdf ......................................................11

vi    Case No. 2:19-cv-08108 DMG (MRWx)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY
JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

48300399_7.docx

# I.     __INTRODUCTION__

"Full and equal enjoyment [under Title III of the Americans with Disabilities Act ("ADA")] does not mean that an individual with disability must achieve an identical result or level of achievement as persons without a disability."

U.S. Dept. of Justice ("DOJ"), "Guidance on ADA Regulations," App. C to 28 C.F.R., Part 36, § 36.201(a) (1991).

This case pits against one another two vastly different interpretations of the ADA and the other laws under which Plaintiffs claim here.  The parties' debate starts with whether Quest needs to provide an *identical and equal* experience for persons with disabilities in all respects, or, as Quest proposes, whether providing "effective communication" to persons with disabilities consistent with the explicit language of 28 C.F.R. § 36.303(c) meets its obligations.  And the debate continues to whether the purported obligation of to provide an identical and equal experience applies to *any, every and all alternative means of accessing* its goods or services, or, as Quest proposes, with the accessibility of the *goods or services themselves*.  Whatever the determination, these central debates present classic questions of law appropriate for summary judgment, or, at a minimum, partial summary judgment that can focus any trial that the Court deems necessary.

Quest Diagnostics Incorporated ("Quest"), along with its subsidiaries, is a leading provider of diagnostic information services, which includes operating Patient Services Centers ("PSCs")  where blood, urine and other patient specimens are collected for testing (the "services").  Quest has long accommodated its PSC patients, including those with visual impairments, through policies, procedures and training that require PSC employees to assist patients with disabilities to enable them to access its services, including assisting them with checking in at the PSCs.  During a two-and-a-half-year period starting in mid-2016, Quest replaced the paper sign-in sheets it had been long using for PSC check-in, coupled with employee assistance for

the disabled, with an electronic means of checking in through touch screen tablets eventually deployed at more than 2,100 PSCs, *but preserved the option of live employee assistance for those patients who needed or desired it.*  In late 2018, Quest embarked on a program to offer an additional option for checking in to receive services at the PSC by adding a three-finger swipe process ("TFS") that permits visually-impaired patients to automatically check in by swiping three fingers on the face of the kiosks, without having to input any information.  Quest did not replace or reduce staff in connection with enabling TFS and continued to preserve the longstanding option of using employee assistance to check in.  Thus, all patients arriving at Quest, including those with visual impairments, had multiple options for checking in – which include utilizing the employee assistance that has always been available since the paper sign-in sheets were used, using the interactive touchscreen of the Kiosk or simply swiping three fingers in any direction.

Under the untenable interpretation of the ADA, Rehabilitation Act and California law espoused by plaintiffs Vargas and American Council of the Blind ("ACB") (collectively, "Plaintiffs"), presenting these options for checking in does not suffice.  Rather, Plaintiffs propose against overwhelming authority that, not only must Quest make its diagnostic testing services accessible, it must also make every ancillary aspect of the means of accessing its services (namely, *every* check-in method) identically and equally accessible to the blind.  And they further propose that adds, among other things, audio output and a tactile keyboard to every Kiosk in more than 2,100 PSCs to provide every blind patient an *identical* check-in experience is the only way for Quest to meet its obligations under these laws. Neither the ADA, Rehabilitation Act nor California law requires that result. "Effective communication," as chosen by Quest, is all that's required by these laws, and the very simple and basic "communication" that is typically involved in checking in (name, birthday and phone number) can be easily transmitted to the phlebotomist that every Quest patient is already seeing as part of their PSC visit.  In

2

Case No. 2:19-cv-08108 DMG (MRWx)
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY
JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

48300399_7.docx

fact, having enhanced the Kiosk experience through TFS for independent check-in without assistance, Quest is surely acting within the bounds of the law.

Moreover, Plaintiffs' assertion that the Rehabilitation Act requires that Quest provide "primary consideration" to the requests of the disabled to make sweeping modifications to the Kiosks fails for multiple reasons outlined below, including that there is no language in the Rehabilitation Act regulations introducing that concept, it runs directly contrary to that law's more liberal "program access" standard, and it is simply impossible to give "primary consideration" to any particular patient in the context of deploying a single Kiosk technology for more than 2,100 PSCs and tens of millions of different PSC patients, when those requests could (and would) be contradictory and inconsistent.

As a further alternative grounds for summary judgment on the ADA claim, Plaintiffs lack standing to bring these claims because *either*: (a) their occasional and speculative marginal, additional wait times, as compared to other customers, does not constitute a "concrete and particularized injury" under the Supreme Court's decision in *Spokeo*, or (b) they face no imminent threat of future injury as required to be awarded injunctive relief, or (c) both.

Finally, Vargas' Unruh and Disabled Persons Act ("DPA") claims fail because the portions based on the ADA claim (Section 51(f) and 54.2(c)) fails with the ADA claim, and there is no evidence to support a claim under the intentional discrimination portion of the Unruh Act (Section 51(b)) and Vargas', damages-only DPA claims imposes no obligations not found under the ADA.

For each of these reasons, explained more fully below, the Quest Defendants respectfully request that the Court enter summary judgment in their favor and against Plaintiffs. In the alternative, the Quest Defendants respectfully request that the Court grant partial summary judgment on all of the subsidiary issues so as to properly narrow the focus of any trial on the merits.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

## II.   FACTUAL BACKGROUND

### A.   Quest's Patient Service Centers and Check-in Methods

Quest is in the business of providing diagnostic information services, which include collecting blood and urine specimens that it then tests in accordance with physician orders.  (Appendix of Evidence ("App.") 4 ¶ 2.)  Quest receives the specimens for testing from hospitals and medical practices, but also collects specimens for testing through approximately 2,100 patient service centers ("PSCs") located throughout the United States.

