# EXHIBIT 16

EXHIBIT 16  PAGE 121

Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com
Alison M. Bernal (SBN 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Telephone: (805) 963-2345
Facsimile: (805) 284-9590

Benjamin J. Sweet
(pro hac vice)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

Attorneys for Plaintiffs Julian Vargas, Anne West, American Council of the Blind, and the Proposed Class

*Additional Counsel Listed on Signature Page*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIAN VARGAS, ANNE WEST and AMERICAN COUNCIL OF THE BLIND, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, inclusive,<br><br>Defendants. | CASE NO.: 2:19-cv-08108-DMG<br><br>**PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S RESPONSES TO QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC.'S REQUESTS FOR ADMISSION, SET ONE** |

Plaintiff American Council of the Blind submits the following response to Requests for Admission from QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC.

## PRELIMINARY STATEMENT

Each of the following responses is rendered and based upon information in the possession of Plaintiff American Council of the Blind at the time of the preparation of these responses. Discovery will continue as long as permitted by

NYE, STIRLING, HALE & MILLER, 33 WEST MISSION STREET, SUITE 201, SANTA BARBARA, CALIFORNIA 93101

1

1  statute or stipulation of the parties, and the investigation of Plaintiff's attorneys and

2  agents will continue to and throughout the trial of this action. Plaintiff, therefore,

3  specifically reserves the right, at the time of trial, to introduce any evidence from

4  any source which may hereinafter be discovered and testimony from any witness

5  whose identity may hereinafter be discovered. If any information has unintentionally

6  been omitted from these responses, Plaintiff reserves the right to apply for relief so

7  as to permit the insertion of the omitted data from these responses.

8        These introductory comments shall apply to each and every response given

9  herein, and shall be incorporated by reference as though fully set forth in all of the

10 responses appearing in the following pages.

## OBJECTIONS TO DEFINITIONS

12 **1.** Plaintiff objects to definition I, "Quest Proposal," to the extent that it

13 incorporates the undefined term "check in."

14 **2.** Plaintiff objects to the definition "Paper Check-in" to the extent that indicates

15 that the only process by which patients at Quest patient service centers checked in to

16 receive services before deployment and activation of the Kiosks consisted of

17 patients using a pen, pencil or other writing implement to write their name on a sign

18 in sheet.  That was not the only process by which patients at Quest patient service

19 centers checked in to receive services before deployment and activation of the

20 Kiosks, and to indicate that it was is inaccurate and misleading.  ACB interprets

21 "Paper Check-in" to refer to all processes by which patients at Quest patient service

22 centers checked in to receive services before deployment and activation of the

23 Kiosks.

## RESPONSES TO REQUESTS FOR ADMISSION

## REQUEST FOR ADMISSION NO. 1:

26      Admit that Paper Check-in was not independently accessible to some

27 individuals who were legally blind.

28 //

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

2

EXHIBIT 16 PAGE 123

PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S RESPONSES TO QUEST DIAGNOSTICS
CLINICAL LABORATORIES, INC.'S REQUESTS FOR ADMISSION, SET ONE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

ACB is unaware of legally blind patients for whom the Paper Check-in System was inaccessible and therefore cannot admit or deny this request.

**REQUEST FOR ADMISSION NO. 2:**

Admit that some legally blind individuals were unable to check in to QUEST PSCs using Paper Check-in without assistance.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

ACB is unaware of legally blind patients for whom the Paper Check-in System was inaccessible and therefore cannot admit or deny this request.

**REQUEST FOR ADMISSION NO. 3:**

Admit that Plaintiffs refused to discuss monetary relief at the Mediation until the parties had first agreed in principle on injunctive relief.

**REQUEST FOR ADMISSION NO. 4:**

Admit that the parties discussed monetary relief at the Mediation.

**REQUEST FOR ADMISSION NO. 5:**

Admit that Quest made the Quest Proposal at the Mediation.

**REQUEST FOR ADMISSION NO. 6:**

Admit that ACB considered the Quest Proposal.

**REQUEST FOR ADMISSION NO. 7:**

Admit that ACB found the Quest Proposal to be an acceptable resolution in principle of the injunctive relief portion of the action, provided the parties could reach agreement on the monetary relief claims in the action.

**REQUEST FOR ADMISSION NO. 8:**

Admit that ACB agreed that it could be communicated to Quest that the Quest Proposal was acceptable in principle to ACB, provided the parties could reach agreement on the monetary relief claims in the action.

**REQUEST FOR ADMISSION NO. 9:**

Admit that ACB at the mediation asked whether, assuming that the parties

3

EXHIBIT 16  PAGE 124

1   could reach agreement on monetary relief, ACB could issue a public

2   communication to its membership publicizing that Quest had implemented the

3   Quest Proposal, which would address the needs of its members.

4   **RESPONSE TO REQUEST FOR ADMISSION NOs. 3-9**

5         ACB objects to Requests for Admission numbers three through nine as they

6   all, whether broadly or narrowly construed, seek disclosures protected by federal

7   and state mediation protections and/or privileges, attorney-client privilege, and the

8   attorney work product doctrine. ACB also objects to Requests for Admission

9   numbers three through nine because in each request Quest seeks admissions

10   regarding the "mediation that occurred in this action on March 12, 2020 in Los

11   Angeles, California," in direct violation of the Mediation Agreement—signed by the

12   parties—in which both Plaintiff and Defendant expressly agreed that the referenced

13   mediation proceedings would be confidential and not subject to discovery.  Requests

14   for Admission numbers three through nine are the subject of a pending motion for

15   protective order.  Thus, ACB will not answer Quest's requests for admission

16   numbers three through nine.

17   **REQUEST FOR ADMISSION NO. 10**

18         Admit that some individuals who are legally blind are not able to use voice

19   over technology coupled with a tactile keyboard or speech recognition to utilize a

20   touchscreen device.

21   **RESPONSE TO REQUEST FOR ADMISSION NO. 10**

22   ACB is unable to either admit or deny this request for admission. ACB is

23   unaware of anyone whose legal blindness causes them to be unable to use voice

24   over technology coupled with a tactile keyboard or speech recognition to utilize a

25   touchscreen device.

26   //

27   //

28   //

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

4

**EXHIBIT 16  PAGE 125**

PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S RESPONSES TO QUEST DIAGNOSTICS
CLINICAL LABORATORIES, INC.'S REQUESTS FOR ADMISSION, SET ONE

Dated: August 12, 2021

NYE, STIRLING, HALE & MILLER, LLP

*/s/ Jonathan D. Miller*

Jonathan D. Miller
jonathan@nshmlaw.com
Alison M. Bernal
alison@nshmlaw.com
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Telephone: (805) 963-2345

Benjamin J. Sweet
(Admitted *Pro Hac Vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

Matthew K. Handley
(Admitted *Pro Hac Vice*)
mhandley@hfajustice.com
HANDLEY FARAH &
ANDERSON PLLC
777 6th Street NW
Washington, DC 20001
Telephone: (202) 559-2411

*Attorneys for Plaintiffs*

EXHIBIT 16  PAGE 126

PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S RESPONSES TO QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC.'S REQUESTS FOR ADMISSION, SET ONE

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF SANTA BARBARA

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Santa Barbara, State of California. My business address is 33 West Mission Street, Suite 201, Santa Barbara, California 93101.

On August 12, 2021, I served true copies of the following document(s) described as following document(s):

**PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S SECOND SET OF INTERROGATORIES TO DEFENDANT QUEST DIAGNOSTICS, INCORPORATED**

on the interested parties in this action as follows:

David Raizman, Esq.
david.raizman@ogletree.com
Amber L. Roller
amber.roller@ogletree.com
J. Nicholas Marfori
nicholas.marfori@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, California 90071
Telephone: 213-239-9800

*Attorneys for Defendant*

[X]  **BY EMAIL**: I caused the above listed document(s) to be sent via electronic mail to the above listed email address from the email address chloe@nshmlaw.com and did not receive an error message after sending.

[X]  **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed above and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with my company's practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on July 16, 2021, at Santa Barbara, California.

*/s/ Chloe Lucado*
Chloe Lucado

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S RESPONSES TO QUEST DIAGNOSTICS
CLINICAL LABORATORIES, INC.'S REQUESTS FOR ADMISSION, SET ONE

EXHIBIT 16 PAGE 127

# EXHIBIT 17

EXHIBIT 17  PAGE 128

Page 1

1                UNITED STATES DISTRICT COURT

              CENTRAL DISTRICT OF CALIFORNIA

2

       -----------------------------:

3     JULIAN VARGAS, et al.,         :

                                     :

4              Plaintiffs,           :

                                     :

5          vs.                       : Case No.:

                                     : 2:19-cv-08108

6     QUEST DIAGNOSTICS CLINICAL     : DMG (MRWx)

      LABORATORIES, INC., et al.,    :

7                                    :

               Defendants.           :

8      -----------------------------:

9

10

11      REMOTE VIDEO-TAPED 30(b)(6) DEPOSITION OF

12                  CLARK RACHFAL

13

14    DATE:          June 9, 2020

15    TIME:          10:16 a.m.

16    LOCATION:      Alexandria, Virginia

17    REPORTED BY:   Shari R. Broussard, RPR, CSR

                     Reporter, Notary

18

19

20

21

22    Job No. CS4621386

Page 86

1          A    Again, much like that figure, any trends

2     that I'm aware of are anecdotal.  So I -- I know

3     at ACB we have many active Braille users, but I've

4     heard that Braille literacy, however that is

5     defined, is trending down.

6          Q    Do you understand any reasons why

7     Braille literacy is trending down?

8          A    I do not.

9          Q    Do ACB members use smartphones?

10         A    Yes.

11         Q    And do they use smartphones to assist

12    them with effective communication with the outside

13    world?

14         A    Yes.

15         Q    Is that common?

16         A    Very common.

17         Q    Okay.  Do all members of ACB use

18    smartphones?

19         A    I don't know.

20         Q    Can smartphones provide some level of

21    visual recognition that can be voiced to a user?

22         A    What do you mean by "visual recognition

Page 88

1    short texts.  Sometimes it picks up the text

2    pretty easily, other times there is, you know,

3    more of a delay or an incomplete reading of text.

4         Q    Are you familiar with the use on,

5    let's -- let's take smartphones, of distinct

6    gestures on the touchscreen of a smartphone to

7    signal or request a certain function on that

8    phone?

9         A    So yes, I'm aware of using a -- a

10   gesture with accessibility settings to access a

11   smartphone.

12        Q    Okay.  And those gestures include

13   swipes?

14        A    Yes.

15        Q    And taps?

16        A    Yes.

17        Q    And swipes and taps with different

18   numbers of fingers, correct?

19        A    For different gestures, yes.

20        Q    And swipes in different directions?

21        A    Yes.

22        Q    In your experience are your members --

EXHIBIT 17 PAGE 131

Page 89

1      ACB members adept at using those distinct gestures

2      with use of their smartphone?

3           A    Those who use smartphones are very adept

4      at those gestures.

5           Q    Would you say the vast majority of ACB

6      members use smartphones?

7           A    I -- I couldn't give you a -- an

8      estimate.  I -- I would say that in my experience

9      many of our members competently use smartphones.

10          Q    More than 50 percent?

11          A    I -- I don't know.  Those that use

12     smartphones like their smartphones, those that

13     don't use smartphones like the device that they

14     have chosen to use.

15          Q    Do any of your members prefer to use

16     their own smartphones for their effective

17     communication needs over the devices of third

18     parties like businesses?

19          A    Will you repeat that question, please.

20               MR. RAIZMAN:  Shari, please.

21               THE REPORTER:  Yes.

22               (The reporter read the record

Page 91

1    BY MR. RAIZMAN:

2         Q    Yeah.  Are you familiar with the fact

3    that Quest has provided a method of checking in at

4    patient service centers by swiping in any

5    direction with three fingers on -- on the

6    touchscreen?

7         A    I'm aware of Quest's proposal for a

8    three-finger swipe.  I disagree that it completes

9    the check-in service for a customer.

10        Q    And I'm just asking whether you're

11   familiar with -- with the fact that -- that the

12   three-finger swipe can be made in order to

13   register that person as having arrived at Quest.

14        A    And I -- I'm aware of the proposal for

15   the three-finger swipe.  To my knowledge it does

16   not register the individual.  It does not provide

17   any personal information into the system for that

18   individual.

19        Q    Okay.  Do you know what personal

20   information is put into the system at the Quest

21   kiosk?

22        A    The specific information, no, but from

Page 94

1    BY MR. RAIZMAN:

2         Q    Let's go back to the three-finger swipe.

3              Do you agree that a three-finger swipe

4    in any direction is a gesture that ACB members who

5    are adept at using smartphones could easily

6    master?

7         A    So yes, I believe that our members could

8    physically perform a three-finger swipe as long as

9    it is effectively communicated to them.  I'd say

10   that that's a -- a common gesture for iOS, you

11   know, Apple operating system devices.

12        Q    Going back to what's been marked as

13   Exhibit 60, there was a question asked about ACB's

14   litigation involving touchscreen devices.  It's

15   number 16.

16             Do you recall that question and your

17   response to that question?  It appears on pages 27

18   and 28 of Exhibit 60.

19        A    Yes.

20        Q    Okay.  And do you recall that you

21   answered as to only two other touchscreen-related

22   litigation matters other than the instant lawsuit

EXHIBIT 17 PAGE 134

Page 115

1    your lawyers did as well, so I actually am asking

2    about what Ms. Rehder said to ACB in the first

3    instance about her difficulties at Quest.

4        A    So I did not speak with Ms. Rehder

5    directly.  I believe that was a phone conversation

6    between her and Claire Stanley.  So my

7    understanding of that phone call was that Robin

8    Rehder shared that she was unable to independently

9    avail herself of the check-in service due to the

10   inaccessible kiosk at Quest.

11       Q    Did you ever -- did ACB ever receive any

12   other complaints about access to Quest services

13   before November 2018 and Ms. Rehder's call to

14   Claire Stanley?

15       A    I don't know.

16       Q    Can a blind person -- a person who's

17   totally blind independently use a paper sign-in

18   sheet?

19       A    No.

20       Q    Did you ever receive any complaints

21   about Quest's use of paper sign-in sheets?

22       A    No, because Quest offered an auxiliary

Page 116

1     service to be able to complete those sign-in

2     sheets.

3          Q     And what was that?

4          A     Having a receptionist available upon

5     entry of the facility.

6          Q     And when did Quest in your knowledge

7     cease offering receptionists to be available?

8          A     I don't know the specific date or if

9     it's the -- the same time frame, you know,

10    nationwide, but we began to hear about it from our

11    members and their experiences in November of 2018.

12         Q     So your information is that Quest made a

13    change to cease providing receptionists in its

14    waiting areas?

15         A     That's my understanding, yes.

16         Q     But that providing receptionists was an

17    adequate auxiliary aid and service?

18         A     It was adequate because it was timely

19    and provided prompt service to the individual.

20         Q     So someone might have to wait for the

21    receptionist to help them sign in if they were

22    blind, correct?

Page 188

1        Q    I'm -- I'm going to ask you to be more
2     specific and just give me the specific language
3     that you're referencing where ACB requests screen
4     readers or fonts -- or font size increases.
5        A    Would you like me to open the letter
6     again?
7        Q    Yes, if you wouldn't mind.
8        A    Okay.  And what -- what number was that?
9     I know it's Exhibit 65, but the number for the
10    attachment.
11             MR. HANDLEY:  The Bates number?
12             MR. RAIZMAN:  405 and 406.
13             THE WITNESS:  Thank you.
14             So in the third sentence of the first
15    paragraph where we identify that Quest is using a
16    registration or check-in service via an
17    inaccessible kiosk and we share that the tablet
18    does not provide the option to turn on a screen
19    reader or screen magnification.  So that is the
20    specific reference that I am referring to.
21    BY MR. RAIZMAN:
22        Q    So you understand the sentence -- part

EXHIBIT 17 PAGE 137

Page 189

1      of the sentence that reads "The tablet does not

2      include the option to turn on a screen reader or

3      to increase the font size" as a request for each

4      of those functionalities to be added?

5          A    I -- I read that as we are sharing

6      specific ways that Quest can make their kiosk

7      accessible.

8          Q    Okay.  But not requesting any particular

9      one?

10         A    We're -- we're not dictating to Quest

11     how -- you know, what vendor specific technology

12     they use.  We're just pointing out that these

13     are -- these two -- these are two examples of

14     specific commonly found tools and resources, you

15     know, types of technology that can be used to make

16     a kiosk or a touchscreen user interface

17     accessible.

18         Q    You're actually saying that the tablet

19     does not have these features; is that -- is that

20     correct?  Technically isn't that what it says?

21         A    The tablet as designed by -- and

22     implemented by Quest does not have those features

EXHIBIT 17 PAGE 138

Page 190

1      available to the consumer, but iOS -- Apple

2      operating system in an iOS platform has those

3      services built in.

4           Q    Well, when the letter goes on to point

5      out that the front desk was not manned by a

6      receptionist, was that also a request by ACB for

7      staffing of a receptionist?

8           A    I read that as acknowledgment of no

9      other auxiliary aid or service, leaving only the

10     inaccessible kiosk for the -- the check-in

11     service.

12          Q    Is that your reading or is that an

13     advocate's position?

14          A    That is my understanding of what we are

15     trying to communicate with this letter.

16          Q    Right, but someone reading the letter

17     might understand that -- so, for example, someone

18     at Quest reading the letter might understand that

19     ACB was pointing out three different things that

20     ACB believed was missing, the screen reader,

21     failure to have the ability to increase font size

22     and the lack of a receptionist; isn't that a fair

Page 191

1    reading of the letter?

2        A    I -- I think those are all items that we

3    were bringing to Quest's attention that propose-

4    -- that posed barriers to our members' accessibly

5    in having equal access to Quest service, including

6    their check-in and registration service.

7        Q    Is there anything in the letter -- so

8    should the letter be read as a request for all

9    three of those to be provided:  Screen reader,

10   increase of font size and a receptionist?

11       A    My interpretation of the letter is that

12   we were bringing accessibility barriers to Quest's

13   attention and that we were seeking a dialogue to

14   be able to address the barriers raised by our

15   members.

16            We never received a written response to

17   this letter and our concerns from Quest, so I'm

18   not exactly sure how they interpreted it.

19       Q    Okay.

20            MR. HANDLEY:  David, I sent the --

21   Clark, the -- the very last e-mail in your inbox

22   should be the one that has the documents that

Page 192

1    David was about to refer to that has the title 577

2    in it.

3              THE WITNESS:  Okay.

4              MR. RAIZMAN:  Okay.  I'm still asking

5    about the letter though.

6              MR. HANDLEY:  Okay.

7    BY MR. RAIZMAN:

8        Q    But -- but the letter itself does not

9    specifically request any specific auxiliary aid,

10   service or mode of effective communication; isn't

11   that right?

12       A    The -- the letter specifically

13   references the inaccessible kiosk that could be

14   made accessible by having available a screen

15   reader and screen magnification, which are

16   commonly found accessibility solutions especially

17   in iOS Apple operating system software and

18   tablets.

19       Q    If Quest were to have responded to this

20   letter by merely increasing the font size, would

21   that have been an adequate response from ACB's

22   perspective?

EXHIBIT 17 PAGE 141

Page 193

1      A    I don't want to speculate because Quest

2   did not respond in that manner.  We would be

3   seeking full and equal access for our members.

4      Q    So -- I ask again.  So was the request

5   here for all of the things that Mr. Bridges'

6   letter point out were missing or just some of them

7   or any of them?

8      A    The request is for broad, effective

9   communication and equal access and we were

10  highlighting to Quest that, with their

11  inaccessible kiosk, things that they could

12  specifically do are having a screen reader and

13  screen magnification.

14     Q    And another thing they could

15  specifically do would be to have a receptionist,

16  correct?

17     A    I'm scrolling down to that section.

18     Q    I'll read it for you.

19     A    Please do.

20     Q    Just like it says that the tablet does

21  not include, it says, "The front desk was not

22  manned by a receptionist.  As a result, the only

Page 194

1    way to check in is via the inaccessible tablet."

2        A    Yes.  So, again, I -- I hear that and

3    read that as the tablet is -- or the kiosk is

4    inaccessible, it can be made accessible, and

5    without -- without someone there to provide, you

6    know, prompt, immediate equal access, there are no

7    other options for people who are blind or visually

8    impaired.

9        Q    Are the pages -- do you have -- do you

10   have Exhibit 67 open to you yet and pages 577 and

11   578?

12       A    I -- I do not have it open.  I will open

13   it now.

14       Q    Okay.

15       A    Attachment 577, correct?

16       Q    Correct, yes, and 578.

17            MR. HANDLEY:  Yeah, I -- what I'm

18   thinking, David, is I combined the entire chain

19   that you were referencing into one doc, so he now

20   has it as one document.

21            MR. RAIZMAN:  Gotcha.

22   BY MR. RAIZMAN:

EXHIBIT 17 PAGE 143

Page 279

1                    CERTIFICATE OF NOTARY PUBLIC

2            I, SHARI R. BROUSSARD, the officer before

3      whom the foregoing deposition was taken, do hereby

4      certify that the witness whose testimony appears

5      in the foregoing deposition was duly sworn by me;

6      that the testimony of said witness was taken by me

7      in stenotype and thereafter reduced to typewriting

8      under my direction; that said deposition is a true

9      record of the testimony given by said witness;

10     that I am neither counsel for, related to, nor

11     employed by any of the parties to the action in

12     which this deposition was taken; and, further,

13     that I am not a relative or employee of any

14     counsel or attorney employed by the parties

15     hereto, nor financially or otherwise interested in

16     the outcome of this action.

17

18                      *Shari R. Broussard*

19                   SHARI R. BROUSSARD

                     Notary Public in and for the

20                   District of Columbia

21

       My commission expires:

22     August 14, 2025

# EXHIBIT 18

EXHIBIT 18  PAGE 145

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3   JULIAN VARGAS, ANNE WEST, and        )

 4   AMERICAN COUNCIL OF THE BLIND,       ) Case No.

 5   individually on behalf of           ) 2:19-cv-8108

 6   themselves and all others similarly  )

 7   situated,                            )

 8                   Plaintiffs,          )

 9   vs.                                  )

10   QUEST DIAGNOSTICS, CLINICAL          )

11   LABORATORIES, INC., QUEST            )

12   DIAGNOSTICS HOLDINGS, INC., QUEST    )

13   DIAGNOSTICS INCORPORATED; and DOES   )

14   1-10, inclusive,                     )

15                   Defendants.          )

16

17

18          30 (B)(1) DEPOSITION OF TAYLOR CARR

19                   April 12, 2021

20

21

22   REPORTED REMOTELY BY:

23   AMBER S. WILLIAMS, C.S.R. No. 1080

24   Notary public

25
```

                                              Page 1

EXHIBIT 18  PAGE 146

| | | |
|---|---|---|
| 1 | Q.   And again, specifically within your role | 12:36PM |
| 2 | of business process redesign director, what type of | 12:36PM |
| 3 | day-to-day tasks were you doing in the 2015 | 12:36PM |
| 4 | timeframe?  What type of projects were you working | 12:36PM |
| 5 | on? | 12:37PM |
| 6 | MR. RAIZMAN:  Object to form. | 12:37PM |
| 7 | THE WITNESS:  There was many, many projects. | 12:37PM |
| 8 | Primary ones were Patient Services, but others as | 12:37PM |
| 9 | well. | 12:37PM |
| 10 | Q.   (BY MR. MILLER):  Were the primary | 12:37PM |
| 11 | projects you were working on with Patient Services | 12:37PM |
| 12 | when you came on board in 2015? | 12:37PM |
| 13 | A.   It was understanding our patient | 12:37PM |
| 14 | experience and using experience design to make that | 12:37PM |
| 15 | better. | 12:37PM |
| 16 | Q.   Other than just the general overview of | 12:37PM |
| 17 | looking at patient experience, was there any specific | 12:37PM |
| 18 | projects you were being asked to work on in the 2015 | 12:37PM |
| 19 | timeframe with Patient Services? | 12:37PM |
| 20 | A.   There was specific products and services | 12:37PM |
| 21 | that sat underneath the umbrella of patient | 12:37PM |
| 22 | experience.  Do you have a specific product or | 12:37PM |
| 23 | service that you're looking to understand further? | 12:37PM |
| 24 | Q.   Yeah.  I'm trying to understand what | 12:37PM |
| 25 | products or services you were working on in 2015 | 12:37PM |

Page 29

EXHIBIT 18  PAGE 147

| | | |
|---|---|---|
| 1 | under that broader umbrella? | 12:38PM |
| 2 | A.   There was -- under "Patient Experience," | 12:38PM |
| 3 | there's three that were connected, and it was | 12:38PM |
| 4 | preregistration, appointment scheduling, and | 12:38PM |
| 5 | electronic check-in. | 12:38PM |
| 6 | Q.   Also known as e-Check? | 12:38PM |
| 7 | A.   Yeah.  Also known as e-Check-in. | 12:38PM |
| 8 | Q.   e-Check-in.  Excuse me.  e-Check-in. | 12:38PM |
| 9 | Did any part of your compensation when | 12:38PM |
| 10 | you took on the position of director involve stock | 12:38PM |
| 11 | options that the company provided to you? | 12:38PM |
| 12 | A.   No. | 12:38PM |
| 13 | Q.   Specifically with respect to Quest | 12:38PM |
| 14 | e-Check-in project, what did you understand the | 12:39PM |
| 15 | project to be when you started in 2015? | 12:39PM |
| 16 | A.   Can you ask more specific?  There's a | 12:39PM |
| 17 | lot to unpack, I guess, so... | 12:39PM |
| 18 | Q.   That's why we are here today, so we can | 12:39PM |
| 19 | take it broad and then move into the specific.  But I | 12:39PM |
| 20 | just -- when you started with Quest in 2015 in this | 12:39PM |
| 21 | position, I assume somebody described for you what | 12:39PM |
| 22 | the project was going to be with respect to | 12:39PM |
| 23 | e-Check-in.  Is that correct or incorrect? | 12:39PM |
| 24 | A.   I wouldn't say it was correct or | 12:39PM |
| 25 | incorrect.  There's a lot within what we were trying | 12:39PM |

Page 30

EXHIBIT 18  PAGE 148

