Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com
Alison M. Bernal (SBN 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Telephone: (805) 963-2345

Benjamin J. Sweet
(*Admitted Pro Hac Vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

Attorneys for Plaintiffs Julian Vargas, American Council of the Blind, and the Proposed Class

*Additional counsel for Plaintiffs listed on signature page*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIAN VARGAS, ANNE WEST, and AMERICAN COUNCIL OF THE BLIND, individually on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, inclusive,<br><br><br>Defendants. | Case No.: 2:19-cv-08108-DMG<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>[*FILED CONCURRENTLY WITH NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION, APPENDIX OF EXHIBITS AND [PROPOSED] ORDER*]<br><br>**Hearing Date: October 29, 2021**<br>**Time: 10:00 am**<br>**Courtroom: 8C**<br><br>Complaint Filed: September 18, 2019<br>Discovery Cutoff: August 27, 2021<br>Pretrial Conf: December 7, 2021<br>Trial Date: January 11, 2022<br>District Judge: Hon. Dolly M. Gee<br>Magistrate: Hon. Michael R. Wilner<br><br>**REDACTED** |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

# TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................5

II.    STATEMENT OF FACTS .....................................................................7

       A.    ECSS Saves Quest Tens of Millions of Dollars ............................7

       B.    ECSS's Rationale: Cost Savings ..................................................8

       C.    Quest Implements ECSS at Every PSC Nationwide ....................10

       D.    TFS Does Not Render The ECSS Kiosk Independently Accessible for Blind Patients ...........................................................................12

       E.    Quest Has Not Incorporated TFS Across Its PSC Network .........13

       F.    Lead Plaintiff Vargas Cannot Independently Access ECSS .........15

             1. Julian Vargas ......................................................................15

             2. ACB Members' Experiences Mirror Those of Plaintiff Vargas..............17

III.   ARGUMENT ......................................................................................18

       A.    Summary of the Argument ..........................................................18

       B.    Class Requirements of Rule 23(a) ...............................................19

             1. Numerosity ..........................................................................19

             2. Commonality ........................................................................20

             3. Typicality ............................................................................21

             4. Adequacy .............................................................................22

       C.    Class Requirements of Rule 23(b)(2) for Injunctive Class .........23

       D.    Rule 23(b)(3) Predominance and Superiority Are Easily Satisfied. ..........24

             1. Common questions of law and fact predominate over individual questions .................................................................24

             2. Class certification is superior to other means of resolving this dispute ....................................................................28

IV.    CONCLUSION....................................................................................28

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR CLASS CERTIFICATION

## <u>TABLE OF AUTHORITIES</u>

*Amchem Products, Inc. v. Windsor*

  *521 U.S. 591, 617 (1997)* ........................................................................28

*Arnold v. United Artists Theatre Circuit, Inc.*

  *158 F.R.D. 439, 450 (N.D. Cal. 1994)* ......................................................22

*Briseno v. ConAgra Foods, Inc.*

  *844 F.3d 1121 (9th Cir. 2017)* ...........................................................26, 28

*Californians for Disability Rights v. Cal. Dept. of Trans.*

  *249 F.R.D. 334, 346 (N.D. Cal. 2008)* ......................................................22

*Ellis v. Costco Wholesale Corp.*

  *657 F.3d 970, 981 (9th Cir. 2011).* ......................................................21,22

*Greater Los Angeles Agency on Deafness, Inc. v. Reel Serv. Mgmt.*

  *2014 WL 12561074, at \*7 (C.D. Cal. May 6, 2014)* ...............................20

*Grove v. De La Cruz*

  *407 F.Supp.2d 1126, 1130-31 (C.D. Cal. 2005)* ......................................24

*Hanlon v. Chrysler Corp.*

  *150 F.3d 1011, 1020 (9th Cir. 1998).* ..................................................22, 25

*In re Korean Ramen Antitrust Litig.*

  *2017 WL 235052, at \*21 (N.D. Cal. 1/19/17)* .........................................26

*In re Yahoo Mail Litigation*

  *308 F.R.D. 577, 595 (N.D. Cal. 2015).* .................................................23, 24

*Just Film, Inc. v. Buono*

  *847 F.3d 1108, 1116 (9th Cir. 2017)* ........................................................22

*Kumar v. Salov N. Am. Corp.*

  *2016 WL 3844334, at \*7 (N.D. Cal. 7/15/16)* .........................................26

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

3

*Mazza v. Am. Honda Motor Co.*

    *666 F.3d 581, 589 (9th Cir. 2012)* .................................................................25

*Melgar v. CSK Auto, Inc.*

    *681 F. App'x 605, 607 (9th Cir. 2017)* ......................................................26

*Moeller v. Taco Bell Corp.*

    *220 F.R.D. 604, 608 n. 8 (N.D.Cal.2004)*.........................................20,22

*Molski v. M.J. Cable, Inc.*

    *481 F.3d 724, 731 (9th Cir. 2007)*.........................................................25

*Mullins v. Direct Digital, LLC*

    *795 F.3d 654, 667 (7th Cir. 2015)*.........................................................26

*Nat'l Fed'n of the Blind v. Target Corp.*

    *582 F.Supp.2d 1185, 1199 (N.D. Cal. 2007)*.........................................20

*Nevarez v. Forty Niners Football Company, LLC*

    *326 F.R.D. 562, 576 (N.D. Cal. 2018)*.............................................19, 25

*Parson v. Ryan*

    *754 F.3d 657, 675 (9th Cir. 2014)*.........................................................21

*Rodriguez v. Hayes*

    *591 F.3d 1105, 1125-26 (9th Cir. 2010).* ............................................23

*Shields v. Walt Disney Parks and Resorts US, Inc.*

    *279 F.R.D. 529, 543 (C.D. Cal. 2011)*...................................................19

*Walker v. Life Ins. Co. of the Southwest*

    *953 F.3d 624, 632 (9th Cir. 2020)*.................................................26, 27

*Wal-Mart Stores, Inc. v. Dukes*

    *564 U.S. 338 (2011)*.................................................................7, 21

*Fed.R.Civ.P. 23(b)* ...................................................................*passim*

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

4

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR CLASS CERTIFICATION

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This nationwide civil rights class action lawsuit presents nationally significant questions of access for legally blind Americans to a leading provider of healthcare diagnostic services during an ongoing global pandemic. In 2014, Defendants Quest Diagnostics Incorporated, *et al.* ("Defendants" or "Quest") launched e-Check-In Self-Service ("ECSS"). ECSS is an automated kiosk-based service designed to reduce its phlebotomists' interactions with patients, freeing them up to service a greater numbers of patients per day. ██████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████ (Ex. 20, at PA0668:15-25, PA0669:2-670:10, PA0676 [Walsh dep. and exhibit].) █████████████████████████████████████████ █████████████ (*Id.*)

ECSS permits sighted patients to perform several activities at the kiosk, including self-check in, self-editing of personal information in a private setting, the option to wait safely outside and receive a text message when the patient's turn has arrived, specimen drop off and pick up, and the ability to request help via an on-screen help button. It also permits sighted patients to know where they stand in the service queue, reducing anxiety during the check-in process. Quest itself recognizes that ECSS is an "essential aspect of Defendant's business model and of Defendant's ability to provide a positive, efficient and simple patient experience." (Ex. 29, at PA0793 [Quest discovery responses].)

