# EXHIBIT 1

Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com
Alison M. Bernal (SBN 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Telephone: (805) 963-2345

Benjamin J. Sweet
(*Admitted Pro Hac Vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

Attorneys for Plaintiffs Julian Vargas,
American Council of the Blind, and the Proposed Class

*Additional counsel for Plaintiff listed on signature page*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

JULIAN VARGAS, ANNE WEST, and
AMERICAN COUNCIL OF THE
BLIND, individually on behalf of
themselves and all others similarly
situated,

                    Plaintiffs,

          v.

QUEST DIAGNOSTICS CLINICAL
LABORATORIES, INC., QUEST
DIAGNOSTICS HOLDINGS, INC.,
QUEST DIAGNOSTICS
INCORPORATED; and DOES 1-10,
inclusive,

                    Defendants.

Case No.: 2:19-cv-08108-DMG

**DECLARATION OF ALISON M. BERNAL**

[*CONCURRENTLY FILED WITH MOTION FOR CLASS CERTIFICATION AND SUPPORTING DOCUMENTS*]

**Hearing Date:    October 29, 2021**
**Time:              10:00 am**
**Courtroom:      8C**

Complaint Filed: September 18, 2019
Discovery Cutoff: August 27, 2021
Pretrial Conf: December 7, 2021
Trial Date: January 11, 2022
District Judge: Hon. Dolly M. Gee
Magistrate: Hon. Michael R. Wilner

# DECLARATION OF ALISON M. BERNAL

I, ALISON M. BERNAL, declare as follows:

1.      I am an attorney at law duly qualified to practice before the Courts of the State of California and before this Court and am a member of the firm Nye, Stirling, Hale & Miller, LLP, attorneys for Plaintiffs Julian Vargas, American Council of the Blind, and the Proposed Class in the above captioned matter. The facts stated herein are stated of my own personal knowledge and, if called and sworn as a witness, I could and would testify competently thereto. This declaration is made in support of Plaintiffs' motion for class certification.

2.      On August 23, 2021, I sent a letter to Defendants' counsel requesting to meet and confer pursuant to Local Rule 7-3 to discuss Plaintiffs' anticipated motion for class certification. The letter further outlined the general bases for Plaintiff's anticipated motion. I am attaching a true and correct copy of the August 23, 2021, letter as **Exhibit 35** to the Appendix of Exhibits.

3.      Pursuant to Local Rule 7-3, I met and conferred with Defendants' counsel David Raizman on August 26, 2021, regarding Plaintiff Vargas' intent to move for class certification. My partner Jordan Porter also attended. Due to the pandemic, we held this meet and confer telephonically. A court reporter was present for the meet and confer. During our call, we discussed each element of Rule 23, Rule 23(b)(2), and Rule 23(b)(3), and why we believed Plaintiff met these requirements. Defendants disagreed that Plaintiff established each element. A true and correct copy of the transcript from the August 26, 2021, meet and confer is attached as **Exhibit 36** to the Appendix of Exhibits.

4.      One of the requests Plaintiffs make in their motion for class certification is for an order appointing my firm, Nye, Stirling, Hale & Miller, LLP, and our co-counsel, Handley Farah & Anderson PLLC, as lead counsel for the proposed classes. In support of that request, our managing partner, Jonathan Miller, who is also counsel of record in this case, and Matthew Handley of Handley Farah

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1 & Anderson, have submitted declarations outlining the firms' respective experience

2 in class actions and civil rights actions.

3      I declare under penalty of perjury under the laws of the United States of

4 America that the foregoing is true and correct. Signed this 9th day of September

5 2021, in Santa Barbara, California.

6

7                                          _____/s/ Alison M. Bernal_____
                                           ALISON M. BERNAL, Declarant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

DECLARATION OF ALISON M. BERNAL

# EXHIBIT 2

Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com
Alison M. Bernal (SBN 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Telephone: (805) 963-2345

Benjamin J. Sweet
(*Admitted Pro Hac Vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

Attorneys for Plaintiffs Julian Vargas,
American Council of the Blind, and the Proposed Class

*Additional counsel for Plaintiff listed on signature page*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIAN VARGAS, ANNE WEST, and AMERICAN COUNCIL OF THE BLIND, individually on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, inclusive,<br><br><br><br>        Defendants. | Case No.: 2:19-cv-08108-DMG<br><br>**DECLARATION OF JONATHAN D. MILLER**<br><br>[*CONCURRENTLY FILED WITH MOTION FOR CLASS CERTIFICATION AND SUPPORTING DOCUMENTS*]<br><br>**Hearing Date:** **October 29, 2021**<br>**Time:** **10:00 am**<br>**Courtroom:** **8C**<br><br>Complaint Filed: September 18, 2019<br>Discovery Cutoff: August 27, 2021<br>Pretrial Conf: December 7, 2021<br>Trial Date: January 11, 2022<br>District Judge: Hon. Dolly M. Gee<br>Magistrate: Hon. Michael R. Wilner |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

## DECLARATION OF JONATHAN D. MILLER

I, JONATHAN D. MILLER, declare as follows:

1.      I am an attorney at law duly qualified to practice before the Courts of the State of California and before this Court and am the managing partner of the firm Nye, Stirling, Hale & Miller, LLP, attorneys for Plaintiffs Julian Vargas, American Council of the Blind ("ACB"), and the Proposed Class in the above captioned matter. The facts stated herein are stated of my own personal knowledge and, if called and sworn as a witness, I could and would testify competently thereto. This declaration is made in support of Plaintiff's motion for class certification.

2.      Plaintiff's motion for class certification relies on the testimony from several witnesses on behalf of Defendants and Plaintiffs. I have outlined the dates of those depositions below, with reference to the exhibit containing the relevant portion of the deposition testimony.

3.      On April 8, 2021, I took the deposition of Marc Yarrison, an employee of Quest and a designated corporate witness pursuant to FRCP, Rule 30(b)(6). I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 5** to the Appendix of Exhibits.

4.      On April 12, 2021, I took the deposition of Taylor Carr, an employee of Quest and a designated corporate witness pursuant to FRCP, Rule 30(b)(6). The deposition took two sessions, and the second session was on July 30, 2021. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 6** to the Appendix of Exhibits.

5.      On April 14, 2021, my partner Jordan Porter took the deposition of Max O'Campo, an employee of Quest and a designated corporate witness pursuant to FRCP, Rule 30(b)(6). I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 7** to the Appendix of Exhibits.

6.      On April 16, 2021, I took the deposition of Jody Reilly, an employee of Quest and a designated corporate witness pursuant to FRCP, Rule 30(b)(6). I have

PA0005

1  produced true and correct copies of relevant portions of the deposition transcript as

2  **Exhibit 8** to the Appendix of Exhibits.

3      7.    On April 20, 2021, I took the deposition of Christopher Grant, an

4  employee of Quest and a designated corporate witness pursuant to FRCP, Rule

5  30(b)(6). I have produced true and correct copies of relevant portions of the

6  deposition transcript as **Exhibit 9** to the Appendix of Exhibits.

7      8.    On April 22, 2021, Defendants took the deposition of proposed Lead

8  Plaintiff Julian Vargas. I defended the deposition. I have produced true and correct

9  copies of relevant portions of Mr. Vargas' deposition transcript as **Exhibit 10** to the

10  Appendix of Exhibits.

11      9.    On April 27, 2021, Defendants took the deposition of ACB member

12  Ralph Black. The deposition lasted two sessions, with the second session on August

13  5, 2021. My co-counsel, Mr. Handley, defended the deposition. I have produced true

14  and correct copies of relevant portions of the deposition transcript as **Exhibit 11** to

15  the Appendix of Exhibits.

16      10.   On April 27, 2021, Defendants took the deposition of ACB member

17  Ardis Bazyn. The deposition lasted two sessions, with the second session on August

18  6, 2021. My co-counsel, Mr. Handley, defended the deposition. I have produced true

19  and correct copies of relevant portions of the deposition transcript as **Exhibit 12** to

20  the Appendix of Exhibits.

21      11.   On April 29, 2021, Defendants took the deposition of ACB member

22  Mary Haroyan. My co-counsel, Mr. Handley, defended the deposition. I have

23  produced true and correct copies of relevant portions of the deposition transcript as

24  **Exhibit 13** to the Appendix of Exhibits.

25      12.   On April 29, 2021, Defendants took the deposition of ACB member

26  Nona Haroyan. My co-counsel, Mr. Handley, defended the deposition. I have

27  produced true and correct copies of relevant portions of the deposition transcript as

28  **Exhibit 14** to the Appendix of Exhibits.

Nye, Stirling, Hale & Miller
33 West Mission Street, Suite 201
Santa Barbara, California 93101

PA0006

13.     On May 3, 2021, Defendants took the deposition of ACB member Donna Grahmann. The deposition lasted two sessions, with the second session on August 5, 2021. My co-counsel, Mr. Handley, defended the deposition. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 15** to the Appendix of Exhibits.

14.     On May 6, 2021, Defendants took the deposition of ACB member Kathy Lyons. My co-counsel, Mr. Handley, defended the deposition. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 16** to the Appendix of Exhibits.

15.     On May 6, 2021, Defendants took the deposition of ACB member Regina Brink. My co-counsel, Mr. Handley, defended the deposition. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 17** to the Appendix of Exhibits.

16.     On June 9, 2021, Defendants took the deposition of ACB's corporate witness pursuant to FRCP, Rule 30(b)(6). Clark Rachfal appeared on behalf of ACB. I have produced true and correct copies of relevant portions of his deposition transcript at **Exhibit 18** to the Appendix of Exhibits.

17.     On June 29, 2021, I took the deposition of third-party Lilitab, LLC's corporate witness pursuant to FRCP, Rule 30(b)(6). The witness who appeared for Lilitab was Adam Aronson. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 19** to the Appendix of Exhibits.

18.     On July 1, 2021, I took the deposition of Quest employee Tom Walsh. I have produced true and correct copies of relevant portions of Mr. Walsh's deposition transcript as **Exhibit 20** to the Appendix of Exhibits.

19.     On August 3, 2021, I took the deposition of Prudencia Magana, an employee of Quest. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 21** to the Appendix of Exhibits.

20.     On August 19, 2021, Defendants took the deposition of ACB member

DECLARATION OF JONATHAN D. MILLER

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PA0007

and former employee, Claire Stanley. I defended the deposition. I have produced relevant portions of Ms. Stanley's deposition transcript as **Exhibit 22** to the Appendix of Exhibits.

21.     On May 21, 2021, Defendants took the deposition of ACB member Robin Rehder. My co-counsel, Mr. Handley, defended the deposition. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 23** to the Appendix of Exhibits.

22.     In addition to the depositions, the parties have exchanged written discovery and documents in response to requests for production of documents. I have produced a true and correct copy of relevant portions of the written discovery and document production as **Exhibit 24** (Plaintiff ACB's Fourth Supplemental Responses to Interrogatories), **Exhibit 25** (Quest Responses to Interrogatories from Julian Vargas, 4/7/21), **Exhibit 26** (Quest Responses to Interrogatories from ACB, 4/19/21), **Exhibit 27** (Relevant portions of Defendants' document production), **Exhibit 28** (Defendants' Responses to Requests for Admission), **Exhibit 29** (Quest Responses to Interrogatories from Anne West, 10/28/20), and **Exhibit 30** (Quest Response to 30(b)(6)) to the Appendix of Exhibits.

