1   Jonathan D. Miller (SBN 220848)         Benjamin J. Sweet
    jonathan@nshmlaw.com                    (*Admitted Pro Hac Vice*)
2   Alison M. Bernal (SBN 264629)           ben@nshmlaw.com
    alison@nshmlaw.com                      NYE, STIRLING, HALE
3   NYE, STIRLING, HALE                     & MILLER, LLP
    & MILLER, LLP                           1145 Bower Hill Road, Suite 104
4   33 West Mission Street, Suite 201       Pittsburgh, PA 15243
    Santa Barbara, CA 93101                 Telephone: (412) 857-5350
5   Telephone: (805) 963-2345
6
7
8   Attorneys for Plaintiffs Julian Vargas,
    American Council of the Blind, and the Proposed Class
9
10  ***Additional counsel for Plaintiff listed on signature page***

11

12              **UNITED STATES DISTRICT COURT**

13          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

14

| | |
|---|---|
| 15  JULIAN VARGAS and AMERICAN COUNCIL OF THE BLIND, individually on behalf of themselves and all others similarly situated, | Case No.: 2:19-cv-08108-DMG |
| 16 | |
| 17              Plaintiffs, | **PLAINTIFFS' OPPOSITION TO QUEST'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** (Redacted) |
| 18        v. | |
| 19  QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, inclusive, | [*Filed concurrently with Statement of Genuine Disputes of Material Fact and Plaintiffs' Additional Facts; Appendix of Exhibits*] |
| 20 | |
| 21 | **Hearing Date:   October 8, 2021** |
| 22 | **Time:          2:00 p.m.** |
| 23 | **Courtroom:     8C** |
| 24              Defendants. | Complaint Filed: September 18, 2019 |
| 25 | Discovery Cutoff: August 27, 2021 |
| 26 | Pretrial Conf: December 7, 2021 |
| 27 | Trial Date: January 11, 2022 |
|  | District Judge: Hon. Dolly M. Gee |
|  | Magistrate: Hon. Michael R. Wilner |

28

i

# **TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................ 4

II.     STATEMENT OF FACTS .................................................................. 5

        A.     ECSS Saves Quest Tens of Millions of Dollars ..................... 5

        B.     ECSS's Rationale:  Cost Savings ............................................ 5

        C.     Quest Implements ECSS at Every PSC Nationwide .............. 7

        D.     TFS Does Not Render The ECSS Kiosk Independently Accessible
               for Blind Patients .................................................................. 8

        E.     Quest Has Not Incorporated TFS Across Its PSC Network ... 9

        F.     Lead Plaintiff Vargas Cannot Independently Access ECSS ........ 10

               1.     Julian Vargas .............................................................. 10

               2.     ACB Members' Experiences Mirror Those of Vargas ........ 12

               3.     Quest's Deficient Policies and Training Result in the
                      Company Failing to Give Primary Consideration to
                      Requested Accommodations of Its Blind Customers ........ 12

III.    ARGUMENT ..................................................................................... 14

        A.     ECSS Is A Service, Privilege or Advantage of Which Quest
               Denies Plaintiffs Full and Equal Enjoyment .......................... 14

        B.     Quest Claims It Intended Its Kiosks To Improve the Patient
               Experience And Cannot Now Deny The Legally Blind The Same
               Improved Experience It Provides Sighted Patients ................ 17

        C.     Even if Not Services, Privileges, or Advantages Themselves, the
               Kiosks Connect Patients to Quest's Phlebotomy Services and
               Other Services the Kiosks Provide ....................................... 20

        D.     Quest Failed to Give Primary Consideration to the Requests Of Its
               Legally Blind Patients And So Violated the ACA and
               Rehabilitation Act ............................................................... 22

               1.     Quest Must Give Primary Consideration ...................... 23

               2.     Quest Failed to Give Primary Consideration To the
                      Requests of the Legally Blind ..................................... 25

        E.     Quest Cannot Succeed in Its Summary Judgment Arguments
               Against Plaintiff Vargas' Unruh Claim ................................. 26

        F.     The Three-Finger-Swipe Process Does Not Moot Plaintiffs'

ii

Claims..............................................................................................................28

IV.   CONCLUSION ..........................................................................................28

**PLAINTIFFS' OPPOSITION TO QUEST'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165, 1173-74 (9th Cir. 2010)...........................................................................................19, 20

*Arroyo v. Aldabashi*, No. 16-cv-06181-JCS, 2018 WL 4961637, at *5 (N.D. Cal. Oct. 15, 2018) ...........................................................................27

*Baughman v. Walk Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012)....18, 19, 20

*Boemio v. Love's Restaurant,* 954 F.Supp. 204, 208 (S.D.Cal.1997).......................22

*Clavo v. Zarrabian*, 2004 WL 3709049 (C.D. Cal. May 17, 2004)..........................28

*DiCarlo v. Walgreens Boots Alliance Inc.*, 2016 WL 482982, at *2 (S.D.N.Y. 2016)................................................................................................15

*Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1210 (9th Cir. 2020)..........................26

Doran v. 7-Eleven, Inc., 509 F. App'x 647, 648 (9th Cir. 2013) .............................26

*Duvall v. Cnty of Kitsap*, 260 F.3d 1124, 1137 (9th Cir. 2001) .............................24

*Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011) .........................................................................................18

*Greater Los Angeles Agency of Deafness, Inc. v. Reel Services Mgmt. LLC*, 2014 WL 12561074 at *5 (C.D. Cal. May 6, 2014)............................................28

*Grove v. De La Cruz*, 407 F.Supp.2d 1126, 1130-31 (C.D. Cal. 2005)...................28

*Johnson v. Wayside Prop., Inc.*, 41 F. Supp. 3d 973, 980–81 (E.D. Cal. 2014)...................................................................................................27

*K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1099-1100 (9th Cir. 2013).................................................................................24

*Kalani v. Starbucks Coffee Co.*, 698 Fed. App'x 883 (9th Cir. 2017) ...............19, 20

*Martinez v. Cnty of Alameda*, 512 F. Supp. 3d 978, 987 (N.D. Cal. 2021) .............24

*Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65 (1986) ......................................17

*Molski v. M.J. Cable, Inc.,* 481 F.3d 724, 731 (9th Cir. 2007)..........................26, 27

*Munson v. Del Taco, Inc*., 46 Cal. 4th 661, 665 (2009) ..........................................27

*Nat'l Fed. Of the Blind v. United Airlines, Inc.,* 813 F.3d 718, 723 n.2 (9th Cir. 2016)...................................................................................................15

*Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562, 586 (N.D. Cal. 2018) ................................................................................................26

**PLAINTIFFS' OPPOSITION TO QUEST'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

*Oregon Paralyzed Veterans of America v. Regal Cinemas, Inc.*, 339 F.3d 1126 (9th Cir.2003) .................................................................................. 18

*Rivera v. Crema Coffee Co. LLC*, 438 F. Supp. 3d 1068, 1073–74, 1078 (N.D. Cal. 2020) ..................................................................................... 27

*Robles v. Domino's Pizza, LLC*, 913 F.3d 989, 905 (9th Cir. 2019).................. 21, 22

*Sawczyn v. BM Harris Bank Nat'l Ass'n,* 8 F. Supp. 3d 1108, 1110 (D. Minn. 2014) ...................................................................................... 15

