# EXHIBIT 1

Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com
Alison M. Bernal (SBN 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Telephone: (805) 963-2345

Benjamin J. Sweet
(*Admitted Pro Hac Vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

Attorneys for Plaintiffs Julian Vargas,
American Council of the Blind, and the Proposed Class

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

JULIAN VARGAS and AMERICAN
COUNCIL OF THE BLIND, individually
on behalf of themselves and all others
similarly situated,

　　　　　Plaintiffs,

　　　v.

QUEST DIAGNOSTICS CLINICAL
LABORATORIES, INC., QUEST
DIAGNOSTICS HOLDINGS, INC.,
QUEST DIAGNOSTICS
INCORPORATED; and DOES 1-10,
inclusive,

　　　　　Defendants.

Case No.: 2:19-cv-08108-DMG

**DECLARATION OF ALISON M. BERNAL**

[*CONCURRENTLY FILED WITH OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND SUPPORTING DOCUMENTS*]

**Hearing Date:　October 8, 2021**
**Time:　　　　　10:00 am**
**Courtroom:　　8C**

Complaint Filed: September 18, 2019
Discovery Cutoff: August 27, 2021
Pretrial Conf: December 7, 2021
Trial Date: January 11, 2022
District Judge: Hon. Dolly M. Gee
Magistrate: Hon. Michael R. Wilner

## DECLARATION OF ALISON M. BERNAL

I, ALISON M. BERNAL, declare as follows:

1.      I am an attorney at law duly qualified to practice before the Courts of the State of California and before this Court and am a member of the firm Nye, Stirling, Hale & Miller, LLP, attorneys for Plaintiffs Julian Vargas, American Council of the Blind, and the Proposed Class in the above captioned matter. The facts stated herein are stated of my own personal knowledge and, if called and sworn as a witness, I could and would testify competently thereto. This declaration is made in support of Plaintiffs' opposition to Defendants' motion for summary judgment.

2.      Pursuant to Local Rule 7-3, I met and conferred with Defendants' counsel David Raizman on August 26, 2021, regarding Plaintiff Vargas' intent to move for class certification and Defendants' intention to move for summary judgment. My partner Jordan Porter also attended. Due to the pandemic, we held this meet and confer telephonically. A court reporter was present for the meet and confer. During our call, we both the bases for Plaintiffs' motion for class certification, and Defendants' bases for their motion for summary judgment. The parties did not reach agreement on the issues. A true and correct copy of the transcript from the August 26, 2021, meet and confer is attached as **Exhibit 33** to the Appendix of Exhibits.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Signed this 17th day of September 2021, in Santa Barbara, California.

_/s/    Alison M. Bernal_
ALISON M. BERNAL, Declarant

# EXHIBIT 2

Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com
Alison M. Bernal (SBN 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Telephone: (805) 963-2345

Benjamin J. Sweet
(*Admitted Pro Hac Vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

Attorneys for Plaintiffs Julian Vargas,
American Council of the Blind, and the Proposed Class

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

JULIAN VARGAS and AMERICAN COUNCIL OF THE BLIND, individually on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, inclusive,

Defendants.

Case No.: 2:19-cv-08108-DMG

**DECLARATION OF JONATHAN D. MILLER**

[*CONCURRENTLY FILED WITH OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND SUPPORTING DOCUMENTS*]

**Hearing Date:      October 8, 2021**
**Time:                   10:00 am**
**Courtroom:        8C**

Complaint Filed: September 18, 2019
Discovery Cutoff: August 27, 2021
Pretrial Conf: December 7, 2021
Trial Date: January 11, 2022
District Judge: Hon. Dolly M. Gee
Magistrate: Hon. Michael R. Wilner

## DECLARATION OF JONATHAN D. MILLER

I, JONATHAN D. MILLER, declare as follows:

1.      I am an attorney at law duly qualified to practice before the Courts of the State of California and before this Court and am the managing partner of the firm Nye, Stirling, Hale & Miller, LLP, attorneys for Plaintiffs Julian Vargas, American Council of the Blind ("ACB"), and the Proposed Class in the above captioned matter. The facts stated herein are stated of my own personal knowledge and, if called and sworn as a witness, I could and would testify competently thereto. This declaration is made in support of Plaintiff's opposition to Defendants' motion for summary judgment.

2.      Plaintiffs' opposition to Defendants' motion for summary judgment relies on the testimony from several witnesses on behalf of Defendants and Plaintiffs. I have outlined the dates of those depositions below, with reference to the exhibit or exhibits containing true and correct copies of the relevant portion of the deposition testimony.

3.      On April 8, 2021, I took the deposition of Marc Yarrison, an employee of Quest and a designated corporate witness pursuant to FRCP, Rule 30(b)(6). I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 5** and **Exhibit 34** to the Appendix of Exhibits.

4.      On April 12, 2021, I took the deposition of Taylor Carr, an employee of Quest and a designated corporate witness pursuant to FRCP, Rule 30(b)(6). The deposition took two sessions, and the second session was on July 30, 2021. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 6** and **Exhibit 35** to the Appendix of Exhibits.

5.      On April 14, 2021, my partner Jordan Porter took the deposition of Max O'Campo, an employee of Quest and a designated corporate witness pursuant to FRCP, Rule 30(b)(6). I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 7** to the Appendix of Exhibits.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA  93101

PA0004

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

6.      On April 16, 2021, I took the deposition of Jody Reilly, an employee of Quest and a designated corporate witness pursuant to FRCP, Rule 30(b)(6). I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 8** and **Exhibit 36** to the Appendix of Exhibits.

7.      On April 20, 2021, I took the deposition of Christopher Grant, an employee of Quest and a designated corporate witness pursuant to FRCP, Rule 30(b)(6). I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 9** and **Exhibit 37** to the Appendix of Exhibits.

8.      On April 22, 2021, Defendants took the deposition of proposed Lead Plaintiff Julian Vargas. I defended the deposition. I have produced true and correct copies of relevant portions of Mr. Vargas' deposition transcript as **Exhibit 10** to the Appendix of Exhibits.

9.      On April 27, 2021, Defendants took the deposition of ACB member Ralph Black. The deposition lasted two sessions, with the second session on August 5, 2021. My co-counsel, Mr. Handley, defended the deposition. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 11** to the Appendix of Exhibits.

10.     On April 27, 2021, Defendants took the deposition of ACB member Ardis Bazyn. The deposition lasted two sessions, with the second session on August 6, 2021. My co-counsel, Mr. Handley, defended the deposition. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 12** to the Appendix of Exhibits.

11.     On April 29, 2021, Defendants took the deposition of ACB member Mary Haroyan. My co-counsel, Mr. Handley, defended the deposition. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 13** to the Appendix of Exhibits.

12.     On April 29, 2021, Defendants took the deposition of ACB member Nona Haroyan. My co-counsel, Mr. Handley, defended the deposition. I have

1   produced true and correct copies of relevant portions of the deposition transcript as

2   **Exhibit 14** to the Appendix of Exhibits.

3        13.    On May 3, 2021, Defendants took the deposition of ACB member

4   Donna Grahmann. The deposition lasted two sessions, with the second session on

5   August 5, 2021. My co-counsel, Mr. Handley, defended the deposition. I have

6   produced true and correct copies of relevant portions of the deposition transcript as

7   **Exhibit 15** to the Appendix of Exhibits.

8        14.    On May 6, 2021, Defendants took the deposition of ACB member

9   Kathy Lyons. My co-counsel, Mr. Handley, defended the deposition. I have

10  produced true and correct copies of relevant portions of the deposition transcript as

11  **Exhibit 16** to the Appendix of Exhibits.

12       15.    On May 6, 2021, Defendants took the deposition of ACB member

13  Regina Brink. My co-counsel, Mr. Handley, defended the deposition. I have

14  produced true and correct copies of relevant portions of the deposition transcript as

15  **Exhibit 17** to the Appendix of Exhibits.

16       16.    On June 9, 2021, Defendants took the deposition of ACB's corporate

17  witness pursuant to FRCP, Rule 30(b)(6). Clark Rachfal appeared on behalf of

18  ACB. I have produced true and correct copies of relevant portions of his deposition

19  transcript at **Exhibit 18** and **Exhibit 38** to the Appendix of Exhibits.

20       17.    On June 29, 2021, I took the deposition of third-party Lilitab, LLC's

21  corporate witness pursuant to FRCP, Rule 30(b)(6). The witness who appeared for

22  Lilitab was Adam Aronson. I have produced true and correct copies of relevant

23  portions of the deposition transcript as **Exhibit 19** to the Appendix of Exhibits.

24       18.    On July 1, 2021, I took the deposition of Quest employee Tom Walsh. I

25  have produced true and correct copies of relevant portions of Mr. Walsh's

26  deposition transcript as **Exhibit 20**  and **Exhibit 44** to the Appendix of Exhibits.

27       19.    On August 3, 2021, I took the deposition of Prudencia Magana, an

28  employee of Quest. I have produced true and correct copies of relevant portions of

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA  93101

the deposition transcript as **Exhibit 21** and **Exhibit 39** to the Appendix of Exhibits.

20.    On August 19, 2021, Defendants took the deposition of ACB member and former employee, Claire Stanley. I defended the deposition. I have produced relevant portions of Ms. Stanley's deposition transcript as **Exhibit 22** and **Exhibit 40** to the Appendix of Exhibits.

21.    On May 21, 2021, Defendants took the deposition of ACB member Robin Rehder. My co-counsel, Mr. Handley, defended the deposition. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 23** to the Appendix of Exhibits.

