# EXHIBIT 9

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JULIAN VARGAS, ANNE     )
     WEST, and AMERICAN      )
 5   COUNCIL OF THE BLIND,   ) Case No. 2:19-cv-8108
     individually on behalf  )
 6   of themselves and all   )
     others similarly        )
 7   situated,               )
                             )
 8              Plaintiffs,  )
                             )
 9      vs.                  )
                             )
10   QUEST DIAGNOSTICS       )
     CLINICAL LABORATORIES,  )
11   INC., QUEST DIAGNOSTICS )
     HOLDINGS, INC.,         )
12   QUEST DIAGNOSTICS       )
     INCORPORATED; and       )
13   DOES 1-10, inclusive,   )
                             )
14              Defendants.  )
     _____)
15
16
17        REMOTE DEPOSITION OF CHRISTOPHER GRANT
18               As a 30(b)(6) Witness
19             (Via Zoom Videoconference)
20              Thursday, April 20, 2021
21
22
23   REPORTED BY:  Michelle Milan Fulmer
                   CSR No. 6942, RPR, CRR, CRC
24
25
                                         Page 1
```

PA0232

```
 1                  UNITED STATES DISTRICT COURT
 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JULIAN VARGAS, ANNE    )
     WEST, and AMERICAN     )
 5   COUNCIL OF THE BLIND,  ) Case No. 2:19-cv-8108
     individually on behalf )
 6   of themselves and all  )
     others similarly       )
 7   situated,              )
                            )
 8              Plaintiffs, )
                            )
 9       vs.                )
                            )
10   QUEST DIAGNOSTICS      )
     CLINICAL LABORATORIES, )
11   INC., QUEST DIAGNOSTICS)
     HOLDINGS, INC.,        )
12   QUEST DIAGNOSTICS      )
     INCORPORATED; and      )
13   DOES 1-10, inclusive,  )
                            )
14              Defendants. )
     _____)
15
16
17        Remote deposition of CHRISTOPHER GRANT, taken
18   before Michelle Milan Fulmer, a Certified Shorthand
19   Reporter for the State of California, with principal
20   office in the County of Orange, commencing at
21   11:30 a.m., Thursday, April 20, 2021.
22
23
24
25
```

                                                    Page  2

PA0233

```
 1   APPEARANCES OF COUNSEL:
 2
 3   FOR PLAINTIFFS:
 4
            NYE, STIRLING, HALE & MILLER, LLP
 5          BY:  Benjamin J. Sweet, Esq.
            1145 Bower Hill Road, Suite 104
 6          Pittsburgh, Pennsylvania 15243
            TEL: (412) 857-5350
 7          EMAIL:  ben@nshmlaw.com
            (Via Zoom Videoconference)
 8
 9          NYE, STIRLING, HALE & MILLER, LLP
            BY:  Callum Appleby, Esq.
10          33 West Mission Street, Suite 201
            Santa Barbara, California 93101
11          TEL: (805) 963-2345
            EMAIL:  callum@nshmlaw.com
12          (Via Zoom Videoconference)
13
            HANDLEY FARAH & ANDERSON, PLLC
14          BY:  Matthew K. Handley, Esq.
            777 6th Street NW, 11th Floor
15          Washington, DC 20001
            EMAIL:  mhandley@hfajustice.com
16          (Via Zoom Videoconference)
17
     FOR DEFENDANTS:
18
            OGLETREE DEAKINS NASH SMOAK & STEWART, PC
19          BY:  David Raizman, Esq.
            400 South Hope Street, Suite 1200
20          Los Angeles California 90071
            TEL:  (213) 457-5862
21          EMAIL:  david.raizman@ogletree.com
            (Via Zoom Videoconference)
22
23   THE VIDEOGRAPHER:
24          Dave Halvorson
            (Via Zoom Videoconference)
25
```

                                              Page  3

```
 1    ALSO PRESENT:

 2         Amer Pharaon

           (Via Zoom Videoconference)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

PA0235

```
1                      I N D E X
2    WITNESS                        EXAMINATION
3    CHRISTOPHER GRANT
4                                   PAGE
5              BY MR. SWEET            8
6              BY MR. RAIZMAN        279
7
8               E X H I B I T S
9                                       Page
10   Exhibit        Description       Identified
11   Exhibit 53     Excel spreadsheet, Bates     98
                    range beginning with
12                  QUEST-VARGAS000036266
13   Exhibit 54     Email Bates stamped         113
                    QUEST-VARGAS000036322
14
     Exhibit 55     Email chain Bates stamped   126
15                  QUEST-VARGAS000036276
16   Exhibit 56     Email Bates stamped         153
                    QUEST-VARGAS000036501
17
     Exhibit 57     Email chain Bates stamped   192
18                  QUEST-VARGAS000038939 -
                    38940
19
     Exhibit 58     Email Bates stamped         270
20                  QUEST-VARGAS000037495 -
                    37496
21
22
23
24
25
                                        Page 5
```

PA0236

```
 1              (Previously marked and attached)
 2
                          E X H I B I T S
 3
                                                        Page
 4     Exhibit          Description                   Identified
 5     Exhibit 2        New Patient Experience           140
                        Deployment CapEx Request
 6                      April 2016
 7     Exhibit 7        Email chain Bates stamped        228
                        QUEST-VARGAS000007361 -
 8                      7363
 9     Exhibit 12       Email chain Bates stamped        247
                        QUEST-VARGAS000028740 -
10                      28741
11     Exhibit 13       Email chain Bates stamped        273
                        QUEST-VARGAS000028746 -
12                      28747
13     Exhibit 15       Email chain Bates stamped        208
                        QUEST-VARGAS000038805 -
14                      38806
15     Exhibit 17       Email chain Bates stamped        198
                        QUEST-VARGAS000037980 -
16                      37981
17     Exhibit 21       E-Check In:  Buy vs. Build       269
                        Meeting Notes, Bates stamped
18                      QUEST-VARGAS000040261 -
                        40264
19
       Exhibit 24       CapEx document                   129
20
       Exhibit 25       Email chain Bates stamped        158
21                      QUEST-VARGAS000039966 -
                        39967
22
       Exhibit 33       eCheck-In Installation Guide   235
23
24
25

                                                     Page  6
```

```
 1    is that right?

 2        A    Correct.  Correct.

 3        Q    And this was on a piece of paper with a pen

 4    or pencil?

 5        A    That is correct.                        09:51:26

 6        Q    And was there generally staff located in

 7    the waiting area of Quest PSCs during this time

 8    period?

 9             MR. RAIZMAN:  Object as to form.

10             THE WITNESS:  Not generally, no.        09:51:42

11    BY MR. SWEET:

12        Q    So how would a person get called back for,

13    for example, a blood draw?  How would that work?

14        A    The phlebotomist would escort the leaving

15    patient to the door, go over to the clipboard, and   09:51:58

16    announce the next person to come back with them,

17    generally speaking.

18        Q    And at some point did Quest determine --

19             Well, strike that.  We'll get to that in a

20    moment.                                          09:52:16

21             What aids and auxiliary services were

22    offered for blind users prior to the implementation

23    of eCheck-In self-service?

24             MR. RAIZMAN:  Object as to form.

25             THE WITNESS:  I'm trying to recall.  There   09:52:36
```

Page 45

```
 1    was training that had been done for the

 2    phlebotomists to be sensitive.  They went through

 3    training on being able to -- when they came out with

 4    a patient to scan the patient services waiting area

 5    and to identify anybody with a disability and to be      09:52:57

 6    able to escort them back as soon as possible from

 7    there.

 8    BY MR. SWEET:

 9        Q    So prior to the implementation of express

10    check-in self-service, it's your understanding that      09:53:12

11    there was training provided to the company's

12    phlebotomists on dealing with folks with

13    disabilities?

14        A    I -- I believe so.

15        Q    And is that a written training manual?          09:53:23

16        A    I -- I can't -- I don't remember what form

17    it takes.

18        Q    Well, how did you gain an understanding

19    that there was training with regard to how to deal

20    with people with disabilities prior to express           09:53:36

21    check-in's implementation?

22        A    It probably came up in orientation into my

23    new role, but I don't recall how it -- it was

24    discovered.

25             MR. RAIZMAN:  Move to strike.                   09:53:50
```

Page 46

PA0239

```
1        A    I -- I don't.

2        Q    What were some of the benefits that

3    customers could enjoy from use of the self-service

4    kiosk?

5        A    Can you -- can you be more specific on that    10:44:26

6    question?  It's pretty broad.

7        Q    I assume the self-service kiosk had a

8    number of features; right?

9        A    Yeah.

10       Q    What were they?                                 10:44:38

11       A    So ease of use.  It was a -- again, the

12   platform itself created a solution for us to

13   continuously improve from confirming appointments,

14   being able to notify when you were in the waiting

15   room, being able to inform the PSR who their next      10:45:03

16   patient would be and how to prepare for that.  It

17   eliminated the clipboard and all the challenges

18   associated with that.  And I think the voice of the

19   customer really asked us to put that in to really

20   say, you know, we -- we prefer to engage you through   10:45:29

21   this kind of mechanism on this platform than through

22   a clipboard.

23            So a lot of the solutioning was, you know,

24   as a result of voice of the customer, voice of our

25   employees.  Again, that was our focus is how do we     10:45:46
```

Page 71

1    create solutions that can help that patient

2    experience and help the phlebotomists do their job

3    more effectively.

4        Q    Was there --

5             Did checking in at the self-service kiosk        10:46:01

6    allow you to enter the queue?

7        A    You -- if you engaged the iPad, yes, you

8    could be in the queue, but this was not the only

9    way.  Again, recall that I talked about how our PSRs

10   had been trained previous to that to scan the rooms     10:46:23

11   to be able to come alongside those folks who had

12   disabilities and to be able to accelerate their

13   appointment and accelerate their care at that time.

14       Q    But let's talk about that, that training.

15            When did this training take place to the        10:46:40

16   PSRs about dealing with folks with disabilities?

17       A    I believe that was an ongoing part of the

18   training with phlebotomists as they came on.

19       Q    And how did you gain that understanding?

20       A    That was (inaudible).  I don't know.  I         10:46:58

21   don't recall.

22       Q    So you have an understanding that there was

23   an ongoing training for PSRs that involved sweeping

24   the waiting area for folks with disabilities?

25       A    Yeah.  That situational awareness was           10:47:15

Page 72

PA0241

```
 1    it's called certification or not, that's your word,

 2    not mine.

 3        Q    Do you know if the training is updated

 4    every year?

 5        A    I think training -- I think it was our        10:49:58

 6    practice that training was reviewed on a regular

 7    basis, but I -- again, people in training could tell

 8    you the specifics on that.  I wouldn't know.

 9        Q    Who was it reviewed by?

10        A    It would be a lot of stakeholders within     10:50:21

11    Quest and then the regions as well would participate

12    in that.  But, again, people in training would be

13    able to answer these questions better than I.

14        Q    Do you know whether the express check-in

15    self-service allows a patient to wait outside of the   10:50:55

16    PSC and be alerted by text when it's time for their

17    sample to be taken?

18        A    I believe that was a feature that was

19    introduced in -- I think we -- it may have been, if

20    I can recall -- and, again, I'm trying to remember     10:51:15

21    here.  If you have documentation, it makes this a

22    little bit easier.  But if I can recall, I thought

23    that that feature was late 2019 and more of a

24    COVID-19 tool that we could use, that it would allow

25    people a little bit more sense of not being exposed    10:51:37
```

Page 75

PA0242

1    to an environment and try to, you know, again,

2    encourage social distancing.

3             I think that's -- I think that's correct.

4    I could be wrong.  Again, if you've got

5    communications on that, I'd be happy to talk to          10:51:55

6    those.

7        Q    You would agree that's a benefit of using

8    the self-service check-in?

9        A    It's one of the benefits.  Again, remember,

10   the eCheck-In is a platform that allows us to do          10:52:05

11   continuous improvement.  So that could be a

12   continuous improvement because of that platform that

13   may in the past have not been available to us.

14       Q    Do you recall that one of the reasons for

15   the adoption of eCheck-In self-service was to reduce      10:52:23

16   the company's staffing needs?

17       A    I didn't say that.

18       Q    Do you have a recollection of that?

19       A    No.

20       Q    Was one of the reasons to shorten wait          10:52:39

21   times for patients?

22       A    It was to make the experience better based

23   on the voice of the customer.  That was the result.

24       Q    You don't have a recollection that it was

25   about reducing patient wait times?                        10:52:53

Page 76

PA0243

```
 1   program?
 2       A    I -- I vaguely remember that there would
 3   have been a pilot rollout, but I can't remember.
 4   This is early on in my tenure at Quest.  So I'm
 5   being pulled in a lot of different directions and I   01:53:59
 6   don't really recall, but that's sort of a normal
 7   process at Quest is the pilot.  It's not unusual.
 8       Q    So after Quest rolled out the kiosks across
 9   its network, was there any way for a patient
10   entering a PSC to enter the queue to be seen and     01:54:42
11   serviced, any way for that patient to enter the
12   queue without checking in at the eCheck-In
13   self-service kiosk?
14       A    Through the scanning of the PSR, sure.
15       Q    Other than the scanning of the PSR, was      01:55:01
16   there any other way?
17       A    Ask your question one more time so I can be
18   specific.
19       Q    Other than the scanning of the QR code, was
20   there any other way, other than checking in at the    01:55:15
21   kiosk, that they could enter the queue?
22       A    Yeah.  So you're asking questions that
23   are -- that don't reflect the real functionality;
24   right?  You're asking could you do it without the
25   kiosk or with a QR -- without the QR code, without    01:55:30
```

Page 166

1    the kiosk, and you could do the -- you could do the

2    QR code.  I believe there was a help button that was

3    placed on there.  So there was that.  And always,

4    you know, the training of the phlebotomists to be

5    able to spot these folks, anybody with a disability        01:55:49

6    in the waiting room, and be able to service them

7    without having to go through the kiosk.

8        Q    So, sir, to get an email with a QR code,

9    you have to make an appointment on the website;

10   right?                                                     01:56:02

11       A    That was my understanding, yes.

12       Q    Okay.  And did you ever perform any

13   evaluation in the time frame from 2016 to 2019

14   whether Quest's website was accessible for blind

15   people?                                                    01:56:16

16       A    That was outside of my scope.  The web, the

17   internet, all those tools, functionalities, they

18   were not under our purview.  We were only focused on

19   the -- in the PSC interaction.

20       Q    Okay.                                             01:56:30

21       A    So other folks would evaluate that and look

22   at that, but I don't think I interacted on that one.

23       Q    So you, you specifically, you personally

24   did not order a review of the accessibility of the

25   Quest website in the time frame from 2016 to 2019;        01:56:46

                                                   Page 167

PA0245

```
 1       Q    What were they?

 2       A    They could see where the kiosk was.  The

 3   TVs are closed captioned.  So there were those.

 4       Q    And were there any --

 5            I'm sorry.  Are you finished?          02:54:47

 6       A    Yes.

 7       Q    And were there any auxiliary aids and

 8   services as of November 1, 2019, that would allow a

 9   person to be prompted without seeing anything?

10       A    I'm not sure when the -- this goes back to  02:55:02

11   the video loop and when that was implemented.  That

12   would be my response.  If that video loop was in

13   place, that would be one of the auxiliary of a host

14   of responses we had to address our patients with

15   disabilities.                                  02:55:23

16       Q    Well, sir, we've had testimony in this case

17   that the video loop was put into place in August of

18   2020.

19       A    Okay.

20       Q    Is that accurate?                     02:55:31

21       A    I don't know.

22            MR. RAIZMAN:  Object as to form.

23            THE WITNESS:  I don't know.

24   BY MR. SWEET:

25       Q    You don't know?                       02:55:41
```

                                                    Page 201

```
1    BY MR. SWEET:

2        Q    And you don't have any understanding of

3    what the protocols were within Quest to process a

4    claim, for example?

5            MR. RAIZMAN:  Object as to form.           03:28:31

6            THE WITNESS:  I'm not sure I understand.  I

7    mean, unpack that question a little bit more.

8    There's a lot there.

9    BY MR. SWEET:

10       Q    No problem.                               03:28:40

11           Are there specific Quest personnel that are

12   assigned for dealing with feedback or complaints

13   from customers?

14       A    I believe there are, but who they are I

15   don't know.  But I believe there is an organization 03:28:51

16   that does look at those, but I don't know who it is

17   or what they're called or where they're at.

18       Q    And during your time as executive director

19   of national patient services, did you ever become

20   aware from any source of complaints on behalf of    03:29:03

21   blind customers complaining about accessibility of

22   the kiosks?

23       A    Oh, I'm sure I did.  It wouldn't surprise

24   me if there were complaints on that.

25       Q    Did any of those --                        03:29:20
```

                                            Page 222

```
 1       A     Again --

 2             Can I finish my question -- my answer?

 3       Q     Certainly.

 4       A     Again, I would just -- you know, just

 5   recall there's a quarter of a million people coming      03:29:26

 6   through the PCCs -- PSCs across the country every

 7   day, 2,200 sites, 4,500 IOPs.  So there is a broad

 8   group of folks that we're managing as -- you know,

 9   at Quest on a daily basis.

10       Q     Sir, you mentioned a moment ago that there     03:29:46

11   are 250,000 people coming through the PSCs on a

12   given day; is that accurate?

13       A     Yeah.  That's generally the number we were

14   using, yeah.

15       Q     Going back to the blind customer complaints    03:30:05

16   that you believe you received in the 2016 to 2019

17   time frame, did any of those complaints cause you to

18   reevaluate any of the features of the eCheck-In

19   self-service kiosks?

20       A     I believe it did.  I mean, for me, I saw        03:30:27

21   the complaints and we did our very best to remediate

22   the issues by contacting the patient when we could,

23   but I also was cognizant that this is the voice of

24   the customer.  This is valuable information and

25   feedback we were getting from the customer that        03:30:43
```

Page 223

PA0248

```
 1    that would be -- that we could possibly implement.

 2         Q    Sir, did anyone on your team, anyone on

 3    your team consult with anyone who specialized in

 4    accessibility with regard to the accessibility of

 5    the kiosk for blind individuals between 2016 --          05:07:55

 6         A    Not --

 7         Q    -- and 2019?

 8         A    Yeah.  Not that I can recall.

 9         Q    Okay.  Did you direct anyone to speak with

10    a specialist in accessibility during that time           05:08:04

11    frame?

12         A    Again, not that I can recall.

13         MR. SWEET:  Okay.  I have no further

14    questions at this time, David.

15         MR. RAIZMAN:  Thanks.  I just have one               05:08:14

16    brief area of questioning.

17

18                    EXAMINATION

19    BY MR. RAIZMAN:

20         Q    Mr. Grant, do you know whether the             05:08:22

21    three-finger swipe solution was implemented at the

22    patient service centers?

23         A    Yes.

24         Q    And do you know whether anyone within Quest

25    approved its implementation?                             05:08:40
```

Page 279

# EXHIBIT 10

Page 1

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4      JULIAN VARGAS, ANNE WEST and  ) Case No.
       AMERICAN COUNCIL OF THE BLIND ) 2:19-cv-08108 DMG(MRW)x
5      individually on behalf of     )
       themselves and all others     )
6      similarly situated,           )
                                     )
7                      Plaintiffs,   )
                                     )
8          v.                        )
                                     )
9      QUEST DIAGNOSTICS CLINICAL    )
       LABORATORIES, INC., QUEST     )
10     DIAGNOSTICS HOLDINGS, INC.,   )
       QUEST DIAGNOSTICS,            )
11     INCORPORATED; and DOES 1-10,  )
       inclusive,                    )
12                                   )
                       Defendants.   )
13     _____)

14

15          REMOTE VIDEOTAPED DEPOSITION OF JULIAN VARGAS

16                     Van Nuys, California

17                   Thursday, April 22, 2021

18

19

20

21     Reported by:
       ANELA SHERADIN, CSR NO. 9128

22

23     JOB NO. 4523491

24

25     PAGES 1 - 255

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JULIAN VARGAS, ANNE WEST and  ) Case No.
     AMERICAN COUNCIL OF THE BLIND ) 2:19-cv-08108 DMG(MRW)x
 5   individually on behalf of     )
     themselves and all others     )
 6   similarly situated,           )
                                   )
 7                   Plaintiffs,   )
                                   )
 8        v.                       )
                                   )
 9   QUEST DIAGNOSTICS CLINICAL    )
     LABORATORIES, INC., QUEST     )
10   DIAGNOSTICS HOLDINGS, INC.,   )
     QUEST DIAGNOSTICS,            )
11   INCORPORATED; and DOES 1-10,  )
     inclusive,                    )
12                                 )
                     Defendants.   )
13   _____)
14
15           The videotaped deposition of JULIAN VARGAS
16   is being taken on behalf of Defendants via Veritext
17   Virtual Zoom, and all parties, the witness, court
18   reporter and videographer are appearing remotely.
19   This deposition is taking place on Thursday, April 22,
20   2021, beginning at 10:04 a.m. and ending at 5:50 p.m.,
21   before ANELA SHERADIN, Certified Shorthand Reporter No.
22   9128.
23
24
25
```

```
                                                    Page 3

 1    APPEARANCES:
 2
 3    For Plaintiff:
 4         NYE, STIRLING, HALE & MILLER, LLP
           BY:  JONATHAN D. MILLER, ESQ.
 5         33 West Mission Street, Suite 201
           Santa Barbara, California 93101
 6         805.963.2345
           jonathan@nshmlaw.com
 7
           NYE, STIRLING, HALE & MILLER, LLP
 8         BY:  BENJAMIN J. SWEET, ESQ.
           1145 Bower Hill Road, Suite 104
 9         Pittsburgh, Pennsylvania 15243
           412.857.5350
10         ben@nshmlaw.com
11         -and-
12         HANDLEY FARAH & ANDERSON PLLC
           BY:  MATTHEW K. HANDLEY, ESQ.
13         777 6th Street, NW, 11th Floor
           Washington, DC 20001
14         202.559.2411
           mhandley@hfajustice.com
15
16    For Defendants:
17         OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
           BY:  AMBER L. ROLLER, ESQ.
18         400 South Hope Street, Suite 1200
           Los Angeles, California 90071
19         213.239.9800
           amber.roller@ogletree.com
20
21    Also Present:
22         AMER PHARAON, CORPORATE COUNSEL
23
      The Videographer:
24
           ROBERT FENTON
25
```

Page 4

1                          INDEX

2     WITNESS                              EXAMINATION

3     JULIAN VARGAS

4

5                    BY MS. ROLLER              7, 236

6                    BY MR. MILLER           211, 251

7

8

9

10

11                       EXHIBITS

12                        (None)

13

14

15

16

17

18

19           INSTRUCTION NOT TO ANSWER

20                 PAGE        LINE

21                  48          3

22                 202          2

23                 246         24

24                 251          7

25

```
                                              Page 5

 1            Van Nuys, California, Thursday, April 22, 2021

 2                           10:04 a.m.

 3                            ooOOoo

 4            THE VIDEOGRAPHER:  Good morning.  We're on the

 5      record.  The time is 10:04 a.m. Pacific Standard Time.

 6      Today is April 22nd, 2021.

 7            Please note that the microphones are sensitive

 8      and may pick up whispering, private conversations, and

 9      cellular interference.  Please turn off all cell phones

10      or place them away from the microphones as they can

11      interfere with the deposition audio.  Audio and video

12      recording will continue to take place unless all parties

13      agree to go off the record.

14            My name is Robert Fenton.  I'm a notary video

15      technician with Veritext Legal Solutions located in

16      Los Angeles, California.  The court reporter is

17      Anela Sheradin from Veritext Legal Solutions.

18            We are recording these proceedings over

19      videoconference technology due to COVID-19.  This is

20      media unit one for the video deposition of Julian Vargas

21      in the action entitled Julian Vargas v. Quest

22      Diagnostics.  This deposition is being taken on behalf

23      of the defense.  The case number is 2:19-cv-08108

24      DMG(MRW).

25            I am not related to any party in this action
```

Page 6

1    nor am I financially interested in the outcome.

2            Counsel and all present in the room and

3    everyone attending remotely will now state their

4    appearances and affiliations for the record.  If there

5    are any objections to proceeding, please state them at

6    the time of your appearance, beginning with the noticing

7    attorney.

8            MS. ROLLER:  Good morning.  Amber Roller for

9    defendants Quest Diagnostics Clinical Laboratories,

10   Inc., Quest Diagnostics Holdings, Inc., and Quest

11   Diagnostics Incorporated.

12           MR. MILLER:  I was going to allow Mr. Pharaon

13   to introduce himself next since he's on the defense

14   side.

15           MR. PHARAON:  Amer Pharaon, corporate counsel

16   for Quest Diagnostics.

17           MR. MILLER:  Thank you very much.  Jonathan

18   Miller for Mr. Julian Vargas, Miss Anne West, American

19   Council of the Blind and the putative class.

20           MR. SWEET:  Good morning.  Benjamin Sweet from

21   Nye, Sterling, Hale & Miller, also for plaintiffs and

22   the class.

23           MR. HANDLEY:  Good morning, Matthew Handley

24   from Handley Farah & Anderson on behalf of the class and

25   the plaintiffs.

Page 7

1          MR. VARGas:  And I'm Julian Vargas, plaintiff

2    in the case.

3          THE VIDEOGRAPHER:  Thank you.

4          Could the court reporter please administer the

5    oath.

6          (Witness sworn.)

7          THE VIDEOGRAPHER:  Thank you, you may proceed.

8               ooOOoo

9               JULIAN VARGAS,

10   having been first administered an oath, was examined and

11   testified as follows:

12                    EXAMINATION

13

14   BY MS. ROLLER:

15        Q   Good morning, Mr. Vargas.  Thank you for

16   joining us today.  Can you please state and spell your

17   full name for the record?

18        A   Yes.  My name is Julian Vargas, spelled

19   J-U-L-I-A-N; last name, Vargas, V-A-R-G-A-S.

20        Q   Thank you.  Do you have a middle name?

21        A   I do.  I don't usually use it, but --

22        Q   Okay.  Can you provide it just so we have your

23   full legal name?

24        A   Antonio.

25        Q   Okay.  So good morning.  My name is Amber

                                                      Page 8

1    Roller, as you heard from the initial introductions, and

2    I am one of the attorneys for Quest, all of the Quest

3    entities that are parties in this lawsuit, but Quest

4    Diagnostics -- let's say Quest Diagnostics Incorporated.

5    Okay?

6         A    Yes.

7         Q    Okay.  Do you understand that we're here today

8    to take your deposition?

9         A    I do.

10        Q    Have you ever had your deposition taken before?

11        A    Yes, I have.

12        Q    On how many occasions?

13        A    One previous occasion.

14        Q    And when was that?

15        A    I believe that was February 10th of this year.

16        Q    And was that in relation to a lawsuit?

17        A    Yes.

18        Q    Were you a party to that lawsuit?

19        A    Yes.

20        Q    What was the name of the lawsuit?

21        A    It was against Labcorp, so it's myself and a

22    class against Labcorp.

23        Q    Okay.  So you had the deposition fairly

24    recently, but I'm going to go over just some ground

25    rules to remind you what a deposition is like and what I

Page 9

1   think we'll all expect of you from the deposition and

2   what you can expect of me.   Okay?

3       A    Yes.

4       Q    Okay.   So, first of all, I just want to remind

5   you that your testimony is under oath; so although

6   your -- it looks like you are in your kitchen, I'm at my

7   office, and we're scattered around -- all around the

8   country, your testimony carries with it the same penalty

9   of perjury as if you were testifying in court.   Do you

10  understand that?

11      A    Yes, I do.

12      Q    Okay.   And the court reporter is taking down

13  everything you say and so it's important that you give

14  audible responses.   So instead of shaking your head up

15  and down or nodding, you say yes or no.

16          And I will do my best that if you do shake your

17  head and you don't give an audible answer, I'll just ask

18  you, "Is that a yes?" or "Is that a no?"   I'm not trying

19  to be rude.   I'm just trying to make sure that the

20  record is clear.   Okay?

21      A    I understand.

22      Q    Okay.   And, you know, we're here -- usually we

23  do depositions in person.   It's a lot more difficult

24  when we do depositions by Zoom, because in addition to

25  technological difficulties that we may have, we also

1  have to contend with the fact that if we speak over each

2  other it might blur the record and the court reporter

3  won't be able to hear anything, because if I'm talking

4  and then you talk, you mute out what I'm saying and then

5  it's just a mess for the court reporter.  Okay?

6          So what I'm going to do is I'm going to ask you

7  to make sure that you let me finish my questions before

8  you answer and then I will do -- I will endeavor to do

9  the same for you.

10          And if we start talking over each other, we'll

11  just -- I'll try to remind you or you can try to remind

12  me that we need to wait for the other person to finish

13  their -- their sentence before the next person responds.

14  Okay?

15     A   Yes, I understand.

16     Q   Great.  Thank you.  So if I ask you a question

17  and you answer it, I'm going to assume that you

18  understood my questions.  So, please, if you don't

19  understand a question, let me know and I'll do my best

20  to try to rephrase it as I think it's appropriate.

21  Okay?

22     A   Yes.

23     Q   And if at any point we need breaks, you need a

24  break, if you want to step away, you want to walk, you

25  need to use the restroom, you can go ahead and do that

Page 11

1    so long as there's no question pending.  If there's a

2    question pending, I'll just ask you to finish the answer

3    to your question and then we can take a break.

4            I will try to take breaks every 45 minutes to

5    an hour just to give us time to stretch our legs; but if

6    you need one before then, just let me know.

7        A    Okay.

8        Q    Are you under the influence of any medications,

9    drugs or alcohol that would impair your ability to give

10   your best testimony today?

11       A    No.

12       Q    Is there any other reason, maybe a lack of

13   sleep, that you're not able to give your best testimony

14   here today?

15       A    No.

16       Q    Okay.  So we'll proceed forward with your

17   deposition.

18            So I understand you're in your kitchen right

19   now.  Are you in the kitchen at your home?

20       A    Yes.

21       Q    And what address are you at right now?

22       A    13741 Oxnard Street, Apartment 9, Van Nuys,

23   California 91401.

24       Q    Is there anybody else in the apartment with you

25   right now?

Page 12

```
 1        A    No.

 2        Q    Okay.  If somebody else comes in to the room

 3   that you're in for your deposition, if you could please

 4   let me know so we can make sure that we take a break if

 5   you need to switch rooms for privacy.  Okay?

 6        A    Yes.

 7        Q    And it seems like you're on a phone, not a

 8   computer; is that correct?

 9        A    Correct.

10        Q    Do you have any computers or any other screens

11   or communication devices within reach of you right now?

12        A    No.

13        Q    Aside from your phone which you're using.

14        A    Right, no, I don't.

15        Q    Okay.  Do you have any documents within reach

16   of you right now?

17        A    I do not.

18        Q    Did you do anything to prepare for your

19   deposition today?

20        A    Yes.

21        Q    What did you do?

22        A    I spoke with my attorneys and we had several

23   prep sessions.

24        Q    Okay.  First of all, how many would you

25   estimate that you had of these prep sessions?
```

Page 13

1          A     I had three.

2          Q     Okay.   And on the first session, how long did

3     that last?

4          A     Probably an hour and a half to two hours.

5          Q     Okay.   And who did you meet with or speak with

6     during that prep session?

7          A     I spoke with Benjamin Sweet and Jonathan

8     Miller.

9          Q     Was there anybody else present during that

10    meeting?

11         A     No.

12         Q     Okay.   And how about the second meeting, who

13    did you -- or how long did that one last?

14         A     Approximately the same length of time.

15    Probably closer to the hour and a half on that one and

16    that was only with Jonathan Miller.

17         Q     Okay.   And I forgot to ask you, when was that

18    first session?

19         A     That first session was Monday, the 19th, I

20    believe it was.

21         Q     Okay.   And then the second session, when was

22    that?

23         A     That was the next day, the 20 -- the 20th.

24         Q     Okay.   And then the third session, how long did

25    that one last?

Page 14

1          A    That lasted a little over an hour and a half.

2          Q    And who did you have a meeting with on that

3     occasion?

4          A    Benjamin Sweet.

5          Q    And was anybody else present?

6          A    No.

7          Q    What day was that?

8          A    That was yesterday.

9          Q    Okay.  Did you review any documents in

10    preparation for your deposition?

11         A    Yes.

12         Q    What documents were those?

13         A    Documents related to the case such as requests

14    that were made, what was provided under discovery,

15    documents that I submitted, things along those lines.

16         Q    Okay.  Did you review the Complaint in this

17    matter?

18         A    Yes, I did.

19         Q    Did you review the First Amended Complaint in

20    this matter?

21         A    Yes, I did.

22         Q    Okay.  Did you review all of the documents that

23    you produced to your counsel or any of the documents

24    that you produced to your counsel in this litigation?

25         A    Yes, I did.

Page 15

1      Q   Did you review any documents that you did not

2   produce to your counsel in this litigation?

3      A   No, I did not.

4      Q   Okay.  Did any of these documents refresh your

5   recollection as to your claims against Quest or your

6   visits to any Quest patient service centers?

7      A   Yes.

8      Q   What documents were those?

9      A   They were the -- the initial, you know,

10   complaints that were submitted.

11      Q   Okay.  Do you remember submitting discovery

12   responses to -- in response to Quest's discovery in this

13   case?

14      A   Yes.

15      Q   Okay.  Did you have any conversations about

16   your deposition with anybody else besides your

17   attorneys?

18      A   No.

19      Q   When did you start looking for an attorney to

20   bring a lawsuit against Quest?

21      A   Well, I already had a relationship with my

22   attorney prior to this, but I went to him when I

23   encountered the issue.

24      Q   Okay.  And how did you originally -- I

25   understand you had a relationship with these attorneys.

Page 16

1   How did you originally find them or learn of them?

2       A    They were referred to me by a good friend.

3       Q    Okay.  And when did you first contact them?

4       A    In general or regarding this case?

5       Q    In general.  I'm sorry, I spoke over you.

6       A    That's okay.

7       Q    In general.

8       A    Probably some time around maybe 2014, 2015.

9       Q    Okay.  And then I know there's three gentlemen

10  who are representing you and they seem to be all from

11  different places, so is there a specific person that

12  you -- a specific attorney that you were referred to and

13  then they all became part of your team or was it all

14  three of them collectively that you were referred to?

15      A    No, the specific person originally was

16  Benjamin Sweet.

17      Q    Okay.  So I know you gave us your name at the

18  beginning of the deposition.  Have you gone by any other

19  name than Julian Vargas or Julian Antonio Vargas?

20      A    No, I have not.

21      Q    What's your date of birth, Mr. Vargas?

22      A    February 1st, 1969.

23      Q    And you gave us your address which was 13741

24  Oxnard Street, Apartment 9 in Van Nuys; correct?

25      A    Correct.

Page 17

1       Q    And how long have you been at that address?

2       A    I've been at this address since July of 2018.

3       Q    Okay.  And prior to July 2018, where did you

4    live?

5       A    I'd lived for a long time in Reseda at -- do

6    you want that address, too, or just the city?

7       Q    If you can recall it.

8       A    Yeah.  The address was 19155 Victory Boulevard,

9    Apartment 226, Reseda, California 91335.

10      Q    And when did you move into that location?

11      A    I believe that was sometime in the summer of

12   2003.

13      Q    Okay.  So from summer of 2003 until

14   approximately July of 2018 you were living at the Reseda

15   address and then since July 2018 you've been living at

16   the Van Nuys address; correct?

17      A    Correct.

18      Q    Have you lived anywhere else since the summer

19   of 2003 that we haven't discussed?

20      A    Yes.  In 2017, I briefly intended to move to

21   the state of Florida to be closer to my parents, but

22   some things went wrong in the process and a bad

23   hurricane approached and then I decided it was probably

24   better to come back to California for a while.

25      Q    Okay.

Page 18

```
 1      A   So I came back; and until I found this location
 2   I'm currently in, I did stay with a friend.
 3      Q   Okay.  What was -- do you recall the address of
 4   that location where your friend lived?
 5      A   10309 Laramie Avenue, Chatsworth, California
 6   91311.
 7      Q   Okay.  Can you spell that street name for us?
 8      A   Oh, yeah.  It's L-A-R-A-M-I-E.
 9      Q   Okay.  How long were you living at that Laramie
10   address, if you can give me an estimate?
11      A   I would say from mid-September of 2017 through
12   July of 2018 when I was able to secure this apartment.
13      Q   Okay.  Have you lived anywhere else besides
14   these three locations since the summer of 2003?
15      A   It's possible I briefly -- it may appear as
16   though I lived in Florida, because I gave my parents'
17   address when I was attempting that relocation.  I can
18   give you that address, if you'd like.
19      Q   Sure.
20      A   It's 1117 Northeast -- it's just NE,
21   abbreviated -- 19th Court, Cape Coral, Florida 33909.
22      Q   But you actually never lived there; correct?
23      A   No, I was there less than a month.
24      Q   Okay.  And aside from those locations that
25   you -- your parents' house that you seem to have been
```

Page 19

1   visiting for a while and then the Chatsworth, Van Nuys,

2   and Reseda locations, have you lived anywhere else in

3   the past -- since September of 2000 -- I mean, sorry,

4   since the summer of 2013?

5        A   No, I have not.

6        Q   When you lived at the -- or you're currently

7   living at the Van Nuys address.  Does anybody live there

8   with you?

9        A   No.

10       Q   Has anybody ever lived with you there?

11       A   No.

12       Q   Okay.  How about the Reseda address, has

13  anybody ever lived there with you?

14       A   No.

15       Q   And then you were living with a friend in

16  Chatsworth.  What's your friend's name?

17       A   Vickie Parker, and that's Vickie spelled

18  V-I-C-K-I-E.

19       Q   And last name is Parker, P-A-R-K-E-R?

20       A   Yes.

21       Q   And I guess I'm assuming that she lived there

22  when you lived there; is that correct?

23       A   Yeah, it's her and her husband's home.

24       Q   And what's her husband's name?

25       A   Ronald Smith.

Page 20

1        Q    Okay.  And I understand that you have a cell

2    phone; correct?

3        A    Correct.

4        Q    And what kind of cell phone is that?

5        A    It is an iPhone.

6        Q    Do you know what model?

7        A    Yeah, iPhone SE, the one that came out last

8    year in 2020.

9        Q    So would that be like the 12?

10       A    No, not the 12.  This is a -- it's sort of a

11   lower price point iPhone.  They call it the SE.  I think

12   it stands for special edition.

13           And, yeah, they usually introduce that for

14   people who don't want to pay the full price for a

15   flagship.

16       Q    Okay.  When did you get this version, your

17   iPhone SE?

18       A    This iPhone I got -- I believe it was November

19   of last year.

20       Q    So November of 2020?

21       A    Correct.

22       Q    Okay.  And prior to November 2020, what kind of

23   phone did you have, cell phone?

24       A    I had also used an iPhone.  It was the iPhone

25   XR.

Page 21

1        Q    What's the designation of the R, if you know?

2    I'm not familiar with that one.

3        A    You know, I'm not sure what Apple exactly meant

4    by the R; but, basically, it was the lower end of the

5    flagship range that year that they were introduced.

6        Q    Okay.  And when did you get that phone?

7        A    I believe I got that in October of 2018.

8        Q    And between October 2018 and November 2020, did

9    you have any other phones between -- aside from the

10   iPhone XR?

11       A    I have had Android phones as well but I don't

12   use as a main phone, but I use it to keep up with the

13   developments in the Android operating system

14   particularly relating to accessibility.

15       Q    Okay.  And what Android models have you had in

16   the past, let's say, five years?

17       A    In the past five years, I've probably had

18   the -- the -- I think it was called a Google Nexus 5X, I

19   believe it was.

20       Q    I'm sorry, Google Nexus what?

21       A    5X, as in x-ray.

22       Q    Okay.

23       A    And then I've had the Google Pixel 3, and I now

24   currently own the Google Pixel -- here's more confusing

25   numbers -- 4a (5G).

Page 22

1     Q   Okay.  And do you have any idea when you owned

2  these Android phones or when you were using these

3  Android phones?  Would you use one and then trade it in

4  for another and then trade it in for another or would

5  you kind of simultaneously use all of them?

6     A   No, I would more or less upgrade them and then

7  pass along the old ones to either family or friends that

8  would need phones.

9     Q   Okay.  So can you give me an estimate of when

10  you had the Google Nexus 5X?

11     A   Let me think.  I believe I got the -- I don't

12  remember exactly when I got it, but I think I used it

13  till about October or November of 2018, I believe.

14     Q   Okay.  And then you switched over to the Pixel

15  in about October or November of 2018?

16     A   Yes.

17     Q   Okay.  And then how long did you keep that

18  until you got your Google Pixel?

19     A   Wait.  So I got the --

20     Q   I'm sorry, Google Pixel 4a (5G).

21     A   Okay.  I got the 4a (5G), I believe it was

22  sometime last month, so I just got it recently.

23     Q   Okay.  Aside from those phones that we

24  discussed -- there's five of them, three Androids, two

25  iPhones -- have you had any other iPhones since, let's

Page 23

1   say, 2018 or any other --

2        A    No.

3        Q    -- phones?

4        A    No.

5        Q    Okay.  Do you have a landline?

6        A    No, I do not.

7        Q    Okay.  What is the cell phone number associated

8   with your current iPhone SE?

9        A    That would be area code (818) 648-8066.

10        Q    Is that the same number that you had on the

11   iPhone XR?

12        A    Yes.

13             MR. MILLER:  Pardon me.  Pardon me,

14   Miss Roller.  I just want to mark his -- his cell phone

15   number as confidential.  I don't want that being out in

16   the public record.

17             MS. ROLLER:  That's fine.

18             MR. MILLER:  So I'd like that marked subject to

19   the protective order.

20   BY MS. ROLLER:

21        Q    And, I'm sorry, what did you say about the

22   iPhone XR?

23        A    Yes, it was the same number associated with

24   that one.

25        Q    How long have you had that cell phone number

Page 24

1   for?

2       A   Oh, that cell phone number, I've probably had

3   it since sometime in maybe 2005 or so, I want to say.

4   I'm not 100 percent sure, but it's somewhere around

5   there.

6       Q   So for the last 10 years at least?

7       A   At least, yes.

8       Q   So I want to go through your employment

9   history, let's say, for the last five years.  Have you

10  been employed in the last five years?

11      A   In the last five years, I have not.

12      Q   Okay.  Have you earned any income through doing

13  any sort of work in the last five years?

14      A   Yes.

15      Q   Okay.  Explain to me what you have done for

16  monetary compensation in the last five years.

17      A   Well, aside from the state and federal benefits

18  that I receive due to my disability, I have done

19  training and consulting work for people who want to

20  learn more about or how to use the accessibility on

21  mobile devices.

22      Q   Okay.  Is that with a company or is that like a

23  freelance job you do?

24      A   Freelance.

25      Q   Okay.  So can you explain a little more in

1  detail what you do when you teach folks to use this

2  technology?

3      A   It depends on where they are as far as

4  understanding how this technology works.  There are some

5  people who are brand new to it who have never used a

6  touchscreen device, and I need to sit with them and show

7  them with the device and also with their hands, my hands

8  and their hands, I show them -- well, first I explain

9  the way the device works, the way the accessibility

10  works.  And I then go talk to them about -- and show

11  them how to execute the various swiping and tapping,

12  multi-finger gestures that one must do to use the

13  device.

14      Q   Okay.  And what kind of devices do you teach

15  individuals on?

16      A   Primarily it's iPhone.

17      Q   Okay.  Do you have -- so I would say you have

18  proficiency with using the accessibility features on an

19  iPhone.  Is that a true statement?

20      A   Yes, particularly the VoiceOver screen reader.

21      Q   Okay.  And how about -- go ahead.

22      A   Particularly the VoiceOver screen reader that's

23  built into all IOS devices.

24      Q   Okay.  And how about the Android, do you have

25  proficiency in using the Android accessibility features?

1      A   Yes, again, more -- more specifically the

2   TalkBack screen reader that's built into that operating

3   system.

4      Q   And do you teach individuals on the Android as

5   well?

6      A   Not very much.  I get a lot of questions about

7   it, but for the most part, the inquiries and ultimately

8   the people I work with seem to be more interested or

9   geared toward the iPhone.

10      Q   The individuals that you teach to use this

11   technology, do they vary in visual impairments or in

12   visual abilities and inabilities?

13      A   Yes.

14      Q   So tell me the -- tell me the range that

15   you've -- range of individuals you've worked with in

16   that capacity.

17      A   Anywhere from people who are experiencing

18   vision loss for the first time to people that are

19   totally blind, as some have had visual disability all

20   their life; others, again, it's more recent so it kind

21   of runs the gamut.

22      Q   So there are some individuals that you teach

23   who are losing their vision and so you're preparing them

24   to be able to deal with the day when they actually can't

25   see anymore?

Page 27

1      A    Correct.

2      Q    Okay.  And when you teach them, do you teach

3  them over Zoom or do you teach them in person?

4      A    Well, usually it's in person; but over this

5  last year particularly, that's been challenging, so it's

6  had to be remotely over Zoom or by phone call.

7      Q    Okay.  And have you been pretty successful in

8  being able to teach people how to use this technology

9  remotely?

10      A    It's a lot harder to teach it to somebody who

11  isn't familiar with it.  Now, somebody who is familiar

12  with it and maybe just wants to become a little bit more

13  proficient or, you know, get a little bit better with

14  their grasp of it, that's a lot easier to do remotely.

15  That doesn't require in person.

16      Q    Okay.  So do you get paid for this freelance

17  work?

18      A    Sometimes.

19      Q    Do you charge an hourly rate or what's your

20  compensation schedule like for that?

21      A    I tend to go based on what the person can

22  afford, because in this community, it's -- you know, a

23  lot of blind people don't have a ton of money, so it

24  really just depends.

25      Q    Okay.  And I'll kind of get in more of the --

Page 28

1   get in to more of the training, but I'm also curious, I

2   understand that you also worked for the Center for the

3   Partially Sighted; is that correct?

4        A    Correct.

5        Q    And what do you do for the Center for the

6   Partially Sighted?

7        A    More or less the same kind of work, although I

8   also did work with computer training sometimes there

9   with people as well.

10       Q    Okay.  And what do you mean you work with

11  computer training?  What's that entail?

12       A    Teaching them how to use the JAWS screen reader

13  for the Windows platform.

14       Q    Is that something you do in person?

15       A    Yes.

16       Q    Okay.  So when was the last time you did

17  something that you taught -- I guess we'll call it

18  teaching; right?  I mean that's kind of what you did;

19  right?

20       A    Yes, yes.

21       Q    So when was the last time you taught through

22  the Center for the Partially Sighted?

23       A    I want to say it was sometime in maybe summer,

24  early fall of 2016.

25       Q    Okay.  And then when was the last time you did

Page 29

1    freelance work?

2        A    I just recently worked for someone this last

3    Friday.

4        Q    Okay.  So that one, the Center for the

5    Partially Sighted is kind of a past teaching gig that

6    you had and you're now doing more freelance work; is

7    that correct?

8        A    Yeah, the Center for the Partially Sighted

9    unfortunately had financial difficulties and closed

10   down; otherwise, I'd probably still be working for them

11   because they were wonderful to work for.

12       Q    Okay.  Did you have a job there?  Was it an

13   actual employment relationship with the Center for the

14   Partially Sighted?

15       A    Yes, it was, but it was kind of -- it wasn't

16   like a set amount of hours.  It was more like when the

17   Center -- or the State Department of Rehabilitation

18   Services would send a client to them needing that

19   specific type of training, they would then call me and

20   give me the information on how many hours were approved

21   for that and then I would make arrangements with the

22   clients and we would meet at the offices of the Center

23   for the Partially Sighted to do the training.

24       Q    Okay.  When you -- how many individuals did you

25   train while you were working with the Center for

Page 30

1    Partially Sighted?  Just give me an estimate.

2         A    Boy, that's hard to say.  Probably, give or

3    take, 50 or more.

4         Q    All right.  And then how about the freelance

5    work, how many people do you think that you've trained

6    over the course of your time doing freelance training?

7         A    Probably about 50 to 100 or so, give or take.

8         Q    All right.  And I actually didn't ask, when did

9    you start doing the freelancing work?

10        A    Let me see, when did I start this.  I think I

11   started it in earnest probably around 2008 or '09.

12        Q    Okay.  Did you ever get any sort of training

13   yourself or are you self-taught with the assistive

14   technology?

15        A    I'm more or less self-taught.  I listen to a

16   lot of podcasts, I read a lot of information, I belong

17   to a lot of various mailing lists where these topics are

18   discussed and tips and tricks are shared.

19        Q    Okay.  Okay.  I'll get into it a little more,

20   because I'm curious about the different technology

21   available using the iPhone and the Android, but I'll

22   move on to some other things before we get there.

23             Are you currently married or have a significant

24   other?

25        A    I do have a significant other.

1    Q    Okay.  And what is his or her name?

2    A    Her name is Jaymee, J-A-Y-M-E-E; Castillo,

3    C-A-S-T-I-L-L-O.

4    Q    Okay.  And I think you said she does not live

5    with you; correct?

6    A    No.

7    Q    I'm sorry, is that correct?

8    A    Oh, I'm sorry, that is correct.

9    Q    Okay.  And how long have you been with

10   Miss Castillo?

11   A    Since 2012.

12   Q    Okay.  And do you have any children?

13   A    No.

14   Q    Do you have any caretakers or any assistants?

15   A    No.

16   Q    So I understand that you are visually impaired;

17   correct?

18   A    Correct.

19   Q    Okay.  And would you -- do you understand what

20   I mean when I say visually impaired?

21   A    I understand that you're probably using that as

22   sort of a catch-all for any sort of visual disability,

23   anything that meets the legal requirement for blindness.

24   Q    Okay.  And to you is there a difference between

25   visually impaired and blind?

PA0280

Page 32

```
 1        A    I personally prefer to use the word blind just
 2    because it's the legal term.
 3        Q    Okay.
 4        A    But I know -- I know there's a lot of people
 5    that tend to shy away from the word blind so, you know,
 6    I'm okay using the term interchangeably.
 7        Q    All right.  So, to you, what does it mean to be
 8    legally blind?
 9        A    It means that with corrective vision you cannot
10    see better than 20 over 200.
11        Q    And do you qualify as visually blind -- I'm
12    sorry, legally blind?
13        A    Absolutely.
14        Q    And I understand you have a condition that
15    caused your blindness; is that correct?
16        A    Yes, there's a genetic condition.
17        Q    What's that called?
18        A    Leber's congenital amaurosis.
19        Q    And you were --
20        A    Or you -- or you could look it up, also.  It's
21    LCA.
22        Q    Okay.  And I'll get the spelling for the court
23    reporter after this.
24             And you were diagnosed at or around birth with
25    this condition; is that correct?
```

Page 33

```
 1       A    Correct.

 2       Q    Does that affect both of your eyes?

 3       A    Yes.

 4       Q    So what's your current level of vision right

 5  now?

 6       A    I believe in my best eye it's somewhere over 20

 7  over 800.

 8       Q    And what's your best eye?

 9       A    The right eye.

10       Q    And then in your left eye, do you have any

11  vision in your left eye?

12       A    I have some, but it's -- it's not as good.

13  It's more -- I don't know if you say blurry or just kind

14  of -- it -- you know, I can see certain things far away

15  and get an idea of what they are, but I can't read or

16  anything like that much with the left eye.

17       Q    Okay.  Do you take periodic visual tests to

18  assess your vision kind of as the years go by?

19       A    I do every so often go to eye doctors to have

20  that checked.  I -- I have to have another exam soon

21  because I recently had some cataract surgery and that's

22  kind of changed some things in terms of the prescription

23  sunglasses that I wear when I'm outside.

24       Q    Okay.  When did you have the cataract surgery?

25       A    The most recent one was on the 13th of this
```

Page 34

1    month, so not too long ago, and the previous one was on

2    the 16th of March.

3        Q    2021 as well?

4        A    Yes.

5        Q    Did you have any cataract surgery prior to

6    that?

7        A    No.

8        Q    And did you have the cataract surgery on both

9    eyes or just one eye?

10       A    Both eyes.

11       Q    So at this current time, explain to me what you

12   can see.  Can you see shapes?  Can you see things that

13   are bright?  What can you make out and what can't you

14   make out?

15           MR. MILLER:  Objection; overbroad.

16           But go ahead.

17           THE WITNESS:  In general, lighting affects a

18   lot of what I see.  It's always been that way from the

19   beginning.  The brighter generally means the more things

20   that I can see, however, as my condition deteriorates,

21   as it is known to do as I get older and has definitely

22   been doing, I find that I'm a lot more light sensitive;

23   so now it's like, yeah, I want bright but not too bright

24   because then that works against me.

25           When the contrast in the lighting is right, I

Page 35

1   can, you know, see some shapes.  I can even see some

2   colors, although I have a hard time distinguishing like,

3   for example, blue and green.  You know, colors that are

4   close to each other present more of a challenge.

5           But it's so hard to explain it.  Sometimes I

6   wish -- because I get asked this question all the time,

7   sometimes I wish I had like a pair of glasses I could

8   put on somebody and say here, look at what I see.

9       Q   It's hard.

10      A   It's so hard to explain, but yes.  And it's

11  kind of a moving target because, again, my condition is

12  deteriorating.  So things that I could see even a year

13  ago from a greater distance, suddenly I can't -- I have

14  to get closer to it to kind of be able to make out what

15  they are.

16      Q   Okay.  So, like, let me ask you, for example,

17  in your apartment.  So if you were to come up to the

18  refrigerator, would you be able to see the refrigerator

19  as you are getting closer to it and you know that

20  there's a shape and you know it's likely the

21  refrigerator because you know where your refrigerator

22  is?

23      A   Well, visually, yeah, if the sun -- if there's

24  light coming into the window as it is now, as I approach

25  I would probably be able to see it because the

```
 1    contrast -- you know, the refrigerator is a very bright,

 2    light color but, at night, for example, I wouldn't be

 3    able to see it as well.

 4          So I -- a lot of times, believe it or not, I

 5    use other methods like hearing, touch.  You know, I kind

 6    of use a little bit of all my senses, too, to get a

 7    picture of what's around me and how close I am to

 8    something.

 9    Q    Okay.  If you had your lights on in the kitchen

10    at night, though, would you be able to see the

11    refrigerator?

12    A    Depending on what angle I'm approaching from

13    and the way the light is shining on it, yes.

14    Q    Okay.  So if you wanted to open the

15    refrigerator, are you able to based on your sight see

16    where the handle is or is that something that you're not

17    able to make out on your refrigerator if, let's say, the

18    lights are on or it's -- the light from outside is

19    coming in?

20    A    If the lighting is right, I might be able to;

21    but generally speaking, I go -- I do that by feel.

22    Q    Okay.  Do you receive regular medical treatment

23    or medical visits for your eye condition?

24    A    No.

25    Q    How frequently -- I think you had mentioned you
```

Page 37

1   go to an exam.  How frequently do you do eye exams or go

2   see an eye doctor?

3        A    Every few years, at least.  I think the last

4   time I was seen by an eye doctor was back in the summer

5   of 2017 and then, of course, the doctor that saw me and

6   performed the cataract surgery.

7            But like I said, I now -- I now need to

8   reschedule an appointment to get reexamined because I

9   have to get the prescriptions redone for the sunglasses.

10       Q    Do you have -- when you say an eye doctor, do

11  you see an optometrist or an ophthalmologist?

12       A    Usually an ophthalmologist and somebody who is

13  a specialist in low vision.

14       Q    Do you have a -- like a go-to ophthalmologist

15  that you see routinely or regularly?

16       A    I don't anymore.  That's one thing I'm looking

17  for.  And, actually, my -- the doctor who did my surgery

18  recommended one, so I'm probably going to be contacting

19  that office to schedule an appointment with them.

20       Q    Okay.  Who was your previous ophthalmologist

21  that sounds like you're no longer seeing?

22       A    That would be Dr. Angela Shihady.

23       Q    Any idea how to spell that?

24       A    I don't, but in one of the documents that was

25  presented under discovery, her name should be there

Page 38

1    because she's the one who wrote me that legally blind

2    letter that I submitted.

3         Q   Okay.  How did it come about that you needed to

4    have the cataract surgery?

5         A   Well, Dr. Shihady actually saw the start of a

6    cataract when I saw her last and she had mentioned it to

7    me and said that it's something that I might want to

8    address at some point, so --

9         Q   Okay.  Go ahead.

10        A   So, unfortunately, because of the -- all the

11   things that happened with regard to my attempt to move

12   and all that stuff and then finding another place to

13   relocate to, you know, a lot of things happened and, of

14   course, last year COVID happened.

15            So it's been a crazy mess but, yeah, that -- I

16   finally decided this year to start taking care of things

17   that were on the list and the cataract surgery was one

18   that I felt I needed to address because I did notice

19   that it did seem like things were starting to get kind

20   of darker and cloudier and it was, I believe, being

21   caused by the cataracts.

22        Q   When did you start noticing that?

23        A   I've been noticing it for a while, probably for

24   at least the last year in particular.

25        Q   Why did you stop seeing Dr. Shihady?

Page 39

1        A    Well, again, I -- I only go to these doctors

2    every few years, and because of the things that happened

3    between that last visit and now, I hadn't had a chance.

4             She's no longer practicing at that clinic where

5    I saw her at.  I'm not sure she's even in the area

6    anymore, so she's no longer available, hence the reason

7    I now need to find a new specialist.

8        Q    Got it.  What was the clinic that you went to?

9        A    I think it was called the Children's Retinal

10   Clinic or something.  Again, it's -- it's listed in that

11   document that I presented, the legally blind letter.

12       Q    Do you know what city that clinic is in?

13       A    Yeah, it was in Eagle Rock, California.  What

14   happened was it's across from the Center for the

15   Partially Sighted; so when that -- when that office

16   closed, that's apparently -- because she used to work

17   for the Center for the Partially Sighted.

18            So, apparently, that's where she went

19   immediately after and that's where my records were

20   apparently transferred to, was that clinic, so I decided

21   to go there because it just made sense since I was

22   already familiar with her and she had my records there.

23       Q    Got it.  And then who is the new physician --

24   who's the doctor who did your cataract surgery?

25       A    His name is Dr. Michael Colvard.

Page 40

1      Q    You know I'm going to ask you for the spelling

2  on that.

3      A    Good question.  I -- I don't know.

4      Q    C or K?

5      A    I think it's -- I think it's a C.  It's called

6  the Colvard-Kandavel Eye Center.  I can give you the

7  phone number.

8      Q    If you have that, yes, please.

9      A    Area code 818.

10     Q    Okay.

11     A    906.

12     Q    Okay.

13     A    2929.  And I can give you their address as

14  well.

15     Q    Yes, please.

16     A    5363 Balboa Boulevard, Suite 545.

17     Q    Okay.

18     A    And that's in Encino, California, but I don't

19  remember the zip code.

20     Q    That's fine.  And then who did Dr. Colvard

21  refer you to as a specialist?

22     A    He wrote it down for me, so I have to have that

23  read.  But I believe it was -- he said it was Dr. Phoo

24  and he spelled it P-H-O-O.  And he is in Encino,

25  California as well, but I don't have the address

Page 41

1    memorized.

2         Q    Okay.  When you go to the doctor's, like when

3    you would go to Dr. Shihady, would you typically go by

4    yourself or would somebody go with you?

5         A    Usually by myself.

6         Q    Were there any occasions where somebody like,

7    perhaps, Miss Castillo would go with you?

8         A    No.

9         Q    Okay.  And you said Dr. Shihady's office was --

10   she was at the Children's Clinic --

11        A    Retinal Institute or something like that.

12   Those are some of the words that I remember.

13        Q    And then she -- did she used to work for the

14   Center for the Partially Sighted and then she switched

15   over to that Children's Retinal Clinic across the way?

16        A    Correct.

17        Q    Okay.  What floor was Dr. Shihady's office on?

18        A    I believe it was the first floor.

19        Q    And when you'd go, how would you get there?

20        A    I probably either took Access Services which is

21   paratransit.  I think that is probably how I went.

22        Q    Okay.  And then would they drop you off right

23   at the front building entrance?

24        A    Correct.

25        Q    And how would you get from the building

Page 42

1    entrance to the specific doctor's office, like

2    Dr. Shihady's office?

3        A    You know, I don't remember the details on how I

4    navigated that particular instance but, in general, you

5    know, I'll walk into a building and I'll try to kind of

6    get an idea of what the layout is.

7            You know, if there's a front desk there and

8    somebody addresses me, I might tell them -- you know,

9    they'll ask, you know, can I help and I'll tell them

10   what I'm trying to find, and maybe that person or

11   somebody that they call for might help me; or if it's

12   not that far away and they can give me good enough

13   directions, I can generally find it.

14       Q    Okay.  Is it -- are you comfortable with having

15   somebody, maybe if they're at the reception desk, like

16   leading you to the office that you are trying to go to?

17           MR. MILLER:  It's vague and ambiguous and

18   overbroad.

19           THE WITNESS:  So it really just depends on the

20   situation, what the layout is.  You know, if it's a very

21   complicated maze and if I'm running late, for example, I

22   might -- I might resort to that.

23           But if I've got plenty of time and there's no

24   hurry and it doesn't sound incredibly complicated, I

25   like to try to do it myself to kind of keep my mobility

Page 43

 1    skills honed.

 2    BY MS. ROLLER:

 3        Q   Okay.  And is that kind of the general position

 4    you take whenever you visit like a doctor's office or a

 5    building?

 6            MR. MILLER:  It's vague and it lacks

 7    foundation.

 8            THE WITNESS:  Yeah, I mean, like I said, it

 9    just depends.  It depends on the situation and all

10    various factors.

11    BY MS. ROLLER:

12        Q   From your home to Dr. Shihady's office, how

13    long would it typically take to get there?

14        A   Boy, that's hard.  I don't know if -- where

15    you're located, but traffic here in Los Angeles can be a

16    very tricky thing.

17            I think by car technically it's supposed to

18    maybe take like 20 or 30 minutes, but it could certainly

19    take a lot longer if there's traffic; and, also, when

20    you are using paratransit, oftentimes they can pick up

21    and drop off people along the way.  It's a shared-ride

22    service.

23        Q   Okay.  When you've gone to Dr. Shihady's

24    office, give me a ballpark of how many times you've seen

25    her.

Page 44

1          A    Probably at least two or three times.

2          Q    Do you ever recall when you're at her office

3    needing to use the restroom?

4          A    I don't recall.

5          Q    Okay.  When you've gone to Dr. Shihady's

6    office, have you ever been asked to fill out paperwork?

7          A    They -- they more or less have all my

8    information on file because I've been going to that

9    center for -- the Center for the Partially Sighted when

10   they were open, I was going there for some time.

11         Q    Okay.  Have you ever --

12         A    So --

13         Q    Go ahead.

14         A    So, yeah, I mean I'm sure -- I'm sure at some

15   point I did fill out some paperwork.

16         Q    Okay.  If -- in that situation, do you recall

17   how you were provided the paperwork to complete?

18         A    Generally I was asked the questions and I

19   provided the answers.

20         Q    What kind of information do you recall

21   providing?  Like what kind of information would they ask

22   you for?

23         A    You know, my name, address, things like that,

24   condition, you know, things related to the -- to the

25   reason why I'm going there in the first place for eye

Page 45

1    exams.

2        Q    Okay.  Would they ask you, like, Social

3    Security number?

4        A    I don't recall.  I mean I had to give insurance

5    cards, like you always do when you go to a medical

6    place, but I don't recall if Social Security number was

7    asked.

8        Q    Okay.  I'm just thinking about like a new

9    patient or patient updated information that all doctors

10   ask me every time I go to the doctor or a lot of times

11   when I start a new doctor, you know, they give you

12   that -- they give you a sheet and it wants to know your

13   whole history, about all of the conditions you may have

14   ever had and if your parents have had any things; so I'm

15   wondering if you ever recall filling out or completing

16   some sort of information sheet like that.

17       A    I don't recall getting that extensive of

18   questions over there.

19       Q    Okay.  So when you would -- when they would ask

20   you to complete certain patient document -- patient

21   documents and they'd read it audibly to you, you would

22   just give them the verbal response; and then as far as

23   you knew, they would be writing it down to complete your

24   paperwork?

25            MR. MILLER:  It's vague.

Page 46

1           THE WITNESS:  Yes.

2   BY MS. ROLLER:

3       Q   Okay.  When you go to, let's say, like

4   Dr. Shihady's office, you obviously went there for the

5   first time at some point.  When you went subsequent

6   times, were you generally able to navigate on a second

7   visit because you'd been there the first time?

8       A   Yes.

9       Q   Okay.  And would you require assistance -- did

10   you require assistance at that point, the second time,

11   let's say, you went to Dr. Shihady's office?

12       A   I don't believe so.

13       Q   So I want to get a sense -- I know you had said

14   that when you started noticing the cataracts, you

15   started noticing your vision being impaired in some

16   ways.  So I'm curious, as to in the last, let's say five

17   years, how has your vision changed or the severity of

18   your LCA changed?

19       A   In general, I've become more sensitive to glare

20   and I can't see things as far as I used to be able to,

21   so, you know, for things like identifying landmarks when

22   I'm traveling, so it's a lot harder.

23           Also distinguishing the difference between like

24   a grass line on a sidewalk or things like that, visually

25   I -- I can't do that nearly as well; so I absolutely

Page 47

1    rely a lot more on cane technique to give me that

2    information.

3        Q    Okay.  And so let's talk about you can't

4    identify landmarks.  So were you able to identify

5    landmarks in 2015?

6        A    Better than now.

7        Q    And has it gotten steadily worse from 2015 to

8    the present?

9        A    Yes.

10       Q    Is there any point in the last, let's say, 10

11   or 15 years where you noticed a drastic decline in your

12   vision or has it been steady?

13       A    It's been kind of steady.  There hasn't been

14   any major shock.

15       Q    Okay.  Aside from for your vision, do you

16   receive any other regular medical treatment from any

17   doctors?

18       A    Yes.

19       Q    Okay.  And who are those doctors?

20       MR. MILLER:  I'm going to object to the extent

21   it goes beyond his vision and blindness, that it seeks

22   to intrude on his right to privacy and instruct him not

23   to answer those questions beyond -- I'll let him answer

24   all the questions about his blindness and his visits to

25   PSCs, but otherwise it's HIPPA protected and I don't see

Page 48

1    a basis for it in this case, and I'm instructing him not

2    to answer that, those questions.

3              (Instruction not to answer.)

4    BY MS. ROLLER:

5        Q   I see in discovery responses that you see a

6    primary care physician, Dr. Paul Diehl; is that correct?

7        A   I'm going to follow my attorney's advice and

8    not answer those questions.

9              MR. MILLER:  You can answer -- you can answer

10   that question.

11             THE WITNESS:  Oh, okay.  Yes.

12   BY MS. ROLLER:

13       Q   Okay.  And how frequently do you see Dr. Diehl?

14       A   At least -- well, at least once a year for a

15   physical exam and every so often just routine kind of

16   stuff.

17       Q   Do you ever have your blood drawn for -- I

18   understand we're here -- you've gone to Quest, you've

19   had your blood drawn, I've seen those documents.

20             Have you ever had your blood drawn for any

21   treatment related to your blindness?

22       A   Yes.

23       Q   Okay.  Have you ever had your blood drawn for

24   any other medical treatment?

25       A   Yes.

Page 49

1      Q    Okay.  So how many times do you believe you've

2    had your blood drawn related to your blindness?

3      A    In recent times probably one.

4      Q    Okay.  Let's say is that -- when you say recent

5    times, what do you mean by recent times?

6      A    Probably like in the last maybe 10 years or so.

7      Q    Okay.  And then how about for other medical

8    treatments, how many times have you had your blood drawn

9    for those other medical treatments unrelated to your

10   eyes?

11     A    Several times.  At least once a year we do a

12   full physical which requires full blood tests, fasting,

13   all that stuff.

14     Q    And for the last how many years have you been

15   doing that routine blood work?

16     A    That routine blood work has been going on

17   probably for about as long as I've been seeing

18   Dr. Diehl.

19     Q    And how long is that?

20     A    That was probably since the summer of 2002.

21     Q    2002 is what you said?

22     A    Yes, correct.

23     Q    Okay.  So you've had your blood drawn basically

24   about, so far, nine times with -- oh, sorry, no, I'm bad

25   at math -- so about 19 times at the request of Dr. Diehl

Page 50

```
 1   for your annual physical and you believe one time
 2   related to the treatment of your eyes; is that accurate?
 3        A    Well, yeah, and for other reasons as well.
 4        Q    Okay.  How many times have you had your blood
 5   drawn for other reasons?
 6        A    Probably, we'll say, two or three.
 7        Q    Okay.  So for, let's say, the past -- since
 8   about 2002, would you say that it's fair to estimate
 9   that you've had your blood drawn approximately 20 --
10   let's see -- 22 to 23 times?
11        A    Yeah, to my best memory, I would say that's
12   correct.
13        Q    Okay.  I know you had mentioned you use a cane.
14   Do you require any other assistive technology besides a
15   cane -- and I think you discussed the screen reader on
16   your phone -- to assist you in your activities of daily
17   living?
18             MR. MILLER:  It's vague.
19             THE WITNESS:  Yes.
20   BY MS. ROLLER:
21        Q    Okay.  What are those?
22        A    Oh, just about everything.  Traveling, so, for
23   example, I use orientational GPS apps to tell me what
24   streets I'm on, what intersections I'm approaching, what
25   address I'm in front of.
```

Page 51

1           I -- I use it for reading barcodes on things to

2     see what -- what's in that can of soup, which kind it

3     is, that sort of thing.

4           I use OCR -- which stands for optical character

5     recognition -- apps to read mail that I get.  So, you

6     know, all kinds of things like that.  As much help as I

7     can get providing information that is not available to

8     me visually, I try to find technology that gives me

9     access to that same information.

10        Q    Is this all done on your phone?

11        A    Yes.

12        Q    Okay.  Is there any other sort of electronic

13    device that you use to assist you?

14        A    I have a desktop computer as well, a Windows

15    computer using the JAWS screen reader.

16        Q    And I assume you use email; is that correct?

17        A    Correct.

18        Q    So how do you review your emails?

19        A    I primarily do it these days on the iPhone

20    because it's very efficient.  The built-in mail app

21    works very nicely; and with the use of the built-in

22    VoiceOver screen reader in the iPhone, I can pretty much

23    interact with that email app, I can browse through the

24    emails.

25           I get a lot of emails every day.  I mentioned

Page 52

1   earlier I belong to a lot of different email Listservs

2   that discuss all kind of aspects of technology, so

3   oftentimes you get a lot of busy threads; and if I can

4   see that the subject of one, it's not something that's

5   of interest to me, I can very easily with an

6   activation -- activating a few gestures, you know, get

7   rid of that thread and keep going to the next one.  So

8   that's how I do it.  The built-in email app is fully

9   accessible with the built-in screen reader that Apple

10  provides.

11      Q   Okay.  If you --

12          MR. MILLER:  Miss Roller, no rush.  We've been

13  going over an hour, so whenever is convenient for you to

14  take a break, I'd appreciate it.

15          MS. ROLLER:  Sure.  Let me get through this and

16  then I'll -- we can take a break.

17      Q   I'm curious as to how you review email

18  attachments.  Does the VoiceOver also work with like a

19  PDF email attachment?

20      A   If by PDF --

21          MR. MILLER:  Go ahead.

22          THE WITNESS:  If the PDF is properly formatted

23  so that screen reader can access the information, yes, I

24  can do that.

25  // //

Page 53

1   BY MS. ROLLER:

2      Q   Is there a -- when you say it's properly

3   formatted, do you -- can you explain what that is?

4      A   So, for example, a PDF is an image file.

5   Oftentimes somebody might just take a picture of a

6   document or scan a copy of a document and save it as a

7   PDF.

8           Well, that's an image.  The screen reader is

9   going to have a lot harder of a time accessing that

10  information because it is not -- it's not been

11  formatted.  It wasn't like it was generated within the

12  PDF itself and saved as such so that the screen reader

13  can see, for example, the lines, the paragraphs, the

14  words, the characters, the spacing and such.

15     Q   I understand.  Okay.  So if something was like

16  a searchable PDF, then would you be able to use that

17  from your experience in the VoiceOver technology?

18     A   Yes.

19     Q   Okay.  And how about like a Word document,

20  would that also work for the VoiceOver?

21     A   Yes, I've been able to read Word documents with

22  VoiceOver.

23         MS. ROLLER:  Okay.  We can go ahead and take a

24  break and then we'll be back.  What -- I don't know who

25  asked for the break, but how long are you thinking?

Page 54

1    Like 10 minutes?

2            MR. MILLER:  10 minutes is fine.

3            MS. ROLLER:  Okay, perfect.  So we -- it is now

4    10 -- 11:09 Pacific.  Let's come back at 11:20.  Okay?

5            MR. MILLER:  Thank you.

6            THE VIDEOGRAPHER:  Going off the record at

7    11:09 a.m.

8            (Recess.)

9            THE VIDEOGRAPHER:  We're back on the record at

10   11:28 a.m.

11   BY MS. ROLLER:

12       Q   Okay.  Mr. Vargas, welcome back.  Do you

13   understand you're still under oath?

14       A   I do.

15       Q   Okay, great.  Do you read Braille?

16       A   I do not.

17       Q   Of the 100 or so individuals that you have

18   taught to use the assistive technology, do you know how

19   many of those folks read Braille?

20       A   I don't know.

21       Q   Do you know if any of them do?

22       A   I'm sure some do, but I just don't have a

23   number.

24       Q   In your experience, is proficiency in Braille

25   common or uncommon?

Page 55

1        MR. MILLER:  It's vague.

2        THE WITNESS:  It's -- there's a lot of blind

3    people who read it if they were fortunate enough to have

4    been taught to read it when they were children.

5    BY MS. ROLLER:

6        Q    I'm just trying to get a sense.  I've heard

7    it's like a dying language, but I wasn't sure if that

8    was your impression as well.

9        A    I think some would like to present it that way,

10   but it really is an important language and I feel it's

11   not being taught enough to children as much as it

12   should.

13        I think any child that has a diagnosis of legal

14   blindness regardless to what degree I think should be

15   taught Braille and, unfortunately, my teachers felt that

16   because I could read large print at the time that there

17   was no sense wasting time with Braille.

18        Q    When would -- when did you stop having the

19   ability to read large print?

20        A    Probably around 2002, 2003 is when I really

21   started to notice the decrease in my vision that made it

22   harder and harder to read print.

23        Q    So you're very proficient with a phone.  When

24   you use your iPhone 10 SE, do you use the, like, regular

25   keyboard that's offered on the iPhone?

Page 56

1      A    Yes, I use both the onscreen keyboard that's

2   provided and I also, at times, use a third-party

3   keyboard that's called FlickType that also allows you to

4   sort of predictively type into the board.

5      Q    FlickType?

6      A    Yes.

7      Q    Like F-L-I-C-K?

8      A    Yeah, T-Y-P-E.

9      Q    Okay.  And how does that function work?

10     A    Basically, you tap your fingers where you think

11  the letters are roughly near, and it has a predictive

12  engine that does a pretty decent job at guessing at what

13  you're trying to type.

14          So you type out the word as you think it is and

15  you swipe to the right, and it's offered -- it offers

16  you that suggestion what it thinks it is; and if it's

17  right, you just keep on typing the next word and so on

18  and so forth.

19     Q    Is it kind of like autocorrect?

20     A    No, because it doesn't correct anything for

21  you.  It just --

22     Q    Okay.

23     A    -- makes it easier, faster to enter input.

24     Q    Does the Android have the same ability to use

25  that third type -- a third-party app?

Page 57

1    A    No.

2    Q    So that's exclusively for an iPhone?

3    A    Correct.

4    Q    How do you type on an Android?

5    A    I use the -- the Google onscreen keyboard.

6    Q    Okay.  And so I'm aware that iPhone has some

7    different tap and swipe and gesture accessibility

8    functions; is that correct?

9    A    Correct.

10   Q    So can you describe some to me?  Give me five

11   or ten different gestures or functions that the iPhone

12   has for accessibility, if you can.

13        MR. MILLER:  It calls for a narrative.

14        Go ahead.

15        THE WITNESS:  So the two basic gestures are

16   your tap or touch with one finger and then your double

17   tap where you take the same finger and tap the screen

18   twice.

19        When VoiceOver is enabled, it acts as an

20   overlay between me and what's on the screen, so as I run

21   any finger across the screen or swipe left and right to

22   move between any element -- you know, in other words,

23   anything that you can interact with on the screen -- it

24   puts it in focus; that's what they call it.

25        And when something is in focus, you can then

Page 58

1  issue a command, the two-finger double tap, to say, yes,

2  I want to interact with that item.  Please activate it.

3          It would be the equivalent of you seeing the

4  icon you want to open and touching it with one finger

5  and it would open.

6  BY MS. ROLLER:

7      Q   Okay.  And so there's a function for a single

8  tap; correct?

9      A   Yeah, that's -- that's what you use to put

10  focus on or run your finger along the screen to find --

11  and as you're running your finger on the screen, it says

12  to you what's underneath your finger.

13      Q   Okay.  And then if you want to click on that

14  icon, whatever it is, let's say it's Facebook, then you

15  double tap to get the Facebook app to open up?

16      A   Yeah.  When focus is put on Facebook, you can

17  then lift your finger and double tap or you can also do

18  something called a split tap where your finger is

19  sitting on Facebook and then with another finger I tap

20  the screen and that also says open that item.

21      Q   Okay.  And then is there a gesture for a three

22  finger, a three tap that does some functionality?

23      A   Yeah, I mean, there's one-, two-, three-, and

24  four-finger gestures, and now you can even reassign

25  gestures to things that are more convenient for you.

Page 59

1         So there's quite a plethora of them and, you

2     know, if you go to apple.com/accessibility, I'm sure you

3     can find all of this information and -- and become more

4     informed, if you so choose, but it's specific --

5         Q   And then that leads to the ability to --

6             MR. MILLER:  Pardon me.  Pardon me.  Pardon me,

7     Miss Roller, he wasn't done with his answer.

8             MS. ROLLER:  Oh, I'm sorry.

9             THE WITNESS:  I was going to say since you

10    specifically said three-finger gestures, yes, there are

11    three-finger gestures.  We use single tap, double tap,

12    triple tap, quadruple tap; also swipe up, left/right,

13    up/down, and those are for scrolling pages and things

14    like that.

15    BY MS. ROLLER:

16        Q   Okay.  And is that a -- when you scroll up and

17    down, is that a single finger or is that two fingers?

18        A   That's three fingers.

19        Q   Oh, three fingers --

20        A   Since you asked about three fingers, I'm

21    telling you specifically about three-finger gestures.

22        Q   Okay.  And then so what's the three-finger

23    gesture?

24        A   Do you want me to go through all of them?

25        Q   Sure, if you can give me just a brief summary

Page 60

1    of them.

2         MR. MILLER:  It calls for a narrative --

3    objection.  It calls for a narrative.

4         Go ahead.

5         THE WITNESS:  So three-finger single tap, means

6    you touch a screen one time with three fingers, will

7    tell you the location of whatever is last put in focus.

8         Three-finger double tap will mute your speech,

9    meaning that you're not now turning off your screen

10   reader, but you don't want it talking at the moment.

11        Three-finger triple tap turns on and off

12   something called Screen Curtain which is very important

13   because that's there for privacy; so if you're out and

14   about or are using a device that supports that gesture,

15   you now have the ability to interact with that screen,

16   you're hearing on your headphones and you're touching

17   the screen, but anybody around you sees a black screen.

18   They can't see what you're doing or what you are

19   interacting with.

20        So that's, perhaps, one of the most important,

21   three-finger gestures; and then, you know, three-finger

22   swipe up, scrolls the screen up; three-finger swipe

23   down, scrolls it -- you know -- now, three-finger swipe

24   up scrolls down, so it's like you're moving the list up.

25        Three-finger swipe down, it's like you're

Page 61

1    moving it back up.  Three-finger swipe from left to

2    right means you're going back to the previous home

3    screen; three finger from right to left means you are

4    going to the next screen.

5    BY MS. ROLLER:

6        Q    Okay.

7        A    So that's kind of a general idea.

8        Q    And these are things that you teach folks when

9    you're training them on how to use assistive technology?

10       A    Correct.

11       Q    In your experience, has it been pretty easy for

12   people to master these gestures?

13       A    Yes.

14       Q    And then, like, if you show them here's a

15   double tap, are they typically able to get it on the

16   second try when they try to double tap it?

17            MR. MILLER:  Objection; vague and ambiguous, it

18   lacks foundation.

19            Go ahead.

20            THE WITNESS:  Yeah, it really depends on the

21   level.  Some people grasp it faster than others; but

22   what I always tell my students is practice, practice,

23   practice.  That's what you need to do.

24            The more you interact with this device, it's

25   like anything else, you develop muscle memory, you

Page 62

1    develop control of your fingers.

2            And the more you do it, the better you get at

3    it.  At some point, it's not something that you think,

4    oh, wait, is it three fingers or two fingers.  You just

5    instinctively interact with the device using those

6    gestures once you've learned them.

7    BY MS. ROLLER:

8        Q   Okay.  Like, for example, for a -- like a --

9    the swiping to the left or to the right or to the up and

10   down, that's a typical -- typically an easy gesture,

11   like, physically to do; right?  It's literally just

12   swiping?

13       A   Yeah, it's literally like -- the idea is you

14   have to -- and I teach them how to have spacing between

15   the fingers because they can't be too close together or

16   they -- the screen might think it's one big fat finger,

17   so you teach them to space it apart.

18           And then, yeah, you -- swipe gestures typically

19   start before you make contact with the screen because

20   the screen needs to feel movement, the movement.

21           You can't put three fingers and then swipe

22   because now you've taken focus away from whatever you're

23   looking at before; so gestures always start, you know,

24   sort of like in -- it's like a mid-motion thing.

25       Q   Okay.

Page 63

1      A   So all -- all this is learned with practice and

2   it depends on the student's ability and also their

3   willingness to, you know, do as I suggest, that they

4   practice with this device on a daily basis.

5      Q   Have you seen people pick this up like after

6   one training session or even after you explain them --

7   explain to them how to do it once, they're like, okay, I

8   got this?

9      A   In some cases.  It just depends.  Again, it

10   depends on if they're brand new to this and they've

11   never interacted with a touchscreen.  Somebody like that

12   is going to have a little bit of a harder time.

13          Somebody who has had some touchscreen

14   experience and maybe just didn't know how to do the

15   spacing or how to, you know, time the swipes, things

16   like that, and they might pick it up a little faster.

17          So it really -- it's very individual.  There's

18   no two cases that are identical.

19      Q   Okay.  Have you ever -- so, actually, let me go

20   back.  Those gestures that you can use on the iPhone,

21   have you encountered those type of gestures in other

22   type of accessibility devices whether it's -- or other

23   devices that have accessibility features whether it's

24   like a tablet or different types of phones?

25      A   As long as they're running the IOS operating

Page 64

1    system, in this case since we're talking Apple, yes, as

2    long as the VoiceOver is enabled, those gestures will

3    work.

4              A good example of this is our voting booths now

5    that we have in Los Angeles County, they are using, I

6    believe, an iPad-based system; that when you get to the

7    machine and plug the headphones in, it instantly

8    recognizes that accessibility is going to be used.

9              It turns it on, a voice comes on, and it more

10   or less gives you a little bit of a tutorial on the

11   gestures that you will need to use and how to raise the

12   volume, speed or slow down the rate of speech, those

13   kinds of things.

14             And it works very nicely because, again, these

15   are gestures that are consistent, they're gestures I

16   already use in my daily life, so this was really a cinch

17   to just go in there and vote independently, and it was a

18   wonderful thing that they put these machines in.

19        Q    Okay.  So that's actually part of what I was

20   wondering, is these gestures that you use on the iPhone,

21   like the swipe gestures and the tap gestures, those are

22   pretty common gestures among platforms in your

23   experience --

24        A    Yes.

25        Q    -- right?

Page 65

1      A   Yes.

2           MR. MILLER:  Objection; vague and ambiguous, it

3   lacks foundation.

4   BY MS. ROLLER:

5      Q   Okay.  And so once somebody has the basic

6   ability to use those gestures, they can kind of transfer

7   over into other electronic platforms; correct?

8           MR. MILLER:  Objection.  It lacks foundation.

9           Go ahead.

10          THE WITNESS:  Yes.  And in a lot of cases when

11  a tutorial is provided for, like it is with the voting

12  machines -- because I -- I know people who have used

13  them that did not have as much experience with

14  touchscreens and had told me that they picked it up

15  pretty quick because the -- it's explained to them.

16          And they don't use a lot of complication to

17  them.  It's just -- you know, there's not a lot of them

18  to memorize like you are when you are learning the

19  iPhone fully.

20          MS. ROLLER:  Okay.  I'm going to move strike

21  everything after yes as nonresponsive.

22      Q   Okay.  So have you ever been to a business or

23  other location that uses an electronic device for

24  check-in other than the voting that you just talked

25  about?

Page 66

1      A    For check-in with -- be more specific.

2      Q    Sure.  For checking in to let them know you're

3  there.

4      A    Yes.

5      Q    Okay.  Where have you used electronic devices?

6      A    Well, as far as checking in to places,

7  unfortunately, I've been presented with them, but I have

8  not yet found one that has the built-in accessibility

9  needed for me to independently use it to check in.

10     Q    Okay.  So -- but you have been presented with

11  these electronic devices for check-in on at least one

12  occasion; correct?

13     A    Yes.

14     Q    Okay.  Where would that -- where was -- how

15  many times?

16     A    That was one time at Labcorp.

17     Q    Okay.  And anywhere else?

18     A    No.

19     Q    Have you ever been -- have you ever been

20  confronted with the electronic -- an electronic check-in

21  at Quest?

22     A    Yes.

23     Q    Okay.  So Quest is another location.  Any other

24  locations besides Labcorp and Quest?

25     A    No.

Page 67

1      Q    Have you ever made any purchases on electronic
2   devices before?
3      A    Yes.
4      Q    Okay.  What kind of -- and, actually, let me
5   clarify that.  Have you ever gone to like a business
6   establishment or a store and made purchases on an
7   electronic device at that location?  I'm not talking
8   about like on the Internet.
9      A    Oh, okay.  I have been able to successfully use
10  some of these tabletop -- the things at restaurants that
11  have built-in -- that have the accessibility built into
12  them.
13     Q    And is that like a -- where you order online or
14  order at the table and then you pay your bill at the
15  table, that type of thing?
16     A    Correct.
17     Q    Okay.  What locations did you experience that
18  at?
19     A    I've experienced it at Applebee's restaurant.
20     Q    Which Applebee's?
21     A    In Northridge.
22     Q    And is that one -- were you able to interact
23  with that Applebee's -- I don't even know what to call
24  it.  What would you call that device?
25     A    I just call it a tabletop tablet or something

Page 68

1    like that because --

2         Q    Okay.

3         A    -- that's effectively what it is.  It's a

4    modified tablet for customers to interact with and

5    ultimately, you know, put in a credit card and approve a

6    payment.

7         Q    Okay.  So the Applebee's in Northridge, is that

8    where you encountered the tabletop tablet?

9         A    Correct.

10        Q    Anywhere else?

11        A    Now, that's the only one I've encountered where

12   I've been able to use it.

13        Q    Are there other ones that you've encountered

14   that you were not able to use?

15        A    Yes.

16        Q    Where?

17        A    Various restaurants.  I think -- I'm trying to

18   think.  Like Red Robin I think is one of them.  I'm

19   trying to remember.  I -- I don't remember offhand

20   because I -- I just haven't seen that type -- you know,

21   sometimes I know they're there at the table but, you

22   know, the waitress takes the order and does all that

23   stuff so I haven't always looked at them.

24        Q    Okay.  At Red Robin, at what location was that?

25        A    That would be -- they had one in Woodland Hills

Page 69

1    at the Topanga mall.

2        Q    Okay.  And so when you were at the Applebee's

3    in Northridge, you said that one was accessible to you,

4    you were able to use it; correct?

5        A    Correct.

6        Q    Okay.  Did you use it or did you order through

7    the waitress?

8        A    I ordered through the waitress, but I paid the

9    check through the device.

10       Q    Okay.  Why did you decide to order through the

11   waitress?

12       A    Because at the time I was placing the order, I

13   hadn't looked at the device, so I just made the order

14   the way I normally do; and afterward, as I was exploring

15   the table, I found the device and I thought, well, let

16   me look and see if this thing has a headphone jack on

17   it, because I try and do that whenever I encounter one,

18   and I was pleasantly surprised to find tactile markings

19   and a headphone jack.

20            And so immediately I pulled out my headphones

21   that I always carry with me and plugged it in and was

22   pleasantly surprised to hear a voice instructing me on

23   how to interact with this device.

24       Q    How about the Red Robin tabletop tablet, did

25   you interact with that at all?

Page 70

1       A    I felt it and didn't find any tactile markings

2    or headphone jack.

3       Q    Did you -- was it a touchscreen?

4       A    Yes.

5       Q    Okay.  Did you try to manipulate it using just

6    the touchscreen at Red Robin?

7       A    No, because I didn't find any tactile buttons

8    or markings or headphone jacks so that says to me that

9    that machine is not accessible.

10      Q    Of all of the screens that you've -- well, let

11   me ask you.  Are there any other -- any other electronic

12   devices or tablets that you've encountered that --

13   whether or not you were able to use them, that you've

14   encountered for checking in or ordering or making

15   purchases other than the ones we've talked about?

16           MR. MILLER:  Objection; vague and ambiguous.

17           THE WITNESS:  Yeah, I mean, these things are

18   showing up everywhere from point of sale terminals to

19   tabletop tablets like I've described.  It's -- it's

20   starting to become more common.

21           McDonald's, for example, put in some kiosks a

22   few years ago and it had the same problem, that it was

23   not accessible so I couldn't use it.  I had to go to the

24   counter and make an order.

25           So it -- I think the general trend is that

Page 71

1   these things are going to become more and more common

2   to -- for businesses to cut costs and hire less people,

3   so I'm concerned about these things not being

4   accessible.

5   BY MS. ROLLER:

6       Q    The McDonald's location that you visited where

7   they had a kiosk, where was that located?

8       A    I don't remember specifically because there's

9   been so many.  Locations in Los Angeles; there's one

10  near the Braille Institute, for example, in Los Angeles.

11      Q    Okay.  Did you try to manipulate that kiosk

12  device to see if it would -- if you could use it or did

13  you just reach for a headphone jack and find that there

14  wasn't one?

15      A    I looked for a headphone jack, and I didn't

16  find a headphone jack but I found a button that looked

17  like it had some kind of tactile markings on it.

18           So I pushed that button thinking, okay, maybe

19  it's going to speak out loud to me, but it didn't.

20           From what I understand, what it actually does

21  is it lights up a light that, I guess, if there's staff

22  nearby and they see that light on, it indicates that I'm

23  somebody who needs help.

24      Q    Okay.  And did somebody -- after you did that,

25  did somebody assist you?

Page 72

1       A    After a while somebody did come over.  And I

2   asked them, you know, is this machine made for a blind

3   person to use, does it have a headphone jack that I'm

4   not finding.  And they told me, no, that they would have

5   to put the order in for me.

6       Q    Okay.  How long did it take between the time

7   you pushed that button and the time somebody came to

8   talk to you from McDonald's?

9       A    Probably a good 5 to 10 minutes.  It took a

10  while because I think it was kind of busy.

11      Q    Do you recall when this took place?

12      A    Oh, gosh.  I think this was sometime in 2019 is

13  the last time I looked for that.

14      Q    And then did you end up placing your order

15  through the McDonald's employee?

16      A    Yes.

17      Q    Okay.

18      A    Since that was the only option.

19      Q    Had you ever encountered a touchscreen where,

20  like for check-in, where all you needed to do is perform

21  like a simple function or gesture to allow you to check

22  in?

23           MR. MILLER:  Objection; vague and ambiguous.

24           THE WITNESS:  I don't recall, because if that

25  was available, it was never made clear to me or known to

Page 73

1    me that that option was available.

2    BY MS. ROLLER:

3        Q    Would that be an option that you'd take if you

4    had that opportunity?

5        A    No, because I want the full accessibility to

6    all the services that anybody else can walk in there and

7    use that kiosk for, so that would not be acceptable.

8        Q    What if the sole function was to let somebody

9    know you were there and that was the only function that

10   anybody would be able to have?

11           MR. MILLER:  Objection.  It lacks foundation,

12   incomplete hypothetical, vague and ambiguous.

13           Go ahead.

14           THE WITNESS:  I would say that if that is the

15   only function available to anybody who used that kiosk,

16   blind or not, and it was made clear that this was the

17   way to do it, push this button, do this gesture,

18   whatever, then, yes; but if that -- if there are more

19   options available by use of that kiosk to anybody, I

20   want to have access to them as well.  I don't just want

21   one of the various functions.

22   BY MS. ROLLER:

23       Q    What if you don't need the other functions?

24   Let's say they're not even relevant to you, does it

25   bother you that you don't have access to those features?

Page 74

1           MR. MILLER:  Objection; vague and ambiguous,

2    incomplete hypothetical, it lacks foundation.

3           But go ahead.

4           THE WITNESS:  Yes, it bothers me because I'm

5    not the only blind person in the world.  There are

6    many -- there's thousands of blind people in the state

7    and across the country who have various degrees of

8    vision loss, as I mentioned earlier, and have various

9    abilities as well.

10          So what might be okay for me at that moment may

11   not be okay for somebody else, and I feel that as a

12   representative of this class I should consider the

13   interests of all the people that are blind and -- or

14   potentially barred by the full accessability to that

15   device.

16   BY MS. ROLLER:

17       Q   Okay.  Do you have any hobbies?

18       A   Yes.

19       Q   What are your hobbies?

20          MR. MILLER:  Objection to the extent it invades

21   his right to privacy, it goes beyond the scope of

22   reasonably discoverable material.

23          But you can give her your general interests.

24          THE WITNESS:  You know, let's say --

25          MS. ROLLER:  Hold on.

Page 75

1          Counsel, you know, you've been holding

2   Mr. Raizman to the standard of not making speaking

3   objections, so I would ask that you -- you know, you do

4   the same under Rule, what, 30(c)(2) and state your

5   objections without being argumentative and without

6   coaching your witness.

7          Q   So you can go ahead, Mr. Vargas.

8          MR. MILLER:  I'm not going to debate counsel on

9   the record.  The record will show that I have stated

10  only those objections permitted under the Evidence Code

11  and stated nothing further and allowing the witness to

12  answer.

13  BY MS. ROLLER:

14         Q   Go ahead, Mr. Vargas.

15         A   Yeah, I mean, I like going out for walks, I

16  like listening to music.  I like reading, you know,

17  talking books and things like that.  I obviously am

18  interested in computers and mobile devices, so I like --

19         Q   Do -- go ahead.

20         A   I like, you know, all kinds of tech-related

21  things.

22         Q   Do a lot of your hobbies -- so it sounds like,

23  from what you've said, a lot of your hobbies are kind of

24  things that you do at home, you know, you could read

25  books at home.

Page 76

```
 1            Do you do hobbies that take you out of the
 2    house frequently?  Like, let's say, concerts.  Do you
 3    like baseball games?  You're here in Los Angeles.  Do
 4    you like going to Dodger games, you know, concerts at
 5    the Nokia Center?  Do you do those types of things?
 6            MR. MILLER:  Same objections.
 7            THE WITNESS:  I'm not really -- I was born
 8    deficient of the sports gene, so I'm not really all that
 9    into sports.
10            Concerts, sometimes, not so much the big
11    concerts, but I like maybe smaller concerts in the park.
12            I like going on hikes and things like that.  I
13    like getting together with friends and going out to the
14    malls and shopping and exploring places.  So I -- I
15    definitely like to be out of the house, that's for sure.
16    BY MS. ROLLER:
17        Q   Maybe not right now but maybe in general.
18        A   Yeah.
19        Q   Do you -- when you typically go do these
20    things, like if you go to concerts, do you do them on
21    your own or do you go with people?
22        A   Usually with people.
23        Q   And when you're out -- when you're out with
24    people, do you allow your friends or your -- whoever
25    you're with to assist you to the extent you need
```

Page 77

1    assistance with getting around or using features or
2    functions of wherever you're at?
3            MR. MILLER:  Objection; vague and ambiguous, it
4    lacks foundation.
5            THE WITNESS:  So a lot of my friends are also
6    blind and low vision, so we all kind of sort of help
7    each other out.  It's not that I have somebody or bring
8    them like as a chaperone or something like that, you
9    know, but we all just get-together and navigate things.
10   Some of us are a little better at certain skills than
11   others and collectively we help each other out and have
12   a good time.
13   BY MS. ROLLER:
14       Q   That reminds me.  So you have a group of people
15   who are either blind or low vision?
16       A   Correct.
17       Q   Is one of those -- are one of those friends who
18   referred you to your attorneys?
19       A   Yes.
20       Q   Who -- what's the name of the person who
21   referred you to your attorneys?
22       A   Her name is Sophia Montano.
23       Q   Do you know how she knows these counsel?
24       A   I don't know.
25       Q   Do you know if she's ever filed a lawsuit using

Page 78

1    them as her attorneys?

2        A    I believe she has.

3        Q    Do you know how many?

4        A    I don't know.

5        Q    Do you know if it's more or less than five?

6        A    I don't know.

7        Q    I assume with your vision that you don't

8    personally drive; is that accurate?

9        A    Correct.  That would be a disaster.

10       Q    And you -- typically you said you use -- well,

11   at least you have used in the past the paratransit.  Is

12   there any other form of transportation that you use when

13   you go places?

14       A    Yeah, I believe in using all modes available

15   and whichever is appropriate.  So sometimes it's

16   paratransit, sometimes it's Uber and Lyft, sometimes

17   it's the public bus or train, sometimes it's just a

18   friend who drives, and sometimes it's just my own two

19   feet.

20       Q    Got it.  When you've gone out on any of these

21   sort of hobbies or you go out with your friends or

22   you -- whatever you are doing for pleasure, have you

23   ever made a request for an auxiliary aid or service

24   while you're out?

25                MR. MILLER:  Object to the extent it interferes

Page 79

1   with his right to privacy and beyond the scope of

2   discoverable material.

3            Go ahead.

4            THE WITNESS:  Yeah, I'm not sure what you mean

5   by that, if you could clarify.

6   BY MS. ROLLER:

7      Q    Sure.  So when you've gone to lunch with your

8   friends, have you ever made a request that the waitress

9   read you items on the menu because maybe the menu

10  doesn't have -- it's not in Braille or it's not online

11  or you've never been to that place before?

12           MR. MILLER:  Same objections.

13           THE WITNESS:  Yeah, I mean, if that's the only

14  way to get the info on the menu and if it's not a

15  restaurant which I'm familiar with, I might ask for

16  that.

17  BY MS. ROLLER:

18     Q    And are they -- are people typically willing to

19  provide you the assistance you need?

20           MR. MILLER:  It lacks foundation, same

21  objections; it interferes with his rights to privacy.

22           THE WITNESS:  You know, that really depends.

23  There are some people who are really good and are very

24  patient and understanding, and other people are kind of

25  in a hurry and maybe they have other tables to wait and,

Page 80

1   you know, kind of sort of hurry you along and maybe

2   don't give you as many of the things that are on the

3   menu.  At that point you are kind of more or less

4   reliant on what they want to tell you about.

5   BY MS. ROLLER:

6       Q   Okay.  We're talking about menus but are there

7   any other types of aids or services or assistance you've

8   asked for while kind of out in the world, enjoying your

9   day?

10          MR. MILLER:  Objection; overbroad, it calls for

11  a narrative.

12          THE WITNESS:  What do you mean by aids and

13  assistance exactly?

14  BY MS. ROLLER:

15      Q   Assistance, help.  Any help you need to do what

16  you went to that place to do whether it's eat and, you

17  know, you need to figure out what's on the menu or you

18  need assistance locating something.

19          MR. MILLER:  Same objections.

20          THE WITNESS:  Yeah, I mean, there are times,

21  I'm sure, that I have asked for that.

22  BY MS. ROLLER:

23      Q   And could you give me examples of when you've

24  asked for -- I mean, really, it's just asking somebody

25  for help.  Have you ever -- tell me times or

Page 81

1   circumstances under which you've asked for help when

2   you've been out.

3           MR. MILLER:  Objection.  It calls for a

4   narrative, overbroad.  It potentially seeks to invade

5   his right to privacy.

6           Go ahead.

7           THE WITNESS:  So things, for example, like if I

8   go into a restaurant and they say -- ask me how many in

9   my party, and I tell them, and they say, okay, right

10  this way, I might say, hey, can I take your elbow and

11  use what's called the sighted guide technique.

12          So I might do -- I might use that because it

13  does make it a little easier, especially if there's a

14  lot of tables and you have to kind of weave through the

15  patterns and things like that, it can be helpful to ask

16  for that assistance so that would be an example.

17      Q   Okay.  In the last 10 years, how many times do

18  you think you've asked for that type of assistance?

19          MR. MILLER:  Objection; overbroad.

20          Go ahead.

21          THE WITNESS:  Honestly, I -- I can't put a

22  number on that.

23  BY MS. ROLLER:

24      Q   Can you give me an estimate?  I mean I'm

25  entitled to an estimate, so let me help you.  Is it more

Page 82

1   or less than 10 times?

2           MR. MILLER:  Same objections.

3           Go ahead.

4           THE WITNESS:  Yes, I would say it's more than

5   10 times.

6   BY MS. ROLLER:

7       Q   How about is it more or less than 50 times?

8       A   And how much -- what's the period of time we're

9   talking?

10      Q   Let's say in the last 10 years.

11      A   Yeah, probably over 50.

12      Q   Okay.  Is it more or less than a hundred times?

13          MR. MILLER:  Same objections.

14          THE WITNESS:  Yeah, I mean, it's so hard to

15  say.  I guess we can keep going up the number scale, but

16  it's -- so, yeah, I mean, if we're talking 10 years,

17  it's probably been somewhere around there.

18  BY MS. ROLLER:

19      Q   Okay.  And I'm not trying to trick you.  I'm

20  just trying to get an understanding of, you know, the

21  kind of assistance you've asked for.  Would you say it's

22  your practice that when you go to a restaurant you ask

23  if you can use the sighted guide technique any time you

24  go?

25      A   Not always, because, again, it depends on the

Page 83

1   layout of the restaurant, how busy it is.  If it's a

2   clear path, sometimes if there's not a lot of noise, I

3   can hear the footsteps of the person and that's enough

4   for me to follow; so it really just depends on the

5   individual circumstance or what's going on at that

6   location at the time.

7        Q    Does it make you uncomfortable to ask folks for

8   assistance using the guided sight technique?

9             MR. MILLER:  Objection.  It lacks foundation.

10            THE WITNESS:  Well, you know, at any time that

11  you have to ask for help, it, you know, causes a little

12  bit of embarrassment.  Ideally I'd like to be able to do

13  things on my own without anybody's assistance whenever

14  possible.

15            So it's -- it's something that sometimes I just

16  have to do because it's the only way to get done what

17  I'm trying to get done; but whenever possible and if I

18  can do it myself, I'd prefer always to try to go that

19  route.

20  BY MS. ROLLER:

21       Q    Aside from the guided sight technique at

22  restaurants, is there any other time that you can recall

23  where you asked for some sort of assistance while out

24  and about doing things?

25            MR. MILLER:  It calls for a narrative,

Page 84

1    objection.

2              THE WITNESS:  Yeah, I mean, you know, I'm sure

3    I've probably asked, you know, if -- if I -- because I

4    use apps to -- like a GPS app, for example, to help get

5    me close to a location.

6              So let's say it's a Starbucks I'm trying to

7    find.  So the GPS might get me close enough to the

8    building right there where it is; but if there are

9    multiple doors and a lot of things in the way and if

10   there's a lot of people around and I'm -- feel like I've

11   exhausted, you know, my options in terms of going and

12   trying different doors and trying to find a way in, I

13   might ask somebody passing by, hey, is the Starbucks

14   near here, you know, that kind of thing, but it's -- I

15   always try to do it independently first.

16   BY MS. ROLLER:

17       Q    Do you ever call locations in advance of your

18   visit to try to get like maybe verbal instructions or a

19   lay of the land before you go somewhere?

20       A    Yes, I do.

21       Q    Okay.  Is that something you frequently do?

22       A    It depends on the circumstances.  In some cases

23   I do do it because, you know, I've never been to the

24   place and I may -- it may be helpful for me to know, at

25   least, some landmarks, some things that are nearby.

Page 85

1          Because here, sometimes it's hard -- addresses

2     aren't always well-listed, so even when you ask

3     somebody, hey, I'm looking for this address, sometimes

4     they'll say, yeah, I don't see numbers in front of these

5     buildings.

6          So I always do try to -- and if I feel like

7     it's going to be a situation where it really helps to

8     know that information, to try to make that call ahead of

9     time and to find out information that helps me to be

10    prepared for when I get there on the ground.

11    Q    Okay.  And that's to actually find a building;

12    right?  So that's like to get to your destination, not

13    necessarily once you reach your destination, like

14    navigating the inside; is that right?

15    A    Sometimes I will ask about information about

16    navigating the inside.  So, you know, for example, if

17    it's located in a building and they gave me a suite

18    number, I might say -- you know, if it's Suite 545, for

19    example, I might say is that on the fifth floor.  You

20    know, is it near the elevator, you know, that kind of

21    thing.  I've asked questions like that.

22    Q    Okay.  And does that assist you in navigating

23    on the day that you actually go visit the building or

24    the suite in that situation?

25    A    Yes.

Page 86

1      Q   And so, for example, if you were going to visit

2   an office building in a suite and you called and they

3   gave you directions, they gave you the landmarks to the

4   building and then they told you, you know, when you get

5   in the front door, the elevator is on the left, you take

6   it to this floor; and then you walk in -- you know, you

7   walk left out of the elevator, you go down the hall, it

8   will be the third door on your left, and then once you

9   open the door, I want you to walk 10 steps forward, two

10  steps to the right and that's where the receptionist is,

11  would that assist you in navigating to that -- to your

12  end location that you are trying to get to?

13          MR. MILLER:  Objection; vague and ambiguous,

14  incomplete hypothetical.

15          Go ahead.

16          THE WITNESS:  Yeah, I mean, any information

17  that helps to make it a little easier to find the place

18  is always welcome and helpful.

19  BY MS. ROLLER:

20      Q   Have you ever requested that type of detailed

21  description to get to a destination?

22          MR. MILLER:  Same objections.

23          Go ahead.

24          THE WITNESS:  I'm sure I probably have at some

25  point if I felt that it was needed.

Page 87

1    BY MS. ROLLER:

2        Q    What helps you decide whether it's needed or

3    not?  What factors?

4        A    Like if it sounds like it's going to be a big

5    office building, for example, with maybe multiple wings,

6    if it's an outdoor shopping center, it's especially

7    helpful maybe to know what stores are, you know,

8    immediately on either side of the place that I'm looking

9    for.

10           It might help to know what the anchor tenant of

11   that shopping center is so that if my Access driver is

12   looking for it, I can say, oh, yeah, look for the --

13   look for the building there.  There's going to be a

14   7-Eleven in that shopping center and it's right near

15   there; so, yeah, that's when things like that would

16   help.

17       Q    Let's say in the past five years, how many

18   times have you reached out for some sort of assistance

19   in getting to a place?

20           MR. MILLER:  Objection; overbroad, it calls for

21   a narrative.

22           Go ahead.

23           THE WITNESS:  Boy, it's hard to put a number on

24   it; but, I don't know, 20 to 30, give or take.

25   // //

Page 88

1    BY MS. ROLLER:

2        Q    And that was because based on your just general

3    assessment, you thought that it might be a trickier

4    situation or you might need a little more assistance

5    than what your navigational apps can provide you?

6        A    Correct, because navigational apps do not work

7    well indoors.  So they can get me close enough to a

8    building where I could typically find the door, but once

9    I'm in there, GPS stops working so I have to rely on

10   other skills to get the rest -- get to the rest of the

11   way.

12       Q    Okay.  So, as you know, I represent Quest.  I'm

13   here to talk to you partially about your experience at

14   Quest at the patient service center.  Do you know what

15   I'm talking about when I say the Quest patient center

16   just generally?

17       A    Yes.

18       Q    Okay.  So at least on one occasion you used

19   Quest Diagnostics for some sort of blood work; right?

20       A    Correct.

21       Q    Okay.  Are there more than one occasion that

22   you went to Quest?

23       A    I probably have over the years because,

24   generally, when my doctor wants blood work, I'll --

25   sometimes if it's not done there in their facility and I

Page 89

1    have to, you know -- you know, without going to his

2    office first, I'll often choose a location, a lab that's

3    closest and convenient for me to get to from home or

4    wherever I may happen to be on the day that I am going

5    to go get the work done.

6        Q    While you've said there might be more than one

7    time, so did you -- in the past five years have you

8    visited Quest more than one time?

9        A    I'm not 100 percent sure, because, again, I --

10   I go to whatever the closest lab is; so sometimes it

11   might have been Quest, sometimes it might have been

12   something else.

13       Q    Okay.

14       A    So just to be safe, I'll say that it is

15   possible that I've visited Quest more than once in the

16   last five years.

17       Q    Did you do anything to figure out how many

18   times you've visited Quests in the past five years?

19       A    No.

20       Q    Okay.  So you didn't check any emails to see if

21   you had any appointments -- appointment reminders from

22   Quest?

23       A    No, because generally -- I think most of the

24   time that I've been to Quest it's been more like

25   walk-in.

Page 90

1      Q   Okay.  Did you look at any calendar invites to

2   see if you had written anything down regarding any sort

3   of visits with Quest?

4      A   Not that I recall.

5      Q   Did you call any of your doctors to request

6   your lab results to ascertain whether you got those done

7   at Quest or another lab?

8          MR. MILLER:  I'll object to the extent it calls

9   for attorney-client privilege, instruct you not to

10  answer anything you've asked your lawyers to do.

11  Outside of anything that you've asked your lawyers to

12  do, you can answer.

13         THE WITNESS:  I'm going to follow my attorney's

14  advice.

15         MR. MILLER:  You can answer to the extent that

16  it's something that you -- that you did not instruct

17  your attorneys to do.  So if you can answer

18  independently of that, go ahead.

19         THE WITNESS:  Okay.  Yes, I did.

20  BY MS. ROLLER:

21      Q   Okay.  And what did you do to try to ascertain

22  the number of times you've gone to Quest in the past

23  five years?

24      A   Well, I asked my doctor to send me the lab

25  report for the most recent visit to Quest.

Page 91

1      Q   Okay.  And when did you make that request of

2  your doctor?

3      A   It might have been -- well, it was earlier this

4  year.  I don't remember the exact date.

5      Q   Was it -- we're in April now, so was it January

6  or February or was it March, April?

7      A   I want to say probably January, February time

8  frame.

9      Q   And did your doctor provide you with the

10  information you requested?

11     A   Yes.

12     Q   When did your doctor provide that to you?

13     A   Within a day or so.

14     Q   Okay.  And then did you provide that to your

15  attorneys?

16     A   Correct.

17     Q   Okay.  Did -- how many doctors did you reach

18  out to to get your lab work?

19     A   Just my personal care physician.

20     Q   Dr. Diehl?

21     A   Correct.

22     Q   Does anybody besides Dr. Diehl or -- in the

23  past five years, has anybody besides Dr. Diehl given you

24  an order to complete blood work outside of their

25  facility, so at a third party?

Page 92

1      A    Anybody other than Dr. Diehl?

2      Q    Yes.

3      A    No.

4      Q    Okay.  And when you talked to Dr. Diehl or

5  Dr. Diehl's office asking for the lab results, you said

6  that you asked for the most recent lab result; is that

7  correct

8      A    Correct.

9      Q    Had you previously made a request for lab

10 results from the past?

11          MR. MILLER:  Vague and ambiguous.

12          THE WITNESS:  No.

13 BY MS. ROLLER:

14     Q    Why not?

15          MR. MILLER:  Objection.  It lacks foundation.

16          Go ahead.

17          THE WITNESS:  Because I didn't need it.  I

18 didn't feel I needed it.

19 BY MS. ROLLER:

20     Q    You said that you believed you went to Quest

21 multiple times, so I'm going to represent to you that in

22 response to discovery, you identified at least only one

23 date on which you went to Quest and that was

24 June 25th, 2019.  Does that sound right for at

25 least one visit to Quest Diagnostics?

Page 93

1      A    That's correct.

2      Q    Okay.  The other visits that you believe you

3    may have had, were they before or after that June 25th,

4    2019 visit?

5      A    They would have been before.

6      Q    Can you give me an estimate as to when those

7    other two visits would have taken place?

8      A    I can't recall.  Probably, you know, in 2015 or

9    so.

10      Q    Both of those visits would be in 2015?

11      A    One of them at least would have been.  And,

12    again, because I -- I don't know 100 percent for sure

13    what labs.  I don't have them committed to memory what

14    labs I go to every year for the physical exam blood

15    work.

16      Q    Okay.  And just so I'm clear, you didn't make

17    a request of your doctor for any of the labs prior to

18    June 25th, 2019; correct?

19          MR. MILLER:  Objection to the extent it calls

20    for attorney-client privilege and I'll instruct you not

21    to answer.  Outside of anything you've asked your

22    attorneys to do, you may answer.

23          THE WITNESS:  So I personally didn't but I did

24    instructed my attorneys to request those records, and I

25    filled out a release.  I signed a release form.

Page 94

1    BY MS. ROLLER:

2        Q    Okay.  If your attorneys did not produce as

3    part of this litigation any other lab results from

4    Quest aside from the June 25th, 2019, would that lead

5    you to believe that you actually only visited Quest on

6    one occasion?

7            MR. MILLER:  Objection.  It lacks foundation.

8            Go ahead.

9            THE WITNESS:  No, because I -- I'm certain that

10   I have visited Quest in the past.  It's -- it's one of

11   the two big labs here, so -- and I get this exam done

12   every year; so if at the time I was closer to a Quest,

13   then I would have gone there.  I just don't remember the

14   exact dates.

15   BY MS. ROLLER:

16       Q    Okay.  But one was in 2015 and then one was at

17   some point, again, before June 25th, 2019; correct?

18       A    To the best of my recollection.

19       Q    Okay.  Do you know if that second visit was

20   before or after 2015?

21       A    I don't know.

22       Q    I'm just trying to figure out timing on this

23   and when you believe that you went to Quest and so we

24   can at least refer to -- when we're talking about them,

25   we can at least refer to them by the year.

Page 95

1      A   Yeah, I just -- like I said, I don't remember

2    the years because every year it's a little different and

3    it depends on what I'm close to, it depends on if the

4    day that we schedule the exam, you know, if it's -- if

5    the timing works right, I would come in fasting so I

6    would go -- and in that case, I would use whatever lab

7    was there in the medical building where my doctor is; so

8    it just depends or, in some cases, the physical exam is

9    done, you know, after I would do the -- you know, I'm

10   instructed to do blood work before and then come in for

11   the exam.  So, in that case, I'd go by whatever lab

12   happens to be closer to where I am or I'm going to be on

13   the day that I want the service.

14      Q   Okay.  All right.  So then we talked about

15   three visits.  Do you believe there is a fourth visit or

16   are you pretty confident that there have only been three

17   visits to Quest?

18      A   Like I said, I -- I don't recall specifics, so

19   I -- I can't say.

20      Q   Okay.  What Quest locations have you visited,

21   patient service centers?

22      A   Other than the one on the 25th of June 2019?

23      Q   Which one was that one?  What location was

24   that?

25      A   That was Sherman Oaks.

Page 96

```
 1        Q    Okay.  And then --
 2        A    At --
 3        Q    Go ahead.
 4        A    At one point I also visited one in Tarzana,
 5   California.
 6        Q    Okay.  Anywhere else?
 7        A    And possibly in West Hills, California where
 8   the doctor's office is located because I'm not sure if
 9   at some point the lab that was in the building was a
10   Quest lab or not.  Yeah, so I'm not sure.
11        Q    Aside from those three locations, have you ever
12   been to any other Quest patient service centers?
13        A    Not that I recall.
14        Q    Do you recall going to a Quest patient service
15   center, the same one more than on one occasion?
16        A    If the one near or in the medical facility was
17   a Quest, then, yes, I probably did go to it on more than
18   one occasion.
19        Q    How many occasions do you believe you went to
20   that one?
21        A    It's hard to say because it depends on how the
22   physical exam was scheduled, and I don't have that -- I
23   don't have that memorized.
24        Q    You had mentioned an eCheck-in kiosk that you
25   encountered when you went to Quest.  Do you remember
```

Page 97

1    talking about that?

2        A    Yes.

3        Q    How many times did you encounter an eCheck-in

4    kiosk at Quest?

5        A    It would be on the June 25th, 2019 visit.

6        Q    Okay.  Did you encounter the eCheck-in kiosk on

7    any of your other visits to either the Tarzana or the

8    West Hills patient service center?

9        A    I don't recall encountering one there.

10       Q    Okay.

11            MR. MILLER:  Miss Roller, when it's convenient,

12   we've been going over another hour, so maybe we can off

13   the record talk about whether we want a tentative break

14   or a lunch break at some point.

15            MS. ROLLER:  Okay.  That's fine.  We can --

16   yeah, this is a fine time to go on a break, so we can go

17   off the record for a discussion on what type of break

18   we're going to take.

19            THE VIDEOGRAPHER:  Going off the record at

20   12:23 p.m.

21            (Discussion off the record.)

22            (Lunch recess.)

23            THE VIDEOGRAPHER:  We are back on the record at

24   1:19 p.m.

25   // //

Page 98

BY MS. ROLLER:

Q   Okay.  Mr. Vargas, you understand you are still under oath?

A   Yes, I do.

Q   Great.  So when we left off, we were talking about the three visits to Quest Diagnostics, about three visits that you remember.

And I had mentioned -- I think I had said I wanted to know all the times you went to Quest for blood work, and I meant to be more broad than that because I do know Quest does more than just blood work.

So if I expand that to be how many times you've gone to Quest for any sort of lab work, whether it's a urinalysis or blood work, would that change your answer in any way or is it those about approximately three times?

A   Yes, it doesn't change -- it's the same answer --

Q   Okay.

A   -- is what I was trying to say.

Q   Of those three or so times that you went to Quest Diagnostics patient service centers, did you actually get labs done on those three occasions?

A   Yes.

Q   So let's talk about your visit in 2015 in

Page 99

1    that -- again, it's hard because I'm not entirely sure

2    if that was your first visit to Quest or a second visit

3    to Quest.

4            So, actually, maybe let's talk about it in the

5    terms of first visit to Quest.  So the first time you

6    ever went to Quest, why did you go to Quest?  Why did

7    you choose Quest over some other laboratory?

8        A   It probably had to do with proximity to where I

9    was at the time.

10       Q   Okay.  And on your first visit to Quest, do you

11   recall what location it was that you went on the first

12   visit, whether it was the Tarzana or the West Hills

13   location?

14       A   Honestly, I don't recall.

15       Q   Do you have an address for the Tarzana

16   location?

17       A   I do not.

18       Q   Do you know the cross streets of the Tarzana

19   location?

20       A   Roughly Reseda Boulevard and Ventura Boulevard

21   are probably the nearest major cross streets.

22       Q   And how about for the West Hills location?

23       A   It would probably be around Woodlake Avenue and

24   Sherman Way or possibly also Medical Center Drive.

25       Q   Okay.  And I think there are two locations in

Page 100

1    West Hills.  I think there's one that's like in the

2    hospital and then one that's outside of the hospital.

3    Was -- do you recall whether it was one of those two

4    locations or any other landmarks?

5         A   I don't recall going into a hospital site, so I

6    don't think it would be in the hospital.

7         Q   Okay.  So on the first occasion that you went

8    to Quest, did you make an appointment or were you a

9    walk-in?

10        A   I believe it was a walk-in.

11        Q   Is that how you would typically go to Quest, as

12   a walk-in or was it -- would you sometimes take

13   appointments?

14        A   No, I think for the most part it was walk-in.

15        Q   Okay.  In advance of your first visit to Quest,

16   did you call them to get any information about their

17   location or directions or any helpful tips?

18        A   I don't recall.

19        Q   Is there anything that would refresh your

20   recollection as to whether you called in advance of that

21   visit?

22        A   Probably the location.  If it was the West

23   Hills location, then I probably wouldn't have done it

24   because it was there in very close proximity to the

25   doctor's office, so it was probably in the building or

Page 101

1    thereabouts.

2        Q   Do you -- do you recall ever calling in advance

3    of any visit to Quest?

4        A   It's possible, although I don't recall, but

5    it's possible that I would have called the Tarzana one

6    only because that was an area where I was a little less

7    familiar.

8        Q   Okay.  So let's talk about that call to the

9    Tarzana location.  So what do you recall from that

10   telephone call?

11       A   I don't recall much, but I'm guessing I

12   probably called them to ask their address, their office

13   hours, you know, things like that.

14           And, again, if I felt like I needed it, I might

15   have asked what's nearby you, you know, the usual kind

16   of thing I would ask if I'm going in an unfamiliar

17   location where I feel like that would help me to

18   navigate a little more easy.

19       Q   Do you recall who you spoke with?

20       A   I do not.

21       Q   Do you recall if you spoke with somebody at the

22   actual Tarzana location or if it was somebody that was

23   on a general call number?

24       A   I don't recall.

25       Q   Do you recall anything else from that call with

Page 102

1    somebody from Quest in advance of your Tarzana visit?

2         A    No, I don't.

3         Q    Do you remember how you got the phone number to

4    call the Tarzana location?

5         A    Probably got it from the doctor's office.

6         Q    Okay.  And did you -- you did speak with

7    somebody; correct?

8         A    I don't recall for sure, but I'm just saying

9    that if I did call, it would have been for that location

10   more than the other one only because that was a little

11   less familiar.

12        Q    Okay.  On that first visit to a Quest patient

13   service center, how did you check in for that visit?

14   How did you let them know you were -- you had arrived or

15   that you needed an appointment?

16        A    I probably just walked in and went to the --

17   the -- I think, at least, with the West Hills one, if I

18   recall, you just walked in and it was right there next

19   to the door, the window.

20        Q    Okay.  You're saying you probably did this, you

21   probably did that.  Does that mean that you have no

22   independent recollection of your visit -- your first

23   visit to Quest patient service center?

24        A    Yeah, I don't have a clear recollection.

25        Q    Okay.  Do you have a clear recollection of your

Page 103

1  second visit to a Quest patient service center?

2      A    No.

3      Q    Okay.  Do you have a clear recollection of your

4  June 25th, 2019 visit to a Quest patient service center?

5      A    Yes, I have a better recollection of that.

6      Q    Okay.  So, then, let's talk about -- it seems

7  like it might be easier for you to talk about your

8  visits based on the location as opposed to whether it

9  was your first or second visit; is that accurate?

10     A    Yes.

11     Q    Okay.  So let's talk about your visit to West

12 Hills.  So do you recall how you got to the West Hills

13 location?

14     A    It was -- I was already there because I went to

15 the first part of the physical exam which involved

16 getting the blood work; and then as soon as I was done

17 with the blood work, I would go back to the doctor's

18 office to proceed with the first part of the exam.

19     Q    Okay.  And you said that when you walked in the

20 front door at the West Hills location, the window was

21 immediately to the right; is that correct?

22     A    To the best of my recollection.

23     Q    Okay.  What window are you talking about?

24     A    The window where you talk to somebody who's

25 working there.

Page 104

1    Q    Okay.  And when you went to that window, was

2    somebody there?

3    A    Yes.

4    Q    Was there a line?

5    A    I don't recall a line.

6    Q    And when you spoke with the person that was

7    there, what did you tell that person when you first

8    arrived?

9    A    I handed them the paper that the doctor had

10   given with their blood work request as well as my

11   insurance cards.

12   Q    Okay.  And did they have a response?

13   A    Well, yeah, probably good morning and all that

14   kind of thing.

15   Q    Okay.  Did they check you in at that point?

16   A    Yes.

17   Q    Did they ask you any further questions?

18   A    Not at that moment, no.

19   Q    Okay.  Did they direct you to sit down?

20   A    I'm trying to remember.

21        No, I think I was taken right in.  I don't

22   think there were many people there.

23   Q    And then what happened after you were taken in?

24   A    Oh, I was taken to a chair where you sit down

25   and, at that point, I think I was asked a few more

Page 105

1   questions about my -- you know, my address and things

2   like that and verifying that my insurance was, you know,

3   my insurance and things like that, and then the

4   phlebotomist proceeded to draw the blood.

5        Q   Did you have to sign in at all for that visit?

6        A   I don't recall.

7        Q   And then after the phlebotomist took your

8   blood, what happened next?

9        A   I pretty much was -- I pretty much left and

10   then went back to the doctor's office to proceed with

11   the first part of the physical examination.

12        Q   Okay.  How long between the time you set foot

13   in the Quest patient service center and the time you

14   left?

15        A   It's hard to say, but maybe -- maybe 5 to 10

16   minutes.

17        Q   Okay.  And aside from the person that was at

18   the window, did you -- and the phlebotomist who drew

19   your blood, did you interact with anybody else at the

20   Quest patient service center during that visit?

21        A   I don't recall.

22        Q   Okay.  Do you recall whether your doctor

23   received your results from that visit?

24        A   Yes.

25        Q   And did your doctor receive your results, to

Page 106

1    your knowledge?

2         A    Yes, because those are discussed during the

3    second visit for the -- for the remainder of the

4    examination.

5         Q    Okay.  Did your insurance cover your visit to

6    Quest on that day?

7         A    Yes.

8         Q    What type of insurance do you have or did you

9    have at that time?

10        A    Medicare, Medi-Cal.

11        Q    Do you have the same insurance today?

12        A    Yes.

13        Q    Between that visit and today has your insurance

14   changed at all?

15        A    No.

16        Q    And aside from what we've already discussed, do

17   you recall anything else about your visit to the West

18   Hills Quest patient service center?

19        A    No.

20        Q    Okay.  So let's talk about your second visit to

21   Quest or it might have been your first visit, but the

22   visit to the Tarzana location, do you recall that?

23        A    Yes.

24        Q    Okay.  So you said in advance of that lo- -- in

25   advance of that visit, you may have contacted somebody

Page 107

1    at Quest; correct?

2        A    Correct.

3        Q    Do you recall how you got to that Tarzana

4    location?

5        A    I probably took paratransit.

6        Q    And was that in conjunction with a doctor's

7    visit or was that like a separate visit to the lab?

8        A    It was the same thing, blood work for a

9    physical exam, but this time the visits to the doctor

10   were separate from the lab.

11       Q    Okay.  Do you know how -- how much delay there

12   was in between you seeing the doctor and then you going

13   to get the labs?

14       A    I don't recall.

15       Q    Were you a walk-in on this visit?

16       A    I believe so.

17       Q    Okay.  And what do you recall from that visit

18   to the Tarzana location?

19            MR. MILLER:  Objection.  It calls for a

20   narrative.

21            Go ahead.

22            THE WITNESS:  Nothing out of the ordinary.  I

23   think on that one it -- that was a busier location, so

24   I -- I believe I waited in a line to get to the window;

25   and when I got to the window, I interacted with the

Page 108

 1    person there and gave them the information, as I did

 2    with the other time, and then I was directed to wait.

 3    BY MS. ROLLER:

 4        Q    Okay.  Did you -- were you a walk-in on that --

 5    on this visit?

 6        A    I believe so.

 7        Q    How long do you believe you waited from the

 8    time you got in to the patient service center in Tarzana

 9    until the time you were able to speak with the

10    receptionist to get checked in?

11        A    Probably about 5 to 10 minutes.  There were

12    people there.

13        Q    Okay.  Were you able to sense about how many

14    people were there?

15        A    No, I couldn't.

16        Q    Did you overhear any conversations between the

17    folks in front of you and the Quest employee who was

18    checking people in?

19        A    Yes.

20        Q    Okay.  What do you recall from those

21    conversations?

22        A    I didn't pay attention to what they were.

23        Q    Was it your impression that -- oh, sorry, go

24    ahead.

25        A    No, I didn't recall what they were other than

Page 109

1   that they were having conversations, you know,

2   interaction.

3       Q   Okay.  Was it your impression based on what you

4   recall that the people were also checking in for their

5   appointments with the person at the front desk?

6       A   I -- like I said, I didn't really pay attention

7   to the nature of the conversations but, you know, I

8   would guess that it was fairly routine business.

9       Q   Did you sign in on any sign-in sheet during

10  that visit?

11      A   I did not.  I think the person behind the desk

12  did that for me.

13      Q   Okay.  Do you know if anybody else in front of

14  you signed in on a sign-in sheet?

15      A   I don't know.

16      Q   Do you know if anybody else in line in front of

17  you had an appointment?

18      A   I don't know.

19      Q   When you walked in to the patient service

20  center, were you greeted by anybody before you got to

21  the front of the line -- greeted by anybody that worked

22  at Quest before you got to the front of the line?

23      A   I don't think so.

24      Q   Okay.  And how long after -- so when you went

25  to check in, did you hand them your prescription for

Page 110

1   whatever you needed -- whatever labs you needed that

2   day?

3        A    Yes.

4        Q    Did you provide the receptionist with your

5   insurance card?

6        A    Yes.

7        Q    Did you -- were you asked any questions about

8   your visit, about your identity, anything like that?

9        A    No.

10       Q    Do you recall any other conversations that you

11  had with that receptionist before he or she asked you to

12  take a seat?

13       A    No.

14       Q    How long between the time that you took a seat

15  and the time you were called back by the phlebotomist

16  for your service?

17       A    I'm trying to think.  It was so long ago.  But

18  I think it was probably -- I was there a while.  I think

19  it was a good 20 to 30 minutes.

20       Q    All right.  When you went back to the room,

21  were you asked any additional questions regarding your

22  identity or your prescription or what you were there

23  for?

24       A    Yeah, I believe so.

25       Q    What do you recall being asked?

Page 111

1    A    Pretty much that, you know, what I was there

2    for, verifying my identity, my insurance, my address,

3    things like that.

4    Q    Okay.  And then you did have your blood drawn

5    or your specimen taken; correct?

6    A    That's correct.

7    Q    And then after that did you leave?

8    A    Yes.

9    Q    So overall you spent approximately 5 to 10

10   minutes in line, 20 to 30 minutes waiting for your

11   service.  So how long would you estimate it was from the

12   time you stepped foot into the patient service center

13   until the time you left?

14   A    Probably either a good 40 minutes or so.

15   Q    Okay.  And do you know whether your doctor

16   received your lab results from that visit at the Tarzana

17   location?

18   A    Yes, because they were discussed during the

19   second part of the physical exam.

20   Q    Okay.  At any time -- I'm sorry, between the

21   West Hills and the Tarzana location, did you go to both

22   locations alone when you went?

23   A    Yes.

24   Q    Okay.  At any time following your visits, did

25   you ever reach out to anyone at Quest to talk to them

Page 112

1   about your experience during your visits -- during these

2   two visits?

3          MR. MILLER:  Objection.  It lacks foundation.

4          Go ahead.

5          THE WITNESS:  I don't recall.  I don't think

6   so.

7   BY MS. ROLLER:

8       Q   Okay.  Would you say that these two visits to

9   Quest at the West Hills location and the Tarzana

10   location were uneventful?

11          MR. MILLER:  Objection; vague.

12          Go ahead.

13          THE WITNESS:  Yeah, I would say so.

14   BY MS. ROLLER:

15       Q   Okay.  Do you remember anything else from that

16   Tarzana visit or -- that we haven't discussed?

17       A   No, not to the best of my memory.

18       Q   Okay.  Let's talk about your June 25, 2019

19   visit.  Is that your most recent visit to a Quest

20   patient service center?

21       A   I believe so.

22       Q   And so you have not been to a Quest patient

23   service center since that visit; right?

24       A   I don't think so.

25       Q   For that visit were you a walk-in as well?

Page 113

1    A    I believe so.

2    Q    Is this the first time that you had encountered

3  an eCheck-in kiosk at Quest?

4    A    Yes.

5    Q    Why did you go to Quest on that day?

6    A    Because it was the closest lab to where I live,

7  and when I did a search for labs, that was the first one

8  that came up in the listing so I chose to go to that

9  one.

10    Q    Okay.  So let me ask you this and maybe this

11  will help us get something narrowed down.  So you lived

12  at the Van Nuys address since July of 2018?

13    A    Correct.

14    Q    I'm sorry, from -- since July of 2018; correct?

15    A    Yes.

16    Q    And that's your current address?

17    A    Yes.

18    Q    And then you lived in the Reseda location from

19  2013 until, for all intents and purposes, 2017 when you

20  lived with your friend; right?

21    A    In 2003 to 2017.

22    Q    Sorry, from 2003 to 2017.

23         Okay.  So do you know if you would have been

24  living at the Van Nuys location or at the Chatsworth

25  location or the Reseda location when you went to the

Page 114

1   West Hills Quest patient service center?

2           MR. MILLER:  Objection; compound.

3           THE WITNESS:  When I went to the West Hills, I

4   was living in the -- at the Reseda location.

5   BY MS. ROLLER:

6       Q   Okay.  And how about Tarzana?

7       A   Same thing.

8       Q   Okay.  So we can say with pretty good certainty

9   that you visited both the West Hills location and the

10  Tarzana location at some point before mid-September --

11  before July 2018; right?

12      A   Yes.

13      Q   Okay.  And then you went to the Van Nuys

14  location on June 25th, 2019 when you were living at the

15  current address, the Van Nuys address; right?

16      A   Correct.

17      Q   And so when you were -- if you were living at

18  the Reseda address when you went to both West Hills and

19  Tarzana, why would you go to a different location each

20  time?

21      A   Well, the West Hills location I went to because

22  that was close to where I was at the -- at that day, so

23  on those occasions the appointment was scheduled in such

24  a way that it was early enough in the morning that it

25  made sense to come in, fasting, because that's what you

Page 115

 1    have to do for that type of blood work, and then be able

 2    to -- as soon as I'm done with that, proceed with the

 3    exam, and then eat as opposed to appointments that are

 4    scheduled for later in the day where I didn't want to --

 5    you know, I -- I didn't want to do fasting and then have

 6    to travel to -- to the West Hills location.

 7            So it all depends.  If they were able to

 8    schedule me in the morning at West Hills at my doctor's

 9    office, then I would usually go to the lab that's

10    closest to there; but if I did not have a morning

11    appointment at my doctor's office, then I would elect to

12    just do that from home and go to the closest location to

13    me there.

14       Q   Understood.  Okay.  So on June 25th, 2019,

15    based on the logic you just explained, that probably

16    meant that you didn't go to the doctor on that day; is

17    that correct?

18       A   I did not and that was a different type of

19    blood test.  It was not associated with an annual

20    physical.

21       Q   Okay.  Did you call the -- well, first of all,

22    what location did you go to -- do you know the address

23    of the location you went to on June 25th, 2019?

24       A   I believe it was like 4849 or at least in the

25    4800 block of Van Nuys Boulevard.

Page 116

1      Q   Okay.  Do you recall the cross streets of that
2   location?
3      A   I don't know if it was Houston Street or
4   some- -- I'm not 100 percent sure.
5      Q   Is there any businesses or landmarks that you
6   can tell me that were around that patient service
7   center?
8      A   No.
9      Q   How did you get to the Van Nuys location on
10   June 25th, 2019?
11      A   I took paratransit.
12      Q   And did they drop you off right in front of the
13   building?
14      A   Yes.
15      Q   Is this location, is this patient service
16   center inside a building or is it a stand-alone
17   location?
18      A   I believe it's inside a building.
19      Q   Okay.  And do you recall what floor it's on?
20      A   I do not.
21      Q   Did you call the patient service center in
22   advance of your visit?
23      A   I attempted to do so and had a bit of a
24   difficult time because it doesn't seem that it's --
25   they're set up now where you can call and talk to

Page 117

1    somebody there.  I think I ended up having to talk to

2    somebody at a national call center or something like

3    that.

4         Q   Okay.  Do you recall when you spoke with

5    somebody from Quest in advance of your visit?

6         A   I believe it was the day before.

7         Q   And what did you call to ask?  What was the

8    purpose of your call?

9         A   I was calling to -- hoping to talk to somebody

10   locally, of course, to ask about local businesses or

11   landmarks or things that might be helpful, but also I

12   wanted to find out what was the time of day when they

13   were not as busy because I wanted to come in during that

14   time.

15        Q   Okay.  And do you recall what information you

16   received from that call?

17        A   I was told that early afternoon was usually a

18   good time.  I don't believe I was able to get any useful

19   information as far as landmarks or things like that from

20   somebody at a call center as opposed to somebody who is

21   there locally, but I got enough information to at least

22   be able to get me there and, you know, get the address

23   located.

24        Q   Is there a reason why you do walk-in versus

25   make appointments?

Veritext Legal Solutions

Page 118

1       A     Probably just because of transportation issues.

2    Sometimes you don't know when paratransit is going to

3    get you there or any form of public transit, for that

4    matter, when it's going to get you there, so whenever

5    it's possible to do walk-in, I go with that because that

6    way I don't have to worry about it if I miss my

7    appointment.

8       Q     Okay.  Did you ever -- do you ever call in

9    advance to any location that you're going to, whether

10   it's like a lab or anything else and say, hey, I'm

11   blind.  I'm coming tomorrow around this time, you know,

12   I want somebody to be aware so I can get assistance to

13   the extent necessary?

14      A     Well, as I said before, sometimes if I feel --

15   especially if it's an unfamiliar area and I feel like it

16   would be helpful to know some landmarks or, you know,

17   useful hints, I will call and ask those questions.  I

18   don't usually ask for any type of special assistance --

19      Q     Do you --

20      A     -- in advance.

21      Q     Okay.  Do you ever give the locations a warning

22   or a heads-up, like, hey, I'm coming and I'm blind or do

23   you just ask your questions?

24      A     I ask my questions and it's possible, in the

25   course of conversation, I may mention, yes, I'm blind

Page 119

1   and this is why I'm asking you this, but I don't call

2   and say, hey, heads-up, blind person coming in so, you

3   know, move the furniture out of the way and have

4   somebody there to help him.  I don't do that, no.

5        Q   Okay.  So when you went to the Quest patient

6   service center in Van Nuys on June 25th, 2019, do you

7   recall what time of day you went?

8        A   I think it was around maybe, give or take,

9   in the afternoon.

10       Q   Do you remember what day of the week this was?

11       A   I do not.

12       Q   Okay.

13       A   It was a weekday but -- so I know that much,

14   but I don't recall the actual date.

15       Q   Do you remember the name of the doctor who

16   ordered you to get labs done for that visit?

17       A   Yes, my primary care physician.

18       Q   Dr. Diehl?

19       A   Correct.

20       Q   Okay.  Did anyone go with you to this visit?

21       A   No.

22       Q   Had you been to that location before in the

23   past or in that area in the past?

24            MR. MILLER:  Objection.

25            THE WITNESS:  No.

Page 120

1    BY MS. ROLLER:

2         Q    And when you first walked in the door to the

3    Van Nuys location on June 25th, 2019, was there a

4    greeter there or somebody that was helping the flow of

5    patients?

6         A    No.

7         Q    Okay.  What did you do when you first stepped

8    foot in the patient service center?

9              MR. MILLER:  Objection.  It calls for a

10   narrative.

11             Go ahead.

12             THE WITNESS:  I went to locate the window

13   because I figured that's a good place to start.

14   BY MS. ROLLER:

15        Q    Okay.  And were you able to find the window?

16        A    Eventually, although it was a little difficult

17   because there was nobody there, where normally I might

18   hear a conversation or something that at least gets me

19   pointed in the right direction.

20        Q    So you found the window.  How long did it take

21   for you to find a window?

22        A    Probably a few minutes, two or three.

23        Q    All right.  And then once you were at the

24   window, what did you do?

25        A    I went to the window, I listened.  I didn't

Page 121

1   hear anybody.  I said hello a couple of times and nobody

2   was there, so I basically just stood there.

3       Q   Okay.  Did somebody eventually come to the

4   window?

5       A   Well, somebody eventually came out and that was

6   only to admit, I guess, another patient that was in the

7   waiting room who had already checked in earlier --

8       Q   How long --

9       A   -- and that's it.

10      Q   Go ahead.

11      A   So that was the only way I was able to get

12  anybody's attention there, was when that person came out

13  to call in that other patient.

14      Q   How long between the time you stepped in the

15  Quest patient center and the time that that person came

16  out to get the other patient?

17      A   I would say I waited there a good 10 to 15

18  minutes at that window.  It was a long wait.

19      Q   Okay.  And when the -- do you know if the

20  person that came out was a phlebotomist?

21      A   I believe so, but I didn't know it at the time

22  but only because that's the same person that ultimately

23  took my blood.

24      Q   Okay.  When that phlebotomist came out, did

25  you -- did you get the attention of the phlebotomist?

Page 122

1        A    Yes.

2        Q    Do you remember his or her name?

3        A    I do not.

4        Q    Okay.  Was it -- can you describe that person

5    to me in whatever description that you're able to

6    provide?  Was it male, female?  Sound young, old?

7        A    It was a female.  I would say not young or old,

8    so probably like in her 30s or something.  I think she

9    was a little short in stature, but that's about all I

10   can recall as far as details.

11       Q    Okay.  And are you able to tell that she was

12   short in stature because you are able to see the

13   figures?

14       A    No, that one's because I could hear where her

15   voice was coming from.  The lighting in there was a

16   little dark so I couldn't see things like that.

17       Q    So you're able to tell somebody's height based

18   on if their voice is coming from a high place or a low

19   place?

20       A    Yeah.

21       Q    Is there any other characteristics that

22   you're -- that you can recall from that phlebotomist?

23       A    No.

24       Q    Did she have a high voice?  A low voice?

25   Normal?

Page 123

1        A    I think normal.  There's nothing in particular

2   outstanding about her voice.  It was normal.

3        Q    Okay.  And so when she came out to get another

4   patient, did you get her attention or did she make

5   con- -- make contact with you?

6        A    She noticed me and I told her, you know, that I

7   was here to get some blood work.

8        Q    Okay.  How do you know that she noticed you?

9        A    Because she addressed me.

10       Q    And what did she say?

11       A    She said something to the effect of hi, sir,

12   can I help you.

13       Q    And what was your response?

14       A    I told her yes, I was here to get some blood

15   work that was prescribed by my doctor.

16       Q    And then what was her response?

17       A    She directed me to the kiosk and said this is

18   where you check in.

19       Q    Okay.  And how did she direct you to the kiosk?

20       A    I'm trying to remember.  I think I was -- I was

21   kind of saying, you know, where is it or, you know, she

22   told me to, you know, turn in a certain direction, but I

23   think ultimately she -- she did just kind of guide me to

24   it.

25       Q    Okay.  Did she guide you, like physically guide

Page 124

1     through your elbow?

2          A    Yeah, I mean, I don't recall exactly the

3     contact that was made when she guided me.

4          Q    Okay.  And so she had called a patient and was

5     having that patient wait while she assisted you; is that

6     correct?

7          A    Yes, she was telling that patient to come in

8     and then she got me over to the kiosk.

9          Q    And then what happened once you reached the

10    kiosk?

11         A    I had looked around for the signs that I look

12    for that a kiosk is accessible such as tactile markings

13    or a headphone jack or a tactile keypad.  I didn't find

14    any such things.

15         Q    And was the phlebotomist waiting there with you

16    while you were searching for the various -- various

17    features of the kiosk?

18         A    Yeah, I think so, because it didn't take long

19    for me to feel for those things.  And then I told her

20    that this machine is not accessible to blind people so

21    that I was going to need her help in signing in because

22    of the lack of accessibility of the kiosk.

23         Q    Okay.  And first of all, when you got to the

24    kiosk, were you able to see the shape of the kiosk and

25    see that it was there?

Page 125

1        A    I think my hand was put on it so I was able to

2    kind of feel it.

3        Q    Okay.  And in response to you saying that you

4    needed assistance checking in, what did the phlebotomist

5    do or say?

6        A    She told me okay, just wait a second while she

7    took that patient in.

8        Q    Okay.  And did she come back for you?

9        A    Yes.

10       Q    And how long between the time she said wait a

11   second and the time she returned?

12       A    Probably about five minutes or so.

13       Q    Was it -- was it your impression that she was

14   completing a service on the patient or that she was just

15   putting the patient in the room so she could come help

16   you?

17            MR. MILLER:  It calls for speculation.

18            Go ahead.

19            THE WITNESS:  Yeah, I'm not sure.  I mean after

20   all was said and done, I believe that was the case

21   because I don't believe that anybody else was working

22   there other than her.

23   BY MS. ROLLER:

24       Q    Okay.  Did you hear -- when she came back out,

25   did you hear the other patient leaving or --

Page 126

1     A    I don't recall.

2     Q    Okay.  And just to be clear, I made an

3    assumption, but I'm assuming that the same phlebotomist

4    who directed you to the kiosk is the one who came back

5    for you; is that true?

6     A    Yes.

7     Q    And then did she assist you in checking in?

8     A    Yes.

9     Q    So tell me how she -- the interaction between

10   you and the phlebotomist when she returned to assist

11   you.

12          MR. MILLER:   Objection.   It calls for a

13   narrative.

14          Go ahead.

15          THE WITNESS:   Well, when she came back, she

16   asked me again what I was there for, so I told her; and

17   I gave her the paperwork from the doctor as well as the

18   insurance cards.

19          And unlike other visits to other labs, she

20   asked for all the other information.   The verification

21   of personal information stuff, I had to provide that

22   there at the window, possibly within earshot of other

23   people.

24   BY MS. ROLLER:

25          Q   Were you at the window or were you at the

Page 127

1    kiosk?

2        A    No, I think we were back at the window because

3    the kiosk was not going to be helpful.

4        Q    Okay.  And what specific questions did she ask

5    of you?

6        A    You know, the usual; my full name, my address,

7    things like that, what I was there for, the type of

8    testing, things that were going to be done.

9        Q    Did she ask you for any other information

10   besides your name and your address and why you were

11   there?

12       A    I don't recall.  It's just -- yeah, the kind of

13   stuff they usually ask during that process, you know,

14   insurance -- you know, verifying my insurance.

15       Q    Do you know if anybody was in the patient

16   service center waiting room at that time?

17       A    I couldn't tell.  Like I said, it was kind of

18   dark in there, so I can't really tell if there were

19   other people there; but I'm going to assume that there

20   was, at least, you know, one other person there, if

21   nothing else, the patient that was -- that had just

22   been -- that had been examined or had their blood work

23   taken, but I couldn't tell.

24       Q    Okay.  So you actually don't know; right?

25   You're just assuming?

Page 128

1      A    Yeah, I don't know.

2      Q    Okay.  When she asked you to provide the

3  information at the window, did you ask her if you could

4  instead provide it in the backroom or in a different

5  location that was more private?

6           MR. MILLER:  Objection.  It lacks foundation.

7           Go ahead.

8           THE WITNESS:  No, I think at that point I just

9  wanted to kind of get it over with, so we took care of

10  it there.

11  BY MS. ROLLER:

12      Q    How did you feel about providing her with your

13  contact information at the window?

14      A    Well, you know, given today's world that we

15  live in, I don't like giving personal information aloud

16  and not knowing who could hear it.  But, you know,

17  again, it was what I felt I needed to do at that moment

18  to get past there and get the blood work done.

19      Q    Okay.  If you felt like you didn't want to give

20  that information, then why didn't you ask her if you

21  could provide information in a more private area?

22      A    I don't know.

23      Q    Okay.  Did you ask her if anybody else was in

24  the patient service center at that time?

25      A    No.

Page 129

1      Q   Would you have felt uncomfortable providing

2   that information to her at the window if there was

3   nobody else in the lobby at that time?

4      A   Well, if I knew for a fact that nobody was

5   there, then, yeah, it would probably not be as big of a

6   deal.  But, naturally, if I can do so independently and

7   privately, that's always the optimal choice.

8      Q   What is the information that you -- that you

9   don't like giving out publicly?

10     A   Anything that's personally identifiable to me,

11  you know, my -- my address, phone numbers, the insurance

12  that I use, you know, things like that.  What -- what

13  I'm actually there for, that's, you know, medical

14  information.

15     Q   Okay.  So you told me that you provided her

16  with your name and your address.  Did you provide her

17  with your phone number?

18     A   I don't recall, but I know a lot of times that

19  info is asked for.

20     Q   Okay.  And you told me that you handed her your

21  insurance information, so did you have to also verbally

22  relay that information to her as well?

23     A   Yes, because she asked.

24     Q   And I'm confused.  If she had it in her hand,

25  was she asking for clarification or was she asking you

Page 130

```
 1    for the policy number?  What was she asking you for?

 2         A   No, she just wanted to verify your -- you know,

 3    what's your insurance, and I said it.

 4         Q   Okay.  Is that -- do you believe that the type

 5    of insurance you have is private information?

 6         A   Yes.

 7         Q   Okay.  Why do you believe that's private?

 8         A   Because I don't believe it's anybody's business

 9    what my insurance is.

10         Q   Okay.

11         A   Who's paying for my medical care.

12         Q   And then when she asked you what you were there

13    for, what was your response?

14         A   I was there because my physician wanted some

15    blood work drawn.

16         Q   And that's what you told her?

17         A   Yes.

18         Q   Okay.  Did you -- do you recall any other

19    information that she asked for that you provided her

20    during that visit?

21         A   I don't recall.

22         Q   And ultimately after that interaction with the

23    phlebotomist, you were checked in; is that correct?

24         A   Yes, I was checked in.

25         Q   Okay.  Did she ask you to sit down and wait to
```

Page 131

1    be called back or did she take you back immediately for

2    the blood draw?

3        A    I think I did have to wait another five minutes

4    or so before she came back out and took me in for the

5    blood draw.

6        Q    Okay.  Was it your sense that she took any

7    other patients before you?

8        A    I couldn't tell.

9        Q    So aside from this single individual, did you

10   interact with anybody else at Quest during that visit?

11       A    Not as far as I know.

12       Q    To your knowledge, was there anybody else there

13   at that location that -- any other Quest employees at

14   that location during that visit?

15       A    If they were, I was not aware of their

16   presence.  I didn't hear them.

17       Q    And you did get your blood drawn on that

18   occasion; right?

19       A    Yes.

20       Q    And to your knowledge, did your doctor receive

21   your results?

22       A    Yes.

23       Q    And you know that because you probably

24   discussed those results with your doctor?

25       A    Correct.

Page 132

```
 1      Q   Okay.  While you're there -- while you were

 2   there on that visit, either while you were waiting or as

 3   you were entering or leaving, did you see anybody else

 4   or did you -- did you hear anybody else ask for

 5   assistance with check-in?

 6           MR. MILLER:  Objection; compound.

 7           Go ahead.

 8           THE WITNESS:  I did not hear anybody ask for

 9   assistance.

10   BY MS. ROLLER:

11      Q   Okay.  While you were there on that visit, did

12   you hear a TV playing in the background?

13      A   You know, honestly, I don't recall, but I know

14   that there usually is a TV; so there probably was one

15   but I -- I wasn't really paying attention.

16      Q   Okay.  At any point during your visit -- oh.

17   So after you got your blood drawn, you left; is that

18   correct?

19      A   Yeah, but I did make a point to mention to her

20   that their kiosk process was inaccessible, and I

21   suggested to her that she talk to whoever she needed to

22   talk to to make sure that blind people are able to use

23   this kiosk, especially since -- especially at that

24   location it's clear that there's not a lot of people

25   working there, and that the only way, apparently, to
```

Page 133

1  alert them of your presence is by interacting with that;

2  so I told them that it is important that they make these

3  machines accessible so that blind people can use them

4  just as equally as sighted people.

5      Q   When did you have that conversation with the

6  phlebotomist?

7      A   Probably, you know, when all was said and done

8  when we were -- when I was getting ready to leave.

9      Q   And did you already tell me the extent of what

10  you said to the phlebotomist about the kiosk?

11          MR. MILLER:  Objection.  It calls for a

12  narrative.

13          But go ahead.

14          THE WITNESS:  I'm not sure what you mean by

15  that.

16  BY MS. ROLLER:

17      Q   Sure.  Is there anything else you remember

18  telling the phlebotomist about your feelings on the

19  kiosk?

20      A   Nothing more or less than what I just told you.

21      Q   Okay.  And did she respond?

22      A   She said -- you know, she agreed with me that

23  it needed to be that way, and she said that yes, she

24  would tell her superiors.

25      Q   Okay.  What specifically did she say, if you

Page 134

1    can recall?

2        A    Something like I'll let them know or something

3    to that effect.

4        Q    No, I'm sorry, about the -- you said she agreed

5    with you.  So what I'm asking is I want to know

6    specifically what she said to you, if you can recall.

7        A    She said you're right, something along the

8    lines of everybody should be able to use that machine.

9    I don't know why they don't make it that way and then

10   she said she would let them know.

11       Q    And she said she would let her supervisor know?

12       A    Yes.

13       Q    Did you ask to be contacted by anyone from

14   Quest about the kiosk?

15       A    You know, I probably did because I -- usually

16   when -- when I -- that's kind of the standard thing I do

17   when I encounter barriers like that, and I usually make

18   a point of saying, hey, if I could be of any help or if

19   I could provide any more feedback, you know, feel free

20   to contact me.

21       Q    Do you have a specific recollection of doing

22   that on this occasion?

23       A    I believe I did.

24       Q    Well, I mean, I'm asking if you have a specific

25   recollection.

Page 135

1      A    Yes, I did.

2      Q    Okay.  And did you leave a phone number?

3      A    I don't think I restated a number.  I just

4  assumed they use my contact information.

5      Q    At any point after your visit, did you reach

6  out to anybody else at Quest regarding your visit on

7  June 25th, 2019?

8      A    I don't think so.

9      Q    Okay.  Did you ever follow up with the

10  phlebotomist or anyone at Quest regarding the discussion

11  you had with the phlebotomist about the kiosk?

12          MR. MILLER:  Objection.  It lacks foundation.

13          Go ahead.

14          THE WITNESS:  No, I certainly couldn't reach

15  that phlebotomist because they don't have it set up

16  where you can call their office; but, no, I -- I did not

17  follow up with any more calls.

18  BY MS. ROLLER:

19      Q    Why not?

20      A    I don't know.  I just assumed that she would

21  pass on my information and that somebody would contact

22  me eventually.

23      Q    And has anybody contacted you?

24      A    No.

25      Q    When you were at the patient service center on

Page 136

1  this day, did you provide any payments for the services?

2      A    No, it's all covered through insurance.

3      Q    Have you ever provided any payment at any Quest

4  location?

5      A    No.

6      Q    Have you ever provided any payment at any lab

7  where you had your blood work or any specimens taken?

8      A    Not that I recall.

9      Q    Following your visit to Quest on June 25th,

10 2019, did you receive a patient survey in your email

11 regarding your experience during your visit?

12     A    No.

13     Q    Did you ever look on the Quest website or reach

14 out to anybody at Quest to see how to make a complaint

15 or give feedback regarding your visit?

16     A    I did not.

17     Q    Okay.  Have you been back -- well, let me ask

18 you.  Have you ever -- have you told me everything that

19 you recall from your visit to the Sherman Oaks patient

20 service center on June 25th, 2019?

21     A    To the best of my recollections.

22     Q    Is there anything that would refresh your

23 recollection as to your visit or any information that

24 you believe is missing about -- that you haven't

25 discussed with me about that visit?

Page 137

1           MR. MILLER:  Objection; compound.

2           Go ahead.

3           THE WITNESS:  I don't believe so.

4    BY MS. ROLLER:

5       Q    Okay.  Have you been back to Quest since

6    June 25th, 2019?

7       A    No, I have not because it -- it wasn't the most

8    convenient location, plus, I guess, after that

9    experience, I decided to try a different lab for my next

10   time the doctor did something.

11      Q    And have you gone to other labs since

12   June 25th, 2019?

13      A    Yes.

14      Q    How many times have you had -- how many times

15   has your doctor ordered you to get some sort of specimen

16   that would require you to visit a lab since June 25th,

17   2019?

18      A    I believe two other times.

19      Q    Okay.  And your doctor has ordered you to get

20   blood work pretty consistently every year; correct?

21      A    Correct.

22      Q    When was the last time you had any blood work

23   or specimen done at a lab?

24      A    I believe it was, I want to say, March 9th.

25      Q    Of this year?

Page 138

1        A    Yes.

2        Q    Okay.  And then did you have any blood work or

3    lab work done in 2020?

4        A    Yes.

5        Q    When approximately was that?

6        A    I believe it was January of 2020.  I forget the

7    date, but somewhere around there.

8        Q    So that was about six months after you visited

9    Quest; right?

10       A    Yes.

11       Q    And so do you have any plans to get any blood

12   work or specimen taken in the future?

13       A    Yes.

14       Q    Okay.  When?

15       A    Probably sometime in May.  I think that's when

16   we're doing the annual exam, so I anticipate he's going

17   to ask for blood work.

18       Q    All right.  And do you have plans to go back to

19   Quest for that visit?

20       A    If that's the closest location or unless

21   it's -- again, like I mentioned before, where it's timed

22   in such a way early enough that I can use the lab that's

23   in the medical building there already, then, yeah, I

24   would consider going back to Quest.

25       Q    Well, do you have any concrete plans?  Have you

Page 139

1   decided you're actually going back to Quest for your May

2   2021 visit?

3       A    I haven't decided only because, again, I don't

4   know what the parameters are going to be, you know, if

5   I'm doing it there in the building or if I'm going to be

6   at home and going to a nearby lab, so it all just

7   depends on where I am and what's the most convenient.

8       Q    Okay.  But didn't you just tell me that the

9   reason that you haven't gone back to Quest since

10  June 25th, 2019 is because you didn't think their kiosk

11  was accessible?

12      A    Well, I -- I decided to try a different lab

13  after that experience but, you know, ultimately I want

14  the kiosk at Quest and everywhere else to be accessible

15  and I don't want to have to factor this into my decision

16  every time I'm going to go to a lab, so I would prefer

17  to go to my nearest lab and Quest happens to be one of

18  those that's very close to me; so I would definitely go

19  to it, especially if I knew that the kiosks were going

20  to be made accessible.

21      Q    Are there any other labs that are within the

22  same distance from your home as Quest?

23      A    Yeah, Labcorp is just a little further away.

24      Q    How much further?

25      A    Maybe another mile or so.  I don't know

Page 140

1    offhand.  I don't know the actual distance, but I

2    believe that the Quest lab is just a tad bit closer.

3         Q    In May 20- -- it sounds like you have an

4    appointment with your doctor in May of this year;

5    right?

6         A    Yes.

7         Q    Okay.  And that's Dr. Diehl?

8         A    Correct.

9         Q    And so there's the potential that if you make a

10   morning appointment with Dr. Diehl that you'll actually

11   go to whatever patient service center or whatever lab is

12   close to Dr. Diehl; is that accurate?

13        A    Yes.

14        Q    And which -- what is the lab that is close to

15   Dr. Diehl's office?

16        A    You know, I don't know the name of it because I

17   think it at one point was Quest but now I don't think

18   it's Quest anymore.  I -- I don't remember its name.

19        Q    Is it -- you're saying like it's another

20   company that has a lab?

21        A    It's there inside the building.  I'm not sure

22   what their affiliation is with the doctor's office, but

23   that's where they sent me to.

24        Q    Okay.  Do you have your May 2021 appointment

25   scheduled with Dr. Diehl?

Page 141

1       A    I do.  I don't have it in memory, but I think

2    it might be like May the 1st or somewhere early in May.

3       Q    Okay.  Is it a morning appointment or an

4    afternoon appointment?

5       A    I'm not sure.  I'd have to look and see.

6       Q    Do you have access to the appointment date and

7    time as you're sitting here right now?

8       A    Not easily.

9       Q    Okay.  What do you mean by not easily?

10      A    Because I think I have to go into their patient

11   portal and, you know, do some button pushing and things

12   like that on the phone so -- and I don't want to disrupt

13   what we're doing and mess up the video again.

14      Q    Okay.  You don't have like a calendar that you

15   keep or a printout that you get?

16      A    No.

17      Q    Okay.  So have you told me everything right now

18   that you remember about all of your visits to any Quest

19   patient service center?

20      A    To the best of my recollection, yes.

21      Q    Have you told me everything you remember about

22   your interactions with anyone at Quest during those

23   visits?

24      A    To the best of my recollection, yes.

25      Q    And do you -- have you told me everything that

Page 142

1    you remember about your interactions with any Quest

2    employees in general?

3         A   To the best of my recollection, yes.

4         Q   So I want to be clear, at no time did

5    anybody -- at no time did anyone at Quest ever refuse to

6    provide you with services that you came to Quest for;

7    right?

8         A   It depends how you ask that, because, yes, I

9    got the blood test that I went for; but when I couldn't

10   access the kiosk, I feel like in a sense that was a

11   service that was denied to me because of the

12   inaccessibility barrier.

13        Q   Okay.  But you were able to check in; correct?

14        A   Yes, ultimately --

15        Q   Okay.  And nobody --

16        A   -- after a long wait.

17        Q   Oh, I'm sorry.

18        A   After a long wait, yes.

19        Q   Okay.  And nobody at Quest ever told you that

20   checking in with the kiosk was the only way to check in;

21   right?

22        A   No, but when the lady first came out, that's

23   the first place she directed me to.

24        Q   Have you ever -- have you sensed that anybody

25   else, when you've been at Quest, has used the patient --

Page 143

1    the kiosk to check in?

2         A    I couldn't tell.

3         Q    Okay.  So are you aware that since your last

4    visit to Quest in June of 2019 that Quest implemented

5    specific procedures to assist patients who are visually

6    impaired with checking in?

7              MR. MILLER:  Object to the extent it calls for

8    attorney-client privilege.

9              Outside of anything you know from that source,

10   you can answer.

11             THE WITNESS:  No.

12   BY MS. ROLLER:

13        Q    Okay.  So I'll explain to you what Quest has

14   implemented just for your own personal knowledge.  So

15   Quest now has a three-finger swipe on the kiosk, that if

16   you take three fingers and you swipe up, it will

17   automatically check you in, give you a patient number,

18   not require you to input any information, and that will

19   notify the Quest staff that you're there.  Okay?

20        A    Okay.

21        Q    And so the three-finger gesture, that's a

22   gesture that you're familiar with; right?

23             MR. MILLER:  Objection.  It lacks --

24             THE WITNESS:  It is.

25             MR. MILLER:  Go ahead.

Page 144

1          THE WITNESS:  It --

2          MR. MILLER:  Incomplete hypothetical.

3          Let me state that objection over.  Objection.

4    It lacks foundation, incomplete hypothetical.

5          Go ahead.

6          It's also vague.

7          Go ahead.

8          THE WITNESS:  So, yes, I'm familiar with the

9    gesture, but it's not associated normally with the

10   action that you're describing.

11   BY MS. ROLLER:

12      Q   Okay.  Now that you know it and now that I've

13   informed you that's how you can check in at the Quest

14   patient service centers, do you believe that's adequate

15   to permit you to check in on your own next time you go

16   to Quest?

17          MR. MILLER:  Objection.  It lacks foundation,

18   incomplete hypothetical.

19          Go ahead.

20          THE WITNESS:  I -- I don't think it's

21   completely satisfactory because that's only letting me

22   do one thing that that kiosk offers.

23          As I understand it, patients are also able to,

24   you know, input all the information that I'm normally

25   asked for to say it out, via that machine and get

Page 145

1  themselves completely registered in independently

2  without necessarily having to interact with or say all

3  these things out loud to somebody.

4          So that is the kind of accessibility I think

5  that would be ideal, something that gives me full access

6  to all the services offered by that interface.

7  BY MS. ROLLER:

8     Q   And so you believe that that would not provide

9  you -- that checking in using a three-finger swipe and

10  having that notify the phlebotomist will not allow you

11  to check in for your services at the Quest location?

12          MR. MILLER:  Objection; incomplete

13  hypothetical, it lacks foundation.

14          Go ahead.

15          THE WITNESS:  It only does part of it but still

16  I have to provide this additional info that other people

17  can just interact at the screen and input themselves

18  independently.

19  BY MS. ROLLER:

20    Q   What do you believe the other information is

21  that other people can input into the screen that you

22  can't?

23          MR. MILLER:  Same objections.

24          Go ahead.

25          THE WITNESS:  I imagine the things that I'm

Page 146

1   asked about normally, you know, my -- my full name,

2   address, whatever contact information, insurance

3   information, things that I normally would have to

4   provide to somebody spoken aloud and trust that they're

5   doing it in a place where I'm out of earshot of other

6   people, they can do themselves without that concern.

7   BY MS. ROLLER:

8       Q   How do you know that that's what the kiosk

9   function offers?

10      A   I believe this to be true because why else

11  would you offer that kiosk.  If it -- if it was just to

12  alert of a check-in, you could put a button that people

13  can press.

14          The fact that there's a touchscreen there

15  suggests to me that there is a need for input and

16  further interaction other than just saying, hey, I'm

17  here, so a blind person should have the same level of

18  access to that interface that a sighted person does.

19      Q   When you provide your information to the

20  phlebotomist or whoever you provide your information to

21  upon check-in, how long does that conversation typically

22  last between you and the phlebotomist?

23      A   Several minutes at least.

24      Q   Okay.

25      A   Five minutes or so, give or take.

Page 147

1       Q   So they ask you for your name, your address,

2   your insurance information, and why you're there, and

3   you believe that takes five minutes to exchange that

4   information?

5       A   Yeah, I mean, I'm just guessing.  I don't sit

6   there with a stopwatch, but it's somewhere around there.

7       Q   Okay.  So what more do you believe is needed

8   for the -- for a kiosk to be accessible in your opinion?

9           MR. MILLER:  Objection to the extent it calls

10  for premature disclosure of expert opinion.

11          But you can tell her your understanding.

12          THE WITNESS:  Well, like I said before,

13  anything that a sighted person is able to walk up to

14  that kiosk and do, a blind person should be able to do

15  independently.  The technology exists.

16          As I mentioned earlier in your questioning,

17  there are tablet-based kiosks that already -- you know,

18  like at the voting centers, that make use of the

19  built-in accessibility that these operating systems come

20  with, so it's just a matter of enabling its

21  accessibility and putting in a headphone jack and

22  putting in some tactile marking or perhaps even a

23  tactile keypad.

24          Because, again, I'm not the only blind person.

25  There are people who have other challenges as well, so

Page 148

1   maybe a tactile keypad as well so someone with

2   neuropathy or who has difficulty with motor skills and

3   managing a touchscreen could use tactile keys to

4   interact with and have a voice read aloud to them what

5   they're interacting with and confirm their choices.

6            So bottom line is whatever you, for example, as

7   a sighted person can do at that kiosk, I as a blind

8   person should also be able to do independently if

9   it's -- if the accessibility is enabled in that device.

10  BY MS. ROLLER:

11      Q    Okay.  So let me ask you just questions about

12  the functionality.  So now that you know that there's a

13  three-finger swipe function, you can go up to the kiosk,

14  take three fingers and do a swipe up and that checks you

15  in instantly without you needing to -- to provide any

16  information -- okay?  You know -- you know that now;

17  right -- or at least I'm representing that to you;

18  right?

19      A    Right.

20           MR. MILLER:  Objection.  It lacks foundation

21  and calls for him to speculate.

22           Go ahead.  You can answer.

23           Are you asking him to accept your

24  representation, Counsel?  Because --

25           MS. ROLLER:  Yeah.

Page 149

1     Q   I'm just asking you to -- this is what I'm

2  representing to you, so just go with me on this.  So I'm

3  telling you that in order -- if there's a kiosk that

4  requires you to swipe three fingers up and it checks you

5  in, my question to you is, is functionally would you be

6  able to do that?

7     A   Yes, functionally I -- functionally I would be

8  able to do that.

9     Q   Okay.  And now that you've been to the patient

10  service center in Sherman Oaks and you know exactly

11  where the kiosk is -- right?  Because you were directed

12  to it -- you would -- now that I've represented to you

13  how you can check in, you would be able to independently

14  go over to the kiosk, three finger swipe up and check

15  yourself in; correct?

16         MR. MILLER:  Objection.  It lacks foundation,

17  incomplete hypothetical.

18         Go ahead.

19         THE WITNESS:  Well, as I understand your

20  description, it sounds like what I would do is trigger

21  some sort of alert to the phlebotomist that, hey,

22  somebody is here that might need your assistance, so I

23  don't believe that that means checking myself in because

24  I think there's other information that I need to

25  ultimately provide to complete that process.

Page 150

1          So, again, it's -- it's a good start but the

2     machine needs to be made fully accessible so that a

3     blind person can do it from start to finish the same way

4     a sighted person would.  We shouldn't have any less

5     options than a sighted person.

6     BY MS. ROLLER:

7          Q    Okay.  Well, I mean, I appreciate your

8     response, but it doesn't answer my question.  My

9     question is just could you actually do it.  I understand

10    that you take issue with the way that I'm describing it

11    or I'm calling it you checking in.  But I'm asking

12    functionally, would you be able to get to that kiosk

13    today, do the three-finger swipe and wait to be taken

14    back for your blood work?

15         A    Yes, I could find the kiosk, I could find the

16    screen, I could do the three-finger swipe, and I guess

17    wait until somebody comes out and talks to me.

18         Q    Okay.

19         A    But the way I see it, I don't see how that's

20    much different than going to the window, I guess, other

21    than if somebody is not at the window, but it's -- it's

22    not a complete solution.

23         Q    If you called -- let's say you were going to a

24    Quest location that you had never gone to before, you've

25    never been to that location, and you called and they

Page 151

1   gave you directions to get to the kiosk within the

2   waiting room, do you think you'd also be able to

3   independently access that kiosk and do the three-finger

4   swipe to inform the phlebotomist that somebody is there?

5           MR. MILLER:  Objection; incomplete

6   hypothetical, it lacks foundation, vague and ambiguous.

7           Go ahead.

8           THE WITNESS:  So, yes, with all that direction

9   and guidance I could.  But, to be honest, at that -- at

10  this point, I think if I could hear somebody talking at

11  the window, I probably would just go straight there

12  because I don't see where I'm getting anything -- any

13  great benefit from just letting the kiosk alert that I'm

14  here --

15  BY MS. ROLLER:

16      Q   Okay.

17      A   -- if I can't do anything else with it.

18      Q   And I'll represent to you that in addition to

19  this functionality that the eCheck-in kiosk that Quest

20  has, they've also developed a segment on that TV, that

21  you said you knew that they had, that explains how to

22  check in using that-three finger swipe.  Have you heard

23  that?

24          MR. MILLER:  Objection --

25          THE WITNESS:  No, I have not.

Page 152

1           MR. MILLER:  Objection to the extent it calls

2     for attorney-client privilege.

3           From any other source you can answer, which I

4     think you just have.

5           THE WITNESS:  No, I have not.

6     BY MS. ROLLER:

7       Q   Okay.  Do you believe that that's adequate to

8     inform somebody how to use the kiosk?

9           MR. MILLER:  Objection.  It lacks foundation,

10    it's an incomplete hypothetical, and it's vague.

11          Go ahead.

12          THE WITNESS:  All it does, I suppose, is it

13    tells the blind person who is there trying to figure

14    this out -- and who knows how often that prompt is going

15    to play, that, yes, if you can find this kiosk, get to

16    the screen, and do those three-finger swipe to let

17    somebody know you're there.

18    BY MS. ROLLER:

19      Q   And so that -- do you think that's adequate

20    direction to advise somebody on how to use the kiosk if

21    they're visually impaired?

22          MR. MILLER:  Objection.  It lacks foundation,

23    incomplete hypothetical, it's vague.

24          Go ahead.

25          THE WITNESS:  It's better than nothing, I

Page 153

1    suppose, but it just doesn't seem like it accomplishes a

2    whole lot of anything useful.

3    BY MS. ROLLER:

4        Q    Why not?

5        A    Because in the end even, if I find this kiosk

6    and do this gesture, I'm still having to wait for the

7    human to eventually come and help me finish the check-in

8    process as opposed to what every other sighted person

9    who walks in there can do, is go in there and not just

10   let them know that they're there, but also input all

11   this other information, not only expediting things, but

12   also, again, making it so that they don't have to say

13   personal details out loud potentially in the earshot of

14   others.

15       Q    Is it your impression that once you do the

16   three-finger swipe that somebody from Quest comes out to

17   the kiosk and inputs the remaining information into the

18   kiosk or -- just that's my question.

19            MR. MILLER:  Objection; incomplete

20   hypothetical, it lacks foundation, it's vague.

21            THE WITNESS:  My understanding is that I find

22   this kiosk and I do this gesture and I wait for somebody

23   to come.

24   BY MS. ROLLER:

25       Q    And what -- what are you waiting for them to

Page 154

1    come to do?

2            MR. MILLER:  Objection; incomplete

3    hypothetical, it lacks foundation, it's vague.

4            Go ahead.

5            THE WITNESS:  I believe they come to help me

6    finish the check-in process.

7    BY MS. ROLLER:

8        Q   Okay.  If I told you that once you do the

9    three-finger swipe, you're put in the queue and when

10   you're called, it's because you are being taken back to

11   the draw room, does that change your opinion?

12           MR. MILLER:  Objection; incomplete

13   hypothetical, it lacks foundation, and it's vague.

14           Go ahead.

15           THE WITNESS:  It helps but it's still denying

16   me all the other services that are available to that

17   kiosk to other people; so it's better than nothing but

18   it's not a complete solution.

19   BY MS. ROLLER:

20       Q   And then you had mentioned that -- that the

21   Quest TV segment that I explained to you is going on,

22   you mentioned that it depends on how frequently the

23   segment plays.  In your opinion, what is an adequate

24   amount of time between the segments playing?

25           MR. MILLER:  Objection.  It lacks foundation,

Page 155

1    it's an incomplete hypothetical.

2              Go ahead.

3              THE WITNESS:  I would think it would need to

4    play quite frequently because how does a TV know when a

5    blind person walks in?  So if a blind person walks in

6    right after the segment played, assuming that you're not

7    going to have it playing every, you know, 5, 10, 20

8    seconds, because that's not going to be entertaining to

9    the rest of the people that are also watching that TV to

10   pass the time, it means that I as a blind person have to

11   wait for that segment to play, assuming that I'm even

12   paying attention to the TV.

13   BY MS. ROLLER:

14       Q   Okay.  So you think, in your opinion, that it

15   would be 5, 10, or 15 seconds -- every 5, 10 or 15

16   seconds that that segment is playing?

17       A   Or more often because, again, you don't know

18   when the blind person is going to walk in; and if you

19   are trying to bring us as much parody as everybody else

20   as possible, you would constantly have to be alerting to

21   that feature so that a blind person walks in and doesn't

22   have to wait substantially longer to figure this out

23   before everybody else does.

24       Q   Okay.  So I think, if I'm understanding you

25   correctly, your position is that this segment should

Page 156

1   just play on a loop, a continuous loop, so the whole

2   time it's going, so no matter when you step in -- step

3   foot into the patient service center, you are always

4   going to be hearing it; is that right?

5              MR. MILLER:  It's an incomplete hypothetical,

6   it lacks foundation, it's vague.

7              But go ahead, you can tell her.

8              THE WITNESS:  Yes, or you can just make the

9   thing fully accessible, the way it could easily be made

10  easily accessible so that a blind person just walks and

11  finds it, looks for tactile markings, looks for

12  headphone jacks, plugs in, and can be on their way.

13  BY MS. ROLLER:

14     Q   Okay.  All right.  So I've explained to you the

15  procedures that Quest has implemented at its patient

16  service centers to assist individuals with visual

17  impairments or blind individuals with checking in.  And

18  assuming that these representations are true and that

19  you now know what's provided at the Quest locations,

20  would you go back to Quest?

21             MR. MILLER:  I'll object to the extent that

22  it's an incomplete hypothetical and it lacks foundation.

23             But you can answer.

24             THE WITNESS:  Well, like I said, it's better

25  than nothing; but, honestly, if I walk into that room

Page 157

1   and I hear voices coming from what I believe to be the

2   window, I'm just going to go straight there and not even

3   bother with the machine because it's -- it's useless.

4   BY MS. ROLLER:

5        Q    Okay.  Well, that's not -- my question is a

6   little different.  So my question is is I'm telling you

7   now what they offer.

8            You had previously testified that if you knew

9   that Quest provided accessible kiosks, you would go

10  back.  And you have this appointment coming up in May

11  2021, and one of those considerations is -- of what

12  laboratory you are going to use is what time your

13  appointment is but also what location is closer to your

14  house.

15           And so I've told you what Quest offers at their

16  location as far as eCheck-in for blind individuals.  And

17  now that you know that, if you don't go to a lab close

18  to your doctor, will you go back to Quest knowing the

19  type of check-in that they have?

20           MR. MILLER:  Objection; compound, incomplete

21  hypothetical, it lacks foundation.

22           Go ahead.

23           THE WITNESS:  And, again, I would say that it's

24  better than nothing, but I don't -- I wouldn't define

25  that as an accessible kiosk because it -- only one part

1    of it is accessible.  So, yes, if Quest is the closest

2    lab to me, I would go back and attempt to make use of

3    the system.

4    BY MS. ROLLER:

5        Q    Okay.  So knowing the specific procedures that

6    Quest has as of today, you would go back in May -- for

7    your May draw, you would go back to Quest?

8            MR. MILLER:  It misstates his testimony.

9            Go ahead.

10           It lacks foundation, incomplete hypothetical.

11           Go ahead.

12           THE WITNESS:  Yeah, again, it -- it depends on

13   if that's the closest one to where I'm going to be going

14   from; and, yes, you know, I would make use of it, to try

15   it out and see how it works.

16           But as I also stated, if I hear voices coming

17   from the window, I'm probably going to go straight to

18   the window, skip the extra step because it ultimately

19   doesn't really give me all what I'm looking for.

20   BY MS. ROLLER:

21       Q    Okay.  If your position is that Quest's

22   eCheck-in kiosk is not accessible based on what they are

23   providing right now, why would you go back to Quest

24   instead of going to a different lab?

25           MR. MILLER:  Objection; argumentative.

Page 159

1          Go ahead.

2          THE WITNESS:  Well, again, if it happens to be

3    the closest one, then it makes sense to go and to try it

4    out.

5          But, no, it is not a fully accessible kiosk.

6    It is a part of it, one part of it is accessible by

7    means of that gesture.  And, yeah, now that I know it, I

8    will try it out and make use of it if it is the most

9    effective way to go.

10         Like if nobody is at the window like on my last

11   visit on the 25th of June 2019, I -- I would do that in

12   hopes that I wouldn't have to wait another 10 to 15

13   minutes for somebody to come out and acknowledge me.

14   BY MS. ROLLER:

15      Q   You testified that the Labcorp lab is like less

16   than a mile away from the Quest one.  Why wouldn't you

17   go to the Labcorp location if you believed that the

18   Quest location is not accessible to you?

19      A   Because I don't believe that they have an

20   accessible kiosk either.

21      Q   Okay.  Is what's more important to you, going

22   to a place that you believe has an accessible check-in

23   or going to a place that's close?

24      A   Close matters; but then, yes, an accessible

25   check-in is absolutely a plus, and I would consider

Page 160

1    maybe even going a little further out of the way to get

2    to a place that's accessible and it allows me to do this

3    independently, because as I stated previously, I always

4    opt to try to go the doing-it-myself-independently route

5    first.

6        Q   Okay.  The last --

7            MR. MILLER:  Miss Roller.  Miss Roller, just so

8    I can get it in, we've been going an hour and a half.

9    Can we have a break at a convenient moment?

10           MS. ROLLER:  Sure, we can take a break.

11           MR. MILLER:  Thanks.

12           MS. ROLLER:  Let's do 10 minutes, 2:55?

13           MR. MILLER:  Thank you.

14           THE VIDEOGRAPHER:  Going off the record at

15   p.m.

16           (Recess.)

17           THE VIDEOGRAPHER:  We are back on the record at

18   3:03 p.m.

19   BY MS. ROLLER:

20       Q   Mr. Vargas, you understand you're still under

21   oath?

22       A   Yes, I do.

23       Q   Okay.  So we discussed that you have had your

24   blood drawn or had samples collected two times since

25   your June 25th, 2019 visit to Quest.  You had one in

Page 161

1    January of 2020 and one in March of 2021; correct?

2        A    Correct.

3        Q    Okay.  In January of 2020, what lab or facility

4    did you go to for your specimen collection?

5        A    That was -- that was Labcorp.

6        Q    Okay.  And then in March, just a couple -- last

7    month, where did you go at that time?

8        A    The lab that's in the medical building where my

9    doctor's office is.

10       Q    What's that called?

11       A    I don't know its name offhand.

12       Q    Is it Dignity Health?

13       A    Honestly, I don't recall.

14       Q    Okay.  And that's the lab in the building with

15   Dr. Diehl?

16       A    Correct.

17       Q    And that's the lab you said you would go back

18   to if your appointment was -- with Dr. Diehl was in the

19   morning?

20       A    Yes, if I needed to come in there fasting to do

21   blood work and then have a visit with him at -- you

22   know, immediately after, I -- I would choose that lab

23   just because it's all there and I'm fasting so, you

24   know, I don't want to be doing a lot of traveling and

25   stuff with an empty stomach.

Page 162

1        Q    Okay.  And is that the one that you said you

2    thought might have formerly been Quest?

3        A    Yes.

4        Q    Okay.  Did you use that one when it was Quest?

5        A    Probably.

6        Q    Okay.  And you mentioned -- this just reminded

7    me.  You mentioned that you called some number before

8    you visited the Van Nuys location or Sherman Oaks

9    location in June of 2019.  Do you remember what

10   number -- what phone number you called from?

11       A    What number I called from?

12            I don't know.  It might have been from my

13   mobile number.

14       Q    Okay.  Is there any other phone that you would

15   have used?

16       A    Probably not, because the way I got the number

17   was by asking Siri for information.  So usually when I

18   go that route, I just -- you know, I'm given the option

19   to call so I call.

20       Q    Is there any chance you would have used

21   Miss Castillo's phone to call?

22       A    No.

23       Q    Okay.  So let's talk about your visit to

24   Labcorp in January of 2020.  Is that the first time

25   you've ever used a Labcorp facility?

                                              Page 163

1        A    To the best of my recollection.

2        Q    And just tell me generally about your visit to

3    Labcorp and your experience there.

4             MR. MILLER:  Objection.  It calls for a

5    narrative, beyond the scope of discoverable material.

6             Go ahead.

7             THE WITNESS:  Generally speaking, I went there

8    to get blood work done for the annual physical and ran

9    into a similar problem with an inaccessible kiosk, but

10   unlike Quest, Labcorp had more people working there.

11   BY MS. ROLLER:

12       Q    Okay.  What location did you go -- what Labcorp

13   location did you go to in January of 2020?

14       A    It's the one in Van Nuys.  I think it's like

15   152 something Vanowen Street.  I know the nearest

16   intersection was Sepulveda Boulevard.

17       Q    Did you make an appointment for that visit?

18       A    No, I did not.

19       Q    Why did you decide to go there instead of

20   Quest?

21       A    After the experience I had there, I kind of

22   felt like I wanted to try something different to see if

23   I had an overall better experience, and especially

24   because that was going to be a fasting blood test where

25   the test that I had done at Quest was not a fasting.

Page 164

1  So, generally speaking, if I'm going to do a fasting, I

2  like to, you know, have it be as hassle-free as

3  possible.

4       Q    Did you go with anyone to that visit?

5       A    No, I did not.

6       Q    And how long was your total visit on that day

7  from the time you walked in to the Labcorp facility till

8  the time you left?

9       A    Roughly maybe 30 to 40 minutes, give or take.

10      Q    And you said that you encountered what you

11 believed to be an inaccessible kiosk at that location?

12      A    Yes.

13      Q    Okay.  Why -- describe to me the kiosk that

14 Labcorp provides.

15           MR. MILLER:  Objection --

16           THE WITNESS:  Well, I didn't --

17           MR. MILLER:  Just let me get an objection on

18 the record.

19           Objection.  It calls for a narrative.

20           Go ahead.

21           THE WITNESS:  I never actually interacted with

22 the kiosk there because I was told when I asked if

23 the -- if a kiosk was going to be required and, if so,

24 if it was accessible to blind people and I was told that

25 it was not accessible.

Page 165

1    BY MS. ROLLER:

2        Q    When did you ask that question?

3        A    I asked that question I think it was a day or

4    two before I decided to go, because, again, I didn't

5    want to find all this out on the morning of when I'm

6    fasting.

7            So I went at least a couple of days before just

8    to kind of learn where it was, find -- learn how to find

9    it in the building, and I actually went in to the

10   location and interacted with staff there.

11           And I told them of my intentions; that I was

12   going to be coming back soon for some blood work and

13   asking in general just what's your check-in procedure,

14   what am I -- what am I expecting; so in that

15   conversation, the kiosk came up and I was told that it

16   was not accessible.

17       Q    If you knew that the kiosk was not accessible

18   before your appointment, why would you keep your

19   appointment?  Why wouldn't you go somewhere else?

20       A    Because I needed this work done, and unlike the

21   Quest location, there were other staff there.  It wasn't

22   just one person manning the office or at least that's

23   what it seemed.

24           So -- and I was told that there would be more

25   than one person working there in the morning, so I felt

Page 166

1    that it was, you know, again, better than nothing, but

2    at least I -- I was assured that somebody would be there

3    to assist me.

4        Q   Okay.  When -- when you understood that their

5    kiosk was not accessible, what did you understand that

6    to mean?

7        A   Meaning that it cannot be independently used by

8    a blind person.

9        Q   And when you learned that, did anybody at

10   Labcorp tell you how you would instead need to check in?

11       A   Yes, they told me to come to the window, and

12   they told me that somebody would be able to help me and

13   would -- because I expressed my concern about stating my

14   information out loud -- told me that they would not have

15   me give that information out, you know, in the waiting

16   room in front of people.

17       Q   Did you try to use the eCheck-in kiosk at

18   Labcorp at any point?

19       A   No, because the staff told me that it was not

20   accessible, so I didn't see the need in trying it out if

21   the people who worked there tells me that I wouldn't be

22   able to use it.

23       Q   Okay.  And so when you went back on the actual

24   day, did you go up to the window to check in?

25       A   Yes.

Page 167

1      Q   And how long did it take between the time you

2  set foot in the -- we'll call that a patient service

3  center as well -- how long did it take between the time

4  you stepped foot in the patient service center and the

5  time that you were assisted and checked in?

6      A   Probably around 10 minutes or so.

7      Q   Okay.  And then after you checked in, did you

8  wait to be called to the back?

9      A   Yes.

10      Q   Did you provide your -- any personal

11  information to check in on that day?

12      A   When I -- at the window I gave my insurance

13  cards and the paperwork from the doctor, but I was not

14  asked any questions there at the window.

15      Q   Were you asked any questions about your

16  identity and the reason for being there at any point

17  during that visit?

18      A   Yeah, later when we were in the back presumably

19  or hopefully out of earshot from the waiting room.

20      Q   Okay.  And were you okay with that?

21      A   It was what I had to do at the moment, but it

22  was not satisfactory, because as I've stated before, I

23  feel that as long as there's a check-in kiosk available

24  for convenience to other people, that same convenience

25  should be available to blind people as well who want to

Page 168

1    do so independently.

2        Q    And I don't remember if you told me this.  Were

3    you a walk-in or did you make an appointment at that

4    visit?

5        A    I believe I was a walk-in.

6        Q    And so you said that your whole visit to

7    Labcorp was about 30 to 40 minutes.  You spent 10

8    minutes checking in, so is it safe to say you spent

9    about 20 to 30 minutes waiting to be seen in the back

10   for the blood draw and having the blood draw?

11       A    Yeah, more or less.

12       Q    Okay.  Did you call or talk to anybody at

13   Labcorp about what you perceived to be an inaccessible

14   kiosk?

15       A    Yes.  When I went in initially to find out what

16   to expect on the morning of my going in and I was told

17   that the kiosk was inaccessible, I told the person there

18   that that needed to be addressed.  That they should make

19   that kiosk accessible to blind people.

20       Q    Okay.  And did -- what did that person say in

21   response?

22       A    Similar to what the person at Quest said.  They

23   agreed that it should be, and they told me that they

24   would pass along my suggestion.

25       Q    Aside from that one discussion with somebody at

Page 169

1    Labcorp, have you talked to anybody else at Labcorp

2    since that time about your experience or your concern

3    that the kiosk is not accessible?

4        A    No.

5        Q    Okay.  Were there people in front of you in

6    line when you got to Labcorp on that day?

7        A    Yes.

8        Q    And that's why you waited 10 minutes?

9        A    Yeah.

10       Q    Okay.  While you were there, did you overhear

11   any of the reasons why any of the other folks were in

12   line as opposed to checking in at the kiosk?

13       A    I didn't hear a lot in the way of conversation.

14       Q    Okay.  Okay.  And then let's talk about your

15   visit in -- did you tell me everything you can remember

16   about your visit to Labcorp?

17       A    To the best of my recollection.

18            MR. MILLER:  Objection.  It calls for a

19   narrative, it lacks foundation.

20            Go ahead.

21   BY MS. ROLLER:

22       Q    Okay.  All right.  So let's talk about your

23   March visit, March 2021 visit to the lab in your

24   doctor's office.  Is it -- if I said it's called United

25   West Labs, does that -- does that sound about right?

Page 170

1        A    Honestly, I don't know.

2        Q    Okay.  And it's in the -- it's the lab that's

3   in the building of Dr. Diehl's office; correct?

4        A    Yes.

5        Q    Okay.  All right.  So when you went to that lab

6   just last month, had you been to that lab before?

7        A    I've been to a lab in that building.  I can't

8   say that I recall for sure that it was exactly in that

9   same room, but I've been to a lab in that building

10  before.

11       Q    Okay.  Talk to me about your experience at that

12  visit on March -- in March 2021.  Did you have a good

13  experience there?

14            MR. MILLER:  Objection.  It calls for a

15  narrative.

16            Go ahead.

17            THE WITNESS:  Well, I got there a few minutes

18  before the lab actually opened.  And when I was waiting

19  outside, the person who -- who works at the lab came

20  and, as they were approaching the door and unlocking it,

21  they addressed me; and pretty much as soon as they

22  opened the door, they guided me to the window where I

23  again handed over the paperwork from the doctor.

24  BY MS. ROLLER:

25       Q    Okay.  And you were a walk-in on that visit?

Page 171

1       A    Yes.

2       Q    Do you know if they have an eCheck-in kiosk?

3       A    I don't know.

4       Q    And did they check you in at the window?

5       A    Yes.

6       Q    Did you provide any verbal personal information

7    when you were checking in?

8       A    I didn't have to.  Apparently, it was all in

9    the paperwork that the doctor sent to them.

10      Q    Okay.  And so you were the first person there

11   so you didn't need to wait; right?

12      A    Right.  Right.

13      Q    And how long between the time that you walked

14   in and the time you were taken back for your specimen

15   collection?

16      A    Probably about 5 to, at the most, 10 minutes.

17   It was fairly quick.

18      Q    As you're sitting here today, do you know if

19   that location has any sort of electronic check-in

20   system?

21      A    I do not know.

22      Q    Have you ever used an eCheck-in system that you

23   believe is accessible?

24      A    eCheck-in.  Could you be specific?  Meaning a

25   terminal somewhere or something on my phone that I can

Page 172

1    check-in or --

2         Q    Okay.  So like what we're talking about, you

3    said Labcorp has one, Quest has one.  Have you ever

4    encountered a sort of check-in to inform the business

5    that you're there that you believe to be accessible?

6              MR. MILLER:  Objection --

7              THE WITNESS:  I have not.

8    BY MS. ROLLER:

9         Q    Have you heard of any that you believe are

10   accessible?

11        A    I have not.

12             MR. MILLER:  And objection to the extent it

13   calls for attorney-client privilege, but that's fine.

14   Go ahead.

15   BY MS. ROLLER:

16        Q    Was your experience at the lab in Dr. Diehl's

17   building, was that a positive experience?

18        A    Yes, I would say so.

19        Q    And how far is Dr. Diehl's office driving from

20   your house?

21        A    Probably a good 20 or more minutes depending on

22   traffic.

23        Q    All right.  You -- would you go back to that

24   lab based on your experience?

25        A    Well, if that was -- in that circumstance where

Page 173

1  an early-morning fasting was required and then an

2  immediate appointment shortly thereafter, yes, I would

3  go there.

4       Q   Okay.  Earlier you testified that you'd be

5  willing to drive farther if you knew that the lab was

6  accessible, and then you've testified that you didn't

7  think that the Labcorp eCheck-in was accessible.  In

8  this lawsuit, you take the position that the Quest

9  eCheck-in is not accessible, so wouldn't that mean that

10 you would rather drive that extra 10 or 15 minutes to go

11 to a lab that you know is accessible to you and provide

12 you the same experience as other people?

13      A   Well, just to --

14          MR. MILLER:  It's an incomplete hypothetical.

15          But go ahead.

16          THE WITNESS:  So, to clarify, I don't drive.  I

17 have to be driven.  But, again, like I've mentioned

18 before, it depends on various circumstances.

19          In this particular case with the fasting, I

20 just find it more convenient to go to one place and get

21 two things done when I'm on an empty stomach versus, you

22 know, having to go to Sherman Oaks and then get to a

23 lab, that I have to arrange for other transportation and

24 then pick me up from Sherman Oaks and then take me to

25 West Hills to see my doctor, so that just wouldn't be

Page 174

1    very practical.

2           So, in this particular instance, you mentioned,

3    if it's a fasting blood test that's required and there's

4    an early-morning appointment that I am going to on that

5    same day, I would elect to go to the lab in my doctor's

6    office building just because it just makes more sense.

7    I think most people would do that as well.

8        Q    Okay.  And aside from the upcoming May visit

9    that you have, do you have any other plans at this point

10   to get your blood drawn or any specimens collected aside

11   from that May collection that you need?

12       A    Only when my doctor requests it.  Unless

13   there's a specific thing he's testing for, it's

14   generally going to be at least once a year as part of

15   the annual physical.

16       Q    Okay.  So right now you know of the May one,

17   but you don't know of any other ones that you'll need in

18   the near future?

19       A    I do not.

20           MR. MILLER:  Objection; vague.

21           Go ahead.

22   BY MS. ROLLER:

23       Q    All right.  So do you know who Anne West is?

24       A    Yes.

25       Q    Who's Anne West?

Page 175

1       A    She's also one of the plaintiffs in this
2   lawsuit.
3       Q    Do you personally know her?
4       A    I do not.
5       Q    Have you ever communicated with her in any way?
6       A    No, I have not.
7       Q    Not by email, phone?
8       A    No.
9       Q    Okay.  Have you ever talked to any other
10  individuals who are blind or have visual impairments
11  about their experiences with any eCheck-in devices?
12      A    Yeah, I'm sure I have.  I talk to a lot of
13  people, especially blind people about technology and
14  issues, so inevitably topics are bound to come up.
15      Q    Okay.  Have you talked with them specifically
16  about eCheck-ins?
17      A    I don't have specific recollection, but I'm
18  certain that I have.
19      Q    Okay.  Can -- I'm sorry.
20      A    I'm sure that I have because, again, you know,
21  I talk to people about tech stuff all the time and we
22  talk about inaccessible interfaces.
23      Q    Have you had or do you recall any specific
24  conversations you've had with individuals about that
25  topic?

Page 176

1        A    No, I don't.

2        Q    Have you ever talked to any other blind

3    individuals or individuals with visual impairments about

4    their experience with Quest eCheck-in?

5        A    No, I have not.

6        Q    Okay.  Do you have any knowledge about anybody

7    else who's blind or visually impaired that uses the

8    Quest labs?

9            MR. MILLER:  Objection to the extent it calls

10    for attorney-client privilege.

11            Outside of anything you've learned from

12    counsel, you can answer.

13            THE WITNESS:  No.

14    BY MS. ROLLER:

15        Q    You said your -- some of your friends are blind

16    or visually impaired; right?

17        A    Correct.

18        Q    Do you know if any of them use Quest labs?

19        A    I don't know.

20        Q    Have you ever talked to them about your visits

21    or your visit to Quest and your experience with the

22    eCheck-in?

23        A    No, I have not.

24        Q    Have you talked to any members of the American

25    Council for the Blind?

Page 177

1        MR. MILLER:  Objection to the extent it calls

2    for attorney-client privilege.

3        But outside of anything you've done with

4    counsel, you can answer.

5        THE WITNESS:  I have friends that are members

6    of the American Council of the Blind.

7    BY MS. ROLLER:

8        Q    Okay.  And who are your friends?

9        A    I -- I don't know that I can name all of them

10   just like this at one time, but for a fact Vickie and

11   Ron, the people who I, you know, stayed with temporarily

12   in 2017 are members of the council.

13       Q    Okay.  Anybody else?

14       A    Other acquaintances that I run into at, you

15   know, conventions or technology shows or, you know,

16   blindness-type events.

17       Q    Okay.  And you had mentioned that you have

18   reviewed the First Amended Complaint in this case;

19   right?

20       A    Yes.

21       Q    Do you remember the names of any individuals

22   identified in that First Amended Complaint?

23       A    Offhand, I do not other than Anne West.

24       Q    Okay.  So I'm going to ask you if you talked to

25   any specific people, and just say yes or no and I'll try

Page 178

1   to go down through the list pretty quickly.   Okay?

2        A    Okay.

3        Q    All right.   Ralph Black?

4        A    No.

5        Q    Arvis Bauzen.

6        A    I -- I have interacted with her before locally.

7        Q    How do you know her?

8        A    She's a member of the council and I believe

9   also a friend of Vickie.

10       Q    Okay.   Has she -- I'm sorry.

11            Have you talked to her about your experiences

12   at Quest?

13       A    No, I have not.

14       Q    Has she talked to you about her experiences at

15   Quest?

16       A    No, she has not.

17       Q    Okay.   Margie Donovan?

18       A    No.

19       Q    Bill White?

20       A    No.

21       Q    Robert Wendt?

22       A    No.

23       Q    Regina Brink?

24       A    No.

25       Q    Adele Molin?

Page 179

1     A    No.

2     Q    Nona Haroyan?

3     A    No.

4     Q    Mary Haroyan?

5     A    No.

6     Q    Robin Rehder?

7     A    No.

8     Q    Kathy Lyons?

9     A    No.

10    Q    Elizabeth Doan?

11    A    No.

12         MS. ROLLER:  And Madam Court Reporter, I'll

13  give you a list of these to save you later.

14    Q    Diane Michaels?

15    A    No.

16    Q    Paula Moisenberg?

17    A    No.

18    Q    Debbie Heitalla?

19    A    No.

20    Q    Jack Jorgensen?

21    A    No.

22    Q    Patricia Leposki?

23    A    No.

24    Q    Nicholas McNeal?

25    A    No.

Page 180

1    Q    Deborah Downey?

2    A    No.

3    Q    Mary Alice Gary?

4    A    No.

5    Q    Harvey Heagy?

6    A    No.

7    Q    Valerie Stander?

8    A    No.

9    Q    Cherise Colmender?

10   A    No.

11   Q    Kashay, I think, Wells?

12   A    No.

13   Q    Linda Utzig?

14   A    No.

15   Q    Clarise Henry?

16   A    No.

17   Q    Alice Crespo?

18   A    No.

19   Q    Debbie Dimeck?

20   A    No.

21   Q    Carlene Fiorello?

22   A    No.

23   Q    Donna Gramann?

24   A    No.

25   Q    Okay.  Are you a member of -- let's call it

Page 181

1   ACB.  Are you a member of ACB?

2        A    No, I'm not.

3        Q    Okay.  Are you part of any other disability

4   access groups or organizations?

5        A    I'm a member of NFB, National Federation of the

6   Blind.

7        Q    And do you have any sort of leadership role in

8   that, in NFB?

9        A    No.

10       Q    What is your role?

11       A    Just a chapter member.

12       Q    How long have you been a chapter member?

13       A    I believe I joined the federation in probably

14   around 2005.

15       Q    And then I might have asked you this question

16   generally, but have you spoken with anybody at NFB

17   regarding your experiences at Quest?

18       A    No.

19       Q    Have you spoken with anybody at NFB about their

20   experiences at Quest?

21       A    No.

22       Q    What's your involvement with NFB?

23       A    I am a member of the San Fernando Valley

24   chapter.

25       Q    What do you do as a member?

Page 182

1      A    Attend meetings.  We sometimes put on

2    activities for the community; some are fundraising, some

3    are activities meant to benefit the community

4    presentations.

5      Q    How often do you guys have chapter meetings?

6      A    Monthly.

7      Q    Do you attend them generally?

8      A    Yes.

9      Q    Okay.  Are you on like a ListServ of chapter

10   members?

11     A    Yes.

12     Q    Are you part of any other disability access

13   groups or organizations?

14     A    No.

15     Q    Is the Center for the Partially Sighted, is

16   that like an organization?

17     A    It was.  It doesn't exist anymore, to the best

18   of my knowledge, but it was there to provide services to

19   blind and low vision people, anything from eye exams to

20   technology evaluations, training, you know, things like

21   that.  Sometimes they also had support groups, so that's

22   what they are.

23     Q    Okay.  So you seem to have like a lot of -- a

24   big group or a big network of individuals who are blind

25   or are visually impaired.  Is that accurate to say?

Page 183

1        A    Yes.

2        Q    Do you talk with them just generally about

3    technology and what's going on and the kind of assistive

4    technology that you expect when you're interacting with

5    the world?

6              MR. MILLER:  Objection; compound and vague.

7              THE WITNESS:  Yeah, I mean, when you're hanging

8    around with blind people, the subject of technology is

9    often a popular one; and when you know a thing or two

10   about it, you know, people always want to pick your

11   brain, ask you questions.

12             So I -- we always end up talking about things

13   like this.  You know, what -- what phones, what apps,

14   what things are accessible, which things are not; so,

15   yeah, it comes up.

16   BY MS. ROLLER:

17       Q    Have you found that different -- of your

18   friends and colleagues who have visual impairments, have

19   different preferences for apps and functionality with

20   technology?

21             MR. MILLER:  Objection.  It lacks foundation,

22   vague.

23             Go ahead.

24             THE WITNESS:  Yeah, I mean, in that respect

25   blind people are no different than other people.  You

Page 184

1    know, everybody has preferences, things that work better

2    for them that are easier.

3           You know, some people like Android, some people

4    like IOS, some people like Windows computers, some

5    people like Macs, some -- you know, so it can run the

6    gamut; but, yeah, there's different preferences.

7    BY MS. ROLLER:

8       Q    Do you -- do you know any folks that you deal

9    with who don't like, like, audible instructions or using

10   headphone jacks as part of the technology?

11          MR. MILLER:  Objection; compound, it lacks

12   foundation.

13          THE WITNESS:  I haven't heard of too many

14   problems with using headphones because there are times

15   that they come in really handy.  In noisy places, for

16   example, it's nice to kind of isolate what you're trying

17   to hear.

18          In some cases, you're doing it for privacy,

19   because when you are using a screen reader, everything

20   is naturally spoken aloud that you interact with or

21   type, so you would use headphones to try to prevent that

22   getting out as much as possible.

23          There are sometimes people who will also have

24   hearing difficulties and maybe they might prefer

25   over-the-ear headphones versus earbuds, but overall,

Page 185

1   I've not heard too many blind people having problems

2   with using headphones at certain times for things.

3   BY MS. ROLLER:

4       Q    When you've been training folks or when you've

5   been just dealing with folks in general who are blind or

6   visually impaired, have you ever had any of them say,

7   you know what, I don't even want to deal with

8   technology.  I would just rather have a person assist

9   me?

10      A    There are times that some people say that and

11  that's usually more a statement made out of frustration,

12  especially, you know, when they're just learning it and

13  they hit a wall or something like that, they might say

14  something like that; but, in general, most of them want

15  to have some connection to technology because it really

16  does open up a lot of doors for us.

17      Q    Do some of the folks that you've dealt with

18  interact or prefer to interact with technology on their

19  own devices versus, for example, like a tabletop tablet

20  or an eCheck-in?

21          MR. MILLER:  It's vague and an incomplete

22  hypothetical.

23          Go ahead.

24          It lacks foundation.

25          THE WITNESS:  Yeah, it really depends.  Like I

Page 186

1  said, it runs the gamut.  Everybody has preferences so

2  that's why it's good to have as many options as

3  possible.

4  BY MS. ROLLER:

5      Q   As far as you go, would you prefer to interact

6  with a business' technology or would you rather interact

7  with your own personal device?

8      A   It depends on -- on what's being done.

9  Sometimes it's nice to be able to have both.  You know,

10  from what I understand, one of the options that are

11  available through these self-check-in things is the

12  ability to receive a text message to let you know when

13  it's your turn.

14          So, you know, that's one of those situations

15  where it's kind of nice to use both.  So it just, again,

16  depends on the situation and what's called for and

17  what's the most easy and convenient way to get it done.

18      Q   Would you find it easier to use your own device

19  versus a business' device because at least you always

20  know where your device is?

21          MR. MILLER:  Objection.  It lacks foundation,

22  incomplete hypothetical.

23          Go ahead.

24          It's also vague.

25          THE WITNESS:  Yes, sometimes.  Sometimes that's

Page 187

1    true, but sometimes using your own device might mean

2    jumping through extra hoops whereas using the one that's

3    there at the business is already -- you know, if it's

4    set up to be fully accessible and it makes it so that a

5    blind person can interact with it and use it

6    independently might make more sense just because it's

7    already there.  I don't have to do something with

8    connecting to something else to then interact with that

9    service.

10   BY MS. ROLLER:

11       Q   Okay.  So what I'm getting from your testimony

12   is that a lot of it just depends, like whether people

13   want to use technology or not, it depends on the person.

14   Whether they want to use a business' technology or their

15   own technology, that also depends, and it just

16   depends -- it varies from person to person and device to

17   device; right?

18           MR. MILLER:  The question is compound and it

19   lacks foundation, incomplete hypothetical, and it

20   misstates his testimony.

21           Go ahead.

22           THE WITNESS:  Well, and it depends on the

23   person's abilities, too.  Like I mentioned earlier in

24   testimony, there are people who have motor skill

25   difficulties or who have neuropathy so they don't have

Page 188

1    the ability, perhaps, to use a touchscreen the same way

2    that I do, where having a tactile keypad of some sort

3    with up-and-down arrows and a select button kind of

4    thing would also be very helpful to them in that

5    respect.

6            So, again, there's a wise saying that, you

7    know, it's good to cover all the options and not just

8    assume that only one way is what works for everybody.

9    BY MS. ROLLER:

10       Q   Okay.  Have you ever sent like a complaint

11   letter to any company regarding the inaccessibility of

12   any of their features or any of their -- I'm sorry --

13   any of their facilities or any features of their

14   facilities?

15           MR. MILLER:  I'll object to the extent that

16   calls for attorney-client privileged communications.

17           Anything you've done independent of using

18   counsel, you can testify to.

19           THE WITNESS:  I don't recall.

20           MS. ROLLER:  Okay.  I don't think that any

21   letter that Mr. -- that even your office has sent on

22   behalf of Mr. Vargas to a third party would be

23   attorney-client communication, so --

24           MR. MILLER:  Then you -- then you can ask that

25   question, because the way you asked it was more vague.

Page 189

1    So if you want to ask that question --

2            MS. ROLLER:  Okay.

3        Q   So as far as you know, have your attorneys sent

4    any demand letters or complaints to any company or

5    business on your behalf relating to inaccessible

6    features of their business or their facility?

7            MR. MILLER:  Objection; compound.

8            Go ahead.

9            THE WITNESS:  Yes.

10   BY MS. ROLLER:

11       Q   Okay.  And who are those businesses that were

12   the recipients of these letters or letter?

13       A   I'm trying to think.  I don't have it in front

14   of me, but there have -- like a website, for example, I

15   think it was called Swiss Colony.

16       Q   Okay.  And how about any -- well, let's

17   start -- back up.  How many of these letters do you

18   believe your counsel has sent on your behalf?

19       A   I don't recall offhand.

20       Q   Is it more or less than 10?

21       A   I would probably say less.

22       Q   Okay.  Is it more or less than five?

23       A   I'm not sure.

24       Q   Okay.  And just to be clear, when I'm saying

25   demands, what I mean is not necessarily a lawsuit but

Page 190

1   just a letter to -- I'm sorry -- a letter to a company

2   saying that you believe that there's features or their

3   facility is not accessible to either you or blinded

4   individuals in general.

5        A   Okay.

6        Q   Do you -- did you understand the difference?

7        A   Yeah, I believe so.

8        Q   Do you understand the difference?

9        A   Yes.

10       Q   Okay.  So what I'm talking about right now is

11   not lawsuits, I'm talking about demands, so do you

12   believe there have been more or less than five of those?

13       A   I cannot specifically recall at this time.

14       Q   I'm just asking for an estimate.

15       A   I guess, if you want to say, 5 to 10, I'm not

16   sure.

17       Q   Okay.

18       A   I don't recall.

19       Q   5 to 10.  And you said Swiss --

20           MR. MILLER:  He said he doesn't recall.  The

21   record will speak for itself.

22   BY MS. ROLLER:

23       Q   You said Swiss Colony was one of them.

24       A   Yes.

25       Q   I believe you filed a lawsuit against them; is

Page 191

1    that correct?

2        A    I'm trying to remember what it was exactly.

3    Yes.

4        Q    Okay.  Is there any -- who else can you recall

5    that your attorneys sent a demand letter to on your

6    behalf?

7        A    I can't recall right now at this moment.

8        Q    Is there anything that will refresh your

9    recollection as to those -- those businesses or

10   locations?

11       A    I would probably have to look through

12   information or possibly talk to my attorneys and got my

13   memory refreshed.

14       Q    So are there so many that you're not even able

15   to remember which ones they are?

16           MR. MILLER:  It's argumentative and vague.

17           THE WITNESS:  I'm just not remembering at this

18   moment.

19   BY MS. ROLLER:

20       Q    Okay.  I know you've also filed a lawsuit

21   against Labcorp; right?

22       A    Yes.

23       Q    Okay.  Did you send -- in advance of your

24   filing the lawsuit, did you send them any letter saying

25   that you believe that their facilities were

Page 192

1    inaccessible?

2         A    I let my attorneys handle things like that so

3    with -- I believe if that was part of the process, then

4    they did it.

5         Q    Okay.  You said that you didn't believe

6    McDonald's kiosks were accessible.  Did you send

7    McDonald's or did your attorney send McDonald's a letter

8    on your behalf about --

9         A    No.

10        Q    -- your perceived inaccessibility of the

11   kiosks?

12        A    No.

13        Q    Why not?

14        A    I don't know.

15             MR. MILLER:  Objection to the extent it calls

16   for attorney-client privilege.

17             But you can answer anything independent of

18   that.

19             THE WITNESS:  I don't know.

20   BY MS. ROLLER:

21        Q    Do you want to sue McDonald's over kiosks?

22             MR. MILLER:  Objection to the extent it calls

23   for attorney-client privilege.

24             You can answer anything beyond that.

25             THE WITNESS:  I would like to eventually have

Page 193

1  kiosks everywhere be made accessible.

2  BY MS. ROLLER:

3      Q   Well, that -- I understand that.  But my

4  question is do you -- do you have an intention to sue

5  McDonald's over their kiosks?

6      A   At this time, no.  I have not gone to

7  McDonald's in quite some time.

8      Q   Okay.  You identified Red Robin and their

9  tabletop tablet not being accessible.  Have your

10 attorneys sent a letter to Red Robin on your behalf

11 regarding inaccessibility of their tabletop tablet?

12     A   No.

13     Q   Okay.  And do you have an intention of suing

14 Red Robin about their tablet?

15     A   Not at this time.

16     Q   Okay.  Why do you not have an intention to sue

17 them?  What makes their tablet different than -- or

18 their situation different than, let's say, Quest's

19 situation where you decided to sue Quest?

20         MR. MILLER:  Objection; argumentative, beyond

21 the scope of discoverable material.

22         Go ahead, tell her.

23         THE WITNESS:  Red Robin and -- and Quest labs

24 are two very different things.  I go to Red Robin to --

25 you know, to eat.  It's a leisure activity and, at the

Page 194

1   end of the day, I can hand the server my credit card,

2   and they swipe it and do what they need to do without my

3   having to say aloud any personal information or anything

4   like that.

5           So I guess I -- I would definitely like to see

6   all kiosks be made accessible, but I think if I had to

7   put them in a priority list, if you will, I would

8   consider things like Red Robin and McDonald's a lot

9   lower in importance.

10  BY MS. ROLLER:

11      Q   Okay.  Are there any other locations that

12  you're aware of right now that you believe are a high

13  priority that do not provide accessible access to

14  individuals who are blind or visually impaired?

15      A   Not that I've encountered at this time.

16      Q   Okay.  And the demand letters that your

17  attorneys have sent on your behalf, it sounds like you

18  haven't identified a single one that hasn't resulted in

19  a lawsuit.  Have you sued every company that you believe

20  your attorneys have sent a demand letter to?

21      A   Yes.

22      Q   Okay.  And how many lawsuits have you been

23  involved in as a plaintiff or, let's say, a class

24  member?

25          MR. MILLER:  I'd just object to the extent it's

Page 195

1    compound.

2            But go ahead.

3            THE WITNESS:  As a plaintiff, this lawsuit,

4    Labcorp, and Swiss Colony.  As a class member, I was not

5    involved in the litigation, but I was a part of the

6    class for a lawsuit against Target for inaccessible

7    website problems.

8    BY MS. ROLLER:

9        Q   Okay.  Did you do anything in that Target

10   lawsuit or were you just the recipient of maybe a coupon

11   settlement or some gift certificate?

12       A   Yeah, a recipient of a settlement.

13       Q   Okay.  So do you believe that there are other

14   demands that have been sent on your behalf aside from

15   Swiss Colony, Labcorp, and Quest?

16       A   No.

17       Q   Have you settled with any businesses regarding

18   your claims that their facilities or websites are not

19   accessible?

20       A   Can you clarify that?

21       Q   Sure.  Have you engaged in -- have you -- so to

22   settle a claim or a lawsuit is basically where you go

23   and you say I believe that you've violated the law and

24   then the parties may negotiate and then there's a

25   settlement that's been reached and usually it involves a

Page 196

1    settlement agreement.  Have you done that with any

2    companies regarding your claims of inaccessibility?

3         A    Yes.

4         Q    Okay.  What companies are those?

5         A    Swiss Colony.

6         Q    Any others?

7         A    Not that I recall.

8         Q    Okay.  And in all three of the cases, the

9    lawsuits that you've filed, are you being represented by

10   the same attorneys in all three?

11        A    Yes.

12        Q    And is the Labcorp lawsuit about your perceived

13   inaccessibility of their kiosk?

14        A    Yes.

15        Q    What's your role in that case?

16        A    I am representing the class.  I'm a plaintiff.

17        Q    Okay.  And do you feel as the class

18   representative that you will take the same position in

19   the Labcorp lawsuit as you're going to take in this

20   lawsuit against Quest and their kiosks?

21             MR. MILLER:  It's vague and an incomplete

22   hypothetical.

23             But you can answer.

24             THE WITNESS:  Yes.

25   // //

Page 197

1    BY MS. ROLLER:

2        Q    Are you going to take the same position no

3    matter what?

4            MR. MILLER:  Again, it's a vague question, it's

5    an incomplete hypothetical.

6            Go ahead.

7            THE WITNESS:  I don't know what you mean by no

8    matter what.

9    BY MS. ROLLER:

10       Q    Well, are you going to maintain that same

11   position throughout both cases?

12           MR. MILLER:  Again, objection, it's vague and

13   ambiguous.

14           If you understand it, you can answer.

15           THE WITNESS:  I'm going to maintain the

16   position that the check-in kiosk needs to be made fully

17   accessible to blind people and not just part of it, but

18   fully accessible so any blind person regardless of their

19   ability can walk in and exercise their choice to use a

20   kiosk to whatever extent they want to.

21   BY MS. ROLLER:

22       Q    Okay.  And in the Swiss Colony case -- well,

23   let me ask you, in the Labcorp case have you made a

24   settlement demand?

25           MR. MILLER:  I'm going to object that it calls

Page 198

1    for attorney-client privilege.

2            You can answer the simple question as to

3    whether there's been settlement discussions.

4            THE WITNESS:  There have been settlement

5    discussions, but yeah.

6    BY MS. ROLLER:

7        Q    Okay.  Have you -- do you believe you're

8    entitled to monetary relief as part of that lawsuit?

9            MR. MILLER:  Objection.

10           THE WITNESS:  What I'm --

11           MR. MILLER:  Go ahead.

12           THE WITNESS:  What -- what I'm seeking is

13   injunctive relief and statutory minimum damages on

14   behalf of myself and the class.

15   BY MS. ROLLER:

16       Q    Okay.  What is -- what's a statutory minimum

17   damage?

18           MR. MILLER:  Objection.  It calls for a legal

19   conclusion.

20           You can tell her your understanding.

21           THE WITNESS:  It means what the law allows for

22   minimally as far as what -- what is due for these

23   violations.

24   BY MS. ROLLER:

25       Q    What do you believe that to be?

Page 199

```
 1          MR. MILLER:  Objection.  It calls for a legal
 2   conclusion.
 3          Go ahead.
 4   BY MS. ROLLER:
 5      Q   What amount?
 6          MR. MILLER:  It's vague.
 7          THE WITNESS:  I don't -- I don't know the
 8   amount offhand, quite frankly.  You know, this is not a
 9   money thing for me, so I just want to ultimately see to
10   it that these kiosks are made accessible and that blind
11   people such as myself can go in there and have equal
12   access to them as everybody else.
13   BY MS. ROLLER:
14      Q   So if the kiosks were made accessible but you
15   didn't get any money in statutory damages, would that be
16   okay with you?
17      A   I would --
18          MR. MILLER:  Objection; incomplete
19   hypothetical, it lacks foundation.
20          Go ahead.
21          THE WITNESS:  I would want, obviously, my
22   attorneys to get paid for all the work that they are
23   doing in presenting this case and in representing me,
24   and I would want the members of the class to get what
25   they are allowed under the law.
```

Page 200

1   BY MS. ROLLER:

2       Q   Okay.  So would you be willing to forgo your

3   statutory damages?

4           MR. MILLER:  Objection.  It's a vague and

5   ambiguous question, it lacks foundation.

6           THE WITNESS:  I am -- I'm not seeking to get

7   anything more than what's allowed under the law --

8   BY MS. ROLLER:

9       Q   Okay.

10      A   -- for these violations.

11      Q   I'm sorry.  I'm just asking because you said

12  it's not about the money.  So I'm curious as to if you

13  don't think it's not about the money, then are you fine

14  if everybody else gets their statutory damages and your

15  attorneys get paid and you get the injunctive relief

16  that you want but you don't get any money, is that okay

17  with you?

18          MR. MILLER:  Objection.  It calls for a legal

19  conclusion, it lacks foundation, incomplete

20  hypothetical.

21          Go ahead.

22          THE WITNESS:  I think I would be remiss to not

23  take something that I'm entitled to, but it's -- you

24  know, when I -- when I said it's not about the money, it

25  means I'm not memorizing words and looking at this as a

Page 201

1  big pay day and thinking, oh, I'm going to get X amount

2  of dollars blah, blah, blah.  This is not what this is

3  about; but, yes, I want what's due to me and due to all

4  members of the class that I represent.

5  BY MS. ROLLER:

6     Q   Okay.  And that's the position I think that --

7  maybe we've been talking about that in the Labcorp

8  context.  Is that the same kind of position you have on

9  the monetary component of the Quest lawsuit?

10         MR. MILLER:  Vague.

11         Go ahead.

12         THE WITNESS:  Yes.

13  BY MS. ROLLER:

14     Q   Okay.  And then what's the status of the Swiss

15  Colony lawsuit, is that one pending or resolved?

16     A   I believe it's resolved itself.

17     Q   Okay.  And was that through a settlement?

18     A   Yes.

19     Q   And in that case, did you demand -- make a

20  demand for monetary compensation?

21         MR. MILLER:  I'm going to object --

22         THE WITNESS:  I --

23         MR. MILLER:  I'm going to object to the extent

24  that it involves both a private settlement that's

25  confidential and attorney-client privilege and instruct

Veritext Legal Solutions

Page 202

1   you not to answer.

2           (Instruction not to answer.)

3           MS. ROLLER:  What I'm asking him is what he

4   demanded.  I'm not asking him what he got.

5           MR. MILLER:  I know but it's going to be

6   privileged under Evidence Code 408 and you're not

7   entitled to know it, so I'm instructing him not to

8   answer it on the basis of privilege under Evidence Code

9   408 and any attorney-client communication.

10          If there is any basis for you to answer that

11  without anything you've learned from counsel or the

12  subjects of confidential settlement or the privilege

13  under Evidence Code 408, you may answer.

14          THE WITNESS:  I'm going to follow my attorney's

15  advice.

16  BY MS. ROLLER:

17      Q   In that case, the Swiss Colony case, did you

18  believe that you were entitled to more than the minimum

19  statutory damages that you believe you are entitled to

20  in the Labcorp case?

21      A   I'm sorry, restate that.

22      Q   Sure.  You said that you believed in the

23  Labcorp case and the Quest case that you are entitled to

24  minimum statutory damages.

25      A   Yes.

Page 203

1      Q   So what I'm -- what I'm asking is in the Swiss

2   Colony case, did you believe you were entitled to more

3   than that?

4           MR. MILLER:  Objection.  It lacks foundation.

5           But go ahead, you can tell her.

6           THE WITNESS:  I believe I'm entitled to

7   whatever the minimum statutory damages are.

8   BY MS. ROLLER:

9      Q   I'm just asking if you thought that that case

10  was different and so you thought you deserved more or

11  less.

12          MR. MILLER:  Objection to the extent it lacks

13  foundation.

14          Go ahead.  You can tell her what your

15  understanding is.

16          THE WITNESS:  My understanding is that I got

17  what I was entitled to in that case.  It was

18  satisfactorily resolved.

19  BY MS. ROLLER:

20     Q   And did you demand injunctive relief in that

21  case?

22     A   Yes.

23     Q   That was a website accessibility case; correct?

24     A   Yes.

25     Q   And did you get -- were you satisfied with the

Page 204

1    results in that case --

2        A    Yes.

3        Q    -- the injunctive relief result?

4        A    Yes.

5        Q    Were you a class member in that case?

6        A    I'm not sure that there was a class in that

7    case.

8        Q    Okay.  So you brought it -- you brought the

9    case as a class action but it might not have been

10   certified?

11           MR. MILLER:  Misstates the evidence.

12           THE WITNESS:  Yeah, I'm not sure.  I'd have to

13   look at the documents again to refresh my memory because

14   it was a while ago.

15   BY MS. ROLLER:

16       Q    Okay.

17       A    By the way, is it okay to take a restroom break

18   soon?

19       Q    Sure, we can take a restroom break now.

20           MR. MILLER:  Okay.  Thank you.

21           THE VIDEOGRAPHER:  Going off the record at

22   p.m.

23           (Recess.)

24           THE VIDEOGRAPHER:  We are back on the record at

25   4:11 p.m.

Page 205

1    BY MS. ROLLER:

2         Q    Okay.  I only have a couple of more questions

3    and then I think we can wrap up.  You had testified

4    earlier that you had seen the Complaint and the First

5    Amended Complaint in this case; correct?

6         A    Correct.

7         Q    Did you see them before your attorney filed

8    them?

9         A    Oh, I'm guessing yes, because I had to agree to

10   them, so yes.

11        Q    As you sit here today, have you found anything

12   in either the Complaint or the First Amend Complaint

13   that you believed to be inaccurate?

14        A    No.

15        Q    Without going into the specifics of whatever

16   offer may or may not have been made, are you aware that

17   Quest has made a settlement offer to you --

18        A    Yes.

19        Q    -- and the putative class?

20        A    Yes.

21        Q    Okay.  Are you aware of how many, if it's more

22   than one?

23        A    I only offhand recall about the one.

24        Q    Okay.  Are you aware that there was a mediation

25   between Quest and, I guess, you guys, you as the

Page 206

1    putative class member?

2        A    Yes.

3        Q    Did you attend that mediation?

4        A    I did not.

5        Q    Okay.  Have you lost -- have you had any

6    economic loss as a result of your visit to Quest on

7    June 25th, 2019?

8            MR. MILLER:  Objection; vague and ambiguous.

9            Go ahead.

10            THE WITNESS:  No.

11   BY MS. ROLLER:

12       Q    Have you had any other type of loss as a result

13   of that visit?

14            MR. MILLER:  Same objections; vague and

15   ambiguous, it calls for a legal conclusion.

16            Go ahead.

17            THE WITNESS:  No, I mean, other than just the

18   frustrating experience of being told that I had to use a

19   kiosk to check in only to find that it's inaccessible.

20   BY MS. ROLLER:

21       Q    Have you treated with a mental health provider

22   since your June 25th, 2019 visit at Quest?

23            MR. MILLER:  Objection to the extent that it

24   violates HIPPA.

25            But you can answer.

Page 207

1          THE WITNESS:  No.

2     BY MS. ROLLER:

3          Q    Are you making any claims that as a result of

4     your visit to Quest you've suffered emotional distress?

5          A    No.

6          Q    Do you have any facts to believe that Quest

7     discriminated against you or individuals with disability

8     intentionally?

9          MR. MILLER:  I'm going to object to the extent

10    it calls for attorney-client privilege and instruct you

11    not to answer to the extent it's something that's been

12    relayed to you by counsel.  Outside of anything that

13    counsel has told you, you can answer.

14         THE WITNESS:  So, I'm sorry, could you restate

15    the question?

16    BY MS. ROLLER:

17         Q    Sure.  Do you have any facts to believe that

18    Quest intentionally discriminated against you or other

19    individuals who are blind or visually impaired?

20         MR. MILLER:  Objection to the extent it calls

21    for attorney-client privilege, instruct you not to

22    answer as it relates to attorney-client privilege.  You

23    can answer on anything beyond attorney-client privilege.

24         THE WITNESS:  I would say the obvious fact is

25    that despite technology being available to do so,

Page 208

1   their -- the kiosks have not been made accessible.

2          The operating systems on any of these things

3   run on -- have built-in accessibility, so the fact that

4   in today's day and age these things are not enabled and

5   made known to blind people that they have -- you know,

6   that they can use these kiosks by way of this

7   accessibility, yeah, I would say that I feel

8   discriminated against because of that.

9   BY MS. ROLLER:

10     Q   So my question wasn't whether you feel

11   discriminated against.  My question was whether you have

12   any facts that leads you to believe that Quest did this

13   intentionally and intentionally tried to discriminate

14   against you or other individuals who are blind or

15   visually impaired.

16          MR. MILLER:  Objection; asked and answered, it

17   calls for a legal conclusion objection.  Objection to

18   the extent it calls for attorney-client privilege and

19   instruct you not to answer with respect to any

20   privileged information, but you can answer, again,

21   beyond anything that you've learned from your counsel.

22          THE WITNESS:  Well, again, the fact that

23   despite accessible technology being ubiquitous, built

24   into the operating system and not being enabled, to me

25   that's the obvious fact that led to discrimination

Page 209

1    against myself and other similarly situated blind

2    people.

3    BY MS. ROLLER:

4        Q   Okay.  Aside from your belief that the

5    technology is widespread, you don't have any other

6    specific facts to indicate that Quest intentionally

7    discriminated against you; right?

8            MR. MILLER:  Objection to the extent it calls

9    for attorney-client privilege and instruct you not to

10   answer as to any privilege.  Objection to the extent it

11   calls for a legal conclusion.

12           Go ahead.

13           THE WITNESS:  So fact, the kiosks are not fully

14   accessible.  Fact, accessibility is built into the

15   operating system of most of these mobile or tablet

16   operating systems, so those are facts.

17   BY MS. ROLLER:

18       Q   Okay.

19       A   So what that means is that a blind person

20   cannot independently walk in there and get the full use

21   and availability that's offered to everybody else who

22   chooses to go the route of using the kiosks.  Those are

23   facts.

24       Q   Okay.  Aside from that, is there anything else

25   that you believe are facts that demonstrate that Quest

Page 210

1    intentionally discriminated against you or other blind

2    or visually impaired individuals?

3              MR. MILLER:  Objection to the extent it calls

4    for attorney-client privilege, instruct you not to

5    answer.  Objection to the extent that it calls for a

6    legal conclusion.

7              You may answer beyond that.

8              THE WITNESS:  At this point I'm going to follow

9    the advice of my attorney.

10   BY MS. ROLLER:

11       Q   No, he told you you can answer if

12   there's any -- if there's anything that you didn't learn

13   from him.  I just want to make sure that there's --

14             MR. MILLER:  And if there's any other

15   additional facts other than what you've stated and other

16   than what you've learned from counsel, you can go ahead

17   and tell her.  If not, you can tell her that.

18             THE WITNESS:  No, there's no additional facts.

19   I think the facts that are presented are pretty obvious.

20             MS. ROLLER:  Okay.  So I don't have any further

21   questions.

22             MR. MILLER:  Why don't we take a 10-minute

23   break, then, and we'll come back and do our redirect.

24   Thank you very much, Miss Roller.

25             THE VIDEOGRAPHER:  Going off the record at

Page 211

```
 1   p.m.
 2           (Recess.)
 3           THE VIDEOGRAPHER:  We are back on the record at
 4   4:41 p.m.
 5                         EXAMINATION
 6
 7   BY MR. MILLER:
 8       Q   Mr. Vargas, welcome back.
 9       A   Thank you.
10       Q   I want to follow up on some of Miss Roller's
11   questions.  Mr. Vargas, do you have a recognized
12   disability?
13       A   Yes, I do.  I have been legally blind since
14   birth.
15       Q   And on June 25th, 2019, did you attempt to
16   access a lab -- excuse me -- a Quest patient service
17   center?
18       A   Yes, I did.
19       Q   And was that the location at 4849 Van Nuys
20   Boulevard in Sherman Oaks, California?
21       A   Correct.
22       Q   And just for clarity, did you -- was that a
23   walk-in appointment?
24       A   Yes.
25       Q   And when you attempted to walk in the Quest
```

Page 212

1    location on June 25th of 2019, was that location open to

2    the public?

3         A    Yes, it was.

4         Q    Did anyone prohibit you initially from trying

5    to walk through the front door?

6         A    Not at all.

7         Q    When you entered the Quest patient service

8    center on June 25th, 2019, you eventually encountered a

9    self-service eCheck-in kiosk; is that right?

10        A    Yes, after I waited a significant amount of

11   time before somebody finally came out, I was directed to

12   this kiosk.

13        Q    And that wait, I believe you said, was

14   approximately 10 to 15 minutes; is that accurate?

15        A    Yes.

16        Q    As far as you know, do sighted individuals have

17   to wait 10 to 15 minutes before being able to

18   independently access the self-service eCheck-in kiosk?

19             MS. ROLLER:   Objection.   It calls for

20   speculation, it lacks foundation.

21             THE WITNESS:   I don't believe so.

22   BY MR. MILLER:

23        Q    In other words, sir, had you -- had you not

24   been blind, do you believe you would have been able to

25   independently access the self-service eCheck-in kiosk

Page 213

1    sooner than the 10 to 15 minutes that you had to wait?

2              MS. ROLLER:  Objection.  It calls for --

3              THE WITNESS:  Yes.

4              MS. ROLLER:  Objection.  It calls for

5    speculation, it lacks foundation, incomplete

6    hypothetical.

7              MR. MILLER:  Madam, Reporter, did you get the

8    answer?

9              THE REPORTER:  I did.

10   BY MR. MILLER:

11       Q    Do you believe that you were denied access to

12   the Quest self-service eCheck-in kiosk based on your

13   disability?

14       A    Yes, because it was not accessible.

15       Q    Were you able to use all of the features that

16   were offered on the Quest self-service eCheck-in kiosk

17   when you went to the Quest patient service center on

18   June 25th, 2019?

19       A    I was not able to use --

20              MS. ROLLER:  I'm sorry.  Objection.  It calls

21   for speculation, it lacks foundation.

22   BY MR. MILLER:

23       Q    You may answer.

24       A    I was not able to use any of the features

25   offered because it was, again, not accessible.

Page 214

1       Q   Miss Roller represented to you certain updates

2   that have been made to a Quest patient service center

3   eCheck-in kiosk.  One she neglected to discuss is the

4   wait-by-text option.

5           I'll represent to you that Quest advertises

6   that there is presently a wait-by-text option at the

7   eCheck-in self-service kiosks that allows an individual

8   who can fully and independently access that kiosk to

9   select an option to allow them to wait outside and be

10  texted at the time of their appointment.

11          Assuming that my representation is correct,

12  would you believe that to be a benefit to a patient?

13      A   Especially now during COVID-19, it's obviously

14  best to try to avoid indoor places with other people.

15  So, yes, if I had the option to wait outside and to be

16  texted, I would make use of that feature.

17      Q   If as a blind individual you were not provided

18  that option, would you agree that you were not receiving

19  an equal experience to the service that the eCheck-in

20  provides?

21          MS. ROLLER:  Objection.  It --

22          THE WITNESS:  Yes.

23          MS. ROLLER:  Objection.  It calls for a legal

24  conclusion.

25  // //

Page 215

1    BY MR. MILLER:

2         Q    On the date that you went to -- well, strike

3    that.  Let me ask it more clearly.  On June 25th, 2019,

4    when you went to the patient service center that Quest

5    operates on Van Nuys Boulevard in Sherman Oaks, were you

6    provided any audio recordings to assist you with

7    independently accessing the eCheck-in self-service

8    kiosk?

9         A    No, I was not.

10        Q    Were you provided with any screen reader

11   software to allow you to independently access the

12   eCheck-in self-service kiosk at Quest?

13        A    No.

14        Q    Were you provided any magnification software?

15        A    No.

16        Q    Any optical readers?

17        A    No.

18        Q    Any secondary audio programs?

19        A    No.

20        Q    Any large print materials?

21        A    No.

22        Q    Any accessible electronic information or

23   technology?

24        A    No.

25        Q    Or any other effective means of allowing you to

Page 216

1    independently access the self-service eCheck-in kiosk?

2        A    No.

3        Q    Did the phlebotomist ever represent to you that

4    she was a qualified reader under the Americans with

5    Disabilities Act?

6        A    No.

7            MS. ROLLER:  Objection.  It calls for a legal

8    conclusion, it calls for speculation.

9    BY MR. MILLER:

10       Q    Do you have an understanding of whether the

11   Quest self-service eCheck-in kiosk is independently

12   accessible for legally blind individuals?

13           MS. ROLLER:  Objection.  It calls for a legal

14   conclusion.

15           THE WITNESS:  It was definitely not seeming to

16   be accessible to me.

17   BY MR. MILLER:

18       Q    Why do you believe it is not accessible to

19   individuals who are legally blind?

20       A    Because I could not find any kind of tactile

21   markings pointing to a headphone jack which is what one

22   would normally expect to find if you were using an

23   accessible device like that.

24           There's no tactile keypad, for example, as you

25   might find on some of them, so there was nothing that

Page 217

1    indicated to me that that machine could be independently

2    used by a blind person because none of the marks I would

3    look for were found.

4        Q    Did the lack of accessible features deter you

5    from making use of the services offered by the

6    self-service eCheck-in kiosk at the Quest location you

7    visited in 2019?

8        A    Yes, I was not able to do any kind of

9    transacting via that kiosk because it required a sighted

10   person to operate it so it did not have accessibility

11   for a blind person to use.

12       Q    And so just to be clear, you had to wait 10 to

13   15 minutes before anyone even helped you access the

14   eCheck-in self-service kiosk; correct?

15       A    That's correct.

16       Q    And then that was done in a public waiting

17   room; correct?

18       A    Yes.

19       Q    And you were asked --

20       A    Yes.

21       Q    And you were asked to announce your private

22   information out loud in that public waiting room;

23   correct?

24       A    Yes.

25       Q    While not being -- while not being able to see

Page 218

1    how many other individuals were present; correct?

2        A    Correct, I couldn't tell who or how many people

3    might be there.

4        Q    And then even after you identified a Quest

5    employee to assist you, you still had to wait again

6    before she returned to the eCheck-in self-service kiosk

7    to be able to assist you with that device; right?

8        A    Yes, she had to come back out and then take my

9    information and input it.

10       Q    And that was approximately another five

11   minutes?

12       A    Correct.

13       Q    And then even once you were checked in, the

14   phlebotomist did not immediately take you back and

15   render the services; correct?

16       A    Yeah, I had to wait.

17       Q    You had to wait a third time before you could

18   get --

19       A    Yes.

20       Q    -- services; correct?

21       A    Correct.

22       Q    Did that cause you to feel any embarrassment or

23   humiliation?

24       A    Yes.   You know, after a while when you run into

25   situations like this, it is embarrassing, it's

Page 219

1    humiliating.  It makes you feel like you're a

2    third-class citizen of some kind that anybody else can

3    walk in there and not have to undergo the same amount of

4    hassle and waiting and so they offer this service to all

5    of their patients who happen to be able to see without

6    impairment.

7         Q   Did it cause you any frustration or

8    embarrassment to be directed to an eCheck-in

9    self-service kiosk that you could not use?

10        A   Yes, it did.

11        Q   Can you tell me what you -- can you tell me

12   what humiliation or frustration that caused you?

13        A   Well, I feel like it made me look a little

14   foolish to be taken to a machine that I would not be

15   able to use, so here I am looking around trying to

16   interact with this machine looking for things that

17   aren't there.

18        Q   If Quest decides as a result of hearing what

19   you said today that it's going to provide individuals

20   who are legally blind the opportunity to independently

21   access the self-service eCheck-in kiosk, would you

22   return there?

23        A   Yes, absolutely.

24        Q   And do you intend to return there any way for

25   any other reasons?

Page 220

1          A    Well, after what I was told earlier about this

2   new partial accessibility feature that was introduced

3   which, at least, would allow me to announce my presence

4   to the phlebotomist who was somewhere in the back, I

5   would certainly under the right circumstances would want

6   to go there to, you know, not only to get my blood work

7   done but to test this out and also to further test to

8   see if any additional enhancements have been added since

9   then.

10         Q    And do you intend return to Quest to do this

11  testing and determine whether you can independently

12  access all the features of the eCheck-in kiosk after

13  learning --

14         A    Yes.

15         Q    -- of that provision from Ms. Roller?

16         A    Absolutely.

17         Q    Mr. Vargas, how did you come to be involved in

18  this litigation?

19         A    I spoke to my attorneys shortly after I had the

20  experience and expressed my frustration and

21  disappointment and asked what can we do.

22         Q    And without revealing anything privileged, why

23  did you want to be involved in this -- in this

24  litigation?

25         A    Well, because knowing how I felt, I can only

Page 221

1   imagine other blind people who encounter this barrier

2   all across our nation, in this state, I -- I would like

3   to make it so that people don't have to feel that so

4   that -- and so that I myself can go in there and not

5   have to feel that and I can go in there confidently and

6   make use of all the services, the same level of services

7   that's offered to everybody else who's sighted.

8        Q    Would you be pleased with Quest if they made

9   this eCheck-in kiosk service independently accessible to

10  you?

11       A    Absolutely.

12       Q    Would you recommend it to other individuals in

13  the blind community as a -- as a good option for an

14  accessible experience if they made this eCheck-in

15  service independently accessible to you?

16       A    I absolutely would.  I would sing their praises

17  from here to kingdom come and just let everybody know,

18  hey, Quest is a place where you can go in and check in

19  independently and finally that barrier of

20  inaccessibility has been removed there.

21       Q    Why did you select the counsel that you did in

22  this case?

23       A    The came very highly recommended and I've known

24  them for years.

25       Q    And who are your lawyers in this case?

Page 222

1      A    Benjamin Sweet, Jonathan Miller, and Matt

2   Handley.

3      Q    And why do you believe these lawyers are

4   qualified to handle this litigation?

5           MS. ROLLER:  Objection.  It calls for

6   speculation.

7   BY MR. MILLER:

8      Q    You can answer.

9      A    In my personal opinion, again, they come highly

10  recommended and, in my interactions with them, I clearly

11  see a passion that's there and an understanding of our

12  daily struggles and a willingness to want to help us out

13  and help us, you know, level the playing field and,

14  again, just give us a little thing known as equality.

15     Q    Do you understand that you are applying to be a

16  class representative in this case?

17     A    Yes, I do.

18     Q    What are the duties and responsibilities of the

19  class representative in your understanding?

20     A    My duties are is always to act in the best

21  interests of the class which means not just think about

22  my own needs but think about all other blind people

23  across our state in this country who face these barriers

24  every day.

25           So my duties involve things like, you know,

Page 223

1    keeping in regular touch with my attorneys, to

2    supervising and directing them, reviewing and approving

3    documents, searching for or providing responses in

4    documents.

5           Just, in general, staying on top of the details

6    of the case.  Also what I'm doing today, here, sitting

7    for this deposition, that's simply part of the duties to

8    represent the class, being ready to appear at a hearing

9    if it's necessary, to actively participate in any

10   settlement negotiations.

11          So, again, do what I think could -- is the best

12   job and best representation for all the blind people who

13   experience similar barriers and frustrations.

14     Q    And without revealing any privileged

15   communications, do you believe you've performed those

16   duties in this case?

17     A    Yes.

18     Q    What are your motivations in serving as the

19   class representative?

20     A    My motivations are, again, to -- to try to do

21   my little part in this world to level the playing field

22   and remove barriers of inaccessibility so that other

23   blind people can do things like go to a lab and

24   independently check themselves in without having to

25   endure extra waits or embarrassment or humiliation.

Page 224

1     Q    Do you have any individual financial motivation

2     serving as the class representative in this case?

3     A    None whatsoever.

4     Q    And having -- and, again, without revealing

5     anything privileged, have you kept abreast of the

6     developments in this case?

7     A    Yes, I have.

8     Q    Where is this case pending?

9     A    In the Federal Central District Court in Los

10    Angeles.

11    Q    Who's the judge?

12    A    Judge Dolly Gee.

13    Q    And who are the plaintiffs?

14    A    That would be myself, Anne West, and the

15    American Council of the Blind.

16    Q    And what laws are you suing under?

17    A    Under the Americans with Disabilities Act, the

18    National Rehabilitation Act, and California Persons with

19    Disabilities Act, and the Unruh Act of California.

20    Q    And as a representative of the national

21    class -- or strike that.

22         What is the national class you are seeking to

23    represent?

24    A    All similarly situated blind people across the

25    country that have experienced similar barriers and

Page 225

1    frustrations at Quest laboratory locations.

2        Q    And what is the California class that you are

3    seeking to represent?  Is that a separate class?

4        A    Yeah, it's a subclass.  And, again, similarly,

5    blind people in California that have experienced similar

6    barriers, similar frustrations as well as embarrassment

7    or humiliation because of the lack of these

8    accessibility capabilities to these devices.

9        Q    And as to the national class, what relief do

10   you understand you are seeking as to the national class?

11       A    I am seeking injunctive relief.

12       Q    And as to the California subclass, what relief

13   do you understand you are seeking as to the California

14   subclass?

15       A    Injunctive relief as well and statutory minimum

16   damages.

17       Q    Are you also seeking attorney's fees and costs

18   as to the national class and subclass to the extent you

19   are successful?

20       A    Absolutely.  If anybody should get paid, it

21   should be the lawyers that are doing such a phenomenal

22   job by going to bat for us and helping us navigate these

23   tricky waters.

24       Q    When was the Complaint filed in this case?

25       A    The original Complaint was filed, I believe, in

Page 226

1  September, if I'm not mistaken, the 15th of 2019.

2      Q    Was an Amended Complaint filed in this case?

3      A    Yes, it was.

4      Q    When was the Amended Complaint filed?

5      A    If I'm not mistaken, I believe that's May 15th

6  of 2020.

7      Q    And currently do you understand we're appearing

8  in discovery?

9      A    Yes.

10          MS. ROLLER:   What was that -- I'm sorry, what

11 was that question?

12          MR. MILLER:   Currently do you understand that

13 we're appearing in discovery in the case.

14          And I believe he said yes.   Did you get that,

15 Madam Reporter?

16     Q    And is discovery over yet, Mr. Vargas?

17     A    No, it is not.

18     Q    When do you understand discovery to end?

19     A    Pretty much -- I think it's -- I'm trying to

20 remember.   I think it's somewhere in August of this

21 year.

22     Q    Okay.   How many pages of documents has Quest

23 produced in this action?

24     A    I think it's been somewhere in the neighborhood

25 of 42,000 or so.

Page 227

1    Q    How often do you communicate with your-- again,

2  without revealing privilege, how often do you

3  communicate with your lawyers in this action?

4    A    Fairly regularly.  At least once or more a

5  month.

6    Q    Approximately how many times would you say

7  you've communicated with your lawyers in total about

8  this matter, again, without revealing privilege?

9    A    I want to say probably in the neighborhood of

10  20 to 30 times.

11    Q    And you were asked earlier by Miss Roller

12  whether there were varying degrees of blindness.  Do you

13  recall some of the discussions around that?

14    A    Yes, I do.

15    Q    And you were also asked by Miss Roller whether

16  there were some individualized preferences in terms of

17  the technology.  Do you recall that, those answers?

18    A    Yes, I do.

19    Q    But despite there being individual levels of

20  blindness and individual preferences of technology, are

21  there still common solutions that allow the legally

22  blind community to independently access technology?

23    MS. ROLLER:  Objection.  It calls for expert

24  opinion, it lacks foundation, it calls for speculation.

25  // //

Page 228

1    BY MR. MILLER:

2        Q    You can answer, sir.

3        A    Well, as somebody who does work in this field,

4    I can say that there are -- there are some common

5    solutions, in particular, the screen reader, because at

6    the end of the day, everybody, you know, can more or

7    less hear.

8            So the screen reader covers a lot of different

9    levels of blindness, because if we can all hear the

10   screen reader, we can at least interact with the screen.

11           There are other nice things as well, like in --

12   as I mentioned earlier, most of these operating systems

13   nowadays, these mobile operating systems offer an

14   accessibility suite.

15           So they offer things like, obviously, the

16   screen reader but also magnification capability, the

17   ability to change the contrast, the color, or make it

18   noncolored for people who have color blindness.

19           There are a lot of things that the makers of

20   these operating systems and devices include in their

21   operating system.

22           So it's just a simple matter of making it so

23   that a user can walk up to one of these devices and

24   execute a universal or some type of a gesture or a push

25   of a button or, in a lot of cases, just plugging in the

Page 229

1    headphones actually suffices for that.

2           So as soon as you plug in the headphones, that

3    sends a signal, oh, this person wants to -- this person

4    is going to need accessibility.

5           So at that point, a prompt would come up and a

6    voice comes up talking to you and you can interact with

7    the screen via touchscreen or if they also include

8    tactile buttons which are also helpful for people who

9    have neuropathy or motor disabilities, it gives you the

10   ability to go through a quick tutorial of some basic

11   gestures or button sequences that allow one to interact

12   with that device and the services that are offered.

13       Q   You're familiar with the accessibility suite

14   that's on the Apple IOS devices including the iPhone and

15   the iPad; correct?

16       A   Correct.

17       Q   Does that IOS suite differ depending upon the

18   level of somebody's blindness?

19       A   It --

20       Q   Is it the same IOS features on every device?

21   Does Apple offer the same IOS suite of features?

22       A   Yes, it is.

23           MS. ROLLER:  Objection.  It calls for

24   speculation.

25   // //

Page 230

1   BY MR. MILLER:

2       Q    So, for example, you have an iPhone; right?

3       A    Yes.

4       Q    Is the Apple IOS features that are on your

5   iPhone the same as the Apple IOS features that are on my

6   iPhone for vision disability?

7           MS. ROLLER:  Objection.  It calls for

8   speculation.

9           THE WITNESS:  Actually, the answer is yes,

10  because one nice thing about Apple is that they keep

11  everybody's devices fairly well updated, so they really

12  make a point of getting you to up- -- install updates

13  when they come out, and the -- the accessibility

14  features are there.

15          One, any -- you know, I can go to the Apple

16  store, for example, and pick up any IOS device on

17  display; and by either triple tapping on a button or

18  invoking Siri and asking her to enable the very -- the

19  accessibility feature that I want, it is available.

20          I don't need to wait for a salesperson to come

21  and do it for me.  So this is fairly universal, it's out

22  there.  It's in all the modern IOS devices.

23  BY MR. MILLER:

24      Q    And let me talk specifically about the iPad.

25  Have you reviewed the accessibility suite that's on the

Page 231

1    Apple iPad?

2         A   Yes.

3         Q   And in your -- and have you reviewed that

4    accessibility suite on more than one version of iPads?

5         A   Yes.

6         Q   And have you found that accessibility suite to

7    be a common solution to allowing different blind users

8    with different levels of disability to access Apple's

9    devices?

10             MS. ROLLER:  Objection.  It calls for

11   speculation, it lacks foundation, incomplete

12   hypothetical, it calls for a legal conclusion.

13   BY MR. MILLER:

14        Q   You can answer, sir.

15        A   The answer would be yes, it's there.  And as I

16   mentioned, there are different components to it so the

17   blind person can enable the features that they are

18   finding to be most helpful to them.  It's not a one-size

19   fits all.

20        Q   You mentioned that there are some common swipes

21   that can be done on an Apple IOS device; is that right?

22        A   Yes.

23        Q   And Miss Roller described to you a three-finger

24   swipe gesture that Quest is apparently attempting to

25   offer at their patient service centers.  Based on the

Page 232

1   description she provided with the three-finger swipe, is

2   that how it's commonly used on -- on an iPad?

3       A   No.  Generally speaking a three-finger swipe is

4   used to move or scroll screens.  So by swiping up or

5   down with three fingers, you're basically moving what's

6   in view of that screen.

7           So if the -- if the -- if, for example, you

8   have a -- like the settings menu which might have a lot

9   of different entries in it, they may not all fit on that

10  one official screen.  So just like you would with one

11  finger swipe up to get to the part of the screen that

12  you want to see, we do it with a three-finger swipe up.

13          And, conversely, to move back up the screen to

14  something that we may have pushed out of view but trying

15  to get to a lower part, we would do a three-finger swipe

16  down.

17          Three-finger swipe left and right is commonly

18  used to move between home screens on the -- on the main

19  part of the device.

20      Q   Now, this three-finger swipe that Miss Roller

21  described, Quest never came to you and asked you if

22  that's what you wanted, did they?

23      A   No.

24      Q   I mean you made a complaint to Quest.  Did

25  anyone from Quest ever follow up with you regarding the

Page 233

1   complaint you made?

2       A    No.

3       Q    You made some requests to -- or strike that.

4            You made some requests on the accessibility

5   features you wanted; isn't that true?

6            MS. ROLLER:  Objection.  It misstates

7   testimony.

8   BY MR. MILLER:

9       Q    Let me ask.  Did you make some requests to

10  Quest on what you would have liked to have seen when you

11  were attempting to use the eCheck-in kiosk?

12      A    Yes.

13      Q    And what were those requests?

14      A    I asked for them to make their kiosks fully

15  accessible to people with blindness so that they could

16  independently use it to check in or avail themselves of

17  whatever other services that are offered to everybody

18  else via that kiosk.

19      Q    And did Quest ever respond to that, that

20  request that you made to you?

21      A    Other than the phlebotomist who agreed that

22  that should be done and that she would forward that

23  feedback to the appropriate parties, I have not heard

24  anything from them.

25      Q    Did Quest, to your knowledge, ever give primary

Page 234

1   consideration to what you were asking to be done with

2   the kiosks?

3       A    No.

4       Q    To your knowledge, did Quest ever document the

5   reasons in writing that it could not give primary

6   consideration to your requests?

7       A    I don't believe so.

8       Q    Now, outside of just the Apple iPad device, you

9   mentioned that voting machines often contain -- or

10  strike that.

11       You mentioned that the voting machines more

12  recently contain features that allow blind users to

13  independently access them.  Is that your understanding?

14      A    Yes.

15      Q    And do they provide different ones depending on

16  the level of blindness or is it a common suite of

17  features?

18       MS. ROLLER:  Objection.  It calls for

19  speculation.

20  BY MR. MILLER:

21      Q    If you know.

22      A    Well, now that they are using an iPad-based

23  solution, there are various options offered.  It's not

24  just a screen reader.  They offer pretty much what is

25  available to any user of an IOS device via the

Page 235

1    accessibility suite that's built in.

2        Q    But, again, that's the common accessibility

3    suite.  It doesn't differ from iPad to iPad.

4        A    Right.

5        Q    Why do you want these Quest eCheck-in

6    self-service kiosks -- strike that.

7             Why do you want to be able to serve yourself at

8    a Quest eCheck-in self-service kiosk?

9        A    Well, I want the option to make use of whatever

10   services are available to everybody else, for starters;

11   but, in particular, in this -- in this situation, I

12   don't want to have to wait a significant amount of time

13   for somebody to show up to then acknowledge me and then,

14   you know, possibly have to wait longer while they -- you

15   know, especially if it's only one person working, I want

16   to be able to do that myself.  I want to avoid wait

17   time, if possible, or at least cut down on it.

18             I want to be able to make use of other

19   features, like the one you recently mentioned about

20   being able to be notified of my turn via text; so if

21   it's a crowded waiting room, and especially now with

22   COVID-19, I -- I want to have that -- that ability to

23   make that choice to say, okay, you know what, it's too

24   full in here.  I want to -- I prefer to wait outside but

25   I want to be notified when it's my turn.

Page 236

1      Q   Miss Roller asked you whether you contacted or

2   independently interviewed members of the potential

3   putative class.  Is that a job you believe -- strike

4   that.

5           Have you done that, sir?

6      A   No, I have not.

7      Q   Who have you left that to?

8      A   I totally left that up to my attorneys.  That's

9   their job.

10          MR. MILLER:  We can take five minutes, if we

11   could, and go off the record.

12          THE VIDEOGRAPHER:  Going off the record at

13   p.m.

14          (Recess.)

15          THE VIDEOGRAPHER:  We are back on the record at

16   5:21 p.m.

17          MR. MILLER:  Thank you very much.

18          Welcome back, Mr. Vargas.  I have no further

19   questions for you at this time.  Thank you.

20                    FURTHER EXAMINATION

21

22   BY MS. ROLLER:

23      Q   Okay.  I have some follow-up questions.

24      A   Sure.

25      Q   Okay.  So, Mr. Vargas, is it your belief that

Page 237

1  all sighted people are able to use the eCheck-in kiosk

2  at Quest?

3      A   You know, I assume so, because we only need our

4  eyes to see the screen, so --

5      Q   Okay.  What about people that are not

6  technologically savvy?

7      A   Well, they may not want to or choose, but the

8  whole point is that they have -- they can make that

9  choice.  I under the current way it's set up don't have

10  that choice.  I only have one option.

11      Q   Are you aware that on the eCheck kiosk --

12  eCheck-in kiosk at Quest, that there's a help button for

13  individuals who can't use the eCheck-in kiosk because,

14  for example, maybe they are not technologically savvy?

15          MR. MILLER:  It lacks foundation, it calls for

16  speculation, incomplete hypothetical.

17          But go ahead, you can answer.

18          THE WITNESS:  I wasn't aware of it, but it

19  sounds like it accomplishes the same thing as that

20  three-finger swipe thing you described earlier.

21  BY MS. ROLLER:

22      Q   Right.  And so if that -- if that help button

23  accomplishes the same thing that the three-finger swipe

24  button accomplishes, then doesn't -- wouldn't that mean

25  that individuals who are sighted are actually also not

Page 238

1    using all of the features of the kiosk?

2            MR. MILLER:  It lacks foundation, it's an

3    incomplete hypothetical.

4            THE WITNESS:  I can't imagine that Quest or any

5    company would go through the trouble and expense of

6    putting in these kiosks if they felt that a significant

7    amount of the population was not going to use them, so I

8    think it stands to reason that the expectation is that

9    most of the people who are sighted would use the kiosks;

10   but in the event that somebody is and chooses not to or

11   cannot for whatever the reason is, then that's a choice

12   that they make.  They -- they chose not to use that

13   kiosk.

14   BY MS. ROLLER:

15       Q   So do you believe that people that are not

16   technologically savvy are choosing not to use the kiosk

17   because they don't have technological skills?

18       A   Well, it doesn't sound --

19           MR. MILLER:  Objection; argumentative,

20   incomplete hypothetical.

21           Go ahead.

22           THE WITNESS:  It doesn't sound like one needs a

23   whole lot of technological savvy to use that kiosk

24   because it sounds pretty straightforward.  You go in

25   there, you put in your name and pertinent information.

Page 239

1   BY MS. ROLLER:

2        Q   So are you saying that you can't conceive of a

3   situation where somebody cannot -- who is -- who has

4   sight and is able-bodied cannot use an eCheck-in kiosk,

5   not chooses not to, but cannot use an eCheck-in kiosk?

6             MR. MILLER:  Objection; incomplete

7   hypothetical, it lacks foundation.

8             You can answer.

9             THE WITNESS:  Again, I can't imagine that if

10  it's expected that a lot of people were going to have

11  this difficulty that Quest or anybody else would go

12  through the trouble or an expense of putting these

13  kiosks in.

14  BY MS. ROLLER:

15       Q   So, I mean, I think what it's -- what you're

16  saying is it sounds like you're saying that you do agree

17  that there are some sighted people who cannot use the

18  eCheck-in kiosk and have the same -- have the same

19  functionality of the eCheck-in kiosk as somebody who

20  uses a three-finger swipe; right?

21            MR. MILLER:  Objection.  It lacks foundation,

22  it calls for speculation and it's an incomplete

23  hypothetical, it misstates his testimony.

24            Go ahead.

25            THE WITNESS:  There very well may be.  You

Page 240

1   know, we're -- most all humans are not the same, so we

2   all have different abilities and preferences.  So, yeah,

3   I suppose it's possible there may be some.

4   BY MS. ROLLER:

5       Q   I want to take you back to your June 25th, 2019

6   visit to the Quest patient service center.  When you

7   reached out to the phlebotomist or when the phlebotomist

8   noticed that you were standing there and needed

9   assistance, did you inform her that you were blind?

10      A   I don't think I needed to.  I had a white -- a

11  long white cane in my hand and that's kind of

12  universally understood to mean blindness.

13          If I -- if I understand correctly, it's a

14  question you have to answer to pass the driver's test,

15  is that -- what the white cane means, so I don't think I

16  needed to state it.  I think it was fairly obvious.

17      Q   Okay.  So the answer is you did not tell her

18  that you were blind; correct?

19      A   No.

20          MR. MILLER:  Objection.  It's vague and

21  ambiguous with respect to time.

22  BY MS. ROLLER:

23      Q   So you did not -- so you did not tell her

24  before she directed you to the kiosk that you were

25  blind; correct?

Page 241

1      A   I did not.  But, again, the long white cane in

2   my hand -- I use a very long cane.  It's about 66 inches

3   in height, so I think it's fairly obvious what that is,

4   and I didn't feel like I needed to state it then.

5           MS. ROLLER:  I'm going to move to strike

6   everything after I did not.

7      Q   During --

8           MR. MILLER:  I'm going to move to reinstate.

9   Thank you.  Go ahead.

10  BY MS. ROLLER:

11     Q   During your wait when the phlebotomist

12  brought -- took you over to the kiosk and had you wait

13  there, were you standing at the kiosk that entire time

14  waiting for her to return?

15     A   Yes.

16     Q   Okay.  And at that point, did anybody come in

17  and check in on the e-kiosk while you were standing

18  there?

19     A   I don't think so.

20     Q   Okay.  And so in between the time that the

21  phlebotomist directed you to the kiosk and the time she

22  returned, to your knowledge, nobody checked in in that

23  time period; correct?

24     A   Again, I -- I couldn't see that well in there,

25  so I can't say with certainty, but it didn't seem that

                                              Page 242

1    way.

2         Q    Well, were you standing right in front of the

3    kiosk?

4         A    No.  Once I realized it was inaccessible, I

5    stepped to the side.

6         Q    Okay.  Are you aware that anybody was taken in

7    to the draw room between the time that the phlebotomist

8    directed you to the kiosk and the time that you were

9    taken back to the draw room aside from that one person

10   the phlebotomist was assisting when she came out and

11   asked you if you needed assistance?

12        A    I don't know.

13        Q    Did you hear of anybody going in the back?

14             MR. MILLER:  Objection.  It lacks foundation.

15             Go ahead.

16             THE WITNESS:  I don't know.

17   BY MS. ROLLER:

18        Q    Did you hear any phlebotomists come out and

19   call anybody's name aside from that one patient that the

20   phlebotomist was assisting?

21        A    I don't know.

22        Q    You don't know or you don't recall?

23        A    I don't recall.

24        Q    Okay.  Is there any reason to believe that --

25   or do you have any reason to believe that between the

Page 243

1  time that the phlebotomist greeted you and the time you

2  were taken back to the draw room that anybody else was

3  helped before you aside from that one woman or that one

4  person who was called while you were waiting to check

5  in?

6       A    I think it's possible but I couldn't tell.

7       Q    Well, I'm asking if you have any reason to

8  believe, so do you have any facts to -- to support that

9  that may have happened?

10      A    I do not.

11      Q    Okay.  Did you expect to be taken back by the

12 phlebotomist before the other patient who she came out

13 to collect?

14      A    No.  Obviously, they were there ahead of me so

15 I would not expect to be ahead of somebody in line.

16      Q    Okay.  And then I think you testified that you

17 weren't aware that there was anybody else in the patient

18 service center while you were waiting for the

19 phlebotomist to come back and assist you; correct?

20           MR. MILLER:  It lacks foundation.

21           Go ahead.

22           THE WITNESS:  What I said was is I couldn't

23 tell.

24 BY MS. ROLLER:

25      Q    Okay.  Is there any reason -- I'm sorry.  Is

Page 244

1    there any reason or are there any facts for you to

2    believe that there was somebody else that was there?

3            MR. MILLER:  Again.  It lacks --

4            THE WITNESS:  No facts.

5    BY MS. ROLLER:

6        Q    So you said that you felt like you looked

7    foolish trying to use a kiosk that wasn't accessible to

8    you; right?  That's what you just testified to with

9    Mr. Miller?

10       A    Yes, I felt foolish doing that because, you

11   know, I'm looking for something that isn't there.

12       Q    So -- but if nobody is there to see that, how

13   do you feel foolish?

14       A    Well, like I said, I couldn't tell whether

15   somebody was there or not.

16       Q    Okay.  And you testified in response to

17   Mr. Miller's questions that you intend to return to

18   Quest under, quote, unquote the right circumstances.

19       A    Yes.

20       Q    Do you have -- what date do you intend to

21   return to Quest?

22       A    I don't have a date in mind.

23       Q    Okay.  You testified that now that you know how

24   to use a three-finger swipe, that you'll be able to use

25   that function on the kiosk if you were to ever go back

Page 245

1    to Quest.  Do you remember we talked about that?

2        A   Yes.

3        Q   Okay.  And so even though that's not the

4    traditional -- or what you said is the traditional

5    function for the three-finger swipe, you're still going

6    to be able to use that now that you know how that kiosk

7    works; right?

8        A   Yes.

9        Q   And do you have any reason to believe that any

10   other visually impaired or blind individuals once

11   they're informed how to use the kiosk with the

12   three-finger swipe, that they are not going to be able

13   to use the three-finger swipe in the nontraditional way?

14           MR. MILLER:  It lacks foundation, incomplete

15   hypothetical.

16           Go ahead.

17           THE WITNESS:  Once they're informed, they --

18   they should be able to.

19   BY MS. ROLLER:

20       Q   Okay.  So you -- in response to Mr. Miller's

21   questions, you had testified that Quest didn't ask you

22   how you thought it should make its kiosks accessible to

23   individuals.  Do you remember that?

24       A   Yes.

25       Q   And you said you would have liked to have been

Page 246

1   part of that discussion or some -- you said something

2   along those lines; right?

3        A   Yes, I would have liked somebody to follow up

4   with me and ask me for -- for more input.

5        Q   Okay.  Are you aware that Quest proposed

6   updates to the kiosks at the mediation before

7   implementing the three-finger swipe?

8             MR. MILLER:  I'll object to the extent you are

9   attempting to -- no, no.  I'm going to object to the

10  extent that you are trying to violate the mediation

11  privilege right now which, as you know, is not

12  permissible, and I'm going to instruct him not to answer

13  to the extent you are inviting him to participate in the

14  violation of the mediation privilege.

15            And I'm also going to instruct him not answer

16  on the basis if anything he learned about the mediation

17  came from attorney-client privilege, and I'm going to

18  instruct him on that basis as well.  It's an

19  inappropriate question and you know it.

20            MS. ROLLER:  I don't think it's an

21  inappropriate question.

22            MR. MILLER:  Well, we'll agree to disagree and

23  he'll follow my instruction.

24            (Instruction not to answer.)

25  // //

Page 247

1    BY MS. ROLLER:

2       Q   Okay.  Mr. Vargas, are you aware that Quest

3    proposed to -- that Quest attempted as part of this

4    litigation to get feedback on its proposed solution

5    before implementing a three-finger swipe?

6       A   I'm going to follow the instruction of my

7    attorney.

8            MR. MILLER:  Yeah, outside of anything that

9    your counsel told you, if you have any awareness of it,

10   you can testify; but if it only came from counsel, then

11   just tell her and you can tell her you can't answer it.

12           THE WITNESS:  No, I'm not aware of anything

13   outside of that.

14   BY MS. ROLLER:

15      Q   Okay.  Are you aware of any of the -- any of

16   the proposed solutions that were offered by Quest to

17   make its -- to update its eCheck-in kiosks before it

18   implemented those, the three-finger swipe?

19           MR. MILLER:  Objection to the extent it's

20   attorney-client privilege.  I'm going to instruct you

21   not to answer.  If you know about it from any other

22   source, you can tell Miss Roller.

23           THE WITNESS:  I'm going to follow the

24   instruction of my attorney and I'm not going to answer.

25   // //

Page 248

1   BY MS. ROLLER:

2      Q   I think he said if you learned from any other

3   sources that --

4          MR. MILLER:  If you heard it from any other

5   source, you can tell her.

6          THE WITNESS:  I have not heard it from any

7   other source.

8   BY MS. ROLLER:

9      Q   If you were -- if you were told that the

10  three-finger swipe was something that Quest was

11  considering to implement at its eCheck-in kiosks, would

12  you have provided feedback on your thoughts regarding

13  the three-finger swipe?

14         MR. MILLER:  Incomplete hypothetical, it lacks

15  foundation.

16         Go ahead.

17         THE WITNESS:  If I had been told that this was

18  what you described was going to be the solution that you

19  were going to put forth, I would have gladly welcomed

20  the opportunity to give feedback and more or less would

21  have stated what I've said to you earlier, that that is

22  not a complete solution because that, at best, only

23  gives access to one of the features and services that's

24  offered to sighted people via the kiosk.

25  // //

Page 249

1    BY MS. ROLLER:

2        Q    Okay.  And just so I can be clear on one of my

3    questions, so when you say that Quest did not propose

4    solutions to you as far as updates to its -- its

5    eCheck-in kiosks, so you are not taking in account

6    anything you've learned from counsel in the litigation;

7    right?

8        A    I'm sorry, clarify that, please.

9        Q    Sure.  So you said that Quest never came back

10   to you and never asked you about your opinion on what it

11   can do to make its eCheck-in kiosks successful; right?

12       A    Right.

13       Q    And so when you are making that statement, you

14   are not considering any solutions that may have been

15   proposed by Quest and relayed to you through your

16   counsel; right?

17       A    Correct.

18       Q    Okay.  And so there may be -- feasibly there

19   may be solutions that were relayed to you through your

20   counsel but -- but that's not -- but we're not talking

21   about that; right?

22            MR. MILLER:  Objection.  To the extent it calls

23   for attorney-client privilege instruct you not to answer

24   on privilege.  You can answer outside of that.

25            MS. ROLLER:  Okay.  Give me one second.

Page 250

1          Okay.  So, Counsel, I have just looked at

2   Federal Rule of Evidence 403, and I disagree with your

3   assertion that -- requesting that my question was in

4   violation of the -- what you're calling the mediation

5   privilege or, I think, it's 408.

6          So I want to state my objection and reask the

7   question because I'm not using the -- my question is not

8   intended to prove or disprove the validity or amount of

9   a disputed claim.

10         So I'm going to go ahead and reask my question

11  and then you can make whatever instruction you want to

12  your client and then we can at least have that if we

13  decide to move to compel that.  Okay?

14         MR. MILLER:  Yeah, my objection was twofold.

15  It was both under the mediation privilege, but it was

16  also under the attorney-client privilege because my

17  client has testified that he did not personally attend

18  the mediation so his only basis for any knowledge about

19  a settlement discussion in mediation would be vis-a-vis

20  his attorneys and so I'm going to instruct him not to

21  answer on any question of what he would have learned

22  from the mediation attended by his attorneys on his

23  behalf.  But you can go ahead and ask it and I'll

24  instruct him again.

25         MS. ROLLER:  Okay, then, I'm going to ask in a

Page 251

1   different way.

2        Q    Are you aware, Mr. Vargas, that Quest proposed

3   updates to the kiosks as part of any settlement offer?

4             MR. MILLER:  I'm going to object to the extent

5   it calls for attorney-client privilege and instruct him

6   not to answer.

7             (Instruction not to answer.)

8             MS. ROLLER:  Okay.

9             THE WITNESS:  And I'm going to follow my

10  attorney's advice.

11            MS. ROLLER:  Okay.  I have no further

12  questions.

13            MR. MILLER:  Thank you.  We'll take another

14  very short break and be right back with you.

15            THE VIDEOGRAPHER:  Going off the record at

16  p.m.

17            (Recess.)

18            THE VIDEOGRAPHER:  We're going back on the

19  record at 5:48 p.m.

20                    FURTHER EXAMINATION

21

22  BY MR. MILLER:

23        Q    Mr. Vargas, welcome back.  I just want to

24  follow up on one last line of questioning Miss Roller

25  asked you to make sure that the record is clear.

Page 252

1           Do you intend to go back to the Quest location
2    you've visited in 2019?
3       A    Yes, I do.
4       Q    And when do you intend to go back to that
5    location?
6       A    Whenever my doctor requests blood work that
7    maybe doesn't involve me having to get up early and go
8    fasting, so --
9       Q    So let me pause for a second.  So if the May
10   appointment is not in the morning and does not require
11   fasting, do you intend to go back there in May?
12      A    Yes.
13      Q    For what purpose?
14      A    Other than -- than necessary blood work that we
15   need, I'm very curious now to test out this function,
16   this three-finger swipe function that was described.  I
17   want to see how it works, you know, how long it takes to
18   get a response, absolutely, I intend to go back.
19      Q    And to the extent that you do have to go early
20   in the morning to your doctor and fast in May, when is
21   the next time that you intend to return to the Quest
22   patient service center that you visited in 2019?
23      A    The next time my doctor requests blood work or
24   requests blood work where I don't have to necessarily
25   deal with a fasting early morning, where I can come in

Page 253

1    in the afternoon, perhaps, because I'll be at home and

2    it will just be more convenient for me to get there.

3        Q    So to the extent that's in conjunction with

4    your next annual physical, do you intend to return to

5    this Quest patient service then?

6        A    Absolutely.

7        Q    And, again, for the same reasons, to both test

8    it and to -- because it's convenient to your house?

9        A    Yeah; and, in fact, even once the COVID-19

10   situation maybe becomes less and less of a factor, I'm

11   curious -- I don't know if I'd be allowed to, but I'd

12   almost be curious just to go in there and try it out

13   even if I don't have a reason to be there.

14       Q    To see if it's accessible?

15       A    Yes.

16       Q    To test its accessibility?

17       A    Yes.

18            MR. MILLER:  No further questions.

19            MS. ROLLER:  I have no questions.

20            MR. MILLER:  We can now go off the record.

21   Thank you.

22            THE VIDEOGRAPHER:  Okay.  We're going off

23   record at 5:50 p.m.  This concludes today's testimony

24   given by Julian Vargas.  All media recordings will be

25   retained by Veritext Legal Services.

Page 254

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4     before me at the time and place herein set forth; that

5     any witnesses in the foregoing proceedings, prior to

6     testifying, were duly sworn; that a record of the

7     proceedings was made by me using machine shorthand

8     which was thereafter transcribed under my direction;

9     that the foregoing transcript is a true record of the

10    testimony given.

11         Further, that if the foregoing pertains to

12    the original transcript of a deposition in a Federal

13    Case, before completion of the proceedings, review of

14    the transcript [  ] was [ X ] was not requested.

15         I further certify I am neither financially

16    interested in the action nor a relative or employee

17    of any attorney or party to this action.

18         IN WITNESS WHEREOF, I have this date

19    subscribed my name.

20

21    Dated:  May 7, 2021

22

23    _____

          ANELA SHERADIN

24        CSR NO. 9128

25

# EXHIBIT 11

Page 1

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4       JULIAN VARGAS, ANNE     )
        WEST and AMERICAN       )
5       COUNCIL OF THE BLIND,   )
        individually on behalf  )  Case No. 2:19-cv-08108 DMG (MRWx)
6       of themselves and all   )
        others similarly        )
7       situated,               )
                                )
8                Plaintiffs,    )
                                )
9       vs.                     )
                                )
10      QUEST DIAGNOSTICS       )
        CLINICAL LABORATORIES,  )
11      INC., QUEST             )
        DIAGNOSTICS HOLDINGS,   )
12      INC., QUEST DIAGNOSTICS )
        INCORPORATED; and DOES  )
13      1-10, inclusive,        )
                                )
14               Defendants.    )
        _____)

15

16

17           REMOTE VIDEOTAPED DEPOSITION OF RALPH DANIEL BLACK

18                        April 27, 2021

19

20

21

22

23

24

        Job No. CS4522969
25      Reported by: Maryann Matthews, CSR #737

```
                                                                Page 2
 1              REMOTE VIDEOTAPED DEPOSITION OF RALPH DANIEL BLACK

 2

 3          BE IT REMEMBERED that the remote videotaped deposition

 4     of RALPH DANIEL BLACK was taken via videoconference by the

 5     Defendants before Veritext Legal Solutions, Maryann Matthews,

 6     Court Reporter  and Notary Public in and for the County of Ada,

 7     State of Idaho, on Tuesday, the 27th day of April, 2021,

 8     commencing at the hour of 2:07 p.m. Pacific Daylight Time in

 9     the above-entitled matter.

10

11     APPEARANCES (Remotely):

12

       For the Plaintiffs and the Witness:

13

                          HANDLEY FARAH & ANDERSON PLLC

14                        By:  Matthew K. Handley, Esq.

                          777 6th Street NW, 11th Floor

15                        Washington, D.C.  20001

                          Telephone:  (202) 559-2411

16                        Facsimile:  (844) 300-1952

                          mhandley@hfajustice.com

17

18     For the Defendants: OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

                          By:  Amber L. Roller, Esq.

19                        400 South Hope Street, Suite 1200

                          Los Angeles, California  90071

20                        Telephone:  (213) 239-9800

                          Facsimile:  (213) 239-9045

21                        amber.roller@ogletree.com

22

       Videographer:      Gregg Eisman

23

24

25
```

Page 3

1                        I N D E X

2               E X A M I N A T I O N

3

RALPH DANIEL BLACK                              PAGE

4

5    By:  Ms. Roller..................................6

6

7                    E X H I B I T S

8               (No exhibits marked.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Q.   And how many -- so I want to get a little

2     more information about your actual experience on the

3     day.

4               So when you first walked into the patient

5     service center, what did you do?

6          A.   We started to go up to the window to talk to

7     the receptionist, and there were -- there was a line of

8     people there.

9               And the person behind the desk and some of

10    the customers started saying, "No, no, you have to go

11    over to the kiosk."  But first, before we did that,

12    we -- you know, we attempted to go to a window.

13         Q.   Okay.  Did you -- was there some -- like, a

14    greeter, like, a Quest employee that was kind of helping

15    the flow of traffic when you first arrived?

16         A.   I don't recall that.  There might have been,

17    but I don't remember.

18         Q.   Okay.  And then -- so when you were waiting

19    in line at the window, how long was it before you spoke

20    with the person at the window who told you to go to the

21    kiosk?

22         A.   Well, it wasn't exactly like that.  We --

23    when we went to the line to go to the window, I believe

24    that the person that was at the desk sort of, you know,

25    yelled to us, "No, no, you have to go to the kiosk."

1         And some of the other customers also said,

2    "No, no, go over there." So it wasn't -- you know, we

3    didn't get all the way up to the desk and then get told

4    we had to go to the kiosk.

5       Q.   Okay.  And then what did you do after you

6    were told to go to the kiosk?

7       A.  Well, we went over there, but it quickly

8    became apparent that we weren't going to be able to

9    utilize the kiosk.  So then we went back and tried to --

10   and did go up to the window.

11      Q.   Okay.  Why did it become apparent that you

12   wouldn't be able to utilize the kiosk?

13      A.  Well, you know, I looked at it and, you know,

14   it was just a touch-screen type device that didn't have

15   any accessibility features that I could use.  And as I

16   said, my wife uses a wheelchair.  She has limited manual

17   dexterity and reach range, and the kiosk was up pretty

18   high.

19         She couldn't reach it and, you know, so she

20   couldn't use it and I couldn't use it; and it was, you

21   know -- it might conceivably have been possible for the

22   two of us to have figured out how to do it together.

23        But, you know, everybody was in the line, you

24   know, sort of anxious to get through the process and,

25   you know, we were -- didn't feel like trying to struggle

1    in the middle of all of that with doing it with the two

2    of us, so we left and went back to talk to the

3    receptionist.

4         Q.   How long did you wait in line at the kiosk

5    before you actually got up to the front of the kiosk?

6         A.   I don't remember.  It wasn't too long.  Maybe

7    five minutes or something.

8         Q.   Were there a certain number of people that

9    you can recall that were in front of you checking in?

10        A.   No, I don't.

11        Q.   Okay.  Once you realized you couldn't use the

12   kiosk to check in, you went over to the receptionist

13   desk, right?

14        A.   Yes.

15        Q.   And was somebody there?

16        A.   Yes.

17        Q.   And what did you say to them at that point?

18        A.   Well, I explained to her that we couldn't use

19   the kiosk, and she said, "Well, you know, that's the way

20   we do things.  You have to use the kiosk."

21             And so I had to -- you know, went back

22   through it with her again and explained, you know, my

23   wife's limitations and my visual impairment, and between

24   the two of us we couldn't do it.

25             And so then she said, "Oh, well, let me see

Page 29

1  what we can do about that," or something, and then she

2  went off; and I think she consulted with somebody else,

3  I believe.

4          I don't know if she did it by phone or in

5  person or what, but then she came back and said, "Okay,"

6  you know, "we'll deal with you here at the desk."

7      Q.   Was it your understanding that she wasn't

8  aware that you were physically unable to check in until

9  you actually explained the situation to her?

10     A.   Well, I imagine -- I don't know.

11     Q.   Okay.  And then as soon as you explained to

12  her that you actually couldn't physically check in, then

13  she -- did she check you in?

14     A.   Well, you know, what I tried to explain to

15  her was that we already had our paper lab orders with us

16  which, you know, I ultimately gave to her; and we really

17  didn't need to check in on the kiosk.  But at first, you

18  know, they didn't want to take the paperwork, but she

19  ultimately did.

20     Q.   Okay.  And then did she ask you for any other

21  information besides what was contained in the paperwork

22  to check you in?

23     A.   I don't remember for sure.

24     Q.   Do you recall feeling like you didn't -- you

25  felt uncomfortable providing whatever information she

Page 35

1    the receptionist said to you in response?

2         A.   I don't recall.  I don't think we got much of

3    a response to that.

4         Q.   Okay.  At any point after your visit did you

5    speak with anybody at Quest about your experience on

6    that day?

7         A.   No.

8         Q.   Or communicate with Quest in any way?

9         A.   I don't recall.  You know, sometimes they

10   send one of those follow-up satisfaction things and I

11   might have gotten one of those and responded, but it --

12   but I don't have any recollection about that.

13        Q.   Do you have any recollection of what you

14   might have said in response to that survey?

15        A.   No, I really don't know.

16        Q.   Did you talk to your wife about your visit on

17   that day and your -- I don't remember the word you said,

18   but the fact that you couldn't use the kiosk?

19        A.   Yeah.  We were both pretty frustrated about

20   the whole situation.  And we talked to each other and to

21   friends about, you know, what a screwed-up situation it

22   was and how, you know, frustrating and humiliating it

23   was to have to go through that.

24        Q.   All right.  Who did you speak with aside from

25   your wife?  You said you spoke with some friends?

Page 36

```
 1        A.   I don't recall exactly.  I mean, I know that

 2   for a couple weeks after that we were kind of agitated

 3   about it and did discuss it.  I think we might have

 4   talked to my brother about it.  I don't remember who all

 5   else.

 6        Q.   Would you go back to Quest?

 7        A.   If I could help it.

 8        Q.   So that's a "No," if you can help it?

 9        A.   Correct.

10        Q.   Okay.  Do you have any plans right now to go

11   back to Quest in the near future?

12        A.   No.

13        Q.   So are you aware that, since your visit,

14   Quest had implemented specific procedures to assist

15   patients who are visually impaired with checking in on

16   that iPad?

17             MR. HANDLEY:  Object as assuming facts not in

18   evidence.

19        Q.   (BY MS. ROLLER) You can answer.

20        A.   No, I'm not aware of it.

21        Q.   Okay.  So if I told you that at this point

22   Quest has enabled the iPad so that if you do a

23   three-finger swipe up the iPad, it immediately checks

24   you in, do you believe that's adequate to permit you to

25   check in at a Quest Diagnostics patient center?
```

```
1         A    No.  I've had to devote several hours to
2    dealing with this deposition.
3         Q    Aside from that?
4         A    No.
5         Q    Are you currently employed?              09:58:56
6         A    No.  I'm retired.
7         Q    When did you retire?
8         A    I retired from full-time work with the
9    State of California in January of 2011.  I did some
10   part-time work for the state for several years after  09:59:20
11   that until, I believe, around July of 2017.  I did
12   some other consulting work on and off between 2011
13   and 2019, but I have not done any paid work since
14   the end of 2019.
15        Q    Do you believe that you have suffered any  09:59:54
16   emotional distress as a result of your visit to
17   Quest in May of 2020?
18        A    Well, yes.  It was emotionally distressing,
19   frustrating.  Whatever word you want to use.
20        Q    Did you seek any health -- treatment from a  10:00:37
21   health care or mental health provider as a result of
22   that?
23        A    No.
24        Q    Do you plan on seeking any treatment with a
25   health care provider as a result of the frustration  10:00:56
```

Page 72

PA0513

```
 1    you say you suffered as a result of the May 2020

 2    visit?

 3         A    No.

 4         Q    That frustration that you suffered, is

 5    that -- how long did that last?                    10:01:22

 6         A    I don't know.  You know, probably that was

 7    something that was on my mind, knowing me, for a

 8    period of, I don't know, three or four weeks after

 9    the incident -- excuse me -- occurred, of course,

10    and that frustration or irritation has recurred as a   10:01:51

11    result of having to go through this whole process.

12         Q    Is there anything that you didn't do during

13    that time period that you would have otherwise done

14    because of your frustration or irritation, like life

15    activities?                                         10:02:20

16         A    I'm not sure I understand the question.

17    But if you're saying did I -- did it interfere with

18    me doing some activity that I otherwise wanted to

19    do, I think the answer would be no.

20         Q    Okay.  That's exactly what I was asking.   10:02:30

21    So thank you for putting it so eloquently.

22              Okay.  Mr. Black, well, I think I'm done

23    with you.  I just needed to follow up with a few

24    things because I didn't have the opportunity last

25    time due to some time constraints, but that is it   10:02:54
```

Page 73

PA0514

# EXHIBIT 12

Page 1

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4        JULIAN VARGAS, ANNE    )
         WEST and AMERICAN      )
5        COUNCIL OF THE BLIND,  )
         individually on behalf )  Case No. 2:19-cv-08108 DMG (MRWx)
6        of themselves and all  )
         others similarly       )
7        situated,              )
                                )
8                  Plaintiffs,  )
                                )
9        vs.                    )
                                )
10       QUEST DIAGNOSTICS      )
         CLINICAL LABORATORIES, )
11       INC., QUEST            )
         DIAGNOSTICS HOLDINGS,  )
12       INC., QUEST DIAGNOSTICS)
         INCORPORATED; and DOES )
13       1-10, inclusive,       )
                                )
14                 Defendants.  )
         _____ )

15

16

17          REMOTE VIDEOTAPED DEPOSITION OF ARDIS BAZYN

18                       April 27, 2021

19

20

21

22

23

24

         Job No. CS4522969

25       Reported by: Maryann Matthews, CSR #737

Page 2

1           REMOTE VIDEOTAPED DEPOSITION OF ARDIS BAZYN

2

3           BE IT REMEMBERED that the remote videotaped

4     deposition of ARDIS BAZYN was taken via videoconference

5     by the  Defendants before Veritext Legal Solutions,

6     Maryann Matthews, Court Reporter and Notary Public in

7     and for the County of Ada, State of Idaho, on Tuesday,

8     the 27th day of April, 2021, commencing at the hour of

9     9:07 a.m. Pacific Daylight Time in the above-entitled

10    matter.

11

12    APPEARANCES (Remotely):

13

      For the Plaintiffs and the Witness:

14

                          NYE, STIRLING, HALE & MILLER, LLP
15                        By:  Benjamin J. Sweet, Esq.
                          1145 Bower Hill Road, Suite 104
16                        Pittsburgh, Pennsylvania  15243
                          Telephone:  (412) 857-5350
17                        ben@nshmlaw.com

18

                          HANDLEY FARAH & ANDERSON, PLLC
19                        By:  Matthew K. Handley, Esq.
                          777 6th Street NW, 11th Floor
20                        Washington, D.C.  20001
                          Telephone:  (202) 559-2411
21                        Facsimile:  (844) 300-1952
                          mhandley@hfajustice.com

22

23

24

25

Page 3

1    APPEARANCES (Contd.)

2

     For the Defendants: OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

3                         By:  Amber L. Roller, Esq.

                          400 South Hope Street, Suite 1200

4                         Los Angeles, California  90071

                          Telephone:  (213) 239-9800

5                         Facsimile:  (213) 239-9045

                          amber.roller@ogletree.com

6

7    Videographer:        Gregg Eisman

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                         I N D E X

2                   E X A M I N A T I O N

3

ARDIS BAZYN                                          PAGE

4

5    By:  Ms. Roller....................................6

6

7                       E X H I B I T S

8                   (No exhibits marked.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 29

1              (Unintelligible crosstalk.)

2        Q.   (BY MS. ROLLER) So when you first walked in

3   the door to the Quest patient service center on Alameda,

4   were you encountered by a greeter or somebody that said,

5   "Welcome to Quest.  What can we help you with?"

6        A.   No.

7        Q.   Okay.  What did you do once you first walked

8   in?

9        A.   We went to the counter and my husband signed

10   us in.

11        Q.   Okay.  And how did he sign you in?

12        A.   I'm not sure because he did it.

13        Q.   Was your husband there to get blood work done

14   that day, too?

15        A.   Yes.

16        Q.   And when he went to the counter, did you just

17   sit down in one of the chairs in the waiting room?

18        A.   I waited for him to sign us in, and then he,

19   you know, told us where there were places we could sit.

20        Q.   Okay.  How long did it take for him to sign

21   you guys in?

22        A.   No more than a couple minutes.

23        Q.   And did he go up to the, like, reception desk

24   and speak to somebody, based on your understanding?

25        A.   No.

Page 33

1          Q.   Are you aware if those people were there

2    before you or if they came in after you?

3          A.   I believe they were there before us, but I

4    couldn't tell for sure because there were people coming

5    in, you know, so --

6          Q.   Understood.  Aside from the person who drew

7    your blood, did you have any interaction with anybody

8    else from Quest during that visit?

9          A.   No.

10         Q.   And following your visit to Quest, do you

11   know if your doctor received your sample, your results?

12         A.   Yes.

13         Q.   Okay.  How do you know that?

14         A.   Because I got a lab report from them when --

15   when they sent it.

16         Q.   While you were there at Quest, the Quest

17   patient service center on November 19, 2020, did you

18   overhear any other patients there who needed assistance

19   either checking in or doing anything at the patient

20   service center?

21         A.   No.

22         Q.   While you were in the waiting room for that

23   ten to 15 minutes, did you hear a TV going off in the

24   waiting room?

25         A.   I don't think so.  I don't remember one.

Page 41

1    there, would you feel satisfied with that method?

2         A.   Like I said before, I would -- I would have

3    to know that it's -- that it knew it was me that's

4    checking in so I'd feel comfortable that I'd be the next

5    person in line called in.

6         Q.   Okay.  And how would you want that to be

7    accomplished?

8              MR. SWEET:  Objection.  Vague.

9              THE WITNESS:  I would need a verbal

10   confirmation that I was the next one in line or that I

11   was all set to go.

12        Q.   (BY MS. ROLLER) Okay.  If the confirmation

13   was that you were patient number one and then you went

14   and sat down and somebody came out and said, "Patient

15   number one," would you feel satisfied with that check-in

16   process?

17        A.   If I was the right person called, yes.

18        Q.   Okay.  Understood.  So as far as you know --

19   or I'm sorry.  Let me rephrase that.

20             You personally have never checked in using

21   the E-check-in kiosk at Quest, correct?

22        A.   Correct.

23        Q.   And the other times that you went to Quest

24   without your husband, like, for example, in 2019, how

25   did you check in on that visit?

Page 42

1        A.    Waited until -- at the counter until someone
2    came out.
3        Q.    And in 2019 during that visit, how long did
4    it take for somebody to come out to the counter to check
5    you in?
6        A.    Oh, I think, you know, five or ten minutes.
7        Q.    Okay.  And then did you go to Quest in 2018?
8        A.    Yes.
9        Q.    And do you recall if you went alone or with
10   your husband on that visit?
11       A.    No, I was alone.  I -- they had an attendant
12   then, so --
13       Q.    Okay.  And how long did it take for you to
14   check in in 2018, at your 2018 visit?
15       A.    I just went right up to the counter and they
16   took my name.
17       Q.    Do you recall what location this was that you
18   went to in 2018?
19       A.    Oh, I think it was the 201 South Buena Vista,
20   but I'm not positive.  But I --
21       Q.    Do you know --
22       A.    That one is easier for me to get to, so I
23   generally try to do that one when I'm by myself.
24       Q.    And when you checked in at the 2018 visit,
25   what information did they ask of you in order to check

```
 1        Q    Okay.  Have you ever talked to any other      09:33
 2   individuals that have visual impairments about their     09:33
 3   experiences at Quest Diagnostics?                        09:33
 4        A    Just my husband.                               09:33
 5        Q    And aside -- what did you talk to your         09:33
 6   husband about?                                           09:33
 7        A    Well, I just asked him what he used to sign    09:33
 8   in if he -- you know, if he signed a paper or, you       09:33
 9   know, what he had used.                                  09:33
10        Q    Okay.  And at last deposition, you testified   09:33
11   that you actually weren't sure how he signed you in on   09:33
12   your visits.  And did you -- did you ask him after       09:33
13   your deposition how you guys got signed in?             09:33
14        A    Yeah.  He told me it was some kind of a        09:34
15   touchscreen thing that he had trouble with because      09:34
16   his -- he's got low vision, so he had to use a           09:34
17   magnifier, and he had trouble with it.                   09:34
18        Q    Okay.  And did he tell you how many times     09:34
19   he's used that kiosk to check you in?                    09:34
20        A    No, he didn't.                                 09:34
21        Q    And did he ultimately check you guys in on    09:34
22   the kiosk, or did he have to wait for assistance from    09:34
23   Quest staff member?                                      09:34
24        A    I think he was -- I'm pretty sure that's what  09:34
25   he did when the two of us went, that he used the         09:34
```

Page 11

PA0522

```
 1        Q    Do you believe you have lost any income        09:47

 2   associated with your visits to Quest Diagnostics?        09:47

 3        A    No.                                             09:47

 4        Q    Do you believe you have experienced any        09:47

 5   emotional distress associated with your visits to        09:47

 6   Quest Diagnostics?                                       09:47

 7        A    Not particularly.                              09:47

 8        Q    Okay.  What do you mean by that, no            09:47

 9   particularly?                                            09:47

10        A    Well, just annoyance, you know, but nothing,   09:47

11   you know.  Nothing major.                                09:47

12        Q    Okay.  Why were you annoyed with respect to    09:47

13   your visits?                                             09:47

14        A    Well, when I'm not sure what I'm doing, you    09:47

15   know, sometimes I get annoyed.                           09:47

16        Q    Is this all visits, or is this only some       09:47

17   visits?                                                  09:48

18        A    No.  Just, you know, occasional visits.        09:48

19        Q    Okay.  Of your visits in the last, let's say,  09:48

20   five years, how many of those do you think you were --   09:48

21   you experienced annoyance at?                            09:48

22        A    Just a couple.                                 09:48

23        Q    So two to three?                               09:48

24        A    Yeah, I'd say that.                            09:48

25        Q    And specifically what do you mean by you're    09:48
```

Page 20

PA0523

```
 1    not sure what you're doing?                          09:48

 2        A   Well, like you come in and there's no one    09:48

 3    there to talk to and to deal with, and you're not sure  09:48

 4    what, you know, to do at that particular point.      09:48

 5        Q   Is that different than what you would        09:48

 6    experience at any place that you go to?              09:48

 7        A   Yes.  It's usually helpful if they have a    09:48

 8    customer service desk or someone I can go to ask, you  09:48

 9    know, where to check in or what -- you know, in that  09:48

10    way.                                                 09:49

11        Q   How often do you encounter the situation     09:49

12    where you go to a place and you're kind of not sure  09:49

13    what to do because there's nobody there waiting to   09:49

14    assist you?                                          09:49

15        A   I'm not really sure.  Most the time there's  09:49

16    someone there at most places I go.                   09:49

17        Q   Has there been any time at -- that you've    09:50

18    gone to Quest where you did not receive your blood   09:50

19    draw?                                                09:50

20        A   No.                                          09:50

21        Q   Have you ever been to Quest or has there ever  09:50

22    been an instance at Quest where you did not receive  09:50

23    your draw results?                                   09:50

24        A   I generally don't get the results from them.  09:50

25    I usually get the results from my doctor.            09:50
```

Page 21

PA0524

# EXHIBIT 13

Page 1

 1                    UNITED STATES DISTRICT COURT

 2                    CENTRAL DISTRICT OF CALIFORNIA

 3

 4      JULIAN VARGAS, ANNE    )
        WEST and AMERICAN      )
 5      COUNCIL OF THE BLIND,  )
        individually on behalf )  Case No. 2:19-cv-08108 DMG (MRWx)
 6      of themselves and all  )
        others similarly       )
 7      situated,              )
                               )
 8              Plaintiffs,    )
                               )
 9      vs.                    )
                               )
10      QUEST DIAGNOSTICS      )
        CLINICAL LABORATORIES, )
11      INC., QUEST            )
        DIAGNOSTICS HOLDINGS,  )
12      INC., QUEST DIAGNOSTICS)
        INCORPORATED; and DOES )
13      1-10, inclusive,       )
                               )
14              Defendants.    )
        _____)

15

16

17          REMOTE VIDEOTAPED DEPOSITION OF MARY HAROYAN

18                      April 29, 2021

19

20

21

22

23

24

        Job No. CS4522974

25      Reported by: Maryann Matthews, CSR #737

Page 2

1       REMOTE VIDEOTAPED DEPOSITION OF MARY HAROYAN

2

3       BE IT REMEMBERED that the remote videotaped

4  deposition of MARY HAROYAN was taken via videoconference

5  by the Defendants before Veritext Legal Solutions,

6  Maryann  Matthews, Court Reporter and Notary Public in

7  Maryann  the County of Ada, State of Idaho, on Wednesday,

8  the 29th day of April, 2021, commencing at the hour of

9  9:02 a.m. Pacific Daylight Time in the above-entitled

10  matter.

11

12  APPEARANCES (Remotely):

13

    For the Plaintiffs and the Witness:

14

                NYE, STIRLING, HALE & MILLER, LLP

15             By:  Benjamin J. Sweet, Esq.

                1145 Bower Hill Road, Suite 104

16             Pittsburgh, Pennsylvania  15243

                Telephone:  (412) 857-5350

17             ben@nshmlaw.com

18

                HANDLEY FARAH & ANDERSON, PLLC

19             By:  Matthew K. Handley, Esq.

                777 6th Street NW, 11th Floor

20             Washington, D.C.  20001

                Telephone:  (202) 559-2411

21             Facsimile:  (844) 300-1952

                mhandley@hfajustice.com

22

23

24

25

PA0526

Page 3

1    APPEARANCES (Contd.)

2

For the Defendants: OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

3                      By:  Amber L. Roller, Esq.

                      400 South Hope Street, Suite 1200

4                      Los Angeles, California  90071

                      Telephone:  (213) 239-9800

5                      Facsimile:  (213) 239-9045

                      amber.roller@ogletree.com

6

7    Videographer:      Robert Fenton

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                          I N D E X

2                   E X A M I N A T I O N

3

MARY HAROYAN                                    PAGE

4

5     By:  Ms. Roller...................................7

6

7                      E X H I B I T S

8                   (No exhibits marked.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 32

1          Q.   Okay.  So let's talk about your -- the

2    first time you encountered the E-check-in kiosk, which

3    you said would have been at that May 24th, 2017 visit.

4               So on that day do you recall if you were a

5    walk-in appointment or if you had made an appointment

6    in advance for that visit?

7          A.   It was a walk-in appointment.

8          Q.   Okay.  Do you recall about what time of day

9    you went?

10         A.   No.  I mean, could have been late morning

11   or very early afternoon, but I really don't know.

12         Q.   Okay.  And were you there -- you were

13   obviously there to get some sort of sample taken?

14         A.   Yes.

15         Q.   Do you know if you were alone that visit?

16         A.   No.  Actually, my father was with me.

17         Q.   Okay.  And when you first walked -- well,

18   first of all, how long was your total visit at Quest

19   that day from the time you walked into the patient

20   service center on Boylston to the time you left the

21   building?

22         A.   I really don't remember.  I don't think it

23   was that long, I mean, but I really honestly can't

24   remember.

25         Q.   Okay.  And then once you first walked in

Page 33

1    the door, what happened?

2           A.   My dad and I went over to the tablet.  I

3    assume that's what we must have done -- or we went to

4    the window and were told to go to the tablet.  I

5    really don't remember, but I know that we had to use

6    the -- the tablet to check in.

7           Q.   Is your father sighted?

8           A.   Yes.

9           Q.   Okay.  And when you went to the tablet, did

10   your father check in for you on the tablet?

11          A.   He attempted to.  He's -- he's not -- he's

12   an older gentleman, obviously, and he is not at all

13   adept with technology.

14               So I'm recalling we probably had to ask for

15   some help from somebody there to help with that

16   because I -- you know, he wouldn't have -- it would

17   not have been intuitive to him how to, you know,

18   access the technology.

19          Q.   Okay.  Do you recall one way or the other

20   if you went to the front desk first or if you went

21   straight to the kiosk?

22          A.   I -- I don't remember.  I really don't

23   remember.

24          Q.   Okay.  And then once your father realized

25   he probably wasn't technologically savvy enough to use

Page 37

1      A.   Well, who would have eventually had it.

2      Q.   Okay.

3      A.   Yeah.  I don't know if it was a Quest Lab

4   employee, but I know in my experience there at Quest

5   Lab I have absolutely had a patient, another patient

6   there, another person waiting, help with the

7   check-in -- help me with the check-in process.

8      Q.   Okay.

9      A.   I'm -- I have absolutely had that

10   experience there.

11      Q.   When did you have that experience?

12      A.   Well, somewhere -- 2017, 2018, 2019, it

13   would have been, you know, when the tablet, you know,

14   became installed and I was there on my own.

15           I did not go with my father, and the

16   phlebotomist was probably in the inner room with a

17   patient, you know.  So it would have been a situation

18   like that.

19      Q.   So there were -- I think you said you

20   believe that since 2017 you had six visits.

21           Of those six visits, how many times do you

22   believe you were assisted with check-in by another

23   patient as opposed to a Quest employee?

24      A.   Probably at least twice.

25      Q.   Okay.  And you don't recall which specific

Page 38

1    visit that was?

2          A.    No.

3          Q.    So I'm going back to the May 21st, 2017

4    visit.  So after you were checked in, were you asked

5    to go ahead and sit down and then wait your turn?

6          A.    Yes.  Well, we knew, once we were checked

7    in, to sit in the waiting room and wait, yes.

8          Q.    Okay.  And then were you called back for

9    your blood draw?

10         A.    Yes.

11         Q.    And how long did you wait between the time

12   that you checked in and the time you were called back

13   for your blood draw?

14         A.    As I said earlier, I don't remember how

15   long I was there waiting because there were other

16   people there.  I don't think it was that long.

17   Perhaps -- you know, 15, 20 minutes perhaps.

18         Q.    Okay.  And then you were taken to the

19   back --

20         A.    Yes.

21         Q.    -- for your draw?

22         A.    Uh-huh.

23         Q.    Did the phlebotomist ask you for any

24   information once you got to the draw room?

25         A.    There's always confirmation, that they want

1    into that, you know, we've been going for an hour.  Do

2    you want a break or do you want to continue to go?

3                 THE WITNESS:  No, I'm fine.  I've --

4                 MS. ROLLER:  Okay.

5                 THE WITNESS:  -- got some water.

6                 MR. HANDLEY:  Are you sure you don't need

7    water or anything to --

8                 THE WITNESS:  Yeah, I've got water with me

9    already.  I'm just going to take the water now, so,

10   yeah, I'm fine.  I can continue.

11                MS. ROLLER:  Madam Court Reporter, are you

12   okay without a break or do you need a break?

13                THE REPORTER:  I'm fine, thanks.

14                MS. ROLLER:  Okay.  Perfect.

15        Q.   (BY MS. ROLLER) Okay.  So let's talk about

16   your January 2020 visit.  Do you remember when that

17   visit was?

18        A.   The day?  No, I don't remember the day in

19   January, but it would have been -- I had an

20   appointment with my primary care doctor, so it would

21   have been following up from that, I assume.

22        Q.   Okay.  Do you know if it was in about

23   September or -- no, it was January 2020, right?

24        A.   January, yeah.

25        Q.   Okay.  And do you know if you were a

Page 62

1    walk-in or an appointment on that visit?

2         A.   I'm pretty sure that would have been an

3    appointment.

4         Q.   Okay.  And would you have completed the

5    pre-registry information before you went so that you

6    had your -- you had the code ready?

7         A.   Yes.

8         Q.   Okay.  Do you recall if your dad went with

9    you on that visit?

10        A.   I would probably say yes.

11        Q.   Okay.  And do you recall if, on that visit,

12   your dad assisted you with the check-in or if you had

13   assistance with the phlebotomist on that visit?

14        A.   I would say that he would have been the

15   first -- first to attempt to finish the check-in with

16   the bar code; and if there was any problem, then he

17   would have asked someone there to help.

18        Q.   Okay.  And then do you know how long you

19   were there for that visit?

20        A.   I'm guessing not very long.

21        Q.   Okay.  Around the same amount of time as

22   the other visits, ten to 15 minutes?

23        A.   I would -- I would think so.  Especially,

24   you know, going at that time of the morning, you know,

25   not much more than 15 minutes, I wouldn't think.

Page 63

```
 1        Q.   Okay.   Do you recall seeing other patients
 2   being called back for their draw between the time you
 3   checked in and the time you were taken back?
 4        A.   You know, there could have been, you know,
 5   maybe one or two people, you know.   Depends on --
 6   yeah.
 7             I suppose that's -- yes, especially since
 8   I -- well, if I had an appointment, I would have
 9   gotten there close to the appointment time.   But it's
10   possible somebody could have been called before I went
11   in.
12        Q.   Okay.   But you don't have any specific --
13        A.   No.
14        Q.   -- recollection?
15        A.   No.
16        Q.   And so let me ask you kind of generally
17   about all of your visits.   So for the six visits that
18   we've already discussed from 2017 to 2020, you've
19   mentioned there was somebody at the front on at least
20   one of those visits, like a Quest receptionist at one
21   of those visits.
22             Do you recall a Quest receptionist being at
23   the front at any of the other visits of the other
24   five?
25        A.   Actually, it's not a receptionist.   I don't
```

# EXHIBIT 14

Page 1

1                     UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4      JULIAN VARGAS, ANNE     )
       WEST and AMERICAN       )
5      COUNCIL OF THE BLIND,   )
       individually on behalf )  Case No. 2:19-cv-08108 DMG (MRWx)
6      of themselves and all   )
       others similarly        )
7      situated,               )
                               )
8              Plaintiffs,     )
                               )
9      vs.                     )
                               )
10     QUEST DIAGNOSTICS        )
       CLINICAL LABORATORIES,  )
11     INC., QUEST             )
       DIAGNOSTICS HOLDINGS,   )
12     INC., QUEST DIAGNOSTICS)
       INCORPORATED; and DOES )
13     1-10, inclusive,        )
                               )
14             Defendants.     )
       _____)

15

16

17           REMOTE VIDEOTAPED DEPOSITION OF NONA HAROYAN

18                       April 29, 2021

19

20

21

22

23

24

       Job No. CS4522974
25     Reported by: Maryann Matthews, CSR #737

Veritext Legal Solutions
800-567-8658                                    973-410-4098

PA0533

Page 2

```
 1              REMOTE DEPOSITION OF NONA HAROYAN
 2
 3          BE IT REMEMBERED that the remote videotaped
 4    deposition of MARY HAROYAN was taken via videoconference
 5    by the Defendants before Veritext Legal Solutions,
 6    Maryann  Matthews, Court Reporter and Notary Public in
 7    Maryann  the County of Ada, State of Idaho, on Wednesday,
 8    the 29th day of April, 2021, commencing at the hour of
 9    1:01 p.m. Pacific Daylight Time in the above-entitled
10    matter.
11
12    APPEARANCES (Remotely):
13
      For the Plaintiffs and the Witness:
14
                          NYE, STIRLING, HALE & MILLER, LLP
15                        By:  Jordan T. Porter, Esq.
                               Margaret A. Parker, Esq.
16                        33 West Mission Street, Suite 201
                          Santa Barbara, California  93101
17                        Telephone:  (805) 963-2345
                          Facsimile:  (805) 284-9590
18                        jordan@nshmlaw.com
                          meg@nshmlaw.com
19
20                        HANDLEY FARAH & ANDERSON, PLLC
                          By:  Matthew K. Handley, Esq.
21                        777 6th Street NW, 11th Floor
                          Washington, D.C.  20001
22                        Telephone:  (202) 559-2411
                          Facsimile:  (844) 300-1952
23                        mhandley@hfajustice.com
24
25
```

Page 3

1    APPEARANCES (Contd.)

2

     For the Defendants: OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

3                         By:  Amber L. Roller, Esq.

                          400 South Hope Street, Suite 1200

4                         Los Angeles, California  90071

                          Telephone:  (213) 239-9800

5                         Facsimile:  (213) 239-9045

                          amber.roller@ogletree.com

6

7    Videographer:        Robert Fenton

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                        I N D E X

2               E X A M I N A T I O N

3

NONA HAROYAN                                    PAGE

4

5    By:  Ms. Roller....................................7

6

7                    E X H I B I T S

8               (No exhibits marked.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 36

1      went in independently.

2           Q.   Okay.  And you're thinking that he probably

3      wasn't there the September 20th, 2017 visit?

4           A.   Correct.

5           Q.   Okay.  And so for those two visits you

6      probably -- did you drive yourself to that -- I'm sorry.

7                Did you use paratransit to the September 20th

8      visit?

9           A.   Yes.

10          Q.   Okay.  So when is the first time you recall

11     encountering the Quest E-check-in device?

12          A.   I honestly don't know.  I'm -- I don't know

13     if it was 2018 or it was 2017.  I honestly don't

14     remember.

15          Q.   Okay.  Do you remember the visit that you

16     first encountered the E-check-in kiosk?

17          A.   I do.  I don't know the date, but I -- I

18     remember.

19          Q.   Right.  Was it a visit that your father was

20     with you at or were you alone?

21          A.   I -- no.

22          Q.   Was that -- is that no, your father wasn't

23     there or, no, you were not -- you were alone?

24          A.   I don't believe he was with me, no.

25          Q.   Okay.  And so you think that was probably the

Page 37

1    September 20th, 2017 visit?

2         A.   Could have been.

3         Q.   Okay.  So when you had that visit, do you

4    recall -- let's start with September 20th, 2017.  It

5    seems like that might be the first time you encountered

6    the kiosk.

7              Is that about right?

8         A.   Could be, yes.

9         Q.   Okay.  Do you recall if you were a walk-in

10   for that or if you had made an appointment?

11        A.   I believe I may have had an appointment in --

12   with my doctor in -- in -- in the building and gone for

13   lab work.  So it was a walk-in.

14        Q.   Okay.  And do you know what time you showed

15   up to that visit on September 20th, 2017?

16        A.   Not at all.

17        Q.   Okay.  So I have records that show you as a

18   walk-in on that visit, and you came in at 7:38 in the

19   morning.

20              So would that lead you to believe that

21   perhaps you didn't see your doctor before then?

22        A.   Obviously -- yeah, obviously not.  That must

23   have been an appointment for an early morning blood --

24   blood work that had to be done before 7:30.  Okay.

25        Q.   Okay.

1          A.    Yeah.

2          Q.    So do you think that that -- let me ask you,

3    the first time you encountered the Quest E-check-in

4    kiosk, was it an early morning appointment like that, do

5    you believe?

6          A.    I honestly don't know.  I really don't.

7          Q.    Okay.  So tell me what you do remember from

8    the first time you encountered the E-check-in.  And you

9    know what I'm talking about, right --

10         A.    Yeah.

11         Q.    -- when I say "E-check-in"?

12         A.    Sure.

13         Q.    Yeah.

14         A.    Well, I remember coming into the lab and

15   seeing this, well, tablet there and that prior to that,

16   you know, it was a different system -- there was no

17   system, but -- and thinking, uh-oh, I'm not going to be

18   able to utilize this.  There was no audible component.

19   It's the touch screen, and I couldn't use it.

20         Q.    When you walked into the patient service

21   center, did you immediately notice that there was a sort

22   of E-check-in tablet?

23         A.    Well, I walked in and I noticed that there

24   was something -- you know, it's a very small office

25   where we go to, so I noticed that there was something

Page 39

1  there.

2           And what normally was there was a podium, and

3  that was no longer there and it was this other device.

4  And there was -- I believe there was someone at the --

5  at the kiosk, you know, checking in.

6           And I was -- immediately I went, oh, you

7  know, is this going to be a problem?  I don't know.  And

8  then I realized that there was no -- when it was my turn

9  to go to it, I was like, there's no way I can use this.

10          Q.   So the podium that was usually there, that's

11  normally where you would sign in?

12          A.   Correct.

13          Q.   And would you sign in on a piece of paper?

14          A.   Yeah.  It was a -- it was a paper that was

15  there.

16          Q.   What information would you be requested to

17  provide on that sign-in sheet?

18          A.   Just your name.

19          Q.   Okay.  And what time you arrived?

20          A.   If it required that?  I -- I don't know.  I

21  just put my name.

22          Q.   Okay.  And then you said when you got there,

23  there was somebody there checking in.  Are you talking

24  about another patient?

25          A.   Correct.

1          Q.   Okay.  So you were comfortable with giving

2    your name and birth date to her to fill in on the kiosk?

3          A.   Honestly, I was -- this was all new and I was

4    just kind of taken aback, the fact that this was a whole

5    new system; and I -- you know, I wanted to get in and

6    out of there as quickly as possible.  So, you know, I --

7    I did what I had to do at the time.

8          Q.   Are you uncomfortable with people knowing

9    your birth date?

10         A.   I'm uncomfortable with giving my personal

11   information out in a public setting, yes.

12         Q.   Okay.  What personal information are you

13   uncomfortable with providing in a public setting?

14         A.   Well, I could ask the same of you.  I don't

15   think it's anyone's business what my age is, and a

16   sighted person or a person without a disability who was

17   checking in doesn't announce their information to the

18   rest of the room.

19              So, yeah, I -- it's my private business, and

20   I really don't feel like announcing it to everyone in

21   the room.

22         Q.   No, my question was, which part of that

23   information.  So are you comfortable providing your

24   first and last name?

25         A.   My first name --

Page 43

```
 1        Q.   Okay.
 2        A.   -- I don't have a problem with.
 3        Q.   Okay.  So your last name you're uncomfortable
 4   with?
 5        A.   I just -- you know, for privacy purposes, I
 6   don't feel like announcing my name and my date of birth
 7   to -- to strangers in a room.
 8        Q.   Okay.
 9        A.   And I shouldn't have to.
10        Q.   And just to be clear, when the
11   phlebotomist -- when you went up to the phlebotomist to
12   let her -- I assume it's a she.
13             Was it a she or a he?
14        A.   It was woman.
15        Q.   It was a woman.  Okay.  So when you went up
16   to the female phlebotomist and asked her for assistance,
17   had the other patient already come up and was kind of
18   like waiting there to be taken back to the draw room?
19        A.   She came out of the room and called the other
20   patient already.  And before -- before the patient went
21   into the room, I said, "Excuse me.  I need some
22   assistance."
23        Q.   And then did she lead the patient back, drop
24   the patient back off there, and then come and help you?
25        A.   Yes.  I believe the patient went into the --
```

Page 46

1          A.   I -- I really do not.

2          Q.   Okay.  Between the time that you checked in

3     and the time that you were called back, did any other

4     patients get called back?

5          A.   I -- I honestly don't know.

6          Q.   Did you see any other Quest employees there

7     during your visit?

8          A.   I think it was just the one phlebotomist

9     there that day, so I think she was the only one.  But,

10    you know, I'm not a hundred percent sure.

11         Q.   Okay.  All right.  So let's talk about your

12    next visit.  And I assume that at -- your next visit I

13    have is December 1st, 2017.

14         A.   Okay.

15         Q.   Do you recall that visit with any

16    specificity?

17         A.   I do not.

18         Q.   Okay.  Do you think your dad went with you to

19    that visit?

20         A.   I'm assuming so, yes.

21         Q.   And why do you say that?

22         A.   Because now I obviously knew about the kiosk,

23    so I -- I'm going to need assistance checking in.

24         Q.   Okay.  And then -- so when you went there

25    that second time that you had already anticipated the

Page 47

1    kiosk was going to be there, do you know if you had an

2    appointment?

3          A.   I don't know.

4          Q.   And did your father check in for you on the

5    kiosk?

6          A.   He could have attempted to, yes.

7          Q.   Okay.  If he didn't -- if he wasn't

8    successful, how do you believe you got checked in?

9          A.   There was a time when we also had another

10   patient in the room who assisted us.

11         Q.   And what did that patient do to assist you?

12         A.   Actually typed in the information on the

13   screen.  It was -- yeah.

14         Q.   What information?

15         A.   My name -- the check-in -- whatever questions

16   are asked in the check-in system.

17         Q.   And how did that come about, where another

18   patient assisted you?

19         A.   Because my dad, who was 80 -- well, he was 87

20   at the time, but in his 80's and is so not technology

21   capable -- was having a lot of trouble.

22              And a very -- you know, a kind person wanted

23   to help us because the Quest staff was, you know,

24   drawing blood and had -- the doors were closed.  And

25   they were -- they were busy.  So, again, a very kind

Page 48

1  person wanted to assist us.

2      Q.   And when you came in that day, between -- did

3  you go immediately with your father to the kiosk?

4      A.   When we walked in?

5      Q.   Yeah, when you walked in.

6      A.   Yes.

7      Q.   Okay.  At that point you knew there was a

8  kiosk; you knew that was a way to check in, right?

9      A.   Correct.

10     Q.   Okay.  And how many people do you recall

11 being in the waiting room on that day?

12     A.   Well, there was at least one.  I'm not sure.

13 I think there was at least another person there, too.

14 So there was two other patients at least.

15     Q.   Okay.  And you don't recall if that's the

16 December 1st, 2017 visit or a subsequent visit?

17     A.   I'm not sure.  I just know that at one point

18 we had assistance from a patient, another patient.

19     Q.   Was that only on one visit out of your eight

20 visits?

21     A.   It may have been one other time, but I'm not

22 a hundred percent sure.

23     Q.   Okay.  So maybe I'll do it this way.  Out of

24 your eight visits that you went to, you've told me about

25 one where the phlebotomist checked you in on the kiosk.

# EXHIBIT 15

Page 1

```
 1                    UNITED STATES DISTRICT COURT
 2                    CENTRAL DISTRICT OF CALIFORNIA
 3
 4      JULIAN VARGAS, ANNE   )
        WEST and AMERICAN     )
 5      COUNCIL OF THE BLIND, )
        individually on behalf )  Case No. 2:19-cv-08108 DMG (MRWx)
 6      of themselves and all )
        others similarly      )
 7      situated,             )
                              )
 8                Plaintiffs, )
                              )
 9      vs.                   )
                              )
10      QUEST DIAGNOSTICS     )
        CLINICAL LABORATORIES, )
11      INC., QUEST           )
        DIAGNOSTICS HOLDINGS, )
12      INC., QUEST DIAGNOSTICS)
        INCORPORATED; and DOES )
13      1-10, inclusive,      )
                              )
14                Defendants. )
        _____)
15
16
17          REMOTE VIDEOTAPED DEPOSITION OF DONNA GRAHMANN
18                          May 3, 2021
19
20
21
22
23
24
        Job No. CS4522975
25      Reported by: Maryann Matthews, CSR #737
```

PA0545

Page 2

1          REMOTE VIDEOTAPED DEPOSITION OF DONNA GRAHMANN

2

3          BE IT REMEMBERED that the remote videotaped

4     deposition of DONNA GRAHMANN was taken via videoconference

5     by the Defendants before Veritext Legal Solutions, Maryann

6     Matthews, Court Reporter and Notary Public in and for the

7     County of Ada, State of Idaho, on Monday, the 3rd day of May,

8     2021, commencing at the hour of 8:53 a.m. Pacific Daylight Time

9     in the above-entitled matter.

10

11

        APPEARANCES (Remotely):

12

13    For the Plaintiffs and the Witness:

14                          HANDLEY FARAH & ANDERSON PLLC

                            By:  Matthew K. Handley, Esq.

15                          777 6th Street, NW - 11th Floor

                            Washington, D.C.  20001

16                          Telephone:  (202) 559-2411

                            Facsimile:  (844) 300-1952

17                          mhandley@hfajustice.com

18

      For the Defendants: OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

19                          By:  Amber L. Roller, Esq.

                            400 South Hope Street, Suite 1200

20                          Los Angeles, California  90071

                            Telephone:  (213) 239-9800

21                          Facsimile:  (213) 239-9045

                            amber.roller@ogletree.com

22

23    Videographer:       Robert Fenton

24

25

Page 3

1                          I N D E X

2                     E X A M I N A T I O N

3

DONNA GRAHMANN                                          PAGE

4

5    By:  Ms. Roller......................................5

6

7                        E X H I B I T S

8                    (No exhibits marked.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 34

1    to any other locations besides that Tomball, Texas,

2    location you just gave me the address for?

3          A.   In the last five?  I may have had one blood

4    draw at a different Quest location in my doctor's

5    office, the hospital building there, and I believe it

6    was a Quest as well.

7          Q.   Do you know the address of your doctor's

8    building?

9          A.   I don't know that one right offhand.

10         Q.   Do you recall when that visit would have

11   been?

12         A.   Pardon me?

13         Q.   When was that visit that you think you had

14   visited a Quest Labs in your doctor's office?

15         A.   That may have been two to three years ago

16   when I had to do it there.

17         Q.   So you'd mentioned this Quest tablet that you

18   encountered during at least a visit, right, to check in?

19         A.   Yes.

20         Q.   Do you recall the first time you encountered

21   that check-in tablet?

22         A.   I'm not sure how long that has been there.  I

23   didn't see when they put it in there, so -- I was told

24   by someone I was behind in line that you had to fill in

25   this -- this tablet.  So I wasn't able to do that, and

1    the person in line helped me do that.

2           Q.   When was that visit?

3           A.   From the time they first put the tablet in,

4    which I don't know how long that's been there.

5           Q.   Do you remember that first time you

6    encountered the tablet?

7           A.   The very first time, yes, is when I had a

8    lady that was in front of me that had to help me.

9           Q.   Okay.  Was your husband there on that visit?

10          A.   He dropped me off there.

11          Q.   So he didn't come into the actual laboratory?

12          A.   Correct.

13          Q.   I called it a laboratory.  I guess I'll call

14   it a patient service center.  Okay?

15          A.   Huh.

16          Q.   On that visit do you recall -- so you have no

17   recollection of what year that visit was, right?

18          A.   I don't recall because I -- with me going so

19   frequently, I don't recall when they actually put that

20   in.  I know it's been there a while.

21          Q.   Prior to them putting the E-check-in kiosk

22   in, how would you inform staff that you had arrived?

23          A.   Usually they had someone sitting at the

24   little receptionist window and I could just give her my

25   name, and they would automatically have my lab sheet

Page 36

1    because the doctor would send it to them electronically.

2        Q.    And then you believe that process changed

3    when they introduced the E-check-in kiosk?

4        A.    I know that the -- the doctor still sends the

5    info electronically, but the check-in is what has

6    changed.  Because there's not always someone at the

7    counter, and that's when they put that tablet there that

8    is inaccessible to me.

9        Q.    So let's talk about that first visit where

10   you encountered the E-check-in kiosk.  Do you know if

11   you made an appointment that day or if you were a

12   walk-in?

13       A.    Sometimes -- most of the time I'll make an

14   appointment, but not always.  And at that very first one

15   I don't recall if I had an appointment or not.

16       Q.    How do you make appointments?

17       A.    Over the phone.  They have an automated line

18   you can call.

19       Q.    And are you able to successfully make

20   appointments for your visits using that online system --

21   I mean, over-the-phone system?

22       A.    I can.

23       Q.    What information do they take from you during

24   that --

25       A.    They --

```
 1              Do you remember that?

 2       A    I do.

 3       Q    And at your deposition you actually said

 4  that you were scheduled to go to Quest the very next

 5  day.                                              01:36:17

 6       A    I was.

 7       Q    Okay.  Did you go to Quest on that day?

 8       A    I did.

 9       Q    Was that May 4th, 2021?

10       A    It was.                                 01:36:26

11       Q    Okay.  So I would like to talk to you about

12  that experience at Quest on May 4th, 2021.

13              Did you make an appointment for that visit?

14       A    Yes.

15       Q    Did you go to that visit alone?          01:36:44

16       A    I was dropped off.

17       Q    Who were you dropped off by?

18       A    My husband.

19       Q    And did he go and run his errands while he

20  dropped you off?                                  01:36:58

21       A    He did.

22       Q    When you first walked into the patient

23  service center on May 4th, 2021, what did you do

24  when you got there?

25       A    Walked up toward the counter and I don't  01:37:16
```

Page 88

1    recall if someone was there or not on the May 4th

2    one, but I knew about testing with the three-finger

3    swipe.  So I tried the three-finger swipe when I got

4    up to the counter and nothing, no voiceover, no

5    nothing.  I felt around the edge of the kiosk.  Did        01:37:45

6    not feel a jack for a headphone.  And when I had no

7    voiceover response, I just had to wait at the

8    counter until someone arrived.

9         Q    And what specifically did you do when you

10   went up to the kiosk?                                      01:38:08

11        A    I did a three-finger swipe up.

12        Q    And nothing happened when you did that?

13        A    Correct.  Well, I don't know.  If something

14   might have happened that didn't involve voiceover,

15   something could have happened, but if it did, I have       01:38:24

16   no way of knowing that.

17        Q    Okay.  You didn't hear any audible, any

18   audible sound coming from the kiosk?

19        A    No.

20        Q    And how many times did you do the               01:38:35

21   three-finger swipe on the kiosk?

22        A    I know at least two.  I don't know if it

23   was more than that, but I know I tried it two times,

24   at least.

25        Q    And how are you able to be sure that you        01:38:56

Page 89

PA0551

```
1    actually were using the kiosk when you did the

2    three-finger swipe?

3         A    Because I could feel the item.  It's on a

4    stand on the counter.

5         Q    Okay.  And was this the same location, the    01:39:15

6    Tomball location that you always go to?

7         A    It is.

8         Q    And after you attempted to use the kiosk,

9    you said you waited for a receptionist?

10        A    I did.                                         01:39:32

11        Q    How long did you wait until you were

12   assisted by a receptionist?

13        A    At that time I don't recall.  Probably five

14   minutes, at least.

15        Q    And were you assisted by a receptionist or    01:39:54

16   a phlebotomist or do you not know?

17        A    I don't know if they have an actual

18   receptionist.  So it was probably a phlebotomist.

19        Q    And when you were encountered --

20             When you encountered the phlebotomist, what   01:40:14

21   happened next?

22        A    They came out and checked me in.

23        Q    What information did you provide in order

24   to get checked in?

25        A    My full name and -- well, first name, last    01:40:26
```

Page 90

```
 1    check in on the kiosk?

 2         A    I did not hear that.

 3         Q    Do you recall ever hearing any sort of

 4    segment on any Quest television during any of your

 5    visits talking about how you can check in using a        01:58:32

 6    three-finger swipe?

 7         A    I do not recall hearing that.

 8         Q    And you said you didn't ask the

 9    phlebotomist if you could attempt to check in on

10    your own using a three-finger swipe; right?            01:58:55

11         A    I did not because she was already typing

12    info or clearing the screen or doing something.  So

13    she was already on the kiosk.

14         Q    On this visit, did you provide any payment

15    at Quest?                                              01:59:16

16         A    No.

17         Q    And you didn't touch the kiosk on

18    August 2nd at all; correct?

19         A    I touched probably the bottom frame of it,

20    and that's when I realized that person was there.      01:59:30

21         Q    Okay.  On this visit, did you talk to any

22    Quest staff member about the kiosk and your

23    difficulty using it on prior occasions, such as your

24    May 4th, 2021, visit?

25         A    I do recall mentioning that I thought it      01:59:57
```

Page 103

PA0553

1    was supposed to be accessible now by doing a

2    three-finger swipe up, and the person, the

3    phlebotomist, she acted like she didn't know it was

4    going to be accessible at all.  So when I said it

5    was supposed to have voice activation or a                02:00:21

6    three-finger swipe up would activate the voice

7    activation, she didn't act like she knew anything

8    about that at all.

9         Q    When you say she acted like she didn't know

10   anything about that, what's that mean?                    02:00:37

11        A    She just kinda was huh.  So she didn't

12   really respond as if she knew it was accessible.

13        Q    Did she say anything about whether it was

14   or was not capable of a three-finger swipe check-in?

15        A    No.                                             02:01:01

16        Q    And is this the same phlebotomist who

17   assisted you with check-in and who drew your blood?

18        A    I believe so.

19        Q    And on this visit, do you recall hearing or

20   is there any way for you to tell me how many              02:01:16

21   individual Quest staff members you think were there

22   on that day?

23        A    There's no way for me to know that.  I know

24   there was more than one, but, you know, there's --

25   with the rooms in there, you can't really tell how        02:01:33

                                                    Page 104

PA0554

# EXHIBIT 16

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3
     JULIAN VARGAS, ANNE WEST AND        )
 4   AMERICAN COUNCIL OF THE BLIND,      )
     INDIVIDUALLY ON BEHALF OF           )
 5   THEMSELVES AND ALL OTHERS SIMILARLY)  CASE NO.
     SITUATION,                          )
 6                                       )  2:19-CV-08108
                    PLAINTIFFS,          )  DMG
 7                                       )
          VS.                            )
 8                                       )
     QUEST DIAGNOSTICS CLINICAL          )
 9   LABORATORIES, INC., QUEST           )
     DIAGNOSTICS HOLDINGS, INC., QUEST   )
10   DIAGNOSTICS INCORPORATED; AND DOES  )
     1-10, INCLUSIVE,                    )
11                                       )
                    DEFENDANTS.          )
12                                       )
     _____)
13
14
15
16
17
18
               VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF
19
                      KATHLEEN LYONS
20
                   THURSDAY, MAY 6, 2021
21
22
23
24
          JOB NO. 4522978-A
25
          REPORTED BY:  MELIA BASAVAND, CSR NO. 14089
```

Page 2

1      VIDEOTAPED DEPOSITION OF KATHLEEN LYONS, TAKEN ON BEHALF

2      OF THE DEFENDANTS, AT 12:23 P.M., THURSDAY, MAY 6, 2021,

3      AT BUFFALO, NEW YORK, BEFORE MELIA BASAVAND, CSR NO.

4      14089.

5

6

7

8      APPEARANCES OF COUNSEL:

9

10     FOR THE PLAINTIFFS:

11             HANDLEY FARAH & ANDERSON
               BY:  MATTHEW K. HANDLEY, ESQ.

12             -- VIA VIDEOCONFERENCE --
               777 6TH STREET NW

13             11TH FLOOR
               WASHINGTON, D.C., 20001

14             (202) 559-2411
               MHANDLEY@HFAJUSTICE.COM

15

16             -- AND --

17             NYE STIRLING HALE & MILLER, LLP
               BY:  BENJAMIN J. SWEET, ESQ.

18             -- VIA VIDEOCONFERENCE --
               1145 BOWER HILL ROAD

19             SUITE 104
               PITTSBURGH, PENNSYLVANIA 15243

20             (412) 857-5350
               BEN@NSHMLAW.COM

21

22

23

24

25

1                A P P E A R A N C E S (CONTINUED)

2

      FOR THE DEFENDANT:

3

                OGLETREE, DEAKINS, NASH, SMOAK & STEWART

4                BY:  AMBER L. ROLLER, ESQ.

                -- VIA VIDEOCONFERENCE --

5                400 SOUTH HOPE STREET

                SUITE 1200

6                LOS ANGELES, CALIFORNIA 90071

                (213) 239-9800

7                AMBER.ROLLER@OGLETREE.COM

8

9      ALSO PRESENT:   ROBERT FENTON, VIDEOGRAPHER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                           I N D E X

2    WITNESS                  EXAMINATION                PAGE

3    KATHLEEN LYONS

4                             BY MS. ROLLER              7

5

6

7

8

9

10

11

12                        E X H I B I T S

13                          (NONE.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 37

```
 1        Q    Can you give me an estimate.

 2        A    No.

 3        Q    Was it in 2020?

 4        A    No.  It was probably before that.

 5        Q    Was it 2019?

 6        A    I don't know if that was the first time or

 7   not.

 8        Q    Okay.  Do you remember the first time that

 9   you encountered the E check-in kiosk?

10        A    I don't remember when it was, no.

11        Q    But do you remember the visit in your head?

12        A    I just don't remember when I first

13   encountered that electronic device.

14        Q    Okay.  I understand that.  What I'm asking

15   is do you remember -- do you have a memory in your

16   head that oh, I remember encountering this check-in

17   device even though you don't remember the date?

18        A    Yes.

19        Q    Okay.  And so tell me what you recall about

20   that visit.

21        A    When I need to sign in, I have to tell

22   whoever is with me the answers to the questions and

23   that makes me very uncomfortable because it's not

24   very far away from the waiting room.  And then a lot

25   of what they need is personal information.  I'm not
```

Page 38

1   in the habit of giving out my birth date in public.

2           One time we got signed in for the wrong

3   thing because the person that was with me didn't

4   understand or didn't ask me or something, and he

5   said we were there for a drop off when, in fact, we

6   were there for a diagnostic test.  I just remember

7   being very uncomfortable because I had to give these

8   answers out loud.

9       Q    What --

10      A    I wasn't able to -- I wasn't able to --

11      Q    Go ahead.  I'm sorry, I cut you off.

12      A    I wasn't able to have access to the device

13  itself because it had no speech.

14      Q    So the first time that you encountered the

15  device, did you go with somebody to that visit?

16      A    Yes.

17      Q    Do you recall who it was?

18      A    I've gone with different people at different

19  times for different reasons.  Very frequently it's

20  my friend Arnie, and he's very good about driving me

21  places and helping me out with things like that.

22      Q    And when you went to Quest on that first

23  visit, where you encountered the kiosk, was Arnie

24  with you on that visit?

25      A    I don't remember.

Page 42

```
 1      A    Right.

 2      Q    Okay.  And how about your last name?

 3      A    Well, they go together.

 4      Q    Okay.

 5      A    And I don't like people knowing my name.

 6      Q    On any of your visits to Quest have you ever

 7  seen -- well, let me -- let me rephrase that.

 8           How many times do you think that you've been

 9  to Quest since they've had this E check-in kiosk?

10      A    Golly, probably ten or so I would guess.

11      Q    And of those ten times have you always had

12  somebody else check you in on the E kiosk?

13      A    Yes.

14      Q    Have you ever gone up to the receptionist or

15  one of the Quest employees and asked them if they

16  could check you in?

17      A    You can't find them.  They're not there at

18  the desk.  And the only other place I would know to

19  look would be where you go in to have your blood

20  drawn, and you're not supposed to go in there until

21  you're called.

22      Q    So that's a yes that you've had somebody

23  check you in all of those approximate ten times that

24  you've been to Quest when they had the E check-in

25  kiosk?
```

Page 43

1          A       I had somebody that was with me.  Or one

2    time a patient that was waiting volunteered to do

3    it, and there again I had to give her that personal

4    information.   And I didn't know her at all.   That

5    made me very uncomfortable.

6          Q       The people that have been with you

7    typically, you mentioned Arnie?

8          A       Yes.

9          Q       Is there anybody else that you can recall

10   that's gone with you to Quest when you've needed to

11   use the E check-in kiosk?

12         A       Seymour Knox, IV, went with me one time.

13   Gary Szczepankiewicz went with me one time.

14         Q       What was that person's first name?

15         A       Gary.

16         Q       Gary.  Okay.  And the court reporter is

17   definitely going to ask you how to spell those

18   names.

19                 So Seymour and Gary and Arnie.  Anybody else

20   that you can recall that's been with you?

21         A       Probably my friend Carla.

22                 Carla with a C.

23         Q       Anybody else?

24         A       There might have been, but I don't remember.

25         Q       Do all of those folks know your first and

Page 76

1       Q    Okay.

2       A    Assuming that the receptionist would put the

3   information into the kiosk.

4       Q    Okay.  What if the receptionist wouldn't put

5   the information into the kiosk and --

6            What if the receptionist wouldn't put the

7   information into the kiosk and instead just checked

8   you in on their computer?

9            MR. SWEET:  Same objection.

10           THE WITNESS:  I don't think that's how it

11  works, but I haven't been able to check in with a

12  receptionist, as I said, in many years because there

13  has not been a receptionist there to do that.

14  BY MS. ROLLER:

15      Q    Okay.  I'm just trying to understand your

16  preference is and if -- if it was possible, what --

17  what you would prefer.  So if there was --

18      A    I would prefer that the kiosk be equipped

19  with speech, such as voiceover on the iPhone, and a

20  head jack place so that you could plug in your

21  earphones and use that system.

22      Q    If you -- if the kiosk had that, would you

23  still have somebody come to the patient service

24  center with you on your visits to Quest?

25           MR. SWEET:  Objection.  Calls for

# EXHIBIT 17

Page 1

1                    UNITED STATES DISTRICT COURT
2                    CENTRAL DISTRICT OF CALIFORNIA
3
     JULIAN VARGAS, ANNE WEST AND          )
4    AMERICAN COUNCIL OF THE BLIND,        )
     INDIVIDUALLY ON BEHALF OF             )
5    THEMSELVES AND ALL OTHERS SIMILARLY)  CASE NO.
     SITUATION,                            )
6                                          )  2:19-CV-08108
                        PLAINTIFFS,        )  DMG
7                                          )
          VS.                              )
8                                          )
     QUEST DIAGNOSTICS CLINICAL            )
9    LABORATORIES, INC., QUEST             )
     DIAGNOSTICS HOLDINGS, INC., QUEST     )
10   DIAGNOSTICS INCORPORATED; AND DOES    )
     1-10, INCLUSIVE,                      )
11                                         )
                        DEFENDANTS.        )
12                                         )
     _____)
13
14
15
16
17
18
                    VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF
19
                         REGINA MARIE BRINK
20
                         THURSDAY, MAY 6, 2021
21
22
23
24
         JOB NO. 4522978-B
25
         REPORTED BY:  MELIA BASAVAND, CSR NO. 14089

```
                                                    Page 2

 1      VIDEOTAPED DEPOSITION OF REGINA MARIE BRINK, TAKEN ON

 2      BEHALF OF THE DEFENDANTS, AT 2:04 P.M., THURSDAY, MAY 6,

 3      2021, AT SACRAMENTO, CALIFORNIA, BEFORE MELIA BASAVAND,

 4      CSR NO. 14089.

 5

 6

 7

 8      APPEARANCES OF COUNSEL:

 9

10      FOR THE PLAINTIFFS:

11              HANDLEY, FARAH & ANDERSON

                BY:  MATTHEW K. HANDLEY, ESQ.

12              -- VIA VIDEOCONFERENCE --

                777 6TH STREET NW

13              11TH FLOOR

                WASHINGTON, D.C., 20001

14              (202) 559-2411

                MHANDLEY@HFAJUSTICE.COM

15

16      FOR THE DEFENDANT:

17              OGLETREE, DEAKINS, NASH, SMOAK & STEWART

                BY:  AMBER L. ROLLER, ESQ.

18              -- VIA VIDEOCONFERENCE --

                400 SOUTH HOPE STREET

19              SUITE 1200

                LOS ANGELES, CALIFORNIA 90071

20              (213) 239-9800

                AMBER.ROLLER@OGLETREE.COM

21

22

23      ALSO PRESENT:  ROBERT FENTON, VIDEOGRAPHER

24

25
```

Page 3

1                        I N D E X

2   WITNESS                EXAMINATION                PAGE

3   REGINA MARIE BRINK

4                        BY MS. ROLLER            6

5

6

7

8

9

10

11

12                     E X H I B I T S

13                        (NONE.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 41

1        Q     And how long have you been a Quest

2    Diagnostic's patient?

3        A     Since 2012 when I switched to Dignity

4    Health.

5        Q     What location of Quest have you visited

6    since 2012?

7        A     So 3000 Q Street, like the letter Q, where

8    my doctor's office is and then 7248 South Land Park

9    Drive which is near my home.

10       Q     And what makes you decide whether you go to

11   one location or the other?

12       A     Accessibility.

13       Q     What do you mean by that?

14       A     So I was going to Q Street, and at Q Street

15   they have a board that --

16             Well, let me back up.

17             At Q Street you go in, and from what I

18   understand, there is a kiosk.  But I go up to the

19   receptionist.  She takes my name down, and I sit

20   down, and I wait.  And when she has time, she calls

21   me back up because she's checking in a lot of

22   different people.  It's very crowded.  And so I

23   usually have a wait.

24             And then when she has time, she puts my

25   number in for me or my information in and she tells

1   me a number, but she says she'll also have them come

2   out and tell me.  And the reason being is they

3   flashed the numbers across the board that you can

4   see, but it does not speak.  And I won't know when

5   my number comes up to go in.

6           And so I was sitting down, and I would wait

7   until -- well, there's another process.

8           So when she assigns me that number, she

9   calls me back up.  And she puts in my actual --

10  like, I have to show her the paper or tell her the

11  information for her to look up my doctor.  And then

12  she puts me in the queue for the actual test I'm

13  there for.  Then I wait, and they would call me in.

14  And they would have to come out and call my name.

15          And so sometimes I would come up and say,

16  hey, you know, I asked the patient next to me, and

17  they're already on No. 25.  You said I was No. 21.

18  Can you remind them that they need to call me.  And

19  so then they would do it.  So sometimes I would be

20  waiting, and I know that I would lose my turn

21  because I couldn't see the board.

22          And so I left that place, and we found the

23  smaller Quest near my house, and I've been going

24  there ever since, since 2018.  And that place is

25  smaller and so it's less confusing.  There is still

Page 43

1   that same process for check-in, but there's less

2   people, so less waiting, and they don't forget me as

3   often.   The only thing I don't care for --

4           Well, I'll -- I'll wait.

5           But anyway when I was assessing

6   accessibility, that was the main reason I switched

7   to the Land Park.

8       Q    Okay.   So if I understand this correctly,

9   you used to go to this 3000 Q Street prior to 2018.

10  And then in 2018 you switched over to the Land Park

11  Street location or Land Park Drive location?

12      A    Yes.

13      Q    Okay.   And so from 2012 until the 2013, you

14  were always going to the Q Street location?

15      A    Yes.

16      Q    When was the last time you were at Quest

17  Diagnostics?

18      A    It was this year let me think.   I want to

19  say, like, January or February of 2021 since I had

20  to do my blood tests -- my annual blood tests.

21      Q    And then prior to that when did you go the

22  last time?

23      A    I believe somewhere around October,

24  November.   Somewhere in there.

25      Q    Okay.   And before that?   Can you recall when

Page 46

1       A     Yes.

2       Q     Okay.

3       A     I used to just -- you know, if she ordered a

4    blood test, I just walk downstairs and try to do it

5    if I could right there unless I was fasting.

6       Q     Okay.  And so when you first encountered

7    that kiosk, it sounds like your daughter was the one

8    that informed you of that; is that right?

9       A     Yes.

10      Q     So did she tell you?

11      A     She just said there's -- there's a thing you

12   have to check-in, mom.  But I don't think it talks

13   to you.

14            And I said okay, well, where is it?

15            She showed it to me.

16            And I said I just -- you know, I said

17   probably let me ask.  So I said is this successful?

18   Can I turn this on to talk?

19            And she said no.

20            And I said well, can I get some assistance?

21            And I generally don't allow my kids to do

22   those kinds of things for me.  So I insisted on

23   assistance from someone at the counter, the

24   reception area.

25      Q     Was there a receptionist sitting there at

Page 47

1    the counter when you arrived?

2        A    I don't recall.

3        Q    Okay.  How long was it after your daughter

4    informed you that there was a kiosk that you spoke

5    with a receptionist or whoever it was that you spoke

6    with?

7        A    It -- it was a little bit.  It wasn't a

8    quick process.

9        Q    Okay.  So you learned about the kiosk and

10   then did you stand there?  Did you wait for somebody

11   to come out?

12           How did you engage somebody from Quest?

13       A    I think I asked my daughter was there a desk

14   and we went to the desk.  And I think there might

15   have been a line, and I had to wait my turn.  And I

16   don't know if there was someone at that desk that

17   whole time.

18       Q    When is that --

19           Sorry, go ahead.

20       A    So I was -- there was just some time.  I

21   just remember some waiting time before I was

22   actually able to talk to someone at that desk she

23   took me too.

24       Q    And when you spoke with the Quest staff

25   member at the the desk, what did you say?

Page 48

1      A      I said I'm totally blind so I can't operate

2    the kiosk to sign in.

3      Q      And did you ask at that point if it was --

4    if it had speaking capabilities?

5      A      I think I just said I can't operate it.

6      Q      Did you try to operate it?

7      A      No.

8      Q      Okay.  And then what did the Quest staff

9    member say in response?

10     A      She said well, could your daughter help you?

11     Q      And then what did you say?

12     A      I said no.  I'm not comfortable with that.

13     Q      And then what happened after that?

14     A      She said okay.  Well, you have to wait, but

15   I can assist you.

16     Q      Okay.  And then how long after that

17   conversation with a Quest staff member did she

18   assist you?

19     A      It was probably about 10, 15 minutes.

20     Q      How did she assist you?

21     A      I don't know.  She -- she asked for my card

22   and then she started to ask me more involved

23   questions.  But it was in the waiting room, and so I

24   asked her could we go into a private office.  So she

25   had me wait again and then she took me into an

Page 51

1      A     Yes.

2      Q     How long did it take from the time that you

3  first spoke with the receptionist or, whoever it

4  was, to request assistance to the time that they

5  took you to that private room to get your

6  information?

7      A     I don't remember the exact time, but it was

8  an extended time because my daughter was complaining

9  about it.

10     Q     Was it less than ten minutes or more than

11 ten minutes?

12     A     More than ten minutes.

13     Q     Was it more or less than 15 minutes?

14     A     More than that.  I would say between half an

15 hour and 45 if I had to guesstimate.

16     Q     And while you were waiting to be taken to

17 the side room, where were you?

18     A     In the main waiting room.

19     Q     And in that time period did you see other

20 patients or hear other patients coming in?

21     A     Definitely very busy and crowded.

22     Q     Approximately how many did you notice came

23 in after you?

24     A     I couldn't remember.  It's too long ago.

25     Q     Okay.  And in that time that you were

Page 54

 1      A    Yes.  Because he was switching to my doctor

 2   and so I was orienting him and seeing if he liked

 3   the set up there.

 4      Q    Okay.  So when do you think your husband

 5   went with you to the first visit at Quest?

 6      A    Probably 2015.

 7      Q    Okay.  Do you remember any of your visits --

 8   any other visits at that 3000 Q Street location

 9   besides the one that we've already talked about

10   which was your first visit?

11      A    Well, I remember going to that lab, and I

12   know the routine I did.  I just can't say if it's my

13   second, third, fourth.  You know, I've gone there

14   quite a bit.

15      Q    Understood.  So I guess what I'm -- my

16   question -- my question could have been more clear.

17   So my question is -- is do you have any specific

18   recollections of anything happening on any other

19   visits to that Q Street location other than that

20   first visit?

21      A    Just that sometimes it would take longer

22   than others.  So it's -- what I would do is go

23   straight to the desk, tell them I would need

24   assistance checking in.  They would have me sit

25   down, wait until they could, you know, have time to

Page 56

1      Q      Okay.   When you would go in during those

2   visits from 2012 to 2018, do you recall how many

3   times there was somebody at the front desk who was

4   able to assist you?

5      A      Almost every time I went up there.   I do

6   remember a couple of times I had to ask somebody,

7   and I would need to go to the -- I'd have to ask a

8   patient, and they would say oh, she'll -- she'll be

9   back -- blah, blah, blah.   And so I'd have to stand

10  there and wait until she got back to the desk.

11     Q      But most of the time would you say that

12  there was somebody waiting at the desk?

13     A      Yes.

14     Q      And how many times do you recall that there

15  was not somebody waiting at the desk where you

16  needed to wait for them?

17     A      Like I said, one or two.

18     Q      Okay.   How -- how long did you need to wait

19  on those one or two occasions for somebody to return

20  to the desk?

21     A      About five minutes maybe.

22     Q      Okay.   And then would the time vary between

23  the time you said you needed assistance and then the

24  time that you were checked in?

25     A      Yes.

1      A    Not that I know of.  I just finished my

2    checks and everything came back good, and I finished

3    my eye appointment so...

4      Q    Okay.  Are you satisfied with the procedure

5    that you have in place for the Land Park location

6    where you go to the receptionist and -- assuming

7    that you made an appointment -- they just

8    immediately check you in?

9      A    No.  But I like it better than Q Street.

10      Q    Okay.  And what -- why where you not

11    satisfied with that process?

12      A    I would prefer to be able to use the kiosk

13    myself and not have to ask for assistance.  As I

14    shared with you, independence is very important to

15    me and privacy is extremely important to me.  And

16    although I'm waiting less time, I'm -- it's still

17    not the same experience as the sighted people coming

18    through.

19        And I feel that it's -- it's just my

20    personal preference that I would be able to have the

21    same things accessible to me as everybody else.  I

22    also think that I should have been made aware that

23    there was a texting option.

24        Suppose I did prefer waiting outside.  I had

25    no idea there was a texting option.

Page 85

1      Q    And do you know -- do you know how that
2   option is communicated?
3      A    No.  I just found out about it when -- when
4   she mentioned it at that time.
5      Q    Okay.  And what is your understanding of the
6   purpose for checking in when you get to Quest?
7           MR. HANDLEY:  Objection.  Vague.
8           Go ahead, Regina.
9           THE WITNESS:  Oh, that's -- I was just going
10  to say I didn't understand.
11  BY MS. ROLLER:
12     Q    Sure.
13          Why do you think you check-in at Quest?
14  What's the purpose of it?
15          MR. HANDLEY:  Objection.  Vague.
16          Go ahead.
17          THE WITNESS:  So I know you have to do it.
18  BY MS. ROLLER:
19     Q    Okay.  So let me ask maybe a more direct
20  question.  Is it your understanding that the reason
21  that you check-in is to let them know that you're
22  there for your blood draw?
23     A    Well, I would say it's more accurate to say
24  that it's to put -- be put in the queue --
25     Q    Okay.

# EXHIBIT 18

## REDACTED

TO BE FILED UNDER SEAL PENDING THE COURT'S RULING ON PLAINTIFF'S APPLICATION

# EXHIBIT 19

```
1                  UNITED STATES DISTRICT COURT
2              FOR THE CENTRAL DISTRICT OF CALIFORNIA
3
4        JULIAN VARGAS, ANNE WEST, AND )
         AMERICAN COUNCIL OF THE BLIND,)
5        INDIVIDUALLY ON BEHALF OF     )
         THEMSELVES AND ALL OTHERS     )
6        SIMILARLY SITUATED,           )
                                       )
7                                      )
                           PLAINTIFFS, )
8                                      )
                                       )
9        vs.                          )CASE NO. 2:19-CV-8108
                                       )
10                                     )
         QUEST DIAGNOSTICS CLINICAL    )
11       LABORATORIES, INC., QUEST     )
         DIAGNOSTICS HOLDINGS, INC.,   )
12       QUEST DIAGNOSTICS INCORPORATED)
         AND DOES 1-10, INCLUSIVE,     )
13                                     )
                                       )
14                                     )
                           DEFENDANTS. )
15       _____)
16
17
18        30(b)(6) DEPOSITION OF ADAM ARONSON, PERSON MOST
19               KNOWLEDGEABLE FOR LILITAB, LLC,
20                      JUNE 29, 2021
21
22
23
24       JOB NO:  4667387
25       REPORTER: JESSICA N. NAVARRO, C.S.R. NO. 13512
```

Page 1

PA0610

```
1    VIDEOCONFERENCE DEPOSITION OF ADAM ARONSON TAKEN ON
2    BEHALF OF PLAINTIFFS AT 9:03 A.M., ON TUESDAY,
3    JUNE 29, 2021, CALIFORNIA, BEFORE JESSICA N.
4    NAVARRO, C.S.R. NO. 13512, PURSUANT TO NOTICE.
5
6    APPEARANCES OF COUNSEL
7
8    FOR PLAINTIFF:
9            NYE, STIRLING, HALE & MILLER, LLP
             BY JONATHAN D. MILLER, ATTORNEY AT LAW
10           33 WEST MISSION STREET, SUITE 201
             SANTA BARBARA, CALIFORNIA  93101
11           805.963.2345
             JONATHAN@NSHMLAW.COM
12
13   FOR DEFENDANTS:
14           OGLETREE, DEAKINS, NASH,
             SMOAK & STEWART, P.C.
15           BY DAVID RAIZMAN, ATTORNEY AT LAW
             400 SOUTH HOPE STREET, SUITE 1200
16           LOS ANGELES, CALIFORNIA 90071
             213.239.9800
17           DAVID.RAIZMAN@OGLETREE.COM
18
19
20   ALSO PRESENT:
21           ANTHONY GALINO, VIDEOGRAPHER
22           AMER PHARAON
23
24
25
```

Page  2

PA0611

```
 1                        I N D E X

 2

 3   WITNESS              EXAMINATION         PAGE

 4   ADAM ARONSON         BY MR. MILLER        5, 126

 5                        BY MR. RAIZMAN      103

 6

 7

 8                     E X H I B I T S

 9   NO.          PAGE       DESCRIPTION

10   EXHIBIT 72    24        PLAINTIFF JULIAN VARGAS' RULE

                             30(b)(6) DEPOSITION NOTICE TO

11                           LILITAB LLC

12   EXHIBIT 73    25        KIOSK PRODUCT COMPARISON

13   EXHIBIT 74    38        KIOSK PRODUCT COMPARISON

14   EXHIBIT 75    41        KIOSK PRODUCT COMPARISON

15   EXHIBIT 76    42        KIOSK PRODUCT COMPARISON

16   EXHIBIT 77    44        LILITAB ACCESSORIES

17   EXHIBIT 78    59        EMAIL CHAIN

18   EXHIBIT 79    81        EMAIL CHAIN

19   EXHIBIT 80    91        QUEST EMAILS

20   EXHIBIT 81    93        QUEST EMAILS

21   EXHIBIT 82    95        HARDWARE OPTIONS

22

23

24        QUESTIONS INSTRUCTED NOT TO BE ANSWERED

25                        (NONE)

                                             Page  3
```

```
 1    2012 through the present?                        09:20

 2        A    Yes, we have.  Although, as I -- with the

 3    exceptions I mentioned.  There are -- there are a

 4    large subset of accessories that never make it onto

 5    the website, either because they don't have broad   09:20

 6    economic potential or because they're very specific

 7    to a -- very specific use case or customer or client

 8    use.

 9        Q    Some customized feature, for example, that

10    a client might ask for?                            09:20

11        A    That's correct.

12        Q    And your current title at Lilitab, is that

13    the CEO?

14        A    That's correct.

15        Q    And how long have you held that title,    09:21

16    since 2012?

17        A    That's correct.  I mean, theoretically a

18    little bit before that because the company was

19    formed before the website went live, but, yeah.

20        Q    Approximately, how many individuals does  09:21

21    Lilitab presently employee?

22        A    Currently, I think it's 12 employees right

23    now.

24        Q    And then do you -- you farm out the actual

25    manufacturing of your devices?                     09:21
```

Page 21

PA0613

```
 1    was making available for purchase as of the 2015        09:30

 2    time frame?

 3         A    That's correct.

 4         Q    And the accessory option would include a

 5    headphone, for example?                                 09:30

 6         A    That's correct.  Headphone jack, which

 7    means you can plug your own headphones into it.  We

 8    also offer headphones you can hang on the mount

 9    itself.

10         Q    So, let me focus on that just for a           09:30

11    moment.  In 2015, as it indicates here, one of the

12    options that a third party could purchase from your

13    company would be a headphone jack -- a unit that had

14    a headphone jack; is that right?

15         A    That's correct.                               09:31

16         Q    And separately they could also purchase

17    headphones from your company that were wired into

18    the -- to the kiosk; is that right?

19         A    That's also possible.

20         Q    And those units would then have a holder      09:31

21    for the headphones that would hang off the kiosk?

22         A    That's correct.

23         Q    And would those headphones then allow

24    access to sound out of the tablets that are listed

25    in the tablet support?                                  09:31
```

Page 29

PA0614

```
 1          A    Depends upon the tablet, but yes.  So all      09:31

 2     the iPads, probably most of the Android tablets,

 3     yes.

 4               It just depended upon on if there's space

 5     inside the enclosure to fit the headphone jack.  I      09:31

 6     believe all the tablets listed here, yes, but I

 7     couldn't -- I can't say 100 percent unless I went

 8     back and looked at all the configurations.  But I

 9     can tell you that it's true for all the iPads.

10          Q    Okay.  That's where I want to focus my        09:31

11     questions.  I'm going to ask it again just to make a

12     clear record.

13               Am I correct in understanding as of 2015

14     it was possible to add headphones through a Lilitab

15     enclosure that would interface with the iPads?         09:32

16          A    If you added that option to your kiosk,

17     yes.

18          Q    And separately, am I correct in

19     understanding that Lilitab would even sell third

20     party's headphones that could then access the iPad    09:32

21     that are on the computer under tablets --

22          A    No, we didn't -- no, we didn't sell the

23     headphones, we would sell the mount that would hold

24     the headphones and the facility to plug those

25     headphones into the tablet, but we would not provide  09:32
```

Page 30

```
 1    the headphones or resell the headphones ourselves,        09:32
 2    no.
 3          Q    The headphones could be provided from some
 4    other third party vendor; is that --
 5          A    Yeah, we provided a recommendation of a        09:32
 6    couple of different headphones that we thought were
 7    good options for this use, but we didn't actually
 8    procure them and resell them ourselves.
 9          Q    Again, just to make a clear record, as of
10    2015 there were basically two options if you wanted       09:32
11    headphones.  One was to have a headphone jack placed
12    in a Lilitab enclosure; correct?
13          A    That's correct.
14          Q    And that can be purchased for an
15    additional fee; is that true?                             09:32
16          A    That's right.
17          Q    And do you know approximately what it was
18    in 2015?
19          A    I'd have to go back and look, but I think
20    it was $30 per kiosk.                                     09:33
21          Q    Your best estimate would be $30 per kiosk?
22          A    That's correct.
23          Q    And then separately another option in 2015
24    would be to purchase a headphone mount and the
25    wiring capability to add a third party headphone          09:33
```

Page 31

PA0616

```
 1    device?                                          09:33

 2        A    That's right.

 3        Q    And how much would that have cost in

 4    around 2015?

 5        A    Again, I can't remember, but I believe it  09:33

 6    was somewhere around $50.

 7        Q    Best estimate would be approximately $50?

 8        A    That would be my best guess. I could go

 9    back and look for you, but that's my best guess.

10        Q    I'll try and see if I have other documents  09:33

11    that refresh your memory as we go through here

12    today.

13        A    Okay.

14        Q    In addition, am I correct in understanding

15    the one of the accessory options that existed for  09:33

16    the kiosks identified in Exhibit 73 was a keyboard

17    mount?

18        A    That's correct.

19        Q    And what was that accessory for?

20        A    To accept a Bluetooth keyboard,           09:34

21    specifically the Apple wireless keyboard at the

22    time.  So that would allow you to use a keyboard

23    with any tablet that you wanted to for text input.

24        Q    So if the company wanted to have a

25    keyboard that would allow text input into the iPad  09:34
```

Page 32

PA0617

1    device, your company could offer that mount for                    09:34

2    sale; is that right?

3         A    That's true.  Of course, you can use a

4    screen for text input.  But if you're doing a lot of

5    text input, then a keyboard is going to be superior,    09:34

6    so...

7         Q    And am I correct in understanding then

8    that the intention would be that the keyboard would

9    interface with the tablet device?

10        A    That's correct.                                           09:34

11        Q    Specifically at that time it would

12   interface, from your understanding, with the iPad

13   devices that are identified in the tablet support?

14        A    All of the tablets could use it, including

15   the iPad, that's correct.                                          09:34

16        Q    Am I correct that in addition to the Floor

17   Pro, both the Counter Pro and Surface Pro also

18   offered keyboard options, keyboard mounting options?

19        A    The Wall Pro could accept a keyboard.

20   The -- I'm not sure, actually.  This is probably a     09:35

21   better -- what this document here shows is probably

22   better recollection than mine.  If it says it can

23   accept a keyboard mount, then it can.

24             So looking at this document, everything

25   except for that one in the far right, if -- if you     09:35

Page 33

PA0618

```
 1          A     If someone designed that app            09:39
 2   appropriately, they could use -- they could leverage
 3   all that in conjunction with audio out facility, for
 4   example, headphone jack or headphone mounted on the
 5   kiosk.  That's out of our control though.  That's an  09:39
 6   app design, which we didn't do app design for Quest.
 7          Q     That would be up to the company or who is
 8   ever actually purchasing the tablet themselves?
 9          A     That's correct.
10          Q     But in terms of what Lilitab could       09:39
11   provide, Lilitab could provide a kiosk that had a
12   headphone jack that would allow somebody to access,
13   for example, the voiceover technology in an
14   accessibility suite on an iPad?
15          A     Yes, that's true.                        09:39
16          Q     Lilitab had that ability to provide that
17   type of kiosk back in 2015; correct?
18          A     That's correct.
19          Q     And has that ability to provide a kiosk
20   that could have a headphone jack and interface with   09:39
21   voiceover technology from 2015 to the present; isn't
22   that true?
23          A     That's correct.
24          Q     So that a company seeking to want to
25   utilize a voiceover technology on an iPad could        09:40
```

Page 37

PA0619

```
 1    purchase the Lilitab enclosure that would              09:40

 2    accommodate the headphone jack to be able to do that

 3    functionality?

 4         A    That's correct.

 5         Q    And, again, that headphone jack would be      09:40

 6    somewhere in the range of 30 extra dollars per unit;

 7    is that true?

 8         A    Yeah, that's my recollection.

 9         Q    I'm going to go through a few more of

10    these just to get your best testimony here.           09:40

11         A    Sure.

12         Q    Let me show you what I'll mark Exhibit 74.

13              (Whereupon, Plaintiff's Exhibit 74 was

14               marked for identification by the court

15               reporter and attached hereto.)              09:40

16    BY MR. MILLER:

17         Q    And it's another printout through The

18    Wayback Machine of Lilitab's website as it would

19    have existed in April of 2016.  And can you take a

20    moment and look at this document and verify whether   09:41

21    that's true?

22         A    I mean, glancing at it, it looks -- it

23    looks like it's right.  This is obviously stripped

24    all the formatting and styling off of it, so it's

25    not exactly what it would have looked like on our     09:41
```

Page 38

PA0620

```
 1      inaccuracies in the photos shown here.  And it looks      09:46

 2      like the content below maybe accurate.  I'm mainly

 3      keying that off of the tablet generations that are

 4      supported which look to be accurate for the year.

 5              But I can tell you those photos up at --          09:47

 6      the screen shots of the photos are definitely not

 7      accurate.

 8          Q    Okay.  We'll pin that down.  Let me ask

 9      just some foundational questions.

10          A    Sure.                                            09:47

11          Q    In 2018 did Lilitab continue to offer

12      kiosks that had headphone jack options?

13          A    Oh, yeah.

14          Q    And the same is true in 2019, Lilitab

15      continued to offer kiosk options that had headphone     09:47

16      jack availability?

17          A    Yes, and we can continue to this day.

18          Q    All right.  Through the present; correct?

19          A    Yes.

20          Q    And the same with respect to kiosks that       09:47

21      can hold keyboards, Lilitab offered for sale in 2018

22      to the present kiosk options that could hold

23      keyboards if the company chose to purchase those

24      options?

25          A    Yes, that's correct.                           09:47
```

Page 43

PA0621

```
 1     some point in time Lilitab engaged with Quest on its        10:06

 2     E check-in project?

 3          A    Yes.

 4          Q    And when was Lilitab first contacted by

 5     Quest regarding the E check-in project?                     10:06

 6          A    You know, I don't know.  I can't remember,

 7     but I presume it would have been at least 2016.  But

 8     I really don't remember exactly.

 9          Q    How did you first learn about the Quest E

10     check-in project?                                           10:06

11          A    I can't remember to be honest with you.

12     But I can tell you that many of our referral -- many

13     of our work comes in via referral, so they could

14     have been referred via Apple or another tech partner

15     or they may have come in directly.  I don't know.          10:06

16          Q    What did you understand Quest wanted to do

17     with their E check-in project?

18          A    They wanted to automate their check-in

19     process by using a low-cost self-service device to

20     do that.                                                    10:07

21          Q    And when you say automated, automated from

22     what?

23          A    Well, I'm not an expert on Quest

24     Operations, so I don't know if I'm the right person

25     to answer that question.  But check-in, not               10:07
```

Page 52

PA0622

| | | |
|---|---|---|
| 1 | including Quest, but generally speaking, check-in to | 10:07 |
| 2 | Enterprise involves somebody coming to the | |
| 3 | Enterprise that has an appointment, usually | |
| 4 | preexisting, that they need to confirm and check-in | |
| 5 | with.  So that means, you know, hi, I am Adam | 10:07 |
| 6 | Aronson.  I've arrived and I'm here waiting for my | |
| 7 | appointment.  And using a tablet or kiosk to | |
| 8 | moderate that and track that it's typically how a | |
| 9 | check-in process works. | |
| 10 |     Q     Yeah.  Did you have any understanding that | 10:07 |
| 11 | Quest was looking to migrate from having a person | |
| 12 | physically check in patients to moving -- to having | |
| 13 | a kiosk perform that function? | |
| 14 |     A     We may have discussed that, but I'm not | |
| 15 | 100 percent sure if that's what I remember or not. | 10:08 |
| 16 | I can tell you that often these check-in systems are | |
| 17 | used alongside people, but I can't remember the | |
| 18 | exact discussions we had with Quest. | |
| 19 |     Q     Did you have any understanding as to where | |
| 20 | Quest was attempting to implement the kiosks that it | 10:08 |
| 21 | was interested in purchasing? | |
| 22 |     A     Yeah, I was aware this was going to go -- | |
| 23 | this was going to be a project that was going to go | |
| 24 | into all their phlebotomy labs across the United | |
| 25 | States. | 10:08 |

Page 53

PA0623

```
 1    Lilitab kiosks?                                    10:21

 2        A    I do remember that name, yes.

 3        Q    And in particular am I correct in

 4    understanding that in and around May 22nd, 2016

 5    Quest was seeking to evaluate several Lilitab     10:22

 6    products as referenced here in this email?

 7        A    It would look that way judging from this

 8    email and that is my vague recollection, yes.

 9        Q    So that would have included the Floor Pro

10    with the floor stand?                             10:22

11        A    Yes, that's correct.

12        Q    And it says with accessories.  I want to

13    focus in on that part of the request.  QR code

14    reader tray.  It says "Is something like this

15    available?"  Did Lilitab offer a QR code reader tray  10:22

16    in 2016?

17        A    Yes.

18        Q    And what did -- what did a QR code reader

19    tray do with respect to the kiosk?

20        A    That was the ID -- the ID tray that you   10:22

21    pointed out before.  So, what it does is it offers a

22    platen that is -- that held -- allows you to hold an

23    ID sized document at the correct distance from the

24    rear camera so that it can focus on it accurately

25    and take a good clear picture.                     10:23
```

Page 64

```
 1          Q     Did you have an understanding that Quest        10:23
 2    was looking to allow ID cards to be read at its
 3    kiosk in the 2016 time frame?
 4          A     Yes, that's my recollection.
 5          Q     There was also an ask regarding a magnetic      10:23
 6    swipe reader.  Did Lilitab have an option that
 7    allowed for a magnetic swipe reader in 2016?
 8              MR. RAIZMAN:  Object to form.
 9              THE WITNESS:  Yes.
10    BY MR. MILLER:                                              10:23
11          Q     And what did the magnetic swipe reader
12    allow?
13          A     The reading of magnetic stripes from cards
14    that had them.
15          Q     So, for example, payment cards that might      10:23
16    have a magnetic stripe?
17          A     Anything with a mag stripe.
18          Q     Would that include -- would that include
19    payment cards, such as debit --
20          A     Yes.                                            10:23
21          Q     -- cards?
22          A     Yes.
23          Q     As well as licenses, for example?
24          A     Yes, if they have a mag stripe.  Not all
25    licenses did at the time.                                  10:23
```

Page 65

PA0625

1         Q    And was it your understanding that Quest          10:23

2    in 2016 was seeking to potentially acquire a kiosk

3    that would allow for a magnetic stripe reader

4    functionality?

5         A    Potentially, yes.                                  10:24

6         Q    And, addition -- additionally, Mr. Ocampo

7    was asking about an ID scanning tray.  Did Lilitab

8    offer an ID scanning tray in the 2016 timeframe as

9    an accessory?

10        A    We did.                                            10:24

11        Q    And what does the ID scanning tray do

12   generally?

13        A    That's what we just talked about.  It's

14   the same thing as the QR code reader tray

15   effectively.                                                 10:24

16        Q    Okay.  Again, allows an ID to be scanned

17   and read?

18        A    That's correct.  Take a picture of an ID.

19        Q    So in 2016 it was also your understanding

20   that Quest was seeking to look at accessories around        10:24

21   ID scanning?

22        A    Yes.

23        Q    To have functionality availability at its

24   kiosk?

25        A    Yes.                                               10:24

Page 66

PA0626

```
 1    discussed in those conversations?                    10:49

 2        A    I don't specifically.  But one of the

 3    features of the H Head is that the headphone jack

 4    passthrough, I'm sure that would have been

 5    mentioned.  But we would have gone through all the   10:50

 6    features of the H Head.  That's just one of the

 7    features that's available.

 8        Q    That would be your practice to have that

 9    discussion in the 2018 time frame with respect to a

10    call about new products?                             10:50

11        A    That's accurate, yes.

12        Q    So, is it your best testimony that if you

13    had a call with Quest in the 2018 time frame about

14    the new H Head rollout you would have discussed the

15    availability off a headphone jack?                   10:50

16        A    It's highly likely, yes.

17        Q    And if we take a look here at your

18    February 22nd, 2018 email above, it's again

19    timestamped 10:17, it's from you to various

20    individuals, including Mr. Ocampo; is that right?    10:50

21        A    Looks that way, yeah.

22        Q    You say "For the H Head, as long as you

23    choose a face plate that exposes the front facing

24    camera, the ALS will be exposed."

25             Can you explain what you meant by that?     10:51
```

Page 87

```
 1    accessories that a particular customer or client      11:19

 2    would want?

 3         A    That's correct.

 4         Q    Do you know whether Quest acquired any

 5    accessories from Lilitab?                               11:19

 6         A    I don't.  I'd have to go back and look at

 7    the invoices and quotes we prepared for them.  I

 8    would expect that they did because it's rare for us

 9    to make a deployment that doesn't have at least one

10    accessory of some variety or another, but I can't      11:20

11    recall until I go back and look at those invoices.

12         Q    Would you agree that the invoices would be

13    the best evidence of what accessories, if any, Quest

14    acquired from your company?

15         A    As far as Lilitab is concerned, yes,         11:20

16    because we don't ship a product unless we -- unless

17    someone's paid for it.  And we can't -- we can't

18    bill them unless it's a line item on the quote or

19    the invoice, so...

20         Q    To your knowledge, did Quest ever come to    11:20

21    you and raise any issue about whether its kiosks

22    were accessible to the blind community?

23              MR. RAIZMAN:  Object as to form.

24              THE WITNESS:  I don't recall that, no.

25
```

                                                Page 100

PA0628

```
 1    BY MR. MILLER:                                          11:20

 2         Q     To your knowledge, did Quest ever come to

 3    you and ask you to make an enclosure that could be

 4    accessible to blind patients?

 5              MR. RAIZMAN:  Object as to form.              11:21

 6              THE WITNESS:  No, they did not.

 7    BY MR. MILLER:

 8         Q     So am I correct in understanding that from

 9    2016 to the present, Lilitab never engaged in any

10    analysis as to whether it could provide an enclosure    11:21

11    that would have functionality that would make the

12    kiosk independently useable by blind patients?

13              MR. RAIZMAN:  Object as to form.

14              MR. MILLER:  For Quest.

15              THE WITNESS:  Not -- we did not do that --     11:21

16    well, hang on a second.  Can you restate the

17    question, please?

18    BY MR. MILLER:

19         Q     Yeah.  I just want to make sure I'm

20    correct in the statement.                               11:21

21              Is it true that from 2016 to the present,

22    Lilitab was never asked to undertake any analysis by

23    Quest to determine whether it could provide a kiosk

24    enclosure that would allow the kiosk to be

25    independently useable by blind patients?                11:21
```

                                                   Page 101

PA0629

| | | |
|---|---|---|
| 1 | accessibility? | 11:26 |
| 2 | A    Yes, and reach range as well.  So similar | |
| 3 | to this, although not in as explicit detail. | |
| 4 | Q    Okay.  And do you have any expertise in | |
| 5 | ADA compliance? | 11:26 |
| 6 | A    Yeah.  I've been designing interactive | |
| 7 | kiosks my entire 25 plus year career.  I sat on the | |
| 8 | Kiosk Organization Board -- Advisory Board for ADA | |
| 9 | compliance when ADA was going through its -- | |
| 10 | updating its recommendations, so I probably know as | 11:26 |
| 11 | much about ADA compliance for kiosks as most anyone | |
| 12 | out there. | |
| 13 | Q    Okay.  And that knowledge -- so you say | |
| 14 | you were on the ADA board.  Was that the access | |
| 15 | board that you served on, the advisory committee? | 11:26 |
| 16 | A    No.  There is a kiosk group of kiosk | |
| 17 | manufacturers that maintain their own advisory board | |
| 18 | to generate advisory input for the ADA process. | |
| 19 | Q    Okay.  What's that called? | |
| 20 | A    I can't remember off the top of my head, | 11:27 |
| 21 | I'd have to go back and check, but I can find that | |
| 22 | for you.  I believe it's KMA, Kiosk Manufacturer | |
| 23 | Association, but I can find that in more explicit | |
| 24 | detail for you. | |
| 25 | Q    Okay.  And is that advisory board | 11:27 |

Page 106

PA0630