# EXHIBIT 20

## REDACTED

TO BE FILED UNDER SEAL PENDING THE COURT'S RULING ON PLAINTIFF'S APPLICATION

# EXHIBIT 21

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4    JULIAN VARGAS, ANNE WEST, and )  Case No. 2:19-cv-8108
      AMERICAN COUNCIL OF THE       )
 5    BLIND, individually on behalf )
      of themselves and all others  )
 6    similarly situated,           )
                                    )
 7              Plaintiffs,         )
                                    )
 8         v.                       )
                                    )
 9    QUEST DIAGNOSTICS CLINICAL    )
      LABORATORIES, INC., QUEST     )
10    DIAGNOSTICS HOLDINGS, INC.,   )
      QUEST DIAGNOSTICS             )
11    INCORPORATED; and DOES 1-10,  )
      inclusive,                    )
12                                  )
              Defendants.           )
13    _____)

14

15

16                      --oOo--

17       VIDEOTAPED DEPOSITION OF PRUDENCIA MAGANA

18           Taken on behalf of the Defendants

19                  August 3, 2021

20          ***TAKEN VIA VIDEOCONFERENCE***

21                      --oOo--

22

23

24

25

                                          Page 1
```

PA0677

```
 1              BE IT REMEMBERED THAT, pursuant to the Federal
 2    Rules of Civil Procedure, the deposition of PRUDENCIA
 3    MAGANA, was taken before Maureen Kelly,
 4    OCSR No. 00-0364, WCSR No. 3401, on Tuesday, August 3,
 5    2021, commencing at the hour of 10:10 a.m., the
 6    proceedings being reported via Zoom videoconference.
 7                         --oOo--
 8
 9
10                        APPEARANCES
11             (ALL APPEARING VIA VIDEOCONFERENCE)
12    Attorney for the Plaintiffs:
               NYE, STIRLING, HALE & MILLER, LLP
13             BY MR. JONATHAN D. MILLER
                  MR. BENJAMIN J. SWEET
14             33 West Mission Street, Suite 201
               Santa Barbara, CA 93101-2455
15             805-963-2345
               jonathan@nshmlaw.com
16             ben@nshmlaw.com
17    Attorney for the Defendants:
               OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC
18             BY DAVID H. RAIZMAN
               400 South Hope Street, Suite 1200
19             Los Angeles, CA 90071-2818
               213-239-9800
20             david.raizman@ogletree.com
21
      Also Present: John MacDonell - Videographer
22                 Amer Pharaon
23                       --oOo--
24
25
```

                                             Page 2

PA0678

```
 1                           INDEX
 2     EXAMINATION BY:                            PAGE
 3     MR. MILLER                                5, 96
       MR. RAIZMAN                                 95
 4
                             --oOo--
 5
 6
 7
                            EXHIBITS
 8
       EXHIBIT NO.    ITEM                        PAGE
 9
       Exhibit 104    Photo of Vargas              42
10     Exhibit 105    Photo of Vargas              42
11                         --oOo--
12
13     INSTRUCTION not to Answer:             (None.)
14                         --oOo--
15
16     REQUEST for Production:                (None.)
17                         --oOo--
18
19
20
21
22
23
24
25
                                              Page 3
```

PA0679

```
 1              A.    I don't remember.

 2              Q.    As of June 25th, 2019, were you working at

 3      the 4955 Van Nuys Boulevard location of Quest?

 4              A.    I think so.

 5              Q.    And was anyone else working there on that

 6      date?

 7              A.    I don't remember.

 8                    MR. RAIZMAN:  Hey, Jon?

 9                    MR. MILLER:  Yes.

10                    MR. RAIZMAN:  I'm going to need a break

11      probably in the next 10 minutes, and I -- you may be

12      getting into a new topic.  But you can go for 10 minutes

13      but I do need a break eventually.

14                    MR. MILLER:  Why don't we just take the

15      break now?  It's just as easy as any time.

16                    MR. RAIZMAN:  Okay.  Thank you very much.

17                    MR. MILLER:  Thank you.

18                    THE VIDEOGRAPHER:  Okay.  We're off the

19      record.  It's 11:03 a.m.

20                         (A recess was taken.)

21                    THE VIDEOGRAPHER:  And we are back on the

22      record.  It's 11:16 a.m.

23      BY MR. MILLER:  (Continuing)

24              Q.    Ms. Magana, did you interact with Julian

25      Vargas on June 25th, 2019, at a Quest patient service
```

Page 41

1    center located at 4955 Van Nuys Boulevard?

2            A.    I don't remember.

3            Q.    I'm going to share a screen and show you

4    what I'll mark as next in order, Exhibit 104.

5                    (EXHIBIT marked: Exhibit 104.)

6    BY MR. MILLER:  (Continuing)

7            Q.    I'll represent to you this is a photograph

8    of Mr. Vargas.  Does this refresh your memory of whether

9    you interacted with Mr. Vargas on June 25th, 2019?

10           A.    I don't remember.  I don't remember.

11           Q.    So this photograph does not refresh your

12   memory that you interacted with Mr. Vargas on June 25th,

13   2019?

14           A.    No.

15           Q.    I will show you another photograph that I

16   will mark next in order, Exhibit 105.

17                    (EXHIBIT marked: Exhibit 105.)

18   BY MR. MILLER:  (Continuing)

19           Q.    It's another photograph of Mr. Vargas.

20   Does this photograph refresh your memory that you

21   interacted with Mr. Vargas on June 25th of 2019?

22           A.    I don't remember.

23           Q.    So the photograph does not refresh your

24   memory that you interacted with Mr. Vargas at a Quest

25   patient service center on June 25th, 2019?

Page 42

PA0681

1          A.   No, I don't remember.

2          Q.   So then you're not able to tell us what

3     time Mr. Vargas came into the Quest patient service

4     center on June 25th, 2019, are you?

5          A.   I don't remember.

6          Q.   And you're not able to tell us whether

7     there was a greeter available at the Quest patient

8     service center on June 25th, 2019, are you?

9               MR. RAIZMAN:  Object as to form.

10    BY MR. MILLER:  (Continuing)

11         Q.   You can answer.

12         A.   I don't remember.  There is PSRs.

13         Q.   Are you able to -- I'm sorry.

14         A.   PSRs, patient services.

15         Q.   What does -- what does PSR stand for?

16         A.   Patient services center.

17         Q.   A PSC you mean, patient service center?

18         A.   Yes.

19         Q.   Was there any other employee working with

20    you on June 25th, 2019, to assist you at the Quest

21    patient service center at 4955 Van Nuys Boulevard?

22              MR. RAIZMAN:  Object as to form.

23              THE WITNESS:  I don't remember.

24    BY MR. MILLER:  (Continuing)

25         Q.   Can you tell me whether anyone was working

Page 43

PA0682

```
 1              A.   I don't remember.
 2              Q.   Do you know of any documents that would
 3      refresh your memory on the specific training you
 4      received around the kiosk for blind patients?
 5              A.   Patient every needs -- managing every
 6      patient needs.
 7              Q.   Outside of the managing every patient needs
 8      training, are you aware -- strike that.
 9                   So it's your -- it's your memory that the
10      managing every patient needs training contains training
11      around how blind patients can use the kiosk; is that
12      right?
13              A.   I think so.
14              Q.   Are you aware of any other training other
15      than the managing every patient needs training that was
16      provided to you by Quest that indicated how blind
17      patients could use the kiosk?
18              A.   I don't remember.
19              Q.   Did Quest ever tell you that the kiosk was
20      not independently accessible by blind patients?
21                   MR. RAIZMAN:   Object as to form.
22      BY MR. MILLER:   (Continuing)
23              Q.   You can answer.
24              A.   I think so.
25              Q.   You think Quest informed you that the kiosk
```

Veritext Legal Solutions
866 299-5127

PA0683

```
 1              A.   I don't remember.
 2              Q.   Have you ever been trained by Quest that
 3     you are required to give primary consideration to the
 4     accommodation requests of a disabled patient when
 5     checking in at a Quest patient service center?
 6                   MR. RAIZMAN:   Object as to form.
 7     BY MR. MILLER:   (Continuing)
 8              Q.   You can answer.
 9              A.   I think so.
10              Q.   When were you first trained on giving
11     primary consideration to an individual with
12     disabilities' request at a Quest service center?
13                   MR. RAIZMAN:   Objection as to form.
14     BY MR. MILLER:   (Continuing)
15              Q.   You can answer.
16              A.   When I first got hired and every year.
17              Q.   Back in 2017?
18              A.   Mm-hmm.   And every year.
19              Q.   And was that through the managing every
20     patient needs training you received?
21              A.   I think so.
22              Q.   And you believe that training covered the
23     topic of giving primary consideration to an individual
24     with disabilities' requests when they're checking in.
25     Right?
```

1              MR. RAIZMAN:  Object as to form.

2      BY MR. MILLER:  (Continuing)

3          Q.   Is that right?

4          A.   I think so.

5          Q.   And what's your understanding of what it

6      means based on the training you had to give primary

7      consideration to an individual with disabilities'

8      accommodation requests when they check in?

9              MR. RAIZMAN:  Object as to form.

10     BY MR. MILLER:  (Continuing)

11         Q.   You can answer.

12         A.   Can you repeat it again?

13         Q.   Yeah.

14             Based on the training Quest has provided to

15     you, what do you understand it to mean to give primary

16     consideration to an individual with disabilities'

17     request when they are checking in?

18         A.   Help them.

19         Q.   Do you have any understanding as to whether

20     if they make a specific request for an accommodation,

21     that you have to provide it?

22             MR. RAIZMAN:  Objection as to form.

23     BY MR. MILLER:  (Continuing)

24         Q.   You can answer.

25         A.   According to the -- to the Quanum?

PA0685

1      Q.   My question was a little more specific.  Do

2  you have any understanding based on the training you

3  received that if an individual with disabilities asked

4  for a certain type of accommodation, you either have to

5  provide it or document in writing the reasons why you

6  cannot?

7            MR. RAIZMAN:  Object as to form.

8  BY MR. MILLER:  (Continuing)

9      Q.   I'm sorry.  Go ahead.

10      A.   I think so.

11      Q.   You think you were provided that training

12  by Quest through the managing every patient needs

13  training?

14      A.   I think so.

15      Q.   And you believe you had that training in

16  2017; is that right?

17      A.   I think so.

18      Q.   All -- every year up to the present.

19  Correct?

20      A.   Correct.

21      Q.   And have you ever had to document on any

22  occasion -- or strike that.

23            Have you ever had to provide an

24  accommodation on any occasion to a disabled patient at

25  Quest?

1           A.     Can you repeat it again please?

2           Q.     Yeah.

3                  Have you ever had to give primary

4    consideration to a disabled patient's need for

5    accommodation at a Quest patient service center?

6                  MR. RAIZMAN:   Object as to form.

7    BY MR. MILLER:   (Continuing)

8           Q.     You can answer.

9           A.     It depends.

10          Q.     Can you think of any instance as you sit

11   here today where you had to give primary consideration

12   to an individual with disabilities' accommodation

13   request at a Quest patient service center?

14          A.     It all depends.

15          Q.     No.   I'm asking whether you can recall any

16   instance where you've ever given primary consideration

17   to an individual with disabilities' accommodation

18   request while employed at Quest.

19                 MR. RAIZMAN:   I'm just going to have a

20   standing objection as to form with respect to the phrase

21   "primary consideration".

22                 You can answer.   I don't want to keep

23   interrupting.

24                 THE WITNESS:   I don't remember.

25   BY MR. MILLER:   (Continuing)

PA0687

1          Q.    Go ahead.

2          A.    I don't remember.

3          Q.    Are you aware of any occasion where you

4    ever documented that you couldn't provide an

5    accommodation to an individual with disability who was

6    making an accommodation request?

7          A.    I don't remember.

8          Q.    Let me show you what was previously marked

9    in another deposition -- let me see -- as Exhibit 47.

10   And I'll share my screen for ease of reference.  This is

11   Exhibit 47 to the Jody Reilly deposition.  Can you see

12   the document I'm showing you?

13         A.    Yes.

14         Q.    And it's labeled "Patient Services -

15   Managing Every Patient's Needs due every 12 Months."

16   And I'm going to scroll down through the document, and

17   tell me -- I just want you to generally familiarize

18   yourself with it.  I'll blow it up.

19             MR. RAIZMAN:  I'm going to put it in front

20   of her because it's a large document but it's going to

21   take me --

22             MR. MILLER:  Sure.

23             MR. RAIZMAN:  -- a second to do that.

24             MR. MILLER:  Sure.  Why don't we -- it's

25   already in the -- it's already in the share folder.

                                            Page 71

PA0688

# EXHIBIT 22

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4    JULIAN VARGAS, ANNE     )
      WEST, and AMERICAN      )
 5    COUNCIL OF THE BLIND,   ) Case No. 2:19-cv-8108
      individually on behalf  )
 6    of themselves and all   )
      others similarly        )
 7    situated,               )
                              )
 8              Plaintiffs,   )
                              )
 9       vs.                  )
                              )
10    QUEST DIAGNOSTICS       )
      CLINICAL LABORATORIES,  )
11    INC., QUEST DIAGNOSTICS )
      HOLDINGS, INC.,         )
12    QUEST DIAGNOSTICS       )
      INCORPORATED, and       )
13    DOES 1-10, inclusive,   )
                              )
14              Defendants.   )
      _____)
15
16
17         REMOTE DEPOSITION OF CLAIRE STANLEY
18              (Via Zoom Videoconference)
19               Thursday, August 19, 2021
20
21    REPORTED BY:  Michelle Milan Fulmer
                    CSR No. 6942, RPR, CRR, CRC
22
23    JOB NO. 4769235
      PAGE 85 THROUGH PAGE 88 IS MARKED "CONFIDENTIAL"
24    UNDER THE PROTECTIVE ORDER AND SEPARATELY BOUND
25    PAGES 1 - 225
```

                                                    Page 1

PA0689

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4    JULIAN VARGAS, ANNE    )
      WEST, and AMERICAN     )
 5    COUNCIL OF THE BLIND,  ) Case No. 2:19-cv-8108
      individually on behalf )
 6    of themselves and all  )
      others similarly       )
 7    situated,              )
                             )
 8               Plaintiffs, )
                             )
 9       vs.                 )
                             )
10    QUEST DIAGNOSTICS      )
      CLINICAL LABORATORIES, )
11    INC., QUEST DIAGNOSTICS)
      HOLDINGS, INC.,        )
12    QUEST DIAGNOSTICS      )
      INCORPORATED, and      )
13    DOES 1-10, inclusive,  )
                             )
14               Defendants. )
      _____)
15
16
17        Remote deposition of CLAIRE STANLEY, taken
18    before Michelle Milan Fulmer, a Certified Shorthand
19    Reporter for the State of California, with principal
20    office in the County of Orange, commencing at
21    12:06 p.m., Thursday, August 19, 2021.
22
23
24
25
```

Page  2

PA0690

```
 1    APPEARANCES OF COUNSEL:
 2
 3    FOR PLAINTIFFS:
 4
             NYE, STIRLING, HALE & MILLER, LLP
 5           BY:  Jonathan D. Miller, Esq.
             33 West Mission Street, Suite 201
 6           Santa Barbara, California 93101
             TEL: (805) 963-2345
 7           EMAIL:  jonathan@nshmlaw.com
             (Via Zoom Videoconference)
 8
 9    FOR DEFENDANTS:
10           OGLETREE DEAKINS NASH SMOAK & STEWART, PC
             BY:  David Raizman, Esq.
11           400 South Hope Street, Suite 1200
             Los Angeles, California 90071
12           TEL:  (213) 457-5862
             EMAIL:  david.raizman@ogletree.com
13           (Via Zoom Videoconference)
14
      THE VIDEOGRAPHER:
15
             Anthony Gulino
16           (Via Zoom Videoconference)
17
      ALSO PRESENT:
18
             Amer Pharaon
19           (Via Zoom Videoconference)
20
21
22
23
24
25
                                              Page  3
```

PA0691

```
 1                    I N D E X
 2    WITNESS                        EXAMINATION
 3    CLAIRE STANLEY
 4                                      PAGE
 5               BY MR. RAIZMAN          8, 208
 6               BY MR. MILLER        196, 218
 7
 8
 9                  E X H I B I T S
10                                      Page
11    Exhibit       Description       Identified
12    Exhibit 106   Declaration of          32
                    Claire Stanley
13
      Exhibit 107   Robin Rehder notes      108
14
      Exhibit 108   Stanley_2018_calls      118
15                  Bates stamped
                    PL00673 - 681
16
      Exhibit 109   Stanley_2018_calls      118
17                  Bates stamped
                    PL00673 - 681
18
      Exhibit 110   Letter from Eric Bridges  133
19                  to Steve Rusckowski, CEO
20    Exhibit 111   Survey Responses,       181
                    Bates stamped
21                  PL00683 - 693
22
23
24
25
                                        Page  4
```

PA0692

```
 1                    (Previously marked)

 2
                       E X H I B I T S
 3
                                                    Page
 4
       Exhibit          Description               Identified
 5
       Exhibit 62       Emails, Bates stamped        119
 6                      PL00418 - 439

 7     Exhibit 63       ACB Chart, Bates stamped     169
                        PL00392
 8
       Exhibit 65       Letter from Eric Bridges     133
 9                      to Steve Rusckowski, CEO

10     Exhibit 66       Call Log, Bates stamped      143
                        PL00570 - 573
11
       Exhibit 67       ACB notes, Bates stamped     143
12                      PL00577 - 596

13     Exhibit 69       ACB June 2020 Survey,        144
                        Bates stamped
14                      PL00415 - 416

15

16

17

18

19

20

21

22

23

24

25


                                             Page  5
```

PA0693

```
 1        A    At least one that I can recall.

 2        Q    Okay.  Let's explore that, and then we'll

 3   try to better understand if there may be others that

 4   you're not recalling.

 5             When was that one occasion that you went to    13:34:12

 6   Quest?

 7        A    It was in 2020.  I -- either in the summer

 8   or fall of 2020.

 9        Q    Did you go as part of your discharge of

10   duties for ACB or as just part of your own health       13:34:41

11   care?

12        A    I went because my doctor ordered lab work.

13        Q    Your doctor ordered lab work.  Did your

14   doctor say, "Go get this lab work at Quest"?

15        A    No.  My doctor gave me several labs that       13:34:57

16   were in the area and this was one of them.

17        Q    Why did you pick Quest in the summer or

18   fall of 2020?

19        A    I wanted to see what their services were

20   like.                                                    13:35:11

21        Q    Why?

22        A    I just was curious what the setup was like.

23        Q    Were you curious because of this

24   litigation?

25        A    Yes.                                           13:35:30
```

Page 61

PA0694

1    line prior to visiting?

2        A    Not that I recall.

3        Q    Okay.  And you felt comfortable doing that

4    because you'd had success in your life finding front

5    doors to store locations out there in the -- in the        13:43:35

6    public; correct?

7        A    Yes.

8        Q    Okay.  And once you entered the Quest

9    location, how is it that you found --

10            Well, let me ask you this.                         13:43:50

11            Was there a kiosk available at that patient

12    service center, to your knowledge?

13        A    I don't know because I'm blind and there --

14    it didn't make any noise.  So I had no way of

15    knowing.                                                   13:44:06

16        Q    Understood.

17            It's possible that you touched one or

18    someone made reference to it and you spoke to

19    someone about a kiosk.  So that's why I ask.

20            But you have no knowledge of there being a        13:44:16

21    kiosk at that location?

22        A    I have no knowledge of what was there,

23    period, because I'm blind and I walked in and heard

24    nothing.

25        Q    So the entire time you were there, you           13:44:29

Page 68

PA0695

```
 1    says, "Come on in, come on in and sign in," and I

 2    say, "I need to talk to a human being."

 3        Q    Okay.  And you're comfortable not using the

 4    tablet on those occasions and getting the personal

 5    assistance?                                          13:46:01

 6            MR. MILLER:  Lacks foundation.

 7            Go ahead.

 8            THE WITNESS:  I want equal access to be

 9    independent to sign in the same way all other

10    patients or customers sign in.                       13:46:10

11    BY MR. RAIZMAN:

12        Q    I understand you want that, but you --

13    you've accepted the personal assistance in those

14    occasions with other medical care providers who use

15    tablets that you were not able to use; correct?      13:46:24

16        A    In the moment I've done what I've had to

17    do, but I am not happy with it.  I still believe

18    that I need to be able to independently sign in by

19    myself and have full access to every accommodation

20    or function that every other customer or patient     13:46:44

21    has.

22        Q    Right.

23            So how many times have you encountered the

24    use of a tablet device that you were unable to use

25    in connection with your visiting let's stick with    13:46:57
```

Page 70

PA0696

1    the health care provider industry first?

2         A    I would not be able to give you a number.

3         Q    More than once?

4         A    Probably.

5         Q    Okay.  More than the one time you visited    13:47:21

6    Quest?  Let's start with that.

7         A    Yes.  More than just Quest.

8         Q    Okay.  Can you say that it was more or less

9    than five times at other health care providers?

10        A    I don't know.  I don't even always know if    13:47:41

11   there is a kiosk there because I can't see it.  So

12   unless somebody says, "Sign in on the kiosk," I

13   don't know it's there.

14        Q    Okay.  So there may be occasions where you

15   visit a health care provider where you may not even    13:47:54

16   know that they're using a tablet or kiosk device for

17   checking in; is that right?

18        A    Unless somebody verbally says there's a

19   kiosk.

20        Q    Okay.  Have you ever used a kiosk or    13:48:06

21   check-in device at any health care provider that had

22   audio output?

23        A    No.

24        Q    What about more generally in the business

25   world?  Have you ever encountered in the business    13:48:22

Page 71

1    world, in general, the retail world, any commercial

2    activity that you've undertaken where you've been

3    asked or required to use a tablet or touch screen

4    device to interact with that business?

5        A    If you consider banking commercial, yes.    13:48:41

6    I've used ATMs.

7        Q    Okay.  How about other than banking?

8        A    Not that I can think of, no.

9        Q    Restaurants?  Ever been asked to use a

10   touch screen device at a restaurant?    13:49:00

11       A    I have been asked to use them.

12       Q    Okay.  And in those occasions have you been

13   able to use them?

14       A    No.

15       Q    And have you been provided personal    13:49:12

16   assistance that allowed you to undertake the

17   transaction at those restaurants?

18       A    Oftentimes, I have to rely on friends that

19   are with me.

20       Q    Okay.  So you have received assistance that    13:49:31

21   allowed you to place the order or, otherwise,

22   interact with the business other than through the

23   tablet or device; correct?

24       A    Can you say it -- restate that?

25       Q    That's okay.  We'll just move on.  It might    13:49:49

                                          Page 72

PA0698

```
 1        A    Again, it's been a while.  But if I

 2   remember correctly, once the paperwork portion was

 3   done and the insurance, which took the longest,

 4   getting the actual lab work done was quicker.

 5        Q    Okay.  Can you give me an estimate of how      13:59:28

 6   long it took?

 7        A    No, I cannot.

 8        Q    Okay.  And after the lab work was done, did

 9   you immediately proceed to the exit?

10        A    Yes.                                            13:59:39

11        Q    Did you call a Lyft or Uber to pick you up

12   while you --

13        A    Yes.

14        Q    -- were still in the Quest room or did you

15   exit Quest and then make the call or use the app to      13:59:48

16   ask for a ride?

17        A    I cannot remember.

18        Q    Did you make any requests of anyone at

19   Quest for reasonable modifications or for auxiliary

20   aids or services while you were there?                   14:00:10

21        A    Do you mean while I was physically in the

22   location?

23        Q    Yes.

24        A    I said I needed help signing in.

25        Q    Okay.  Was that before or after the            14:00:27
```

Page 81

PA0699

```
 1    individual said, "Are you here for phlebotomy

 2    services"?

 3            That's the first thing that the Quest

 4    representative said to you; correct?

 5        A    I don't think I remember the exact wording,   14:00:44

 6    but that's what he conveyed.

 7        Q    Okay.  And your response to that was, "I

 8    need help checking in" or was your response that

 9    "Yes"?

10        A    Again, I don't remember the exact wording.   14:00:59

11    I just know I conveyed, "I'm here.  I need to check

12    in.  I'm here for blood work."

13        Q    Okay.  And the immediate response to that

14    from the phlebotomist was to lead you into the back;

15    correct?                                             14:01:12

16        A    Yes.

17        Q    Any other requests for reasonable

18    modifications of policies, practices, and procedures

19    or for auxiliary aids or services while you were at

20    Quest on that occasion?                              14:01:25

21        A    No.

22        Q    Did you ever correspond with Quest in any

23    way, writing or orally, after that?

24        A    After, no.

25        Q    Did you ever correspond with Quest, orally  14:01:44
```

Page 82

PA0700

```
 1        A    No.

 2        Q    You indicated that you had to wait for some

 3   period of time.  You couldn't tell Mr. Raizman

 4   specifically how long, but do you have a range or

 5   an estimate of how long you waited when you walked    17:44:05

 6   in?

 7        A    It was probably at least three minutes.

 8   Maybe more.

 9        Q    Okay.  Can you give us the best range that

10   you have or the best estimate of time that you have   17:44:13

11   today?

12        A    Perhaps three to five minutes.

13        Q    Before somebody first interfaced with you?

14        A    Correct.

15        Q    Okay.  And then you indicated --           17:44:21

16             At any point in time were you able to use a

17   kiosk, assuming there was one, at the location you

18   visited in Rockville?

19        A    No, I was not.

20        Q    Were you able to access any of the services  17:44:32

21   within a kiosk, assuming there was one at that

22   Rockville location?

23        A    No, I was not.

24        Q    For example, were you -- were you ever

25   offered the opportunity to wait outside the facility   17:44:44
```

Page 204

PA0701

# EXHIBIT 23

Page 1

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

      JULIAN VARGAS, ANNE WEST AND          )
4     AMERICAN COUNCIL OF THE BLIND,        )
      INDIVIDUALLY ON BEHALF OF             )
5     THEMSELVES AND ALL OTHERS SIMILARLY)  CASE NO.
      SITUATION,                            )
6                                           )  2:19-CV-08108
                        PLAINTIFFS,         )  DMG
7                                           )
            VS.                             )
8                                           )
      QUEST DIAGNOSTICS CLINICAL            )
9     LABORATORIES, INC., QUEST             )
      DIAGNOSTICS HOLDINGS, INC., QUEST     )
10    DIAGNOSTICS INCORPORATED; AND DOES    )
      1-10, INCLUSIVE,                      )
11                                          )
                        DEFENDANTS.         )
12                                          )
      _____)

13

14

15

16

17

18

                VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF
19
                       ROBIN CHARLOTTE REHDER
20
                       FRIDAY, MAY 21, 2021
21

22

23

24

      JOB NO. 4589711
25

      REPORTED BY:  MELIA BASAVAND, CSR NO. 14089

Page 2

1     VIDEOTAPED DEPOSITION OF ROBIN CHARLOTTE REHDER, TAKEN ON
2     BEHALF OF THE DEFENDANTS, AT 10:31 A.M., FRIDAY, MAY 21,
3     2021, AT HENDERSON, NEVADA, BEFORE MELIA BASAVAND, CSR
4     NO. 14089.
5
6
7
8
9     APPEARANCES OF COUNSEL:
10
11    FOR THE PLAINTIFFS:
12            HANDLEY FARAH & ANDERSON
              BY:  MATTHEW K. HANDLEY, ESQ.
13            -- VIA VIDEOCONFERENCE --
              777 6TH STREET NW
14            11TH FLOOR
              WASHINGTON, D.C., 20001
15            (202) 559-2411
              MHANDLEY@HFAJUSTICE.COM
16
17    FOR THE DEFENDANT:
18            OGLETREE, DEAKINS, NASH, SMOAK & STEWART
              BY:  AMBER L. ROLLER, ESQ.
19            -- VIA VIDEOCONFERENCE --
              400 SOUTH HOPE STREET
20            SUITE 1200
              LOS ANGELES, CALIFORNIA 90071
21            (213) 239-9800
              AMBER.ROLLER@OGLETREE.COM
22
23
24    ALSO PRESENT:  ROBERT FENTON, VIDEOGRAPHER
25

Page 3

1                              I N D E X

2

3      WITNESS                   EXAMINATION              PAGE

4      ROBIN CHARLOTTE REHDER

5                                BY MS. ROLLER              6

6

7

8

9

10

11

12

13                           E X H I B I T S

14                              (NONE.)

15

16

17

18

19

20

21

22

23

24

25

Page 45

1    the first time that you encountered the E check-in

2    device kiosk?

3        A    Yes.

4        Q    So between 2015, your first visit, and

5    approximately August 7th, 2018, you don't recall

6    coming across the E check-in device?

7        A    No, I don't.

8        Q    And for those visits between that time

9    period would you just check-in with a receptionist?

10       A    Yes.

11       Q    All right.  So tell me about your first

12   experience at Quest where they had these E check-in

13   devices.

14       A    When I came in in 2018, there was no one at

15   the desk, and somebody came up to me and offered to

16   help me sign in.

17            And I said what is it?  A touch screen?

18            They said yes.

19            And I could tell they were nervous,

20   embarrassed when they were asking me my name and

21   birthday, but they typed it in.  And it was a

22   patient, and I called and complained about it

23   because it's against the HIPAA law for a patient to

24   sign another patient in.

25            I called the local Quest office and

Page 46

1      explained my situation.  You know, I just didn't

2      feel comfortable, and I could tell that the patient

3      didn't either, and it's not right.

4              But when I went back in 19 -- in '20, there

5      was one at the desk.  And I also --

6      Q    Okay.

7      A    I'm sorry.

8      Q    Go ahead.

9      A    I just felt that that that situation was

10     very uncomfortable, and it shouldn't have happened.

11     And that's why I'm here now too.

12             I know other places, for example, I

13     understand -- and I know this is out of line, and I

14     apologize -- but I understand stores are trying to

15     go complete checkout by yourself and that to me is

16     putting people out of work.  And I have a --

17     (unintelligible) -- working, and I have a job.  It's

18     just losing the human touch, and I don't like it.

19             I realize it's 2021.

20     Q    Like the automated check-in, checkout

21     processes is because you think that it's displacing

22     workers and taking jobs away from people?

23     A    Plus you're losing the human touch, the

24     communication verbal contact.

25     Q    Okay.  So I want to talk about this visit in

# EXHIBIT 24

Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com
Alison M. Bernal (SBN 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Telephone: (805) 963-2345
Facsimile: (805) 284-9590

Benjamin J. Sweet
(pro hac vice)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

Attorneys for Plaintiffs Julian Vargas, American Council of the Blind, and the Proposed Class

*Additional Counsel Listed on Signature Page*

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIAN VARGAS and AMERICAN COUNCIL OF THE BLIND, individually on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, inclusive,<br><br>    Defendants. | CASE NO.: 2:19-cv-8108<br><br>**PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S FOURTH SUPPLEMENTAL RESPONSE TO FIRST SET OF INTERROGATORIES FROM DEFENDANT QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC.** |

Plaintiff American Council of the Blind submits the following fourth supplemental response to First Set of Interrogatories from Defendant Quest Diagnostics Clinical Laboratories, Inc.

1

PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S FOURTH SUPPLEMENTAL RESPONSE TO FIRST SET OF INTERROGATORIES FROM DEFENDANT QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC.

PA0707

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

**PRELIMINARY STATEMENT**

Each of the following responses is rendered and based upon information in the possession of Plaintiff American Council of the Blind at the time of the preparation of these responses. Discovery will continue as long as permitted by statute or stipulation of the parties, and the investigation of Plaintiff's attorneys and agents will continue to and throughout the trial of this action. Plaintiff, therefore, specifically reserves the right, at the time of trial, to introduce any evidence from any source which may hereinafter be discovered and testimony from any witness whose identity may hereinafter be discovered. If any information has unintentionally been omitted from these responses, Plaintiff reserves the right to apply for relief so as to permit the insertion of the omitted data from these responses.

These introductory comments shall apply to each and every response given herein, and shall be incorporated by reference as though fully set forth in all of the responses appearing in the following pages.

**SUPPLEMENTAL RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 4**

Please identify and describe any and all occasions in which any ACB members (including, without limitation, the Named Members) were unable to utilize the services at a PSC (including, without limitation, any of the PSCs identified in paragraphs 26-33 of the Complaint) because of alleged difficulty using the Kiosk at the PSC (including, but not limited to, any complaints by ACB's members and any documentation of complaints by ACB's members).

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4**

ACB objects to this request as overly broad, unduly burdensome, unreasonable, and not proportional to the needs of the case.  ACB is a membership organization of over eight thousand individuals.  It is impossible for ACB to know any and all occasions in which any ACB members (including, without limitation, the Named Members) were unable to utilize the

2

PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S FOURTH SUPPLEMENTAL
RESPONSE TO FIRST SET OF INTERROGATORIES FROM DEFENDANT QUEST
DIAGNOSTICS CLINICAL LABORATORIES, INC.

1    services at a PSC.  Determining "each and every" such member of ACB would also require

2    ACB to seek out information that is not in its possession, custody or control.  Discovery

3    obligations are limited to information "in the responding party's possession, custody, or

4    control."  See, e.g., Fed. R. Civ. P. 34(a)(1).  No provision of the Rules authorizes a defendant

5    to request information from an associational plaintiff when such information is in the

6    possession, custody, and control of a third party on whose membership the association relies

7    for standing.

8        ACB also objects to this request to the extent it seeks the production of information

9    impinging on the privacy interests of its members or other third parties.

10       Without waiving any objections, ACB responds as follows: occasions in which ACB

11   members who have faced accessibility barriers when seeking out Quest's services are

12   described in documents Bates numbered PL00392-PL00402, and PL00418-PL00439.  ACB is

13   unaware of any blind ACB member who has been able to independently utilize all of the

14   services of Quest's check-in kiosks, because such services are inaccessible to blind customers.

15   Additional detail concerning blind ACB members' experiences with accessibility barriers at

16   Quest is described below:

17       •   Christina Law goes for testing at Quest every three to six months. When she goes

18           for appointments, she would bring a staff member from her long-term care facility

19           and ask them to help her check in using the kiosk. She has never been able to use

20           the kiosk independently due to her blindness and its inaccessibility. She is planning

21           on returning for follow-up testing and confirmed she would visit other Quest

22           locations if needed.

23       •   Margie Donovan goes to Quest every three to four months.  Her last two visits were

24           on August 2, 2021 and in either late March or early April 2021.  During her visits

25           she waits in the waiting room until a staff member comes to get another patient,

26           and she asks them to check her in. She has never been able to use the kiosk to

27           check in because it is inaccessible, resulting in delays with her appointments. She is

28   Nye, Stirling, Hale & Miller
33 West Mission Street, Suite 201
Santa Barbara, California 93101

3

PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S FOURTH SUPPLEMENTAL
RESPONSE TO FIRST SET OF INTERROGATORIES FROM DEFENDANT QUEST
DIAGNOSTICS CLINICAL LABORATORIES, INC.

PA0709

1    planning to return to Quest for follow up appointments and would visit other Quest

2    locations if she needed to.

3    • Chris Gray goes to Quest every three to four months and his last visit was

4    approximately four months ago. When he visits, he waits in the waiting room of the

5    center for a staff member to come out and get another patient. He asks that staff

6    member to help him check in.  He has never been able to independently use the

7    kiosk because of his blindness. This resulted in delays with his appointments

8    because he is not able to check in immediately when he enters the facility like other

9    patients. He is planning on returning but said he also goes to LabCorp where the

10   staff is more accommodating. He did confirm that he would be willing to visit other

11   Quest locations if he needed to.

12   • Don Moore has not visited Quest in approximately two years. When he did go, he

13   had a staff member at the center help him check in for appointments. He has never

14   been able to independently use the kiosks to check in for appointments because

15   they were not accessible to blind patients. He is currently not planning to return to

16   Quest but would if his doctor sent him there.

17   • Debbie Rozear goes to Quest every three to six months. Her last visit was in

18   January 2021. She usually attends her appointments with someone else and that

19   person helps her check in.  She has never been able to independently check in using

20   the kiosk. She is currently undecided as to whether she is going to return to Quest

21   or go to other Quest locations because she recently visited a hospital for lab tests

22   and reported a more accessible experience there.

23   • Adelle Moller last visited Quest Diagnostics in 2018. She is blind and was not ever

24   able to check in independently due to the inaccessibility of the check-in kiosk. She

25   experienced delays; had to wait multiple times for a staff member to assist her with

26   the check-in process; and politely refused an offer of assistance from a fellow

27   patient waiting their turn because she felt uncomfortable providing a stranger with

28

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA  93101

4

PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S FOURTH SUPPLEMENTAL
RESPONSE TO FIRST SET OF INTERROGATORIES FROM DEFENDANT QUEST
DIAGNOSTICS CLINICAL LABORATORIES, INC.

her personal information. Adelle no longer visits Quest facilities because her doctor's office has their own lab facility.

- Harvey Heagy last visited Quest in April of 2021. He goes to a Quest facility every three to four months for bloodwork. He is blind and has not ever been able to independently check in using the kiosk due to its inaccessibility. He has had to rely on fellow patients to sign him in and has experienced delays. He would like for the check-in kiosks to be made accessible and does not wish to go to a different Quest facility. He has never been able to use the text-when-the-phlebotomist-is-ready feature of the kiosk.

- Debbie Hietala last visited Quest in November of 2020. She is blind and has not ever been able to independently check in using the check-in kiosk due to its inaccessibility. She does not want to visit a different Quest facility because the location of the one she goes to is conveniently located in her neighborhood. She has to have someone she trusts accompany her to her appointments to assist her with checking in. She has never been able to use the text-when-the-phlebotomist is ready feature of the kiosk.

- Patricia Lipovsky is blind and last visited Quest in 2020. She has never been able to use the check-in kiosk independently due to its inaccessibility. A Quest staff member begrudgingly assisted her with checking in. Ms. Lipovsky felt uncomfortable giving out her personal information with other people in the waiting room. She asked if she could do so privately and was told no. She has never been able to use the text-when-the-phlebotomist is ready feature of the kiosk. She does not want to return to Quest due to her negative experience and now goes to a different facility that is less conveniently located but more accommodating.

- Ian Foley has had several negative experiences when visiting Quest locations. Since the check-in kiosks were inaccessible to him, he often had to rely on someone to accompany him, another person in line, or a staff member to check him

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

5

PA0711

1   in. He was uncomfortable in these situations due to privacy concerns.  Since there

2   was no way for him to check in independently, and no receptionist in the waiting

3   area, he would sometimes sit for over an hour before a staff member would

4   recognize that he needed assistance.  During his most recent visit to Quest labs in

5   May of 2021, he made an appointment online and received a text alert while sitting

6   in the waiting area when his appointment was ready, but he would prefer to be able

7   to use the functions of the kiosk, and that such functions be made accessible for the

8   blind. He would be willing to visit other Quest locations.

9   • Nicholas McNeill has visited a couple of different Quest Diagnostics locations. In a

10   recent visit, no staff member was in the reception area to assist him with the check-

11   in process.  He waited at least 20 minutes before being acknowledged by staff.

12   Nicholas tried having someone accompany him during the next couple of visits, but

13   this was a burden to him and others.  Most recently, he went to another Quest

14   location where he was able to receive text alerts to notify him when he was to be

15   seen. However, during that visit three patients walked in after him and were seen

16   before him because they were able to use the kiosk.  He will continue visiting

17   Quest Diagnostics in the future because of frequent lab work.

18   • Mary Alice Gary first used quest in 2018.  She typically goes every 3 to 4 months.

19   Prior to the pandemic, only once was there someone behind the counter to assist her

20   during the check-in process. She did not like accepting help from others waiting in

21   line because she did not want to share private information with them. During the

22   pandemic, staff have been available to obtain names and phone numbers due to

23   social distancing and limits on people inside.

24   • Holly Turrie last visited Quest Diagnostics in March of 2020.  She was unable to

25   independently use the check-in kiosk to sign in. Since the kiosk was inaccessible to

26   her as a blind person, and no staff available to assist, she had to rely on another

27   patient that was also waiting to be seen. The individual offered to assist her with

28

6

PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S FOURTH SUPPLEMENTAL
RESPONSE TO FIRST SET OF INTERROGATORIES FROM DEFENDANT QUEST
DIAGNOSTICS CLINICAL LABORATORIES, INC.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

the check-in process. She was also not given the option to sit in the waiting room and be alerted via text when a phlebotomist was available to see her.  Holly has never been able to independently use the check-in kiosk at any Quest location.  She is willing to visit other locations based on appointment availability.  She will need to return to Quest Diagnostics in the future to have lab work done.

- Dianne Michaels has visited Quest Diagnostics once.  At her visit, no one was there to help with the check-in process when she walked into the Quest waiting area. She does not want to return to Quest unless the kiosks are made accessible.

- Cassandra Jessie visits Quest approximately every 4 months and last visited Quest on May 17, 2021. When she goes to Quest, she has a staff member at the center help her check in for appointments because she is unable to check in independently. She has never been able to independently use the kiosks to check in for appointments because they are not accessible to blind patients. She is currently planning on returning, but only because of the location's convenience.

- Bill White goes for testing at Quest every six months. When he goes for appointments, he would bring his brother, who assists in checking in using the kiosk. He has never been able to use the kiosk independently due to his blindness and the kiosk's inaccessibility. He is planning on returning for follow-up testing and would visit other Quest locations depending on location, as his current location is downstairs from his doctor's office.

- Elizabeth Doane goes to Quest every three to six months. Her last visit was approximately a month ago. At her visits, she would wait in the waiting room until a staff member came and assisted her. She has never been able to use the kiosk independently, resulting in delays with her appointments. She is planning to return to Quest for follow up appointments and would visit other Quest locations if she needed to.

PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S FOURTH SUPPLEMENTAL RESPONSE TO FIRST SET OF INTERROGATORIES FROM DEFENDANT QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC.

PA0713

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

- Karlene Fiorello visits Quest about every six months. Her last visit was at the end of March 2021. Because she is blind, when visiting Quest Karlene needs to take a sighted person with her, or she relies on other patients to check in for her.  She cannot independently use the kiosk to check in for her appointments.  The lack of an accessible check in system has resulted in delays during her appointments, and she dislikes having strangers check in for her.  Karlene plans to return to Quest for her different appointments in the future. Karlene would be willing to travel to other Quest locations for her appointments. She has never been able to use the feature of the kiosk allowing a patient to receive a text when the phlebotomist is ready.

- Paula Muysenberg visits Quest two to three times per year.  Prior to the pandemic, Paula relied on other patients to sign in to the lab.  During the pandemic her husband has made an appointment for her on-line and Paula receives a text announcing when she was ready to be seen.  Paula has not been able to use the kiosk to sign in to quest labs without assistance from others.  Paula plans to return to Quest in the future.  Paula would be willing to visit other Quest locations.

- Debbi Dymek visits Quest approximately every six months. Her last visit was just before Easter.  Debbi checks in to Quest by having her sighted husband check in for her because the kiosk is not independently accessible to her.  She always has her husband with her, so she does not check in herself.  Debbi plans to return to Quest.  Debbi would be willing to go to other Quest locations based on availability.

- Claire Stanley visited Quest for blood work once in approximately 2019.  When she arrived there was no staff member present to check people in.  She believes there was a check-in kiosk in the waiting room, but was unable to independently access it.  A staff member heard Claire in the waiting room and came out to check her in and bring her back for her lab work.

- Nona Haroyan's experiences at Quest are described in the transcript of her April 29, 2021 deposition.

8

PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S FOURTH SUPPLEMENTAL RESPONSE TO FIRST SET OF INTERROGATORIES FROM DEFENDANT QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC.

1  • Mary Haroyan's experiences at Quest are described in the transcript of her April
2     29, 2021 deposition.
3  • Regina Brink's experiences at Quest are described in the transcript of her May 6,
4     2021 deposition.
5  • Kathy Lyons's experiences at Quest are described in the transcript of her May 6,
6     2021 deposition.
7  • Donna Grahmann's experiences at Quest are described in the transcripts of her May
8     3, 2021 and August 5, 2021 depositions.
9  • Ralph Black's experiences at Quest are described in the transcripts of his April 27,
10     2021 and August 5, 2021 depositions.
11  • Ardis Bazyn's experiences at Quest are described in the transcripts of her April 27,
12     2021 and August 6, 2021 depositions.
13  • Robin Rehder's experiences at Quest are described in the transcript of her May 21,
14     2021 deposition.

15

16  Dated: August 25, 2021                    NYE, STIRLING, HALE & MILLER, LLP

17                                            */s/ Jonathan D. Miller*
                                             Jonathan D. Miller
18                                           Alison M. Bernal
                                             Benjamin J. Sweet
19                                           Jordan T. Porter

20

21                                           HANDLEY FARAH & ANDERSON

22                                           */s/ Matthew Handley*
                                             Matthew K. Handley
23

24                                           *Attorneys for Plaintiffs*

25

26

27

28

PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S FOURTH SUPPLEMENTAL
RESPONSE TO FIRST SET OF INTERROGATORIES FROM DEFENDANT QUEST
DIAGNOSTICS CLINICAL LABORATORIES, INC.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

**PROOF OF SERVICE**
**DISTRICT OF COLUMBIA**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the District of Columbia. My business address is 200 Massachusetts Avenue, NW, 7th Floor, Washington, DC, 20001.

On August 25, 2021 I served true copies of the following document(s) described as following document(s):

**PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S FOURTH SUPPLEMENTAL RESPONSE TO FIRST SET OF INTERROGATORIES FROM DEFENDANT QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC.**

on the interested parties in this action as follows:

David Raizman, Esq.
david.raizman@ogletree.com
Amber L. Roller
amber.roller@ogletree.com
J. Nicholas Marfori
nicholas.marfori@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, California 90071
Telephone: 213-239-9800
Facsimile: 213-239-9045

*Attorneys for Defendants*

[X]     **BY EMAIL ON AUGUST 25, 2021**: I caused the above listed document(s) to be sent via electronic mail to the above listed email address from the email address mhandley@hfajustice.com and did not receive an error message after sending.

[X]     **BY MAIL ON AUGUST 26, 2021:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed above and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with my company's practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I declare under penalty of perjury under the laws of the State of California and the District of Columbia that the above is true and correct. Executed on August 25, 2021.

*/s/ Matthew Handley*
Matthew Handley

10

PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S FOURTH SUPPLEMENTAL RESPONSE TO FIRST SET OF INTERROGATORIES FROM DEFENDANT QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

## VERIFICATION

I have read the foregoing PLAINTIFF AMERICAN COUNCIL OF THE
BLIND'S FOURTH SUPPLEMENTAL RESPONSE TO FIRST SET OF
INTERROGATORIES FROM DEFENDANT QUEST DIAGNOSTICS CLINICAL
LABORATORIES, INC. and know its contents.

I am the Director of Advocacy and Governmental Affairs of the American Council of the
Blind, a party to this action, and am authorized to make this verification for and on its
behalf, and I make this verification for that reason. I have read the foregoing document(s).
I am informed and believe and on that ground allege that the matters stated in the
responses to the Interrogatories are true.

Executed on ___9/8/2021_____.

I declare under penalty of perjury under the laws of the United States of America
that the foregoing is true and correct to the best of my knowledge.

DocuSigned by:

Clark Rachfal

878C1C7D71C2426...

Clark Rachfal

PA0717

# EXHIBIT 25

1  OGLETREE, DEAKINS, NASH,
   SMOAK & STEWART, P.C.
2  DAVID RAIZMAN, CA Bar No. 129407
   david.raizman@ogletree.com
3  AMBER L. ROLLER, CA Bar No. 273354
   amber.roller@ogletree.com
4  J. NICHOLAS MARFORI, CA Bar No. 311765
   nicholas.marfori@ogletree.com
5  400 South Hope Street, Suite 1200
   Los Angeles, California 90071
6  Telephone:   213-239-9800
   Facsimile:   213-239-9045
7
   Attorneys for Defendants
8  QUEST DIAGNOSTICS CLINICAL
   LABORATORIES, INC.; QUEST
9  DIAGNOSTICS HOLDINGS, INC. and
   QUEST DIAGNOSTICS INCORPORATED
10

11              **UNITED STATES DISTRICT COURT**

12             **CENTRAL DISTRICT OF CALIFORNIA**

13  JULIAN VARGAS, ANNE WEST and          Case No. 2:19-cv-08108 DMG (MRWx)
    AMERICAN COUNCIL OF THE
14  BLIND, individually on behalf of      **DEFENDANT QUEST DIAGNOSTICS**
    themselves and all others similarly   **INCORPORATED'S RESPONSES TO**
15  situated,                             **PLAINTIFF JULIAN VARGAS' FIRST**
                                          **SET OF INTERROGATORIES**
16              Plaintiffs,

17        v.                              Complaint Filed: September 18, 2019
                                          Trial Date:      January 11, 2022
18  QUEST DIAGNOSTICS CLINICAL            District Judge:  Hon. Dolly M. Gee
    LABORATORIES, INC., QUEST                              Courtroom 8C, First St.
19  DIAGNOSTICS HOLDINGS, INC.,           Magistrate Judge: Hon. Michael R. Wilner
    QUEST DIAGNOSTICS                                       Courtroom 550, Roybal
20  INCORPORATED; and DOES 1-10,
    inclusive,
21
                Defendants.
22

23

24

25

26

27

28
                                          Case No. 2:19-cv-08108 DMG (MRWx)

46703563_1.docx        DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSES
                       TO PLAINTIFF JULIAN VARGAS'S FIRST SET OF INTERROGATORIES

                                                                        PA0718

| | |
|---|---|
| PROPOUNDING PARTY: | Plaintiff JULIAN VARGAS |
| RESPONDING PARTY: | Defendant QUEST DIAGNOSTICS |
| | INCORPORATED |
| SET NO.: | ONE |

Defendant Quest Diagnostics Incorporated ("Defendant") responds to Plaintiff Julian Vargas's ("Plaintiff") First Set of Interrogatories, as follows:

## I.

## **PRELIMINARY STATEMENT**

The following responses are based on the present knowledge, information, and belief of the three defendants ("Defendants"), as derived from (a) the knowledge and information of present employees of Defendants gained in their capacity as such, and (b) a review of the files maintained by Defendants that would be likely to contain the information called for by the Interrogatories. These responses are subject to amendment and supplementation as Defendants acquires additional information and completes its review and analysis and made without prejudice to Defendants' right to use subsequently discovered or developed information.

Except for facts explicitly stated in these responses, no admissions of any nature whatsoever are implied or should be inferred. The fact that any Interrogatory in this set has been objected to should not be taken as an admission or acceptance of the existence of any facts set forth or assumed by such interrogatory, or that such constitutes admissible evidence.

Defendants respond for themselves alone, and expressly declines to respond on behalf of, or based on information maintained by or available to any other entity or party. Defendants' responses are based solely on information in its possession, custody, and/or control. Specific objections to each Interrogatory are made on an individual basis in Defendants' responses below. In addition to these specific objections, Defendants makes certain continuing objections (the "General Objections") to the interrogatories. Defendants' response to each individual

1   Case No. 2:19-cv-08108 DMG (MRWx)

1   Interrogatory is submitted without prejudice to, and without in any respect limiting

2   or waiving, any General Objection not expressly set forth in that response.

3                                            **II.**

4                              **GENERAL OBJECTIONS**

5           Defendants provide these responses subject to the general objections set forth

6   below ("General Objections").

7           1.       Defendants object generally to these Interrogatories on the ground and

8   to the extent that they seek information that is not within Defendants' possession,

9   custody or control, and/or for which Defendants are completely reliant on third

10  parties that Plaintiff has not named as a defendant in this action.

11          2.       Defendants object generally to these Interrogatories to the extent that

12  they seek the disclosure of information protected by the attorney-client privilege, the

13  work product doctrine, or any other applicable privilege or protection from

14  disclosure.  Defendants does not intend to disclose any information subject to any

15  such privilege or protection from disclosure, and the inadvertent disclosure of

16  privileged or protected information shall not constitute a waiver of any kind.

17          3.       Defendants object generally to these Interrogatories to the extent that

18  they call for disclosure of trade secrets, proprietary information, or other confidential

19  information, the disclosure of which would harm the rights or interests of the owner

20  or possessor of such information.  To the extent Plaintiff's Interrogatories call for

21  information that is confidential, private, or proprietary, Defendants will produce the

22  otherwise discoverable information upon Plaintiff's agreement to an appropriate

23  confidentiality order.

24          4.       Defendants object generally to these Interrogatories to the extent they

25  purport to impose obligations beyond those required or authorized by the Federal

26  Rules of Civil Procedure or other applicable law, including without limitation the

27  limit on interrogatories allowed per party set forth in Rule 33(a)(1) of the Federal

28  Rules of Civil Procedure in that the requesting parties who have collectively

2                                    Case No. 2:19-cv-08108 DMG (MRWx)

46703563_1.docx

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSE
TO PLAINTIFF JULIAN VARGAS'S FIRST SET OF INTERROGATORIES

PA0720

1  exceeded the limit are completely aligned and represented by the same counsel of

2  record.

3         5.      Defendants also objects on the ground that that Plaintiff's definition of

4  "YOU" and "YOUR" is vague and overly broad because Plaintiff has defined

5  "YOU" and "YOUR" to mean "Defendant Quest Diagnostics Incorporated and its

6  consolidated subsidiaries, agents, assigns, employees, representatives, and counsel;

7  and any other representative or person acting on behalf of Defendant." For purposes

8  of responding to each of Plaintiff's Interrogatories which rely upon the term "YOU"

9  or "YOUR," Defendants have reasonably construed "YOU" and "YOUR" to mean

10  and refer to Defendant and its wholly-owned subsidiaries.

11         6.      Defendants object on the ground that Plaintiff's definition of

12  "PATIENT SERVICE CENTER" is vague and overbroad in that it defines

13  "PATIENT SERVICE CENTER" as "a Quest Diagnostics location where a patient

14  can obtain clinical laboratory services from Quest Diagnostics." For purposes of

15  responding to each of the Interrogatories which rely upon the term "PATIENT

16  SERVICE CENTER," Defendants have reasonably construed "PATIENT SERVICE

17  CENTER" to mean and refer only to a patient service center located within the

18  United States that is open to the public, provides specimen collection and related

19  services in furtherance of diagnostic testing services, bears the name Quest

20  Diagnostics, and is operated by Quest Diagnostics Incorporated or its wholly owned

21  subsidiaries. This definition excludes any physician office or similar location, where

22  Quest has placed an employee, such as a phlebotomist, to provide specimen

23  collection services for patients of that physician office or location.

24         7.      Defendants object on the ground that Plaintiff's definition of "E-

25  CHECK-IN KIOSK" is vague and overbroad because it defines "E-CHECK-IN

26  KIOSK" as "Defendant's touchscreen electronic check-in at PATIENT SERVICE

27  CENTERS" without specifying that it is a device used by patients to check-in at

28  Quest patient service centers. For purposes of responding to each of the

46703563_1.docx

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSE
TO PLAINTIFF JULIAN VARGAS'S FIRST SET OF INTERROGATORIES

PA0721

1  Interrogatories which rely upon the term "E-CHECK-IN KIOSK," Defendants have

2  reasonably construed "E-CHECK-IN KIOSK" to mean and refer only to the

3  touchscreen device that can be used by patients to check-in (*i.e.*, inform the facility

4  of their arrival) when they arrive at Patient Service Centers (as defined above),

5  where such kiosks are available.  The term "Kiosk" shall be used interchangeably

6  with "E-CHECK-IN KIOSK" subject to Defendants' objection and interpretation as

7  set forth in this paragraph.

8     These General Objections are incorporated by reference into each and every

9  response below to the extent applicable.  Various objections may be specifically

10 referred to in the responses below for purposes of clarity.  However, failure to

11 incorporate specifically an objection is not to be construed as a waiver of any such

12 objection.

13                                    **III.**

14                    **RESPONSES TO INTERROGATORIES**

15 **INTERROGATORY NO. 1:**

16     How many patients did Defendant service in 2018 at YOUR PATIENT

17 SERVICE CENTERS located in California?

18 **RESPONSE TO INTERROGATORY NO. 1:**

19     Defendants object on the ground that the Interrogatory seeks information not

20 relevant to any party's claim or defense and is not proportional to the needs of the

21 case.  Defendants further object to this Interrogatory as overbroad and unduly

22 burdensome, in that it would require an amount of time and effort for response that is

23 unreasonable and unjustified.  Subject to these objections, the total number of check-

24 ins on the Kiosks at the Patient Services Centers in California in 2018 was

25 7,515,365.

26 **INTERROGATORY NO. 2:**

27     How many unique patient visits did Defendants service in 2018 at YOUR

28 PATIENT SERVICE CENTERS located in California?

**RESPONSE TO INTERROGATORY NO. 2:**

Defendants object on the ground that the Interrogatory seeks information not relevant to any party's claim or defense and is not proportional to the needs of the case.  Defendants further object to this Interrogatory as overbroad and unduly burdensome, in that it would require an amount of time and effort for response that is unreasonable and unjustified.

Subject to these objections, after a diligent and good faith search, Defendants are unable to provide a response because its records systems do not permit Defendants to accurately determine the aggregate number of unique patients that visited Patient Service Centers in a given year and thus does not permit Defendants to provide the information purportedly sought.

**INTERROGATORY NO. 3:**

How many of the patients identified in response to interrogatory number 1 are legally blind?

**RESPONSE TO INTERROGATORY NO. 3:**

Defendants objects on the ground that the Interrogatory seeks information not relevant to any party's claim or defense and is not proportional to the needs of the case.  Defendants also objects on the ground that the Interrogatory requires Defendants to undertake a burdensome and extremely complicated and uncertain calculation that itself would be subject to great uncertainty.  Defendants further objects on the ground that this Interrogatory calls for disclosure of Defendants' confidential, financial, proprietary, trade secret or competitively sensitive information.

Subject to and without waiving these objections, Defendants respond as follows:

After a diligent and good-faith search, Defendants are unable to respond to this Interrogatory because Defendants does not keep data that would allow Defendants to respond to this Interrogatory.

5

Case No. 2:19-cv-08108 DMG (MRWx)

**INTERROGATORY NO. 4:**

How many patients did Defendant service in 2019 at YOUR PATIENT SERVICE CENTERS located in California?

**RESPONSE TO INTERROGATORY NO. 4:**

Defendants object on the ground that the Interrogatory seeks information not relevant to any party's claim or defense and is not proportional to the needs of the case. Defendants further object to this Interrogatory as overbroad and unduly burdensome, in that it would require an amount of time and effort for response that is unreasonable and unjustified. Subject to these objections, the total number of check-ins on the Kiosks at the Patient Services Centers in California in 2019 was 8,584,783.

**INTERROGATORY NO. 5:**

How many unique patient visits did Defendant service in 2019 at YOUR PATIENT SERVICE CENTERS located in California?

**RESPONSE TO INTERROGATORY NO. 5:**

Defendants object on the ground that the Interrogatory seeks information not relevant to any party's claim or defense and is not proportional to the needs of the case. Defendants further object to this Interrogatory as overbroad and unduly burdensome, in that it would require an amount of time and effort for response that is unreasonable and unjustified.

Subject to these objections, after a diligent and good faith search, Defendants is unable to provide a response because its records systems do not permit Defendants to accurately determine the aggregate number of unique patients that visited Patient Service Centers in a given year and thus does not permit Defendant to provide the information purportedly sought.

**INTERROGATORY NO. 6:**

How many of the patients identified in response to interrogatory number 4 are legally blind?

6                Case No. 2:19-cv-08108 DMG (MRWx)

**RESPONSE TO INTERROGATORY NO. 6:**

Defendants object on the ground that the Interrogatory seeks information not relevant to any party's claim or defense and is not proportional to the needs of the case. Defendants also object on the ground that the Interrogatory requires Defendants to undertake a burdensome and extremely complicated and uncertain calculation that itself would be subject to great uncertainty. Defendants further objects on the ground that this Interrogatory calls for disclosure of Defendants' confidential, financial, proprietary, trade secret or competitively sensitive information.

Subject to and without waiving these objections, Defendants respond as follows:

After a diligent and good-faith search, Defendants are unable to respond to this Interrogatory because Defendants do not maintain data that would permit Defendants to respond to this Interrogatory.

**INTERROGATORY NO. 7:**

How many patients did Defendant service in 2020 at YOUR PATIENT SERVICE CENTERS located in California?

**RESPONSE TO INTERROGATORY NO. 7:**

Defendants object on the ground that the Interrogatory seeks information not relevant to any party's claim or defense and is not proportional to the needs of the case. Defendants further object to this Interrogatory as overbroad and unduly burdensome, in that it would require an amount of time and effort for response that is unreasonable and unjustified.

Subject to these objections, the total number of check-ins on the Kiosks at the Patient Services Centers in California in 2020 was 8,027,696.

**INTERROGATORY NO. 8:**

How many unique patient visits did Defendant service in 2020 at YOUR PATIENT SERVICE CENTERS located in California?

Case No. 2:19-cv-08108 DMG (MRWx)

46703563_1.docx

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSE
TO PLAINTIFF JULIAN VARGAS'S FIRST SET OF INTERROGATORIES

**RESPONSE TO INTERROGATORY NO. 8:**

Defendants object on the ground that the Interrogatory seeks information not relevant to any party's claim or defense and is not proportional to the needs of the case.  Defendants further object to this Interrogatory as overbroad and unduly burdensome, in that it would require an amount of time and effort for response that is unreasonable and unjustified.

Subject to these objections, after a diligent and good faith search, Defendants are unable to provide a response because its records systems do not permit Defendants to accurately determine the aggregate number of unique patients that visited Patient Service Centers in a given year and thus does not permit Defendants to provide the information purportedly sought.

**INTERROGATORY NO. 9:**

How many of the patients identified in response to interrogatory number 7 are legally blind?

**RESPONSE TO INTERROGATORY NO. 9:**

Defendants object on the ground that the Interrogatory seeks information not relevant to any party's claim or defense and is not proportional to the needs of the case.  Defendants also object on the ground that the Interrogatory requires Defendants to undertake a burdensome and extremely complicated and uncertain calculation that itself would be subject to great uncertainty.  Defendants further object on the ground that this Interrogatory calls for disclosure of Defendants' confidential, financial, proprietary, trade secret or competitively sensitive information.

Subject to and without waiving these objections, Defendants respond as follows:

After a diligent and good-faith inquiry, Defendants are unable to respond to this Interrogatory because Defendants do not maintain data that would permit

8

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSE
TO PLAINTIFF JULIAN VARGAS'S FIRST SET OF INTERROGATORIES

46703563_1.docx

PA0726

1  Defendant to respond to this Interrogatory.

2  **INTERROGATORY NO. 10:**

3      IDENTIFY the number of employees working at all of YOUR PATIENT

4  SERVICE CENTERS in the United States of America in 2017.

5  **RESPONSE TO INTERROGATORY NO. 10:**

6      Defendants object on the ground that the Interrogatory seeks information not

7  relevant to any party's claim or defense and is not proportional to the needs of the

8  case.  Defendants further object to this Interrogatory as overbroad and unduly

9  burdensome, in that it would require an amount of time and effort for response that is

10  unreasonable and unjustified.

11      Subject to these objections, the total number of employees in 2017 in the

12  United States in applicable job positions, including at the Patient Service Centers,

13  was 16,689.

14  **INTERROGATORY NO. 11:**

15      IDENTIFY the number of employees working at all of YOUR PATIENT

16  SERVICE CENTERS in the United States of America in 2018.

17  **RESPONSE TO INTERROGATORY NO. 11:**

18      Defendants object on the ground that the Interrogatory seeks information not

19  relevant to any party's claim or defense and is not proportional to the needs of the

20  case.  Defendants further object to this Interrogatory as overbroad and unduly

21  burdensome, in that it would require an amount of time and effort for response that is

22  unreasonable and unjustified.

23      Subject to these objections, the total number of employees in 2018 in the

24  United States in applicable job positions, including at the Patient Service Centers,

25  was 17,410.

26

27  **INTERROGATORY NO. 12:**

28      IDENTIFY the number of employees working at all of YOUR PATIENT

9

46703563_1.docx

PA0727

1  SERVICE CENTERS in the United States of America in 2019.

2  **RESPONSE TO INTERROGATORY NO. 12:**

3       Defendants object on the ground that the Interrogatory seeks information not

4  relevant to any party's claim or defense and is not proportional to the needs of the

5  case.  Defendants further object to this Interrogatory as overbroad and unduly

6  burdensome, in that it would require an amount of time and effort for response that is

7  unreasonable and unjustified.

8       Subject to these objections, the total number of employees in 2019 in the

9  United States in applicable job positions, including at the Patient Service Centers,

10  was 17,547.

11  **INTERROGATORY NO. 13:**

12       IDENTIFY the number of employees working at all of YOUR PATIENT

13  SERVICE CENTERS in the United States of America in 2020.

14  **RESPONSE TO INTERROGATORY NO. 13:**

15       Defendants object on the ground that the Interrogatory seeks information not

16  relevant to any party's claim or defense and is not proportional to the needs of the

17  case.  Defendants further object to this Interrogatory as overbroad and unduly

18  burdensome, in that it would require an amount of time and effort for response that is

19  unreasonable and unjustified.

20       Subject to these objections, the total number of employees in 2020 in the

21  United States in applicable job positions, including at the Patient Service Centers,

22  was 18,517.

23

24  **INTERROGATORY NO. 14:**

25       IDENTIFY all costs associated with equipping an E-CHECK-IN KIOSK at

26  YOUR PATIENT SERVICE CENTERS with translation software.

27  **RESPONSE TO INTERROGATORY NO. 14:**

28       Defendants object to this Interrogatory as vague and ambiguous, particularly

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSE
TO PLAINTIFF JULIAN VARGAS'S FIRST SET OF INTERROGATORIES

1   as to the phrase "all costs associated with equipping" and "translation software," and

2   Defendants cannot ascertain what the Request is seeking with reasonable

3   particularity.  Defendants further object on the ground that the Interrogatory seeks

4   information not relevant to any party's claim or defense and is not proportional to the

5   needs of the case.  Defendants further object on the ground and to the extent that this

6   Interrogatory seeks the production of documents protected by the attorney-client

7   privilege, the work-product doctrine, or any other applicable privilege or protection

8   from disclosure.

9         Subject to and without waiving these objections, Defendants respond as

10   follows:

11         After a diligent and good-faith inquiry, Defendants areunable to respond to

12   this Interrogatory because Defendants do not have the information requested in its

13   possession, custody, or control.

14   **INTERROGATORY NO. 15:**

15         How many patients did Defendant service in 2018 at YOUR PATIENT

16   SERVICE CENTERS located in the United States of America?

17   **RESPONSE TO INTERROGATORY NO. 15:**

18         Defendants object on the ground that the Interrogatory seeks information not

19   relevant to any party's claim or defense and is not proportional to the needs of the

20   case.  Defendants further object to this Interrogatory as overbroad and unduly

21   burdensome, in that it would require an amount of time and effort for response that is

22   unreasonable and unjustified.

23         Subject to these objections, the total number of check-ins on the Kiosks at the

24   Patient Services Centers in the United States in 2018 was 32,696,929.

25

26   **INTERROGATORY NO. 16:**

27         How many unique patient visits did Defendant service in 2018 at YOUR

28   PATIENT SERVICE CENTERS located in the United States of America?

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSE
TO PLAINTIFF JULIAN VARGAS'S FIRST SET OF INTERROGATORIES

**RESPONSE TO INTERROGATORY NO. 16:**

Defendants object on the ground that the Interrogatory seeks information not relevant to any party's claim or defense and is not proportional to the needs of the case. Defendants further object to this Interrogatory as overbroad and unduly burdensome, in that it would require an amount of time and effort for response that is unreasonable and unjustified.

Subject to these objections, after a diligent and good faith search, Defendants are unable to provide a response because its records systems do not permit Defendants to accurately determine the aggregate number of unique patients that visited Patient Service Centers in a given year and thus does not permit Defendants to provide the information purportedly sought.

**INTERROGATORY NO. 17:**

How many of the patients identified in response to interrogatory number 15 are legally blind?

**RESPONSE TO INTERROGATORY NO. 17:**

Defendants object on the ground that the Interrogatory seeks information not relevant to any party's claim or defense and is not proportional to the needs of the case. Defendants further object on the ground that the Interrogatory requires Defendants to undertake a burdensome and extremely complicated and uncertain calculation that itself would be subject to great uncertainty. Defendants further object on the ground that this Interrogatory calls for disclosure of Defendants' confidential, financial, proprietary, trade secret or competitively sensitive information.

Subject to and without waiving these objections, Defendants respond as follows:

After a diligent and good-faith inquiry, Defendants are unable to respond to this Interrogatory because Defendants do not maintain data that would permit

12

46703563_1.docx

1    Defendants to respond to this Interrogatory.

2    **INTERROGATORY NO. 18:**

3         How many patients did Defendant service in 2019 at YOUR PATIENT

4    SERVICE CENTERS located in the United States of America?

5    **RESPONSE TO INTERROGATORY NO. 18:**

6         Defendants object on the ground that the Interrogatory seeks information not

7    relevant to any party's claim or defense and is not proportional to the needs of the

8    case.  Defendants further object to this Interrogatory as overbroad and unduly

9    burdensome, in that it would require an amount of time and effort for response that is

10   unreasonable and unjustified.

11        Subject to these objections, the total number of check-ins on the Kiosks at the

12   Patient Services Centers in the United States in 2019 was 38,046,872.

13

14   **INTERROGATORY NO. 19:**

15        How many unique patient visits did Defendant service in 2019 at YOUR

16   PATIENT SERVICE CENTERS located in the United States of America?

17   **RESPONSE TO INTERROGATORY NO. 19:**

18        Defendants further object on the ground that the Interrogatory seeks

19   information not relevant to any party's claim or defense and is not proportional to the

20   needs of the case.  Defendants further object to this Interrogatory as overbroad and

21   unduly burdensome, in that it would require an amount of time and effort for

22   response that is unreasonable and unjustified.

23        Subject to these objections, after a diligent and good faith search, Defendants

24   are unable to provide a response because its records systems do not permit

25   Defendants to accurately determine the aggregate number of unique patients that

26   visited Patient Service Centers in a given year and thus does not permit Defendants

27   to provide the information purportedly sought.

28

46703563_1.docx

PA0731

**INTERROGATORY NO. 20:**

How many of the patients identified in response to interrogatory number 18 are legally blind?

**RESPONSE TO INTERROGATORY NO. 20:**

Defendants object on the ground that the Interrogatory seeks information not relevant to any party's claim or defense and is not proportional to the needs of the case. Defendants also object on the ground that the Interrogatory requires Defendants to undertake a burdensome and extremely complicated and uncertain calculation that itself would be subject to great uncertainty. Defendants further objects on the ground that this Interrogatory calls for disclosure of Defendants' confidential, financial, proprietary, trade secret or competitively sensitive information.

Subject to and without waiving these objections, Defendants respond as follows:

After a diligent and good-faith inquiry, Defendants are unable to respond to this Interrogatory because Defendants do not maintain data that would permit Defendants to respond to this Interrogatory.

**INTERROGATORY NO. 21:**

How many patients did Defendant service in 2019 at YOUR PATIENT SERVICE CENTERS located in the United States of America?

**RESPONSE TO INTERROGATORY NO. 21:**

Defendants object on the ground that the Interrogatory seeks information not relevant to any party's claim or defense and is not proportional to the needs of the case. Defendants further object to this Interrogatory as overbroad and unduly burdensome, in that it would require an amount of time and effort for response that is unreasonable and unjustified. Defendants further object to this Interrogatory on the ground that it is duplicative of Interrogatory No. 18.

Subject to these objections, the total number of check-ins on the Kiosks at the

14

46703563_1.docx

PA0732

1 | Patient Service Centers in the United States in 2019 was 38,046,872.

2

3 | **INTERROGATORY NO. 22:**

4 | How many unique patient visits did Defendant service in 2019 at YOUR

5 | PATIENT SERVICE CENTERS located in the United States of America?

6 | **RESPONSE TO INTERROGATORY NO. 22:**

7 | Defendants object on the ground that the Interrogatory seeks information not

8 | relevant to any party's claim or defense and is not proportional to the needs of the

9 | case. Defendants further object to this Interrogatory as overbroad and unduly

10 | burdensome, in that it would require an amount of time and effort for response that is

11 | unreasonable and unjustified. Defendants further object to this interrogatory on the

12 | ground that it is duplicative of Interrogatory No. 20.

13 | Subject to these objections, after a diligent and good faith search, Defendants

14 | are unable to provide a response because its records systems do not permit

15 | Defendants to accurately determine the aggregate number of unique patients that

16 | visited Patient Service Centers in a given year and thus does not permit Defendants

17 | to provide the information purportedly sought.

18

19 | **INTERROGATORY NO. 23:**

20 | How many of the patients identified in response to interrogatory number 21

21 | are legally blind?

22 | **RESPONSE TO INTERROGATORY NO. 23:**

23 | Defendants object on the ground that the Interrogatory seeks information not

24 | relevant to any party's claim or defense and is not proportional to the needs of the

25 | case. Defendants also object on the ground that the Interrogatory requires

26 | Defendants to undertake a burdensome and extremely complicated and uncertain

27 | calculation that itself would be subject to great uncertainty. Defendants further

28 | objects on the ground that this Interrogatory calls for disclosure of Defendants'

1  confidential, financial, proprietary, trade secret or competitively sensitive

2  information.

3       Subject to and without waiving these objections, Defendants respond as

4  follows:

5       After a diligent and good-faith inquiry, Defendants are unable to respond to

6  this Interrogatory because Defendants do not maintain data that would permit

7  Defendants to respond to this Interrogatory.

8

9  DATED: April 7, 2021              OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

10

11

12                                   By: /s/ David Raizman
13                                       David Raizman
                                         Amber L. Roller
                                         J. Nicholas Marfori
14
                                     Attorneys for Defendants
15                                   QUEST DIAGNOSTICS CLINICAL
                                     LABORATORIES, INC.; QUEST
16                                   DIAGNOSTICS HOLDINGS, INC. and
                                     QUEST DIAGNOSTICS INCORPORATED
17

18

19

20

21

22

23

24

25

26

27

28

46703563_1.docx

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSE
TO PLAINTIFF JULIAN VARGAS'S FIRST SET OF INTERROGATORIES

1                 **CERTIFICATE OF SERVICE**

2 STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3        I am employed in the County of Los Angeles, State of California; I am over the age of 18 years and not a party to this action. My business address is 400 South Hope Street, Suite 1200, Los Angeles, California 90071.

5        On April 8, 2021, I served the following document(s) described as:

6         DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSES TO PLAINTIFF JULIAN VARGAS' FIRST SET OF INTERROGATORIES

9 on the persons below as follows:

| | |
|---|---|
| Jonathan D. Miller, Esq.<br>Alison M. Bernal, Esq.<br>Jordan T. Porter, Esq.<br>NYE, STIRLING, HALE & MILLER, LLP<br>33 West Mission Street, Suite 201<br>Santa Barbara, CA 93101<br>Telephone: (805) 963-2345<br>Facsimile: (805) 284-9590<br>Email:  jonathan@nshmlaw.com<br>        alison@nshmlaw.com<br>        jordan@nshmlaw.com<br>        lindsey@nshmlaw.com<br>        meg@nshmlaw.com | Attorneys for Plaintiffs<br>Julian Vargas, Anne West,<br>American Council of the Blind, and<br>the Proposed Class |
| Matthew K. Handley, Esq.<br>HANDLEY FARAH & ANDERSON PLLC<br>777 6th Street, NW - 11th Floor<br>Washington, DC 20001<br>Telephone: (202) 559-2411<br>Facsimile: (844) 300-1952<br>Email:  mhandley@hfajustice.com | Attorneys for Plaintiffs<br>Julian Vargas, Anne West,<br>American Council of the Blind, and<br>the Proposed Class |
| Benjamin J. Sweet, Esq.<br>Nye Stirling Hale & Miller, LLP<br>1145 Bower Hill Road, Suite 104<br>Pittsburgh, PA 15243<br>Telephone: (412) 857-5350<br>Email:  ben@nshmlaw.com | Attorneys for Plaintiffs<br>Julian Vargas, Anne West,<br>American Council of the Blind, and<br>the Proposed Class |

26        I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses as indicated above and:

28 ☐    deposited the sealed envelope or package with the United States Postal Service, with the postage fully prepaid.*

Case No. 2:19-cv-08108 DMG (MRWx)

46703563_1.docx

PA0735

1  ☒      placed the envelope or package for collection and mailing, following our
        ordinary business practices. I am readily familiar with this business's practice
2       for collecting and processing correspondence for mailing. On the same day
        that correspondence is placed for collection and mailing, it is deposited in the
3       ordinary course of business with the United States Postal Service, in a sealed
        envelope or package with postage fully prepaid.
4
        I am employed in the county where the mailing occurred. The envelope or
5  package was placed in the mail at Los Angeles, California.

6  ☒      (Federal)   I declare that I am employed in the office of a member of the Bar
                    of this Court at whose direction the service was made. I declare
7                   under penalty of perjury under the laws of the United States of
                    America that the above is true and correct.
8
        Executed on April 8, 2021, at Los Angeles, California.
9

10  Gerard Salas
    _____            _____
11  Type or Print Name                          Signature

12

13                                                              46703563.1

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

46703563_1.docx                          2            Case No. 2:19-cv-08108 DMG (MRWx)
                              CERTIFICATE OF SERVICE

1

**VERIFICATION**

2   I have read the foregoing **DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSES TO PLAINTIFF JULIAN VARGAS' FIRST SET OF INTERROGATORIES**

3 and know its contents.

4 ☐  I am a party to this action.  The matters stated in the foregoing document are true of my own knowledge except as to those matters that are stated on information and belief, and to

5   those matters I believe them to be true.

6 ☒  I am ☐ an officer ☐ a partner ☒ Director, National Patient Services, Technology, and Support for Quest Diagnostics Incorporated ("Quest"), a defendant to this action, and am

7   authorized to make this verification for and on its behalf, and I make this verification for that reason.

8

9     ☒   I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

10     ☐   The matters stated in the foregoing document are true of my own knowledge except as to those matters that are stated on information and belief, and as to those matters I

11       believe them to be true.

12 ☐  I am one of the attorneys for _____ a party to this action.  Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this

13   verification for and on behalf of that party for that reason.  I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

14

15   Executed on May 21, 2021, at _Schwenksville, Pennsylvania.

16   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

17

18   Marc Yarrison

         _____    _____

19 Type or Print Name        Signature

20

21                47229921.1

22

23

24

25

26

27

28

1
VERIFICATION

# EXHIBIT 26

1  OGLETREE, DEAKINS, NASH,
   SMOAK & STEWART, P.C.
2  DAVID RAIZMAN, CA Bar No. 129407
   david.raizman@ogletree.com
3  AMBER L. ROLLER, CA Bar No. 273354
   amber.roller@ogletree.com
4  J. NICHOLAS MARFORI, CA Bar No. 311765
   nicholas.marfori@ogletree.com
5  400 South Hope Street, Suite 1200
   Los Angeles, California 90071
6  Telephone:  213-239-9800
   Facsimile:  213-239-9045
7
   Attorneys for Defendants
8  QUEST DIAGNOSTICS CLINICAL
   LABORATORIES, INC.; QUEST
9  DIAGNOSTICS HOLDINGS, INC. and
   QUEST DIAGNOSTICS INCORPORATED
10

11              **UNITED STATES DISTRICT COURT**

12             **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 13  JULIAN VARGAS, ANNE WEST and AMERICAN COUNCIL OF THE | Case No. 2:19-cv-08108 DMG (MRWx) |
| 14  BLIND, individually on behalf of themselves and all others similarly | **DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSE TO** |
| 15  situated, | **PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S FIRST SET OF** |
| 16              Plaintiffs, | **INTERROGATORIES** |
| 17  v. | |
| 18  QUEST DIAGNOSTICS CLINICAL | Complaint Filed:  September 18, 2019 |
| 19  LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., | Trial Date:         January 11, 2022 District Judge:    Hon. **Dolly** M. Gee |
| 20  QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, | Courtroom 8C, First St. Magistrate Judge: Hon. Michael R. Wilner |
| 21  inclusive, | Courtroom 550, Roybal |
| 22              Defendants. | |

23

24

25

26

27

28

Case No. 2:19-cv-08108 DMG (MRWx)

46208779_1.docx

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSE TO
PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S FIRST SET OF INTERROGATORIES

PA0738

| | |
|---|---|
| PROPOUNDING PARTY: | Plaintiff AMERICAN COUNCIL OF THE BLIND |
| RESPONDING PARTY: | Defendant QUEST DIAGNOSTICS |
| | INCORPORATED |
| SET NO.: | ONE |

Defendant Quest Diagnostics Incorporated ("Defendant") responds to Plaintiff American Council of the Blind's ("Plaintiff") First Set of Interrogatories, as follows:

## I.

## PRELIMINARY STATEMENT

The following responses are based on the present knowledge, information, and belief of the three defendants ("Defendants"), as derived from (a) the knowledge and information of present employees of Defendants gained in their capacity as such, and (b) a review of the files maintained by Defendants that would be likely to contain the information called for by the Interrogatories. These responses are subject to amendment and supplementation as Defendants acquires additional information and completes its review and analysis and made without prejudice to Defendants' right to use subsequently discovered or developed information.

Except for facts explicitly stated in these responses, no admissions of any nature whatsoever are implied or should be inferred. The fact that any Interrogatory in this set has been objected to should not be taken as an admission or acceptance of the existence of any facts set forth or assumed by such interrogatory, or that such constitutes admissible evidence.

Defendants respond for themselves alone, and expressly declines to respond on behalf of, or based on information maintained by or available to any other entity or party. Defendants' responses are based solely on information in its possession, custody, and/or control. Specific objections to each Interrogatory are made on an individual basis in Defendants' responses below. In addition to these specific objections, Defendants makes certain continuing objections (the "General Objections") to the interrogatories. Defendants' response to each individual

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSE TO
PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S FIRST SET OF INTERROGATORIES

PA0739

1  Interrogatory is submitted without prejudice to, and without in any respect limiting

2  or waiving, any General Objection not expressly set forth in that response.

3                                              **II.**

4                              **GENERAL OBJECTIONS**

5        Defendants provide these responses subject to the general objections set forth

6  below ("General Objections").

7        1.     Defendants object generally to these Interrogatories on the ground and

8  to the extent that they seek information that is not within Defendants' possession,

9  custody or control, and/or for which Defendants are completely reliant on third

10 parties that Plaintiff has not named as a defendant in this action.

11       2.     Defendants object generally to these Interrogatories to the extent that

12 they seek the disclosure of information protected by the attorney-client privilege, the

13 work product doctrine, or any other applicable privilege or protection from

14 disclosure.  Defendants does not intend to disclose any information subject to any

15 such privilege or protection from disclosure, and the inadvertent disclosure of

16 privileged or protected information shall not constitute a waiver of any kind.

17       3.     Defendants object generally to these Interrogatories to the extent that

18 they call for disclosure of trade secrets, proprietary information, or other confidential

19 information, the disclosure of which would harm the rights or interests of the owner

20 or possessor of such information.  To the extent Plaintiff's Interrogatories call for

21 information that is confidential, private, or proprietary, Defendants will produce the

22 otherwise discoverable information upon Plaintiff's agreement to an appropriate

23 confidentiality order.

24       4.     Defendants object generally to these Interrogatories to the extent they

25 purport to impose obligations beyond those required or authorized by the Federal

26 Rules of Civil Procedure or other applicable law, including without limitation the

27 limit on interrogatories allowed per party set forth in Rule 33(a)(1) of the Federal

28 Rules of Civil Procedure in that the requesting parties who have collectively

46208779_1.docx

PA0740

1  exceeded the limit are completely aligned and represented by the same counsel of

2  record.

3       5.     Defendants also objects on the ground that that Plaintiff's definition of

4  "YOU" and "YOUR" is vague and overly broad because Plaintiff has defined

5  "YOU" and "YOUR" to mean "Defendant Quest Diagnostics Incorporated and its

6  consolidated subsidiaries, agents, assigns, employees, representatives, and counsel;

7  and any other representative or person acting on behalf of Defendant."  For purposes

8  of responding to each of Plaintiff's Interrogatories which rely upon the term "YOU"

9  or "YOUR," Defendants have reasonably construed "YOU" and "YOUR" to mean

10  and refer to Defendant and its wholly-owned subsidiaries.

11       6.     Defendants object on the ground that Plaintiff's definition of

12  "PATIENT SERVICE CENTER" is vague and overbroad in that it defines

13  "PATIENT SERVICE CENTER" as "a Quest Diagnostics location where a patient

14  can obtain clinical laboratory services from Quest Diagnostics."  For purposes of

15  responding to each of the Interrogatories which rely upon the term "PATIENT

16  SERVICE CENTER," Defendants have reasonably construed "PATIENT SERVICE

17  CENTER" to mean and refer only to a patient service center located within the

18  United States that is open to the public, provides specimen collection and related

19  services in furtherance of diagnostic testing services, bears the name Quest

20  Diagnostics, and is operated by Quest Diagnostics Incorporated or its wholly owned

21  subsidiaries.  This definition excludes any physician office or similar location, where

22  Quest has placed an employee, such as a phlebotomist, to provide specimen

23  collection services for patients of that physician office or location.

24       7.     Defendants object on the ground that Plaintiff's definition of "E-

25  CHECK-IN KIOSK" is vague and overbroad because it defines "E-CHECK-IN

26  KIOSK" as "Defendant's touchscreen electronic check-in at PATIENT SERVICE

27  CENTERS" without specifying that it is a device used by patients to check-in at

28  Quest patient service centers.  For purposes of responding to each of the

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSE TO
PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S FIRST SET OF INTERROGATORIES

1  Interrogatories which rely upon the term "E-CHECK-IN KIOSK," Defendants have

2  reasonably construed "E-CHECK-IN KIOSK" to mean and refer only to the

3  touchscreen device that can be used by patients to check-in (i.e., inform the facility

4  of their arrival) when they arrive at Patient Service Centers (as defined above),

5  where such kiosks are available.  The term "Kiosk" shall be used interchangeably

6  with "E-CHECK-IN KIOSK" subject to Defendants' objection and interpretation as

7  set forth in this paragraph.

8      These General Objections are incorporated by reference into each and every

9  response below to the extent applicable.  Various objections may be specifically

10  referred to in the responses below for purposes of clarity.  However, failure to

11  incorporate specifically an objection is not to be construed as a waiver of any such

12  objection.

13                              **III.**

14                **RESPONSES TO INTERROGATORIES**

15  **INTERROGATORY NO. 1:**

16      How many patients did Defendant service in 2017 at YOUR PATIENT

17  SERVICE CENTERS located in California?

18  **RESPONSE TO INTERROGATORY NO. 1:**

19      Defendants object on the ground that the Interrogatory seeks information not

20  relevant to any party's claim or defense and is not proportional to the needs of the

21  case.  Defendants further object to this Interrogatory as overbroad and unduly

22  burdensome, in that it would require an amount of time and effort for response that is

23  unreasonable and unjustified.  Subject to these objections, the total number of check-

24  ins on the Kiosks at the Patient Services Centers in California in 2017 was

25  4,366,111.

26  **INTERROGATORY NO. 2:**

27      How many unique patient visits did Defendant service in 2017 at YOUR

28  PATIENT SERVICE CENTERS located in California?

46208779_1.docx

4                    Case No. 2:19-cv-08108 DMG (MRWx)

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSE TO
PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S FIRST SET OF INTERROGATORIES

PA0742

**RESPONSE TO INTERROGATORY NO. 2:**

Defendants object on the ground that the Interrogatory seeks information not relevant to any party's claim or defense and is not proportional to the needs of the case. Defendants further object to this Interrogatory as overbroad and unduly burdensome, in that it would require an amount of time and effort for response that is unreasonable and unjustified.

Subject to these objections, after a diligent and good faith search, Defendants are unable to provide a response because its records systems do not permit Defendants to accurately determine the aggregate number of unique patients that visited Patient Service Centers in a given year and thus does not permit Defendants to provide the information purportedly sought.

**INTERROGATORY NO. 3:**

How many of the patients identified in response to interrogatory number 1 are legally blind?

**RESPONSE TO INTERROGATORY NO. 3:**

Defendants objects on the ground that the Interrogatory seeks information not relevant to any party's claim or defense and is not proportional to the needs of the case. Defendants also objects on the ground that the Interrogatory requires Defendants to undertake a burdensome and extremely complicated and uncertain calculation that itself would be subject to great uncertainty. Defendants further objects on the ground that this Interrogatory calls for disclosure of Defendants' confidential, financial, proprietary, trade secret or competitively sensitive information.

Subject to and without waiving these objections, Defendants respond as follows:

After a diligent and good-faith search, Defendants are unable to respond to this Interrogatory because Defendants does not keep data that would allow Defendants to respond to this Interrogatory.

5

Case No. 2:19-cv-08108 DMG (MRWx)

46208779_1.docx

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSE TO
PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S FIRST SET OF INTERROGATORIES

PA0743

**INTERROGATORY NO. 4:**

How many patients did Defendant service in 2017 at YOUR PATIENT SERVICE CENTERS located in the United States of America?

**RESPONSE TO INTERROGATORY NO. 4:**

Defendants object on the ground that the Interrogatory seeks information not relevant to any party's claim or defense and is not proportional to the needs of the case. Defendants further object to this Interrogatory as overbroad and unduly burdensome, in that it would require an amount of time and effort for response that is unreasonable and unjustified.

Subject to these objections, the total number of check-ins on the Kiosks at the Patient Services Centers in the United States in 2017 was 15,924,343.

**INTERROGATORY NO. 5:**

How many unique patient visits did Defendant service in 2017 at YOUR PATIENT SERVICE CENTERS located in the United States of America?

**RESPONSE TO INTERROGATORY NO. 5:**

Defendants object on the ground that the Interrogatory seeks information not relevant to any party's claim or defense and is not proportional to the needs of the case. Defendants further object to this Interrogatory as overbroad and unduly burdensome, in that it would require an amount of time and effort for response that is unreasonable and unjustified.

Subject to these objections, after a diligent and good faith search, Defendants are unable to provide a response because its records systems do not permit Defendants to accurately determine the aggregate number of unique patients that visited Patient Service Centers in a given year and thus does not permit Defendants to provide the information purportedly sought.

**INTERROGATORY NO. 6:**

How many of the patients identified in response to interrogatory number 4 are legally blind?

Case No. 2:19-cv-08108 DMG (MRWx)

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSE TO PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S FIRST SET OF INTERROGATORIES

**RESPONSE TO INTERROGATORY NO. 6:**

Defendants object on the ground that the Interrogatory seeks information not relevant to any party's claim or defense and is not proportional to the needs of the case. Defendants also object on the ground that the Interrogatory requires Defendants to undertake a burdensome and extremely complicated and uncertain calculation that itself would be subject to great uncertainty. Defendants further object on the ground that this Interrogatory calls for disclosure of Defendants' confidential, financial, proprietary, trade secret or competitively sensitive information.

Subject to and without waiving these objections, Defendants respond as follows:

After a diligent and good-faith inquiry, Defendants are unable to respond to this Interrogatory because Defendants do not maintain data that would permit Defendant to respond to this Interrogatory.

DATED: April 7, 2021                    OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.


By: /s/ David Raizman
    David Raizman
    Amber L. Roller
    J. Nicholas Marfori

Attorneys for Defendants
QUEST DIAGNOSTICS CLINICAL
LABORATORIES, INC.; QUEST
DIAGNOSTICS HOLDINGS, INC. and
QUEST DIAGNOSTICS INCORPORATED

Case No. 2:19-cv-08108 DMG (MRWx)

46208779_1.docx

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSE TO
PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S FIRST SET OF INTERROGATORIES

PA0745

1                            **CERTIFICATE OF SERVICE**

2  STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3        I am employed in the County of Los Angeles, State of California; I am over the age of 18 years and not a party to this action.  My business address is
4  400 South Hope Street, Suite 1200, Los Angeles, California 90071.

5       On April 8, 2021, I served the following document(s) described as:

6        DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSE TO PLAINTIFF AMERICAN COUNCIL OF THE
7           BLIND'S FIRST SET OF INTERROGATORIES

8

9  on the persons below as follows:

| | |
|---|---|
| 10   Jonathan D. Miller, Esq. | Attorneys for Plaintiffs |
|       Alison M. Bernal, Esq. | Julian Vargas, Anne West, American |
| 11   Jordan T. Porter, Esq. | Council of the Blind, and the |
|       NYE, STIRLING, HALE & MILLER, LLP | Proposed Class |
| 12   33 West Mission Street, Suite 201 | |
|       Santa Barbara, CA  93101 | |
| 13   Telephone:  (805) 963-2345 | |
|       Facsimile:   (805) 284-9590 | |
| 14   Email:        jonathan@nshmlaw.com | |
|                 alison@nshmlaw.com | |
| 15              jordan@nshmlaw.com | |
|                 lindsey@nshmlaw.com | |
| 16              meg@nshmlaw.com | |
| 17   Matthew K. Handley, Esq. | Attorneys for Plaintiffs |
|       HANDLEY FARAH & ANDERSON PLLC | Julian Vargas, Anne West, American |
| 18   777 6th Street, NW - 11th Floor | Council of the Blind, and the |
|       Washington, DC  20001 | Proposed Class |
| 19   Telephone:  (202) 559-2411 | |
|       Facsimile:   (844) 300-1952 | |
| 20   Email:        mhandley@hfajustice.com | |
| 21   Benjamin J. Sweet, Esq. | Attorneys for Plaintiffs |
|       Nye Stirling Hale & Miller, LLP | Julian Vargas, Anne West, American |
| 22   1145 Bower Hill Road, Suite 104 | Council of the Blind, and the |
|       Pittsburgh, PA  15243 | Proposed Class |
| 23   Telephone:  (412) 857-5350 | |
|       Email:        ben@nshmlaw.com | |
| 24 | |

25

26       I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses as indicated above and:

27  ☐    deposited the sealed envelope or package with the United States Postal Service, with the postage fully prepaid.*

28

PA0746

☒   placed the envelope or package for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope or package with postage fully prepaid.

I am employed in the county where the mailing occurred. The envelope or package was placed in the mail at Los Angeles, California.

☒   (Federal)   I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on April 8, 2021, at Los Angeles, California.

Gerard Salas
_____
Type or Print Name                          Signature

2                    Case No. 2:19-cv-08108 DMG (MRWx)

CERTIFICATE OF SERVICE

PA0747

**VERIFICATION**

I have read the foregoing **DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSE TO PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S FIRST SET OF INTERROGATORIES** and know its contents.

☐   I am a party to this action.  The matters stated in the foregoing document are true of my own knowledge except as to those matters that are stated on information and belief, and to those matters I believe them to be true.

☒   I am ☐ an officer ☐ a partner ☒ Director, National Patient Services, Technology, and Support for Quest Diagnostics Incorporated ("Quest"), a defendant to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.

  ☒   I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

  ☐   The matters stated in the foregoing document are true of my own knowledge except as to those matters that are stated on information and belief, and as to those matters I believe them to be true.

☐   I am one of the attorneys for _____ a party to this action.  Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason.  I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on May 21, 2021, at Schwenksville, Pennsylvania.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Marc Yarrison
_____          _____

Type or Print Name                                          Signature

PA0748

# EXHIBIT 27

## REDACTED

TO BE FILED UNDER SEAL
PENDING THE COURT'S
RULING ON PLAINTIFF'S
APPLICATION

# EXHIBIT 28

1  OGLETREE, DEAKINS, NASH,
   SMOAK & STEWART, P.C.
2  DAVID RAIZMAN, CA Bar No. 129407
   david.raizman@ogletree.com
3  AMBER L. ROLLER, CA Bar No. 273354
   amber.roller@ogletree.com
4  J. NICHOLAS MARFORI, CA Bar No. 311765
   nicholas.marfori@ogletree.com
5  400 South Hope Street, Suite 1200
   Los Angeles, California  90071
6  Telephone:  213-239-9800
   Facsimile:   213-239-9045
7
   Attorneys for Defendants
8  QUEST DIAGNOSTICS CLINICAL
   LABORATORIES, INC.; QUEST
9  DIAGNOSTICS HOLDINGS, INC. and
   QUEST DIAGNOSTICS INCORPORATED
10

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13  JULIAN VARGAS, ANNE WEST and        Case No. 2:19-cv-08108 DMG (MRWx)
    AMERICAN COUNCIL OF THE
14  BLIND, individually on behalf of    **DEFENDANT QUEST DIAGNOSTICS**
    themselves and all others similarly **INCORPORATED'S RESPONSE TO**
15  situated,                           **PLAINTIFF JULIAN VARGAS' FIRST**
                                        **SET OF REQUESTS FOR ADMISSION**
16              Plaintiffs,

17       v.

18  QUEST DIAGNOSTICS CLINICAL          Complaint Filed: September 18, 2019
    LABORATORIES, INC., QUEST           Trial Date:      January 11, 2022
19  DIAGNOSTICS HOLDINGS, INC.,         District Judge:  Hon. Dolly M. Gee
    QUEST DIAGNOSTICS                                    Courtroom 8C, First St.
20  INCORPORATED; and DOES 1-10,        Magistrate Judge: Hon. Michael R. Wilner
    inclusive,                                           Courtroom 550, Roybal
21
22              Defendants.

23

24

25

26

27

28

47339893_4.docx

| | | |
|---|---|---|
| 1 | PROPOUNDING PARTY: | Plaintiff JULIAN VARGAS |
| 2 | RESPONDING PARTY: | Defendant QUEST DIAGNOSTICS |
| 3 | | INCORPORATED |
| 4 | SET NO.: | ONE |

Defendant Quest Diagnostics Incorporated ("Defendant") responds to Plaintiff Julian Vargas' First Set of Requests for Admission to Defendant Quest Diagnostics Incorporated (the "Requests") as follows:

## I.

## **PRELIMINARY STATEMENT**

Defendant makes the following answers, responses, and objections to the Requests of Plaintiff Julian Vargas ("Plaintiff"). Each of the following responses is made subject to any and all objections as to competence, relevance or other grounds that would require exclusion of such statement if made by a witness present and testifying in court. Any and all such objections and grounds are expressly reserved and may be interposed at the time of the trial.

These responses are based on Defendant's present knowledge, information, and belief, as derived from (a) the knowledge and information of present employees of Defendant gained in their capacity as such, and (b) a review of the files maintained by Defendant that would be likely to contain the information called for by the Requests. These responses are subject to amendment and supplementation as Defendant acquires additional information and completes its review and analysis and made without prejudice to Defendant's right to use subsequently discovered or developed information.

No incidental or implied admissions are intended by these Responses. The fact that Defendant responds or objects to any Request should not be taken as an admission that Defendant accepts or admits the existence of any facts assumed by such Request or that such Response or objection constitutes admissible evidence as to any such assumed facts. The fact that Defendant responds to part of or all of any

47339893_4.docx

Request is not intended to be, and shall not be, construed as, a waiver by Defendant of any part of any objection to any Request.

Defendant will respond to Plaintiff's Requests in accordance with Rules 26 and 36 and will not provide responses to the extent such responses would exceed the requirements of those Rules. Defendant responds for it alone, and expressly declines to respond on behalf of, or based on information maintained by or available to any other entity or party. Specific objections to each Request are made on an individual basis in Defendant's responses below. In addition to these specific objections, Defendant makes certain continuing objections (the "General Objections") to the Requests. Defendant's response to each individual request is submitted without prejudice to, and without in any respect limiting or waiving, any General Objection not expressly set forth in that response.

## II.

## **GENERAL OBJECTIONS**

Defendant provides these responses subject to the general objections set forth below ("General Objections").

1.     Defendant objects that Plaintiff's definition of "YOU" and "YOUR" is vague and overly broad because Plaintiff has defined "YOU" and "YOUR" to mean "Defendant Quest Diagnostics Incorporated and its consolidated subsidiaries, agents, assigns, employees, representatives, and counsel; and any other representative or person acting on behalf of Defendant." For purposes of responding to each of Plaintiff's Requests which rely upon the term "YOU" or "YOUR," Defendant has reasonably construed "YOU" and "YOUR" to mean and refer only to Defendant.

2.     Defendant objects on the ground that Plaintiff's definition of "PATIENT SERVICE CENTER" is vague and overbroad in that it defines "PATIENT SERVICE CENTER" as "a Quest Diagnostics location where a patient can obtain clinical laboratory services from Quest Diagnostics." For purposes of responding to each of the Requests which rely upon the term "PATIENT SERVICE

2

47339893_4.docx

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S
RESPONSE TO PLAINTIFF JULIAN VARGAS' FIRST SET OF REQUESTS FOR ADMISSION

PA0752

CENTER," Defendant has reasonably construed "PATIENT SERVICE CENTER" to mean and refer only to a patient service center located within the United States that is open to the public, provides specimen collection and related services in furtherance of diagnostic testing services, bears the name Quest Diagnostics, and is operated by Quest Diagnostics Incorporated or its wholly owned subsidiaries.  This definition excludes any physician office or similar location, where Quest has placed an employee, such as a phlebotomist, to provide specimen collection services for patients of that physician office or location.

3.      Defendant objects on the ground that Plaintiff's definition of "E-CHECK-IN KIOSK" that it is vague and overbroad because it defines "E-CHECK-IN KIOSK" as "Defendant's touchscreen electronic check-in at its PATIENT SERVICE CENTERS" without specifying that it is a device used by patients to check-in at Quest patient service centers.  For purposes of responding to each of the Requests which rely upon the term "E-CHECK-IN KIOSK," Defendant has reasonably construed "E-CHECK-IN KIOSK" to mean and refer only to the touchscreen device that can be used by patients to check-in (*i.e.*, inform the facility of their arrival) when they arrive at Patient Service Centers (as defined herein), where such kiosks are available.  The term "Kiosk" shall be used interchangeably with "E-CHECK-IN KIOSK" subject to Defendant's objection and interpretation as set forth in this paragraph.

These General Objections are incorporated by reference into each and every response below to the extent applicable.  Various objections may be specifically referred to in the responses below for purposes of clarity.  However, failure to incorporate specifically an objection is not to be construed as a waiver of any such objection..

47339893_4.docx

# III.

## <u>RESPONSES TO REQUESTS FOR ADMISSION</u>

### <u>REQUEST FOR ADMISSION NO. 1:</u>

Admit that documents produced by Quest, Bates numbered as follows—QUEST-VARGAS000036496; QUEST-VARGAS000035087-90; QUEST-VARGAS000033037-48; QUEST-VARGAS000035119-76; QUEST-VARGAS000034658-66; QUEST-VARGAS000007361-63; QUEST-VARGAS000037909-10; QUEST-VARGAS000037977; QUEST-VARGAS000035335-36; QUEST-VARGAS000036699; QUEST-VARGAS000028740-41; QUEST-VARGAS000028746-47; QUEST-VARGAS000030878-79; QUEST-VARGAS000038805-06; QUEST-VARGAS000037605-06; QUEST-VARGAS000037980-81; QUEST-VARGAS000036566-78; QUEST-VARGAS000036700-02; QUEST-VARGAS000036947-54; QUEST-VARGAS000040261-64; QUEST-VARGAS000040267-69; QUEST-VARGAS000040280-84; QUEST-VARGAS000039990; QUEST-VARGAS000039966-67; QUEST-VARGAS000035475-76; QUEST-VARGAS000000022-41; QUEST-VARGAS000004496-99; QUEST-VARGAS000040161-66; QUEST-VARGAS000040791; QUEST-VARGAS000002811; QUEST-VARGAS000000583-637; QUEST-VARGAS000036495-96; QUEST-VARGAS000036320; QUEST-VARGAS000000858; QUEST-VARGAS000001053-54; QUEST-VARGAS000036677-81; QUEST-VARGAS000035240-43; QUEST-VARGAS000028740-41; QUEST-VARGAS000039721-26; QUEST-VARGAS000038679; QUEST-VARGAS000031121; QUEST-VARGAS000040972-41085; QUEST-VARGAS000041092-41152; QUEST-VARGAS000030691; QUEST-VARGAS000034803-34941; QUEST-VARGAS000032693-94; QUEST-VARGAS000031630-35; QUEST-VARGAS000041684; QUEST-

4

Case No. 2:19-cv-08108 DMG (MRWx)

47339893_4.docx

1   VARGAS000036226; QUEST-VARGAS000036322; QUEST-

2   VARGAS000036276; QUEST-VARGAS000036501; QUEST-

3   VARGAS000038939-40; and QUEST-VARGAS000037495-96—are true and

4   authentic copies of the genuine original documents.

5   **RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

6          Defendant incorporates the above Preliminary Statement and General

7   Objections into this response by this reference as though they are set forth in full.

8   Defendant further objects that this Request is unduly burdensome and improperly

9   compound as it requests admissions regarding 52 separate documents, comprising

10  over 600 pages and each such "document" often consisting of multiple documents.

11  Defendant also objects on the ground and to the extent that this Request calls for

12  admissions regarding documents protected by the attorney-client privilege and

13  attorney-work-product doctrine, including documents that are subject to the

14  Clawback Order (ECF No. 64) in this action.  Plaintiff's continued retention or use

15  of, or reference to, a document subject to the Clawback Order, as exhibited in this

16  Request, constitutes contempt of that Order.

17         Subject to and without waiving the objections, Defendant responds as follows:

18  Defendant directs Plaintiff to Exhibit 1 to these Responses, which sets forth

19  Defendant's response as to each of the documents identified in this Request for

20  which a response may be provided.  Except as expressly admitted in Exhibit 1, all

21  other portions of this Request are denied.

22  **REQUEST FOR ADMISSION NO. 2:**

23         Admit that documents produced by Quest, Bates numbered as follows—

24  QUEST-VARGAS000036496; QUEST-VARGAS000035087-90; QUEST-

25  VARGAS000033037-48; QUEST-VARGAS000035119-76; QUEST-

26  VARGAS000034658-66; QUEST-VARGAS000007361-63; QUEST-

27  VARGAS000037909-10; QUEST-VARGAS000037977; QUEST-

28  VARGAS000035335-36; QUEST-VARGAS000036699; QUEST-

47339893_4.docx

VARGAS000028740-41; QUEST-VARGAS000028746-47; QUEST-

VARGAS000030878-79; QUEST-VARGAS000038805-06; QUEST-

VARGAS000037605-06; QUEST-VARGAS000037980-81; QUEST-

VARGAS000036566-78; QUEST-VARGAS000036700-02; QUEST-

VARGAS000036947-54; QUEST-VARGAS000040261-64; QUEST-

VARGAS000040267-69; QUEST-VARGAS000040280-84; QUEST-

VARGAS000039990; QUEST-VARGAS000039966-67; QUEST-

VARGAS000035475-76; QUEST-VARGAS000000022-41; QUEST-

VARGAS000004496-99; QUEST-VARGAS000040161-66; QUEST-

VARGAS000040791; QUEST-VARGAS000002811; QUEST-

VARGAS000000583-637; QUEST-VARGAS000036495-96; QUEST-

VARGAS000036320; QUEST-VARGAS000000858; QUEST-

VARGAS000001053-54; QUEST-VARGAS000036677-81; QUEST-

VARGAS000035240-43; QUEST-VARGAS000028740-41; QUEST-

VARGAS000039721-26; QUEST-VARGAS000038679; QUEST-

VARGAS000031121; QUEST-VARGAS000040972-41085; QUEST-

VARGAS000041092-41152; QUEST-VARGAS000030691; QUEST-

VARGAS000034803-34941; QUEST-VARGAS000032693-94; QUEST-

VARGAS000031630-35; QUEST-VARGAS000041684; QUEST-

VARGAS000036226; QUEST-VARGAS000036322; QUEST-

VARGAS000036276; QUEST-VARGAS000036501; QUEST-

VARGAS000038939-40; and QUEST-VARGAS000037495-96—were made at or

near the time of the regularly conducted activity to which the documents pertain.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

Defendant incorporates the above Preliminary Statement and General

Objections into this response by this reference as though they are set forth in full.

Defendant further objects that this Request is unduly burdensome and improperly

compound as it requests admissions regarding 52 separate documents, comprising

over 600 pages and each such document often consisting of multiple documents.
Defendant also objects that this Request is vague and ambiguous as to the phrase
"regularly conducted activity," given the varying substance, origin, and nature of
each of the 52 documents identified in this Request and the varying "activities"
described within each of the documents.  Defendant also objects on the ground and
to the extent that this Request calls for admissions regarding documents protected by
the attorney-client privilege and attorney-work-product doctrine, including
documents that are subject to the Clawback Order (ECF No. 64) in this action.
Plaintiff's continued retention or use of, or reference to, a document subject to the
Clawback Order, as exhibited in this Request, constitutes contempt of that Order.

Subject to and without waiving the objections, Defendant responds as follows:
Defendant directs Plaintiff to Exhibit 1 to these Responses, which sets forth
Defendant's response as to each of the documents identified in this Request for
which a response may be provided. Except as expressly admitted in Exhibit 1, all
other portions of this Request are denied.

**REQUEST FOR ADMISSION NO. 3:**

Admit that documents produced by Quest, Bates numbered as follows—
QUEST-VARGAS000036496; QUEST-VARGAS000035087-90; QUEST-
VARGAS000033037-48; QUEST-VARGAS000035119-76; QUEST-
VARGAS000034658-66; QUEST-VARGAS000007361-63; QUEST-
VARGAS000037909-10; QUEST-VARGAS000037977; QUEST-
VARGAS000035335-36; QUEST-VARGAS000036699; QUEST-
VARGAS000028740-41; QUEST-VARGAS000028746-47; QUEST-
VARGAS000030878-79; QUEST-VARGAS000038805-06; QUEST-
VARGAS000037605-06; QUEST-VARGAS000037980-81; QUEST-
VARGAS000036566-78; QUEST-VARGAS000036700-02; QUEST-
VARGAS000036947-54; QUEST-VARGAS000040261-64; QUEST-
VARGAS000040267-69; QUEST-VARGAS000040280-84; QUEST-

7

47339893_4.docx

VARGAS000039990; QUEST-VARGAS000039966-67; QUEST-
VARGAS000035475-76; QUEST-VARGAS000000022-41; QUEST-
VARGAS000004496-99; QUEST-VARGAS000040161-66; QUEST-
VARGAS000040791; QUEST-VARGAS000002811; QUEST-
VARGAS000000583-637; QUEST-VARGAS000036495-96; QUEST-
VARGAS000036320; QUEST-VARGAS000000858; QUEST-
VARGAS000001053-54; QUEST-VARGAS000036677-81; QUEST-
VARGAS000035240-43; QUEST-VARGAS000028740-41; QUEST-
VARGAS000039721-26; QUEST-VARGAS000038679; QUEST-
VARGAS000031121; QUEST-VARGAS000040972-41085; QUEST-
VARGAS000041092-41152; QUEST-VARGAS000030691; QUEST-
VARGAS000034803-34941; QUEST-VARGAS000032693-94; QUEST-
VARGAS000031630-35; QUEST-VARGAS000041684; QUEST-
VARGAS000036226; QUEST-VARGAS000036322; QUEST-
VARGAS000036276; QUEST-VARGAS000036501; QUEST-
VARGAS000038939-40; and QUEST-VARGAS000037495-96—were made by a
person with knowledge of the activity to which the documents pertain or were made
from information transmitted by a person with knowledge of the activity to which the
documents pertain.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Defendant incorporates the above Preliminary Statement and General
Objections into this response by this reference as though they are set forth in full.
Defendant further objects that this Request is unduly burdensome and improperly
compound as it requests admissions regarding 52 separate documents, comprising
over 600 pages and each such document often consisting of multiple documents.
Defendant also objects that this Request is vague and ambiguous as to the term
"activity" and phrase "information transmitted," given the varying substance, origin,
and nature of each of the 52 documents identified in this Request and the varying

8

47339893_4.docx

PA0758

"activities" and "information" described within each of the documents.  Defendant also objects on the ground and to the extent that this Request calls for admissions regarding documents protected by the attorney-client privilege and attorney-work-product doctrine, including documents that are subject to the Clawback Order (ECF No. 64) in this action.  Plaintiff's continued retention or use of, or reference to, a document subject to the Clawback Order, as exhibited in this Request, constitutes contempt of that Order.

Subject to and without waiving the objections, Defendant responds as follows: Defendant directs Plaintiff to Exhibit 1 to these Responses, which sets forth Defendant's response as to each of the documents identified in this Request for which a response may be provided.  Except as expressly admitted in Exhibit 1, all other portions of this Request are denied.

**REQUEST FOR ADMISSION NO. 4:**

Admit that documents produced by Quest, Bates numbered as follows— QUEST-VARGAS000036496; QUEST-VARGAS000035087-90; QUEST-VARGAS000033037-48; QUEST-VARGAS000035119-76; QUEST-VARGAS000034658-66; QUEST-VARGAS000007361-63; QUEST-VARGAS000037909-10; QUEST-VARGAS000037977; QUEST-VARGAS000035335-36; QUEST-VARGAS000036699; QUEST-VARGAS000028740-41; QUEST-VARGAS000028746-47; QUEST-VARGAS000030878-79; QUEST-VARGAS000038805-06; QUEST-VARGAS000037605-06; QUEST-VARGAS000037980-81; QUEST-VARGAS000036566-78; QUEST-VARGAS000036700-02; QUEST-VARGAS000036947-54; QUEST-VARGAS000040261-64; QUEST-VARGAS000040267-69; QUEST-VARGAS000040280-84; QUEST-VARGAS000039990; QUEST-VARGAS000039966-67; QUEST-VARGAS000035475-76; QUEST-VARGAS000000022-41; QUEST-VARGAS000004496-99; QUEST-VARGAS000040161-66; QUEST-

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S
RESPONSE TO PLAINTIFF JULIAN VARGAS' FIRST SET OF REQUESTS FOR ADMISSION

47339893_4.docx

VARGAS000040791; QUEST-VARGAS000002811; QUEST-

VARGAS000000583-637; QUEST-VARGAS000036495-96; QUEST-

VARGAS000036320; QUEST-VARGAS000000858; QUEST-

VARGAS000001053-54; QUEST-VARGAS000036677-81; QUEST-

VARGAS000035240-43; QUEST-VARGAS000028740-41; QUEST-

VARGAS000039721-26; QUEST-VARGAS000038679; QUEST-

VARGAS000031121; QUEST-VARGAS000040972-41085; QUEST-

VARGAS000041092-41152; QUEST-VARGAS000030691; QUEST-

VARGAS000034803-34941; QUEST-VARGAS000032693-94; QUEST-

VARGAS000031630-35; QUEST-VARGAS000041684; QUEST-

VARGAS000036226; QUEST-VARGAS000036322; QUEST-

VARGAS000036276; QUEST-VARGAS000036501; QUEST-

VARGAS000038939-40; and QUEST-VARGAS000037495-96—were prepared and

kept by YOU in the course of regularly conducted activity of a business,

organization, occupation, or calling.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Defendant incorporates the above Preliminary Statement and General

Objections into this response by this reference as though they are set forth in full.

Defendant further objects that this Request is unduly burdensome and improperly

compound as it requests admissions regarding 52 separate documents, comprising

over 600 pages and each such document often consisting of multiple documents.

Defendant also objects that this Request is vague and ambiguous as to the term

"activity" and phrase "information transmitted," given the varying substance, origin,

and nature of each of the 52 documents identified in this Request and the varying

"activities" and "information" described within each of the documents.  Defendant

also objects on the ground and to the extent that this Request calls for admissions

regarding documents protected by the attorney-client privilege and attorney-work-

product doctrine, including documents that are subject to the Clawback Order (ECF

No. 64) in this action.  Plaintiff's continued retention or use of, or reference to, a document subject to the Clawback Order, as exhibited in this Request, constitutes contempt of that Order.

Subject to and without waiving the objections, Defendant responds as follows: Defendant directs Plaintiff to Exhibit 1 to these Responses, which sets forth Defendant's response as to each of the documents identified in this Request for which a response may be provided.  Except as expressly admitted in Exhibit 1, all other portions of this Request are denied.

**REQUEST FOR ADMISSION NO. 5:**

Admit that documents produced by Quest, Bates numbered as follows— QUEST-VARGAS000036496; QUEST-VARGAS000035087-90; QUEST-VARGAS000033037-48; QUEST-VARGAS000035119-76; QUEST-VARGAS000034658-66; QUEST-VARGAS000007361-63; QUEST-VARGAS000037909-10; QUEST-VARGAS000037977; QUEST-VARGAS000035335-36; QUEST-VARGAS000036699; QUEST-VARGAS000028740-41; QUEST-VARGAS000028746-47; QUEST-VARGAS000030878-79; QUEST-VARGAS000038805-06; QUEST-VARGAS000037605-06; QUEST-VARGAS000037980-81; QUEST-VARGAS000036566-78; QUEST-VARGAS000036700-02; QUEST-VARGAS000036947-54; QUEST-VARGAS000040261-64; QUEST-VARGAS000040267-69; QUEST-VARGAS000040280-84; QUEST-VARGAS000039990; QUEST-VARGAS000039966-67; QUEST-VARGAS000035475-76; QUEST-VARGAS000000022-41; QUEST-VARGAS000004496-99; QUEST-VARGAS000040161-66; QUEST-VARGAS000040791; QUEST-VARGAS000002811; QUEST-VARGAS000000583-637; QUEST-VARGAS000036495-96; QUEST-VARGAS000036320; QUEST-VARGAS000000858; QUEST-VARGAS000001053-54; QUEST-VARGAS000036677-81; QUEST-

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S
RESPONSE TO PLAINTIFF JULIAN VARGAS' FIRST SET OF REQUESTS FOR ADMISSION

VARGAS000035240-43; QUEST-VARGAS000028740-41; QUEST-VARGAS000039721-26; QUEST-VARGAS000038679; QUEST-VARGAS000031121; QUEST-VARGAS000040972-41085; QUEST-VARGAS000041092-41152; QUEST-VARGAS000030691; QUEST-VARGAS000034803-34941; QUEST-VARGAS000032693-94; QUEST-VARGAS000031630-35; QUEST-VARGAS000041684; QUEST-VARGAS000036226; QUEST-VARGAS000036322; QUEST-VARGAS000036276; QUEST-VARGAS000036501; QUEST-VARGAS000038939-40; and QUEST-VARGAS000037495-96—were made in the regular practice of the activity to which the documents pertain.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Defendant incorporates the above Preliminary Statement and General Objections into this response by this reference as though they are set forth in full. Defendant further objects that this Request is unduly burdensome and improperly compound as it requests admissions regarding 52 separate documents, comprising over 600 pages and each such document often consisting of multiple documents. Defendant also objects that this Request is vague and ambiguous as to the phrase "regular practice of the activity," given the varying substance, origin, and nature of each of the 52 documents identified in this Request and the various "activities" described within each of the documents.  Defendant also objects on the ground and to the extent that this Request calls for admissions regarding documents protected by the attorney-client privilege and attorney-work-product doctrine, including documents that are subject to the Clawback Order (ECF No. 64) in this action. Plaintiff's continued retention or use of, or reference to, a document subject to the Clawback Order, as exhibited in this Request, constitutes contempt of that Order.

**REQUEST FOR ADMISSION NO. 6:**

Admit that all foundational requirements for the admission of documents produced by Quest, Bates numbered as follows—QUEST-VARGAS000036496;

12

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S
RESPONSE TO PLAINTIFF JULIAN VARGAS' FIRST SET OF REQUESTS FOR ADMISSION

47339893_4.docx

QUEST-VARGAS000035087-90; QUEST-VARGAS000033037-48; QUEST-VARGAS000035119-76; QUEST-VARGAS000034658-66; QUEST-VARGAS000007361-63; QUEST-VARGAS000037909-10; QUEST-VARGAS000037977; QUEST-VARGAS000035335-36; QUEST-VARGAS000036699; QUEST-VARGAS000028740-41; QUEST-VARGAS000028746-47; QUEST-VARGAS000030878-79; QUEST-VARGAS000038805-06; QUEST-VARGAS000037605-06; QUEST-VARGAS000037980-81; QUEST-VARGAS000036566-78; QUEST-VARGAS000036700-02; QUEST-VARGAS000036947-54; QUEST-VARGAS000040261-64; QUEST-VARGAS000040267-69; QUEST-VARGAS000040280-84; QUEST-VARGAS000039990; QUEST-VARGAS000039966-67; QUEST-VARGAS000035475-76; QUEST-VARGAS000000022-41; QUEST-VARGAS000004496-99; QUEST-VARGAS000040161-66; QUEST-VARGAS000040791; QUEST-VARGAS000002811; QUEST-VARGAS000000583-637; QUEST-VARGAS000036495-96; QUEST-VARGAS000036320; QUEST-VARGAS000000858; QUEST-VARGAS000001053-54; QUEST-VARGAS000036677-81; QUEST-VARGAS000035240-43; QUEST-VARGAS000028740-41; QUEST-VARGAS000039721-26; QUEST-VARGAS000038679; QUEST-VARGAS000031121; QUEST-VARGAS000040972-41085; QUEST-VARGAS000041092-41152; QUEST-VARGAS000030691; QUEST-VARGAS000034803-34941; QUEST-VARGAS000032693-94; QUEST-VARGAS000031630-35; QUEST-VARGAS000041684; QUEST-VARGAS000036226; QUEST-VARGAS000036322; QUEST-VARGAS000036276; QUEST-VARGAS000036501; QUEST-VARGAS000038939-40; and QUEST-VARGAS000037495-96—have been satisfied.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Defendant incorporates the above Preliminary Statement and General Objections into this response by this reference as though they are set forth in full. Defendant further objects that this Request is unduly burdensome and improperly compound as it requests admissions regarding 52 separate documents, comprising over 600 pages and each often consisting of multiple documents. Defendant also objects that this Request is vague and ambiguous given the varying substance, origin, and nature of each of the 52 documents identified in this Request and some of the individual documents within each of the documents. Defendant also objects that this Request is vague and ambiguous in its use of the phrase "foundational requirements," as potentially applying to varying, unidentified requirements that are readily capable of definition. Defendant also objects on the ground and to the extent that this Request calls for admissions regarding documents protected by the attorney-client privilege and attorney-work-product doctrine, including documents that are subject to the Clawback Order (ECF No. 64) in this action. Plaintiff's continued retention or use of, or reference to, a document subject to the Clawback Order, as exhibited in this Request, constitutes contempt of that Order.

**REQUEST FOR ADMISSION NO. 7:**

Admit that YOU maintain accurate records of all patient visits to PATIENT SERVICE CENTERS in the United States which occurred from September 2019 to present.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Defendant incorporates the above Preliminary Statement and General Objections into this response by this reference as though they are set forth in full. Defendant objects on the ground that the Request is vague and ambiguous as a whole and as to the terms/phrases "accurate records" and "all patient visits," as Defendant cannot ascertain what the request is seeking with any reasonable specificity. Defendant further objects that the request is overbroad on the ground and to the

14

47339893_4.docx

PA0764

extent that it seeks information not relevant to any subject matter of this action nor
reasonably likely to lead to the discovery of admissible evidence because such
information is not relevant to Plaintiffs' claims.  Defendant also objects on the
ground and to the extent that this Request calls for information that is protected from
disclosure by the attorney-client privilege and attorney-work-product doctrine.
Further, Defendant objects on the ground and to the extent that this Request calls for
disclosure of Defendant's proprietary information and/or confidential information
concerning individuals who are not parties to this action in violation of their privacy
rights.  Defendant further objects to this Request on the ground and to the extent that
the records it maintains are only accurate to the extent that accurate information is
provided by patients or other third parties.  Defendant further objects to this Request
on the ground that some of the information recorded may have been edited,
corrected, amended, changed, deleted, updated, or otherwise modified in the ordinary
course of business and/or subject to Quest's document retention policy.

Subject to and without waiving the objections, Defendant responds as follows:
Defendant admits that, subject to any edits, corrections, amendments, changes,
deletions or updates made in the ordinary course of business and subject to its
document retention policy, Quest maintains records of the names that: (1) individuals
without appointments used when checking in at a Patient Service Center kiosk from
September 2019 to the present; and (2) individuals with appointments who checked
in for their appointments at a Patient Service Center kiosk from September 2019 to
the present used to schedule their appointments.  Except as expressly admitted, all
other portions of this Request are denied.

**REQUEST FOR ADMISSION NO. 8:**

Admit that YOU maintain the names of patients for all patient visits to
PATIENT SERVICE CENTERS in the United States which occurred from
September 2019 to present.

47339893_4.docx

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

Defendant incorporates the above Preliminary Statement and General Objections into this response by this reference as though they are set forth in full. Defendant objects on the ground that the Request is vague and ambiguous as a whole and as to the phrase "all patient visits," as Defendant cannot ascertain what the request is seeking with any reasonable specificity. Defendant further objects that the request is overbroad on the ground and to the extent that it seeks information not relevant to any subject matter of this action nor reasonably likely to lead to the discovery of admissible evidence because such information is not relevant to Plaintiffs' claims. Defendant also objects on the ground and to the extent that this Request calls for information that is protected from disclosure by the attorney-client privilege and attorney-work-product doctrine. Further, Defendant objects on the ground and to the extent that this Request calls for disclosure of Defendant's proprietary information and/or confidential information concerning individuals who are not parties to this action in violation of their privacy rights. Defendant further objects to this Request on the ground and to the extent that the names it maintains in its records consist solely of the names provided by patients or other third parties. Defendant further objects to this Request on the ground that some of the name information recorded may have been edited, corrected, amended, changed, deleted, updated, or otherwise modified in the ordinary course of business and/or subject to Quest's document retention policy.

Subject to and without waiving the objections, Defendant responds as follows: Defendant admits that, subject to any edits, corrections, amendments, changes, deletions or updates made in the ordinary course of business and subject to its document retention policy, Quest maintains records of the names that: (1) individuals without appointments used when checking in at a Patient Service Center kiosk from September 2019 to the present; and (2) individuals with appointments who checked in for their appointments at a Patient Service Center kiosk from September 2019 to

16

Case No. 2:19-cv-08108 DMG (MRWx)

47339893_4.docx

the present used to schedule their appointments.  Except as expressly admitted, all other portions of this Request are denied.

**REQUEST FOR ADMISSION NO. 9:**

Admit that YOU maintain patient healthcare insurance information of patients for all patient visits to PATIENT SERVICE CENTERS in the United States which occurred from September 2019 to present.

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Defendant incorporates the above Preliminary Statement and General Objections into this response by this reference as though they are set forth in full. Defendant objects on the ground that the Request is vague and ambiguous as a whole and as to the terms/phrases "patient healthcare insurance information" and "all patient visits," as Defendant cannot ascertain what the request is seeking with any reasonable specificity.  Defendant further objects that the request is overbroad on the ground and to the extent that it seeks information not relevant to any subject matter of this action nor reasonably likely to lead to the discovery of admissible evidence because such information is not relevant to Plaintiffs' claims.  Defendant also objects on the ground and to the extent that this Request calls for information that is protected from disclosure by the attorney-client privilege and attorney-work-product doctrine.  Further, Defendant objects on the ground and to the extent that this Request calls for disclosure of Defendant's proprietary information and/or confidential information concerning individuals who are not parties to this action in violation of their privacy rights. Defendant further objects to this Request on the ground and to the extent that the health insurance information it maintains in its records consists solely of the health insurance information provided by some (but not all) patients or other third parties.  Defendant further objects to this Request on the ground that some of the health insurance information recorded may have been edited, corrected, amended, changed, deleted, updated, or otherwise modified in the ordinary course of business and/or subject to Quest's document retention policy.

Subject to and without waiving the objections, Defendant responds as follows: Defendant admits that, subject to any edits, corrections, amendments, changes, deletions or updates made in the ordinary course of business and its document retention policy, Quest maintains certain healthcare insurance information for patients serviced at Patient Service Centers from September 2019 to the present, but only to the extent that: (1) Quest requested that the patient provide the healthcare insurance information, as such information is not requested from all patients serviced at Patient Service Centers; (2) the patient provided the healthcare insurance information and the information was inputted into Quest's system; and (3) the patient's order was entered, completed, and filed.  Except as expressly admitted, all other portions of this Request are denied.

**REQUEST FOR ADMISSION NO. 10:**

Admit that YOU maintain patient home address information for all patient visits to PATIENT SERVICE CENTERS in the United States which occurred from September 2019 to present.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

Defendant incorporates the above Preliminary Statement and General Objections into this response by this reference as though they are set forth in full. Defendant objects on the ground that the Request is vague and ambiguous as a whole and as to the phrase "all patient visits," as Defendant cannot ascertain what the request is seeking with any reasonable specificity.  Defendant further objects that the request is overbroad on the ground and to the extent that it seeks information not relevant to any subject matter of this action nor reasonably likely to lead to the discovery of admissible evidence because such information is not relevant to Plaintiffs' claims.  Defendant also objects on the ground and to the extent that this Request calls for information that is protected from disclosure by the attorney-client privilege and attorney-work-product doctrine.  Further, Defendant objects on the ground and to the extent that this Request calls for disclosure of Defendant's

18

47339893_4.docx

proprietary information and/or confidential information concerning individuals who are not parties to this action in violation of their privacy rights.  Defendant further objects to this Request on the ground and to the extent that the patient home address information it maintains in its records consists solely of the home address information provided by patients or other third parties.  Defendant further objects to this Request on the ground that some of the home address information recorded may have been edited, corrected, amended, changed, deleted, updated, or otherwise modified in the ordinary course of business and/or subject to Quest's document retention policy.

Subject to and without waiving the objections, Defendant responds as follows: Defendant admits that, subject to any edits, corrections, amendments, changes, deletions or updates made in the ordinary course of business and subject to its document retention policy, Quest maintains home address information for patients serviced at Patient Service Centers from September 2019 to the present, but only to the extent that: (1) Quest requested that the patient provide the home address information, as such information is not requested from all patients serviced at Patient Service Centers; (2) the patient provided the home address information and the information was inputted into Quest's system; and (3) the patient's order was entered, completed, and filed.  Except as expressly admitted, all other portions of this Request are denied.

**REQUEST FOR ADMISSION NO. 11:**

Admit that YOU maintain patient telephone numbers for all patient visits to PATIENT SERVICE CENTERS in the United States which occurred from September 2019 to present.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

Defendant incorporates the above Preliminary Statement and General Objections into this response by this reference as though they are set forth in full. Defendant objects on the ground that the Request is vague and ambiguous as a whole

19

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S
RESPONSE TO PLAINTIFF JULIAN VARGAS' FIRST SET OF REQUESTS FOR ADMISSION

and as to the phrase "all patient visits," as Defendant cannot ascertain what the request is seeking with any reasonable specificity.  Defendant further objects that the request is overbroad on the ground and to the extent that it seeks information not relevant to any subject matter of this action nor reasonably likely to lead to the discovery of admissible evidence because such information is not relevant to Plaintiffs' claims.  Defendant also objects on the ground and to the extent that this Request calls for information that is protected from disclosure by the attorney-client privilege and attorney-work-product doctrine.  Further, Defendant objects on the ground and to the extent that this Request calls for disclosure of Defendant's proprietary information and/or confidential information concerning individuals who are not parties to this action in violation of their privacy rights.  Defendant further objects to this Request on the ground and to the extent that the telephone numbers it maintains in its records consist solely of the telephone numbers provided by patients or other third parties.  Defendant further objects to this Request on the ground that some of the telephone numbers information recorded may have been edited, corrected, amended, changed, deleted, updated, or otherwise modified in the ordinary course of business and/or subject to Quest's document retention policy.

Subject to and without waiving the objections, Defendant responds as follows: Defendant admits that, subject to any edits, corrections, amendments, changes, deletions or updates made in the ordinary course of business and subject to its document retention policy, Quest maintains a telephone number for patients serviced at Patient Service Centers from September 2019 to the present, but only to the extent that: (1) Quest requested that the patient provide their telephone number, as such information is not requested from all patients serviced at Patient Service Centers; (2) the patient provided the telephone number and that information was inputted into Quest's system; and (3) the patient's order was entered, completed, and filed. Except as expressly admitted, all other portions of this Request are denied.

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S
RESPONSE TO PLAINTIFF JULIAN VARGAS' FIRST SET OF REQUESTS FOR ADMISSION

47339893_4.docx

PA0770

**REQUEST FOR ADMISSION NO. 12:**

Admit that YOU maintain patient email address information for all patient visits to PATIENT SERVICE CENTERS in the United States which occurred from September 2019 to present.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

Defendant incorporates the above Preliminary Statement and General Objections into this response by this reference as though they are set forth in full. Defendant objects on the ground that the Request is vague and ambiguous as a whole and as to the phrase "all patient visits," as Defendant cannot ascertain what the request is seeking with any reasonable specificity. Defendant further objects that the request is overbroad on the ground and to the extent that it seeks information not relevant to any subject matter of this action nor reasonably likely to lead to the discovery of admissible evidence because such information is not relevant to Plaintiffs' claims. Defendant also objects on the ground and to the extent that this Request calls for information that is protected from disclosure by the attorney-client privilege and attorney-work-product doctrine. Further, Defendant objects on the ground and to the extent that this Request calls for disclosure of Defendant's proprietary information and/or confidential information concerning individuals who are not parties to this action in violation of their privacy rights. Defendant further objects to this Request on the ground and to the extent that the email information it maintains in its records consist solely of the email information provided by patients or other third parties. Defendant further objects to this Request on the ground that some of the email information recorded may have been edited, corrected, amended, changed, deleted, updated, or otherwise modified in the ordinary course of business and/or subject to Quest's document retention policy.

Subject to and without waiving the objections, Defendant responds as follows: Defendant admits that, subject to any edits, corrections, amendments, changes, deletions or updates made in the ordinary course of business and subject to its

21

47339893_4.docx

PA0771

1   document retention policy, Quest maintains email addresses for patients serviced at

2   Patient Service Centers from September 2019 to the present, but only to the extent

3   that: (1) Quest requested that the patient provide their email address; (2) the patient

4   opted to provide the email address and that information was inputted into Quest's

5   system; and (3) the patient's order was entered, completed, and filed.  Except as

6   expressly admitted, all other portions of this Request are denied.

7

8   DATED:      July 9, 2021          OGLETREE, DEAKINS, NASH, SMOAK &
                                      STEWART, P.C.
9

10

11                                    By: /s/ David Raizman
                                         David Raizman
12                                       Amber L. Roller
                                         J. Nicholas Marfori
13
                                      Attorneys for Defendants
14                                    QUEST DIAGNOSTICS CLINICAL
                                      LABORATORIES, INC.; QUEST
15                                    DIAGNOSTICS HOLDINGS, INC. and
                                      QUEST DIAGNOSTICS INCORPORATED
16

17

18

19

20

21

22

23

24

25

26

27

28

22          Case No. 2:19-cv-08108 DMG (MRWx)

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S
RESPONSE TO PLAINTIFF JULIAN VARGAS' FIRST SET OF REQUESTS FOR ADMISSION

Exhibit 1

PA0774

| Document Bates Nos. | RFA 1 | RFA 2 | RFA 3 | RFA 4 |
|---|---|---|---|---|
| QUEST-VARGAS000036496 | Deny | Deny | Deny | Deny |
| QUEST-VARGAS000035087-90 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that made on or near November 14, 2017. Deny all other portions of Request. | Admit | Admit |
| QUEST-VARGAS000033037-48 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made approximately Fall of 2018. Deny all other portions of Request. | Admit | Admit |
| QUEST-VARGAS000035119-76 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that made on or near February 20, 2017. Deny all other portions of Request. | Admit | Admit |
| QUEST-VARGAS000034658-66 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that the entries on the spreadsheet were made on or near the date on the 2nd and/or 3rd columns of the spreadsheet. Deny all other portions of Request. | Admit that the entries made in the column "Detailed Resolution" were made by a person who had knowledge of the information contained within that column. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000037361-63 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that is was made on or near May 5, 2016. Deny all other portions of Request. | Admit | Admit |
| QUEST-VARGAS000037909-10 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that is was made on or near October 18, 2016. Deny all other portions of Request. | Admit | Admit |
| QUEST-VARGAS000037977 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny as to the images of Twitter posts. Deny all other portions of Request. | Admit that it was made on or near January 5, 2017. Deny all other portions of Request. | Admit as to email itself, but lack knowledge to admit or deny as to the Twitter posts. Deny all other portions of Request. | Admit as to email itself. Deny all other portions of Request. |
| QUEST-VARGAS000035335-36 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near February 10, 2017. Deny all other portions of Request. | Admit as to the emails drafted by Gina Hall and Marc Yarnson, but lack knowledge to admit or deny as to the Patient Inquiry (February 9, 2017, 9:52 a.m. email). Deny all other portions of Request. | Admit |
| QUEST-VARGAS000036699 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny as to the images of Twitter posts. Deny all other portions of Request. | Admit that it was made on or near March 6, 2017. Deny all other portions of Request. | Admit as to email itself, but lack knowledge to admit or deny as to the Twitter posts. Deny all other portions of Request. | Admit as to email itself, but lack knowledge to admit or deny as to the Twitter posts. Deny all other portions of Request. |
| QUEST-VARGAS000028740-41 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near March 22, 2017. Deny all other portions of Request. | Admit | Admit |
| QUEST-VARGAS000028746-47 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near January 15, 2019. Deny all other portions of Request. | Admit | Admit |
| QUEST-VARGAS000030878-79 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near February 5, 2019. Deny all other portions of Request. | Admit | Admit |
| QUEST-VARGAS000037605-06 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that the email itself was made on or near June 11, 2019. Deny all other portions of Request. | Admit as to the June 11, 2019 email, but lack knowledge to admit or deny as to the Patient Inquiry (May 15, 2019 email). Deny all other portions of Request. | Admit |

PA0775

| | | | |
|---|---|---|---|
| QUEST-VARGAS000379980-81 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near November 1, 2019. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000365566-78 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near November 15, 2016. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000367D0-02 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near June 12, 2017. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000369947-54 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near October 7, 2016. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000042261-64 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near August 27, 2015. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000040267-69 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near August 27, 2015. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000040280-84 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near September 3, 2015. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000039990 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made as part of the capital expenditure approval process. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000039966-67 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near April 25, 2016. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000035475-76 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near June 4, 2016. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000000022-41 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near April 2016. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000000496-99 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near June 23, 2016. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000040161-66 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near April 11, 2017. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000040791 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near December 11, 2017. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000002811 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near October 3, 2016. Deny all other portions of Request. | Admit |

PA0776

| | | | |
|---|---|---|---|
| QUEST-VARGAS000058J-637 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near September 18, 2018. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000036495-96 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near April 21, 2016. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000036320 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near July 11, 2016. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000000858 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near September 25, 2017. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000010S3-54 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near May 10, 2017. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000036677-81 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near January 9, 2017. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000035240-43 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near February 20, 2017. Deny all other portions of Request. | Lack knowledge to admit or deny as to the Patient Inquiry (February 17, 2017 9:11 a.m. email). Admit as to the content contained in the remaining emails. Deny all other portions of Request. |
| QUEST-VARGAS000028740-41 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near March 22, 2017. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000039721-26 | Admit, except as to Bates no. QUEST-VARGAS000039726 and as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near March 12, 2021, except as to Bates no. QUEST-VARGAS000039726. Deny all other portions of Request. | Admit, except as to Bates no. QUEST-VARGAS000039726. Deny all other portions of Request. |
| QUEST-VARGAS000038679 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or before October 1, 2010. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000031121 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near 2014. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000040972-41085 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near August 7, 2018. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000041092-41152 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near August 7, 2018. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000030691 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near November 6, 2018. Deny all other portions of Request. | Admit |

| | | |
|---|---|---|
| QUEST-VARGAS000034803-34941 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near March 4, 2021. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000032693-94 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near October 5, 2010. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000031630-35 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Defendant lacks adequate information at this time to admit or deny this Request. | Admit |
| QUEST-VARGAS000041684 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near May 2016. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000036226 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made as part of the capital expenditure approval process. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000036322 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near November 28, 2016. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000036276 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near December 21, 2015. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000036501 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near April 26, 2016. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000038939-40 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near January 18, 2019. Deny all other portions of Request. | Admit |
| QUEST-VARGAS000037495-96 | Admit, except as to any portions that are distorted or not legible, or portions that have been redacted, or any attachments not included within the document. Deny all other portions of Request. | Admit that it was made on or near July 15, 2016. Deny all other portions of Request. | Admit |

**CERTIFICATE OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

      I am employed in the County of Los Angeles, State of California; I am over the age of 18 years and not a party to this action.  My business address is 400 South Hope Street, Suite 1200, Los Angeles, California 90071.

      On July 9, 2021, I served the following document(s) described as:

DEFENDANT QUEST DIAGNOSTICS INCORPORATED'S RESPONSE TO PLAINTIFF JULIAN VARGAS' FIRST SET OF REQUESTS FOR ADMISSION

**BY COURTESY E-MAIL OR ELECTRONIC TRANSMISSION:**  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the person[s] at the e-mail addresses listed on the attached service list. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

| | |
|---|---|
| Jonathan D. Miller, Esq.<br>Alison M. Bernal, Esq.<br>Jordan T. Porter, Esq.<br>NYE, STIRLING, HALE & MILLER, LLP<br>33 West Mission Street, Suite 201<br>Santa Barbara, CA  93101<br>Telephone:  (805) 963-2345<br>Facsimile:  (805) 284-9590<br>Email:    jonathan@nshmlaw.com<br>        alison@nshmlaw.com<br>        jordan@nshmlaw.com<br>        lindsey@nshmlaw.com<br>        meg@nshmlaw.com | Attorneys for Plaintiffs<br>Julian Vargas, Anne West,<br>American Council of the Blind,<br>and the Proposed Class |
| Matthew K. Handley, Esq.<br>HANDLEY FARAH & ANDERSON PLLC<br>200 Massachusetts Avenue, NW – 7th Fl.<br>Washington, DC  20001<br>Telephone:  (202) 559-2411<br>Facsimile:  (844) 300-1952<br>Email:    mhandley@hfajustice.com | Attorneys for Plaintiffs<br>Julian Vargas, Anne West,<br>American Council of the Blind,<br>and the Proposed Class |
| Benjamin J. Sweet, Esq.<br>Nye Stirling Hale & Miller, LLP<br>1145 Bower Hill Road, Suite 104<br>Pittsburgh, PA  15243<br>Telephone:  (412) 857-5350<br>Email:    ben@nshmlaw.com | Attorneys for Plaintiffs<br>Julian Vargas, Anne West,<br>American Council of the Blind,<br>and the Proposed Class |

PA0778

1 ☒ (Federal) I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

2

3

Executed on July 9, 2021, at Los Angeles, California.

4

5 Marilyn Moretti

Type or Print Name                    Signature

6

7                                                                    46497414.1

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

CERTIFICATE OF SERVICE

**CERTIFICATE OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

     I am employed in the County of Los Angeles, State of California; I am over the age of 18 years and not a party to this action.  My business address is 400 South Hope Street, Suite 1200, Los Angeles, California 90071.

     On July 9, 2021, I served the following document(s) described as:

DEFENDANT QUEST DIAGNOSTICS
INCORPORATED'S RESPONSE TO
PLAINTIFF JULIAN VARGAS' FIRST SET
OF REQUESTS FOR ADMISSION

on the persons below as follows:

| | |
|---|---|
| Jonathan D. Miller, Esq.<br>Alison M. Bernal, Esq.<br>Jordan T. Porter, Esq.<br>NYE, STIRLING, HALE & MILLER, LLP<br>33 West Mission Street, Suite 201<br>Santa Barbara, CA  93101<br>Telephone:  (805) 963-2345<br>Facsimile:   (805) 284-9590<br>Email:       jonathan@nshmlaw.com<br>              alison@nshmlaw.com<br>              jordan@nshmlaw.com<br>              lindsey@nshmlaw.com<br>              meg@nshmlaw.com | Attorneys for Plaintiffs<br>Julian Vargas, Anne West,<br>American Council of the Blind,<br>and the Proposed Class |
| Matthew K. Handley, Esq.<br>HANDLEY FARAH & ANDERSON PLLC<br>200 Massachusetts Avenue, NW – 7th Fl.<br>Washington, DC  20001<br>Telephone:  (202) 559-2411<br>Facsimile:   (844) 300-1952<br>Email:       mhandley@hfajustice.com | Attorneys for Plaintiffs<br>Julian Vargas, Anne West,<br>American Council of the Blind,<br>and the Proposed Class |
| Benjamin J. Sweet, Esq.<br>Nye Stirling Hale & Miller, LLP<br>1145 Bower Hill Road, Suite 104<br>Pittsburgh, PA  15243<br>Telephone:  (412) 857-5350<br>Email:       ben@nshmlaw.com | Attorneys for Plaintiffs<br>Julian Vargas, Anne West,<br>American Council of the Blind,<br>and the Proposed Class |

PA0780

1        I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses as indicated above and:

☐       deposited the sealed envelope or package with the United States Postal Service, with the postage fully prepaid.*

☒       placed the envelope or package for collection and mailing, following our ordinary business practices.  I am readily familiar with this business's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope or package with postage fully prepaid.

        I am employed in the county where the mailing occurred.  The envelope or package was placed in the mail at Los Angeles, California.

☒       (Federal)    I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

        Executed on July 9, 2021, at Los Angeles, California.

Wendy Jones
_____              _____
Type or Print Name                       Signature

46709212.1

2
CERTIFICATE OF SERVICE

# EXHIBIT 29

1  OGLETREE, DEAKINS, NASH,
   SMOAK & STEWART, P.C.
2  DAVID RAIZMAN, CA Bar No. 129407
   david.raizman@ogletree.com
3  AMBER L. ROLLER, CA Bar No. 273354
   amber.roller@ogletree.com
4  J. NICHOLAS MARFORI, CA Bar No. 311765
   nicholas.marfori@ogletree.com
5  400 South Hope Street, Suite 1200
   Los Angeles, California 90071
6  Telephone:  213-239-9800
   Facsimile:   213-239-9045
7
   Attorneys for Defendants
8  QUEST DIAGNOSTICS CLINICAL
   LABORATORIES, INC.; QUEST
9  DIAGNOSTICS HOLDINGS, INC. and QUEST
   DIAGNOSTICS INCORPORATED
10

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 13  JULIAN VARGAS, ANNE WEST, and AMERICAN COUNCIL OF THE | Case No. 2:19-cv-08108 DMG(MRWx) |
| 14  BLIND, individually on behalf of themselves and all others similarly | **DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S RESPONSE TO** |
| 15  situated, | **PLAINTIFF ANNE WEST'S FIRST SET OF INTERROGATORIES** |
| 16              Plaintiffs, | |
| 17         v. | Complaint Filed: September 18, 2019 |
| 18  QUEST DIAGNOSTICS CLINICAL | Removal Filed:   Date |
|     LABORATORIES, INC., QUEST | Trial Date:       None |
| 19  DIAGNOSTICS HOLDINGS, INC., | District Judge:   Hon. Dolly M. Gee |
|     QUEST DIAGNOSTICS | Courtroom 8C, First St. |
| 20  INCORPORATED; and DOES 1-10, | Magistrate Judge: Hon. Michael R. Wilner |
|     inclusive, | Courtroom 550, Roybal |
| 21 | |
| 22              Defendants. | |

23

24

25

26

27

28

44638098_7.docx

PA0782

PROPOUNDING PARTY:     Plaintiff ANNE WEST

RESPONDING PARTY:      Defendant QUEST DIAGNOSTICS,

                       INCORPORATED

SET NO.:               ONE

 Defendant Quest Diagnostics, Incorporated ("Defendant" or "Quest")
responds to plaintiff Anne West's ("Plaintiff") First Set of Interrogatories, as
follows:

## I.

## PRELIMINARY STATEMENT

 The following responses are based on Defendant's present knowledge,
information, and belief, as derived from (a) the knowledge and information of
present employees of Defendant gained in their capacity as such, and (b) a review of
the files maintained by Defendant that would be likely to contain the information
called for by the Interrogatories. These responses are subject to amendment and
supplementation as Defendant acquires additional information and completes its
review and analysis and made without prejudice to Defendant's right to use
subsequently discovered or developed information.

 Except for explicit facts admitted herein, no admissions of any nature
whatsoever are implied or should be inferred. The fact that any Interrogatory herein
has been objected to should not be taken as an admission or acceptance of the
existence of any facts set forth or assumed by such interrogatory, or that such
constitutes admissible evidence.

 Defendant responds for itself alone, and expressly declines to respond on
behalf of, or based on information maintained by or available to any other entity or
party. Defendant's responses are based solely on information in its possession,
custody, and/or control. Specific objections to each Interrogatory are made on an
individual basis in Defendant's responses below. In addition to these specific

1  Case No. 2:19-cv-08108 DMG(MRWx)
DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S RESPONSE TO
PLAINTIFF ANNE WEST'S FIRST SET OF INTERROGATORIES

PA0783

1   objections, Defendant makes certain continuing objections (the "General

2   Objections") to the interrogatories.  Defendant's response to each individual

3   Interrogatory is submitted without prejudice to, and without in any respect limiting

4   or waiving, any General Objection not expressly set forth in that response.

5                                              **II.**

6                              **GENERAL OBJECTIONS**

7                Defendant provides these responses subject to the general objections set forth

8   below ("General Objections").

9          1.        Defendant objects generally to these Interrogatories on the ground and

10   to the extent that they seek information that is not within Defendant's possession,

11   custody or control, and/or for which Defendant is completely reliant on third parties

12   that Plaintiff has not named as a defendant in this action.

13         2.        Defendant objects generally to these Interrogatories to the extent that

14   they seek the disclosure of information protected by the attorney-client privilege, the

15   work product doctrine, or any other applicable privilege or protection from

16   disclosure.  Defendant does not intend to disclose any information subject to any

17   such privilege or protection from disclosure, and the inadvertent disclosure of

18   privileged or protected information shall not constitute a waiver of any kind.

19         3.        Defendant objects generally to these Interrogatories to the extent that

20   they call for disclosure of trade secrets, proprietary information, or other confidential

21   information, the disclosure of which would harm the rights or interests of the owner

22   or possessor of such information.  To the extent Plaintiff's Interrogatories call for

23   information that is confidential, private, or proprietary, Defendant will produce the

24   otherwise discoverable information upon Plaintiff's agreement to an appropriate

25   confidentiality order.

26         4.        Defendant objects generally to these Interrogatories to the extent they

27   purport to impose obligations beyond those required or authorized by the Federal

28

44638098_7.docx

2                    Case No. 2:19-cv-08108 DMG(MRWx)

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S RESPONSE TO
PLAINTIFF ANNE WEST'S FIRST SET OF INTERROGATORIES

PA0784

1    Rules of Civil Procedure or other applicable law.

2        5.    Defendant also objects on the ground that that Plaintiff's definition of

3    "YOU" and "YOUR" is vague and overly broad because Plaintiff has defined

4    "YOU" and "YOUR" to mean "Defendant Quest Diagnostics Incorporated and its

5    consolidated subsidiaries, agents, assigns, employees, representatives, and counsel;

6    and any other representative or person acting on behalf of Defendant."  For purposes

7    of responding to each of Plaintiff's Interrogatories which rely upon the term "YOU"

8    or "YOUR," Defendant has reasonably construed "YOU" and "YOUR" to mean and

9    refer only to Defendant.

10       6.    Defendant objects on the ground that Plaintiff's definition of

11   "PATIENT SERVICE CENTER" is vague and overbroad in that it defines

12   "PATIENT SERVICE CENTER" as "a Quest Diagnostics location where a patient

13   can obtain clinical laboratory services from Quest Diagnostics."  For purposes of

14   responding to each of the Interrogatories which rely upon the term "PATIENT

15   SERVICE CENTER," Defendant has reasonably construed "PATIENT SERVICE

16   CENTER" to mean and refer only to a patient service center located within the

17   United States that is open to the public, provides specimen collection and related

18   services in furtherance of diagnostic testing services, bears the name Quest

19   Diagnostics, and is operated by Quest Diagnostics Incorporated or its wholly owned

20   subsidiaries.  This definition excludes any physician office or similar location, where

21   Quest has placed an employee, such as a phlebotomist, to provide specimen

22   collection services for patients of that physician office or location.

23       7.    Defendant objects on the ground that Plaintiff's definition of "E-

24   CHECK-IN KIOSK" that it is vague and overbroad because it defines "E-CHECK-

25   IN KIOSK" as "Defendant's touchscreen electronic check-in at PATIENT SERVICE

26   CENTERS" without specifying that it is a device used by patients to check-in at

27   Quest patient service centers.  For purposes of responding to each of the

28

44638098_7.docx

3        Case No. 2:19-cv-08108 DMG(MRWx)

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S RESPONSE TO
PLAINTIFF ANNE WEST'S FIRST SET OF INTERROGATORIES

1   Interrogatories which rely upon the term "E-CHECK-IN KIOSK," Defendant has

2   reasonably construed "E-CHECK-IN KIOSK" to mean and refer only to the

3   touchscreen device that can be used by patients to check-in (i.e., inform the facility

4   of their arrival) when they arrive at Patient Service Centers (as defined herein),

5   where such kiosks are available.  The term "Kiosk" shall be used interchangeably

6   with "E-CHECK-IN KIOSK" subject to Defendant's objection and interpretation as

7   set forth in this paragraph.

8        These General Objections are incorporated by reference into each and every

9   response below to the extent applicable.  Various objections may be specifically

10  referred to in the responses below for purposes of clarity.  However, failure to

11  incorporate specifically an objection is not to be construed as a waiver of any such

12  objection.

13                                    **III.**

14                    **RESPONSES TO INTERROGATORY**

15  **INTERROGATORY NO. 1:**

16        IDENTIFY all facts that support YOUR Second Affirmative Defense as set

17  forth in YOUR ANSWER.

18  **RESPONSE TO INTERROGATORY NO. 1:**

19        Defendant also objects on the ground that this Interrogatory seeks information

20  protected from disclosure by the attorney-client privilege, attorney work product

21  doctrine, or any other applicable privilege or protection from disclosure.  Defendant

22  further objects that this Interrogatory is premature because discovery in this matter is

23  just beginning and a deferred answer may be appropriate. *See* Fed. R. Civ. P. 33,

24  cmt. to Subdivision (b) (1970 Amend.).  Defendant's affirmative defenses may be

25  based, in part, upon information or documents not presently within Defendant's

26  knowledge or possession, which will be discovered during the course of discovery.

27  Defendant further objects on the ground that this Interrogatory is overly broad and

28

44638098_7.docx

4          Case No. 2:19-cv-08108 DMG(MRWx)

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S RESPONSE TO
PLAINTIFF ANNE WEST'S FIRST SET OF INTERROGATORIES

unduly burdensome in that the Interrogatory seeks "all facts" and requires Defendant to provide a narrative account of its case. *See Hernandez v. Best Buy Co.,* No. 13CV2587-JM KSC, 2014 WL 5454505, at *6 (S.D. Cal. Oct. 27, 2014) (citing *Hiskett v. Wal–Mart Stores, Inc.,* 180 F.R.D. 403, 404–405 (D. Kan. 1998)).

Subject to and without waiving its objections, and reasonably interpreting this Interrogatory to seek only the principal facts that support Defendant's Second Affirmative Defense, Defendant responds as follows:

Defendant denies that it deprives, or ever deprived, blind and visually-impaired individuals of the full benefits of its services at Patient Service Centers. In addition, Defendant is in the process of further improving access to its services at its Patient Service Centers for persons who are blind or who have visual impairments, which improvements will be complete before the time that this action is finally adjudicated. More specifically, Defendant has developed and/or continues to implement measures at each Patient Service Center that has Kiosks, including, but not limited it:

- Maintaining practices and procedures for Patient Services Representatives stationed at patient service centers ("PSRs") related to assisting patients who are blind or visually impaired, including assisting such patients with using the Kiosk to check in.

- Providing Kiosks programmed to respond to a specified touchscreen gesture on the Kiosk by a patient who is blind or visually impaired that (A) automatically checks in the patient without the need to gather any additional information at the Kiosk and placing the patient in queue to be serviced by, or speak with, a PSR; and (B) triggers an audible Kiosk message advising the patient they have signed in, assigning the patient a numerical ID number, informing the patient that their number will be called, and instructing the patient to take a seat until the assigned and

44638098_7.docx

5                    Case No. 2:19-cv-08108 DMG(MRWx)
DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S RESPONSE TO
PLAINTIFF ANNE WEST'S FIRST SET OF INTERROGATORIES

PA0787

1       audibly-announced number is called.

2       • Inclusion of an audio segment to the Quest TV audio/video

3          programming currently played at Patient Service Centers that instructs

4          all patients who are blind or visually impaired on how to check in using

5          the Kiosk by using a specified touchscreen gesture.

6       • Training PSRs on patient assistance procedures and Kiosk functionality

7          for patients who are blind or visually impaired as part of the Americans

8          with Disabilities Act training that is provided to: (a) all PSRs upon

9          being newly hired; and (b) all currently-employed PSRs on an annual or

10         biennial basis.

11      Discovery is continuing, and Defendant intends to supplement its response

12  upon discovery of additional information.

13  **INTERROGATORY NO. 2:**

14      IDENTIFY all DOCUMENTS YOU contend supports the facts identified in

15  YOUR response to Interrogatory No. 1.

16  **RESPONSE TO INTERROGATORY NO. 2:**

17      Defendant incorporates the above Preliminary Statement and General

18  Objections into this response by this reference as though they are set forth in full.

19  Defendant further objects that this Interrogatory is premature because discovery in

20  this matter is just beginning and a deferred answer may be appropriate. *See* Fed. R.

21  Civ. P. 33, cmt. to Subdivision (b) (1970 Amend.).  Defendant also objects on the

22  ground and to the extent that this Interrogatory seeks information and documents

23  protected from disclosure by the attorney-client privilege, attorney work product

24  doctrine, or any other applicable privilege or protection from disclosure.

25  Defendant's affirmative defenses may be based, in part, upon information or

26  documents not presently within Defendant's knowledge or possession, which will be

27  discovered during the course of discovery.

28

44638098_7.docx      6      Case No. 2:19-cv-08108 DMG(MRWx)
DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S RESPONSE TO
PLAINTIFF ANNE WEST'S FIRST SET OF INTERROGATORIES

PA0788

1      Subject to and without waiving its objections, Defendant responds as follows:

2      The Kiosks themselves, the Quest TV content, including the audio played on

3 the Quest TVs, Quest's relevant, responsive Patient Services policies and procedures

4 (including the "Greet Patient Etiquette" policy), and Quest's training materials,

5 including "Managing Every Patient's Needs" training.  Discovery is continuing, and

6 Defendant intends to supplement its response upon discovery of additional

7 information.

8 **INTERROGATORY NO. 3:**

9      IDENTIFY all PERSONS known to YOU to have knowledge AND/OR

10 information concerning the facts identified in YOUR response to Interrogatory No.

11 1.

12 **RESPONSE TO INTERROGATORY NO. 3:**

13      Marc Yarrison, Taylor Carr, and Max O'Campo.  These individuals may be

14 contacted solely through counsel for Defendant.

15 **INTERROGATORY NO. 4:**

16      IDENTIFY all facts that support YOUR Fourth and Fifth Affirmative

17 Defenses that Plaintiffs lack standing, as set forth in YOUR ANSWER.

18 **RESPONSE TO INTERROGATORY NO. 4:**

19      Defendant objects that this Interrogatory is premature because discovery in

20 this matter is just beginning and a deferred answer may be appropriate. *See* Fed. R.

21 Civ. P. 33, cmt. to Subdivision (b) (1970 Amend.).  Defendant's affirmative defenses

22 may be based, in part, upon information or documents not presently within

23 Defendant's knowledge or possession, which will be discovered during the course of

24 discovery.  Defendant further objects on the ground that this Interrogatory is overly

25 broad and unduly burdensome in that the Interrogatory seeks "all facts" and requires

26 Defendant to provide a narrative account of its case. *See Hernandez v. Best Buy Co.,*

27 No. 13CV2587-JM KSC, 2014 WL 5454505, at *6 (S.D. Cal. Oct. 27, 2014) (citing

28

44638098_7.docx

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S RESPONSE TO
PLAINTIFF ANNE WEST'S FIRST SET OF INTERROGATORIES

PA0789

1   *Hiskett v. Wal–Mart Stores, Inc.,* 180 F.R.D. 403, 404–405 (D. Kan. 1998)).

2         Subject to and without waiving its objections, and reasonably interpreting this

3   Interrogatory to seek only the principal facts that support Defendant's Fourth and

4   Fifth Affirmative Defense, Defendant responds as follows:

5         Plaintiffs Vargas and West and the members of the American Council of the

6   Blind lack standing because they have not suffered an injury in fact as required for

7   standing under Article III of the United States Constitution.  Plaintiff American

8   Council of the Blind cannot establish associational standing because its members

9   lack standing to sue in their own right and because the claims asserted and relief

10  requested requires the participation of the individual members.  Discovery is

11  continuing and Defendant intends to supplement its response upon discovery of

12  additional information regarding Plaintiffs and their alleged experiences at Patient

13  Service Centers.

14  **INTERROGATORY NO. 5:**

15        IDENTIFY every "equivalent service" YOU offered to Plaintiffs at YOUR

16  PATIENT SERVICE CENTER, as set forth in YOUR ANSWER.

17  **RESPONSE TO INTERROGATORY NO. 5:**

18        Defendant objects on the ground that this Interrogatory is vague and

19  ambiguous, particularly because it fails to define the term "equivalent service,"

20  which is not defined and is subject to multiple definitions.  Defendant also objects on

21  the ground that the Interrogatory calls for a legal conclusion.  Defendant also objects

22  that this Interrogatory is premature because discovery in this matter is just beginning

23  and a deferred answer may be appropriate.  *See* Fed. R. Civ. P. 33, cmt. to

24  Subdivision (b) (1970 Amend.).  Defendant's affirmative defenses may be based, in

25  part, upon information or documents not presently within Defendant's knowledge or

26  possession, which will be discovered during the course of discovery.

27        Subject to and without waiving its objections, and reasonably interpreting this

28

44638098_7.docx

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S RESPONSE TO
PLAINTIFF ANNE WEST'S FIRST SET OF INTERROGATORIES

PA0790

1  Interrogatory to seek only the principal facts in response to the Interrogatory,

2  Defendant responds as follows:

3      Defendant maintains practices and procedures and trainings requiring PSRs to

4  accommodate and assist patients with visual impairments, including assisting such

5  patients with checking in.  Discovery is continuing and Defendant intends to

6  supplement its response upon discovery of additional information.

7  **INTERROGATORY NO. 6:**

8      IDENTIFY all DOCUMENTS YOU contend supports the facts identified in

9  YOUR response to Interrogatory No. 5.

10  **RESPONSE TO INTERROGATORY NO. 6:**

11      Quest's relevant, responsive Patient Services policies and procedures

12  (including the "Greet Patient Etiquette" standard operating procedure) and

13  "Managing Every Patient's Needs" training.  Discovery is continuing, and Defendant

14  intends to supplement its response upon discovery of additional information.

15  **INTERROGATORY NO. 7:**

16      IDENTIFY all facts that support YOUR Eighth Affirmative Defense, as set

17  forth in YOUR ANSWER.

18  **RESPONSE TO INTERROGATORY NO. 7:**

19      Defendant incorporates the above Preliminary Statement and General

20  Objections into this response by this reference as though they are set forth in full.

21  Defendant objects on the ground that this Interrogatory is unduly burdensome as it is

22  duplicative of Interrogatory No. 5.  Defendant further objects on the ground that this

23  Interrogatory calls for a legal conclusion.  Defendant also objects that this

24  Interrogatory is premature because discovery in this matter is just beginning and a

25  deferred answer may be appropriate.  *See* Fed. R. Civ. P. 33, cmt. to Subdivision (b)

26  (1970 Amend.).  Defendant's affirmative defenses may be based, in part, upon

27  information or documents not presently within Defendant's knowledge or

28

44638098_7.docx

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S RESPONSE TO
PLAINTIFF ANNE WEST'S FIRST SET OF INTERROGATORIES

PA0791

1 | possession, which will be discovered during the course of discovery.

2 | **INTERROGATORY NO. 8:**

3 | IDENTIFY all DOCUMENTS YOU contend supports the facts identified in

4 | YOUR response to Interrogatory No. 7.

5 | **RESPONSE TO INTERROGATORY NO. 8:**

6 | Defendant objects that this Interrogatory is unduly burdensome because it is

7 | duplicative of Interrogatory No. 6.

8 | Subject to and without waiving its objections, Defendant responds as follows:

9 | Not applicable.

10 | **INTERROGATORY NO. 9:**

11 | IDENTIFY all PERSONS known to YOU to have knowledge AND/OR

12 | information concerning the facts identified in YOUR response to Interrogatory No.

13 | 7.

14 | **RESPONSE TO INTERROGATORY NO. 9:**

15 | Not applicable.

16 | **INTERROGATORY NO. 10:**

17 | IDENTIFY all facts that support YOUR Ninth Affirmative Defense, as set

18 | forth in YOUR ANSWER.

19 | **RESPONSE TO INTERROGATORY NO. 10:**

20 | Defendant objects that this Interrogatory is premature because discovery in

21 | this matter is just beginning and a deferred answer may be appropriate. *See* Fed. R.

22 | Civ. P. 33, cmt. to Subdivision (b) (1970 Amend.). Defendant's affirmative defenses

23 | may be based, in part, upon information or documents not presently within

24 | Defendant's knowledge or possession, which will be discovered during the course of

25 | discovery.

26 | Subject to and without waiving its objections, and reasonably interpreting the

27 | Interrogatory to seek on the principal facts that support Defendant's Ninth

28 |

44638098_7.docx

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S RESPONSE TO
PLAINTIFF ANNE WEST'S FIRST SET OF INTERROGATORIES

PA0792

1  Affirmative Defense, Defendant responds as follows:

2       Defendant's overall self-service check-in process is an essential aspect of

3  Defendant's business model and of Defendant's ability to provide a positive,

4  efficient, and simple patient experience.  Plaintiffs' apparent request for the

5  elimination of the Kiosks, which support Defendant's self-service check-in process,

6  would result in a fundamental alteration of the nature of the services provided by

7  Defendant at its Patient Service Centers.  Discovery is continuing, and Defendant

8  intends to provide supplemental and/or amended responses upon discovery of

9  additional information.

10  **INTERROGATORY NO. 11:**

11       IDENTIFY all DOCUMENTS YOU contend supports the facts identified in

12  YOUR response to Interrogatory No. 10.

13  **RESPONSE TO INTERROGATORY NO. 11:**

14       Defendant objects on the ground and to the extent that this Interrogatory seeks

15  information and documents protected from disclosure by the attorney-client

16  privilege, attorney work product doctrine, or any other applicable privilege or

17  protection from disclosure.  Defendant further objects that this Interrogatory is

18  premature because discovery in this matter is just beginning and a deferred answer

19  may be appropriate.  *See* Fed. R. Civ. P. 33, cmt. to Subdivision (b) (1970 Amend.).

20  Defendant's affirmative defenses may be based, in part, upon information or

21  documents not presently within Defendant's knowledge or possession, which will be

22  discovered during the course of discovery.

23       Subject to and without waiving its objections, Defendant responds as follows:

24       The Capital Expenditure Request for the E Check-In project and the New

25  Patient Experience Deployment CapEx Request PowerPoint presentation.  Discovery

26  is continuing, and Defendant intends to provide supplemental and/or amended

27  responses upon discovery of additional information.

28

11     Case No. 2:19-cv-08108 DMG(MRWx)

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S RESPONSE TO
PLAINTIFF ANNE WEST'S FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 12:**

IDENTIFY all PERSONS known to YOU to have knowledge AND/OR information concerning the facts identified in YOUR response to Interrogatory No. 10.

**RESPONSE TO INTERROGATORY NO. 12:**

Marc Yarrison, Christopher Grant, and Max O'Campo. These individuals may be contacted solely through counsel for Defendant.

**INTERROGATORY NO. 13:**

IDENTIFY all of YOUR PATIENT SERVICE CENTERS that feature an E-CHECK-IN KIOSK.

**RESPONSE TO INTERROGATORY NO. 13:**

Defendant objects on the ground that this Interrogatory is vague, ambiguous, and overbroad in its use of the term "E-CHECK-IN KIOSK."

Subject to and without waiving its objections, Defendant responds as follows:

Defendant refers Plaintiff to the documents produced in response to Plaintiff's Request for Production of Documents No. 42, which identifies the Patient Service Centers that offer a Kiosk as a means for patients to check in.

**INTERROGATORY NO. 14:**

IDENTIFY all of YOUR PATIENT SERVICE CENTERS that feature an E-CHECK-IN KIOSK that is independently-usable by visually impaired PERSONS.

**RESPONSE TO INTERROGATORY NO. 14:**

Defendant incorporates the above Preliminary Statement and General Objections into this response by this reference as though they are set forth in full. Defendant objects on the ground that this Interrogatory is vague, ambiguous, and overbroad, particularly as to the term "independently-usable," as Defendant cannot ascertain what information this Interrogatory seeking with reasonable particularity. Defendant also objects on the ground that the Interrogatory calls for a legal

1  conclusion.

2      Subject to and without waiving its objections, Defendant responds as follows:

3      Defendant maintains that its patient check-in process at its patient service

4  centers, including offering a Kiosk for patient check-in, is usable by visually-

5  impaired patients.  Defendant refers Plaintiff to the documents produced in response

6  to Plaintiff's Request for Production of Documents No. 42, which lists the patient

7  service centers that offer a Kiosk as a means for patients to check in.

8  **INTERROGATORY NO. 15:**

9      IDENTIFY the total amount of operating costs YOU saved by outfitting

10  YOUR PATIENT SERVICE CENTERS with E-CHECK-IN KIOSKS.

11  **RESPONSE TO INTERROGATORY NO. 15:**

12      Defendant objects on the ground that this Interrogatory is vague, ambiguous,

13  and overbroad as to time, particularly as to the terms "total amount," "operating

14  costs, and "outfitting," as Defendant cannot ascertain what information this

15  Interrogatory seeking with reasonable particularity.  Defendant further objects on the

16  ground that this Interrogatory calls for disclosure of Defendant's confidential,

17  financial, proprietary, trade secret or competitively sensitive information.  Defendant

18  further objects that this Interrogatory is premature because discovery in this matter is

19  just beginning and a deferred answer may be appropriate.  *See* Fed. R. Civ. P. 33,

20  cmt. to Subdivision (b) (1970 Amend.).  Defendant also objects on the ground that

21  the Interrogatory requires Defendant to engage a forensic expert to undertake a

22  burdensome and extremely complicated and uncertain calculation that itself would

23  be subject to great uncertainty.  Defendant also objects on the ground and to the

24  extent that the Interrogatory requires Defendant to develop and then share its

25  thoughts, mental impressions, and strategies regarding its defense of the action.

26  Defendant also objects on the ground that the request seeks information not relevant

27  to any party's claim or defense and is not proportional to the needs of the case.

28

44638098_7.docx

13          Case No. 2:19-cv-08108 DMG(MRWx)

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S RESPONSE TO
PLAINTIFF ANNE WEST'S FIRST SET OF INTERROGATORIES

1    Subject to and without waiving its objections, Defendant responds as follows:

2    The Capital Expenditure Request for the E Check-In project and the New

3    Patient Experience Deployment CapEx Request PowerPoint presentation show

4    estimated, potential costs/savings information for the E Check-In project.

5    **INTERROGATORY NO. 16:**

6    IDENTIFY all PERSONS supplying YOU with the E-CHECK-IN KIOSK

7    hardware.

8    **RESPONSE TO INTERROGATORY NO. 16:**

9    Defendant objects on the ground that this Interrogatory is vague, ambiguous,

10   and overbroad as to time, particularly as to the terms "supplying" and "hardware," as

11   Defendant cannot ascertain what information this Interrogatory seeking with

12   reasonable particularity.  Defendant further objects on the ground that this

13   Interrogatory calls for disclosure of Defendant's confidential, financial, proprietary,

14   trade secret or competitively sensitive information.

15   Subject to and without waiving its objections, Defendant responds as follows:

16   Defendant will provide a substantive response to this Interrogatory once a

17   protective order is in place.

18   **INTERROGATORY NO. 17:**

19   IDENTIFY all PERSONS supplying YOU with the E-CHECK-IN KIOSK

20   software.

21   **RESPONSE TO INTERROGATORY NO. 17:**

22   Defendant objects on the ground that this Interrogatory is vague, ambiguous,

23   and overbroad, particularly as to the terms "supplying" and "software," as Defendant

24   cannot ascertain what information this Interrogatory seeking with reasonable

25   particularity.

26   Subject to and without waiving its objections, Defendant responds as follows:

27   Defendant developed and maintains all software operating on the Kiosks that

28

14    Case No. 2:19-cv-08108 DMG(MRWx)

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S RESPONSE TO
PLAINTIFF ANNE WEST'S FIRST SET OF INTERROGATORIES

1    did not come as part of the standard software on the tablets used in the Kiosks.

2

3

4    DATED: October 28, 2020                OGLETREE, DEAKINS, NASH, SMOAK &
                                            STEWART, P.C.
5

6

7                                           By:  _____
8                                                David Raizman
                                                 Amber L. Roller
9                                                J. Nicholas Marfori

10                                          Attorneys for Defendants
                                            QUEST DIAGNOSTICS CLINICAL
11                                          LABORATORIES, INC.; QUEST
                                            DIAGNOSTICS HOLDINGS, INC. and
12                                          QUEST DIAGNOSTICS INCORPORATED

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                            15          Case No. 2:19-cv-08108 DMG(MRWx)
44638098_7.docx        DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S RESPONSE TO
                         PLAINTIFF ANNE WEST'S FIRST SET OF INTERROGATORIES

PA0797

**CERTIFICATE OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

     I am employed in the County of Los Angeles, State of California; I am over the age of 18 years and not a party to this action.  My business address is 400 South Hope Street, Suite 1200, Los Angeles, California 90071.

     On October 28, 2020, I served the following document(s) described as:

**DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S RESPONSE TO PLAINTIFF ANNE WEST'S FIRST SET OF INTERROGATORIES**

on the persons below as follows:

| | |
|---|---|
| Jonathan D. Miller, Esq.<br>Alison M. Bernal, Esq.<br>Jordan T. Porter, Esq.<br>NYE, STIRLING, HALE & MILLER, LLP<br>33 West Mission Street, Suite 201<br>Santa Barbara, CA  93101<br>Telephone:  (805) 963-2345<br>Facsimile:  (805) 284-9590<br>Email:    jonathan@nshmlaw.com<br>          alison@nshmlaw.com | Attorneys for Plaintiffs<br>Julian Vargas and Anne West |
| Matthew K. Handley, Esq.<br>HANDLEY FARAH & ANDERSON PLLC<br>777 6th Street, NW - 11th Floor<br>Washington, DC  20001<br>Telephone:  (202) 559-2411<br>Facsimile:  (844) 300-1952<br>Email:    mhandley@hfajustice.com | Attorneys for Plaintiffs<br>Julian Vargas and Anne West |
| Benjamin J. Sweet, Esq.<br>Nye Stirling Hale & Miller, LLP<br>1145 Bower Hill Road, Suite 104<br>Pittsburgh, PA  15243<br>Telephone:  (412) 857-5350<br>Email:    ben@nshmlaw.com | Attorneys for Plaintiffs<br>Julian Vargas and Anne West |

     I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses as indicated above and:

☐    deposited the sealed envelope or package with the United States Postal Service, with the postage fully prepaid.*

☒    placed the envelope or package for collection and mailing, following our ordinary business practices.  I am readily familiar with this business's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the

1
CERTIFICATE OF SERVICE

PA0798

1    ordinary course of business with the United States Postal Service, in a sealed
     envelope or package with postage fully prepaid.

2

3    I am employed in the county where the mailing occurred.  The envelope or
     package was placed in the mail at Los Angeles, California.

4    ☒    (Federal)    I declare that I am employed in the office of a member of the Bar
                       of this Court at whose direction the service was made.  I declare
5                      under penalty of perjury under the laws of the United States of
                       America that the above is true and correct.

6

7

8    Executed on October 28, 2020, at Los Angeles, California.

Sasan Ektefaie
9    _____          _____
     Type or Print Name                        Signature
10

*    **(SIGNATURE MUST BE OF PERSON DEPOSITING ENVELOPE IN MAIL SLOT, BOX, OR BAG)**
11

12                                                                    40404493.1

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2
CERTIFICATE OF SERVICE

PA0799



RECEIVED
NOV 0 2 2020
By: .......................

PA0800

# EXHIBIT 30

1  OGLETREE, DEAKINS, NASH,
   SMOAK & STEWART, P.C.
2  DAVID RAIZMAN, CA Bar No. 129407
   david.raizman@ogletree.com
3  AMBER L. ROLLER, CA Bar No. 273354
   amber.roller@ogletree.com
4  J. NICHOLAS MARFORI, CA Bar No. 311765
   nicholas.marfori@ogletree.com
5  400 South Hope Street, Suite 1200
   Los Angeles, California  90071
6  Telephone:  213-239-9800
   Facsimile:   213-239-9045
7
   Attorneys for Defendants
8  QUEST DIAGNOSTICS CLINICAL
   LABORATORIES, INC.; QUEST
9  DIAGNOSTICS HOLDINGS, INC. and
   QUEST DIAGNOSTICS INCORPORATED
10

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13  JULIAN VARGAS and ANNE WEST,        Case No. 2:19-cv-08108 DMG (MRWx)
    individually on behalf of themselves
14  and all others similarly situated,      **DEFENDANT QUEST DIAGNOSTICS,**
                                            **INCORPORATED'S OBJECTIONS**
15              Plaintiffs,                 **AND SECOND FURTHER**
                                            **SUPPLEMENTAL RESPONSES AND**
16       v.                                 **OBJECTIONS TO PLAINTIFF**
                                            **JULIAN VARGAS'S AMENDED RULE**
17  QUEST DIAGNOSTICS CLINICAL             **30(b)(6) DEPOSITION NOTICE**
    LABORATORIES, INC., QUEST
18  DIAGNOSTICS HOLDINGS, INC.,
    QUEST DIAGNOSTICS
19  INCORPORATED; and DOES 1-10,          Date:       March 8, 2021
    inclusive,                            Time:       8:00 a.m. PST/ 11:00 a.m.
20                                                     EST
                Defendants.               Place:      Veritext Remote Deposition;
21                                                     Tel: 866-299-5227
                                                       (Zoom link to be provided)
22
                                          Complaint Filed: September 18, 2019
23                                        Removal Filed:   Date
                                          Trial Date:      None
24                                        District Judge:  Hon. Dolly M. Gee
                                                           Courtroom 8C, First St.
25                                        Magistrate Judge:Hon. Michael R. Wilner
                                                           Courtroom 550, Roybal
26

27

28
                                     1          Case No. 2:19-cv-08108 DMG (MRWx)
    DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
    SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
                            DEPOSITION NOTICE

48145216_1.docx

1   Defendants Quest Diagnostics Incorporated ("Defendant") hereby objects and

2   further responds to Plaintiff Julian Vargas's Amended Rule 30(b)(6) Deposition

3   Notice to Person Most Knowledgeable at Quest Diagnostics, Incorporated (the

4   "Notice").  Julian Vargas is referred to as "Plaintiff" below, and all plaintiffs in this

5   action are referred to collectively below as "Plaintiffs."

6   **I.**

7   ## PRELIMINARY STATEMENT

8   These responses, while based on a diligent search and other efforts by all

9   defendants in this action ("Defendants") and their counsel to obtain requested

10   documents, reflect only the current state of Defendants' possession of materials and

11   its knowledge, understanding and belief relating to the matters about which inquiry

12   has been made.  Discovery and investigation in this action continue.  In addition,

13   Defendants have not yet completed investigation of the facts, documents and

14   evidence relating to these requests for information and this action and may still

15   discover facts, documents or evidence that are not set forth or reflected in these

16   responses, but which may be responsive.  Accordingly, these responses are neither

17   intended as, nor should any way be deemed, an admission or representation that

18   further documents or information does not exist.  Defendants anticipate that as this

19   action proceeds, further documents and information may be discovered, and

20   Defendants reserves the right to modify or supplement these responses based on

21   subsequently discovered matters.

22   Defendants respond for themselves alone, and expressly decline to respond on

23   behalf of, or based on information maintained by or available to any other entity or

24   party.  Defendants' responses are based solely on information in their possession,

25   custody and/or control that each has encountered as part of its diligent, good faith

26   efforts.  Specific objections to each request are made on an individual basis in

27   Defendants' responses below.  In addition to these specific objections, Defendants

28

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

PA0802

1   make certain continuing objections (the "General Objections") to the Notice.

2   Defendants' response to each individual topic is submitted without prejudice to, and

3   without in any respect limiting or waiving, any General Objection not expressly set

4   forth in that response.  Defendants reserve the right to amend or supplement these

5   objections and responses.  Defendants further reserve the right to object to the

6   admission of any of the documents or testimony provided pursuant to the Notice at

7   any hearing or in any proceeding before the Court including, but not limited to, any

8   merits briefing.

9                                          **II.**

10                            **<u>GENERAL OBJECTIONS</u>**

11          Defendants provide these responses to the Notice subject to the general

12   objections set forth below (the "General Objections"):

13          1.      Defendants generally object to the Notice on the grounds that, beyond

14   the overbreadth and unduly burdensomeness of various particular subject matters in

15   the Notice, the Notice, taken as a whole, is overbroad and unduly burdensome in that

16   it purports to require Defendants to prepare witnesses on a vast number of subjects,

17   many of which would require hours and hours of study without the ability to

18   adequately prepare witness on such subjects.

19          2.      Defendants generally object to the Notice on the grounds that it employs

20   "artful pleading" to evade the letter and spirit of the limitation on the number of

21   depositions that can be taken in an action without leave of Court or agreement of the

22   parties, as codified in Rule 30(a)(2)(a)(i) of the Federal Rules of Civil Procedure.

23          3.      Defendants generally object to the Notice on the ground and to the

24   extent that, in conjunction with individual notices of deposition sent to at least two of

25   Defendants' designated witnesses under this Notice, it purports to require witnesses

26   to switch between roles in the same deposition as both a percipient witness and as a

27   Rule 30(b)(6) witness.

28

---

3                           Case No. 2:19-cv-08108 DMG (MRWx)

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

1        4.      Defendants generally object on the ground that Plaintiff's definition of

2   "YOU" and "YOUR" is vague and overly broad because Plaintiff has defined

3   "YOU" and "YOUR" to mean "Defendant Quest Diagnostics Incorporated and its

4   consolidated subsidiaries, agents, assigns, employees, representatives, and counsel;

5   and any other representative or person acting on behalf of Defendant." For purposes

6   of responding to each of the topics in the Notice that use the term "YOU" or

7   "YOUR," Defendants have reasonably construed "YOU" and "YOUR" to mean and

8   refer only to defendant Quest Diagnostics Incorporated and its wholly-owned

9   subsidiaries in the United States. Accordingly, responses to each of the topics in the

10   Notice are provided on behalf of all of the Defendants.

11        5.      Defendants generally object on the ground that Plaintiff's definition of

12   "PATIENT SERVICE CENTER" is vague and overbroad in that it defines

13   "PATIENT SERVICE CENTER" as "a Quest Diagnostics location where a patient

14   can obtain clinical laboratory services from Quest Diagnostics." For purposes of

15   responding to each of the topics in the Notice, Defendants have reasonably construed

16   "PATIENT SERVICE CENTER" to mean and refer only to a patient service center

17   located within the United States that is open to the public, provides specimen

18   collection and related services in furtherance of diagnostic testing services, bears the

19   name Quest Diagnostics, and is operated by Quest Diagnostics Incorporated or one

20   of its wholly-owned subsidiaries. This definition excludes any physician office or

21   similar location where Quest has placed an employee, such as a phlebotomist, to

22   provide specimen collection services for patients of that physician office or location.

23        6.      Defendants generally object on the ground that Plaintiff's definition of

24   "E-CHECK-IN KIOSK" is vague and overbroad because it defines "E-CHECK-IN

25   KIOSK" as "Defendant's touchscreen electronic check-in at PATIENT SERVICE

26   CENTERS" without specifying that it is a device used by patients to check in at

27   Quest patient service centers. For purposes of responding to each of the topics that

28

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

PA0804

1   rely upon the term "E-CHECK-IN KIOSK," Defendants have reasonably construed

2   "E-CHECK-IN KIOSK" to mean and refer only to the touchscreen device that can be

3   used by patients to check in (i.e., inform that facility of their arrival) when they

4   arrive at Patient Service Centers (as defined above), where such kiosks are available.

5   The term "Kiosk" shall be used interchangeably with "E-CHECK-IN KIOSK"

6   subject to Defendants' objection and interpretation as set forth in this paragraph.

7         7.     The parties have met and conferred extensively over a prolonged period

8   on the propriety of this Notice and the topics included in the Notice, as well as the

9   adequacy of the testimony provided in response to the Notice, including without

10  limitation in meet and confer sessions conducted on April 27, 2021 and May 12,

11  2021, in an informal discovery conference with the Court on May 3, 2021, and

12  through emails and letters (including without limitation Defendants' May 7, 2021

13  letter).  Defendants hereby incorporate by reference the objections stated by them

14  throughout this meet and confer process.

15        These General Objections are incorporated by reference into each and every

16  response to any topic below to the extent applicable.  Various objections may be

17  specifically referred to in the responses below for purposes of clarity.  However,

18  failure to incorporate specifically an objection is not to be construed as a waiver of

19  any such objection.

20                                  **III.**

21                      **OBJECTIONS TO TOPICS**

22  **TOPIC NO. 1:**

23        YOUR decision to outfit YOUR PATIENT SERVICE CENTERS with

24  E-CHECK-IN KIOSKS.

25  **OBJECTION TO TOPIC NO. 1:**

26        Subject to their objections, Defendants will produce Marc Yarrison as their

27  designee to testify on this topic.

28
                                  5              Case No. 2:19-cv-08108 DMG (MRWx)

48145216_1.docx

**SUPPLEMENTAL RESPONSE TO TOPIC NO. 1:**

Subject to their above objections and those presented in their various meet and confer emails and letters (including without limitation the May 5, 2021 letter) and meet and confer discussions (including without limitation those on April 27, 2021 and May 12, 2021) and pursuant to an agreement of the parties, Defendants provide the following supplemental response:

Each of the specific topics for which Plaintiffs propose further deposition testimony at page 4 of their May 11, 2021 letter are inappropriate for further deposition testimony from a Rule 30(b)(6) designee for one or more of the following reasons:  Plaintiffs had ample opportunity to question one or more of Defendants' Rule 30(b)(6) designees about these topics and failed to take advantage of those opportunities; Plaintiffs exhausted the seven hours of testimony they were seeking from Defendants' designee on this topic and did not use the allotted time in a good faith effort to gather the desired testimony; Plaintiffs failed to present Defendants' Rule 30(b)(6) designees with documents that would permit them to respond to these topics; Defendants' Rule 30(b)(6) designees adequately addressed these topics; and/or the identified topics are not relevant to a claim or defense in the action. Defendants further respond that they did not undertake an analysis of costs, undue burden or fundamental alteration in making the determination to implement the eCheck-in Kiosks in 2016.

**FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 1:**

The final version of the CapEx document that was approved by Quest was produced by Defendants as Bates No. QUEST-VARGAS000035245 on March 26, 2021.

**TOPIC NO. 2:**

The reasons why YOU decided to outfit YOUR PATIENT SERVICE CENTERS with E-CHECK-IN KIOSKS.

48145216_1.docx

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6) DEPOSITION NOTICE

PA0806

**OBJECTION TO TOPIC NO. 2:**

Subject to their objections, Defendants will produce Marc Yarrison as their designee to testify on this topic.

**SUPPLEMENTAL RESPONSE TO TOPIC NO. 2:**

Subject to their above objections and those presented in their various meet and confer emails and letters (including without limitation the May 5, 2021 letter) and meet and confer discussions (including without limitation those on April 27, 2021 and May 12, 2021) and pursuant to an agreement of the parties, Defendants provide the following supplemental response:

Each of the specific topics for which Plaintiffs propose further deposition testimony at page 4 of their May 11, 2021 letter are inappropriate for further deposition testimony from a Rule 30(b)(6) designee for one or more of the following reasons:  Plaintiffs had ample opportunity to question one or more of Defendants' Rule 30(b)(6) designees about these topics and failed to take advantage of those opportunities; Plaintiffs exhausted the seven hours of testimony they were seeking from Defendants' designee on this topic and did not use the allotted time in a good faith effort to gather the desired testimony; Plaintiffs failed to present Defendants' Rule 30(b)(6) designees with documents that would permit them to respond to these topics; Defendants' Rule 30(b)(6) designees adequately addressed these topics; and/or the identified topics are not relevant to a claim or defense in the action. Defendants further respond that they did not undertake an analysis of costs, undue burden or fundamental alteration in making the determination to implement the eCheck-in Kiosks in 2016.

**FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 2:**

The final version of the CapEx document that was approved by Quest was produced by Defendants as Bates No. QUEST-VARGAS000035245 on March 26, 2021.

7                Case No. 2:19-cv-08108 DMG (MRWx)

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

PA0807

**TOPIC NO. 3:**

The amount of business operating costs YOU saved by switching YOUR PATIENT SERVICE CENTERS to E-CHECK-IN KIOSKS from live-person check-in procedures.

**OBJECTION TO TOPIC NO. 3:**

Defendants object to this topic on the grounds that it assumes facts that are not true, including but not limited to the assumption that the deployment of Kiosks at the Patient Service Centers saved "business operating costs" and the assumption that Defendants have calculated "[t]he amount of business operating costs" saved by deploying Kiosks.  Defendants further object to this topic on the ground that it is vague and ambiguous with respect to the term "business operating costs."

Subject to their objections, Defendants will produce Marc Yarrison as their designee to testify on Defendants' projections of the additional costs that could be incurred and saved by reason of the deployment of the Kiosks.

**SUPPLEMENTAL RESPONSE TO TOPIC NO. 3:**

Subject to their above objections and those presented in their various meet and confer emails and letters (including without limitation the May 5, 2021 letter) and meet and confer discussions (including without limitation those on April 27, 2021 and May 12, 2021) and pursuant to an agreement of the parties, Defendants provide the following supplemental response:

Each of the specific topics for which Plaintiffs propose further deposition testimony at page 4 of their May 11, 2021 letter are inappropriate for further deposition testimony from a Rule 30(b)(6) designee for one or more of the following reasons:  Plaintiffs had ample opportunity to question one or more of Defendants' Rule 30(b)(6) designees about these topics and failed to take advantage of those opportunities; Plaintiffs exhausted the seven hours of testimony they were seeking from Defendants' designee on this topic and did not use the allotted time in a good

Case No. 2:19-cv-08108 DMG (MRWx)

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

1 | faith effort to gather the desired testimony; Plaintiffs failed to present Defendants'

2 | Rule 30(b)(6) designees with documents that would permit them to respond to these

3 | topics; Defendants' Rule 30(b)(6) designees adequately addressed these topics;

4 | and/or the identified topics are not relevant to a claim or defense in the action.

5 | Defendants further respond that they did not undertake an analysis of costs, undue

6 | burden or fundamental alteration in making the determination to implement the

7 | eCheck-in Kiosks in 2016.

8 | **FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 3:**

9 | The final version of the CapEx document that was approved by Quest was

10 | produced by Defendants as Bates No. QUEST-VARGAS000035245 on March 26,

11 | 2021.

12 |

13 | **TOPIC NO. 4:**

14 | All proposals YOU sought from vendors to provide E-CHECK-IN KIOSKS at

15 | YOUR PATIENT SERVICE CENTERS.

16 | **OBJECTION TO TOPIC NO. 4:**

17 | Defendants object to this topic on the ground that it does not seek information

18 | that relates to a claim or defense in this action.  Defendants further object to this

19 | topic on the ground that it is grossly overbroad in its scope and disproportionate to

20 | the needs of this case in that, viewed most generously as to potential relevance, it

21 | seeks vast quantities of information that do not relate to a claim or defense in the

22 | action.

23 | Subject to their objections, Defendants will produce Max Ocampo as their

24 | designee to testify on this topic.

25 | **SUPPLEMENTAL RESPONSE TO TOPIC NO. 4:**

26 | Subject to their above objections and those presented in their various meet and

27 | confer emails and letters (including without limitation the May 5, 2021 letter) and

28 |

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

PA0809

1  meet and confer discussions (including without limitation those on April 27, 2021

2  and May 12, 2021) and pursuant to an agreement of the parties, Defendants provide

3  the following supplemental response:

4      Defendants' designee on this topic should not be made to re-appear for

5  deposition for one or more of the following reasons:  Plaintiffs had ample

6  opportunity to question Defendants' Rule 30(b)(6) designee about this topic and

7  failed to take advantage of those opportunities; Plaintiffs exhausted the seven hours

8  of testimony they were seeking from Defendants' designee on this topic and did not

9  use the allotted time in a good faith effort to gather the desired testimony; Plaintiffs

10  failed to present Defendants' Rule 30(b)(6) designee with documents that would

11  permit him to respond to Plaintiffs' questions on these topics; Defendants' Rule

12  30(b)(6) designee adequately addressed the questions asked of him on this topic;

13  and/or the identified topic is not relevant to a claim or defense in the action.

14  Defendants further respond that they currently purchase the Lillitab kiosks from

15  ePlus, without any written agreement in place with Lillitab.  Defendants further

16  respond that they will agree to meet and confer further on any alleged need for

17  further testimony from a Rule 30(b)(6) designee on this topic after Plaintiffs have

18  exhausted good faith efforts to gather documents from those third parties that they

19  have subpoenaed, or will subpoena, for documents and/or deposition testimony.

20  **TOPIC NO. 5:**

21      The date on which YOU began implementing E-CHECK-IN KIOSKS at

22  YOUR PATIENT SERVICE CENTERS.

23  **OBJECTION TO TOPIC NO. 5:**

24      Defendants object to this topic on the ground that it is an inappropriate subject

25  for deposition testimony and other, far more appropriate methods exist for securing

26  the information sought by this topic.

27      Subject to their objections, and pursuant to an agreement of the parties,

28

48145216_1.docx

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

PA0810

1  Defendants have produced a document (Bates No. QUEST-VARGAS 00000039568-

2  39608) that provides the date on which the e-check-in on the Kiosk was first

3  deployed at a Patient Service Center.

4  **TOPIC NO. 6:**

5      The number of PATIENT SERVICE CENTERS with E-CHECK-IN KIOSKS

6  in the United States as of September 18, 2019.

7  **OBJECTION TO TOPIC NO. 6:**

8      Defendants object to this topic on the ground that it is an inappropriate subject

9  for deposition testimony and other, far more appropriate methods exist for securing

10  the information sought by this topic.

11      Subject to their objections, and pursuant to an agreement of the parties,

12  Defendants have produced a document (Bates No. QUEST-VARGAS 00000039568-

13  39608) that provides the date on which e-check-in on the Kiosk was first deployed at

14  each Patient Service Center.

15  **SUPPLEMENTAL RESPONSE TO TOPIC NO. 6:**

16      Subject to their above objections and those presented in their various meet and

17  confer emails and letters (including without limitation the May 5, 2021 letter) and

18  meet and confer discussions (including without limitation those on April 27, 2021

19  and May 12, 2021) and pursuant to an agreement of the parties, Defendants provide

20  the following supplemental response:

21      The data collected in the document labeled as Bates No. QUEST-VARGAS

22  00000039568-39608 results from an amalgam of two databases that were

23  independently-sourced, meaning that not all information provided is necessarily

24  consistent with other information provided.  Nonetheless, it is the best record that

25  Defendants have of the first activation and first use of the Kiosks.

26      The data populating the column labeled "Active Date" in Bates No. QUEST-

27  VARGAS 00000039568-39608 reports the date on which eCheck-in was first

28

11          Case No. 2:19-cv-08108 DMG (MRWx)

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

1  activated at the particular Patient Service Centers identified in the document.  The

2  data populating the column labeled "First Check-In" in Bates No. QUEST-VARGAS

3  00000039568-39608 reports the date when a check-in transaction was first recorded

4  at that location.

5  **TOPIC NO. 7:**

6  The number of PATIENT SERVICE CENTERS with E-CHECK-IN KIOSKS

7  in California as of September 18, 2019.

8  **OBJECTION TO TOPIC NO. 7:**

9  Defendants object to this topic on the ground that it is an inappropriate subject

10  for deposition testimony and other, far more appropriate methods exist for securing

11  the information sought by this topic.

12  Subject to their objections, and pursuant to an agreement of the parties,

13  Defendants have produced a document (Bates No. QUEST-VARGAS 00000039568-

14  39608) that provides the date on which e-check-in on the Kiosk was first deployed at

15  each Patient Service Center.

16  **SUPPLEMENTAL RESPONSE TO TOPIC NO. 7:**

17  Subject to their above objections and those presented in their various meet and

18  confer emails and letters (including without limitation the May 5, 2021 letter) and

19  meet and confer discussions (including without limitation those on April 27, 2021

20  and May 12, 2021) and pursuant to an agreement of the parties, Defendants provide

21  the following supplemental response:

22  The data collected in the document labeled as Bates No. QUEST-VARGAS

23  00000039568-39608 results from an amalgam of two databases that were

24  independently-sourced, meaning that not all information provided is necessarily

25  consistent with other information provided.  Nonetheless, it is the best record that

26  Defendants have of the first activation and first use of the Kiosks.

27  The data populating the column labeled "Active Date" in Bates No. QUEST-

28

12        Case No. 2:19-cv-08108 DMG (MRWx)

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6) DEPOSITION NOTICE

48145216_1.docx

PA0812

1  VARGAS 00000039568-39608 reports the date on which eCheck-in was first

2  activated at the particular Patient Service Centers identified in the document.  The

3  data populating the column labeled "First Check-In" in Bates No. QUEST-VARGAS

4  00000039568-39608 reports the date when a check-in transaction was first recorded

5  at that location.

6  **TOPIC NO. 8:**

7       The number of PATIENT SERVICE CENTERS in the United States as of

8  September 18, 2019, that have a live person available during all business hours to

9  check in patients.

10  **OBJECTION TO TOPIC NO. 8:**

11       Defendants object to this topic on the ground that it is an inappropriate subject

12  for deposition testimony and other, far more appropriate methods exist for securing

13  the information sought by this topic.  Defendants further object to this topic in that

14  the information sought by this topic has been provided to Plaintiffs in the form of a

15  spreadsheet.

16       Subject to their objections, and pursuant to an agreement of the parties,

17  Defendants respond that, as of September 18, 2019, every Patient Services Center in

18  the United States had a live person available to assist with checking in patients

19  during all business hours that the Patient Service Center was operating.

20  **FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 8:**

21       Subject to their objections, and pursuant to an agreement of the parties,

22  Defendants respond that they will produce a document  that identifies the number of

23  Patient Service employees in the United States who were employed by defendant

24  Quest Diagnostics Incorporated and/or its wholly-owned subsidiaries in 2019 and

25  who held the job titles reflected in the spreadsheet, as well as the work location to

26  which they were coded at that time.  Employees who held more than one job title in a

27  given reporting period are counted separately for each job title held.

28

48145216_1.docx

**SECOND FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 8 (August 16, 2021):**

Subject to their objections, and pursuant to an agreement of the parties, Defendants respond that they have previously produced a document (QUEST-VARGAS 42007 that identifies the number of Patient Service employees in the United States who were employed by defendant Quest Diagnostics Incorporated and/or its wholly-owned subsidiaries in 2019 and who held the job titles reflected in the spreadsheet, as well as the work location to which they were coded at that time. Employees who held more than one job title in a given reporting period are listed separately for each job title held.

Although Plaintiffs have not requested information regarding independent contractors working at Patient Service Centers, Defendants are also producing, contemporaneously with these Objections, a document (QUEST-VARGAS 42029) that identifies the number of independent contractors who were assigned in the years 2017-2020 to positions that typically would work at Patient Service Centers and the work location to which they were coded at that time. Independent contractors who were assigned to work during multiple time periods are counted separately for each time period worked.  Defendants are also producing a spreadsheet (QUEST-VARGAS 42028) that identifies the job templates and descriptions for these independent contractors.

**TOPIC NO. 9:**

The number of PATIENT SERVICE CENTERS in California as of September 18, 2019, that have a live person available during all business hours to check in patients.

**OBJECTION TO TOPIC NO. 9:**

Defendants object to this topic on the ground that it is an inappropriate subject for deposition testimony and other, far more appropriate methods exist for securing

14

Case No. 2:19-cv-08108 DMG (MRWx)

48145216_1.docx

PA0814

1   the information sought by this topic.  Defendants further object to this topic in that

2   the information sought by this topic has been provided to Plaintiffs in the form of a

3   spreadsheet.

4          Subject to their objections, and pursuant to an agreement of the parties,

5   Defendants respond that, as of September 18, 2019, every Patient Services Center in

6   California had a live person available to assist with checking in patients during all

7   business hours that the Patient Service Center was operating.

8   **FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 9:**

9          Subject to their objections, and pursuant to an agreement of the parties,

10  Defendants respond that they will produce a document that identifies the number of

11  Patient Service employees in California who were employed by defendant Quest

12  Diagnostics Incorporated and/or its wholly-owned subsidiaries in 2019 and who held

13  the job titles reflected in the spreadsheet, as well as the work location to which they

14  were coded at that time.  Employees who held more than one job title in a given

15  reporting period are counted separately for each job title held.

16  **SECOND FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 9**

17  **(August 16, 2021):**

18         Subject to their objections, and pursuant to an agreement of the parties,

19  Defendants respond that they have previously produced a document (QUEST-

20  VARGAS 42006) that identifies the number of Patient Service employees in

21  California who were employed by defendant Quest Diagnostics Incorporated and/or

22  its wholly-owned subsidiaries in 2019 and who held the job titles reflected in the

23  spreadsheet, as well as the work location to which they were coded at that time.

24  Employees who held more than one job title in a given reporting period are listed

25  separately for each job title held.

26         Although Plaintiffs have not requested information regarding independent

27  contractors working at Patient Service Centers, Defendants are also producing,

28

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

contemporaneously with these Objections, a document (QUEST-VARGAS 42029) that identifies the number of independent contractors who were assigned in the years 2017-2020 to positions that typically would work at Patient Service Centers and the work location to which they were coded at that time. Independent contractors who were assigned to work during multiple time periods are counted separately for each time period worked.  Defendants are also producing a spreadsheet (QUEST-VARGAS 42028) that identifies the job templates and descriptions for these independent contractors.

**TOPIC NO. 10:**

The number of PATIENT SERVICE CENTERS in the United States as of September 18, 2019, that have only one employee working during regular business hours.

**OBJECTION TO TOPIC NO. 10:**

Defendants object to this topic on the ground that it is an inappropriate subject for deposition testimony and other, far more appropriate methods exist for securing the information sought by this topic.  In fact, Plaintiffs have agreed that Defendants may supply this information through a sworn, written response.  Defendants further object to this topic on the ground that it is seeks information that is grossly burdensome and disproportionate to the needs of this action in that the information sought is unique as to each of thousands of Patient Service Centers and constantly varies.

**SUPPLEMENTAL RESPONSE TO TOPIC NO. 10:**

Subject to their above objections and those presented in their various meet and confer emails and letters (including without limitation the May 5, 2021 letter) and meet and confer discussions (including without limitation those on April 27, 2021 and May 12, 2021) and pursuant to an agreement of the parties, Defendants provide the following supplemental response:

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6) DEPOSITION NOTICE

48145216_1.docx

PA0816

1       The information that Plaintiffs seek through this Topic cannot be readily

2   determined from any centralized database at Quest.  The available information

3   responsive to this Topic that is centrally maintained is found in:  (1) the document

4   produced by Defendants as Bates No. 41938-42005, which reports, as of September

5   2019, the average number of Patient Services full-time equivalents ("FTE") that

6   were assigned within its financial system to each Patient Service Center; and (2) a

7   document to be produced by Defendants that provides an FTE working productivity

8   analysis for each Patient Service Center, as of September 2019.

9   **FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 10:**

10       On May 28, 2021, Defendants produced BATES NO. QUEST-VARGAS

11   000042006, which is the FTE working productivity analysis for each Patient Service

12   Center, as of September 2019, referenced above.

13       Subject to their objections, and pursuant to an agreement of the parties,

14   Defendants further respond that they will produce a document that identifies the

15   number of Patient Service employees in the United States who were employed by

16   defendant Quest Diagnostics Incorporated and/or its wholly-owned subsidiaries in

17   2019 and who held the job titles reflected in the spreadsheet, as well as the work

18   location to which they were coded at that time.  Employees who held more than one

19   job title in a given reporting period are counted separately for each job title held.

20   **SECOND FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 10**

21   **(August 16, 2021):**

22       Subject to their objections, and pursuant to an agreement of the parties,

23   Defendants respond that they have previously produced a document (QUEST-

24   VARGAS 42007 that identifies the number of Patient Service employees in the

25   United States who were employed by defendant Quest Diagnostics Incorporated

26   and/or its wholly-owned subsidiaries in 2019 and who held the job titles reflected in

27   the spreadsheet, as well as the work location to which they were coded at that time.

28

17        Case No. 2:19-cv-08108 DMG (MRWx)

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

1   Employees who held more than one job title in a given reporting period are listed

2   separately for each job title held.

3     Although Plaintiffs have not requested information regarding independent

4   contractors working at Patient Service Centers, Defendants are also producing,

5   contemporaneously with these Objections, a document (QUEST-VARGAS 42029)

6   that identifies the number of independent contractors who were assigned in the years

7   2017-2020 to positions that typically would work at Patient Service Centers and the

8   work location to which they were coded at that time. Independent contractors who

9   were assigned to work during multiple time periods are counted separately for each

10  time period worked.  Defendants are also producing a spreadsheet (QUEST-

11  VARGAS 42028) that identifies the job templates and descriptions for these

12  independent contractors.

13  **TOPIC NO. 11:**

14    The number of PATIENT SERVICE CENTERS in California as of

15  September 18, 2019, that have only one employee working during regular business

16  hours.

17  **OBJECTION TO TOPIC NO. 11:**

18    Defendants object to this topic on the ground that it is an inappropriate subject

19  for deposition testimony and other, far more appropriate methods exist for securing

20  the information sought by this topic.  In fact, Plaintiffs have agreed that Defendants

21  may supply this information through a sworn, written response.  Defendants further

22  object to this topic on the ground that it is seeks information that is grossly

23  burdensome and disproportionate to the needs of this action in that the information

24  sought is unique as to the approximately more than 400 Patient Service Centers in

25  California, as of September 18, 2019, and constantly varies.

26  **SUPPLEMENTAL RESPONSE TO TOPIC NO. 11:**

27    Subject to their above objections and those presented in their various meet and

28

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

confer emails and letters (including without limitation the May 5, 2021 letter) and meet and confer discussions (including without limitation those on April 27, 2021 and May 12, 2021) and pursuant to an agreement of the parties, Defendants provide the following supplemental response:

The information that Plaintiffs seek through this Topic cannot be readily determined from any centralized database at Quest.  The available information responsive to this Topic that is centrally maintained is found in:  (1) the document produced by Defendants as Bates No. 41938-42005, which reports, as of September 2019, the average number of Patient Services full-time equivalents ("FTE") that were assigned within its financial system to each Patient Service Center; and (2) a document to be produced by Defendants that provides an FTE working productivity analysis for each Patient Service Center, as of September 2019.

**FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 11:**

On May 28, 2021, Defendants produced BATES NO. QUEST-VARGAS 000042006, which is the FTE working productivity analysis for each Patient Service Center, as of September 2019, referenced above.

Subject to their objections, and pursuant to an agreement of the parties, Defendants further respond that they will produce a document  that identifies the number of Patient Service employees in California who were employed by defendant Quest Diagnostics Incorporated and/or its wholly-owned subsidiaries in 2019 and who held the job titles reflected in the spreadsheet, as well as the work location to which they were coded at that time.  Employees who held more than one job title in a given reporting period are counted separately for each job title held.

**SECOND FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 11 (August 16, 2021):**

Subject to their objections, and pursuant to an agreement of the parties, Defendants respond that they have previously produced a document (QUEST-

19                 Case No. 2:19-cv-08108 DMG (MRWx)

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

VARGAS 42006) that identifies the number of Patient Service employees in California who were employed by defendant Quest Diagnostics Incorporated and/or its wholly-owned subsidiaries in 2019 and who held the job titles reflected in the spreadsheet, as well as the work location to which they were coded at that time. Employees who held more than one job title in a given reporting period are listed separately for each job title held.

Although Plaintiffs have not requested information regarding independent contractors working at Patient Service Centers, Defendants are also producing, contemporaneously with these Objections, a document (QUEST-VARGAS 42029) that identifies the number of independent contractors who were assigned in the years 2017-2020 to positions that typically would work at Patient Service Centers and the work location to which they were coded at that time. Independent contractors who were assigned to work during multiple time periods are counted separately for each time period worked.  Defendants are also producing a spreadsheet (QUEST-VARGAS 42028) that identifies the job templates and descriptions for these independent contractors. 7215201Defendants respond that they have previously produced a document (QUEST-VARGAS [insert number of previously-produced document] that identifies the number of Patient Service employees in the United States who were employed by defendant Quest Diagnostics Incorporated and/or its wholly-owned subsidiaries in 2019 and who held the job titles reflected in the spreadsheet, as well as the work location to which they were coded at that time.

**TOPIC NO. 12:**

YOUR maintenance, management, and/or administration policies, practices and/or procedures at YOUR PATIENT SERVICE CENTERS.

**OBJECTION TO TOPIC NO. 12:**

Defendants object to this topic on the grounds that it seeks information that is grossly burdensome and disproportionate to the needs of this action in that the

48145216_1.docx

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6) DEPOSITION NOTICE

1  "policies, practices and/or procedures" applicable to the maintenance, management,

2  and/or administrative policies of thousands of Patient Service Centers seeks a vast

3  quantity of information, the vast majority of which does not relate to a claim or

4  defense in the action.  Defendants further object to this topic on the ground that the

5  policies, practices and/or procedures at the Patient Service Centers can vary widely

6  depending on a number of factors.

7       Subject to their objections, Defendants will produce Jody Reilly to testify

8  about the policies and procedures in effect at the Patient Service Centers that are

9  relevant to issues concerning patients who are blind or who have visual impairments.

10  **TOPIC NO. 13:**

11       The maintenance, management, and/or administration policies, practices

12  and/or procedures of the E-CHECK-IN KIOSKS.

13  **OBJECTION TO TOPIC NO. 13:**

14       Defendants object to this topic on the ground that it is seeks information that is

15  grossly burdensome and disproportionate to the needs of this action in that the

16  "policies, practices and/or procedures" applicable to the Kiosks seeks a vast quantity

17  of information, the vast majority of which does not relate to a claim or defense in the

18  action.  Defendants further object to this topic on the ground that the policies,

19  practices and/or procedures at the Patient Service Centers applicable to the Kiosks

20  can vary widely depending on a number of factors.

21       Subject to their objections, Defendants will produce Jody Reilly to testify

22  about the policies and procedures in effect at the Patient Service Centers relevant to

23  issues concerning patients who are blind or who have visual impairments.

24  **TOPIC NO. 14:**

25       YOUR management structure from the corporate owner to the individual

26  PATIENT SERVICE CENTER managers.

27

28

48145216_1.docx

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

## OBJECTION TO TOPIC NO. 14:

Defendants object to this topic on the ground that it is an inappropriate subject for deposition testimony and other, far more appropriate methods exist for securing the information sought by this topic.  Defendants further object to this topic on the ground that the information sought by this topic has been provided to Plaintiffs in the form of an organizational chart.   Defendants further object to this topic on the ground that it is grossly disproportionate to the needs of the case as the vast majority of the information about the "management structure" about which Plaintiffs seek testimony bears no relation to a claim or defense in the action.

Subject to their objections, and pursuant to an agreement of the parties, Defendants have agreed to provide a sworn, written statement providing the following information:

(1)    As of the date identified in the statement, the identity of the Executive Director of National Patient Services, his or her direct reports, and their direct reports' reports.

(2)    As of the date identified in the statement, the identity of the Vice President, Strategy and Digital Transformation and his or her direct reports.

(3)    As of the date identified the statement, the identity of the Quest Diagnostics Patient Services Directors.

(4)    As of the present date, the direct supervisors of the individuals identified in Numbers 1, 2, and 3 above.

## SUPPLEMENTAL RESPONSE TO TOPIC NO. 14:

Subject to their above objections and those presented in their various meet and confer emails and letters (including without limitation the May 5, 2021 letter) and meet and confer discussions (including without limitation those on April 27, 2021 and May 12, 2021) and pursuant to an agreement of the parties, Defendants provide the following supplemental response as to certain positions within Quest in 2018 and

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

PA0822

1  2019:

2       1.     In 2018 and 2019, the Executive Director of National Patient Services

3  was Chris Grant.  His direct reports who reported to him at any point during that time

4  period were:  Adria Marallo, Catherine, Garroni, Beverly Hoskinson, Marc Yarrison,

5  Priscilla Pruitt, Taylor Carr, and Joseph Hulseman.

6       2.     In 2018 and 2019, the identity of the Executive Director, O2C Process

7  and Programs was Tom Walsh.  His direct reports who reported to him at any point

8  during that time period were: Constance Crimmins, John Edward Matalavy, Sean

9  Kent, Joseph Locricchio, Richard Congersky, and Yatin Birla.

10       3.     In 2018 and 2019, the Senior Directors of Patient Services for the

11  Patient Service Centers were: Katherine McCarthy, Cynthia Beltzer, Lisa Marie

12  Gavin, Keith Ward, and Walter Dusseldorp.  In 2018 and 2019, the Directors of

13  Patient Services for the Patient Service Centers were:  Malinda Weyrick, Jeremy

14  Stein, and Tanuj Pasricha.

15       4.     In 2018 and 2019, Scott Jeffers was the direct supervisor of the

16  Executive Director of National Patient Services and the Executive Director, 02C

17  Process and Programs.

18  **TOPIC NO. 15:**

19       Any agreements between YOU and any other PERSON regarding providing

20  maintenance, management, and/or administration of the check-in procedures at each

21  location identified in Plaintiffs' FIRST AMENDED COMPLAINT, Paragraphs 26

22  and 27.

23  **OBJECTION TO TOPIC NO. 15:**

24       Defendants object to this topic on the ground that it is an inappropriate subject

25  for deposition testimony and other, far more appropriate methods exist for securing

26  the information sought by this topic.  Defendants further object to this topic on the

27  ground that the information sought by this topic has been provided to Plaintiffs in the

28   

48145216_1.docx

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

PA0823

1  form of the agreements, which speak for themselves.   Defendants further object to

2  this topic on the ground that it is grossly disproportionate to the needs of the case as

3  the vast majority of the information about any such agreements bears no relation to a

4  claim or defense in the action.

5      Subject to their objections, Defendants agree to produce Max Ocampo as their

6  designee to testify on this topic.

7  **TOPIC NO. 16:**

8      Any agreements between YOU and any other PERSON regarding providing

9  maintenance, management, and/or administration of the E-CHECK-IN KIOSKS

10  check-in procedures at each location identified in Plaintiffs' FIRST AMENDED

11  COMPLAINT, Paragraphs 26 and 27.

12  **OBJECTION TO TOPIC NO. 16:**

13      Defendants object to this topic on the ground that it is vague and ambiguous in

14  its request for information regarding the "maintenance, management, and

15  administration of . . . check-in procedures."  Defendants further object to this topic

16  on the ground that it is an inappropriate subject for deposition testimony and other,

17  far more appropriate methods exist for securing the information sought by this topic.

18  Defendants further object to this topic on the ground that the information sought by

19  this topic has been sought Plaintiffs in the form of the agreements, which would

20  speak for themselves.

21      Subject to their objections, Defendants agree to produce Max Ocampo as their

22  designee to testify on this topic only to the extent there are any such agreements, as

23  Defendants reasonably understand this topic.

24  **TOPIC NO. 17:**

25      All actions taken by YOU to ensure the E-CHECK-IN KIOSKS at YOUR

26  PATIENT SERVICE CENTERS are compliant with the ADA.

27

28

48145216_1.docx

PA0824

**OBJECTION TO TOPIC NO. 17:**

Defendants object to this topic on the grounds that it is overbroad and disproportionate to the needs of the case as the vast majority of the information about ADA compliance bears no relation to a claim or defense in the action, except to the extent that it impacts the use of the check-in procedures by patients who are blind or who have visual impairments.  Defendants further object to this topic on the grounds that it is vague and ambiguous in its use of the phrase "compliant with the ADA" as the ADA is a vast and complex statutory and regulatory scheme.

Subject to their objections, and pursuant to an agreement of the parties, Defendants will produce Marc Yarrison to testify on this topic as it relates to the use of the check-in procedures at Patient Service Centers by patients who are blind or who have visual impairments.

**FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 17:**

Subject to their objections, and pursuant to an agreement of the parties, Defendants further respond that QUEST-VARGAS 40793 is a Quest business record and QUEST-VARGAS 41653-41781 is a compilation of Quest business records.

**TOPIC NO. 18:**

All actions taken by YOU to ensure the E-CHECK-IN KIOSKS at YOUR PATIENT SERVICE CENTERS are compliant with the REHAB ACT.

**OBJECTION TO TOPIC NO. 18:**

Defendants object to this topic on the grounds that it is overbroad and disproportionate to the needs of the case as the vast majority of the information about Rehabilitation Act compliance bears no relation to a claim or defense in the action, except to the extent that it impacts the use of the check-in procedures by patients who are blind or who have visual impairments.  Defendants further object to this topic on the grounds that it is vague and ambiguous in its use of the phrase "compliant with the REHAB ACT" as the Rehabilitation Act is a vast and complex

48145216_1.docx

PA0825

1  statutory and regulatory scheme.

2      Subject to their objections, and pursuant to an agreement of the parties,

3  Defendants will produce Marc Yarrison to testify on this topic as it relates to the use

4  of the check-in procedures at Patient Service Centers by patients who are blind or

5  who have visual impairments.

6  **FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 18:**

7      Subject to their objections, and pursuant to an agreement of the parties,

8  Defendants further respond that QUEST-VARGAS 40793 is a Quest business record

9  and QUEST-VARGAS 41653-41781 is a compilation of Quest business records.

10  **TOPIC NO. 19:**

11      All policies or procedures maintain by YOU that address compliance with the

12  ADA at YOUR PATIENT SERVICE CENTERS.

13  **OBJECTION TO TOPIC NO. 19:**

14      Defendants object to this topic on the grounds that it is overbroad and

15  disproportionate to the needs of the case as the vast majority of the information about

16  ADA compliance bears no relation a claim or defense in the action, except to the

17  extent that it impacts the use of the check-in procedures by patients who are blind or

18  who have visual impairments.  Defendants further object to this topic on the grounds

19  that it is vague and ambiguous in its use of the phrase "compliance with the ADA" as

20  the ADA is a vast and complex statutory and regulatory scheme.

21      Subject to their objections, and pursuant to an agreement of the parties,

22  Defendants will produce Jody Reilly to testify on this topic as it relates to the use of

23  the check-in procedures at Patient Service Centers by patients who are blind or who

24  have visual impairments.

25  **TOPIC NO. 20:**

26      All policies or procedures maintain by YOU that address compliance with the

27  REHAB ACT at YOUR PATIENT SERVICE CENTERS.

28

26      Case No. 2:19-cv-08108 DMG (MRWx)

48145216_1.docx

PA0826

**OBJECTION TO TOPIC NO. 20:**

Defendants object to this topic on the grounds that it is overbroad and disproportionate to the needs of the case as the vast majority of the information about Rehabilitation Act compliance bears no relation to a claim or defense in the action, except to the extent that it impacts the use of the check-in procedures by patients who are blind or who have visual impairments.  Defendants further object to this topic on the grounds that it is vague and ambiguous in its use of the phrase "compliance with the REHAB ACT" as the Rehabilitation Act is a vast and complex statutory and regulatory scheme.

Subject to their objections, and pursuant to an agreement of the parties, Defendants will produce Jody Reilly to testify on this topic as it relates to the use of the check-in procedures at Patient Service Centers by patients who are blind or who have visual impairments.

**TOPIC NO. 21:**

All policies or procedures maintained by YOU to ensure compliance with providing aids and auxiliary services, as defined in 28 C.F.R. 36.303 at PATIENT SERVICE CENTERS from January 1, 2016, to present.

**OBJECTION TO TOPIC NO. 21:**

Defendants object to this topic on the grounds that it is vague and ambiguous in its use of the phrase "providing aids and auxiliary services," as that phrase is neither used nor defined in 28 C.F.R. § 36.303, and in its use of the phrase "compliance with providing…."  Defendants further object to this topic on the grounds that it is overbroad and disproportionate to the needs of the case as the vast majority of the information about compliance with 28 C.F.R. § 36.303 bears no relation to a claim or defense in the action, except to the extent that it impacts the use of the check-in procedures by patients who are blind or who have visual

48145216_1.docx

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6) DEPOSITION NOTICE

1 impairments.

2        Subject to their objections, and pursuant to an agreement of the parties,

3 Defendants will produce Jody Reilly to testify on this topic as it relates to the use of

4 the check-in procedures at Patient Service Centers by patients who are blind or who

5 have visual impairments.

6 **TOPIC NO. 22:**

7        All policies or procedures maintained by YOU that demonstrate each way in

8 which YOU ensured effective communication, as defined in 28 C.F.R. 36.303(c),

9 with visually impaired PERSONS during the E-CHECK-IN KIOSK check-in

10 process, at YOUR PATIENT SERVICE CENTERS from January 1, 2016, to

11 present.

12 **OBJECTION TO TOPIC NO. 22:**

13        Defendants object to this topic on the grounds that it is vague and ambiguous

14 in its use of the phrase "effective communication, as defined in 28 C.F.R. §

15 36.303(c)" as "effective communication" is not defined in that regulation.

16        Subject to their objections, Defendants will produce Jody Reilly to testify on

17 this topic as it relates to communicating with patients who are blind or who have

18 visual impairments while using the check-in procedures at the Patient Service

19 Centers.

20 **TOPIC NO. 23:**

21        The training YOU provide to YOUR employees and independent contractors

22 RELATING to how to communicate effectively with visually impaired PERSONS

23 during the check-in process at YOUR PATIENT SERVICE CENTERS.

24 **OBJECTION TO TOPIC NO. 23:**

25        Subject to their objections, Defendants will produce Jody Reilly to testify on

26 this topic as it relates to communicating with patients who are blind or who have

27 visual impairments while using the check-in procedures at the Patient Service

28

48145216_1.docx

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

PA0828

1   Centers.

2   **TOPIC NO. 24:**

3       All complaints YOU have received from January 1, 2016, to the present from

4   any individual YOU know to be legally blind alleging difficulty accessing the E-

5   CHECK-IN at YOUR PATIENT SERVICE CENTERS.

6   **OBJECTION TO TOPIC NO. 24:**

7       Defendants object to this topic on the grounds that it is vague and ambiguous

8   in its use of the term "complaints," which is subject to multiple interpretations by

9   different individuals.  Defendants further object to this topic on the ground that it

10  falsely assumes that Defendants "know" that any of the patients are legally blind.

11  Defendants further object to this topic on the ground that it is an inappropriate

12  subject for deposition testimony and other, far more appropriate methods exist for

13  securing the information sought by this topic.  Defendants further object to this topic

14  on the grouns that it is unduly burdensome to the extent it would purport to require

15  any designee to master all of the facts related to any given "complaint," especially

16  when all such available facts are recorded in documents that have been produced to

17  Plaintiffs in this action.  Defendants further object to this topic on the ground that the

18  information sought by this topic has been provided to Plaintiffs in the form of the

19  complaints, which speak for themselves.

20      Subject to their objections, Defendants agree to produce Jody Reilly as their

21  designee to testify on this topic to the extent it involves the maintenance of

22  documents relating to feedback Patient Advocacy received from patients claiming to

23  be blind or to have visual impairments who experienced difficulties using the check-

24  in procedures at the Patient Service Centers.

25  **SUPPLEMENTAL RESPONSE TO TOPIC NO. 24:**

26      Subject to their above objections and those presented in their various meet and

27  confer emails and letters (including without limitation the May 5, 2021 letter) and

28

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

PA0829

1  meet and confer discussions (including without limitation those on April 27, 2021

2  and May 12, 2021) and pursuant to an agreement of the parties, Defendants provide

3  the following supplemental response:

4       Defendants agree that the statements made by or attributed to the individuals

5  and/or patients that are contained or reported in the following documents were

6  received by Defendants; recorded, maintained, or generated by Defendants in the

7  ordinary course of business; and that the documents themselves are business records

8  recorded, maintained or generated in the ordinary course of business:  QUEST-

9  VARGAS 28740-41, 34658, 35335.

10

11  **FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 24:**

12       Subject to their objections, and pursuant to an agreement of the parties,

13  Defendants further respond that QUEST-VARGAS 37977-37978 is a Quest business

14  record and QUEST-VARGAS 41653-41681 is a compilation of Quest business

15  records.

16  **TOPIC NO. 25:**

17       All complaints YOU have received from January 1, 2016, to the present from

18  any individual RELATING to the E-CHECK-IN at YOUR PATIENT SERVICE

19  CENTERS.

20  **OBJECTION TO TOPIC NO. 25:**

21       Defendants object to this topic on the ground that it is vague and ambiguous in

22  its use of the term "complaints," which is subject to multiple interpretations by

23  different individuals.  Defendants further object to this topic on the ground that it is

24  an inappropriate subject for deposition testimony and other, far more appropriate

25  methods exist for securing the information sought by this topic.  Defendants further

26  object to this topic on the ground that it is unduly burdensome to the extent it would

27  purport to require any designee to master all of the facts related to any given

28

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

PA0830

1   "complaint," especially when all such available facts are recorded in documents that

2   have been produced to Plaintiffs in this action.  Defendants further object to this

3   topic on the ground that it is unduly burdensome and grossly disproportionate to the

4   needs of the case in that all of the complaints of individuals other than putative class

5   members relating to the use of check-in procedures at the Patient Service Centers

6   bears no relation to a claim or defense in the action.   All of the relevant information

7   sought by this topic is sought in Topic No. 24.

8

9   **SUPPLEMENTAL RESPONSE TO TOPIC NO. 25:**

10          Subject to their above objections and those presented in their various meet and

11   confer emails and letters (including without limitation the May 5, 2021 letter) and

12   meet and confer discussions (including without limitation those on April 27, 2021

13   and May 12, 2021) and pursuant to an agreement of the parties, Defendants provide

14   the following supplemental response:

15          Defendants agree that the statements made by or attributed to the individuals

16   and/or patients that are contained or reported in the following documents were

17   received by Defendants; recorded, maintained, or generated by Defendants in the

18   ordinary course of business; and that the documents themselves are business records

19   recorded, maintained or generated in the ordinary course of business:  QUEST-

20   VARGAS 28740-41, 34658, 35335.

21   **FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 25:**

22          Subject to their objections, and pursuant to an agreement of the parties,

23   Defendants further respond that QUEST-VARGAS 37977-37978 is a Quest business

24   record and QUEST-VARGAS 41653-41681 is a compilation of Quest business

25   records.

26

27

28

48145216_1.docx

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

**TOPIC NO. 26:**

All agreements, COMMUNICATIONS or other DOCUMENTS between YOU and any state, federal or local regulator regarding the ADA and/or any other state or local accessibility regulation that is related to YOUR PATIENT SERVICE CENTERS.

**OBJECTION TO TOPIC NO. 26:**

Defendants object to this topic on the grounds that it is unduly burdensome, overbroad and disproportionate to the needs of the case as the vast majority of the information about ADA compliance issues bears no relation to a claim or defense in the action, except to the extent that it impacts the use of the check-in procedures by patients who are blind or who have visual impairments.

Subject to their objections, Defendants will produce Jody Reilly to testify on this topic as it relates to any communications between Defendant and any state, federal or local regulator, relating to the use of the Kiosks at Patient Service Centers by patients who are blind or who have visual impairments, which were located after a diligent and good faith search.

**TOPIC NO. 27:**

YOUR customer demographics or similar customer-related metrics that include information concerning customers with visual disabilities or other disabilities, including the number of visually impaired PERSONS who patronize YOUR PATIENT SERVICE CENTERS on a weekly, monthly and/or annual basis.

**OBJECTION TO TOPIC NO. 27:**

Defendants object to this topic on the ground that it falsely assumes that Defendants maintain demographic information about patients with visual disabilities.

Subject to their objections, Defendants state that there is no demographic information on patients with visual disabilities at Patient Service Centers that they were able to identify after a diligent and good faith search and thus no designee can

48145216_1.docx

PA0832

1 testify to that issue.

2 **SUPPLEMENTAL RESPONSE TO TOPIC NO. 27:**

3       Subject to their above objections and those presented in their various meet and

4 confer emails and letters (including without limitation the May 5, 2021 letter) and

5 meet and confer discussions (including without limitation those on April 27, 2021

6 and May 12, 2021) and pursuant to an agreement of the parties, Defendants provide

7 the following supplemental response:

8       The number of times the three-finger swipe has been applied to the Kiosks at

9 the Patient Service Centers does not provide responsive information because, among

10 other things, anyone (regardless of visual impairment) can apply the three-finger

11 swipe and the three-finger swipe can be applied either intentionally or inadvertently

12 by patients, Defendants' staff, or any other individuals (e.g., the thre-finger swipe

13 was inadvertently applied numerous times by Defendants' staff when cleaning the

14 Kiosks during the COVID-19 pandemic).  Notwithstanding the inability to correlate

15 three-finger swipe data with the number of patients with visual impairments who

16 visit Patient Service Centers, the number of times that the three-finger swipe has

17 been applied on a monthly basis at Patient Service Center Kiosks is:

18     •     August 2020:    25,724 times

19     •     September 2020:  31,409 times

20     •     October 2020:   29,205 times

21     •     November 2020:  22,909 times

22     •     December 2020:  24,040 times

23     •     January 2021:   21,530 times

24     •     February 2021:  17,993 times

25 **TOPIC NO. 28:**

26       All efforts YOU made between January 1, 2016, to the present, to make the E-

27 CHECK-IN KIOSKS accessible and independently usable by visually impaired

28

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

PA0833

1  PERSONS.

2  **OBJECTION TO TOPIC NO. 28:**

3       Subject to their objections, Defendants will produce Marc Yarrison as their

4  designee to testify on this topic, except to the extent that Defendants will produce

5  Taylor Carr as their designee to testify on efforts related to the implementation of the

6  three-finger swipe process for patients with visual impairments to check in at Patient

7  Service Centers.

8  **TOPIC NO. 29:**

9       All efforts YOU made between January 1, 2016, to the present, to give

10  primary consideration to the requests of visually impaired PERSONS when

11  determining to implement E-CHECK-IN KIOSKS at YOUR PATIENT SERVICE

12  CENTERS.

13  **OBJECTION TO TOPIC NO. 29:**

14       Defendants object to this topic on the grounds that it is vague and ambiguous

15  in its use of the phrase "primary consideration" in this context and its use of the

16  phrase "the requests of visually impaired PERSONS" without identifying which

17  requests or what they relate to. Defendants further object to this topic on the ground

18  that it falsely assumes that they received "requests of visually impaired PERSONS"

19  at the time it was determined to deploy the Kiosks.

20  **SUPPLEMENTAL RESPONSE TO TOPIC NO. 29:**

21       Subject to their above objections and those presented in their various meet and

22  confer emails and letters (including without limitation the May 5, 2021 letter) and

23  meet and confer discussions (including without limitation those on April 27, 2021

24  and May 12, 2021) and pursuant to an agreement of the parties, Defendants provide

25  the following supplemental response:

26       Defendants restate and incorporate here all of their objections stated during the

27  depositions of the Rule 30(b)(6) designee(s) or other witnesses, and again during the

28

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

PA0834

1  meet and confer process referenced above, that were based on the attorney-client

2  privilege and attorney work product doctrine as it applies to the consideration that

3  led to the implementation of the three-finger swipe and related documentary,

4  auditory and operational changes.  Subject to these objections, and Plaintiffs' express

5  agreement that the production of such documents will not constitute a waiver

6  (subject matter or otherwise) of the attorney-client privilege and attorney work

7  product protection, Defendants will produce on May 21, 2021 documents bearing

8  Bates Nos. QUEST-VARGAS 41938-41976, which are non-privileged documents

9  relating to the statements of third parties who provided feedback to Defendants on

10  their preferred methodology of interacting with the Kiosks.  Defendants further agree

11  to consider in good faith any future request that Plaintiffs may make for additional

12  deposition testimony directed at the content of such documents and any non-

13  privileged events or statements relating to such content.

14  **FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 29:**

15        Subject to their objections, and pursuant to an agreement of the parties,

16  Defendants further respond that they will offer to produce Taylor Carr for an

17  additional 60 minutes of testimony on the topic of the unredacted portions of the

18  non-privileged documents produced after Mr. Carr's deposition (QUEST-VARGAS

19  41938-41976), provided that (1) Plaintiffs waive any and all objections to Quest's

20  prior assertions of attorney-client and work product privilege as to Quest's

21  considerations of modifications to the e-Check-in kiosk before implementing the

22  three-finger swipe and associated changes, (2) Plaintiffs do not inquire into the same

23  privileged areas of questioning to which Quest previously objected, and (3) Plaintiffs

24  waive their pursuit of further testimony under this Topic.

25  **TOPIC NO. 30:**

26        YOUR claim, in your Sixth Affirmative Defense, that Plaintiffs failed to

27  request a reasonable modification of policies, practices or procedures and/or

28

48145216_1.docx

PA0835

1  Plaintiffs failed to request an auxiliary aid or service.

2  **OBJECTION TO TOPIC NO. 30:**

3       Defendants object to this topic on the ground that testimony cannot be

4  provided as to the absence of an event.

5       Subject to their objections, Defendants will produce Jody Reilly as their

6  designee to testify, where applicable, to the company's lack of information following

7  a diligent and good faith search about any requests by individual Plaintiffs to request

8  a reasonable modification of policies, practices or procedures and/or for an auxiliary

9  aid or service.

10  **TOPIC NO. 31:**

11       All efforts YOU made between January 1, 2016, and the present to consider

12  all resources available for use in the funding and operation of YOUR E-CHECK-IN

13  KIOSKS when concluding that providing E-CHECK-IN-KIOSKS accessible to

14  visually impaired PERSONS would be a fundamental alteration of the nature of

15  YOUR self check-in service.

16  **OBJECTION TO TOPIC NO. 31:**

17       Defendants object to this topic on the grounds that it is vague and ambiguous

18  in its use of the phrase "consider all resources available" and Kiosks "accessible to

19  visually impaired PERSONS" in that different visually impaired PERSONS would

20  need different means of accessing the same device.  Defendants further object to this

21  topic on the grounds that it falsely assumes that the check-in process was or is not

22  fully accessible to persons with visual impairments, or that Defendants concluded

23  that providing Kiosks "accessible to visually impaired PERSONS would be a

24  fundamental alteration."

25  **SUPPLEMENTAL RESPONSE TO TOPIC NO. 31:**

26       Subject to their above objections and those presented in their various meet and

27  confer emails and letters (including without limitation the May 5, 2021 letter) and

28

36        Case No. 2:19-cv-08108 DMG (MRWx)

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

PA0836

1  meet and confer discussions (including without limitation those on April 27, 2021

2  and May 12, 2021) and pursuant to an agreement of the parties, Defendants provide

3  the following supplemental response:

4      Defendants restate and incorporate here all of their objections stated during the

5  depositions of the Rule 30(b)(6) designee(s) or other witnesses, and again during the

6  meet and confer process referenced above, that were based on the attorney-client

7  privilege and attorney work product doctrine as it applies to the consideration that

8  led to the implementation of the three-finger swipe and related documentary,

9  auditory and operational changes.  Subject to these objections, and Plaintiffs' express

10 agreement that the production of such documents will not constitute a waiver

11 (subject matter or otherwise) of the attorney-client privilege and attorney work

12 product protection, Defendants will produce on May 21, 2021 documents bearing

13 Bates Nos. QUEST-VARGAS 41938-41976, which are non-privileged documents

14 relating to the statements of third parties who provided feedback to Defendants on

15 their preferred methodology of interacting with the Kiosks.  Defendants further agree

16 to consider in good faith any future request that Plaintiffs may make for additional

17 deposition testimony directed at the content of such documents and any non-

18 privileged events or statements relating to such content.

19 **FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 31:**

20     Subject to their objections, and pursuant to an agreement of the parties,

21 Defendants further respond that they will offer to produce Taylor Carr for an

22 additional 60 minutes of testimony on the topic of the unredacted portions of the

23 non-privileged documents produced after Mr. Carr's deposition (QUEST-VARGAS

24 41938-41976), provided that (1) Plaintiffs waive any and all objections to Quest's

25 prior assertions of attorney-client and work product privilege as to Quest's

26 considerations of modifications to the e-Check-in kiosk before implementing the

27 three-finger swipe and associated changes, (2) Plaintiffs do not inquire into the same

28

37        Case No. 2:19-cv-08108 DMG (MRWx)

48145216_1.docx

PA0837

1 privileged areas of questioning to which Quest previously objected, and (3) Plaintiffs

2 waive their pursuit of further testimony under this Topic.

3

4 **TOPIC NO. 32:**

5     All efforts YOU made between January 1, 2017, to the present to consider the

6 resources available for use in the funding and operation of YOUR E-CHECK-IN

7 KIOSK when concluding that providing E-CHECK-IN KIOSKS accessible to

8 visually impaired PERSONS would result in an undue financial burden.

9 **OBJECTION TO TOPIC NO. 32:**

10     Defendants object to this topic on the grounds that it is vague and ambiguous

11 in its use of the phrase "consider the resources available" and Kiosks "accessible to

12 visually impaired PERSONS" in that different visually impaired PERSONS would

13 need different means of accessing the same device.  Defendants further object to this

14 topic on the grounds that it falsely assumes that the check-in process was not fully

15 accessible to persons with visual impairments or that Defendants concluded that

16 providing Kiosks "accessible to visually impaired PERSONS would result in an

17 undue financial burden."

18 **SUPPLEMENTAL RESPONSE TO TOPIC NO. 32:**

19     Subject to their above objections and those presented in their various meet and

20 confer emails and letters (including without limitation the May 5, 2021 letter) and

21 meet and confer discussions (including without limitation those on April 27, 2021

22 and May 12, 2021) and pursuant to an agreement of the parties, Defendants provide

23 the following supplemental response:

24     Defendants restate and incorporate here all of their objections stated during the

25 depositions of the Rule 30(b)(6) designee(s) or other witnesses, and again during the

26 meet and confer process referenced above, that were based on the attorney-client

27 privilege and attorney work product doctrine as it applies to the consideration that

28

38     Case No. 2:19-cv-08108 DMG (MRWx)

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

1  led to the implementation of the three-finger swipe and related documentary,

2  auditory and operational changes.  Subject to these objections, and Plaintiffs' express

3  agreement that the production of such documents will not constitute a waiver

4  (subject matter or otherwise) of the attorney-client privilege and attorney work

5  product protection, Defendants will produce on May 21, 2021 documents bearing

6  Bates Nos. QUEST-VARGAS 41938-41976, which are non-privileged documents

7  relating to the statements of third parties who provided feedback to Defendants on

8  their preferred methodology of interacting with the Kiosks.  Defendants further agree

9  to consider in good faith any future request that Plaintiffs may make for additional

10  deposition testimony directed at the content of such documents and any non-

11  privileged events or statements relating to such content.

12  **FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 32:**

13         Subject to their objections, and pursuant to an agreement of the parties,

14  Defendants further respond that they will offer to produce Taylor Carr for an

15  additional 60 minutes of testimony on the topic of the unredacted portions of the

16  non-privileged documents produced after Mr. Carr's deposition (QUEST-VARGAS

17  41938-41976), provided that (1) Plaintiffs waive any and all objections to Quest's

18  prior assertions of attorney-client and work product privilege as to Quest's

19  considerations of modifications to the e-Check-in kiosk before implementing the

20  three-finger swipe and associated changes, (2) Plaintiffs do not inquire into the same

21  privileged areas of questioning to which Quest previously objected, and (3) Plaintiffs

22  waive their pursuit of further testimony under this Topic.

23

24  **TOPIC NO. 33:**

25         All efforts YOU made between January 1, 2017, to the present to consider the

26  resources available for use in the funding and operation of YOUR E-CHECK-IN

27  KIOSK when concluding that providing E-CHECK-IN KIOSK accessible to visually

28

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

PA0839

1 | impaired PERSONS would result in an undue administrative burden.

2 | **OBJECTION TO TOPIC NO. 33:**

3 | Defendants object to this topic on the ground that it is vague and ambiguous in

4 | its use of the phrase "consider the resources available" and Kiosk "accessible to

5 | visually impaired PERSONS" in that different visually impaired PERSONS would

6 | need different means of accessing the same device.  Defendants further object to this

7 | topic on the ground that it falsely assumes that the check-in process was not fully

8 | accessible to persons with visual impairments, or that Defendants concluded that

9 | providing Kiosks "accessible to visually impaired PERSONS would result in an

10 | undue administrative burden."

11 | **SUPPLEMENTAL RESPONSE TO TOPIC NO. 33:**

12 | Subject to their above objections and those presented in their various meet and

13 | confer emails and letters (including without limitation the May 5, 2021 letter) and

14 | meet and confer discussions (including without limitation those on April 27, 2021

15 | and May 12, 2021) and pursuant to an agreement of the parties, Defendants provide

16 | the following supplemental response:

17 | Defendants restate and incorporate here all of their objections stated during the

18 | depositions of the Rule 30(b)(6) designee(s) or other witnesses, and again during the

19 | meet and confer process referenced above, that were based on the attorney-client

20 | privilege and attorney work product doctrine as it applies to the consideration that

21 | led to the implementation of the three-finger swipe and related documentary,

22 | auditory and operational changes.  Subject to these objections, and Plaintiffs' express

23 | agreement that the production of such documents will not constitute a waiver

24 | (subject matter or otherwise) of the attorney-client privilege and attorney work

25 | product protection, Defendants will produce on May 21, 2021 documents bearing

26 | Bates Nos. QUEST-VARGAS 41938-41976, which are non-privileged documents

27 | relating to the statements of third parties who provided feedback to Defendants on

28 |

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

PA0840

1  their preferred methodology of interacting with the Kiosks.  Defendants further agree

2  to consider in good faith any future request that Plaintiffs may make for additional

3  deposition testimony directed at the content of such documents and any non-

4  privileged events or statements relating to such content.

5

6  **FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 33:**

7  Subject to their objections, and pursuant to an agreement of the parties,

8  Defendants further respond that they will offer to produce Taylor Carr for an

9  additional 60 minutes of testimony on the topic of the unredacted portions of the

10  non-privileged documents produced after Mr. Carr's deposition (QUEST-VARGAS

11  41938-41976), provided that (1) Plaintiffs waive any and all objections to Quest's

12  prior assertions of attorney-client and work product privilege as to Quest's

13  considerations of modifications to the e-Check-in kiosk before implementing the

14  three-finger swipe and associated changes, (2) Plaintiffs do not inquire into the same

15  privileged areas of questioning to which Quest previously objected, and (3) Plaintiffs

16  waive their pursuit of further testimony under this Topic.

17

18  **TOPIC NO. 34:**

19  The number of patients YOU serviced from January 1, 2017, to the present at

20  YOUR PATIENT SERVICE CENTERS in California.

21  **OBJECTION TO TOPIC NO. 34:**

22  Defendants object to this topic on the ground that it is an inappropriate subject

23  for deposition testimony and other, far more appropriate methods exist for securing

24  the information sought by this topic.   Defendants further object to this topic on the

25  ground and to the extent it is duplicative of other discovery requests propounded in

26  this action.

27  Subject to their objections, and pursuant to an agreement of the parties,

28

Case No. 2:19-cv-08108 DMG (MRWx)

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

1   Defendants have agreed to provide a sworn, written statement providing the number

2   of check-ins at the Patient Services Centers in California from January 2017 through

3   February 2021.

4   **FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 34 (August 16,**

5   **2021):**

6          Subject to their objections, Defendants provide the following supplemental

7   response.  The approximate number of walk-in and appointment patients for whom

8   orders were entered and filed in each of the years 2017-2020 at Patient Service

9   Centers in California, not including orders for specimens dropped off at Patient

10   Service Centers in California, is as follows:

11        •2017:     7,212,678

12        •2018:     7,248,481

13        •2019:     7,797,947

14        •2020:     7,215,201

15

16   **TOPIC NO. 35:**

17          The number of unique patient visits that occurred from January 1, 2017, to the

18   present at YOUR PATIENT SERVICE CENTERS in California.

19   **OBJECTION TO TOPIC NO. 35:**

20          Defendants object to this topic on the ground that it is an inappropriate subject

21   for deposition testimony and other, far more appropriate methods exist for securing

22   the information sought by this topic.   Defendants further object to this topic on the

23   ground that it is vague and ambiguous in its use of the phrases "unique patient visits"

24   and "visits," each of which is subject to multiple interpretations.  Defendants further

25   object to this topic on the ground that their records systems do not permit Defendants

26   to accurately isolate each unique patient's visits to the Patient Service Centers and

27   thus does not permit Defendants to provide the information purportedly sought.

28

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

PA0842

1    Defendants further object to this topic on the ground and to the extent it is

2    duplicative of other discovery requests propounded in this action.

3    **TOPIC NO. 36:**

4        The number of patients YOU serviced at YOUR PATIENT SERVICE

5    CENTERS in California from January 1, 2017, to the present who are legally blind.

6    **OBJECTION TO TOPIC NO. 36:**

7        Defendants object to this topic on the ground that it is an inappropriate subject

8    for deposition testimony and other, far more appropriate methods exist for securing

9    the information sought by this topic.   In fact, Plaintiffs have agreed to permit

10   Defendants to produce the responsive information in the form of a sworn, written

11   statement.  Defendants further object to this topic on the grounds that it is vague and

12   ambiguous in its use of the phrases "legally blind" and "patients," each of which is

13   subject to multiple interpretations.  Such ambiguity is further amplified here where

14   Plaintiffs do not use the phrase "unique" to describe the number of patients as they

15   did in Topic No. 35.  Defendants further object to this topic on the ground that their

16   records systems do not permit Defendants to accurately isolate each unique patient's

17   visits to the Patient Service Centers and thus does not permit Defendants to provide

18   the information purportedly sought.  Defendants further object to this topic on the

19   ground and to the extent it is duplicative of other discovery requests propounded in

20   this action.  Defendants further object to this topic on the ground that it falsely

21   assumes that Defendants collect or maintain records of patients who are legally

22   blind.

23       Subject to their objections, and despite Plaintiffs' agreement to permit a

24   sworn, written response in lieu of testimony, Defendants are unable to produce either

25   a designee or a sworn written statement providing the information sought because

26

27

28

48145216_1.docx

PA0843

1  such information does not exist.

2  **TOPIC NO. 37:**

3  The number of patients YOU serviced at YOUR PATIENT SERVICE

4  CENTERS in the United States from January 1, 2017, to the present who are legally

5  blind.

6  **OBJECTION TO TOPIC NO. 37:**

7  Defendants object to this topic on the ground that it is an inappropriate subject

8  for deposition testimony and other, far more appropriate methods exist for securing

9  the information sought by this topic.   In fact, Plaintiffs have agreed to permit

10  Defendants to produce the responsive information in the form of a sworn, written

11  statement.  Defendants further object to this topic on the ground that it is vague and

12  ambiguous in its use of the phrases "legally blind" and "patients," each of which is

13  subject to multiple interpretations.  Such ambiguity is further amplified here where

14  Plaintiffs do not use the phrase "unique" to describe the number of patients as they

15  did in Topic No. 35.  Defendants further object to this topic on the ground that their

16  records systems do not permit Defendants to accurately isolate each unique patient's

17  visits to the Patient Service Centers and thus does not permit Defendants to provide

18  the information purportedly sought.  Defendants further object to this topic on the

19  ground and to the extent it is duplicative of other discovery requests propounded in

20  this action.  Defendants further object to this topic on the ground that it falsely

21  assumes that Defendants collect or maintain records of patients who are legally

22  blind.

23  Subject to their objections, and despite Plaintiffs' agreement to permit a

24  sworn, written response in lieu of testimony, Defendants are unable to produce either

25  a designee or a sworn written statement providing the information sought because

26  such information does not exist.

27

28

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

PA0844

**TOPIC NO. 38:**

The number of visually impaired PERSONS who visited YOUR PATIENT SERVICE CENTERS and utilized YOUR E-CHECK-IN KIOSKS.

**OBJECTION TO TOPIC NO. 38:**

Defendants object to this topic on the ground that it is an inappropriate subject for deposition testimony and other, far more appropriate methods exist for securing the information sought by this topic.   In fact, Plaintiffs have agreed to permit Defendants to produce the responsive information in the form of a sworn, written statement.  Defendants further object to this topic on the ground that it is vague and ambiguous in its use of the phrase "number of visually impaired PERSONS," which is subject to multiple interpretations.  Such ambiguity is further amplified here where Plaintiffs do not use the phrase "unique" to describe the number of persons as they did in Topic No. 35.  Defendants further object to this topic on the ground that their records systems do not permit Defendants to accurately isolate each unique patient's visits to the Patient Service Centers and thus does not permit Defendants to provide the information purportedly sought.  Defendants further object to this topic on the ground and to the extent it is duplicative of other discovery requests propounded in this action.  Defendants further object to this topic on the ground that it falsely assumes that Defendants collect or maintain records of patients who are visually impaired.

Subject to their objections, and despite Plaintiffs' agreement to permit a sworn, written response in lieu of testimony, Defendants are unable to produce either a designee or a sworn written statement providing the information sought because such information does not exist.

**SUPPLEMENTAL RESPONSE TO NO. 38:**

Subject to their above objections and those presented in their various meet and confer emails and letters (including without limitation the May 5, 2021 letter) and

45                Case No. 2:19-cv-08108 DMG (MRWx)

48145216_1.docx

PA0845

1  meet and confer discussions (including without limitation those on April 27, 2021

2  and May 12, 2021) and pursuant to an agreement of the parties, Defendants provide

3  the following supplemental response:

4        The number of times the three-finger swipe has been applied to the Kiosks at

5  the Patient Service Centers does not provide responsive information because, among

6  other things, anyone (regardless of visual impairment) can apply the three-finger

7  swipe and the three-finger swipe can be applied either intentionally or inadvertently

8  by patients, Defendants' staff, or any other individuals (e.g., the thre-finger swipe

9  was inadvertently applied numerous times by Defendants' staff when cleaning the

10 Kiosks during the COVID-19 pandemic).  Notwithstanding the inability to correlate

11 three-finger swipe data with the number of patients with visual impairments who

12 visit Patient Service Centers, the number of times that the three-finger swipe has

13 been applied on a monthly basis at Patient Service Center Kiosks is:

14        •        August 2020:        25,724 times

15        •        September 2020:    31,409 times

16        •        October 2020:       29,205 times

17        •        November 2020:    22,909 times

18        •        December 2020:    24,040 times

19        •        January 2021:        21,530 times

20        •        February 2021:      17,993 times

21 **TOPIC NO. 39:**

22        The number of PATIENT SERVICE CENTERS that utilize E-CHECK-IN

23 KIOSKS with screen-reader accessibility.

24 **OBJECTION TO TOPIC NO. 39:**

25        Defendants object to this topic on the ground that it is an inappropriate subject

26 for deposition testimony and other, far more appropriate methods exist for securing

27 the information sought by this topic.   In fact, Plaintiffs have agreed to permit

28                                              46              Case No. 2:19-cv-08108 DMG (MRWx)

48145216_1.docx

1 Defendants to produce the responsive information in the form of a sworn, written

2 statement.   Defendants further object to this topic on the grounds that it is vague and

3 ambiguous in its use of the phrase "screen-reader accessibility."

4       Subject to their objections, Defendants respond that none of the Patient

5 Service Centers has Kiosks that are equipped with screen-reading software.

6 **TOPIC NO. 40:**

7       How patient data is recorded by YOU.

8 **OBJECTION TO TOPIC NO. 40:**

9       Defendants object to this topic on the ground that it is vague and ambiguous as

10 to what the underlying subject of testimony is because "patient data" and the means

11 of recording "patient data" can refer to vast quantities and categories of information

12 maintained by Defendants.  Defendants further object to this topic on the grounds

13 that it is unduly burdensome and grossly disproportionate to the needs of this action

14 in that Defendants maintain vast amounts of patient data in multiple different

15 categories, the vast majority of which bear no relation to a claim or defense in this

16 action.

17       Subject to their objections, Defendants will produce Marc Yarrison as their

18 designee to testify on the topic of what patient data is recorded by the Kiosks at the

19 Patient Service Centers.

20 **TOPIC NO. 41:**

21       How YOU define blindness, legal blindness and/or visual disability.

22 **OBJECTION TO TOPIC NO. 41:**

23       Defendants object to this topic on the ground that it falsely assumes that

24 Defendants "define" the terms referenced in this topic.

25 **TOPIC NO. 42:**

26       The information stated in YOUR 2018 SEC 10-Q filings.

27

28

47       Case No. 2:19-cv-08108 DMG (MRWx)

48145216_1.docx

**OBJECTION TO TOPIC NO. 42:**

Defendants object to this topic on the ground that it is vague and ambiguous in identifying which of the four 2018 10-Q filings is referenced, or what information in any of the filings is the subject of the testimony sought.  Defendants further object to this topic on the ground that it is an inappropriate subject for deposition testimony and other, far more appropriate methods exist for securing the information sought by this topic.   Defendants further object to this topic on the ground that it is unduly burdensome and grossly disproportionate to the needs of this action in that it seeks testimony on a vast quantity of information on dozens, if not hundreds, of topics.

**TOPIC NO. 43:**

The information stated in YOUR 2019 SEC 10-Q filings.

**OBJECTION TO TOPIC NO. 43:**

Defendants object to this topic on the ground that it is vague and ambiguous in identifying which of the four 2018 10-Q filings is referenced, or what information in any of the filings is the subject of the testimony sought.  Defendants further object to this topic on the ground that it is an inappropriate subject for deposition testimony and other, far more appropriate methods exist for securing the information sought by this topic.   Defendants further object to this topic on the ground that it is unduly burdensome and grossly disproportionate to the needs of this action in that it seeks testimony on a vast quantity of information on dozens, if not hundreds, of topics.

**TOPIC NO. 44:**

The number of full-time equivalent employees at each of YOUR PATIENT SERVICE CENTERS.

**OBJECTION TO TOPIC NO. 44:**

Defendants object to this topic on the ground that it is an inappropriate subject for deposition testimony and other, far more appropriate methods exist for securing the information sought by this topic.   In fact, Plaintiffs have agreed to permit

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6) DEPOSITION NOTICE

48145216_1.docx

PA0848

1  Defendants to produce the responsive information in the form of a sworn, written

2  statement.  Defendants further object to this topic on the ground that the phrase "full-

3  time equivalent employees" is subject to multiple interpretations.  Defendants further

4  object to this topic on the grounds that is unduly burdensome in that it seeks a

5  tremendous amount of information about more than 2,000 Patient Service Centers,

6  each of which is subject to daily variations in its employee count.  Defendants further

7  object to this topic on the ground that it is grossly disproportionate to the needs of

8  this case in that it seeks vast quantities of variable information from thousands of

9  sources that is not related to a claim or defense in the action.  Among other things,

10  the number of full-time employees at any given Patient Service Center does not

11  provide any information about the number of employees working at that Patient

12  Service Center at any given time.  Defendants further object to this topic on the

13  ground that it is duplicative of other discovery requests propounded by Plaintiffs in

14  the action.

15  Subject to their objections, and pursuant to an agreement of the parties to

16  provide the responsive information in the form of a sworn, written statement,

17  Defendants respond that they will provide a sworn, written statement identifying the

18  overall number of employees working at Patient Service Centers from 2017 through

19  2020.

20

21  **SUPPLEMENTAL RESPONSE TO TOPIC NO. 44:**

22  Subject to their above objections and those presented in their various meet and

23  confer emails and letters (including without limitation the May 5, 2021 letter) and

24  meet and confer discussions (including without limitation those on April 27, 2021

25  and May 12, 2021) and pursuant to an agreement of the parties, Defendants provide

26  the following supplemental response:

27  The information that Plaintiffs seek through this Topic cannot be readily

28

48145216_1.docx

1  determined from any centralized database at Quest. The available information

2  responsive to this Topic that is centrally maintained is found in: (1) the document

3  produced by Defendants as Bates No. 41938-42005, which reports, as of September

4  2019, the average number of Patient Services full-time equivalents ("FTE") that

5  were assigned within its financial system to each Patient Service Center; and (2) a

6  document to be produced by Defendants that provides an FTE working productivity

7  analysis for each Patient Service Center, as of September 2019.

8  **FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 44:**

9      On May 28, 2021, Defendants produced BATES NO. QUEST-VARGAS

10  000042006, which is the FTE working productivity analysis for each Patient Service

11  Center, as of September 2019, referenced above.

12  **SECOND FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 44**

13  **(August 16, 2021):**

14      Subject to their objections, and pursuant to an agreement of the parties,

15  Defendants respond that they have previously produced a document (QUEST-

16  VARGAS 42007) that identifies the number of Patient Service employees in the

17  United States who were employed by defendant Quest Diagnostics Incorporated

18  and/or its wholly-owned subsidiaries in 2019 and who held the job titles reflected in

19  the spreadsheet, as well as the work location to which they were coded at that time.

20  Employees who held more than one job title in a given reporting period are listed

21  separately for each job title held.

22      Although Plaintiffs have not requested information regarding independent

23  contractors working at Patient Service Centers, Defendants are also producing,

24  contemporaneously with these Objections, a document (QUEST-VARGAS 42029)

25  that identifies the number of independent contractors who were assigned in the years

26  2017-2020 to positions that typically would work at Patient Service Centers and the

27  work location to which they were coded at that time. Independent contractors who

28

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

PA0850

1  were assigned to work during multiple time periods are counted separately for each

2  time period worked.  Defendants are also producing a spreadsheet (QUEST-

3  VARGAS 42028) that identifies the job templates and descriptions for these

4  independent contractors.

5  **TOPIC NO. 45:**

6      The number of monthly patient encounters at YOUR PATIENT SERVICE

7  CENTERS in California during each year from 2017 through 2020.

8  **OBJECTION TO TOPIC NO. 45:**

9      Defendants object to this topic on the ground that it is an inappropriate subject

10  for deposition testimony and other, far more appropriate methods exist for securing

11  the information sought by this topic.   In fact, Plaintiffs have agreed to permit

12  Defendants to produce the responsive information in the form of a sworn, written

13  statement.  Defendants further object to this topic on the ground that the phrase

14  "patient encounters" is subject to multiple interpretations.  Defendants further object

15  to this topic on the grounds that is unduly burdensome and grossly disproportionate

16  to the needs of this case in that it seeks vast quantities of information, on a monthly

17  basis, that are not related to a claim or defense in the action.  Defendants further

18  object to this topic on the ground that it is duplicative of other discovery requests

19  propounded by Plaintiffs in the action.

20      Subject to their objections, and pursuant to an agreement of the parties,

21  Defendants respond that they will provide a sworn, written statement identifying the

22  number of check-ins at the Patient Service Centers in California from 2017 through

23  2020.

24  **SUPPLEMENTAL RESPONSE TO TOPIC NO. 45:**

25      Subject to their above objections and those presented in their various meet and

26  confer emails and letters (including without limitation the May 5, 2021 letter) and

27  meet and confer discussions (including without limitation those on April 27, 2021

28

51      Case No. 2:19-cv-08108 DMG (MRWx)

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

and May 12, 2021) and pursuant to an agreement of the parties, Defendants provide the following supplemental response:

The approximate number of check-ins recorded at the Patient Service Centers in California in each of the following years were:

- 2017:      4,366,111
- 2018:      7,515,365
- 2019:      8,584,783
- 2020:      8,027,696

**FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 45 (August 16, 2021):**

Subject to their objections, Defendants provide the following supplemental response.  The approximate number of walk-in and appointment patients for whom orders were entered and filed in each of the years 2017-2020 at Patient Service Centers in California, not including orders for specimens dropped off at Patient Service Centers in California, is as follows:

- 2017:      7,212,678
- 2018:      7,248,481
- 2019:      7,797,947
- 2020:      7,215,201

**TOPIC NO. 46:**

The number of monthly patient encounters at YOUR PATIENT SERVICE CENTERS in the United States during each year from 2017 through 2020.

**OBJECTION TO TOPIC NO. 46:**

Defendants object to this topic on the ground that it is an inappropriate subject for deposition testimony and other, far more appropriate methods exist for securing the information sought by this topic.   In fact, Plaintiffs have agreed to permit Defendants to produce the responsive information in the form of a sworn, written

52          Case No. 2:19-cv-08108 DMG (MRWx)

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6) DEPOSITION NOTICE

48145216_1.docx

1  statement.  Defendants further object to this topic on the ground that the phrase

2  "patient encounters" is subject to multiple interpretations.  Defendants further object

3  to this topic on the grounds that is unduly burdensome and grossly disproportionate

4  to the needs of this case in that it seeks vast quantities of information, on a monthly

5  basis, that are not related to a claim or defense in the action.  Defendants further

6  object to this topic on the ground that it is duplicative of other discovery requests

7  propounded by Plaintiffs in the action.

8          Subject to their objections, and pursuant to an agreement of the parties,

9  Defendants respond that they will provide a sworn, written statement identifying the

10  number of check-ins at the Patient Service Centers in the United States from 2017

11  through 2020.

12  **SUPPLEMENTAL RESPONSE TO TOPIC NO. 46:**

13          Subject to their above objections and those presented in their various meet and

14  confer emails and letters (including without limitation the May 5, 2021 letter) and

15  meet and confer discussions (including without limitation those on April 27, 2021

16  and May 12, 2021) and pursuant to an agreement of the parties, Defendants provide

17  the following supplemental response:

18          The approximate number of check-ins recorded at the Patient Service Centers

19  in the United States in each of the following years were:

20       • 2017:        15,924,343

21       • 2018:        32,696,929

22       • 2019:        38,046,872

23       • 2020:        35,404,092

24  **FURTHER SUPPLEMENTAL RESPONSE TO TOPIC NO. 46 (August 16,**

25  **2021):**

26          Subject to their objections, Defendants provide the following supplemental

27  response.  The approximate number of walk-in and appointment patients for whom

28

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

PA0853

1   orders were entered and filed in each of the years 2017-2020 at Patient Service

2   Centers in the United States, not including orders for specimens dropped off at

3   Patient Service Centers in the United States, is as follows:

4       •2017:      32,274,118

5       •2018:      32,200,027

6       •2019:      34,610,742

7       •2020:      32,007,219

8   DATED:  August 16, 2021        OGLETREE, DEAKINS, NASH, SMOAK &
9                                      STEWART, P.C.

10

11                       By:  /s/ David Raizman
12                           David Raizman
                        Amber L. Roller
13                           J. Nicholas Marfori

14                       Attorneys for Defendants
                    QUEST DIAGNOSTICS CLINICAL
15                       LABORATORIES, INC.; QUEST
                    DIAGNOSTICS HOLDINGS, INC. and
16                       QUEST DIAGNOSTICS INCORPORATED

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER
SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6)
DEPOSITION NOTICE

48145216_1.docx

PA0854

## VERIFICATION

I have read the foregoing **DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6) DEPOSITION NOTICE** and know its contents.

☐   I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters that are stated on information and belief, and to those matters I believe them to be true.

☒   I am ☐ an officer ☐ a partner ☒ Director, National Patient Services, Technology, and Support for Quest Diagnostics Incorporated ("Quest"), a defendant to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.

    ☒   I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

    ☐   The matters stated in the foregoing document are true of my own knowledge except as to those matters that are stated on information and belief, and as to those matters I believe them to be true.

☐   I am one of the attorneys for _____ a party to this action. Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on August ___, 2021, at _____, _____.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____          _____

Type or Print Name                                        Signature

1     Case No. 2:19-cv-08108 DMG (MRWx)

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER SUPPLEMENTAL RESPONSES TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6) DEPOSITION NOTICE

48145216_1.docx

PA0855

**CERTIFICATE OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California; I am over the age of 18 years and not a party to this action.  My business address is 400 South Hope Street, Suite 1200, Los Angeles, California 90071.

On August 16, 2021, I served the following document(s) described as:

DEFENDANT QUEST DIAGNOSTICS, INCORPORATED'S OBJECTIONS AND SECOND FURTHER SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF JULIAN VARGAS'S AMENDED RULE 30(b)(6) DEPOSITION NOTICE

on the persons below as follows:

| | |
|---|---|
| Jonathan D. Miller, Esq.<br>Alison M. Bernal, Esq.<br>Jordan T. Porter, Esq.<br>NYE, STIRLING, HALE & MILLER, LLP<br>33 West Mission Street, Suite 201<br>Santa Barbara, CA  93101<br>Telephone:   (805) 963-2345<br>Facsimile:   (805) 284-9590<br>Email:   jonathan@nshmlaw.com<br>       alison@nshmlaw.com<br>       jordan@nshmlaw.com<br>       lindsey@nshmlaw.com<br>       meg@nshmlaw.com | Attorneys for Plaintiffs<br>Julian Vargas, Anne West,<br>American Council of the Blind,<br>and the Proposed Class |
| Matthew K. Handley, Esq.<br>HANDLEY FARAH & ANDERSON PLLC<br>200 Massachusetts Avenue, NW – 7th Fl.<br>Washington, DC  20001<br>Telephone:   (202) 559-2411<br>Facsimile:   (844) 300-1952<br>Email:   mhandley@hfajustice.com | Attorneys for Plaintiffs<br>Julian Vargas, Anne West,<br>American Council of the Blind,<br>and the Proposed Class |
| Benjamin J. Sweet, Esq.<br>Nye Stirling Hale & Miller, LLP<br>1145 Bower Hill Road, Suite 104<br>Pittsburgh, PA  15243<br>Telephone:   (412) 857-5350<br>Email:   ben@nshmlaw.com | Attorneys for Plaintiffs<br>Julian Vargas, Anne West,<br>American Council of the Blind,<br>and the Proposed Class |

I enclosed the documents in sealed envelopes or package addressed to the persons at the addresses as indicated above and placed the envelope or package for collection and mailing, following our ordinary business practices.  I am readily familiar with this business's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope or package with postage fully prepaid.

1

Case No. 2:19-cv-08108 DMG (MRWx)

CERTIFICATE OF SERVICE

PA0856

☒     (Federal)     I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on August 16, 2021, at Los Angeles, California.

Marilyn Moretti
_____               _____
Type or Print Name                                                   Signature

48145216.1

2     Case No. 2:19-cv-08108 DMG (MRWx)
CERTIFICATE OF SERVICE

PA0857

# EXHIBIT 31

DocuSign Envelope ID: F6D1B52C-5887-4956-A838-6FC6D8B550A7

1   Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com
2   Alison M. Bernal (SBN 264629)
alison@nshmlaw.com
3   NYE, STIRLING, HALE
& MILLER, LLP
4   33 West Mission Street, Suite 201
Santa Barbara, CA 93101
5   Telephone: (805) 963-2345
Facsimile: (805) 284-9590
6
7   *Attorneys for Plaintiffs Julian Vargas,*
*American Council of the Blind, and the*
*Proposed Class*
8

Benjamin J. Sweet
(Admitted *Pro Hac Vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

9   **UNITED STATES DISTRICT COURT**

10   **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

11

12   JULIAN VARGAS, ANNE WEST, and
AMERICAN COUNCIL OF THE
13   BLIND, individually on behalf of
themselves and all others similarly
14   situated,

15           Plaintiffs,

16       v.

17   QUEST DIAGNOSTICS CLINICAL
LABORATORIES, INC., QUEST
18   DIAGNOSTICS HOLDINGS, INC.,
QUEST DIAGNOSTICS
19   INCORPORATED; and DOES 1-10,
inclusive,

20           Defendants.

CASE NO.: 2:19-cv-8108

**DECLARATION OF MARK
DERRY IN SUPPORT OF
PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION**

Complaint Filed: September 18, 2019
Pretrial Conf: December 7, 2021
Trial Date: January 11, 2022
District Judge: Hon. Dolly M. Gee
Magistrate: Hon. Michael M. Wilner

21

22           **DECLARATION OF MARK DERRY**

23       I, Mark Derry, hereby declare:

24       1.    I am an Americans with Disabilities Act ("ADA") investigator and

25   President of Eastlake, Derry & Associates, LLC, ADA Accessibility Solutions. I have

26   extensive experience in accessibility, universal design, and ADA consulting and

27   training. The following facts are within my personal knowledge and, if called as a

28

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1

DECLARATION OF MARK DERRY

DocuSign Envelope ID: F6D1B52C-5887-4956-A838-6FC6D8B550A7

witness, I could and would competently testify to these facts. I make this declaration in support of Plaintiff's Motion for Class Certification.

2.      Attached hereto as **Exhibit A** is a true and correct copy of my curriculum vitae which outlines my experience in investigating and opining on the accessibility of public accommodations.

3.      Plaintiffs' counsel retained me to investigate whether Defendant Quest's eCheck-in kiosks at certain Patient Service Center ("PSC") locations were accessible to blind individuals.

4.      Following my retention, I investigated 24 Quest PSC locations between June 12, 2021, and August 18, 2021.

5.      I personally visited each of the 24 Quest PSC locations detailed in my report.

6.      While at each PSC, I assessed the accessibility of the eCheck-in kiosk. I also took photographs at each location.

7.      I put the results of my investigation into a report, dated August 23, 2021. This report is based on my personal observations during my investigation and my experience in the field of ADA accessibility. A true and correct copy of my report is attached as **Exhibit B.**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 4th day of September, 2021, in Morgantown, West Virginia.

_____

Mark Derry, Declarant

DECLARATION OF MARK DERRY

PA0859

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA  93101

# EXHIBIT A

PA0860

**Mark E. Derry**                    <u>**Curriculum Vitae**</u>                    **737 Powell Ave.**
**(304)685-3510**                                                            **Morgantown, WV 26505**

<u>**PROFILE:**</u>
<      Extensive architectural and communication accessibility design and barrier removal experience
<      Expert in laws relevant to civil rights as well as building codes and standards for accessibility
<      Nationally-known Trainer, with the ability to effectively develop and deliver positive learning outcomes
<      Strong commitment to the Americans with Disabilities Act (ADA), and Independent Living Philosophy

<u>**EXPERIENCE OUTLINE:**</u>
**Eastlake, Derry & Associates, LLC**
737 Powell Avenue, Morgantown, WV 26505
*President,* 6/99 to present
     **Mr. Derry currently provides accessibility & ADA consulting and training services, including accessibility surveys and survey training for State and Local Governments, Public Accommodations, Fair Housing entities, Corporations, and Advocates.  He has provided accessibility surveys as well as plan review services for various architectural firms, and surveyed almost every type of facility since 1999, with his specialties having included Universities, Medical Care Facilities, and Public Accommodations with multiple locations.** In 2001, Mark assessed the Johns Hopkins University Campus, in Baltimore, MD, with more than 60 buildings at 2.6 million square feet over 128 campus acres. In 2004, he completed an accessibility survey of Loyola College of Maryland, and in 2018 Morgan State University in Baltimore, and has provided access survey consulting with Lock Haven University and Kutztown University in PA.  From 2002 thru 2005, Mark provided site surveys and settlement consultations for Access Now v. Triad Hospitals, Inc with over 50 hospital campus facilities in the mid- and southwest, and the following year provided consulting for case settlement with the Department of Justice regarding multiple locations of Valley Radiology imaging centers. From 2007-2015 Mr. Derry worked with Community Health Systems Professional Services Corporation on an accessibility survey and remediation program for over 260 medical care facilities throughout the U.S., as well as due diligence surveys of prospective facility acquisitions, and new construction plan review.  Other satisfied proactive accessibility program development clients have included RadioShack Corporation, Zamias Property Management Services, the American Psychological Association, City of Bowie, MD, the WV Attorney General's Office, Wood County Airport, among many others.
**Mr. Derry Provides presentations on the ADA Titles II & III, the ADA Accessibility Standards and updates, Fair Housing / 504 accessibility, and Accessibility Survey Training.**  Since 2015, Mr. Derry has developed and presented a new training project with the National Council on Independent Living (NCIL), called the ADA Accessibility Survey Academy Project (ADA ASAP) to provide accessibility survey training nationally for staff at Centers for Independent Living.  Other past training customers include the ADA National Network, the U.S. Department of Defense, Tennessee DOT, New Mexico DOT, Cornell University, The Kennedy Center for the Performing Arts, AIA West Virginia, AIA Oklahoma, Oklahoma State University, Arkansas State University, the National Center on Accessibility, Penn State University, Department of Defense, Triad Hospitals, and many (over 100) Centers for Independent Living nationally.
     **Mr. Derry is a past Vice President of NCIL.  He has represented NCIL on the Public Rights of Way Access Advisory Committee for the U.S. Access Board, and more recently on the Medical & Diagnostic Equipment Advisory Committee.  He served as a member of the NCIL Board of Directors from 2000 thru 2016.  As Co-Chair of the NCIL ADA/Civil Rights Subcommittee, he provided written and oral testimony regarding rulemaking on accessibility standards, and several settlement/consent agreements to the U.S. Department of Justice, the U.S. Access Board and in the Congressional Record.   Mark is a past Chair of the West Virginia Statewide Independent Living Council (SILC), Past Chair of the West Virginia ADA Coalition, and 2015 Inductee to the WV Independent Living Hall of Fame.**

1

PA0861

**National ADA Network**
**ADA Center for the Mid-Atlantic Region (Federal Region 3)**
451 Hungerford Drive, Rockville, MD  20850-4151
*Technical Assistance Specialist,* 8/97 to 10/99 (1999 to 2010 contract **Trainer**)

Provided technical assistance to callers on the national ADA Hotline, and helped develop a tracking system for handling calls. Developed new curriculum directed at architects and building officials and wrote articles for Center Newsletter "ADA in Focus", and articles for training ads and CIL newsletters.

Continued as a contract Trainer, providing presentations on behalf of the ADA Center within Region III, including a multi-level ADA Standards training utilizing survey techniques to teach the principles of accessibility and Universal Design.

**Action Toward Independence, Inc.**
2927 Route 6, Slate Hill, NY 10973
*Program Manager / Architectural Barrier Consultant / ADA Coordinator,*  3/94 to 7/97

Responsible for initial setup of full-time Satellite Office, and for the management of Center operations, training and supervision of five full time staff and three volunteers.  Developed architectural consulting services including: commercial site surveys, home evaluations to determine consumers' needs, project planning, and contract administration.  Set up and organized a Resource Library for ADA and Assistive Technology at the Center.  Developed and hosted monthly NPR radio call-in talk show called "Making Waves" to promote awareness and provide information on ADA and other issues effecting people with disabilities.

**Ma-Mar Construction, Inc.,** Sparrowbush, NY
*Owner,* 1983 to 1993

Owned and operated construction business specializing in residential home improvements and remodeling. Designed and built custom kitchens, bathrooms, and other projects utilizing up to three construction crews while managing marketing, sales, and bookkeeping operations.

**Wright-Way, Inc.,** Garland, TX
*Accessible Van Designer/Builder,* 1981-1983

Specialized in the design and construction of accessible van conversions.  Installed wheelchair lifts, power doors, power seat systems, hand controls, raised roofs, and complete interiors to enable people with disabilities to drive.

**MILITARY SERVICE:** *United States Air Force,* Honorably Discharged

**EDUCATION and TRAINING:**
U.S. Air Force, Denver, CO, **Technical Procurement,**  *1976*
U.S. Air Force, Whiteman AFB, MO, **Contract Administration**  *1977*
Bergen Community College, Paramus, NJ **Construction Estimating**  *1986*
Action Toward Independence, Slate Hill, NY **ADA/ADAAG Training** (DREDF) *1994*
NCIL ADA-ILC National Training Project,  **Advanced ADA Training** (M.Golden)  *1996*
ADA-Ohio Training Project, **EEOC/ADA Title I Advanced Training** (R.Jones)  *1997*
Department of Justice, **ADA Title II & III Advanced Training**  *1998*
NCIL/DOJ/DOT, **ADA & Transportation Training**  *1998*
BOCA International**, Accessibility Codes Training**  *1998*
Access Board (USATBCB), **Accessibility Guidelines Advanced Training** *1999*
National Center on Accessibility (NCA), **Recreation Guidelines Training** *2000*

PA0862

**DETAILED EXPERIENCE:**
(Since founding Eastlake, Derry & Associates in 1999)

**2018**
Tabit v. Kroger Stores – ADA Survey (limited) and Deposition for injury case
Advanced Survey Level 3 Training – Wisconsin
American Psychological Association (APA) Convention Sites – Chicago, IL
Carlson Lynch Sweet Kilpela & Carpenter, LLP Pittsburgh – ADA Public Rights of Way Survey Training
Moe's Mini Warehousing, Parkersburg, WV – ADA Survey and Report
Toyota Motor Company, Buffalo, WV Plant – ADA Survey and Report
2018 National ADA Symposium, Pittsburgh, PA – Attendee
Buchanan Ingersoll Rooney, PC - ALDI Stores ADA Surveys and Reports
Maryland Commission on Civil Rights, Baltimore, MD – Access to ADA Surveys Level 1

**2017**
University of Arkansas – ADA Survey Training Level 1 & 2
Morgan State University (MSU) Campus Survey – 50 Campus Building & Associated Walkways
NCIL ASAP Training – Camp Hill, PA
American Psychological Association (APA) Convention Sites – San Francisco
NCIL ASAP Training – LaCrosse, Wisconsin
University of Arkansas – ADA Survey Training Level 1 & 2
WVnet Offices, Morgantown, WV – ADA Survey and Report

**2016**
United Refining Company (374 Kwik Fill Gas Stations and Conv. Stores surveyed for settlement)
Clear Mountain Banks (10 Branches surveyed)
American Psychological Association (APA) Convention Sites – Washington, DC
NCIL ASAP Training – Nitro, West Virginia
Pennsylvania Parks and Forests Survey Training
ACIL, Charleston, WV – Advanced Level 3 ADA Survey Training
Stage AE, Pittsburgh, PA – ADA Consultation and Report for settlement
NCIL ASAP Training – ILRCSF San Francisco
Independence First, Milwaukee, WI (1-on-1 Survey Training with interpreter)
Monmouth County, NJ – (Subcon of UD&C) ADA Accessibility Training

**2015**
CHS Hospitals (Final 4)
Fairfax County, VA: Survey Training(s) for USDOJ settlement remediation surveys
American Psychological Association (APA) Convention Sites – Washington, DC
Pittsburgh Penguins Lemieux Sports Complex – New construction ADA Plan Review
ADA Anniversary Celebration at the White House and Kennedy Center for the Performing Arts
ADA Legacy Bus Tour (May 4-8)
West Virginia Disability Caucus
IRWW Final Session at Penn State
NCIL ASAP Survey Training Project Beta Tested – Eastern Shore CIL

3

**2014**
CHS Hospitals (Multiple Campus)
Carlson Lynch Sweet Kilpela & Carpenter, LLP - Investigator Survey Training
Red Cross – developed NCIL/Red Cross MOU for accessibility surveys at emergency shelters
American Psychological Association (APA) Convention Sites – Toronto
Lehigh Valley, PA CIL Survey Trainings (Level 1 & Level 2)
MD Human Rights Commission – Access to ADA Survey Training Level 1
PA Recreation and Park Society - ADA Accessibility Training
Inclusive Recreation for Wounded Warriors (IRWW) – Penn State/DOD project (typically 4 times per year)

**2013**
CHS Hospitals (Typically one campus per month)
American Psychological Association (APA) Convention Sites – Honolulu, HI
Freedom Valley CIL – ADA Standards Training
Amtrak Survey Training (Subcon of UD&C) – Philadelphia, PA
Produced Minority Report for MDEAAC at U.S. Access Board
Fairfax County, VA – Access to ADA Level 2 Survey Training
Mountain State CIL, Huntington, WV – Access to ADA Level 1Survey Training
Anthracite Region CIL, PA Training – ADA Accessibility Standards Training
CLINCH CIL VA Training – ADA Accessibility Standards
Hampton Inn Charleston, WV – ADA Facility Survey & Report
Progressive Independence, Norman, OK – Access to ADA Surveys Training Level 2
Inclusive Recreation for Wounded Warriors (IRWW) – Penn State/DOD project (typically 4 times per year)

**2012**
CHS Hospitals (Typically one campus per month)
Johns Hopkins Medical Research Campus (Subcon of UD&C) Survey of Wolfe Building
Mainstream Inc., Littlerock, AR - Access to ADA Surveys Level 1 & 2
Fairfax County, VA Level 1 Survey Training
American Psychological Association (APA) Convention Sites – Washington, DC
City of Morgantown, WV – ADA Title II Survey Training Level 1
Progressive Independence, Norman, OK – Access to ADA Surveys Level 1
Virginia Statewide IL Conference – Keynote Speaker
Inclusive Recreation for Wounded Warriors (IRWW) – Penn State/DOD project (typically 4 times per year)

**2011**
CHS Hospitals (Typically one campus per month)
City of Tulsa, OK – AIA and Code Officials – Accessibility Surveys Level 1
Amtrak Stations – Phoenix, Tucson, and Flagstaff – ADA Surveys and Reports (Subcon of UD&C)
American Psychological Association (APA) Convention Sites – Orlando, FL
Amtrak 30th Street Station, Philadelphia, PA – Facility Survey (Subcon of UD&C)
Mainstream Inc., Littlerock, AR - Access to ADA Surveys Level 1 & 2
Kansas Association of CILs – Keynote Address
Amtrak Union Station, Chicago, IL - ADA Survey (Subcon of UD&C)
CHS Hospitals – Matsu Valley Regional Hospital, Palmer, AK
Johns Hopkins Medical Research Campus – (Subcon of UD&C) Multiple Buildings Surveys
Amtrak ASAS Training II – Jacobs Engineering Survey Training (Subcon of UD&C)
Inclusive Recreation for Wounded Warriors (IRWW) – Penn State/DOD project (typically 4 times per year)

**2010**
CHS Hospitals (Typically one campus per month)
UPMC Hospital Plan Reviews (final 10/10 Subcon of ADA Inc.)
Dollar Bank Plan Reviews (multiple as Subcon of ADA Inc.)
Amtrak ASAS Training I – Jacobs Engineering Survey Training (Subcon of UD&C)
Sterling Jewelers Store Surveys - 21 Stores (Subcon of UD&C)
Mid-Atlantic ADA Center - Access to ADAAG Level 2 Training – York, PA
American Psychological Association (APA) Convention Sites


**2009**
CHS Hospitals (Typically one campus per month)
Mainstream Inc., Littlerock, AR - Access to ADA Surveys Level 1 & 2
Inclusive Recreation for Wounded Warriors (IRWW) – Penn State/DOD project (typically 4 times per year)
Lehigh Valley, PA CIL – Music-fest Survey Training
Life and Independence for Today (LIFT) CIL  - Access to ADAAG Survey Training Level 2
Days Inn Arlington, VA – Survey and Report for settlement
Blue Ridge CIL, VA – Access to ADAAG Level 1
American Psychological Association (APA) Convention Sites – Washington, DC
Mid-Atlantic ADA Center - Access to ADAAG Level 1 - Newark, DE
UPMC Hospital Plan Reviews (Subcon of ADA Inc.)
Quik Trip Corp Tech. Assistance – 1-year consulting project re: U.S. DOJ settlement remediation (500 stores)


**2008**
CHS Hospitals (Typically one campus per month)
Inclusive Recreation for Wounded Warriors (IRWW) – Penn State/DOD project (typically 4 times per year)
SWDBTAC Webcast: Accessibility in Medical Care Facilities
Kansas Association of CILs – Keynote Speaker
Liberty Resources, Philadelphia, PA – Access to ADAAG Level 1 & 2
UPMC Hospital Plan Reviews (Subcon of ADA Inc.)
American Psychological Association (APA) Convention Sites – Toronto
Quik Trip Corp Tulsa, OK – Corporate Training – ADA Surveying at Quik Trip Stores
Pipestem and Canaan Valley Resorts, WV – Title II Park Surveys and Reports
Burger King (200 California Stores) Surveys and Reports (Subcon of UD&C)
American Psychological Association (APA) Convention Sites
Loch Haven University, PA – Site Walkthroughs and Reports / limited surveys
Altoona, PA CIL – Access to ADAAG Level 1 Training
DE Department of Transportation – Accessible Public Rights of Way Survey Presentation
Access to ADA Surveys Level 3 Training – ED&A Offices, Morgantown, WV
ADA Amendments Act Negotiation Meetings representing NCIL (several leading up to the 2008 passage)

5

PA0865

**2007**
CHS Hospitals – Initial meetings to begin ADA Program
Mid-Atlantic ADA Center - Access to ADAAG Level 2 Alexandria, VA
Inclusive Recreation for Wounded Warriors (IRWW) – Penn State/DOD project initial trial training
Ability Resources, Tulsa, OK – Access to ADAAG Level 1
CVS Stores (15) Sandusky and Cleveland, OH – (Subcon of UD&C) Surveys and Reports for settlement
CIL of Central PA – Access to ADAAG Level 1 Training
Federated Stores (Macy's) in MD, VA, and DC – (Subcon of UD&C) Surveys & Reports for settlement
American Psychological Association (APA) Convention Sites
Bohler Engineering, MD – Accessible Public Rights of Way Training
West Virginia Fire Marshall's Office – Access to ADA Surveys Training
Glenarden, MD Title II Consultations re: City Hall
Freedom Center CIL, Frederick, MD – Access to ADAAG Level 2 Training
Williamsport, PA CIL – Access to ADAAG Level 2 Training
Asian American Hotel Owners Association – ADA Consulting re existing properties
AIA West Virginia – Access to ADAAG Update Session / Panel
Barter Theatre, Abingdon, VA – ADA Survey, Consultation and Deposition for ADA case
Kutztown University, PA – ADA Survey and consultation for facility remediation / settlement
Radio Shack Corporate Offices, Fort Worth Texas – ADA Consultation and Design

**2006**
Gould Turner Group - Plan Review – Oro Valley Hospital, Nevada
Life and Independence for Today (LIFT) CIL  - Access to ADAAG Survey Training Level 1
Tri-County Patriots for Independent Living – Access to ADAAG Level 2
City of Charlotte, NC – Title II ADA Accessibility Training
Kanawha County Libraries, West Virginia – Survey and Report for U.S.DOJ settlement
VA IL State Conference – Keynote Speaker
Jonesboro, AR – Access to ADA Title II Accessibility Surveys Level 1
Mainstream Inc., Little Rock, AR - Access to ADA Surveys Level 2
NEPACIL, Scranton, PA – Retreat Keynote Speaker
American Psychological Association (APA) Convention Sites
Lifepoint Hospitals, Logan, WV – ADA Consultation and report
Harbor's Edge Assisted Living Center, Norfolk, VA – Accessibility Survey and Report
Great Lakes Region ADA Center Webinar: Signage for Permanent Rooms and Spaces
Radio Shack Washington, DC Stores – ADA Surveys for settlement
CIL of North Central PA – Access to ADAAG Level 1 Survey Training
GAP Store, Laurel Park Mall, IL – ADA Survey and Report for remediation of barriers
Freedom CIL, Frederick, MD – Access to ADAAG Level 1
Mid-Atlantic ADA Center - Access to ADAAG Level 1 – Morgantown, WV
Radio Shack Corporate, Fort Worth, TX – Tech Assist., consultation re counters & displays
American Health Lawyers Association (AHLA) – Luncheon Presentation
AHLA Webinar: Update on ADA and Healthcare Facilities (co-presented with Minh Vu and John Wodatch)
Triad Hospitals – Final Settlement Meetings
Radio Shack Corporate, Fort Worth, TX – Store Model Reviews for Merchandising Floorplans
Radio Shack Corporate, Fort Worth, TX – ADA Program video and handouts review and comments
Radiologix, Inc. – Survey and Reports for four imaging facilities in San Jose, CA for settlement
Triad Hospitals – Stipulation Review and comments for settlement
West Virginia Code Officials Association – ADA Update Training

## 2005

Triad Hospitals (Typically one or two campus per month)
Radio Shack - ADA Plan Reviews – Model Store Floorplans
Tennessee DOT – Access to ADAAG Survey Training Level 1 & 2
Advanced Radiology, Baltimore, MD – ADA Surveys and reports for settlement
APRIL Conference, Honolulu, HI - Attendee
Radio Shack – Tech Assist. on Nextel and Verizon Displays
City of Morgantown – ADA Title II Training
American Psychological Association (APA) Convention Sites
Access to ADAAG Level 1 & 2 – ED&A Offices, Morgantown, WV
15th Annual ADA Celebration, Charleston, WV – Keynote Speaker
Triad Hospitals – Testimony at Fairness Hearing for Settlement
WVU Hospitals – ADA Facilities Seminar
AIA West Virginia – Access to ADAAG Update Session / Panel
Mainstream Inc., Little Rock, AR - Access to ADA Surveys Level 1 & 2

## 2004

Triad Hospitals (Typically one or two campus per month)
Safeway Grocery Stores (300 stores in CA, MD, VA, PA, and NJ (Subcon of UD&C) ADA Surveys
Walmart Wyomissing, PA Store - ADA Survey for settlement
Ingersoll-Rand Corporation – ADA Consulting re: proposed Disability Awareness Campaign
Mid-Atlantic ADA Center - Access to ADAAG Level 1 - Bowie, MD
Kennedy Center for the Performing Arts LEAD Conference – ADA Surveys Basics
City of Jonesboro, AR – Access to ADAAG Title II Survey Training
American Psychological Association (APA) Convention Sites
Loyola University of Maryland – ADA Campus Survey (20 buildings) and Report / Tech Asst.
Gould Turner Group, Nashville, TN – ADA Plan Review – hospitals
Mid-Atlantic ADA Center - Access to ADAAG Level 2 - Bowie, MD

## 2003

Triad Hospitals (Typically one or two campus per month)
"Good Access is Good Business" – T24 CALDAG Training, Sacramento, CA
University of Arkansas – ADA Title II Training
City of Wheeling, WV – ADA Title II Training
AIA West Virginia – Access to ADAAG Update Session / Panel
Gould Turner Group, Nashville, TN – ADA Plan Review – hospitals
Fairmont State College, Fairmont, WV – ADA Surveys (limited) and consultation on remediation
National Council on Independent Living (NCIL) ADA Survey Training – Oklahoma City, OK
ADA Anniversary Gala, Washington, DC – Guest
Lifepoint Hospitals, Logan, WV – ADA Due-diligence Walkthrough
WV ADA Coalition – Access to ADAAG Level 1 – Flatwoods, WV
Mid-Atlantic ADA Center - Access to ADAAG Basic - Bowie, MD
National Center on Accessibility (NCA) – Staff Training – ADA Accessibility Surveys
Montgomery County, NJ – (Subcon of UD&C) ADA Title II Accessibility Training
American Psychological Association (APA) Convention Sites
CJ Maggie's Restaurants – ADA Survey and Report - Morgantown, WV Store
ADA Compliance Services Company, Park Ridge, NJ – Staff Accessibility Survey Training
Triad Hospitals – ADA Settlement Negotiations Meetings, Miami, FL

7

**2002**
Triad Hospitals (Typically one or two campus per month)
Jacksonville CIL, Jacksonville, FL – Access to ADAAG Survey Training
Williamsport, PA CIL – Access to ADAAG Level 1 Training
York CIL, York, PA – Access to ADAAG and ANSI Training
Life and Independence for Today (LIFT) CIL  - Access to ADAAG and ANSI Training
Mainstream Inc., Little Rock, AR - Access to ADA Surveys
Mid-Atlantic ADA Center - Access to ADAAG Level 2 - Bowie, MD
WV Bed & Breakfast Owners Association – ADA Presentation, Lakeview C.C.
The Westin Diplomat Resort Hotel, Hollywood, FL – ADA Site Survey
Justin Dart Memorial / ADA Gala – Guest
American Psychological Association (APA) Convention Sites
Tampa CIL, Tampa FL – Access to ADAAG Survey Training
Ability Resources, Tulsa, OK – Access to ADAAG Survey Training
Penn State University and the PA ADA Coalition – Access to ADAAG Survey Training
Bastian & Harris, AIA Charleston, WV – ADA Consultation and Plan Review re: Marshall University

**2001**
Mid-Atlantic ADA Center - Access to ADAAG Level 1 - Bowie, MD
Triad Hospitals – Initial ADA Remediation Project Presentation – Dallas, TX
Lehigh Valley CIL – Mid-Atlantic ADA Center Resource Library Training
WV Commission on the Arts, Accessibility Advisory Committee – ADA Access Presentation
PA ADA Coalition Retreat – ADA Surveys for Advocacy
Manassis CIL, VA – Access to ADAAG Level 1 Training
Lehigh Valley CIL, PA - Access to ADAAG Level 1 Training
Bovis Lend/Lease Corp., Nashville, TN – Access to ADA Basic Training
American Psychological Association (APA) Convention Sites
Johns Hopkins University, Homewood Campus – ADA Survey and Report – 56 Buildings/128 acres
U.S. Access Board PROWAAC Meeting, Atlanta, GA – Member representing NCIL
Triad Hospitals – River Region Medical Center – 1st ADA Survey and Report of 50-hospital case
Mainstream Inc., Little Rock, AR - Access to ADA Surveys
Mid-Atlantic ADA Center - Access to ADAAG Level 1 – Charleston, WV
Kansas Association of CILs – Access to ADAAG Survey Training Level 1
Kansas City CIL - Access to ADAAG Survey Training Level 1
CJ Maggie's Restaurants, Buchannon and Elkins, WV – ADA Surveys and Reports
Hawaii ADA Coalition, Honolulu, Hawaii – Access to ADAAG Survey Training Level 1
Westin Diplomat Resort Hotel, Hollywood, FL – New Construction Project 2nd Plan Reviews
AIA West Virginia – Access to ADAAG Update Session / Panel

**2000**
Westin Diplomat Resort Hotel, Hollywood, FL – New Construction Project 1st Plan Reviews
Stewart v. Kanawha County Mediation – ADA consultation regarding curb ramp remediation
Naval Surface Warfare Center, MD – Accessibility Training – Accessible Facilities for Employees
Herald Dispatch Newspaper, Huntington, WV – ADA Consultation and design for Main Entrance
U.S. Access Board PROWAAC Meeting DC – Member representing NCIL
New Mexico State Department of Highways and Transportation – ADA Survey Program Trainings (2)
Federated Department Stores, Atlanta, GA – (Subcon of UD&C) ADA Surveys of 18 Stores
WV Supreme Court – ADA Title II Facilities Training

**2000 (continued)**
U.S. Access Board PROWAAC Meeting San Francisco – Member representing NCIL
City of Bowie, MD – ADA Consultations for DOJ Project Civic Access Settlement
Wood County Airport, Wood County, WV – ADA Survey and Report
Mainstream Inc., Little Rock, AR - Access to ADA Surveys
U.S. Access Board PROWAAC Meeting DC – Member representing NCIL
WV Interior Designers Conference – ADA Accessibility Presentation
Hertz Rental Car Corporate Office, Park Ridge, NJ – "Good Access is Good Business" presentation
DMW Landscape Architects, Towson, MD – ADA Access in the Public Rights-of-Way
PCCD Conference, Harrisburg, PA – Keynote Speaker/Facilitator
Bristol CIL, Bristol, VA – Access to ADAAG Basic Training
American Psychological Association (APA) Convention Sites
SWDBTAC – Access to ADAAG Survey Training, Biloxi, MS
Burns & McDonnell, AIA, Kansas City, KS – ADA Accessibility Surveys for Hertz Rental Car Properties
NCIL National Teleconference – "Providing ADA Surveys at Your Centers"

**1999**
Zamias Properties – ADA Surveys of 15 Shopping Malls
All Federal Region 3 CILs - Mid-Atlantic ADA Center Resource Library Training onsite
American Psychological Association (APA) – ADA Surveys (limited) of Convention Sites

9

PA0869

# EXHIBIT B

PA0870



**737 Powell Avenue, Morgantown, WV  26505**

■ **304-685-3510**

**www.adaderry.net** ■ **adamarkd@gmail.com**

August 23,2021

**Outline of Issues for Mark Derry to Investigate:**

1) When you walk into Quest, does the location have a bell or device to announce your presence? **No, very few locations had an entrance bell or device to announce your presence.**

2) When you walk into Quest, is there a patient service representative available in the waiting room to assist patients with check in? **No. There may sometimes be a window, but the window was never staffed. You have to catch a staff member when they pop their head out the treatment area door to call the next person in the cue, as they rarely ask if anyone needs assistance.**

3) When you walk into Quest, how are individuals directed to the e-Check In Kiosk?

Is there signage? **Yes. Usually printed, sometimes handwritten on paper.**
How are blind patients directed? **They are not directed until/unless the message plays on the LCD Monitor. Then they would have to find the kiosk. Not all kiosks were set up for the three finger swipe. Many times it would be just one out of three kiosks would accept the three finger swipe, at some other locations none would take the swipe.**
Is there an audio message that plays on the LCD monitor? **Sometimes. Softly.** If so, how frequently does the message play? **Inconsistently at 15 to 20 minutes at some locations**. Is it audible? **Yes, if you are near the monitor.** What does the message say? **To proceed to a kiosk and do a three finger swipe, and you will be placed in the que to be called by staff. If you need assistance you should ask a staff member…(but they only appear in the doorway to call the next person by name, and then they are gone. They never asked if anyone needed additional assistance, with very few exceptions.)**

4) Wait time – how long does one have to wait to hear the audio message instructing someone to check in? **15 to 20 minutes if it is playing at all.**

5) When attempting to utilize the three finger swipe, are you able to access independently any of the other features on the Kiosk? **No.** Edit personal information? **No.** Wait by text option? **No.**

PA0871

6) Does the Kiosk have a help button? **Yes, but only to sighted individuals using the touch screen.** Is that button available only on the touch screen or in an area independent of the touch screen? **Only on the touch screen when you can see and you tap it. It is <u>not made available</u> <u>at all</u> on the three finger swipe screens.**

7) Once you three finger swipe, is there a confirming audio message that instructs you that you are checked in? **Sometimes.** Does that audio message tell you an estimated wait time? **If it comes on, Yes.**

8) Once checked in via three finger swipe, does your entry appear in the video LCD monitor wait time que? **Yes.** Are there any aids or auxiliary services to let blind patients know where they are in the cue? **No.** How long is the wait for a Quest employee to come out of the back room once three finger swipe occurs? **Wait time varies by how many people are in the cue – which if you are blind, you don't necessarily know. Staff calls people in the order they came in at most locations. Staff do not come out based on the three finger swipe immediately.**

9) Do you observe Quest employees regularly "sweeping" the waiting room to see if anyone needs help? **Almost never.**

10) How many Quest employees are you observing from the public waiting room in each location? **Usually two to three.**



PA0873

**Investigator:** Mark Derry
**Contact:** 304-685-3510
**Trip Date:** 6/12/21-6/14/21; 8/12/21 -8/18/21
**Report Date:** 8/23/2021

Tracking Sheet - Quest Patient S...

| Date | Address / Office Location | State | Approach | | | | Accessible Kiosk Features | | | | | Comments | Photos |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Audible Entrance Bell or Device? | Staffed Waiting Room? | Audible Directions to Kiosk? | Audible Message on LCD Monitor? | Audio Instructions Wait Time | Three Finger Swipe on all kiosks? | Confirming Message Provided? | Appears on LCD with wait time and Positon | Staff Regulary Sweeping to offer help? | | |
| 6/12/2021 | 7789 Foothill Blvd, Tujunga | CA | No | No | No | No | N/A | N/A | N/A | N/A | No | Located in a Von's Supermarket Pharmacy. No kiosk is provided. | Quest1 |
| 6/12/2021 | 8501 Wilshire Blvd, Suite 305, Beverly Hills | CA | No | No | No | No | N/A | Yes (1) | No | Yes | Yes | Un-staffed window. Staff explained they were closing for the day. | Quest2 |
| 6/14/2021 | 201 S. Buena Vista St.., Suite 225, Burbank | CA | No | No | No | No | N/A | Yes (1) | No | Yes | No | Three finger swipe worked, then staff member came out to ask if I needed assistance. | Quest3 |
| | 2701 W Alameda Ave, Suite 406, Burbank | CA | No | No | No | No | N/A | No | N/A | N/A | No | No Three finger swipe, but staff came out when she was helping someone else. | Quest4 |
| | 2601 W. Alameda Ave Suite 114 Burbank | CA | No | No | No | No | N/A | No | No | N/A | Yes | Three finger sweep did not work. Large reception room with person behind a desk. | Quest5 |
| | 18370 Burbank Blvd, Suite 108 Tarzana | CA | No | No | No | No | N/A | Yes | Yes | Yes | No | This was a different model kiosk than the usual. Had voice output. No input available following swipe. | Quest6 |
| | 5525 Etiwanda Ave, Suite 307 Tarzana | CA | No | No | No | No | N/A | No | N/A | N/A | No | Three finger swipe did not work. | Quest7 |
| | 14624 Sherman Way, Suite 101 Van Nuys | CA | No | No | No | No | N/A | Yes | No | Yes | No | Swipe worked but there was no audible confirmation | Quest8 |
| | 4849 Van Nuys Blvd., Suite 208 Sherman Oaks | CA | Location Closed at time of Site Visit | | | | | | | | | Location Closed Temporarily | Quest9 |
| 6/14/2021 | 4955 Van Nuys Blvd., Suite 611 Sherman Oaks | CA | No | No | No | No | N/A | Yes | Yes | Yes | No | | Quest10 |

Eastlake Derry & Associates, LLC
ADA Accessibility Solutions

PA0874

| # | Date | Address | State | | | | | | | | | | Notes | Quest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | 8/12/2021 | 1779 Walden Ave Suite 300 Cheektowaga | NY | No | No | No | Yes | N/A | Yes | Yes | Yes | Yes | "Not taking walk-ins right now" | Quest11 |
| 12 | | 1317 Jefferson Ave, Buffalo | NY | Yes | No | No | Yes | 15 Min | No | No | No | No | Three finger swipe just brought up tap screen for sighted. | Quest12 |
| 13 | | 455 Delaware Ave Buffalo | NY | Yes | No | No | Yes | 15 Min. | Not all - 1 of 2 | Yes | Yes | No | Kiosk did not provide any options as it does for sighted patients | Quest13 |
| 14 | | 3842 Harlem Rd, Cheektowaga | NY | No | No | No | Yes | 15 Min. | No | N/A | N/A | No | Very crowded waiting room. | Quest14 |
| 15 | | 264 Center Rd, West Seneca | NY | Yes | No | No | No | N/A | Yes | Yes | Yes | No | This had different touch screen kiosk. No other features available | Quest15 |
| 16 | 8/12/2021 | 1106 Union Rd, Southgate Plz, West Seneca | NY | No | No | No | No | N/A | 1 of 3 | Yes | Yes | No | They took Ashley before me, she had a 4 minute wait and I had a 1 minute wait. | Quest16 |
| 17 | 8/13/2021 | 3500 Main St., University Plz Amherst | NY | | | | | Location Closed at time of Site Visit | | | | | Sign says "Closed until further Notice" | Quest17 |
| 18 | | 3620 Sheridan Dr., Suite 100 Amherst | NY | No | No | No | No | N/A | 2 of 3 | Yes | Yes | No | Swipe only on 2 of 3 kiosks | Quest18 |
| 19 | | 2350 Maple Rd., Amherst | NY | No | No | No | No | N/A | 1 of 2 | Yes | Yes | No | Closed 2pm, went back next day. | Quest22 / Quest19 |
| 20 | 8/13/2021 | 3950 E. Robinson Rd., Suite 105 Amherst | NY | Yes | No | No | Yes | 15 Min. | Yes | Yes | Yes | No | Could not access any other features or help button from three finger swipe | Quest20 |
| 21 | | 4181 Transit Rd., Transit Town Plz Amherst | NY | No | No | No | Yes | Not in 30 min there | No 0 of 3 | N/A | N/A | N/A | Very busy location. | Quest21 |
| 22 | 8/18/2021 | 233 Broad St Milford | CT | No | No | No | Yes | 17 Min. | Yes | Yes | Yes | No | Message for blind consumers played 17 minutes after I arrived | Quest23 |
| 23 | | 2890 Main St Stratford | CT | No | No | No | Yes | 8 Min after arrival | Yes | Yes | Yes | No | Message tells you you are number but doesn't say how many others are in the que | Quest24 |
| 24 | 8/18/2021 | 1825 Barnum Ave Stratford | CT | | | | | Location Closed at time of Site Visit | | | | | Note on door says location closed as of July 16th | Quest25 |

| # | Date | Address | State | | | | | | | | | | Notes | Quest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25 | 8/18/2021 | 555 Lordship Blvd Stratford | CT | No | Yes | No | N/A | N/A | Yes | Yes | Yes | Yes | "tell her to knock on the door and someone will come out and help" | Quest26 |
| 26 | | 970 E. Main St, Bridgeport | CT | No | No | No | Yes | 10 Min after arrival | Yes | Yes | Yes | No | | Quest27 |
| 27 | | 1450 Barnum Ave Bridgeport | CT | Location Closed at time of Site Visit | | | | | | | | | Note on door reads "No Appointments" "Closed early" | Quest28 |
| 28 | | 1677 E. Main St Bridgeport | CT | Location Closed at time of Site Visit | | | | | | | | | Note on door reads Closed please visit other locations | Quest29 |
| 29 | 8/18/2021 | 3180 Main St. Beechmont Ave Bldg., 1st Fl Bridgeport | CT | No | No | No | Yes | 15 Min. | Yes | Yes | Yes | No | You have to yell at them when they stick their head thru the door so they stop. | Quest30 |

PA0875

# EXHIBIT 32

1   Jonathan D. Miller (Bar No. 220848)
    jonathan@nshmlaw.com
2   Alison M. Bernal (Bar No. 264629)
    alison@nshmlaw.com
3   NYE, STIRLING, HALE & MILLER, LLP
    33 West Mission Street, Suite 201
4   Santa Barbara, California  93101
    Telephone: (805) 963-2345
5   Facsimile: (805) 563-5385

6   Attorneys for Plaintiffs Julian Vargas,
    American Council of the Blind, and the
7   Proposed Class

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

10  JULIAN VARGAS, and AMERICAN         CASE NO.: 2:19-cv-8108
    COUNCIL OF THE BLIND, individually
11  and on behalf of all others similarly
    situated,                          **DECLARATION OF RACHAEL
12                                     BRADLEY MONTGOMERY IN
            Plaintiffs,                SUPPORT OF PLAINTIFF'S
13                                     MOTION FOR CLASS
        v.                             CERTIFICATION AND IN
14                                     OPPOSITION TO
    QUEST DIAGNOSTICS CLINICAL         DEFENDANT'S MOTION FOR
15  LABORATORIES, INC., QUEST          SUMMARY JUDGMENT
    DIAGNOSTICS HOLDINGS, INC.,
16  QUEST DIAGNOSTICS
    INCORPORATED; and DOES 1-10,       **Hearing Date:    October 29, 2021
17  inclusive,                         Time:             10:00 am
                                       Courtroom:        8C
18          Defendants.
                                       Complaint Filed: September 18, 2019
19                                     Pretrial Conf: December 7, 2021
                                       Trial Date: January 11, 2022
20                                     District Judge: Hon. Dolly M. Gee
                                       Magistrate: Hon. Michael M. Wilner
21

22

23

24

25

26

27

28

*(sidebar)* NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

I, Rachael Bradley Montgomery, declare as follows:

1. I make this declaration based on my personal knowledge. If called to testify, I could and would competently testify as to the matters set forth herein. This declaration is submitted in support of plaintiffs' motion for class certification and opposition to defendants' motion for summary judgement.

## I.   QUALIFICATIONS

**Professional and Educational Background**

2. I have over 20 years of experience in usability, disability-related education, and accessibility. I currently work as an Accessibility Specialist at the Library of Congress, though this report is not being done in my capacity as an employee of the Library of Congress.  Prior to July 2021, I consulted on the accessibility of kiosks, web sites, software applications, and overall organizations for several years. As a consultant, I regularly evaluated kiosks, web sites, and mobile applications for clients.  I have written and implemented kiosk and web standards, procurement guidelines, testing methodologies, and training programs for a number of organizations. I co-chair the W3C Accessibility Guidelines Working Group and am executive director of a charity that helps small organizations remove accessibility barriers.

3. I have a Master's in Information Studies focused on usability of emerging technology from University of Illinois Urbana-Champaign. I have a PhD in Information Science focused on usability and accessibility from University of Maryland, College Park. I periodically teach courses in usability, user experience, and accessibility at both institutions, as well as speak about these topics at various events. A copy of my CV is attached as **Exhibit A**.

4. During the previous 4 years I have been deposed once in relation to kiosk accessibility, in the civil action styled Davis, et al. v. Laboratory Corporation of America Holdings, 20-cv-00893 (C.D. Cal.).

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

DECLARATION OF RACHAEL BRADLEY MONTGOMERY

PA0877

## II.     ASSIGNMENT

5.  I have been retained by counsel for Plaintiffs to offer my expert opinion on:

- Whether the services provided by Quest's kiosks are independently and privately accessible to blind users, and

- Whether providing kiosks that are independently and privately accessible to blind users would be readily achievable, and would not result in an undue financial burden or fundamentally alter the essential nature of the goods and services offered by Quest.

6.  **Exhibit B** includes a list of all documents and data that I considered for my assignment.

7.  I reserve the right to amend or supplement this declaration if additional relevant documents or information become available.

8.  I am being compensated at a rate of $125 per hour for my time spent on this matter except for time spent preparing for and testifying at deposition, for which I am being compensated $200 per hour for my time.

9.  My compensation is not contingent on the nature of my findings or the outcome of this case.

## III.    OPINIONS

**A.     The services provided by the Quest kiosks are not independently and privately accessible to blind users.**

10. **Exhibit C** presents the standards from the Americans with Disabilities Act (ADA), Section 508 of the Rehabilitation Act of 1973 (508), and Web Content Accessibility Guidelines that support blind users. Some key requirements to ensure independent access from these standards are:

2

PA0878

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

- Speech output either publicly through speakers or privately through headphones (ADA 707.5, 508 402.2). If the kiosk output includes personal information, output through headphones would be expected to provide comparable privacy to visual output (508 405.1). Speech output allows blind users to interact with the kiosks and complete their tasks using the kiosk (508 302.1).

- Braille instructions to indicate how to start speech output (ADA 707.8, 508 402.2.5).

- Tactile controls which make using the kiosk much easier for low vision and blind users (ADA 707.6.1, 508 407.3.1). and

- Volume control and the ability to repeat speech (ADA 707.5.1, 508 402.3.1, 402.2.4)

### a) Kiosk prior to addition of help button or three finger swipe

11. I was unable to personally assess the version of the kiosk that existed prior to the addition of the help button or three finger swipe; however, it is described in Adam Aronson's deposition transcript of 6/29/21, Julian Vargas' deposition transcript of 04/22/21, Tom Walsh's deposition transcript of 07/01/21, Marc Yarrison's deposition transcript of 4/8/21, Exhibit #2 to the transcripts (Quest-Vargas000036494) and Exhibit #7 to the transcripts (Quest-Vargas000007361-7363).

12. Based on these descriptions, the kiosks did not have a headphone jack (Aronson p. 57), provide speech output (Walsh p. 43, 63), braille instructions (Vargas p. 124, Yarrison p. 116-117) or a tactile navigation keypad (Vargas p. 124).

13. Without speech output and tactile controls, there is no way for a blind user, who relies on tactile and audio alternatives, to independently and privately access any services provided by the kiosk, including any check in services.

14. This version of the kiosk also allowed sighted users to interact with it using a non-English language, and view wait time and place in queue (Exhibit #2 to the

3

DECLARATION OF RACHAEL BRADLEY MONTGOMERY

PA0879

DocuSign Envelope ID: 491E79C4-ACE7-4734-A9E5-98E6E14EEBDE

transcripts p. 2), none of which would be independently and privately accessible to a blind user. The television, as designed to work with this version of the kiosk, also displayed name, visit details, and wait time.

### b) Kiosk with help button prior to addition of three finger swipe

15. I inspected the version of the Kiosk that included the help button but did not yet include three finger swipe functionality on July 30, 2021.

16. The help button on the kiosk I inspected threw an error message (see Figure 1).

17. My understanding is that pressing the help button, which was located on the screen and not tactilely discernable, was designed to provide an audio message to assist the user. Even if this is the case, the kiosk is not independently or privately accessible because it does not include any braille instructions on how to start the speech output.



Figure 1: Error on Kiosk Inspected July 30



Figure 2: Check in Options on Kiosk Inspected July 30



Figure 3: Check in Complete on Kiosk Inspected July 30

18. This kiosk also lacks tactilely discernable controls. 407.3.1 in Section 508 states "Input controls shall be operable by touch and tactilely discernible without activation." 707.6.1 in the ADA states, "At least one tactilely discernible input control shall be provided for each function." If the only speech output provided in this version is triggered by the help button, a blind user should be able to identify

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

4

PA0880

DocuSign Envelope ID: 491E79C4-A5E7-4734-A9E7-98F6E14EEBDE

the help button by touch, without activating it. In this design, the kiosk has no tactile indication of where the help button is located or that it even exists.  The button is located in the upper right of the screen, but not in the corner, so even with directions, it could be missed by the blind user.

19. Finally, this kiosk design does not allow the user to control the volume or repeat the speech output. The ability to control the volume output and repeat speech is important in a public setting where it may be difficult to hear or a user may be distracted.

20. I also attempted a three finger swipe on this version of the kiosk, but the three finger swipe did not work and returned an error message.

21. The services provided by this kiosk are not independently or privately accessible because the kiosk does not include any braille instructions on how to start the speech output, the help button cannot be located tactilely, and the user is unable to control volume and speech output.

### c) Kiosk with help button and three finger swipe

22. I inspected the version of the kiosk with the help button and three finger swipe functionality during two visits to Quest labs.

23. The first visit was to the lab at 21785 Filigree Ct, Unit 204, Ashburn, VA 20147, United States on July 29, 2021.

24. The second visit was the to the lab at 521 E Market St, Leesburg, VA 20176 on August 30, 2021.

25. In both cases a three finger swipe led to audio output.

26. During the first visit, I was visiting for a lab appointment and was unable to fully understand what was said in the audio output.

27. In the second visit, I was able to confirm the audio output provided a patient number, wait time, and told me to take a seat.

28. Both locations had a television providing information on place in queue and approximate wait time.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

DocuSign Envelope ID: 991E79C4-ACE7-473A-A9E7-98E6E1AEEBDE

29. In the first visit, the audio from the television was barely audible and I never heard instructions on kiosk use within the 4 minutes I was in the waiting room.

30. In the second visit, the television was audible and played the instructions on how to use the three finger swipe after about 7 minutes in the waiting room.

31. The three finger swipe used for adding an individual to queue does not meet accessibility standards as it lacks:

- Braille instructions to initiate the speech output;
- Tactilely discernable controls; and
- Volume control and the ability to repeat speech

32. Unless a phlebotomist is present in the waiting room to explain how to use the kiosk, an individual who does not know about the three finger swipe option in advance has no way to find out how to interact with the kiosk without the television, due to the lack of braille instructions and tactile controls. The primary way to know about the three finger swipe is through the television.

33. The lack of volume control and inability to repeat speech presents a major hurdle in this attempted three finger swipe solution.

34. The television must be on with adequate volume to tell the user about the three finger swipe but the user cannot interrupt or pause the television (ADA 707.5.1, 508 402.2.4).

35. The television audio makes it more difficult to hear the speech output on the kiosk and the user has no way to find out what was said if they miss it without using a three finger swipe a second time.

36. In the version of the kiosk with the help button and the three finger swipe, the only feature of the kiosk possibly available to the blind user is the ability to be added to the queue and wait in the waiting room.

37. The only way to monitor one's place in the queue while waiting is through the display on the television screen.

38. The kiosks I inspected offered several additional services, including:

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

6

PA0882

DocuSign Envelope ID: 491E79C4-A5E7-4734-A9E7-98E6E14EEBDE

- • Languages other than English,
- • Checking in with an appointment, which are given priority,
- • Picking up an empty collection container,
- • Delivering a prepared specimen, and
- • Choosing to wait somewhere other than the waiting room.

39. These additional features are captured in figures 4, 5 and 6 which were taken during my August 30th visit.

  

Figure 4: What can we help you with screen

Figure 5: What can we help you with screen

Figure 6: Where will you wait screen

40. In addition to the missing services, the delay in waiting for the instructions on how to use the kiosk potentially places the blind patient behind other patients who arrive while the blind patient is waiting to hear what to do or get assistance.

41. The queueing order by the kiosk is: Appointments, Healthcare Professional Drop Off or Pick Up, Patient Drop Off or Pick Up, all others (Quanum Release Notes December 2017 QUEST-VARGAS000039496 p. 9). Patients using the smart help are given a number as a walk-in, which falls under "all others" (New ECheckin Requirements QUEST-VARGAS000035545, #13.5.2.3.3).

42. This queuing delay occurred during my second inspection visit. No staff was present when I entered, so I waited to sign in until I heard the audio instructions on

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

7

PA0883

DocuSign Envelope ID: d91E79C4-AC87-4734-A9E7-98F6E14EEBDE

the three finger swipe. This took a little over 7 minutes. By the time the instructions played on the television, two other patients had entered and used the kiosk before me and my announced wait time was over 30 minutes. As a sighted individual, I could tell my position in queue from the television, but a blind individual would have no way to tell this.

43. In addition to adding a patient to queue, the three finger swipe is also intended to notify a phlebotomist that a visually impaired patient is in the waiting room through an alert bell (Yarrison Transcript p. 244) and in Quanum (Exhibit #47 to the transcripts p. 45). Per Exhibit #47 (Quest-Vargas000034803-34941) "[a]fter the patient identified as "Visually impaired" appears in your queue, you should promptly go to the waiting room, call the patient by their numerical ID (e.g., Patient 01), greet the patient, and ask them whether they have an appointment." (p. 46). Phlebotomists have the option of turning off the audio signal (Yarrison Transcript, p. 245). This could lead to a longer wait time before the blind patient gets assistance. In my first visit, the phlebotomist came out in 2 minutes 50 seconds. While I cannot be certain that the audio signal was turned off in my second visit, the phlebotomist did not come out to assist me after I used the three finger swipe. Someone came out and brought another patient back 6 minutes after the three finger swipe, but did not ask about a visually impaired patient.

44. Based on my observations and review of documents, the services available through the Quest kiosks are not independently and privately accessible to blind users. If the kiosk services provided are expanded, such as ID and insurance card recognition and payment (see Tom Walsh's deposition transcript of 07/01/21 p. 86-89) these would also not be accessible to blind users.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

DECLARATION OF RACHAEL BRADLEY MONTGOMERY

PA0884

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

**B.      Providing kiosks at Quest labs that are independently and privately accessible to blind users is readily achievable and would not create an undue financial burden or fundamentally alter the essential nature of the goods and services offered by Quest.**

45. Readily achievable solutions exist for providing an independently accessible kiosk for blind users. The iPad selected for these kiosks includes built in speech reader capabilities within its standard accessibility suite. This screen reader provides the speech output needed to interact with a kiosk application.

46. Lilitab, the kiosk vendor from which Quest purchased the kiosk shells, provided an option to include a standard headphone jack for approximately $30 per kiosk (Adam Aronson's deposition transcript of 6/29/21 p. 38).  The H and M units offered by Lilitab also allow for optional volume control access (Adam Aronson's deposition transcript of 6/29/21 p. 4). The custom software could use common accessibility practices to integrate with iOS' built in screenreader.  This approach would have ensured all kiosk services were accessible to blind users. iOS software can also be coded to start the screen reader when personal headphones are inserted into the headphone jack. Creating accessible software that works with a screen reader is a common solution that provides kiosk accessibility for blind individuals and private listening that would provide the privacy needed for health information.

47. This solution outlined in paragraph 46 would allow Quest to maintain the functionality and utility of its kiosks, while increasing the accessibility for blind users.

48. Other options also exist, including the AudioNav keypad for iOS which costs $309.75 (Exhibit D p.1) and has tactile navigation keys and a headphone jack. This kit includes the firmware, adapter, cables, and power supply for the keypad. The iPad adapter allows multiple USB cables to be used so that the kiosk can receive power and work with devices.  An additional cost would be required to mount the keypad. The advantage of using the AudioNav or a comparable keypad is that it uses

9

DocuSign Envelope ID: d91E79C4-ACE7-4734-A9E4-98F6E14EEBDE

an external headphone jack, rather than the headphone jack of the actual iPad. This lowers maintenance costs if the tactile keypad needs to be replaced due to wear.

49. Using iOS' native screenreader along with accessible software, allowing speech output through a headphone jack, and providing an tactile keypad for navigation would allow all current and future services provided by the kiosk to be independently and privately accessible to blind users.

50. Based on the information presented above, it is my opinion to a reasonable degree of certainty that the services provided by the Quest kiosk are not privately and independently accessible to blind users. None of the versions, including the most recent, meet accessibility standards. Even if a blind user was able to perform a three finger swipe on the kiosk, the kiosk does not provide the same set of services to blind users as it provides to sighted kiosk users.

51. Based on the information presented above, it is also my opinion to a reasonable degree of certainty that providing kiosks accessible to blind users is readily achievable, and would not create an undue financial burden, or fundamentally alter the essential nature of the goods and services offered by Quest.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Signed this 9th day of September 2021, in Paeonian Springs, VA.

/s/    _Rachael Bradley Montgomery_
RACHAEL BRADLEY MONTGOMERY, Declarant

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

DECLARATION OF RACHAEL BRADLEY MONTGOMERY

PA0886

# Exhibit A

PA0887

DocuSign Envelope ID: d991E79C4-AC57-4734-A9E5-98F6E14EEBDE

# Rachael Bradley Montgomery, PhD

16766 Clarkes Gap Road; Paeonian Springs, VA 20129
ta11y.accessibility@gmail.com
410-591-9202

## Skills Summary

- 20 years of experience in disability-related education, accessibility, and human computer interaction
- Experience evaluating and remediating kiosks, websites, mobile and desktop applications, and facilities
- Seven years of experience setting up large-scale accessibility programs at 3 separate organizations
  - Working with corporate leadership and across departments and locations to effect change
  - Establishing and growing disability related employee resource groups integrated into a larger diversity program
- Four years of experience applying ADA and Section 508, as well as other accessibility and universal design best practices to kiosk evaluation and procurement
- Five years of program and department management experience, managing between 30 and 60 fulltime equivalents across multiple projects
- Experience with WCAG and applying WCAG 2.0 and 2.1 to specific organization's needs
- Experience designing and adapting accessibility and usability courses to serve the needs of students with a wide range of technical and domain experience
  - Created three courses on accessibility and usability for professional students. Instructed over 1,500 developers, testers, program managers, designers and usability engineers
  - Nine years of experience teaching online and in-person in both university and professional settings

## Professional Experience

| | |
|---|---|
| **Library of Congress** | **Jul 2021-Present** |
- Accessibility Specialist

| | |
|---|---|
| **Ta11y Consulting** | **May 2019 - Present** |
- Accessibility and usability consulting

| | |
|---|---|
| **MITRE, McLean, VA** | **Mar 2004 - May 2019** |
- Usability and Accessibility, Principle Engineer
- Accessibility Council Lead
- Associate Department Head and Project Manager

| | |
|---|---|
| **Hood College, Frederick, Maryland** | **Oct 2002 - Feb 2004** |
| **Enoch Pratt Free Library, Baltimore, Maryland** | **May 2002 - Sep 2002** |
| **Woodruff Library, Emory University, Atlanta, Georgia** | **Jun 2000 - Mar 2002** |

## Service

| | |
|---|---|
| **Accessible Community, Paeonian Springs, VA** | **2017 - Present** |
- Director of 501c3 Charity dedicated to helping small businesses, libraries, religious organizations, and other community organizations better engage with people with disabilities
- Providing seminars on physical and technical accessibility

| | |
|---|---|
| **Web Accessibility Working Group (W3C)** | **2016 - Present** |
- Co-chair Accessibility Guidelines Working Group (March, 2020-Present)

- Co-facilitator Cognitive and Learning Disabilities Task Force (August 2019-Present)
- Contributor WCAG 2.1 and related documents
- Editor on WCAG 2.2, WCAG 3.0 and Making Content Usable

## Teaching Experience

**Adjunct Lecturer**       College of Information Studies, University of Maryland, College Park
Fall 2021-Present          Trace Center Faculty Affiliate – Universal Kiosk Standards
Fall 2019-Present          Information User Needs and Assessment, User Centered Design
Spring 2010-2013           Introduction to Information Technology

**Adjunct Lecturer**       School of Information Science, University of Illinois, Urbana Champaign
2019-Present               Usability Engineering

**Instructor**             Professional Settings
2012-Present               Accessibility for Developers, Testers, and Usability Engineers

## Education

**PhD in information Studies**                                                    **December 2009**
University of Maryland, College Park, MD

**MS in Information Science**                                                     **August 2003**
University of Illinois, Champaign, IL

**BA in Art History and Historic Preservation (Phi Beta Kappa)**                  **May 1998**
Goucher College, Towson, MD

**ADA Coordinator Certification** (In Process)

**Certificates in Universal Design** (Human Performance, Public Accommodations, Interior Environments)
Center for Inclusive Design and Environmental Access, University of Buffalo

## Select Publications and Presentation

Bradley Montgomery, R., and Boniello Miller, L (2021). Most Common Kiosk Mistakes. CSUN Assistive
    Technology Conference. Virtual.

Spellman, J., Montgomery, R., Lauriat, S. and Cooper, M. editors (2021). W3C Accessibility Guidelines
    (WCAG) 3.0 W3C Editor's Draft 20 January 2021. Latest at https://w3c.github.io/silver/guidelines/

Seeman, L., Bradley Montgomery, R., Lee, S. and Ran, R. editors. Making content usable for people with
    cognitive and learning disabilities W3C Working Draft 11 December 2020. Latest at
    https://www.w3.org/TR/coga-usable/

Adams, C., Campbell, A. Montgomery, R., Cooper, M. and Kirkpatrick, A. editors. Web Content Accessibility
    Guidelines (WCAG) 2.2 W3C Working Draft 11 August 2020. Latest at
    https://www.w3.org/TR/WCAG22/

Bradley Montgomery, R. (2020). Creating a Usable Kiosk Experience for Customers with Disabilities. The Paciello
    Group Development Blog.

Boniello Miller, L. and Bradley Montgomery, R. (2020) Kiosk Accessibility: Understanding the Kiosk User Experience.
    *CSUN Assistive Technology Conference*. San Diego, CA.

Bradley Montgomery, R. (2020). Creating an Accessible Escape Room. *CSUN Assistive Technology Conference*. San Diego, CA.

Bostic, T., Bradley Montgomery, R., Brunelle, J., Chudnov, D., Higgins, J., and Stanley, J. (2019). Exploring the Intersections of Web Science and Accessibility. *International Conference on Human Systems Engineering and Design*. Munich, Germany.

Bradley Montgomery, R. (2018). Beyond Standards. Taking a Holistic Approach to Accessibility Evaluation. *CSUN Assistive Technology Conference*. San Diego, CA.

Weiss, M. and Bradley Montgomery, R. (2017).  Using Personas and Other Usability Techniques to Improve Accessibility. *CSUN Assistive Technology Conference*. San Diego, CA.

Bradley Montgomery, R. and Weiss, M. (2016). Comparing Custom Accessibility Checklists. *CSUN Assistive Technology Conference*. San Diego, CA.

# Exhibit B
## Documents Considered

- Quest-Vargas000036494
- Quest-Vargas000035087-35090
- Quest-Vargas000035119-35176
- Quest-Vargas000034658-34666
- Quest-Vargas000007361-7363
- Quest-Vargas000037909-37910
- Quest-Vargas000037977-37978
- Quest-Vargas000036699
- Quest-Vargas000028740-28741
- Quest-Vargas000035335-35336
- Quest-Vargas000028746-28747
- Quest-Vargas000030878-30879
- Quest-Vargas000037605-37606
- Quest-Vargas000037980-37981
- Quest-Vargas000036566-36578
- Quest-Vargas000036700-36702
- Quest-Vargas000036947-36954
- Quest-Vargas000040261-40264
- Quest-Vargas000040267-40269
- Quest-Vargas000040280-40284
- Quest-Vargas000039990
- Quest-Vargas000039966-39967
- Quest-Vargas000035475-35476
- Quest-Vargas000000022-41
- Quest-Vargas000004496-4499
- Quest-Vargas000040161-40166
- Quest-Vargas000040791
- Quest-Vargas000000583-637
- Quest-Vargas000036677-36681
- Quest-Vargas000030691
- Quest-Vargas000034803-34941
- Quest-Vargas000036266
- Quest-Vargas000036322
- Quest-Vargas000005723-5731
- Quest-Vargas000007941-7945
- Quest-Vargas000004496-4499
- Quest-Vargas000023072-23075
- Quest-Vargas000029367-29369
- Quest-Vargas000030591-30592
- Quest-Vargas000029304-29309

DocuSign Envelope ID: 491E79C4-A5E7-4734-A9EF-99F6E14EEBDE

- Quest-Vargas000041970-41971
- Quest-Vargas000041962
- Quest-Vargas000041949-41952
- Quest-Vargas000041972-41976
- Quest-Vargas000041963-41969
- Quest-Vargas000041953-41961
- Quest-Vargas000041938-41948
- Quest-Vargas000028016-28017
- Quest-Vargas000009816-9819
- Quest-Vargas000005703
- Quest-Vargas000038770-38771
- Quest-Vargas000035545-35549
- Quest-Vargas000038755-38775
- Quest-Vargas000039488-39511
- Transcript of 6-29-21 Deposition of Adam Aronson
- Transcript of 4-22-21 Deposition of Julian Vargas
- Transcript of 7-1-21 Deposition of Tom Walsh
- Transcript of 4-8-21 Deposition of Marc Yarrison
- Transcript of 4-12-21 Deposition of Taylor Carr
- Transcript of 7-30-21 Deposition of Taylor Carr
- Email exchanges between Lilitab and Quest discussing QR Code Reader Tray
- Email exchanges regarding Quest migrating from the "K head" to the new "H head" unit––describes "forward looking" functionality
- Final "CapEx" submitted for eCheck-In project
- The website lilitab.com

DocuSign Envelope ID: d91E79C4-ACE7-4734-A9E7-98F6E14EEBDE

# Exhibit C: Referenced Standards

## ADA Standards that Support Blind Users

Abbreviated. Full standards including exceptions at:
https://www.ada.gov/regs2010/2010ADAStandards/2010ADAstandards.htm

**307.2 Protrusion Limits:** Objects with leading edges more than 27 inches (685 mm) and not more than 80 inches (2030 mm) above the finish floor or ground shall protrude 4 inches (100 mm) maximum horizontally into the circulation path.

**707.5 Speech Output:** Machines shall be speech enabled. Operating instructions and orientation, visible transaction prompts, user input verification, error messages, and all displayed information for full use shall be accessible to and independently usable by individuals with vision impairments. Speech shall be delivered through a mechanism that is readily available to all users, including but not limited to, an industry standard connector or a telephone handset. Speech shall be recorded or digitized human, or synthesized.

**707.5.1 User Control:** Speech shall be capable of being repeated or interrupted. Volume control shall be provided for the speech function.

**707.5.2 Receipts**: Where receipts are provided, speech output devices shall provide audible balance inquiry information, error messages, and all other information on the printed receipt necessary to complete or verify the transaction.

**707.6.1 Input Controls:** At least one tactilely discernible input control shall be provided for each function. Where provided, key surfaces not on active areas of display screens, shall be raised above surrounding surfaces. Where membrane keys are the only method of input, each shall be tactilely discernable from surrounding surfaces and adjacent keys.

**707.6.2 Numeric Keys:** Numeric keys shall be arranged in a 12-key ascending or descending telephone keypad layout. The number five key shall be tactilely distinct from the other keys.

**707.6.3.2 Tactile Symbols**: Function key surfaces shall have tactile symbols as follows: Enter or Proceed key: raised circle; Clear or Correct key: raised left arrow; Cancel key: raised letter ex; Add Value key: raised plus sign; Decrease Value key: raised minus sign.

**707.8 Braille Instructions:** Braille instructions for initiating the speech mode shall be provided.

1

PA0893

DocuSign Envelope ID: d91E79C4-ACE7-4734-A9E3-98F6E14EEBDE

## Section 508 Kiosk Standards that Support Blind Users

Abbreviated. Full standards including exceptions at:  https://www.access-board.gov/ict/#508

**C205.2 WCAG Conformance:** User interface components, as well as the content of platforms and applications shall conform to Level A and Level AA Success Criteria and Conformance Requirements in WCAG 2.0 (incorporated by reference, see 702.10.1).

**302.1 Without Vision:** Where a visual mode of operation is provided, ICT shall provide at least one mode of operation that does not require user vision.

**402.2 Speech-Output Enabled:** ICT with a display screen shall be speech-output enabled for full and independent use by individuals with vision impairments.

**402.2.1 Information Displayed On-Screen:** Speech output shall be provided for all information displayed on-screen.

**402.2.2 Transactional Outputs:** Where transactional outputs are provided, the speech output shall audibly provide all information necessary to verify a transaction.

**402.2.3 Speech Delivery Type and Coordination:** Speech output shall be delivered through a mechanism that is readily available to all users, including, but not limited to, an industry standard connector or a telephone handset. Speech shall be recorded or digitized human, or synthesized. Speech output shall be coordinated with information displayed on the screen.

**402.2.4 User Control:** Speech output for any single function shall be automatically interrupted when a transaction is selected. Speech output shall be capable of being repeated and paused.

**402.2.5 Braille Instructions:** Where speech output is required by 402.2, braille instructions for initiating the speech mode of operation shall be provided. Braille shall be contracted and shall conform to 36 CFR part 1191, Appendix D, Section 703.3.1.

**402.3 Volume:** ICT that delivers sound, including speech output required by 402.2, shall provide volume control and output amplification conforming to 402.3.

**402.3.1 Private Listening:** Where ICT provides private listening, it shall provide a mode of operation for controlling the volume. Where ICT delivers output by an audio transducer typically held up to the ear, a means for effective magnetic wireless coupling to hearing technologies shall be provided.

**402.3.2 Non-private Listening:** Where ICT provides non-private listening, incremental volume control shall be provided with output amplification up to a level of at least 65 dB. A function shall be provided to automatically reset the volume to the default level after every use.

**405.1 Privacy, General:** The same degree of privacy of input and output shall be provided to all individuals. When speech output required by 402.2 is enabled, the screen shall not blank automatically.

**406.1 Standard Connections, General:** Where data connections used for input and output are provided, at least one of each type of connection shall conform to industry standard non-proprietary formats.

**407.3.1 Tactilely Discernible:** Input controls shall be operable by touch and tactilely discernible without activation.

2

PA0894

**407.3.2 Alphabetic Keys:** Where provided, individual alphabetic keys shall be arranged in a QWERTY-based keyboard layout and the "F" and "J" keys shall be tactilely distinct from the other keys.

**407.3.3 Numeric Keys:** Where provided, numeric keys shall be arranged in a 12-key ascending or descending keypad layout. The number five key shall be tactilely distinct from the other keys. Where the ICT provides an alphabetic overlay on numeric keys, the relationships between letters and digits shall conform to ITU-T Recommendation E.161 (incorporated by reference, see 702.7.1).

**407.7 Tickets, Fare Cards, and Keycards:** Where tickets, fare cards, or keycards are provided, they shall have an orientation that is tactilely discernible if orientation is important to further use of the ticket, fare card, or keycard.

**410.1 General:** Where provided, color coding shall not be used as the only means of conveying information, indicating an action, prompting a response, or distinguishing a visual element.

3

## WCAG 2.1 A and AA Criteria that Support Blind Users

Abbreviated. Full standards including exceptions at:  https://www.w3.org/TR/WCAG21/

**1.1.1 Non-text Content**: All non-text content that is presented to the user has a text alternative that serves the equivalent purpose, except for the situations listed below: Controls, Inputs; Time-Based Media; Test; Sensory; CAPTCHA, and Decoration, Formatting, Invisible.

**1.2.1 Audio Only and Video Only**: For prerecorded audio-only and prerecorded video-only media, the following are true, except when the audio or video is a media alternative for text and is clearly labeled.

**1.2.3 Audio Description or Media Alternative (Prerecorded)**: An alternative for time-based media or audio description of the prerecorded video content is provided for synchronized media, except when the media is a media alternative for text and is clearly labeled as such.

**1.2.5 Audio Description (Prerecorded)**: Audio description is provided for all prerecorded video content in synchronized media.

**1.3.1 Info and Relationships**: Information, structure, and relationships conveyed through presentation can be programmatically determined or are available in text.

**1.3.2 Meaningful Sequence**: When the sequence in which content is presented affects its meaning, a correct reading sequence can be programmatically determined.

**1.3.3 Sensory Characteristics**: Instructions provided for understanding and operating content do not rely solely on sensory characteristics of components such as shape, color, size, visual location, orientation, or sound.

**1.3.4 Orientation**: Content does not restrict its view and operation to a single display orientation, such as portrait or landscape, unless a specific display orientation is essential.

**1.4.1 Use of Color**: Color is not used as the only visual means of conveying information, indicating an action, prompting a response, or distinguishing a visual element.

**1.4.2 Audio Control**: If any audio on a Web page plays automatically for more than 3 seconds, either a mechanism is available to pause or stop the audio, or a mechanism is available to control audio volume independently from the overall system volume level.

**1.4.13 Content on Hover or Focus**: Where receiving and then removing pointer hover or keyboard focus triggers additional content to become visible and then hidden, the following are true. Dismissable, Hoverable, Persistent

**2.1.1 Keyboard**: All functionality of the content is operable through a keyboard interface without requiring specific timings for individual keystrokes, except where the underlying function requires input that depends on the path of the user's movement and not just the endpoints.

**2.1.2 No Keyboard Trap**: If keyboard focus can be moved to a component of the page using a keyboard interface, then focus can be moved away from that component using only a keyboard interface, and, if it requires more than unmodified arrow or tab keys or other standard exit methods, the user is advised of the method for moving focus away.

4

**2.2.1 Timing Adjustable (Level A)**: For each time limit that is set by the content, at least one of the following is true: Turn off, Adjust, Extend, Real-time Exception, Essential Exception, 20 Hour Exception

**2.2.2 Pause, Stop, Hide**: For moving, blinking, scrolling, or auto-updating information, all of the following are true

**2.4.1 Bypass Blocks**: A mechanism is available to bypass blocks of content that are repeated on multiple Web pages.

**2.4.2 Page Titled**: Web pages have titles that describe topic or purpose.

**2.4.3 Focus Order**: If a Web page can be navigated sequentially and the navigation sequences affect meaning or operation, focusable components receive focus in an order that preserves meaning and operability.

**2.4.4 Link Purpose (In Context)**: The purpose of each link can be determined from the link text alone or from the link text together with its programmatically determined link context, except where the purpose of the link would be ambiguous to users in general.

**2.4.5 Multiple Ways**: More than one way is available to locate a Web page within a set of Web pages except where the Web Page is the result of, or a step in, a process.

**2.4.6 Headings and Labels**: Headings and labels describe topic or purpose.

**3.1.1 Language of Page**: The default human language of each Web page can be programmatically determined.

**3.1.2 Language of Parts**: The human language of each passage or phrase in the content can be programmatically determined except for proper names, technical terms, words of indeterminate language, and words or phrases that have become part of the vernacular of the immediately surrounding text.

**3.2.1 On Focus**: When any user interface component receives focus, it does not initiate a change of context.

**3.2.2 On Input**: Changing the setting of any user interface component does not automatically cause a change of context unless the user has been advised of the behavior before using the component.

**3.2.3 Consistent Navigation**: Navigational mechanisms that are repeated on multiple Web pages within a set of Web pages occur in the same relative order each time they are repeated, unless a change is initiated by the user.

**3.2.4 Consistent Identification**: Components that have the same functionality within a set of Web pages are identified consistently.

**3.3.1 Error Identification**: If an input error is automatically detected, the item that is in error is identified and the error is described to the user in text.

**3.3.2 Labels or Instruction**: Labels or instructions are provided when content requires user input.

5

DocuSign Envelope ID: 491E79C4-ACE7-4734-A9E7-98E6E14EEBDE

**3.3.3 Error Suggestion**: If an input error is automatically detected and suggestions for correction are known, then the suggestions are provided to the user, unless it would jeopardize the security or purpose of the content.

**3.3.4 Error Prevention (Legal, Financial, Data)**: For Web pages that cause legal commitments or financial transactions for the user to occur, that modify or delete user-controllable data in data storage systems, or that submit user test responses, at least one of the following is true: Reversible, Checked, Confirmed

**4.1.2 Name, Role, Value**: For all user interface components (including but not limited to: form elements, links and components generated by scripts), the name and role can be programmatically determined; states, properties, and values that can be set by the user can be programmatically set; and notification of changes to these items is available to user agents, including assistive technologies.

**4.1.3 Status Messages**: In content implemented using markup languages, status messages can be programmatically determined through role or properties such that they can be presented to the user by assistive technologies without receiving focus.

6

Exhibit D

DocuSign Envelope ID: 891E79C4-ACE7-4734-A9E5-68F6E14EEBDE

DocuSign Envelope ID: 891E79C4-ACE7-4734-A9E5-68F6E14EEBDE

# AudioNav Keypad for iOS – Screenshot 9 Sept 2021

Lisa Seeman

**storm** Interface Specialists since 1986

🌐 +44 (0)1895 431421  📞 +1 (480) 584 3910  🛒  🔍

Home   About   Products ⌄   Manufacturing   News ⌄   Downloads   Contact   Search 🔍

Part Number: INP781-01    Range: ATP

## AudioNav™ Developer Kit for iOS

PRICE EACH **$309.75** excl VAT

Qty
[ 1 ]   [ Add to Cart ]

For ordered quantities of up to 20 pieces these products are usually despatched within 10 working days. Please contact us for a despatch schedule for deliveries of more than 20 pieces.

DESCRIPTION

The AudioNav was developed primarily for use in applications where the host PC is a Windows PC. However, it is also possible to use this ADA compliant assistive USB interface with an iOS device.

Please note, the AudioNav must have iOS specific firmware in order for it to work with an iOS device. Some other interface products are also required.

This developer kit contains everything needed for connecting an AudioNav to an iOS device, including the AudioNav itself (with iOS specific firmware).

The kit contains:
- AudioNav with iOS specific firmware (please note, the kit is supplied with a panel mounted version of the AudioNav with green LEDs)
- iPad adaptor (with 3 USB sockets)
- Cable USB A to mini USB (Qty 2)
- Lightning to USB Camera Adaptor
- Power Supply (2 port) with USA adaptor
- Cable USB A to Lightning
- Cable USB A to micro USB





AudioNav Website

PA0900

# EXHIBIT 33

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3     _____
                                      )
 4     JULIAN VARGAS, ANNE WEST,      )
       and AMERICAN COUNCIL OF        )
 5     THE BLIND, individually        )
       on behalf of themselves and    )
 6     all others similarly situated,)
                                      )
 7          Plaintiffs,               )
                                      )
 8          v.                        ) Case No.: 19CV01953
                                      )
 9     QUEST DIAGNOSTICS CLINICAL     )
       LABORATORIES, INC., QUEST      )
10     DIAGNOSTICS HOLDINGS, INC.,    )
       QUEST DIAGNOSTICS             )
11     INCORPORATED; and DOES 1-10,   )
       inclusive,                     )
12                                    )
            Defendants.               )
13                                    )
            CASE NO.: 2:19-cv-8108    )
14     _____)
15
16
17
18       REPORTER'S TELEPHONIC TRANSCRIPT OF PROCEEDINGS
19                   MEET AND CONFER
20                Thursday, August 26, 2021
21
22     Reported by:
       JOANNA BROADWELL
23     CSR No. 10959
24     Job No. 4780142
25     PAGES 1 - 41
```

Page 1

PA1034

```
 1                 UNITED STATES DISTRICT COURT

 2             FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3   _____
                                    )
 4   JULIAN VARGAS, ANNE WEST,      )
     and AMERICAN COUNCIL OF        )
 5   THE BLIND, individually        )
     on behalf of themselves and    )
 6   all others similarly situated,)
                                    )
 7        Plaintiffs,               )
                                    )
 8        v.                        ) Case No.: 19CV01953
                                    )
 9   QUEST DIAGNOSTICS CLINICAL     )
     LABORATORIES, INC., QUEST      )
10   DIAGNOSTICS HOLDINGS, INC.,    )
     QUEST DIAGNOSTICS              )
11   INCORPORATED; and DOES 1-10,   )
     inclusive,                     )
12                                  )
             Defendants.            )
13                                  )
          CASE NO.: 2:19-cv-8108    )
14   _____)

15

16

17

18

19

20            Reporter's telephonic Transcript of

21   Proceedings taken remotely beginning at 10:02 a.m. and

22   ending at 11:04 a.m. on Thursday, August 26, 2021,

23   before JOANNA BROADWELL, Certified Shorthand Reporter

24   No. 10959.

25
```

                                                   Page 2

PA1035

```
 1

 2

 3    APPEARANCES:

 4

 5    For Plaintiffs:

 6    OGLETREE DEAKINS NASH SMOAK & STEWART PC

 7    David Raizman, Esq.

 8    400 S. Hope St, Suite 1200,

 9    Los Angeles, CA 90071

10    (213) 239-9800

11    david.raizman@ogletree.com

12

13    For the Defendants:

14    NYE STIRLING HALE & MILLER LLP

15    Alison Bernal, Esq.

16    33 West Mission Street Suite 201

17    Santa Barbara, CA 93101

18    (805) 963-2345

19    alison@nshmlaw.com

20

21

22

23

24

25
```

Page 3

PA1036

```
 1                    Thursday, August 26, 2021

 2                         10:02 a.m.

 3        REPORTER'S TRANSCRIPT OF TELEPHONIC PROCEEDINGS

 4        MR. RAIZMAN:  I guess one of my motions is

 5   dependent on your guy's willingness -- it's somewhat

 6   besides the meet and confer but it is important, I think

 7   for the meet and confer -- is whether you guys are

 8   willing to come up with a new briefing schedule on class

 9   certification that would have that motion decided

10   earlier.

11        You probably have a view on that.  I just would

12   like to hear that.  Then we'll know.

13        MR. PORTER:  I think what we want to do, David --

14   and Madam Court Reporter, this is Jordan Porter -- is I

15   think we should align our hearing dates for the motion

16   for class cert with the summary judgment motion.

17        MR. RAIZMAN:  So just have them all heard at the

18   same time and schedule?

19        MR. PORTER:  That's right.  And that is also

20   based in part on the judge's comments when we modified

21   the briefing schedule the last time and kind of where we

22   wound up here.

23        MR. RAIZMAN:  Yeah.  So take me through that,

24   Jordan.  When would the motion be -- you guys would make

25   the motion, then, on September the 3rd; is that right?
```

PA1037

```
1          MR. PORTER:  We would make the motion on

2    September 10th.  We just need to have the hearing dates

3    align.  That is all.

4          MR. RAIZMAN:  Well, the last date for hearing

5    summary judgment is October.

6          MS. BERNAL:  8th, probably.

7          MR. RAIZMAN:  8th.

8          MS. BERNAL:  That is correct.  I know they are

9    one week apart here.

10         MR. RAIZMAN:  Yeah.  So, I mean, you guys, I am

11   just going to state the obvious.  You guys have written

12   this motion before with Labcor.  You have been working

13   on it, I am sure.  I don't know why you can't try to

14   make that motion on September 3rd and we could have some

15   semblance of not having crossing motions.  And our

16   oppositions, we'd each be working on something instead

17   of working on two briefs if we were on the same

18   schedule.

19         If you could move it up to September 3rd;

20   otherwise we're going back to the Court and asking for a

21   different briefing schedule which I think might work.

22   Let me hear your proposal, Jordan.  What were you guys

23   thinking?  You want them on the same day.  I don't have

24   a problem with that in theory or practice, but what

25   would those -- what would the briefing schedule look
```

Page 5

PA1038

1   like?

2          MR. PORTER:  Just bear with me for a second,

3   David, while I pull up -- when I get to the last

4   briefing schedule that actually has all of your dates in

5   it as well.

6          MS. BERNAL:  I think it is Document 62, right?

7          MR. PORTER:  Is that the one?

8          MS. BERNAL:  Yeah.  The last have the class cert

9   dates.

10          MR. PORTER:  Last date for hearing.  I think we

11   would because at the last date for the class cert motion

12   hearing date is the 29th, right?

13          MR. RAIZMAN:  Right.

14          MR. PORTER:  Wouldn't we try to find a date

15   somewhere between those dates and per the stipulation

16   presented to the Court have it all there at once,

17   tracked together?

18          MR. RAIZMAN:  So that is certainly something

19   that -- you know, I think it's -- it is certainly

20   something I can talk about with my client.  So I think

21   it makes sense.  But what date were you thinking of,

22   like the 15th?

23          MR. PORTER:  I was thinking -- let's see here.

24   What are the Judge's hearing dates, actually?  Let's see

25   here.

Page 6

PA1039

```
 1          MR. RAIZMAN:  Good question.  I think since we've

 2    been all focused on Fridays we just assumed.  But it is

 3    worth checking to make sure it is correct.

 4          MR. PORTER:  Fridays at 9:30.  Let's see if she

 5    is dark at all on any of these.  Looks like her closed

 6    motion dates are the 26th, 24th -- the days before and

 7    after holidays.

 8          MR. RAIZMAN:  Right.  Okay.  So I think it makes

 9    sense for all of us to have these hearings on the same

10    day on a sort of parallel briefing track.  Our motion,

11    your motion, and then we do -- you oppose ours, we're

12    opposing yours at the same time, and then we switch to

13    replies.  I would like to coordinate that.  I would also

14    like this decided as soon as possible.  I mean, I know

15    my client's strong interest and one of the attractions

16    in having a summary judgment heard on October 8th was to

17    have those issues decided.

18          And as you will hear, we're moving in

19    alternative.  I am not sure if that was clear from my

20    earliest request for the motion, but I am pretty sure I

21    put in there that we would be moving for partial summary

22    judgment in the alternative.  Just to have issues

23    narrowed is also critically important in a case of this

24    magnitude and scope.  So I thought -- I mean, tell me

25    whether you guys can live with October 15th or whether
```

Page  7

PA1040

```
 1   you will need to go back and check that with your

 2   people.  I know I will need to check anything different

 3   with my people, but I am certainly willing to do that.

 4        MR. PORTER:  Let's check both the 15th and the

 5   22nd, David.  There are some calendar issues that I

 6   think I need to have a better understanding of how that

 7   may affect that.  So I am not prepared to actually say

 8   the 15th or the 22nd.  I am trying to figure out what is

 9   going on and where we will be on those as I work

10   backwards from those dates.  I can have that resolved by

11   tomorrow.

12        MR. RAIZMAN:  Okay.  Just keep this in mind,

13   Jordan.  I don't know how my client is going to react.

14   He likes the idea of having the summary judgment motion

15   heard first, and he would like it decided sooner.  So

16   the farther back we get from October 8th the less likely

17   we're going to be able to coordinate these things.

18        MR. PORTER:  Understood.

19        MR. RAIZMAN:  So I hope that you guys can make

20   this happen on the 15th, because I think that is going

21   to make it more likely to get an agreement.

22        MS. BERNAL:  So that I understand, I am just

23   trying to take notes because some of this requires us to

24   go back and really look at our calendars better, with

25   the proposal for the 15th hearing date, what is the
```

Page 8

PA1041

```
1    briefing schedule you had proposed for that?

2         MR. RAIZMAN:  We don't have any choice on our

3    motion.  It's got to be due September 3rd because there

4    is a cutoff, right?  I guess we could try to modify that

5    and see if the judge would go for that.  But I --

6         MR. PORTER:  I don't know that I would try that,

7    actually.

8         MR. RAIZMAN:  Right and I don't know if I can sit

9    here and wait for it, right?  Because I am writing a

10   motion, as you guys probably are, for a week later.  I

11   feel like we should both try to file on the 3rd and give

12   ourselves extra time.  These are important issues.  To

13   some degree they are novel issues.  I would like to, you

14   know, allow the briefing to happen, especially on the

15   opposition side so that each side gets, you know, a fair

16   opportunity and not be squeezed by the ordinary motion

17   calendar.  So that is helped by us both moving on the

18   3rd if that's possible.  And that also allows --

19        MR. PORTER:  Yeah.  We're not going to be --

20   we're not going to be in the position to do it on the

21   3rd.

22        MR. RAIZMAN:  All right.  That is good to know.

23   The problem with that, of course, is that -- as I work

24   this out in my head, if we move on the 3rd, which we're

25   going to assume we have to do unless the Court gives us
```

Page 9

PA1042

```
 1    relief -- the math problem, right -- if we move on the

 2    3rd you would have until -- under the current

 3    circumstances you would have until the 17th.

 4          So you would be trying to oppose my motion for

 5    summary judgment while you are trying to finish your

 6    class cert.  You would file your class cert on the 10th.

 7    I don't know.  You would give me two weeks, until the

 8    24th, I assume, to do it, to do my opposition which is

 9    my proposal, and then you would have your reply on the

10    1st.  And then we would have the 15th would be the

11    hearing date.  I think that is what makes the most

12    sense.

13          And that would require, you know, you giving us

14    two weeks on the opposition and one week on the reply on

15    your motion, and we'll have given you two weeks on the

16    opposition and one week on the reply for ours.

17          MR. PORTER:  Okay.

18          MR. RAIZMAN:  You will be writing a motion and

19    doing an opposition, and then I'll be doing an

20    opposition and doing a reply as well.  So that's the

21    problem with it.  But, you know, that's the way to get

22    these on for the same date and get them on for the 15th,

23    which I think is probably the only way my client is

24    going to work.

25          And just going back to what you said, you know,
```

Page 10

PA1043

```
 1    the Court gave us a stern warning about the 29th.  I am

 2    not sure the 22nd won't just -- you know, seven more

 3    days -- save us, right?  And I know my client is

 4    concerned about that.  And somewhere in the back of this

 5    there is a mediation cutoff date of some kind, right?

 6    That mediation is never going to be successful without

 7    some resolution of these two motions, or let's just say

 8    it is less likely to be successful.

 9         And so I think it really behooves us -- and I

10    know you can't commit to this on this call -- you

11    already said that -- but I don't think the 22nd changes

12    the equation enough from the Judge's warning to really

13    help.

14         And that's why I wrote back in July to you guys

15    and said, hey, let's move this -- let's move the

16    briefing schedule up because we're no longer in trial.

17    And that trial had sort of driven the calendaring that

18    we did to these later dates.

19         MR. PORTER:  Yeah.  David, I appreciate it is a

20    dynamic situation and we have the same dynamics working

21    in the other direction in the interim.  As you know, the

22    state courts have reopened and created new pressures.

23    Yeah.  So settlement conference completion date is

24    November 8th.

25         MR. RAIZMAN:  Right.  So a week.  Yeah.
```

Page 11

PA1044

1          MR. PORTER:  Alison, maybe you can jump in here.

2     But the scheduling proposal, I think we agree, there is

3     something happening for somebody every week between the

4     3rd and the 15th.

5          MS. BERNAL:  So this is the -- and I understand

6     this is the kind of the warning we got in the last

7     request to the Court, but if we phrase this as we don't

8     want the Court working us up twice on the same fact

9     pattern, obviously a different request, either summary

10    judgment or class cert, but it is really the same

11    underlying facts.  We don't want the Court having to

12    look at this twice.

13         So if we can get a stipulated briefing schedule

14    with the hearing on the same date, and you know, whether

15    that summary judgment being filed at the same time as

16    the class cert following the class cert briefing

17    schedule or what, I think the Court would appreciate

18    that in spite of the earlier comments.  I don't know

19    that, and maybe there is not enough time to make that

20    request, but it is just a thought.

21         MR. RAIZMAN:  Yeah.  Alison, I am in favor of

22    trying that.  And if you are suggesting we both move on

23    a parallel track so we move on September 10th --

24         MS. BERNAL:  Basically the class cert dates.

25         MR. RAIZMAN:  Yes.  Well, the class cert dates

Page 12

PA1045

```
 1    based on an earlier hearing date, though.

 2         MS. BERNAL:  If we can, yeah.  We just have to be

 3    mindful that the Court won't want that reply filed any

 4    closer to the hearing date normally.

 5         MR. RAIZMAN:  Right, especially if it's got two

 6    major motions to decide.  That may be a disincentive for

 7    the Court here that we need to be sensitive to.

 8         MS. BERNAL:  Yeah.

 9         MR. RAIZMAN:  So maybe it makes sense to keep on

10    this dual track having them heard on the same day, but I

11    am all in favor of trying to track it, but we would

12    obviously need -- we would need something quickly from

13    the Court on that.

14         MS. BERNAL:  Yeah.

15         MR. RAIZMAN:  But whatever.  We're moving ahead

16    as if we have to file next Friday, and that's just the

17    way it is.  But if there is a way to get a ruling in the

18    meantime, hopefully soon, then I think we should try to

19    get something to the Court sooner than later.

20         MS. BERNAL:  Maybe if we move forward, I mean,

21    you are drafting your motion, but get something on file,

22    and we can talk about which dates work best.  So, you

23    know, you are protecting your client's interest by

24    getting it on file, and then if you get a ruling from

25    the Court in the interim then great, you don't have to
```

Page 13

PA1046

```
 1    file so quickly.  Ideally that really would come from
 2    the Court as to the hearing date soon in the next week
 3    or two.
 4         MR. RAIZMAN:  Right.  Well, ideally the ruling
 5    would come before that, but, yeah.  I guess what I ask
 6    is that you guys look hard to see if you could do 15th,
 7    because I think without that we might not have a
 8    stipulation on all of these things that we otherwise
 9    agree on.  Because I just don't think it moves the ball
10    enough to change the Court's view of this.
11         And you notice the one thing I am not doing is
12    asking the Court to move any other dates which is the
13    other option here.  Because part of what is creating
14    this crunch is her not giving us leeway on the pretrial
15    conference and all that.
16         MS. BERNAL:  Yeah.  I think that would not be met
17    very well based on her prior orders.
18         MR. RAIZMAN:  I think that is probably true, but
19    at least this tees that up for her implicitly without
20    her even asking about it.  But that is probably right.
21    So I would ask us to look at the 15th, get back to me,
22    and then either propose a briefing schedule for the two
23    motions or not.  But I am good if we can agree on the
24    15th.
25         And so -- by the way, I mean, that is the last to
```

Page 14

PA1047

```
 1    be heard, but we can agree between us today that you are

 2    going to file on the 10th, we'll oppose it on the 24th,

 3    and you will do your reply on the 1st.  We had a longer

 4    briefing schedule before.

 5         MS. BERNAL:  We did.  I was just looking at that

 6    and see if that was the way to --

 7         MR. RAIZMAN:  I have taken a week away from each

 8    of our oppo's and our replies, is what I've done.  And

 9    that allows us to move the hearing date up by two weeks.

10    So if you guys are agreeable to the briefing schedule we

11    don't need her permission to have your motion heard on

12    the 15th.

13         MS. BERNAL:  No.

14         MR. RAIZMAN:  And that would be a favorable

15    result.  But we have an agreement, and I will stick to

16    it, to do it otherwise.  But if we do it otherwise we're

17    going to make our motion for decertification and try to

18    have it heard first.  I don't -- trust me, I am not like

19    dying to do that, but I can't not try to knock out the

20    damages class or not have a ruling on knocking out the

21    damages class and going to a mediation that is going to

22    be meaningful in any way.  I would think you guys would

23    feel the same, but I don't know.

24         It just doesn't make logical sense to -- you

25    know, once we're all staring at the results of these two
```

Page 15

PA1048

1    rulings the case is probably going to look different.

2    It is either going to look really good for you or really

3    good for us or it is going to be some mix.  But it is

4    going to be different.

5         MS. BERNAL:  Okay.  So I think we have got the

6    proposal here.  We will look hard at what we can do as

7    far as that proposal.  And you know, 9-10, 9-24, 10-1

8    for briefing on class cert, which is a good time to set

9    it for the 10-15 hearing.  So we'll look at that part.

10        And do you want to get to the substance here of

11   the meet and confer?

12        MR. RAIZMAN:  Sure.  So on our summary judgment

13   motion, I think we have a basic disagreement on what the

14   statute regulations require.  And I think it's a

15   disagreement that is going to have to be resolved by the

16   Court.  But here we are.  We're meeting and conferring.

17        So I think, you know, point one through three --

18   I am going to leave primary consideration aside for the

19   moment, and let's just deal with the ADA claim and the

20   Unruh Act's incorporation of the ADA claim.  So we just

21   have a different view than you about what is required.

22   And our view is that what is required is effective

23   communication and that it need not be a prescribed path.

24   And that is sort of one basic difference that we have

25   and that we also challenge this notion of absolute

Page 16

PA1049

```
 1    equality of the communication.

 2         So we think communication can be made through

 3    alternative means for -- so that just because we develop

 4    a technology doesn't mean that that technology needs to

 5    be accessible.  It's what that technology is designed to

 6    deliver just needs to go accessible and in an effective

 7    way.

 8         So that's the fundamental difference.  And I

 9    don't know that we -- I know that we don't bridge that

10    gap, but it is a legal question that we would like the

11    Court to address because it will dictate, I think, sort

12    of the result, because I actually think in many ways

13    there is not a tremendous amount of factual difference

14    as to, you know, what the device can or can't do and

15    what a blind or visually-impaired patient needs to do

16    when they come.

17         So that's -- we think, these issues that are

18    identified in one through three of my email yesterday

19    are really the crux of understanding whether we're

20    fulfilling the obligation or not.  When it comes to

21    primary consideration, I believe I understand your

22    argument.  It wasn't in the complaint.  So I don't know

23    that it's ever been fully or articulated in the way I am

24    sure you will in your opposition.

25         But as I understand it, it is based on the Rehab
```

Page 17

1     act.  The Rehab Act regulations of course have no such

2     regulation.  We don't think you can regulate by website.

3     We don't think primary consideration is directed to

4     circumstances like these where you are developing a

5     technology for literally hundreds of thousands of

6     people.

7          We don't think you can give primary consideration

8     to every request when you have hundreds of thousands of

9     people who might each request something and

10    theoretically be entitled as a primary consideration.

11    We don't think primary consideration, putting aside the

12    fact that it is not in the regulations so it is

13    extra-regulatory is even consistent with the Rehab Act

14    obligation of program access.

15         So we think if the DOJ did issue such a

16    regulation we think it is contrary to the program -- it

17    is directly contrary to the notion of program access

18    which was actually intended to be a much more liberal

19    compliance standard viewing in its entirety

20    accessibility of goods and services.

21         So whatever primary consideration means we think

22    we meet well the Rehabilitation Act standard that's been

23    in place for -- don't make me do the math -- 38 years

24    before primary consideration came up.  Everyone

25    understood what the Rehab Act meant and how it was

Page 18

PA1051

```
 1    different from Title III, for example, the permit
 2    program access.  And we think that the primary
 3    consideration regulations, to the extent it is out
 4    there, is directly inconsistent with all of that law and
 5    all of the ways in which the Rehab Act has been
 6    interpreted.
 7         Finally on primary consideration we believe that
 8    we gave that primary consideration.  There is a long
 9    record of our engaging in discussions with ACB.  And
10    there is -- it's documented.  And we met with focus
11    groups, three different focus groups.  Focus group is
12    not always the right word, but I am using that as a
13    shorthand -- three different groups of individuals with
14    blindness.  So we did give consideration to the blind
15    community when we came up with the three-finger swipe.
16    So that is that argument.
17         The standing arguments are twofold.  We argue
18    that there has to be an injury.  In fact, there is case
19    law in similar context that, you know, having to wait a
20    little bit longer to be helped is not injury, in fact.
21    We also think that there is no imminent threat of future
22    harm in part because of the three-finger swipe, and the
23    fact that once it is used people will know how to use
24    it.  So the next time, whether they had to wait, for
25    example, for Quest to tell them, they won't have to wait
```

Page 19

PA1052

```
 1    the second time because they will understand how to

 2    check in.

 3          And then finally on the Unruh Act claim, if the

 4    ADA Act fails, which of course does not rely on primary

 5    consideration, then the -- you are going to need to

 6    prove intentional discrimination.  And I don't think

 7    that that can be done under the circumstances.

 8          MR. PORTER:  Okay.  So just to clarify then, your

 9    motion is not going to be moving on mootness grounds; is

10    that correct, David?

11          MR. RAIZMAN:  Well, no, that is not correct.

12    That is the imminent threat of future harm, no imminent

13    threat of future harm.  I think mootness -- I mean,

14    mootness is also a standing principle.  And it is

15    closely related here.  We might sort of cite to some of

16    the mootness case law as well as an alternative.

17          So I think that, Jordan, is an argument that

18    we're looking at developing.  But there is still this

19    imminent threat requirement whether or not something is

20    moot or not.  But you could, I think, as a factual

21    matter sort of see them in the same light.

22          MR. PORTER:  And I guess the problem with that,

23    know, that argument, as we set forth the other day in

24    our supplemental disclosures is the three-finger swipe

25    isn't university rolled out.  Quest T.V. has not
```

Page 20

```
 1   universally rolled it out despite testimony to the

 2   contrary.

 3        MR. RAIZMAN:  I know that is the evidence that

 4   you guys have, and I obviously got this yesterday,

 5   effectively.  So I don't have an ability to really speak

 6   to that as a factual matter because that is news to me.

 7        MR. PORTER:  Okay.  And one of the concerns that

 8   it, of course, raises for us is before some of the Quest

 9   executives testified about that to the extent of this

10   rollout under oath I think at least three times.  What

11   sort of investigation did they do to determine if it is

12   actually rolled out.  It appears that it is not rolled

13   out in many, many, many locations, certainly nowhere

14   near 2200 locations.

15        MR. RAIZMAN:  And that is based on Mr. Derry's

16   going to 29 locations?

17        MR. PORTER:  Well, it is also based on the ACB

18   members' subsequent experience there.  So, yeah, that is

19   right, I mean the subsequent experience there.

20        MR. RAIZMAN:  Yeah.  Again, I am not in a

21   position to address it.  The actions were taken to roll

22   it out in all locations.  And, Jordan, I got this -- I

23   think it was sent to me after midnight yesterday or

24   yesterday morning after midnight.  So I didn't have a

25   chance to look at it until yesterday afternoon.  And so
```

Page 21

PA1054

```
1    needless to say I don't have a response back on the

2    factual part of that.

3         But that may impact our moving on that particular

4    basis.  And I understand what you are saying, is that

5    you are going to try to generate a factual issue on

6    that, right.  So that may be enough of a factual dispute

7    for us to not move on that basis.

8         But obviously we need to look at that, and we're

9    going to look at whether the steps were taken.  You

10   know, isolated instances, which might be what is being

11   experienced with a system this large is we don't think a

12   violation of the ADA.  And there is a regulation to that

13   effect.  And so I can't really speak to, you know, how

14   we may approach that issue, depending on what our own

15   review of facts looks like.

16        MR. PORTER:  Okay.

17        MS. BERNAL:  David, just kind of going back to

18   the earlier argument, I think we have a different view

19   of what the ADA requires, but, you know, that would be

20   for the judge to decide here.  And then on the remainder

21   we're going to agree to disagree as to whether the

22   primary consideration regs are applicable and whether

23   Quest complied with those.

24        Is there anything left on the MSJ to meet and

25   confer on?
```

PA1055

```
 1            MR. RAIZMAN:  I don't think so, Alison.  I think
 2     those are our primary arguments that you guys stated in
 3     your motion.  There are sub-arguments.  I have tried to
 4     reference as many of them as possible in talking about
 5     them, but they all fall under these categories.
 6            MS. BERNAL:  Yes.  Okay.  Do you want to meet and
 7     confer on the class cert?
 8            MR. RAIZMAN:  Go ahead.
 9            MS. BERNAL:  So we laid this out in our letter,
10     and I am sure you are well-versed in the Ninth Circuit
11     law on it, but for purposes of the meet and confer I am
12     just going to go through it.  And then you can let me
13     know.  I am guessing we'll agree to disagree on these as
14     well.
15            But we would move both for the nationwide and the
16     California damages sub-class for numerosity.  We would
17     argue that Quest's own records in their interrogatory
18     responses as well Mr. Grant's deposition testimony,
19     would provide the factual basis to argue that there is a
20     class so numerous that joinder of all class members is
21     impracticable for the Rule 23(a) requirement.
22            Generally you just have to show greater than 41,
23     which there is complaints from at least that many people
24     as well as the survey responses from ACB members and
25     their testimony.
```

Page 23

PA1056

```
 1              I believe in the interrogatory responses as well

 2     as the deposition testimony from Mr. Grant you provided

 3     the annual number of visits both nationally and in

 4     California over the relevant class period.  And then in

 5     the Ninth Circuit you can use statistical evidence so

 6     that a numerosity expert would provide that statistical

 7     analysis based on census data.  So that's what we would

 8     contend would meet the numerosity requirements.

 9          Did you want to go on each element, or you want

10     me to just roll through all of our elements, David?

11          MR. RAIZMAN:  What is your preference, Alison?

12          MS. BERNAL:  Why don't I just go through it.  Is

13     that okay with you?

14          MR. RAIZMAN:  Sure.

15          MS. BERNAL:  For adequacy, Rule 23(a)(4), the

16     representative party would have to fairly and adequately

17     protect the interest of the class which is for both the

18     named plaintiffs and their counsel, whether there is

19     conflicts of interest with other class members and

20     whether the named plaintiff and the counsel can

21     prosecute the action vigorously on behalf of the class.

22          On this Mr. Vargas testified at his deposition

23     regarding the steps he has taken to be a good class rep

24     including supervising the litigation, responding to

25     document requests, consulting with counsel dozens of
```

                                                    Page 24

PA1057

```
 1    times, approving filings, preparing and sitting for his
 2    deposition.  He has knowledge of the key facts including
 3    the jurisdiction, the judge, and the causes of action.
 4    And I think this would meet the fairly low threshold
 5    that is required in the Ninth Circuit and the Central
 6    District to be a class rep.
 7         And then we would further submit declarations on
 8    behalf of our firm and our co-counsel, Mr. Handley's
 9    firm setting forth the class counsel's adequacy of
10    representation which I think would also meet the
11    23(a)(4) requirements.
12         For typicalities, the claims just have to be
13    typical of the class.  So if they arise in the same
14    course of events and they make similar legal arguments
15    to prove the defendant's liability, so this again would
16    look to Mr. Vargas's testimony regarding his visits to
17    Quest and the fact that he encountered a kiosk that was
18    not independently accessible.  This is consistent with
19    the sworn testimony from ACB members as well.
20         On typicality, Mr. Vargas testified that he is
21    seeking the minimum statutory damages, not compensatory
22    damages, so this goes to show typicality would be met if
23    he is not an individual seeking compensatory damages
24    that would otherwise be available under Unruh, and that
25    further ensures his claims are not atypical from the
```

Page 25

PA1058

```
 1    class as a whole.
 2         Commonality, 23(a)(2), members of the class may
 3    sue or be sued as representative parties on behalf of
 4    all members if there are common questions of law or fact
 5    to that class.  So here we have the witnesses admitting
 6    the kiosks are not accessible.  I think this would kind
 7    of tie in to what you had earlier said more of the
 8    undisputed facts of summary judgment, you know, the
 9    common questions of facts are the accessible of the
10    kiosks, whether legally-blind individuals may use those
11    kiosks.
12         We would guess here those kiosks were rolled out
13    across the 2200 PSC network.  There wasn't training on
14    how to assist blind individuals with use of the kiosk.
15    I think that is Yarrison, Reilly and Carr who testified
16    as to that.  And then for the commonality as well,
17    just -- sorry.  I lost my train of thought completely.
18    I got an email that completely distracted me.  So that's
19    what we would get to on commonality.
20         Now I think where more of the cite maybe is a
21    23(b)(2) requirement.  I am sorry, the 23(b)(2) would be
22    for the nationwide class.  So that is whether Quest has
23    acted or refused to act on grounds generally applicable
24    to the class.  Here we would cite to the admission,
25    again, that the kiosks were not independently accessible
```

Page 26

PA1059

```
1    throughout the class period for blind individuals across

2    the nationwide network, the testimony of the 48 ACB

3    members and Mr. Vargas, that they were identically

4    harmed by the lack of an independently accessible kiosk.

5         And then for 23(b)(3), that we need to show the

6    predominance over individual questions, and so here we

7    have the common interest that predominates because all

8    legally blind individuals were injured in exactly the

9    same way.  The kiosk was rolled out the same across

10   every PSC in California.  That is the Yarrison and Carr

11   depositions.  None of the kiosks were accessible for

12   blind patients, which is Yarrison's deposition.

13        The individual issues that California and

14   sub-class members would have do not predominate, and

15   again, this is because Mr. Vargas testified clearly, and

16   the complaint is clear that it is seeking minimum

17   statutory damages which do not require individual proof

18   of intent.  I think that is the Target.com case that

19   clarifies intentional discrimination is not required for

20   an Unruh Act claim predicated on an ADA claim.

21        So with that in mind we just need to prove

22   through statistical census data that the number -- show

23   the number of visits by each claimant during the class

24   period, which is information Quest itself has within its

25   custody and control so it would be capable of easy
```

Page 27

PA1060

```
 1    calculation and then some verifiable proof of legal
 2    blindness.
 3          This can be accomplished, as other courts have
 4    allowed, through a variety of means, SSDI registration
 5    based on legally-blind status, government issued I.D.
 6    cards identifying the claimant's blindness, note from a
 7    physician diagnosing blindness.  There is a variety of
 8    ways that courts have allowed this.  And this is
 9    something that a claims administrator is fully capable
10    of accepting or rejecting claims that are submitted to
11    them, so it is not a barrier to calculation.
12          So I think those would be our main arguments
13    there.  I mean, I don't want to go into every case cite
14    or anything like that.  But do you have any specific
15    questions on that?  Oh, I think I missed superiority.
16    Apologies for that.
17          So additionally, under 23(b)(3) we would argue
18    that the class action is a superior method to resolving
19    this than individual adjudication.  This is because --
20    hold on one second.  Sorry about that.  So for
21    superiority under 23(b)(3) there is no indication
22    anywhere in the records that class members have an
23    interest in individually controlling their own cases.
24    The cost of litigating individual matters is
25    prohibitive.  There haven't been any corollary lawsuits
```

Page 28

PA1061

```
 1    against Quest for this.  There is really no unique

 2    difficulties in managing this class action.  It is

 3    really the most efficient way to address the legal and

 4    factual issues to determine if these class members are

 5    entitled to relief.  So those would be our arguments on

 6    class certification.

 7         MR. RAIZMAN:  Okay.  I think we have broad

 8    differences of opinion that I know we are not going to

 9    bridge in this call, but let me just ask a couple of

10    questions.  You said you have numbers for the annual

11    number of visits.  I think you are talking about the

12    annual number of total visits, right, not class member

13    or putative class member visits?

14         MS. BERNAL:  Correct.  So from that -- and I

15    believe these are both -- and I don't have the exact

16    numbers.  I think Mr. Grant testified something like

17    250,000 patients a day visit Quest nationwide.  And then

18    in the interrogatory responses there is the annual

19    number of visits in California and nationwide.  So

20    through that it would then be a statistical analysis

21    which the Ninth Circuit has allowed.

22         MR. RAIZMAN:  That's what I thought.  I just

23    wanted to know whether you had -- were claiming

24    something about class members' numbers.

25         MS. BERNAL:  No.  Individual class numbers I
```

Page 29

PA1062

```
1    think you can get above 41 for at least the nationwide

2    one based on the complaint and the ACB members'

3    testimony.

4         MR. RAIZMAN:  So on the adequacy, how does it

5    work between ACB and Mr. Vargas with respect to

6    determining what is best for the class?

7         MS. BERNAL:  So the class -- and I will

8    double-check on this, but my understanding is we are

9    moving for certification on behalf of Mr. Vargas.  And

10   he would be the class representative.

11        MR. RAIZMAN:  Okay.  So ACB is playing no role in

12   that?

13        MS. BERNAL:  Yeah.

14        MR. RAIZMAN:  Are its members members of the

15   class?

16        MS. BERNAL:  Well, they would be putative class

17   members.  They are not representative class members.

18        MR. RAIZMAN:  Right.  So they are represented by

19   ACB and by Mr. Vargas?

20        MS. BERNAL:  I don't think the associational

21   representation is the same as the representation for

22   purposes of adequacy.  They are members of ACB, and they

23   agreed to testify as they had made complaints in

24   declarations, but there is a difference there as far

25   as -- you know, there is not really two levels of
```

Page 30

```
 1    representation for purposes of this class certification.
 2         And, David, I do just want to clarify.  I am
 3    double-checking, but I believe that class cert will be
 4    brought on behalf of Mr. Vargas as the class
 5    representative.  I want to double-check that.
 6         MR. RAIZMAN:  That's always been the allegation.
 7    I didn't think that -- I think Matt has probably said
 8    elsewhere that ACB is not the class rep.
 9         MS. BERNAL:  Yeah.  I don't think that is proper
10    to bring them as a class rep either on some of these
11    claims.
12         MR. RAIZMAN:  Okay.  We're clearly going to
13    disagree on typicality.  I think everybody has
14    experience, but I don't -- you know, I don't what to say
15    about that.  So you went through these factors as they
16    related to the first kiosk.  My question is do they also
17    relate to the experiences with the current kiosk, the
18    one that has the three-finger swipe in it?
19         MS. BERNAL:  Most of the factual evidence that we
20    have is based on the, you know, pre-complaint kiosk that
21    did not have the three-finger swipe.  And as the
22    investigation showed and the individuals' experiences
23    showed, they did not all get to encounter that
24    three-finger swipe on subsequent visits.  So I believe
25    the factual -- you know, both through discovery and
```

Page 31

PA1064

```
 1    depositions and everything, that, you know, we get
 2    through this case was based on the prior kiosk.
 3         MR. RAIZMAN:  So are you challenging the current
 4    kiosk in any of the claims, or are you just saying that
 5    in response to an argument that we'll make that it is
 6    moot?
 7         MS. BERNAL:  Well, it would --
 8         MR. RAIZMAN:  Sorry.  Go ahead.
 9         MS. BERNAL:  Sorry.  I completely cut you off
10    there if you wanted to finish.  I thought you were
11    finished.
12         MR. RAIZMAN:  I think you probably understood my
13    question.  So I am okay.
14         MS. BERNAL:  Yeah.  So we would use that to both
15    challenge a mootness argument on the three-finger swipe,
16    so that's, you know, to the extent I don't know if
17    mootness would come up in the class cert, but certainly
18    in responding to the MSJ that would be the main purpose
19    of that, you know, saying that this fix is not actually
20    the fix that is needed.
21         I don't -- and I think through that argument it
22    would necessarily probably tie back into the class cert
23    because to the extent, you know, our class period goes
24    into the time after the three-finger swipe, we would
25    have to show that even with the three-finger swipe it is
```

Page 32

PA1065

```
 1    still accessible to the blind individual.  And I think
 2    there is that testimony and that evidence through the
 3    investigation.
 4         MR. RAIZMAN:  You just preliminary sort of
 5    answered one of my questions.  It is what is the class
 6    period.
 7         MS. BERNAL:  So we don't have it -- let me check
 8    my notes on this, David, to make sure I am not speaking
 9    out of turn.  Bear with me for one second.  You know,
10    David, I don't have the exact class period right now.  I
11    am going to write in that my notes to get that back to
12    you.  That is not something we decided on finally yet.
13         MR. RAIZMAN:  Okay.  I think that is relevant to
14    a lot of what we might oppose.  And what is your -- I
15    think you suggested it.  So you would not have
16    individual adjudication of people's damages claims?
17    They would just submit that they visited and that they
18    are probably of status to be a member of the class.  And
19    that's the way you would attempt to prove entitlement to
20    damages?
21         MS. BERNAL:  Yeah.  And I think that is something
22    that not necessarily has to be decided on class cert,
23    but that is something that if a class is certified the
24    claims administrator is capable of undertaking questions
25    to determine whether that person visited Quest, and then
```

Page 33

PA1066

```
1    that person can certify through a variety of means,

2    through government, medical, note or something that they

3    are legally blind.  It is something that the claims

4    administrator could decide and doesn't have a barrier,

5    doesn't make the class unmanageable.

6           So, yes, statutory, statutory damages only, so

7    they are not submitting proof of, you know, their

8    general damages.  It would just be a statutory analysis.

9           MR. RAIZMAN:  And no analysis of what happened to

10   them on their visit?

11          MS. BERNAL:  Just that they had visited that

12   Quest location during the class period and they are

13   legally bland, yes.

14          MR. RAIZMAN:  No analysis, for example, that they

15   walked in and got served right away because a

16   phlebotomist greeted them when they walked in right away

17   and they got helped right away, served right away, that

18   you would still allow a claim under that circumstance?

19          MS. BERNAL:  I don't think it needs an individual

20   inquiry on that, no, when it is a universal across the

21   board implementation of the kiosk.  Because there is

22   still a service that PSC has that was inaccessible to

23   the class member who visited it.

24          MR. RAIZMAN:  Right.  This is why you don't have

25   a lot of damages, Unruh Act damages to point to, at
```

Page 34

PA1067

```
 1    least not since Dukes?  Because we don't think that is
 2    right at all.  We do think we're entitled to defend each
 3    claim.  You don't just -- you don't just cha-ching an
 4    Unruh Act claim.  You have got to prove up.
 5         I also strongly challenge the idea that this is
 6    superior or that the cost prohibitiveness of bringing
 7    individual claims is some factor here, because I think
 8    we all understand just how prevalent these are.  And
 9    Judge Gee will know, any judge that is sitting in the
10    Central District will know that the idea that these
11    class members are somehow unwilling to bring claims
12    simply doesn't hold water.  And so I don't quite
13    understand how you can assert with a straight face that
14    the cost of litigating individual lawsuits is
15    prohibitive.
16         So I think we have strong differences on
17    superiority and what is required in managing the claims.
18    But I am interested to hear that you are not -- you are
19    not proposing any actual adjudication of the -- you
20    know, before a court or jury, for that matter, of the
21    Unruh Acts damages.
22         MS. BERNAL:  Correct in that we're just seeking
23    the minimum statutory not compensatory.
24         MR. RAIZMAN:  Do you guys know offhand -- I don't
25    remember whether you had a jury trial demand.
```

Page 35

PA1068

1          MS. BERNAL:  I would think we did, but I think it

2     would also depend on what claims are left at the end of

3     obviously injunctive relief when we get there.  Let me

4     get back to the pleadings.

5          MR. RAIZMAN:  That is okay.  You either did or

6     you didn't.  I guess that is the part that I assumed you

7     did, and I have been operating under the assumption that

8     you did.

9          MS. BERNAL:  I assume as well.  Let me check.

10    Yeah, jury trial demanded, yeah.

11         MR. RAIZMAN:  You are obviously seeking to

12    adjudicate these claims without a jury.

13         MS. BERNAL:  No.  I don't think that is correct.

14    I mean, if we get -- if we get the certified -- and then

15    it is for the jury to decide whether there were

16    violations of the law, and they can do the math on it.

17         MR. RAIZMAN:  Wait a minute.  I thought you said

18    you were going to manage this by having people submit

19    their government-issued I.D. card or their SSDI status

20    and the number of visits they had.

21         MS. BERNAL:  Yes.  So that would be, though, at

22    the end.  So a jury would determine the liability, and

23    then in order to get the damages administered to the

24    class, that's how they would go.

25         MR. RAIZMAN:  The jury would determine liability

                                                    Page 36

PA1069

```
 1   as a class.  The amount of damages or entitled to

 2   damages is sort of a yes, no, the $4,000?  It is sort of

 3   in the claims administrator's hands?

 4        MS. BERNAL:  Do you have anything further on the

 5   class certification motion?

 6        MR. RAIZMAN:  That is a question.

 7        MS. BERNAL:  That was a question?

 8        MR. RAIZMAN:  Yes.

 9        MS. BERNAL:  Oh, sorry.  I thought that was a --

10        MR. RAIZMAN:  I want to understand.  You are

11   proposing a way to adjudicate these damages claims,

12   right, the (b)(c) part.  And my question for you is it

13   seems to be unfolding in front of me, no fault of yours.

14   We're trying to do this as efficiently as possible.  I

15   just want to understand.  You are proposing that a jury

16   will decide liability as to the entire class, and then a

17   class administrator of some sort will then give a

18   determination, yes, no, as to $4,000 only based on

19   whether someone can prove they're legally blind or

20   sufficiently blind and then that they, in fact, visited.

21   Is that how you are proposing to adjudicate the damages

22   claim?

23        MS. BERNAL:  You know, I haven't thought through

24   the trial strategy at this point.  I was focusing just

25   more on the predominant factors for class certification.
```

Page 37

```
 1    But I think for purposes of class certification, setting
 2    out the claims administrator is more than capable of
 3    handling this, whether it is after trial or after a
 4    class action settlement, it is sufficient to meet the
 5    predominance.
 6              MR. RAIZMAN:  I am talking about superiority.  I
 7    am talking about, in your own words, unique issues in
 8    managing the class.  And I am talking about the (b)(3)
 9    class.  You don't have a proposal at this time for how
10    that is going to happen?
11              MS. BERNAL:  For the 23(b)(3) superiority?  I'm
12    sorry.  I thought you were talking about predominance.
13    So I don't think that really impacts superiority.  Are
14    you talking about the difficulties in managing the class
15    action?
16              MR. RAIZMAN:  Yeah.  What is your plan for how
17    that is going to happen?
18              MS. BERNAL:  Yeah.  So if there is liability,
19    whether that is decided by the Court or a jury, there
20    will then -- with a liability determination, you can
21    create a pool for class members to submit to.  They
22    would submit that to a claims administrator, get through
23    the process we set forth above, and that would say
24    either you are entitled to that or you are not entitled
25    to that.  I think that presents no greater difficulties
```

Page 38

PA1071

```
 1    than any other sort of class action.  And it is, in
 2    fact, easier than a lot of consumer-type class actions
 3    in managing it.
 4         MR. RAIZMAN:  Okay.  All right.  So if I can
 5    suggest that our most urgent task is to try to reach
 6    agreement on these two briefing schedules.  Will you try
 7    to get back to me as soon as possible, sort of first in
 8    concept on the 15th, and then working back from there we
 9    can talk about briefing schedule?
10         MS. BERNAL:  Yes.
11         MR. PORTER:  Yes.  We will have that to you no
12    later than tomorrow morning, probably this afternoon.
13         MR. RAIZMAN:  Yes.  I mean, I think we really
14    need to know that.  I understand, and I have to talk to
15    my client too.  So I am not saying for you to do what
16    you can't do.  But whatever you can do will certainly
17    answer our ability to brief it.
18         MR. PORTER:  Right.  I would say I will get back
19    to you this afternoon, but I don't know that I could be.
20    I will get back to you tomorrow morning.  If we get
21    there this afternoon we'll certainly let you know right
22    away.  I am sensitive to the issues.
23         MR. RAIZMAN:  Okay.  Awesome.  I am running late
24    for another call.  I appreciate your time this morning,
25    and hopefully we'll be in touch had afternoon.
```

Page 39

PA1072

1

2                    (TIME NOTED:  11:04 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 40

PA1073

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4              That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were administered an oath; that

8     a record of the proceedings was made by me using

9     machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12             Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [ ] was [ ] was not requested.

16         I further certify I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or any party to this action.

19         IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21

22    Dated: August 30, 2021

23

24              JOANNA BROADWELL

25              CSR No. 10959

                                        Page 41

PA1074

# EXHIBIT 34

## <u>*REDACTED*</u>

## TO BE FILED UNDER SEAL
## PENDING THE RULING ON
## PLAINTIFF'S APPLICATION

# EXHIBIT 35

```
1              UNITED STATES DISTRICT COURT

2           FOR THE CENTRAL DISTRICT OF CALIFORNIA

3   JULIAN VARGAS, ANNE WEST, and        )

4   AMERICAN COUNCIL OF THE BLIND,       ) Case No.

5   individually on behalf of            ) 2:19-cv-8108

6   themselves and all others similarly  )

7   situated,                            )

8                      Plaintiffs,       )

9   vs.                                  )

10  QUEST DIAGNOSTICS, CLINICAL          )

11  LABORATORIES, INC., QUEST            )

12  DIAGNOSTICS HOLDINGS, INC., QUEST    )

13  DIAGNOSTICS INCORPORATED; and DOES   )

14  1-10, inclusive,                     )

15                      Defendants.      )

16

17

18          30 (B)(1) DEPOSITION OF TAYLOR CARR

19                  April 12, 2021

20

21

22  REPORTED REMOTELY BY:

23  AMBER S. WILLIAMS, C.S.R. No. 1080

24  Notary public

25
```

                                                    Page 1

PA0970

| | | |
|---|---|---|
| 1 | Also, if there is anyone present in the room with you | 12:11PM |
| 2 | not on video, please so indicate. | 12:11PM |
| 3 | MR. MILLER:  Thank you very much.  This is | 12:11PM |
| 4 | Jonathan Miller for -- on behalf of the plaintiffs, | 12:11PM |
| 5 | and plaintiffs consent to that arrangement. | 12:11PM |
| 6 | MR. RAIZMAN:  This is David Raizman on behalf | 12:11PM |
| 7 | of defendants.  There is no one in the room with me, | 12:11PM |
| 8 | and we consent to the method of recording the depo. | 12:11PM |
| 9 | TAYLOR CARR, | |
| 10 | first duly sworn to tell the truth relating to said | |
| 11 | cause, testified remotely as follows: | |
| 12 | EXAMINATION | |
| 13 | BY MR. MILLER: | 12:12PM |
| 14 | Q.   Good afternoon, Mr. Carr.  As I've | 12:12PM |
| 15 | already indicated, I represent the plaintiffs in the | 12:12PM |
| 16 | lawsuit that has been filed against defendants | 12:12PM |
| 17 | Quest Diagnostics, and you understand that you're | 12:12PM |
| 18 | here today to have your deposition taken in that | 12:12PM |
| 19 | matter? | 12:12PM |
| 20 | A.   Yes. | 12:12PM |
| 21 | Q.   And you understand that you're here to | 12:12PM |
| 22 | testify to both in your individual capacity and as | 12:12PM |
| 23 | the 30(b)(6) designee by Quest as the person most | 12:12PM |
| 24 | knowledgeable regarding the three-finger swipe at the | 12:12PM |
| 25 | e-Check kiosk; is that true? | 12:12PM |

Page 8

| | | |
|---|---|---|
| 1 | A.   I believe so.  I think there's two | 12:12PM |
| 2 | questions there.  I think I'm testifying on behalf of | 12:12PM |
| 3 | myself. | 12:12PM |
| 4 | Q.   Let me break it down for you.  You | 12:12PM |
| 5 | understand you're here to testify both individually | 12:12PM |
| 6 | today, correct? | 12:12PM |
| 7 | A.   I understand I'm here to testify | 12:12PM |
| 8 | individually, correct. | 12:12PM |
| 9 | Q.   And you also understand that you're here | 12:12PM |
| 10 | to testify today as a 30(b)(6) designee by Quest on | 12:13PM |
| 11 | the three-finger swipe at the eCheck kiosk; is that | 12:13PM |
| 12 | true? | 12:13PM |
| 13 | A.   That's correct. | 12:13PM |
| 14 | Q.   Can you please state your full name for | 12:13PM |
| 15 | the record? | 12:13PM |
| 16 | A.   Taylor Carr. | 12:13PM |
| 17 | Q.   Have you ever been known by any other | 12:13PM |
| 18 | names? | 12:13PM |
| 19 | A.   No. | 12:13PM |
| 20 | Q.   Have you ever had your deposition taken | 12:13PM |
| 21 | before? | 12:13PM |
| 22 | A.   No. | 12:13PM |
| 23 | Q.   Have you ever provided testimony in any | 12:13PM |
| 24 | trial or administrative proceeding? | 12:13PM |
| 25 | A.   I have not. | 12:13PM |

Page 9

| | | |
|---|---|---|
| 1 | Q.   And again, specifically within your role | 12:36PM |
| 2 | of business process redesign director, what type of | 12:36PM |
| 3 | day-to-day tasks were you doing in the 2015 | 12:36PM |
| 4 | timeframe?  What type of projects were you working | 12:36PM |
| 5 | on? | 12:37PM |
| 6 | MR. RAIZMAN:  Object to form. | 12:37PM |
| 7 | THE WITNESS:  There was many, many projects. | 12:37PM |
| 8 | Primary ones were Patient Services, but others as | 12:37PM |
| 9 | well. | 12:37PM |
| 10 | Q.   (BY MR. MILLER):  Were the primary | 12:37PM |
| 11 | projects you were working on with Patient Services | 12:37PM |
| 12 | when you came on board in 2015? | 12:37PM |
| 13 | A.   It was understanding our patient | 12:37PM |
| 14 | experience and using experience design to make that | 12:37PM |
| 15 | better. | 12:37PM |
| 16 | Q.   Other than just the general overview of | 12:37PM |
| 17 | looking at patient experience, was there any specific | 12:37PM |
| 18 | projects you were being asked to work on in the 2015 | 12:37PM |
| 19 | timeframe with Patient Services? | 12:37PM |
| 20 | A.   There was specific products and services | 12:37PM |
| 21 | that sat underneath the umbrella of patient | 12:37PM |
| 22 | experience.  Do you have a specific product or | 12:37PM |
| 23 | service that you're looking to understand further? | 12:37PM |
| 24 | Q.   Yeah.  I'm trying to understand what | 12:37PM |
| 25 | products or services you were working on in 2015 | 12:37PM |

Page 29

| | | |
|---|---|---|
| 1 | under that broader umbrella? | 12:38PM |
| 2 | A.   There was -- under "Patient Experience," | 12:38PM |
| 3 | there's three that were connected, and it was | 12:38PM |
| 4 | preregistration, appointment scheduling, and | 12:38PM |
| 5 | electronic check-in. | 12:38PM |
| 6 | Q.   Also known as e-Check? | 12:38PM |
| 7 | A.   Yeah.  Also known as e-Check-in. | 12:38PM |
| 8 | Q.   e-Check-in.  Excuse me.  e-Check-in. | 12:38PM |
| 9 | Did any part of your compensation when | 12:38PM |
| 10 | you took on the position of director involve stock | 12:38PM |
| 11 | options that the company provided to you? | 12:38PM |
| 12 | A.   No. | 12:38PM |
| 13 | Q.   Specifically with respect to Quest | 12:38PM |
| 14 | e-Check-in project, what did you understand the | 12:39PM |
| 15 | project to be when you started in 2015? | 12:39PM |
| 16 | A.   Can you ask more specific?  There's a | 12:39PM |
| 17 | lot to unpack, I guess, so... | 12:39PM |
| 18 | Q.   That's why we are here today, so we can | 12:39PM |
| 19 | take it broad and then move into the specific.  But I | 12:39PM |
| 20 | just -- when you started with Quest in 2015 in this | 12:39PM |
| 21 | position, I assume somebody described for you what | 12:39PM |
| 22 | the project was going to be with respect to | 12:39PM |
| 23 | e-Check-in.  Is that correct or incorrect? | 12:39PM |
| 24 | A.   I wouldn't say it was correct or | 12:39PM |
| 25 | incorrect.  There's a lot within what we were trying | 12:39PM |

Page 30

```
 1              A.   Partial, I would say.  I'd have to look    12:45PM

 2      back.                                                   12:46PM

 3              Q.   How about 2018?                            12:46PM

 4              A.   I think sure but not primarily.  It was    12:46PM

 5      primarily 2015 and --                                  12:46PM

 6              Q.   How about -- I'm sorry.                    12:46PM

 7              A.   I said '16.                                12:46PM

 8              Q.   2016.  Do you still work on the            12:46PM

 9      e-Check-in project in any form?                        12:46PM

10              A.   Yes.                                       12:46PM

11              Q.   Was there ever a break in time that you    12:46PM

12      didn't work on the e-Check-in project for any years    12:46PM

13      between 2015 and the present?                          12:46PM

14              A.   Yes.                                       12:46PM

15              Q.   When was that?  What years did you not     12:46PM

16      work on the e-Check-in project?                        12:46PM

17              A.   Probably -- I think 2019 I think is what   12:46PM

18      it was.  Sorry.  I'm having to think back of other     12:46PM

19      duties at the time.                                    12:46PM

20              Q.   Did you become re-involved in the         12:46PM

21      e-Check-in project in 2020?                            12:46PM

22              A.   Yes.                                       12:47PM

23              Q.   When?                                      12:47PM

24              A.   With COVID and everything that was        12:47PM

25      happening last year, there was a lot of -- a lot of    12:47PM
```

Page 36

| | | |
|---|---|---|
| 1 | hats that were being worn across the organization to | 12:47PM |
| 2 | support driving a great experience with our customers | 12:47PM |
| 3 | with the layer of COVID. | 12:47PM |
| 4 | Q.   So it was in response to COVID that you | 12:47PM |
| 5 | became re-involved in the e-Check-in project?  Is | 12:47PM |
| 6 | that -- am I understanding your testimony correctly? | 12:47PM |
| 7 | A.   It rose to prominence, correct. | 12:47PM |
| 8 | Q.   And are you still involved in the | 12:47PM |
| 9 | e-Check-in project as we sit here today?  Do you | 12:47PM |
| 10 | still work on that project in any capacity? | 12:47PM |
| 11 | A.   The only thing I would say is, like, the | 12:47PM |
| 12 | term e-Check-in is -- tends to be internal, so do I | 12:47PM |
| 13 | work on our means of getting customers checked in | 12:47PM |
| 14 | with ease from an experience perspective?  Yes. | 12:47PM |
| 15 | Q.   An e-Check-in project dealt with the | 12:47PM |
| 16 | check-in process at Patient Service Centers that | 12:47PM |
| 17 | Quest operates throughout the United States; is that | 12:48PM |
| 18 | true? | 12:48PM |
| 19 | A.   Say that again.  I'm sorry. | 12:48PM |
| 20 | Q.   Yes.  The e-Check-in project dealt with | 12:48PM |
| 21 | the manner and means which -- with which patients | 12:48PM |
| 22 | check in at Quest Patient Service Centers throughout | 12:48PM |
| 23 | the United States; is that accurate? | 12:48PM |
| 24 | A.   It dealt with one method by which | 12:48PM |
| 25 | customers could check in. | 12:48PM |

Page 37

```
 1          Q.   You mentioned that there were other ways     01:02PM
 2   of checking in prior to the implementation of the        01:02PM
 3   e-Check-in project other than that paper system.         01:02PM
 4   What other check-in methods are you aware of?            01:02PM
 5          A.   Verbal.                                       01:02PM
 6          Q.   And when you say that, that would be a        01:02PM
 7   patient going to a phlebotomist or a reception person    01:02PM
 8   and attempting to verbally check in?                     01:02PM
 9          A.   Two pieces there.  I would just say a         01:02PM
10   phlebotomist.  A phlebotomist who is in our wait room    01:02PM
11   or arrival space, and a customer grabs them with a       01:03PM
12   question.                                                01:03PM
13          Q.   When you were working on e-Check-in           01:03PM
14   project, you were attempting to improve patient          01:03PM
15   experience.  That was one of the objectives; is that    01:03PM
16   right?                                                   01:03PM
17          A.   The ultimate objective.  The experience      01:03PM
18   was everything.                                          01:03PM
19          Q.   And you had to understand what the prior     01:03PM
20   experience was before the implementation of the         01:03PM
21   e-Check-in project to be able to assess that and        01:03PM
22   improve it, right?                                       01:03PM
23          A.   Very -- a key element of framing the         01:03PM
24   experience problems, correct -- to improve.             01:03PM
25          Q.   And so other than the verbal method of       01:03PM
```

Page 45

PA0977

| | | |
|---|---|---|
| 1 | When you were working to fill in | 03:29PM |
| 2 | information in this template, were you trying to be | 03:29PM |
| 3 | as accurate as possible? | 03:29PM |
| 4 | A.   Of course, yes. | 03:29PM |
| 5 | Q.   You certainly didn't want to | 03:29PM |
| 6 | misrepresent any information in seeking a capital | 03:29PM |
| 7 | expenditure from Quest, did you? | 03:30PM |
| 8 | A.   Of course not. | 03:30PM |
| 9 | Q.   And when we look at here under the | 03:30PM |
| 10 | header "Project Name," that was for the eCheck, | 03:30PM |
| 11 | correct? | 03:30PM |
| 12 | A.   Per Row 14, Project Name, it says | 03:30PM |
| 13 | "eCheck." | 03:30PM |
| 14 | Q.   And it says, "Project Drive Product | 03:30PM |
| 15 | No. BPR005."  Was that an internal number used to | 03:30PM |
| 16 | identify the project? | 03:30PM |
| 17 | A.   I don't recall.  It's not striking any | 03:30PM |
| 18 | amount of memory on what the number is. | 03:30PM |
| 19 | Q.   Above there it says, under line 9, | 03:30PM |
| 20 | "Start date:  January 1st, 2016." | 03:30PM |
| 21 | Did you understand that to be the start | 03:30PM |
| 22 | date of the eCheck project? | 03:30PM |
| 23 | MR. RAIZMAN:  Objection.  Foundation. | 03:30PM |
| 24 | THE WITNESS:  No.  I don't know. | 03:30PM |
| 25 | Q.   (BY MR. MILLER):  How about the end date | 03:30PM |

Page 130

PA0978

| | | |
|---|---|---|
| 1 | of December 31st, 2020?  Did you understand that to | 03:30PM |
| 2 | be the end date of implementing the e-Check-in | 03:31PM |
| 3 | project? | 03:31PM |
| 4 | A.   I don't know. | 03:31PM |
| 5 | Q.   Under line 21, it says, "Project | 03:31PM |
| 6 | Rationale:  Cost Savings." | 03:31PM |
| 7 | Isn't it true that cost savings was the | 03:31PM |
| 8 | rationale for implementing the e-Check-in kiosk? | 03:31PM |
| 9 | A.   No.  The template is prefilled.  We | 03:31PM |
| 10 | didn't have a choice. | 03:31PM |
| 11 | Q.   Oh, you had to list cost savings? | 03:31PM |
| 12 | A.   There's only one template.  I don't | 03:31PM |
| 13 | think there's even -- like, you can't edit that | 03:31PM |
| 14 | field. | 03:31PM |
| 15 | Q.   So any project that seeks capital | 03:31PM |
| 16 | expenditure has to be for cost savings? | 03:31PM |
| 17 | A.   No. | 03:31PM |
| 18 | Q.   Did you attempt to edit the field? | 03:31PM |
| 19 | A.   I don't recall. | 03:31PM |
| 20 | Q.   Do you know any documents that would | 03:31PM |
| 21 | refresh your recollection? | 03:31PM |
| 22 | A.   No. | 03:31PM |
| 23 | Q.   Did you ever in writing disagree with | 03:31PM |
| 24 | anyone at Quest as to whether cost savings was the | 03:31PM |
| 25 | principal project rationale for the e-Check-in kiosk? | 03:32PM |

Page 131

| | | |
|---|---|---|
| 1 | A.   No.   It was not the principal rationale. | 03:32PM |
| 2 | Patient experience was always the first and foremost | 03:32PM |
| 3 | need. | 03:32PM |
| 4 | MR. MILLER:  Move to strike as nonresponsive. | 03:32PM |
| 5 | Q.   (BY MR. MILLER):  My question was more | 03:32PM |
| 6 | specific. | 03:32PM |
| 7 | Did you ever communicate with anyone in | 03:32PM |
| 8 | writing at Quest disagreeing that cost savings was | 03:32PM |
| 9 | the project rationale and instead indicating that it | 03:32PM |
| 10 | was about patient experience? | 03:32PM |
| 11 | MR. RAIZMAN:  Object as to form. | 03:32PM |
| 12 | THE WITNESS:  No.  It was always about | 03:32PM |
| 13 | patient experience. | 03:32PM |
| 14 | Q.   (BY MR. MILLER):  Do you believe that | 03:32PM |
| 15 | the project rationale stated here under e-Check-in | 03:32PM |
| 16 | CapEx is incorrect? | 03:32PM |
| 17 | A.   No, I don't believe it's incorrect. | 03:32PM |
| 18 | Q.   So cost savings was at least one of the | 03:32PM |
| 19 | rationales for implementing the e-Check-in kiosk; | 03:32PM |
| 20 | isn't that true? | 03:32PM |
| 21 | A.   No.  I think -- no. | 03:32PM |
| 22 | Q.   Did -- again, did you ever make any -- | 03:32PM |
| 23 | strike that. | 03:32PM |
| 24 | Let's go to "Summarized Project | 03:32PM |
| 25 | Description" under lines 23 through 26. | 03:33PM |

Page 132

PA0980

```
 1          MR. RAIZMAN:  -- exclude anything you learned    04:02PM

 2     from counsel.                                          04:02PM

 3          THE WITNESS:  Yeah.  I don't know.                04:02PM

 4          Q.   (BY MR. MILLER):  Other than counsel,        04:02PM

 5     whose idea was it to implement the three-finger-swipe  04:02PM

 6     method of checking in for blind patients?              04:02PM

 7          A.   Am I -- are you asking me or on behalf       04:02PM

 8     of Quest?  Like, is this the 30(b)(6) --               04:02PM

 9          Q.   On behalf of Quest, do you know whose        04:02PM

10     decision it was, other than counsel's, to implement   04:02PM

11     the three-finger swipe?                                04:02PM

12          A.   I honestly don't know.  Don't know.          04:02PM

13          Q.   Did you come up with the three-finger        04:02PM

14     swipe as the option?                                   04:02PM

15          A.   No.  Going back to what I mentioned my       04:02PM

16     role was in Human-centered design, I helped with      04:02PM

17     framing our understanding of getting to that place.   04:02PM

18          MR. MILLER:  Move to strike everything after     04:02PM

19     "No."                                                  04:02PM

20          Q.   (BY MR. MILLER):  Once a blind              04:02PM

21     individual does a three-finger swipe on the kiosk, am  04:03PM

22     I correct in understanding that it gives an audio      04:03PM

23     instruction to provide the potential wait time in      04:03PM

24     certain locations?                                     04:03PM

25          A.   Yes.                                         04:03PM
```

Page 155

| | | |
|---|---|---|
| 1 | So with -- on behalf of Quest, did you | 04:06PM |
| 2 | assist in any manner in coming up with the audio | 04:06PM |
| 3 | messaging that would be relayed to blind patients | 04:07PM |
| 4 | using the three-finger swipe? | 04:07PM |
| 5 | MR. RAIZMAN:  Same objection.  Same | 04:07PM |
| 6 | instruction not to answer as to communications to or | 04:07PM |
| 7 | from counsel and those considerations. | 04:07PM |
| 8 | THE WITNESS:  Yeah.  I don't know. | 04:07PM |
| 9 | Q.   (BY MR. MILLER):  Do you know what the | 04:07PM |
| 10 | audio messaging says with respect to the three-finger | 04:07PM |
| 11 | swipe and what's provided in response? | 04:07PM |
| 12 | A.   Not word for word. | 04:07PM |
| 13 | Q.   How about just generally, do you know | 04:07PM |
| 14 | what it says? | 04:07PM |
| 15 | A.   Based upon what you instructed me here, | 04:07PM |
| 16 | yes. | 04:07PM |
| 17 | Q.   I want to know what you understand it to | 04:07PM |
| 18 | say, though.  Generally, what do you understand the | 04:07PM |
| 19 | audio messaging to contain? | 04:07PM |
| 20 | A.   Information about checking in. | 04:07PM |
| 21 | Q.   And specifically what information -- as | 04:07PM |
| 22 | Quest 30(b)(6) representative, what information about | 04:07PM |
| 23 | checking in is relayed in the audio messages? | 04:07PM |
| 24 | A.   That they're checked in and one of our | 04:07PM |
| 25 | phlebotomists will come out shortly and serve them, | 04:08PM |

Page 159

| | | |
|---|---|---|
| 1 | Q.   And what specific -- what specific work | 04:38PM |
| 2 | did the Research Management group do for you in 2017 | 04:39PM |
| 3 | as it related to the e-Check-in services project? | 04:39PM |
| 4 | A.   They helped overall with the experience. | 04:39PM |
| 5 | So when I say "the experience," it's customers coming | 04:39PM |
| 6 | to Quest were checking in is an element of that | 04:39PM |
| 7 | experience. | 04:39PM |
| 8 | Q.   But specifically, in 2017, did they | 04:39PM |
| 9 | assist you in serving customers, or how -- how -- | 04:39PM |
| 10 | what -- what specific work was done with this group | 04:39PM |
| 11 | in that timeframe? | 04:39PM |
| 12 | A.   So this group, similar to the January | 04:39PM |
| 13 | 2020 with the visually impaired, helps us identify | 04:39PM |
| 14 | customers that we want to include in the design | 04:39PM |
| 15 | process to participate and iterate and make our | 04:39PM |
| 16 | experience better. | 04:39PM |
| 17 | Q.   In 2017, which customers were you | 04:39PM |
| 18 | attempting to include in the design process? | 04:39PM |
| 19 | A.   I don't know if I can convey that part, | 04:39PM |
| 20 | honestly.  It's not related to this -- I don't | 04:39PM |
| 21 | know -- this case or just is part of my normal | 04:39PM |
| 22 | innovation experience work and it might be privy to | 04:40PM |
| 23 | another organization.  I'm sorry.  I don't know. | 04:40PM |
| 24 | Q.   There were certainly some demographics | 04:40PM |
| 25 | that you wanted to learn about in 2017 that you used | 04:40PM |

Page 165

PA0983

```
 1              MR. RAIZMAN:  And here -- this is a yes-or-no        04:46PM

 2    question because --                                           04:46PM

 3              THE WITNESS:  Yes.                                  04:46PM

 4              MR. RAIZMAN:  All right.                            04:46PM

 5         Q.   (BY MR. MILLER):  And did you document             04:46PM

 6    that in writing?                                              04:46PM

 7              THE WITNESS:  Sorry, Dave.                          04:46PM

 8              Sorry.                                              04:46PM

 9         Q.   (BY MR. MILLER):  And did you document             04:46PM

10    that in writing?                                              04:47PM

11         A.   Yes.  We summarized the findings from --           04:47PM

12    per the Human-centered design process.                       04:47PM

13         Q.   And what specifically were the takeaways           04:47PM

14    that you had from this focus group?                          04:47PM

15              MR. RAIZMAN:  Objection.  Instruction not to       04:47PM

16    answer.  It's privileged.                                    04:47PM

17         Q.   (BY MR. MILLER):  Did you implement any            04:47PM

18    of the things that you learned from the focus group          04:47PM

19    into the design of the three-finger swipe?                   04:47PM

20         A.   One of the outputs from the focus group            04:47PM

21    was the three-finger swipe.  And I should say that's         04:47PM

22    where it originated -- like, that's where it                 04:48PM

23    originated, and there's a lot of consideration from          04:48PM

24    the origination that led eventually to the                   04:48PM

25    three-finger swipe.                                          04:48PM
```

Page 171

```
 1          MR. RAIZMAN:  All right.  You need to stop        04:48PM
 2    talking about the consideration.  You can just talk     04:48PM
 3    about what you learned from the focus group             04:48PM
 4    participants.                                            04:48PM
 5          THE WITNESS:  Okay.                                04:48PM
 6          MR. RAIZMAN:  Okay?                                04:48PM
 7          MR. MILLER:  I think -- and correct me if I'm      04:48PM
 8    wrong, Counsel.  I don't want to ask questions that     04:48PM
 9    you deem privileged.  I would like to learn what        04:48PM
10    he -- what he obtained from the focus group             04:48PM
11    participants.  Are you claiming privilege to that       04:48PM
12    information or not?                                      04:48PM
13          MR. RAIZMAN:  I am not.                            04:48PM
14          MR. MILLER:  Okay.                                 04:48PM
15          Q.   (BY MR. MILLER):  So -- so -- let me ask      04:48PM
16    a question.                                              04:48PM
17               What did you learn from the focus group      04:48PM
18    participants?                                            04:48PM
19          A.   Yeah.  There was four key elements, and      04:48PM
20    preparation was everything for the visually impaired.   04:48PM
21    Structure is key, use audio, and have employees that    04:48PM
22    are trained to be highly helpful and sensitive to ADA   04:49PM
23    needs.                                                   04:49PM
24          Q.   And what did you understand structure to     04:49PM
25    be in those four takeaways?                             04:49PM
```

Page 172

PA0985

```
 1    own smart devices -- that they had, you know,      04:51PM

 2    elements on their own devices that helped them      04:51PM

 3    navigate their worlds.                              04:51PM

 4         Q.   Independently, as far as you could tell?  04:51PM

 5         A.   Yeah.  Like, one example that a           04:51PM

 6    gentleman shared is he had an app on his phone that 04:51PM

 7    it could see objects in his world and verbally convey 04:51PM

 8    what those objects were.                            04:51PM

 9         Q.   Once the decision was made to implement   04:51PM

10    the three-finger swipe, was there ever any further  04:52PM

11    effort to obtain any feedback from visually impaired 04:52PM

12    individuals as to whether it was an effective means 04:52PM

13    of checking in?                                     04:52PM

14         A.   Personally, not that I was involved in.   04:52PM

15         Q.   How about that you're aware of?           04:52PM

16         A.   Not that I'm aware of.                    04:52PM

17         Q.   Was there any other takeaways that you    04:52PM

18    had -- strike that.                                 04:52PM

19              Was there any other feedback that you     04:52PM

20    received from this user group in Las Vegas in 2020  04:52PM

21    other than what you've already relayed to me that was 04:52PM

22    then used to effect any of Quest products or        04:53PM

23    services?                                           04:53PM

24         A.   No.  What I've summarized is the output.  04:53PM

25         Q.   Was there any effort undertaken as part   04:53PM
```

Page 174

PA0985-A

```
 1          A.   After the fact of changing an           04:55PM

 2   experience?  I'm not sure if I understand.          04:55PM

 3          Q.   As part of the decision on whether to   04:55PM

 4   change the experience, I'm asking whether you went  04:55PM

 5   back and saw whether there were any complaints lodged 04:55PM

 6   at Quest and then followed up with those individuals 04:55PM

 7   about their experiences with the e-Check-in kiosk.   04:56PM

 8          A.   I see.  If we continue to get feedback  04:56PM

 9   within a specific area of the experience after we   04:56PM

10   change it, we haven't gotten it right, and we'll    04:56PM

11   continue to iterate and try to make it bitter.      04:56PM

12          Q.   Yeah.  I'm sorry.  I apologize.  You're 04:56PM

13   still not understanding my question, so maybe I'm not 04:56PM

14   being clear.                                        04:56PM

15              What I'm asking is prior to the decision 04:56PM

16   to implement the three-finger swipe, did you ever go 04:56PM

17   back and survey Quest patients who had had          04:56PM

18   difficulty -- or visually impaired and had difficulty 04:56PM

19   accessing the e-Check-in service to see what their  04:56PM

20   experience was like?                                04:56PM

21          A.   Maybe.  I don't know.  I mean, the only 04:56PM

22   reason why I'm -- sorry.  Yeah, I don't know.       04:56PM

23          Q.   I'm just asking what you know.  That's  04:56PM

24   all.                                                04:56PM

25          MR. RAIZMAN:  Exclude anything you know from 04:56PM
```

Page 177

PA0986

| | | |
|---|---|---|
| 1 | it's like me personally?  That's not necessarily -- | 04:58PM |
| 2 | Q.   (Inaudible). | 04:58PM |
| 3 | A.   -- goes back to -- | 04:58PM |
| 4 | Q.   Sorry. | 04:58PM |
| 5 | MR. RAIZMAN:  And I'm going to ask you to | 04:58PM |
| 6 | exclude all of the consultation with counsel from | 04:58PM |
| 7 | this response. | 04:58PM |
| 8 | THE WITNESS:  Yeah. | 04:58PM |
| 9 | Q.   (BY MR. MILLER):  I'm asking in your | 04:58PM |
| 10 | capacity as a 30(b)(6) witness for Quest, in the | 04:58PM |
| 11 | three-finger swipe, what were the next steps after | 04:58PM |
| 12 | you obtained this feedback from the group in Las | 04:58PM |
| 13 | Vegas in 2020 to implement the three-finger swipe? | 04:58PM |
| 14 | A.   Yeah.  I don't know.  I wasn't involved. | 04:58PM |
| 15 | Q.   Okay.  Fair enough.  How about in -- in | 04:58PM |
| 16 | separate and apart from your role in 30(b)(6), | 04:58PM |
| 17 | individually did you have any participation in the | 04:58PM |
| 18 | three-finger swipe process after the focus group? | 04:59PM |
| 19 | A.   No. | 04:59PM |
| 20 | Q.   Who was involved, do you know, in | 04:59PM |
| 21 | implementing the three-finger swipe at Quest after | 04:59PM |
| 22 | you -- after the focus group? | 04:59PM |
| 23 | A.   I think that's the privileged stuff.  I | 04:59PM |
| 24 | don't know. | 04:59PM |
| 25 | Q.   You believe that that -- | 04:59PM |

Page 179

PA0987

| | | |
|---|---|---|
| 1 | actual queue, right?  That's still displayed to | 05:50PM |
| 2 | patients? | 05:50PM |
| 3 | A.   Correct. | 05:50PM |
| 4 | Q.   All right.  And so with respect to the | 05:50PM |
| 5 | audio loop, how long is the audio loop at Patient | 05:50PM |
| 6 | Service Centers that contains this message? | 05:50PM |
| 7 | A.   I don't know. | 05:51PM |
| 8 | Q.   How often does the audio message to use | 05:51PM |
| 9 | a three-finger swipe play? | 05:51PM |
| 10 | A.   Every 7 to 10 minutes. | 05:51PM |
| 11 | Q.   Isn't it true, Mr. Carr, that the audio | 05:51PM |
| 12 | loop differs from Patient Service Center to Patient | 05:51PM |
| 13 | Service Center in terms of its length? | 05:51PM |
| 14 | A.   I don't know. | 05:51PM |
| 15 | Q.   Isn't it true that within the same | 05:51PM |
| 16 | Patient Service Center the audio loop can differ in | 05:51PM |
| 17 | terms of its length and content? | 05:51PM |
| 18 | A.   I don't know. | 05:51PM |
| 19 | Q.   Would it surprise you to learn, | 05:51PM |
| 20 | Mr. Carr, that there are locations -- Patient Service | 05:51PM |
| 21 | Center locations where the message to blind patients | 05:51PM |
| 22 | to check in is as long as 30 minutes before it's | 05:51PM |
| 23 | displayed in a duplicate form? | 05:51PM |
| 24 | A.   I don't know about that. | 05:51PM |
| 25 | Q.   Are you -- would it surprise you to | 05:51PM |

Page 196

| | | |
|---|---|---|
| 1 | learn that there are locations within Quest Patient | 05:52PM |
| 2 | Service Centers where blind patients have to wait at | 05:52PM |
| 3 | least 15 minutes before they can actually hear the | 05:52PM |
| 4 | instruction to use the three-finger swipe? | 05:52PM |
| 5 | A.   Yeah.   I don't know about that either. | 05:52PM |
| 6 | Q.   Does Quest still accept walk-ins for | 05:52PM |
| 7 | blind patients -- walk-in appointments? | 05:52PM |
| 8 | A.   Customers can walk in to be served at | 05:52PM |
| 9 | all of our locations across the country. | 05:52PM |
| 10 | Q.   Including blind customers, correct? | 05:52PM |
| 11 | A.   All customers that want to get | 05:52PM |
| 12 | healthcare services from us, and it may not -- | 05:52PM |
| 13 | Q.   -- walk in, right? | 05:52PM |
| 14 | A.   They may not be walking, right?  Maybe | 05:52PM |
| 15 | in a wheelchair, may being pushed by a family member. | 05:52PM |
| 16 | All customers can come in and visit us to be served. | 05:52PM |
| 17 | Q.   Including blind customers, right? | 05:52PM |
| 18 | A.   Yes, all customers. | 05:52PM |
| 19 | Q.   And so if a blind customer comes in as a | 05:52PM |
| 20 | walk-in to Quest, isn't it true that they need to | 05:52PM |
| 21 | wait to hear the audio message on the LCD screen | 05:53PM |
| 22 | before they have any other instruction as to how to | 05:53PM |
| 23 | check in vis-à-vis the three-finger swipe at the | 05:53PM |
| 24 | kiosk? | 05:53PM |
| 25 | MR. RAIZMAN:  Object as to form. | 05:53PM |

Page 197

| | | |
|---|---|---|
| 1 | Q.   I want to talk about what Quest | 05:59PM |
| 2 | specifically provided.  When a customer walks in the | 05:59PM |
| 3 | waiting room, am I correct that the first instruction | 05:59PM |
| 4 | from an audio perspective to a blind patient that | 05:59PM |
| 5 | they can use three-finger swipe comes from the audio | 05:59PM |
| 6 | loop on the LCD monitor? | 05:59PM |
| 7 | MR. RAIZMAN:  Object as to form. | 05:59PM |
| 8 | THE WITNESS:  I don't know. | 05:59PM |
| 9 | Q.   (BY MR. MILLER):  Two individuals walk | 05:59PM |
| 10 | into a Quest PSC where three-finger swipe technology | 06:00PM |
| 11 | is implemented, and there's a video loop that tells | 06:00PM |
| 12 | the blind user that there's a three-finger swipe | 06:00PM |
| 13 | option.  With that -- I want you to -- I want you to | 06:00PM |
| 14 | assume for a moment that that loop plays every | 06:00PM |
| 15 | 15 minutes.  Okay? | 06:00PM |
| 16 | And so a sighted individual and a blind | 06:00PM |
| 17 | individual both have -- walk in -- they're walk-ins. | 06:00PM |
| 18 | They haven't preplanned.  They're coming to the | 06:00PM |
| 19 | Patient Service Center as a walk-in.  They walk in | 06:00PM |
| 20 | the door at the same time.  Blind user has to wait | 06:00PM |
| 21 | 15 minutes -- isn't it correct? -- to hear the | 06:00PM |
| 22 | messaging before they know to use the check in, | 06:00PM |
| 23 | whereas a sighted person can go e-Check-in right | 06:00PM |
| 24 | away? | 06:00PM |
| 25 | MR. RAIZMAN:  Object to form. | 06:00PM |

Page 203

```
 1    three-finger swipe to check in?                    06:04PM

 2         A.   I don't know.                            06:04PM

 3         Q.   Prior to implementing the three-finger   06:04PM

 4    swipe, did Quest give any consideration on whether it  06:05PM

 5    could implement speech output at the e-Check-in kiosk  06:05PM

 6    that would allow a blind user to independently     06:05PM

 7    navigate through the kiosk workflow and check in   06:05PM

 8    themselves?                                        06:05PM

 9         MR. RAIZMAN:  Object.  Instruct not to answer  06:05PM

10    except to the extent that consideration was given by  06:05PM

11    a member of the focus group.                       06:05PM

12         MR. MILLER:  Which portion are you allowing   06:05PM

13    him to answer, Counsel?                            06:05PM

14         MR. RAIZMAN:  He can answer the question if   06:05PM

15    it came from a focus group member.  I don't know if  06:05PM

16    it did.  But, otherwise, the considerations are    06:06PM

17    privileged.  They're all part of a privileged      06:06PM

18    process.                                           06:06PM

19         THE WITNESS:  So the only thing --            06:06PM

20         Q.   (BY MR. MILLER):  Go ahead.              06:06PM

21         A.   The only thing that came out of the      06:06PM

22    focus group is the visually impaired customers had  06:06PM

23    their own devices that leveraged their own screen  06:06PM

24    readers to navigate the world.                     06:06PM

25         Q.   Did you ask the focus group whether they  06:06PM
```

Page 208

PA0991

| | | |
|---|---|---|
| 1 | asking -- well, let me ask it more specifically. | 06:08PM |
| 2 | Between 2015 and August of 2020, did Quest ever | 06:09PM |
| 3 | consider whether it could implement an easily | 06:09PM |
| 4 | identified headphone jack on the check-in kiosk so | 06:09PM |
| 5 | that the blind or visually impaired user could | 06:09PM |
| 6 | interact with the kiosk speech output system | |
| 7 | privately and independently? | 06:09PM |
| 8 | MR. RAIZMAN:  I'm going to object.  Instruct | 06:09PM |
| 9 | you not to answer as privilege to anything that was | 06:09PM |
| 10 | considered as part of the three-finger swipe process | 06:09PM |
| 11 | and answering the question except to the extent it | 06:09PM |
| 12 | was discussed with the focus group. | 06:09PM |
| 13 | THE WITNESS:  It did not come up at the focus | 06:09PM |
| 14 | group because they're using their own devices. | 06:09PM |
| 15 | Q.   (BY MR. MILLER):  Did Quest ever | 06:09PM |
| 16 | consider -- prior to the focus group whether it could | 06:09PM |
| 17 | implement an easily identified headphone jack on the | 06:09PM |
| 18 | check-in kiosk so that the blind or visually impaired | 06:09PM |
| 19 | could interact with the kiosk speech output system | 06:09PM |
| 20 | privately and independently? | 06:09PM |
| 21 | MR. RAIZMAN:  Again, just in connection with | 06:09PM |
| 22 | the three-finger swipe, it's all privileged.  So | 06:09PM |
| 23 | exclude that from your response.  Outside of the | 06:09PM |
| 24 | three-finger swipe, did Quest consider the headphone | 06:10PM |
| 25 | jack. | 06:10PM |

| | | |
|---|---|---|
| 1 | THE WITNESS:  I don't know. | 06:10PM |
| 2 | Q.  (BY MR. MILLER):  Did Quest ever | 06:10PM |
| 3 | consider whether a braille label could be placed on | 06:10PM |
| 4 | the kiosk to provide instruction to help locate the | 06:10PM |
| 5 | headphone jack as well as instruction of how to start | 06:10PM |
| 6 | speech output? | 06:10PM |
| 7 | MR. RAIZMAN:  Instruct not to answer as | 06:10PM |
| 8 | privileged.  Any considerations given in connection | 06:10PM |
| 9 | with the three-finger swipe except to the extent the | 06:10PM |
| 10 | focus group raised the issue. | 06:10PM |
| 11 | THE WITNESS:  So pertinent to the focus | 06:10PM |
| 12 | group, we asked specifically about braille because we | 06:10PM |
| 13 | cited it's something I don't know how to read.  And | 06:10PM |
| 14 | the visually impaired individuals that were present | 06:10PM |
| 15 | scoffed at braille because it's hard to discover | 06:10PM |
| 16 | where it is at. | 06:10PM |
| 17 | Q.  (BY MR. MILLER):  So the 10 individuals | 06:10PM |
| 18 | that you surveyed to decide what to do here you claim | 06:10PM |
| 19 | scoffed at braille? | 06:10PM |
| 20 | A.  Well, they said it's something they | 06:10PM |
| 21 | don't leverage routinely because they're leveraging | 06:11PM |
| 22 | their device that has all the capabilities they need | 06:11PM |
| 23 | to navigate the world. | 06:11PM |
| 24 | Q.  So my question is a little different, | 06:11PM |
| 25 | though.  I'm going to ask it again.  Prior to the | 06:11PM |

Page 212

| | | |
|---|---|---|
| 1 | implementation of the three-finger swipe, did Quest | 06:11PM |
| 2 | consider whether a braille label could be placed on | 06:11PM |
| 3 | the kiosk to provide instruction to help locate a | 06:11PM |
| 4 | headphone jack as well as instructions on how to | 06:11PM |
| 5 | start speech output? | 06:11PM |
| 6 | MR. RAIZMAN:  Objection.  Privileged. | 06:11PM |
| 7 | Instruct not to answer as to any considerations given | 06:11PM |
| 8 | other than in connection with the focus group. | 06:11PM |
| 9 | THE WITNESS:  I think I've summarized the | 06:11PM |
| 10 | braille with the focus group.  I mean, I don't know | 06:11PM |
| 11 | if you have any more specific questions with the | |
| 12 | focus group. | 06:11PM |
| 13 | Q.  (BY MR. MILLER):  Prior to the focus | 06:11PM |
| 14 | group, did Quest ever consider whether a braille | 06:11PM |
| 15 | label could be placed on the kiosk to provide | 06:11PM |
| 16 | instruction to help locate a headphone jack as well | 06:11PM |
| 17 | as instruction on how to start speech output prior to | 06:11PM |
| 18 | the focus group? | 06:11PM |
| 19 | MR. RAIZMAN:  Yeah.  I understand.  Same | 06:11PM |
| 20 | instruction, because there might have been privileged | 06:12PM |
| 21 | conversations prior to the focus group as well.  So | 06:12PM |
| 22 | exclude anything having to do with the three-finger | 06:12PM |
| 23 | swipe except as the focus group.  Outside of that, | 06:12PM |
| 24 | you can testify whether you considered that. | 06:12PM |
| 25 | THE WITNESS:  Yeah.  I don't know, Mr. | 06:12PM |

Page 213

| | | |
|---|---|---|
| 1 | Q.    (BY MR. MILLER):  In settling in on the | 06:15PM |
| 2 | three-finger swipe, did you take into consideration | 06:16PM |
| 3 | any of the complaints that our clients have in this | 06:16PM |
| 4 | litigation? | 06:16PM |
| 5 | MR. RAIZMAN:  Objection.  Beyond the scope. | 06:16PM |
| 6 | You can answer if you know. | 06:16PM |
| 7 | THE WITNESS:  I don't. | 06:16PM |
| 8 | Q.    (BY MR. MILLER):  Since we're on this | 06:16PM |
| 9 | topic and just trying to finish it out, let's go to | 06:16PM |
| 10 | Exhibit 6 for a moment.  We'll come back to 24 | 06:16PM |
| 11 | briefly here.  I'm going to show you what's been | 06:16PM |
| 12 | marked as Exhibit 6 to Mr. Yarrison's deposition. | 06:16PM |
| 13 | Bear with me. | 06:16PM |
| 14 | Exhibit 6? | 06:16PM |
| 15 | MR. RAIZMAN:  Is that not in his exhibit | 06:16PM |
| 16 | share? | 06:16PM |
| 17 | MR. MILLER:  It may be but I'm just going to | 06:16PM |
| 18 | put it in Mr. Carr's so he can easily see it. | 06:16PM |
| 19 | MR. RAIZMAN:  I am not getting access to | 06:16PM |
| 20 | exhibit share.  Just -- I'll let you know when it | 06:16PM |
| 21 | becomes available.  Exhibit 6 you said? | 06:17PM |
| 22 | MR. MILLER:  Yes.  It should be there. | 06:17PM |
| 23 | MR. RAIZMAN:  Okay.  It's booting up now. | 06:17PM |
| 24 | I'm getting a spinning circle. | 06:17PM |
| 25 | THE WITNESS:  Mine is there. | 06:17PM |

Page 217

PA0995

| | | |
|---|---|---|
| 1 | today.  I mean, Mark, I'm sure, was there. | 07:26PM |
| 2 | Q.  So I want to direct your attention to | 07:26PM |
| 3 | page 29 of this document.  It's -- in actuality, | 07:26PM |
| 4 | looks like page 8 of the exhibit, but it's the Bates | 07:26PM |
| 5 | No. 29.  It's the header, "Patient Services is | 07:26PM |
| 6 | invested in three projects to improve the patient | 07:26PM |
| 7 | experience through digitization, e-Check-in, previsit | 07:26PM |
| 8 | registration, and appointment response design." | 07:26PM |
| 9 | A.  I'm on that page.  There's a number 7 in | 07:26PM |
| 10 | the bottom left of the PowerPoint slide? | 07:26PM |
| 11 | Q.  Yes. | 07:26PM |
| 12 | A.  Yep.  I'm on it. | 07:26PM |
| 13 | Q.  And it says, "Enhancements slash | 07:26PM |
| 14 | sufficiency," it's the patient experience enhancement | 07:26PM |
| 15 | slash sufficiency.  It goes on to say, "In total the | 07:26PM |
| 16 | three projects enable 9 million within the current | 07:27PM |
| 17 | strategic plan and dramatically improves the patient | 07:27PM |
| 18 | experience."  What was the 9 million in reference to? | 07:27PM |
| 19 | A.  I don't recall from this single slide. | 07:27PM |
| 20 | Q.  How about further down where it says, | 07:27PM |
| 21 | "Project e-Check-in scope 2200 PSCs," was that the | 07:27PM |
| 22 | amount of Patient Service Centers that were to get | 07:27PM |
| 23 | the e-Check-in? | 07:27PM |
| 24 | A.  And you're referring to the table on the | 07:27PM |
| 25 | bottom of that? | 07:27PM |

Page 260

PA0996

| | | |
|---|---|---|
| 1 | Q.   Yes. | 07:27PM |
| 2 | A.   Reading that line, it's what it looks | 07:27PM |
| 3 | like from the scope perspective. | 07:27PM |
| 4 | Q.   And in terms of capital, it says, | 07:27PM |
| 5 | "9.7M," which I presume is million; is that right? -- | 07:27PM |
| 6 | that was the capital that was going to be required to | 07:27PM |
| 7 | do the project? | 07:27PM |
| 8 | MR. RAIZMAN:  Object to form. | 07:27PM |
| 9 | THE WITNESS:  We have to refer, again, back | 07:27PM |
| 10 | to that CapEx on what the final numbers were because | 07:27PM |
| 11 | that's what was ultimately approved.  So this just | 07:27PM |
| 12 | summarizes -- and I don't know if this exactly the | 07:27PM |
| 13 | same summary that synced up to what was approved. | 07:28PM |
| 14 | Q.   (BY MR. MILLER):  Well, if you take a | 07:28PM |
| 15 | look at that 9.7 million number and you go back to | 07:28PM |
| 16 | the CapEx, which was Exhibit 24 -- feel free to pull | 07:28PM |
| 17 | it up for yourself. | 07:28PM |
| 18 | A.   Okay.  I'm opening it up.  In the CapEx, | 07:28PM |
| 19 | which row do you want me to reference? | 07:28PM |
| 20 | Q.   Let me ask you this:  From the CapEx, | 07:28PM |
| 21 | can you tell what the total cost of the e-Check-in | 07:28PM |
| 22 | is? | 07:28PM |
| 23 | A.   You -- yeah.  You would have to ask | 07:28PM |
| 24 | somebody in finance to know for sure.  It wasn't my | 07:28PM |
| 25 | expertise. | 07:28PM |

Page 261

| | | |
|---|---|---|
| 1 | A.   I don't know. | 08:41PM |
| 2 | Q.   And once -- once that screen was | 08:42PM |
| 3 | touched, isn't it true that a slide similar to | 08:42PM |
| 4 | Slide 12 came up that provided all different language | 08:42PM |
| 5 | options? | 08:42PM |
| 6 | A.   I don't know if this was ever | 08:42PM |
| 7 | implemented. | 08:42PM |
| 8 | Q.   Is it true that the language options | 08:42PM |
| 9 | were, in fact, implemented in 2016 by Quest? | 08:42PM |
| 10 | MR. RAIZMAN:  Object as to form. | 08:42PM |
| 11 | Q.   (BY MR. MILLER):  And that you | 08:42PM |
| 12 | participated in that process? | 08:42PM |
| 13 | A.   As part of the patient-user experience, | 08:42PM |
| 14 | we got feedback about language offerings, and I know | 08:42PM |
| 15 | language offers were added to check-in. | 08:42PM |
| 16 | Q.   In the 2016-2017 timeframe, correct? | 08:42PM |
| 17 | A.   I don't recall the exact timeframe. | 08:42PM |
| 18 | Q.   And patients could utilize or select | 08:42PM |
| 19 | their language as part of that offering; isn't that | 08:42PM |
| 20 | right?  The ones that were offered? | 08:42PM |
| 21 | A.   The intent via the experience was to | 08:42PM |
| 22 | meet a broad audience of primary language they | 08:43PM |
| 23 | preferred to use. | 08:43PM |
| 24 | Q.   And if we take a look at Screen 13, | 08:43PM |
| 25 | there's a question as to how an individual would like | 08:43PM |

Page 304

| | | |
|---|---|---|
| 1 | Q    And in fact, is that what occurred?  Was | 13:53:24 |
| 2 | there a two-hour consumer sprint with eight to ten | 13:53:27 |
| 3 | visually-impaired respondents as part of the focus | 13:53:30 |
| 4 | group work that Quest did? | 13:53:32 |
| 5 | A    There was a focus group.  In terms of the | 13:53:35 |
| 6 | exact amount of time, it -- I don't recall the exact | 13:53:40 |
| 7 | amount of time. | 13:53:41 |
| 8 | Q    Do you have any information to believe it | 13:53:43 |
| 9 | was longer than the two hours referenced here? | 13:53:47 |
| 10 | A    No.  Only thing is it may have been like | 13:53:50 |
| 11 | two hours and five minutes.  Just want to be as | 13:53:54 |
| 12 | honest as I possibly can.  So... | 13:53:57 |
| 13 | Q    It was only one focus group, though, that | 13:53:59 |
| 14 | Quest conducted with visually-impaired respondents. | 13:54:02 |
| 15 | Is that true? | 13:54:03 |
| 16 | A    Yes. | 13:54:04 |
| 17 | MR. RAIZMAN:  Objection to form. | 13:54:05 |
| 18 | THE WITNESS:  Yes.  For this event itself that | 13:54:08 |
| 19 | we are referencing per the document in front of me. | 13:54:12 |
| 20 | BY MR. MILLER: | 13:54:12 |
| 21 | Q    Has Quest conducted any other focus groups | 13:54:16 |
| 22 | with visually-impaired respondents since the | 13:54:19 |
| 23 | January 16, 2020 focus group referenced here? | 13:54:23 |
| 24 | MR. RAIZMAN:  Object as to form. | 13:54:25 |
| 25 | THE WITNESS:  I'd say no from -- in comparison | 13:54:33 |

Page 340

```
 1    e-mail.                                          13:55:54

 2        Q    Was the focus group ever informed that you    13:55:56

 3    were Quest employees?                           13:55:59

 4        A    No.                                      13:56:01

 5        Q    Was the focus group ever informed that the    13:56:03

 6    feedback that was being sought was for Quest?    13:56:08

 7        A    No.                                      13:56:09

 8        Q    Was the focus group ever informed that the    13:56:12

 9    feedback that was being sought was in relation to    13:56:14

10    the Quest eCheck-in kiosk?                       13:56:17

11        A    No.                                      13:56:22

12        Q    Was the focus group that was gathered ever    13:56:25

13    informed about what services might be offered at a    13:56:30

14    Quest eCheck-in kiosk?                           13:56:33

15        A    No.                                      13:56:36

16        Q    Was the focus group ever provided a Quest    13:56:39

17    eCheck-in kiosk to test?                         13:56:42

18        A    No.                                      13:56:44

19        Q    Was the focus group ever asked what their    13:56:47

20    preferences would be in relationship to an eCheck-in    13:56:50

21    kiosk at Quest?                                  13:56:53

22        A    No.                                      13:56:55

23        Q    Was it ever disclosed to the focus group    13:56:58

24    that Quest allowed sighted consumers to self-edit    13:57:02

25    their personal information at the eCheck-in kiosk?    13:57:06
```

Page 342

PA1000

```
 1        MR. RAIZMAN:  Object as to the form.        13:57:08

 2        THE WITNESS:  So going back to my previous   13:57:11

 3   response, the focus group that Lori helped us plan  13:57:14

 4   that's summarized in this e-mail, those individuals  13:57:18

 5   did not -- they were not aware we worked for Quest.  13:57:23

 6   BY MR. MILLER:                                 13:57:23

 7        Q    My question was more specific.         13:57:24

 8             Was it ever disclosed to the focus group  13:57:26

 9   that Quest allows sighted consumers to self-edit   13:57:29

10   their personal information at an eCheck-in kiosk?  13:57:33

11        MR. RAIZMAN:  Object as to form.           13:57:35

12        THE WITNESS:  So similar response would -- there  13:57:40

13   was no conversation about Quest.               13:57:45

14   BY MR. MILLER:                                 13:57:45

15        Q    I'm going to keep asking though because I  13:57:47

16   need to make a clear record.                   13:57:49

17             Were the -- were the focus group        13:57:53

18   respondents ever asked what their preference would  13:57:56

19   be to self edit their personal information at Quest  13:57:59

20   eCheck-in kiosks?                              13:58:01

21        MR. RAIZMAN:  Object as to form.  Foundation.  13:58:06

22        THE WITNESS:  Yeah.  Again, there was no     13:58:10

23   conversation about Quest.                      13:58:14

24   BY MR. MILLER:                                 13:58:14

25        Q    Was it ever disclosed to the respondents  13:58:16
```

Page  343

PA1001

1    that Quest was considering having a self ID card to          13:58:21

2    scan both license and/or information cards and               13:58:25

3    insurance cards at its kiosks?                               13:58:28

4        MR. RAIZMAN:  Object as to form.  Beyond the            13:58:30

5    scope of the deposition.                                     13:58:38

6        THE WITNESS:  Again, no, there was no                   13:58:41

7    conversations about Quest.                                   13:58:44

8    BY MR. MILLER:                                               13:58:44

9        Q    Was there ever any other focus group where        13:58:48

10   the blind community was asked whether Quest                  13:58:51

11   implementation of a wait by text option was                  13:58:56

12   something that they would want to avail themselves           13:58:57

13   of for a walk-in appointment?                                13:59:04

14       MR. RAIZMAN:  Object as to form.  Beyond the            13:59:08

15   scope.                                                       13:59:11

16       THE WITNESS:  For that scenario, since it               13:59:15

17   differs from what is in front of me, I don't know            13:59:20

18   how -- I don't know how to answer it because I don't         13:59:23

19   know what you would be referencing.                          13:59:25

20   BY MR. MILLER:                                               13:59:25

21       Q    Well, isn't it true, Mr. Carr, that after         13:59:28

22   this particular focus group, Quest did put an option         13:59:31

23   on the kiosk that allowed somebody who was self              13:59:35

24   checking in to get notification by text when they            13:59:39

25   were going to be called?                                     13:59:40

PA1002

| | | |
|---|---|---|
| 1 | MR. RAIZMAN:  Object as to form.  Beyond the | 13:59:42 |
| 2 | scope.  I mean, you can use your time asking | 13:59:44 |
| 3 | questions beyond the scope.  But these are clearly | 13:59:46 |
| 4 | beyond the scope that was agreed to for this | 13:59:49 |
| 5 | deposition. | 13:59:51 |
| 6 | Answer, Mr. Carr. | 13:59:54 |
| 7 | THE WITNESS:  Yeah.  Unless we are going to | 13:59:57 |
| 8 | reference a document, I don't recall the timing for | 13:59:58 |
| 9 | what you are referencing as related to this focus | 14:00:04 |
| 10 | group. | 14:00:05 |
| 11 | BY MR. MILLER: | 14:00:05 |
| 12 | Q    I'm just asking beyond this focus group | 14:00:10 |
| 13 | that's referenced here, was there ever any other | 14:00:12 |
| 14 | time that Quest subsequently went to the blind | 14:00:15 |
| 15 | community and asked whether they would like to | 14:00:18 |
| 16 | utilize a wait by text option when they were | 14:00:22 |
| 17 | checking in at a kiosk at Quest? | 14:00:26 |
| 18 | MR. RAIZMAN:  I object that it lacks foundation. | 14:00:28 |
| 19 | And it's beyond the scope of the deposition agreed | 14:00:31 |
| 20 | to. | 14:00:36 |
| 21 | BY MR. MILLER: | 14:00:36 |
| 22 | Q    You can answer, Mr. Carr. | 14:00:39 |
| 23 | A    Yeah, again, I don't -- I don't know, | 14:00:41 |
| 24 | Mr. Miller. | 14:00:41 |
| 25 | Q    I want to go to next in order, Exhibit 98. | 14:00:48 |

Page 345

| | | |
|---|---|---|
| 1 | (Whereupon the reporter asked for | 14:14:03 |
| 2 | clarification) | 14:14:03 |
| 3 | THE WITNESS:  -- with visually-impaired | 14:14:03 |
| 4 | customers, per Mr. Miller's question. | 14:14:16 |
| 5 | BY MR. MILLER: | 14:14:16 |
| 6 | Q    As you sit here today, can you tell me | 14:14:29 |
| 7 | about any prior occasion that you've interacted with | 14:14:31 |
| 8 | the visually-impaired community prior to this focus | 14:14:34 |
| 9 | group in January of 2020? | 14:14:35 |
| 10 | MR. RAIZMAN:   I'm going to object that it's | 14:14:37 |
| 11 | beyond the scope of the deposition. | 14:14:42 |
| 12 | THE WITNESS:   It would be speculative. | 14:14:45 |
| 13 | BY MR. MILLER: | 14:14:45 |
| 14 | Q    If we look at bullet point No. 1 in | 14:14:48 |
| 15 | Exhibit 99, it says, | 14:14:51 |
| 16 | "HMW helped customers convey 'I need | 14:14:55 |
| 17 | help when I arrive' during scheduling and | 14:15:01 |
| 18 | appointment and when they arrive at our | 14:15:03 |
| 19 | space before touching a kiosk." | 14:15:05 |
| 20 | And I want to focus specifically on that | 14:15:07 |
| 21 | last part. | 14:15:09 |
| 22 | How did Quest decide to solve the issue of | 14:15:12 |
| 23 | a visually-impaired customer conveying the need for | 14:15:19 |
| 24 | help when they arrived at a Patient Service Center | 14:15:23 |
| 25 | before touching the kiosk? | 14:15:25 |

Page 354

```
 1        A    I've seen this document, and I know that      14:32:55

 2   there was a visit to Wright State.                       14:32:59

 3        Q    A visit by Quest employees?                    14:33:04

 4        A    I know there was a visit by one employee.      14:33:09

 5        Q    And which employee was that?                   14:33:16

 6        A    I'd have to see like the e-mail or the         14:33:17

 7   agenda for those corporate records in this.  I don't     14:33:19

 8   recall completely off the top of my head.  I mean, I     14:33:22

 9   think I know, but again, it was over a year ago.         14:33:24

10        Q    What is your best memory of who from Quest     14:33:29

11   went to Wright State?                                    14:33:32

12        A    I think it was a woman named Bridget.          14:33:36

13        Q    What is Bridget's last name?                   14:33:39

14        A    I don't recall.                                14:33:40

15        Q    Does -- did Bridget work on this project       14:33:43

16   with you in terms of getting feedback from the blind     14:33:46

17   community?                                               14:33:48

18        MR. RAIZMAN:  Object as to form.                    14:33:50

19        THE WITNESS:  I don't know.  Again, it would be     14:33:55

20   speculative.  It's --                                    14:33:59

21   BY MR. MILLER:                                           14:33:59

22        Q    What was the purpose of going to Wright        14:34:02

23   State to interview students?                             14:34:03

24        A    Using the human-centered design method -- I    14:34:10

25   can see the date that this was created after our         14:34:12
```

Page 368

PA1005

| | | |
|---|---|---|
| 1 | focus group.  Similar to the topic of our focus | 14:34:19 |
| 2 | group of empathy, discovery and define, this looks | 14:34:23 |
| 3 | like similar questions. | 14:34:27 |
| 4 | Q    Did you utilize any of the information you | 14:34:29 |
| 5 | received from Wright State in coming up with the | 14:34:32 |
| 6 | solutions that Quest was attempting to implement? | 14:34:36 |
| 7 | A    There was a lot of considerations, and | 14:34:41 |
| 8 | there are still considerations that happen now for | 14:34:46 |
| 9 | our customer experience that we -- | 14:34:49 |
| 10 | Q    I'm specifically -- I'm specifically asking | 14:34:51 |
| 11 | whether any of the information from Wright State was | 14:34:55 |
| 12 | even considered? | 14:34:59 |
| 13 | A    This is general.  We -- like we use | 14:35:03 |
| 14 | information via our human-centered design method to | 14:35:08 |
| 15 | try to improve our customer experience.  So it's -- | 14:35:13 |
| 16 | it would be speculative again.  It's all the | 14:35:15 |
| 17 | considerations that go into producing what you can | 14:35:18 |
| 18 | experience as a customer if you visit Quest today. | 14:35:21 |
| 19 | Q    Did you review this feedback from Wright | 14:35:24 |
| 20 | State before you implemented the three-finger swipe? | 14:35:30 |
| 21 | A    Are you asking me personally, or are you | 14:35:32 |
| 22 | asking as a representative of Quest? | 14:35:36 |
| 23 | Q    I'm asking you personally first. | 14:35:38 |
| 24 | Did you review or evaluate any of this | 14:35:40 |
| 25 | information before three-finger swipe was | 14:35:42 |

Page 369

```
 1   implemented by Quest?                              14:35:47

 2      A    I don't recall personally seeing this     14:35:49

 3   heading on this document with -- you are sharing  14:35:53

 4   with me in this form.                             14:35:57

 5      Q    Do you know whether Quest ever considered 14:35:59

 6   any information that it received from Wright State 14:36:01

 7   prior to implementing the three-finger swipe?     14:36:07

 8      A    Similar to my previous response, there's a 14:36:09

 9   lot of considerations that are made before something 14:36:12

10   is deployed in our customer experience.  And it   14:36:16

11   would be speculative.  It would be -- the answer  14:36:19

12   would be possible.  But again, that's speculative. 14:36:21

13   I don't know.                                     14:36:21

14      Q    Well, if we go down to the second page,   14:36:26

15   there was a note from the interview that says,    14:36:29

16           "Transportation is a huge deal.  Even     14:36:32

17           when access to public transit -- even     14:36:34

18           with -- when access to public transit, it 14:36:38

19           can be quite expensive.  Project,         14:36:40

20           mobility - RTA public transit, paratransit 14:36:44

21           company, they have rules that you have to 14:36:46

22           be there early.  Because I want to say if 14:36:51

23           you are late for your appointment, we have 14:36:52

24           to reschedule.  So making that a punishment 14:36:54

25           won't work for them.  The bus is not      14:36:58
```

Page 370

| | | |
|---|---|---|
| 1 | predictable at all." | 14:36:59 |
| 2 | Do you see that note? | 14:37:00 |
| 3 | A    I'm reading that underneath notes from | 14:37:03 |
| 4 | interview on page 2.   Yes. | 14:37:04 |
| 5 | Q    Do you know whether, prior to the | 14:37:06 |
| 6 | implementation of three-finger swipe, Quest ever | 14:37:08 |
| 7 | considered whether transportation posed a problem | 14:37:12 |
| 8 | for its disabled customers trying to get to Quest | 14:37:16 |
| 9 | for a pre-scheduled appointment? | 14:37:18 |
| 10 | A    Similar.   But there's a lot of | 14:37:23 |
| 11 | considerations that are being made or have been | 14:37:28 |
| 12 | made.   It would be, again, speculative.   I don't | 14:37:30 |
| 13 | know. | 14:37:30 |
| 14 | Q    Do you know whether Quest ever tried to | 14:37:34 |
| 15 | consider what percentage of its customers are | 14:37:37 |
| 16 | walk-in appointments at Quest? | 14:37:42 |
| 17 | MR. RAIZMAN:   Object as to form.   And I'm going | 14:37:44 |
| 18 | to object to the extent it calls for privileged | 14:37:47 |
| 19 | considerations that led to the three-finger swipe. | 14:37:52 |
| 20 | Instruct the witness not to answer as to those | 14:37:54 |
| 21 | considerations. | 14:38:01 |
| 22 | BY MR. MILLER: | 14:38:01 |
| 23 | Q    Let me hand you -- let me send you | 14:38:04 |
| 24 | Exhibit 102.   Please let me know when you've | 14:38:10 |
| 25 | received it. | 14:38:15 |

Page 371

```
 1        A    A step in the human-centered design process    15:15:24

 2   that was part of, say, the previous document, I         15:15:28

 3   recall seeing a page that talks about prototyping as    15:15:31

 4   an element of human-centered design.                    15:15:33

 5        Q    But when you say "prototype", was it a        15:15:38

 6   prototype around how facilities could be modified       15:15:40

 7   based on the feedback that was received from the        15:15:44

 8   focus group?                                            15:15:46

 9        A    It's not a physical facility.  A database     15:15:49

10   is a digital storage location is what the heading       15:15:53

11   references.                                             15:15:54

12        Q    In the right-hand column, it says in the      15:15:59

13   second to last paragraph and into the last             15:16:03

14   paragraph,                                              15:16:04

15             "Visually impaired indicated the             15:16:07

16        description was clear and would help orient        15:16:09

17        them when arriving.  However, it wouldn't          15:16:13

18        help them to know how to interact with the         15:16:16

19        kiosk.  They offered the use of tactile            15:16:18

20        strips on the floor to guide them within a         15:16:22

21        lane."                                             15:16:23

22        Do you know who provided that specific             15:16:26

23   feedback about the tactile strips?                      15:16:28

24        A    Per the document, it would be whomever the    15:16:33

25   team themselves referenced on the previous page had     15:16:38
```

Page 380

PA1009

| | | |
|---|---|---|
| 1 | conversations with to do the empathy, discovery and | 15:16:40 |
| 2 | define. | 15:16:43 |
| 3 | Q    But it would have been some part of the | 15:16:44 |
| 4 | focus group.  Is that your understanding? | 15:16:46 |
| 5 | A    So to make clear, between this document and | 15:16:51 |
| 6 | the other ones, there was three key events that | 15:16:56 |
| 7 | culminated in a multitude of considerations. | 15:16:58 |
| 8 | So the timing was January for the first | 15:17:01 |
| 9 | focus group, which I think that's what you are | 15:17:04 |
| 10 | referencing. | 15:17:04 |
| 11 | Then there was the Wright School visit | 15:17:09 |
| 12 | where more considerations were gathered that have -- | 15:17:10 |
| 13 | like culminated in some additional information and | 15:17:14 |
| 14 | insights that led us to what you are seeing and | 15:17:15 |
| 15 | showing here.  And I think that is the March sprint | 15:17:18 |
| 16 | event. | 15:17:18 |
| 17 | Q    Okay.  Fair enough. | 15:17:21 |
| 18 | Do you know whether Quest ever put tactile | 15:17:25 |
| 19 | strips of the floors of their Patient Service | 15:17:28 |
| 20 | Centers to guide their blind patients to the kiosks? | 15:17:32 |
| 21 | MR. RAIZMAN:  Object.  Beyond the scope. | 15:17:35 |
| 22 | BY MR. MILLER: | 15:17:35 |
| 23 | Q    Do you know, Mr. Carr? | 15:17:42 |
| 24 | A    Do you want me to answer? | 15:17:44 |
| 25 | Q    Yes, please. | 15:17:45 |

Page 381

| | | |
|---|---|---|
| 1 | A    As related to the sprint event that this | 15:17:49 |
| 2 | document tries to summarize, I do not specifically | 15:17:54 |
| 3 | recall that happening. | 15:17:55 |
| 4 | Q    In the next slide on -- under "phone tree," | 15:18:03 |
| 5 | there was a -- in the right-hand column, it says, | 15:18:05 |
| 6 | why at the rehabilitation -- | 15:18:06 |
| 7 | "While at the rehabilitation services | 15:18:09 |
| 8 | for the blind, they were clear about their | 15:18:12 |
| 9 | need to speak with a human prior to | 15:18:14 |
| 10 | arrival." | 15:18:15 |
| 11 | Do you know whether Quest made any | 15:18:18 |
| 12 | modifications to its process in response to that | 15:18:22 |
| 13 | comment so that people calling in advance of their | 15:18:25 |
| 14 | appointment could speak with a human? | 15:18:29 |
| 15 | A    I do know, based upon this event and the | 15:18:31 |
| 16 | previous two that I mentioned, with all the | 15:18:33 |
| 17 | considerations, that Quest is constantly in a state | 15:18:36 |
| 18 | of trying to improve their customer experience, with | 15:18:39 |
| 19 | the phone tree being an element with when customers | 15:18:42 |
| 20 | call prior to coming to our locations. | 15:18:45 |
| 21 | Q    But does the phone tree allow customers to | 15:18:47 |
| 22 | interact with a human? | 15:18:50 |
| 23 | A    Yes. | 15:18:52 |
| 24 | Q    If we go to the next page, "Kiosk Update | 15:18:54 |
| 25 | Version 1," there's a second to last paragraph on | 15:19:00 |

Page 382

| | | |
|---|---|---|
| 1 | them." | 15:23:44 |
| 2 | Do you know whether, as part of the | 15:23:46 |
| 3 | feedback that was considered, Quest ever considered | 15:23:51 |
| 4 | using the screen reader technology in the iPads that | 15:23:55 |
| 5 | were in the kiosks and concluded that it would | 15:23:58 |
| 6 | otherwise impose undue hardship on the company to do | 15:24:02 |
| 7 | so? | 15:24:02 |
| 8 | MR. RAIZMAN:  I'm going to object that the | 15:24:05 |
| 9 | second part of the question in particular calls for | 15:24:08 |
| 10 | privileged information.  I would let the witness | 15:24:15 |
| 11 | answer with respect to the question of whether that | 15:24:17 |
| 12 | issue was considered.  But not with respect to the | 15:24:23 |
| 13 | undue burden.  So instruct not to answer as to | 15:24:26 |
| 14 | consideration of the undue burden or any other legal | 15:24:30 |
| 15 | significance of the consideration. | 15:24:32 |
| 16 | THE WITNESS:  Mr. Miller, could you ask the | 15:24:38 |
| 17 | question again? | 15:24:39 |
| 18 | MR. MILLER:  Why don't you tell me what part you | 15:24:42 |
| 19 | will let him answer more clearly, Mr. Raizman.  That | 15:24:45 |
| 20 | way I don't have to parse it. | 15:24:46 |
| 21 | MR. RAIZMAN:  Sure. | 15:24:46 |
| 22 | You can answer whether -- well, I don't | 15:24:50 |
| 23 | want -- there was quite a bit of information there. | 15:24:53 |
| 24 | You will tell me if I don't get it right, | 15:24:55 |
| 25 | Mr. Miller. | 15:24:56 |

Page 387

| | | |
|---|---|---|
| 1 | But the information about the iPad | 15:24:59 |
| 2 | functionality of voiceover, whether that was | 15:25:02 |
| 3 | considered. | 15:25:07 |
| 4 | THE WITNESS:  The part that was considered -- | 15:25:09 |
| 5 | I'm going to extend this from the focus group -- is | 15:25:12 |
| 6 | the use of their devices. | 15:25:14 |
| 7 | So when I read that feedback, they are | 15:25:20 |
| 8 | indicating the use of a screen reading technology on | 15:25:22 |
| 9 | their device with a giant screen where the second | 15:25:27 |
| 10 | element from a consideration is, you know, something | 15:25:31 |
| 11 | that they can walk away from as a gift, as it | 15:25:34 |
| 12 | indicates in that last sentence. | 15:25:38 |
| 13 | BY MR. MILLER: | 15:25:39 |
| 14 | Q    Did you ever consider whether the use of | 15:25:41 |
| 15 | voiceover on the existing kiosk could allow blind | 15:25:45 |
| 16 | individuals to independently access the kiosk? | 15:25:47 |
| 17 | A    There's a lot of considerations.  And | 15:25:53 |
| 18 | visually-impaired customers varies where they can | 15:25:58 |
| 19 | interact with our kiosk. | 15:26:00 |
| 20 | (Whereupon the reporter asked for | 15:26:00 |
| 21 | clarification) | 15:26:00 |
| 22 | THE WITNESS:  And they are supported with help | 15:26:02 |
| 23 | with our phlebotomists to help. | 15:26:16 |
| 24 | BY MR. MILLER: | 15:26:16 |
| 25 | Q    My question was just a little more specific | 15:26:18 |

Page 388

```
 1    though, which was did you ever consider whether the      15:26:22

 2    use of voiceover technology could be implemented on      15:26:25

 3    the iPad to allow visually-impaired customers or         15:26:30

 4    legal -- or why don't we say legally-blind customers     15:26:33

 5    independently interact with the kiosk?  So I'm           15:26:37

 6    asking specifically whether voiceover was                15:26:38

 7    considered.                                              15:26:40

 8        MR. RAIZMAN:  This is beyond the scope of the        15:26:41

 9    redirect.  It's beyond the scope of the direct too,      15:26:46

10    or your cross, however you want to phrase it.  So        15:26:51

11    I'm going to instruct the witness not to answer the      15:26:53

12    question.                                                15:26:55

13        MR. MILLER:  Okay.  I think we're done here then     15:26:59

14    based on your instruction.  So I'm presuming you are     15:27:02

15    not going to let him answer any more questions.          15:27:06

16        MR. RAIZMAN:  If it's within the scope of my         15:27:08

17    very limited redirect, I'll let you ask them.            15:27:13

18        MR. MILLER:  Well, it was -- I think this was        15:27:16

19    within the scope, but we'll debate it later.  I          15:27:20

20    think we can move on from here.                          15:27:21

21          So thank you very much, Mr. Carr.                  15:27:22

22        THE WITNESS:  Thank you.                             15:27:45

23          (Whereupon a discussion was held                   15:27:45

24          off the record)                                    15:27:45

25        THE VIDEOGRAPHER:  This concludes the video          15:27:57
```

Page 389

# EXHIBIT 36

## _REDACTED_

## TO BE FILED UNDER SEAL PENDING THE RULING ON PLAINTIFF'S APPLICATION