# EXHIBIT 37

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JULIAN VARGAS, ANNE      )
     WEST, and AMERICAN       )
 5   COUNCIL OF THE BLIND,    ) Case No. 2:19-cv-8108
     individually on behalf   )
 6   of themselves and all    )
     others similarly         )
 7   situated,                )
                              )
 8              Plaintiffs,   )
                              )
 9      vs.                   )
                              )
10   QUEST DIAGNOSTICS        )
     CLINICAL LABORATORIES,   )
11   INC., QUEST DIAGNOSTICS)
     HOLDINGS, INC.,          )
12   QUEST DIAGNOSTICS        )
     INCORPORATED; and        )
13   DOES 1-10, inclusive,    )
                              )
14              Defendants.   )
     _____)
15
16
17        REMOTE DEPOSITION OF CHRISTOPHER GRANT
18              As a 30(b)(6) Witness
19            (Via Zoom Videoconference)
20             Thursday, April 20, 2021
21
22
23   REPORTED BY:  Michelle Milan Fulmer
                   CSR No. 6942, RPR, CRR, CRC
24
25
```

                                              Page 1

PA1031

```
 1              Ben, in the next five minutes or so, I just
 2      need a break whenever it works for you.
 3              MR. SWEET:  Sure.
 4         Q    So you mentioned that there was training,
 5      you may have learned about training for folks with      09:54:08
 6      disabilities, training regarding how to deal with
 7      patients with disabilities at your orientation.
 8              Were you given any training on the ADA in
 9      your orientation?
10         A    Again, like I said, I was -- I speculate       09:54:24
11      that I --
12         Q    I don't want you to speculate.
13         A    -- (inaudible) part of orientation.
14              Yeah.  I can't recall, then.
15         Q    You don't recall receiving training?          09:54:35
16         A    No.
17         Q    Did you at any point have a conversation
18      with Ms. Marallo or anyone else about what training
19      is provided to phlebotomists about dealing with
20      disabled patients?                                      09:54:54
21         A    I don't -- I don't recall any of those
22      conversations.
23         Q    You don't recall ever discussing that issue
24      with Ms. Marallo?
25         A    Again, I just don't recall.                    09:55:06
```

                                                        Page 47

```
 1        A    I really don't.

 2        Q    Okay.  How about after the rollout of the

 3   self-service kiosks, were there any physical bells

 4   in any of the 2,200 locations at that point?

 5        A    There may have been.  Like I said, there's    10:19:37

 6   2,200 PSCs and they're all different across the

 7   country.  So I -- I don't know.  I -- you could

 8   assume that there could be, but I don't know.

 9        Q    There was never a directive issued that

10   there should be bells in the PSCs after the rollout    10:19:50

11   of eCheck-In self-service?

12        A    A physical bell, no.  Not that I recall.

13   Unless you've got something you can show me that can

14   refresh my memory, I don't recall.

15        Q    Is there a --                                 10:20:08

16             Was a directive issued or was a

17   functionality put into place that alerted

18   phlebotomists to a patient's presence after they

19   logged in at the eCheck-In self-service?

20        A    Well, that's a good question.  I -- I         10:20:23

21   believe there -- there was, but I can't remember the

22   specifics of that.

23        Q    Do you recall --

24        A    But, again, if you've got something you can

25   show me, you know, to help refresh my memory, that     10:20:39
```

Page 51

PA1033

```
 1    that would have been part of the conversations with

 2    Adria.  But specifically to your question, I don't

 3    recall any.  But I would imagine, in my role, that

 4    would have been part of the conversations.

 5        Q    Did you direct Ms. Marallo to consult with     10:25:47

 6    any accessibility experts prior to developing the

 7    training?

 8             MR. RAIZMAN:  Object as to form.

 9             THE WITNESS:  I don't know.  I don't

10    recall.                                                 10:26:05

11    BY MR. SWEET:

12        Q    Did you, yourself, consult with any

13    accessibility experts prior to the training being

14    put together?

15             MR. RAIZMAN:  Object as to form.              10:26:13

16             THE WITNESS:  Yeah.  I -- I don't recall

17    that.  I really don't.

18    BY MR. SWEET:

19        Q    Did you direct anyone else at Quest to

20    consult with accessibility experts prior to the         10:26:24

21    development of the curriculum for the training for

22    the phlebotomists on how to deal with folks with

23    disabilities?

24        A    Again, I just don't recall any of those

25    specifics.                                              10:26:38
```

Page 56

PA1034

```
 1        A    I -- I don't.

 2        Q    What were some of the benefits that

 3   customers could enjoy from use of the self-service

 4   kiosk?

 5        A    Can you -- can you be more specific on that    10:44:26

 6   question?  It's pretty broad.

 7        Q    I assume the self-service kiosk had a

 8   number of features; right?

 9        A    Yeah.

10        Q    What were they?                                10:44:38

11        A    So ease of use.  It was a -- again, the

12   platform itself created a solution for us to

13   continuously improve from confirming appointments,

14   being able to notify when you were in the waiting

15   room, being able to inform the PSR who their next       10:45:03

16   patient would be and how to prepare for that.  It

17   eliminated the clipboard and all the challenges

18   associated with that.  And I think the voice of the

19   customer really asked us to put that in to really

20   say, you know, we -- we prefer to engage you through    10:45:29

21   this kind of mechanism on this platform than through

22   a clipboard.

23             So a lot of the solutioning was, you know,

24   as a result of voice of the customer, voice of our

25   employees.  Again, that was our focus is how do we      10:45:46
```

Page 71

PA1034-A

```
 1    create solutions that can help that patient

 2    experience and help the phlebotomists do their job

 3    more effectively.

 4        Q    Was there --

 5             Did checking in at the self-service kiosk     10:46:01

 6    allow you to enter the queue?

 7        A    You -- if you engaged the iPad, yes, you

 8    could be in the queue, but this was not the only

 9    way.  Again, recall that I talked about how our PSRs

10    had been trained previous to that to scan the rooms    10:46:23

11    to be able to come alongside those folks who had

12    disabilities and to be able to accelerate their

13    appointment and accelerate their care at that time.

14        Q    But let's talk about that, that training.

15             When did this training take place to the      10:46:40

16    PSRs about dealing with folks with disabilities?

17        A    I believe that was an ongoing part of the

18    training with phlebotomists as they came on.

19        Q    And how did you gain that understanding?

20        A    That was (inaudible).  I don't know.  I       10:46:58

21    don't recall.

22        Q    So you have an understanding that there was

23    an ongoing training for PSRs that involved sweeping

24    the waiting area for folks with disabilities?

25        A    Yeah.  That situational awareness was         10:47:15
```

Page 72

PA1034-B

1    it's called certification or not, that's your word,

2    not mine.

3        Q    Do you know if the training is updated

4    every year?

5        A    I think training -- I think it was our        10:49:58

6    practice that training was reviewed on a regular

7    basis, but I -- again, people in training could tell

8    you the specifics on that.  I wouldn't know.

9        Q    Who was it reviewed by?

10       A    It would be a lot of stakeholders within      10:50:21

11   Quest and then the regions as well would participate

12   in that.  But, again, people in training would be

13   able to answer these questions better than I.

14       Q    Do you know whether the express check-in

15   self-service allows a patient to wait outside of the  10:50:55

16   PSC and be alerted by text when it's time for their

17   sample to be taken?

18       A    I believe that was a feature that was

19   introduced in -- I think we -- it may have been, if

20   I can recall -- and, again, I'm trying to remember    10:51:15

21   here.  If you have documentation, it makes this a

22   little bit easier.  But if I can recall, I thought

23   that that feature was late 2019 and more of a

24   COVID-19 tool that we could use, that it would allow

25   people a little bit more sense of not being exposed   10:51:37

                                                    Page 75

PA1034-C

1    to an environment and try to, you know, again,

2    encourage social distancing.

3            I think that's -- I think that's correct.

4    I could be wrong.  Again, if you've got

5    communications on that, I'd be happy to talk to      10:51:55

6    those.

7        Q    You would agree that's a benefit of using

8    the self-service check-in?

9        A    It's one of the benefits.  Again, remember,

10   the eCheck-In is a platform that allows us to do      10:52:05

11   continuous improvement.  So that could be a

12   continuous improvement because of that platform that

13   may in the past have not been available to us.

14       Q    Do you recall that one of the reasons for

15   the adoption of eCheck-In self-service was to reduce  10:52:23

16   the company's staffing needs?

17       A    I didn't say that.

18       Q    Do you have a recollection of that?

19       A    No.

20       Q    Was one of the reasons to shorten wait       10:52:39

21   times for patients?

22       A    It was to make the experience better based

23   on the voice of the customer.  That was the result.

24       Q    You don't have a recollection that it was

25   about reducing patient wait times?                    10:52:53

Page 76

PA1034-D

```
 1        A    I believe that was one of the benefits that

 2    we could achieve through this based on voice of the

 3    customer, yes.

