KRISTEN CLARKE
Assistant Attorney General
REBECCA B. BOND (CSBN 202220)
Chief
KATHLEEN P. WOLFE
Special Litigation Counsel
KEVIN J. KIJEWSKI
Deputy Chief
CHRISTINE KIM (DCBN 1044186)
Trial Attorney

U.S. Department of Justice
950 Pennsylvania Ave, N.W. - 4CON
Washington, D.C.  20530
Telephone: (202) 305-0043
Facsimile: (202) 305-9775
Email: Christine.Kim@usdoj.gov

Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIAN VARGAS and AMERICAN COUNCIL OF THE BLIND, individually on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, inclusive,<br><br>Defendants. | **CASE NO. 2:19-cv-08108-DMG-MRW**<br><br>**Hon. Dolly M. Gee**<br><br>**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA** |

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND .................................................................................2

DISCUSSION .........................................................................................................5

   A.    Quest must provide auxiliary aids and services so that individuals with

   disabilities can fully and equally enjoy all of its services. .....................................6

   B.    Quest provides "services" covered under the ADA through its self-service

   kiosks. ...................................................................................................................11

   C.    Title III's regulation on "accessible or special goods" does not shield Quest

   from its obligation to provide auxiliary aids or services under the ADA. ...........13

CONCLUSION .....................................................................................................15

CERTIFICATE OF SERVICE .............................................................................16

i

# **TABLE OF AUTHORITIES**

**Federal Cases**

*Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc.*, 603 F.3d 666 (9th Cir. 2010) ...........................................................................14

*Baughman v. Walt Disney World Co.*, 685 F.3d 1131 (9th Cir. 2012)........... 8, 9, 12

*Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075 (9th Cir. 2004).......................8

*Landis v. Washington State Major League Baseball Stadium Pub. Facilities Dist.*, 2021 WL 3891566, --- F.4th --- (9th Cir. Sept. 1, 2021) ......................................8

*Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227 (10th Cir. 2016) ...............11

*McNeil v. Time Insurance Co.,* 205 F.3d 179 (5th Cir. 2000)................................14

*Perrin v. United States*, 444 U.S. 37 (1979) ............................................................11

*Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir.), *cert. denied,* 140 S. Ct. 122 (2019)...............................................................................................................9

*Sandifer v. U.S. Steel Corp.*, 571 U.S. 220 (2014) ................................................11

*Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104 (9th Cir. 2000) ........14

**Federal Statutes**

28 U.S.C. § 517 .........................................................................................................1

Americans with Disabilities Act

    42 U.S.C. § 12101(a)(3), (5) ...............................................................................5

    42 U.S.C. § 12101(b)(1)........................................................................................5

42 U.S.C. § 12103(1) ...................................................................................7

Title III

    42 U.S.C. §§ 12181-12189 ................................................................1

    42 U.S.C. § 12182.......................................................................6, 7

    42 U.S.C. § 12182(a) ................................................................ 5, 8, 9

    42 U.S.C. § 12182(b)(1)(A)(i)-(ii).................................................6, 9

    42 U.S.C. § 12182(b)(2)(A)(iii)............................................... 7, 9, 10

**Federal Regulations**

28 C.F.R. pt. 36 .....................................................................................1, 7

28 C.F.R. pt. 36, App. C .................................................................. 10, 13

28 C.F.R. § 36.201(a).................................................................................6

28 C.F.R. § 36.202(a)-(b).........................................................................6

28 C.F.R. § 36.303 ...................................................................................7

28 C.F.R. § 36.303(a).......................................................................... 7, 9, 10

28 C.F.R. § 36.303(c)(1)(ii) ...................................................................7, 8

28 C.F.R. § 36.303(b) ..............................................................................7

28 C.F.R. § 36.307 ..............................................................................6, 13

28 C.F.R. § 36.307(a)..............................................................................13

28 C.F.R. § 36.307(c)..............................................................................13

**Miscellaneous**

DYNATOUCH, *Interactive Wayfinding/Directory Kiosk*,

   https://www.dynatouch.com/self-service-solutions/wayfinding-directory-kiosk/ .2

FRANKMAYER, *Healthcare Kiosks*,

   https://www.frankmayer.com/industries/healthcare/ .............................................2

Glenda Wrenn et al., *Using a self-service kiosk to identify behavioural health*

   *needs in a primary care clinic serving an urban, underserved population*, 22 J.

