OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
DAVID RAIZMAN, CA Bar No. 129407
david.raizman@ogletree.com
AMBER L. ROLLER, CA Bar No. 273354
amber.roller@ogletree.com
J. NICHOLAS MARFORI, CA Bar No. 311765
nicholas.marfori@ogletree.com
400 South Hope Street, Suite 1200
Los Angeles, California 90071
Telephone: 213-239-9800
Facsimile: 213-239-9045

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIAN VARGAS, ANNE WEST and AMERICAN COUNCIL OF THE BLIND, individually on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, inclusive,<br><br>        Defendants. | Case No. 2:19-cv-08108 DMG (MRWx)<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Filed concurrently with Response To Plaintiffs' Statement of Genuine Facts and Additional Facts; Declaration of Joseph A. Krock; Declaration of David Raizman; and Objections To Plaintiffs' Evidence]<br><br>Date:             October 8, 2021<br>Time:             2:00 p.m.<br>Place:            Courtroom 8C<br><br><br>Complaint Filed: September 18, 2019<br>Trial Date:        January 11, 2022<br>District Judge:    Hon. Dolly M. Gee<br>                  Courtroom 8C, First St.<br>Magistrate Judge: Hon. Michael R. Wilner<br>                  Courtroom 550, Roybal |

Case No. 2:19-cv-08108 DMG (MRWx)

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR
SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

48649475_1.docx

# <u>TABLE OF CONTENTS</u>

**Page**

I.  INTRODUCTION ............................................................................. 1

II.  FACTUAL AND PROCEDURAL BACKGROUND ............................ 3

    A.  The Initial Version Of The Kiosk In Place At The Time Of Plaintiffs' Complaints In This Action Merely Checked Patients In ........................................................................................ 4

    B.  The Initial Version Of The Kiosk At Issue In This Action Requires Entry Only Of Name, Birthday And Telephone, All of Which Can Be Gathered Privately In Draw Room; The TFS Enhancement Requires NO Private Information To Check In ................................................................................. 4

    C.  Quest Training Expressly Directs Individualized Attention To Every Patient (And Patients With Disabilities, In Particular); Indeed, The Core Training is Called "Managing Every Patient's Needs" ................................................ 4

    D.  No Employee Cuts Or Cost-Savings Were Planned Or Projected In Connection With Kiosks' Initial Approval And Rollout ............................................................................... 5

    E.  The 46 Recorded Feedback Items Are Not All Complaints About The Kiosk, Or The Lack Of Independent Access To The Kiosk; In Addition, They Are All Hearsay ......................... 6

    F.  Many Blind Patients (Including Vargas) Received Immediate Assistance From Quest Phlebotomists And Check-In ................................................................................ 7

    G.  Mark Derry's Flawed, Non-Scientific Survey Must Be Rejected And Offered No Weight ......................................... 8

III.  LEGAL ARGUMENT ...................................................................... 9

    A.  Plaintiffs Try To Move The Goalposts *After* Quest's Dispositive Motion ...................................................................... 9

    B.  As Stated Plainly In The DOJ's SOI And Countless Authorities, No *Specific Device Or Auxiliary Aid* Or Service Is Required, And The Explicit Relief Sought By Plaintiffs – An Independently Accessible Device That Can Be Used Without Quest Phlebotomist Assistance – Is Nowhere Required ................................................................ 11

    C.  Plaintiffs' Assertion That The Kiosk Is Itself A "Service" Does Not Alter The Analysis Or Result On This Motion For Multiple Reasons. .................................................................. 14

    D.  Plaintiffs' Opposition Only Serves To Confirm That Quest

i

Case No. 2:19-cv-08108 DMG (MRWx)

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR
SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

48649475_1.docx

Has No Obligation Under The Rehabilitation Act To Provide "Primary Consideration" To The "Effective Communication" Requests Of ACB And Plaintiff Julian Vargas ........................................................................................ 18

E.      Vargas' Unruh Act And DPA Claims Fail. ................................... 21

F.      Plaintiffs' Opposition Nowhere Argues That They Have Experienced An Injury In Fact, Or An Imminent Threat Of Future Injury ........................................................................... 21

G.      TFS Renders Moot Plaintiffs' Claims ........................................... 24

H.      DOJ's SOI Does Not Contradict Any Basis for Summary Judgment ..................................................................................... 24

IV.     CONCLUSION ..................................................................................... 25

48649475_1.docx

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Antoninetti v Chipotle Mexican Grill, Inc.*,
   643 F.3d 1165 (9th Cir. 2010) ................................................................. 17

*Attias v. Crandall*,
   968 F.3d 931 (9th Cir. 2020) ................................................................... 15

*Baughmann v. Walt Disney World Co.*,
   685 F.3d 1131 (9th Cir. 2012) ................................................................. 17

*K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*,
   725 F.3d 1088 (9th Cir. 2013) ............................................................. 18, 19

*Coleman v Quaker Oats*,
   232 F.3d 1271 (9th Cir. 2000) ................................................................. 19

*DiCarlo v. Walgreens Boots Alliance Inc.*,
   2016 WL 482982 at *2 (S.D.N.Y 2016) ................................................... 12

*Doe v. CVS Pharmacy, Inc.*,
   982 F.3d 1204 (9th Cir. 2020) ................................................................. 19

*Duvall v. Cnty of Kitsap*,
   260 F.3d 1124 (9th Cir. 2001) ................................................................. 18

*Fortuyne v. AMC Media Cinema*,
   364 F.3d 1075 (9th Cir. 2014) ................................................................. 17

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ............................................................................... 22

*Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc.*,
   603 F.3d 666 (9th Cir. 2010) ................................................................... 14

*Hernandez v. Polanco Enterprises, Inc.*,
   624 Fed. Appx. 964 (9th Cir. 2015) ......................................................... 21

*Hooper v. City of St. Paul*,
   2019 WL 4015443 (D. Minn. Aug. 26, 2019) ........................................... 20

*Kirola v. City & Cty. of San Francisco*,
   860 F.3d 1164 (9th Cir. 2017) .......................................................... 7, 9, 13

*Landis, Fortuyne, Robles v. Domino's Pizza*,
   913 F.3d 898 (9th Cir. 2019) ................................................................... 17

*Landis v Washington State Major League Baseball Stadium*,
   2021 WL 3891566 (9th Cir. Sept. 1, 2021) ............................................... 17

iii

Case No. 2:19-cv-08108 DMG (MRWx)

48649475_1.docx

*Lima v. United States Dep't of Educ.*,
  947 F.3d 1122 (9th Cir. 2020) ............................................................... 21

*Martinez v. Cnty of Alameda*,
  512 F. Supp. 3d 978 (N.D. Cal. 2021) ..................................................... 18

*Matrix Int'l Textile, Inc. v. Monopoly Textile, Inc.*,
  No. CV 16-0084 FMO, 2017 U.S. Dist. LEXIS 168133 (C.D. Cal.
  May 9, 2017) .............................................................................................. 8

*McNeil v. Time Ins. Co.*,
  205 F.3d 179 (5th Cir. 2000) ........................................................... 14, 25

*Moreno Roofing Co., Inc. v. Nagle*,
  99 F.3d 340 (9th Cir.1996) .............................................................. 21, 22

*Nat'l Fed'n of the Blind v. Target Corp.*,
  452 F. Supp. 2d 946 (N.D. Cal. 2006) .................................................... 14

*Nat'l Fed'n of the Blind v. United Airlines Inc.*,
  813 F.3d 718 (9th Cir. 2016) .................................................................. 12

*O'Campo v. Chico Crossroads*,
  2011 WL 5241351 (E.D. Cal. October 31, 2011) ............................. 10, 24

*Paulick v. Starwood Hotels & Resorts Worldwide, Inc.*,
  2012 WL 2990760 (N.D. Cal. Jul. 20, 2012) .......................................... 10