### B.   Quest's Transition From Paper to Electronic Check-in

Before the events of which Plaintiffs complain, patients at Quest PSCs indicated their arrival, or check in, by entering their names on a paper sign-in sheet maintained in the waiting room.  (*Id.* ¶ 4.) The Patient Service Representatives (or phlebotomists) staffing the PSCs would enter the waiting room, review the sign-in sheet and call the next patient back for specimen collection.  (*Id.* ¶ 5.)   A cornerstone of Quest's phlebotomist policies, procedures, and training had been – and remains − to require PSC employees to scan the waiting room each time they entered to find any individuals who may need assistance, including those who were blind or had other disabilities.  (App. 3 ¶¶ 3-19, App. 8-15, 28.) Those with no or little vision were generally reliant on interface with, and assistance from, phlebotomists because they could not independently read the sign-in sheet.

Despite the longstanding use of this sign-in process at Quest PSCs, and the process being completely inaccessible without phlebotomist assistance to at least the totally blind, neither Plaintiff nor ACB is aware of even a single complaint under the ADA or analogous laws about the inaccessibility of this process.  (App. 16 at 2-3 (Responses Nos. 1 and 2); App. 17 at 115:20-116:5.)  Nor have Plaintiffs offered any evidence in this matter that Vargas, any ACB member, or any other Quest patient, had ever requested a paper sign-in process independently accessible to the blind without phlebotomist assistance.

In 2015, to improve the experience of patients and employees at PSCs through digitization, Quest began to explore ways to modify its PSC check-in practices, along with other aspects of its patient interaction – from making appointments and pre-registration for the visits to how one checks in.  (App. 4 ⁋ 6; App. 18 at 29:10-30:8, 31:2-12, 37:20-39:17.)   None of these modifications eliminated or reduced available employee assistance to any patient facing challenges with the technology or who simply prefers human interaction.  (App. 4 ⁋ 10.) After considering a wide variety of options, in April 2016, Quest chose to install, over a two-and-a-half year rollout, one or more electronic, touchscreen tablets that patients could use to check in at PSCs.  (App. 4 ⁋ 7.)  The tablets, when placed in plastic casings and mounted on posts, were known as "Kiosks."  (*Id.*)   A Kiosk user would be prompted to check in by entering a first and last name, birthday and phone number.  (App. 4 ⁋ 8.) Once they had done so, the Kiosk would check them in and place them in queue to be served by a phlebotomist. (*Id.*)  The queue, with estimated wait times, would also be displayed on one or more of the "Quest TV" monitors present at PSCs.  (*Id.*) Patients were free to use or forego the Kiosk, using employee assistance available to blind and sighted persons to check in.  (*Id.* ⁋ 10.)

Quest took care to ensure that it satisfied the explicit design standards applicable to the Kiosks in ADA Standards for Accessible Design (36 C.F.R. Pt. 1191, App. B & D, "ADAS"), including that all of the operable parts of the Kiosk were within "reach range" of someone using a wheelchair (ADAS 308, 309) and that the freestanding Kiosks were detectable by blind cane users (ADAS 307).  (App. 4 ⁋ 9.)  In designing the Kiosk, Quest could not anticipate or predict future requests for "auxiliary aids and services" (42 U.S.C. § 12182(b)(2)(a)(iii)) or for "reasonable modification of policies, practices and procedures" (42 U.S.C. § 12182(b)(2)(a)(ii)) that the ADA requires be considered when made, and had no obligation to do so. (App. 4 ⁋ 10.)  Moreover, it was replacing an existing system of signing in on a paper sheet, which had worked successfully for years for its blind patients, with

48300399_7.docx

another, digital system of checking in that was also accessible with the assistance of Quest phlebotomists. As it had for years, Quest was relying on its business model, approach to patient service, policies, procedures, and phlebotomists' training to assist any and all patients, including its disabled patients, with the check-in process. (*Id.*; App. 3 ¶¶ 3-4.) Quest's plan and business case for the Kiosk rollout did not include a plan to reduce then-existing PSC staffing or to replace PSC staff with Kiosks. (App. 4 ¶ 10.) Indeed, because electronic check-in and other improvements were expected to reduce transaction time for each patient by approximately one minute, it was expected that Quest phlebotomists would have additional time, among other things, to continue to address the needs of persons requiring assistance, including persons with disabilities. (*Id.* ¶ 11.)

But, rather than simply relying on these assumptions about how the Kiosks would work once rolled out, Quest also planned to identify problems that *any* of its patients may be experiencing with the Kiosk through its extensive methods for soliciting and receiving patient complaints and feedback and engaging in the "iterative" process that is an inherent part of the rollout of any electronic or other technology. (App. 4 ¶¶ 12-13; App. 3 ¶¶ 19-20.)

### C.    The Kiosks and the Iterative Process

As with the rollout of almost any technology on this large a scale, Quest always contemplated Kiosk implementation to be an "iterative" process. Namely, Quest knew that it would continue to study the actual experience of Kiosk users and address any needs or problems through future changes, modifications and alterations (*i.e.*, iterations) to the Kiosk or the processes associated with the Kiosks' usage. (App. 4 ¶ 13.) Such iterations were an inherent expectation of the electronic technology, which, unlike the paper and pen sign-in sheet process, was capable of continued modification and improvement.

Quest expected to gather information about Kiosk user experience by, among other things, (1) studying usage at some early rollout PSCs, (2) monitoring patient

48300399_7.docx

feedback, including feedback provide to patient service representatives at the PSCs
and through the surveys it routinely takes of PSC visitors, and (3) its ongoing system
of receiving and responding to patient concerns and complaints.  (App. 4 ¶ 13; App.
3 ¶ 20.)  Between 2016 and 2020, Patient Advocacy received feedback from forty-
five (45) patients (or their advocates) about either the inaccessibility of the Kiosks or
inadequate staffing at the PSCs based on these methods.  (App. 3 ¶ 21; App. 9.)