```
 1    to improve from an experience perspective.          12:39PM

 2          Q.   Let's take it one at a time.  I'll come   12:39PM

 3    back to the other items.  I just want to start with  12:39PM

 4    the e-Check-in project.  What was attempting to be   12:39PM

 5    accomplished there with the e-Check-in project in    12:40PM

 6    2015?                                                12:40PM

 7          A.   The experience goal was to make it        12:40PM

 8    easier for our customers to be served by our         12:40PM

 9    phlebotomists.                                       12:40PM

10          Q.   Any other goals that were being           12:40PM

11    undertaken with respect to the e-Check-in project?   12:40PM

12          A.   No.                                       12:40PM

13          Q.   Was it considered one of the benefits of  12:40PM

14    the project that you reduce -- you, being Quest,     12:40PM

15    would reduce the amount of full-time equivalent that 12:40PM

16    would be needed to deal with growth within the       12:40PM

17    company?                                             12:40PM

18          A.   What was the word you used?  Pull -- I    12:40PM

19    don't know what that word -- pull time, is that what 12:40PM

20    you said?                                            12:40PM

21          Q.   I don't think -- I think I broke up, so   12:40PM

22    we'll try it again.  Was one of the benefits within  12:40PM

23    the e-Check-in project that there would be a -- let  12:40PM

24    me strike that and say it again.                     12:40PM

25                Was one of the benefits of the          12:41PM
```

Page 31

EXHIBIT 18  PAGE 149

| | | |
|---|---|---|
| 1 | hats that were being worn across the organization to | 12:47PM |
| 2 | support driving a great experience with our customers | 12:47PM |
| 3 | with the layer of COVID. | 12:47PM |
| 4 | Q.   So it was in response to COVID that you | 12:47PM |
| 5 | became re-involved in the e-Check-in project?  Is | 12:47PM |
| 6 | that -- am I understanding your testimony correctly? | 12:47PM |
| 7 | A.   It rose to prominence, correct. | 12:47PM |
| 8 | Q.   And are you still involved in the | 12:47PM |
| 9 | e-Check-in project as we sit here today?  Do you | 12:47PM |
| 10 | still work on that project in any capacity? | 12:47PM |
| 11 | A.   The only thing I would say is, like, the | 12:47PM |
| 12 | term e-Check-in is -- tends to be internal, so do I | 12:47PM |
| 13 | work on our means of getting customers checked in | 12:47PM |
| 14 | with ease from an experience perspective?  Yes. | 12:47PM |
| 15 | Q.   An e-Check-in project dealt with the | 12:47PM |
| 16 | check-in process at Patient Service Centers that | 12:47PM |
| 17 | Quest operates throughout the United States; is that | 12:48PM |
| 18 | true? | 12:48PM |
| 19 | A.   Say that again.  I'm sorry. | 12:48PM |
| 20 | Q.   Yes.  The e-Check-in project dealt with | 12:48PM |
| 21 | the manner and means which -- with which patients | 12:48PM |
| 22 | check in at Quest Patient Service Centers throughout | 12:48PM |
| 23 | the United States; is that accurate? | 12:48PM |
| 24 | A.   It dealt with one method by which | 12:48PM |
| 25 | customers could check in. | 12:48PM |

Page 37

EXHIBIT 18  PAGE 150

1          Q.   And how many -- and how many methods          12:48PM

2     were there to check in at Patient Services centers      12:48PM

3     prior to the E project Check-in -- or the e-Check-in     12:48PM

4     project?  How many methods could patients utilize       12:48PM

5     prior to the implementation of -- strike it.  Let me     12:48PM

6     ask it again clearly.

7               How many methods were there for               12:48PM

8     patients to check in prior to implementation of the     12:48PM

9     e-Check-in project at Quest?                            12:48PM

10         A.   I don't know.  I can think of one:            12:48PM

11    Paper.  But I'm sure there's many others.               12:48PM

12         Q.   Was the one that you're aware of prior        12:48PM

13    to 20 -- or strike that.                                12:49PM

14               Prior to the implementation of the           12:49PM

15    e-Check-in project, was it a paper sign-in that         12:49PM

16    patients used when they got --                          12:49PM

17         A.   That was the primary method.                  12:49PM

18         Q.   And how -- I'm sorry.  I apologize.           12:49PM

19    There's a delay here.  So go ahead, please finish       12:49PM

20    your answer.                                            12:49PM

21         A.   That was the primary, paper and pen.          12:49PM

22         Q.   And so am I correct that before the           12:49PM

23    e-Check-in project was implemented, the patient         12:49PM

24    walked into a Patient Service Center, the primary       12:49PM

25    method of checking in was to go to a piece of paper     12:49PM

Page 38

EXHIBIT 18  PAGE 151

```
 1    and sign in your name?                          12:49PM

 2           A.   There -- that's one method.  But --  12:49PM

 3           Q.   Were there -- were there any other   12:49PM

 4    methods that you were aware of prior to the      12:49PM

 5    e-Check-in project being implemented by Quest other 12:49PM

 6    than paper signing?                              12:50PM

 7           A.   Well, yeah.  The way you formulated that 12:50PM

 8    question, it assumes somebody is walking in.  We have 12:50PM

 9    customers that come in in very many different forms 12:50PM

10    and fashions that we serve every single day.     12:50PM

11           Q.   Well, I'm just asking whether you're  12:50PM

12    aware of any other method of checking in at Quest 12:50PM

13    Patient Service Centers prior to the implementation 12:50PM

14    of the e-Check-in project, other than the paper sign 12:50PM

15    in that you just mentioned?

16           A.   Via humans.  Phlebotomists are a key

17    element to customers being able to be checked in.

18           THE REPORTER:  Can we hold on a second?  You

19    guys are freezing up on me?

20           MR. MILLER:  No problem.

21           THE REPORTER:  Can we go off the record for a

22    moment because my internet connection is unstable.

23           MR. MILLER:  Absolutely.                  12:50PM

24           THE VIDEOGRAPHER:  Going off the record at  12:50PM

25    12:50.                                           12:50PM
```

Page 39

EXHIBIT 18  PAGE 152

```
 1                    REPORTER'S CERTIFICATE

 2          I, Amber S. Williams, CSR NO. 1080,

 3   Certified Shorthand Reporter, certify:

 4          That the foregoing proceedings were taken

 5   before me at the time and place therein set forth, at

 6   which time the witness was put under oath by me.

 7          That the testimony and all objections made

 8   were recorded stenographically by me and transcribed

 9   by me or under my direction.

10          That the foregoing is a true and correct

11   record of all testimony given, to the best of my

12   ability.

13          I further certify that I am not a relative

14   or employee of any attorney or party, nor am I

15   financially interested in the action.

16          IN WITNESS WHEREOF, I set my hand and seal

17   this 21st day of April, 2021.

18

19

20

21          AMBER S. WILLIAMS, CSR NO. 1080

22          Notary Public

23          Post Office Box 2636

24          Boise, Idaho  83701-2636

25   My commission expires June 1, 2021


                                        Page 327
```

EXHIBIT 18  PAGE 153

# EXHIBIT 19

EXHIBIT 19  PAGE 154

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4    JULIAN VARGAS, ANNE      )
      WEST, and AMERICAN       )
 5    COUNCIL OF THE BLIND,  ) Case No. 2:19-cv-8108
      individually on behalf )
 6    of themselves and all   )
      others similarly         )
 7    situated,               )
                              )
 8              Plaintiffs, )
                              )
 9        vs.                 )
                              )
10    QUEST DIAGNOSTICS        )
      CLINICAL LABORATORIES, )
11    INC., QUEST DIAGNOSTICS)
      HOLDINGS, INC.,          )
12    QUEST DIAGNOSTICS        )
      INCORPORATED, and        )
13    DOES 1-10, inclusive,   )
                              )
14              Defendants. )
      _____)
15
16
17         REMOTE DEPOSITION OF CLAIRE STANLEY
18            (Via Zoom Videoconference)
19             Thursday, August 19, 2021
20
21    REPORTED BY:  Michelle Milan Fulmer
                    CSR No. 6942, RPR, CRR, CRC
22
23    JOB NO. 4769235
      PAGE 85 THROUGH PAGE 88 IS MARKED "CONFIDENTIAL"
24    UNDER THE PROTECTIVE ORDER AND SEPARATELY BOUND
25    PAGES 1 - 225
```

                                          Page 1

EXHIBIT 19  PAGE 155

1          Is that a declaration that you executed

2     recently, in the last two months?

3        A    Yes.

4        Q    Okay.  We'll be looking at that later.  I

5     just want to try to identify generally first.        12:21:34

6          You talked about notes taken about survey

7     responses.

8          Which survey were you referring to?

9        A    I should change my wording.

10         It wasn't notes.  It was the actual content   12:21:49

11    of emails.

12       Q    Oh, okay.  So you looked at emails in

13    response to a survey that ACB put out?

14       A    Correct.

15       Q    Okay.  And just so we're clear, is that the   12:22:05

16    June 2020 survey that went out?

17       A    Yes.

18       Q    Okay.  So, for example, did you look at any

19    notes or emails or any other documents relating to

20    other outreach efforts you made to understand the    12:22:25

21    experiences of blind people with -- with Quest?

22       A    Can you rephrase that question?

23       Q    I'm going to withdraw the question.  We'll

24    move on.

25         I want to go through a few what we lawyers      12:22:47

                                                    Page 17

EXHIBIT 19  PAGE 156

1    I'm asking about any person who is a member of the

2    blind community.

3           You're not suggesting to me, by the way,

4    that everyone in the blind community feels exactly

5    the same on this topic, are you?                    14:28:51

6        A    No community is identical in everything,

7    but I'm saying you see very big trends.

8        Q    Okay.  What trends are you seeing?  What

9    numbers can you -- have you seen with respect to the

10   embrace of technology?                              14:29:07

11       A    I really don't know a number.  I'd have to

12   literally go in and poll the community.

13       Q    Have you seen surveys of this kind that

14   have reported on this issue anywhere?

15       A    No, I have not.                             14:29:21

16       Q    So you're just basing this on your own

17   personal knowledge?

18       A    And being a member of the American Council

19   of the Blind and a staff member at one time of the

20   American Council of the Blind, yes.                 14:29:32

21       Q    And I'm not talking about the mission of

22   the American Council of the Blind.

23           I'm talking about the opinions expressed by

24   members or other members of the blind community.

25       A    Yes.                                        14:29:45

                                                        Page 97

EXHIBIT 19  PAGE 157

1     Q    Okay.  And no member of ACB or no member of

2     the blind community in any of your travels in this

3     lifetime have ever expressed to you that they would

4     prefer to use personal assistance in interacting

5     with a business than to use technology to interact     14:30:01

6     with a business?

7     A    Every member I know wants equal access to

8     whatever the services are.  So however they look or,

9     you know, however they process.

10    Q    So whether that's true or not, I'm actually     14:30:20

11    asking you about whether anyone has expressed to

12    you, like said the words or words to the effect that

13    they would prefer personal assistance to using

14    digital technology.

15    A    I cannot definitively say on X date     14:30:41

16    John Smith told me that's what their preference is.

17    No.  I can't give you a specific instance.

18    Q    Well, I'm not asking for a specific

19    instance.

20         I'm first asking whether you recall anyone     14:30:52

21    ever expressing that sentiment to you.

22    A    I don't think so, no.

23    Q    Okay.  Have you ever looked into what

24    percentage of ACB membership uses smartphones?

25    A    No.  I don't have a number.     14:31:17

Page 98

EXHIBIT 19  PAGE 158

```
 1        Q     Do you have information at all that some
 2    members of the blind community don't have
 3    smartphones?
 4        A     Yes.  There is definitely some who don't.
 5        Q     And why is that?                    14:31:28
 6        A     One large reason -- well, there's a couple
 7    reasons, but one large reason is for financial
 8    reasons.
 9        Q     Okay.  Any other reasons?
10        A     That the elderly population isn't used to   14:31:39
11    them.
12        Q     And when you refer to the elderly
13    population, who are you referring to?
14        A     I don't have an age that it starts at.
15    But, you know, some of us grew up with smart        14:31:52
16    devices, whereas others it came into vogue later in
17    life.  So they might not be as, you know, used to
18    using them.
19        Q     So anyone who was -- who did not grow up
20    with smart devices would fit into the elderly       14:32:10
21    population in your prior testimony?
22        A     Or just were at an older age where things
23    aren't as -- don't come as easily, I guess.
24        Q     Okay.  And is that a trend that you've
25    noticed in the general community, that is, the      14:32:29
```

Page 99

EXHIBIT 19  PAGE 159

```
 1    non-blind community, that some segment of the

 2    elderly people who did not grow up with technology

 3    prefer personal assistance to technology?

 4        A    I wouldn't say it's a blanket statement.  I

 5    have plenty of people in my life I know who, you      14:32:49

 6    know, could be my grandparents who love their

 7    smartphones.  So, it's not a blanket statement.

 8        Q    All right.  But you've come across elderly

 9    non-blind who would prefer personal assistance to

10    using digital technology to interact with the        14:33:03

11    business world?

12        A    Again, I couldn't make a blanket statement

13    for any particular population of people.

14        Q    But you've heard the sentiment expressed

15    among the non-blind elderly; correct?                 14:33:18

16        A    Not even that they necessarily want someone

17    to do it for them.  They just want it to be easier.

18    And so easier could mean a whole spectrum of

19    different things.

20        Q    Okay.  You, yourself, use a smartphone; is   14:33:32

21    that right?

22        A    Yes, I do.

23        Q    Do you use any single or series of gestures

24    to communicate func- -- to activate functions on

25    that smartphone?                                      14:33:47
```

Page 100

EXHIBIT 19  PAGE 160

```
 1    and swiping motions to activate functionality?

 2         A    I've never used one.  So I don't know.

 3         Q    Okay.

 4         A    But I believe so.

 5         Q    Okay.  So let's stick with your use.      14:35:06

 6         A    Uh-huh.

 7         Q    How many different gestures do you

 8    personally use on your smartphone to activate

 9    different functionalities on the phone?

10         A    Maybe three or four routine ones.          14:35:19

11         Q    Okay.  Which ones?

12         A    Do you want me to literally walk you

13    through what I do?

14         Q    Tell me what gesture you use and what you

15    use it for in however it's easiest to do that.     14:35:33

16         A    If you take two fingers and you swipe down

17    vertically, it will read everything on the page.  If

18    you take one finger and you swipe left to right

19    horizontally, you can go line -- line to line.  If

20    you do two fingers and you kind of move them in a     14:35:53

21    circular position, you can go through different

22    options.

23         Yeah.  I'd say those are the three big ones

24    I use.  I'm sure there are others, but I am not a

25    tech savvy person.                                   14:36:08

                                              Page 102
```

EXHIBIT 19  PAGE 161

1    with Claire Stanley at cstanley@acb.org."

2         So having just read to you that entry from

3    the December 14th, 2018, Dots and Dashes, do you

4    recall seeking input through Dots and Dashes?

5         A    Yes.                                    15:18:38

6         Q    Okay.  And, you know, I know I'm not

7    letting you review it, but what I just read to you,

8    is that language that you played some role in

9    writing to include in Dots and Dashes?

10        A    Yes.                                    15:18:53

11        Q    Okay.  And there was a separate email to

12   the leadership list serve seeking responses; is that

13   right?

14        A    To my recollection.

15        Q    Okay.  And this Dots and Dashes, what was  15:19:07

16   the purpose of sending it out to Dots and Dashes as

17   opposed to or in addition to the leadership list

18   serve?

19        A    Just acted as a different venue to get the

20   information out there.                            15:19:27

21        Q    Okay.  And to whom does Dots and Dashes go

22   to?

23        A    I actually do not know who is subscribed to

24   the list.

25        Q    Okay.  This description in the document I'm  15:19:38

Page 127

EXHIBIT 19  PAGE 162

```
 1    reading, and I'm reading from PL 574, a document

 2    produced by ACB, "Dots and Dashes is a short

 3    newsletter featuring a variety of topics and ACB

 4    stories."

 5         Does that accurately describe your own        15:19:57

 6    experience with Dots and Dashes?

 7    A    Yes.

 8    Q    Okay.  And you don't know whether that

 9    went, for example, to all of the members of the

10    membership list serve?                             15:20:10

11    A    Yeah.  I -- I don't know who is on the

12    subscription list for Dots and Dashes.

13    Q    Okay.  Did you receive any responses to

14    Dots and Dashes from any of the recipients of

15    Dots and Dashes about Quest?                       15:20:25

16    A    I received responses in December, but I

17    have no way of knowing which push-out they responded

18    to.

19    Q    Well, if they responded before

20    Dots and Dashes went out, you know they were not    15:20:40

21    responding to Dots and Dashes; correct?

22    A    That's a fair assumption, yes.

23    Q    Okay.  So my question is whether you recall

24    receiving any responses to your Dots and Dashes

25    inquiry, to whomever it went.                       15:20:56
```

                                           Page 128

EXHIBIT 19  PAGE 163

1          Q    Okay.  And just in your experiences, was

2     this unusual in any way in ACB's practices for a

3     single member to report a difficulty, for ACB to

4     then solicit information from the leadership list

5     serve, receive some responses, and then reach out to    15:28:53

6     the entity that -- with which that first individual

7     had difficulty?

8          A    To rephrase, are you saying was this

9     situation, the way we dealt with it unusual?

10         Q    Yes.                                           15:29:13

11         A    No.

12         Q    Okay.  So there was nothing atypical about

13    the approach, at least, leading up to the sending of

14    the letter?

15         A    No.                                            15:29:24

16         Q    Okay.  And let's just, I guess, take a

17    quick look at the letter to make sure we're on the

18    same page here.

19         A    Are you referring to the letter we sent to

20    Quest?                                                   15:29:59

21         Q    I am.

22         A    Okay.

23              MR. RAIZMAN:  And I have to take a couple

24    steps.  So I'm going to go off the record again,

25    unfortunately.                                           15:30:12

                                                    Page 132

1    respect to the Quest kiosk?

2        A    Yes.

3        Q    Okay.  It says here, "Additionally, many

4    customers we have communicated with explain that

5    when they arrived at your various locations to get    15:37:22

6    lab work done, the front desk was not manned by a

7    receptionist."

8             Do you recall writing that?

9        A    Yes.

10        Q    Okay.  Does that also mean that some of the    15:37:31

11    customers that you communicated with up until the

12    point of this letter did or were greeted by a

13    receptionist or other individual manning the front

14    desk?

15        A    Can you rephrase that?                          15:37:52

16        Q    Isn't it true that some of the individuals

17    with whom you had communicated as of the time of

18    this letter had been greeted by someone staffing the

19    front desk?

20        A    I would have to reread the comments to see     15:38:10

21    if any of them had mentioned previously that that

22    had happened.  I would have to reread all the

23    comments.

24        Q    If any -- if any had mentioned it,

25    wouldn't -- and none had been greeted, wouldn't you    15:38:22

                                        Page 137

EXHIBIT 19  PAGE 165

```
 1    have said all of our customers we communicated with

 2    were not greeted?

 3        A    Can you state that again?

 4        Q    That's okay.  We'll withdraw -- I'll

 5    withdraw the question.                            15:38:39

 6             You then say after the comment, "the front

 7    desk was not manned by a receptionist," "As a

 8    result, the only way to check in is via the

 9    inaccessible tablet.  The lack of a receptionist

10    leaves blind customers without a way to sign in."  15:38:51

11             Do you recall writing that?

12        A    Yes.

13        Q    Doesn't that mean then that a receptionist

14    or other individual staffing the front desk would

15    permit blind customers to sign in?                15:39:07

16        A    No.  I disagree.  They still wouldn't be

17    able to sign in independently.

18        Q    Okay.  But you included that in this letter

19    because you were concerned at the time that the lack

20    of a receptionist left blind customers without a way 15:39:24

21    to sign in, in your opinion; correct?

22        A    Yes.  But they still don't have an inde- --

23    even if a person was there, they still couldn't sign

24    in independently.

25        Q    Do you see anything in this letter that I'm  15:39:37
```

                                                    Page 138

EXHIBIT 19  PAGE 166

```
 1        A    I don't recall, but I believe we have it on

 2    a timeline.

 3        Q    Okay.  And was it --

 4             Who was on the call?

 5        A    Counsel was there, Amer Pharaon.  And I      15:43:21

 6    believe there was -- there was another individual on

 7    the secondary call and I think he might have been on

 8    the first one as well, but I can't say completely,

 9    but I think it was Chris Grant.

10        Q    Okay.  So I just want to be clear that       15:43:43

11    we're not talking about -- you said counsel and then

12    you spoke Amer Pharaon's name.

13        A    Yes.

14        Q    That's one person; right?

15        A    Correct.                                     15:43:52

16        Q    Okay.  So Amer Pharaon was on the call.

17    Chris Grant was on the call.

18             Was there anyone else from Quest on the

19    call?

20        A    Not to my recollection.                      15:44:00

21        Q    Okay.  And who was on the call on the ACB

22    end, if you know?

23        A    Myself and Eric Bridges.

24        Q    Okay.  Clark Rachfal wasn't on the call?

25        A    I don't believe he was an employee of ACB    15:44:17
```

Page 141

EXHIBIT 19  PAGE 167

1    yet or he just started.

2        Q    Okay.  In any event, he wasn't on the call?

3        A    No.

4            MR. RAIZMAN:  All right.  Jon, I don't know

5    how you want to do it, but if you can send her          15:44:31

6    what's been marked as Exhibit 67, which is PL 577

7    through 596.

8            MR. MILLER:  Yeah.  Can you forward that

9    one to me just for ease, Counsel, if you have it

10   right in front of you?                                  15:44:49

11           MR. RAIZMAN:  I think I can.  Let's go off

12   the record.

13           THE WITNESS:  Before we do that, can we

14   take a quick break?

15           MR. RAIZMAN:  Of course.  Let's take a        15:44:56

16   break.  Let's go off the record.

17           MR. MILLER:  Why don't we -- thanks.  Are

18   we off?

19           THE VIDEOGRAPHER:  We're going off the

20   record.  The time is 3:45 Eastern Daylight Time and    15:45:03

21   this is the end of Media Unit Number 5.

22           (Recess taken.)

23           (Off the record at 3:45 p.m.  Back on the

24   record at 3:57 p.m.)

25           THE VIDEOGRAPHER:  We're going back on the      15:57:37

                                                    Page 142

EXHIBIT 19  PAGE 168

```
 1    record.  The time is 3:57 p.m.  This is the start of

 2    Media Unit Number 6.

 3    BY MR. RAIZMAN:

 4        Q    All right.  Let's take a look --

 5             And I sent all of these next series of        15:57:57

 6    documents to your counsel.  I'm not sure if he's

 7    forwarded them yet.

 8             MR. MILLER:  I have.

 9             MR. RAIZMAN:  Thank you.

10        Q    Let's look first at the one marked           15:58:09

11    Exhibit sixty -- 66, if we could.

12             While you're waiting to receive that, my

13    question is --

14        A    Well, which?  Because these don't have

15    subjects.  So which one?  The most recent?  Second    15:58:39

16    that you sent?

17             MR. RAIZMAN:  I don't know what order

18    they're being sent, I'm afraid.

19             MR. MILLER:  Yeah.  Counsel, you actually

20    sent Exhibit sixty -- it looks like 67 got sent       15:58:50

21    twice.  So I actually didn't -- I did not receive

22    66.

23             MR. RAIZMAN:  That's an error.  I'm going

24    to correct that now and we'll talk about 67

25    instead.                                              15:59:03
```

Page 143

EXHIBIT 19  PAGE 169

```
 1    you or Mr. Bridges said, except for the two last

 2    lines.  Everything else is expressed in terms of

 3    something a representative of Quest said or asked.

 4         It then shows, "I asked what they will do

 5    if they cannot identify whether someone has a       16:07:43

 6    disability and they could not answer that question."

 7         Do you recall writing that?

 8    A    Yes.

 9    Q    And do you recall saying that or asking

10    that during the meeting?                            16:07:55

11    A    If it's in my notes, I'm sure I implied it.

12    I don't remember the whole conversation.

13    Q    Okay.  You don't remember that part of the

14    conversation at all?

15    A    I remember the theme or the topic.  So yes.  16:08:08

16    Q    What were you --

17         I don't understand the comment.  Can you

18    explain to me what you were driving at?  What was

19    the concern you had about being --

20    A    Yes.                                           16:08:21

21    Q    -- able to identify whether someone has a

22    disability?

23         Please do.

24    A    They -- they seemed to -- based on these

25    ideas they had presented to us, if a phlebotomist   16:08:31
```

Page 149

EXHIBIT 19  PAGE 170

```
 1              If I could --

 2      A    I'm sorry, Jon?

 3              MR. MILLER:  It should be the most recent

 4    one I sent.

 5              THE WITNESS:  Okay.                      16:11:11

 6    BY MR. RAIZMAN:

 7      Q    Here I'm only looking for your review of

 8    the pages marked 570 through 572.  So not the last

 9    page.

10      A    Which one did you say to go through?  2?   16:12:22

11      Q    Page 72, yeah.

12      A    72.  Okay.

13      Q    All right.  So focusing on those three

14    pages of Exhibit 66, the pages marked PL 570 to 572,

15    does that represent your effort to summarize each of  16:13:23

16    the contacts of any kind with Quest during the time

17    period covered?

18      A    Yes.

19      Q    And does it capture all of the contacts

20    with Quest before --                               16:13:40

21      A    Yes.

22      Q    -- ACB entered the litigation?

23      A    To my recollection, yes.

24      Q    Okay.  And this is a document you prepared?

25      A    Yes.                                        16:13:56
```

Page 152

EXHIBIT 19  PAGE 171

```
 1        Q    Okay.  Who is Walter, Walter Dusseldorp,

 2   and why did you contact him at some point?

 3        A    I don't recall how I got his name.  I just

 4   know along the way it was one of the contact names

 5   suggested to reach out to.                        16:14:16

 6        Q    Left off of here is the letter to

 7   Mr. Rusckowski that we discussed a while back.  Do

 8   you recall that?

 9             Do you know where in the timeline that

10   letter fell?  Before or after, for example, the    16:14:30

11   December 13th voicemail message?

12        A    Well, you said it was -- you -- your date

13   is the 13th.  So presumably right before that.

14        Q    I don't want you to go by my date because

15   I'm just a lawyer on the case.  I need someone who   16:14:51

16   can give competent testimony.

17             So I'm looking at your document.  You said

18   you left a voicemail message for Gerber and Kocher,

19   if I'm pronouncing it correctly, on December 13th,

20   2018.                                              16:15:04

21             Am I reading -- am I interpreting that

22   entry correctly?

23        A    That's correct.

24        Q    And you did leave a voicemail message for

25   those individuals?                                 16:15:11
```

Page 153

EXHIBIT 19  PAGE 172

```
 1       A    Yes.

 2       Q    What did you call that folder?

 3       A    I don't recall.  It was probably something

 4    as simple as Quest.

 5       Q    Okay.  And the notes of the April 12th,      16:20:48

 6    2019, conversation, if you ever wrote any, would

 7    have been in the same folder as the January 25th,

 8    2019, conversation; correct?

 9       A    Yes, they would.

10       Q    Okay.  In any event, are you trying to      16:21:05

11    summarize the conversation here in Exhibit 66?

12       A    Can you specify where you mean?

13       Q    Yes.

14            The entry, and I'm going to read it in

15    full, says, "4/12/19.  Claire and Clark spoke with    16:21:22

16    Amer and Chris.  They asked for connections to tech

17    companies."

18            Is that sort of the outcome of the

19    conversation?  Can't be everything that was said in

20    an hour.                                             16:21:37

21       A    Yes.  I think that would have been the

22    overarching takeaway.

23       Q    So as of April 12th, 2019, is it accurate

24    to say that ACB had not sent Quest the names of any

25    tech companies as was discussed on January 25th,      16:21:54
```

Page 158

EXHIBIT 19  PAGE 173

```
 1      little bit different.

 2              If you could turn to Ardis --

 3      A     Ardis Bazyn.

 4      Q     -- Bazyn.

 5              Oh, I was going to say it right.  On        17:12:11

 6      PL 687.

 7      A     Let me scroll down.  Okay.

 8      Q     Is this an example of someone who didn't

 9      answer the survey questions, but told their story?

10      A     Yes.                                          17:13:18

11      Q     Okay.  And others did that as well and

12      that's recorded in this document; correct?

13      A     I believe so.  Yes.

14      Q     And with respect to those respondents, like

15      Ardis Bazyn, you just copied exactly what she wrote   17:13:40

16      in her email and pasted it into this rolling

17      document; correct?

18      A     Exactly.

19      Q     All right.  I don't have any more questions

20      about that document and I only have a few more      17:13:51

21      questions, then I want to take a break, review my

22      notes.  But let me just ask these few questions.

23              Are you familiar with the term qualified

24      reader?

25      A     In what context?                              17:14:04

                                                  Page 186
```

1    what was happening in the back room at Quest while

2    they were asking for a variety of information,

3    whether that was checking in or was something more

4    than that; isn't that correct?