Yet from its very inception, Quest never intended to offer ECSS access to its legally blind customers. The Company admits that for the entirety of the Class Period, ECSS did not have *any* features which would make it independently accessible for legally blind customers. (Ex. 5, at PA0029:17-24 [Yarrison dep.].) The remarkable consistency in the accounts of legally blind Quest customers, including the nine American Council of the Blind ("ACB") members deposed in this

5

action, is striking. Legally blind Quest customers are left to fend for themselves within Quest's PSCs, often having to rely on the assistance of unknown third parties to gain access to Quest's diagnostic services. (Ex. 12, at PA0518-A:7-12 [Bazyn dep.: husband checked her in]; Ex. 17, at PA0570:24-571:12 [Brink dep.: Quest employee asked for Brink's daughter to help]; Ex. 15, at PA0547A:20-548:1 [Grahmann dep.: relied on another patient, a stranger, to check her in]; Ex. 13, at PA0531:3-532:2, PA0532A:3-532C:15 [M. Haroyan dep.: relied on other patients – strangers – to sign her in twice before, and her father once]; Ex. 14, at PA0543:9-544:1, PA0542A:11-542B:8 [N. Haroyan dep.: relied on another patient, a stranger, to sign her in, as well as her father on other occasions]; Ex. 16, at PA0561:22-561A:5, PA0560:18-21 [Lyons dep.: relied on another patient, a stranger, to check her in, and now has to bring different people to help her check in]; Ex. 23, at PA0705:14-706:3 [Rehder dep.: relied on another patient, a stranger, to check her in].) This is what disability discrimination looks like.

Yet even after receiving dozens of complaints from its legally blind customers about ECSS's inaccessibility, Quest took no meaningful action to provide them access to ECSS. It was only after Plaintiffs instituted this lawsuit that Quest even considered any accessibility improvements to ECSS.

But, as explained in detail below, Quest's belated, half-hearted effort to bring ECSS into compliance with the law – a three-finger swipe ("TFS") capability – is woefully deficient. Purportedly introduced in August 2020 and still not fully functional at most Quest patient service centers ("PSC"), TFS itself does not provide independent access to ECSS for legally blind Quest customers, according to (1) the investigation of kiosk accessibility expert Rachael Montgomery, (2) the field investigation of experienced accessibility investigator Mark Derry and, (3) the personal experiences of Lead Plaintiff Julian Vargas and ACB member Donna Grahmann, both of whom re-visited Quest PSCs in 2021 after Quest purportedly completed the TFS rollout. (Ex. 4, ¶¶ 3-4 [Vargas Dec.]; Ex. 31 [Derry dec.]; Ex. 32

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

[Montgomery dec.]; Ex. 15, at PA0550:24-552:2, PA0553:21-554:8 [Grahmann dep.].)

Here, the expansive factual record is undisputed that during the Class Period Quest discriminated against legally blind customers such as Lead Plaintiff Julian Vargas – as well as thousands of other legally blind Americans – by refusing to provide them independent access to ECSS. Quest's belated fix, TFS – where it is offered at all – at best offers legally blind customers a separate and lesser experience. Accordingly, because this case presents multiple issues common to legally blind customers of Quest – and because those questions can be remedied with a common *answer* (*i.e.,* a fully accessible ECSS kiosk) – it is uniquely suited for class treatment. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ("*Dukes*").

## II. STATEMENT OF FACTS

### A. ECSS Saves Quest Tens of Millions of Dollars

Quest operates 2,152 PSCs nationwide and 419 PSCs in California where patients can obtain many diagnostic services. (Ex. 30, at PA0811-812 [Quest discovery responses].) Approximately 250,000 people come through Quest PSCs daily. (Ex. 9, at PA0248:10-14 [Grant dep.].)[1] Quest maintains contact information including email addresses and phone numbers and can match a patient's particular encounter to the PSC he or she visited on a particular date through its internal data service called Quanum. (Ex. 20, at PA0664:13-665:7 [Walsh dep.].)

Beginning in 2014, Quest looked for ways to service patients faster, which

_____

[1] In 2017, there were 4,366,111 check-ins at kiosks at California PSCs/15,924,343 nationally. In 2018, there were 7,515,365 check-ins at its California PSCs/32,696,929 nationally. In 2019, 8,584,783 California/ 38,046,872 nationally, and 8,027,696 in California 2020. (Ex. 25, at PA0722, PA0724-725, PA0731; Ex. 26 at PA0742, PA0744 [Quest discovery responses].)

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

would allow for more patient visits per day at its PSCs, thereby increasing Quest's profitability. (*Id.* at PA0636:10-24.) Quest considered several innovations before ultimately landing on ECSS. (*Id.* at PA0637:5-15; Ex. 6, at PA0070:2-5 [Carr dep.].) ECSS offers patients several important features including, for example, ███████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████ (Ex. 27, at

PA0749 [QUEST-VARGAS 000035245 – eCheckin CapEx tab - Summarized

Project Description]; Ex. 9, at PA0240:7-241:3 [Grant dep.].)[2] Quest never

performed any analysis of what it would cost to provide its legally blind customers

with access to ECSS. (*See* Ex. 6, at PA0081:4-84:5 [Carr dep.]; Ex. 20, at

PA0658:1-19 [Walsh dep.]; Ex. 5, at PA0043:11-44:3 [Yarrison dep.].)

### B.     ECSS's Rationale: Cost Savings

████████████████████████████████████████

███████████████ (Ex. 20, at PA0669:25-670:10, PA0668:15-25, PA0676 [Walsh dep.

and exhibit].) ███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████ (*Id.* at PA0641:17-642:1.)

Quest considered several tablet and enclosure vendors for ECSS. One vendor,

_____

[2] Since 2016 Quest has had firm plans to roll out additional features for ECSS, including identification scanners and credit card payment scanners – all of which will be inaccessible to legally blind customers. (Ex. 19, at PA0624:12-626:25 [Aronson dep.].) ███████████████████████████████ (Ex. 20, at PA0660:23-661:1 [Walsh dep.].)

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR CLASS CERTIFICATION

Habey, asked Quest if it needed audio for the kiosk. (Ex. 20, at PA0649:24-651:25 [Walsh dep.].) This led Quest's IT team to question whether Quest should add audio to "service patients with impaired vision," and whether they needed to bring the kiosk into compliance with the ADA to service visually-impaired patients. (*Id.* at PA0652:2-654:9.) Rather than follow through on these questions, Quest ultimately chose a kiosk that was not independently accessible for its legally blind patients. (*Id.* at PA0655:5-25; Ex. 5, at PA0039:6-40:12, PA0045:3-46:18 [Yarrison dep.].)