23.     One of the requests Plaintiff makes in his motion for class certification is for an order appointing my firm, Nye, Stirling, Hale & Miller, LLP, and our co-counsel, Handley Farah & Anderson PLLC, as lead counsel for the proposed classes. In support of that request, I am providing the following outline of my firm's experience both in class actions and civil rights actions. Additionally, my co-counsel, Matthew Handley of Handley Farah & Anderson, has submitted a declaration outlining his firm's relevant experience.

24.     Nye, Stirling, Hale & Miller, LLP ("NSHM") is headquartered in Santa Barbara, California, and has an office in Pittsburgh, Pennsylvania. NSHM has extensive experience both in civil rights cases and class actions. The firm represents individuals, corporations, and public entities in class actions and civil rights cases

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PA0008

litigated in the United States, both on behalf of plaintiffs and defendants. My firm has served as sole lead-counsel, as co-lead counsel, or on an executive committee in numerous class actions, including cases brought on behalf of individuals in various jurisdictions.

25.    I am working on this case with my partners, Benjamin Sweet, Alison Bernal, and Jordan Porter, as well as our associates, Margaret Parker and Callum Appleby. Members of our team working on this case are admitted to practice before the United States Supreme Court, all state courts in California and Pennsylvania, and in the following Federal Courts: U.S.D.C. for the Central District of California, U.S.D.C. for the Northern District of California, U.S.D.C. for the Eastern District of California, U.S.D.C. for the District of Colorado, U.S.D.C. for the Western District of Pennsylvania, U.S.D.C. for the Western District of New York , U.S.D.C. for the Northern District of New York, U.S.D.C for the Central District of Illinois, U.S.D.C. for the Northern District of Illinois, U.S.D.C. for the Southern District of Illinois, U.S.D.C. for the Western District of Michigan. We are also admitted to the following Federal Appellate Courts: U.S.C.A. for the First Circuit, the Second Circuit, the Third Circuit, the Fifth Circuit, the Ninth Circuit, and the Tenth Circuit.

26.    I and my partners working on this case have acquired substantial experience in class actions and other complex litigation and have obtained favorable settlements as class counsel. My partners working on this case have been class counsel in the following class actions:  representing a class of consumers who purchased defective car seats (*Julian v. Evenflo Co., Inc*. [Central District of California Case. No. 2:14-CV-01774 RKG-AS]); representing a class of consumers alleging false advertising claims against FRS, who marketed health care products based on Lance Armstrong's use of such products, when in fact it was Armstrong's use of anabolic steroids that contributed to his success (*Hyle, et al. v. FRS, et al*. [Central District of California Case No. CV 13-01456 BRO (MANx)]); representing a class of consumers alleging false advertising claims against Pharmavite for its

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

marketing of Vitamin E supplements (*Weintraub v. Pharmavite, LLC* [Central District of California Case No. 2:14-cv-03218]); represented a class of consumers alleging false advertising claims against Walmart to the Ninth Circuit (*Boris v. Walmart* [Ninth Circuit Case No. 14-55752]); defended a corporation against class claims of wage and hour violations [*Knapp v. Cellular Sales of California* [Santa Barbara Superior Court Case No. 17CV03596]); representing a class of consumers who purchased vehicles with defective engines (*In re Kia Engine Litigation* [Central District of California Case No. 8:17-cv-00838-JLS-JDE]); representing a class of mobility-disabled consumers injured by excessive sloping in parking lots, in violation of the ADA (*Shetler v. Amerco Real Estate Company; U-Haul International, Inc*. [W.D. Penn. Case No. 2:18-cv-00867]; *Sigmon v. Tanger Factory Outlet Centers, Inc., et al*. [Dist. of S.C., Case No. 2:18-CV-03325]; *Sigmon v. Bridgestone Americas, Inc., et al*. [Dist. of S.C., Case No. 2:18-cv-03324]; *Murphy v. Aaron's, Inc.* [Dist. of Colo., Case No. 1:19-cv-601]; *Murphy v. Western Alta Holdings, LP, et al*. [Dist. of Colo., Case No. 1:19-cv-498]; *Block, et al. v. Red Lobster Management, LLC* [N.D. Ill., Case No. 1:19−cv−01434]; *Murphy v. United States Beef Corp*. [Dist. Colo., Case No. 1:19-cv-471]; *Sigmon v. Urban Edge Properties, et al.* [Dist. S.C., Case No. 2:2018-cv-01354]; *Kouri, et al., v. Regency Centers Corp*. [Dist. Colo, Case No. 1:19-cv-00658]; *Dieter v. Aldi, Inc*. [W.D. Penn., Case No. 2:2018-cv-00846]; *Mellenthin, et al., v. Casey's General Stores, Inc*. [S.D. Ill., Case No. 3:2017-cv-00068]; defended a corporation against class claims of illegal recording of telephone calls (*Zamar v. Mercury* [Los Angeles Superior Court Case No. C469266]); defended a corporation against claims of wage and hour violations (*Johnson v. Renaud's Bakery & Bistro, Inc.* [Los Angeles Superior Court Case No. 19STCV35046]); representing a class of consumers who purchased mascara fraudulently marketed as all natural (*Schmitt, et al. v. Younique* [Central District of California Case No. 8:17-cv-01397-JVS-JDE]); representing a class of consumers harmed by Kia/Hyundai's deceptive and fraudulent engine issues

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

7

PA0010

(*In re Hyundai and Kia Engine Litigation* [Central District of California Case No. 8:17-cv-00838-JLS-JDE]); and representing a proposed class of legally blind patients injured by an inaccessible check-in kiosk, in violation of the ADA (*Davis, et al. v. Laboratory Corporation of America Holdings* [Central District of California Case No. 2:20-cv-00893-FMO-KS].)

27.    Additionally, prior to joining NSHM, my partner Benjamin Sweet who is working on this case, served as Lead Counsel in several nationwide federal class action cases asserting violations of the Americans with Disabilities Act, including *Heinzl v. Cracker Barrel Old Country Stores, Inc.,* Civil Action No. 14-1455, 2016 WL 2347367 (W.D. Pa. 2016) (certified class action which resulted in remediation of accessible parking facilities at more than 600 Cracker Barrel stores throughout the United States); *Heinzl v. Boston Market Corp.*, 2014 WL 5803144 (W.D. Pa. 2014) (denying defendant's motion to dismiss putative class action brought on behalf of class of mobility disabled plaintiffs); *Mellenthin v. Casey's General Stores, Inc.*, 2018 WL 999131 (C.D. Ill. 2018) (denying defendant's motion to dismiss putative class action brought on behalf of class of mobility disabled plaintiffs); *Badger v. PREIT Associates, LP*, 2017 WL 663570 (W.D. Pa. 2017) (denying defendant's motion to dismiss putative class action brought on behalf of class of mobility-disabled plaintiffs), among many others. Mr. Sweet also has extensive practice in federal securities class action litigation. He helped to obtain significant recoveries on behalf of class members in several nationwide class actions, including *In re Tyco, Int'l Sec. Litig.*, No. 02-1335-B (D.N.H.) ($3.2 billion total recovery for class members, the largest ever recovery from a single corporate defendant in a federal securities action), *In re Wachovia Preferred Securities and Bond/Notes Litig.*, No. 09-Civ. 6351 (RJS), (S.D.N.Y.) ($627 million recovery for class members) and *In re CVS, Inc. Sec. Litig.*, No. 01-11464-JLT (D. Mass.) ($110 million recovery for class members).

28.    Additionally, I and my partners working on this case have decades of

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

8

PA0011

experience in both prosecuting and defending civil rights actions, including through verdict and on appeal. A sample of the civil rights cases I and my partners have handled include *Alcox v. City of Lompoc* (C.D. Cal. Case number 5:17-cv-00507-JVS-JEMx) (defending public entity against claims of violation of the Fifth and Fourteenth Amendments, following Judge Selna's granting of habeas corpus after 25 years' incarceration); *Ast, et al. v. City of Santa Maria, et al.* (C.D. Cal. Case number 2:14-cv-02909- JCG) (prosecuting claims of violation of 42 U.S.C. § 1983, amongst other claims, on behalf of three police lieutenants against public entity, including a multi-week arbitration through decision); *Anduri v. City of Santa Barbara* (C.D. Cal. Case number 2:16-cv-05461) (prosecuting claim for violation of 42 U.S.C. § 1983, among other claims, on behalf of family of deceased police officer); *Bryden v. City of Santa Barbara* (Santa Barbara Superior Court case number 17CV01529) (prosecuting claim for violation of 42 U.S.C. § 1983, among other claims, on behalf of police dispatcher against public entity, including a multi-week trial to verdict); *Terris v. County of Santa Barbara* (Santa Barbara Superior Court, case number 1339251) (defended public entity against discrimination claims brought by a former employee); *Miller v. City Of Simi Valley,* 324 F. App'x 681, 682 (9th Cir. 2009) (defended public entity against claims of unlawful arrest and violation of civil rights under 42 U.S.C. § 1983); *Morales v. City of Simi Valley* (defended public entity against claims of excessive force and violation of civil rights under 42 U.S.C. § 1983); *Bowen v. Arias*, No. CV 09-0975-R (MLG), 2009 WL 482892, at *1 (C.D. Cal. Feb. 23, 2009) (defended public entity against claims of violation of civil rights under 42 U.S.C. § 1983 arising under the Fourth Amendment for unlawful search and seizure).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Signed this 9th day of September 2021, in Santa Barbara, California.

_____*/s/   Jonathan D. Miller*_____
JONATHAN D. MILLER. Declarant

DECLARATION OF JONATHAN D. MILLER

PA0012

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

# EXHIBIT 3

Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com
Alison M. Bernal (SBN 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Telephone: (805) 963-2345
Facsimile: (805) 284-9590

Benjamin J. Sweet
(Admitted *Pro Hac Vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

*Attorneys for Plaintiffs Julian Vargas, American Council of the Blind, and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JULIAN VARGAS, ANNE WEST, and AMERICAN COUNCIL OF THE BLIND, individually on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, inclusive,<br><br>    Defendants. | CASE NO.: 2:19-cv-8108<br><br>**DECLARATION OF MATTHEW K. HANDLEY**<br><br>*[CONCURRENTLY FILED WITH MOTION FOR CLASS CERTIFICATION AND SUPPORTING DOCUMENTS]*<br><br>**Hearing Date:  October 29, 2021**<br>**Time:              10:00 a.m.**<br>**Courtroom:      8C**<br><br>Complaint Filed: September 18, 2019<br>Pretrial Conf: December 7, 2021<br>Trial Date: January 11, 2022<br>District Judge: Hon. Dolly M. Gee<br>Magistrate: Hon. Michael M. Wilner |

1

DECLARATION OF MATTHEW K. HANDLEY

## DECLARATION OF MATTHEW K. HANDLEY

I, Matthew K. Handley, declare as follows:

1.     I am an attorney at law duly qualified to practice before the Courts of the State of New York and the District of Columbia and am admitted *pro hac vice* before this Court in this civil action. I am a founding partner of the firm Handley Farah & Anderson PLLC, attorneys for Plaintiffs Julian Vargas, American Council of the Blind ("ACB"), and the Proposed Class in the above captioned matter. The facts stated herein are stated of my own personal knowledge and, if called and sworn as a witness, I could and would testify competently thereto. This declaration is made in support of Plaintiff's motion for class certification.