*Vega-Ruiz v. Northwell Health*, 992 F.3d 61, 66 (2d Cir. 2021)............. 23, 24, 25, 26

*West v. Moe's Franchisor*, 2015 WL 8484567 (S.D.N.Y. Dec. 9, 2015) ............... 15

*Zukle v. Regents of Univ. of Calif.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999).......................................................................................... 22

2

**Statutes**

28 C.F.R. § 35.160(b)(2) ........................................................................23, 24

28 C.F.R. § 35.164 ......................................................................................24

28 C.F.R. § 39.160 ......................................................................................24

28 CFR 35.160 through 35.164 ...................................................................23

29 U.S.C. § 794(a) ......................................................................................22

29 U.S.C. §794d...........................................................................................17

42 U.S.C. § 12133 .......................................................................................22

42 U.S.C. § 12182(a) ............................................................................14, 20

45 C.F.R § 92.101(b)(2)(i) ..........................................................................16

45 C.F.R. § 84.3(h) .....................................................................................22

45 C.F.R. § 84.4(b)(1)(ii) ............................................................................16

45 C.F.R. § 84.4(b)(1)(ii)-(iii) ....................................................................22

45 C.F.R. § 84.52(a)(2)-(3) .........................................................................22

45 C.F.R. § 92.102(a) .................................................................................23

992 F.3d at 66 .............................................................................................26

992 F.3d at 66 n.5 .......................................................................................25

Cal. Civ. Code § 51(b) .................................................................................27

Cal. Civ. Code § 51(f) .................................................................................27

Cal. Civ. Code § 55.56(b), (c) ....................................................................26

F.R.C.P. 15(b)..............................................................................................26

**PLAINTIFFS' OPPOSITION TO QUEST'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

I.   **INTRODUCTION**

After refusing to provide legally blind Americans with independent access to its e-Check-In Self-Service ("ECSS") for the entirety of the Class Period; after refusing to meet its legal burden to give primary consideration to the requested accommodations of plaintiffs Julian Vargas ("Vargas") and the American Council of the Blind ("ACB") even after this lawsuit was filed, or to record in writing the reasons for denying them access; after claiming – falsely – that its purported "fix", a woefully deficient "three finger swipe" ("TFS") functionality had been rolled out across its national network of 2,152 patient service centers ("PSCs"); after claiming – falsely – ECSS was aimed at improving the patient experience when internal Quest documents make clear it was really aimed at saving the Company more than ▓▓▓▓ in costs; after improperly producing highly relevant documents in support of this Motion for the very first time well after the close of fact discovery;[1] after filing multiple sworn declarations from Quest executives that *directly contradicts* testimony those same executives gave under oath at deposition; after repeatedly and improperly asserting legal privilege over the details of TFS then relying upon TFS in service of a mootness argument, Defendants Quest Diagnostics Incorporated, *et al.* ("Defendants" or "Quest") asks this Court to summarily dismiss this nationwide civil rights class action lawsuit.

Quest's Motion for Summary Judgment seeks to obfuscate and conceal its discriminatory conduct toward legally blind Americans over the duration of the Class Period. The expansive factual record emphatically establishes however, Quest discriminated systematically against legally blind customers such as Lead Plaintiff Julian Vargas—as well as thousands of other legally blind Americans—by refusing

---

[1] Quest's improper tactics are addressed in Plaintiffs' Objections to Evidence.

Nye, Stirling, Hale & Miller
33 West Mission Street, Suite 201
Santa Barbara, California 93101

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

to provide them independent access to ECSS in violation of the ADA, Rehabilitation Act, and California Unruh Act. Because genuine issues of material fact abound, as described in detail below, Quest's Motion for Summary Judgment should be denied.

## II.  STATEMENT OF FACTS

### A.  ECSS Saves Quest Tens of Millions of Dollars

Quest operates 2,152 PSCs nationwide and 419 PSCs in California where patients can obtain many diagnostic and other services. (PF 1.) Beginning in 2014, Quest looked for ways to save costs, allowing for more patient visits per day at its PSCs, thereby increasing Quest's profitability. (PF 2.) Quest considered several innovations before ultimately landing on ECSS. (PF 5.) ECSS offers patients several important features including: (1) an automated check in process for any diagnostic services performed at the PSC, (2) the ability to wait safely outside and receive a text message when the patient's turn has arrived (a feature added during the COVID-19 pandemic), (3) specimen drop off and pick up, and (4) alerting a patient to his or her place in the service queue, a feature designed to reduce patient anxiety in the check-in process. (PF 6.) Quest never performed any analysis of what it would cost to provide its legally blind customers with access to ECSS. (PF 8.)

### B.  ECSS's Rationale:  Cost Savings

The clear goal of ECSS,



(PF 9.)

(PF 10.)

(PF 11.)

Quest considered several tablet and enclosure vendors for ECSS. One vendor asked Quest if it needed audio for the kiosk. (PF 12.) This led Quest's IT team to question whether Quest should add audio to "service patients with impaired vision,"

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1  and whether they needed to bring the kiosk into compliance with the ADA to service

2  blind patients. (PF 13.) Rather than follow through on these questions, Quest chose a

3  kiosk for its legally blind customers that was not independently accessible. (PF 14.)

4      Quest contracted with vendor Lilitab to provide the iPad tablet and enclosure

5  for ECSS. Lilitab offered (and offers) kiosks with accessible features and could have

6  provided the same to Quest if so desired. (PF 15.) The accessible features include a

7  $30 headphone jack placed in a Lilitab enclosure to allow a blind user access to

8  audio from the tablet, and specifically, to access the iPad's built-in voiceover

9  technology, and a $95 tactile keyboard. (PF 16, 17, 18.) Quest could have purchased

10  an AudioNav keypad for iOS which costs just $309.75 per kiosk. (PF 19.) **Using**

11  **Quest's own internal cost saving projections, Quest could have provided at**

12  **least one independently accessible kiosk option at its 2,152 PSCs for just**

13  **$935,582 – allowing it to still enjoy a massive cost savings from the ECSS**

14  **rollout of $** ▮▮▮▮▮▮ . (PF 20.) Yet, Quest never even inquired about the

15  possibility of having an accessible kiosk for legally blind customers, despite Lilitab

16  expressly informing Quest that it could outfit the kiosk with a $30 headphone jack

17  for accessibility. (PF 21.) Quest's focus was instead on getting a "low cost" kiosk,

18  according to Lilitab's CEO Adam Aronson. (PF 22.)

19      The Quest IT team recommended an iPad tablet with a Lilitab enclosure for

20  the ECSS kiosk. (PF 23.) The IT team was aware the iPad had accessibility features

21  within its iOS suite yet undertook no analysis of whether the ECSS kiosk could

22  utilize the built-in accessibility features. (PF 24.) ▮▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24  (PF 25.) The IT team noted ADA-compliant kiosk options, but Quest never followed

25  up on them despite it posing no undue financial burden to the Company. (PF 26.)

26      The working prototype kiosk Quest's IT team developed, which Quest

27  ultimately implemented, had a base, a mount or post, enclosure, and the iPad itself.

28  (PF 27.) While the kiosk contained a touchscreen help swipe button a sighted

customer could use if he or she was having difficulty with the kiosk, the help button had no audio or other functionality that would allow a blind user to use it independently. (PF 28.) During the IT development Quest did not delegate anyone to address ADA accessibility issues related to ECSS. (PF 29.) *Quest freely admits that during the Class Period, ECSS contained no features that would make it independently usable by legally blind people.* (PF 30.)