22.    In addition to the depositions, the parties have exchanged written discovery and documents in response to requests for production of documents. I have produced a true and correct copy of relevant portions of the written discovery and document production as **Exhibit 24** (Plaintiff ACB's Fourth Supplemental Responses to Interrogatories), **Exhibit 25 (**Quest responses to interrogatories, 4/7/21), **Exhibit 26** (Quest responses to interrogatories, 4/19/21), **Exhibit 27 (**Relevant portions of Defendants' document production), **Exhibit 28** (Defendants' responses to requests for admission), **Exhibit 29** (Quest responses to interrogatories, 10/28/20), and **Exhibit 30** (Quest response to 30(b)(6)) to the Appendix of Exhibits.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Signed this 17th day of September 2021, in Santa Barbara, California.

     ___/s/____*Jonathan D. Miller*_____
     JONATHAN D. MILLER, Declarant

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

*EXHIBIT 3 (PA0008-PA0016)*

*INTENTIONALLY LEFT BLANK*

# EXHIBIT 4

Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com
Alison M. Bernal (SBN 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Telephone: (805) 963-2345
Facsimile: (805) 284-9590

Benjamin J. Sweet
(Admitted *Pro Hac Vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

*Attorneys for Plaintiffs Julian Vargas, American Council of the Blind, and the Proposed Class*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIAN VARGAS, ANNE WEST, and AMERICAN COUNCIL OF THE BLIND, individually on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, inclusive,<br><br>Defendants. | CASE NO.: 2:19-cv-8108<br><br>**DECLARATION OF JULIAN VARGAS IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Complaint Filed: September 18, 2019<br>Pretrial Conf: December 7, 2021<br>Trial Date: January 11, 2022<br>District Judge: Hon. Dolly M. Gee<br>Magistrate: Hon. Michael M. Wilner |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

## <u>DECLARATION OF JULIAN VARGAS</u>

I, Julian Vargas, hereby declare:

1.     I am one of the Plaintiffs in this matter. The following facts are within my personal knowledge and, if called as a witness, I could and would competently testify to these facts. I make this declaration in support of Plaintiff's Motion for Class Certification.

DECLARATION OF JULIAN VARGAS

PA0017

DocuSign Envelope ID: A88267A8-999A-4354-A5EA-CE3B5CF7DBDE

2.	I went to a Quest PSC again on June 10, 2021. I arrived at the PSC at 12:33 p.m. As I entered the location, I heard the tail end of the portion of the content loop directed toward blind patients. However, the volume was not adequate for me to hear the message from my vantage point. I then had to wait an additional 8 to 10 minutes until the content loop played again. During this 8-minute period – but not during the portion of the message directed to blind patients – information was given on the "wait by text" option. The message made clear that it was only available to those who could use the kiosk independently.

3.	After approximately 8 to 10 minutes, the message directed me to perform a 3-finger swipe at the kiosk. However, the message did not give directions as to where the kiosk itself was located, so I had to fumble around to find it. The content loop simply said that patients should ask a staff member to assist if they had trouble locating the kiosk. However, at no time while I was waiting for the audio message loop did any Quest staff member enter the waiting area or sweep the waiting area for walk-ins. Once I located the kiosk, I checked and confirmed there was still no headphone jack or tactile keypad.

4.	After I performed the swipe by swiping up, an audio message played which stated that I was patient "001" and that I would be serviced in 3 minutes. I then waited 17 minutes to be serviced. When the phlebotomist finally greeted me at 12:58 p.m., I explained that I was there to test the accessibility of the 3-finger swipe system and asked whether the "wait by text" option was available to me as a walk-in blind user. The phlebotomist told me the "wait by text" option is not available for blind users who walk in but only for those who make appointments online and can scan a QR code at the kiosk.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 3rd day of September, 2021, in Van Nuys, California.

Julian Vargas, Declarant

2

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

# EXHIBIT 5

# <u>REDACTED</u>

# TO BE FILED UNDER SEAL PENDING THE COURT'S RULING ON PLAINTIFF'S APPLICATION

# EXHIBIT 6

```
 1                UNITED STATES DISTRICT COURT

 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3   JULIAN VARGAS, ANNE WEST, and         )

 4   AMERICAN COUNCIL OF THE BLIND,        ) Case No.

 5   individually on behalf of             ) 2:19-cv-8108

 6   themselves and all others similarly   )

 7   situated,                             )

 8                     Plaintiffs,         )

 9   vs.                                   )

10   QUEST DIAGNOSTICS, CLINICAL           )

11   LABORATORIES, INC., QUEST             )

12   DIAGNOSTICS HOLDINGS, INC., QUEST     )

13   DIAGNOSTICS INCORPORATED; and DOES    )

14   1-10, inclusive,                      )

15                     Defendants.         )

16

17

18              30 (B)(1) DEPOSITION OF TAYLOR CARR

19                      April 12, 2021

20

21

22   REPORTED REMOTELY BY:

23   AMBER S. WILLIAMS, C.S.R. No. 1080

24   Notary public

25
```

Page 1

PA0065

```
 1              THE 30(B)(1) DEPOSITION OF TAYLOR CARR was
 2      taken on behalf of the plaintiffs via
 3      videoconference, commencing at 12:08 p.m. PST on
 4      April 12, 2021, before Amber S. Williams via
 5      videoconference, Certified Shorthand Reporter and
 6      Notary Public within and for the State of Idaho, in
 7      the above-entitled matter.
 8
 9                      APPEARANCES:
10      For Plaintiffs via videoconference:
11           NYE, STIRLING, HALE & MILLER, LLP
12           BY:  JONATHAN D. MILLER
13           33 West Mission Street, Suite 201
14           Santa Barbara, California  93101
15           jonathan@nshmlaw.com
16      For Defendants via videoconference:
17           OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC
18           BY:  DAVID RAIZMAN
19           400 South Hope Street, Suite 1200
20           Los Angeles, California  90071
21           david.raizman@ogletree.com
22           Also Present via videoconference:
23           Dustin Brown, videographer
24           Callum Appleby
25           Matthew Handley
```

                                                    Page  2

1        Benjamin Sweet

2        Amer Pharaon

3        Margaret Parker

4        Amber Roller

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1                        I N D E X

 2

 3    TESTIMONY OF TAYLOR CARR                    Page

 4      Examination by Mr. Miller...................  8

 5

 6

 7                       EXHIBITS

 8    Exhibit 21.   e-Check in Buy vs. Build........  79

 9                  Meeting Notes, 08/27/15, Bates

10                  Nos. QUEST-VARGAS000040261 -

11                  QUEST-VARGAS000040264

12    Exhibit 22.   e-Check in Options Analysis...... 103

13                  Build vs. Buy Decision,

14                  08/27/15, Bates

15                  Nos. QUEST-VARGAS000040267 -

16                  QUEST-VARGAS000040269

17    Exhibit 23.   e-Check in Buy vs. Build........ 109

18                  Meeting Notes, 09/03/15, Bates

19                  Nos. QUEST-VARGAS000040280 -

20                  QUEST-VARGAS000040284

21    Exhibit 24.   Final CapEx..................... 116

22    Exhibit 25.   E-mail chain, Bates ............ 251

23                  Nos. QUEST-VARGAS000039966 -

24                  QUEST-VARGAS000039967

25

                                              Page  4
```

PA0068

```
 1                  Exhibits (Continued)

 2    Exhibit 26.   E-mail chain, Bates ............. 275

 3                  Nos. QUEST-VARGAS000035475 -

 4                  QUEST-VARGAS000035476

 5    Exhibit 27.   New Patient Experience.......... 257

 6                  Deployment CapEx Request, Bates

 7                  Nos. QUEST-VARGAS000000022 -

 8                  QUEST-VARGAS000000041

 9    Exhibit 28.   E-mail chain, Bates ............. 279

10                  Nos. QUEST-VARGAS000004496 -

11                  QUEST-VARGAS000004499

12    Exhibit 30.   Building a Superior Customer..... 294

13                  Experience at Lower Cost

14                  document, Bates

15                  Nos. QUEST-VARGAS000040161 -

16                  QUEST-VARGAS000040166

17    Exhibit 31.   Patient UX Vision PowerPoint..... 299
```

```
18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

PA0069

| | | |
|---|---|---|
| 1 | under that broader umbrella? | 12:38PM |
| 2 | A.   There was -- under "Patient Experience," | 12:38PM |
| 3 | there's three that were connected, and it was | 12:38PM |
| 4 | preregistration, appointment scheduling, and | 12:38PM |
| 5 | electronic check-in. | 12:38PM |
| 6 | Q.   Also known as e-Check? | 12:38PM |
| 7 | A.   Yeah.  Also known as e-Check-in. | 12:38PM |
| 8 | Q.   e-Check-in.  Excuse me.  e-Check-in. | 12:38PM |
| 9 | Did any part of your compensation when | 12:38PM |
| 10 | you took on the position of director involve stock | 12:38PM |
| 11 | options that the company provided to you? | 12:38PM |
| 12 | A.   No. | 12:38PM |
| 13 | Q.   Specifically with respect to Quest | 12:38PM |
| 14 | e-Check-in project, what did you understand the | 12:39PM |
| 15 | project to be when you started in 2015? | 12:39PM |
| 16 | A.   Can you ask more specific?  There's a | 12:39PM |
| 17 | lot to unpack, I guess, so... | 12:39PM |
| 18 | Q.   That's why we are here today, so we can | 12:39PM |
| 19 | take it broad and then move into the specific.  But I | 12:39PM |
| 20 | just -- when you started with Quest in 2015 in this | 12:39PM |
| 21 | position, I assume somebody described for you what | 12:39PM |
| 22 | the project was going to be with respect to | 12:39PM |
| 23 | e-Check-in.  Is that correct or incorrect? | 12:39PM |
| 24 | A.   I wouldn't say it was correct or | 12:39PM |
| 25 | incorrect.  There's a lot within what we were trying | 12:39PM |