 4        Q    Do you have a recollection that it improved

 5    each PSC's productivity?                          10:53:06

 6        A    I'd have to see a report on that to answer

 7    that question correctly.

 8        Q    Independent of seeing a report, do you have

 9    an understanding of that, sir?

10        A    Conceptually, yes.                        10:53:23

11        Q    And is it also the case that the rollout of

12    eCheck-In self-service allowed for more patient

13    visits in each PSC per day?

14        A    No, it didn't.

15        Q    It did not?                               10:53:41

16        A    No.

17        Q    Mr. Yarrison told us that it did.  Was he

18    incorrect?

19            MR. RAIZMAN:  Object as to form.

20            THE WITNESS:  I don't know what question    10:54:00

21    you asked him.  So I'm not going to speculate what

22    he was thinking.

23    BY MR. SWEET:

24        Q    But he is incorrect if that was his

25    assertion?                                         10:54:11
```

Page 77

PA1034-E

```
 1    at the kiosk, read that QR code, and then that would

 2    automatically register you at the PSC.

 3        Q    Are you aware of whether there was a

 4    headphone jack available at the self-service kiosks

 5    from 2016 to 2019?                                11:51:46

 6        A    You know, I don't know.  I don't know.

 7        Q    Do you know what a qualified reader is,

 8    sir?

 9        A    No, I don't.

10        Q    Do you know whether personnel at the     11:52:02

11    company's PSCs were ever trained to be qualified

12    readers in the time frame from 2016 to 2019?

13            MR. RAIZMAN:  Object as to form.

14            THE WITNESS:  I -- I have no idea if they

15    were or they weren't.                             11:52:17

16    BY MR. SWEET:

17        Q    Did you ever order that qualified reader

18    training be given to the personnel at the PSCs?

19            MR. RAIZMAN:  Object as to form.

20            THE WITNESS:  Again, unless I have an email 11:52:27

21    in front of me, I -- it's hard for me to make that

22    recollection.

23    BY MR. SWEET:

24        Q    Do you have any independent memory, aside

25    from looking at a document, whether you ever ordered 11:52:36
```

                                                        Page 112

PA1035

```
 1    the extent of my, you know, guidance to the team is,

 2    you know, let's make sure we're -- you know, we're

 3    looking at all aspects of our patient population.

 4    It's -- you know, a quarter of a million people pass

 5    through the doors every day.  It's kind of hard to      01:52:33

 6    do big, broad-stroke implementations across 2,200

 7    PSCs.

 8            So by having that platform, it got us a

 9    little bit better ability to really look at, you

10    know, what could improve that patient experience.      01:52:43

11        Q    So did you at any point direct your team to

12    make accessibility a priority in its decisions it

13    was making with regard to the eCheck-In self-service

14    project?

15            MR. RAIZMAN:  Object as to form.              01:53:05

16            THE WITNESS:  I think it would have been

17    part of the total solution.

18    BY MR. SWEET:

19        Q    Right.

20            But did you ever give any specific            01:53:13

21    direction to your team on accessibility?

22        A    I don't -- yeah.  I may have.  I don't

23    recall.

24        Q    Now, when -- when eCheck-In self-service

25    was first rolled out, was there at first a pilot      01:53:41
```

Page 165

PA1036

```
1    aspire them to a solution.  So I would have given

2    some guidelines, but, again, I would have given

3    deference to the team that actually know this stuff

4    and how it works.  I don't.

5         Q    Do you recall what type of guidance you        02:05:51

6    gave with regard to the tablet or the enclosure?

7         A    No, I don't.

8         Q    Do you recall whether you directed that the

9    tablet or enclosure be accessible to blind people?

10        A    Again, the eCheck-In platform was an          02:06:05

11   opportunity for us to do continuous improvement and

12   to put together a roadmap of, you know, how can we,

13   through time, you know, continue to iterate and

14   continue to improve on the solution.

15        Q    Right.                                         02:06:26

16             But we discussed earlier today the fact

17   that the kiosk did not have accessible features

18   which would make them independently usable for blind

19   folks, and I'm just wondering if you raised that at

20   any point with decision-makers and put it sort of     02:06:39

21   front and center in terms of importance.

22             MR. RAIZMAN:  Object as to form.

23             THE WITNESS:  Yeah.  I don't recall

24   specific conversations around that.

25   ///                                                     02:06:58
```

Page 175

PA1037

```
 1        Q    Prior to April of 2019, it's correct that

 2   Quest did not have any SOPs for dealing with its

 3   blind patients; correct?

 4        A    I don't know if that's correct.

 5        Q    Did the company eventually develop an SOP      03:07:05

 6   for dealing with blind patients?

 7        A    I can't remember off the top of my head if

 8   we did or not.

 9        Q    Did you ever direct that an SOP be created

10   for dealing with blind patients?                        03:07:20

11        A    I may have.  I can't remember.

12        Q    Are you aware of, as you sit here today,

13   sir, whether there are specific instructions that

14   are given to your PSRs throughout the network about

15   how to deal with blind patients specifically?           03:07:40

16        A    There may be.  I can't speak to what's

17   there today.

18        Q    Sir, are you familiar with what's known as

19   the interactive process under Section 1557 of the

20   Affordable Care Act?                                     03:08:04

21        A    No.

22        Q    Have you ever had any training on the

23   interactive process under Section 1557 of the

24   Affordable Care Act?

25        A    No, I haven't.                                 03:08:14
```

Page 211

1       Q      Do you know whether Quest provides its

2    phlebotomists with any training on how to engage in

3    the interactive process under Section 1557 of the

4    Affordable Care Act?

5       A      No, I don't know.                          03:08:26

6       Q      Did you ever direct any training for

7    phlebotomists on the interactive process under

8    Section 1557 of the Affordable Care Act?

9       A      Not that I'm aware of.

10      Q      And you have not received any training      03:08:37

11   yourself on the interactive process?

12      A      I don't believe so.

13      Q      Does Quest provide any of its personnel at

14   the PSCs, its phlebotomists generally and its PSRs,

15   does it provide them with any training on the         03:08:57

16   Federal Rehabilitation Act of 1973?

17      A      I don't have any knowledge of that.

18      Q      Did you ever direct --

19      A      If it is, I don't know.  It could exist.  I

20   just -- I just don't know.  I can't speak to it.      03:09:10

21      Q      During your tenure as executive director of

22   national patient services, did you ever order that

23   any training be provided to the PSC-level personnel

24   on the Rehabilitation Act of 1973?

25      A      Again, that -- you used the word did I       03:09:28

                                                    Page 212

PA1039

```
 1    conversation.  It may have been, but I don't recall

 2    it.

 3        Q    Was it part of the conversation in 2020?

 4            MR. RAIZMAN:  I'm going to object to the

 5    extent it calls for consultations with counsel which   04:26:17

 6    are privileged and I'd instruct you not to answer as

 7    to such consultation.

 8            MR. SWEET:  So, just so I'm clear, is that

 9    an instruction not to answer my question?

10            MR. RAIZMAN:  Instruction as to answer your    04:26:37

11    question to the extent it's based on the

12    considerations led by counsel.

13            MR. SWEET:  All right.

14            MR. RAIZMAN:  I'll simplify it.  It's an

15    instruction not to answer in this particular           04:26:51

16    question the way it's phrased.

17    BY MR. SWEET:

18        Q    From whom did you first hear about

19    three-finger swipe?

20        A    I -- as I said earlier, I don't recall who    04:27:08

21    had authorship of that idea.

22        Q    Okay.  Can you explain to me how it works?

23        A    No.

24        Q    You don't know how it works?

25        A    I don't.  No, I don't know how it works.      04:27:21
```

Page 258

```
 1    Again --

 2        Q    Do you know whether --

 3        A    Most of this --

 4        Q    I'm sorry.  I interrupted again.  I'm

 5    sorry.  Go ahead.                              04:27:27

 6        A    Yeah.  The three-finger swipe was really --

 7    if I remember correctly, I -- I'm just trying to put

 8    that in a time frame and I'm a little bit confused

 9    because of my transition out of national patient

10    services into my new role and I think there may have  04:27:49

11    been an overlay there and I just don't want to speak

12    out of turn on my knowledge.

13             Other than that, I don't know who authored

14    it.  I really don't know how it works and it's been

15    a year and a half, almost two years since some of    04:28:01

16    those conversations.  So it's just not top of mind.