   INNOVATION IN HEALTH INFORMATICS 3, 323 (2015),

   https://informatics.bmj.com/content/bmjhci/22/3/323.full.pdf ............................2

*Merriam-Webster Dictionary*, https://www.merriam-

   webster.com/dictionary/service .........................................................................11

*Webster's Third New Int'l Dictionary* 2075 (2002) ...............................................11

# **INTRODUCTION**

The United States respectfully submits this statement of interest because this litigation implicates the proper interpretation and application of Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12181-12189, and its implementing regulation, 28 C.F.R. pt. 36, to the use of self-service kiosks in health care settings.[1]  As the agency charged by Congress with administering the ADA, the United States Department of Justice has a vital interest in ensuring that public accommodations' use of such kiosks does not result in discrimination against individuals with disabilities.

Quest Diagnostics Incorporated and its subsidiaries (collectively, Quest) own and operate over 2,100 patient service centers where they provide diagnostic testing and health care services to patients across the country.  First Am. Class Action Compl. ¶¶ 21, 42, ECF No. 41 (FAC).  Plaintiffs, individuals with visual impairments and an advocacy organization serving the interests of people who are blind or visually impaired, allege that Quest's self-service kiosks at these patient service centers are inaccessible and that Quest violates the ADA by failing to

---

[1] Under 28 U.S.C. § 517, the Attorney General is authorized to send an officer of the Department of Justice to any district in the United States "to attend to the interests of the United States in a suit pending in a court of the United States."

provide effective communication and denying Plaintiffs an equal opportunity to enjoy Quest's health care services.  FAC ¶¶ 2, 6, 64–65.

Many health care providers have adopted electronic technologies for managing medical records and providing services, such as self-service kiosks, and these kiosks can offer a variety of functions, including allowing individuals to check in for appointments, complete medical forms, pay fees, answer health assessments, and access maps to navigate the facility.[2]  As the Court considers the pending motion, the United States respectfully submits this Statement to outline how the ADA's legal framework applies to the use of kiosks in health care settings.

## **FACTUAL BACKGROUND**

The United States does not take a position on the factual disputes at issue in Defendants' motion for summary judgment.  We briefly summarize relevant allegations only as background for the legal issues discussed.

Quest provides diagnostic testing and health care services.  At over 2,100 of its patient service centers, Quest requires patients to use a visual, touchscreen, self-

---

[2] *See, e.g.*, Glenda Wrenn et al., *Using a self-service kiosk to identify behavioural health needs in a primary care clinic serving an urban, underserved population*, 22 J. INNOVATION IN HEALTH INFORMATICS 3, 323 (2015), https://informatics.bmj.com/content/bmjhci/22/3/323.full.pdf; FRANKMAYER, *Healthcare Kiosks*, https://www.frankmayer.com/industries/healthcare/ (last visited Sept. 20, 2021); DYNATOUCH, *Interactive Wayfinding/Directory Kiosk*, https://www.dynatouch.com/self-service-solutions/wayfinding-directory-kiosk/ (last visited Sept. 20, 2021).

service kiosk. Mem. P. & A. Supp. Defs.' Mot. Summ. J. or Partial Summ. J. 1–2, ECF No. 95-1 (MSJ). When arriving for a scheduled appointment, a patient can use the kiosk to input personal information—name, birth date, and phone number—and to check in to alert staff of their presence. MSJ 5. Patients without a scheduled appointment can use the kiosk to place themselves on a waitlist to be seen. MSJ 5. Based on the information entered into the kiosk, phlebotomists go to the check-in area to call back the next patient. MSJ 4–5. Plaintiffs claim that a patient can also use the kiosk to opt to wait somewhere other than the check-in area, such as outside or in a car, and receive a text message when it is time to meet with a phlebotomist. Pls.' Mem. P. & A. Supp. Mot. Class Certification 5, ECF No. 107-1 (PMCC); Pls.' Opp. Quest's MSJ 7, ECF No. 111 (Opp. MSJ).