*Spokeo v. Robins*,
  136 S. Ct. 136 S. Ct. 1540, 1547 (2016) ................................................ 23

*U.S. v. Kitsap Physicians Service*,
  314 F.3d 995 (9th Cir. 2002) .............................................................. 1, 21

*United States v. Lewis*,
  837 F.2d 415 (9th Cir. 1988) .................................................................... 8

*Vega-Ruiz v. Northwell Health*,
  992 F.3d 61 (2d Cir. 2021) (ACA) ................................................... 18, 19

*West v. More's Franchisor*
  2015 WL 8484567 (S.D.N.Y. 2015) ...................................................... 12

*Weyer v. Twentieth Century Fox Film Corp.*,
  198 F.3d 1104 (9th Cir. 2000) .................................................... 14, 15, 25

*Whitaker v. Kajima Dev. Corp.*,
  2020 WL 1972290 (C.D. Cal. Jan. 30, 2020) .......................................... 21

**Other State Cases**

*Doe v. Pennsylvania*,
  2021 WL 1212574 (M.D. Penn. Mar. 31, 2021) ..................................... 19

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR
SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

**Federal Statutes**

42 U.S.C.
§ 12182(b)(2)(A)(iii) ................................................................................. 15

ADA 707 ................................................................................................... 12

ADA Title II................................................................................ 2, 18, 19, 20

Americans with Disabilities Act Title III ....................................................... 1

**Other State Statutes**

Civ. Code
§ 51(b).................................................................................................... 21
§ 51(f) .................................................................................................... 21

Evid. Code
§ 801(c) ................................................................................................... 6

**Other Authorities**

14 C.F.R. § 382.57 .................................................................................... 12

28 C.F.R., pt. 36, § 36.201(a) (1991) ........................................................... 3

28 C.F.R. § 36.211(b) ......................................................................... 7, 9, 13

28 C.F.R. § 36.303 ............................................................................... 16, 19

28 C.F.R. § 36.303(c)(1), (2) .......................................................... 12, 15, 16

28 C.F.R. § 36.307 .................................................................................... 15

 (28 C.F.R. § 36.307(a)) ........................................................................... 25

36 C.F.R. pt. 1191, Appendix B, D ............................................................. 11

45 C.F.R. 92.102(a) ............................................................................. 18, 19

80 Fed. Reg. 54172, 54186 (Sept. 8, 2015) ................................................. 18

DOJ, "Effective Communication" (Jan. 2014), available at
https://www.ada.gov/effective-comm.htm ................................................... 12

Fed. R. Civ. P. 56(g) ................................................................................. 13

Rule 15 .................................................................................................... 19

Rule 15(b) ................................................................................................ 19

Rule 26(a)(1) ............................................................................................. 8

48649475_1.docx

# I.    **<u>INTRODUCTION</u>**

The core question in this case and on this motion can readily be decided on summary judgment – does Title III of the Americans with Disabilities Act ("Title III") require Quest's Kiosks at its Patient Services ("PSCs") to be "independently accessible"– without any Quest PSC staff assistance − to Plaintiffs and, by necessary extension, people with all varying disabilities?  Plaintiffs' two Complaints plainly frame this question and their Opposition now plainly restates this as the relief Plaintiffs seek.  As demonstrated in the moving papers and again below, Title III contains no such requirement, just that covered public accommodations such as Quest offer "auxiliary aids or services" in the form of "effective communication" to provide the same services available at the Kiosk.  Quest does just that through longstanding policies, procedures and training that require its PSC staff to assist patients with disabilities with using the Kiosk and through the additional enhancement of the Three-Finger Swipe ("TFS"), which enables blind patients, if they so choose, to check in at the Kiosk without any assistance.  Indeed, if Title III required "independent access" to the Kiosk itself, several of the examples of "auxiliary aids and services" in the Department of Justice's ("DOJ") own regulation that involve *service-dependent* access would be rendered meaningless.  The very notion of an "auxiliary … *service*" necessarily implies service-dependent access.  Indeed, the DOJ's Statement of Interest ("SOI") (ECF No. 118) nowhere contends independent access is required, in fact disclaiming any "conten[tion] that Quest must provide a *particular* auxiliary aid or service."  (SOI at 10 (emphasis added), 8-9 (only requiring provision of a "like service" through "effective communication").)   Quest's personnel are trained to do exactly that, and Plaintiffs' facial challenge to the use of a touchscreen Kiosk that is not "independently accessible" should be dismissed.

Critical to understanding the remainder of this motion is that Plaintiffs' First Amended Complaint (ECF No. 41 (May 2020)) solely challenged the lawfulness of the initial Kiosk, which was rolled out from 2016-18 and whose core functionality

was to replace the paper sign-in sheets previously in use to announce a patient's arrival (*i.e.*, check them in).   Because Quest's trained staff assists patients with Kiosk check-in, just as it had done for years with paper sign-in, Plaintiffs seek to distract the Court with gross (and often irrelevant) distortions of the factual record and with claims about *the post-Complaint* implementation of the TFS enhancement, and *post-Complaint* Kiosk functionality that Quest is currently piloting.  The Court should reject these invitations to distraction.

The *only* relevance of the TFS enhancement to this motion is that Quest has shown, in the alternative to the longstanding assistance provided by Quest's PSC employees, that the addition of TFS indisputably provides a means of "independent access" to Quest's services, thus addressing and rendering moot Plaintiffs' explicit and only complaint about the initial Kiosks.  Plaintiffs' inadmissible and inapposite factual contentions about whether the TFS actually worked in statistically insignificant instances is beside the point where (a) Quest has indisputably addressed Plaintiffs' allegations in this action that the Kiosk must be and is not "independently accessible"; and (b) where Plaintiffs are challenging the *mode* of "effective communication," not whether it works in every instance.

As to the "primary consideration" doctrine that Plaintiffs attempt to impose on Quest's decision to implement either the initial Kiosks or the TFS-enabled Kiosks, Plaintiffs tacitly admit that there is no Title III or Rehabilitation Act regulation imposing that duty on Quest.  Reliance on Title II of the ADA or the Affordable Care Act ("ACA") has no impact here where no claims are made under those laws.  Notably, the SOI presented here by DOJ, the agency responsible for the unambiguous Title II regulation, does not take the position that "primary consideration" has any relevance or application under the Rehabilitation Act.  And Plaintiffs' Opposition is completely silent on, thus conceding, several other moving paper arguments against the doctrine's applicability here.

Because of Plaintiffs' misdirection about the actual contentions in this lawsuit,

it is not surprising that the DOJ's SOI is largely devoted to a set of facts, allegations and contentions that are both disputed and not at issue here.  The DOJ made clear at the time of the ADA's passage that:

> "Full and equal enjoyment [under Title III of the Americans with Disabilities Act ("ADA")] does not mean that an individual with disability must achieve an identical result or level of achievement as persons without a disability."

U.S. Dept. of Justice ("DOJ"), "Guidance on ADA Regulations," App. C to 28 C.F.R., Part 36, § 36.201(a) (1991).  The SOI does not disclaim that pronouncement, nor could it.  As the DOJ acknowledges in the SOI, the requirement is not absolute equality of access to every discrete feature available to all guests; a Title III entity must "tak[e] reasonable steps to afford individuals with disabilities a 'like experience.'"  (SOI at 8 (quoting *Baughmann v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012).)  Holding otherwise would actually deprive Quest and other public accommodations the ability to offer new products and services to guests unless they could be made identically accessible to persons with all manners and degree of disabilities.  That was not the DOJ's interpretation in 1991 in the immediate wake of the ADA's passage, and the statute has not changed.