**D.**    **ACB And Quest Discuss Improvements To The Kiosks, And The**
      **Intervening Vargas/West Lawsuit**

In December 2018, ACB's Executive Director, Eric Bridges, sent near-
identical letters about the Kiosks to Quest's General Counsel and its CEO on behalf
of unidentified members of ACB.  (App. 19 at17:8-22, 127:24-128:4, 132:4-15,
186:14-25; App. 20.)  Quest responded to the letters on January 2, 2019, and its then-
Director of National Patient Services, Chris Grant, and an in-house Quest lawyer had
two discussions with ACB (January 25, and April 12, 2019) and exchanged multiple
emails.  (App. 19 at 137:7-138:17, 141:22-142:8, 142:24-143:2, 149:3-13, 152:7-
153:1; App. 7; App. 21; App. 2 ¶¶ 3-4.)  By July 2019, ACB had retained counsel
Matthew Handley, who continued to correspond with Quest's representatives.  (App.
19 at 158:4-11, 211:14-214:5; App. 7.)  While these discussions continued, on
September 18, 2019, Quest was sued without notice in this action by Vargas and
former plaintiff Anne West.[1]  (ECF No. 1.)  Eventually, ACB sought to join this
action. (ECF Nos. 34, 40.)  At the January 10, 2020 Scheduling Conference, Vargas,
West and Quest agreed to an early mediation of this dispute, which occurred on
March 12, 2020.  (ECF No. 33.)

While ACB occasionally referred to making the Kiosks "independently
accessible" to its blind members, at no point during is presuit discussions with Quest
did ACB demand a specific method or technology to replace or supplement the

---

[1] West dismissed her claims with prejudice on May 27, 2021.  (ECF No. 78.)

48300399_7.docx

existing Kiosks.  (App. 2 ¶¶ 3, 5; App. 17 at 188:22-191:15, 192:8-194:8; App. 7.)

Nor could Quest have understood that ACB was making a request on behalf of any particular ACB member or representative.[2]   Indeed, ACB's initial letters explicitly referenced a concern that certain PSCs did not have sufficient Quest phlebotomists in the PSC waiting rooms to assist patients with check-in, apparently assuming incorrectly that Quest had replaced employees with Kiosks.  (App. 20.)

> **E.**   **Three Finger Swipe Is Implemented, Providing Independent Access To Blind Users Of The Kiosk**

In response to the discussions with ACB and the impending mediation, Quest undertook an extensive, months-long exploration of methods it could use to enhance the Kiosk check-in process so that blind users could independently check in, even with Quest's continued provision of phlebotomist assistance.  (App. 2 ¶ 4.)   Among other things, Quest solicited feedback from three different groups (including focus groups) of blind individuals or individuals who worked with accommodating the blind to understand what blind consumers wanted when interacting with electronic technology.  (App. 1 ¶¶ 4-6.)  Based on that exploration and interaction with three different groups of blind consumers and their advocates, Quest developed a proposal in advance of the March 2020 mediation that has come to be known as the "Three Finger Swipe" ("TFS") enhancement.  (App. 1 ¶ 6.) Employee assistance with the check-in process, whether through TFS or another mode, remained available.  (*Id.*) Following the mediation, Quest's then-Director of National Patient Services approved moving forward with implementing the TFS enhancement, which consists of three complementary components to permit independent check-in at the Kiosks: (1) Enabling the Kiosks to automatically check in patients who swiped three fingers on the Kiosk screen in any direction, which then provides an audio message that tells

---

[2] ACB did not even identify any of its members on whose behalf it had contacted Quest until a December 10, 2019 letter from its counsel.  (App. 7.)

the patient that they have been checked in and assigned a generic patient ID number, and that this number would be called when it was their turn to be seen, and further providing notification to Quest phlebotomists at the PSC that an individual with visual impairments had checked in; (2) Programming Quest TVs at the PSCs to play, on continuous loop, an audio message that instructs patients who are blind or who have visual impairments on how to check in at the Kiosk with the TFS; and (3) Developing and assigning updated ADA training for PSC employees on the TFS and how to assist the blind and other patients with disabilities to access Quest's services. (App. 2 ¶ 6; App. 1 ¶ 6.)  The TFS capability was installed in all PSCs in August 2020.  (App. 1 ¶ 7.) The audio message on the Quest TVs at the PSCs was activated in January 2021, and the enhanced training of PSC employees was rolled out and assigned in March 2021.  (*Id.*)

   With TFS' implementation, blind patients (or any other patients) at the PSCs can be checked in to receive services simply by applying three fingers to the face of the Kiosk tablet and swiping in any direction.  Because blind guests are intimately familiar through use of their smartphones with the operation of touchscreens through the application of unique finger gestures on their screens (App. 17 at 86:9-16, 88:4-89:4, 94:3-11; App. 22 at 143:21-24; App. 19 at 97:15-98:15, 99:2-100:20, 102:4-10), the TFS solution is a reliable means of providing independent check-in access to the blind.  The alternative of phlebotomist assistance remains available.

## III.   LEGAL ARGUMENT

### A.   Summary Judgment Standard

   Courts must grant summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Rule 56 also allows a court to grant summary judgment on a part of a claim or defense. *See* Fed. R. Civ. P. 56(a). The standard applied to Quest's alternative motion for partial summary judgment is identical to the

9

Case No. 2:19-cv-08108 DMG (MRWx)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

48300399_7.docx

standard for a motion seeking summary judgment. *See*, *e.g.*, *Kennedy v. U.S. Citizenship & Immigration Servs.*, 871 F. Supp. 2d 996, 1006 (N.D. Cal. 2012).