5        A    I know he was interacting with the computer    17:50:50

6    to process whatever he needed to do so I could get

7    my blood work done.

8        Q    Okay.  And that might have involved

9    checking in, it might have involved other things

10   needed to get your blood work taken; correct?          17:51:00

11       A    I assume that's true.

12       Q    Okay.  You gave testimony about qualified

13   reader, knowing the terminology and the jargon.

14            Is that the terminology and the jargon

15   that's used in the business or are you talking about   17:51:20

16   terminology and jargon in the blind community?  What

17   were you referring to?

18       A    Terminology applicable to what the person

19   is reading.

20       Q    Okay.  So, for example, terminology to       17:51:32

21   understand that the kiosk is asking you your first

22   and last name; correct?

23       A    Correct.

24       Q    Okay.  And terminology to understand that

25   the kiosk is asking for your phone number; correct?    17:51:44

Page 211

EXHIBIT 19  PAGE 175

```
 1        A    Correct.

 2        Q    Okay.  So that's the terminology and jargon

 3   that one would need to understand to check in at a

 4   Quest kiosk; correct?

 5        A    Assuming that's what it asks.  I don't know    17:51:57

 6   what it asks for because I've never been able to use

 7   one.

 8        Q    But in terms of your understanding of

 9   qualified reader, they're qualified if they

10   understand the terminology and jargon used that       17:52:08

11   they're actually reading; correct?

12        A    Correct.

13        Q    You talked about two solutions.  You

14   described them as common solutions.

15             Have you -- well, let's skip that.           17:52:26

16             One of them was enlarged print; correct?

17        A    Correct.

18        Q    And that would be for people who have some

19   level of vision; correct?

20        A    Yes.  It's what we call low vision.          17:52:41

21        Q    Okay.  So people with low vision might want

22   enlarged print; correct?

23        A    Correct.

24        Q    You testified in response to Mr. Miller's

25   question about never receiving any further            17:53:06
```

Page 212

EXHIBIT 19  PAGE 176

1    communications from Quest after in April 2019 you

2    sent the names of two technology companies; is that

3    right?

4        A    That's correct.

5        Q    Okay.  Did you ever reach out to Quest        17:53:21

6    again?

7        A    We were waiting to hear back from Quest.

8        Q    Okay.  And you gave more testimony now in

9    response to Mr. Miller's questions about things that

10   were said during the verbal conversations.          17:53:38

11       Any reason you didn't record those in your

12   notes?

13       A    Can you specify what you're referring to?

14       Q    You were trying to be accurate in your

15   note-taking; correct?                               17:53:51

16       A    Yes, I was.

17       Q    Are you sure, by the way, about the

18   one-hour estimate of your -- your April phone call

19   with Mr. Pharaon and Mr. Grant and Clark Rachfal?

20       A    I -- it's purely an estimate.  I don't      17:54:08

21   recall.

22       Q    Isn't it actually true that the

23   conversation was more like three to four minutes?

24       A    I -- I don't recall.

25       Q    Do you recall whether you called them or     17:54:19

Page 213

EXHIBIT 19  PAGE 177

```
 1    they called you?  Maybe used a conference line?

 2        A    I'm sure we used a conference line, but

 3    that's all I remember.

 4        Q    Do you recall whether you provided the

 5    conference line or Quest did?                    17:54:32

 6        A    I don't recall.

 7        Q    But you're pretty sure there was an hour of

 8    conversation there?

 9        A    Like I said, that's just an estimate.

10        Q    It's an estimate that would be a lot     17:54:43

11    different than estimating three to five minutes,

12    wouldn't it?

13        A    I'm -- yeah.  I'm sure.

14        Q    Okay.  So are you absolutely clear then on

15    what was said during that conversation, not knowing  17:54:55

16    whether it was an hour or three to five minutes?

17        A    I recall the main theme of the call

18    surrounding connecting them with tech firms who

19    specialize in accessibility.

20        Q    Okay.  And a few weeks later you did that?  17:55:10

21        A    Correct.

22        Q    Okay.  So you never reached out to them

23    after you sent them the names of the tech companies.

24             Do you know if anyone acting on ACB's

25    behalf did?                                       17:55:29
```

                                            Page  214

EXHIBIT 19  PAGE 178

```
 1                      CERTIFICATION

 2                           OF

 3              CERTIFIED SHORTHAND REPORTER

 4

 5              I, the undersigned, a Certified Shorthand

 6      Reporter of the State of California do hereby

 7      certify:

 8                  That the foregoing proceedings were taken

 9      before me at the time and place herein set forth;

10      that any witnesses in the foregoing proceedings,

11      prior to testifying, were placed under oath; that a

12      verbatim record of the proceedings was made by me

13      using machine shorthand which was thereafter

14      transcribed under my direction; further, that the

15      foregoing is an accurate transcription thereof.

16                  I further certify that I am neither

17      financially interested in the action nor a relative

18      or employee of any attorney of any of the parties.

19                  IN WITNESS WHEREOF, I have this date

20      subscribed my name.

21      Dated:  September 2, 2021, 2021.

22

23

24

                        Michelle Milan Fulmer

                        CSR No. 6942, RPR, CRR, CRC
25

                                            Page  222
```

# EXHIBIT 20

EXHIBIT 20  PAGE 180

CONFIDENTIAL



**American Council of the Blind**

Together for a bright future

1703 N. Beauregard St., Suite 420
Alexandria, VA 22311
Tel: (202) 467-5081
Fax: (703) 465-5085

Steve Rusckowski, CEO
Quest Diagnostics
500 Plaza Dr.
Secaucus, NJ 07094
1-866-697-8378

**Exhibit 00065**

6/9/2021
ACB/Rachfal - V1

Dear Mr. Rusckowski:

I am writing on behalf of the American Council of the Blind (ACB). ACB is a member-based organization of people who are blind and visually impaired that strives to increase the independence, security, equality of opportunity, and to improve quality of life for all blind and visually impaired people.

It has come to our attention that many of your facilities use an electronic tablet to sign customers in. This tablet is not accessible for customers who are blind or visually impaired; the tablet does not include the option to turn on a screen reader or to increase the font size. Without such accessibility functions, blind and visually impaired individuals are unable to utilize the device. Additionally, many customers we have communicated with explained that when they arrived at your various locations to get lab work done, the front desk was not manned by a receptionist. As a result, the only way to check in is via the inaccessible tablet. The lack of a receptionist leaves blind customers without a way to sign in. On occasion, a Quest Diagnostics employee was available to assist a person with signing in. However, that employee was often a lab technician who came from the back of the lab to assist the customer. The presence of the technician was sporadic and unreliable. Many people we communicated with said they had to rely on friends or family members to sign them in; they could not do so independently. And, on more than one occasion, our members explained that they had to rely on other customers who were complete strangers to them to successfully sign in. This violates their right to privacy.

The blind and visually impaired community is composed of a greater number of older, retired Americans, as well as individuals with additional medical conditions. Such people need to get lab work done on a more regular basis. Consequently, many of the customers we have spoken to get lab work done at Quest Diagnostics on a regular basis.

Under Title III of the Americans with Disabilities Act, businesses such as Quest Diagnostics that provide services to the public must provide reasonable accommodations to customers with disabilities, such as blindness. Reasonable accommodations must provide equal access to the goods or services. As it currently stands, blind and visually impaired customers of many Quest Diagnostics location do not have equal access to your lab services. Below is a list of 4 different locations across the United States where blind and visually impaired customers have faced challenges receiving services at Quest Diagnostics because of inaccessible services. This is a small subsection of the locations reported; we have, at this time, heard from more than a dozen consumers across the country who have faced similar obstacles. Here are four specific locations where such problems have been experienced:

- 11212 State Hwy. 151, Medical Plaza I, Suite 210, San Antonio, TX 78251
- 6006 49th Street North, Suite 300, St. Petersburg, FL 33709

**EXHIBIT 20  PAGE 181**

CONFIDENTIAL

PL00405

- 1106 Union Rd., Southgate Plaza, West Seneca, NY 14224
- 210 N. Boulder Hwy, Henderson, NV 89015

We are eager to speak with the decision-makers at Quest Diagnostics to communicate our concerns and find a way to make Quest Diagnostics services accessible to all customers. ACB would be happy to set up a time to talk with Quest Diagnostics.

Thank you for your time. I look forward to speaking with Quest Diagnostics soon.

Sincerely,

Eric Bridges
Executive Director

# EXHIBIT 21

EXHIBIT 21  PAGE 183

Call Log:

Quest Diagnostics:

1-866-697-8378

Amer Pharaon

Corporate Council

973 520-2738

Amer.s.pharaon@questdiagnostics.com

Walter Dusseldorp

646 208-5217

Robert Kocher

410 247-9100 ex 1690

Dennis Gerber

410 536-1387

Karen Clinger

215 394-0837

12/13/18:

Left a voicemail message for both Gerber and Kocher

12/19/18:

Received a call back from a Jackie; she told me to call Karen Clinger; I left a voicemail message for Clinger

1/02/19:

I left voicemail messages for all 3 of them around 2:30 PM

1/03/19:

**Exhibit 00066**

6/9/2021
ACB/Rachfal - V1

EXHIBIT 21  PAGE 184

PL00570

Amer Pharaon called looking for Eric; I spoke with him; he wanted to understand more about the issue; I explained the general issues; I told him I would confer with Eric and we will email him back with suggestions for times we can speak to everyone at Quest; he wanted to know more so he knows more about who at Quest he should invite to the meeting

1/04/19:

Received a call back from a Walter Dusseldorp; I explained that I had spoken to Amer; he said to keep speaking with Amer but he gave me his number as well and said to call him with any issues if needed

Walter Dusseldorp

646 208-5217

1/08/19:

I emailed Amer Pharaon back with 2 date suggestions

1/25/19:

Had phone meeting with Amer and Chris

3/22/19:

Sent an email asking to check in after our last phone meetine

3/28/19:

Amer emailed me back asking to talk at the end of the week;

4/01/19:

I emailed him back and apologized that his date suggestion did not work; I asked if he could talk this week.

4/03/19:

He emailed back and said this week will not work; he is out of town; provided several date suggestions for next week; I responded with a few times/dates that work for me

EXHIBIT 21  PAGE 185

PL00571

4/12/19:

Claire and Clark spoke with Amer and Chris; they asked for connections to tech companies

4/22/19:

Claire emailed Amer the contact information for Level Access and Paciello Group

EXHIBIT 21  PAGE 186
PL00572

# EXHIBIT 22

EXHIBIT 22  PAGE 187

Page 1

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4    JULIAN VARGAS, ANNE WEST and  ) Case No.
     AMERICAN COUNCIL OF THE BLIND ) 2:19-cv-08108 DMG(MRW)x
5    individually on behalf of     )
     themselves and all others     )
6    similarly situated,           )
                                   )
7                   Plaintiffs,    )
                                   )
8         v.                       )
                                   )
9    QUEST DIAGNOSTICS CLINICAL    )
     LABORATORIES, INC., QUEST     )
10   DIAGNOSTICS HOLDINGS, INC.,   )
     QUEST DIAGNOSTICS,            )
11   INCORPORATED; and DOES 1-10,  )
     inclusive,                    )
12                                 )
                    Defendants.    )
13   _____)

14

15      REMOTE VIDEOTAPED DEPOSITION OF JULIAN VARGAS

16                 Van Nuys, California

17               Thursday, April 22, 2021

18

19

20

21   Reported by:
     ANELA SHERADIN, CSR NO. 9128

22

23   JOB NO. 4523491

24

25   PAGES 1 - 254

Veritext Legal Solutions

```
                                             Page 143
 1    the kiosk to check in?

 2        A   I couldn't tell.                    14:23:55

 3        Q   Okay.  So are you aware that since your last   14:23:56

 4    visit to Quest in June of 2019 that Quest implemented

 5    specific procedures to assist patients who are visually

 6    impaired with checking in?

 7            MR. MILLER:  Object to the extent it calls for   14:24:15

 8    attorney-client privilege.

 9            Outside of anything you know from that source,   14:24:17

10    you can answer.

11            THE WITNESS:  No.                    14:24:23

12    BY MS. ROLLER:                               14:24:23

13        Q   Okay.  So I'll explain to you what Quest has   14:24:24

14    implemented just for your own personal knowledge.  So

15    Quest now has a three-finger swipe on the kiosk, that if

16    you take three fingers and you swipe up, it will

17    automatically check you in, give you a patient number,

18    not require you to input any information, and that will

19    notify the Quest staff that you're there.  Okay?

20        A   Okay.                               14:24:58

21        Q   And so the three-finger gesture, that's a   14:24:59

22    gesture that you're familiar with; right?

23            MR. MILLER:  Objection.  It lacks --   14:25:03

24            THE WITNESS:  It is.                14:25:05

25            MR. MILLER:  Go ahead.               14:25:05
```

Page 254

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4     before me at the time and place herein set forth; that

5     any witnesses in the foregoing proceedings, prior to

6     testifying, were duly sworn; that a record of the

7     proceedings was made by me using machine shorthand

8     which was thereafter transcribed under my direction;

9     that the foregoing transcript is a true record of the

10    testimony given.

11         Further, that if the foregoing pertains to

12    the original transcript of a deposition in a Federal

13    Case, before completion of the proceedings, review of

14    the transcript [  ] was [ X ] was not requested.

15         I further certify I am neither financially

16    interested in the action nor a relative or employee

17    of any attorney or party to this action.

18         IN WITNESS WHEREOF, I have this date

19    subscribed my name.

20

21    Dated: May 7, 2021

22

23                         _____

                           ANELA SHERADIN

24                         CSR NO. 9128

25

EXHIBIT 22 PAGE 190

# EXHIBIT 23

EXHIBIT 23  PAGE 191



**U.S. Department of Justice**
Civil Rights Division
*Disability Rights Section*



# Effective Communication

## Overview

The Department of Justice published revised final regulations implementing the Americans with Disabilities Act (ADA) for title II (State and local government services) and title III (public accommodations and commercial facilities) on September 15, 2010, in the Federal Register. These requirements, or rules, clarify and refine issues that have arisen over the past 20 years and contain new, and updated, requirements, including the 2010 Standards for Accessible Design (2010 Standards).

**People who have vision, hearing, or speech disabilities ("communication disabilities") use different ways to communicate. For example, people who are blind may give and receive information audibly rather than in writing and people who are deaf may give and receive information through writing or sign language rather than through speech**.

The ADA requires that title II entities (State and local governments) and title III entities (businesses and nonprofit organizations that serve the public) communicate effectively with people who have communication disabilities. The goal is to ensure that communication with people with these disabilities is equally effective as communication with people without disabilities.

This publication is designed to help title II and title III entities ("covered entities") understand how the rules for effective communication, including rules that went into effect on March 15, 2011, apply to them.

- The purpose of the effective communication rules is to ensure that the person with a vision, hearing, or speech disability can communicate with, receive information from, and convey information to, the covered entity.

- Covered entities must provide auxiliary aids and services when needed to communicate effectively with people who have communication disabilities.

- The key to communicating effectively is to consider the nature, length, complexity, and context of the communication and the person's normal method(s) of communication.

EXHIBIT 23  PAGE 192

Effective Communication _____

- The rules apply to communicating with the person who is receiving the covered entity's goods or services as well as with that person's parent, spouse, or companion in appropriate circumstances.

## Auxiliary Aids and Services

The ADA uses the term "auxiliary aids and services" ("aids and services") to refer to the ways to communicate with people who have communication disabilities.

- For people who are blind, have vision loss, or are deaf-blind, this includes providing a qualified reader; information in large print, Braille, or electronically for use with a computer screen-reading program; or an audio recording of printed information. A "qualified" reader means someone who is able to read effectively, accurately, and impartially, using any necessary specialized vocabulary.

- For people who are deaf, have hearing loss, or are deaf-blind, this includes providing a qualified notetaker; a qualified sign language interpreter, oral interpreter, cued-speech interpreter, or tactile interpreter; real-time captioning; written materials; or a printed script of a stock speech (such as given on a museum or historic house tour) . A "qualified" interpreter means someone who is able to interpret effectively, accurately, and impartially, both receptively (i.e., understanding what the person with the disability is saying) and expressively (i.e., having the skill needed

to convey information back to that person) using any necessary specialized vocabulary.

- For people who have speech disabilities, this may include providing a qualified speech-to-speech transliterator (a person trained to recognize unclear speech and repeat it clearly), especially if the person will be speaking at length, such as giving testimony in court, or just taking more time to communicate with someone who uses a communication board. In some situations, keeping paper and pencil on hand so the person can write out words that staff cannot understand or simply allowing more time to communicate with someone who uses a communication board or device may provide effective communication. Staff should always listen attentively and not be afraid or embarrassed to ask the person to repeat a word or phrase they do not understand.

In addition, aids and services include a wide variety of technologies including 1) assistive listening systems and devices; 2) open captioning, closed captioning, real-time captioning, and closed caption decoders and devices; 3) telephone handset amplifiers, hearing-aid compatible telephones, text telephones (TTYs), videophones, captioned telephones, and other voice, text, and video-based telecommunications products; 4) videotext displays; 5) screen reader software, magnification software, and optical readers; 6) video description and secondary auditory programming (SAP) devices that pick up video-described audio feeds for television programs; 7) accessibility features in electronic documents and other electronic

and information technology that is accessible (either independently or through assistive technology such as screen readers).

**Real-time captioning** (also known as computer-assisted real-time transcription, or CART) is a service similar to court reporting in which a transcriber types what is being said at a meeting or event into a computer that projects the words onto a screen. This service, which can be provided on-site or remotely, is particularly useful for people who are deaf or have hearing loss but do not use sign language.

The free nationwide **telecommunications relay service** (TRS), reached by calling 7-1-1, uses communications assistants (also called CAs or relay operators) who serve as intermediaries between people who have hearing or speech disabilities who use a text telephone (TTY) or text messaging and people who use standard voice telephones. The communications assistant tells the telephone user what the other party is typing and types to tell the other party what the telephone user is saying. TRS also provides speech-to-speech transliteration for callers who have speech disabilities.

**Video relay service** (VRS) is a free, subscriber-based service for people who use sign language and have videophones, smart phones, or computers with video communication capabilities. For outgoing calls, the subscriber contacts the VRS interpreter, who places the call and serves as an intermediary between the subscriber and a person who uses a standard voice telephone. The interpreter tells the telephone user what the subscriber is signing and signs to the subscriber what the telephone user is saying.

**Video remote interpreting** (VRI) is a fee-based service that uses video conferencing technology to access an off-site interpreter to provide real-time sign language or oral interpreting services for conversations between hearing people and people who are deaf or have hearing loss. The new regulations give covered entities the choice of using VRI or on-site interpreters in situations where either would be effective. VRI can be especially useful in rural areas where on-site interpreters may be difficult to obtain. Additionally, there may be some cost advantages in using VRI in certain circumstances. However, VRI will not be effective in all circumstances. For example, it will not be effective if the person who needs the interpreter has difficulty seeing the screen (either because of vision loss or because he or she cannot be properly positioned to see the screen, because of an injury or other condition). In these circumstances, an on-site interpreter may be required.

If VRI is chosen, **all** of the following specific performance standards must be met:

- real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication;

- a sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the face, arms, hands, and fingers of the person using sign language, regardless of his or her body position;

Effective Communication

- a clear, audible transmission of voices; and

- adequate staff training to ensure quick set-up and proper operation.

## Effective Communication Provisions

Covered entities must provide aids and services when needed to communicate effectively with people who have communication disabilities.

The key to deciding what aid or service is needed to communicate **effectively** is to consider the nature, length, complexity, and context of the communication as well as the person's normal method(s) of communication.

Some easy solutions work in relatively simple and straightforward situations. For example:

- In a lunchroom or restaurant, reading the menu to a person who is blind allows that person to decide what dish to order.

- In a retail setting, pointing to product information or writing notes back and forth to answer simple questions about a product may allow a person who is deaf to decide whether to purchase the product.

Other solutions may be needed where the information being communicated is more extensive or complex. For example:

- In a law firm, providing an accessible electronic copy of a legal document that is being drafted for a client who is blind allows the client to read the draft at home using a computer screen-reading program.

- In a doctor's office, an interpreter generally will be needed for taking the medical history of a patient who uses sign language or for discussing a serious diagnosis and its treatment options.

A person's method(s) of communication are also key. For example, sign language interpreters are effective only for people who use sign language. Other methods of communication, such as those described above, are needed for people who may have lost their hearing later in life and do not use sign language. Similarly, Braille is effective only for people who read Braille. Other methods are needed for people with vision disabilities who do not read Braille, such as providing accessible electronic text documents, forms, etc., that can be accessed by the person's screen reader program.

Covered entities are also required to accept telephone calls placed through TRS and VRS, and staff who answer the telephone must treat relay calls just like other calls.

**Many deaf-blind individuals use support service providers** (SSPs) to assist them in accessing the world around them. SSPs are not "aids and services" under the ADA. However, they provide mobility, orientation, and informal communication services for deaf-blind individuals and are a critically important link enabling them to independently access the community at large.

EXHIBIT 23  PAGE 195

The communications assistant will explain how the system works if necessary.

Remember, the purpose of the effective communication rules is to ensure that the person with a communication disability can receive information from, and convey information to, the covered entity.

## Companions

In many situations, covered entities communicate with someone other than the person who is receiving their goods or services. For example, school staff usually talk to a parent about a child's progress; hospital staff often talk to a patient's spouse, other relative, or friend about the patient's condition or prognosis. The rules refer to such people as "companions" and require covered entities to provide effective communication for companions who have communication disabilities.

The term "companion" includes any family member, friend, or associate of a person seeking or receiving an entity's goods or services who is an appropriate person with whom the entity should communicate.

## Use of Accompanying Adults or Children as Interpreters

Historically, many covered entities have expected a person who uses sign language to bring a family member or friend to interpret for him or her. These people often lacked the impartiality and specialized vocabulary needed to interpret effectively and accurately. It was particularly problematic to use people's children as interpreters.

The ADA places responsibility for providing effective communication, including the use of interpreters, directly on covered entities. They cannot require a person to bring someone to interpret for him or her. A covered entity can rely on a companion to interpret in only two situations.

> (1) In an emergency involving an imminent threat to the safety or welfare of an individual or the public, an adult or minor child accompanying a person who uses sign language may be relied upon to interpret or facilitate communication only when a qualified interpreter is not available.

> (2) In situations *not* involving an imminent threat, an adult accompanying someone who uses sign language may be relied upon to interpret or facilitate communication when a) the individual requests this, b) the accompanying adult agrees, and c) reliance on the accompanying adult is appropriate under the circumstances. This exception does *not* apply to minor children.

Even under exception (2), covered entities may *not* rely on an accompanying adult to interpret when there is reason to doubt the person's impartiality or effectiveness. For example:

- It would be inappropriate to rely on a companion to interpret who feels conflicted about communicating bad news to the person or has a personal stake in the outcome of a situation.

- When responding to a call alleging spousal abuse, police should never rely on one spouse to interpret for the other spouse.

EXHIBIT 23  PAGE 196

Effective Communication _____

## Who Decides Which Aid or Service Is Needed?

When choosing an aid or service, title II entities are **required** to give primary consideration to the choice of aid or service requested by the person who has a communication disability. The state or local government must honor the person's choice, unless it can demonstrate that another equally effective means of communication is available, or that the use of the means chosen would result in a fundamental alteration or in an undue burden (see limitations below) . If the choice expressed by the person with a disability would result in an undue burden or a fundamental alteration, the public entity still has an obligation to provide an alternative aid or service that provides effective communication if one is available.

Covered entities may require reasonable advance notice from people requesting aids or services, based on the length of time needed to acquire the aid or service, but may not impose excessive advance notice requirements. "Walk-in" requests for aids and services must also be honored to the extent possible.

Title III entities are **encouraged** to consult with the person with a disability to discuss what aid or service is appropriate. The goal is to provide an aid or service that will be effective, given the nature of what is being communicated and the person's method of communicating.

## Limitations

Covered entities are required to provide aids and services unless doing so would result in an "undue burden," which is defined as significant difficulty or expense. If a particular aid or service would result in an undue burden, the entity must provide another effective aid or service, if possible, that would not result in an undue burden. Determining what constitutes an undue burden will vary from entity to entity and sometimes from one year to the next. The impact of changing economic conditions on the resources available to an entity may also be taken into consideration in making this determination.

**State and local governments**: in determining whether a particular aid or service would result in undue financial and administrative burdens, a title II entity should take into consideration the cost of the particular aid or service in light of all resources available to fund the program, service, or activity and the effect on other expenses or operations. The decision that a particular aid or service would result in an undue burden must be made by a high level official, no lower than a Department head, and must include a written statement of the reasons for reaching that conclusion.

**Businesses and nonprofits**: in determining whether a particular aid or service would result in an undue burden, a title III entity should take into consideration the nature and cost of the aid or service relative to their size, overall financial resources, and overall expenses. In general, a business or nonprofit with greater resources is expected to do more to ensure effective communication than one with fewer resources. If the

EXHIBIT 23  PAGE 197

entity has a parent company, the administrative and financial relationship, as well as the size, resources, and expenses of the parent company, would also be considered.

In addition, covered entities are not required to provide any particular aid or service in those rare circumstances where it would fundamentally alter the nature of the goods or services they provide to the public. In the performing arts, for example, slowing down the action on stage in order to describe the action for patrons who are blind or have vision loss may fundamentally alter the nature of a play or dance performance.

## Staff Training

A critical and often overlooked component of ensuring success is comprehensive and ongoing staff training. Covered entities may have established good policies, but if front line staff are not aware of them or do not know how to implement them, problems can arise. Covered entities should teach staff about the ADA's requirements for communicating effectively with people who have communication disabilities. Many local disability organizations, including Centers for Independent Living, conduct ADA trainings in their communities. The Department's ADA Information Line can provide local contact information for these organizations.