Quest contracted with Lilitab to provide the iPad tablet and enclosure for ECSS. Lilitab's CEO Adam Aronson, who has been designing accessible kiosks for over 25 years, testified that Lilitab offered (and offers) kiosks with accessible features and could have provided the same to Quest if so desired. (Ex. 19, at PA0613:12-19, PA0630:4-18, PA0614:10-615:17, PA0619:10-620:8 [Aronson dep.].) The accessible features include a headphone jack placed in a Lilitab enclosure to allow a blind user access to audio from the tablet, and specifically, to access the iPad's built-in voiceover technology. (*Id.* at PA0614:10-615:17, PA0619:10-620:8.) *This accessible headphone jack cost just $30 per kiosk.* (*Id.* at 31:9-22.) *Lilitab also offered (and offers) the option of a tactile keyboard for accessibility for just $95 per enclosure.* (*Id.* at PA0617:14-618:15, PA0621:11-25.) Finally, Quest could have purchased an AudioNav keypad for iOS which costs just $309.75 per kiosk. (*See* Ex. 32, ¶ 48 [Montgomery dec.].) **Accordingly, using Quest's own internal cost saving projections, the Company could have provided at least one independently accessible kiosk option at its 2,152 PSCs for just $935,582 – allowing it to still enjoy a massive cost savings from the ECSS rollout of** ▮▮▮▮▮▮▮

Yet Lilitab CEO Aronson testified Quest never inquired about the possibility of having an accessible kiosk for blind customers, despite him expressly informing Quest that Lilitab could outfit the kiosk with an inexpensive headphone jack for accessibility. (Ex. 19, at PA0627:12-16, PA628:20-629:6 [Aronson dep.].) In

Aronson's words, Quest's focus was instead on getting a "low cost" kiosk. (*Id.,* at PA0622:16-20.)

The Quest IT team recommended an iPad tablet for the ECSS kiosk with the Lilitab enclosure. (Ex. 20, at PA0645:10-646:21 [Walsh dep.].) The IT team was aware the iPad had accessibility features within its iOS suite yet undertook no analysis of whether the ECSS kiosk could utilize the built-in accessibility features. (*Id.* at PA0656:25-657:19; Ex. 6, at PA0072:2-75:12 [Carr dep.]; Ex. 5, at PA0041:21-42:3 [Yarrison dep.].) ███████████████████████████████████ ███████████████████████████████████████████████████ (Ex. 20, at PA0674:4-17 [Walsh dep.]; Ex. 5, at PA0049-64 [Exhibits from Yarrison dep.].) The IT team also noted ADA-compliant kiosk options, but Quest never followed up on them despite their posing no undue financial burden to the Company. (Ex. 20, at PA0674:19-675:20 [Walsh dep.]; Ex. 5, at PA0042:24-43:88, PA0045:4-47:3 [Yarrison dep.].)

The working prototype kiosk Quest's IT team developed, which Quest ultimately implemented, had a base, a mount or post, enclosure, and the iPad itself. (Ex. 7, at 106:13-21 [O'Campo dep.].) While the kiosk contained a touchscreen help swipe button a sighted customer could use if he or she was having difficulty with the kiosk, the help button had no audio or other functionality that would allow a blind user to use it independently. (Ex. 20, at PA0638:24-640:3 [Walsh dep.].) Indeed, at no time during the IT development did Quest delegate anyone to address ADA accessibility issues related to ECSS. (*Id.* at PA0643:14-644:23, PA0647:24-648:5; Ex. 6, at PA0076:9-80:3 [Carr dep.].) *In fact, Quest admits that during the Class Period, ECSS contained no features that would make it independently usable by legally blind people.* (Ex. 5, at PA0029:17-24 [Yarrison dep.].)

## C.   Quest Implements ECSS at Every PSC Nationwide

Once the IT team developed the working prototype, it sent the prototype to Quest's national patient services team for implementation. (Ex. 20, at PA0637A:6-

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

16 [Walsh dep.].) Quest then implemented the ECSS kiosk at all 2,152 PSCs nationwide beginning in 2016. (*Id.* at PA0640:18-641:1; Ex. 5, at PA0027:8-13, PA0028:1-8 [Yarrison dep.]; Ex. 19, at PA0623:19-25 [Aronson dep.].) When a sighted patient checks in at the kiosk, Quest places that patient in line by time of check in with a video monitor in the PSC displaying the patient's wait time and place in queue. (Ex. 20, at PA0666:12-19, PA0671:9-672:225 [Walsh dep.].) The ECSS kiosk communicates to the phlebotomist's screen in the back of the PSC when a patient checks in. (*Id.* at PA0663:9-20.) ECSS's implementation has indeed reduced patient wait time for sighted patients, allowing Quest to enjoy increased productivity. (*Id.* at PA0673:5-8.)

After the initial rollout, ███████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ (*Id.* at PA0659:1-24.) ██████████████████████████████████████████████████ ████████████████████████ (PA0660:23-662:14.) In addition, during the Covid-19 pandemic Quest rolled out a "wait where you want" feature that allows sighted patients to input their phone number into the kiosk and wait outside to avoid close contact with other customers. (*Id.* at PA0667:1-8; Ex. 6, at PA0086:11-87:24 [Carr dep.]; Ex. 9, at PA0242:14-243:13 [Grant dep.].) Quest does not offer these additional services to its legally blind customers.

█████████████████████████████████████████████████████████ ██████████████████████████ (Ex. 5, at PA0031:20-38:20, and PA0049-57 [Yarrison dep. and exhibit]; Ex. 9, at PA0247:18-24 [Grant dep.].) For instance, on May 24, 2017, Quest received a complaint from a customer "about the difficulties she had with signing in with the iPad. No one was at the front desk and she could not read the instruction. A patient from the waiting room helped her sign in, but now the other patient knows personal information." (Ex. 6, at PA0092:25-94:5 [Carr dep.].) Another complaint from April 2018 alerted Quest that a low vision patient

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

11

1   was told she needed to register at the computer, but she could not see well enough to

2   do that. (*Id.,* at PA0094:16-95:19.) A complaint from August 2018 alerted Quest

3   that its kiosk violates the ADA and a blind patient could not independently use the

4   kiosk. (*Id.,* at PA0095:20-96:25.) ████████████████████████████████████

5   ████████████████████████████████████████ (Ex. 5, at

6   PA0031:20-38:20, and PA0049-57 [Yarrison dep. and exhibit].)

7        Well after Plaintiffs initiated this lawsuit, and in an attempt to moot Plaintiffs'

8   claims in this litigation, Quest began to roll out the TFS feature at its PSCs. TFS

9   purportedly would allow legally blind customers to use a 3-finger gesture at the

10  kiosk to enter the queue for service. (Ex. 6, at PA0087:25-88:1, PA0097:20-98:7

11  [Carr dep.].) Quest's executives claimed under oath that TFS has been rolled out

12  throughout its PSC network by March 2021. (*Id.* at PA0089:2-8, PA099:17-19; Ex.