2.     One of the requests Plaintiff makes in his motion for class certification is for an order appointing my firm, Handley Farah & Anderson PLLC, and our co-counsel, Nye, Stirling, Hale & Miller, LLP, as counsel for the proposed classes. In support of that request, I am providing an outline of my firm's experience both in civil rights actions and class actions. Additionally, my co-counsel, Jonathan Miller of Nye, Stirling, Hale & Miller, LLP, has submitted a declaration outlining his firm's relevant experience.

3.     Handley Farah & Anderson ("HFA") is headquartered in Washington, DC, and has offices in New York, New York and Boulder, Colorado. HFA represents individuals in class actions and civil rights cases litigated across the United States. I and other attorneys in my firm have served as co-lead counsel in numerous class actions in various jurisdictions and have obtained favorable settlements as class counsel. My firm is currently serving as co-lead counsel in the following putative class actions:

- *Jien et al v. Perdue Farms, Inc.* et al, 1:19-cv-02521-SAG (D. Md.) – representing tens of thousands of low wage poultry processing plant workers in a nationwide antitrust wage-fixing class action.

- *Albert et al v. Global Tel\*Link Corp. et al*, 8:20-cv-01936-PWG (D.

2

PA0014

Md.) – representing thousands of consumers of telephone services for families of prisoners in a nationwide antitrust price-fixing class action.

4.     For more than 15 years I have devoted my practice to securing relief for victims of corporate and government wrongdoing. Prior to founding Handley Farah & Anderson, I was the Director of Litigation at the Washington Lawyers' Committee for Civil Rights and Urban Affairs, one of the nation's preeminent civil rights non-profit law firms, where I directed the Washington Lawyers' Committee's active litigation docket. A substantial portion of the Washington Lawyers' Committee's active litigation docket was focused on enforcing the rights of the disability community, with an emphasis on cases on behalf of the blind community. Examples of civil rights cases where I served as co-lead counsel include:

- *Stanley, et al. v. Barbri,* Case No. 3:16-cv-01113-O (N.D. Tex.): A disability rights case that successfully compelled the country's leading bar exam preparation course to make its on-line course accessible to blind students.

- *American Council of the Blind, et al. v. General Services Administration*, 1:14-cv-00671-BAH (D.D.C): A disability rights case that compelled the U.S. government agency in charge of accessibility to make its own website portal accessible to thousands of blind government contractors.

- *Little, et al. v. Washington Metro Area Transit Authority*, 14-cv-1289 (D.D.C.): A class action on behalf of thousands of African American applicants for employment at Washington DC's mass transit system who were rejected because of a racially discriminatory criminal record screening policy. The case resulted in a policy change and a $6.5 million fund to compensate victims.

5.     Prior to joining the Washington Lawyers' Committee, I was a partner at the law firm of Cohen Milstein Sellers & Toll, where I focused my practice on civil rights and securities fraud class actions. My civil rights docket at Cohen Milstein was focused on enforcing the rights of the disability community. Cases on which I worked include: *Equal Rights Center v. Archstone*, 04-cv-3975 (D. Md.) and *Equal*

3

PA0015

*Rights Center v. Equity Residential*, 1:06-cv-1060, (D. Md.): Fair Housing Act cases litigated on behalf of a disability-rights organization alleging that housing developers failed to design and construct housing accessible to the disability community, resulting in thousands of apartment units across the country being made accessible.

6.     Before joining Cohen Milstein Sellers & Toll, I was a litigation associate at the law firm of Covington & Burling.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Signed this 7th day of September 2021, in Washington, DC.

*/s/ Matthew K. Handley*
MATTHEW K. HANDLEY, Declarant

# EXHIBIT 4

1  Jonathan D. Miller (SBN 220848)
   jonathan@nshmlaw.com
2  Alison M. Bernal (SBN 264629)
   alison@nshmlaw.com
3  NYE, STIRLING, HALE
   & MILLER, LLP
4  33 West Mission Street, Suite 201
   Santa Barbara, CA 93101
5  Telephone: (805) 963-2345
   Facsimile: (805) 284-9590
6

Benjamin J. Sweet
(Admitted *Pro Hac Vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

7  *Attorneys for Plaintiffs Julian Vargas,*
   *American Council of the Blind, and the*
   *Proposed Class*

8

9               **UNITED STATES DISTRICT COURT**

10        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

11

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| 12  JULIAN VARGAS, ANNE WEST, and AMERICAN COUNCIL OF THE BLIND, individually on behalf of themselves and all others similarly situated, | CASE NO.: 2:19-cv-8108 |
| | **DECLARATION OF JULIAN VARGAS IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |
| 15           Plaintiffs, | |
| 16           v. | Complaint Filed: September 18, 2019 |
| 17  QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, inclusive, | Pretrial Conf: December 7, 2021 Trial Date: January 11, 2022 District Judge: Hon. Dolly M. Gee Magistrate: Hon. Michael M. Wilner |
| 20           Defendants. | |

21

22            **<u>DECLARATION OF JULIAN VARGAS</u>**

23        I, Julian Vargas, hereby declare:

24        1.    I am one of the Plaintiffs in this matter. The following facts are within

25  my personal knowledge and, if called as a witness, I could and would competently

26  testify to these facts. I make this declaration in support of Plaintiff's Motion for Class

27  Certification.

28

1

DECLARATION OF JULIAN VARGAS

2.      I went to a Quest PSC again on June 10, 2021. I arrived at the PSC at 12:33 p.m. As I entered the location, I heard the tail end of the portion of the content loop directed toward blind patients. However, the volume was not adequate for me to hear the message from my vantage point. I then had to wait an additional 8 to 10 minutes until the content loop played again. During this 8-minute period – but not during the portion of the message directed to blind patients – information was given on the "wait by text" option. The message made clear that it was only available to those who could use the kiosk independently.

3.      After approximately 8 to 10 minutes, the message directed me to perform a 3-finger swipe at the kiosk. However, the message did not give directions as to where the kiosk itself was located, so I had to fumble around to find it. The content loop simply said that patients should ask a staff member to assist if they had trouble locating the kiosk. However, at no time while I was waiting for the audio message loop did any Quest staff member enter the waiting area or sweep the waiting area for walk-ins. Once I located the kiosk, I checked and confirmed there was still no headphone jack or tactile keypad.

4.      After I performed the swipe by swiping up, an audio message played which stated that I was patient "001" and that I would be serviced in 3 minutes. I then waited 17 minutes to be serviced. When the phlebotomist finally greeted me at 12:58 p.m., I explained that I was there to test the accessibility of the 3-finger swipe system and asked whether the "wait by text" option was available to me as a walk-in blind user. The phlebotomist told me the "wait by text" option is not available for blind users who walk in but only for those who make appointments online and can scan a QR code at the kiosk.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 3rd day of September, 2021, in Van Nuys, California.

DocuSigned by:

4389E04F7499474...

Julian Vargas, Declarant

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

2

DECLARATION OF JULIAN VARGAS

# EXHIBIT 5

# **REDACTED**

# TO BE FILED UNDER SEAL PENDING THE COURT'S RULING ON PLAINTIFF'S APPLICATION

# EXHIBIT 6

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3   JULIAN VARGAS, ANNE WEST, and        )

 4   AMERICAN COUNCIL OF THE BLIND,       ) Case No.

 5   individually on behalf of            ) 2:19-cv-8108

 6   themselves and all others similarly  )

 7   situated,                            )

 8                    Plaintiffs,         )

 9   vs.                                  )

10   QUEST DIAGNOSTICS, CLINICAL          )

11   LABORATORIES, INC., QUEST            )

12   DIAGNOSTICS HOLDINGS, INC., QUEST    )

13   DIAGNOSTICS INCORPORATED; and DOES   )

14   1-10, inclusive,                     )

15                    Defendants.         )

16

17

18          30 (B)(1) DEPOSITION OF TAYLOR CARR

19                    April 12, 2021

20

21

22   REPORTED REMOTELY BY:

23   AMBER S. WILLIAMS, C.S.R. No. 1080

24   Notary public

25
```

                                              Page 1

PA0065

```
 1            THE 30(B)(1) DEPOSITION OF TAYLOR CARR was

 2    taken on behalf of the plaintiffs via

 3    videoconference, commencing at 12:08 p.m. PST on

 4    April 12, 2021, before Amber S. Williams via

 5    videoconference, Certified Shorthand Reporter and

 6    Notary Public within and for the State of Idaho, in

 7    the above-entitled matter.

 8

 9                    APPEARANCES:

10    For Plaintiffs via videoconference:

11         NYE, STIRLING, HALE & MILLER, LLP

12         BY:  JONATHAN D. MILLER

13         33 West Mission Street, Suite 201

14         Santa Barbara, California  93101

15         jonathan@nshmlaw.com

16    For Defendants via videoconference:

17         OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC

18         BY:  DAVID RAIZMAN

19         400 South Hope Street, Suite 1200

20         Los Angeles, California  90071

21         david.raizman@ogletree.com

22         Also Present via videoconference:

23         Dustin Brown, videographer

24         Callum Appleby

25         Matthew Handley
```

                                              Page  2

1        Benjamin Sweet

2        Amer Pharaon

3        Margaret Parker

4        Amber Roller

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

PA0067