### C.   Quest Implements ECSS at Every PSC Nationwide

Once the IT team developed the working prototype, it sent the prototype to Quest's national patient services team for implementation. (PF 31.) Quest implemented the ECSS kiosk at all 2,152 PSCs nationwide beginning in 2016. (PF 32.) When a sighted patient checks in at the kiosk, Quest places that patient in line by time of check in with a video monitor in the PSC displaying the patient's wait time and place in queue. (PF 33.) The ECSS kiosk communicates to the phlebotomist's screen in the back of the PSC when a patient checks in. (PF 34.) ECSS's implementation has reduced patient wait time for sighted patients, allowing Quest to enjoy increased productivity. (PF 35.)

After the initial rollout, ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ (PF 36.) ████████████████████████ (PF 37.) In addition, during the COVID-19 pandemic Quest added a "wait where you want" feature that allows sighted patients to input their phone number into the kiosk and wait outside to avoid close contact with other customers. (PF 38.) Quest does not offer these additional services to its legally blind customers. ████████████████████████████████████████████████████████████████████████████████████████████ (PF 39.) For instance, on May 24, 2017, Quest received a complaint "about the difficulties she had with signing in with the iPad. No one was at the front desk and she could not read the instruction. A patient from

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA  93101

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

the waiting room helped her sign in, but now the other patient knows personal information." (PF 40.) An April 2018 complaint alerted Quest that a low vision patient was told she needed to register at the computer, but could not see to do that. (PF 41.) An August 2018 complaint stated the kiosk violates the ADA and a blind patient could not independently use the kiosks. (PF 42.) ████████████████████

████████████████████████████████████ (PF 43.)

After Plaintiffs filed this lawsuit, and in an attempt to moot Plaintiffs' claims, Quest began to roll out the TFS feature at some of its PSCs. TFS purportedly would allow legally blind customers to use a 3-finger gesture at the kiosk to enter the service queue. (PF 44.) Quest's executives claimed under oath TFS has been rolled out throughout its PSC network by August 2020, with an audio loop on a video screen directing patients to check in at the kiosk, and that the audio loop repeats every seven to 10 minutes. (PF 45, 46.) All of these claims are provably false.

### D. TFS Does Not Render The ECSS Kiosk Independently Accessible for Blind Patients

TFS does not provide independent and private access to all kiosk services (*e.g.,* "wait where you want," specimen drop-off, appointment check-in versus walk-in). (PF 47.) Even the service of receiving a patient number for the queue is not accessible because a blind patient would have no accessible instruction for how to do it, with no Braille instruction option or tactile keyboard. (PF 48.) Moreover, the audio volume of the LCD monitors in the PSC waiting areas regularly interferes with the audio of the kiosk. (PF 49.) The benefit and service of knowing where you are in the queue—an important feature according to Quest—is also inaccessible because the only place it appears is in the LCD monitor, which a blind customer cannot see. (PF 50.) TFS does not allow blind customers to make use of the kiosk's features, including the "wait where you want" option available to Quest's sighted customers. (PF 51.) For these reasons, TFS is itself inaccessible to the legally blind and provides an unequal and lesser experience for legally blind customers. (PF 52.)

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

### E.   <u>Quest Has Not Incorporated TFS Across Its PSC Network</u>

Not only does TFS fail to provide blind individuals with an opportunity to independently access the ECSS kiosk service but, contrary to the Company's sworn testimony, it is not even available throughout the Quest PSC network. (*Compare,* Dkt. 95-1, at 16:9-10, against PF 53.) In response to Quest's claims it implemented TFS across its PSC network, accessibility investigator Mark Derry investigated 24 Quest PSC locations and discovered Quest's purported "solution" is riddled with glaring deficiencies at every single one, barring any argument of mootness. (PF 54.)

To cite just one example, at many Quest locations, there is no way for blind patients to know TFS even exists. (PF 55.) To inform blind patients of TFS, Quest relies on a voice message which is supposed play in a loop from an LCD monitor in the PSC. (PF 56.) Quest's 30(b)(6) witness on TFS falsely testified this audio loop is available at all locations. (PF 57.) Yet, Derry's investigation showed Quest only plays this "content loop" message every 15 to 20 minutes – *and there was no audio loop at all at 14 of 24 investigated locations*. (PF 58, 59.) At those 14 locations, blind patients have no way of knowing TFS is an option for them. (PF 60.)

Even more troublingly, only *one* of the 24 investigated locations had a Quest employee present in the waiting room. (PF 61.) Quest's claim that employees "sweep" the waiting area to assist blind customers is thus simply not true. (PF 61.) Moreover, ███████████████████████████████████ ████████████████ (PF 62.) For blind customers of these locations, there was no independent access to Quest's services at all during the Class Period unless the one employee on duty—a phlebotomist who is busy taking specimens—happened to sweep the waiting area. As the investigation and the experiences of Plaintiff Vargas and ACB members make clear, this simply does not occur regularly. (PF 63, 64.)[2]

---

[2] The Derry investigation is consistent with kiosk expert Montgomery's investigation showing that TFS is itself inaccessible. (PF 47-51.)

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

To compound these glaring deficiencies, TFS is only available at select kiosks within the investigated PSCs: only 13 of the 24 investigated locations had all kiosks outfitted with TFS. (PF 65.) And only 13 of the 24 investigated locations had an audio message confirming the blind customer had successfully checked in and entered the queue, though the audio is often not loud enough to be heard. (PF 66.) Accordingly, blind customers at Quest locations without an active audio message have no way of knowing whether they checked in and without any Quest staff present in the waiting areas and no accessible "help" button available for blind patients, they have no way to find out. In this way, a check in system specifically aimed at ███████████████████████████████████████████████, actually has the perverse effect of increasing anxiety for Quest's blind patients. (Ex. 27, at PA0749 [QUEST-VARGAS000039990]).)[3]

### F.   Lead Plaintiff Vargas Cannot Independently Access ECSS

#### 1.   Julian Vargas

Julian Vargas lives in Van Nuys, California. (PF 67.) He is legally blind and uses screen reader as an auxiliary aid that allows him to understand the information displayed on a screen. (PF 68.) Mr. Vargas works as a consultant providing training and support to individuals on the use of assistance technology. (PF 69.)

On June 25, 2019, Mr. Vargas took paratransit to a Quest PSC close to his house to obtain lab work. (PF 70.) There was no greeter. (PF 71.) He took several minutes to locate a check-in window. (PF 72.) Once at the window, he said "hello" several times without any employee coming out to help. (PF 73.) After about 10 to

---

[3] Plaintiff's counsel provided Mr. Derry's report to Defendants well in advance of this briefing and asked whether Defendant would continue to argue mootness. In a meet and confer, when asked about the factual basis of Quest's mootness defense, defense counsel stated, "so I don't really have an ability to speak to that as a factual matter because that is news to me." (PF 114.) *To date, Quest has failed to provide Plaintiffs with any factual substantiation of its TFS mootness argument.*

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

15 minutes, a phlebotomist came out to call another patient in for lab work. (PF 74.) A sighted individual would not have had to wait, as he or she could have independently used the kiosk to check in. (PF 75.)