Page 30

```
 1              Q.   You mentioned that there were other ways    01:02PM

 2    of checking in prior to the implementation of the         01:02PM

 3    e-Check-in project other than that paper system.          01:02PM

 4    What other check-in methods are you aware of?             01:02PM

 5              A.   Verbal.                                      01:02PM

 6              Q.   And when you say that, that would be a       01:02PM

 7    patient going to a phlebotomist or a reception person     01:02PM

 8    and attempting to verbally check in?                      01:02PM

 9              A.   Two pieces there.  I would just say a        01:02PM

10    phlebotomist.  A phlebotomist who is in our wait room     01:02PM

11    or arrival space, and a customer grabs them with a        01:03PM

12    question.                                                 01:03PM

13              Q.   When you were working on e-Check-in          01:03PM

14    project, you were attempting to improve patient           01:03PM

15    experience.  That was one of the objectives; is that     01:03PM

16    right?                                                    01:03PM

17              A.   The ultimate objective.  The experience     01:03PM

18    was everything.                                           01:03PM

19              Q.   And you had to understand what the prior     01:03PM

20    experience was before the implementation of the          01:03PM

21    e-Check-in project to be able to assess that and         01:03PM

22    improve it, right?                                        01:03PM

23              A.   Very -- a key element of framing the        01:03PM

24    experience problems, correct -- to improve.              01:03PM

25              Q.   And so other than the verbal method of      01:03PM
```

Page 45

```
 1    accessibility folder.                              01:36PM

 2          Q.   (BY MR. MILLER):  Was there ever any     01:36PM

 3    consideration given by the team you were working with  01:36PM

 4    at Quest as to whether to utilize the iPad's internal  01:36PM

 5    accessibility features in the e-Check-in service that  01:36PM

 6    was being offered?                                 01:37PM

 7          A.   Yes.  There -- that's actually how I      01:37PM

 8    learned about it.                                  01:37PM

 9          Q.   And how -- how would -- how was that      01:37PM

10    decision made?                                     01:37PM

11          A.   As a team.                              01:37PM

12          Q.   Let's start with when that decision was   01:37PM

13    made.                                              01:37PM

14          A.   I don't recall specifically when that     01:37PM

15    decision was made.                                 01:37PM

16          Q.   You may not have a specific date, but     01:37PM

17    what year was that decision made?                  01:37PM

18          A.   Early on 2015 or 2016.  But I don't have  01:37PM

19    specifics on when that team decided.               01:37PM

20          Q.   And which team was making the decision?   01:37PM

21          A.   The team I was on.                       01:37PM

22          Q.   And what specific accessibility features  01:37PM

23    did the team utilize within Apple's iOS?           01:37PM

24          A.   A feature called touch accommodations.    01:37PM

25          Q.   And how did the team utilize touch        01:38PM
```

Page 64

PA0072

| | | |
|---|---|---|
| 1 | accommodations within the e-Check-in service that | 01:38PM |
| 2 | Quest offers? | 01:38PM |
| 3 | A.   That capability allows for multiple | 01:38PM |
| 4 | different types of touches to occur on the device and | 01:38PM |
| 5 | then for it to be interpreted correctly. | 01:38PM |
| 6 | Q.   And specifically what was Quest trying | 01:38PM |
| 7 | to accomplish that it decided to use the touch | 01:38PM |
| 8 | accessibility feature on Apple's IOS device? | 01:38PM |
| 9 | A.   Yeah.  As part of our experience design | 01:38PM |
| 10 | process, we capture customer feedback through, you | 01:38PM |
| 11 | know, multitude of ways.  And one of those led us to | 01:38PM |
| 12 | leveraging that to improve the experience for | 01:39PM |
| 13 | customers checking in. | 01:39PM |
| 14 | Q.   Was there ever any consideration given | 01:39PM |
| 15 | in the 2015 timeframe as to whether to use Apple's | 01:39PM |
| 16 | voiceover accessibility feature for vision users? | 01:39PM |
| 17 | A.   I don't recall. | 01:39PM |
| 18 | Q.   Are you aware of any documents that | 01:39PM |
| 19 | would refresh your recollection? | 01:39PM |
| 20 | A.   No. | 01:39PM |
| 21 | Q.   In the 2015 timeframe, was there ever | 01:39PM |
| 22 | any consideration given to utilizing Apple's audio | 01:39PM |
| 23 | description feature within its accessibility IOS | 01:39PM |
| 24 | platform? | 01:39PM |
| 25 | A.   I don't recall. | 01:39PM |

Page 65

```
 1            Q.   Are you aware of any documents that        01:39PM

 2    would refresh your recollection?                        01:39PM

 3            A.   No.                                        01:39PM

 4            Q.   Within the 2015 timeframe, was there       01:39PM

 5    ever any consideration given to utilizing Apple's       01:39PM

 6    spoken content feature within the accessibility         01:39PM

 7    platform on IOS?                                        01:39PM

 8            MR. RAIZMAN:  Object to foundation.             01:40PM

 9            THE WITNESS:  One thing I should say is I        01:40PM

10    don't think -- I don't know, like, all the features     01:40PM

11    in that folder.  So yeah, I don't recall.  But they     01:40PM

12    could have been.                                        01:40PM

13            Q.   (BY MR. MILLER):  But your answer is you    01:40PM

14    don't recall, correct?                                  01:40PM

15            A.   Yeah.  I don't recall.                     01:40PM

16            Q.   And are you aware of any documents that    01:40PM

17    would refresh your memory?                              01:40PM

18            A.   No.                                        01:40PM

19            Q.   From -- from -- from 2015 to the           01:40PM

20    present, are you aware of whether Quest has ever        01:40PM

21    considered utilizing the voiceover feature in the       01:40PM

22    accessibility panel of Apple's IOS?                     01:40PM

23            A.   Am I answering for myself what I was       01:40PM

24    involved in or Quest as a company?                      01:40PM

25            Q.   I'm asking what you know.  Are you         01:40PM
```

Page 66

PA0074

```
 1    aware, from any source, whether -- strike that.        01:40PM

 2              Are you aware from any source whether         01:40PM

 3    Quest ever utilized the voiceover functionality in     01:40PM

 4    the accessibility panel of Apple's IOS for the         01:41PM

 5    e-Check-in service from 2015 to the present?           01:41PM

 6         A.   Yeah.   I don't know.                         01:41PM

 7         Q.   Are you aware of whether Quest ever          01:41PM

 8    utilized the audio description feature within Apple's   01:41PM

 9    accessibility panel in the IOS from 2015 to the        01:41PM

10    present?                                                01:41PM

11         MR. RAIZMAN:   Object to foundation.              01:41PM

12         THE WITNESS:   Yeah.   I don't know.              01:41PM

13         Q.   (BY MR. MILLER):   Are you aware of          01:41PM

14    whether Quest ever utilized the spoken content         01:41PM

15    feature within Apple's IOS accessibility panel from    01:41PM

16    2015 to the present?                                   01:41PM

17         MR. RAIZMAN:   Object.   Foundation.              01:41PM

18         THE WITNESS:   Again, I don't know.               01:41PM

19         Q.   (BY MR. MILLER):   Are you aware of          01:41PM

20    whether -- strike that.                                01:41PM

21              When you went to incorporate the touch       01:41PM

22    feature for accessibility, were you able to get        01:41PM

23    access to that feature through an API that Apple       01:41PM

24    offers?                                                01:42PM

25         MR. RAIZMAN:   Object to form.                    01:42PM
```

Page 67

| | | |
|---|---|---|
| 1 | A.   I do not. | 02:12PM |
| 2 | Q.   From a patient experience perspective, | 02:12PM |
| 3 | are you aware of how blind users can utilize a | 02:13PM |
| 4 | tactile keyboard to independently access technology? | 02:13PM |
| 5 | MR. RAIZMAN:  Objection.  Foundation. | 02:13PM |
| 6 | THE WITNESS:  Am I answering as Taylor an | 02:13PM |
| 7 | awareness that there's visually impaired people in | 02:13PM |
| 8 | the world?  Or am I answering on behalf of Quest? | 02:13PM |
| 9 | Q.   (BY MR. MILLER):  As an employee of | 02:13PM |
| 10 | Quest, are you aware of whether blind patients can | 02:13PM |
| 11 | utilize tactile keyboards to independently access | 02:13PM |
| 12 | technology? | 02:13PM |
| 13 | MR. RAIZMAN:  Object.  Beyond the scope. | 02:13PM |
| 14 | THE WITNESS:  I think it would be | 02:13PM |
| 15 | speculation.  I mean, I'm not visually impaired.  I | 02:13PM |
| 16 | don't -- I don't know how you -- yeah.  I don't know. | 02:13PM |
| 17 | Q.   (BY MR. MILLER):  I'm just asking | 02:13PM |
| 18 | whether you know.  You've mentioned that you were in | 02:13PM |
| 19 | charge of patient experience for the e-Check-in | 02:13PM |
| 20 | service, correct? | 02:13PM |
| 21 | A.   I was in -- apart of the team focusing | 02:13PM |
| 22 | on patient-user experience, correct. | 02:13PM |
| 23 | Q.   And from that perspective in your role, | 02:13PM |
| 24 | are you aware of how blind patients can utilize a | 02:13PM |
| 25 | tactile keyboard to independently access technology? | 02:14PM |