17        Q    When were those conversations, sir?

18        A    Again, I really don't recall when those

19    conversations occurred.

20        Q    You said a moment ago a year and a half or  04:28:15

21    two years ago; is that accurate?

22        A    I think so.  I think that time frame is

23    probably generally correct.  I'm sure if there's

24    something more specific that we can refer to, I

25    think that might help.                          04:28:30
```

Page 259

1       Q     So would that be 2019?

2       A     Again, I don't know.  I'm sorry to say

3    that.  Just with the transition and then plus COVID

4    activity, my placement of events is kind of blurry

5    on all of that.  There was a lot going on.            04:28:50

6       Q     Did you email with your colleagues about

7    the three-finger swipe idea?

8       A     I very well could have, yeah.

9       Q     And you produced those emails to your

10   counsel?                                               04:29:04

11      A     They had access to all my emails and all my

12   files.

13      Q     You didn't destroy any emails about

14   three-finger swipe; right?

15      A     No.  No.  I don't destroy emails.            04:29:14

16      Q     And you don't have an understanding of how

17   it works?

18      A     No.  A fundamental understanding, no.

19      Q     Do you know whether use of the three-finger

20   swipe alerts the phlebotomist to the presence of the  04:29:29

21   person who's making the three-finger swipe?

22      A     I guess so.  If you say so.  I don't -- I

23   really -- you're asking me questions about

24   functionality of the device and I really -- I can't

25   give you an answer to it.  I really can't.  I don't   04:29:44

                                              Page 260

| | |
|---|---|
| 1 | know what all went into it, how does it all work.  I |
| 2 | do know it's a way to quickly notify, get |
| 3 | registered.  But beyond that, questions of how it |
| 4 | works, I don't -- I don't know.  I'm just not an |
| 5 | engineer.  I don't understand that stuff.          04:30:01 |
| 6 | Q    Understood. |
| 7 |      Now, I think we talked a little bit earlier |
| 8 | today about this issue called wait by text. |
| 9 |      Do you recall that discussion? |
| 10 | A    I do.  I do.                                  04:30:13 |
| 11 | Q    And is it your understanding -- |
| 12 | A    It was a long time ago. |
| 13 | Q    Is it your understanding, Mr. Grant, that |
| 14 | during COVID the company deployed a wait by text |
| 15 | option?                                            04:30:26 |
| 16 | A    I thought that was my recollection.  It may |
| 17 | have surfaced in 2019 conceptually and they were |
| 18 | working on it, but it all sort of got accelerated |
| 19 | perhaps by COVID, but -- so, again, it's one of |
| 20 | those future functions that we were able to put in.  04:30:47 |
| 21 | And, you know, my tenure out, COVID, new role, all |
| 22 | those kinds of things, I -- so it could have been as |
| 23 | early as 2019 and then just got accelerated because |
| 24 | of COVID. |
| 25 | Q    Regardless of when the wait by text option   04:31:06 |

                                              Page 261

# EXHIBIT 38

## <u>*REDACTED*</u>

## TO BE FILED UNDER SEAL PENDING THE RULING ON PLAINTIFF'S APPLICATION

# EXHIBIT 39

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4    JULIAN VARGAS, ANNE WEST, and )  Case No. 2:19-cv-8108
      AMERICAN COUNCIL OF THE       )
 5    BLIND, individually on behalf )
      of themselves and all others  )
 6    similarly situated,           )
                                    )
 7              Plaintiffs,         )
                                    )
 8         v.                       )
                                    )
 9    QUEST DIAGNOSTICS CLINICAL    )
      LABORATORIES, INC., QUEST     )
10    DIAGNOSTICS HOLDINGS, INC.,   )
      QUEST DIAGNOSTICS             )
11    INCORPORATED; and DOES 1-10,  )
      inclusive,                    )
12                                  )
                Defendants.         )
13    _____)
14
15
16                    --oOo--
17        VIDEOTAPED DEPOSITION OF PRUDENCIA MAGANA
18           Taken on behalf of the Defendants
19                 August 3, 2021
20         ***TAKEN VIA VIDEOCONFERENCE***
21                    --oOo--
22
23
24
25
                                              Page 1
```

PA1057

```
 1      against the information you have in Quest Quanum?
 2              A.   Yes, to make sure that's the patient.
 3              Q.   In the time that you've been -- well, let
 4      me take it step by step.  Between 2017 and 2020 when you
 5      were at the 4955 location of Quest did you ever service
 6      any blind patients?
 7              A.   I don't remember.
 8              Q.   At any time that you've been a Quest
 9      employee have you ever serviced any patients who were
10      blind?
11              A.   Not that I remember.
12              Q.   Have you ever had any specific training on
13      how to assist blind patients?
14              A.   I think so.
15              Q.   And what specific training have you had at
16      Quest on how to assist blind patients?
17              A.   In the managing patients.
18              Q.   The managing patient services training that
19      you previously testified to?
20              A.   Yes.
21              Q.   And aside from the managing patient
22      services training have you had any other training at
23      Quest on how to assist blind patients?
24              A.   I think so.
25              Q.   What other training have you had?
```

Page 40

1    the bell tone by somebody checking in in the waiting

2    room?

3         A.   I don't remember.

4         Q.   So it goes on to say in page 43 of

5    Exhibit 47 that once they have successfully done so, the

6    kiosk will play a short audio message informing them

7    that they have been checked in and may take a seat, and

8    assigning them a numerical patient ID that will be

9    verbally called by a PSR.  First of all, have you ever

10   heard this short audio message coming from the kiosk?

11        A.   I don't remember.

12        Q.   Do you know whether your kiosk at the

13   current patient service center you're at displays an

14   audio message when someone uses a three-finger swipe?

15        A.   I don't remember.

16        Q.   Have you, yourself, ever tried the

17   three-finger swipe on the kiosk at the current patient

18   service center that you work at?

19        A.   I don't remember.

20        Q.   As part of your -- as part of your training

21   were you -- were you asked to try the three-finger swipe

22   option so you knew how it would work?

23        A.   I don't remember.

24        Q.   Have you ever observed any patients using

25   the three-finger swipe option at the kiosk at your

Page 82

1     as visually impaired when checking in at the eCheck-in

2     kiosk?

3              A.   The numerical ID and it shows in Quanum.

4              Q.   Maybe -- maybe you're not understanding my

5     question.  Let me ask it perhaps more clearly.

6                   Prior to the implementation of the

7     three-finger swipe when a patient was at the kiosk

8     trying to check in, was there any method by which they

9     could identify themselves as visually impaired, before

10    the three-finger swipe was implemented?

11             A.   I don't remember.

12             Q.   Are you aware of any other aids or

13    auxiliary services that were provided to blind patients

14    attempting to check in at the kiosk prior to the

15    implementation of the three-finger swipe?

16                  MR. RAIZMAN:  Object as to form.

17    BY MR. MILLER:  (Continuing)

18             Q.   You can answer.

19             A.   I don't remember.

20             Q.   Are you aware of any other aids or

21    auxiliary services other than the three-finger swipe

22    that are currently available to blind patients

23    attempting to check in at an eCheck-in kiosk?

24                  MR. RAIZMAN:  Objection as to form.

25    BY MR. MILLER:  (Continuing)

                                               Page 86

PA1060

```
 1    collected at 4955 Van Nuys?

 2          A.   West Hills.

 3          Q.   And then once the samples were tested at

 4    the West Hills location, would those results be sent

 5    back via Quanum?

 6          A.   No.

 7          Q.   Would the results be sent from the West

 8    Hills location to the doctor via Quanum?

 9               MR. RAIZMAN:  Object as to form.

10    BY MR. MILLER:  (Continuing)

11          Q.   You can answer.

12          A.   I think it goes directly to the doctor.  We

13    don't have anything to do with it.

14               MR. RAIZMAN:  Move to strike.

15    BY MR. MILLER:  (Continuing)

16          Q.   Are you able to review a patient's prior

17    test results in Quanum?

18          A.   No.

19          Q.   Were you ever trained by Quest to scan the

20    waiting room for patients requiring assistance?

21          A.   Repeat that again.

22          Q.   Were you ever trained by Quest to scan the

23    waiting room for patients requiring assistance?

24          A.   Not that I remember.

25          Q.   If you're assisting a patient and the bell
```