The parties agree that individuals with visual impairments cannot independently navigate all of the functions available on the self-serve kiosk because of their disabilities. MSJ 11; FAC ¶ 5; PMCC 5; Opp. MSJ 4–12. Plaintiffs claim that no staff are available to assist individuals with using the kiosk or checking in for their medical appointments, so they are forced to seek assistance from and divulge personal information to a sighted person, including a stranger in the check-in area, who is not on Quest's staff. FAC ¶¶ 29–30, 32–33; PMCC 6, 14; Opp. MSJ 10–12, 15, 20. Quest claims that its phlebotomists, in addition to providing diagnostic testing services, will assist individuals who cannot

independently use the kiosk with the check-in process, MSJ 4–6, 14–15, but Plaintiffs dispute this, FAC ¶¶ 29–30, 32–33; PMCC 6, 17–18; Decl. Mark Derry Supp. PMCC PA0871–72, ECF No. 107-5 (Derry Decl.); Opp. MSJ 15, 20.

Quest also asserts that it provides effective communication to patients with visual impairments by offering a "three-finger swipe" option on the self-service kiosks.  MSJ 8–9, 15.  The patient can swipe three fingers simultaneously across the kiosk screen to alert staff of their presence.  MSJ 8–9.  Quest alleges that it broadcasts an audio announcement on a television in the check-in area to alert individuals about the three-finger swipe function.  MSJ 9.  Plaintiffs contest whether Quest provides this function on all self-service kiosks and whether Quest broadcasts the audio announcement at each patient service center.  PMCC 12–15; Opp. MSJ 8–10.

Plaintiffs allege that where a patient successfully uses the three-finger swipe function, that patient is treated, in terms of check-in priority, similarly to someone who arrives without a scheduled appointment and elects to join the waitlist. PMCC 11, 12; Decl. Rachael Bradley Montgomery Supp. PMCC ¶¶ 36, 38, ECF No. 107-5 (Montgomery Decl.); Derry Decl. PA0871–72; Opp. MSJ 8.  In other words, according to Plaintiffs, patients with visual impairments who successfully use Quest's purported means of providing effective communication are placed at the end of the waitlist and must wait to be assisted even if they have a scheduled

appointment.  *Id.*  Plaintiffs allege that the three-finger swipe function does not afford individuals with visual impairments the opportunity to use the self-service kiosks to choose the option to wait somewhere other than the check-in area. PMCC 11–13; Montgomery Decl. ¶¶ 36, 38; Opp. MSJ 8.

## **DISCUSSION**

Congress's purpose in enacting the ADA was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).  Congress found that individuals with disabilities continually encounter various forms of discrimination including "communication barriers" and that discrimination persists in "critical areas" such as "health services."  *Id.* § 12101(a)(3), (5).   To remedy such discrimination, the ADA prohibits public accommodations, such as Quest, from denying individuals with disabilities the full and equal enjoyment of their goods, services, facilities, privileges, advantages, or accommodations.  *Id.* § 12182(a).

Plaintiffs claim that Quest violates the ADA by denying them a service offered as a matter of course to others—the opportunity to privately and independently control important aspects of their health care visits—and, because of this, Quest denies them full and equal enjoyment of its health care services.  Quest argues that all that this Court should consider is whether patients with visual impairments can access its diagnostic testing services and not whether individuals

5

with disabilities face unequal opportunities in accessing those same diagnostic services or are denied other services that Quest provides.  MSJ 11–12.  Quest also argues that the check-in and related services that it provides through its kiosks are not services covered by the ADA and that, even if these services are covered, the ADA's goods and inventory regulation, 28 C.F.R. § 36.307, does not compel Quest to alter its services and kiosks.  MSJ 11.  Quest's interpretation of the ADA cannot be squared with the text of the statute, its implementing regulation, or the principles underlying them.