For each of these reasons and those presented below, the Quest Defendants respectfully request that the Court enter summary judgment in their favor and against Plaintiffs.  In the alternative, the Quest Defendants respectfully request that the Court grant partial summary judgment on all of the subsidiary issues so as to properly narrow the focus of any trial on the merits.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs submit reams upon reams of paper designed to bury the reader in purported "genuine issues of fact" that would defeat summary judgment.  But the vast majority of these submissions address grossly irrelevant or inaccurate topics – like Quest's alleged financial motives in developing the initial Kiosk – and nearly all of it badly distorts the record.  Because of the sheer quantity of paper, it is ill-advised to

contribute to Plaintiffs' tactics by rebutting irrelevant facts, even if distorted beyond recognition.  Instead, Quest focuses this Factual and Procedural Background Section on responding here only as to those undisputed facts that the Court needs to grant summary judgment.

### A.   The Initial Version Of The Kiosk In Place At The Time Of Plaintiffs' Complaints In This Action Merely Checked Patients In

Plaintiffs' Opposition papers are replete with attacks on a version of the Kiosk that was not in place at the time of either of the Complaints in this action.  While Quest vigorously challenges the materiality and admissibility of Plaintiffs' evidence about Quest's current Kiosk, and as argued in Section III.A below, such facts are irrelevant to the analysis of *Plaintiffs' affirmative claims* in the action, which challenged the initial Kiosk that contained the limited core functionality of checking patients in.  (App. 4 ¶¶ 7-8. 10.)  The Kiosk replaced the paper sign-in system that preceded it and also required Quest employee assistance for its success.  (*Id.* ¶¶ 4-5; App. 3 ¶ 4.)

### B.   The Initial Version Of The Kiosk At Issue In This Action Requires Entry Only Of Name, Birthday And Telephone, All of Which Can Be Gathered Privately In Draw Room; The TFS Enhancement Requires NO Private Information To Check In

There is likewise no dispute that the only personal information needed for check-in on the initial version of the Kiosk the patient's name, birthday and telephone number.  (App. 4 ¶¶ 7-8, 10.)  All of this information can be gathered privately in the draw room.  (App. 3 ¶ 8.)  Just as indisputably, the TFS enhancement requires the entry of **no** private information.  (App. 17 at 86:9-16, 88:4-89:4, 94:3-11; App. 22 at 143:21-24; App. 19 at 97:15-98:15, 99:2-100:20, 102:4-10.) A swipe of three fingers in any direction across the face of the Kiosk, and the patient is automatically checked in.  (*Id.*)

### C.   Quest Training Expressly Directs Individualized Attention To Every Patient (And Patients With Disabilities, In Particular); Indeed, The Core Training is Called "Managing Every Patient's Needs"

Before the events of which Plaintiffs complain, patients at Quest PSCs

4

Case No. 2:19-cv-08108 DMG (MRWx)

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

48649475_1.docx

indicated their arrival, or check in, by entering their names on a paper sign-in sheet maintained in the waiting room.  (App. 4 ⁋⁋ 4, 5; App. 3 ⁋ 4.) A cornerstone of Quest's phlebotomist policies, procedures, and training had been – and remains − to require PSC employees to scan the waiting room each time they entered to find any individuals who may need assistance, including those who were blind or had other disabilities.  (App. 3 ⁋⁋ 3-19, App. 8-15, 28.)

In fact, the updated training materials rolled out in Spring 2021 ("Managing *Every Patient*'s Needs") repeatedly reiterated and emphasized the importance of meeting the needs of every Quest patient, including materials on meeting the potential needs of patients with different kinds of disabilities.  (App. 3 ⁋ 7-8, App. 10-11 (emphasis added).) The absence of specific legal jargon from the training materials (such as "primary consideration") does not render inadequate the training, which directs consideration to *each* patient's needs, as the title of the training suggests.

### D.   No Employee Cuts Or Cost-Savings Were Planned Or Projected In Connection With Kiosks' Initial Approval And Rollout

While Quest's motives in implementing the Kiosk bear no relevance to Quest's compliance with the "effective communication" mandate, Plaintiffs have grossly distorted the evidence to ascribe motives to Quest that should be addressed briefly here.  Quest's witnesses were uniform in testifying that the Kiosks were implemented to improve patient and phlebotomist experience – a fact also made plain by Quest's core Business Case document, which reiterated and emphasized these same bases for the Kiosks.  (Pl. Ex. __ at 27:10-28:8 (Walsh); Pl. Ex. __ at 63:23-64:4 (Grant)); Ex. **E** to Suppl. Raizman Decl.)  To attempt to rebut this testimony, Plaintiffs have taken completely out of context an internal, administrative Capital Expenditure Request ("CapEx"), which Kiosk co-sponsors Chris Grant and Tom Walsh explicitly identified in their depositions as a *financial* approval document, "owned" by Finance.  (Pl. Ex. 20 at PA668:20-25; Grant Depo. (Ex. **B** to Suppl. Raizman Decl.) at 69:6-70:8.)  As such, it is expected that the CapEx contains financial impact projections so that

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

Quest's financial expenditure of more than $14 million to roll out the Kiosks could be understood for all of its financial impact.  Understanding financing impact, and predicting potential cost savings, does not equate with a cost-savings motive for the Kiosks.  (Pl. Ex. ___ at 27:10-28:8; Ex. **E** to Suppl. Raizman Decl.)  Indeed, while some of the financial projections saw a "per-patient" savings, Quest did not plan on reducing expenditures, or increasing revenues, in approving the CapEx.  (Pl. Ex. 20 at PA0636:10-637:6.)  In particular, no reductions in PSC staffing were planned in connection with the Kiosks' rollout. (App. 4 ⁋ 10.) To Plaintiffs' disappointment, this was not the classic bogeyman of machines replacing humans.  While the time savings in processing patients was expected to give phlebotomists less administrative work and more time to interface with patients, that time could be used to see more patients (a projected possibility of the CapEx) or to spend more time with patients who needed extra assistance.

### E.   The 46 Recorded Feedback Items Are Not All Complaints About The Kiosk, Or The Lack Of Independent Access To The Kiosk; In Addition, They Are All Hearsay

Plaintiffs cite to records maintained by Quest over the four-year period during and following the Kiosk's rollout that logged any Kiosk-related feedback that Quest's Patient Advocacy team received about from blind patients and inaccurately characterizes them as "45 complaints from blind patients about [Kiosk] inaccessibility."  (Opp. at 8, citing to PA49-57.)[1]  Even a brief review of the document makes clear that: (1) they are not 45 "complaints"; and (2) many are not about the Kiosk.  (*Id. passim.*)  For example,

---

[1] Since the chart records statements made by outside declarants to Quest's patient advocacy representatives, the matters asserted in the chart regarding these patients' visits are plainly hearsay.  Evid. Code § 801(c).

48649475_1.docx

████████████████████████████████████████████████████

████████████████████████████████████  In any event, Quest's receipt of 45 items of Kiosk feedback from blind patients in a four-year period – where Plaintiffs' statistical expert on class certification speculatively estimates 31,683 blind visitors in half the time (ECF No. 106-1 at 20) (seven one-hundredths (.07) of a percentage point) – belies Plaintiffs' allegations of programmatic difficulties with the Kiosk check-in process.