While Quest bears the initial burden of showing the district court "that there is an absence of evidence to support [Plaintiff's] case" (*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)), once making such a showing, Quest is entitled to summary judgment unless Plaintiffs establish, with concrete evidence, that there remains a genuine issue of material fact: "facts that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 247-48, 256. The "substantive law" determines which facts are material. *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 916 (9th Cir. 1996). To create a "genuine" issue about such a material fact, Plaintiffs must produce a "sufficient" "quantum of evidence" that a "reasonable jury" could return a verdict in her favor; evidence that is "merely colorable, or is not significantly probative," is insufficient. *Id.*

**B.** **Title III Obligates Quest To Provide "Auxiliary Aids and Services" That Permit Its Disabled Customers Access To Its Services, Which It Has, Not To Create Entirely Different Goods Or Services.**

Quest does not manufacture or sell Kiosks, or check-in services. Rather, Quest is in the business of providing diagnostic information services based on the collection of patient specimens. It is well-settled that Title III does not require provision of *different* goods or services to persons with disabilities, merely nondiscriminatory enjoyment of those that are provided. 28 C.F.R. § 36.307 (Title III "does not require a public accommodation to alter its inventory to include accessible or special goods that are designed for, or facilitate use by, individuals with disabilities"); *Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc.*, 603 F.3d 666, 671 (9th Cir. 2010); *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115-16 (9th Cir. 2000) ("The ordinary meaning of [Title III] is that whatever goods or services the place provides, it cannot discriminate on the basis of disability in providing enjoyment of those goods and services. This language does not require

provision of different goods or services, just nondiscriminatory enjoyment of those that are provided."); *Nat'l Fed'n of the Blind v. Target Corp*., 452 F. Supp. 2d 946, 956 (N.D. Cal. 2006) ("The purpose of the ADA's public accommodations requirements is to ensure accessibility to the goods offered …, not to alter the nature or mix of goods that the public accommodation has typically provided.").

The *diagnostic services* offered by Quest are, and have always been, fully accessible to Quest's blind patients, even if the Kiosk, one method of checking in to the PSC to receive those services, was once accessible only with the assistance of a phlebotomist. Neither Vargas nor ACB's members claim that they were unable to access those diagnostic services.  While Plaintiffs appear to argue that the Kiosk itself is a "good or service" of Quest that must be equally accessible, that completely ignores the Ninth Circuit's clear instruction that the ADA "does not require provision of different goods or services" (*Weyer*, 198 F.3d at 1115-1116) and the Congressional intent recorded in 28 C.F.R. § 36.307 that makes explicit that Quest need not "alter its inventory to include accessible or special goods."  But the Kiosk is not itself a Quest good or service, as Plaintiffs assert; it is merely one of multiple means currently available to access Quest's diagnostic services.  (App. 4 ⁋⁋ 10-11.)

The analogy to restaurant menus is instructive.  Like the Kiosk, a menu is a means of access to a restaurant's food and beverages and is plainly inaccessible to the blind without a restaurant employee's assistance.  A restaurant could surely provide an audible or Braille version of its menu for its blind diners, but DOJ guidance on "effective communication" is clear that "[i]n a lunchroom or restaurant, reading the menu to a person who is blind allows that person to decide what dish to order."  DOJ, "Effective Communication" (2014), https://www.ada.gov/effective-comm.pdf, App. 23.  *See also Camarillo v. Carrols Corp*., 518 F.3d 153, 157 (2d Cir. 2008) ("While restaurants are not necessarily required to have on hand large print menus that [the plaintiff] would be able to read, they are required to ensure that their menu options are effectively communicated to individuals who, like [the

48300399_7.docx

plaintiff], are legally blind."). Extending the analogy to Plaintiffs' expected demand here for specific technology, this very demand by hearing-impaired restaurant patrons has likewise been soundly rejected: "The law is crystal clear that the ADA does not require DAL to force its franchisees to *adopt a specific technological solution*, so long as the franchisees can ensure that their employees can communicate effectively with [disabled] individuals." *Sullivan v. Doctor's Assocs. LLC*, No.1:19-cv-719-GHW, 2020 WL 2319295 at \*5 (S.D.N.Y. May 8, 2020).

As noted at the top of the brief, "full and equal enjoyment" does not require an "identical result or level of achievement." "Guidance on ADA Regulation," App. C to 28 C.F.R. Part 36 (1991), § 36.201(a). Reconciling the jurisprudential and metaphysical challenge of legislatively-mandated "equality," the Fifth Circuit explained that, while "it is literally possible, though strained, to construe 'full and equal enjoyment' to suggest that the disabled must be able to enjoy every good and service offered to the same and identical extent as those who are not disabled ... such a reading is plainly unrealistic, and surely unintended, because it makes an unattainable demand." *See McNeil v. Time Ins. Co.*, 205 F.3d 179, 187 (5th Cir. 2000); *see also Dobard v. San Francisco Bay Area Rapid Transit Dist.,* 1993 WL 372256, \*3 (N.D. Cal. Sept. 7, 1993).[3]

---

[3] Quest anticipates that Plaintiffs will point to a number of Court decisions regarding touchscreen technology. However, this line of cases suggests that where, as here, assistance and effective communication is readily available, nothing in the ADA or supporting regulations requires alterations to enable blind users to operate touchscreens without assistance. *See West v. Moe's Franchisor, LLC*, 2015 WL 8484567, at \*3 (S.D.N.Y. 2015); *Dicarlo v. Walgreens Boot Alliance, Inc.,* 2016 WL 482982, at \*2 (S.D.N.Y. 2016). Rather, liability has attached where effective communication is not provided, or qualified readers not offered, not by the mere existence of touchscreen technology. *See Boyer v. Five Guys Enterprises, LLC*, 2018 WL 4680007, at \*7 (C.D. Cal. 2018).

48300399_7.docx

**C.     In Communicating Visual Material, Quest Need Only Provide
Effective Communication (Not Equal Communication) Of The Very
Basic PSC Check-in Process, Which It Clearly Does**

**1.     "Effective Communication" is the Standard under Title III of
the ADA and Requires Effective (not Identical or Equal)
Communication**

Title III requires public accommodations to "take such steps as may be
necessary to ensure that no individual with a disability is excluded, denied services,
segregated or otherwise treated differently than other individuals because of the
absence of *auxiliary aids and services*."  42 U.S.C. § 12181(b)(2)(A)(iii) (emphasis
added).  The DOJ explained this "auxiliary aids and services" obligation in 28 C.F.R.
§ 36.303 ("Section 36.303"), which provides that public accommodations must
"furnish appropriate auxiliary aids and services where necessary to ensure ***effective
communication*** with individuals with disabilities."  Section 36.303(c) (emphasis
added).  However, "the ultimate decision as to what measures to take rests with the
public accommodation, provided that the method chosen results in effective
communication." Section 36.303(c)(1)(ii).  As the DOJ explained:

> The auxiliary aid requirement is a flexible one. A public
> accommodation can choose among various alternatives as long as the
> result is effective communication. . . . Similarly, a clothing boutique
> would not be required to have Brailled price tags if sales personnel
> provide price information orally upon request.