**For more information about the ADA, please visit our website or call our toll-free number.**

ADA Website: www.ADA.gov

To receive e-mail notifications when new ADA information is available, visit the ADA Website and click on the link near the bottom of the right-hand column.

**ADA Information Line**

800-514-0301 (Voice) and 800-514-0383 (TTY)

Call M-W, F 9:30 a.m. – 5:30 p.m., Th 12:30 p.m. – 5:30 p.m., (Eastern Time) to speak with an ADA Specialist (calls are confidential) or call 24 hours a day to order publications by mail.

For people with disabilities, this publication is available in alternate formats.

Duplication of this document is encouraged.

January 2014

EXHIBIT 23  PAGE 198

The Americans with Disabilities Act authorizes the Department of Justice (the Department) to provide technical assistance to individuals and entities that have rights or responsibilities under the Act. This document provides informal guidance to assist you in understanding the ADA and the Department's regulations.

This guidance document is not intended to be a final agency action, has no legally binding effect, and may be rescinded or modified in the Department's complete discretion, in accordance with applicable laws. The Department's guidance documents, including this guidance, do not establish legally enforceable responsibilities beyond what is required by the terms of the applicable statutes, regulations, or binding judicial precedent.

EXHIBIT 23  PAGE 199

# EXHIBIT 24

EXHIBIT 24  PAGE 200

1   OGLETREE, DEAKINS, NASH,
    SMOAK & STEWART, P.C.
2   DAVID RAIZMAN, CA Bar No. 129407
    david.raizman@ogletree.com
3   AMBER L. ROLLER, CA Bar No. 273354
    amber.roller@ogletree.com
4   J. NICHOLAS MARFORI, CA Bar No. 311765
    nicholas.marfori@ogletree.com
5   400 South Hope Street, Suite 1200
    Los Angeles, California 90071
6   Telephone: 213-239-9800
    Facsimile: 213-239-9045
7
    Attorneys for Defendants
8   QUEST DIAGNOSTICS CLINICAL
    LABORATORIES, INC.; QUEST
9   DIAGNOSTICS HOLDINGS, INC. and
    QUEST DIAGNOSTICS INCORPORATED
10

11                  **UNITED STATES DISTRICT COURT**

12                  **CENTRAL DISTRICT OF CALIFORNIA**

13  JULIAN VARGAS, ANNE WEST and       Case No. 2:19-cv-08108 DMG (MRWx)
    AMERICAN COUNCIL OF THE
14  BLIND, individually on behalf of   [DISCOVERY MATTER]
    themselves and all others similarly
15  situated,                          **JOINT STIPULATION REGARDING
                                       DEFENDANTS' MOTION TO
16         Plaintiffs,                 COMPEL CLARK RACHFAL TO
                                       RESPOND TO QUESTIONS HE WAS
17      v.                             INSTRUCTED TO, AND REFUSED,
                                       TO ANSWER**
18  QUEST DIAGNOSTICS CLINICAL
19  LABORATORIES, INC., QUEST          Date:      August 18, 2021
    DIAGNOSTICS HOLDINGS, INC.,        Time:      9:30 a.m.
20  QUEST DIAGNOSTICS               Place:     Courtroom 550
    INCORPORATED; and DOES 1-10,
21  inclusive,                         [Filed concurrently with Notice of Motion;
                                       Declaration of David Raizman; Declaration
22         Defendants.                 of Jonathan Miller; Civil Trial Scheduling
                                       Order; and [Proposed] Order]
23
24                                     Complaint Filed: September 18, 2019
                                       Trial Date:      January 11, 2022
25                                     District Judge:  Hon. Dolly M. Gee
                                                        Courtroom 8C, First St.
26                                     Magistrate Judge: Hon. Michael R. Wilner
                                                        Courtroom 550, Roybal
27
28

Pursuant to Local Rule 37-2 *et seq.*, defendants Quest Diagnostics Clinical Laboratories, Inc., Quest Diagnostics Holdings, Inc., and Quest Diagnostics Incorporated (collectively, "Quest" or "Defendants") and plaintiffs Julian Vargas and American Council of the Blind ("ACB") (collectively, "Plaintiffs") hereby submit their joint stipulation of issues in dispute regarding Quest's motion to compel ACB's Rule 30(b)(6) designee, Clark Rachfal, to answer questions to which ACB's counsel objected and instructed Mr. Rachfal not to answer.

# I.  **INTRODUCTORY STATEMENTS**

### *Defendants' Introductory Statement*

Quest provides diagnostic testing information services at patient service centers ("PSCs") located around the country, at which Quest successfully provides blood draw, urine collection, and other related services to patients, including persons with disabilities. From 2016 through 2018, Quest replaced its written sign-in sheets at the PSC waiting rooms with electronic touchscreen tablets ("Kiosks") at which patients may check in to indicate their arrival. Any patient experiencing difficulty checking in for any reason will be greeted by one of the PSCs phlebotomists, who are trained to scan the wait rooms for individuals requiring assistance of any kind, including assistance with checking in. Plaintiffs sued Quest in 2019, claiming that the Kiosks are not independently accessible to persons with visual impairments and implicitly rejecting the adequacy of Quest's providing "auxiliary aids and services" to such patients (and others experiencing difficulty with the Kiosks).

In 2020, Quest began to deploy the latest of a continuing round of enhancements to its Kiosk, including one which permits visually impaired patients who have difficulty using the touchscreen components of the Kiosk to check in by taking any three fingers and swiping in any direction on the face of the Kiosk to automatically check in. Upon administration of the three finger swipe, an audible message from the kiosk informs the patient that they have been checked in and will

JOINT STIPULATION REGARDING DEFENDANTS' MOTION TO COMPEL FURTHER TESTIMONY OF CLARK RACHFAL

EXHIBIT 24  PAGE 202

1    be called when it is their turn to be seen.  An audible message recurrently plays in

2    the PSC waiting rooms announcing to patients with visual impairments how to use

3    the three-finger swipe to check-in, and PSC employees have been trained on the

4    implementation of the three-finger swipe and how to assist patients in using it.  Quest

5    is informed and believes that Plaintiffs will argue in this litigation that the three-

6    finger swipe process does not meet Quest's obligations under law.

7           On June 9, 2021, Quest took the deposition of ACB's 30(b)(6) designee, Clark

8    Rachfal.  During the deposition, Mr. Rachfal was asked, but instructed not to answer

9    by ACB's counsel, a multitude of questions regarding ACB's internal consideration

10   of whether Quest's deployment of the three-finger swipe enhancement would meet

11   their members' needs, despite the clear relevance of this consideration to rebut

12   Plaintiffs' claim that Quest failed to give "primary consideration" to Plaintiffs'

13   desired "auxiliary aid or service" in using the Kiosks.  Therefore, Quest seeks the

14   further deposition testimony of Mr. Rachfal on the questions he was instructed not,

15   and refused, to answer.

16          ***Plaintiffs' Introductory Statement***

17          Quest's introductory statement fails to point out that the *only* testimony it

18   seeks to compel here are answers to questions explicitly targeted at ACB's

19   communications and positions taken during mediation. *See* Exhibit 2 to Raizman

20   Decl.  On March 12, 2020, days before the country shut down related to the spread of

21   COVID-19, the parties attended a confidential mediation. All in attendance at that

22   mediation signed a mediation confidentiality agreement that expressly agreed that

23   the proceedings would be kept confidential under California Evidence Code section

24   1115 *et seq*. Quest now seeks to violate that agreement so that it may re-depose

25   American Council of the Blind's 30(b)(6) witness on protected communications

26   made during the March 12, 2020 mediation. Quest's instant motion tellingly fails to

27   acknowledge that Quest assented to a choice of law in advance of the mediation.

28

JOINT STIPULATION REGARDING DEFENDANTS' MOTION TO COMPEL FURTHER TESTIMONY OF
CLARK RACHFAL

47910849_3.docx

**EXHIBIT 24  PAGE 203**

Instead, Quest buries its head in the sand as to the mediation agreement it signed and argues that federal law should apply. However, even if the mediation confidentiality agreement had never existed, application of the federal mediation privilege compels the same conclusion: communications made in conjunction with a formal mediation are protected from discovery and disclosure. To permit Quest to compel such discovery eviscerates trust in the mediation and ADR processes and instead punishes Plaintiffs for their willingness to come to the table and mediate.

## II.    ISSUES IN DISPUTE

### *Defendants' Position*

Quest seeks an order from this Court (1) compelling the further deposition of ACB's 30(B)(6) Designee, Clark Rachfal, and order to compel him to answer the questions posed at: 48:9-21, 50:10-22, 51:1-20, and 70:3-71:18. (Declaration of David Raizman ("Raizman Decl.") ¶ 3; Exhibit 2 to Raizman Decl. (deposition transcript excerpts of questions that Mr. Rachfal refused to answer).)

### A.    Quest is Entitled to Answers to Some or All of Questions That ACB's 30(B)(6) Designee, Clark Rachfal, Was Instructed Not to Answer

Plaintiffs have asserted in this litigation that, as part of Section 504 of the Rehabilitation Act, Quest had an obligation to give "primary consideration" to requests for "auxiliary aids and services" made by ACB (and Plaintiff and the putative class) when, among other things, it recently undertook to implement the ability to check in on the Kiosks using a "three-finger swipe." Although Quest vigorously contends that the "primary consideration" doctrine does not apply in the context of this case, if a Court disagrees, it should be permitted to prove that it actually gave "primary consideration" to ACB's advance approval of the three-finger swipe process outlined in the Quest's Introduction above in March 2020. However, at his deposition, Mr. Rachfal was instructed not to answer questions about ACB's

JOINT STIPULATION REGARDING DEFENDANTS' MOTION TO COMPEL FURTHER TESTIMONY OF CLARK RACHFAL

47910849_3.docx

EXHIBIT 24  PAGE 204

assessment, evaluation or approval of Quest's offer to implement the three-finger swipe, ACB's internal consideration of, and response to, and acceptance of Quest's proposal, on the basis of the attorney-client privilege and the mediation agreement signed by counsel for Julian Vargas. (*See* Exhibit 2 to Raizman Decl.)

Neither the attorney-client privilege, nor the mediation agreement (which ACB did not sign), justifies Mr. Rachfal's refusal to respond to Quest's questions regarding the three-finger swipe. First, the attorney-client privilege only protects disclosure of communications with counsel; it does not protect disclosure of underlying facts by those who communicated with an attorney. *Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981). Even assuming that ACB consulted with an attorney concerning Quest's proposal, Quest's examination of Mr. Rachfal properly seeks the underlying facts and circumstances concerning ACB's consideration, assessment, evaluation and approval of Quest's proposal to implement a three finger swipe enhancement. Second, neither the mediation agreement (to the extent applicable insofar as ACB did not sign it) nor Federal Rule of Evidence 408 prohibits the discoverability of settlement communications or conduct relating to settlement negotiations. The mediation agreement explicitly recognizes that statements made in the course of or pursuant to mediation "are not admissible in any civil proceeding to the extent provided by law." (Exhibit 1 to Raizman Decl.) As this case is in federal court and the claims are brought under federal law, Federal Rule of Evidence 408 (not state or any other evidentiary law) applies. FRE 408 is only concerned with the *admissibility* at trial of settlement discussions; it does not restrict the discoverability of communications or conduct relating to settlement discussions. Finally, to the extent that ACB claims privilege or confidentiality with respect to mediation communications, it has waived any such protections from disclosure by asserting the "primary consideration" doctrine.

/ / /

JOINT STIPULATION REGARDING DEFENDANTS' MOTION TO COMPEL FURTHER TESTIMONY OF CLARK RACHFAL

EXHIBIT 24 PAGE 205

*Plaintiffs' Position*

Quest seeks to re-depose Mr. Rachfal, ACB's 30(b)(6) witness, on a specific category of information that is plainly protected by both federal and state mediation protections and/or privileges—namely, what was discussed at the March 12, 2020 mediation. The backdrop of the March 12, 2020 mediation should be briefly highlighted. The mediation occurred the day before the country shut down due to the spread of COVID-19. (Declaration of Jonathan Miller, ("Miller Decl."), ¶ 2.)  Three attorneys from Plaintiffs' counsel attended, including counsel who flew in from both Washington D.C. and Pittsburgh. (*Id.*) Plaintiffs' counsel went to significant lengths to attend in person, participated in good faith, and would not have participated if it had known that Quest would later seek to divulge confidential communications that transpired during the mediation.  Everyone in attendance, including counsel for Quest, who now seek to eviscerate the privilege, signed the mediation confidentiality agreement and thus agreed to be bound by its terms. (*Id.*) Quest's contention that ACB did not sign the mediation confidentiality agreement is plainly erroneous as ACB was represented at the mediation by Matthew Handley, Jonathan Miller, and Benjamin Sweet, all of whom signed the mediation confidentiality agreement. (**Exhibits A-C** to Miller Decl., ¶ 2)

All substantive communication between the parties flowed through a formal federal magistrate, who cannot be compelled to testify to resolve any dispute about what Quest actually proposed at the mediation. (Miller Decl., ¶ 3.); *see also* Cal. Evid. Code § 703.5. Communications between Plaintiffs' counsel and the mediator were then conveyed to clients through attorney-client privileged communications. (*Id.*) Any reaction or questions Plaintiffs had to these communications were also conveyed to their counsel. (*Id.*) Quest has no basis to pierce privilege to seek these communications.

JOINT STIPULATION REGARDING DEFENDANTS' MOTION TO COMPEL FURTHER TESTIMONY OF CLARK RACHFAL

47910849_3.docx

**EXHIBIT 24  PAGE 206**

A.   **<u>The Parties are Bound by California Evidence Section 1115 *et seq.*</u>**
**<u>By Virtue of the Mediation Agreement Signed Prior to Mediation</u>**

The mediation agreement signed by the parties expressly agreed that the proceedings would be kept confidential under California Evidence Code section 1119. By contract, Quest assented to being subject to California Evidence Code section 1119. Quest now seeks to violate that agreement and conveniently ignores that notwithstanding a choice of law debate, Quest signed an agreement that expressly adopted California Evidence Code sections 1115 *et seq.* These facts are parallel to those in *Apollo Educ. Group, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 784 Fed. App'x 500, 502 (9th Cir. 2019), wherein "prior to mediation, Apollo and National Union signed the Mediation Agreement. The Mediation Agreement expressly adopted California Evidence Code §§ 1115–28; included a provision that '[n]o evidence of anything said or any admission made for the purpose of, in the course of, or pursuant to, the Mediation shall be admissible or subject to discovery.'" So too here, Quest and Plaintiffs signed an agreement that expressly states that "[t]he mediation . . . is subject to the provisions of California Evidence Code section 1115 et seq." (**Exhibit A** to Miller Decl; **Exhibit 1** to Raizman Decl.) The Ninth Circuit in *Apollo* affirmed the district court's order finding the mediation-related communications inadmissible and stated as follows:

> California's mediation privilege is intended to encourage mediation by providing "broad protection for the confidentiality of communications exchanged in relation to that process, even where this protection may sometimes result in the unavailability of valuable civil evidence." *Cassel v. Superior Court*, 51 Cal. 4th 113, 136, 119 Cal.Rptr.3d 437, 244 P.3d 1080 (Cal. 2011). "[T]he mediation confidentiality statutes must be applied in strict accordance with their plain terms," with "[j]udicial construction, and judicially crafted exceptions, ... permitted only where due process is implicated, or where literal construction would produce absurd results. *Id.* at 124, 119 Cal.Rptr.3d 437, 244 P.3d 1080.

JOINT STIPULATION REGARDING DEFENDANTS' MOTION TO COMPEL FURTHER TESTIMONY OF CLARK RACHFAL

**EXHIBIT 24  PAGE 207**

47910849_3.docx

1    784 Fed. App'x at 502-503.

2        In light of the mediation agreement signed by all in attendance at the

3    mediation, Quest's claim—unsupported by any legal authority—that "as this case is

4    in federal court and the claims are brought under federal law, Federal Rule of

5    Evidence 408 (not state or any other evidentiary law) applies" is wrong. In *Apollo*,

6    the case was also brought in federal court, in the United States District Court for the

7    District of Arizona. However, the fact that the case was brought in federal court did

8    not permit either party to ignore the language of the signed mediation agreement

9    wherein the parties consented to be bound by California Evidence Code sections

10   1115 through 11128.

11       This same fact pattern was analyzed also in *Perez v. Indian Harbor Ins. Co.*,

12   No. 4:19-cv-07288-YGR, 2020 WL 2322996 (N.D. Cal. May 11, 2020). In *Perez*,

13   the parties signed a confidentiality agreement that provided: "[t]he mediation to

14   which this agreement pertains shall be subject to the provisions of [California]

15   Evidence Code sections 1115 et seq." *Id.* at *6. The District Court, citing *Apollo*,

16   "agree[d] that the confidentiality agreement—as agreed to by the parties in the *Perez*

17   *I* litigation—applies in this matter, and therefore California state's mediation

18   confidentiality provisions guide the Court in its determination of whether the

19   materials should be stricken." *Id.* at *7. Similar to both *Apollo* and *Perez*, the fact

20   that the instant matter is brought in federal court does not permit Quest to ignore the

21   mediation agreement its counsel signed as a prerequisite to the parties attending

22   mediation. For these reasons, Quest's instant motion must be denied and Mr. Rachfal

23   may not be compelled to testify about communications made during the March 12,

24   2020 mediation.

25   / / /

26   / / /

27   / / /

28

7        Case No. 2:19-cv-08108 DMG (MRWx)

JOINT STIPULATION REGARDING DEFENDANTS' MOTION TO COMPEL FURTHER TESTIMONY OF
CLARK RACHFAL

47910849_3.docx

**EXHIBIT 24  PAGE 208**

**B.** **Even Assuming Federal Law Applies, The Federal Mediation
Privilege Prohibits Disclosure of Statements Made During
Mediation**

Plaintiffs maintain that California Evidence Code sections 1115 *et seq.* apply
based on the parties' mutual assent by signing the mediation confidentiality
agreement. However, even assuming *arguendo* that federal law applies, as Quest
contends, application of the federal mediation privilege yields the same conclusion:
mediation communications are protected, and Mr. Rachfal cannot be compelled to
testify about them. Like California law, federal law also recognizes a federal
mediation privilege, but it is based on federal common law rather than statute and
was developed based on the interplay between Federal Rules of Evidence 408 and
501. *See Folb v. Motion Picture Indus. Pension & Health Plans*, 16 F. Supp. 2d
1164, 1179-1180 (D.C. Cal. 1998); *Sheldone v. Pa. Turnpike Comm'n*, 104 F. Supp.
2d 511, 517 (W.D. Pa. 2000).

In *Folb v. Motion Picture Industry Pension & Health Plans*, a federal question
based on the Employee Retirement Income Security Act of 1974 (ERISA) was
removed to federal court along with pendent state claims. 16 F. Supp. 2d at 1167.
The suit was brought by a fired employee who alleged that he had been illegally
discharged in retaliation for whistle blowing. *Id.* at 1166.  The employer maintained
that the plaintiff's termination was justified because he had sexually harassed another
employee. *Id.* at 1166.  The plaintiff sought discovery relating to a prior mediation
between the Plans and the employee who claimed the plaintiff had harassed her,
arguing that this mediation information would show that the Plans had maintained
there had been no harassment. *Id.* "FRE 501 is silent as to the appropriate source of
privilege for cases like this with claims based on both federal and state law. Courts
have filled this interstice with a 'general rule [that] 'in federal question cases where
pendent state claims are raised the federal common law of privileges should govern

JOINT STIPULATION REGARDING DEFENDANTS' MOTION TO COMPEL FURTHER TESTIMONY OF
CLARK RACHFAL

**EXHIBIT 24  PAGE 209**

all claims of privilege raised in the litigation." Ellen E. Deason, *Predictable Mediation Confidentiality in the U.S. Federal System*, 17 Ohio St. J. on Disp. Resol. 239, 285 (2002) (citing *Ironworkers Local Union No. 17 Ins. Fund v. Philip Morris, Inc.*, 35 F. Supp. 2d 582, 589 n.14 (N.D. Ohio 1999); *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 367 n.10 (9th Cir. 1992); *Hancock v. Hobbs*, 967 F.2d 462, 466-67 (11th Cir. 1992); *von Bulow v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987); *Wm. T. Thompson Co. v. Gen. Nutrition Corp.*, 671 F.2d 100, 104 (3d Cir. 1982); *Mem'l Hosp. v. Shadur*, 664 F.2d 1058, 1061, 1061 n.3 (7th Cir. 1981)).

"Applying this 'general rule,' the *Folb* court ruled that privilege was governed by federal common law and proceeded to outline a federal mediation privilege that partially blocked discovery of the mediation." *Id.* at 285-86 (citing *Folb*, 16 F. Supp. 2d at 1169-80). Like *Folb*, the instant case is a federal question case with pendent state law claims. Thus, the federal mediation privilege adopted in *Folb*, is "applicable to all communications made in conjunction with a formal mediation," and thus applicable here. 16 F. Supp. 2d 1179-80. The testimony Quest seeks from Mr. Rachfal is precisely that which falls into the contours of the privilege established in *Folb*, "information disclosed in conjunction with mediation proceedings with a neutral." *Id.* at 1180; *see also Karubian v. Kaiser Ventures, LLC*, No. EDCV 17-597 PSG (Ex), 2018 WL 10517183 at *4 (C.D. Cal. Oct. 17, 2018) ("Confidentiality is an important feature of mediations and other alternative dispute resolution processes. Promising participants confidentiality in these proceedings 'encourag[es] parties to . . . communicate openly and honestly in order to facilitate successful alternative dispute resolution.'") (quoting *Folb*, 16 F. Supp. 2d at 1172).

Further, in *Microsoft Corp. v. Suncrest Enters.*, No. C03-05424 JF (HRL), 2006 WL 929257 at *1 (N.D. Cal. Jan. 6, 2006), Microsoft deposed Suncrest's 30(b)(6) witness and asked several questions pertaining to an alleged settlement reached in telephone conferences with a mediator. Suncrest's corporate designee

"refused to answer, asserting, among other things, the mediation privilege." *Id.* As Quest does in the instant case vis-à-vis Mr. Rachfal, ACB's corporate designee, Microsoft then moved to compel Suncrest's corporate designee to answer those questions. *Id.* Denying Microsoft's motion to compel as to those questions, the Court "conclude[d] that most of the deposition questions at issue seek information pertaining to the parties' conversations with the mediator and are, therefore, protected." *Id.* at *2. So too here, the deposition questions at issue seek information pertaining to the parties' conversations with the mediator at the March 12, 2020 mediation and are therefore protected. Thus, the information Quest seeks cannot be compelled, and Quest's instant motion must be denied.

C. **Quest's Assertion that Plaintiffs Have "Waived" Mediation Privileges And Protected By Asserting the "Primary Consideration" Doctrine Is Erroneous**

Quest contends that "to the extent ACB claims privilege or confidentiality with respect to mediation communications, it has waived any such protections from disclosure by asserting the 'primary consideration' doctrine." As an initial matter, Quest provides no authority in support of this contention. Quest's unsupported argument that there is a basis to overcome the mediation privilege fails. The question under Section 504 of the Rehabilitation Act is whether Quest met its obligation to give "primary consideration" to the requests of auxiliary aids and services by individuals with disabilities. *See* 28 C.F.R. § 35.160(b)(2). The question is not whether ACB gave "primary consideration" to *Quest's* unilaterally imposed three-finger-swipe solution, which still renders the kiosks independently inaccessible to blind and visually impaired users. Quest has conceded that the three-finger-swipe initiative does not allow for independent use of the kiosks, was developed by Quest's attorneys without Plaintiffs' input or involvement, and was then discussed with Plaintiffs at the March 12, 2020 mediation. ACB's reaction to Quest's "proposal"

JOINT STIPULATION REGARDING DEFENDANTS' MOTION TO COMPEL FURTHER TESTIMONY OF CLARK RACHFAL

**EXHIBIT 24  PAGE 211**

made in a confidential mediation is irrelevant to the primary consideration analysis, as it does not prove or disprove any claim or defense. Despite Quest's attempt to project onto Plaintiffs the obligations that belong to Quest, the question is not whether ACB gave primary consideration to Quest's unilateral decision to alter its kiosk. There is thus no legal or conceivable basis to compel this testimony, much less one strong enough to overcome the mediation privilege and compel disclosure of mediation-related communications. The importance of confidentiality is axiomatic in mediation. To allow Quest to pursue discovery that is plainly protected by mediation privileges set forth in federal common law and the California Evidence Code, and the parties' mediation confidentiality agreement, is contrary to public policy, and would erode both the effectiveness of, and willingness of parties in litigation to participate in mediation and other alternative dispute resolution processes. For these reasons, Quest's instant motion must be denied.

## III. ATTEMPTS TO RESOLVE THIS DISPUTE INFORMALLY

On June 22, 2021, Quest outlined in a letter its request to recall Mr. Rachfal for deposition to answer questions he refused to answer at his June 9, 2021 deposition and to obtain the deposition of Ms. Stanley. (Exhibit 3 to Raizman Decl.) On June 25, 2021, ACB's counsel, Matt Handley, responded in a letter rejecting all of the relief requested here. (Exhibit 4 to Raizman Decl.)

On July 20, 2021, despite the parties being present to conduct a pre-filing conference on Plaintiffs' anticipated motion for a protective order, Plaintiffs' counsel declined to conduct a pre-filing conference on this motion, asserting that Mr. Handley would be better-suited to address the issues presented by this motion. (Raizman Decl. ¶ 6.)[1] On July 21, 2021, the parties further conferred on some of the issues raised by Quest, resolving the issues surrounding Ms. Stanley's deposition.

---

[1] The parties' ongoing meet and confer efforts resulted in the resolution of certain of the discovery issues that Quest hoped to address at the pre-conference filing conference. (Raizman Decl. ¶ 7.)

JOINT STIPULATION REGARDING DEFENDANTS' MOTION TO COMPEL FURTHER TESTIMONY OF CLARK RACHFAL

**EXHIBIT 24   PAGE 212**

1  (*Id.* ¶ 8.)

2      In any event, this motion presents the same privilege issue that is at the heart

3  of Plaintiffs' motion for a protective order about which the parties met and conferred

4  on July 20, 2021, so the parties have adequately met and conferred, but have a

5  disagreement about the application of law to these circumstances.