13  5, at PA0030:10-14 [Yarrison dep.]; Ex. 9, at PA0249:20-23 [Grant dep.].) Quest

14  also claims it implemented an audio loop on a video screen which directs patients to

15  check in at the kiosk and that the audio loop repeats every seven to ten minutes. (Ex.

16  6, at PA0090:8-24, PA0091:8-14 [Carr dep.].) These claims are provably false, as

17  explained below.

## D. TFS Does Not Render The ECSS Kiosk Independently Accessible for Blind Patients

20        TFS does not provide independent and private access to all kiosk services

21  (e.g., "wait where you want," specimen drop-off, appointment check-in versus walk-

22  in). (*See,* Ex. 32, at PA0876-900, ¶¶ 10-51 [Montgomery Declaration].) Moreover,

23  even the service of receiving a patient number for the queue is not accessible

24  because a blind patient would have no accessible instruction for how to do it, with

25  no Braille instruction option or tactile keyboard. (*Id.*) In addition, the audio volume

26  of the LCD monitors in the PSC waiting areas regularly interferes with the audio of

27  the kiosk itself. (*Id.*) The service of knowing where you are in the queue – an

28  important feature according to Quest's own documents – is also inaccessible

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

because the only place it appears is in the LCD monitor, which a blind customer cannot see. (*Id*.) TFS does not allow blind customers to make use of the kiosk's features, including the "wait where you want" option available to Quest's sighted customers. (Ex. 6, at PA0086:11-87:24. [Carr dep.].) For these reasons, TFS is itself inaccessible to the legally blind and provides an unequal and lesser experience for legally blind customers. (Ex. 4, ¶¶3-4 [Vargas dec.], Ex. 15, at PA0550:24-552:2, PA0553:21-554:8 [Grahmann dep.].)

### E.   Quest Has Not Incorporated TFS Across Its PSC Network

Not only does TFS fail to provide blind individuals with an opportunity to independently access the ECSS kiosk service, but, contrary to the Company's sworn testimony, it is not even available throughout the Quest PSC network. (*Compare,* Quest's MSJ (Dkt. 95-1, at 16:9-10, against Ex. 31, at ¶ 7 [Derry dec.].) In response to Quest's repeated claims under oath that Quest implemented TFS across the Company's PSC network (*see* Ex. 6, at PA0089:2-8 [Carr dep.]; Ex. 5, at PA0030:10-14 [Yarrison dep.]; Ex. 9, at PA0249:20-23 [Grant dep.]; Dkt. 95-1, at 16:9-10, Ex. 31 [Derry dec.]), Plaintiff's accessibility investigator, Mark Derry, investigated 24 Quest PSC locations and discovered Quest's purported "solution" is riddled with glaring deficiencies at every single one, barring any argument of mootness. (Ex. 31, at PA0858-875 [Derry dec.].)

To cite just one example, at many Quest locations, Derry found there is no way for blind patients to know TFS even exists. (*Id.*) To inform blind patients of TFS, Quest relies on a voice message which is supposed play on a loop from an LCD monitor located in the patient service centers. (*See,* Ex. 6, at PA0090:8-24 [Carr dep.]; Ex. 5, at PA0048:12-19 [Yarrison dep.]; Ex. 9, at PA0246:7-15 [Grant dep.].) Quest executive Taylor Carr falsely testified this audio loop is present at all locations. (Ex. 6, at PA0100:5-7 [Carr dep.].) Derry's investigation showed Quest only plays this "content loop" message every 15 to 20 minutes – if it is played at all. (Ex. 31 [Derry dec.].) **There was no audio loop at 14 of 24 investigated locations.**

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1  (*Id.*) At those 14 locations, blind patients have no way of even knowing TFS is an

2  option for them. (*Id.*)

3          Even more troublingly, the investigation found only one of the 24

4  investigated locations had a Quest employee present in the waiting room. (*Id.*)

5  Quest's claim that employees "sweep" the waiting area to assist blind customers is

6  simply not true. (*See* Ex. 5, at PA0026:9-22 [Yarrison dep.]; Ex. 9, at PA0238:25-

7  239:7, PA0244:22-245:7 [Grant dep.].) ████████████████████████████████

8  ████████████████████████████████████ (*See* Ex. 27, at PA0749

9  [QUEST-VARGAS 000042029; QUEST-VARGAS000039512-39653].) For blind

10  customers of these locations, there was no independent access to Quest's services at

11  all during the Class Period unless the one employee on duty – a phlebotomist (Ex. 6,

12  at PA0085:6-17, PA0071:6-12 [Carr dep.].) who is busy taking specimens –

13  happened to sweep the waiting area. But as the investigation and the experiences of

14  Plaintiff Vargas and several ACB members make clear, this simply does not occur

15  regularly. (*See, e.g.,* Ex. 31, at PA0858-75 [Derry dec.: finding that a phlebotomist

16  swept the waiting area at only 1 of 24 investigated locations].)

17          To compound these glaring deficiencies, TFS is only available at select kiosks

18  within the investigated PSCs: only 13 of the 24 investigated locations had all kiosks

19  outfitted with TFS. (Ex. 31, at PA0858-75 [Derry dec.].) And only 13 of the 24

20  investigated locations had an audio message confirming the blind customer had

21  successfully checked in and entered the queue, though the audio is often not loud

22  enough to be heard. (*Id.*; *see also,* Ex. 12, at PA0519:22-25 [Bazyn dep.]; Ex. 17, at

23  PA0572:5-6 [Brink dep.].) Accordingly, blind customers at Quest locations without

24  an active audio message have no way of knowing whether they checked in and

25  without any Quest staff present in the waiting areas and no accessible "help" button

26  available for blind patients, they have no way to find out. In this way, a check in

27  system specifically aimed ████████████████████████████████████████

28  ████████████████████ (Ex. 27, at PA0749 [QUEST-VARGAS000039990]),

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1  actually has the perverse effect of increasing anxiety for Quest's blind patients.[3]

2     **F.    Lead Plaintiff Vargas Cannot Independently Access ECSS**

3          **1.    Julian Vargas**

4     Julian Vargas lives in Van Nuys, California. (Ex. 10, at PA0265:23-25

5  [Vargas dep.].) He is legally blind and uses a screen reader as an auxiliary aid that

6  allows him to understand the information displayed on a screen. (*Id.*, at PA0299:13-

7  300:24, PA0460:10-14.) Mr. Vargas works as a consultant providing training and

8  support to individuals on the use of assistance technology. (*Id.*, at PA0273:15-

9  276:24.)