```
 1                    I N D E X

 2

 3    TESTIMONY OF TAYLOR CARR                    Page

 4       Examination by Mr. Miller...................   8

 5

 6

 7                         EXHIBITS

 8    Exhibit 21.    e-Check in Buy vs. Build........   79

 9                   Meeting Notes, 08/27/15, Bates

10                   Nos. QUEST-VARGAS000040261 -

11                   QUEST-VARGAS000040264

12    Exhibit 22.    e-Check in Options Analysis......  103

13                   Build vs. Buy Decision,

14                   08/27/15, Bates

15                   Nos. QUEST-VARGAS000040267 -

16                   QUEST-VARGAS000040269

17    Exhibit 23.    e-Check in Buy vs. Build........  109

18                   Meeting Notes, 09/03/15, Bates

19                   Nos. QUEST-VARGAS000040280 -

20                   QUEST-VARGAS000040284

21    Exhibit 24.    Final CapEx.....................  116

22    Exhibit 25.    E-mail chain, Bates ............  251

23                   Nos. QUEST-VARGAS000039966 -

24                   QUEST-VARGAS000039967

25

                                              Page  4
```

PA0068

1                          Exhibits (Continued)

2      Exhibit 26.    E-mail chain, Bates ............. 275

3                     Nos. QUEST-VARGAS000035475 -

4                     QUEST-VARGAS000035476

5      Exhibit 27.    New Patient Experience.......... 257

6                     Deployment CapEx Request, Bates

7                     Nos. QUEST-VARGAS000000022 -

8                     QUEST-VARGAS000000041

9      Exhibit 28.    E-mail chain, Bates ............. 279

10                     Nos. QUEST-VARGAS000004496 -

11                     QUEST-VARGAS000004499

12      Exhibit 30.    Building a Superior Customer..... 294

13                     Experience at Lower Cost

14                     document, Bates

15                     Nos. QUEST-VARGAS000040161 -

16                     QUEST-VARGAS000040166

17      Exhibit 31.    Patient UX Vision PowerPoint..... 299

18

19

20

21

22

23

24

25

                                              Page 5

PA0069

| | | |
|---|---|---|
| 1 | under that broader umbrella? | 12:38PM |
| 2 | A.   There was -- under "Patient Experience," | 12:38PM |
| 3 | there's three that were connected, and it was | 12:38PM |
| 4 | preregistration, appointment scheduling, and | 12:38PM |
| 5 | electronic check-in. | 12:38PM |
| 6 | Q.   Also known as e-Check? | 12:38PM |
| 7 | A.   Yeah.  Also known as e-Check-in. | 12:38PM |
| 8 | Q.   e-Check-in.  Excuse me.  e-Check-in. | 12:38PM |
| 9 | Did any part of your compensation when | 12:38PM |
| 10 | you took on the position of director involve stock | 12:38PM |
| 11 | options that the company provided to you? | 12:38PM |
| 12 | A.   No. | 12:38PM |
| 13 | Q.   Specifically with respect to Quest | 12:38PM |
| 14 | e-Check-in project, what did you understand the | 12:39PM |
| 15 | project to be when you started in 2015? | 12:39PM |
| 16 | A.   Can you ask more specific?  There's a | 12:39PM |
| 17 | lot to unpack, I guess, so... | 12:39PM |
| 18 | Q.   That's why we are here today, so we can | 12:39PM |
| 19 | take it broad and then move into the specific.  But I | 12:39PM |
| 20 | just -- when you started with Quest in 2015 in this | 12:39PM |
| 21 | position, I assume somebody described for you what | 12:39PM |
| 22 | the project was going to be with respect to | 12:39PM |
| 23 | e-Check-in.  Is that correct or incorrect? | 12:39PM |
| 24 | A.   I wouldn't say it was correct or | 12:39PM |
| 25 | incorrect.  There's a lot within what we were trying | 12:39PM |

Page 30

PA0070

| | | |
|---|---|---|
| 1 | Q.   You mentioned that there were other ways | 01:02PM |
| 2 | of checking in prior to the implementation of the | 01:02PM |
| 3 | e-Check-in project other than that paper system. | 01:02PM |
| 4 | What other check-in methods are you aware of? | 01:02PM |
| 5 | A.   Verbal. | 01:02PM |
| 6 | Q.   And when you say that, that would be a | 01:02PM |
| 7 | patient going to a phlebotomist or a reception person | 01:02PM |
| 8 | and attempting to verbally check in? | 01:02PM |
| 9 | A.   Two pieces there.  I would just say a | 01:02PM |
| 10 | phlebotomist.  A phlebotomist who is in our wait room | 01:02PM |
| 11 | or arrival space, and a customer grabs them with a | 01:03PM |
| 12 | question. | 01:03PM |
| 13 | Q.   When you were working on e-Check-in | 01:03PM |
| 14 | project, you were attempting to improve patient | 01:03PM |
| 15 | experience.  That was one of the objectives; is that | 01:03PM |
| 16 | right? | 01:03PM |
| 17 | A.   The ultimate objective.  The experience | 01:03PM |
| 18 | was everything. | 01:03PM |
| 19 | Q.   And you had to understand what the prior | 01:03PM |
| 20 | experience was before the implementation of the | 01:03PM |
| 21 | e-Check-in project to be able to assess that and | 01:03PM |
| 22 | improve it, right? | 01:03PM |
| 23 | A.   Very -- a key element of framing the | 01:03PM |
| 24 | experience problems, correct -- to improve. | 01:03PM |
| 25 | Q.   And so other than the verbal method of | 01:03PM |

Page 45

PA0071

```
 1    accessibility folder.                                01:36PM
 2         Q.   (BY MR. MILLER):  Was there ever any       01:36PM
 3    consideration given by the team you were working with 01:36PM
 4    at Quest as to whether to utilize the iPad's internal 01:36PM
 5    accessibility features in the e-Check-in service that 01:36PM
 6    was being offered?                                   01:37PM
 7         A.   Yes.  There -- that's actually how I       01:37PM
 8    learned about it.                                    01:37PM
 9         Q.   And how -- how would -- how was that       01:37PM
10    decision made?                                       01:37PM
11         A.   As a team.                                 01:37PM
12         Q.   Let's start with when that decision was    01:37PM
13    made.                                                01:37PM
14         A.   I don't recall specifically when that      01:37PM
15    decision was made.                                   01:37PM
16         Q.   You may not have a specific date, but      01:37PM
17    what year was that decision made?                    01:37PM
18         A.   Early on 2015 or 2016.  But I don't have   01:37PM
19    specifics on when that team decided.                 01:37PM
20         Q.   And which team was making the decision?    01:37PM
21         A.   The team I was on.                          01:37PM
22         Q.   And what specific accessibility features   01:37PM
23    did the team utilize within Apple's iOS?             01:37PM
24         A.   A feature called touch accommodations.     01:37PM
25         Q.   And how did the team utilize touch         01:38PM
```

Page 64

```
 1    accommodations within the e-Check-in service that        01:38PM

 2    Quest offers?                                             01:38PM

 3          A.    That capability allows for multiple           01:38PM

 4    different types of touches to occur on the device and    01:38PM

 5    then for it to be interpreted correctly.                 01:38PM

 6          Q.    And specifically what was Quest trying        01:38PM

 7    to accomplish that it decided to use the touch           01:38PM

 8    accessibility feature on Apple's IOS device?             01:38PM

 9          A.    Yeah.   As part of our experience design     01:38PM

10    process, we capture customer feedback through, you       01:38PM

11    know, multitude of ways.   And one of those led us to    01:38PM

12    leveraging that to improve the experience for            01:39PM

13    customers checking in.                                   01:39PM

14          Q.    Was there ever any consideration given       01:39PM

15    in the 2015 timeframe as to whether to use Apple's       01:39PM

16    voiceover accessibility feature for vision users?        01:39PM

17          A.    I don't recall.                              01:39PM

18          Q.    Are you aware of any documents that          01:39PM

19    would refresh your recollection?                         01:39PM

20          A.    No.                                          01:39PM

21          Q.    In the 2015 timeframe, was there ever        01:39PM

22    any consideration given to utilizing Apple's audio       01:39PM

23    description feature within its accessibility IOS         01:39PM

24    platform?                                                01:39PM

25          A.    I don't recall.                              01:39PM
```

Page 65

PA0073

| | | |
|---|---|---|
| 1 | Q.   Are you aware of any documents that | 01:39PM |
| 2 | would refresh your recollection? | 01:39PM |
| 3 | A.   No. | 01:39PM |
| 4 | Q.   Within the 2015 timeframe, was there | 01:39PM |
| 5 | ever any consideration given to utilizing Apple's | 01:39PM |
| 6 | spoken content feature within the accessibility | 01:39PM |
| 7 | platform on IOS? | 01:39PM |
| 8 | MR. RAIZMAN:  Object to foundation. | 01:40PM |
| 9 | THE WITNESS:  One thing I should say is I | 01:40PM |
| 10 | don't think -- I don't know, like, all the features | 01:40PM |
| 11 | in that folder.  So yeah, I don't recall.  But they | 01:40PM |
| 12 | could have been. | 01:40PM |
| 13 | Q.   (BY MR. MILLER):  But your answer is you | 01:40PM |
| 14 | don't recall, correct? | 01:40PM |
| 15 | A.   Yeah.  I don't recall. | 01:40PM |
| 16 | Q.   And are you aware of any documents that | 01:40PM |
| 17 | would refresh your memory? | 01:40PM |
| 18 | A.   No. | 01:40PM |
| 19 | Q.   From -- from -- from 2015 to the | 01:40PM |
| 20 | present, are you aware of whether Quest has ever | 01:40PM |
| 21 | considered utilizing the voiceover feature in the | 01:40PM |
| 22 | accessibility panel of Apple's IOS? | 01:40PM |
| 23 | A.   Am I answering for myself what I was | 01:40PM |
| 24 | involved in or Quest as a company? | 01:40PM |
| 25 | Q.   I'm asking what you know.  Are you | 01:40PM |

Page 66

PA0074

| | | |
|---|---|---|
| 1 | aware, from any source, whether -- strike that. | 01:40PM |
| 2 | Are you aware from any source whether | 01:40PM |
| 3 | Quest ever utilized the voiceover functionality in | 01:40PM |
| 4 | the accessibility panel of Apple's IOS for the | 01:41PM |
| 5 | e-Check-in service from 2015 to the present? | 01:41PM |
| 6 | A.   Yeah.   I don't know. | 01:41PM |
| 7 | Q.   Are you aware of whether Quest ever | 01:41PM |
| 8 | utilized the audio description feature within Apple's | 01:41PM |
| 9 | accessibility panel in the IOS from 2015 to the | 01:41PM |
| 10 | present? | 01:41PM |
| 11 | MR. RAIZMAN:   Object to foundation. | 01:41PM |
| 12 | THE WITNESS:   Yeah.   I don't know. | 01:41PM |
| 13 | Q.   (BY MR. MILLER):   Are you aware of | 01:41PM |
| 14 | whether Quest ever utilized the spoken content | 01:41PM |
| 15 | feature within Apple's IOS accessibility panel from | 01:41PM |
| 16 | 2015 to the present? | 01:41PM |
| 17 | MR. RAIZMAN:   Object.   Foundation. | 01:41PM |
| 18 | THE WITNESS:   Again, I don't know. | 01:41PM |
| 19 | Q.   (BY MR. MILLER):   Are you aware of | 01:41PM |
| 20 | whether -- strike that. | 01:41PM |
| 21 | When you went to incorporate the touch | 01:41PM |
| 22 | feature for accessibility, were you able to get | 01:41PM |
| 23 | access to that feature through an API that Apple | 01:41PM |
| 24 | offers? | 01:42PM |
| 25 | MR. RAIZMAN:   Object to form. | 01:42PM |

Page 67