The phlebotomist asked Mr. Vargas if he needed help, and Mr. Vargas said he needed to get blood work his doctor ordered. (PF 76.) The phlebotomist directed Mr. Vargas to the kiosk and told him, "this is where you check in." (PF 77.) Mr. Vargas checked the kiosk for tactile markings, a headphone jack, or a tactile keypad that would allow him to use the kiosk. (PF 78.) After not finding any accessibility options, Mr. Vargas told the phlebotomist the kiosk was not accessible to blind people so he would need help signing in. (PF 79.) The phlebotomist took the other patient back for lab work, then came back out approximately five minutes later to help Mr. Vargas. (PF 80.) The phlebotomist asked Mr. Vargas for several pieces of personal information. (PF 81.) Mr. Vargas suggested to the phlebotomist that she talk to whoever she needed to make sure the kiosk was accessible so blind people could use the kiosk. He further offered to provide his feedback to Quest. (PF 82.) The phlebotomist agreed and said she would speak with her supervisors. (PF 83.) To date, however, no one from Quest has ever followed up with Mr. Vargas. (PF 84.) The experience left Mr. Vargas feeling embarrassed, humiliated, and like a "third-class citizen of some kind that anybody else can walk in there and not have to undergo the same amount of hassle and waiting." (PF 85.)

After Quest deposed Mr. Vargas and informed him of the purportedly accessible TFS option, Mr. Vargas returned to a Quest PSC on June 10, 2021. (PF 86.) As he entered the location, he heard the tail end of the portion of the audio content loop directed toward blind patients. (PF 87.) However, the volume was not adequate for him to hear the message from his vantage point. While waiting for the content loop to replay, information was given on the "wait where you want" option, available to those who could use the kiosk independently. (PF 88.) After 8 to 10 minutes, the message directed Mr. Vargas to perform a three-finger swipe at the

11

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

kiosk. (PF 89.) The message did not give directions as to where the kiosk itself was located so Mr. Vargas had to fumble around to find it. (PF 90.) The content loop simply said patients should ask a staff member to assist if they had trouble locating the kiosk. (PF 91.) **However, at no time during the content loop did any Quest staff member enter the waiting area.** (PF 92.) After locating the kiosk, Mr. Vargas confirmed there was still no headphone jack or tactile keypad. (PF 93.)

Once Mr. Vargas performed the TFS, an audio message stated he was patient "001" and that he would be serviced in three minutes; in reality, he waited 17 minutes. (PF 94.) When the phlebotomist greeted him, Plaintiff explained he was there to test the accessibility of the TFS system and asked whether the "wait where you want" option was available to him as a blind user. (PF 95.) The phlebotomist told him the "wait where you want" option is only for those who make appointments online and can independently use the kiosk to scan a QR code. (PF 96.)

## 2. ACB Members' Experiences Mirror Those of Vargas

ACB is a national membership organization of thousands of blind and visually impaired persons which seeks to increase the independence, security, equality of opportunity, and quality of life for all legally blind people. (PF 98.) Nine ACB members testified that they were not able to independently access ECSS, they waited for extended periods for a phlebotomist to come help them, and they felt a loss of dignity and privacy in having to check in with the phlebotomist instead of the service Quest offers everyone else. (PF 99.) *Not one ACB member testified he or she was able to independently access ECSS, and instead had to wait for an attendant to come to the window (putting sighted individuals ahead of them in line) or rely on a third party to aid their check-in at the kiosk.* (PF 100.) Indeed, at least 29 ACB members confirm they could also not access ECSS independently. (PF 101.)

## 3. Quest's Deficient Policies and Training Result in the Company Failing to Give Primary Consideration to Requested Accommodations of Its Blind Customers

Quest has deficient policies and training materials, resulting in Quest failing to give its blind customers' requested accommodations primary consideration, as the Rehabilitation Act and its implementing regulations require. Quest did not provide any training to its patient service representatives on giving primary consideration to the requests of disabled individuals, nor did Quest train employees on documenting in writing the reasons it cannot give primary consideration. (PF 102.) ███████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████. (PF 103.)

Quest can thus point to no policies that require Quest employees to give primary consideration to the requests of disabled individuals, as none exist. Mr. Vargas' experience further supports Quest's lack of policies and/or training on primary consideration, as Mr. Vargas was directed to an inaccessible kiosk, found that it had no features that would allow him to use it, informed the Quest phlebotomist of this problem and suggested Quest do something to fix it. (PF 102.) The phlebotomist who assisted Mr. Vargas with checking in cannot remember any occasion where she documented that she could not provide an accommodation to an individual with disabilities who was making an accommodation request. (PF 104.)

ACB member Claire Stanley had a similar experience when she visited a PSC in 2020. (PF 105.) Ms. Stanley requested help signing in, and a Quest employee instead responded by leading her into the back. (PF 105.) Ms. Stanley was not able to use a Quest kiosk or access any of the service features offered by the kiosk. (PF 106.) Further, prior to the instant litigation, ACB raised its members' concerns about the inaccessible kiosk directly to Quest in a December 2018, letter, and requested a meeting. (PF 107.) The letter requested primary consideration for screen readers (i.e., audio output) and screen magnification. (PF 108.) Quest failed to take this request for primary consideration into account nor did it document its reasons for denying the requested accommodation in writing as required by the Rehabilitation Act. (*Id*.) Finally, Quest is a recipient of federal financial assistance from the

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA  93101

13

1   Centers for Medicare and Medicaid Services ("CMS") and is therefore subject to

2   Section 504 of the Rehabilitation Act and its implementing regulations. (PF 109.)

3   **III.   ARGUMENT**

4       **A.   ECSS Is A Service, Privilege or Advantage of Which Quest Denies Plaintiffs Full and Equal Enjoyment.**

5           Under Title III of the ADA, "[n]o individual shall be discriminated against on

6   the basis of a disability in the full and equal enjoyment of the goods, *services*,

7   facilities, privileges, advantages, or accommodations of any place of public

8   accommodation by any person who owns, leases (or leases to), or operates a place of

9   public accommodation." 42 U.S.C. § 12182(a) (emphasis added). Quest asserts

10  ECSS is not a good or service. (Dkt. 95-1, at 11:15-17 ["But the Kiosk is not itself a

11  Quest good or service, as Plaintiffs assert; it is merely one of multiple means

12  currently available to access Quest's diagnostic services."].) Quest's claim that an

13  offering described as "self service" is actually not a service is facially untenable.

14  Moreover, ECSS does not simply offer a customer an alternative sign-in method;

15  rather, it is the center of a multitude of services Quest offers for the customer to

16  enjoy the full "Quest experience," such as automated check in, specimen drop off

17  and pick up, and knowledge about where a patient stands in the service queue, a

18  feature designed to reduce patient anxiety in the check-in process. (PF 6.) The entire

19  purpose of ECSS, according to Quest itself, was to provide a better *service* to

20  patients (though in reality, the rationale for the new service was cost savings).

21          Since ECSS' initial rollout, Quest further ███████████████████████

22  ████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████. (PF 37.) Quest also rolled out a "wait where you want" feature that allows sighted

26  patients to input their phone number into the kiosk and wait outside to avoid close

27  contact with other customers. (PF 38.) Quest admits that during the class period,

28

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

ECSS contained no features that would make it independently usable by legally blind people. (PF 30.) Thus, Quest does not offer any of these additional, next-generation services to its legally blind customers, nor does it offer any of the base services, such as priority place in line and awareness of one's place in the queue. Quest thus discriminates against the legally blind in violation of the ADA.