Page 89

| | | |
|---|---|---|
| 1 | MR. RAIZMAN:  Object to form. | 02:14PM |
| 2 | THE WITNESS:  So in my role as a human on | 02:14PM |
| 3 | earth, yeah.  I know visually impaired people use | 02:14PM |
| 4 | braille to interact with devices like that. | 02:14PM |
| 5 | Q.  (BY MR. MILLER):  Did Quest ever | 02:14PM |
| 6 | consider utilizing a tactile keyboard to allow its | 02:14PM |
| 7 | blind patients to independently access the e-Check-in | 02:14PM |
| 8 | service? | 02:14PM |
| 9 | MR. RAIZMAN:  I'm going to object.  It's | 02:14PM |
| 10 | beyond the scope.  You can answer from your | 02:14PM |
| 11 | knowledge. | 02:14PM |
| 12 | THE WITNESS:  There was a lot of | 02:14PM |
| 13 | considerations that were made to drive and deliver a | 02:14PM |
| 14 | great experience for our customers. | 02:14PM |
| 15 | MR. MILLER:  Move to strike as nonresponsive. | 02:14PM |
| 16 | My question is more specific. | 02:14PM |
| 17 | Q.  (BY MR. MILLER):  Did Quest ever | 02:14PM |
| 18 | consider utilizing a tactile keyboard to allow blind | 02:14PM |
| 19 | patients to independently access the e-Check-in | 02:14PM |
| 20 | service? | 02:14PM |
| 21 | A.  Again, I -- I can't speak specifically | 02:14PM |
| 22 | because I was focusing on all of our customers that | 02:15PM |
| 23 | were coming to Quest Diagnostics. | 02:15PM |
| 24 | Q.  I'm asking even generally.  I'm asking | 02:15PM |
| 25 | whether you have any information whatsoever from any | 02:15PM |

Page 90

PA0077

```
 1    source whether Quest ever considered utilizing a        02:15PM

 2    tactile keyboard to allow blind patients to             02:15PM

 3    independently access the e-Check-in service?            02:15PM

 4         MR. RAIZMAN:  I'm going to object to the           02:15PM

 5    extent any of your information comes from               02:15PM

 6    communications with counsel.  Otherwise, you can        02:15PM

 7    answer.                                                 02:15PM

 8         THE WITNESS:  It's possible.  I started in         02:15PM

 9    2009.  And there's a lot of considerations              02:15PM

10    potentially in that time and beyond.                    02:15PM

11         Q.  (BY MR. MILLER):  If -- but today is my        02:15PM

12    day to take your deposition, so I'm not asking what's   02:15PM

13    possible.  I'm asking what you know.  So just with      02:15PM

14    that qualification, I'm asking whether you know from    02:15PM

15    any source other than counsel whether Quest ever        02:15PM

16    considered the use of a tactile keyboard to allow its   02:15PM

17    blind patients to independently access it's             02:15PM

18    e-Check-in service?                                     02:16PM

19         A.  It would be speculation.  It -- it's           02:16PM

20    possible, right?  We would have to refer to the         02:16PM

21    documents.  I don't recall.  I don't know.              02:16PM

22         Q.  Is it you don't recall or you don't            02:16PM

23    know?  Which one?                                       02:16PM

24         A.  I may not have been involved in those.         02:16PM

25    It's all speculation.  I'm not involved in all -- go    02:16PM
```

Page 91

| | | |
|---|---|---|
| 1 | ahead. | 02:16PM |
| 2 | Q.   No.  I wanted you to finish.  You're not | 02:16PM |
| 3 | involved in -- go ahead.  You're not involved in all? | 02:16PM |
| 4 | A.   Can you ask your question again? | 02:16PM |
| 5 | Q.   As you sit here today, can you tell me | 02:16PM |
| 6 | from any source other than counsel whether Quest ever | 02:16PM |
| 7 | considered utilizing a tactile keyboard to allow | 02:16PM |
| 8 | blind patients to independently access it's | 02:16PM |
| 9 | e-Check-in service?  Do you have any information at | 02:16PM |
| 10 | all in that regard that you can tell me about today | 02:16PM |
| 11 | at your deposition? | 02:16PM |
| 12 | A.   I don't recall. | 02:16PM |
| 13 | Q.   Do you know of any documents that would | 02:16PM |
| 14 | refresh your recollection as you sit here today? | 02:16PM |
| 15 | A.   No. | 02:17PM |
| 16 | Q.   Do you know whether it was ever | 02:17PM |
| 17 | determined whether a keyboard would be necessary for | 02:17PM |
| 18 | the kiosk as referenced here in Exhibit 21? | 02:17PM |
| 19 | A.   I don't know. | 02:17PM |
| 20 | Q.   Were you involved in any way in making | 02:17PM |
| 21 | the decision as to whether or not to have a keyboard | 02:17PM |
| 22 | for the e-Check-in service? | 02:17PM |
| 23 | A.   I don't know.  We'd have to refer to | 02:17PM |
| 24 | documents. | 02:17PM |
| 25 | Q.   Do you know anyone else at Quest that | 02:17PM |

Page 92

| | | |
|---|---|---|
| 1 | was involved in the decision to -- as to whether or | 02:17PM |
| 2 | not to utilize a keyboard for the e-Check-in kiosk? | 02:17PM |
| 3 | A.   I don't know. | 02:17PM |
| 4 | Q.   Now, if we go down in this document a | 02:17PM |
| 5 | little further on page 2, there's a section that | 02:17PM |
| 6 | says, "Cost known to buy solution."  Was that one of | 02:18PM |
| 7 | the items your team was trying to determine as to how | 02:18PM |
| 8 | much it would cost for the buy sol- -- you know, the | 02:18PM |
| 9 | off-the-shelf solution, if you will -- the buy | 02:18PM |
| 10 | solution? | 02:18PM |
| 11 | A.   As part of those three teams I | 02:18PM |
| 12 | mentioned, yes. | 02:18PM |
| 13 | Q.   And it says here, "Quote needed from | 02:18PM |
| 14 | QuadraMed."  Were you at all involved in any of the | 02:18PM |
| 15 | quotes from QuadraMed? | 02:18PM |
| 16 | A.   I don't recall. | 02:18PM |
| 17 | Q.   Do you know of any document that would | 02:18PM |
| 18 | refresh your recollection? | 02:18PM |
| 19 | A.   No. | 02:18PM |
| 20 | Q.   Was Mr. Yarrison involved in obtaining a | 02:18PM |
| 21 | quote from QuadraMed? | 02:18PM |
| 22 | A.   Per the document in front of me, you're | 02:18PM |
| 23 | referencing on page 2 where Marc has an action, it | 02:18PM |
| 24 | looks like that's the case. | 02:18PM |
| 25 | Q.   Did Mr. Yarrison ever share with you the | 02:18PM |

Page 93

PA0080

| | | |
|---|---|---|
| 1 | Q.   Do you know of any documents that would | 02:42PM |
| 2 | refresh your memory as you sit here today? | 02:42PM |
| 3 | A.   No. | 02:42PM |
| 4 | Q.   Are you aware of whether the headphone | 02:42PM |
| 5 | jack extension that little tab offers is at a cost of | 02:42PM |
| 6 | $20 per unit? | 02:43PM |
| 7 | MR. RAIZMAN:  Objection.  Lack of foundation. | 02:43PM |
| 8 | THE WITNESS:  I don't know.  I already said I | 02:43PM |
| 9 | don't recall and I don't know. | 02:43PM |
| 10 | Q.   (BY MR. MILLER):  Was there ever any | 02:43PM |
| 11 | discussion within your team -- strike that. | 02:43PM |
| 12 | Are you aware from any source whether | 02:43PM |
| 13 | Quest ever determined that utilizing the headphone | 02:43PM |
| 14 | jack extension of little tab would impose an undue | 02:43PM |
| 15 | burden on the company in the implementation of the | 02:43PM |
| 16 | e-Check-in service? | 02:43PM |
| 17 | MR. RAIZMAN:  Object as to form. | 02:43PM |
| 18 | THE WITNESS:  Do you have a timeframe? | 02:43PM |
| 19 | Q.   (BY MR. MILLER):  Yeah.  From 2015 to | 02:43PM |
| 20 | the present, are you aware from any source other than | 02:43PM |
| 21 | counsel that the utilization of little tab's | 02:43PM |
| 22 | headphone jack extension would impose an undue burden | 02:43PM |
| 23 | on Quest in operating e-Check-in service? | 02:43PM |
| 24 | MR. RAIZMAN:  Object as to form. | 02:43PM |
| 25 | THE WITNESS:  Yeah.  I don't know. | 02:44PM |