                                                  Page 90

# EXHIBIT 40

```
 1               UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4    JULIAN VARGAS, ANNE     )
      WEST, and AMERICAN      )
 5    COUNCIL OF THE BLIND,   ) Case No. 2:19-cv-8108
      individually on behalf  )
 6    of themselves and all   )
      others similarly        )
 7    situated,               )
                              )
 8              Plaintiffs,   )
                              )
 9        vs.                 )
                              )
10    QUEST DIAGNOSTICS       )
      CLINICAL LABORATORIES,  )
11    INC., QUEST DIAGNOSTICS )
      HOLDINGS, INC.,         )
12    QUEST DIAGNOSTICS       )
      INCORPORATED, and       )
13    DOES 1-10, inclusive,   )
                              )
14              Defendants.   )
      _____)
15
16
17         REMOTE DEPOSITION OF CLAIRE STANLEY
18             (Via Zoom Videoconference)
19              Thursday, August 19, 2021
20
21    REPORTED BY:  Michelle Milan Fulmer
                 CSR No. 6942, RPR, CRR, CRC
22
23    JOB NO. 4769235
      PAGE 85 THROUGH PAGE 88 IS MARKED "CONFIDENTIAL"
24    UNDER THE PROTECTIVE ORDER AND SEPARATELY BOUND
25    PAGES 1 - 225

                                        Page 1
```

PA1062

```
 1    litigation to make their product accessible?

 2        A    I was in favor of finding a venue in which

 3    we could initiate with Quest to make their services

 4    accessible.

 5        Q    Okay.  You seem not to want to answer my        13:22:40

 6    question.

 7             You -- was litigation an acceptable venue

 8    to you?

 9        A    It likely was, but I honestly just can't

10    remember.                                                 13:23:01

11        Q    So you can't remember, one way or another,

12    whether you advocated in favor of bringing

13    litigation against Quest?

14        A    I can't remember.

15        Q    Do you recall being interested in            13:23:12

16    continuing conversations with Quest instead of

17    entering litigation?

18        A    We did try to engage with Quest and the

19    conversations quickly disintegrated.

20        Q    Okay.  My question was not directed at       13:23:29

21    that.

22             At the time that ACB decided or you were

23    participating in discussions about deciding whether

24    to sue Quest, were you in favor of trying to

25    continue dialogue with Quest as opposed to filing   13:23:43
```

Page 53

PA1063

1    litigation?

2        A    We used dialogue to the extent that was

3    possible and it wouldn't go any further.

4        Q    Okay.  So, in your view, the dialogue had

5    reached its conclusion at the time that ACB decided    13:23:57

6    to sue Quest?

7        A    The dialogue just ceased.  So there was

8    no -- no communication.

9        Q    Okay.  And you were involved in all of that

10   dialogue, as far as you know; correct?    13:24:14

11       A    To the best of my recollection.

12       Q    Okay.  You're not aware of any

13   conversations or meetings that occurred at which you

14   were not present; is that right?

15       A    I believe there was mediation that I was    13:24:28

16   not involved in.

17       Q    Okay.  Fair enough.

18            But before the litigation, you were

19   involved in all of the meetings, conversations, and

20   correspondence with Quest; correct?    13:24:44

21       A    To the best of my memory.

22       Q    Okay.  And you testified in the Labcorp

23   matter that both that matter and this matter, this

24   lawsuit against Quest, started with a single call

25   from an ACB member; is that correct?    13:25:12

Page 54

```
 1        A    Yes.

 2        Q    Okay.  Were you the principal drafter of

 3   the document?

 4        A    Yes.

 5        Q    Okay.  Did Mr. Bridges sign it exactly as    15:33:17

 6   you prepared it?

 7        A    I'm sure there were edits at some point,

 8   but, yes, he signed it.

 9        Q    Okay.  Did he pretty much sign, in

10   substance, the document that you had prepared?      15:33:32

11        A    Yes.

12        Q    What was your purpose in preparing this

13   document?

14        A    Can you rephrase that question?

15        Q    Did you discuss --                         15:33:45

16             I'm going to ask a different question, if

17   you don't mind.

18             Did you discuss with anyone the preparation

19   or sending of this letter before you prepared the

20   draft?                                               15:33:56

21        A    Yes.  Me and the Executive Director spoke.

22        Q    Okay.  So you and Mr. Bridges discussed

23   this and you updated him on Ms. Rehder's call, I

24   assume?

25        A    Yes.                                        15:34:11
```

Page 134

PA1065

```
 1        Q    And you updated him on the response to the

 2   list serve; correct?

 3        A    Yes.

 4        Q    And you discussed what your next steps

 5   should be?                                          15:34:21

 6        A    Yes.

 7        Q    And the two of you decided that you should

 8   send a letter to Quest; right?

 9        A    Yes.

10        Q    Okay.  And I notice that this letter is not   15:34:32

11   dated.

12             I'll represent to you that it was received

13   by AC- -- I'm sorry -- by Quest on or about

14   December 13th, 2018.

15             Does that sound approximately correct as to   15:34:59

16   when -- when it is that this letter was sent out to

17   Mr. Rusckowski?

18        A    Yes.

19        Q    Okay.  Do you have a better estimate of the

20   date than December 13th, 2018?                       15:35:12

21        A    No.

22        Q    Was one of the purposes of this letter to

23   let Quest know about the specific experiences of

24   some ACB leadership?

25        A    Yes.                                        15:35:31
```

Page 135

PA1066

```
 1        Q    Okay.  And I take it that you wanted to do

 2    that in an accurate and truthful way; correct?

 3        A    Yes.

 4        Q    Okay.  And you wanted to accurately report

 5    what it is you were told by Ms. Rehder and then        15:35:48

 6    whatever you were told in response to the leadership

 7    list serve inquiry; correct?

 8        A    Yes.

 9        Q    Okay.  Any of the references in this letter

10    that's Exhibit 65 that you just read that come from    15:36:08

11    someone other than Ms. Rehder or someone in the

12    leadership list serve?

13        A    I don't believe so.

14        Q    Okay.  You say here in the letter, "The

15    tablet does not include the option to turn on a        15:36:33

16    screen reader or to increase the font size."

17             Do you recall writing that?

18        A    Yes.

19        Q    What was the significance of your writing

20    about increasing the font size?                        15:36:50

21        A    Can you rephrase that question?

22        Q    Why did you mention the inability to

23    increase the font size as being an issue?  Was that

24    something you wanted to be able -- you wanted

25    members of the blind community to be able to do with   15:37:05
```

Page 136

PA1067

1    respect to the Quest kiosk?

2       A    Yes.

3       Q    Okay.  It says here, "Additionally, many

4    customers we have communicated with explain that

5    when they arrived at your various locations to get      15:37:22

6    lab work done, the front desk was not manned by a

7    receptionist."

8            Do you recall writing that?

9       A    Yes.

10      Q    Okay.  Does that also mean that some of the    15:37:31

11   customers that you communicated with up until the

12   point of this letter did or were greeted by a

13   receptionist or other individual manning the front

14   desk?

15      A    Can you rephrase that?                          15:37:52

16      Q    Isn't it true that some of the individuals

17   with whom you had communicated as of the time of

18   this letter had been greeted by someone staffing the

19   front desk?

20      A    I would have to reread the comments to see     15:38:10

21   if any of them had mentioned previously that that

22   had happened.  I would have to reread all the

23   comments.

24      Q    If any -- if any had mentioned it,

25   wouldn't -- and none had been greeted, wouldn't you    15:38:22

                                            Page 137

PA1068

```
 1    have said all of our customers we communicated with

 2    were not greeted?

 3        A    Can you state that again?

 4        Q    That's okay.  We'll withdraw -- I'll

 5    withdraw the question.                              15:38:39

 6             You then say after the comment, "the front

 7    desk was not manned by a receptionist," "As a

 8    result, the only way to check in is via the

 9    inaccessible tablet.  The lack of a receptionist

10    leaves blind customers without a way to sign in."   15:38:51

11             Do you recall writing that?

12        A    Yes.

13        Q    Doesn't that mean then that a receptionist

14    or other individual staffing the front desk would

15    permit blind customers to sign in?                  15:39:07

16        A    No.  I disagree.  They still wouldn't be

17    able to sign in independently.

18        Q    Okay.  But you included that in this letter

19    because you were concerned at the time that the lack

20    of a receptionist left blind customers without a way 15:39:24

21    to sign in, in your opinion; correct?

22        A    Yes.  But they still don't have an inde- --

23    even if a person was there, they still couldn't sign

24    in independently.

25        Q    Do you see anything in this letter that I'm  15:39:37
```