**A. <u>Quest must provide auxiliary aids and services so that individuals with disabilities can fully and equally enjoy all of its services.</u>**

Title III's text and implementing regulation are straightforward.  Title III mandates generally that a public accommodation, such as Quest, not discriminate against any individual "on the basis of disability in the full and equal enjoyment of [its] goods, services, facilities, privileges, advantages, or accommodations."  42 U.S.C. § 12182(a); 28 C.F.R. § 36.201(a).  Quest may not deny individuals with disabilities opportunities or afford them unequal opportunities to participate in and benefit from its goods, services, privileges, or advantages.  42 U.S.C. § 12182(b)(1)(A)(i)-(ii); 28 C.F.R. § 36.202(a)-(b).

Discrimination under Section 12182(a) includes a failure to take steps necessary to ensure that no individual with a disability is excluded, denied

services, segregated, or "otherwise treated differently than other individuals"

because of the absence of auxiliary aids and services.[3]  42 U.S.C.

§ 12182(b)(2)(A)(iii).  The term "auxiliary aids and services" refers to the various

ways to communicate with people who have communication disabilities, such as

visual impairments.  *See id.* § 12103(1) (defining "auxiliary aids and services" to

include "qualified readers," "other effective methods of making visually delivered

materials available to individuals with visual impairments," and "acquisition or

modification of equipment or devices").

The Attorney General, as charged by the statute, issued regulations to

implement Title III.  *See* 28 C.F.R. pt. 36.  Those regulations provide further

guidance on public accommodations' obligation to provide auxiliary aids and

services and effective communication.  *See* 28 C.F.R. § 36.303.  Particularly

significant here, the regulations provide additional examples of auxiliary aids and

services that may provide effective communication, including "accessible

electronic and information technology." *Id.* § 36.303(b).  The regulations also

clarify that auxiliary aids and services must be provided "in accessible formats, in

---

[3] The ADA does not require the provision of auxiliary aids or services where the
entity can demonstrate that doing so "would fundamentally alter the nature of the
good, service, facility, privilege, advantage, or accommodation being offered or
would result in an undue burden."  42 U.S.C. § 12182(b)(2)(A)(iii); 28 C.F.R.
§ 36.303(a).  Quest does not allege that providing effective communication as
requested by Plaintiffs would result in a fundamental alteration or undue burden.

a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability" in order to be effective.  *Id.* § 36.303(c)(1)(ii).  The type of auxiliary aid or service necessary to ensure effective communication depends on "the context in which the communication is taking place."  *Id.*  The confidentiality of private information is important in determining what auxiliary aid or service would be appropriate, particularly in the health care context where patient privacy is critical.  *See id.*

As these general and specific prohibitions illustrate, and as recently reaffirmed by the Ninth Circuit, Title III "prohibits anything less than the full and equal enjoyment of places of public accommodation by individuals with disabilities."  *Landis v. Washington State Major League Baseball Stadium Pub. Facilities Dist.*, 2021 WL 3891566, --- F.4th --- (9th Cir. Sept. 1, 2021) (citing 42 U.S.C. § 12182(a)); *see also Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012) (observing that Title III provides for "more than mere access" and instead guarantees full and equal enjoyment).  Full and equal enjoyment is informed, first and foremost, by considering how a public accommodation's facilities are used by individuals without disabilities and then taking reasonable steps to afford individuals with disabilities a "like experience."  *Baughman*, 685 F.3d at 1135 (citing *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 128–29 (2005)); *see also Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1083–84

(9th Cir. 2004) (requiring public accommodation to provide a moviegoer with a disability an adjacent seat for his companion to ensure enjoyment equal to that of moviegoers without disabilities).