**F.**   **Many Blind Patients (Including Vargas) Received Immediate Assistance From Quest Phlebotomists And Check-In**

One of the problems with relying on individual anecdotes when assessing a business with millions of visitors a year is that selective presentation of allegedly problematic visits are disproportionately magnified.  Indeed, the record in this action – relying on just the Plaintiffs and a handful of ACB members – contains many examples of blind patients being immediately assisted.  Indeed, Claire Stanley, the blind, former ACB advocacy director, testified that she waited between 3-5 minutes on one visit and was helped immediately on another visit.  (App. 26 at 1382:1-7; 1387:2-14.)  ████████, an ACB member, wrote in response to an open ACB inquiry about problems at Quest, "There has always been an attendant to take info or had to have someone sign name on the list when the attendant was in back."  (PA00687.)  ████████████ wrote that, "[o]n 6/3/20, her friend told her the kiosk wasn't even there and someone outside was checking people in."  (*Id.*)  Or, Dan Moore "had a staff member at the center help him check in for appointments."  (PA0710.)  Even Mark Derry's completely random visits to 24 PSCs yielded instances of patients being greeted immediately.  (PA 0873 ("Large reception room with person behind a desk."); s*ee also* App. 27 at 1403:6-14, 1404:24-1405:4, 1409:21-24, 1412:19-1413:1, App. 26 at 1348:16-20, 1349:11-1350:12.)  This is why Plaintiffs' isolated, anecdotal evidence cannot be used to prove programmatic inaccessibility.  *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017); 28 C.F.R. § 36.211(b).

### G.    Mark Derry's Flawed, Non-Scientific Survey Must Be Rejected And Offered No Weight

The unscientific and ambiguous observations regarding 24 PSC locations in the Declaration of Mark Derry ("Derry Declaration") should be stricken for mujltiple reasons.  First, it was produced just three days before the close of discovery such that it could not be tested under Quest cross-examination.  *See*, *e.g.*, *Matrix Int'l Textile, Inc. v. Monopoly Textile, Inc.*, No. CV 16-0084 FMO (AJWx), 2017 U.S. Dist. LEXIS 168133 (C.D. Cal. May 9, 2017) at *10 (excluding witnesses fact witnesses disclosed three days before discovery cutoff). Plaintiffs had ample opportunity during this litigation's pendency to engage Derry to conduct his "site survey," timely disclose him, and allow his deposition, but instead sprung his testimony on Quest only days before the cutoff.  Plaintiffs' two prior Rule 26(a)(1) fact witness disclosures never mentioned Derry.  Indeed, Plaintiffs admit they sent Vargas to a Quest PSC *two months before Derry* to test the TFS update. (Opp. at 11.) This improper, prejudicial tactic should not be permitted.  *Matrix Int'l* at *10.

Second, the report and testimony is duplicative of Vargas and seven other ACB members who were deposed and were able to recount and be cross-examined about, their first hand, real-party-in-interest experiences at various Quest PSC locations in several states.   Derry's "observations," as a fully sighted, fact witness, are second-hand, irrelevant and unhelpful to the Court.  *See*, *e,g,*, *United States v. Lewis*, 837 F.2d 415, 418 (9th Cir. 1988) (upholding trial court's exclusion of unnecessarily testimony, duplicative of prior party testimony).

Third, Derry's report and testimony are incompetent and inadmissible evidence. Derry's "report" is actually a set of simple, self-directed questions that were formulated by him or other unknown persons summarizing in declarative statements personal observations he allegedly made at 24 out of more than 2,100 Quest PSC locations in only 3 states.  As the declaration of Quest's statistical expert, Joseph A. Krock, Ph.D. shows, this represents a statistically insignificant sample by which no

8

48649475_1.docx

one – no less a lay witness like Mr. Derry – can evaluate the efficacy of Quest's company-wide TFS enhancement. (Declaration of Joseph A. Krock ¶¶ 11-14.)  A statistically significant sample would require surveying at least 100 to 400 locations (*id.* ¶ 13), would require random selection, and appropriate geographical representation. (*Id.* ¶¶ 15-16.)   Further, Derry's observations occur as a single event at each location for an unrecorded amount of time, essentially an attempt to render final judgment about a location and its Kiosk based on a single, untimed visit, rendering them and any conclusions drawn from them not generalizable.  (*Id.* ¶¶ 17-19.)  Finally, Derry's observations are qualitative, not quantitative, and replete with equivocation and qualifying language such as "may sometimes," "usually," "not all," "many times," "inconsistently," "with few exceptions," "at some locations," "if," "but only," "varies" "almost never," and "usually two to three." (*Id.* ¶¶ 20-22.)   For these reasons, no competent statistical conclusions can be drawn from Derry's factual observations, and his report and testimony is unhelpful to the Court.[2]

## III.  LEGAL ARGUMENT

### A.  Plaintiffs Try To Move The Goalposts *After* Quest's Dispositive Motion

The two Complaints filed in this action make no mention of the TFS enhancement or the "wait outside" functionality or of functionalities that Quest is piloting in a small number of locations, nor could they have because those events happened long after those Complaints were filed.  Rather, Plaintiffs' Complaints make clear that they are contending that the Kiosks "do not contain the necessary technology that would enable a person with a visual impairment to a) enter any personal information necessary to process a transaction in a manner that ensures the

---

[2] Derry's declaration and report also should also be rejected because they are irrelevant to the court's consideration of the issues before it, namely, whether Quest's two modes of "effective communication" (PSR assistance and the TFS enhancement) are effective approaches, not whether there are alleged unique instances where either of these alternatives may not work due to some isolated issue.  *Kirola*, 860 F.3d at 1183; 28 C.F.R. § 36.211(b).

same degree of personal privacy afforded to those without visual impairments; or b) use the device independently and without the assistance of others in the same manner afforded to those without visual impairments."  (Complaint (ECF No. 1) ⁋ 5 at 3; FAC (ECF No. 41) ⁋ 5 at 3.)  In other words, Plaintiffs' central complaint is about the lawfulness of the technology itself, namely, whether Quest's choice to implement touchscreen technology, supplemented by employee-delivered "effective communication," was *per se* unlawful.  Quest's dispositive motion is properly addressed to these allegations.

Plaintiffs' contentions in their Opposition about the alleged inadequacy of COVID-era functionality added to the Kiosks *after* the filing of these Complaints, and *after* the 2019-2019 putative class period for which Plaintiffs seek class certification, or other Kiosk functionality that Quest is piloting in a small number of locations is not at issue in this action.  *Paulick v. Starwood Hotels & Resorts Worldwide, Inc.*, 2012 WL 2990760 at *13 (N.D. Cal. Jul. 20, 2012) (in granting summary judgment for defendant, court declines to consider barriers not alleged in complaint) ("Clearly, there must be a point at which a defendant facing claims under the ADA can be certain that all of the barriers at issue in the case have been identified. The requirement under *Oliver* that all barriers upon which a plaintiff wishes to proceed must be identified in the complaint supports the conclusion that that point is the deadline for amending the complaint."); *O'Campo v. Chico Crossroads*, 2011 WL 5241351, at *2–3 (E.D. Cal. October 31, 2011) (finding that barriers identified only in expert report were outside scope of complaint).

The TFS enhancement is only made relevant here because Quest properly claims in its moving papers that it renders moot Plaintiffs' Complaints' two contentions about the Kiosks' putative inadequacy in this action – lack of independent operation and gathering of personal information.  Plaintiffs' contentions about alleged, isolated difficulties with the TFS enhancement are both mostly inadmissible and also beside the point here because the TFS enhancement fully addresses Plaintiffs' two

10

major contentions in this action and because any ancillary functionality of the Kiosks
can be delivered through longstanding and well-established phlebotomist assistance
using "effective communication" or through other Quest technology.[3]

**B.**     **As Stated Plainly In The DOJ's SOI And Countless Authorities, No _Specific Device Or Auxiliary Aid_ Or Service Is Required, And The Explicit Relief Sought By Plaintiffs – An Independently Accessible Device That Can Be Used Without Quest Phlebotomist Assistance – Is Nowhere Required.**

As noted in Section III.A above, Plaintiffs' Complaints are premised on the
putative requirement of an "independently accessible" Kiosk that can be used without
any support whatsoever from Quest phlebotomists.  Starting with the Introduction to
their Opposition brief, Plaintiffs continue to embrace this as the premise for this case.
(Opp. at 4-5 (". . . Quest discriminated systematically against legally blind customers
… by refusing to provide them independent access to [the Kiosks]….").)  But there is
simply no requirement anywhere that any device or service offered by Quest must be
"independently accessible," without any assistance of Quest phlebotomists at a PSC.