App. B to 28 C.F.R. pt. 36, § 36.303.

Accordingly, it is well-settled that Title III of the ADA does *not* require a
covered entity to provide the specific type of auxiliary aid demanded by a plaintiff.
*McCullum v. Orlando Reg'l Healthcare Sys.*, 768 F.3d 1135, 1147 (11th Cir. 2014)
(holding that regulations do not require all demanded auxiliary aids and services,
explaining that "construing the regulations in this manner would effectively

13                    Case No. 2:19-cv-08108 DMG (MRWx)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY
JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

substitute 'demanded' auxiliary aid for 'necessary' auxiliary aid") (citing and quoting *Liese v. Indian River Cty. Hosp. Dist.,* 701 F.3d 334, 343 (11th Cir. 2012)); *Durand v. Fairview Health Servs.,* 902 F.3d 836, 842 (8th Cir. 2018); *West v. Moe's Franchisor, LLC*, No. 15CV2846, 2015 WL 8484567, at *3 (S.D.N.Y. Dec. 9, 2015) (holding that ADA does not require alteration of the touchscreen soda machines and noting:  "Plaintiffs may be correct that technological additions to the Freestyle machines are both feasible and preferable. However, under the ADA, effective assistance from Moe's employees acting as "qualified readers" is sufficient.").

Because there had been no request for anything other than phlebotomist assistance when Quest used a paper sign-in sheet, it had no reason to suspect that phlebotomist assistance at PSCs would be inadequate to assist blind patients unable to check in independently with the Kiosk.  Indeed, Plaintiffs nowhere assert or point to evidence that Vargas or any ACB member requested a certain kind of Kiosk, or other mode of "effective communication" before the Kiosks' initial rollout.  Rather, the only evidence of any Plaintiffs' request for an alternative to the Kiosk came from ACB, which never requested a particular means of "effective communication" and sought merely a means that permitted independent access, which the TFS allows.

**2.** **The "Effective Communication" Mandate Hinges On The Nature, Length and Complexity Of The Communication; The Kiosk's Communication Could Not Be More Basic, Short, And Simple**

In explaining "effective communication," the DOJ wrote that "[t]he type of auxiliary aid or service necessary to ensure effective communication *will vary* in accordance with the method of communication used by the individual; the *nature, length, and complexity* of the communication involved; and *the context* in which the communication is taking place." Section 303(c)(1)(ii) (emphasis added).

Here, Quest has had longstanding policies, procedures and training programs in place that required PSC employees to provide auxiliary aids and services to

14

48300399_7.docx

patients with disabilities, including assistance with the check-in process.  The Kiosk (TFS-enabled or not) generally requires that a patient provide only basic demographic information (name, birthday and telephone number) to check in. Applying the Section 303 standard quoted above, nothing could be more basic in *nature*, short in *length* and lacking *complexity*.[4]  As such, Quest did not violate the ADA regulation's "effective communication" mandate when deploying Kiosks in the initial rollout, which worked in tandem with phlebotomist assistance, that were not independently accessible to those with certain visual impairments.  Just like text menus that are not independently accessible to the blind in a restaurant and require assistance, Quest's phlebotomists' check-in assistance with this most basic form of communication satisfies Title III's "effective communication" mandate. Moreover, with the TFS solution now providing a *further* alternative mode of "effective communication" to use the Kiosks to check in (with or without employee assistance), there can be no material dispute that Quest is meeting its ADA obligations.[5]

---

[4] To meet the "privacy protection" principle articulated in Section 303(c)(1)(ii), Quest gathers certain information in the private draw rooms where phlebotomists collect specimens from patients.  (App. 3 (Reilly) ¶ 19.)

[5] It is anticipated that Plaintiffs will supply the Court with instances where Vargas or ACB members allege they were unable to use the TFS during isolated visits to the PSCs among millions of patient visits per year.  Because Plaintiffs make a *facial challenge* to Quest's chosen *modes* of "effective communication" (through employee assistance with the Kiosk or the TFS) and seek injunctive relief mandating an entirely different technological mode of communication, the Court should weigh whether Quest's two modes of "effective communication" are effective *approaches*, not whether there are unique instances where either of these alternatives may not work due to some isolated issue.  *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017) ("… we agree with the district court that Kirola and other class members' anecdotal testimony about [barriers to access] did not establish inaccessibility at a programmatic level"); 28 C.F.R. § 36.211(b) ("This section does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs.").  Indeed, Plaintiffs' preferred technological solution may likewise suffer from technology outages and glitches, whereas Quest's permanent offer of phlebotomist assistance is *always available*.

3.      **Quest Has No Obligation Under The Rehabilitation Act To Provide "Primary Consideration" To The "Effective Communication" Requests Of Its Disabled Patients**

While there is no debate that the Rehabilitation Act, like Title III, also requires "effective communication," Plaintiffs appear to ground their Rehabilitation Act claim on the contention that Quest failed to give "primary consideration" to the requests of ACB (or, more generally, people with disabilities) when determining what types of auxiliary aids and services are necessary.  (App. 24 at 10.)  For the reasons set forth below, the putative "primary consideration" obligation does not exist under any of the laws sued under here, and, even if it did, it does nothing to save any of Plaintiffs' claims.[6]

(a)      ***There Is No Dispute That "Primary Consideration" Has No Application To Plaintiffs' Title III Claim.***

In the face of Section 303's explicit mandate that a public accommodation need not provide disabled guests their preferred mode of effective communication (*see* Section III.C.1 above), Plaintiffs do not (and cannot) contend that Title III requires Quest to give "primary consideration" to the requests of persons with vision impairments.  Instead, Plaintiffs rely solely on their Rehabilitation Act claim, only added with the May 2020 filing of the First Amended Complaint, to impose such a putative obligation.  Without citation to any binding authority or regulation, including *any* citation to the Rehabilitation Act regulations (found at 45 C.F.R. Pt. 84), Plaintiffs contend that an ADA *Title II regulation* (applicable to "public entities") applies to Quest under the Rehabilitation Act.  (App. 24 at 10 (referencing 28 C.F.R. § 35.160(b)(2)); App. 25 (same).)  While Quest vigorously contests the applicability of this Title II regulation here, what cannot be disputed is that "primary

---

[6] Plaintiffs' First Amended Complaint nowhere alleges a violation of the putative "primary consideration" requirement.  (ECF No. 41, ¶¶ 85-94 & *passim*.)  In an excess of caution, however, Quest nonetheless addresses this belated contention.