6

7                              Respectfully submitted,

8  DATED: July 28, 2021          OGLETREE, DEAKINS, NASH, SMOAK &
                                  STEWART, P.C.
9

10

11                              By:  /s/ David Raizman
                                     David Raizman
12                                   Amber L. Roller
                                     J. Nicholas Marfori
13
                                Attorneys for Defendants
14                              QUEST DIAGNOSTICS CLINICAL
                                LABORATORIES, INC.; QUEST
15                              DIAGNOSTICS HOLDINGS, INC. and
                                QUEST DIAGNOSTICS INCORPORATED
16

17  DATED: July 28, 2021          /s/ Jonathan Miller
                                By: _____
18

19                                 Jonathan D. Miller (SBN 220848)
                                   jonathan@nshmlaw.com
20                                 Alison M. Bernal (SBN 264629)
                                   alison@nshmlaw.com
21                                 NYE, STIRLING, HALE
                                   & MILLER, LLP
22                                 33 West Mission Street, Suite 201
                                   Santa Barbara, CA 93101
23                                 Telephone: (805) 963-2345

24                                 *Signatures continued below.*

25                                 Benjamin J. Sweet
                                   (*Admitted Pro Hac Vice*)
26                                 ben@nshmlaw.com
                                   NYE, STIRLING, HALE
27                                 & MILLER, LLP
                                   1145 Bower Hill Road, Suite 104
28                              _____
                                         12        Case No. 2:19-cv-08108 DMG (MRWx)
    JOINT STIPULATION REGARDING DEFENDANTS' MOTION TO COMPEL FURTHER TESTIMONY OF
                                    CLARK RACHFAL

EXHIBIT 24  PAGE 213

Pittsburgh, PA 15243
Telephone: (412) 857-5350

Matther K. Handley
(*Admitted Pro Hac Vice*)
mhandley@hfajustice.com
HANDLEY FARAH &
ANDERSON PLLC
777 6ᵗʰ St NW
Washington, DC 20001
Telephone: (202) 559-2411

Attorneys for Plaintiffs JULIAN
VARGAS, AMERICAN COUNCIL OF
THE BLIND, AND THE PROPOSED
CLASS

47910849.3

## Certification Pursuant to Local Rule 5-4.3.4(a)(2)(i)

Pursuant to Local Rule 5-4.3.4(a)(2)(i), I, David Raizman, do attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated: July 28, 2021          By: /s/ David Raizman

47910849.3

13          Case No. 2:19-cv-08108 DMG (MRWx)

JOINT STIPULATION REGARDING DEFENDANTS' MOTION TO COMPEL FURTHER TESTIMONY OF
CLARK RACHFAL

# Stipulation

[2:19-cv-08108-DMG-MRW Julian Vargas et al v. Quest Diagnostics Clinical Laboratories, Inc. et al](#)

ACCO,
(MRWx),DISCOVERY,MANADR,PROTORD

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## Notice of Electronic Filing

The following transaction was entered by Raizman, David on 7/28/2021 at 8:28 PM PDT and filed on 7/28/2021

| | |
|---|---|
| **Case Name:** | Julian Vargas et al v. Quest Diagnostics Clinical Laboratories, Inc. et al |
| **Case Number:** | [2:19-cv-08108-DMG-MRW](#) |
| **Filer:** | Quest Diagnostics Incorporated |
| | Quest Diagnostics Clinical Laboratories, Inc. |
| | Quest Diagnostics Holdings, Inc. |
| **Document Number:** | [80](#) |

**Docket Text:**
**Joint STIPULATION to Compel Clark Rachfal to respond to questions he was instructed to, and refused, to answer filed by defendants Quest Diagnostics Clinical Laboratories, Inc., Quest Diagnostics Holdings, Inc., Quest Diagnostics Incorporated.(Raizman, David)**

**2:19-cv-08108-DMG-MRW Notice has been electronically mailed to:**

Alison M. Bernal     alison@nshmlaw.com, chloe@nshmlaw.com, lindsey@nshmlaw.com

Amber L Roller     amber.roller@ogletreedeakins.com, amber.roller@ogletree.com, LAXDocketing@ogletreedeakins.com, leticia.rivera@ogletreedeakins.com

Benjamin J Sweet     ben@nshmlaw.com, lindsey@nshmlaw.com

**EXHIBIT 24   PAGE 215**

David H Raizman     david.raizman@ogletree.com, david.raizman@ogletreedeakins.com,
leticia.rivera@ogletreedeakins.com, marilyn.moretti@ogletreedeakins.com

Jan Nicholas Marfori     nicholas.marfori@ogletree.com, carla.brown@ogletree.com,
cheree.castille@ogletree.com, Jennifer.Rusie@ogletreedeakins.com

Jonathan D Miller     jonathan@nshmlaw.com, alison@nshmlaw.com,
annie@nshmlaw.com, ben@nshmlaw.com, brenda@nshmlaw.com,
callum@nshmlaw.com, chloe@nshmlaw.com, daniel@nshmlaw.com,
Holly@nshmlaw.com, jennifer@nshmlaw.com, jmwalker@nshmlaw.com,
jordan@nshmlaw.com, lindsey@nshmlaw.com, marisol@nshmlaw.com,
tim@nshmlaw.com

Matthew K. Handley     mhandley@hfajustice.com

**2:19-cv-08108-DMG-MRW Notice has been delivered by First Class U. S. Mail or by
other means BY THE FILER to :**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**I:\19-08108\Motion to Compel Clark Rachfal to Answer\Joint Stip re
Defendants Motion to Compel Clark Rachfal to Respond.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=7/28/2021] [FileNumber=32357156-0
] [2c89124e0b948d143064b8aa29 ec78555c8192663086214846f1a2df6d3cacebeda
09283ac61496f07107ec07283ea2dca5f8da8957f14d0615ada9778dfa533]]

EXHIBIT 24  PAGE 216

# EXHIBIT 25

EXHIBIT 25  PAGE 217



Jonathan D. Miller

Partner
T (805) 963-2345
F (805) 284-9590
E jonathan@nshmlaw.com

May 4, 2021

**VIA E-MAIL**
David Raizman, Esq.
david.raizman@ogletree.com
Amber L. Roller, Esq.
amber.roller@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, California 90071

Re: *Vargas et al. v. Quest, et al.*

Dear Mr. Raizman,

After considering Magistrate Judge Wilner's comments at the discovery conference, we are writing to further meet and confer on the remaining discovery issues in an effort to avoid unnecessarily burdening the Court with motion practice. There are five issues in dispute remaining following the conference. We propose the following in a good faith effort to resolve each of these remaining issues:

**1.** ___*Plaintiffs' Issues:*___

**A.**     **Defendant's production of Rule 30(b)(6) witnesses without proper knowledge and/or preparation and improper coaching.**

Proposal for resolution: Plaintiffs propose that Defendants produce witnesses with sufficient knowledge, per the requirements of Rule 30(b)(6), who are prepared to answer questions on the topics, as set forth below:

TOPICS

1.     YOUR decision to outfit YOUR PATIENT SERVICE CENTERS with
E-CHECK-IN KIOSKS.

**EXHIBIT 25  PAGE 218**

*May 4, 2021*
*Page 11*

The attorney-client privilege "cannot be used as both a shield and a sword." *United States v. Workman* 138 F.3d 1261, 1264 (8th Cir. 1998). Further, relying on advice of counsel waives privilege. *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992); *Peterson v. Wallace Computer Services, Inc.*, 984 F. Supp. 821, 825 (D. Vt. 1997). "Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be waived." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992). In *Chevron*, Pennzoil's former CEO stated in his declaration that insofar as a decision to proceed was based upon certain considerations, it was made in reliance upon the advice of counsel. *Id.* The Ninth Circuit held that "[i]nsofar as Pennzoil's decision to proceed with the Chevron investment was based on tax considerations, that decision was made upon the advice of counsel. Pennzoil cannot invoke the attorney-client privilege to deny Chevron access to the very information that Chevron must refute in order to demonstrate that Pennzoil's Schedule 13D is materially misleading. *Id.* at 1162-63. Similarly, insofar as Quest's implementing the three-finger-swipe method was based on certain considerations, that decision was made—as testified by Mr. Carr—upon the advice of counsel. Quest cannot invoke the attorney-client privilege to deny Plaintiffs access to the very information they must refute to demonstrate that Quest discriminates against the legally blind in violation of state and federal law.

Further, as the Court noted in *United States v. Freeman,* 619 F.2d 1112, 1119-20 (5th Cir. 1980), "'[a]n attorney's involvement in, or recommendation of, a transaction does not place a cloak of secrecy around all the incidents of such a transaction.' This cannot be gotten around by the simple expedient of putting a lawyer in the shoes of the executive or, as [defendant] has done, giving the legal department the power of the corporate executive." *Id.* at 805.

In addition to Plaintiffs' need for discovery on the three-finger-swipe as it relates to rebutting Quest's mootness affirmative defense, this testimony is further necessary to establish one of Plaintiffs' elements on their section 504 of the Rehabilitation Act claim, namely, that Quest must give primary consideration to the requests of people with disabilities when determining what types of auxiliary aids and services are necessary. 28 C.F.R. § 35.160(b)(2).

For instance, in Mr. Carr's deposition, Plaintiffs' counsel posed the following question, "[p]rior to implementing the three-finger swipe, did Quest give any consideration on whether it could implement speech output at the eCheck-in kiosk that

33 West Mission Street, Suite 201, Santa Barbara, California 93101

EXHIBIT 25  PAGE 219

*May 4, 2021*
*Page 14*

4.      Following any necessary hearing, the parties would need two to three weeks to resolve any issues following from the magistrate's order on the motions. That brings it to August 4, 2021. Plaintiffs would then request approximately two weeks to prepare and file their motion for class certification. We thus propose the motion for class certification be filed by **August 20, 2021**. This would also allow your office to complete your trial preparation and trial before having the oppose class certification.

5.      We would propose the opposition to class certification be three weeks after the moving papers, on **September 3, 2021**.

6.      The reply in support of class certification would be due **September 10, 2021.**

7.      The hearing on class certification be held on **September 24, 2021, at 10:00 a.m**.

Finally, we offer to further meet and confer on any remaining issues, either telephonically with a court reporter or in person at a mutually agreeable location.

Very truly yours,

NYE, STIRLING, HALE & MILLER, LLP

JONATHAN D. MILLER

cc:

Matthew K. Handley, Esq.
Benjamin J. Sweet, Esq.
Alison M. Bernal, Esq.
Jordan T. Porter, Esq.

33 West Mission Street, Suite 201, Santa Barbara, California 93101

EXHIBIT 25  PAGE 220

# EXHIBIT 26

EXHIBIT 26  PAGE 221

Page 1

1                  UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3

4    JULIAN VARGAS, ANNE WEST and  ) Case No.
     AMERICAN COUNCIL OF THE BLIND ) 2:19-cv-08108 DMG(MRW)x
5    individually on behalf of     )
     themselves and all others     )
6    similarly situated,           )
                                   )
7                     Plaintiffs,  )
                                   )
8         v.                       )
                                   )
9    QUEST DIAGNOSTICS CLINICAL    )
     LABORATORIES, INC., QUEST     )
10   DIAGNOSTICS HOLDINGS, INC.,   )
     QUEST DIAGNOSTICS,            )
11   INCORPORATED; and DOES 1-10,  )
     inclusive,                    )
12                                 )
                      Defendants.  )
13   _____)

14

15       REMOTE VIDEOTAPED DEPOSITION OF JULIAN VARGAS

16                    Van Nuys, California

17                  Thursday, April 22, 2021

18

19

20

21   Reported by:
     ANELA SHERADIN, CSR NO. 9128

22

23   JOB NO. 4523491

24

25   PAGES 1 - 254

Page 105

1   questions about my -- you know, my address and things

2   like that and verifying that my insurance was, you know,

3   my insurance and things like that, and then the

4   phlebotomist proceeded to draw the blood.

5        Q   Did you have to sign in at all for that visit?   13:30:12

6        A   I don't recall.   13:30:16

7        Q   And then after the phlebotomist took your   13:30:19

8   blood, what happened next?

9        A   I pretty much was -- I pretty much left and   13:30:25

10   then went back to the doctor's office to proceed with

11   the first part of the physical examination.

12        Q   Okay.  How long between the time you set foot   13:30:36

13   in the Quest patient service center and the time you

14   left?

15        A   It's hard to say, but maybe -- maybe 5 to 10   13:30:47

16   minutes.

17        Q   Okay.  And aside from the person that was at   13:30:53

18   the window, did you -- and the phlebotomist who drew

19   your blood, did you interact with anybody else at the

20   Quest patient service center during that visit?

21        A   I don't recall.   13:31:10

22        Q   Okay.  Do you recall whether your doctor   13:31:11

23   received your results from that visit?

24        A   Yes.   13:31:20

25        Q   And did your doctor receive your results, to   13:31:26

Veritext Legal Solutions

EXHIBIT 26  PAGE 223

Page 108

1    person there and gave them the information, as I did

2    with the other time, and then I was directed to wait.

3    BY MS. ROLLER:                                        13:34:38

4        Q   Okay.  Did you -- were you a walk-in on that --   13:34:39

5    on this visit?

6        A   I believe so.                                 13:34:45

7        Q   How long do you believe you waited from the   13:34:47

8    time you got in to the patient service center in Tarzana

9    until the time you were able to speak with the

10   receptionist to get checked in?

11       A   Probably about 5 to 10 minutes.  There were   13:35:03

12   people there.

13       Q   Okay.  Were you able to sense about how many   13:35:10

14   people were there?

15       A   No, I couldn't.                               13:35:15

16       Q   Did you overhear any conversations between the   13:35:16

17   folks in front of you and the Quest employee who was

18   checking people in?

19       A   Yes.                                          13:35:27

20       Q   Okay.  What do you recall from those          13:35:28

21   conversations?

22       A   I didn't pay attention to what they were.     13:35:32

23       Q   Was it your impression that -- oh, sorry, go   13:35:34

24   ahead.

25       A   No, I didn't recall what they were other than   13:35:37

Veritext Legal Solutions

EXHIBIT 26  PAGE 224

Page 121

1    hear anybody.  I said hello a couple of times and nobody

2    was there, so I basically just stood there.

3         Q   Okay.  Did somebody eventually come to the          13:53:28

4    window?

5         A   Well, somebody eventually came out and that was     13:53:31

6    only to admit, I guess, another patient that was in the

7    waiting room who had already checked in earlier --

8         Q   How long --                                         13:53:43

9         A   -- and that's it.                                   13:53:44

10        Q   Go ahead.                                           13:53:45

11        A   So that was the only way I was able to get          13:53:45

12   anybody's attention there, was when that person came out

13   to call in that other patient.

14        Q   How long between the time you stepped in the        13:53:52

15   Quest patient center and the time that that person came

16   out to get the other patient?

17        A   I would say I waited there a good 10 to 15          13:54:01

18   minutes at that window.  It was a long wait.

19        Q   Okay.  And when the -- do you know if the           13:54:12

20   person that came out was a phlebotomist?

21        A   I believe so, but I didn't know it at the time      13:54:21

22   but only because that's the same person that ultimately

23   took my blood.

24        Q   Okay.  When that phlebotomist came out, did         13:54:27

25   you -- did you get the attention of the phlebotomist?

Veritext Legal Solutions

Page 125

```
 1      A    I think my hand was put on it so I was able to    13:58:53

 2   kind of feel it.

 3      Q    Okay.  And in response to you saying that you     13:58:59

 4   needed assistance checking in, what did the phlebotomist

 5   do or say?

 6      A    She told me okay, just wait a second while she    13:59:08

 7   took that patient in.

 8      Q    Okay.  And did she come back for you?            13:59:15

 9      A    Yes.                                             13:59:19

10      Q    And how long between the time she said wait a    13:59:21

11   second and the time she returned?

12      A    Probably about five minutes or so.               13:59:27

13      Q    Was it -- was it your impression that she was    13:59:29

14   completing a service on the patient or that she was just

15   putting the patient in the room so she could come help

16   you?

17          MR. MILLER:  It calls for speculation.            13:59:43

18          Go ahead.                                         13:59:45

19          THE WITNESS:  Yeah, I'm not sure.  I mean after   13:59:45

20   all was said and done, I believe that was the case

21   because I don't believe that anybody else was working

22   there other than her.

23   BY MS. ROLLER:                                          13:59:54

24      Q    Okay.  Did you hear -- when she came back out,  13:59:55

25   did you hear the other patient leaving or --
```

Veritext Legal Solutions

EXHIBIT 26  PAGE 226

```
                                                         Page 158

1    of it is accessible.  So, yes, if Quest is the closest

2    lab to me, I would go back and attempt to make use of

3    the system.

4    BY MS. ROLLER:                                      14:42:22

5       Q    Okay.  So knowing the specific procedures that   14:42:23

6    Quest has as of today, you would go back in May -- for

7    your May draw, you would go back to Quest?

8          MR. MILLER:  It misstates his testimony.       14:42:39

9          Go ahead.                                      14:42:41

10         It lacks foundation, incomplete hypothetical.   14:42:42

11         Go ahead.                                       14:42:44

12         THE WITNESS:  Yeah, again, it -- it depends on   14:42:44

13   if that's the closest one to where I'm going to be going

14   from; and, yes, you know, I would make use of it, to try

15   it out and see how it works.

16         But as I also stated, if I hear voices coming    14:42:56

17   from the window, I'm probably going to go straight to

18   the window, skip the extra step because it ultimately

19   doesn't really give me all what I'm looking for.

20   BY MS. ROLLER:                                        14:43:07

21      Q    Okay.  If your position is that Quest's       14:43:08

22   eCheck-in kiosk is not accessible based on what they are

23   providing right now, why would you go back to Quest

24   instead of going to a different lab?

25         MR. MILLER:  Objection; argumentative.          14:43:23
```

Page 159

| | | |
|---|---|---|
| 1 | Go ahead. | 14:43:25 |
| 2 | THE WITNESS:  Well, again, if it happens to be | 14:43:26 |
| 3 | the closest one, then it makes sense to go and to try it | |
| 4 | out. | |
| 5 | But, no, it is not a fully accessible kiosk. | 14:43:32 |
| 6 | It is a part of it, one part of it is accessible by | |
| 7 | means of that gesture.  And, yeah, now that I know it, I | |
| 8 | will try it out and make use of it if it is the most | |
| 9 | effective way to go. | |
| 10 | Like if nobody is at the window like on my last | 14:43:47 |
| 11 | visit on the 25th of June 2019, I -- I would do that in | |
| 12 | hopes that I wouldn't have to wait another 10 to 15 | |
| 13 | minutes for somebody to come out and acknowledge me. | |
| 14 | BY MS. ROLLER: | 14:44:02 |
| 15 | Q   You testified that the Labcorp lab is like less | 14:44:02 |
| 16 | than a mile away from the Quest one.  Why wouldn't you | |
| 17 | go to the Labcorp location if you believed that the | |
| 18 | Quest location is not accessible to you? | |
| 19 | A   Because I don't believe that they have an | 14:44:22 |
| 20 | accessible kiosk either. | |
| 21 | Q   Okay.  Is what's more important to you, going | 14:44:27 |
| 22 | to a place that you believe has an accessible check-in | |
| 23 | or going to a place that's close? | |
| 24 | A   Close matters; but then, yes, an accessible | 14:44:40 |
| 25 | check-in is absolutely a plus, and I would consider | |

Veritext Legal Solutions

EXHIBIT 26  PAGE 228

Page 254

1        I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3        That the foregoing proceedings were taken

4   before me at the time and place herein set forth; that

5   any witnesses in the foregoing proceedings, prior to

6   testifying, were duly sworn; that a record of the

7   proceedings was made by me using machine shorthand

8   which was thereafter transcribed under my direction;

9   that the foregoing transcript is a true record of the

10  testimony given.

11       Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [  ] was [ X ] was not requested.

15       I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or party to this action.

18       IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated: May 7, 2021

22

23                          _____

                            ANELA SHERADIN

24                          CSR NO. 9128

25

Page 1

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4        JULIAN VARGAS, ANNE    )

         WEST and AMERICAN      )

5        COUNCIL OF THE BLIND,  )

         individually on behalf )  Case No. 2:19-cv-08108 DMG (MRWx)

6        of themselves and all  )

         others similarly       )

7        situated,              )

                                )

8                 Plaintiffs,   )

                                )

9        vs.                    )

                                )

10       QUEST DIAGNOSTICS       )

         CLINICAL LABORATORIES, )

11       INC., QUEST            )

         DIAGNOSTICS HOLDINGS,  )

12       INC., QUEST DIAGNOSTICS)

         INCORPORATED; and DOES )

13       1-10, inclusive,       )

                                )

14                Defendants.   )

         _____ )

15

16

17            REMOTE VIDEOTAPED DEPOSITION OF ARDIS BAZYN

18                         April 27, 2021

19

20

21

22

23

24

         Job No. CS4522969

25       Reported by: Maryann Matthews, CSR #737

EXHIBIT 26  PAGE 230

Page 29

1                    (Unintelligible crosstalk.)

2           Q.   (BY MS. ROLLER) So when you first walked in

3      the door to the Quest patient service center on Alameda,

4      were you encountered by a greeter or somebody that said,

5      "Welcome to Quest.  What can we help you with?"

6           A.   No.

7           Q.   Okay.  What did you do once you first walked

8      in?

9           A.   We went to the counter and my husband signed

10     us in.

11          Q.   Okay.  And how did he sign you in?

12          A.   I'm not sure because he did it.

13          Q.   Was your husband there to get blood work done

14     that day, too?

15          A.   Yes.

16          Q.   And when he went to the counter, did you just

17     sit down in one of the chairs in the waiting room?

18          A.   I waited for him to sign us in, and then he,

19     you know, told us where there were places we could sit.

20          Q.   Okay.  How long did it take for him to sign

21     you guys in?

22          A.   No more than a couple minutes.

23          Q.   And did he go up to the, like, reception desk

24     and speak to somebody, based on your understanding?

25          A.   No.

Page 30

```
 1          Q.   Okay.  Who did he speak with?
 2          A.   He just signed it in whatever -- where they
 3     have you sign in because there wasn't anybody at the
 4     desk.
 5          Q.   Okay.  So, like, on a piece of paper?
 6          A.   I don't know.  I'd have to ask him.  I can
 7     ask him if you want me to.  He's in the other room.
 8          Q.   So within a couple of -- you said a couple of
 9     minutes he had signed in.  And then --
10          A.   Right.
11          Q.   -- did you guys both go and sit down?
12          A.   Yes.
13          Q.   And then at some point were you called back
14     for your blood draw?
15          A.   Yes.
16          Q.   How long after that?
17          A.   About ten minutes, 15.
18          Q.   And did you just wait in the waiting room at
19     that point?
20          A.   Yes.
21          Q.   Did you or your husband, to your knowledge,
22     have any interaction with anybody from Quest between the
23     time he signed you in and the time you were taken back
24     for your blood draw?
25          A.   No.
```

EXHIBIT 26  PAGE 232

Page 42

1          A.   Waited until -- at the counter until someone
2     came out.
3          Q.   And in 2019 during that visit, how long did
4     it take for somebody to come out to the counter to check
5     you in?
6          A.   Oh, I think, you know, five or ten minutes.
7          Q.   Okay.  And then did you go to Quest in 2018?
8          A.   Yes.
9          Q.   And do you recall if you went alone or with
10    your husband on that visit?
11         A.   No, I was alone.  I -- they had an attendant
12    then, so --
13         Q.   Okay.  And how long did it take for you to
14    check in in 2018, at your 2018 visit?
15         A.   I just went right up to the counter and they
16    took my name.
17         Q.   Do you recall what location this was that you
18    went to in 2018?
19         A.   Oh, I think it was the 201 South Buena Vista,
20    but I'm not positive.  But I --
21         Q.   Do you know --
22         A.   That one is easier for me to get to, so I
23    generally try to do that one when I'm by myself.
24         Q.   And when you checked in at the 2018 visit,
25    what information did they ask of you in order to check

Page 57

1                    REPORTER'S CERTIFICATE

2

    STATE OF IDAHO  )
3                   )  ss.
    COUNTY OF ADA   )

4

5       I, MARYANN MATTHEWS, Certified Shorthand Reporter

6   and Notary Public in and for the State of Idaho, do hereby

7   certify:

8       That prior to being examined, the witness named in

9   the foregoing deposition was duly sworn remotely by me to

10  testify to the truth, the whole truth and nothing but the

11  truth;

12      That said deposition was taken down by me in

13  shorthand at the time and place therein named and

14  thereafter reduced to typewriting under my direction,

15  and that the foregoing transcript contains a full,

16  true and verbatim record of said deposition.

17      I further certify that I have no interest in the

18  event of the action.

19      WITNESS my hand and seal this 12th day of May,

20  2021.

21

22                          MARYANN MATTHEWS
                            CSR and Notary
23                          Public in and for the
                            State of Idaho.

24

25  My Commission Expires:  09-12-2025

Page 1

```
1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4       JULIAN VARGAS, ANNE   )
        WEST and AMERICAN     )
5       COUNCIL OF THE BLIND, )
        individually on behalf )  Case No. 2:19-cv-08108 DMG (MRWx)
6       of themselves and all )
        others similarly      )
7       situated,             )
                              )
8                 Plaintiffs, )
                              )
9       vs.                   )
                              )
10      QUEST DIAGNOSTICS     )
        CLINICAL LABORATORIES, )
11      INC., QUEST           )
        DIAGNOSTICS HOLDINGS, )
12      INC., QUEST DIAGNOSTICS)
        INCORPORATED; and DOES )
13      1-10, inclusive,      )
                              )
14                Defendants. )
        _____)

15

16

17         REMOTE VIDEOTAPED DEPOSITION OF RALPH DANIEL BLACK

18                      April 27, 2021

19

20

21

22

23

24

        Job No. CS4522969
25      Reported by: Maryann Matthews, CSR #737
```

EXHIBIT 26  PAGE 235

Page 28

1      in the middle of all of that with doing it with the two

2      of us, so we left and went back to talk to the

3      receptionist.

4            Q.   How long did you wait in line at the kiosk

5      before you actually got up to the front of the kiosk?

6            A.   I don't remember.  It wasn't too long.  Maybe

7      five minutes or something.

8            Q.   Were there a certain number of people that

9      you can recall that were in front of you checking in?

10           A.   No, I don't.

11           Q.   Okay.  Once you realized you couldn't use the

12     kiosk to check in, you went over to the receptionist

13     desk, right?

14           A.   Yes.

15           Q.   And was somebody there?

16           A.   Yes.

17           Q.   And what did you say to them at that point?

18           A.   Well, I explained to her that we couldn't use

19     the kiosk, and she said, "Well, you know, that's the way

20     we do things.  You have to use the kiosk."

21                And so I had to -- you know, went back

22     through it with her again and explained, you know, my

23     wife's limitations and my visual impairment, and between

24     the two of us we couldn't do it.

25                And so then she said, "Oh, well, let me see

Page 49

1                      REPORTER'S CERTIFICATE

2

STATE OF IDAHO  )

3                  )  ss.
COUNTY OF ADA   )

4

5        I, MARYANN MATTHEWS, Certified Shorthand Reporter

6   and Notary Public in and for the State of Idaho, do hereby

7   certify:

8        That prior to being examined, the witness named in

9   the foregoing deposition was duly sworn remotely by me to

10  testify to the truth, the whole truth and nothing but the

11  truth;

12       That said deposition was taken down by me in

13  shorthand at the time and place therein named and

14  thereafter reduced to typewriting under my direction,

15  and that the foregoing transcript contains a full,

16  true and verbatim record of said deposition.

17       I further certify that I have no interest in the

18  event of the action.

19       WITNESS my hand and seal this 12th day of May,

20  2021.

21

22                           MARYANN MATTHEWS
                             CSR and Notary
23                           Public in and for the
                             State of Idaho.