10    On June 25, 2019, Mr. Vargas took paratransit to a Quest PSC close to his

11 house to obtain lab work. (*Id.*, at PA0346:3-5, PA0362:5-6, PA0365:9-14,

12 PA0368:15-19.) There was no greeter. (*Id.* at PA0369:2-6.) He took several minutes

13 to locate a check-in window. (*Id.* at PA0369:7-22.) Once at the window, he said

14 "hello" several times without any employee coming out to help. (*Id.* at PA0369:23-

15 370:2.) After about 10 to 15 minutes, a phlebotomist came out to call another patient

16 in for lab work. (*Id.* at PA0370:3-23.) A sighted individual would not have had to

17 wait, as he or she could have independently used the kiosk to check in. (*Id.* at

18 PA0461:7-21.)

19    The phlebotomist asked Mr. Vargas if he needed help, and Mr. Vargas said he

20 needed to get blood work his doctor ordered. (*Id.* at PA0372:3-15.) The

21 phlebotomist directed Mr. Vargas to the kiosk and told him, "This is where you

22

23 ─────────────

24 [3] Plaintiff's counsel provided Mr. Derry's report to Defendants well in advance of

25 this briefing and asked whether Defendant would continue to argue mootness. In a
   meet and confer held on August 26, 2021, when pressed by Plaintiff's counsel

26 regarding the factual basis of Quest's mootness defense, defense counsel stated, "so
   I don't really have an ability to speak to that as a factual matter because that is news

27 to me." (Ex. 36, at PA01054:5-6.) To date Quest's counsel has failed to provide

28 Plaintiffs with any factual substantiation of its TFS mootness argument.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR CLASS CERTIFICATION

check in." (*Id.*) Mr. Vargas checked the kiosk for tactile markings, a headphone jack, or a tactile keypad that would allow him to use the kiosk. (*Id.* at PA0372:25-373:14.) After not finding any accessibility options, Mr. Vargas told the phlebotomist the kiosk was not accessible to blind people so he would need help signing in. (*Id.* at PA0373:15-22.) The phlebotomist took the other patient back for lab work, then came back out approximately five minutes later to help Mr. Vargas. (*Id.* at PA0374:3-22.) The phlebotomist asked Mr. Vargas for several pieces of personal information. (*Id.* at PA0375:9-376:14.) Mr. Vargas suggested that the phlebotomist talk to whoever she needed to in order to ensure the kiosk was accessible to blind people. He further offered to provide his feedback to Quest. (*Id.* at PA0381:16-382:4, PA0382:13-23.) The phlebotomist agreed and said she would speak with her supervisors. (*Id.*) To date, however, no one from Quest has ever followed up with Mr. Vargas. (*Id.*) The experience left Mr. Vargas feeling embarrassed, humiliated, and like a "third-class citizen of some kind that anybody else can walk in there and not have to undergo the same amount of hassle and waiting." (*Id.* at PA0467:22-468:17.)

After being deposed in this action and informed by Quest's counsel of the purportedly accessible TFS option, Mr. Vargas returned to a Quest PSC on June 10, 2021. (Ex. 4, ¶ 2 [Vargas dec.]; Ex. 10, at PA0406:8-407:3 [Vargas dep.].) As he entered the location, he heard the tail end of the portion of the audio content loop directed toward blind patients. (*Id.*, at ¶ 2.) However, the volume was not adequate for him to hear the message from his vantage point. While waiting for the content loop to replay, information was given on the "wait where you want" option, available to those who could use the kiosk independently. (*Id.*) After approximately 8 to 10 minutes, the message directed Mr. Vargas to perform a three-finger swipe at the kiosk. (*Id.*, at ¶ 3.) The message did not give directions as to where the kiosk itself was located, so Mr. Vargas had to fumble around to find it. (*Id.*) The content loop simply said patients should ask a staff member to assist if they had trouble

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

locating the kiosk. (*Id.*) **However, at no time during the content loop did any Quest staff member enter the waiting area.** (*Id.*) After locating the kiosk, Mr. Vargas confirmed there was still no headphone jack or tactile keypad. (*Id.*)

After Mr. Vargas performed the TFS, an audio message played which stated he was patient "001" and that he would be serviced in three minutes (but he waited 17 minutes). (*Id.*, at ¶ 4.) When the phlebotomist greeted him, Mr. Vargas explained he was there to test the accessibility of the TFS system and asked whether the "wait where you want" option was available to him as a blind user. (*Id.*) The phlebotomist told him the "wait where you want" option is only for those who make appointments online and can independently use the kiosk to scan a QR code. (*Id.*)

Mr. Vargas is serving as a class representative to help remove access barriers to allow himself and other blind people to live as independently as possible, especially in the medical field. (Ex. 10, at PA0442:16-443:9, PA0469:14-471:7 [Vargas dep.].) He has no financial motivation – he simply wants blind people to have access to the services available to others. (*Id.*, at PA0470:8-11, PA472:18-474:3.) Thus, he is seeking only statutory minimum damages and injunctive relief. (*Id.* at PA0447:7-14.) Mr. Vargas has been intimately involved in this litigation by speaking with counsel frequently, responding to discovery, and preparing for and sitting for deposition. (*Id.*, at PA0261:18-263:23, PA0471:15-476:10.) He understands the laws at issue, the Court where the case is venued, and the judge in charge of the case. (*Id.*, at PA0473:4-475:6.)

## 2.    ACB Members' Experiences Mirror Those of Plaintiff Vargas

ACB is a national membership organization of thousands of blind and visually impaired persons which seeks to increase the independence, security, equality of opportunity, and quality of life for all legally blind people. (Ex. 18, at PA0580:9-14, PA0581:5-20, PA0582:17-21 [Rachfal dep.].) Nine ACB members testified that they were not able to independently access ECSS, they waited for

17

extended periods for a phlebotomist to come help them, and they felt a loss of dignity and privacy in having to check in with the phlebotomist instead of the service Quest offers everyone else. (*See, e.g.,* Ex. 12, at PA0520:23-521:5, PA0522:10-17, PA0523:4-524:16 [Bazyn dep.]; Ex. 11, at PA0507:4-510:19, PA0511:16-512:5, PA0513:15-514:19 [Black dep.]; Ex. 17, at PA0566:10-568:7, PA0569:6-571:2, PA0571:16-19, PA0574:1-21, PA0575:4-576:5 [Brink dep.]; Ex. 15, at PA0548:21-549:8, PA0550:22-552:4 [Grahmann dep.]; Ex. 14, at PA0537:10-540:9, PA0541:8-542:9, PA0543:9-544:1 [N. Haroyan dep.]; Ex. 13, at PA0529:3-530:23, PA0531:3-532:2 [M. Haroyan dep.]; Ex. 16, at PA0559:15-560:13, PA0561:14-21, PA0562:15-21 [Lyons dep.]; Ex. 22, at PA0695:8-24, PA0696:23-698:1, PA0701:16-21 [Stanley dep.].) **Not one ACB member testified that he or she was able to independently access ECSS, and instead had to wait for either an attendant to come to the window (putting sighted individuals ahead of them in line) or rely on a third party to aid their check-in at the kiosk.** (*Id*.) Indeed, at least 29 ACB members confirmed they could also not access ECSS independently. (*See,* Ex. 24, at PA0709-715 [ACB discovery responses].)