```
 1           A.   I do not.                              02:12PM

 2           Q.   From a patient experience perspective, 02:12PM

 3    are you aware of how blind users can utilize a     02:13PM

 4    tactile keyboard to independently access technology? 02:13PM

 5           MR. RAIZMAN:   Objection.  Foundation.       02:13PM

 6           THE WITNESS:   Am I answering as Taylor an    02:13PM

 7    awareness that there's visually impaired people in  02:13PM

 8    the world?  Or am I answering on behalf of Quest?   02:13PM

 9           Q.   (BY MR. MILLER):   As an employee of    02:13PM

10    Quest, are you aware of whether blind patients can  02:13PM

11    utilize tactile keyboards to independently access   02:13PM

12    technology?                                         02:13PM

13           MR. RAIZMAN:   Object.  Beyond the scope.    02:13PM

14           THE WITNESS:   I think it would be           02:13PM

15    speculation.  I mean, I'm not visually impaired.  I 02:13PM

16    don't -- I don't know how you -- yeah.  I don't know. 02:13PM

17           Q.   (BY MR. MILLER):   I'm just asking      02:13PM

18    whether you know.  You've mentioned that you were in 02:13PM

19    charge of patient experience for the e-Check-in     02:13PM

20    service, correct?                                   02:13PM

21           A.   I was in -- apart of the team focusing  02:13PM

22    on patient-user experience, correct.               02:13PM

23           Q.   And from that perspective in your role, 02:13PM

24    are you aware of how blind patients can utilize a   02:13PM

25    tactile keyboard to independently access technology? 02:14PM
```

Page 89

PA0076

| | | |
|---|---|---|
| 1 | MR. RAIZMAN:  Object to form. | 02:14PM |
| 2 | THE WITNESS:  So in my role as a human on | 02:14PM |
| 3 | earth, yeah.  I know visually impaired people use | 02:14PM |
| 4 | braille to interact with devices like that. | 02:14PM |
| 5 | Q.  (BY MR. MILLER):  Did Quest ever | 02:14PM |
| 6 | consider utilizing a tactile keyboard to allow its | 02:14PM |
| 7 | blind patients to independently access the e-Check-in | 02:14PM |
| 8 | service? | 02:14PM |
| 9 | MR. RAIZMAN:  I'm going to object.  It's | 02:14PM |
| 10 | beyond the scope.  You can answer from your | 02:14PM |
| 11 | knowledge. | 02:14PM |
| 12 | THE WITNESS:  There was a lot of | 02:14PM |
| 13 | considerations that were made to drive and deliver a | 02:14PM |
| 14 | great experience for our customers. | 02:14PM |
| 15 | MR. MILLER:  Move to strike as nonresponsive. | 02:14PM |
| 16 | My question is more specific. | 02:14PM |
| 17 | Q.  (BY MR. MILLER):  Did Quest ever | 02:14PM |
| 18 | consider utilizing a tactile keyboard to allow blind | 02:14PM |
| 19 | patients to independently access the e-Check-in | 02:14PM |
| 20 | service? | 02:14PM |
| 21 | A.  Again, I -- I can't speak specifically | 02:14PM |
| 22 | because I was focusing on all of our customers that | 02:15PM |
| 23 | were coming to Quest Diagnostics. | 02:15PM |
| 24 | Q.  I'm asking even generally.  I'm asking | 02:15PM |
| 25 | whether you have any information whatsoever from any | 02:15PM |

Page 90

PA0077

| | | |
|---|---|---|
| 1 | source whether Quest ever considered utilizing a | 02:15PM |
| 2 | tactile keyboard to allow blind patients to | 02:15PM |
| 3 | independently access the e-Check-in service? | 02:15PM |
| 4 | MR. RAIZMAN:  I'm going to object to the | 02:15PM |
| 5 | extent any of your information comes from | 02:15PM |
| 6 | communications with counsel.  Otherwise, you can | 02:15PM |
| 7 | answer. | 02:15PM |
| 8 | THE WITNESS:  It's possible.  I started in | 02:15PM |
| 9 | 2009.  And there's a lot of considerations | 02:15PM |
| 10 | potentially in that time and beyond. | 02:15PM |
| 11 | Q.   (BY MR. MILLER):  If -- but today is my | 02:15PM |
| 12 | day to take your deposition, so I'm not asking what's | 02:15PM |
| 13 | possible.  I'm asking what you know.  So just with | 02:15PM |
| 14 | that qualification, I'm asking whether you know from | 02:15PM |
| 15 | any source other than counsel whether Quest ever | 02:15PM |
| 16 | considered the use of a tactile keyboard to allow its | 02:15PM |
| 17 | blind patients to independently access it's | 02:15PM |
| 18 | e-Check-in service? | 02:16PM |
| 19 | A.   It would be speculation.  It -- it's | 02:16PM |
| 20 | possible, right?  We would have to refer to the | 02:16PM |
| 21 | documents.  I don't recall.  I don't know. | 02:16PM |
| 22 | Q.   Is it you don't recall or you don't | 02:16PM |
| 23 | know?  Which one? | 02:16PM |
| 24 | A.   I may not have been involved in those. | 02:16PM |
| 25 | It's all speculation.  I'm not involved in all -- go | 02:16PM |

Page 91

PA0078

| | | |
|---|---|---|
| 1 | ahead. | 02:16PM |
| 2 | Q.   No.   I wanted you to finish.   You're not | 02:16PM |
| 3 | involved in -- go ahead.   You're not involved in all? | 02:16PM |
| 4 | A.   Can you ask your question again? | 02:16PM |
| 5 | Q.   As you sit here today, can you tell me | 02:16PM |
| 6 | from any source other than counsel whether Quest ever | 02:16PM |
| 7 | considered utilizing a tactile keyboard to allow | 02:16PM |
| 8 | blind patients to independently access it's | 02:16PM |
| 9 | e-Check-in service?   Do you have any information at | 02:16PM |
| 10 | all in that regard that you can tell me about today | 02:16PM |
| 11 | at your deposition? | 02:16PM |
| 12 | A.   I don't recall. | 02:16PM |
| 13 | Q.   Do you know of any documents that would | 02:16PM |
| 14 | refresh your recollection as you sit here today? | 02:16PM |
| 15 | A.   No. | 02:17PM |
| 16 | Q.   Do you know whether it was ever | 02:17PM |
| 17 | determined whether a keyboard would be necessary for | 02:17PM |
| 18 | the kiosk as referenced here in Exhibit 21? | 02:17PM |
| 19 | A.   I don't know. | 02:17PM |
| 20 | Q.   Were you involved in any way in making | 02:17PM |
| 21 | the decision as to whether or not to have a keyboard | 02:17PM |
| 22 | for the e-Check-in service? | 02:17PM |
| 23 | A.   I don't know.   We'd have to refer to | 02:17PM |
| 24 | documents. | 02:17PM |
| 25 | Q.   Do you know anyone else at Quest that | 02:17PM |

Page 92

PA0079

| | | |
|---|---|---|
| 1 | was involved in the decision to -- as to whether or | 02:17PM |
| 2 | not to utilize a keyboard for the e-Check-in kiosk? | 02:17PM |
| 3 | A.   I don't know. | 02:17PM |
| 4 | Q.   Now, if we go down in this document a | 02:17PM |
| 5 | little further on page 2, there's a section that | 02:17PM |
| 6 | says, "Cost known to buy solution."  Was that one of | 02:18PM |
| 7 | the items your team was trying to determine as to how | 02:18PM |
| 8 | much it would cost for the buy sol- -- you know, the | 02:18PM |
| 9 | off-the-shelf solution, if you will -- the buy | 02:18PM |
| 10 | solution? | 02:18PM |
| 11 | A.   As part of those three teams I | 02:18PM |
| 12 | mentioned, yes. | 02:18PM |
| 13 | Q.   And it says here, "Quote needed from | 02:18PM |
| 14 | QuadraMed."  Were you at all involved in any of the | 02:18PM |
| 15 | quotes from QuadraMed? | 02:18PM |
| 16 | A.   I don't recall. | 02:18PM |
| 17 | Q.   Do you know of any document that would | 02:18PM |
| 18 | refresh your recollection? | 02:18PM |
| 19 | A.   No. | 02:18PM |
| 20 | Q.   Was Mr. Yarrison involved in obtaining a | 02:18PM |
| 21 | quote from QuadraMed? | 02:18PM |
| 22 | A.   Per the document in front of me, you're | 02:18PM |
| 23 | referencing on page 2 where Marc has an action, it | 02:18PM |
| 24 | looks like that's the case. | 02:18PM |
| 25 | Q.   Did Mr. Yarrison ever share with you the | 02:18PM |

Page 93

PA0080

```
 1              Q.   Do you know of any documents that would      02:42PM
 2    refresh your memory as you sit here today?                  02:42PM
 3              A.   No.                                          02:42PM
 4              Q.   Are you aware of whether the headphone       02:42PM
 5    jack extension that little tab offers is at a cost of       02:42PM
 6    $20 per unit?                                               02:43PM
 7              MR. RAIZMAN:   Objection.   Lack of foundation.   02:43PM
 8              THE WITNESS:   I don't know.   I already said I   02:43PM
 9    don't recall and I don't know.                             02:43PM
10              Q.   (BY MR. MILLER):   Was there ever any        02:43PM
11    discussion within your team -- strike that.                02:43PM
12                   Are you aware from any source whether        02:43PM
13    Quest ever determined that utilizing the headphone         02:43PM
14    jack extension of little tab would impose an undue          02:43PM
15    burden on the company in the implementation of the         02:43PM
16    e-Check-in service?                                        02:43PM
17              MR. RAIZMAN:   Object as to form.                 02:43PM
18              THE WITNESS:   Do you have a timeframe?           02:43PM
19              Q.   (BY MR. MILLER):   Yeah.   From 2015 to      02:43PM
20    the present, are you aware from any source other than      02:43PM
21    counsel that the utilization of little tab's               02:43PM
22    headphone jack extension would impose an undue burden      02:43PM
23    on Quest in operating e-Check-in service?                  02:43PM
24              MR. RAIZMAN:   Object as to form.                 02:43PM
25              THE WITNESS:   Yeah.   I don't know.              02:44PM
```

                                                    Page 100

```
 1           Q.   (BY MR. MILLER):  Did you ever undertake      02:44PM

 2     any analysis as to whether utilizing the little tab      02:44PM

 3     headphone jack extension would impose an undue burden    02:44PM

 4     on Quest in implementing its e-Check-in service?         02:44PM

 5           MR. RAIZMAN:  Object as to form.                   02:44PM

 6           THE WITNESS:  I don't know.  I don't know if       02:44PM

 7     I understand, either, Mr. Miller.  Honestly, I don't     02:44PM

 8     know.                                                    02:44PM

 9           Q.   (BY MR. MILLER):  Did you ever undertake      02:44PM

10     any analysis as to whether utilizing the little tab      02:44PM

11     headphone jack extension would impose a financial --     02:44PM

12     an unachievable financial -- strike that.                02:44PM

13           Did you ever consider whether utilizing            02:44PM

14     the little tab headphone jack extension would impose     02:44PM

15     an undue financial burden on Quest in the e-Check-in     02:44PM

16     service?                                                 02:44PM

17           MR. RAIZMAN:  Object as to form.  All I'm          02:44PM

18     going to say is he told you at the beginning of this     02:44PM

19     deposition if you didn't understand the question,        02:44PM

20     don't answer it, ask for clarification.  But if you      02:44PM

21     understand it, please answer.                            02:44PM

22           MR. MILLER:  Please mark the transcript,           02:45PM

23     Madame Court Reporter, that counsel is engaging in       02:45PM

24     behavior that violates 30C2, that the objections are     02:45PM

25     being stated in a suggestive manner.  Thank you.         02:45PM
```

Page 101

PA0082

| | | |
|---|---|---|
| 1 | Mr. Carr, I'll -- | 02:45PM |
| 2 | MR. RAIZMAN:  Please let the record also | 02:45PM |
| 3 | reflect that counsel has testimony from the witness | 02:45PM |
| 4 | under oath that he didn't understand the prior | 02:45PM |
| 5 | question, yet he keeps using the same phrase in all | 02:45PM |
| 6 | of his questions.  That's violating the standards for | 02:45PM |
| 7 | taking a deposition. | 02:45PM |
| 8 | MR. MILLER:  Not engaging in soliloquy, | 02:45PM |
| 9 | Counsel, here today, sir.  I'm taking a deposition. | 02:45PM |
| 10 | MR. RAIZMAN:  I thought that's what you were | 02:45PM |
| 11 | doing. | 02:45PM |
| 12 | Q.  (BY MR. MILLER):  Mr. Carr, did you ever | 02:45PM |
| 13 | consider whether implementing the little tab kiosk | 02:45PM |
| 14 | that contains a headphone jack extension would impose | 02:45PM |
| 15 | an undue financial burden on Quest? | 02:45PM |
| 16 | MR. RAIZMAN:  Object as to form. | 02:45PM |
| 17 | THE WITNESS:  I don't recall. | 02:45PM |
| 18 | Q.  (BY MR. MILLER):  Do you know of any | 02:45PM |
| 19 | documents that would refresh your memory? | 02:45PM |
| 20 | A.  No. | 02:46PM |
| 21 | Q.  Are you aware from any source other than | 02:46PM |
| 22 | counsel whether Quest ever analyzed that implementing | 02:46PM |
| 23 | the little tab kiosk with a headphone jack extension | 02:46PM |
| 24 | would impose an undue financial burden on the | 02:46PM |
| 25 | company? | 02:46PM |

Page 102

PA0083