Quest's argument its employees provide adequate auxiliary aids or services as qualified readers must also fails in light of the myriad testimony and complaints that blind patients had to rely on non-Quest employee third parties (at times, complete strangers) to assist them with ECSS because no Quest employee was present. (PF 100.) Quest's citations to *West v. Moe's Franchisor*, 2015 WL 8484567 (S.D.N.Y. Dec. 9, 2015) and *DiCarlo v. Walgreens Boots Alliance Inc.*, 2016 WL 482982, at *2 (S.D.N.Y. 2016) involving self-service soda machines in a restaurant context, are distinguishable both procedurally and factually. Both cases were decided on a motion to dismiss, not a motion for summary judgment. *Id*. By contrast here the evidence collected through discovery confirms Quest's employees do not act as qualified readers under the ADA and therefore cannot provide effective communication to Plaintiffs. Moreover, restaurant menu and soda machine cases involve access to a lunch entrée or a soft drink, not access to necessary healthcare during a global pandemic. This is a meaningful distinction. The sensitive privacy concerns implicated here are akin to the ATM machine context where the security of private information is paramount. *See, e.g., Nat'l Fed. Of the Blind v. United Airlines, Inc.,* 813 F.3d 718, 723 n.2 (9th Cir. 2016) (ATMs required to equipped with accessible technologies, such as audio interfaces and tactile keyboard); 2010 Standards for Accessible Design, § 707 (ATMs "shall provide the opportunity for the same degree of privacy of input and output available to all individuals"); *Sawczyn v. BM Harris Bank Nat'l Ass'n,* 8 F. Supp. 3d 1108, 1110 (D. Minn. 2014) ("the [2010 Standards] require ATMs to be speech enabled and to have . . . a headphone jack to allow for privacy while using speech mode.")

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1   In addition, putting aside that ECSS is clearly a service, Quest's senior
2   executives admitted under oath that ECSS provided additional advantages beyond
3   just the check-in functionality. (PF 123 (█████████████████████████
4   ████████████████████████████████████████████████████████████
5   ████████████); *id.* (ECSS has a number of benefits including: confirming
6   appointments, the ability to wait-by-text, notify PSRs of people checked in, and
7   informing the PSR of the next patient's needs); *id.* (Benefits of ECSS include
8   increase patient privacy, patient knowledge of place in queue, reduction of patient
9   wait time, superior customer service, self-service capability, appointment
10  scheduling, and pre-registration).)

11      Finally, nothing about what Plaintiffs seek here – an ECSS kiosk that is
12  independently accessible for legally blind people – is novel. (Dkt. 95-1, at 13.)
13  Nearly five years ago, on December 21, 2016, the Department of Health and Human
14  Services' Office of Civil Rights issued a "Dear Colleagues" letter to all covered
15  entities like Quest, emphasizing the critical importance of independent and equal
16  access to Electronic and Information Technology ("EIT") with a specific emphasis
17  on "self check-in kiosks". (Ex. 43, "OCR Letter.") The OCR letter states in part:

18          [C]overed entities may not provide individuals with disabilities with an aid,
            benefit, or service that his not as effective in affording equal opportunity to
19          obtain the same result, to gain the same benefit, or to reach the same level of
            achievement as that provided to others. 28 C.F.R. § 35.130(b)(1)(ii); 45
20          C.F.R. § 84.4(b)(1)(ii); 45 C.F.R § 92.101(b)(2)(i).

21  *Id.* at 2. The OCR Letter specifically stated in regard to "medical kiosks" that
22  "[s]teps that can be taken to ensure appropriate accessibility may include installation
23  of tactile interfaces or screen readers… ." *Id.* at 3. This persuasive guidance was
24  known and publicly available to Quest prior to ECSS' implementation. And while
25  Quest continues to ignore this guidance, it is entitled to consideration and entirely
26  consistent with the 2018 Section 508 regulations addressing EIT (including those
27  requiring the use of a tactile keyboard and audio output), which are applicable to
28  covered entities like Quest and enforceable through Section 504 of the

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

16

Rehabilitation Act. *See* 29 U.S.C. §794d; *see also Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65 (1986) (An administrative interpretation by an enforcing agency "constitute[s] a body of experience and informed judgment to which courts and litigants may properly resort for guidance." [internal citations omitted]).

**B.**   **Quest Claims It Intended Its Kiosks To Improve the Patient Experience And Cannot Now Deny The Legally Blind The Same Improved Experience It Provides Sighted Patients**

As Quest claims in their Statement of Uncontroverted Facts, Fact No. 7, "[i]n 2015, *to improve the experience of patients* and employees at PSCs through digitization, Quest began to explore ways to modify its PSC check-in practices." (emphasis added.) While the evidence shows Quest sought to realize millions of dollars in cost savings through the implementation of ECSS, Quest's admission that a goal of ECSS was to improve patient experience is important to the instant analysis. So vital is ECSS to Quest that the Company itself recognizes it is an "essential aspect of Defendant's business model and of [its] ability to provide a positive, efficient and simple patient experience." (PF 113.) Quest's senior employees unequivocally testified that in implementing ECSS, improving experience was the "ultimate objective" and that "[t]he primary focus was the patient experience." (PF 115.) In fact, Mr. Carr clarified that "when I say 'the experience,' it's customers coming to Quest were checking in is an element of that experience." (PF 116.) Quest's management explicitly testified that the very purpose of the implementation of ECSS was to improve the customer experience. (PF 117.) While Quest may well have succeeded in improving some aspects of the patient experience for its sighted customers in its march toward cost savings, Quest left its legally blind patient behind with an inferior, unimproved experience in violation of federal and state law (and OCR and Section 508's clear and unequivocal guidance).

More specifically, while Quest claims "it would continue to study the actual experience of Kiosk users and address any needs or problems through future changes, modifications and alterations (i.e., iterations) to the Kiosk or the processes

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

17

associated with the Kiosks' usage" (Dkt. 95-1, at 6:20-23), the record tells a different story. In fact, Quest has continued to ignore its own team members, external recommendations, and numerous complaints from legally blind individuals, requesting an accessible kiosk. (PF 39, 40, 41, 42, 43.) For instance, Quest implemented the option of twenty-six (26) different languages on ECSS. (PF 118.) Quest stated that the "[t]he intent via the experience was to meet a broad audience of primary language they preferred to use." (PF 119.) Thus, as part of its "iterative process," Quest received complaints about ECSS being inaccessible to non-English speakers, made the necessary changes, and achieved an improved result that made ECSS accessible to primary speakers of 26 languages. (PF 120.) Yet despite receiving multiple complaints from the blind and visually impaired, including Plaintiffs, Quest continues to choose to exclude the blind community from the "essential" ECSS experience.