Page 100

```
 1           Q.   (BY MR. MILLER):  Did you ever undertake    02:44PM

 2   any analysis as to whether utilizing the little tab      02:44PM

 3   headphone jack extension would impose an undue burden    02:44PM

 4   on Quest in implementing its e-Check-in service?         02:44PM

 5           MR. RAIZMAN:  Object as to form.                 02:44PM

 6           THE WITNESS:  I don't know.  I don't know if     02:44PM

 7   I understand, either, Mr. Miller.  Honestly, I don't     02:44PM

 8   know.                                                    02:44PM

 9           Q.   (BY MR. MILLER):  Did you ever undertake    02:44PM

10   any analysis as to whether utilizing the little tab      02:44PM

11   headphone jack extension would impose a financial --     02:44PM

12   an unachievable financial -- strike that.                02:44PM

13           Did you ever consider whether utilizing          02:44PM

14   the little tab headphone jack extension would impose     02:44PM

15   an undue financial burden on Quest in the e-Check-in     02:44PM

16   service?                                                 02:44PM

17           MR. RAIZMAN:  Object as to form.  All I'm        02:44PM

18   going to say is he told you at the beginning of this     02:44PM

19   deposition if you didn't understand the question,        02:44PM

20   don't answer it, ask for clarification.  But if you      02:44PM

21   understand it, please answer.                            02:44PM

22           MR. MILLER:  Please mark the transcript,         02:45PM

23   Madame Court Reporter, that counsel is engaging in       02:45PM

24   behavior that violates 30C2, that the objections are     02:45PM

25   being stated in a suggestive manner.  Thank you.         02:45PM
```

Page 101

| | | |
|---|---|---|
| 1 | Mr. Carr, I'll -- | 02:45PM |
| 2 | MR. RAIZMAN:  Please let the record also | 02:45PM |
| 3 | reflect that counsel has testimony from the witness | 02:45PM |
| 4 | under oath that he didn't understand the prior | 02:45PM |
| 5 | question, yet he keeps using the same phrase in all | 02:45PM |
| 6 | of his questions.  That's violating the standards for | 02:45PM |
| 7 | taking a deposition. | 02:45PM |
| 8 | MR. MILLER:  Not engaging in soliloquy, | 02:45PM |
| 9 | Counsel, here today, sir.  I'm taking a deposition. | 02:45PM |
| 10 | MR. RAIZMAN:  I thought that's what you were | 02:45PM |
| 11 | doing. | 02:45PM |
| 12 | Q.   (BY MR. MILLER):  Mr. Carr, did you ever | 02:45PM |
| 13 | consider whether implementing the little tab kiosk | 02:45PM |
| 14 | that contains a headphone jack extension would impose | 02:45PM |
| 15 | an undue financial burden on Quest? | 02:45PM |
| 16 | MR. RAIZMAN:  Object as to form. | 02:45PM |
| 17 | THE WITNESS:  I don't recall. | 02:45PM |
| 18 | Q.   (BY MR. MILLER):  Do you know of any | 02:45PM |
| 19 | documents that would refresh your memory? | 02:45PM |
| 20 | A.   No. | 02:46PM |
| 21 | Q.   Are you aware from any source other than | 02:46PM |
| 22 | counsel whether Quest ever analyzed that implementing | 02:46PM |
| 23 | the little tab kiosk with a headphone jack extension | 02:46PM |
| 24 | would impose an undue financial burden on the | 02:46PM |
| 25 | company? | 02:46PM |

Page 102

PA0083

| | | |
|---|---|---|
| 1 | MR. RAIZMAN:   Object as to form. | 02:46PM |
| 2 | THE WITNESS:   Do you have a timeframe? | 02:46PM |
| 3 | Q.   (BY MR. MILLER):   In 2015 to the | 02:46PM |
| 4 | present? | 02:46PM |
| 5 | A.   Yeah.   I don't know. | 02:46PM |
| 6 | Q.   Do you know how much the little tab | 02:46PM |
| 7 | kiosk that Quest ultimately selected cost the | 02:46PM |
| 8 | company? | 02:46PM |
| 9 | A.   I don't remember. | 02:46PM |
| 10 | Q.   Would it be contained within CapEx -- | 02:46PM |
| 11 | the ultimate final approved CapEx? | 02:46PM |
| 12 | A.   It -- I don't recall.   We'd have to | 02:46PM |
| 13 | refer to that document. | 02:46PM |
| 14 | Q.   Okay.   We'll get there.   I'm going to | 02:46PM |
| 15 | show you what I'll mark next in order, Exhibit 22. | 02:47PM |
| 16 | (Exhibit 22 marked.) | 02:47PM |
| 17 | MR. RAIZMAN:   I'm not able to access the | 02:47PM |
| 18 | document or exhibit share at all right now. | 02:47PM |
| 19 | MR. MILLER:   It's uploading right now, | 02:47PM |
| 20 | Mr. Raizman. | 02:47PM |
| 21 | MR. RAIZMAN:   Okay. | 02:47PM |
| 22 | THE REPORTER:   Can you guys hear me? | 02:48PM |
| 23 | MR. MILLER:   Yes. | 02:48PM |
| 24 | MR. RAIZMAN:   Yes. | |
| 25 | THE REPORTER:   Okay.   I lost video connection | |

Page 103

PA0084

| | | |
|---|---|---|
| 1 | Q.   (BY MR. MILLER):  In assessing -- I | 03:55PM |
| 2 | think you said, "Yes, we have."  Is it locations with | 03:55PM |
| 3 | one employee who's a phlebotomist? | 03:55PM |
| 4 | A.   Can you ask your question again and then | 03:55PM |
| 5 | I will respond, if that's okay? | 03:55PM |
| 6 | Q.   Yeah.  I'm asking isn't it true that | 03:55PM |
| 7 | there are Patient Service Centers that only have one | 03:55PM |
| 8 | employee and that employee is a phlebotomist? | 03:55PM |
| 9 | MR. RAIZMAN:  Object to form. | 03:55PM |
| 10 | THE WITNESS:  Yes, Quest has sites with one | 03:55PM |
| 11 | phlebotomist. | 03:55PM |
| 12 | Q.   (BY MR. MILLER):  It also has sites with | 03:55PM |
| 13 | two employees, and both of those employees are | 03:55PM |
| 14 | phlebotomists; isn't that true? | 03:55PM |
| 15 | MR. RAIZMAN:  Object to form. | 03:55PM |
| 16 | THE WITNESS:  Yes, Quest has sites with two | 03:55PM |
| 17 | phlebotomists. | 03:56PM |
| 18 | Q.   (BY MR. MILLER):  In assessing patient | 03:56PM |
| 19 | experience and trying to deliver the e-Check-in | 03:56PM |
| 20 | service, did you ever think to ascertain how long | 03:56PM |
| 21 | patients would have to -- or strike that -- how long | 03:56PM |
| 22 | blinds patients would have to wait to check in once | 03:56PM |
| 23 | e-Check-in service was implemented by Quest? | 03:56PM |
| 24 | A.   So not specific to the segment that | 03:56PM |
| 25 | you're referring.  So going to back to kind of the | 03:56PM |

Page 149

| | | |
|---|---|---|
| 1 | implemented into the e-Check-in service was the | 03:57PM |
| 2 | wait-by-text option; isn't that true? | 03:57PM |
| 3 | A.   I don't know what that's referring to. | 03:57PM |
| 4 | Q.   You've never heard of the wait-by-text | 03:57PM |
| 5 | option within the e-Check-in service? | 03:58PM |
| 6 | A.   Not -- no. | 03:58PM |
| 7 | Q.   Are you familiar with any screen within | 03:58PM |
| 8 | the e-Check-in service that allows you to let the | 03:58PM |
| 9 | Quest -- strike that.  I'm going to ask it a better | 03:58PM |
| 10 | way. | 03:58PM |
| 11 | Are you -- isn't it true that there is | 03:58PM |
| 12 | an option within the e-Check-in service that lets you | 03:58PM |
| 13 | be texted when -- when your time to be served is | 03:58PM |
| 14 | ready? | 03:58PM |
| 15 | A.   Yes. | 03:58PM |
| 16 | Q.   And what's that called?  What do you | 03:58PM |
| 17 | refer to that as? | 03:58PM |
| 18 | A.   "Wait Where You Want." | 03:58PM |
| 19 | Q.   Okay.  The "Wait Where You Want" option, | 03:58PM |
| 20 | did you assist in having that implemented within the | 03:58PM |
| 21 | e-Check-in service? | 03:58PM |
| 22 | A.   Yeah.  Yes. | 03:58PM |
| 23 | Q.   And -- and is that to improve patient | 03:58PM |
| 24 | experience? | 03:58PM |
| 25 | A.   It was part of experience related to | 03:58PM |

Page 151

PA0086

| | | |
|---|---|---|
| 1 | COVID. | 03:59PM |
| 2 | Q.   Did it exist prior to COVID? | 03:59PM |
| 3 | A.   No. | 03:59PM |
| 4 | Q.   And how does the "Wait Where You Want" | 03:59PM |
| 5 | functionality work? | 03:59PM |
| 6 | A.   It's a component within e-Check-in. | 03:59PM |
| 7 | Q.   Right.  And so once you go and you use | 03:59PM |
| 8 | the e-Check-in service, you can -- one of the screens | 03:59PM |
| 9 | allows you to put in your information to wait where | 03:59PM |
| 10 | you want, right? | 03:59PM |
| 11 | A.   Yes. | 03:59PM |
| 12 | Q.   And so that allows you to either wait in | 03:59PM |
| 13 | the waiting room or some other location, correct? | 03:59PM |
| 14 | A.   Yes. | 03:59PM |
| 15 | Q.   For example, if you didn't want to be in | 03:59PM |
| 16 | a crowded waiting room during COVID, you could wait | 03:59PM |
| 17 | outdoors or in your car? | 03:59PM |
| 18 | A.   Yes. | 03:59PM |
| 19 | Q.   And how would you be notified, then, | 03:59PM |
| 20 | when your -- when your appointment time was called by | 03:59PM |
| 21 | the phlebotomist? | 03:59PM |
| 22 | A.   A text message. | 03:59PM |
| 23 | Q.   Would be sent to your phone? | 03:59PM |
| 24 | A.   Yes. | 04:00PM |
| 25 | Q.   And we'll talk a little more in detail | 04:00PM |