Page 138

PA1069

| | |
|---|---|
| 1 | missing that indicates that ACB was asking that its |
| 2 | members or other people in the blind community |
| 3 | should be able to check in independently? |
| 4 | A    Yeah.  The letter is basically outlining |
| 5 | the accommodations that blind and visually impaired    15:39:59 |
| 6 | people need in order to independently sign in; i.e., |
| 7 | enlargement of the font and screen reading software. |
| 8 | Q    And the mention of a lack of a receptionist |
| 9 | just had no significance at all then, it was just |
| 10 | extra?                                                 15:40:19 |
| 11 | A    It was simply just an extra example of some |
| 12 | of the experiences people had witnessed. |
| 13 | Q    So wouldn't you agree that a reader of this |
| 14 | letter could interpret these multiple references to |
| 15 | the lack of a receptionist or other person available    15:40:38 |
| 16 | to help somebody sign in, that that would address |
| 17 | ACB's concern? |
| 18 | A    No.  I disagree because the letter still |
| 19 | puts a strong emphasis on the need for large print |
| 20 | and/or -- I shouldn't say and/or -- and accessible     15:40:54 |
| 21 | tablets with voiceover or other screen reading |
| 22 | software. |
| 23 | Q    Okay.  But you don't know how it was that |
| 24 | Quest interpreted this letter, do you? |
| 25 | A    I suppose not.                                    15:41:14 |

Page 139

PA1070

```
 1        Q    It says here, "Consequently, many of the

 2    customers we have spoken to get lab work done at

 3    Quest on a regular basis."

 4            Do you remember writing that?

 5        A    Yes.                                    15:41:35

 6        Q    That was only -- that was only Robin Rehder

 7    and the respondents to the list serve that you were

 8    referring to; right?

 9        A    That's true.  Yeah.

10        Q    Approximately how many people was that?    15:41:48

11        A    I would have to look at the list again.

12    I -- I can't give you a number right now.

13        Q    You ask here for a meeting or at least

14    conversation, I think, to talk with

15    Quest Diagnostics.                               15:42:17

16            Did that eventually happen?

17        A    One phone call occurred in January of 2019.

18        Q    Okay.  And were you present at that phone

19    call?

20        A    Yes, I was.                             15:42:31

21        Q    And did you take notes during that phone

22    call?

23        A    I do not recall.

24        Q    Okay.  Do you recall when in January of

25    2019 that conversation took place?               15:43:05
```

Page 140

PA1071

```
 1        A     I don't recall, but I believe we have it on

 2    a timeline.

 3        Q     Okay.  And was it --

 4              Who was on the call?

 5        A     Counsel was there, Amer Pharaon.  And I        15:43:21

 6    believe there was -- there was another individual on

 7    the secondary call and I think he might have been on

 8    the first one as well, but I can't say completely,

 9    but I think it was Chris Grant.

10        Q     Okay.  So I just want to be clear that         15:43:43

11    we're not talking about -- you said counsel and then

12    you spoke Amer Pharaon's name.

13        A     Yes.

14        Q     That's one person; right?

15        A     Correct.                                       15:43:52

16        Q     Okay.  So Amer Pharaon was on the call.

17    Chris Grant was on the call.

18              Was there anyone else from Quest on the

19    call?

20        A     Not to my recollection.                        15:44:00

21        Q     Okay.  And who was on the call on the ACB

22    end, if you know?

23        A     Myself and Eric Bridges.

24        Q     Okay.  Clark Rachfal wasn't on the call?

25        A     I don't believe he was an employee of ACB      15:44:17
```

                                                       Page 141

PA1072

```
 1      yet or he just started.

 2          Q    Okay.  In any event, he wasn't on the call?

 3          A    No.

 4               MR. RAIZMAN:  All right.  Jon, I don't know

 5      how you want to do it, but if you can send her         15:44:31

 6      what's been marked as Exhibit 67, which is PL 577

 7      through 596.

 8               MR. MILLER:  Yeah.  Can you forward that

 9      one to me just for ease, Counsel, if you have it

10      right in front of you?                                 15:44:49

11               MR. RAIZMAN:  I think I can.  Let's go off

12      the record.

13               THE WITNESS:  Before we do that, can we

14      take a quick break?

15               MR. RAIZMAN:  Of course.  Let's take a        15:44:56

16      break.  Let's go off the record.

17               MR. MILLER:  Why don't we -- thanks.  Are

18      we off?

19               THE VIDEOGRAPHER:  We're going off the

20      record.  The time is 3:45 Eastern Daylight Time and    15:45:03

21      this is the end of Media Unit Number 5.

22               (Recess taken.)

23               (Off the record at 3:45 p.m.  Back on the

24      record at 3:57 p.m.)

25               THE VIDEOGRAPHER:  We're going back on the     15:57:37
```

Page 142

PA1073

```
1    record.  The time is 3:57 p.m.  This is the start of

2    Media Unit Number 6.

3    BY MR. RAIZMAN:

4       Q    All right.  Let's take a look --

5            And I sent all of these next series of         15:57:57

6    documents to your counsel.  I'm not sure if he's

7    forwarded them yet.

8            MR. MILLER:  I have.

9            MR. RAIZMAN:  Thank you.

10      Q    Let's look first at the one marked             15:58:09

11   Exhibit sixty -- 66, if we could.

12           While you're waiting to receive that, my

13   question is --

14      A    Well, which?  Because these don't have

15   subjects.  So which one?  The most recent?  Second      15:58:39

16   that you sent?

17           MR. RAIZMAN:  I don't know what order

18   they're being sent, I'm afraid.

19           MR. MILLER:  Yeah.  Counsel, you actually

20   sent Exhibit sixty -- it looks like 67 got sent         15:58:50

21   twice.  So I actually didn't -- I did not receive

22   66.

23           MR. RAIZMAN:  That's an error.  I'm going

24   to correct that now and we'll talk about 67

25   instead.                                                15:59:03
```

Page 143

```
 1              MR. MILLER:  And I do have 67 through 69

 2     and 71 that I forwarded on.

 3              MR. RAIZMAN:  Okay.

 4              THE WITNESS:  69, is that what we said

 5     we're looking at?                               15:59:21

 6              MR. MILLER:  67, I believe.

 7     BY MR. RAIZMAN:

 8         Q    Let's look at sixty -- let's look at 67

 9     until you receive 66.

10              So I don't know if you're already looking   15:59:38

11     at it because you're listening to something.

12         A    It was just opening it.  I need a couple

13     more seconds.

14              MR. MILLER:  I just forwarded 66.

15              MR. RAIZMAN:  We're going to stick with 67   16:00:03

16     as long as it's open and she's reading it.

17              THE WITNESS:  Okay.  I'm opening 67 now.

18     BY MR. RAIZMAN:

19         Q    Can I stop you for a second?  I apologize.

20     I don't want you to look at the whole of it because   16:00:27

21     it's a very large document.

22              I just want you to look at the first two

23     pages, PL 577 and 578, which I'm saying for the

24     record.  It might not help you.  But the last line

25     that I'm asking you to read is, "Eric talked about   16:00:43
```

Page 144

```
 1     connecting the company," and it goes on.

 2             If you could just stop there.

 3     A     Sorry.  Which one?  PL 77?

 4     Q     PL 578.

 5     A     Okay.  Okay.                              16:01:55

 6     Q     So you've read those two pages?

 7     A     Yes.

 8     Q     Okay.  Does that accurately reflect the

 9     conversation that you, Mr. Bridges, Mr. Grant, and

10     Mr. Pharaon had on January 25th, 2019?           16:02:13

11     A     Yes.

12     Q     And was that the first discussion that you

13     had with any representative of Quest about the

14     accessibility of the kiosk device?

15     A     Yes, it was.                              16:02:28

16     Q     Okay.  And are these your notes?

17     A     Yes.

18     Q     Do you know if Mr. Bridges took any notes?

19     A     Not to my recollection.

20     Q     Okay.  Did Mr. Bridges --                 16:02:42

21             Did you send these notes to Mr. Bridges?

22     A     I don't remember.

23     Q     Did you send them to Mr. Rachfal?

24     A     He had not started at this point.  He

25     wasn't an employee.  So I might have shared them at   16:03:02
```

Page 145

PA1076

```
 1     some point, but I don't recall.

 2         Q    Okay.  So it's you, Mr. Bridges, Mr. Grant,

 3     Mr. Pharaon.

 4             Does this accurately reflect what was said

 5     by you and by the Quest representatives?  And by you    16:03:17

 6     I mean --

 7             Well, let me start again.

 8             Does this document accurately reflect what

 9     was said by any of the participants in the

10     January 25th, 2019, meeting?                            16:03:28

11         A    From what I can remember, yes.

12         Q    Okay.  Does it leave anything out?

13         A    Not that I can recall.

14         Q    Do you recall --

15             There's reference here, "Eric talked about    16:03:52

16     connecting the company to a tech firm."

17             Do you see that reference?

18         A    Yes.  I read that.

19         Q    Do you recall that subject coming up at the

20     meeting?                                                16:04:04

21         A    Yes, I do.

22         Q    Was a specific tech firm discussed?

23         A    I can't recall if he gave a specific name

24     or not.

25         Q    There's a reference here, "They seemed to    16:04:15
```