Similarly here, Quest must provide auxiliary aids and services to afford its patients with disabilities a "like experience" and a full and equal opportunity to enjoy its services.  *See Baughman*, 685 F.3d at 1135.  Quest provides services through a visual and electronic means, the self-service kiosk, and the inaccessibility of Quest's kiosks allegedly prevents individuals with visual impairments from accessing those services and subjects them to unequal treatment. Quest must furnish auxiliary aids or services that provide individuals with disabilities the same opportunities as those afforded to individuals without disabilities, including services offered through visual and electronic means like its self-service kiosks.  *See* 42 U.S.C. § 12182(a) (requiring "full and equal enjoyment"); *id.* § 12182(b)(1)(A)(i)-(ii) (prohibiting the denial of opportunities or provision of unequal opportunities); 42 U.S.C. § 12182(b)(2)(A)(iii) (requiring auxiliary aids or services so that individuals with disabilities are not excluded, denied services, segregated, or treated differently); 28 C.F.R. § 36.303(a) (stating same); *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 902, 903–06 & n.4 (9th Cir.), *cert. denied,* 140 S. Ct. 122 (2019) (remanding to district court to consider whether restaurant provided effective communication and "full and equal

enjoyment" to blind patrons where, *inter alia*, restaurant provided allegedly inaccessible website and mobile app for internet ordering and only telephone and in-person ordering options for blind patrons).

While Quest is correct that the ADA does not mandate that individuals with disabilities achieve identical results or levels of achievement as those without disabilities, 28 C.F.R. pt. 36, App. C (discussion of § 36.201), the statute explicitly prohibits public accommodations, such as Quest, from treating individuals with disabilities differently because of the absence of auxiliary aids and services. *See* 42 U.S.C. § 12182(b)(2)(A)(iii); 28 C.F.R. § 36.303(a). Relegating patients with disabilities who have scheduled appointments to the bottom of the walk-in waitlist because of a lack of auxiliary aids and services is treating those patients differently. And if walk-in patients without disabilities can opt to wait somewhere other than the waiting room, then patients with disabilities must not be denied the opportunity to do so as well.

To be clear, the United States does not contend that Quest must provide a particular auxiliary aid or service. But whichever auxiliary aid or service Quest ultimately provides, it must ensure effective communication with patients with disabilities and that no patient with a disability is denied services or otherwise treated less favorably than nondisabled patients.

**B. Quest provides "services" covered under the ADA through its self-service kiosks.**

Quest contends that it primarily provides health care services, so all this Court should consider is whether Plaintiffs and other patients with disabilities ultimately receive diagnostic testing services by a phlebotomist.  MSJ 11.  Quest asserts that the functions it provides through its kiosks are not "services" covered under the ADA, because it does not manufacture or sell the kiosks or sell check-in services.  MSJ 10–11.  Quest's attempt to limit the ADA's definition of "service" cannot be squared with the ordinary meaning of the term and Section 12182's broad statutory mandate.

Because the ADA does not define the term "service," the Court should give the term its "ordinary, contemporary, common meaning."  *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).  One dictionary defines "service" as "a helpful act."  *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/service.  Another defines "service" as "conduct or performance that assists or benefits someone or something."  *Webster's Third New Int'l Dictionary* 2075 (2002) (cited by *Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227, 1231 (10th Cir. 2016)).

Under any ordinary definition of the term, Quest provides patients access to a "service" through its self-service kiosk.  Quest's kiosks provide a way for

11

patients to schedule or check in for their appointments, input personal information, and choose where to wait until they can be seen by Quest's phlebotomists.  In many other medical offices, the patient accesses these same services by communicating directly with a staff person, but Quest has elected not to follow the traditional reception staff model.[4]  Instead, Quest uses a self-service kiosk to perform this "helpful act" that "assists or benefits" Quest's patients.

Indeed, the tasks that Quest has shifted to its self-service kiosks are unquestionably part and parcel of accessing the health care services that Quest provides.  But, as explained above, the ADA does not stop at ensuring "mere access" and instead mandates full and equal enjoyment of all "services" that Quest provides, not just its diagnostic testing services.  *See Baughman*, 685 F.3d at 1135.  Notably, one of Quest's services—the ability to choose to wait in a car or outside rather than the check-in area—poses a significant benefit in light of the rise of COVID-19 as a persistent health issue, and this service is only accessible to individuals who can use the kiosk.  In sum, Quest affords patients who can use

---

[4] Prior to introducing the self-service kiosk model, Quest required patients to check in by using a paper sign-in sheet in the waiting room, and Quest's phlebotomists would review the sheet and call each patient.  Quest admits that the paper sign-in sheet was inaccessible to individuals with visual impairments but alleges that its phlebotomists were trained to scan the waiting room to identify and assist individuals who need assistance, such as those with disabilities.  Quest's prior process is not in dispute in this litigation and should not weigh on whether its current processes provide effective communication.

kiosks the opportunity to control important aspects of their health care visit, while individuals with disabilities are denied the same opportunity.