Plaintiffs cite to no authority requiring an "independently accessible" device
because there is no such authority.  Instead, Plaintiffs cite to a variety of other readily
distinguishable authority to prop up this invalid proposition.  Plaintiffs point to ATM
cases to argue that Quest's Kiosks should be made independently accessible in the
same manner as the Kiosks.  But the fundamental flaw of this argument is that the
ADA design standards contain explicit requirements to make ATMs and fare
machines accessible, but contain none for any other type of transactional device.  _See_
ADA Standards for Accessible Design ("ADAS") 220, 707 (codified at 36 C.F.R. pt.
1191, App. B, D.  Among other things, ATMs must have the audio output, headphone
jack and tactile keypad that Plaintiffs seek here.  ADAS 707.  Indeed, the Department

---

[3] Indeed, ACB member Ian Foley reports that on his "most recent visit, he made an
appointment online and received a text alert while setting in the waiting area when his
appointment was ready."  (PA0711-712; _see also id._ at PA0714 (Paula Muysenberg
report that "husband has made an appointment for her on-line and Paula received a
text when she was ready to be seen.").)

of Justice considered applying these same design standards to a broader category of devices, but explicitly declined to do so.  *See* ADAS 707 Advisory ("Interactive transaction machines (ITMs), other than ATMs, are not covered by Section 707.").

Moreover, the notion that "effective communication" requires an independently accessible device is undermined by the "effective communication" regulation itself, which lists multiple "services" that can be rendered to achieve lawful communication. *See* 28 C.F.R. § 36.303(c)(1), (2) ( "auxiliary ads and services" include these *services* -- interpreters, notetakers, qualified readers[4]).  If these types of "services" can provide "effective communication," then, by definition, the devices themselves do not need to be independently accessible.  But the analysis does not need to end there.  The DOJ's SOI nowhere contains or repeats or even alludes to Plaintiffs' novel contention for "independent access."  It instead states "[t]o be clear, the United States does not contend that Quest must provide a particular auxiliary aid or service."  (SOI at 10.)

All of Plaintiffs' authority and their attempts to distinguish Quest's authority on this issue are unavailing.  First, all of Plaintiffs' cases cited in this section of the Opposition (Section III.A. at 14-17) are either ATM cases or an airport kiosk case, making them readily distinguishable because ADA 707 has explicit requirements for ATMs (excluding ITMs, like the Kiosk) and because the Air Carrier Access Act regulations have explicit accessibility requirements for airport kiosks.  14 C.F.R. § 382.57; *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 722–23, n.2 (9th Cir. 2016).  Second, Plaintiffs' attempt to distinguish the Freestyle soda machine cases (*West v. More's Franchisor,* 2015 WL 8484567 (S.D.N.Y. 2015) and *DiCarlo v.*

---

[4]     Contrary to Plaintiffs' baseless assertion, Quest phlebotomists are "qualified readers." As the DOJ's published guidance states:  "A 'qualified' reader means someone who is able to read effectively, accurately, and impartially, using any necessary specialized vocabulary." DOJ, "Effective Communication" (Jan. 2014), available at https://www.ada.gov/effective-comm.htm, citing 28 C.F.R. § 35.104. Quest phlebotomists can readily read the words "name," "birthday" and "telephone number" and are uniquely and ***most*** qualified and trained to understand and convey or "read" anything that happens during a patient's PSC visit.

*Walgreens Boots Alliance Inc.,* 2016 WL 482982 at *2 (S.D.N.Y 2016)) as inapposite because they were decided on motions to dismiss, not for summary judgment, is ironic because those courts there rejected the necessity of independently accessible devices *as a matter of law*, without the need to explore a factual record.

For all the reasons stated above, this Court should do the same and put an end to Plaintiffs' unsupported prayer for relief for an "independently accessible" device.[5] But, even if the Court finds that a device that is "independently accessible" without any phlebotomist assistance is required, the Court can and should also find that the TFS-enabled Kiosk permits fully-independent access to check-in, thus rendering moot Plaintiffs' claim.[6]  (*See* accompanying Response to Plaintiffs' Statement at Fact No. 30; Opp. at 12 ("Vargas performed the TFS, [etc.]").)[7] Plaintiffs' inadmissible evidence of alleged, isolated instances of difficulties with TFS does not defeat Quest's proof that it has devised an independently accessible *mode* of check-in, which is, after all, the only kind of injunctive relief a court could grant here. *Kirola*, 860 F.3d at 1183 ("… we agree with the district court that *Kirola* and other class members' anecdotal testimony about [barriers to access] did not establish inaccessibility at a programmatic level"). Even if these objectionable and flawed contentions establish, at best, that TFS does not always work, that does not defeat the lawfulness of Quest's chosen mode of effective communication.  *Id.*; 36 C.F.R. § 36.211(b) (isolated instances of operational failures do not constitute a Title III violation).

---

[5] If it declines to fully grant Quest's motion, the Court may still grant partial summary judgment holding, for example, that independently accessible devices and primary consideration are not required under the legal theories in this action.  Eliminating these theories or categories of relief would have the proper and salutary effect of substantially narrowing the issues of proof at any trial.  Fed. R. Civ. P. 56(g).

[6] The TFS enhancement fully addresses the "independence" and "privacy" concerns alleged in the Complaint and FAC.  Ancillary concerns about other functionalities are not at issue here and are also available through other Quest technology (PA0711-712, 714) or Quest PSC phlebotomists.

[7] To meet the "privacy protection" principle articulated in Section 303(c)(1)(ii), Quest gathers certain information in the private draw rooms where phlebotomists collect specimens from patients.  (App. 3 (Reilly) ¶ 19.)

Case No. 2:19-cv-08108 DMG (MRWx)

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

**C.     Plaintiffs' Assertion That The Kiosk Is Itself A "Service" Does Not Alter The Analysis Or Result On This Motion For Multiple Reasons.**

Plaintiffs' lengthy argument that the Kiosk itself is a "service" that must be made equally accessible to persons with disabilities entirely misses the point for the multiple reasons explained below, and changes none of the analysis on this motion.

**1.     A Public Accommodation Need Not Create An Accessible Inventory Of Goods And Services.**

Nothing in Plaintiff's Opposition disputes the well-established ADA principle that a public accommodation is free to select the goods or services it provides, meaning that its goods or services need not themselves be accessible. *Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc*., 603 F.3d 666, 671 (9th Cir. 2010). As the Ninth Circuit aptly wrote in *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115-16 (9th Cir. 2000):

> The ordinary meaning of [Title III] is that whatever goods or services the place provides, it cannot discriminate on the basis of disability in providing enjoyment of those goods and services. This language does not require provision of different goods or services, just nondiscriminatory enjoyment of those that are provided.

Any attempt to distinguish *Weyer* and cases like it as distinguishable "insurance" cases ignores their significance.  Indeed, in those cases, the disabled plaintiffs were deprived of enjoying ***the core and only*** "good or service" offered by the insurance companies – exclusionary insurance policies.  If those companies' insurance policies do not need to be accessible, certainly not every ancillary good or service offered by Quest need itself be independently accessible. *See also McNeil v. Time Ins. Co.*, 205 F.3d 179, 187 (5th Cir. 2000); *Nat'l Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 956 (N.D. Cal. 2006) ("The purpose of the ADA … is not to alter the nature or mix of goods that the public accommodation has typically provided.").