Case No. 2:19-cv-08108 DMG (MRWx)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

48300399_7.docx

consideration" has no application to Plaintiffs' ADA Title III claim or the Unruh Act claim that incorporates ADA violations (but not Rehabilitation Act violations).  Cal. Civ. Code § 51(f).

> **(b)    The Rehabilitation Act, Despite Lengthy, Explicit Regulations That Include An "Auxiliary Aid and Service" Regulation, Nowhere Includes a "Primary Consideration" Requirement**

In support of their "primary consideration" doctrine contention, Plaintiff's cite *only* to a regulation under Title *II* of the ADA—28 C.F.R. § 35.160(b)(2)—which by its own language applies only to Title II entities, not to Title III entities or recipients of federal financial assistance under the Rehabilitation Act. Indeed, the Rehabilitation Act regulations themselves nowhere mention this "primary consideration" obligation (s*ee generally* 45 C.F.R. pt. 84) despite containing an explicit "auxiliary aids and services" regulation. 45 C.F.R. § 84.52(d). Because the Rehabilitation Act regulations are silent on "primary consideration," there is no basis to apply a "primary consideration" mandate under the Rehabilitation Act claim.

> **(c)    There Are Multiple Additional Reasons Why "Primary Consideration" Does Not Apply Under The Rehabilitation Act And Does Not Apply In These Circumstances.**

Any attempt by Plaintiffs to rely on extra-regulatory language from the DOJ must fail for several reasons.  First, it is axiomatic under the Administrative Procedures Act ("APA") that extra-regulatory language carries no weight as agencies cannot make binding regulations outside of the APA's rulemaking process. *Christensen v. Harris County*, 529 U.S. 576, 588 (2000) (an agency cannot "under the guise of interpreting a regulation ... create de facto a new regulation"); *Sierra Club v. Trump*, 929 F.3d 670, 692 (9th Cir. 2019) ("[t]here is no question that DoD did not conduct notice-and-comment rulemaking or other formalized procedures in

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

48300399_7.docx

interpreting [the statute]").

Second, the Rehabilitation Act has been interpreted and applied by federal courts for decades without imposing any "primary consideration" requirement until the Title II regulation was added after passage of the Affordable Care Act.  *See*, *e.g.*, *Southeastern Community College v. Davis,* 442 U.S. 397, 410 (1979) (Rehabilitation Act "require[s] reasonable modifications necessary to correct for instances in which qualified disabled people are prevented from enjoying "'meaningful access' to a benefit because of their disability.").  Third, the mere fact that Title II has a "primary consideration" regulation, and Title II and the Rehabilitation Act "*generally* are interpreted *in pari materia*, that does not mean that the two statutes are always interpreted identically."  *Flynn v. Distinctive Home Care, Inc.*, 812 F.3d 422, 430-431 (5th Cir. 2016) (declining to insert ADA principle into Rehabilitation Act analysis); s*ee also Bonnette v. D.C. Ct. of Appeals,* 796 F. Supp. 2d 164, 183 (D.D.C. 2011) (distinguishing between the Title II and Title III regulations).

Fourth, the heightened standard of "primary consideration" is plainly inconsistent with the lowered "program access" standard under the Rehabilitation Act, where "the "central inquiry is whether the program, "'when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.'" *Bird v. Lewis & Clark College*, 303 F.3d 1015, 1021 (9th Cir. 2002) (quoting 28 C.F.R. § 35.150(a). Even if it had gone through a proper rulemaking process, "primary consideration" cannot be applied under the Rehabilitation Act because it is flatly inconsistent with the lower standard under the Rehabilitation Act.  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019); *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (deferring to agency interpretation unless "plainly erroneous or inconsistent with the regulation.").

Fifth, unlike any individualized request for auxiliary aids or services, such as a request for a sign language interpreter for a deaf patient or having something read aloud for a blind patient, Quest cannot be expected to create multiple multi-million

48300399_7.docx

dollar check-in technologies for millions of its patients.  As noted in Section III.B above, it need only develop and implement one such technology and then provide individualized auxiliary aids and services that would permit disabled patients to use or bypass that technology to gain access to Quest's goods and services.  If it gave "primary consideration" to the request of ACB **or** Vargas and rolled out a particular check-in technology to its 2,100 PSCs, how could it then give "primary consideration" to a second or third request for a different check-in technology? While "primary consideration" may have theoretical application to an individual's request to be accommodated with an auxiliary aid or service, it makes no sense to apply "primary consideration" to Quest's decision to implement an enterprise-wide technology used by its millions of patients.  Primary consideration has no application in the context of technological systems with broad application.

Sixth, because the primary consideration obligation is only triggered by "requests" of individuals with disabilities, it has no application to the original rollout of the first version of the Kiosk.  28 C.F.R. § 35.160(b)(2); *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1137 (9th Cir. 2001), as amended on denial of reh'g (Oct. 11, 2001): ("[A] public entity must 'give primary consideration' to the accommodation **requested** by the disabled individual.") (emphasis added); *see Pierce v. City of Salem*, No. CIV. 06-1715-ST, 2008 WL 4415407, at *23 (D. Or. Sept. 19, 2008) (obligations starts "[o]nce a request for an auxiliary service was made").  There is no evidence here of any parties requesting an auxiliary aid or service in advance of Quest's rollout of the initial Kiosk or blind patient dissatisfaction with the predecessor paper sign-in process.