24

25  My Commission Expires:  09-12-2025

Page 1

1               UNITED STATES DISTRICT COURT
2               CENTRAL DISTRICT OF CALIFORNIA
3
     JULIAN VARGAS, ANNE WEST AND          )
4    AMERICAN COUNCIL OF THE BLIND,        )
     INDIVIDUALLY ON BEHALF OF             )
5    THEMSELVES AND ALL OTHERS SIMILARLY)  CASE NO.
     SITUATION,                            )
6                                          )  2:19-CV-08108
                        PLAINTIFFS,        ) DMG
7                                          )
          VS.                              )
8                                          )
     QUEST DIAGNOSTICS CLINICAL            )
9    LABORATORIES, INC., QUEST             )
     DIAGNOSTICS HOLDINGS, INC., QUEST     )
10   DIAGNOSTICS INCORPORATED; AND DOES    )
     1-10, INCLUSIVE,                      )
11                                         )
                        DEFENDANTS.        )
12                                         )
     _____)
13
14
15
16
17
18
                 VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF
19
                      REGINA MARIE BRINK
20
                      THURSDAY, MAY 6, 2021
21
22
23
24
        JOB NO. 4522978-B
25
        REPORTED BY:  MELIA BASAVAND, CSR NO. 14089

Veritext Legal Solutions

Page 47

1    the counter when you arrived?

2        A    I don't recall.

3        Q    Okay.  How long was it after your daughter

4    informed you that there was a kiosk that you spoke

5    with a receptionist or whoever it was that you spoke

6    with?

7        A    It -- it was a little bit.  It wasn't a

8    quick process.

9        Q    Okay.  So you learned about the kiosk and

10   then did you stand there?  Did you wait for somebody

11   to come out?

12            How did you engage somebody from Quest?

13       A    I think I asked my daughter was there a desk

14   and we went to the desk.  And I think there might

15   have been a line, and I had to wait my turn.  And I

16   don't know if there was someone at that desk that

17   whole time.

18       Q    When is that --

19            Sorry, go ahead.

20       A    So I was -- there was just some time.  I

21   just remember some waiting time before I was

22   actually able to talk to someone at that desk she

23   took me too.

24       Q    And when you spoke with the Quest staff

25   member at the the desk, what did you say?

Page 48

1      A    I said I'm totally blind so I can't operate

2   the kiosk to sign in.

3      Q    And did you ask at that point if it was --

4   if it had speaking capabilities?

5      A    I think I just said I can't operate it.

6      Q    Did you try to operate it?

7      A    No.

8      Q    Okay.  And then what did the Quest staff

9   member say in response?

10     A    She said well, could your daughter help you?

11     Q    And then what did you say?

12     A    I said no.  I'm not comfortable with that.

13     Q    And then what happened after that?

14     A    She said okay.  Well, you have to wait, but

15  I can assist you.

16     Q    Okay.  And then how long after that

17  conversation with a Quest staff member did she

18  assist you?

19     A    It was probably about 10, 15 minutes.

20     Q    How did she assist you?

21     A    I don't know.  She -- she asked for my card

22  and then she started to ask me more involved

23  questions.  But it was in the waiting room, and so I

24  asked her could we go into a private office.  So she

25  had me wait again and then she took me into an

Page 49

1    office and finished the process.

2        Q    What card did she take from you?

3        A    It's a plastic card that Dignity Health

4    hands out -- an insurance card.

5        Q    Okay.  And do you know what information is

6    contained on that information card?

7        A    I know there's a group number and a phone

8    number to call if you have issues, but aside from

9    that I don't know what other numbers appear on it.

10       Q    Do you know if your name is on it?

11       A    Well, yeah, my name is on it.

12       Q    Do you know if your date of birth is on it?

13       A    I don't think so.

14       Q    Do you know if your address is on it?

15       A    I don't think so.

16       Q    Go ahead.  Take a sip.

17       A    You saw the coffee there.

18       Q    Actually, you know what?  Now is a good of a

19   time as any because we've been going for about an

20   hour.  So if you want to take a break, we can take a

21   short five or ten-minute break and then we'll come

22   back.

23            Okay?

24       A    That would be good.  Thank you.

25            MR. HANDLEY:  Yeah.  Why don't we do that.

EXHIBIT 26 PAGE 241

Page 50

1    That sounds good.

2             We can go off the record then.

3             THE VIDEOGRAPHER:  Going off the record at

4    3:03 p.m.

5             (Whereupon, a recess was held from

6             3:03 p.m. until 3:15 p.m.)

7             THE VIDEOGRAPHER:  We're back on the record

8    at 3:15 p.m.

9    BY MS. ROLLER:

10       Q    Okay.  Ms. Brink, you understand you're

11   still under oath?

12       A    Yes.

13       Q    Okay.  So we were talking about the first

14   time you visited the Quest location when you

15   encountered the E check-in kiosk before the break.

16       A    Yes.

17       Q    And you mentioned that you were assisted by

18   a -- somebody from Quest, and they took you into the

19   back room after you requested assistance checking

20   in; right?

21       A    Yes.

22       Q    How long --

23       A    Not the back.  It was another room off to

24   the side.

25       Q    Okay.  A private room?

Page 51

1    A    Yes.

2    Q    How long did it take from the time that you

3  first spoke with the receptionist or, whoever it

4  was, to request assistance to the time that they

5  took you to that private room to get your

6  information?

7    A    I don't remember the exact time, but it was

8  an extended time because my daughter was complaining

9  about it.

10   Q    Was it less than ten minutes or more than

11 ten minutes?

12   A    More than ten minutes.

13   Q    Was it more or less than 15 minutes?

14   A    More than that.  I would say between half an

15 hour and 45 if I had to guesstimate.

16   Q    And while you were waiting to be taken to

17 the side room, where were you?

18   A    In the main waiting room.

19   Q    And in that time period did you see other

20 patients or hear other patients coming in?

21   A    Definitely very busy and crowded.

22   Q    Approximately how many did you notice came

23 in after you?

24   A    I couldn't remember.  It's too long ago.

25   Q    Okay.  And in that time that you were

Page 56

1      Q    Okay.  When you would go in during those

2    visits from 2012 to 2018, do you recall how many

3    times there was somebody at the front desk who was

4    able to assist you?

5      A    Almost every time I went up there.  I do

6    remember a couple of times I had to ask somebody,

7    and I would need to go to the -- I'd have to ask a

8    patient, and they would say oh, she'll -- she'll be

9    back -- blah, blah, blah.  And so I'd have to stand

10    there and wait until she got back to the desk.

11      Q    But most of the time would you say that

12    there was somebody waiting at the desk?

13      A    Yes.

14      Q    And how many times do you recall that there

15    was not somebody waiting at the desk where you

16    needed to wait for them?

17      A    Like I said, one or two.

18      Q    Okay.  How -- how long did you need to wait

19    on those one or two occasions for somebody to return

20    to the desk?

21      A    About five minutes maybe.

22      Q    Okay.  And then would the time vary between

23    the time you said you needed assistance and then the

24    time that you were checked in?

25      A    Yes.

Page 67

1    up immediately to the front desk; is that right?

2         A    Yes.  Where I heard someone speaking.

3         Q    And so there was somebody there when you

4    arrived?

5         A    Yes.

6         Q    Do you know if that was a receptionist or a

7    phlebotomist?

8         A    I think it's the receptionist.  I don't know

9    to tell you the truth.

10        Q    Was it the same person or a different person

11   than drew -- that drew your blood that day?

12        A    A different person that drew the blood.

13        Q    And so how long was it between the time that

14   you talked to that receptionist for the -- whoever

15   it was for the first time and the time that she

16   called you back up?

17        A    Oh, my gosh.  That is around two to three

18   minutes tops.

19        Q    Okay.  And then -- and then when she called

20   you back up, what information did she request of

21   you?

22        A    If I have the printed paper, I could just

23   hand -- excuse me -- I can just hand it to her, and

24   she can take all the information she needs off that.

25             If I've lost my paper, then I usually have

Page 76

1    assistance.  You sit down, and then they call you to

2    check you in.  And then you sit down.  And you go

3    back to be -- actually have the blood draw.

4          The difference is the time is

5    quicker because --

6        Q     Okay.

7        A     -- it's less busy.

8        Q     Okay.  So at the Land Park location --

9          So then I did misunderstand.  So at the Land

10   Park location you come in.  You go up to the

11   receptionist.  They tell you hold on one second.

12   I'll call you back.  They have you sit down.  And

13   then they call you back up.

14          Right?

15       A     Yes.  And that's when you get checked in.

16       Q     Okay.  How long on average is it from the

17   time that you first encountered the receptionist,

18   when you tell them you need assistance, to the time

19   that they check you in at that Land Park location?

20       A     Two to three minutes.

21       Q     Okay.  Since you've been going to the Land

22   Park location, have you ever overheard somebody else

23   needing assistance with check-in?

24       A     Yes.

25       Q     On how many occasions?

Page 78

1   to call you back for your draw; right?

2       A    Correct.

3       Q    On average how many names did they call

4   between the time you checked in and the time that

5   you go back for your blood draw?

6       A    I would usually say it's two or three or

7   sometimes just one.  It's not very busy.

8       Q    At any time at the Land Park location have

9   you heard a TV playing at Quest in the waiting room?

10      A    No.

11      Q    So you went -- your last visit there was in

12  January or February of 2021; right?

13      A    Yes.

14      Q    And do you remember that visit?

15      A    Yes.

16      Q    Was that visit the same process that you

17  described for me with regard to checking in?

18      A    It was a little different because we had to

19  make an appointment because of Covid so I called --

20  I tried to make the appointment online, and I wasn't

21  successful.  It's not very accessible.  So I

22  called -- but there was a phone number.  So I called

23  on the phone, and there's an electronic voice that

24  you can press numbers and set your appointment by

25  the phone.  So that's what I did.

Page 79

1          So when I came in, I had my appointment.

2          And she asked me if I had an appointment.

3          I said I did.

4          She looked me up.

5          And so I immediately gave her the paper and

6    sat down, and there wasn't that same thing.  We --

7    we actually went back.  Right after that, I went

8    back and got the blood draw and left.

9       Q    Okay.  So on that occasion, as soon as you

10   went up to the receptionist, they immediately

11   checked you in without a wait; right?

12      A    Yes.

13      Q    And there was somebody waiting there for

14   you -- waiting there when you arrived?

15      A    Yes, she was at the the desk.

16      Q    So would you estimate that that check-in

17   process is less than a minute?

18      A    Yes.  That was much quicker.

19      Q    Okay.  And is that the only -- the only time

20   that you made an appointment for Quest or did you

21   make one at the October, November 2020 visit as

22   well?

23      A    I know ever since March it's been by

24   appointment only.

25      Q    Ever since March when?

Page 128

1     STATE OF CALIFORNIA     )

2     COUNTY OF LOS ANGELES )     SS.

3

4          I, Melia Basavand, CSR 14089, in and for the

5     State of California, do hereby certify:

6          That prior to being examined, the witness named

7     in the foregoing deposition was by me duly sworn to

8     testify to the truth, the whole truth, and nothing but

9     the truth;

10         That said deposition was taken down by me in

11    shorthand at the time and place therein named and

12    thereafter reduced to typewriting under my direction, and

13    the same is a true, correct, and complete transcript of

14    said proceedings;

15         That if the foregoing pertains to the original

16    transcript of a deposition in a federal case, before

17    completion of the proceedings, review of the transcript

18    { } Was { } was not required.

19         I further certify that I am not interested in the

20    event of the action.

21         Witness my hand this 25th day of May, 2021.

22

23                              *Melia Basavand*

                                Certified Shorthand Reporter

24                              for the State of California

25

EXHIBIT 26  PAGE 249

Page 1

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4        JULIAN VARGAS, ANNE    )
         WEST and AMERICAN      )
5        COUNCIL OF THE BLIND,  )
         individually on behalf )  Case No. 2:19-cv-08108 DMG (MRWx)
6        of themselves and all  )
         others similarly       )
7        situated,              )
                                )
8                  Plaintiffs,  )
                                )
9        vs.                    )
                                )
10       QUEST DIAGNOSTICS       )
         CLINICAL LABORATORIES, )
11       INC., QUEST            )
         DIAGNOSTICS HOLDINGS,  )
12       INC., QUEST DIAGNOSTICS)
         INCORPORATED; and DOES )
13       1-10, inclusive,       )
                                )
14                 Defendants.  )
         _____ )

15

16

17            REMOTE VIDEOTAPED DEPOSITION OF DONNA GRAHMANN

18                         May 3, 2021

19

20

21

22

23

24

         Job No. CS4522975
25       Reported by: Maryann Matthews, CSR #737

Veritext Legal Solutions

EXHIBIT 26 PAGE 250

Page 48

1    then she'll fill in the info for me.

2         Q.   So in that situation -- do you remember a

3    specific instance where a Quest employee helped you

4    check in on the kiosk?

5         A.   Like I said, it was within one of those last

6    five times where they did it.

7         Q.   Do you remember how long it was between the

8    time you stepped foot in the patient service center and

9    the time that the Quest employee assisted you with

10   check-in?

11        A.   It was probably 15 minutes or so.

12        Q.   And what did you do during that 15 minutes

13   that you were waiting?

14        A.   I usually have my iPhone with me, so I will

15   either check e-mail or text or that type of thing.

16        Q.   In that time while you were waiting for a

17   Quest employee to check you in, did anybody else come in

18   between the time you got there and the time you checked

19   in?

20        A.   I'm sure there were, but I couldn't tell you

21   a number of people.  I can hear when the door opens and

22   closes, but whether it's people coming in or others

23   leaving I couldn't tell you.

24        Q.   Okay.  So you don't know one way or the other

25   if people checked in between the time you got there and

Page 78

1                    REPORTER'S CERTIFICATE

2

STATE OF IDAHO  )
3                          )  ss.
COUNTY OF ADA   )

4

5          I, MARYANN MATTHEWS, Certified Shorthand Reporter

6    and Notary Public in and for the State of Idaho, do hereby

7    certify:

8          That prior to being examined, the witness named in

9    the foregoing deposition was duly sworn remotely by me to

10   testify to the truth, the whole truth and nothing but the

11   truth;

12         That said deposition was taken down by me in

13   shorthand at the time and place therein named and

14   thereafter reduced to typewriting under my direction,

15   and that the foregoing transcript contains a full,

16   true and verbatim record of said deposition.

17         I further certify that I have no interest in the

18   event of the action.

19         WITNESS my hand and seal this 21st day of May,

20   2021.

21

22                              _____
                               MARYANN MATTHEWS
23                             CSR and Notary
                               Public in and for the
24                             State of Idaho.

25   My Commission Expires:   09-12-2025

**MARYANN MATTHEWS**
Notary Public - State of Idaho
Commission Number 4446R
My Commission Expires Sep 12, 2025

EXHIBIT 26  PAGE 252

```
 1                UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4    JULIAN VARGAS, ANNE      )
      WEST, and AMERICAN       )
 5    COUNCIL OF THE BLIND,    ) Case No. 2:19-cv-8108
      individually on behalf   )
 6    of themselves and all    ) Volume II
      others similarly         )
 7    situated,                )
                               )
 8              Plaintiffs,    )
                               )
 9       vs.                   )
                               )
10    QUEST DIAGNOSTICS        )
      CLINICAL LABORATORIES,   )
11    INC., QUEST DIAGNOSTICS  )
      HOLDINGS, INC.,          )
12    QUEST DIAGNOSTICS        )
      INCORPORATED, and        )
13    DOES 1-10, inclusive,    )
                               )
14              Defendants.    )
      _____)
15
16
17          REMOTE DEPOSITION OF DONNA GRAHMANN
18             (Via Zoom Videoconference)
19               Thursday, August 5, 2021
20
21
22
23    REPORTED BY:  Michelle Milan Fulmer
                    CSR No. 6942, RPR, CRR, CRC
24
25
```

Page 81

EXHIBIT 26  PAGE 253

```
 1              Do you remember that?

 2       A    I do.

 3       Q    And at your deposition you actually said

 4   that you were scheduled to go to Quest the very next

 5   day.                                          01:36:17

 6       A    I was.

 7       Q    Okay.  Did you go to Quest on that day?

 8       A    I did.

 9       Q    Was that May 4th, 2021?

10       A    It was.                             01:36:26

11       Q    Okay.  So I would like to talk to you about

12   that experience at Quest on May 4th, 2021.

13              Did you make an appointment for that visit?

14       A    Yes.

15       Q    Did you go to that visit alone?        01:36:44

16       A    I was dropped off.

17       Q    Who were you dropped off by?

18       A    My husband.

19       Q    And did he go and run his errands while he

20   dropped you off?                              01:36:58

21       A    He did.

22       Q    When you first walked into the patient

23   service center on May 4th, 2021, what did you do

24   when you got there?

25       A    Walked up toward the counter and I don't   01:37:16
```

Page 88

EXHIBIT 26  PAGE 254

1     recall if someone was there or not on the May 4th

2     one, but I knew about testing with the three-finger

3     swipe.  So I tried the three-finger swipe when I got

4     up to the counter and nothing, no voiceover, no

5     nothing.  I felt around the edge of the kiosk.  Did        01:37:45

6     not feel a jack for a headphone.  And when I had no

7     voiceover response, I just had to wait at the

8     counter until someone arrived.

9         Q    And what specifically did you do when you

10    went up to the kiosk?                                      01:38:08

11        A    I did a three-finger swipe up.

12        Q    And nothing happened when you did that?

13        A    Correct.  Well, I don't know.  If something

14    might have happened that didn't involve voiceover,

15    something could have happened, but if it did, I have       01:38:24

16    no way of knowing that.

17        Q    Okay.  You didn't hear any audible, any

18    audible sound coming from the kiosk?

19        A    No.

20        Q    And how many times did you do the                01:38:35

21    three-finger swipe on the kiosk?

22        A    I know at least two.  I don't know if it

23    was more than that, but I know I tried it two times,

24    at least.

25        Q    And how are you able to be sure that you         01:38:56

                                                    Page 89

EXHIBIT 26  PAGE 255

```
1     actually were using the kiosk when you did the

2     three-finger swipe?

3         A    Because I could feel the item.  It's on a

4     stand on the counter.

5         Q    Okay.  And was this the same location, the     01:39:15

6     Tomball location that you always go to?

7         A    It is.

8         Q    And after you attempted to use the kiosk,

9     you said you waited for a receptionist?

10        A    I did.                                          01:39:32

11        Q    How long did you wait until you were

12    assisted by a receptionist?

13        A    At that time I don't recall.  Probably five

14    minutes, at least.

15        Q    And were you assisted by a receptionist or    01:39:54

16    a phlebotomist or do you not know?

17        A    I don't know if they have an actual

18    receptionist.  So it was probably a phlebotomist.

19        Q    And when you were encountered --

20             When you encountered the phlebotomist, what    01:40:14

21    happened next?

22        A    They came out and checked me in.

23        Q    What information did you provide in order

24    to get checked in?

25        A    My full name and -- well, first name, last     01:40:26
```

Page 90

EXHIBIT 26  PAGE 256

1    straight to the counter.  The kiosk was on the right

2    side of the counter.  My dog took me to the center

3    of the counter.

4         So I kinda felt over toward the right

5    because I didn't hear anybody there.  So when I          01:51:09

6    touched the kiosk, that person spoke up.  It was a

7    man and he was using the kiosk or about to, if he

8    hadn't started yet.  And so I just stepped back with

9    my dog, had my dog sit or lie down, he did both, and

10   waited.  And by that time when the man was finished,    01:51:33

11   the phlebotomist or someone was at the counter and I

12   told them I needed help checking in.  So she came

13   out and, as soon as he was gone, she checked me in.

14        Q    Did you tell her you wanted to attempt to

15   use the three-finger swipe?                             01:51:54

16        A    I didn't because she already was at the

17   kiosk and doing whatever she was going to do on the

18   kiosk.

19        Q    And this was a she --

20        A    It was.                                       01:52:04

21        Q    -- this visit?

22        Okay.  How long was it between the time

23   that you stepped foot into the patient service

24   center and the time that the phlebotomist assisted

25   you in checking in?                                     01:52:28

Page 98

EXHIBIT 26  PAGE 257

1          A     This time it wasn't long.   Probably five

2     minutes or so.   Maybe a little bit more, but not

3     long.

4          Q     And what took place in the five minutes?

5     Because it seems to me that if you walked up and          01:52:45

6     immediately attempted to use the kiosk, but then

7     somebody told you that they were there, and by the

8     time that that person would have checked in, it

9     probably would have been less than five minutes;

10    right?                                                    01:53:04

11         A     I believe you said by the time she helped

12    me, I thought you said.

13         Q     Okay.  So she didn't --

14               Didn't you say that she helped you before

15    or immediately after that first -- that other          01:53:15

16    patient was done checking into the kiosk?

17         A     I told her I needed help before he was

18    finished is correct.

19         Q     Okay.  So she was --

20               Was she waiting at the counter or in the     01:53:27

21    area as you walked up?

22         A     I think she was about to let someone out of

23    the door.

24         Q     So how long do you think it was between the

25    time you walked up to the counter and the time that    01:53:47

                                                         Page 99

EXHIBIT 26  PAGE 258

```
1                CERTIFICATION OF COURT REPORTER

2                        FEDERAL JURAT

3

4            I, the undersigned, a Certified Shorthand

5    Reporter of the State of California do hereby

6    certify:

7                 That the foregoing proceedings were taken

8    before me at the time and place herein set forth;

9    that any witnesses in the foregoing proceedings,

10   prior to testifying, were placed under oath; that a

11   verbatim record of the proceedings was made by me

12   using machine shorthand which was thereafter

13   transcribed under my direction; further, that the

14   foregoing is an accurate transcription thereof; that

15   before completion of the deposition, a review of the

16   transcript [ ] was [X] was not requested.

17            I further certify that I am neither

18   financially interested in the action nor a relative

19   or employee of any attorney of any of the parties.

20            IN WITNESS WHEREOF, I have this date

21   subscribed my name:  Date:  August 17, 2021.

22

23                  Michelle Milan Fulmer

24            Michelle Milan Fulmer

25            CSR 6942, RPR, CRR, CRC
```

                                              Page 118

EXHIBIT 26  PAGE 259

Page 1

```
 1                    UNITED STATES DISTRICT COURT
 2                    CENTRAL DISTRICT OF CALIFORNIA
 3
 4     JULIAN VARGAS, ANNE    )
       WEST and AMERICAN      )
 5     COUNCIL OF THE BLIND,  )
       individually on behalf )  Case No. 2:19-cv-08108 DMG (MRWx)
 6     of themselves and all  )
       others similarly       )
 7     situated,              )
                              )
 8              Plaintiffs,   )
                              )
 9     vs.                    )
                              )
10     QUEST DIAGNOSTICS      )
       CLINICAL LABORATORIES, )
11     INC., QUEST            )
       DIAGNOSTICS HOLDINGS,  )
12     INC., QUEST DIAGNOSTICS)
       INCORPORATED; and DOES )
13     1-10, inclusive,       )
                              )
14              Defendants.   )
       _____)
15
16
17          REMOTE VIDEOTAPED DEPOSITION OF MARY HAROYAN
18                         April 29, 2021
19
20
21
22
23
24
       Job No. CS4522974
25     Reported by: Maryann Matthews, CSR #737
```

Page 34

1    the kiosk, then what happened?

2           A.   We asked for help.  And, honestly, I can't

3    remember if it was maybe somebody else who was there

4    checking in who assisted or we asked the -- you know,

5    the phlebotomist there to help with that.

6           Q.   How long between the time that you realized

7    that you guys couldn't use the kiosk until the time

8    that you got help from somebody?

9           A.   Not long.

10          Q.   Like --

11          A.   I mean, it was pretty quick --

12          Q.   -- a minute?

13          A.   -- I would say.

14               A minute or two probably, yeah.

15          Q.   Okay.  And you don't recall whether it was

16   a Quest employee or whether it was somebody else?

17          A.   Yeah.  I really don't remember.

18          Q.   And --

19          A.   Because I know it was -- I remember there

20   being other people in the waiting room, so there could

21   have been somebody who offered to help.  I really --

22   really don't remember.  I was not feeling that well at

23   the time, so I honestly don't remember.

24          Q.   Okay.  Do you recall the information you

25   provided to the person who assisted you?

Page 44

1    possible, yes --

2          Q.    Okay.

3          A.    -- to -- yeah.

4          Q.    So my records indicate that you checked in

5    at 7:30 in the morning, which is the time they opened,

6    right?

7          A.    Yes.

8          Q.    And that you were out and done and your

9    services completed by 7:41.

10         A.    Uh-huh.

11         Q.    Does that sound about accurate?

12         A.    Yes.

13         Q.    So you were in and out within 11 minutes?

14         A.    That's the reason why I would try to get

15   there early, before other people are ahead of me; and

16   also so that the phlebotomist would be able to assist

17   me with the check-in.

18         Q.    Okay.  Do you recall if you were assisted

19   with the check-in on that visit?

20         A.    Yes, she -- she did because I absolutely

21   would -- knowing I was there at 7:30, I went there on

22   my own and I, you know, relied on the phlebotomist to

23   check me in.

24         Q.    Do you recall if you -- if they open at

25   7:30 and I have a check-in record at 7:30, is that --

Page 45

1    does that indicate to you that you were checked in

2    essentially immediately when you got there by the

3    phlebotomist?

4         A.   Yes.

5         Q.   Do you recall checking in with the

6    phlebotomist independently of that?

7              MR. HANDLEY:  Objection.  Vague.

8              THE WITNESS:  Well, I -- I'll say, I mean,

9    I walked in on my own, and I don't remember if she was

10   right there or in the inner room or there might have

11   been somebody she was finishing up with, even.

12             I really don't know.  But she was made

13   aware very quickly that I was there, and I asked her

14   for help to check in.

15        Q.   (BY MS. ROLLER) And she assisted you?

16        A.   Yes.

17        Q.   She checked you in?

18        A.   Yes, she did.

19        Q.   Okay.  And then you were called back within

20   a couple minutes, and then you were out of there?

21        A.   Yes.

22        Q.   Okay.  And, again, my records show that it

23   was about 11 minutes from the time you checked in

24   until the time you left.

25             That comports with your recollection?

Page 54

1    dad came with me on that one, too.  I --

2         Q.   Okay.  So I have a record that you did have

3    an appointment, and your appointment was at 11:00 a.m.

4         A.   Okay.

5         Q.   Does that sound about right?

6         A.   Yeah.  Uh-huh.

7         Q.   Okay.  And does that lead you to believe

8    that your dad went to that --

9         A.   Yes.

10        Q.   -- appointment as well?

11        A.   Yes.

12        Q.   Okay.  Do you remember how long you were

13   there at that visit on that day?

14        A.   Probably not long because when you get

15   there for an appointment, you know, you were taken

16   pretty much right away.  And the lab work didn't take

17   long, so I suspect it was pretty quick.

18        Q.   Okay.  The check-in process, was that kind

19   of -- was that the same as you described from your

20   November 2018 visit, where your dad went to the kiosk

21   and checked you in using the code that you had on your

22   phone?