## III.   ARGUMENT

### A.   Summary of the Argument

This case is uniquely suitable for class certification pursuant to Rules 23(a), 23(b)(2), and 23(b)(3). The evidence demonstrates, for example:

- Quest's own witnesses admit its kiosks are not independently accessible to legally blind individuals;

- Quest implemented the inaccessible ECSS kiosks across its entire national network of 2,152 PSCs;

- Quest does not offer a qualified aid or auxiliary service to allow legally blind individuals to access the check-in kiosk service;

- Quest has received at least 45 complaints from visually impaired individuals, with records demonstrating at least 29 visually impaired ACB members could

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

18

1    not access the kiosk independently;

2    • Quest has still not remedied ECSS's accessibility failures system wide.

3    As a result of these systemic violations, a class of legally blind individuals

4    who rely upon Quest's services will continue to be denied their civil rights absent

5    class-wide relief. Plaintiff Vargas now moves pursuant to Federal Rule of Civil

6    Procedure, Rules 23(a), 23(b)(2), and 23(b)(3) to certify (1) a nationwide class of

7    legally blind individuals and (2) a California class of legally blind individuals:

8    **<u>Nationwide Injunctive Class:</u>** All legally blind individuals who visited a
     Quest patient service center in the United States between January 1, 2018,
9    through December 31, 2019 (the "Class Period"), and were denied full and
     equal enjoyment of the services, facilities, privileges, advantages, or
10   accommodations due to Quest's failure to make its e-check-in self-service
     kiosks independently accessible to legally blind individuals.

11
     **<u>California Minimum Statutory Damages Class:</u>** All legally blind
12   individuals who visited a Quest patient service center in California during the
     Class Period and were denied full and equal enjoyment of the services,
13   facilities, privileges, advantages, or accommodations due to Quest's failure to
     make its e-check-in self-service kiosks independently accessible to legally
14   blind individuals.

15   **B.    Class Requirements of Rule 23(a)**

16       **1.    Numerosity**

17   "The numerosity requirement is usually satisfied where the class comprises

18   40 or more members, and generally not satisfied when the class comprises 21 or

19   fewer members." *Nevarez v. Forty Niners Football Company, LLC,* 326 F.R.D. 562,

20   576 (N.D. Cal. 2018); *see also Shields v. Walt Disney Parks and Resorts US, Inc.*,

21   279 F.R.D. 529, 543 (C.D. Cal. 2011). Plaintiff easily meets this benchmark by (1)

22   Quest's own records demonstrating 45 complaints from blind individuals, coupled

23   with Plaintiff and 29 ACB members' experiences with the inaccessible kiosk; and

24   (2) census data analysis establishing a class and subclass of thousands of legally

25   blind individuals.

26   First, Quest admits it received 45 complaints from blind individuals who

27   could not access the ECSS kiosk. (Dkt. 95-1, at 14:4-6.) In addition, Plaintiff

28   himself complained to Quest about the inaccessibility (Ex. 10, at PA0381:16-382:4,

PA0382:13-23 [Vargas dep.]), and 29 legally blind ACB members reported similar inability to independently access the ECSS kiosk. (Ex. 24, at PA0709-715 [ACB discovery responses].) Thus, there are at least 75 class members, just from Quest's records and discovery in this case, easily meeting the numerosity benchmark.

Second, census data establishes the actual number of class members far exceeds the Ninth Circuit benchmark. Courts throughout the Ninth Circuit allow plaintiffs to rely on census information about the number of legally blind individuals in the country and the state, and then statistically apply that information to the class plaintiffs seek to designate. *Nat'l Fed'n of the Blind v. Target Corp.*, 582 F.Supp.2d 1185, 1199 (N.D. Cal. 2007) ("Plaintiffs have submitted evidence, based on U.S. Census data, that there are likely thousands of potential class members in the nationwide class based on the large number of people who are legally blind... Courts...have repeatedly certified ADA classes like the one proposed here based on similar evidentiary showings."); *Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 608 n. 8 (N.D.Cal.2004) ("[C]ensus data is frequently relied on by courts in determining the size of proposed classes."); *Greater Los Angeles Agency on Deafness, Inc. v. Reel Serv. Mgmt.*, 2014 WL 12561074, at *7 (C.D. Cal. May 6, 2014) ("*GLAD*"), citing *Shields*, 279 F.R.D. at 543-45 (courts in the Central District "routinely rely on census data and statistics to determine numerosity").

Plaintiff offers the declaration of Jed Greene, CPA. (Ex. 33, at PA0901-993.) Based in part upon patient data provided by Quest, Mr. Greene concludes that from January 1, 2018, through December 31, 2019, a minimum of 6,152 legally blind persons visited a Quest PSC in California and a minimum of 31,863 legally blind persons visited a Quest PSC in the United States. (*Id.*) Thus, Plaintiff has established numerosity.

### 2.   Commonality

To fulfill Rule 23(a)(2)'s commonality prerequisite, Plaintiff must establish there are questions of law or fact common to the class and that "'class members

20

have suffered the same injury.'" *Dukes*, 564 U.S. at 350 (citation omitted). Even post-*Dukes,* the commonality requirement is construed "permissively." *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 981 (9th Cir. 2011). "So long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement of Rule 23(a)(2) … Thus, '[w]here the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists.'" *Parson v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (citations omitted).

Here, the core legal and factual questions will not vary amongst class members but will "generate common *answers* apt to drive the resolution of the litigation." *Dukes,* 564 U.S. at 350. The common questions include whether:

- Quest's ECSS kiosks are independently accessible to legally blind individuals;
- Quest has implemented the inaccessible ECSS kiosks across its national network of 2,152 PSCs;
- Use of the kiosk is a service Quest offers its customers;
- Quest offers a qualified aid or auxiliary service to allow legally blind individuals to access the ECSS kiosk; and
- Quest has remedied the inaccessible ECSS kiosk across its system.

Answering each of these questions will undoubtedly resolve issues of central importance to the present case. *Id*. at 349-350. Put differently, because Quest's failure to provide an independently accessible kiosk in all its PSCs similarly affects all putative class members of legally blind individuals, a classwide proceeding will generate common *answers* (for example, a fully accessible kiosk) to drive resolution of this litigation. *GLAD,* 2014 WL 12561074, at *9. Thus, Rule 23(a)(2)'s commonality requirement is satisfied.