```
 1          MR. RAIZMAN:  Object as to form.              02:46PM

 2          THE WITNESS:  Do you have a timeframe?        02:46PM

 3          Q.   (BY MR. MILLER):   In 2015 to the       02:46PM

 4     present?                                           02:46PM

 5          A.   Yeah.  I don't know.                     02:46PM

 6          Q.   Do you know how much the little tab      02:46PM

 7     kiosk that Quest ultimately selected cost the      02:46PM

 8     company?                                           02:46PM

 9          A.   I don't remember.                        02:46PM

10          Q.   Would it be contained within CapEx --    02:46PM

11     the ultimate final approved CapEx?                 02:46PM

12          A.   It -- I don't recall.  We'd have to      02:46PM

13     refer to that document.                            02:46PM

14          Q.   Okay.  We'll get there.  I'm going to    02:46PM

15     show you what I'll mark next in order, Exhibit 22. 02:47PM

16               (Exhibit 22 marked.)                     02:47PM

17          MR. RAIZMAN:  I'm not able to access the      02:47PM

18     document or exhibit share at all right now.        02:47PM

19          MR. MILLER:  It's uploading right now,        02:47PM

20     Mr. Raizman.                                       02:47PM

21          MR. RAIZMAN:  Okay.                           02:47PM

22          THE REPORTER:  Can you guys hear me?          02:48PM

23          MR. MILLER:  Yes.                             02:48PM

24          MR. RAIZMAN:  Yes.

25          THE REPORTER:  Okay.  I lost video connection
```

PA0084

```
 1          Q.   (BY MR. MILLER):  In assessing -- I      03:55PM

 2    think you said, "Yes, we have."  Is it locations with  03:55PM

 3    one employee who's a phlebotomist?                   03:55PM

 4          A.   Can you ask your question again and then  03:55PM

 5    I will respond, if that's okay?                      03:55PM

 6          Q.   Yeah.  I'm asking isn't it true that      03:55PM

 7    there are Patient Service Centers that only have one  03:55PM

 8    employee and that employee is a phlebotomist?        03:55PM

 9          MR. RAIZMAN:  Object to form.                  03:55PM

10          THE WITNESS:  Yes, Quest has sites with one     03:55PM

11    phlebotomist.                                        03:55PM

12          Q.   (BY MR. MILLER):  It also has sites with   03:55PM

13    two employees, and both of those employees are      03:55PM

14    phlebotomists; isn't that true?                     03:55PM

15          MR. RAIZMAN:  Object to form.                  03:55PM

16          THE WITNESS:  Yes, Quest has sites with two     03:55PM

17    phlebotomists.                                       03:56PM

18          Q.   (BY MR. MILLER):  In assessing patient    03:56PM

19    experience and trying to deliver the e-Check-in      03:56PM

20    service, did you ever think to ascertain how long    03:56PM

21    patients would have to -- or strike that -- how long  03:56PM

22    blinds patients would have to wait to check in once  03:56PM

23    e-Check-in service was implemented by Quest?         03:56PM

24          A.   So not specific to the segment that       03:56PM

25    you're referring.  So going to back to kind of the  03:56PM
```

Page 149

PA0085

```
 1    implemented into the e-Check-in service was the        03:57PM

 2    wait-by-text option; isn't that true?                  03:57PM

 3          A.   I don't know what that's referring to.      03:57PM

 4          Q.   You've never heard of the wait-by-text      03:57PM

 5    option within the e-Check-in service?                  03:58PM

 6          A.   Not -- no.                                  03:58PM

 7          Q.   Are you familiar with any screen within     03:58PM

 8    the e-Check-in service that allows you to let the      03:58PM

 9    Quest -- strike that.  I'm going to ask it a better    03:58PM

10    way.                                                   03:58PM

11          Are you -- isn't it true that there is           03:58PM

12    an option within the e-Check-in service that lets you  03:58PM

13    be texted when -- when your time to be served is       03:58PM

14    ready?                                                 03:58PM

15          A.   Yes.                                        03:58PM

16          Q.   And what's that called?  What do you        03:58PM

17    refer to that as?                                      03:58PM

18          A.   "Wait Where You Want."                      03:58PM

19          Q.   Okay.  The "Wait Where You Want" option,    03:58PM

20    did you assist in having that implemented within the   03:58PM

21    e-Check-in service?                                    03:58PM

22          A.   Yeah.  Yes.                                 03:58PM

23          Q.   And -- and is that to improve patient       03:58PM

24    experience?                                            03:58PM

25          A.   It was part of experience related to        03:58PM
```

Page 151

PA0086

| | | |
|---|---|---|
| 1 | COVID. | 03:59PM |
| 2 | Q. Did it exist prior to COVID? | 03:59PM |
| 3 | A. No. | 03:59PM |
| 4 | Q. And how does the "Wait Where You Want" | 03:59PM |
| 5 | functionality work? | 03:59PM |
| 6 | A. It's a component within e-Check-in. | 03:59PM |
| 7 | Q. Right. And so once you go and you use | 03:59PM |
| 8 | the e-Check-in service, you can -- one of the screens | 03:59PM |
| 9 | allows you to put in your information to wait where | 03:59PM |
| 10 | you want, right? | 03:59PM |
| 11 | A. Yes. | 03:59PM |
| 12 | Q. And so that allows you to either wait in | 03:59PM |
| 13 | the waiting room or some other location, correct? | 03:59PM |
| 14 | A. Yes. | 03:59PM |
| 15 | Q. For example, if you didn't want to be in | 03:59PM |
| 16 | a crowded waiting room during COVID, you could wait | 03:59PM |
| 17 | outdoors or in your car? | 03:59PM |
| 18 | A. Yes. | 03:59PM |
| 19 | Q. And how would you be notified, then, | 03:59PM |
| 20 | when your -- when your appointment time was called by | 03:59PM |
| 21 | the phlebotomist? | 03:59PM |
| 22 | A. A text message. | 03:59PM |
| 23 | Q. Would be sent to your phone? | 03:59PM |
| 24 | A. Yes. | 04:00PM |
| 25 | Q. And we'll talk a little more in detail | 04:00PM |

Page 152

PA0087

```
 1    in a bit about the three-finger swipe option, but you    04:00PM

 2    were responsible for implementing that as well,           04:00PM

 3    correct?                                                   04:00PM

 4          A.    Am I answering on behalf of Quest or           04:00PM

 5    myself?                                                    04:00PM

 6          Q.    On behalf of Quest.                            04:00PM

 7          A.    No.  I wasn't involved in the                  04:00PM

 8    implementation.                                            04:00PM

 9          Q.    Were you involved in the design?               04:00PM

10          A.    Yes.                                           04:00PM

11          Q.    And you understand how the three-finger        04:00PM

12    swipe works, correct?                                      04:00PM

13          A.    Yes.  On behalf of Quest, yes.                 04:00PM

14          Q.    And the three-finger swipe allows a            04:00PM

15    blind patient to go up to the e-Check-in, use three        04:00PM

16    fingers to swipe and check in, right?                      04:00PM

17          A.    Yes.  And/or a phlebotomist supporting a       04:00PM

18    customer checking in.                                      04:00PM

19          Q.    But certainly just one way the blind           04:00PM

20    user could use the e-Check-in is to do a three-finger      04:00PM

21    swipe, correct?                                            04:00PM

22          A.    Yes.                                           04:00PM

23          Q.    And when was that implemented?                 04:00PM

24          A.    I think it was August of last year.            04:01PM

25          Q.    August of 2020, correct?                       04:01PM
```

Page 153

```
 1    that opportunity with the visually impaired.          05:43PM
 2          Q.   And so, specifically, when as the          05:43PM
 3    three-finger swipe implemented at all the PSCs by     05:43PM
 4    Quest?                                                 05:43PM
 5          A.   August 2020.                                05:43PM
 6          Q.   At that point, it was available at all      05:43PM
 7    the PSCs that had e-Check-in services?                 05:43PM
 8          A.   Correct.                                    05:43PM
 9          Q.   And so how would the three-finger swipe     05:43PM
10    work?  Walk me through it.                             05:43PM
11          A.   Yeah.  Customers would use their three      05:43PM
12    digits -- any three digits they so desire, and        05:43PM
13    indicate across the screen, and the screen would      05:43PM
14    recognize that and communicate that to the customers  05:43PM
15    that they've been checked in, as I've summarized, and  05:43PM
16    then also to our phlebotomy staff.                    05:43PM
17          Q.   And would it put them in a queue at that    05:43PM
18    point?                                                 05:43PM
19          A.   Yes.                                        05:43PM
20          Q.   And into the computerized queue that was    05:44PM
21    available through e-Check-in?                          05:44PM
22          A.   Correct.                                    05:44PM
23          Q.   Now, how would blind patients know to      05:44PM
24    use the three fingers to check in?                    05:44PM
25          A.   Yeah.  One of the elements going back      05:44PM
```

Page 190