"As new devices become available, public accommodations must consider using or adapting them to help disabled guests have an experience more akin to that of non-disabled guests." *Baughman v. Walk Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012). *Baughman* involved a disabled visitor to Disneyland who sought use of a Segway, "which allow[ed] her to remain standing," unlike a motorized wheelchair or scooter, and thus "ma[de] it easier for her to visit Disneyland's many attractions, concessions and facilities." *Id.* at 1135-36. The Court in *Baughman* concluded that "[p]ublic accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." In doing so, the Ninth Circuit held that "[t]he ADA guarantees the disabled more than mere access to public facilities; it guarantees them 'full and equal enjoyment.'" *Id.* at 1135 (citing *Oregon Paralyzed Veterans of America v. Regal Cinemas, Inc.*, 339 F.3d 1126 (9th Cir.2003)); *see also Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011) (noting that "assistive technology is not frozen in time: as technology

advances, [] accommodations should advance as well.").

Here, Quest claims (and thus must concede) that ECSS was designed to improve the patient experience, (Quest's UMF No. 7) and in fact recognizes ECSS as an "essential aspect" of its "ability to provide a positive, efficient and simple patient experience." (PF 114.) As in *Baughman*, Quest must—and failed to—adapt to help its legally blind patients have an experience—a new and improved experience—more akin to that of sighted patients. Quest could have, at minimal expense, provided at least one kiosk at each of its 2,152 PSCs that is independently accessible to the legally blind and still saved more than $ ▮ . (PF 17, 18, 19. 20.). It elected not to do so.[4]

Similarly, the Ninth Circuit in *Kalani v. Starbucks Coffee Co.*, 698 Fed. App'x 883 (9th Cir. 2017), affirmed the District Court's decision that "by failing to provide any interior facing accessible seating, Starbucks Company deprived its wheelchair-bound customers of the opportunity to participate, to the same extent as non-disabled patrons, in the social aspects of the 'full and rewarding coffeehouse experience' Starbucks Company consciously affords its able-bodied patrons." *Id*. at 887. And, in *Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165, 1173-74 (9th Cir. 2010), the Ninth Circuit found that non-disabled patrons were afforded the opportunity to "enjoy the 'Chipotle [Mexican fast-food restaurant] experience,'" whereas disabled patrons "could not see and evaluate the various available foods and decide which or how much of each" they might want. As Quest does here, Chipotle offered its disabled plaintiff an inferior substitute experience.

> The substitutes that Chipotle provided . . . do not constitute "equivalent facilitation" because they do not involve "use of other designs and technologies" or "provide [him with] substantially equivalent or greater access to and usability of the facility." They merely provide a substitute experience that lacks the customer's personal participation in the

_____

[4] As further analyzed in Section III. F., *infra*, Quest's TFS functionality does not render the ECSS kiosks independently accessible.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

19

selection and preparation of the food that the full "Chipotle experience" furnishes.

*Id.* at 1174.

The crux of the "unequal experience" arguments in *Baughman*, *Kalani*, and *Antoninetti* is indistinguishable from those advanced in this case; Quest denies Plaintiffs the opportunity to fully participate in the "essential" PSC experience it offers its non-disabled patrons through ECSS. This ECSS experience includes an automated check in process that does not require the patient to wait for the assistance of a Quest employee, the ability to wait outside and receive a text when its patient's turn, alerting a patient to where he or she stands in the service queue to reduce patient anxiety, and, at some PSCs, the ability to scan identification and make payments. (PF 6.) Instead of the ability to participate in this new, improved ECSS experience, Quest's legally blind patients are left with an inferior, stigmatizing and embarrassing experience. (PF 85 [Vargas' experience left him feeling like a "third-class citizen of some kind that anybody else can walk in there and not have to undergo the same amount of hassle and waiting."].) Other legally blind Quest customers had similar inferior, stigmatizing experiences often having no choice but to rely on the assistance of a third party to use the kiosk for them, including strangers in the waiting room. (PF 100.) Quest may not shirk its legal obligations by denying blind patients the same improved customer experience and equivalent access to the many ECSS services it offers to sighted patients.

## C. Even if Not Services, Privileges, or Advantages Themselves, the Kiosks Connect Patients to Quest's Phlebotomy Services and Other Services the Kiosks Provide

Assuming *arguendo,* that Quest's kiosks are not themselves services, privileges, or advantages under 42 U.S.C. § 12182(a), the ADA still applies to the kiosks as they connect patients to Quest's phlebotomy services. *Robles v. Domino's*

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

*Pizza, LLC*, 913 F.3d 989, 905 (9th Cir. 2019).[5] In *Robles*, a blind plaintiff alleged Domino's Pizza failed to design, construct, maintain, and operate its website and mobile application to be fully accessible to him. *Id.* at 902. Domino's "operates a website and app that allows customers to order pizzas and other products for at-home delivery or in-store pickup, and receive exclusive discounts." *Id.* Domino's customers could still also use less technologically advanced methods of ordering pizza such as physically entering Domino's stores or ordering pizza by telephone. Nevertheless, the Ninth Circuit noted:

> Domino's website and app facilitate access to the goods and services of a place of public accommodation—Domino's physical restaurants. *They are two of the primary (and heavily advertised) means of ordering Domino's products to be picked up at or delivered from Domino's restaurants.* We agree with the district court . . . that the ADA applies to Domino's website and app, which connect customers to the goods and services of Domino's physical restaurants.

*Id.* at 905–906 (emphasis added). The Ninth Circuit continued that the "alleged inaccessibility of Domino's website and app impedes access to the goods and services of its physical pizza franchise—which are places of public accommodation." *Id*. at 905. Here, the inaccessibility of ECSS to the legally blind impedes access to not only the phlebotomy services, as all patients must sign in, but also the other services that are offered through ECSS. (PF 6.)

Notably, the Ninth Circuit also stated that Domino's website and app are "two of the primary (and heavily advertised) means of ordering Domino's products," but not the only means, as blind individuals such as Robles could still order pizza by telephone or by physically patronizing a brick-and-mortar store. That Robles had other, less technologically advanced options did not preclude the ADA's application to Domino's website and app, which connect customers to goods and services. In

---

[5] Quest's theory its "self service" kiosk is not a service is plainly contrary to common sense. Quest's brief further never even argues that the features ECSS offers are not benefits or advantages within the meaning of 42 U.S.C. § 12182(a).

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

1   the same exact way, after their implementation, ECSS became the primary and

2   highly encouraged means of checking in to access Quest's phlebotomy services.

3   Quest expected the self-check-in option would be heavily used to allow it to achieve

4   its cost saving goal. (PF 10.) As shown by the experience of Plaintiffs, Quest's

5   employees direct patients to the kiosk when patients approach to check in. (PF 105

6   [The phlebotomist directed Mr. Vargas to the kiosk and explicitly told him, "this is

7   where you check in."].) That Quest purportedly provides the option for check in

8   with employee assistance in limited cases does not relieve Quest of its ADA

9   obligations; as in *Robles*, the ADA applies to Quest's new technological device,

10  ECSS, because ECSS facilitates access to Quest's services. *See Boemio v. Love's*

11  *Restaurant,* 954 F.Supp. 204, 208 (S.D.Cal.1997) ("[T]he standard cannot be 'is

12  access achievable in some manner.' We must focus on the equality of access.")."