Page 152

```
 1    in a bit about the three-finger swipe option, but you    04:00PM

 2    were responsible for implementing that as well,          04:00PM

 3    correct?                                                 04:00PM

 4            A.   Am I answering on behalf of Quest or        04:00PM

 5    myself?                                                  04:00PM

 6            Q.   On behalf of Quest.                         04:00PM

 7            A.   No.  I wasn't involved in the               04:00PM

 8    implementation.                                          04:00PM

 9            Q.   Were you involved in the design?            04:00PM

10            A.   Yes.                                        04:00PM

11            Q.   And you understand how the three-finger     04:00PM

12    swipe works, correct?                                    04:00PM

13            A.   Yes.  On behalf of Quest, yes.              04:00PM

14            Q.   And the three-finger swipe allows a         04:00PM

15    blind patient to go up to the e-Check-in, use three      04:00PM

16    fingers to swipe and check in, right?                    04:00PM

17            A.   Yes.  And/or a phlebotomist supporting a    04:00PM

18    customer checking in.                                    04:00PM

19            Q.   But certainly just one way the blind        04:00PM

20    user could use the e-Check-in is to do a three-finger    04:00PM

21    swipe, correct?                                          04:00PM

22            A.   Yes.                                        04:00PM

23            Q.   And when was that implemented?              04:00PM

24            A.   I think it was August of last year.         04:01PM

25            Q.   August of 2020, correct?                    04:01PM
```

Page 153

PA0088

```
1     that opportunity with the visually impaired.        05:43PM
2          Q.   And so, specifically, when as the         05:43PM
3     three-finger swipe implemented at all the PSCs by   05:43PM
4     Quest?                                              05:43PM
5          A.   August 2020.                              05:43PM
6          Q.   At that point, it was available at all    05:43PM
7     the PSCs that had e-Check-in services?              05:43PM
8          A.   Correct.                                  05:43PM
9          Q.   And so how would the three-finger swipe   05:43PM
10    work?  Walk me through it.                          05:43PM
11         A.   Yeah.  Customers would use their three    05:43PM
12    digits -- any three digits they so desire, and      05:43PM
13    indicate across the screen, and the screen would    05:43PM
14    recognize that and communicate that to the customers 05:43PM
15    that they've been checked in, as I've summarized, and 05:43PM
16    then also to our phlebotomy staff.                  05:43PM
17         Q.   And would it put them in a queue at that  05:43PM
18    point?                                              05:43PM
19         A.   Yes.                                      05:43PM
20         Q.   And into the computerized queue that was  05:44PM
21    available through e-Check-in?                        05:44PM
22         A.   Correct.                                  05:44PM
23         Q.   Now, how would blind patients know to     05:44PM
24    use the three fingers to check in?                  05:44PM
25         A.   Yeah.  One of the elements going back     05:44PM
```

Page 190

```
 1              THE WITNESS:  I know of the 12.          05:49PM

 2         Q.   (BY MR. MILLER):  Do you know anything   05:49PM

 3    beyond that number?                               05:49PM

 4         A.   Related to the three-finger swipe        05:49PM

 5    communication via the Appointment Scheduler and the 05:49PM

 6    on -- or and the phone Appointment Scheduler, I only 05:49PM

 7    know of the 12.                                    05:49PM

 8         Q.   Fair enough.  Now, another method by     05:49PM

 9    which Quest conveys to blind patients that they can 05:49PM

10    presently use the three-finger swipe is vis-à-vis the 05:49PM

11    LCD display that is contain in certain Patient     05:49PM

12    Service Centers, correct?                          05:50PM

13         A.   Correct.                                 05:50PM

14         Q.   And is that communication delivered to   05:50PM

15    all Quest Patient Service Centers vis-à-vis the LCD 05:50PM

16    display?                                           05:50PM

17         A.   Correct.                                 05:50PM

18         Q.   And is that via a video loop?            05:50PM

19         A.   It's via an audio loop.  It happens to   05:50PM

20    be on a video screen.                              05:50PM

21         Q.   Correct.  There's both video content and 05:50PM

22    audio content that's in the loop; isn't that true? 05:50PM

23         A.   Yeah.  The audio is what's changing,     05:50PM

24    though.  What's in the video is static.            05:50PM

25         Q.   And on those screens it still shows the  05:50PM
```

Page 195

| | | |
|---|---|---|
| 1 | actual queue, right?  That's still displayed to | 05:50PM |
| 2 | patients? | 05:50PM |
| 3 | A.   Correct. | 05:50PM |
| 4 | Q.   All right.  And so with respect to the | 05:50PM |
| 5 | audio loop, how long is the audio loop at Patient | 05:50PM |
| 6 | Service Centers that contains this message? | 05:50PM |
| 7 | A.   I don't know. | 05:51PM |
| 8 | Q.   How often does the audio message to use | 05:51PM |
| 9 | a three-finger swipe play? | 05:51PM |
| 10 | A.   Every 7 to 10 minutes. | 05:51PM |
| 11 | Q.   Isn't it true, Mr. Carr, that the audio | 05:51PM |
| 12 | loop differs from Patient Service Center to Patient | 05:51PM |
| 13 | Service Center in terms of its length? | 05:51PM |
| 14 | A.   I don't know. | 05:51PM |
| 15 | Q.   Isn't it true that within the same | 05:51PM |
| 16 | Patient Service Center the audio loop can differ in | 05:51PM |
| 17 | terms of its length and content? | 05:51PM |
| 18 | A.   I don't know. | 05:51PM |
| 19 | Q.   Would it surprise you to learn, | 05:51PM |
| 20 | Mr. Carr, that there are locations -- Patient Service | 05:51PM |
| 21 | Center locations where the message to blind patients | 05:51PM |
| 22 | to check in is as long as 30 minutes before it's | 05:51PM |
| 23 | displayed in a duplicate form? | 05:51PM |
| 24 | A.   I don't know about that. | 05:51PM |
| 25 | Q.   Are you -- would it surprise you to | 05:51PM |

Page 196

| | | |
|---|---|---|
| 1 | within Quest direct that feedback to you | 06:25PM |
| 2 | specifically? | 06:25PM |
| 3 | MR. RAIZMAN:  Object as to form. | 06:25PM |
| 4 | Q.  (BY MR. MILLER):  Or does it come to you | 06:25PM |
| 5 | directly from the patients? | 06:25PM |
| 6 | A.  It does not come direct from the | 06:25PM |
| 7 | patients to me. | 06:25PM |
| 8 | Q.  BY (MR. MILLER):  Who does it come from | 06:25PM |
| 9 | within Quest? | 06:25PM |
| 10 | MR. RAIZMAN:  Object as the form. | 06:25PM |
| 11 | THE WITNESS:  Could be many groups.  I don't | 06:25PM |
| 12 | know specific which ones.  But we have many patient | 06:25PM |
| 13 | customer facing groups. | 06:25PM |
| 14 | Q.  (BY MR. MILLER):  As part of your job | 06:25PM |
| 15 | duties to take customer feedback and evaluate whether | 06:25PM |
| 16 | improvements should be made? | 06:25PM |
| 17 | A.  Yeah.  As I mentioned, that's why we had | 06:25PM |
| 18 | that focus group with the visually impaired.  It's | 06:25PM |
| 19 | instrumental. | 06:25PM |
| 20 | Q.  Do you know whether anyone had your job | 06:25PM |
| 21 | back in 2017 -- the job you currently fulfil in that | 06:26PM |
| 22 | capacity? | 06:26PM |
| 23 | MR. RAIZMAN:  Object as to form. | 06:26PM |
| 24 | THE WITNESS:  I don't know. | 06:26PM |
| 25 | Q.  (BY MR. MILLER):  If we could fast | 06:26PM |

Page 223

PA0092

| | | |
|---|---|---|
| 1 | forward down the chart here another three columns, | 06:26PM |
| 2 | it's the entry that's numbered 27674, dated | 06:26PM |
| 3 | 05/24/2017. | 06:26PM |
| 4 | A.   I see that.  You keep saying columns.  I | 06:26PM |
| 5 | think you mean rows, though, right? | 06:26PM |
| 6 | Q.   Well, I will refer to rows if you want, | 06:26PM |
| 7 | yes.  Sure, I understand the distinction.  Thank you. | 06:26PM |
| 8 | Yes, rows.  I'm sorry. | 06:26PM |
| 9 | A.   Okay. | 06:26PM |
| 10 | Q.   So it's the row with 27674. | 06:26PM |
| 11 | A.   Yeah. | 06:26PM |
| 12 | Q.   The description says, "The patient" -- | 06:26PM |
| 13 | it looks like "ontact"; maybe "contact" is the word. | 06:26PM |
| 14 | It says -- "the New Jersey Blind Citizens Association | 06:26PM |
| 15 | about the difficulties she had with signing in with | 06:26PM |
| 16 | the iPad.  No one was at the front desk and she could | 06:26PM |
| 17 | not read the instruction.  A patient from the waiting | 06:27PM |
| 18 | room helped her sign in, but now the other patient | 06:27PM |
| 19 | knows personal information."  Did you ever receive | 06:27PM |
| 20 | that piece of feedback in or around the 2017 | 06:27PM |
| 21 | timeframe while you were working on the e-Check-in | 06:27PM |
| 22 | kiosk? | 06:27PM |
| 23 | A.   Not specific to this example but we've | 06:27PM |
| 24 | received customer feedback to make the experience | 06:27PM |
| 25 | better on checking in and we're shared some of those | 06:27PM |