Page 146

PA1077

```
 1    believe this was sufficient to assist low vision

 2    patients," and it was in reference to a big yellow

 3    button when people need help with the sign-in

 4    tablet.  You write, "They seemed to believe this was

 5    sufficient to assist low vision patients."          16:04:32

 6            Did anyone actually say that?

 7       A    Let me read the notes again.

 8            Can you rephrase your question?

 9       Q    Sure.

10            Did anyone actually say that they believed   16:05:16

11    the big yellow button was sufficient to assist low

12    vision patients?

13       A    Based on my notes, that's what it sounds

14    like they said.

15       Q    Well, your notes actually say, "They seemed  16:05:29

16    to believe," which suggests that you were inferring

17    as opposed to anyone actually saying that; right?

18    Because otherwise you say in many places, "They

19    stated.  They said."  You don't say, "They said this

20    was sufficient."  You said, "They seemed to believe  16:05:46

21    this was sufficient."

22            What was -- why the different language to

23    describe it?

24       A    I can't remember the -- the -- what they

25    said.  It's been a while.                            16:05:58
```

Page 147

PA1078

1      Q    Okay.  So as far as you recall, you don't

2  recall anyone saying that pressing the big yellow

3  button was sufficient to assist low vision patients?

4      A    Based on the language I used, it sounds

5  like they said there's a help yellow button and the      16:06:14

6  tone of it implied that they thought -- they

7  believed it was an adequate accommodation for people

8  with disabilities or people specifically who are

9  blind or visually impaired.

10     Q    That's your inference that they felt it was      16:06:29

11  adequate accommodation; right?

12     A    Yes.

13     Q    Okay.  And did they talk about other things

14  here that they were doing?  Did they state that any

15  one of them was sufficient?  They talk in a couple      16:06:42

16  lines above, it says, "Chris talked a lot about what

17  the phlebotomists are trained to do.  They're

18  supposed to scan the room every time they go into

19  the lobby," so on and so forth.

20          You don't say there that it seemed that      16:06:58

21  they thought this was sufficient, do you?

22     A    Can you rephrase that question?

23     Q    No.  I'll just withdraw it.

24          There's very little in these notes that I

25  see as I'm reading them that indicate anything that      16:07:23

Page 148

```
 1    you or Mr. Bridges said, except for the two last

 2    lines.  Everything else is expressed in terms of

 3    something a representative of Quest said or asked.

 4         It then shows, "I asked what they will do

 5    if they cannot identify whether someone has a        16:07:43

 6    disability and they could not answer that question."

 7         Do you recall writing that?

 8    A    Yes.

 9    Q    And do you recall saying that or asking

10    that during the meeting?                             16:07:55

11    A    If it's in my notes, I'm sure I implied it.

12    I don't remember the whole conversation.

13    Q    Okay.  You don't remember that part of the

14    conversation at all?

15    A    I remember the theme or the topic.  So yes.  16:08:08

16    Q    What were you --

17         I don't understand the comment.  Can you

18    explain to me what you were driving at?  What was

19    the concern you had about being --

20    A    Yes.                                            16:08:21

21    Q    -- able to identify whether someone has a

22    disability?

23         Please do.

24    A    They -- they seemed to -- based on these

25    ideas they had presented to us, if a phlebotomist    16:08:31
```

Page 149

PA1080

```
 1    saw that somebody had a disability, they would come

 2    out quickly and assist somebody, but not everybody

 3    has a visible disability.  You can be visually

 4    impaired and not use a white cane or have a dog and

 5    still be visually impaired.                          16:08:47

 6          So the question or the idea was implying

 7    how are you going to instantly identify somebody as

 8    being blind or visually impaired?  It's not always

 9    obvious.

10    Q    Okay.  And the next line that represents       16:08:57

11    something said by you or Eric is, "Eric talked

12    about connecting the company to a tech firm to

13    explore how to make their sign-in system

14    accessible."

15          Did Eric, in fact, do that at the meeting?    16:09:11

16    A    Yes.

17    Q    He didn't mention any tech firm?

18    A    I'm sure he did.  I just don't remember

19    which one specifically he referenced.  He might have

20    referenced multiple.                                16:09:21

21    Q    Didn't -- didn't ACB later provide names of

22    tech firms?

23    A    Yes, I think so.

24    Q    So isn't it likely that he didn't mention

25    any tech firms in this call if they were later      16:09:33
```

Page 150

PA1081

1    provided?

2        A    It's possible.  But I know he brought up

3    the concept that there were tech firms out there

4    that specialize in this very kind of thing.

5        Q    Okay.  And what was your understanding of      16:09:45

6    the kind of thing they were specializing in?

7        A    Do you mean the -- the firm itself, the

8    tech firm?

9        Q    Let me ask it a different way.

10        Did Eric say anything that's not recorded       16:10:03

11   here to indicate what exactly the tech firm was

12   going to be doing for Quest?

13       A    Yeah.  Eric explained that there are tech

14   firms out there that help with all kinds of

15   different things; i.e., kiosks and making them       16:10:21

16   accessible.

17       Q    Did he explain anything else on that

18   subject?

19       A    I don't remember specifics.

20       Q    Okay.  And you didn't write anything else     16:10:33

21   down about that; right?

22       A    No.

23       Q    Now, if you could look at Exhibit 66.

24       A    That's a different attachment; correct?

25       Q    It is.  It's a shorter document.            16:10:57

                                      Page 151

PA1082

```
 1              If I could --

 2     A    I'm sorry, Jon?

 3              MR. MILLER:  It should be the most recent

 4   one I sent.

 5              THE WITNESS:  Okay.                    16:11:11

 6   BY MR. RAIZMAN:

 7     Q    Here I'm only looking for your review of

 8   the pages marked 570 through 572.  So not the last

 9   page.

10     A    Which one did you say to go through?  2?   16:12:22

11     Q    Page 72, yeah.

12     A    72.  Okay.

13     Q    All right.  So focusing on those three

14   pages of Exhibit 66, the pages marked PL 570 to 572,

15   does that represent your effort to summarize each of  16:13:23

16   the contacts of any kind with Quest during the time

17   period covered?

18     A    Yes.

19     Q    And does it capture all of the contacts

20   with Quest before --                             16:13:40

21     A    Yes.

22     Q    -- ACB entered the litigation?

23     A    To my recollection, yes.

24     Q    Okay.  And this is a document you prepared?

25     A    Yes.                                      16:13:56
```

Page 152

PA1083

```
 1        Q    Okay.  Who is Walter, Walter Dusseldorp,

 2   and why did you contact him at some point?

 3        A    I don't recall how I got his name.  I just

 4   know along the way it was one of the contact names

 5   suggested to reach out to.                      16:14:16

 6        Q    Left off of here is the letter to

 7   Mr. Rusckowski that we discussed a while back.  Do

 8   you recall that?

 9             Do you know where in the timeline that

10   letter fell?  Before or after, for example, the   16:14:30

11   December 13th voicemail message?

12        A    Well, you said it was -- you -- your date

13   is the 13th.  So presumably right before that.

14        Q    I don't want you to go by my date because

15   I'm just a lawyer on the case.  I need someone who   16:14:51

16   can give competent testimony.

17             So I'm looking at your document.  You said

18   you left a voicemail message for Gerber and Kocher,

19   if I'm pronouncing it correctly, on December 13th,

20   2018.                                             16:15:04

21             Am I reading -- am I interpreting that

22   entry correctly?

23        A    That's correct.

24        Q    And you did leave a voicemail message for

25   those individuals?                                16:15:11
```

Page 153

PA1084

```
 1        A    Yes.

 2        Q    And how did you pick them?

 3        A    I honestly don't remember.

 4        Q    Okay.  And does that or anything else in

 5   the document refresh your memory or otherwise        16:15:30

 6   enable you to say whether you called and left that

 7   voicemail before or after you sent the letter to

 8   Steve Rusckowski?

 9        A    I do believe these were sent right after we

10   sent -- these voice messages were left right after   16:15:46

11   we sent the letter.

12        Q    Okay.  And it says here you received a call

13   back from Jackie telling you to call Karen Clinger

14   on December 19th; correct?

15        A    Yes.                                        16:16:01

16        Q    Okay.  And do you know who Jackie is or was

17   at the time?

18        A    I don't remember her position.  I just know

19   it's one of those you're pointed in 20 directions

20   and you call everybody you're told.                  16:16:15

21        Q    Okay.  But she didn't say who she was?

22        A    I just don't recall at this time.

23        Q    And this was during the Christmas holiday

24   was sort of worked in here; correct?

25        A    Correct.                                    16:16:33
```