## C. **Title III's regulation on "accessible or special goods" does not shield Quest from its obligation to provide auxiliary aids or services under the ADA.**

Quest's reliance on Section 36.307 of the Title III regulations is also misplaced. The regulation states that a public accommodation need not "alter its inventory to include accessible or special goods that are designed for, or facilitate use by, individuals with disabilities." 28 C.F.R. § 36.307(a). Examples of "accessible or special goods" include "Brailled versions of books, books on audio cassettes, closed-captioned video tapes, special sizes or lines of clothing, and special foods to meet particular dietary needs." *Id.* § 36.307(c). This regulation applies only to a public accommodation's tangible goods, and not (as Quest contends) to its services.

The Department, in promulgating this regulation, explained that Section 36.307 does not require alterations to "the nature or mix of goods that the public accommodation has typically provided." 28 C.F.R. pt. 36, App. C (discussion of § 36.307). "In other words, a bookstore, for example, must make its facilities and sales operations accessible to individuals with disabilities, but is not required to stock Brailled or large print books." *Id.* Quest provides health care services and is

not a retailer of self-service kiosks.  Like the bookstore, Quest must make its operations and services, including those provided through the self-service kiosks, equally available to individuals with disabilities.

The cases that Quest cites in support are inapposite.  In those cases, courts determined that Title III does not require insurance companies to modify key contents or terms of their insurance plans so that they are equally valuable to people with disabilities.  *See, e.g.*, *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1116–18 (9th Cir. 2000); *McNeil v. Time Insurance Co.,* 205 F.3d 179, 185–88 (5th Cir. 2000).  But here, Plaintiffs do not challenge the content of the services that Quest provides, including those provided through its kiosks.  Instead, they seek only auxiliary aids and services to fully and equally access Quest's services.  In fact, the Ninth Circuit explained that *Weyer* and *McNeil* do not eliminate the duty of a public accommodation to provide effective communication since, "[b]y its very definition, an auxiliary aid or service is an additional or different service" that must be provided to individuals with disabilities.  *Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc.*, 603 F.3d 666, 672 (9th Cir. 2010).

This Court should similarly reject Quest's attempts to misapply Title III's narrow inventory exception to this case.  That exception does not override the

statutory duty to provide auxiliary aids and services necessary to ensuring equally effective communication with individuals with visual impairments.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court consider this Statement of Interest in this litigation.

DATED: September 20, 2021                    Respectfully submitted,

                                             KRISTEN CLARKE
                                             Assistant Attorney General
                                             Civil Rights Division

                                             REBECCA B. BOND
                                             Chief

                                             KATHLEEN P. WOLFE
                                             Special Litigation Counsel

                                             KEVIN KIJEWSKI
                                             Deputy Chief

                                             */s/ Christine Kim*
                                             CHRISTINE KIM
                                             Trial Attorney
                                             Disability Rights Section
                                             Civil Rights Division
                                             U.S. Department of Justice
                                             950 Pennsylvania Avenue, N.W. – 4CON
                                             Washington, DC 20530
                                             202-305-0043 (telephone)
                                             Christine.Kim@usdoj.gov

                                             9/20/21
                                             Date

## **CERTIFICATE OF SERVICE**

I hereby certify that, on September 20, 2021, I electronically filed the

**Statement of Interest of the United States of America** with the Clerk of the

Court using the CM/ECF system, which will send Notices of Electronic Filing

(NEF) to all registered participants and that paper copies will be sent to those

counsel listed as non-registered participants on this same date.

*/s/ Christine Kim*
CHRISTINE KIM
Trial Attorney
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. – 4CON
Washington, DC 20530
202-305-0043 (telephone)
Christine.Kim@usdoj.gov

*Attorney for the United States of America*

16