In fact, the very existence of the statutory and regulatory "auxiliary aid and service" provision on which this lawsuit is premised presumes the validity of this assertion.  After all, if all goods and services offered by public accommodations were themselves independently accessible, ***there would be no need for such auxiliary aids***

14

*or services*.  42 U.S.C. § 12182(b)(2)(A)(iii).  In fact, the very requirement of "auxiliary … services" (*id.*) necessarily implies that auxiliary or *extra services* must be provided to make the public accommodation's goods and services accessible.[8]

Any attempt to mandate the offering of only accessible goods or services would lead to an unending list of absurd results.  For example, Quest could not play music in its facilities (an amenity offered to its patients) because that music is wholly inaccessible to its deaf patients.  Nor could it paint, hang art or otherwise decorate its facilities in a pleasing fashion because those visual amenities are wholly inaccessible to its blind patients.  And so on.  They would be barred from developing new and innovative goods and services unless each one could be made identically "accessible" to persons with disabilities.  The law does not require any of these absurd results.  The fundamental principle articulated above from *Weyer* remains – there is no obligation to provide accessible goods or services.[9]

### 2. The Core Functionality Of The Kiosks Are Made Equally Accessible Through "Effective Communication" And The Other Functionalities Added After Plaintiffs' Complaints Offer Ancillary Options That Are Also Available Through Either "Effective Communication" Or Other Quest Technology.

Plaintiffs nowhere dispute, nor could they, *either* that the "effective communication" obligation hinges on the nature, length, complexity and context of the communication *or* that the communication here (*i.e.*, name, birthday and telephone number) is as basic as possible and the same communication that phlebotomists had with patients when paper check-in was in place.  28 C.F.R. § 36.303(c)(1)(ii).  Nor can there be any dispute that the original Kiosk and the one in place when Plaintiffs

---

[8] Plaintiffs' efforts to use **non-binding, post-Kiosk rollout** agency guidance (Dec. 2016) to impose legal obligations on Quest beyond those set forth in the unambiguous regulations must be rejected.  *See Attias v. Crandall*, 968 F.3d 931, 937 (9th Cir. 2020) ("If the regulation's text is unambiguous, we give no deference to the agency's interpretation: [t]he regulation then just means what it means.") (quoting *Kisor v. Wilkie*, 139 S.Ct. 2400, 2414-2415).

[9] Likewise, the mere fact that the language of 28 C.F.R. § 36.307 mentions "accessible or special goods," but not services, does not negate the fundamental principle that Title III does not require accessible or special goods or services.

Case No. 2:19-cv-08108 DMG (MRWx)

filed both of their Complaints had the core functionality of checking patients in to receive services.  As a completely ancillary function, checking in at the Kiosk also generated a display on Quest TV of the estimated wait time.[10]  The original Kiosk checked in patients (and the current one does as well) with the entry of one's name, birthday and telephone number.   Perhaps because doing so would undermine their request for an elaborate device, Plaintiffs entirely ignore the "effective communication" regulation's reliance on the nature, length and complexity of the communication, and the context in which it occurs, to determine the appropriate mode of communication.  The exceedingly basic nature of the communication here makes Quest's provision of PSC phlebotomist assistance entirely proper and lawful.

Unable to generate any dispute about the basic nature of the communication in question, Plaintiffs misleadingly rely on the regulatory language stating that the mode of communication must "protect the privacy and independence of the individual with a disability." 28 C.F.R. § 36.303(c)(1)(ii).  First, Plaintiffs nowhere dispute Quest's proffered evidence that all of the information required to check in can be shared in the private draw rooms. Second, Plaintiffs do nothing to establish why any of this requested is "private." Quest's phlebotomists can effectively and privately receive this basic information.

### 3.   A Public Accommodation Need Only Provide "Like" Services, Not Identical Services, To Patients With Disabilities.

As established above and repeated in the DOJ's SOI, there is no requirement to provide an identical result or communication method, only "effective communication."  (SOI at 10; 28 C.F.R. § 36.303 and authority cited in Section III.C of ECF No. 95-1.)  Only "like experiences" are required and that "are not required to make any and all possible accommodations," as Plaintiffs here seek. (SOI at 8;

---

[10] Vargas' own alleged experience with the disparity in estimated (3 minutes) and actual (17) wait time (Opp. at 12) calls into question the cognizability of any "concrete injury" flowing from its absence.  Any such disparity or additional wait time could be the difference between a patient walking in and one with an appointment.

*Baughman*, 685 F.3d at 1135.  Plaintiffs' insistence that Title III mandates that the original Kiosks required a headphone jack, audio output and a tactile keyboard – simply to convey the necessary name, birthday, and telephone number – has no support to meet this "like experiences" standard.

Plaintiffs cite to a multitude of cases that purport to establish that <u>all</u> of the services and amenities of the public accommodation need to be equally available. (Opp. at 18-22.)  Quest accomplishes that goal, subject to the established standard that such services can be delivered as "like experiences" and that there is no single prescribed mode to deliver such services.  The decision in *Antoninetti v Chipotle Mexican Grill, Inc.*, 643 F.3d 1165, 1170 (9th Cir. 2010), is distinguishable because there the restaurant could not make an "equivalent facilitation" defense to escape the force of an express ADA Accessibility Guideline (§ 7.2) because the alternative offered did not provide patrons with equal ability to see or sample the food and thus wasn't equivalent.  *Id.* at 1170.  Here, the only regulation at issue explicitly requires only "effective communication."  *See also Landis v Washington State Major League Baseball Stadium*, 2021 WL 3891566, at _ (9th Cir. Sept. 1, 2021) (enforcing explicit architectural design standard); *Fortuyne v. AMC Media Cinema*, 364 F.3d 1075, ___ (9th Cir. 2014) (enforcing explicit companion seat design standard).

*Landis*, *Fortuyne*, *Robles v. Domino's Pizza*, 913 F.3d 898 (9th Cir. 2019) and *Baughman*, 685 F.3d at 1135, can also be distinguished because the complaints in each went not to some ancillary part of what those business do, but to the very core of the what they sell for public consumption – *Landis* (views of the baseball game), *Fortuyne* (ability to sit with companion during movie), *Robles* at 905-06 (website and mobile app were "two primary means" of ordering pizza without visiting physical location, and plaintiff was prevented from ordering), *Baughman* at 1136 (the mode of mobility throughout a large theme park for an entire visit, relying on specific regulation permitting use of own mobility devices).  Here, the Kiosk services in question (namely, check-in) are ancillary to the core diagnostic and specimen-

17

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

collection services and are delivered through the briefest communications to permit check in.  By providing "effective communication" for all services through its PSC phlebotomist assistance (as enhanced by TFS), Quest is offering full and equal access to its check-in and other services.  (PA711-712, 714 (ACB members able to receive text to phone that they were ready to be seen).)

### D. Plaintiffs' Opposition Only Serves To Confirm That Quest Has No Obligation Under The Rehabilitation Act To Provide "Primary Consideration" To The "Effective Communication" Requests Of ACB And Plaintiff Julian Vargas

Plaintiffs' Opposition does not dispute that there is no Rehabilitation Act regulation that mandates "primary consideration" of requests for "auxiliary aids or services."  Nor does it dispute that Plaintiffs' Title III and Unruh claims have no "primary consideration" requirement.  Moreover, the DOJ's SOI nowhere addresses (let alone supports) the requirement.  Instead, Plaintiffs patch together a claim to a regulatory requirement based on an agency's extra-regulatory language and the *general* commonality between Title II of the ADA and the Rehabilitation Act.  None of that supports the existence of an invisible "primary consideration" requirement under the Rehabilitation Act.