Finally, in developing the TFS enhancement, Quest did give "primary consideration" to the general requests of ACB and sought and received further considerations from the blind, without any obligation to do so.  (*See* Section II.D and II.E above and evidence cited there.)  ACB and Quest engaged in an extended dialogue initiated by a letter in which ACB complained generally of a Kiosk that was

19

48300399_7.docx

not independently accessible to those with visual impairments and the absence of a receptionist to assist with use of the device.  (App. 20; App. 7.)  Although ACB never identified a specific technology or methodology that it was requesting, Quest gave "primary consideration" to ACB's request for an "independently accessible" technology when it developed the TFS solution, which utilized smartphone "gestures" that were familiar to the blind.  (App. 2 ¶¶ 3, 5; App. 17 at 91:2-9, 94-3:1; App. 29; App. 21.)   But Quest heard ACB's input *and* sought out advice from three additional blind groups.  (App. 1 ¶¶ 4-6; App. 6.)  All of these efforts led to the TFS solution that Quest developed in advance of the March 2020 mediation in this matter. (App. 2 Decl. ¶ 4.)  After the mediation, Quest chose to implement the TFS, which was designed to be independently accessible to the blind, just as ACB had suggested. (*Id.* ¶ 6.)  As a result, there can be no dispute that, even if there is a "primary consideration" obligation under the Rehabilitation Act and it applies in these circumstances, Quest gave such consideration to ACB and others who are blind.

For all of these reasons, the "primary consideration" has no application in this case.

**D.    Vargas' Unruh Act And DPA Claims Fails For The Reasons His ADA Claim Fails And Because He Cannot Establish The Intentional Discrimination Necessary To Prove An Unruh Act Claim Not Based On An Incorporated ADA Claim And The DPA Imposes No Different Obligations Than Title III.**

Disabled plaintiffs suing under the Unruh Act can bring a claim directly under Unruh's anti-discrimination provision (Cal. Civ. Code § 51(b)) or under the Act's incorporation of violations of the ADA.  Cal. Civ. Code §§ 51(f), 54.2(c).  Plaintiffs here have done both.   (First Amended Complaint (ECF No. 41) ¶¶ 71-78.)  The Section 51(f) prong of their Unruh Act claim fails for the same reasons the ADA claim fails.  *See* Section III.B-C above.  The Section 51(a) prong of their Unruh Act claim fails because they cannot establish the requisite intentional discrimination.

20

*Munson v. Del Taco, Inc.*, 46 Cal. 4th, 661, 672 (2009) (disability discrimination plaintiff must "plead and prove intentional discrimination in public accommodations in violation of the terms of the Act."), *citing favorably Lentini v. Calif. Center for the Arts*, 370 F.3d 837, 846-847 (9th Cir. 2004) (same).  Neutral policies or practices, applied generally to all patrons, cannot be intentionally discriminatory under the Unruh Act, even if they can be shown to have a discriminatory disparate impact on a protected class.  *Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224, 1237-1239 (2007) (no Unruh Act discrimination for policy that "applied equally to sighted and blind subscribers") (cited favorably in *Greater Los Angeles Agency on Deafness et al. v. Cable News Network, Inc.*, 742 F.3d 414, 425-426 (9th Cir. 2014)).

Plaintiffs here can establish no discriminatory intent by Quest where it developed a Kiosk (and then the TFS solution) to be used generally by all of its patients.  More significantly, the initial Kiosk was merely an electronic version of the paper and pen sign-in sheet that, coupled with phlebotomist assistance, had worked successfully for Quest for decades.  (App. 3 ⁋ 5.)  Plaintiffs have not identified a single complaint from a blind patient about the paper sign-in process.  Moreover, in developing the TFS solution, a further, independent means of checking in, it engaged in feedback with ACB and affirmatively solicited feedback from three other groups of blind consumers and their advocates.  (App. 1 ⁋ 4.)  Whatever complaint Plaintiffs may claim to have with the TFS solution, they cannot establish the intentional discrimination necessary to prevail on the Section 51(b) prong of the Unruh Act. Vargas can cite to no authority indicating the DPA imposes any obligation other than that required by the ADA; the DPA's incorporation of ADA regulations (such as the "effective communication" obligation under Section 303(c)) suggests the contrary. Civ. Code § 54.2(b).

### E.   Plaintiffs Vargas and ACB Lack Standing To Pursue Their Claims

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

21

(1992).  Moreover, the party asserting federal jurisdiction bears the burden of demonstrating standing.  *Krottner v. Starbucks Corp*., 628 F.3d 1139, 1141 (9th Cir. 2010); *Chapman v. Pier I Imports (U.S.), Inc*., 631 F.3d 939, 946 (9th Cir. 2001).

To satisfy the Article III standing requirement, a plaintiff must adequately allege that "(1) [he] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).  An injury is "concrete" if it is "*de facto*"; that is, it must actually exist, and cannot be "abstract."  *Id.*  "A harm is 'particularized' if it "affect[s] the plaintiff in a personal and individual way."  *Lujan* 504 U.S. at 560 n.1. "It is a plaintiff's obligation to 'clearly allege *facts* demonstrating' he has an injury-in-fact that is 'concrete and particularized.'"  *Thurston v. FCA US LLC*, Case No. 5:17-cv-02183-JFW-SP, 2018 WL 700939, at *3 (C.D. Cal. Jan. 26, 2018) (emphasis added) (citing *Spokeo v. Robins*, 136 S. Ct. 136 S. Ct. 1540, 1547 (2016).

### 1.  Occasional, Speculative and Marginal Additional Wait Time Does Not Constitute "Concrete and Particularized" Injury.