23        A.   I assume that would have been the case,

24   yes, because we would have had the same code and he

25   may have, you know, remembered from the previous

Page 59

1          Q.   Okay.  I don't have you as an appointment

2     for this one, so I have you as a walk-in on this one.

3          A.   Oh.

4          Q.   Does that sound right?

5          A.   Well, if that's what you're seeing, then it

6     could be.  Maybe it's just -- yeah.  It's possible I

7     went in as -- do you have a time?

8          Q.   Yeah.  Well, were you working at that time?

9          A.   In 2019, no, I was not.  I had --

10         Q.   Okay.

11         A.   -- retired, so --

12         Q.   So I think you said Quest opens at 7:30,

13    and I have you checking in at 7:35.

14         A.   Oh, okay.  I -- I guess for some reason

15    that day I went early, so I don't know if that

16    means -- well, my dad probably still was -- he might

17    have assisted me.

18              I really -- I really don't remember.  I

19    don't know why I would have gone so early that -- that

20    morning.  I'm just not sure why.

21         Q.   That means if they open the doors at 7:30

22    and you checked in for -- at 7:35, that would lead me

23    to believe that you didn't wait any longer than five

24    minutes to check in, right?

25         A.   I assume it wouldn't have been very long,

EXHIBIT 26 PAGE 265

Page 60

1    but people do start coming in quite early.  Because

2    I'm not the only person who likes -- you know, who's

3    going for those early morning -- you know, the first

4    thing in the morning.  So I'm sure there was already

5    other people there at 7:35.

6         Q.   Do you recall trying to check in on that

7    day?

8         A.   No.  I mean, it would have just been the

9    same as all the others, you know.

10        Q.   Okay.  And you don't remember one way or

11   the other if your dad was there to assist you with the

12   check-in or if you needed to get assistance from the

13   phlebotomist?

14        A.   Yeah.  I don't remember, no.

15        Q.   Okay.

16        A.   I just know I needed assistance.

17        Q.   Understood.  Do you remember anything else

18   from that November 2019 appointment?

19        A.   No.

20        Q.   Okay.  And then you said you went in

21   January 2020, correct?

22        A.   I did say that, yes.  Yeah.  And I --

23        Q.   Okay.

24        A.   Yeah.  Yeah.

25             MS. ROLLER:  And, actually, before I get

EXHIBIT 26 PAGE 266

Page 101

1                    REPORTER'S CERTIFICATE

2

STATE OF IDAHO  )
3                ) ss.
COUNTY OF ADA  )

4

5        I, MARYANN MATTHEWS, Certified Shorthand Reporter

6   and Notary Public in and for the State of Idaho, do hereby

7   certify:

8        That prior to being examined, the witness named in

9   the foregoing deposition was duly sworn remotely by me to

10  testify to the truth, the whole truth and nothing but the

11  truth;

12       That said deposition was taken down by me in

13  shorthand at the time and place therein named and

14  thereafter reduced to typewriting under my direction,

15  and that the foregoing transcript contains a full,

16  true and verbatim record of said deposition.

17       I further certify that I have no interest in the

18  event of the action.

19       WITNESS my hand and seal this 13th day of May,

20  2021.

21      ┌─────────────────────────┐      _____
        │    MARYANN MATTHEWS      │
22      │ Notary Public - State of Idaho │      MARYANN MATTHEWS
        │   Commission Number 44468      │      CSR and Notary
23      │ My Commission Expires Sep 12, 2025 │  Public in and for the
        └─────────────────────────┘      State of Idaho.

24

25  My Commission Expires:  09-12-2025

EXHIBIT 26  PAGE 267

```
                                                    Page 1

 1                  UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4    JULIAN VARGAS, ANNE    )
      WEST and AMERICAN      )
 5    COUNCIL OF THE BLIND,  )
      individually on behalf )  Case No. 2:19-cv-08108 DMG (MRWx)
 6    of themselves and all  )
      others similarly       )
 7    situated,              )
                             )
 8             Plaintiffs,   )
                             )
 9    vs.                    )
                             )
10    QUEST DIAGNOSTICS      )
      CLINICAL LABORATORIES, )
11    INC., QUEST            )
      DIAGNOSTICS HOLDINGS,  )
12    INC., QUEST DIAGNOSTICS)
      INCORPORATED; and DOES )
13    1-10, inclusive,       )
                             )
14             Defendants.   )
      _____)

15

16

17         REMOTE VIDEOTAPED DEPOSITION OF NONA HAROYAN

18                      April 29, 2021

19

20

21

22

23

24

      Job No. CS4522974
25    Reported by: Maryann Matthews, CSR #737
```

Page 40

1          Q.    So you went up to the tablet, you waited in
2     line for the patient to complete their check-in; and
3     then it was your turn to be with this tablet?
4          A.    Correct.
5          Q.    Did you recognize the tablet as an iPad?
6          A.    I did not.  I mean, it was a tablet.  I
7     didn't know it was an Apple device.
8          Q.    Okay.
9          A.    Is it?
10         Q.    And then what happened after you saw this
11    tablet?
12         A.    I -- I think I -- I touched the tablet.
13    Something came on the screen.  And then I realized
14    there's no audible component, and so I just -- I
15    couldn't do anything.
16         Q.    And then what happened next?
17         A.    I sat down and I waited for one of the staff,
18    one of the phlebotomists, to come out so that I could
19    indicate that I was there and that I couldn't use this
20    device to check in.
21         Q.    Okay.  How long between the time you sat down
22    and between the time a phlebotomist came out?
23         A.    They were with a patient.  It might have been
24    five -- five minutes at the most.
25         Q.    And then did you go up to the phlebotomist

EXHIBIT 26  PAGE 269

Page 44

1    into the lab, the room; and she assisted me.

2         Q.   Okay.

3         A.   Again, it's a very small office, so --

4         Q.   Okay.  And then after you got checked in on

5    the kiosk, then what happened next?

6         A.   Oh, I -- I sat down and waited until she

7    called me.

8         Q.   Okay.  About how long was it between the time

9    that you sat down and that you were called back to the

10   draw room?

11        A.   I don't recall.

12        Q.   Was it pretty quick?

13        A.   I -- I just don't recall.  It could have been

14   five minutes, could have been seven minutes.  I have no

15   idea.  I don't recall.

16        Q.   Okay.  And then when you got back to the draw

17   room, did you have any conversation with the

18   phlebotomist at that point?

19        A.   Just -- just the routine, you know, why --

20   what doctor required the -- the blood work, just basic

21   stuff like that.

22        Q.   Did she verify your name?

23        A.   She did.

24        Q.   And date of birth and your personal

25   information?

Page 99

1                      REPORTER'S CERTIFICATE

2

STATE OF IDAHO  )
3                 )  ss.
COUNTY OF ADA   )

4

5          I, MARYANN MATTHEWS, Certified Shorthand Reporter

6    and Notary Public in and for the State of Idaho, do hereby

7    certify:

8          That prior to being examined, the witness named in

9    the foregoing deposition was duly sworn remotely by me to

10   testify to the truth, the whole truth and nothing but the

11   truth;

12         That said deposition was taken down by me in

13   shorthand at the time and place therein named and

14   thereafter reduced to typewriting under my direction,

15   and that the foregoing transcript contains a full,

16   true and verbatim record of said deposition.

17         I further certify that I have no interest in the

18   event of the action.

19         WITNESS my hand and seal this 13th day of May,

20   2021.

21                           _____

22         MARYANN MATTHEWS
           CSR and Notary
23         Public in and for the
           State of Idaho.

24

25   My Commission Expires:  09-12-2025

MARYANN MATTHEWS
Notary Public - State of Idaho
Commission Number 4446R
My Commission Expires Sep 12, 2025

EXHIBIT 26  PAGE 271

                                                    Page 1

1                    UNITED STATES DISTRICT COURT
2                    CENTRAL DISTRICT OF CALIFORNIA
3
        JULIAN VARGAS, ANNE WEST AND        )
4       AMERICAN COUNCIL OF THE BLIND,      )
        INDIVIDUALLY ON BEHALF OF           )
5       THEMSELVES AND ALL OTHERS SIMILARLY)  CASE NO.
        SITUATION,                          )
6                                           )  2:19-CV-08108
                       PLAINTIFFS,          ) DMG
7                                           )
            VS.                             )
8                                           )
        QUEST DIAGNOSTICS CLINICAL          )
9       LABORATORIES, INC., QUEST           )
        DIAGNOSTICS HOLDINGS, INC., QUEST   )
10      DIAGNOSTICS INCORPORATED; AND DOES  )
        1-10, INCLUSIVE,                    )
11                                          )
                       DEFENDANTS.          )
12                                          )
        _____)
13
14
15
16
17
18
                    VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF
19
                             KATHLEEN LYONS
20
                         THURSDAY, MAY 6, 2021
21
22
23
24
        JOB NO. 4522978-A
25
        REPORTED BY:  MELIA BASAVAND, CSR NO. 14089

Page 49

1    there?

2        A    Nobody at the desk.  Nobody at that check-in

3    area.

4        Q    So the only Quest employees that you had

5    seen were the ones who were drawing blood, and they

6    would come out and call a patient?

7        A    Yes.

8        Q    On average of your visits in those

9    approximate ten times, since the E check-in was --

10   you noticed the E check-in was there, how long are

11   your waits for blood draw?

12       A    A lot depends on how many people are there

13   and how many people have appointments on the

14   walk-in.  So it could be anywhere from 45 minutes to

15   an hour and a half.

16       Q    In that 45 minutes to an hour and a half

17   approximately -- approximately how many times do you

18   see a Quest phlebotomist come out to call patients

19   for their blood draw?

20            MR. SWEET:  Objection.  Vague.

21            THE WITNESS:  It varies.  A lot depends on

22   how many people are there and how many have

23   appointments.  But I've had them call several before

24   me sometimes it's a lot.  Sometimes it's maybe six

25   or seven, and other days it's a little bit less.  As

Page 105

1    STATE OF CALIFORNIA    )

2    COUNTY OF LOS ANGELES )    SS.

3

4         I, Melia Basavand, CSR 14089, in and for the

5    State of California, do hereby certify:

6         That prior to being examined, the witness named

7    in the foregoing deposition was by me duly sworn to

8    testify to the truth, the whole truth, and nothing but

9    the truth;

10        That said deposition was taken down by me in

11   shorthand at the time and place therein named and

12   thereafter reduced to typewriting under my direction, and

13   the same is a true, correct, and complete transcript of

14   said proceedings;

15        That if the foregoing pertains to the original

16   transcript of a deposition in a federal case, before

17   completion of the proceedings, review of the transcript

18   { } Was { } was not required.

19        I further certify that I am not interested in the

20   event of the action.

21        Witness my hand this 25th day of May, 2021.

22

23                              *Melia Basavand*

                                Certified Shorthand Reporter

24                              for the State of California

25

EXHIBIT 26  PAGE 274

Page 1

                    UNITED STATES DISTRICT COURT
1
2                    CENTRAL DISTRICT OF CALIFORNIA
3
      JULIAN VARGAS, ANNE WEST AND          )
4     AMERICAN COUNCIL OF THE BLIND,        )
      INDIVIDUALLY ON BEHALF OF             )
5     THEMSELVES AND ALL OTHERS SIMILARLY)  CASE NO.
      SITUATION,                            )
6                                           )  2:19-CV-08108
                        PLAINTIFFS,         )  DMG
7                                           )
           VS.                              )
8                                           )
      QUEST DIAGNOSTICS CLINICAL            )
9     LABORATORIES, INC., QUEST             )
      DIAGNOSTICS HOLDINGS, INC., QUEST     )
10    DIAGNOSTICS INCORPORATED; AND DOES    )
      1-10, INCLUSIVE,                      )
11                                          )
                        DEFENDANTS.         )
12                                          )
      _____)
13
14
15
16
17
18
                  VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF
19
                       ROBIN CHARLOTTE REHDER
20
                       FRIDAY, MAY 21, 2021
21
22
23
24
      JOB NO. 4589711
25
      REPORTED BY:  MELIA BASAVAND, CSR NO. 14089

EXHIBIT 26 PAGE 275

Page 47

1    August 2008.  So when you -- did you go to this

2    visit alone?

3        A    Yes.

4        Q    And when you walked into the Quest location

5    to -- multiple times what -- how did you discover

6    that this E kiosk existed?

7        A    Well, at that particular time someone came

8    up to me and said you have to sign in on the kiosk.

9             And I said I'm not -- I'm not able to do it.

10   There's no voiceover.  And that's when she signed me

11   in.  There was no one at the desk at that time.

12            I called the local office of Quest and

13   explained the situation.

14       Q    When you walked into the patient service

15   center on that visit, did you walk up to the

16   receptionist desk?

17       A    Yes, I usually do.  And I could sense there

18   was no one there.  No one said may I help you.

19       Q    And how long did you wait between the time

20   that you stepped in there and you were waiting at

21   the desk until the time the patient came up to you

22   to help you check-in?

23       A    Not very long.  She realized the predicament

24   I was in.

25       Q    Would you say it was less than a minute?

EXHIBIT 26 PAGE 276

Page 48

```
 1       A     I'd say a couple minutes.

 2       Q     At any point, while you were waiting at the

 3    receptionist desk, did any phlebotomist come out and

 4    call out any patients --

 5       A     Yes.

 6       Q     -- to take them back for their blood draw?

 7       A     Yes.

 8       Q     How many?

 9       A     I'm not sure.

10       Q     So how do you know they came out?

11       A     I heard them call names.

12       Q     And did you ask them to help you?

13       A     I mentioned it to -- when I went back to get

14    my blood work done, I mentioned what happened, and

15    they extended their apology.

16       Q     Okay.  And so you were waiting there and a

17    patient came up to you to assist you with the

18    check-in.  How do you know this person was a

19    patient?

20       A     Well, I can tell when she walked up that she

21    sitting down in the waiting room in the lounge area

22    wherever you wait for the technicians because --

23       Q     And did you --

24       A     -- when I --

25             Sorry.  Go ahead.
```

Page 97

1    STATE OF CALIFORNIA    )

2    COUNTY OF LOS ANGELES )    SS.

3

4        I, Melia Basavand, CSR 14089, in and for the

5    State of California, do hereby certify:

6        That prior to being examined, the witness named

7    in the foregoing deposition was by me duly sworn to

8    testify to the truth, the whole truth, and nothing but

9    the truth;

10        That said deposition was taken down by me in

11    shorthand at the time and place therein named and

12    thereafter reduced to typewriting under my direction, and

13    the same is a true, correct, and complete transcript of

14    said proceedings;

15        That if the foregoing pertains to the original

16    transcript of a deposition in a federal case, before

17    completion of the proceedings, review of the transcript

18    { } Was { } was not required.

19        I further certify that I am not interested in the

20    event of the action.

21        Witness my hand this 9th day of June, 2021.

22

23                 *Melia Basavand*

                  Certified Shorthand Reporter

24                for the State of California

25

EXHIBIT 26 PAGE 278

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JULIAN VARGAS, ANNE    )
     WEST, and AMERICAN     )
 5   COUNCIL OF THE BLIND,  ) Case No. 2:19-cv-8108
     individually on behalf )
 6   of themselves and all  )
     others similarly       )
 7   situated,              )
                            )
 8             Plaintiffs,  )
                            )
 9       vs.                )
                            )
10   QUEST DIAGNOSTICS      )
     CLINICAL LABORATORIES, )
11   INC., QUEST DIAGNOSTICS)
     HOLDINGS, INC.,        )
12   QUEST DIAGNOSTICS      )
     INCORPORATED, and      )
13   DOES 1-10, inclusive,  )
                            )
14             Defendants.  )
     _____)
15
16
17        REMOTE DEPOSITION OF CLAIRE STANLEY
18           (Via Zoom Videoconference)
19            Thursday, August 19, 2021
20
21   REPORTED BY:  Michelle Milan Fulmer
                   CSR No. 6942, RPR, CRR, CRC
22
23   JOB NO. 4769235
     PAGE 85 THROUGH PAGE 88 IS MARKED "CONFIDENTIAL"
24   UNDER THE PROTECTIVE ORDER AND SEPARATELY BOUND
25   PAGES 1 - 225

                                        Page 1
```

EXHIBIT 26  PAGE 279

```
 1        Q    So anything more than 10 seconds, you can't

 2   tell me how long it was that you were waiting for

 3   the phlebotomist?

 4        A    I just don't remember.

 5        Q    Okay.  So it may have been a minute; is      13:54:42

 6   that right?

 7        A    Possibly.

 8        Q    Okay.  And when the phlebotomist did greet

 9   you, what did he or she do or say next?

10        A    I think he asked me to come back into the    13:55:02

11   back with him.

12        Q    Okay.  And did you do that?

13        A    Yes.

14        Q    And as far as you could tell, were there

15   any other human beings in the back with that          13:55:19

16   individual?

17        A    I recall there being two different

18   employees.

19        Q    And by two, do you mean two additional

20   employees or just one additional employee?            13:55:31

21        A    One additional.

22        Q    Okay.  And I think you mentioned that the

23   door was left ajar to the back and you detected

24   that.

25             Did you detect that pretty instantaneously,  13:55:47
```

Page 77

EXHIBIT 26  PAGE 280

```
 1        A    I believe he had me work with one of his

 2     colleagues.

 3        Q    I see.

 4             And did that colleague assist you?

 5        A    Yes.                                    13:57:13

 6        Q    And did they ask you questions in the back?

 7        A    Yes.

 8        Q    Did they ask for your order?

 9        A    Yes.

10        Q    Did you have that printed out already or    13:57:26

11     did you, otherwise, show it to them maybe on a phone

12     or other device?

13        A    If I remember correctly, my doctor had

14     faxed it over.

15        Q    Okay.  So they already had it once you     13:57:37

16     identified yourself?

17        A    Yes.

18        Q    Okay.  And did they do or say anything to

19     indicate that they were checking you in?

20        A    I don't remember anything specific, no.    13:57:54

21        Q    And after you --

22             After they asked you the questions, did

23     they then proceed to take your blood?

24        A    To my best recollection, yes.

25        Q    Okay.  So how much time transpired there in  13:58:11
```

Page 79

EXHIBIT 26  PAGE 281

1  the process of asking you questions before blood was

2  taken?

3      A    If I remember correctly, it took a while

4  because the man who was helping me seemed to really

5  be struggling with the computer and the fax machine     13:58:26

6  and things like that.

7      Q    Okay.  And that being the case, can you

8  tell me how long it took?

9      A    I don't want to guess because it's been a

10  while.                                                  13:58:41

11      Q    Okay.  Do you want to estimate for me, give

12  me your best estimate?

13      A    I really don't remember.

14      Q    Was it more than a minute?

15      A    Yes.  More than a minute.                     13:58:52

16      Q    More than five minutes?

17      A    Yes.  More than five minutes.

18      Q    Was it more than ten minutes?

19      A    At that point I'm getting blurry.  I don't

20  remember.                                              13:59:06

21      Q    Okay.  Fair enough.

22          And I'm almost done with this, so -- and

23  I'm going to ask the same question.

24          How long did it take for you to have the

25  blood drawn?                                           13:59:14

Page 80

EXHIBIT 26  PAGE 282

```
 1        A     Again, it's been a while.  But if I
 2    remember correctly, once the paperwork portion was
 3    done and the insurance, which took the longest,
 4    getting the actual lab work done was quicker.
 5        Q     Okay.  Can you give me an estimate of how      13:59:28
 6    long it took?
 7        A     No, I cannot.
 8        Q     Okay.  And after the lab work was done, did
 9    you immediately proceed to the exit?
10        A     Yes.                                           13:59:39
11        Q     Did you call a Lyft or Uber to pick you up
12    while you --
13        A     Yes.
14        Q     -- were still in the Quest room or did you
15    exit Quest and then make the call or use the app to     13:59:48
16    ask for a ride?
17        A     I cannot remember.
18        Q     Did you make any requests of anyone at
19    Quest for reasonable modifications or for auxiliary
20    aids or services while you were there?                  14:00:10
21        A     Do you mean while I was physically in the
22    location?
23        Q     Yes.
24        A     I said I needed help signing in.
25        Q     Okay.  Was that before or after the           14:00:27
```

Page 81

EXHIBIT 26  PAGE 283

1    individual said, "Are you here for phlebotomy

2    services"?

3           That's the first thing that the Quest

4    representative said to you; correct?

5       A    I don't think I remember the exact wording,    14:00:44

6    but that's what he conveyed.

7       Q    Okay.  And your response to that was, "I

8    need help checking in" or was your response that

9    "Yes"?

10      A    Again, I don't remember the exact wording.    14:00:59

11   I just know I conveyed, "I'm here.  I need to check

12   in.  I'm here for blood work."

13      Q    Okay.  And the immediate response to that

14   from the phlebotomist was to lead you into the back;

15   correct?    14:01:12

16      A    Yes.

17      Q    Any other requests for reasonable

18   modifications of policies, practices, and procedures

19   or for auxiliary aids or services while you were at

20   Quest on that occasion?    14:01:25

21      A    No.

22      Q    Did you ever correspond with Quest in any

23   way, writing or orally, after that?

24      A    After, no.

25      Q    Did you ever correspond with Quest, orally    14:01:44

Page 82

EXHIBIT 26  PAGE 284

```
 1       A     No.

 2       Q     You indicated that you had to wait for some

 3    period of time.  You couldn't tell Mr. Raizman

 4    specifically how long, but do you have a range or

 5    an estimate of how long you waited when you walked    17:44:05

 6    in?

 7       A     It was probably at least three minutes.

 8    Maybe more.

 9       Q     Okay.  Can you give us the best range that

10    you have or the best estimate of time that you have   17:44:13

11    today?

12       A     Perhaps three to five minutes.

13       Q     Before somebody first interfaced with you?

14       A     Correct.

15       Q     Okay.  And then you indicated --            17:44:21

16             At any point in time were you able to use a

17    kiosk, assuming there was one, at the location you

18    visited in Rockville?

19       A     No, I was not.

20       Q     Were you able to access any of the services  17:44:32

21    within a kiosk, assuming there was one at that

22    Rockville location?

23       A     No, I was not.

24       Q     For example, were you -- were you ever

25    offered the opportunity to wait outside the facility  17:44:44
```

                                              Page 204

```
 1              MR. RAIZMAN:  I object as to the form of

 2      the question.

 3      BY MR. MILLER:

 4          Q    What's your best range as to the amount of

 5      time it took for the phlebotomist to check you in      17:45:46

 6      once you were in the back?

 7          A    Perhaps 10 to 15 minutes.

 8          Q    And you indicated that you do intend to

 9      return to Quest; is that right?

10          A    That's correct.                               17:46:00

11          Q    And that will be in response to a doctor's

12      request to go get blood work?

13          A    Yeah.  In fact, I have an appointment

14      coming up soon and I have a feeling she's going to

15      request blood work.                                    17:46:10

16          Q    When is that appointment coming up?

17          A    It's in September.

18          Q    And if the doctor requests blood work in

19      conjunction with that appointment, do you intend to

20      return to the Quest in your neighborhood?              17:46:20

21          A    Yes, I do.

22          Q    You indicated in response to Mr. Raizman's

23      questions that you were preserving documents at the

24      time you did the survey and I think you said it was

25      in June of 2019.                                       17:46:34

                                                  Page 206
```

EXHIBIT 26  PAGE 286

```
 1                        CERTIFICATION

 2                             OF

 3               CERTIFIED SHORTHAND REPORTER

 4

 5              I, the undersigned, a Certified Shorthand

 6     Reporter of the State of California do hereby

 7     certify:

 8                 That the foregoing proceedings were taken

 9     before me at the time and place herein set forth;

10     that any witnesses in the foregoing proceedings,

11     prior to testifying, were placed under oath; that a

12     verbatim record of the proceedings was made by me

13     using machine shorthand which was thereafter

14     transcribed under my direction; further, that the

15     foregoing is an accurate transcription thereof.

16                 I further certify that I am neither

17     financially interested in the action nor a relative

18     or employee of any attorney of any of the parties.

19                 IN WITNESS WHEREOF, I have this date

20     subscribed my name.