### 3. Typicality

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

Rule 23(a)(3) "[t]ypicality focuses on the class representative's claim – but not the specific facts from which the claim arose – and ensures that the interest of the class representative 'aligns with the interests of the class.' The requirement is permissive, such that 'representative claims are "typical" if they are reasonably co-extensive with those of absent class members; they need not be substantially identical.'" *Just Film, Inc. v. Buono,* 847 F.3d 1108, 1116 (9th Cir. 2017) (citation omitted). The requirement protects against a class member "preoccupied with [claims or defenses] unique to it." *Ellis,* 657 F.3d at 984.

Here, Mr. Vargas has the exact same claims as absent class members. He is legally blind. (Ex. 10, at PA0299:13-300:24.) He visited Quest's PSCs during the Class Period. (*Id.* at PA0346:3-5.) He tried to check in at the ECSS kiosk and was not able to access it independently. (*Id.* at PA0373:15-22.) Mr. Vargas' claims are the same or similar to absent class members.

In most cases involving disability access issues, individual idiosyncrasies among class members inevitably exist, including "the nature of their disability, the types of aides used, and the individual nature of each class member's encounters with [the alleged access barriers]." *Moeller,* 220 F.R.D. at 611. But this does not defeat typicality. Mr. Vargas challenges the same denial of equal access to Quest's ECSS kiosk on the same legal grounds as would be challenged by any putative class member. Typicality is thus satisfied. *Ellis,* 657 F.3d at 984; *Arnold v. United Artists Theatre Circuit, Inc.,* 158 F.R.D. 439, 450 (N.D. Cal. 1994); *Californians for Disability Rights v. Cal. Dept. of Trans.*, 249 F.R.D. 334, 346 (N.D. Cal. 2008).

### 4.    Adequacy

Rule 23(a)(4)'s adequacy requirements seek to satisfy constitutional due process concerns, by ensuring unnamed class members are afforded adequate representation before entry of a judgment which binds them. See *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1  conflicts of interest with other class members and (2) will the named plaintiffs and

2  their counsel prosecute the action vigorously on behalf of the class?" *Id.* at 1020.

3  Plaintiff and his counsel meet both requirements here. Plaintiff and the

4  proposed class "share the same claims and interest in obtaining relief, and Plaintiff[]

5  [is] vigorously pursuing relief on behalf of the proposed class." *In re Yahoo Mail*

6  *Litigation,* 308 F.R.D. 577, 595 (N.D. Cal. 2015). There are no conflicts with other

7  class members, and Plaintiff and his counsel have been prosecuting this action

8  vigorously on behalf of the class and are very experienced in both accessibility and

9  class action litigation generally, taking several civil rights actions successfully to

10  verdict. (*See,* Ex. 2, ¶¶ 24-28 [Miller dec.]; Ex. 3, ¶¶ 3-6 [Handley dec.]; Ex. 10, at

11  PA0471:15-476:10 [Vargas dep.].) Accordingly, adequacy is satisfied.

12  **C.      Class Requirements of Rule 23(b)(2) for Injunctive Class**

13  Rule 23(b)(2) requires a showing that Quest "has acted or refused to act on

14  grounds generally applicable to the class." Fed.R.Civ.P. 23(b)(2). Rule 23(b)(2),

15  "does not require us to examine the viability or bases of class members' claims for

16  declaratory and injunctive relief, but only to look at whether class members seek

17  uniform relief from a practice applicable to all of them." *See Rodriguez v. Hayes,*

18  591 F.3d 1105, 1125-26 (9th Cir. 2010).

19  Quest's decision to deploy an identically-inaccessible kiosk throughout its

20  PSC network is clearly conduct that is "generally applicable to the class."

21  Fed.R.Civ.P. 23(b)(2). Quest's witnesses and documents reflect that ECSS kiosks

22  are in every Quest PSC nationwide, that the kiosks are not accessible to legally blind

23  patients, and that staff is generally not available to help. These barriers impact all

24  legally blind users and, therefore, the barriers Plaintiff identifies are generally

25  applicable to the class.[4]

26  _____

27  [4] To the extent Quest challenges the Rule 23(b)(2) class on ascertainability grounds,

28  ascertainability is not a requirement for Rule 23(b)(2) injunctive classes. *In re*

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR CLASS CERTIFICATION

Defendant's argument that TFS "moots" the class claims is without merit. But even if the TFS "fix" was actually a "fix," which it is not, a case becomes moot under the ADA only once a defendant has remedied *all* ADA violations complained of by a plaintiff. *Grove v. De La Cruz*, 407 F.Supp.2d 1126, 1130-31 (C.D. Cal. 2005). Where a defendant remedies some, but not all, complained-of violations, it does not moot the claim. *GLAD,* 2014 WL 12561074, at *5. Nor may a defendant moot a claim by providing the disabled individual partial opportunity to participate in the service, rather than a full and equal opportunity. *Id.*

Here, and as explained in detail above (*see,* II(D), and II(E), *supra*), the TFS does not offer blind individuals a full and equal opportunity to participate. This partial opportunity to participate is not a "full and equal opportunity." And, even if it were a competent solution, the TFS is not in every Quest PSC. (Ex. 31 [Derry dec].)

Accordingly, Quest has not mooted the relief sought and an injunctive relief class is appropriate.

### D.   Rule 23(b)(3) Predominance and Superiority Are Easily Satisfied.

Rule 23(b)(3) requires "questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy." Plaintiff meets both predominance and superiority requirements.

### 1.   Common questions of law and fact predominate over individual questions

Certification of Plaintiff's proposed California Unruh Act minimum statutory damages class pursuant to Rule 23(b)(3) requires common issues to predominate over individual issues. *See* Fed. R. Civ. P. 23(b)(3). The focus of a Rule 23(b)(3)

---

*Yahoo Mail Litigation,* 308 F.R.D. at 596-598. Even if it was, it is "administratively feasible" to ascertain whether an individual is a class member here. *GLAD,* 2014 WL 12561074, at *5 (holding the same as to a deaf class).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR CLASS CERTIFICATION

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

predominance analysis is on whether "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication"; if so, "there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022 (quoting 7A Charles Alan Wright et al., Federal Practice & Procedure § 1778 (2d ed. 1986)). The Ninth Circuit has consistently "held that 'there is a clear justification for handling the dispute on a representative rather than on an individual basis' if 'common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication.'" *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d at 2011).

Here, there are a myriad of common issues capable of common proof which predominate, including whether: (1) the ECSS kiosk is independently accessible to legally blind individuals; (2) Quest implemented the ECSS kiosk across a national network of 2,152 Quest PSCs, including 419 in California; (3) Quest offers a qualified aid or auxiliary service which allows legally blind patients to access the ECSS kiosk privately and independently; (4) Quest has remedied the accessibility failures of the ECSS kiosk in a way that provides equal independent access to the kiosks across its 2,152 PSC network; (5) a common remedy (*i.e.,* a fully accessible kiosk) can be fashioned despite minor differences amongst class members. These issues are uniquely suited for adjudication through common proof. Three additional points bear mentioning.