```
 1            THE WITNESS:  I know of the 12.        05:49PM

 2            Q.   (BY MR. MILLER):  Do you know anything   05:49PM

 3  beyond that number?                            05:49PM

 4            A.   Related to the three-finger swipe   05:49PM

 5  communication via the Appointment Scheduler and the   05:49PM

 6  on -- or and the phone Appointment Scheduler, I only   05:49PM

 7  know of the 12.                                 05:49PM

 8            Q.   Fair enough.  Now, another method by   05:49PM

 9  which Quest conveys to blind patients that they can   05:49PM

10  presently use the three-finger swipe is vis-à-vis the   05:49PM

11  LCD display that is contain in certain Patient   05:49PM

12  Service Centers, correct?                       05:50PM

13            A.   Correct.                          05:50PM

14            Q.   And is that communication delivered to   05:50PM

15  all Quest Patient Service Centers vis-à-vis the LCD   05:50PM

16  display?                                        05:50PM

17            A.   Correct.                          05:50PM

18            Q.   And is that via a video loop?     05:50PM

19            A.   It's via an audio loop.  It happens to   05:50PM

20  be on a video screen.                           05:50PM

21            Q.   Correct.  There's both video content and   05:50PM

22  audio content that's in the loop; isn't that true?   05:50PM

23            A.   Yeah.  The audio is what's changing,   05:50PM

24  though.  What's in the video is static.          05:50PM

25            Q.   And on those screens it still shows the   05:50PM
```

Page 195

PA0090

| | | |
|---|---|---|
| 1 | actual queue, right?  That's still displayed to | 05:50PM |
| 2 | patients? | 05:50PM |
| 3 | A.   Correct. | 05:50PM |
| 4 | Q.   All right.  And so with respect to the | 05:50PM |
| 5 | audio loop, how long is the audio loop at Patient | 05:50PM |
| 6 | Service Centers that contains this message? | 05:50PM |
| 7 | A.   I don't know. | 05:51PM |
| 8 | Q.   How often does the audio message to use | 05:51PM |
| 9 | a three-finger swipe play? | 05:51PM |
| 10 | A.   Every 7 to 10 minutes. | 05:51PM |
| 11 | Q.   Isn't it true, Mr. Carr, that the audio | 05:51PM |
| 12 | loop differs from Patient Service Center to Patient | 05:51PM |
| 13 | Service Center in terms of its length? | 05:51PM |
| 14 | A.   I don't know. | 05:51PM |
| 15 | Q.   Isn't it true that within the same | 05:51PM |
| 16 | Patient Service Center the audio loop can differ in | 05:51PM |
| 17 | terms of its length and content? | 05:51PM |
| 18 | A.   I don't know. | 05:51PM |
| 19 | Q.   Would it surprise you to learn, | 05:51PM |
| 20 | Mr. Carr, that there are locations -- Patient Service | 05:51PM |
| 21 | Center locations where the message to blind patients | 05:51PM |
| 22 | to check in is as long as 30 minutes before it's | 05:51PM |
| 23 | displayed in a duplicate form? | 05:51PM |
| 24 | A.   I don't know about that. | 05:51PM |
| 25 | Q.   Are you -- would it surprise you to | 05:51PM |

Page 196

PA0091

| | | |
|---|---|---|
| 1 | within Quest direct that feedback to you | 06:25PM |
| 2 | specifically? | 06:25PM |
| 3 | MR. RAIZMAN:  Object as to form. | 06:25PM |
| 4 | Q.   (BY MR. MILLER):  Or does it come to you | 06:25PM |
| 5 | directly from the patients? | 06:25PM |
| 6 | A.   It does not come direct from the | 06:25PM |
| 7 | patients to me. | 06:25PM |
| 8 | Q.   BY (MR. MILLER):  Who does it come from | 06:25PM |
| 9 | within Quest? | 06:25PM |
| 10 | MR. RAIZMAN:  Object as the form. | 06:25PM |
| 11 | THE WITNESS:  Could be many groups.  I don't | 06:25PM |
| 12 | know specific which ones.  But we have many patient | 06:25PM |
| 13 | customer facing groups. | 06:25PM |
| 14 | Q.   (BY MR. MILLER):  As part of your job | 06:25PM |
| 15 | duties to take customer feedback and evaluate whether | 06:25PM |
| 16 | improvements should be made? | 06:25PM |
| 17 | A.   Yeah.  As I mentioned, that's why we had | 06:25PM |
| 18 | that focus group with the visually impaired.  It's | 06:25PM |
| 19 | instrumental. | 06:25PM |
| 20 | Q.   Do you know whether anyone had your job | 06:25PM |
| 21 | back in 2017 -- the job you currently fulfil in that | 06:26PM |
| 22 | capacity? | 06:26PM |
| 23 | MR. RAIZMAN:  Object as to form. | 06:26PM |
| 24 | THE WITNESS:  I don't know. | 06:26PM |
| 25 | Q.   (BY MR. MILLER):  If we could fast | 06:26PM |

Page 223

PA0092

```
 1    forward down the chart here another three columns,      06:26PM

 2    it's the entry that's numbered 27674, dated            06:26PM

 3    05/24/2017.                                            06:26PM

 4          A.   I see that.  You keep saying columns.  I    06:26PM

 5    think you mean rows, though, right?                    06:26PM

 6          Q.   Well, I will refer to rows if you want,     06:26PM

 7    yes.  Sure, I understand the distinction.  Thank you.  06:26PM

 8               Yes, rows.  I'm sorry.                       06:26PM

 9          A.   Okay.                                       06:26PM

10          Q.   So it's the row with 27674.                 06:26PM

11          A.   Yeah.                                       06:26PM

12          Q.   The description says, "The patient" --      06:26PM

13    it looks like "ontact"; maybe "contact" is the word.   06:26PM

14    It says -- "the New Jersey Blind Citizens Association   06:26PM

15    about the difficulties she had with signing in with   06:26PM

16    the iPad.  No one was at the front desk and she could  06:26PM

17    not read the instruction.  A patient from the waiting  06:27PM

18    room helped her sign in, but now the other patient     06:27PM

19    knows personal information."  Did you ever receive     06:27PM

20    that piece of feedback in or around the 2017           06:27PM

21    timeframe while you were working on the e-Check-in     06:27PM

22    kiosk?                                                 06:27PM

23          A.   Not specific to this example but we've      06:27PM

24    received customer feedback to make the experience      06:27PM

25    better on checking in and we're shared some of those   06:27PM
```

Page 224

PA0093

```
 1    iterations that have happened over time.              06:27PM

 2         Q.   Do you know whether the three-finger        06:27PM

 3    swipe was considered in response to this piece of     06:27PM

 4    feedback back in May 24th of 2017?                    06:27PM

 5         A.   I don't know.                               06:27PM

 6         Q.   You were still working on the e-Check-in    06:27PM

 7    service back in the 2017 timeframe; isn't that true?  06:27PM

 8         A.   I believe I was still part of the           06:28PM

 9    business process redesign group but I don't know if   06:28PM

10    this project I'd handed off to the -- Mark's          06:28PM

11    departments.                                          06:28PM

12         Q.   But to your knowledge in 2017,              06:28PM

13    three-finger swipe was not part of the discussion,    06:28PM

14    was it, sir?                                          06:28PM

15         A.   I don't know.                               06:28PM

16         Q.   We can forward down to the page with the    06:28PM

17    Bates stamp 34660, and I'm looking at the last row on 06:28PM

18    the page.  It's the complaint number 36826, dated     06:28PM

19    April 5th, 2018.  Tell me when you're there.          06:28PM

20         A.   Yes, I'm there.  Just confirm, 36826,       06:28PM

21    April 5th, 2018, and it says, "West Patient Services  06:28PM

22    LTF."                                                 06:29PM

23         Q.   Correct.  Now, at this point, you were      06:29PM

24    in your current position, correct?                    06:29PM

25         A.   No.  I'm thinking -- no.                    06:29PM
```

Page 225

| | | |
|---|---|---|
| 1 | Q.   Well, it goes on to say, "I was recently | 06:29PM |
| 2 | asked that Quest lab on C S Wadsworth, Friday at 3:30 | 06:29PM |
| 3 | for a routine blood draw.  I am a low vision patient | 06:29PM |
| 4 | and the only way to register is by computer, which I | 06:29PM |
| 5 | cannot see to do.  I was told that elderly people | 06:29PM |
| 6 | were difficult to work with because they're not | 06:29PM |
| 7 | willing to learn new skills, EG computers.  I'm very | 06:29PM |
| 8 | capable of using a computer.  Since losing my | 06:29PM |
| 9 | eyesight, it is a skill I can no longer practice.  I | 06:29PM |
| 10 | would be willing to discuss this further and can be | 06:29PM |
| 11 | reached at" -- it looks redacted, and it says, "Thank | 06:29PM |
| 12 | you."  Do you know whether the three-finger swipe was | 06:29PM |
| 13 | ever considered in response to this complaint after | 06:29PM |
| 14 | 04/05 of 2018? | 06:30PM |
| 15 | MR. RAIZMAN:   Object as to form. | 06:30PM |
| 16 | THE WITNESS:   Yeah.  I don't know. | 06:30PM |
| 17 | Q.   (BY MR. MILLER):  Do you know whether | 06:30PM |
| 18 | anyone at Quest reached out to this individual? | 06:30PM |
| 19 | A.   I don't know. | 06:30PM |
| 20 | Q.   Let's go down to the next page 34661 and | 06:30PM |
| 21 | I'm at the row with complaint No. 42052 at the | 06:30PM |
| 22 | bottom, dated August 29th of 2018.  At this point | 06:30PM |
| 23 | were you in your new position? | 06:30PM |
| 24 | A.   It looks like it was a few months | 06:30PM |
| 25 | beforehand. | 06:30PM |

Page 226

| | | |
|---|---|---|
| 1 | Q.   Nevertheless, it goes on to say, "Your | 06:30PM |
| 2 | new sign in kiosk tablet violates ADA reasonable | 06:30PM |
| 3 | accomodation rules and also violates HIPAA laws | 06:30PM |
| 4 | because blinds visually impaired, those with hand | 06:31PM |
| 5 | problems, motor skill issues, and those who simply | 06:31PM |
| 6 | can't learn modern technology, none can sign in on | 06:31PM |
| 7 | their own and should not be -- and should not require | 06:31PM |
| 8 | another patient in the room to help them.  You | 06:31PM |
| 9 | apparently fired all of your front desk people and | 06:31PM |
| 10 | thought this new technology would save you money, but | 06:31PM |
| 11 | it makes people like me want to find another lab to | 06:31PM |
| 12 | get my tests done to avoid this inhumanity.  I | 06:31PM |
| 13 | suggest very strongly that you bring back humans to | 06:31PM |
| 14 | the front desk and show that you really care about | 06:31PM |
| 15 | your patients.  If you continue violations as above, | 06:31PM |
| 16 | you might well have to deal some legal repercussions | 06:31PM |
| 17 | from your changes.  Saving some money is all well and | 06:31PM |
| 18 | good, but not at the expense of the blind patients | 06:31PM |
| 19 | dignity and privacy when signing in."  Were you ever | 06:31PM |
| 20 | made aware of this complaint? | 06:31PM |
| 21 | A.   No. | 06:31PM |
| 22 | Q.   Do you know whether Quest considered the | 06:32PM |
| 23 | three-finger swipe option in and around the August of | 06:32PM |
| 24 | 2018 timeframe in response to this complaint? | 06:32PM |
| 25 | MR. RAIZMAN:  Objection.  Foundation. | 06:32PM |

Page 227