### D.   Quest Failed to Give Primary Consideration to the Requests Of Its Legally Blind Patients And So Violated the ACA and Rehabilitation Act

15      The Rehabilitation Act and the ADA contain similar requirements and are

16  analyzed in the same way regarding rights and obligations. *Zukle v. Regents of Univ.*

17  *of Calif.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) ("There is no significant

18  difference in analysis of the rights and obligations created by the ADA and the

19  Rehabilitation Act. *See* 42 U.S.C. § 12133."). For instance, Section 504 of the

20  Rehabilitation Act provides that no qualified individual with a disability shall be

21  subjected to disability-based discrimination under any program or activity receiving

22  federal financial assistance. 29 U.S.C. § 794(a); 45 C.F.R. § 84.3(h). Discrimination

23  under Section 504 includes failing to "[a]fford a qualified handicapped person an

24  opportunity to participate in or benefit from the aid, benefit, or service that is not

25  equal to that afforded others," or providing qualified handicapped persons with "an

26  aid, benefit, or service that is not as effective as that provided to others." 45 C.F.R. §

27  84.4(b)(1)(ii)-(iii); *see* 45 C.F.R. § 84.52(a)(2)-(3). There is no dispute that Quest is

28  a recipient of Medicare funding and thus is a "covered entity" subject to the

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1   Rehabilitation Act. (PF 121.) For the reasons explained in sections III. A. through

2   III. C., *supra*, Plaintiffs were denied equal enjoyment of Quest's services and

3   benefits associated with ECSS solely because of their disabilities. Thus, Quest's

4   Motion for Summary Judgment as to Plaintiffs' Rehabilitation Act claim must be

5   denied notwithstanding the primary consideration analysis.

6   **1.    Quest Must Give Primary Consideration**

7   Quest is obligated to give primary consideration to the requests of the

8   disabled because the Affordable Care Act ("ACA") applies Title II requirements to

9   all defendants. *Vega-Ruiz v. Northwell Health*, 992 F.3d 61, 66 (2d Cir. 2021) ("The

10  ACA subject[s] [Title III public accommodations] to the 'primary consideration'

11  obligation where it had previously been subjected to the lesser 'encouraged to

12  consult' obligation."); *see also* 45 C.F.R. § 92.102(a) ("Any entity operating or

13  administering a program or activity under this part shall take appropriate steps to

14  ensure that communications with individuals with disabilities are as effective as

15  communications with others in such programs or activities, in accordance with the

16  standards found at 28 CFR 35.160 through 35.164."). In this way, "the ACA extends

17  'primary consideration' to individuals seeking services at Title III public

18  accommodations. See 28 C.F.R. § 35.160(b)(2)." *Vega-Ruiz,* 992 F.3d at 66; *see*

19  *also* Nondiscrimination in Health Programs and Activities, 80 Fed. Reg. 54172,

20  54186 (Sept. 8, 2015) ("[W]e believe it is appropriate to hold all recipients of

21  Federal financial assistance from HHS to the higher Title II standards as a condition

22  of their receipt of that assistance. . .  Where the regulatory provisions referenced in §

23  92.202 use the term "public entity," that term shall be replaced with "covered

24  entity."); *see* 28 C.F.R. § 35.160(b)(2) ("a [covered] entity shall give primary

25  consideration to the requests of individuals with disabilities.).

26  It is Quest's burden both on summary judgment and at trial to establish they

27  gave the Plaintiffs' requests for accommodation primary consideration, and, if Quest

28  could not provide the accommodations, document *in writing* the reasons why the

Nye, Stirling, Hale & Miller
33 West Mission Street, Suite 201
Santa Barbara, California 93101

23

accommodations could not be provided. 28 C.F.R. § 35.160(b)(2); 28 C.F.R. § 35.164 (a covered entity "has the burden of proving that compliance . . . would result in such alterations or burdens . . . the decision that compliance would [so] result . . . must be accompanied by a written statement for reaching that conclusion.); *Duvall v. Cnty of Kitsap*, 260 F.3d 1124, 1137 (9th Cir. 2001) ("In determining what type of auxiliary aid is necessary, a [covered] entity must 'give primary consideration' to the accommodation requested by the disabled individual. 28 C.F.R. § 35.160(b)(2).); *Martinez v. Cnty of Alameda*, 512 F. Supp. 3d 978, 987 (N.D. Cal. 2021). Rather than meet this burden, Quest argues the Rehabilitation Act regulations do not contain the explicit words "primary consideration." The interplay and overlap between the ADA, Rehabilitation Act, and ACA render such an interpretation spurious. Quest does so because there is no evidence they ever gave Plaintiffs' pre-suit requests any consideration, let alone primary consideration. Because Quest has no evidence to meet its burden, it instead argues the law requiring primary consideration simply does not apply to them. It is in this argument, however, that the fundamental basis of why Plaintiffs have been denied accessibility and this litigation has been necessary is revealed. Indeed, "[i]nsofar as the [ADA's] Title II effective communications regulation has a Section 504 analog . . . it is the Section 504 communications regulation at 28 C.F.R. § 39.160, as that is the regulation with which Congress has specified that Title II communications regulations must be consistent." *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1099-1100 (9th Cir. 2013); 28 C.F.R. § 35.160(b)(2) ("a [covered] entity shall give primary consideration to the requests of individuals with disabilities). Thus, per the Rehabilitation Act's communication regulation, as interpreted in light of the ACA, 28 C.F.R. § 35.160(b)(2) states that "a [covered] entity shall give primary consideration to the requests of individuals with disabilities. As the Second Circuit in *Vega-Ruiz* noted, "[t]he streamlining of treatment afforded defendant-entities [by the ACA] is consistent with the existing framework of the Rehabilitation

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1

Act and has since been adopted as law." *Vega-Ruiz,* 992 F.3d at 66 n.5.

2
### 2. Quest Failed to Give Primary Consideration To the Requests of the Legally Blind

3

4

Primary consideration means a covered entity must "honor the person's

5
choice, unless it can demonstrate that another equally effective means of

6
communication is available, or that the use of the means chosen would result in a

7
fundamental alteration or in an undue burden." U.S. Dep't of Justice, Civil Rights

8
Div., Disability Rights Section, ADA Requirements, Effective Communication,

9
https://www.ada.gov/effective-comm.pdf (Jan. 2014) at 6; accord 28 C.F.R. § Pt. 35,

10
App. A. As stated above, the burden is on Quest, not Plaintiffs, to demonstrate they

11
honored Plaintiffs' choices. Quest cannot meet this burden.

12
This is nowhere more apparent than on the topic of training. Nowhere in

13
Quest's Statement of Uncontroverted Facts do they contend they train their

14
employees to understand and give primary consideration to the requests of the

15
disabled. Quest's Rule 30(b)(6) designee on training, testified Quest did not provide

16
any training to its patient service representatives on giving primary consideration to

17
the requests of disabled individuals or to training employees on documenting in

18
writing the reasons it cannot give primary consideration. (PF 102.) ████████████

19
████████████████████████████████████████████████████████████████.

20
(PF 103.) Further, the phlebotomist who eventually assisted Mr. Vargas during his

21
June 2019 PSC visit could not articulate what primary consideration meant nor

22
could she remember any instance where she provided primary consideration to an

23
individual with disabilities' accommodation request. (PF 111.) Quest has no polices

24
requiring Quest employees to give primary consideration to the requests of disabled

25
individuals, nor did Quest give primary consideration to Mr. Vargas' requests or

26
ACB's December 2018 letter that explicitly requested primary consideration for

27
screen readers (i.e., audio output) and screen magnification. (PF 108.) Whether pre-

28
or post-three-finger swipe's development as a purported fix, Quest never engaged

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

the plaintiffs in this lawsuit, who clearly articulated, among other things, a request for screen readers (i.e., audio output). (PF 108.) Thus, Quest failed to meet its obligation to give primary consideration to the requests of the legally blind.