Page 224

PA0093

| | | |
|---|---|---|
| 1 | iterations that have happened over time. | 06:27PM |
| 2 | Q.    Do you know whether the three-finger | 06:27PM |
| 3 | swipe was considered in response to this piece of | 06:27PM |
| 4 | feedback back in May 24th of 2017? | 06:27PM |
| 5 | A.    I don't know. | 06:27PM |
| 6 | Q.    You were still working on the e-Check-in | 06:27PM |
| 7 | service back in the 2017 timeframe; isn't that true? | 06:27PM |
| 8 | A.    I believe I was still part of the | 06:28PM |
| 9 | business process redesign group but I don't know if | 06:28PM |
| 10 | this project I'd handed off to the -- Mark's | 06:28PM |
| 11 | departments. | 06:28PM |
| 12 | Q.    But to your knowledge in 2017, | 06:28PM |
| 13 | three-finger swipe was not part of the discussion, | 06:28PM |
| 14 | was it, sir? | 06:28PM |
| 15 | A.    I don't know. | 06:28PM |
| 16 | Q.    We can forward down to the page with the | 06:28PM |
| 17 | Bates stamp 34660, and I'm looking at the last row on | 06:28PM |
| 18 | the page.  It's the complaint number 36826, dated | 06:28PM |
| 19 | April 5th, 2018.  Tell me when you're there. | 06:28PM |
| 20 | A.    Yes, I'm there.  Just confirm, 36826, | 06:28PM |
| 21 | April 5th, 2018, and it says, "West Patient Services | 06:28PM |
| 22 | LTF." | 06:29PM |
| 23 | Q.    Correct.  Now, at this point, you were | 06:29PM |
| 24 | in your current position, correct? | 06:29PM |
| 25 | A.    No.  I'm thinking -- no. | 06:29PM |

Page 225

| | | |
|---|---|---|
| 1 | Q.   Well, it goes on to say, "I was recently | 06:29PM |
| 2 | asked that Quest lab on C S Wadsworth, Friday at 3:30 | 06:29PM |
| 3 | for a routine blood draw.  I am a low vision patient | 06:29PM |
| 4 | and the only way to register is by computer, which I | 06:29PM |
| 5 | cannot see to do.  I was told that elderly people | 06:29PM |
| 6 | were difficult to work with because they're not | 06:29PM |
| 7 | willing to learn new skills, EG computers.  I'm very | 06:29PM |
| 8 | capable of using a computer.  Since losing my | 06:29PM |
| 9 | eyesight, it is a skill I can no longer practice.  I | 06:29PM |
| 10 | would be willing to discuss this further and can be | 06:29PM |
| 11 | reached at" -- it looks redacted, and it says, "Thank | 06:29PM |
| 12 | you."  Do you know whether the three-finger swipe was | 06:29PM |
| 13 | ever considered in response to this complaint after | 06:29PM |
| 14 | 04/05 of 2018? | 06:30PM |
| 15 | MR. RAIZMAN:  Object as to form. | 06:30PM |
| 16 | THE WITNESS:  Yeah.  I don't know. | 06:30PM |
| 17 | Q.   (BY MR. MILLER):  Do you know whether | 06:30PM |
| 18 | anyone at Quest reached out to this individual? | 06:30PM |
| 19 | A.   I don't know. | 06:30PM |
| 20 | Q.   Let's go down to the next page 34661 and | 06:30PM |
| 21 | I'm at the row with complaint No. 42052 at the | 06:30PM |
| 22 | bottom, dated August 29th of 2018.  At this point | 06:30PM |
| 23 | were you in your new position? | 06:30PM |
| 24 | A.   It looks like it was a few months | 06:30PM |
| 25 | beforehand. | 06:30PM |

Page 226

| | | |
|---|---|---|
| 1 | Q. Nevertheless, it goes on to say, "Your | 06:30PM |
| 2 | new sign in kiosk tablet violates ADA reasonable | 06:30PM |
| 3 | accomodation rules and also violates HIPAA laws | 06:30PM |
| 4 | because blinds visually impaired, those with hand | 06:31PM |
| 5 | problems, motor skill issues, and those who simply | 06:31PM |
| 6 | can't learn modern technology, none can sign in on | 06:31PM |
| 7 | their own and should not be -- and should not require | 06:31PM |
| 8 | another patient in the room to help them.  You | 06:31PM |
| 9 | apparently fired all of your front desk people and | 06:31PM |
| 10 | thought this new technology would save you money, but | 06:31PM |
| 11 | it makes people like me want to find another lab to | 06:31PM |
| 12 | get my tests done to avoid this inhumanity.  I | 06:31PM |
| 13 | suggest very strongly that you bring back humans to | 06:31PM |
| 14 | the front desk and show that you really care about | 06:31PM |
| 15 | your patients.  If you continue violations as above, | 06:31PM |
| 16 | you might well have to deal some legal repercussions | 06:31PM |
| 17 | from your changes.  Saving some money is all well and | 06:31PM |
| 18 | good, but not at the expense of the blind patients | 06:31PM |
| 19 | dignity and privacy when signing in."  Were you ever | 06:31PM |
| 20 | made aware of this complaint? | 06:31PM |
| 21 | A. No. | 06:31PM |
| 22 | Q. Do you know whether Quest considered the | 06:32PM |
| 23 | three-finger swipe option in and around the August of | 06:32PM |
| 24 | 2018 timeframe in response to this complaint? | 06:32PM |
| 25 | MR. RAIZMAN:  Objection.  Foundation. | 06:32PM |

Page 227

```
 1        MR. RAIZMAN:  Object as to form.              14:15:27
 2        THE WITNESS:  That bullet, if you summarized it,  14:15:33
 3   is about preparation.  And what the ten individuals   14:15:38
 4   from the focus group communicated is their success    14:15:41
 5   in the day to day comes from preparation.             14:15:48
 6   BY MR. MILLER:                                        14:15:48
 7        Q    One of the things that you learned from the  14:15:49
 8   focus group was that individuals with visual          14:15:51
 9   disabilities wanted the ability to ask for help when  14:15:55
10   they arrived at a location.  Right?                   14:16:02
11        A    Can you restate that?                       14:16:04
12        Q    Yes.                                        14:16:04
13             One of the things you learned from the      14:16:06
14   focus group was that individuals with visual          14:16:08
15   disabilities wanted -- wanted an option to ask for    14:16:11
16   help when they arrive at a location.  Correct?        14:16:17
17        A    I'd say just like all -- all customers that  14:16:19
18   were visiting Quest.  So all customers that are       14:16:22
19   visiting Quest want the ability to ask for help.      14:16:26
20        Q    What has Quest done since the eCheck-in     14:16:29
21   kiosk to allow visually-impaired patients to signal   14:16:34
22   that they need help?                                  14:16:36
23        MR. RAIZMAN:  I'm going to object.  It's plainly  14:16:38
24   beyond the scope of this deposition as agreed.        14:16:41
25   ///                                                   14:16:44
```

Page 355

| | | |
|---|---|---|
| 1 | BY MR. MILLER: | 14:16:44 |
| 2 | Q    Go ahead.  You can answer, Mr. Carr. | 14:16:46 |
| 3 | A    Specific to the deposition, I know the | 14:16:50 |
| 4 | three-finger swipe is something that's been put in | 14:16:55 |
| 5 | place which you can go to a Quest and experience. | 14:16:59 |
| 6 | Q    Right.  But does the three-finger swipe | 14:17:00 |
| 7 | allow you to flag that you need help? | 14:17:05 |
| 8 | MR. RAIZMAN:  Beyond the scope.  Object as to | 14:17:08 |
| 9 | the form of the question as well. | 14:17:09 |
| 10 | BY MR. MILLER: | 14:17:11 |
| 11 | Q    Isn't it true the three-finger swipe does | 14:17:13 |
| 12 | not specifically allow someone to flag that they | 14:17:16 |
| 13 | need help? | 14:17:18 |
| 14 | MR. RAIZMAN:  Object as to the form of the | 14:17:19 |
| 15 | question.  And I'm going to further object that it's | 14:17:23 |
| 16 | beyond the scope of the deposition. | 14:17:25 |
| 17 | Maybe we can discuss that off the record | 14:17:29 |
| 18 | because we clearly have a different understanding of | 14:17:31 |
| 19 | the scope of this deposition. | 14:17:32 |
| 20 | BY MR. MILLER: | 14:17:32 |
| 21 | Q    You can answer, Mr. Carr. | 14:17:35 |
| 22 | A    Can you restate the question for me? | 14:17:37 |
| 23 | Q    First of all, does the kiosk have a help | 14:17:44 |
| 24 | button if a customer needs help? | 14:17:48 |
| 25 | A    You broke up again.  Sorry. | 14:17:49 |

Page 356

| | | |
|---|---|---|
| 1 | 2A is what you are referencing? | 14:21:53 |
| 2 | Q   Yes. | 14:21:55 |
| 3 | And so after conducting this focus group | 14:21:58 |
| 4 | and sending this e-mail, how did Quest use audio or | 14:22:04 |
| 5 | change the way it used audio to convey information | 14:22:07 |
| 6 | at the Patient Service Centers? | 14:22:09 |
| 7 | MR. RAIZMAN:  Object as to form of the question. | 14:22:11 |
| 8 | Object that it's beyond the scope of the deposition. | 14:22:14 |
| 9 | BY MR. MILLER: | 14:22:14 |
| 10 | Q   You can answer, Mr. Carr. | 14:22:18 |
| 11 | A   I know that when the three-finger swipe and | 14:22:22 |
| 12 | the help button is used, there's an audio indicator | 14:22:27 |
| 13 | to the customer about what just occurred. | 14:22:32 |
| 14 | Q   And is that audio indicator available at | 14:22:35 |
| 15 | all Quest Diagnostic Patient Service Centers as of | 14:22:39 |
| 16 | today? | 14:22:41 |
| 17 | A   From what I know, I feel pretty confident | 14:22:44 |
| 18 | in saying yes, it's available on all locations | 14:22:47 |
| 19 | with -- | 14:22:50 |
| 20 | MR. RAIZMAN:  Excuse me.  I move to strike as | 14:22:53 |
| 21 | beyond the scope. | 14:22:54 |
| 22 | BY MR. MILLER: | 14:22:54 |
| 23 | Q   And does that audio indicator -- what does | 14:22:57 |
| 24 | that audio indicator tell a patient who has used the | 14:22:59 |
| 25 | three-finger swipe? | 14:23:01 |

Page 360

```
 1        MR. RAIZMAN:  Object.  It's beyond the scope of      14:23:03

 2   the deposition as agreed.                                 14:23:05

 3   BY MR. MILLER:                                            14:23:05

 4        Q    You can answer, Mr. Carr.                       14:23:07

 5        A    I don't recall the exact wording.  But          14:23:09

 6   since it is available in Quest locations, we could        14:23:14

 7   go there and use it and hear it.                          14:23:18

 8        Q    What is your best memory of what the            14:23:20

 9   general audio message is?                                 14:23:23

10        A    I don't feel comfortable saying that            14:23:25

11   because it would be speculative, since we are on the      14:23:27

12   record.                                                   14:23:30

13        MR. RAIZMAN:  I'll object.  Move to strike as        14:23:33

14   beyond the scope.                                         14:23:34

15   BY MR. MILLER:                                            14:23:34

16        Q    As you sit here today, you can't tell me at     14:23:36

17   all what the audio message relays when somebody uses      14:23:40

18   the three-finger swipe, can you?                          14:23:43

19        MR. RAIZMAN:  I'm going to object.  It's beyond      14:23:45

20   the scope of the deposition for which the                 14:23:47

21   plaintiff -- sorry, for which the witness is              14:23:50

22   prepared.                                                 14:23:52

23   BY MR. MILLER:                                            14:23:52

24        Q    You can answer, Mr. Carr.                       14:23:54

25        A    Again, it uses audio.  I don't know the         14:23:56
```

                                                    Page 361

PA0100

# EXHIBIT 7

```
 1                UNITED STATES DISTRICT COURT
 2           FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JULIAN VARGAS, ANNE WEST, and  ) NO. 2:19-cv-8108
     AMERICAN COUNCIL OF THE BLIND, )
 5   individually on behalf of      )
     themselves and all others      )
 6   similarly situated,            )
                                    )
 7                  Plaintiffs,     )
                                    )
 8        v.                        )
                                    )
 9   QUEST DIAGNOSTICS CLINICAL     )
     LABORATORIES, INC., QUEST      )
10   DIAGNOSTICS HOLDINGS, INC.,    )
     QUEST DIAGNOSTICS INCORPORATED;)
11   and DOES 1-10, inclusive,      )
                                    )
12                  Defendants.     )
     _____)
13
14
15
16
           REMOTE VIDEOTAPED DEPOSITION OF MAX O'CAMPO
17
                     New City, New York
18
                  Wednesday, April 14, 2021
19
20
21   Job no. 4530339
     Reported by:
22   Heidi Hummel-Grant
     CSR No. 12556
23
24   Pages 1 - 277
25
```

Page 1

```
 1                  UNITED STATES DISTRICT COURT
 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4    JULIAN VARGAS, ANNE WEST, and  ) NO. 2:19-cv-8108
      AMERICAN COUNCIL OF THE BLIND, )
 5    individually on behalf of      )
      themselves and all others      )
 6    similarly situated,            )
                                     )
 7                      Plaintiffs,  )
                                     )
 8          v.                       )
                                     )
 9    QUEST DIAGNOSTICS CLINICAL     )
      LABORATORIES, INC., QUEST      )
10    DIAGNOSTICS HOLDINGS, INC.,    )
      QUEST DIAGNOSTICS INCORPORATED;)
11    and DOES 1-10, inclusive,      )
                                     )
12                      Defendants.  )
      _____)
13
14
15
16
17           Remote videotaped deposition of
18    MAX O'CAMPO, taken on behalf of Plaintiff, at
19    New City, New York, beginning at 10:12 a.m. and
20    ending at 6:56 p.m., on Wednesday, April 14, 2021,
21    before Heidi Hummel-Grant, Certified Shorthand
22    Reporter No. 12556.
23
24
25
```

Page 2

PA0102

```
 1   APPEARANCES:

 2

 3   For Plaintiffs:

 4       NYE, STIRLING, HALE & MILLER, LLP

 5       BY:  JORDAN PORTER, ESQ.

 6            BENJAMIN J. SWEET, ESQ.

 7       33 West Mission Street

 8       Suite 201

 9       Santa Barbara, California 93101

10       805.963.2345

11       ben@nshmlaw.com

12

13   For Defendants:

14       OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

15       BY:  DAVID RAIZMAN, ESQ.

16       400 South Hope Street

17       Suite 1200

18       Los Angeles, California 90071

19       213.239.9800

20       david.raizman@ogletree.com

21

22   Also present:

23       JOHN MCDONELL, VIDEOGRAPHER

24       AMER PHARAON, QUEST DIAGNOSTICS

25
```

Page 3

```
 1                         INDEX
 2    Witness:
 3    MAX O'CAMPO
 4
 5    Examination:                        Page
 6    MR. PORTER                           7
 7
 8                       EXHIBITS
                Description                       Page
 9
      Exhibit 1    Plaintiff Julian Vargas' Amended    147
10                 Rule 30(b)(6) Deposition Notice to
                   Quest Diagnostics Incorporated
11                 (Previously Marked)
12    Exhibit 32   10/3/2016 Email                     177
                   Subject: RE: On-Site Installation
13                 Guide
14    Exhibit 33   On-Site Installation Guide SOP      186
15    Exhibit 34   4/21/2016 Emails                    195
                   Subject: RE: Revised PSC Summary
16
      Exhibit 35   7/11/2016 Email                     202
17                 Subject: E-Check In, 2016 Budget
                   to Actual
18
      Exhibit 36   9/25/2017 Emails                    204
19                 Subject: RE: 2017 Capital
                   Expenditure Forecast
20
      Exhibit 37   5/10/2017 Emails                    209
21                 Subject: RE: Ambitious Request:
                   eCheck-in and Productivity
22
      Exhibit 38   January 9, 2017, Emails             223
23                 Subject: RE: Corporate Complaint
24    Exhibit 39   February 27, 2017, Emails           234
                   Subject: Patient Inquiry
25
```

Page 4

PA0104

```
 1    EXHIBITS (Continued):                          Page
 2    Exhibit 40  3/22/2017 Emails                    240
                  Subject: eCheck-in Visually
 3                Impaired
 4    Exhibit 7   5/5/2016 Emails                     250
                  Subject: RE: Kiosk Design
 5                (Previously Marked)
 6    Exhibit 41  March 12, 2021, Email               264
                  Subject: Visually Impaired Patient
 7                Prototype
 8
 9                 ^INSTRUCTED NOT TO ANSWER
                        Page   Line
10
                         97    10
11                      175    17
                        264    21
12                      265     3
                        265     9
13                      265    20
14
15
16
17
18
19
20
21
22
23
24
25

                                           Page  5
```

```
 1    used for the eCheck-in syst -- project?              12:25

 2         A   So they're involved in the process,

 3    usually takes a few different people, like the

 4    people that order them, you know, it goes from the

 5    manufacturer to ePlus or our hardware supplier and   12:25

 6    then to Bell Techlogix.  Bell Techlogix configures

 7    them with software to manage them and so forth.  So

 8    it goes through a few different people.

 9         Q   Can you describe for me.  I'm sorry, go

10    ahead.  I didn't mean to interrupt you.             12:26

11         A   Yeah, groups, groups.  That's what I

12    meant.

13         Q   Can you describe for me the -- the

14    physical components of an eCheck-in kiosk?

15         MR. RAIZMAN:  Object to form --               12:26

16         THE WITNESS:  Physical --

17         MR. RAIZMAN:  -- answer if you understand.

18         THE WITNESS:  Physical components of a

19    kiosk.  I mean, at a high level, a base, a mount or

20    post, enclosure, and the iPads, wires.  At a very   12:26

21    high level.

22         MR. PORTER:

23         Q   So in terms of acquiring those

24    components, the iPads, the wires, the enclosure, the

25    base, mounts or enclosure -- or the base, mounts or  12:27
```

Page 84

PA0106

# EXHIBIT 8

## <u>REDACTED</u>

TO BE FILED UNDER SEAL
PENDING THE COURT'S
RULING ON PLAINTIFF'S
APPLICATION