Page 154

PA1085

```
 1        Q    And January 3rd, 2019, Mr. Pharaon called

 2    you back; correct?

 3        A    Correct.

 4        Q    Well, actually I misspoke.  I'm trying to

 5    shorten things.                                    16:16:44

 6             He actually called looking for Eric;

 7    correct?

 8        A    Yes.  That sounds right because the letter

 9    would have been signed by Eric.

10        Q    Okay.  And that ended up getting channeled  16:16:55

11    to you.

12             Do you know why?

13        A    I'm assuming Eric sent it on to me because

14    I was the one who started the whole process of

15    everything.                                        16:17:08

16        Q    Okay.  And as of the time --

17             Okay.  Let's move forward.  There's some

18    interim calls, but this document has an entry for

19    January 25th, 2019, "Had phone meeting with Amer

20    and Chris," and that's the phone meeting that was  16:17:29

21    recorded in the prior exhibit we were looking at,

22    Exhibit 67; right?

23        A    Yes.

24        Q    Okay.  Reading this all the way forward and

25    understanding that it was a complete record of     16:17:49
```

Page 155

PA1086

```
1    everything that happened before the litigation with

2    respect to contacting Quest, it sounds like there's

3    only one other conversation with Quest; is that

4    correct?

5         A    That's correct.                              16:18:02

6         Q    Okay.  And that happened on April 12th,

7    2019; correct?

8         A    Correct.

9         Q    And that's when you and Mr. Rachfal spoke

10   with Mr. Pharaon and Mr. Grant; is that right?        16:18:18

11        A    Yes.

12        Q    Okay.  Do you have notes of that

13   conversation?

14        A    Not to my recollection, no.

15        Q    Was it a short conversation?                16:18:34

16        A    I don't remember.

17        Q    Do you have notes of any of the other

18   conversations that are recorded here in this log,

19   other than the January 25th, 2019, conversation?

20        A    I believe the only two conversations of     16:18:58

21   substance were the two.  All the others were just

22   quick in-passing communication.

23        Q    Okay.  So was this April 12th, 2019,

24   conversation also quick in passing?

25        A    No.  It was longer.                          16:19:14
```

Page 156

PA1087

```
 1       Q    How long was that?

 2       A    I -- I don't recall.  Probably an hour.

 3  Potentially less.

 4       Q    Okay.  And did you take notes during that

 5  conversation?                                    16:19:41

 6       A    I don't remember.

 7       Q    None have been produced to me.

 8            So it would have been your practice to take

 9  notes, right, at a conversation like that for an

10  hour, an hour of time?                           16:19:53

11       A    It's possible, but I can't say 100 percent

12  of the time I take notes.  I try to, but I don't

13  know.

14       Q    Okay.  In any event, you're not aware of

15  any notes that exist today, are you?             16:20:07

16       A    No, I'm not.

17       Q    At some point in time, did you go looking

18  for documents as part of while you were still at --

19  at ACB looking for documents relevant to the Quest

20  litigation?                                      16:20:25

21       A    I don't recall I -- if I personally ever

22  went looking for documents.  I just saved them all

23  in the same folder.

24       Q    Okay.  Did you save all your notes in the

25  same folder?                                     16:20:37
```

Page 157

1     A    Yes.

2     Q    What did you call that folder?

3     A    I don't recall.  It was probably something

4  as simple as Quest.

5     Q    Okay.  And the notes of the April 12th,    16:20:48

6  2019, conversation, if you ever wrote any, would

7  have been in the same folder as the January 25th,

8  2019, conversation; correct?

9     A    Yes, they would.

10     Q    Okay.  In any event, are you trying to    16:21:05

11  summarize the conversation here in Exhibit 66?

12     A    Can you specify where you mean?

13     Q    Yes.

14     The entry, and I'm going to read it in

15  full, says, "4/12/19.  Claire and Clark spoke with    16:21:22

16  Amer and Chris.  They asked for connections to tech

17  companies."

18     Is that sort of the outcome of the

19  conversation?  Can't be everything that was said in

20  an hour.    16:21:37

21     A    Yes.  I think that would have been the

22  overarching takeaway.

23     Q    So as of April 12th, 2019, is it accurate

24  to say that ACB had not sent Quest the names of any

25  tech companies as was discussed on January 25th,    16:21:54

Veritext Legal Solutions
866 299-5127

PA1089

```
 1    2019?

 2        A    Can you say that again?

 3             MR. RAIZMAN:  Would you read it back,

 4    Michelle?

 5             (Whereupon, the record was read              16:22:07

 6             back by the reporter as follows:)

 7             "Q    So as of April 12th, 2019,

 8             is it accurate to say that ACB had

 9             not sent Quest the names of any

10             tech companies as was discussed on         16:21:54

11             January 25th, 2019?"

12             THE WITNESS:  Yes.  It's presumable that we

13    hadn't sent names, but I think we had encouraged

14    them previously in January to seek out companies.

15    BY MR. RAIZMAN:                                     16:22:41

16        Q    So in January 2019, you encouraged them to

17    seek out companies.  Is that what you're saying?

18        A    Yes.

19        Q    And Eric said in January of 2019 that they

20    would -- that you guys would provide the names of    16:22:55

21    some tech companies; correct?

22        A    I don't recall if he said we would give

23    names in January.  We just encouraged them to look

24    for companies.

25        Q    Okay.  So he didn't commit then to do it,   16:23:08
```

Page 159

PA1090

```
 1    but Quest asked in the April call for the names of

 2    companies?

 3        A    The definitive ask for names came in in

 4    April, yes.

 5        Q    Okay.  And the response came 10 days later?   16:23:22

 6        A    That sounds right, yes.

 7        Q    Okay.  And that was you.  You emailed Amer

 8    contact information for Level Access and

 9    Paciello Group; right?

10        A    Yes.                                          16:23:38

11        Q    Okay.  I think that's it for that document.

12             As of that time, we're now in sort of April

13    of 2019, had ACB received any other expressions,

14    unsolicited expressions of concern about Quest's

15    services from any of its -- from any of its members   16:24:10

16    or members of the blind community?

17        A    Not that I recall.

18        Q    And you would have recorded them if you

19    had; right?

20        A    Yes.                                          16:24:24

21        Q    Okay.  Were you familiar with any of the

22    work of Level Access or Paciello Group?

23        A    I can't name specific projects, but I know

24    of the two companies.  I know they're

25    well-respected.                                        16:25:09
```

                                                   Page 160

PA1091

1      Q      Okay.   And were you aware of the particular

2    and different technological solutions that they had

3    available?

4      A      No.

5      Q      Okay.   And in the conversations,            16:25:23

6    Eric Bridges didn't mention any of those specific

7    technological solutions, did he?

8      A      Not that I can recall.

9      Q      Okay.   And other than the two conversations

10   that occurred and that we've already -- you've         16:25:44

11   already testified to, all of the other

12   communications with Quest before the litigation were

13   in writing; correct?

14     A      I believe so, yes.

15     Q      As of April 2019, this conversation that      16:26:01

16   you and Clark had with Mr. Pharaon and Mr. Grant,

17   had ACB hired a lawyer to represent it in connection

18   with this matter?

19     A      Not as of April, no.  I don't believe so.

20     Q      Okay.  When did it do that?                   16:26:24

21     A      I actually do not know which month we

22   officially started working with Mr. Handley.

23     Q      Okay.  I'm going to send you a very short

24   document.  It may be one that you're not able to

25   use.  I -- I hope you can, but I'm going to send it    16:27:11

                                    Page 161

# EXHIBIT 41

## ___REDACTED___

## TO BE FILED UNDER SEAL PENDING THE RULING ON PLAINTIFF'S APPLICATION

# EXHIBIT 42

## _REDACTED_

## TO BE FILED UNDER SEAL PENDING THE RULING ON PLAINTIFF'S APPLICATION

# EXHIBIT 43

GUIDANCE AND RESOURCES FOR ELECTRONIC INFORMATION TECHNOLOGY:
ENSURING EQUAL ACCESS TO ALL HEALTH SERVICES AND BENEFITS
PROVIDED THROUGH ELECTRONIC MEANS

*U.S. Department of Health and Human Services, Office for Civil Rights*

*December 21, 2016*

Dear Colleagues:

As medical technology, such as kiosks and websites, is rapidly becoming an integral component of the healthcare system, it is vital to ensure that this technology is accessible to all individuals, including people with disabilities. The Department of Health and Human Services' (HHS) Office for Civil Rights (OCR) ensures that individuals have equal access to benefits and services and are not subject to unlawful discrimination. In this vein, we draw your attention to the fact that many Electronic and Information Technology (EIT) devices and systems are inaccessible to people with disabilities, limiting their ability to benefit from the programs and services related to these technologies.

Providers of healthcare and health coverage[1] are increasingly implementing computerized systems to assist in providing a broad spectrum of health services and are using mobile applications for care management. Technology is being used in a range of settings, from kiosks for self-service check-in and to take patients' vital signs at medical clinics to patient portals that provide access to electronic health records. The implementation of technology also includes electronic communication with providers and self-contained telemedicine clinics capable of conducting full virtual consultations with doctors via videoconference.

While the advances in EIT have many benefits for both patients and providers, these new technologies are often designed without regard for the needs of individuals with disabilities, which may limit or prevent access by these individuals. Without equal access, individuals with disabilities must either forgo the benefits and services the EIT offers, or request the help of a family member, friend or stranger to operate the EIT for them, possibly exposing their sensitive and confidential health information. Covered healthcare entities should be aware that a failure to ensure that the services they provide through EIT are accessible to people with disabilities may constitute discrimination under Federal civil rights laws.[2]

Under Title II of the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act (Section 504), and Section 1557 of the Affordable Care Act (Section 1557) and their implementing regulations, qualified individuals with disabilities may not be excluded from participation in, denied the benefits of the services, programs, or activities of, or subjected to discrimination by covered entities.[3]

---

[1] Settings include, but are not limited to, hospitals, clinics, doctors' offices, other healthcare facilities, pharmacies, retailers, health insurance issuer websites and other places that offer healthcare services or health coverage.

[2] Section 504 of the Rehabilitation Act of 1973 (Section 504) prohibits discrimination on the basis of disability by entities that receive Federal financial assistance. Title II of the Americans with Disabilities Act of 1990 (ADA) prohibits discrimination on the basis of disability by state and local governments. Section 1557 of the Affordable Care Act (Section 1557) prohibits, among other things, discrimination on the basis of disability by entities that operate a health program or activity, any part of which receives Federal financial assistance, and the Health Insurance Marketplaces.

[3] See the implementing regulations at 28 C.F.R. § 35.130(a); 45 C.F.R § 84.4 (a); 45 C.F.R § 92.101(a).

PA1114

These laws also prohibit covered entities from giving individuals with disabilities an unequal opportunity to participate in or benefit from the entities' aids, benefits, and services as compared to others.[4] Similarly, covered entities may not provide individuals with disabilities with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others.[5] The Section 1557 regulation specifically provides that health programs or activities provided by covered entities through electronic or information technology must be accessible to individuals with disabilities unless doing so would result in undue financial and administrative burdens or fundamental alteration of the health program.[6]

Pursuant to Section 504, Section 1557, and Title II of the ADA, covered entities must offer people with disabilities full and equal access to the EIT they employ, unless those individuals are provided reasonable accommodations or reasonable modifications that permit them to receive all the benefits provided by the EIT in an equally effective manner.[7] For example, a healthcare entity that deploys inaccessible EIT may meet its legal obligations by providing an alternative accessible way for people with disabilities to use the programs or services, such as a staffed desk or telephone information line. These alternatives, however, must provide an equal degree of access to the benefits of the EIT in terms of hours of operation and the range of options and programs available.

As you implement the use of EIT to provide care management or interact with your patients and their families, we encourage you to keep the following considerations in mind with regard to websites, healthcare kiosks, and electronic health records systems.

Websites

Websites operated by covered entities constitute EIT, and health programs and activities offered through websites must comply with the nondiscrimination provisions discussed above. These websites may include, but are not limited to, patient web portals, e-prescriptions, and personal health tools. In the preamble to the rule implementing Section 1557, OCR provided an example of the application of Section 1557 to a health program or activity that uses a website: "a Health Insurance Marketplace[SM] creating a Website for application for health insurance coverage must ensure that individuals with disabilities have an equal opportunity to benefit from the Website's tool that allows comparison of health insurance coverage options, quick determination of eligibility, and facilitation of timely access to health insurance coverage by making its new Web site accessible…."[8]  Covered entities that use websites should consider following the widely accepted industry standard for web accessibility in the Web Content Accessibility Guidelines (WCAG) 2.0.[9] The WCAG 2.0 AA standards delineate ways in which web content can be

---

[4] 28 C.F.R. § 35.130(b)(1)(ii); 45 C.F.R. § 84.4(b)(1)(ii); 45 C.F.R § 92.101(b)(2)(i).
[5] 28 C.F.R. § 35.130(b)(1)(iii); 45 C.F.R. § 84.4(b)(iii); 45 C.F.R § 92.101(b)(2)(i).
[6] 45 C.F.R § 92.204(a).  *See* OCR's webpage for the Section 155 rule:  http://www.hhs.gov/civil-rights/for-individuals/section-1557/index.html.
[7] *See generally* letter from Thomas E. Perez, Assistant Attorney General for Civil Rights, Department of Justice (DOJ), and Russlynn Ali, Assistant Secretary for Civil Rights, U.S. Department of Education, to College and University Presidents, regarding electronic book readers (June 29, 2010), available at https://www.ada.gov/kindle_ltr_eddoj.htm; Letter from Thomas E. Perez, Assistant Attorney General for Civil Rights, DOJ, Jeanine Arden-Omt, Vice President and General Counsel, Case Western Reserve University (Dec. 22, 2009), available at https://www.ada.gov/case_western_univ.htm; Settlement Agreement Between the National Federation of the Blind, the United States of America, and the Law School Admission Council (Apr. 25, 2011), available at https://www.ada.gov/LSAC.htm.
[8] 81 Fed. Reg. 31424 (May 18, 2016).
[9] *See* "Web Content Accessibility Guidelines" (WCAG) (2008); available at http://www.w3.org/TR/WCAG20/

Page **2** of 3

made more accessible to people with a range of disabilities, including visual, auditory, physical, speech, cognitive, language, learning, and neurological disabilities.

Medical Kiosks

Healthcare kiosks include, but are not limited to, self check-in kiosks, physician videoconferencing systems, diagnostic kiosks, health/medication information dispensaries, donor registry kiosks, kiosks that assist patients in taking their vital signs, insurance enrollment kiosks, and pharmacy dispensary kiosks.  Covered entities that offer health programs and activities offered through kiosks must comply with the accessibility requirements discussed above.

Steps that can be taken to ensure appropriate accessibility may include installation of tactile interfaces or screen readers, repositioning of kiosks to be within reach of wheelchair users, and options which allow individuals with motor difficulties to independently operate the kiosks, including voice dictation technology. Ensuring equal access to this emerging EIT will help people with disabilities to take full advantage of the benefits the new technology offers in speed, efficiency and autonomy.

Electronic Health Records

Finally, electronic health records (EHRs) of covered entities must be accessible to people with disabilities so that all patients are able to access their records and communicate effectively with their providers. To promote accessibility, EHRs can be adapted to make records screen-readable and provide descriptions of items such as x-rays or MRI results that would otherwise not be accessible to people with visual disabilities.

Failure to provide people with disabilities access to health programs offered through EIT, as required by Section 504, Section 1557, and Title II of the ADA, denies them the same privileges, benefits, services and advantages that are afforded to people without disabilities.

All entities subject to Section 504, Section 1557, and Title II of the ADA should review their EIT systems to ensure accessibility of their health programs for all persons with disabilities.  Below are some resources that may help you determine if your EIT is accessible and what can be done to make it accessible if it is not.

- W3C's Web Content Accessibility Guidelines (WCAG) 2.0: http://www.w3.org/TR/WCAG20/
- Guidance for Exchange and Medicaid Information Technology (IT) Systems: https://www.cms.gov/CCIIO/Resources/Files/Downloads/exchange_medicaid_it_guidance_0531 2011.pdf
- ADA Best Practices Tool Kit for State and Local Governments: Chapter 5, Website Accessibility under Title II of the ADA: http://www.ada.gov/pcatoolkit/chap5toolkit.htm.

Thank you for all your efforts to promote equal access in your health programs and activities, including those that are offered through EIT.

Sincerely,

 / S /

Jocelyn Samuels

# EXHIBIT 44

## *REDACTED*

## TO BE FILED UNDER SEAL PENDING THE RULING ON PLAINTIFF'S APPLICATION