Initially, Plaintiffs' Opposition makes clear that Plaintiffs are relying on the ACA to impose any "primary consideration" requirement that may exist. (Opp. at 23 ("Quest … obligated to give primary consideration . . . because the Affordable Care Act ("ACA") applies Title II requirements to all defendants." (Opp. at 23.) Plaintiffs also cite to a non-binding "Notice of Proposed Rulemaking."  80 Fed. Reg. 54172, 54186 (Sept. 8, 2015). Plaintiffs' case citations are similarly limited to cases where any discussion of a "primary consideration" requirement stems from the existence of an ACA and/or Title II claim.  *See, e.g., Duvall v. Cnty of Kitsap*, 260 F.3d 1124 (9th Cir. 2001) (Title II); *Martinez v. Cnty of Alameda*, 512 F. Supp. 3d 978, 987 (N.D. Cal. 2021) (Title II); *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1099-1100 (9th Cir. 2013) (Title II); *Vega-Ruiz v. Northwell Health*, 992 F.3d 61, 66

48649475_1.docx

(2d Cir. 2021) (ACA).

The central problem with Plaintiffs' argument is that there is no ACA (or Title II) claim in this case. Plaintiffs blithely ask the Court to ignore this fact, insinuating that the ACA and Rehabilitation Act are identical and the provisions of the latter can simply be read into the former.[11] But while the ACA borrows the enforcement scheme of the Rehabilitation Act, the reverse is not true, and the statutes are not substantively identical. "The ACA diverges from the Rehabilitation Act in that the ACA does not distinguish between Title II public entities and Title III public accommodations … [w]e conclude that a plaintiff bringing a claim under the ACA presents a different case than a plaintiff alleging the same harm under the Rehabilitation Act." *Vega Ruiz v. Northwell Health*, 992 F.3d at 65, 66 (comparing 28 C.F.R. § 36.303 (ADA/Rehab Act re Title III entities) with 45 C.F.R. 92.102(a) (ACA)); *see also KM ex rel Bright*, 725 F.3d at 1099 ("…the connection between Title II and Section 504 is nuanced. Although the general anti-discrimination mandates in the two statutes are worded similarly, there are material differences between the statutes as a whole."); *Doe v. Pennsylvania*, 2021 WL 1212574, at * 5 (M.D. Penn. Mar. 31, 2021) (agreeing with *Vega-Ruiz* that ACA claim differs from claim based on same harm under the incorporated civil rights statute). Thus, regardless of whether a "primary consideration" obligation exists under the ACA, there is no

---

[11] Plaintiffs also contend that, if the Court rejects this argument, they should be allowed to amend their Complaint to include an ACA claim "to conform to proof at trial" pursuant to Rule 15(b). Plaintiffs notice no motion under Rule 15, and the one case they cite, *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1210 (9th Cir. 2020), nowhere addresses amending pleadings to conform to proof. Instead, it is axiomatic that allowing Plaintiffs to include at trial (or summary judgment) a distinct claim that was never -- but could have been – asserted for the prior two years, would be highly prejudicial to Quest. The very premise for amendment – that the ACA and Rehabilitation Act are identical so cause no prejudice – is flawed.  If that were true and the Court so ruled, the amendment would not be necessary.  Thus, no amendment of the Complaint to include an ACA claim should be allowed, either at trial or summary judgment. *Coleman v Quaker Oats*, 232 F.3d 1271 (9th Cir. 2000) (affirming denial of summary judgment where plaintiffs knew of claims for months, but did not move to amend their complaint until summary judgment).

such requirement under any of the laws Plaintiffs chose to sue under in this case.

Moreover, Plaintiffs' Opposition wholly disregards, and effectively concedes, Quest's additional arguments for the inapplicability of the "primary consideration" doctrine to either the initial Kiosk rollout or to these circumstances where a single technology is rolled out to millions of patients at hundreds of PSC nationwide. (*See* ECF No. 95-1, Section III.C.3.c. at 16-20.) Nor do Plaintiffs rebut Quest's assertion that it, in fact, gave primary consideration to the views of multiple members of the blind community.[12] Unable to rebut that Quest met with and discussed these issues with ACB representatives and three other groups, Plaintiffs argue that "nowhere [is the absence of primary consideration] more apparent than on the topic of training." (Opp. at 25 (pointing out the absence of any mention of the words "primary consideration").) Not only do Plaintiffs fail to point to any authority anywhere that there must be "primary consideration" training or that the training must mention those words, the Quest training speaks for itself and is replete with instructions on how to effectively communicate with patients with disabilities to ensure they enjoy and have access to Quest's services. (App. 3 ¶¶ 7-8, App. 10, 11); *see also Hooper v. City of St. Paul*, 2019 WL 4015443, at *15, n.29 (D. Minn. Aug. 26, 2019) (no Title II violation to fail to include primary consideration training where entity "communicated to its officers in multiple ways that they had an obligation to ensure effective communication with deaf individuals."). For the reasons stated here and in Quest's moving papers, the "primary consideration" doctrine is not applicable to the claims at

---

[12] Because Plaintiffs cannot rebut that Quest met and discussed these issues with ACB and other members of the blind community, they instead focus on Quest's failure to produce a writing reflecting its consideration and its decision. (Opposition at 23-24.) It already strains credulity and lawfulness to require that Quest must give "primary consideration" to disabled patients' requests under the Rehabilitation Act without regulatory process required by the Administrative Procedures Act. (*See* ECF No. 95-1 at 17-18.) To further impose on Quest, in the absence of *any* regulation, detailed requirements about *how* "primary consideration" must be documented under a Title II regulation would be wholly dismissive of legitimate due process concerns to, first, understand that you are required to do something, and, second, precisely what you are required to do.

Case No. 2:19-cv-08108 DMG (MRWx)

48649475_1.docx

issue in this case, and it is time to remove it from this lawsuit.

**E.     Vargas' Unruh Act And DPA Claims Fail.**

Plaintiffs' Opposition make no arguments in support of the survival of its California Disabled Persons Act claim.  As such, that claim should be dismissed with prejudice. *U.S. v. Kitsap Physicians Service*, 314 F.3d 995, 999 (9th Cir. 2002) (party's failure to present evidence in opposition brief on summary judgment waived argument); *Moreno Roofing Co., Inc. v. Nagle*, 99 F.3d 340, 343 (9th Cir.1996) (passing remarks in opposition to summary judgment insufficient to avoid waiver).

The portion of Vargas' Unruh Act claim relying on a *direct* violation of Unruh (Civ. Code § 51(b)) fails because the Opposition nowhere mentions or supports, and thereby abandons, it.   (Opp. at 26-27.)  Resting solely on the ADA incorporation prong of Unruh (Civ. Code § 51(f)), it fails along with the ADA claim, before the Court ever need consider the question of mootness.  In citing cases awarding damages upon a showing of discomfort, difficulty or embarrassment (Opp. at 26), Plaintiffs disregard their threshold need to prove liability before this damages case law is even relevant. *Hernandez v. Polanco Enterprises, Inc.*, 624 Fed. Appx. 964, 965 (9th Cir. 2015) (it is axiomatic that a violation of the ADA must precede the consideration of damages). Thus, Plaintiffs must still establish an ADA violation under Civil Code Section 51(f) before relying on the cases cited in their Opposition.  Because the ADA claims fail even before considering mootness, the Unruh Act claim fails.[13]

**F.     Plaintiffs' Opposition Nowhere Argues That They Have Experienced An Injury In Fact, Or An Imminent Threat Of Future Injury**

Plaintiffs' Opposition is completely silent in responding to Quest's arguments that Plaintiffs lack standing both because of the absence of a "concrete and particularized injury" and because of the absence of an imminent threat of future

---

[13]     Even if their ADA claim fails *only* for mootness, the Court may decline the exercise of supplemental jurisdiction over the Unruh Act claims. *Whitaker v. Kajima Dev. Corp.*, 2020 WL 1972290, at *3-5 (C.D. Cal. Jan. 30, 2020); *Lima v. United States Dep't of Educ.*, 947 F.3d 1122, 1128 (9th Cir. 2020).

48649475_1.docx

injury.  The Opposition's silence constitutes a waiver of their response.  *Kitsap Physicians Service*, 314 F.3d at 999; *Moreno Roofing*, 99 F.3d at 343.

Indeed, the Opposition's recounting of Vargas' June 2019 visit to a Quest PSC using the pre-TFS Kiosk fails to demonstrate a "concrete and particularized" injury. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). As told in the Opposition, Vargas arrived at the PSC, waited 10-15 minutes to be greeted by the phlebotomist, was greeted, and waited another five minutes for the phlebotomist to serve another guest before assisting him.  (Opp. at 11.)   Omitted is the undisputed fact that Vargas received diagnostic services.  (App. 5 ¶¶ 12-13; App. 26-27; PA380:17-25.)

Vargas asserts two kinds of injury here – a "waiting injury" and a "personal information" injury.  (*Id.*)  Plaintiffs nowhere respond to, or distinguish, Quest's cases denying standing for much longer instances of waiting for services. (ECF No. 95-1 at 22.)  Even putting that authority aside, Vargas' "waiting injury" is wholly speculative because it is premised on the unsupported assertion that "[a] sighted individual would not have had to wait, as he or she could have independently used the kiosk to check in."  (*Id.*)  Vargas' first speculative assumption is that any given sighted guest *could* have used the Kiosk when evidence relied upon by Plaintiffs establish that some sighted Quest patients cannot or don't want to use the Kiosks (App. 9 at 755-769). Vargas proceeds to rank speculation when asserting that he waited longer than he would have otherwise waited had he been able to check in immediately upon entering the PSC.  Indeed, based on Vargas' telling, it is quite possible, even likely, that the patient the phlebotomist took back while Vargas waited had arrived at the PSC before Vargas, or had made an appointment to be seen at a time before Vargas' arrival; Vargas does not describe hearing or otherwise observing another patient enter the PSC while he waited. (PA0369:15-19, PA0380:12-16.)  In other words, even under Vargas' telling, the phlebotomist very well may have taken Vargas as soon as she became available *and* in the order in which he arrived, meaning that Vargas may have waited

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

48649475_1.docx

*the exact same amount of time* whether or not he had been able to check in at the Kiosk. Vargas' "waiting" injury may very well be non-existent, and is, at best, entirely speculative.  It does not create standing under the rigorous standards adopted in *Spokeo v. Robins*, 136 S. Ct. 136 S. Ct. 1540, 1547 (2016), squarely placing the burden of pleading and proof on federal court plaintiffs.

Vargas' "personal information" injury is so generally described – "several pieces of personal information" – that it too falls short of establishing the concrete injury required for standing.  First, there is no mention or evidence that the information was shared with anyone other than the phlebotomist, which would have violated Quest policy.  (App. 3 ¶ 8.)  Second, because Vargas offers no explanation for why sharing this information causes injury *to him*, his showing falls well short of a "concrete and particularized injury."  Because ACB generally contends only that its members' experiences "[m]irror those of Vargas," they offer no additional facts to establish a "concrete and particularized injury."  (Opp. at 12.)  Their contention that they were not "able to independently access [the Kiosks]" (*id.*) does not constitute "injury" because there is no *per se* requirement for such independent access, provided Quest provides "auxiliary aids and services," as it does.  Both Vargas and ACB (through its members) fail to establish an "injury in fact."

Plaintiffs fare no better when it comes to "imminent threat of future injury." Vargas tells of his post-deposition, post-TFS visit to a Quest PSC on June 10, 2021, and how he waited for the Quest TV message before attempting to use the Kiosk. (Opp. at 12.) Curiously, he does not explain why his careful tracking of the litigation did not equip him with the basic knowledge to swipe three fingers in any direction. But he admits that he "performed the TFS" (*id.*) – a familiar gesture to the blind. (PA0307:21-310:13; 392:21-24) – and was checked in.[14]  The imminent threat of

_____

[14]     The fact that the wait time estimate provided by the Kiosk (three minutes) was so different than the actual wait time (seventeen minutes) only underscores the ephemeral utility of the wait time estimates that Plaintiffs claim had deprived them in

48649475_1.docx

injury is absent because he now knows for all future visits how to apply the TFS without the Quest TV message.

## G. TFS Renders Moot Plaintiffs' Claims

As Vargas' own experience demonstrates (Opp. at 11), the TFS enhancement indisputably permits a person who is completely blind the ability to independently check in to a Quest PSC to receive services and to receive a generic identifying number, without any phlebotomist assistance.    It requires only a swipe and does not require the provision of personal information.  As such, the TFS enhancement renders moot the two central complaints of discrimination about the original Kiosks as contained in the initial and operative Complaints. (FAC ¶ 5 at 3.)   Plaintiffs cannot defeat mootness of their Complaint by pointing to other putative problems related to Kiosk functionality that was added long after both filing of their Complaints and the 2018-2019 period for which Plaintiffs seek class certification.  (ECF No. 106.)

In particular, they cannot complain about emergency functionalities enacted for COVID protection that did not exist at the time of the Complaints or during the requested class period, or about functionalities that are merely being piloted for potential future use.  *O'Campo*, 2011 WL 5241351, at *2–3 (granting summary judgment in finding that barriers identified only in expert report were outside the scope of complaint).  Moreover, at least two ACB members have reported that they were able to receive texts to their phones that they were ready to be seen (by making an appointment online).  (PA711-712, 714.)

## H. DOJ's SOI Does Not Contradict Any Basis for Summary Judgment.

The DOJ's Statement of Interest (ECF No. 118) does nothing to alter any of the analysis on this motion.  First, the three principles articulated in the sub-headings to the SOI's "Discussion" section are either non-controversial, distinguishable under these facts, or both.  The "full and equal enjoyment" mandate is not debatable because

the initial version of the Kiosk.  (Opp. at 12.)

it is drawn directly from Title III's principal mandate.  But, as the DOJ's own writing reflects – in the SOI and elsewhere – there is no mandate for "identical" services, only "like" services and experience.  (SOI at 8, 9.) The argument that the Kiosk itself provides "services" under the statute is an unremarkable red herring on this motion for the reasons throughout this brief.  As the SOI otherwise states (at 10), there is no prescribed method for providing those services (if the Kiosk can even be considered a "service" under the statute); because, as demonstrated above, the "services" available on the Kiosk are otherwise available through "effective communication," Quest has met this obligation.  Lastly, Quest does not rely exclusively on the "limited inventory" regulation (28 C.F.R. § 36.307(a)) to assert that it need not alter its inventory of goods or services.  Quest also relies on established case law from this and other Circuits that the same principle that applies to goods and is made explicit in Section 307(a) applies equally to services and is fundamental to what needs to be made equal.  *See Weyer*, *McNeil*.  The SOI goes on to write "[Plaintiffs] seek only auxiliary aids and services to fully and equally access Quest's services."  (SOI at 14.)  And that's precisely what Quest does, providing "effective communication" through PSC phlebotomist assistance and or the TFS enhancement to enable access to any and all PSC services.

## IV.    CONCLUSION

For the reasons stated fully above, the Quest Defendants respectfully request that the Court grant summary judgment, or, in the alternative, partial summary judgment on the issues cited in the Notice of Motion or on such other issues raised by the parties after Notice that would narrow the issues of proof for trial.

Respectfully submitted,

DATED: September 24, 2021          OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.


By:  /s/ David Raizman
         David Raizman
Attorneys for Defendants

48649475_1.docx

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case No. 2:19-cv-08108 DMG (MRWx)

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION FOR
SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

48649475_1.docx