Plaintiffs claim speculatively that their inability to check in independently has caused others to surpass them in line and caused them to wait longer than other patients.  Neither Vargas nor any ACB member claims a denial of Quest's diagnostic testing services. Multiple courts faced with the present issue have already decided that a delay in an accommodation does not constitute a denial of access.  *O'Connor v. Scottsdale Healthcare Corp.*, 871 F. Supp. 2d 900, 903 (D. Ariz. 2012); *Frankeberger v. Starwood Hotels & Resorts Worldwide, Inc.*, No. C09–1827RSL 2010 WL 2217871, at *4 (W.D. Wash. June 1, 2010); *Skaff v. Meridien North America Beverly Hills, LLC*, 506 F.3d 832, 839-841 (2007).

The decision in *Anderson v. Ross Stores, Inc.*, No. C99-4056 CRB, 2000 WL

22

158529 (N.D. Cal. October 20, 2000) is particularly instructive.  In granting summary judgment for the defendant, the trial court held that "no reasonable jury could find that [the plaintiff] was denied access to the [defendant's] facility or that the defendant denied her request for an accommodation as a result of the forty-five to sixty minute delay…."  *Id*. at *10; see also *O'Connor,* 871 F. Supp. 2d at 904; *Frankeberger,* 2010 WL 2217871, at *4 ("…a wait of less than sixteen minutes for assistance was neither unreasonable nor reflective of discrimination."); *Skaff,* 506 F.3d at 836 (one hour delay in providing accessible room with roll-in shower did not violate ADA).  While some putative class members admit to being helped immediately, Vargas and some ACB members claim waits ranging from one to 90 minutes (most on the short end of this range) before they were assisted.  (App. 5 ¶¶ 12-13; App. 26-27.)  None of these patients claims denial of services.  (*Id.*)  As noted in the case law above, such isolated instances of waiting do not constitute a concrete and particularized injury sufficient to establish ADA standing.

## 2. <u>Plaintiffs Cannot Identify Any Imminent, Future Injury They Will Suffer Without An Injunction.</u>

"To establish standing to pursue injunctive relief, a plaintiff must demonstrate a 'real or immediate threat that [he] will be wronged again—a "likelihood of substantial and immediate irreparable injury."'"  *Molski v. Kahn Winery*, 405 F. Supp. 2d 1160, 1163 (C.D. Cal. 2005) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)); *Thurston*, 2018 WL 700939, at *3-4 ("[E]ven if this Court concluded that Plaintiff adequately alleged an injury-in-fact, dismissal of the ADA claim would still be *required* because the Complaint fails to allege any irreparable injury.").  "[T]he threat must be actual and imminent, not conjectural or hypothetical."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  "A 'mere physical or theoretical possibility' that the challenged conduct will again injure the plaintiff is insufficient to establish a present case or controversy.'"  *Molski*, 405 F. Supp. 2d at 1163 (quoting *Coverdell v. Dep't of Soc. & Health Servs.*, 834 F.2d 758,

48300399_7.docx

766 (9th Cir.1987).  "In evaluating whether an ADA plaintiff has established a likelihood of future injury, courts have been guided by: (1) the proximity of the place of public accommodation to plaintiff's residence, (2) plaintiff's past patronage of defendant's business, (3) the definitiveness of plaintiff's plans to return, and (4) plaintiff's frequency of travel near defendant." *Id.*

Here, the sheer variety of experiences claimed by the testifying deponents demonstrate that their claim of unequal treatment at future visits is purely conjectural or hypothetical. (App. 5 ¶¶ 12-13; App. 26; App. 27.) More significantly, the TFS solution that has been fully in place since March 2021 permits immediate, independent check-in.  (App. 4 ¶ 15.)  Even if Vargas or a putative class member needs to wait to hear the Quest TV message before understanding how to use the TFS, that short wait is not adequate injury to establish standing. (S*ee* Section III.E.1 above.)  Once a blind patient uses the TFS, she will be able to check in independently on the next visit without needing to hear the Quest TV message.

### 3.   TFS Renders Moot Plaintiffs' Claims

Federal courts are courts of limited jurisdiction and can adjudicate only those "cases or controversies" authorized by the Constitution and Congress.  *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994).  A claim is moot if it has lost its character as a present, live controversy.  *Connolly v. Pension Benefit Guaranty Corp.*, 673 F.2d 1110, 1113 (9th Cir. 1982); *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).  A defendant can establish mootness by showing that "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968).  Federal courts cannot take jurisdiction over a claim as to which no effective relief can be granted.  *Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed."); *Oregon Environmental Council v. Kunzman*, 714 F.2d 901, 903 (9th Cir.1983); *see*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

1  Fed. Rule Civ. Proc. 12(h)(3) ("If the court determines at any time that it lacks

2  subject-matter jurisdiction, the court must dismiss the action.").

3         Because Plaintiffs seek only injunctive relief under Title III and the

4  Rehabilitation Act, even if independently accessible check-in is required, Plaintiffs'

5  claims under these statutes are mooted by the Kiosks' TFS functionality.  *Oliver v.*

6  *Ralphs Grocery Co.,* 654 F.3d 903, 905 (9th Cir. 2011) ("a defendant's voluntary

7  removal of alleged barriers prior to trial can have the effect of mooting a plaintiff's

8  ADA claim."); *Parr v. L & L Drive-Inn Rest.*, 96 F. Supp. 2d 1065, 1087 (D. Haw.

9  2000); *Langer v. Encantado II, LLC*, No. 14CV2281-MMA JLB, 2015 WL 1499182,

10  at *3 (S.D. Cal. Apr. 1, 2015), *aff'd*, 677 F. App'x 360 (9th Cir. 2017).

11  **IV.**   **CONCLUSION**

12         For the reasons stated fully above, the Quest Defendants respectfully request

13  that the Court dismissing the action in its entirety, or, in the alternative, partial

14  summary judgment on the issues cited in the Notice of Motion.

15                                   Respectfully submitted,

16  DATED: September 3, 2021          OGLETREE, DEAKINS, NASH, SMOAK &
                                     STEWART, P.C.
17

18

19                                   By:  /s/ David Raizman
                                         David Raizman
20
                                     Attorneys for Defendants
21

22

23

24

25

26

27

28

48300399_7.docx