21     Dated:   September 2, 2021, 2021.

22

23

24                     Michelle Milan Fulmer
                       Michelle Milan Fulmer

25                     CSR No. 6942, RPR, CRR, CRC


                                          Page  222
```

# EXHIBIT 27

EXHIBIT 27  PAGE 288

Page 1

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4     JULIAN VARGAS, ANNE WEST and  ) Case No.
      AMERICAN COUNCIL OF THE BLIND ) 2:19-cv-08108 DMG(MRW)x
5     individually on behalf of     )
      themselves and all others     )
6     similarly situated,           )
                                    )
7                     Plaintiffs,   )
                                    )
8         v.                        )
                                    )
9     QUEST DIAGNOSTICS CLINICAL    )
      LABORATORIES, INC., QUEST     )
10    DIAGNOSTICS HOLDINGS, INC.,   )
      QUEST DIAGNOSTICS,            )
11    INCORPORATED; and DOES 1-10,  )
      inclusive,                    )
12                                  )
                      Defendants.   )
13    _____)

14

15        REMOTE VIDEOTAPED DEPOSITION OF JULIAN VARGAS

16                    Van Nuys, California

17                  Thursday, April 22, 2021

18

19

20

21    Reported by:
      ANELA SHERADIN, CSR NO. 9128

22

23    JOB NO. 4523491

24

25    PAGES 1 - 254

Page 105

1    questions about my -- you know, my address and things

2    like that and verifying that my insurance was, you know,

3    my insurance and things like that, and then the

4    phlebotomist proceeded to draw the blood.

5       Q   Did you have to sign in at all for that visit?    13:30:12

6       A   I don't recall.    13:30:16

7       Q   And then after the phlebotomist took your    13:30:19

8    blood, what happened next?

9       A   I pretty much was -- I pretty much left and    13:30:25

10   then went back to the doctor's office to proceed with

11   the first part of the physical examination.

12      Q   Okay.  How long between the time you set foot    13:30:36

13   in the Quest patient service center and the time you

14   left?

15      A   It's hard to say, but maybe -- maybe 5 to 10    13:30:47

16   minutes.

17      Q   Okay.  And aside from the person that was at    13:30:53

18   the window, did you -- and the phlebotomist who drew

19   your blood, did you interact with anybody else at the

20   Quest patient service center during that visit?

21      A   I don't recall.    13:31:10

22      Q   Okay.  Do you recall whether your doctor    13:31:11

23   received your results from that visit?

24      A   Yes.    13:31:20

25      Q   And did your doctor receive your results, to    13:31:26

Veritext Legal Solutions

EXHIBIT 27 PAGE 290

```
                                                    Page 108
 1   person there and gave them the information, as I did
 2   with the other time, and then I was directed to wait.
 3   BY MS. ROLLER:                                     13:34:38
 4       Q   Okay.  Did you -- were you a walk-in on that --  13:34:39
 5   on this visit?
 6       A   I believe so.                              13:34:45
 7       Q   How long do you believe you waited from the  13:34:47
 8   time you got in to the patient service center in Tarzana
 9   until the time you were able to speak with the
10   receptionist to get checked in?
11       A   Probably about 5 to 10 minutes.  There were  13:35:03
12   people there.
13       Q   Okay.  Were you able to sense about how many  13:35:10
14   people were there?
15       A   No, I couldn't.                            13:35:15
16       Q   Did you overhear any conversations between the  13:35:16
17   folks in front of you and the Quest employee who was
18   checking people in?
19       A   Yes.                                       13:35:27
20       Q   Okay.  What do you recall from those        13:35:28
21   conversations?
22       A   I didn't pay attention to what they were.  13:35:32
23       Q   Was it your impression that -- oh, sorry, go  13:35:34
24   ahead.
25       A   No, I didn't recall what they were other than  13:35:37
```

Page 254

1        I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3        That the foregoing proceedings were taken

4   before me at the time and place herein set forth; that

5   any witnesses in the foregoing proceedings, prior to

6   testifying, were duly sworn; that a record of the

7   proceedings was made by me using machine shorthand

8   which was thereafter transcribed under my direction;

9   that the foregoing transcript is a true record of the

10  testimony given.

11       Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [  ] was [ X ] was not requested.

15       I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or party to this action.

18       IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated: May 7, 2021

22

23

          ANELA SHERADIN

24        CSR NO. 9128

25

Page 1

<pre>
 1                    UNITED STATES DISTRICT COURT

 2                    CENTRAL DISTRICT OF CALIFORNIA

 3

 4      JULIAN VARGAS, ANNE    )
        WEST and AMERICAN      )
 5      COUNCIL OF THE BLIND,  )
        individually on behalf )  Case No. 2:19-cv-08108 DMG (MRWx)
 6      of themselves and all  )
        others similarly       )
 7      situated,              )
                               )
 8               Plaintiffs,   )
                               )
 9      vs.                    )
                               )
10      QUEST DIAGNOSTICS      )
        CLINICAL LABORATORIES, )
11      INC., QUEST            )
        DIAGNOSTICS HOLDINGS,  )
12      INC., QUEST DIAGNOSTICS)
        INCORPORATED; and DOES )
13      1-10, inclusive,       )
                               )
14               Defendants.   )
        _____)

15

16

17           REMOTE VIDEOTAPED DEPOSITION OF ARDIS BAZYN

18                      April 27, 2021

19

20

21

22

23

24

        Job No. CS4522969
25      Reported by: Maryann Matthews, CSR #737
</pre>

EXHIBIT 27  PAGE 293

Page 29

1                (Unintelligible crosstalk.)

2          Q.   (BY MS. ROLLER) So when you first walked in

3     the door to the Quest patient service center on Alameda,

4     were you encountered by a greeter or somebody that said,

5     "Welcome to Quest.  What can we help you with?"

6          A.   No.

7          Q.   Okay.  What did you do once you first walked

8     in?

9          A.   We went to the counter and my husband signed

10    us in.

11         Q.   Okay.  And how did he sign you in?

12         A.   I'm not sure because he did it.

13         Q.   Was your husband there to get blood work done

14    that day, too?

15         A.   Yes.

16         Q.   And when he went to the counter, did you just

17    sit down in one of the chairs in the waiting room?

18         A.   I waited for him to sign us in, and then he,

19    you know, told us where there were places we could sit.

20         Q.   Okay.  How long did it take for him to sign

21    you guys in?

22         A.   No more than a couple minutes.

23         Q.   And did he go up to the, like, reception desk

24    and speak to somebody, based on your understanding?

25         A.   No.

Page 42

1          A.   Waited until -- at the counter until someone

2     came out.

3          Q.   And in 2019 during that visit, how long did

4     it take for somebody to come out to the counter to check

5     you in?

6          A.   Oh, I think, you know, five or ten minutes.

7          Q.   Okay.  And then did you go to Quest in 2018?

8          A.   Yes.

9          Q.   And do you recall if you went alone or with

10    your husband on that visit?

11         A.   No, I was alone.  I -- they had an attendant

12    then, so --

13         Q.   Okay.  And how long did it take for you to

14    check in in 2018, at your 2018 visit?

15         A.   I just went right up to the counter and they

16    took my name.

17         Q.   Do you recall what location this was that you

18    went to in 2018?

19         A.   Oh, I think it was the 201 South Buena Vista,

20    but I'm not positive.  But I --

21         Q.   Do you know --

22         A.   That one is easier for me to get to, so I

23    generally try to do that one when I'm by myself.

24         Q.   And when you checked in at the 2018 visit,

25    what information did they ask of you in order to check

Page 57

1                      REPORTER'S CERTIFICATE

2

    STATE OF IDAHO   )
3                     )  ss.
    COUNTY OF ADA    )

4

5        I, MARYANN MATTHEWS, Certified Shorthand Reporter

6    and Notary Public in and for the State of Idaho, do hereby

7    certify:

8        That prior to being examined, the witness named in

9    the foregoing deposition was duly sworn remotely by me to

10   testify to the truth, the whole truth and nothing but the

11   truth;

12       That said deposition was taken down by me in

13   shorthand at the time and place therein named and

14   thereafter reduced to typewriting under my direction,

15   and that the foregoing transcript contains a full,

16   true and verbatim record of said deposition.

17       I further certify that I have no interest in the

18   event of the action.

19       WITNESS my hand and seal this 12th day of May,

20   2021.

21

22                          MARYANN MATTHEWS
                            CSR and Notary
23                          Public in and for the
                            State of Idaho.

24

25   My Commission Expires:  09-12-2025

```
                                                        Page 1

 1                   UNITED STATES DISTRICT COURT
 2                   CENTRAL DISTRICT OF CALIFORNIA
 3
 4      JULIAN VARGAS, ANNE    )
        WEST and AMERICAN      )
 5      COUNCIL OF THE BLIND,  )
        individually on behalf )  Case No. 2:19-cv-08108 DMG (MRWx)
 6      of themselves and all  )
        others similarly       )
 7      situated,              )
                               )
 8              Plaintiffs,    )
                               )
 9      vs.                    )
                               )
10      QUEST DIAGNOSTICS      )
        CLINICAL LABORATORIES, )
11      INC., QUEST            )
        DIAGNOSTICS HOLDINGS,  )
12      INC., QUEST DIAGNOSTICS)
        INCORPORATED; and DOES )
13      1-10, inclusive,       )
                               )
14              Defendants.    )
        _____)
15
16
17          REMOTE VIDEOTAPED DEPOSITION OF RALPH DANIEL BLACK
18                        April 27, 2021
19
20
21
22
23
24
        Job No. CS4522969
25      Reported by: Maryann Matthews, CSR #737
```

EXHIBIT 27 PAGE 297

Page 28

1    in the middle of all of that with doing it with the two

2    of us, so we left and went back to talk to the

3    receptionist.

4         Q.   How long did you wait in line at the kiosk

5    before you actually got up to the front of the kiosk?

6         A.   I don't remember.  It wasn't too long.  Maybe

7    five minutes or something.

8         Q.   Were there a certain number of people that

9    you can recall that were in front of you checking in?

10        A.   No, I don't.

11        Q.   Okay.  Once you realized you couldn't use the

12   kiosk to check in, you went over to the receptionist

13   desk, right?

14        A.   Yes.

15        Q.   And was somebody there?

16        A.   Yes.

17        Q.   And what did you say to them at that point?

18        A.   Well, I explained to her that we couldn't use

19   the kiosk, and she said, "Well, you know, that's the way

20   we do things.  You have to use the kiosk."

21             And so I had to -- you know, went back

22   through it with her again and explained, you know, my

23   wife's limitations and my visual impairment, and between

24   the two of us we couldn't do it.

25             And so then she said, "Oh, well, let me see

Page 49

REPORTER'S CERTIFICATE

STATE OF IDAHO    )
                  )  ss.
COUNTY OF ADA     )

           I, MARYANN MATTHEWS, Certified Shorthand Reporter
and Notary Public in and for the State of Idaho, do hereby
certify:

           That prior to being examined, the witness named in
the foregoing deposition was duly sworn remotely by me to
testify to the truth, the whole truth and nothing but the
truth;

           That said deposition was taken down by me in
shorthand at the time and place therein named and
thereafter reduced to typewriting under my direction,
and that the foregoing transcript contains a full,
true and verbatim record of said deposition.

           I further certify that I have no interest in the
event of the action.

           WITNESS my hand and seal this 12th day of May,
2021.


                           MARYANN MATTHEWS
                           CSR and Notary
                           Public in and for the
                           State of Idaho.


My Commission Expires:  09-12-2025

Page 1

```
 1                    UNITED STATES DISTRICT COURT
 2                    CENTRAL DISTRICT OF CALIFORNIA
 3
 4      JULIAN VARGAS, ANNE   )
        WEST and AMERICAN     )
 5      COUNCIL OF THE BLIND, )
        individually on behalf )  Case No. 2:19-cv-08108 DMG (MRWx)
 6      of themselves and all )
        others similarly      )
 7      situated,             )
                              )
 8              Plaintiffs,   )
                              )
 9      vs.                   )
                              )
10      QUEST DIAGNOSTICS     )
        CLINICAL LABORATORIES,)
11      INC., QUEST           )
        DIAGNOSTICS HOLDINGS, )
12      INC., QUEST DIAGNOSTICS)
        INCORPORATED; and DOES )
13      1-10, inclusive,      )
                              )
14              Defendants.   )
        _____)
15
16
17            REMOTE VIDEOTAPED DEPOSITION OF MARY HAROYAN
18                       April 29, 2021
19
20
21
22
23
24
        Job No. CS4522974
25      Reported by: Maryann Matthews, CSR #737
```

Page 34

1    the kiosk, then what happened?

2         A.   We asked for help.  And, honestly, I can't

3    remember if it was maybe somebody else who was there

4    checking in who assisted or we asked the -- you know,

5    the phlebotomist there to help with that.

6         Q.   How long between the time that you realized

7    that you guys couldn't use the kiosk until the time

8    that you got help from somebody?

9         A.   Not long.

10        Q.   Like --

11        A.   I mean, it was pretty quick --

12        Q.   -- a minute?

13        A.   -- I would say.

14             A minute or two probably, yeah.

15        Q.   Okay.  And you don't recall whether it was

16   a Quest employee or whether it was somebody else?

17        A.   Yeah.  I really don't remember.

18        Q.   And --

19        A.   Because I know it was -- I remember there

20   being other people in the waiting room, so there could

21   have been somebody who offered to help.  I really --

22   really don't remember.  I was not feeling that well at

23   the time, so I honestly don't remember.

24        Q.   Okay.  Do you recall the information you

25   provided to the person who assisted you?

Page 44

1    possible, yes --

2         Q.   Okay.

3         A.   -- to -- yeah.

4         Q.   So my records indicate that you checked in

5    at 7:30 in the morning, which is the time they opened,

6    right?

7         A.   Yes.

8         Q.   And that you were out and done and your

9    services completed by 7:41.

10        A.   Uh-huh.

11        Q.   Does that sound about accurate?

12        A.   Yes.

13        Q.   So you were in and out within 11 minutes?

14        A.   That's the reason why I would try to get

15   there early, before other people are ahead of me; and

16   also so that the phlebotomist would be able to assist

17   me with the check-in.

18        Q.   Okay.  Do you recall if you were assisted

19   with the check-in on that visit?

20        A.   Yes, she -- she did because I absolutely

21   would -- knowing I was there at 7:30, I went there on

22   my own and I, you know, relied on the phlebotomist to

23   check me in.

24        Q.   Do you recall if you -- if they open at

25   7:30 and I have a check-in record at 7:30, is that --

Page 45

1    does that indicate to you that you were checked in

2    essentially immediately when you got there by the

3    phlebotomist?

4         A.   Yes.

5         Q.   Do you recall checking in with the

6    phlebotomist independently of that?

7              MR. HANDLEY:  Objection.  Vague.

8              THE WITNESS:  Well, I -- I'll say, I mean,

9    I walked in on my own, and I don't remember if she was

10   right there or in the inner room or there might have

11   been somebody she was finishing up with, even.

12             I really don't know.  But she was made

13   aware very quickly that I was there, and I asked her

14   for help to check in.

15        Q.   (BY MS. ROLLER) And she assisted you?

16        A.   Yes.

17        Q.   She checked you in?

18        A.   Yes, she did.

19        Q.   Okay.  And then you were called back within

20   a couple minutes, and then you were out of there?

21        A.   Yes.

22        Q.   Okay.  And, again, my records show that it

23   was about 11 minutes from the time you checked in

24   until the time you left.

25             That comports with your recollection?

Page 54

1    dad came with me on that one, too.  I --

2         Q.   Okay.  So I have a record that you did have

3    an appointment, and your appointment was at 11:00 a.m.

4         A.   Okay.

5         Q.   Does that sound about right?

6         A.   Yeah.  Uh-huh.

7         Q.   Okay.  And does that lead you to believe

8    that your dad went to that --

9         A.   Yes.

10        Q.   -- appointment as well?

11        A.   Yes.

12        Q.   Okay.  Do you remember how long you were

13   there at that visit on that day?

14        A.   Probably not long because when you get

15   there for an appointment, you know, you were taken

16   pretty much right away.  And the lab work didn't take

17   long, so I suspect it was pretty quick.

18        Q.   Okay.  The check-in process, was that kind

19   of -- was that the same as you described from your

20   November 2018 visit, where your dad went to the kiosk

21   and checked you in using the code that you had on your

22   phone?

23        A.   I assume that would have been the case,

24   yes, because we would have had the same code and he

25   may have, you know, remembered from the previous

Page 101

1                    REPORTER'S CERTIFICATE

2

STATE OF IDAHO  )
3                )  ss.
COUNTY OF ADA   )

4

5        I, MARYANN MATTHEWS, Certified Shorthand Reporter

6   and Notary Public in and for the State of Idaho, do hereby

7   certify:

8        That prior to being examined, the witness named in

9   the foregoing deposition was duly sworn remotely by me to

10  testify to the truth, the whole truth and nothing but the

11  truth;

12       That said deposition was taken down by me in

13  shorthand at the time and place therein named and

14  thereafter reduced to typewriting under my direction,

15  and that the foregoing transcript contains a full,

16  true and verbatim record of said deposition.

17       I further certify that I have no interest in the

18  event of the action.

19       WITNESS my hand and seal this 13th day of May,

20  2021.

21       ┌─────────────────────────────┐      _____
         │      MARYANN MATTHEWS        │
22       │ Notary Public - State of Idaho │    MARYANN MATTHEWS
         │   Commission Number 44468    │      CSR and Notary
23       │ My Commission Expires Sep 12, 2025 │  Public in and for the
         └─────────────────────────────┘      State of Idaho.

24

25  My Commission Expires:   09-12-2025

EXHIBIT 27  PAGE 305

Page 1

```
 1                    UNITED STATES DISTRICT COURT
 2                   CENTRAL DISTRICT OF CALIFORNIA
 3
 4      JULIAN VARGAS, ANNE    )
        WEST and AMERICAN      )
 5      COUNCIL OF THE BLIND,  )
        individually on behalf )  Case No. 2:19-cv-08108 DMG (MRWx)
 6      of themselves and all  )
        others similarly       )
 7      situated,              )
                               )
 8              Plaintiffs,    )
                               )
 9      vs.                    )
                               )
10      QUEST DIAGNOSTICS      )
        CLINICAL LABORATORIES, )
11      INC., QUEST            )
        DIAGNOSTICS HOLDINGS,  )
12      INC., QUEST DIAGNOSTICS)
        INCORPORATED; and DOES )
13      1-10, inclusive,       )
                               )
14              Defendants.    )
        _____)
15
16
17          REMOTE VIDEOTAPED DEPOSITION OF NONA HAROYAN
18                       April 29, 2021
19
20
21
22
23
24
        Job No. CS4522974
25      Reported by: Maryann Matthews, CSR #737
```

EXHIBIT 27 PAGE 306

Page 40

1          Q.   So you went up to the tablet, you waited in

2     line for the patient to complete their check-in; and

3     then it was your turn to be with this tablet?

4          A.   Correct.

5          Q.   Did you recognize the tablet as an iPad?

6          A.   I did not.  I mean, it was a tablet.  I

7     didn't know it was an Apple device.

8          Q.   Okay.

9          A.   Is it?

10         Q.   And then what happened after you saw this

11    tablet?

12         A.   I -- I think I -- I touched the tablet.

13    Something came on the screen.  And then I realized

14    there's no audible component, and so I just -- I

15    couldn't do anything.

16         Q.   And then what happened next?

17         A.   I sat down and I waited for one of the staff,

18    one of the phlebotomists, to come out so that I could

19    indicate that I was there and that I couldn't use this

20    device to check in.

21         Q.   Okay.  How long between the time you sat down

22    and between the time a phlebotomist came out?

23         A.   They were with a patient.  It might have been

24    five -- five minutes at the most.

25         Q.   And then did you go up to the phlebotomist

Veritext Legal Solutions

EXHIBIT 27  PAGE 307

Page 99

1                    REPORTER'S CERTIFICATE

2
STATE OF IDAHO  )
3                )  ss.
COUNTY OF ADA   )

4

5        I, MARYANN MATTHEWS, Certified Shorthand Reporter

6   and Notary Public in and for the State of Idaho, do hereby

7   certify:

8        That prior to being examined, the witness named in

9   the foregoing deposition was duly sworn remotely by me to

10   testify to the truth, the whole truth and nothing but the

11   truth;

12        That said deposition was taken down by me in

13   shorthand at the time and place therein named and

14   thereafter reduced to typewriting under my direction,

15   and that the foregoing transcript contains a full,

16   true and verbatim record of said deposition.

17        I further certify that I have no interest in the

18   event of the action.

19        WITNESS my hand and seal this 13th day of May,

20   2021.

21                          _____

22        MARYANN MATTHEWS
         MARYANN MATTHEWS          CSR and Notary
         Notary Public - State of Idaho
23        Commission Number 4446R   Public in and for the
         My Commission Expires Sep 12, 2025   State of Idaho.

24

25   My Commission Expires:  09-12-2025

EXHIBIT 27  PAGE 308

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3
       JULIAN VARGAS, ANNE WEST AND        )
 4     AMERICAN COUNCIL OF THE BLIND,      )
       INDIVIDUALLY ON BEHALF OF           )
 5     THEMSELVES AND ALL OTHERS SIMILARLY)  CASE NO.
       SITUATION,                          )
 6                                         )  2:19-CV-08108
                        PLAINTIFFS,        ) DMG
 7                                         )
            VS.                            )
 8                                         )
       QUEST DIAGNOSTICS CLINICAL          )
 9     LABORATORIES, INC., QUEST           )
       DIAGNOSTICS HOLDINGS, INC., QUEST   )
10     DIAGNOSTICS INCORPORATED; AND DOES  )
       1-10, INCLUSIVE,                    )
11                                         )
                        DEFENDANTS.        )
12                                         )
       _____)
13
14
15
16
17
18
                VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF
19
                    ROBIN CHARLOTTE REHDER
20
                    FRIDAY, MAY 21, 2021
21
22
23
24
       JOB NO. 4589711
25
       REPORTED BY:  MELIA BASAVAND, CSR NO. 14089
```

Veritext Legal Solutions

Page 47

1      August 2008.  So when you -- did you go to this

2      visit alone?

3          A    Yes.

4          Q    And when you walked into the Quest location

5      to -- multiple times what -- how did you discover

6      that this E kiosk existed?

7          A    Well, at that particular time someone came

8      up to me and said you have to sign in on the kiosk.

9              And I said I'm not -- I'm not able to do it.

10     There's no voiceover.  And that's when she signed me

11     in.  There was no one at the desk at that time.

12             I called the local office of Quest and

13     explained the situation.

14         Q    When you walked into the patient service

15     center on that visit, did you walk up to the

16     receptionist desk?

17         A    Yes, I usually do.  And I could sense there

18     was no one there.  No one said may I help you.

19         Q    And how long did you wait between the time

20     that you stepped in there and you were waiting at

21     the desk until the time the patient came up to you

22     to help you check-in?

23         A    Not very long.  She realized the predicament

24     I was in.

25         Q    Would you say it was less than a minute?

Page 48

```
1        A    I'd say a couple minutes.
2        Q    At any point, while you were waiting at the
3    receptionist desk, did any phlebotomist come out and
4    call out any patients --
5        A    Yes.
6        Q    -- to take them back for their blood draw?
7        A    Yes.
8        Q    How many?
9        A    I'm not sure.
10       Q    So how do you know they came out?
11       A    I heard them call names.
12       Q    And did you ask them to help you?
13       A    I mentioned it to -- when I went back to get
14   my blood work done, I mentioned what happened, and
15   they extended their apology.
16       Q    Okay.  And so you were waiting there and a
17   patient came up to you to assist you with the
18   check-in.  How do you know this person was a
19   patient?
20       A    Well, I can tell when she walked up that she
21   sitting down in the waiting room in the lounge area
22   wherever you wait for the technicians because --
23       Q    And did you --
24       A    -- when I --
25            Sorry.  Go ahead.
```

Page 97

1    STATE OF CALIFORNIA   )

2    COUNTY OF LOS ANGELES )   SS.

3

4         I, Melia Basavand, CSR 14089, in and for the

5    State of California, do hereby certify:

6         That prior to being examined, the witness named

7    in the foregoing deposition was by me duly sworn to

8    testify to the truth, the whole truth, and nothing but

9    the truth;

10        That said deposition was taken down by me in

11    shorthand at the time and place therein named and

12    thereafter reduced to typewriting under my direction, and

13    the same is a true, correct, and complete transcript of

14    said proceedings;

15        That if the foregoing pertains to the original

16    transcript of a deposition in a federal case, before

17    completion of the proceedings, review of the transcript

18    { } Was { } was not required.

19        I further certify that I am not interested in the

20    event of the action.

21        Witness my hand this 9th day of June, 2021.

22

23            *Melia Basavand*

            Certified Shorthand Reporter

24            for the State of California

25

EXHIBIT 27 PAGE 312

```
 1                UNITED STATES DISTRICT COURT
 2           FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4    JULIAN VARGAS, ANNE      )
      WEST, and AMERICAN       )
 5    COUNCIL OF THE BLIND,    ) Case No. 2:19-cv-8108
      individually on behalf   )
 6    of themselves and all    )
      others similarly         )
 7    situated,                )
                               )
 8              Plaintiffs,    )
                               )
 9        vs.                  )
                               )
10    QUEST DIAGNOSTICS        )
      CLINICAL LABORATORIES,   )
11    INC., QUEST DIAGNOSTICS  )
      HOLDINGS, INC.,          )
12    QUEST DIAGNOSTICS        )
      INCORPORATED, and        )
13    DOES 1-10, inclusive,    )
                               )
14              Defendants.    )
      _____)
15
16
17         REMOTE DEPOSITION OF CLAIRE STANLEY
18             (Via Zoom Videoconference)
19              Thursday, August 19, 2021
20
21    REPORTED BY:  Michelle Milan Fulmer
                    CSR No. 6942, RPR, CRR, CRC
22
23    JOB NO. 4769235
      PAGE 85 THROUGH PAGE 88 IS MARKED "CONFIDENTIAL"
24    UNDER THE PROTECTIVE ORDER AND SEPARATELY BOUND
25    PAGES 1 - 225
```

                                            Page 1

EXHIBIT 27  PAGE 313

1    Q    So anything more than 10 seconds, you can't

2    tell me how long it was that you were waiting for

3    the phlebotomist?

4    A    I just don't remember.

5    Q    Okay.  So it may have been a minute; is        13:54:42

6    that right?

7    A    Possibly.

8    Q    Okay.  And when the phlebotomist did greet

9    you, what did he or she do or say next?

10    A    I think he asked me to come back into the       13:55:02

11    back with him.

12    Q    Okay.  And did you do that?

13    A    Yes.

14    Q    And as far as you could tell, were there

15    any other human beings in the back with that         13:55:19

16    individual?

17    A    I recall there being two different

18    employees.

19    Q    And by two, do you mean two additional

20    employees or just one additional employee?          13:55:31

21    A    One additional.

22    Q    Okay.  And I think you mentioned that the

23    door was left ajar to the back and you detected

24    that.

25         Did you detect that pretty instantaneously,    13:55:47

                                                    Page 77

EXHIBIT 27  PAGE 314

```
 1                        CERTIFICATION

 2                            OF

 3               CERTIFIED SHORTHAND REPORTER

 4

 5              I, the undersigned, a Certified Shorthand

 6     Reporter of the State of California do hereby

 7     certify:

 8                 That the foregoing proceedings were taken

 9     before me at the time and place herein set forth;

10     that any witnesses in the foregoing proceedings,

11     prior to testifying, were placed under oath; that a

12     verbatim record of the proceedings was made by me

13     using machine shorthand which was thereafter

14     transcribed under my direction; further, that the

15     foregoing is an accurate transcription thereof.

16                 I further certify that I am neither

17     financially interested in the action nor a relative

18     or employee of any attorney of any of the parties.

19                 IN WITNESS WHEREOF, I have this date

20     subscribed my name.

21     Dated:  September 2, 2021, 2021.

22

23

24                    _____
                      Michelle Milan Fulmer

25                    CSR No. 6942, RPR, CRR, CRC


                                          Page  222
```

# EXHIBIT 28

[FILED UNDER SEAL, SUBJECT TO COURT'S RULING ON APPLICATION]

EXHIBIT 28  PAGE 316

# EXHIBIT 29

EXHIBIT 29  PAGE 317

1/25/19

Amer Pharaon, Corporate Council

Chris Grant,  Executive Director of Patient Service Centers

Quest Diagnostics

They want to know more about what "best practices" we suggest to make their PSCs more accessible for blind patients

They want to know what information that blind patients have to give outloud to others is considered personal or inappropriate to share (anything)

They want to know what ACB's goal is to take away from this conversation (the lawyer is definitely fishing here)

Chris talked a lot about what the phlebotomists are trained to do; they are supposed to scan the room everytime they go into the lobby to observe if anyone needs assistance (this never happens)

The phlebotomists undergo sensitivity training on a yearly basis

When people need help with the sign-in tablet, there is a big yellow button they can push; they seemed to believe this was sufficient to assist low vision patients

They stated they have taken actions to increase the font size on the device

They are working to put more of the work up-front; patients fill out the paperwork at home on their own computer's and can just scan it in when they get to the PSC; soon people will be able to scan in with their smart phones

He said the website is accessible, and said it has been tested

They said they are trying to encourage more people to make appointments because it makes it easier; but when asked if walk ins would be eliminated, he said no, they will continue to take walk ins

Talked about having a bell or button to push to get help

The door is apparently transparent

They said it is rare for a waiting room to be empty so a person will never be without someone to ask for help

When someone with a disability comes in, a phlebotomist is supposed to drop everything and help the person

He wants to know the specific locations of labs where such service is not being provided

They stressed that service animals are allowed

I asked what they will do if they cannot identify whether someone has a disability and they could not answer that question



**Exhibit 00067**

6/9/2021
ACB/Rachfal - V1

IBIT 29  PAGE 318

PL00577

Eric talked about connecting the company to a tech firm to explore how to make their sign in system accessible

EXHIBIT 29  PAGE 319

PL00578