First, an individualized showing of intentional discrimination is not required for an Unruh Act claim predicated on an ADA claim where, as here, Plaintiff seeks only minimum statutory damages on behalf of the Class. *Nevarez*, 326 F.R.D. at 586; *see also*, *Molski v. M.J. Cable, Inc.,* 481 F.3d 724, 731 (9th Cir. 2007) ("[t]he litigant need not prove that she suffered actual damages to recover the independent statutory damages of $4,000."). This is particularly so where, as here, the inaccessible public accommodation (*i.e.,* the ECSS kiosk) is *identically-inaccessible*

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

across the company's entire 2,152 PSC network. *See Castaneda v. Burger King Corp.,* 264 F.R.D. 557, 572 (certifying an Unruh Act class because class members "face identical facilities and identical access barriers" across facilities at issue). Thus, each member of the California minimum statutory damages class has a similar interest in the common adjudication of the claim.

Second, the Ninth Circuit in *Briseno v. ConAgra Foods, Inc.,* 844 F.3d 1121 (9th Cir. 2017), and later in *Walker v. Life Ins. Co. of the Southwest,* 953 F.3d 624, 632 (9th Cir. 2020), expressly rejected any feasibility or class member identification requirement at the class certification stage. *Briseno* reasoned that "requiring class proponents to satisfy an administrative feasibility prerequisite 'conflicts with the well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns.'" *Id.* at 1128 [internal citation omitted]; *see also, Mullins v. Direct Digital, LLC*, 795 F.3d 654, 667 (7th Cir. 2015) (parties regularly rely on "claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court" to validate claims); Fed.R.Civ.P. 23 advisory committee's note to 1966 amendment (certification appropriate "despite the need, if liability is found, for separate determinations of the damages suffered by individuals within the class").[5] Thus, "[t]he due process question is not whether the identity of class members can be ascertained with perfect accuracy at the certification stage but whether the defendant will receive a fair opportunity to present its defenses when putative class members actually come forward." *Mullins*,

---

[5] The Ninth Circuit has held *Briseno* even "foreclose[s]…[a defendant's] argument that a self-identifying class is not 'administratively feasible' at the class certification stage." *Melgar v. CSK Auto, Inc.,* 681 F. App'x 605, 607 (9th Cir. 2017); *see also In re Korean Ramen Antitrust Litig.*, 2017 WL 235052, at *21 (N.D. Cal. 1/19/17); *Kumar v. Salov N. Am. Corp.*, 2016 WL 3844334, at *7 (N.D. Cal. 7/15/16).

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

26

795 F.3d at 670; *see also*, *Walker*, 953 F.3d at 632 ("[o]ur cases do not additionally task district courts with analyzing, for predominance purposes, the logistical difficulties attendant to identifying plaintiffs who were exposed to misrepresentations and therefore may be entitled to class membership."). Quest will have ample fair opportunity to present its defenses when putative class members come forward to file their claims.

Third, the declaration of Richard Simmons, President of Analytics Consulting LLC, makes clear that issuing class notice and administering claims for a settlement class of legally blind Californians under the Unruh Act here would pose no unique manageability issues. (See Ex. 34, at ¶¶ 14-25 [Simmons dec].) In fact, here a claims administrator will be armed with better data than one might expect in the administration of, for example, a consumer class action settlement because Quest maintains records of every single patient visit to its PSCs during the Class Period. And because Quest identically denied every legally blind person in California who visited any of the 419 PSCs during the Class Period access to ECSS, the only remaining determination in a claims process is whether there exists a reliable way to prove each individual's legal blindness. There is. California class members can reliably demonstrate blindness with: SSDI registration with legally blind status, government-issued ID cards identifying blindness, or a physician's note diagnosing blindness. *See, e.g.,* https://www.cdss.ca.gov/ inforesources/cdss-programs/ssi-ssp/ssi-ssp-eligibility-summary (allowing physician's notes to verify legal blindness). In addition, according to Mr. Simmons, Quest can identify potentially fraudulent claims by running their names against the California Department of Motor Vehicle Database. (Ex. 34, at ¶ 25 [Simmons dec.].) In this way, the claims administration process is neither unmanageable nor difficult – it is simply a function of confirming eligibility through Quest's own records and the class members' evidence of blindness. Accordingly, no *bona fide* manageability concerns are presented here sufficient to defeat predominance.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

### 2. Class certification is superior to other means of resolving this dispute

Plaintiff satisfies each of the Rule 23(b)(3) superiority factors, including: (1) the class members' interests in individually controlling the prosecution of separate actions, (2) the extent of any litigation concerning the controversy already begun by or against class members, (3) the desirability of concentrating the litigation in the particular forum, and (4) the likely difficulties in managing a class action.

First, there is no indication in the record that class members have an interest in individually controlling their own cases, as the cost of litigation would be prohibitive. *See, e.g., Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 617 (1997). Second, Plaintiff is aware of no other case regarding the accessibility of Quest's kiosk. Third, this forum is desirable because California is home to 419 PSCs – more than any other U.S. state – and the home of proposed Lead Plaintiff Julian Vargas. Finally, this class action does not present any unique difficulties that might render it difficult to manage. *Briseno,* 844 F.3d at 1128 (stating the concern that imposing a standalone administrability requirement to manageability would improperly bar certification in cases where administrability is difficult to demonstrate but for which the class action remains the only realistic way to litigate the case). Rather, Plaintiff will establish both liability and minimum statutory damages by common proof. Quest will then have the opportunity through the claims administration process to present any necessary defenses to the putative class members' claims for statutory damages, both by reference to its internal records and by the class members' verification of their entitlement to the statutory damages. Accordingly, the class action device is the superior method for adjudicating this civil rights suit.

## IV.   CONCLUSION

For the reasons stated herein, Plaintiff respectfully requests that his motion for class certification be granted.

*[Signatures on following page]*

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

Dated: September 10, 2021

Respectfully submitted,

By:    */s/ Jonathan D. Miller*

Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com
Alison M. Bernal (SBN 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101

Benjamin J. Sweet
(Admitted *Pro Hac Vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

Matthew K. Handley
(Admitted *Pro Hac Vice*)
mhandley@hfajustice.com
HANDLEY FARAH &
ANDERSON PLLC
777 6th Street NW
Washington, DC 20001
Telephone: (202) 559-2411

*Attorneys for Plaintiffs JULIAN VARGAS,*
*AMERICAN COUNCIL OF THE BLIND,*
*AND THE PROPOSED CLASS*

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR CLASS CERTIFICATION