```
 1        MR. RAIZMAN:  Object as to form.              14:15:27

 2        THE WITNESS:  That bullet, if you summarized it,  14:15:33

 3   is about preparation.  And what the ten individuals  14:15:38

 4   from the focus group communicated is their success   14:15:41

 5   in the day to day comes from preparation.            14:15:48

 6   BY MR. MILLER:                                       14:15:48

 7        Q    One of the things that you learned from the  14:15:49

 8   focus group was that individuals with visual         14:15:51

 9   disabilities wanted the ability to ask for help when  14:15:55

10   they arrived at a location.  Right?                  14:16:02

11        A    Can you restate that?                     14:16:04

12        Q    Yes.                                       14:16:04

13             One of the things you learned from the     14:16:06

14   focus group was that individuals with visual         14:16:08

15   disabilities wanted -- wanted an option to ask for   14:16:11

16   help when they arrive at a location.  Correct?       14:16:17

17        A    I'd say just like all -- all customers that  14:16:19

18   were visiting Quest.  So all customers that are      14:16:22

19   visiting Quest want the ability to ask for help.     14:16:26

20        Q    What has Quest done since the eCheck-in    14:16:29

21   kiosk to allow visually-impaired patients to signal  14:16:34

22   that they need help?                                 14:16:36

23        MR. RAIZMAN:  I'm going to object.  It's plainly  14:16:38

24   beyond the scope of this deposition as agreed.       14:16:41

25   ///                                                  14:16:44
```

Page 355

| | | |
|---|---|---|
| 1 | BY MR. MILLER: | 14:16:44 |
| 2 | Q    Go ahead.  You can answer, Mr. Carr. | 14:16:46 |
| 3 | A    Specific to the deposition, I know the | 14:16:50 |
| 4 | three-finger swipe is something that's been put in | 14:16:55 |
| 5 | place which you can go to a Quest and experience. | 14:16:59 |
| 6 | Q    Right.  But does the three-finger swipe | 14:17:00 |
| 7 | allow you to flag that you need help? | 14:17:05 |
| 8 | MR. RAIZMAN:  Beyond the scope.  Object as to | 14:17:08 |
| 9 | the form of the question as well. | 14:17:09 |
| 10 | BY MR. MILLER: | 14:17:11 |
| 11 | Q    Isn't it true the three-finger swipe does | 14:17:13 |
| 12 | not specifically allow someone to flag that they | 14:17:16 |
| 13 | need help? | 14:17:18 |
| 14 | MR. RAIZMAN:  Object as to the form of the | 14:17:19 |
| 15 | question.  And I'm going to further object that it's | 14:17:23 |
| 16 | beyond the scope of the deposition. | 14:17:25 |
| 17 | Maybe we can discuss that off the record | 14:17:29 |
| 18 | because we clearly have a different understanding of | 14:17:31 |
| 19 | the scope of this deposition. | 14:17:32 |
| 20 | BY MR. MILLER: | 14:17:32 |
| 21 | Q    You can answer, Mr. Carr. | 14:17:35 |
| 22 | A    Can you restate the question for me? | 14:17:37 |
| 23 | Q    First of all, does the kiosk have a help | 14:17:44 |
| 24 | button if a customer needs help? | 14:17:48 |
| 25 | A    You broke up again.  Sorry. | 14:17:49 |

Page 356

```
 1              2A is what you are referencing?          14:21:53

 2      Q    Yes.                                        14:21:55

 3           And so after conducting this focus group    14:21:58

 4   and sending this e-mail, how did Quest use audio or  14:22:04

 5   change the way it used audio to convey information   14:22:07

 6   at the Patient Service Centers?                     14:22:09

 7      MR. RAIZMAN:  Object as to form of the question.  14:22:11

 8   Object that it's beyond the scope of the deposition. 14:22:14

 9   BY MR. MILLER:                                      14:22:14

10      Q    You can answer, Mr. Carr.                   14:22:18

11      A    I know that when the three-finger swipe and 14:22:22

12   the help button is used, there's an audio indicator  14:22:27

13   to the customer about what just occurred.           14:22:32

14      Q    And is that audio indicator available at    14:22:35

15   all Quest Diagnostic Patient Service Centers as of   14:22:39

16   today?                                              14:22:41

17      A    From what I know, I feel pretty confident   14:22:44

18   in saying yes, it's available on all locations      14:22:47

19   with --                                             14:22:50

20      MR. RAIZMAN:  Excuse me.  I move to strike as    14:22:53

21   beyond the scope.                                   14:22:54

22   BY MR. MILLER:                                      14:22:54

23      Q    And does that audio indicator -- what does  14:22:57

24   that audio indicator tell a patient who has used the 14:22:59

25   three-finger swipe?                                 14:23:01
```

Page 360

```
 1        MR. RAIZMAN:  Object.  It's beyond the scope of     14:23:03

 2   the deposition as agreed.                                14:23:05

 3   BY MR. MILLER:                                           14:23:05

 4        Q    You can answer, Mr. Carr.                      14:23:07

 5        A    I don't recall the exact wording.  But         14:23:09

 6   since it is available in Quest locations, we could       14:23:14

 7   go there and use it and hear it.                         14:23:18

 8        Q    What is your best memory of what the           14:23:20

 9   general audio message is?                                14:23:23

10        A    I don't feel comfortable saying that           14:23:25

11   because it would be speculative, since we are on the     14:23:27

12   record.                                                  14:23:30

13        MR. RAIZMAN:  I'll object.  Move to strike as       14:23:33

14   beyond the scope.                                        14:23:34

15   BY MR. MILLER:                                           14:23:34

16        Q    As you sit here today, you can't tell me at    14:23:36

17   all what the audio message relays when somebody uses     14:23:40

18   the three-finger swipe, can you?                         14:23:43

19        MR. RAIZMAN:  I'm going to object.  It's beyond     14:23:45

20   the scope of the deposition for which the                14:23:47

21   plaintiff -- sorry, for which the witness is             14:23:50

22   prepared.                                                14:23:52

23   BY MR. MILLER:                                           14:23:52

24        Q    You can answer, Mr. Carr.                      14:23:54

25        A    Again, it uses audio.  I don't know the        14:23:56
```

Page 361

# EXHIBIT 7

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JULIAN VARGAS, ANNE WEST, and  ) NO. 2:19-cv-8108
     AMERICAN COUNCIL OF THE BLIND, )
 5   individually on behalf of      )
     themselves and all others      )
 6   similarly situated,            )
                                    )
 7                  Plaintiffs,     )
                                    )
 8        v.                        )
                                    )
 9   QUEST DIAGNOSTICS CLINICAL     )
     LABORATORIES, INC., QUEST      )
10   DIAGNOSTICS HOLDINGS, INC.,    )
     QUEST DIAGNOSTICS INCORPORATED;)
11   and DOES 1-10, inclusive,      )
                                    )
12                  Defendants.     )
     _____)
13
14
15
16
              REMOTE VIDEOTAPED DEPOSITION OF MAX O'CAMPO
17
                      New City, New York
18
                  Wednesday, April 14, 2021
19
20
21   Job no. 4530339
     Reported by:
22   Heidi Hummel-Grant
     CSR No. 12556
23
24   Pages 1 - 277
25
```

                                                    Page 1

PA0101

```
 1             UNITED STATES DISTRICT COURT
 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JULIAN VARGAS, ANNE WEST, and  ) NO. 2:19-cv-8108
     AMERICAN COUNCIL OF THE BLIND, )
 5   individually on behalf of      )
     themselves and all others      )
 6   similarly situated,            )
                                    )
 7                   Plaintiffs,    )
                                    )
 8        v.                        )
                                    )
 9   QUEST DIAGNOSTICS CLINICAL     )
     LABORATORIES, INC., QUEST      )
10   DIAGNOSTICS HOLDINGS, INC.,    )
     QUEST DIAGNOSTICS INCORPORATED;)
11   and DOES 1-10, inclusive,      )
                                    )
12                   Defendants.    )
     _____)
13
14
15
16
17          Remote videotaped deposition of
18   MAX O'CAMPO, taken on behalf of Plaintiff, at
19   New City, New York, beginning at 10:12 a.m. and
20   ending at 6:56 p.m., on Wednesday, April 14, 2021,
21   before Heidi Hummel-Grant, Certified Shorthand
22   Reporter No. 12556.
23
24
25
```

                                                    Page  2

PA0102

```
 1   APPEARANCES:

 2

 3   For Plaintiffs:

 4        NYE, STIRLING, HALE & MILLER, LLP

 5        BY:  JORDAN PORTER, ESQ.

 6              BENJAMIN J. SWEET, ESQ.

 7        33 West Mission Street

 8        Suite 201

 9        Santa Barbara, California 93101

10        805.963.2345

11        ben@nshmlaw.com

12

13   For Defendants:

14        OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

15        BY:  DAVID RAIZMAN, ESQ.

16        400 South Hope Street

17        Suite 1200

18        Los Angeles, California 90071

19        213.239.9800

20        david.raizman@ogletree.com

21

22   Also present:

23        JOHN MCDONELL, VIDEOGRAPHER

24        AMER PHARAON, QUEST DIAGNOSTICS

25
```

Page 3

```
 1                          INDEX
 2   Witness:
 3   MAX O'CAMPO
 4
 5   Examination:                        Page
 6   MR. PORTER                          7
 7
 8                       EXHIBITS
              Description                      Page
 9
     Exhibit 1    Plaintiff Julian Vargas' Amended    147
10                Rule 30(b)(6) Deposition Notice to
                  Quest Diagnostics Incorporated
11                (Previously Marked)
12   Exhibit 32   10/3/2016 Email                     177
                  Subject: RE: On-Site Installation
13                Guide
14   Exhibit 33   On-Site Installation Guide SOP      186
15   Exhibit 34   4/21/2016 Emails                    195
                  Subject: RE: Revised PSC Summary
16
     Exhibit 35   7/11/2016 Email                     202
17                Subject: E-Check In, 2016 Budget
                  to Actual
18
     Exhibit 36   9/25/2017 Emails                    204
19                Subject: RE: 2017 Capital
                  Expenditure Forecast
20
     Exhibit 37   5/10/2017 Emails                    209
21                Subject: RE: Ambitious Request:
                  eCheck-in and Productivity
22
     Exhibit 38   January 9, 2017, Emails             223
23                Subject: RE: Corporate Complaint
24   Exhibit 39   February 27, 2017, Emails           234
                  Subject: Patient Inquiry
25

                                        Page  4
```

PA0104

```
 1    EXHIBITS (Continued):                          Page
 2    Exhibit 40  3/22/2017 Emails                    240
                  Subject: eCheck-in Visually
 3                Impaired
 4    Exhibit 7   5/5/2016 Emails                     250
                  Subject: RE: Kiosk Design
 5                (Previously Marked)
 6    Exhibit 41  March 12, 2021, Email               264
                  Subject: Visually Impaired Patient
 7                Prototype
 8
 9                 ^INSTRUCTED NOT TO ANSWER
                         Page   Line
10
                          97     10
11                        175    17
                          264    21
12                        265     3
                          265     9
13                        265    20
14
15
16
17
18
19
20
21
22
23
24
25
                                            Page  5
```

```
 1    used for the eCheck-in syst -- project?              12:25

 2         A   So they're involved in the process,

 3    usually takes a few different people, like the

 4    people that order them, you know, it goes from the

 5    manufacturer to ePlus or our hardware supplier and   12:25

 6    then to Bell Techlogix.  Bell Techlogix configures

 7    them with software to manage them and so forth.  So

 8    it goes through a few different people.

 9         Q   Can you describe for me.  I'm sorry, go

10    ahead.  I didn't mean to interrupt you.             12:26

11         A   Yeah, groups, groups.  That's what I

12    meant.

13         Q   Can you describe for me the -- the

14    physical components of an eCheck-in kiosk?

15              MR. RAIZMAN:  Object to form --            12:26

16              THE WITNESS:  Physical --

17              MR. RAIZMAN:  -- answer if you understand.

18              THE WITNESS:  Physical components of a

19    kiosk.  I mean, at a high level, a base, a mount or

20    post, enclosure, and the iPads, wires.  At a very    12:26

21    high level.

22              MR. PORTER:

23         Q   So in terms of acquiring those

24    components, the iPads, the wires, the enclosure, the

25    base, mounts or enclosure -- or the base, mounts or  12:27
```

Page 84

PA0106

# EXHIBIT 8

# **REDACTED**

# TO BE FILED UNDER SEAL PENDING THE COURT'S RULING ON PLAINTIFF'S APPLICATION