Under the law cited above the Rehabilitation Act is the appropriate enforcement mechanism for Quest's failure to give primary consideration, as required by the ACA. *Vega-Ruiz,* 992 F.3d at 66. However, in the event the Court disagrees, Plaintiffs should be permitted to amend the pleadings to conform to proof at trial under F.R.C.P. 15(b) to assert an ACA claim, based on the significant overlap between Section 1557 of the ACA and Section 504 of the Rehabilitation Act and the uncontroverted evidence establishing that Quest violated the same. *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1210 (9th Cir. 2020) ("Because Does claim discrimination on the basis of their disability, to state a claim for a Section 1557 violation, they must allege facts adequate to state a claim under Section 504 of the Rehabilitation Act."); *see also* PF 102-112.

### E.  Quest Cannot Succeed in Its Summary Judgment Arguments Against Plaintiff Vargas' Unruh Claim

Plaintiff Vargas is seeking only statutory minimum damages and injunctive relief with respect to his Unruh claim. (PF 122.) An individualized showing of intentional discrimination is not required for an Unruh Act claim predicated on an ADA claim where, as here, Plaintiff seeks only minimum statutory damages on behalf of the Class. *Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562, 586 (N.D. Cal. 2018); *see also Molski v. M.J. Cable, Inc.,* 481 F.3d 724, 731 (9th Cir. 2007) ("[t]he litigant need not prove that she suffered actual damages to recover the independent statutory damages of $4,000."). Instead, plaintiff need only show they "personally encountered" an Unruh Act violation that caused "difficulty, discomfort, or embarrassment" to the class member. Cal. Civ. Code § 55.56(b), (c); *see Doran v. 7-Eleven, Inc.*, 509 F. App'x 647, 648 (9th Cir. 2013).

The Unruh Act provides that:

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

> All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, or sexual orientation are entitled to the full and equal accommodation, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

Cal. Civ. Code § 51(b). Under § 51(f), "[a] violation of the right of any individual under the federal Americans with Disabilities Act of 1990 . . . shall also constitute a violation of this section." Cal. Civ. Code § 51(f); *see also, Molski*, 481 F.3d at 731 (citing Cal. Civ. Code § 51(f)). Under the Unruh Act, the "[t]he litigant need not prove she suffered actual damages to recover the independent statutory damages of $4,000." *Molski*, 481 F.3d at 731. In addition, "[a] plaintiff who establishes a violation of the ADA, [ ] need not prove intentional discrimination in order to obtain damages under section 52." *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 665 (2009).

Next, even if Quest were to obtain summary judgment with respect to Plaintiffs' ADA claim on a mootness theory, Plaintiff Vargas' Unruh claim would survive. "Because a claim for damages under the Unruh Act looks to past harm," Unruh Act claims remain active even if a plaintiff's ADA claims have been rendered moot. *Arroyo v. Aldabashi*, No. 16-cv-06181-JCS, 2018 WL 4961637, at *5 (N.D. Cal. Oct. 15, 2018) (finding that although plaintiff's ADA claim for injunctive relief may be mooted if defendant no longer owned the store that failed to provide wheelchair accessible parking spaces, the plaintiff was nevertheless "entitled to statutory damages for two instances where he was affected or deterred by the Store's failure to provide a van parking space, totaling $8,000" under the Unruh Act); *see also Rivera v. Crema Coffee Co. LLC*, 438 F. Supp. 3d 1068, 1073–74, 1078 (N.D. Cal. 2020) (same); *Johnson v. Wayside Prop., Inc.*, 41 F. Supp. 3d 973, 980–81 (E.D. Cal. 2014) (noting that "even if a defendant has removed barriers to access and thereby mooted the plaintiff's ADA claim, those remedial measures will not moot [an Unruh Act] claim for damages"). For these reasons, Quest's Motion should be denied as to Plaintiff Vargas' Unruh claim.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1

### F.   <u>The Three-Finger-Swipe Process Does Not Moot Plaintiffs' Claims</u>

2      Defendant's argument that TFS "moots" the class claims is without merit as

3   TFS does not provide independent and private access to all kiosk services. (PF 47.)

4   Even if the TFS "fix" were actually a "fix," which it is not, a case becomes moot

5   under the ADA only once a defendant has remedied *all* ADA violations complained

6   of by a plaintiff. *Grove v. De La Cruz*, 407 F.Supp.2d 1126, 1130-31 (C.D. Cal.

7   2005). Where a defendant remedies some, but not all, complained of violations, it

8   does not moot the claim. *Greater Los Angeles Agency of Deafness, Inc. v. Reel*

9   *Services Mgmt. LLC*, 2014 WL 12561074 at *5 (C.D. Cal. May 6, 2014). Nor may a

10  defendant moot a claim by providing the disabled individual partial opportunity to

11  participate in the service, not a full and equal opportunity. *Id.*; *Clavo v. Zarrabian*,

12  2004 WL 3709049 (C.D. Cal. May 17, 2004) at *3 ("Although Plaintiff [a

13  paraplegic man in a wheelchair] was ultimately able to purchase merchandise at the

14  Hawthorne Ralphs, the manner in which he was able to make his purchases was

15  neither 'full' nor 'equal' in comparison to non-disabled patrons.).

16      Here, and as explained in detail in sections III. A. through III. C., *supra*, even

17  if TFS did provide a successful way for blind patients to check in, TFS does not

18  offer blind individuals a full and equal opportunity to participate in and enjoy all the

19  services and conveniences offered as part of the ECSS experience. This partial

20  opportunity to participate is not a "full and equal opportunity." Further, even if TFS

21  were a competent solution, is not present in every Quest PSC. (PF 53, 54, 55, 60.)

22  ### IV.   <u>CONCLUSION</u>

23      For the foregoing reasons, Plaintiffs respectfully request the Court deny

24  Defendants' motion for summary judgment, or in the alternative, summary

25  adjudication.

26  ///

27  ///

28  ///

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

28

Dated: September 17, 2021

Respectfully submitted,

By:  _/s/ Jonathan D. Miller_

        Jonathan D. Miller (SBN 220848)
        jonathan@nshmlaw.com
        Alison M. Bernal (SBN 264629)
        alison@nshmlaw.com
        NYE, STIRLING, HALE
        & MILLER, LLP
        33 West Mission Street, Suite 201
        Santa Barbara, CA 93101

        Benjamin J. Sweet
        (Admitted _Pro Hac Vice_)
        ben@nshmlaw.com
        NYE, STIRLING, HALE
        & MILLER, LLP
        1145 Bower Hill Road, Suite 104
        Pittsburgh, PA 15243
        Telephone: (412) 857-5350

        Matthew K. Handley
        (Admitted _Pro Hac Vice_)
        mhandley@hfajustice.com
        HANDLEY FARAH &
        ANDERSON PLLC
        777 6th Street NW
        Washington, DC 20001
        Telephone: (202) 559-2411

        _Attorneys for Plaintiffs JULIAN VARGAS,_
        _AMERICAN COUNCIL OF THE BLIND,_
        _AND THE PROPOSED CLASS_

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT