OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
DAVID RAIZMAN, CA Bar No. 129407
david.raizman@ogletree.com
AMBER L. ROLLER, CA Bar No. 273354
amber.roller@ogletree.com
J. NICHOLAS MARFORI, CA Bar No. 311765
nicholas.marfori@ogletree.com
400 South Hope Street, Suite 1200
Los Angeles, California 90071
Telephone: 213-239-9800
Facsimile: 213-239-9045

Attorneys for Defendants
QUEST DIAGNOSTICS CLINICAL
LABORATORIES, INC.; QUEST
DIAGNOSTICS HOLDINGS, INC. and
QUEST DIAGNOSTICS INCORPORATED

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIAN VARGAS, ANNE WEST and AMERICAN COUNCIL OF THE BLIND, individually on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 2:19-cv-08108 DMG (MRWx)<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF DEFENDANTS' REPLY TO MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date: October 8, 2021<br>Time: 2:00 p.m.<br>Place: Courtroom 8C<br><br>Complaint Filed: September 18, 2019<br>Trial Date: January 11, 2022<br>District Judge: Hon. Dolly M. Gee<br>Courtroom 8C, First St.<br>Magistrate Judge: Hon. Michael R. Wilner<br>Courtroom 550, Roybal |

48700369_1.docx

**TO PLAINTIFF JULIAN VARGAS and AMERICAN COUNCIL OF THE BLIND AND THEIR ATTORNEYS OF RECORD:**

Pursuant to Central District of California Local Rule 56-1, defendants Quest Diagnostics Clinical Laboratories, Inc., Quest Diagnostics Holdings, Inc. and Quest Diagnostics Incorporated ("Defendants") hereby submit their response to Plaintiffs' Statement of Genuine Disputes of Material Facts and supporting evidence in support of their Reply to Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment of Claims.

Plaintiffs' Statement has been modified solely in the number designations to distinguish between references to Facts 1-37 in Defendants' Response To Plaintiffs' Statement of Genuine Disputes Of Material Facts And Supporting Evidence, which will have an "A" placed in front of them (as in Fact A1, A2 and so on) to distinguish it from Facts 1-116 in Defendants' Response to Plaintiffs' Statement Of Additional Facts, which will have a "B" placed in fronit of them (as in Fact B1, B2 and so on).

**A.     DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND SUPPORTING EVIDENCE**

|  | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| A1. | Quest is in the business of providing diagnostic information, which includes collecting blood and urine specimens that it then tests in accordance with physician orders.<br><br>Appendix of Evidence ("App.") 4 ¶ 2. | Undisputed this represents a portion of Quest's business. |

---

[1] All supporting evidence referenced in this Separate Statement is attached to Defendant's Appendix of Evidence, filed concurrently with this Separate Statement.

| | | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|---|
| | A2. | Quest receives the specimens for testing from hospitals and medical practices, but also collects specimens for testing through approximately 2,100 patient service centers ("PSCs") located throughout the United States.<br><br>App. 4 ⁋ 5; First Amended Complaint ⁋ 42. | Undisputed. |
| | A3. | Before the events of which Plaintiffs complain here, visitors to Quest PSCs would indicate their arrival at Quest PSCs, or check in, by entering their names on a sign-in sheet maintained in the waiting room.  The phlebotomists staffing the PSCs would depart from the "draw rooms" where they drew blood, enter the waiting room, review the sign-in sheet and call the next patient back for specimen collection.<br><br>App. 4 ⁋⁋ 4, 5; App. 3 ⁋ 4. | Undisputed. |
| | A4. | A cornerstone of Quest's phlebotomist training had been – and remains -- to teach PSC employees to scan the waiting room each time they entered to find any individuals who may need assistance, including those who were blind or had other disabilities.<br><br>App. 3 ⁋⁋ 3-4, 6-19; App. 8, 10-15, 27. | Disputed.<br><br>The record facts demonstrate that Quest did not provide adequate training to its phlebotomists in dealing with legally blind customers. In addition, after ECSS was rolled out nationwide, there was no Quest personnel available to help customers at the vast majority of PSCs.<br><br>Compare, Ex. 31, at PA0858-875 [Derry dec.]; Ex. 10, at PA0369:2-370:23 [Vargas dep.]; Ex. 4, at ¶ 3 at PA0018 [Vargas dec.]; Ex. 21, at PA0680:24-682:5; PA0684:2-688:7 [Magana dep.]; Ex. 8, at PA0113:11- 114:19; PA0115:18-117:23; PA0118- 231 [Reilly dep.]; |

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | | Ex. 22, at PA0699:18-700:16 [Stanley dep.]; |
| | | Against Ex. 5, at PA0026:9-22 [Yarrison dep.]; Ex. 9, at PA0238:25- 239:7, PA0244:22-245:7 [Grant dep.]. |
| | | See also, the following citations, also included in the evidentiary objections, which directly contradict Defendants' "fact": Ex. 36 at PA1017:13-19, PA1018:9-PA1019:1, PA1020:12-20, PA1021:24-1022:14, PA1023:3-20, PA1030:4-20. [Reilly dep.]. |

A4. <u>Defendants' Response</u>: None of Plaintiffs' evidence relates to the actual content of Quest's phlebotomist training, which, but for the Reilly Declaration, are the actual training documents themselves and not really subject to dispute. Nearly all of Plaintiffs' evidence relates to isolated instances of unfavorable experiences at Quest PSCs that Plaintiffs speculatively attribute to the inadequacy of training. Such isolated incidents do not support either a violation of law or the inadequacy of training. *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017). Indeed, some of Plaintiffs' evidence reflects that blind patients were promptly assisted. (Ex. 22 (Stanley depo.).) Magana, Yarrison and Grant all testified that staff was trained. (Exs. 21, 5, 9.)

| | A5. | Despite the longstanding use of the paper sign-in process at Quest PSCs, and the process being completely inaccessible without phlebotomist assistance to at least the totally blind, neither Plaintiff nor ACB is aware of even a single complaint under the ADA or analogous laws about the inaccessibility of this process.<br><br>App. 16 at 2-3 (Responses to RFAs Nos. 1 and 2); App. 17 at 115:20-116:5. | Disputed in part. Disputed insomuch as the cited evidence does not support the purported fact. For instance, the cited deposition from Mr. Rachfal's testimony relates to when Quest had a full-time receptionist to help all customers, something they no longer have. (App. 17 at 115:20-116:5). And, the RFA responses state Plaintiff ACB cannot admit or deny the request because it lacks sufficient information, something that does not support Defendants' "fact." (App. 16 at 2-3.)<br><br>See also, Objections to Evidence (The accessibility of a prior check-in system that was not in use at any Quest PSC during the Class Period is irrelevant to the resolution of this action).<br><br>See, Ex. 20 at PA0640:18-641:1 [Walsh dep.]; Ex. 5, at PA0027:8- |

Case No. 2:20-cv-07907 GW (Ex)

48700369_1.docx

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | | 13, PA0028:1-8 [Yarrison dep.]; Ex. 19, at PA0623:19-25 [Aronson dep.] (Quest implemented the ECSS kiosk check in at all 2,152 PSCs nationwide beginning in 2016). |

A5.   Defendants' Response:  Plaintiffs do not fully dispute the fact, only contending that not all of Defendants' evidence supports the fact.  This is incorrect.  In attempting to prove a negative, or absence of complaint, Defendants offer evidence from Mr. Rachfal, ACB's 30(b)(6) witness, inquiring about awareness of any complaints about paper check-in; he had none.  (App. 17 at 1237:20-1238:2 (answering "no").)  Plaintiffs' attempt to limit this testimony to a period when Quest had full-time receptionists is unavailing because Rachfal **still admits** that ACB received no complaints; his testimony about why that was so is inadmissible speculation about the states of minds of countless third parties (Fed. R. Evid. 602), and Quest never reduced staffing (including receptionists) in connection with the Kiosk rollout.  (App. 4 ¶ 10 and Fact No. A8 below.)  Moreover, ACB's response to the Request for Admission that it "lacks sufficient information" actually admits that it lacks information to deny the request, namely, that it is **NOT** aware of any complaint about paper sign-in.  Finally, and significantly, given the opportunity to do so here, Plaintiffs provide no evidence of any kind of any complaint about paper sign-in.   The fact that the paper sign-in process, when combined with phlebotomist assistance with check-in, yielded no complaints of which any party is aware is plainly relevant to the question of whether the initial version of the Kiosks, when combined with phlebotomist assistance with check-in, constituted "effective communication" in the check-in process.

| A6. | Plaintiffs have not offered any evidence that Vargas, any ACB member, or any other Quest patient, had ever requested a sign-in process that was independently accessible to the blind without phlebotomist assistance. <br><br> App. 16 at 2-3 (Responses to RFAs Nos. 1 and 2); App. 17 at 115:20-116:5. | Disputed in part. Disputed insomuch as the cited evidence does not support the purported fact. For instance, the cited testimony from Mr. Rachfal's deposition relates to when Quest employed full-time receptionists to help all customers, something it no longer has at most of its locations. (App. 17 at 115:20-116:5). In addition, in its RFA response Plaintiff ACB states that it cannot admit or deny the request because it lacks sufficient information. It therefore cannot support Defendants' purported "fact." (App. 16 at 2-3.) <br><br> See also, Objections to Evidence (The accessibility of a prior check-in system that was not in use at any Quest PSC during the Class Period is irrelevant to the resolution of this |

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | | action).<br><br>See, Ex. 20 at PA0640:18-641:1 [Walsh dep.]; Ex. 5, at PA0027:8-13, PA0028:1-8 [Yarrison dep.]; Ex. 19, at PA0623:19-25 [Aronson dep.] (Quest implemented ECSS at all 2,152 PSCs nationwide beginning in 2016). |

**A6.** <u>Defendants' Response:</u> Plaintiffs do not fully dispute the fact, only contending that not all of Defendants' evidence supports the fact. This is incorrect. In attempting to prove a negative, or absence of request, Defendants offer evidence from Mr. Rachfal, ACB's 30(b)(6) witness, inquiring about awareness of any request for a sign-in process that was independently accessible to the blind; he had none. (App. 17 at 1237:20-1238:2 (answering "no").) Plaintiffs' attempt to limit this testimony to a period when Quest had full-time receptionists is unavailing because Rachfal still admits that ACB received no complaints (and therefore no requests for fully-accessible sign-in); his testimony about why that was so is inadmissible speculation about the states of minds of countless third parties (Fed. R. Evid. 602), and Quest never reduced staffing (including receptionists) in connection with the Kiosk rollout. (App. 4 ¶ 10 and Fact No. A8 below.) Evidence cited by Plaintiffs from Exs. 20, 5 and 19 is about Kiosks' implementation, not any request for an accessible sign-in process. Moreover, ACB's response to the Request for Admission that it "lacks sufficient information" actually admits that it lacks information to deny the request, namely, that it is **NOT** aware of any request for a fully-accessible sign-in process. Finally, and significantly, given the opportunity to do so here, Plaintiffs provide no evidence of any kind of any complaint about paper sign-in.   As to relevance, the fact that the paper sign-in process, when combined with phlebotomist assistance with check-in, yielded no requests for an accessible sign-in process of which any party is aware is plainly relevant to the question of whether the initial version of the Kiosks, when combined with phlebotomist assistance with check-in, constituted "effective communication" in the check-in process.

| A7. | In 2015, to improve the experience of patients and employees at PSCs through digitization, Quest began to explore ways to modify its PSC check-in practices, along with other aspects of its patient interaction – from making appointments and pre-registration for the visits to how one checks in.<br><br>App. 4 ¶ 6; App. 18 at 29:10-30:8, 31:2-12, 37:20-39:17. | Disputed.<br><br>Disputed that the purpose of the ECSS kiosk was to improve patient experience. In fact, in the internal Quest document setting forth the business case for ECSS – referred to internally at Quest as the Cap Ex – the stated "rationale" for moving to a kiosk-based check-in system was "cost savings."<br><br>See, Ex. 20, at PA0636:10-24, PA0669:25-670:10, PA0668:15-25, PA0676 [Walsh dep. and exhibit].<br><br>See also, the following citations, |

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | | also included in the evidentiary objections, which directly contradict Defendants' purported "fact": Ex. 34 at PA0948:8-14, PA0949:10-17. [Yarrison dep.] |

A7.   <u>Defendants' Response</u>:  Ignoring testimony and other documents with better evidence of Quest's motivations, Plaintiffs cite to a single, financial document -- the Capital Expenditure Request (the "CapEx") -- seeking approval of millions of dollars in expenditures to attempt to distort and falsely reduce to a single motive the true motivations of the co-sponsors of the Kiosk program.  Each of the two co-sponsors testified that the nature of the document and the budgetary approval process required an analysis of the financial impact of the Kiosk program.  (Pl. Ex. 20 at 668:20-25; Grant Depo. at 69:6-70:8, Ex. B to Suppl. Raizman Decl.)  But that does not mean that the financial soundness of the Kiosk program was the reason for its adoption.  In fact, each of the co-sponsors gave unambiguous testimony that the motivation for the Kiosk was, as stated in this Fact No. 7, to improve the patient and phlebotomist experience. (Walsh Depo. (Ex. C to Suppl. Raizman Decl.) at 27:10-28:8; Grant  Depo. at 63:23-64:4, Ex. B to Suppl. Raizman Decl.) The "business justification" document, which Plaintiffs conveniently ignore, corroborates this principle motivation, not the cost-saving motivation Plaintiffs falsely ascribe to Quest. (New Patient Experience – Deployment CapEx Request – QUEST-VARGAS 39963 (Ex. E to Suppl. Raizman Decl.) Even assuming the CapEx accurately describes a financial motivation for the Kiosk program, that does not negate or dispute the motivations stated in this Fact No. A7.

| A8. | None of these modifications eliminated or reduced available employee assistance to any patient facing challenges with the technology or who simply prefers human interaction.<br><br>App. 4 ⁋ 10. | Disputed.<br><br>The entire rationale of ECSS was to save Quest tens of millions of dollars in costs by reducing employee interaction with patients, thereby allowing the company to see greater numbers of patients per day. By its very design, then, ECSS resulted in less employee interaction with patients.<br><br>See, Ex. 20, at PA0638:24-640:3 (Walsh dep.: ECSS "help" button inaccessible to blind individuals), PA0636:10-24, PA0669:25-670:10, PA0668:15-25, PA0676 [Walsh dep. and exhibit establishing the ECSS was projected to save over $40 million in costs through "efficiencies" earned by reducing phlebotomist contact with patients]); Ex. 5, at PA0031:20-38:20, and PA0049-57 [Yarrison dep. and exhibit]; Ex. 9, |

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | | at PA0247:18-24 [Grant dep.]; Ex. 6, at PA0092:25-96:25 [Carr dep.] (relating to complaints about no employees available to help patients check in); Ex. 31, at PA0858-875 [Derry dec.] (relating to no employees in waiting rooms to help patients); See Ex. 27, at PA0749 [QUEST-VARGAS 000042029; QUEST-VARGAS 000039512-39653] (showing 1,130 of its 2,152 PSCs have "1.5" or fewer employees following ECSS rollout |
| | | See also, the following citations, also included in the evidentiary objections, which directly contradict Defendants' purported "fact": Ex. 34 at PA0944:1-PA0945:10, PA0950:18-PA0951:3, PA0952:19-25, PA0945:11-PA0946:7, PA0956:4-10, PA0959:6-12, PA0960:6-9, PA0953:5-18, PA0947:1-8, PA0957:10-24, PA0954:14-PA0955:10, PA0948:8-14, PA0949:10-17, PA0944:1-PA0945:10, PA0961-PA0969. [Yarrison dep., Exhibit #6 to Yarrison dep., Exhibit #6 to Yarrison dep.] |
| A8. | _Defendants' Response:_ As noted in Defendants' Response to Fact No. A7, incorporated by reference here, Plaintiffs at best grossly distort the motivation for the Kiosk program. In fact, the CapEx document actually projects **no** cost reduction as part of the Kiosk reduction. (Ex. 27.) Any "savings" is not the result of a staff reduction or cost reduction, but a per-patient "savings" because more time means that more patients can be seen without adding staff. (New Patient Experience – Deployment CapEx Request – QUEST-VARGAS 39963 (Ex. E to Suppl. Raizman Decl.) What Plaintiffs' evidence does not dispute and cannot is that no staff reductions in the PSCs were planned in connection with the Kiosks' rollout. In fact, Ex. 34 specifically states that there would not be fewer employees, and Quest would keep the same staff. (Ex. 34 at 944-951:3.) | |
| A9. | After considering a wide variety of options, in April 2016, Quest chose to install, over a two-and-a-half year rollout, one or more electronic, touchscreen tablets to allow patients to check in at each of | Disputed in part. Specifically, Plaintiffs dispute the last sentence as the record indicates that patients were not "free to...us[e] employee assistance available to blind and sighted persons to check in." Plaintiffs further dispute any |

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | its PSCs. The tablets, when placed in plastic casings and mounted on posts, were known as "Kiosks." A Kiosk user would be prompted to check in by entering a first and last name, birthday and phone number. Once they had done so, the Kiosk would automatically check them in and place them in queue to be served. The queue, with estimated wait times, would also be displayed on one or more of the "Quest TV" monitors present at each PSC. Patients were free to use or forego the Kiosk, using employee assistance available to blind and sighted persons to check in.<br><br>App. 4 ¶¶ 7-8, 10. | implication that ECSS only allowed a person to check in; in fact, ECSS offered several additional services beyond check in. Finally, Plaintiffs also dispute that the ECSS rollout occurred over the course of a full "two and-a-half" year period, as deposition testimony indicates it took at most two years.<br><br>See also, Evidentiary Objections (compound).<br><br>For Dispute 1 (re: no employee available to help check-in): See, Ex. 6, at PA0092:25-94:5 [Carr dep.]; (complaint Quest received about no one being at front desk); Ex. 31, at PA0858-75 [Derry dec.: finding that a phlebotomist swept the waiting area at only 1 of 24 investigated locations].); Ex. 10 at PA0346:3-5, PA0362:5-6, PA0365:9-14, PA0368:15-19; PA0369:2-6; PA0369:7-22; PA0369:23-370:2; PA0370:3-23; Ex. 12, at PA0520:23-521:5, PA0522:10-17, PA0523:4-524:16 [Bazyn dep.]; Ex. 11, at PA0507:4-510:19, PA0511:16-512:5, PA0513:15-514:19 [Black dep.]; Ex. 17, at PA0566:10-568:7, PA0569:6-571:2, PA0571:16-19, PA0574:1-21, PA0575:4-576:5 [Brink dep.]; Ex. 15, at PA0548:21-549:8, PA0550:22-552:4 [Grahmann dep.]; Ex. 14, at PA0537:10-540:9, PA0541:8-542:9, PA0543:9-544:1 [N. Haroyan dep.]; Ex. 13, at PA0529:3-530:23, PA0531:3-532:2 [M. Haroyan dep.]; Ex. 16, at PA0559:15-560:13, PA0561:14-21, PA0562:15-21 [Lyons dep.]; Ex. 22, at PA0695:8-24, PA0696:23-698:1, PA0701:16-21 [Stanley dep.]<br><br>For Dispute 2 (re: ECSS kiosk's benefits and services): See, Ex. 32, at PA0876-900, ¶¶ 10-51 |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | | [Montgomery dec.]; Ex. 20, at PA0659:1-24, PA0660:23-62:14, PA0667:1-8 [Walsh dep.]; Ex. 6, at PA0086:11-87:24 [Carr dep.]; Ex. 9, at PA0242:14-243:13 [Grant dep.]. |
| | | For Dispute 3 (re: timing of rollout): See, Ex. 20, at PA0640:18-641:1 [Walsh de[.]; Ex. 5, at PA0027:8-13, PA0028:1-8 [Yarrison dep.]; Ex. 19, at PA0623:19-25 [Aronson dep.]. |
| | | See also, the following citations, also included in the evidentiary objections, which directly contradict Defendants' "fact": Ex. 34 at PA0944:1-PA0945:10, PA0950:18-PA0951:3, PA0952:19-25, PA0945:11-PA0946:7, PA0956:4-10, PA0959:6-12, PA0960:6-9, PA0953:5-18, PA0947:1-8, PA0957:10-24, PA0954:14-PA0955:10, PA0948:8-14, PA0949:10-17, PA0944:1-PA0945:10, PA0961-PA0969. [Yarrison dep., Exhibit #6 to Yarrison dep.] |

A9.   Defendants' Response: Plaintiffs' "dispute" with the last sentence is purely semantic.  They do not dispute, nor could they, that Quest's plan was to use phlebotomist assistance in connection with the Kiosks' rollout.  Instead, they point to evidence that they say stands for the proposition that the phlebotomist assistance was unavailable or not as timely.  Plaintiffs' evidence of isolated incidents of longer wait times is not a violation of law, nor does it dispute the availability of phlebotomist assistance.  *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017). Indeed, some of Plaintiffs' evidence reflects that blind patients were promptly assisted.  (App. 26 at 1382:1-7; 1387:2-14 (ACB member helped between 3-5 minutes on one visit and helped immediately on another visit).)  ███████████, an ACB member, wrote in response to an open ACB inquiry about problems at Quest, "There have always been an attendant to take info or had to have someone sign name on the list when the attendant was in back."  (PL00687, Ex. G to Suppl. Raizman Decl.)  ███████████ wrote that, "[o]n 6/3/20, her friend told her the kiosk wasn't even there and someone outside was checking people in."  (*Id.*)  Or, ███████████, "had a staff member at the center help him check in for appointments."  (Ex. 24 at PA0710.)  Even Mark Derry's completely random visits to 24 PSCs yielded instances of patients being greeted immediately.  (Ex. 31 at PA0873 ("Large reception room with person behind a desk."); *see also* App. 27 at 1403:6-14, 1404:24-1405:4, 1409:21-24, 1412:19-1413:1, App. 26 at 1348:16-20, 1349:11-1350:12.)  This is why Plaintiffs'

9

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | isolated, anecdotal evidence cannot be used to prove programmatic inaccessibility. *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017); 28 C.F.R. § 36.211(b). )  All of the evidence submitted by Plaintiffs demonstrates that every blind patient who sought them received diagnostic services at Quest. | |
| A10. | Quest took care to ensure that it satisfied the explicit design standards applicable to the Kiosks in ADA Standards for Accessible Design (36 C.F.R. Pt. 1191, App. B & D, "ADAS"), including that all of the operable parts of the Kiosk were within "reach range" of someone using a wheelchair (ADAS 308, 309) and that the freestanding Kiosks were detectable by blind cane users (ADAS 307).<br><br>App. 4 ¶ 9. | Disputed in part. Undisputed that Quest considered ADA standards related to wheelchair users. Disputed that Quest considered accessibility needs of its blind customers, as Quest's own executives repeatedly testified that blind users were never considered.<br><br>See, Ex. 20, at PA0652:2-654:9, PA0674:4-675:20 [Walsh dep.]; Ex. 5, at PA0045:4-47:3, PA0049-64 [Yarrison dep. and Exhibits from Yarrison dep.]; Ex. 19, at PA0627:12-16, PA628:20-629:6 [Aronson dep.] |
| A10.  Defendants' Response:  Quest's undisputed evidence indicates that Yarrison, Quest's 30(b)(6) witness on this issue, and his team considered the explicit design standards applicable to Kiosks, including ADAS 307, a provision expressly directed at cane users.  (App. 4 ¶ 9; Yarrison Depo. at 146:11-21, 189:2-8, Ex. A to Suppl. Raizman Decl.)  Moreover, those same ADA Standards expressly provide in an Advisory Note 707 that the design standards in ADAS 707 apply to ATMs, but not to interactive transaction machines (ITMs) like the Kiosk.  36 C.F.R. pt. 1191, App. B and D, ADAS 707, Advisory Note.  The fact that one Quest employee, Walsh, may not have considered blind users does not mean that Quest did not.  Some of Plaintiffs' evidence As a result, Quest properly considered the published ADA Standards precisely as stated in this Fact No. A10, and Plaintiffs' evidence does not dispute it. | | |
| A.11 | In designing the Kiosk, Quest could not anticipate or predict the future requests for "auxiliary aids and services" (42 U.S.C. § 12182(b)(2)(a)(iii)) or for "reasonable modification of policies, practices and procedures (42 U.S.C. § 12182(b)(2)(a)(ii)) that the ADA requires be considered when made. | Disputed. Defendants' IT development team was aware of ADA accessibility problems with the kiosks prior to Quest's nationwide rollout of ECSS. The IT team elevated these issues to project management yet Quest nonetheless elected to proceed with the rollout of a cheaper, totally inaccessible kiosk.<br><br>See, Ex. 20, at PA0645:10-646:21, PA0649:24-654:9, PA0655:5-25, PA0656:25-657:19, PA0658:1-19, PA0674:4-675:20 [Walsh dep.]; |

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | App. 4 ¶ 10. | Ex. 6, at PA0072:2-75:12, PA0081:4-84:5 [Carr dep.]; Ex. 5, at PA0041:21-42:3, PA0042:24-44:33, PA0049-64 [Yarrison dep. and exhibits from dep.]; Ex. 19, at PA0622:16-20, PA0627:12-16, PA0628:20-629:6 [Aronson dep.] |
| | | See also, the following citations, also included in the evidentiary objections, which directly contradict Defendants' "fact": Ex. 34 at PA0944:1-PA0945:10, PA0950:18-PA0951:3, PA0952:19-25, PA0945:11-PA0946:7, PA0956:4-10, PA0959:6-12, PA0960:6-9, PA0953:5-18, PA0947:1-8, PA0957:10-24, PA0954:14-PA0955:10, PA0948:8-14, PA0949:10-17, PA0944:1-PA0945:10, PA0961-PA0969. [Yarrison dep., Exhibit #6 to Yarrison dep.] |

**A11.** <u>Defendants' Response:</u> The collective evidence cited by both sides does not dispute this fact. Quest was aware of the ADA Standards design guidelines, which did not impose ATM-like design requirements on the Kiosks. In some of the evidence cited by Plaintiffs, Quest became aware, **after** the initial design and while rollout of the Kiosk, of isolated and statistically rare comments from Quest patients about technological features that could be added in future iterations of the device. The Three Finger Swipe was one such feature to make check-in independently accessible, and it was added by Quest after due consultation with ACB and members of the blind community. None of this evidence disputes that Quest was in a position to know how the Kiosks would be used and what feedback they may generate.

| A12. | In implementing the Kiosks, Quest was replacing an existing system of signing in on a paper sheet, which had worked successfully for years for its blind patients, with another, digital system of checking in that was accessible with the assistance of Quest phlebotomists. As it had for years, Quest was relying on its business model, approach to patient service, policies and phlebotomists' training to assist any and all patients, | Disputed. <br><br> The record demonstrates that after ECSS was rolled out nationwide, there was no Quest personnel available to help customers at the vast majority of PSCs. In addition, Quest personnel did not receive adequate training on assisting blind customers, according to multiple Quest employees. Finally, in moving to the ECSS system, Quest's business motive was cost savings, not helping patients. <br><br> See, Ex. 6, at PA0092:25-94:5 |

| | **Defendants' Uncontroverted Facts and Supporting Evidence[1]** | **Plaintiff's Response to Cited Fact and Supporting Evidence** |
|---|---|---|
| | including its disabled patients, with whatever needs they may have.<br><br>App. 4 ¶ 10; App. 3 ¶¶ 3-4. | [Carr dep.]; (complaint Quest received about no one being at front desk); Ex. 31, at PA0858-75 [Derry dec.: finding that a phlebotomist swept the waiting area at only 1 of 24 investigated locations].); |
| | | Ex. 10 at PA0346:3-5, PA0362:5-6, PA0365:9-14, PA0368:15-19; PA0369:2-6; PA0369:7-22; PA0369:23-370:2; PA0370:3-23 [Vargas dep.]; Ex. 20, at PA0669:25-670:10, PA0668:15-25, PA0676 Walsh dep. And exhibit "Cap Ex" describing cost savings] |
| | | See also, the following citations, also included in the evidentiary objections, which directly contradict Defendants' "fact": Ex. 36 at PA1017:13-19, PA1018:9-PA1019:1, PA1020:12-20, PA1021:24-1022:14, PA1023:3-20, PA1030:4-20. [Reilly dep.]. |
| | | Ex. 34 at PA0944:1-PA0945:10, PA0950:18-PA0951:3, PA0952:19-25, PA0945:11-PA0946:7, PA0956:4-10, PA0959:6-12, PA0960:6-9, PA0953:5-18, PA0947:1-8, PA0957:10-24, PA0954:14-PA0955:10, PA0948:8-14, PA0949:10-17, PA0944:1-PA0945:10, PA0961-PA0969. [Yarrison dep., Exhibit #6 to Yarrison dep.] |

A12.  Defendants' Response: None of Plaintiffs' evidence reflects any change in staffing between the period leading up to, and following the Kiosks' rollout. There was no change.  (CapEx; New Patient Experience – Deployment CapEx Request, Ex. E to Suppl. Raizman Decl.; Ex. 34 at PA0944-951:3 (specifically stating that there would not be fewer employees but Quest would keep the same staff).  The point of this still-undisputed fact was that Quest had no reason to expect that replacing the paper sign-in process that called for phlebotomist assistance, without any change in staffing, with a Kiosk that may require the same assistance.  From a blind patient's perspective, nothing was changing.

Nearly all of Plaintiffs' evidence relates to isolated instances of unfavorable experiences at Quest PSCs that Plaintiffs speculatively and inaccurately attribute to inadequate training.  Such isolated incidents do not support either a violation of

| Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|
| law or the inadequacy of training. *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017). Indeed, some of Plaintiffs' evidence reflects that blind patients were promptly assisted. Claire Stanley, the blind, former ACB advocacy director, testified that she waited between 3-5 minutes on one visit and was helped immediately on another visit. (App. 26 at 1382:1-7; 1387:2-14.) ███████, an ACB member, wrote in response to an open ACB inquiry about problems at Quest, "There has always been an attendant to take info or had to have someone sign name on the list when the attendant was in back." (PL00687, Ex. G to Suppl. Raizman Decl.) ████████████████ wrote that, "[o]n 6/3/20, her friend told her the kiosk wasn't even there and someone outside was checking people in." (*Id.*) Or, ███████████ "had a staff member at the center help him check in for appointments." (Ex. 24 at PA0710.) Even Mark Derry's completely random visits to 24 PSCs yielded instances of patients being greeted immediately. (Ex. 31 at PA0873 ("Large reception room with person behind a desk."); see also App. 27 at 1403:6-14, 1404:22-1405:4, 1409:21-24, 1412:19-1413:1, App. 26 at 1348:16-20, 1349:11-1350:12.) Ex. 10 at 370:3-23 states that a phlebotomist came out to call another patient and Vargas was able to interact with the phlebotomist. This is why Plaintiffs' isolated, anecdotal evidence cannot be used to prove programmatic inaccessibility. *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017); 28 C.F.R. § 36.211(b). | |
| **A13.** Quest's plan and business case for the Kiosk rollout did not include a plan to reduce then-existing PSC staffing or to replace PSC staff with Kiosks. Because electronic check-in and other improvements were expected to reduce transaction time for each patient by approximately one minute, Quest expected that phlebotomists would have additional time, among other things, to continue to address the needs of persons requiring assistance, including persons with disabilities.<br><br>App. 4 ¶ 11. | Disputed.<br><br>The entire purpose behind adopting ECSS was to reduce Quest phlebotomists' interactions with customers, thereby allowing the company to see more patients per day, increasing its efficiency and reducing its costs. While this may have resulted in an average reduction in wait time for sighted customers, Quest admits that it conducted no analysis of whether it reduced wait times for its legally blind customers. The record demonstrates that after ECSS was rolled out nationwide, there was no Quest personnel available to help customers at the vast majority of PSCs.<br><br>See, Ex. 6, at PA0092:25-94:5 [Carr dep.]; (complaint Quest received about no one being at front desk); Ex. 31, at PA0858-75 [Derry dec.: finding that a phlebotomist swept the waiting area at only 1 of 24 investigated locations].); Ex. 10 at PA0346:3-5, PA0362:5-6, PA0365:9-14, PA0368:15-19; PA0369:2-6; |

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL
FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | | PA0369:7-22; PA0369:23-370:2; PA0370:3-23 [Vargas dep.]; Ex. 20, at PA0669:25-670:10, PA0668:15-25, PA0676 [Walsh dep. and exhibit "Cap Ex" describing cost savings] |
| | | See also, the following citations, also included in the evidentiary objections, which directly contradict Defendants' "fact": Ex. 34 at PA0948:8-14, PA0949:10-17, PA0944:1-PA0946:10. [Yarrison dep.] |
| A13. | Defendants' Response: None of Plaintiffs' evidence reflects any change in staffing between the period leading up to, and following the Kiosks' rollout. There was no change. (CapEx; New Patient Experience – Deployment CapEx Request, Ex. E to Suppl. Raizman Decl.; Ex. 34 at PA0944-951:3 (specifically stating that there would not be fewer employees but Quest would keep the same staff). The point of this still-undisputed fact was that Quest had no reason to expect that replacing the paper sign-in process that called for phlebotomist assistance, without any change in staffing, with a Kiosk that may require the same assistance. From a blind patient's perspective, nothing was changing. Nearly all of Plaintiffs' evidence relates to isolated instances of unfavorable experiences at Quest PSCs that Plaintiffs speculatively and inaccurately attribute to reduced staffing. Such isolated incidents do not support either a violation of law or the inadequacy of staffing. *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017). Indeed, some of Plaintiffs' evidence reflects that blind patients were promptly assisted. Claire Stanley, the blind, former ACB advocacy director, testified that she waited between 3-5 minutes on one visit and was helped immediately on another visit. (App. 26 at 1382:1-7; 1387:2-14.) ██████, an ACB member, wrote in response to an open ACB inquiry about problems at Quest, "There has always been an attendant to take info or had to have someone sign name on the list when the attendant was in back." (PL00687, Ex. G to Suppl. Raizman Decl.) ████████ wrote that, "[o]n 6/3/20, her friend told her the kiosk wasn't even there and someone outside was checking people in." (*Id.*) Or, ███████ "had a staff member at the center help him check in for appointments." (Ex. 24 at PA0710.) Even Mark Derry's completely random visits to 24 PSCs yielded instances of patients being greeted immediately. (Ex. 31 at PA0873 ("Large reception room with person behind a desk."); see also App. 27 at 1403:6-14, 1404:24-1405:4, 1409:21-24, 1412:19-1413:1, App. 26 at 1348:16-20, 1349:11-1350:12.) Ex. 10 at 370:3-23 states that a phlebotomist came out to call another patient and Vargas was able to interact with the phlebotomist. This is why Plaintiffs' isolated, anecdotal evidence cannot be used to prove programmatic inaccessibility. *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017); 28 C.F.R. § 36.211(b). | |
| A14. | Quest also planned to identify problems that any of its patients may be experiencing | Disputed.<br><br>The record evidence establishes Defendants ignored multiple |

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | with the Kiosk through its extensive methods for soliciting and receiving patient complaints and feedback and engaging in the "iterative" process that is an inherent part of the rollout of any electronic or other technology.<br><br>App. 4 ¶¶ 12-13; App. 3 ¶¶ 19-20. | complaints from legally blind customers over several years to make the ECSS kiosks independently accessible.<br><br>See, Ex. 20, at PA0638:24-640:3, 674:4-17 [Walsh dep.] (help button not accessible to blind users and company knew ADA compliance was critical but ignored accessible options); Ex. 5, at PA0031:20-38:20, PA0049-64 [Yarrison dep. and exhibits]; Ex. 6, at PA0092:25-96:25 [Carr dep.]; Ex. 10, at PA0381:16-382:23 [Vargas dep., offering to provide suggestions for how to make kiosk accessible]; Ex. 4, at ¶¶ 2-4 at PA0018 [Vargas dec. re: kiosk still not accessible]; Ex. 24, at PA0709-715 [ACB discovery responses identifying members who experienced access issues]; Ex. 18, at PA0583:18-598:1; PA0608 [Rachfal dep. re: letter requesting primary consideration for screen readers, which Quest ignored].<br><br>Irrelevant (immaterial), Fed. R. Evid. 401 and 402. Purportedly applicable policies, trainings, standards, or procedures not produced in discovery in violation of Rule 26 should have no bearing on the analysis.<br><br>See also, the following citations, also included in the evidentiary objections, which directly contradict Defendants' purported "fact": Ex. 34 at PA0953:5-18, PA947:1-8, PA0954:14-PA0955:10, PA0957:10-24, PA0961-PA0969. [Yarrison dep., Exhibit #6 to Yarrison dep.] |

A14.  <u>Defendants' Response</u>: None of Plaintiffs' evidence disputes Quest's evidence that Quest: (a) made extensive efforts to receive and track patient feedback; and (b) that iterations were made to the device in response to some of those comments. For example, in Exhibit 6, Carr testified that Quest received customer feedback to make the experience better and shares some of the iterations that occurred over time. (Ex. 6 at PA0093:12-94:1.)  Indeed, the Three Finger Swipe was yet another iteration implemented that provided a means of

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | independent access. | |
| A15. | Quest always contemplated Kiosk implementation to be an "iterative" process.  Namely, Quest knew that it would continue to study the actual experience of Kiosk users and address any problems through future changes, modifications and alterations (i.e., iterations) to the Kiosk or the processes associated with the Kiosks' usage.<br><br>App. 4 ⸿ 13. | Disputed.<br><br>The evidence establishes Defendants ignored multiple complaints from legally blind customers to make the kiosks independently accessible.<br><br>See, Ex. 20, at PA0638:24-640:3, 674:4-17 [Walsh dep.] (help button not accessible to blind users and company knew ADA compliance was critical but ignored accessible options]; Ex. 5, at PA0031:20-38:20, PA0049-64 [Yarrison dep. and exhibits]; Ex. 6, at PA0092:25-96:25 [Carr dep.]; Ex. 10, at PA0381:16-382:23 [Vargas dep., offering to provide suggestions for how to make kiosk accessible]; Ex. 4, at ¶¶ 2-4 at PA0018 [Vargas dec. re: kiosk still not accessible]; Ex. 24, at PA0709-715 [ACB discovery responses identifying members who experienced access issues]; Ex. 18, at PA0583:18-598:1; PA0608 [Rachfal dep. re: letter requesting primary consideration for screen readers, which Quest ignored].<br><br>See also, the following citations, also included in the evidentiary objections, which directly contradict Defendants' purported "fact": Ex. 34 at PA0953:5-18, PA947:1-8, PA0954:14-PA0955:10, PA0957:10-24, PA0961-PA0969. [Yarrison dep., Exhibit #6 to Yarrison dep.] |
| A15.  <u>Defendants' Response</u>: None of Plaintiffs' evidence disputes Quest's evidence that Quest: (a) made extensive efforts to receive and track patient feedback; and (b) that iterations were made to the device in response to some of those comments.  For example, in Exhibit 6, Carr testified that Quest received customer feedback to make the experience better and shares some of the iterations that occurred over time. (Ex. 6 at PA0093:12-94:1.)  Indeed, the Three Finger Swipe was yet another iteration implemented that provided a means of independent access. | | |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| A16. | Quest expected to gather information about Kiosk user experience by, among other things, (1) studying usage at some early rollout PSCs, (2) monitoring patient feedback, including feedback provide to patient service representatives at the PSCs and through the surveys it routinely takes of PSC visitors, and (3) its ongoing system of receiving and responding to patient concerns and complaints.<br><br>App. 4 ¶ 13; App. 3 ¶¶ 20-21; App. 9. | Disputed:<br><br>The evidence establishes Defendants ignored multiple complaints from legally blind customers to make the kiosks independently accessible.<br><br>See also, Evidentiary Objections (re: sham affidavit conflicting with deposition testimony).<br><br>See, Ex. 20, at PA0638:24-640:3, 674:4-17 [Walsh dep.] (help button not accessible to blind users and company knew ADA compliance was critical but ignored accessible options); Ex. 5, at PA0031:20-38:20, PA0049-64 [Yarrison dep. and exhibits]; Ex. 6, at PA0092:25-96:25 [Carr dep.]; Ex. 10, at PA0381:16-382:23 [Vargas dep., offering to provide suggestions for how to make kiosk accessible]; Ex. 4, at ¶¶ 2-4 at PA0018 [Vargas dec. re: kiosk still not accessible]; Ex. 24, at PA0709-715 [ACB discovery responses identifying members who experienced access issues]; Ex. 18, at PA0583:18-598:1; PA0608 [Rachfal dep. re: letter requesting primary consideration for screen readers, which Quest ignored]. ; Ex. 21, at PA0683-88, 67:2-71:7, 53:19-24, 71:3-7 [Magana dep. re: no idea what primary consideration is and no memory of every providing an accommodation for a blind patient].<br><br>See also, the following citations, also included in the evidentiary objections, which directly contradict Defendants' "fact": Ex. 36 at PA1017:13-19, PA1018:9-PA1019:1, PA1020:12-20, PA1021:24-1022:14, PA1023:3-20, PA1030:4-20. [Reilly dep.]. |

A16.  <u>Defendants' Response</u>: None of Plaintiffs' evidence disputes Quest's evidence that Quest: (a) made extensive efforts to receive and track patient feedback; and (b) that iterations were made to the device in response to some of

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS
48700369_1.docx

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | those comments.  For example, in Exhibit 6, Carr testified that Quest received customer feedback to make the experience better and shares some of the iterations that occurred over time. (Ex. 6 at PA0093:12-94:1.)  Indeed, the Three Finger Swipe was yet another iteration implemented that provided a means of independent access. | |
| A17. | Between 2016 and 2020, Patient Advocacy received feedback from forty-five (45) patients (or their advocates) about either the inaccessibility of the Kiosks or inadequate staffing at the PSCs.<br><br>App. 3 ¶ 21; App. 9. | Undisputed this is what Defendant's produced records indicate is the number of complaints from legally blind customers. Disputed that only 45 legally blind individuals experienced accessibility issues at the kiosks.<br><br>See, e.g., complaints from Vargas and ACB members: Ex. 24, at PA0709-715 [ACB discovery responses]; Ex. 10, at PA0381:16-382:4, PA0382:13-23 [Vargas dep.].<br><br>See also, the following citations, also included in the evidentiary objections, which directly contradict Defendants' "fact": Ex. 36 at PA1017:13-19, PA1018:9-PA1019:1, PA1020:12-20, PA1021:24-1022:14, PA1023:3-20, PA1030:4-20. [Reilly dep.]. |

A17.  <u>Defendants' Response:</u>   Contrary to Plaintiffs' misinterpretation of the Patient Advocacy feedback, the spreadsheet merely reflects 45 patients who identified as blind and who (over four years) reported any complaints about the Kiosks or staffing.  Many of the reported items were feedback or complaints about the staffing at the PSCs or other items aside from the Kiosks' accessibility.  Indeed, several comments reflect no interest in technological accessibility of the Kiosk.  While it is trivially true that Quest cannot report patient feedback that it did not receive and record through its multiple processes of receiving and recording such feedback, Plaintiffs have likewise failed to produce any large number of complaints.  Even ACB, a blind advocacy membership organization that sent out a survey to over its thousands of members and multiple affiliated organizations, only elicited 28 comments about the Kiosks, some of which reflected that the respondents had no difficulty using the PSCs with phlebotomist assistance. (Ex. D to Suppl. Raizman Decl. (Stanley Depo at 172:5-13, 175:11-14 and 17:19, 178:2-10, 180:11-14, 180:25-181:14), Stanley Exs. 69 and 111.)

| A18. | In December 2018, ACB's Executive Director, Eric Bridges, sent near-identical letters about the Kiosks to Quest's General Counsel and | Undisputed Mr. Bridges sent the cited letters.<br><br>Disputed as cited evidence does not support contention of "near- |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | its CEO on behalf of unidentified members of ACB.<br><br>App. 19 at 17:8-22, 127:24-128:4, 132:4-15, 186:14-25; App. 20. | identical" letters.<br><br>See, App. 19 at 17:8-22, 127:24-128:4, 132:4-15, 186:14-25; App. 20 [nothing stating letters are near-identical]. |
| A18. | **Defendants' Response:** Claire Stanley testified that a near-identical letter at the same time to Quest's General Counsel (Stanley Depo at 190:6-13, Ex. D to Suppl. Raizman Decl.).  The letter is, in fact, near-identical, but it is not necessary to submit that letter on reply because the precise contents of that letter are immaterial to this motion or this dispute.  Rather, through this fact and Plaintiffs' absence of dispute to Facts Nos. A19-A21 and to a portion of Fact No. A22, Quest establishes that it engaged in prolonged and active correspondence with ACB about improving the Kiosks' accessibility leading up to Vargas' and West filing a suit on the same subject matter of those discussions in September 2019. | |
| A19. | Quest responded to the letters on January 2, 2019, and its then-Director of National Patient Services, Chris Grant, and an in-house Quest lawyer had two discussions with ACB (January 25, and April 12, 2019) and exchanged multiple emails.<br><br>App. 19 at 137:7-138:17, 141:22-142:8, 142:24-143:2, 149:3-13, 152:7-153:1; App. 21; App. 29; App. 7; App. 23. | Undisputed. |
| A20. | By July 2019, ACB had retained counsel Matthew Handley, who continued to correspond with Quest's representatives.<br><br>App. 19 at 158:4-11, 211:14-214:5; App. 7. | Undisputed. |
| A21. | While discussions between Quest and ACB continued, on September 18, 2019, Quest was sued without notice in this action by Vargas and former plaintiff Anne West.  At the January 10, 2020 Scheduling | Undisputed Plaintiffs sued Quest on September 18, 2019.<br><br>Disputed that Quest did not have notice of its inaccessible kiosk, as it knew of its inaccessibility, knew of low-cost accessible options, and |

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | Conference, Vargas, West and Quest agreed to an early mediation of this dispute, which occurred on March 12, 2020. Eventually, in April 2020, ACB sought to join this action.<br><br>ECF Nos. 1, 33, 34, 40. | knew of the blind users' complaints, including Plaintiff Vargas' complaint to his Quest phlebotomist.<br><br>See also, Evidentiary Objections (re: immaterial fact).<br><br>See, Ex. 10, at PA0381:16-382:4, PA0382:13-23 [Vargas dep.]; Ex. 20, at PA0638:24-640:3, 674:4-17 [Walsh dep.] (help button not accessible to blind users and company knew ADA compliance was critical but ignored accessible options); Ex. 5, at PA0031:20-38:20, PA0049-64 [Yarrison dep. and exhibits]; Ex. 6, at PA0092:25-96:25 [Carr dep.]. |
| A21. **Defendants' Response:** Plaintiffs' evidence does not dispute the critical part of the fact as stated, namely, that neither Vargas nor West, nor their lawyers at the time of the lawsuit (Nye Sterling, *et al.*) provided any notice to Quest of *their lawsuit.* | | |
| A22. | West dismissed her claims with prejudice on May 27, 2021.<br><br>ECF No. 78. | Undisputed. |
| A23. | While ACB occasionally referred to making the Kiosks "independently accessible" to its blind members, at no point during these discussions did ACB demand a specific method or technology to replace or supplement the existing Kiosks.<br><br>App. 2 Decl. ¶¶ 3, 5; App. 17 at 188:22-191:15, 192:8-194:8; App. 29; App. 21; App. 7. | Disputed.<br><br>See also, Evidentiary Objections (re: immaterial fact)<br><br>ACB made clear that it wanted Quest to provide an ECSS kiosk that is independently accessible to its legally blind customers.<br><br>See, Ex. 40, at PA1063:15-PA1064:21, PA1065:22-PA1061:14. [Additional Stanley dep.]; Ex. 18, at PA0599:7-608 [Rachfal dep.].<br><br>and Ex. 38 at PA1045:9-PA1056:9. [Additional Rachfal dep.]<br><br>See also, the following citations, also included in the evidentiary objections, which directly contradict Defendants' "fact": Ex. 37 at PA1037:16-24, PA1040:18- |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | | 25, PA1041:6-16, PA1042:22-PA1043:5, PA1036:20-23, PA1038:5-17. [Grant dep.] |

A23.  <u>Defendants' Response</u>:  Plaintiffs' putative characterization of their dispute – that ACB mentioned independent access – is actually part of Quest's stated fact. In any event, neither Plaintiffs' stated dispute nor its evidence actually disputes that ACB or Plaintiffs never suggested a specific mode of "effective communication."  In fact, the Bridges letter makes reference to the lack of adequate staffing at a PSC, which fact Plaintiffs admit below.  (See Fact No. 25.)  ACB's Rule 30(b)(6) witness, Clark Rachfal, confirmed that no specific solution was sought.  (App. 17 at 1239:22-1240:17; 1241:4-11; 1242:7-15.)  This corroborates the complete absence of any such suggestions being made in any of the written correspondence with Quest or in any of ACB's own notes and logs of the discussions.  (Exs. 38 at PA1052:5-1056:9, 40.)

| | Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| A24. | ACB first identified a member on whose behalf it was speaking to Quest in a December 10, 2019 letter.<br><br>App. 7. | Undisputed. |
| A25. | ACB's initial letters explicitly referenced a concern that certain PSCs did not have sufficient Quest phlebotomists in the PSC waiting rooms to assist patients with check-in.<br><br>App. 20. | Undisputed that this concern was raised in the letter. Disputed that this was the only concern raised in the letter.<br><br>See also, Evidentiary Objections (re: immaterial fact).<br><br>See, Ex. 40, at PA1063:15-PA1064:21, PA1065:22-PA1061:14. [Additional Stanley dep.]; Ex. 18, at PA0599:7-607:8; 608 [Rachfal dep.] and Ex. 38 at PA1045:9-PA1056:9. [Additional Rachfal dep.]. |

A25.  <u>Defendants' Response</u>:  Plaintiffs' putative dispute with this Fact No. A25 does not dispute the fact as stated.

This fact is plainly relevant to Plaintiffs' current demand that only an "independently accessible" device will satisfy Quest's obligations under the ADA.  The Fact is also material to Quest's response to ACB's concerns, as well as the feedback received from a few other blind patients who expressed no interest in an independently accessible device, but expressed an interest in a "service" solution to checking in.  Whether Quest engages in "effective communication" through an "independently accessible" device or through phlebotomist assistance or some combination of the two is the central issue in this lawsuit.  ACB's original concerns, as expressed in Mr. Bridges' letter, contrasts sharply with the independently-accessible-only position now taken by Plaintiffs in this action.

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|---|
| | A26. | In response to the discussions with ACB and the impending mediation, Quest undertook an extensive, months-long exploration of methods it could use to enhance the Kiosk check-in process so that blind users could independently check in.<br><br>App. 2 ¶ 4; App. 1 ¶¶ 3-4. | Disputed that Quest took this action in response to ACB's requests. When asked whether Quest gave ACB's request primary consideration, Quest asserted privilege and instructed the witnesses not to answer. To date, Quest has not produced any evidence that it gave primary consideration to ACB's requests. Quest's purported solution – "three finger swipe" – has not been rolled out across Quest's PSC network and is rife with accessibility issues in its own rite. |
| | | | Ex. 35, at PA0999:13-16, PA1000:2-PA1003:23, PA1004:6-12, PA1005:22-1008:21, PA1012:2-PA1014:20. [Carr dep.] |
| | | | Ex. 18, at PA0599:7-607:8; 608 [Rachfal dep.]; Ex. 10, at PA0382-83 [Vargas dep.] at 133:17-135:24; Ex. 31, at PA0858-875 [Derry dec. re: TFS issues in PSCs] |
| | | | Ex. 32 [Montgomery dec.] at PA0876- 900; |
| | | | Ex. 36 at PA1017:13-19, PA1018:9-PA1019:1, PA1020:12-20, PA1021:24-1022:14, PA1023:3-20. [Reilly dep.]. |
| | | | Ex. 21, at PA0683, 688 [Magana dep.] at 53:7-18, 71:3-7; |
| | | | Ex. 39, at PA1058:8-21, PA1059:16-19, PA1060:6-11, PA1061:22-24. [Additional Magana dep.]. |
| | | | Ex. 35, at PA0975:11-7, PA0981:4-17, PA0984:13-16, PA0986:15-22, PA0987:9-19, PA0982:1-8, PA0991:3-18, PA0992:15-25, PA0993:2-10, PA0993:24-PA0994:8, PA0994:13-24, PA0995:1-7, PA1007:3-13, PA1012:2-PA1014:20, PA1009:12-PA1011:3. [Carr dep.]<br><br>See also, the following citations, |

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | | also included in the evidentiary objections, which directly contradict Defendants' "fact": Ex. 35, at PA0975:11-7, PA0981:4-17, PA0984:13-16, PA0986:15-22, PA0987:9-19, PA0982:1-8, PA0991:3-18, PA0992:15-25, PA0993:2-10, PA0993:24-PA0994:8, PA0994:13-24, PA0995:1-7, PA1007:3-13, PA1012:2-PA1014:20, PA1009:12-PA1011:3. [Carr dep.] |
| | | Ex. 37 at PA1037:16-24, PA1040:18- 25, PA1041:6-16, PA1042:22-PA1043:5, PA1036:20-23, PA1038:5-17. [Grant dep.] |

A26.  <u>Defendants' Response:</u>  None of Plaintiffs' evidence disputes Quest's assertion that its implementation of the Three Finger Swipe was in response to all of the feedback it had received, including ACB's, about the desire for an independently accessible means of checking in. Similarly, Plaintiff has only speculation and no evidence that Quest's work on the Three Finger Swipe was in reaction to the lawsuit and not to its ongoing discussions with ACB.

Vargas' and West's lawsuit in Fall 2019 did change the nature of Quest's consideration of added modes of effective communication and of the complexion of the discussions with ACB that had been taking place at that point.  Any agreement with ACB would not fully or necessarily resolve Quest's legal exposure without consultation with Vargas and West and the putative class counsel who represented them, and any attempt to implement new technology would have to pass legal muster in the now-pending litigation.  As a result, Quest's legal counsel became directly involved in all of these discussions and efforts.  For those reasons, direct questions at deposition about Quest's reactions to specific kinds of technology, properly drew attorney-client, work product objections, which Plaintiffs have not challenged.  There is nothing privileged, however, in saying that Quest considered the feedback it received from all quarters in coming up with the Three Finger Swipe.  In fact, Quest did not claim a privilege as to (and provided both documents and testimony of) its consultations with members of the blind community (including ACB) in the process that led to the development of the Three Finger Swipe. It is baseless speculation for Plaintiffs to claim that Quest's actions were a response to the lawsuit and not to the interaction with the three groups, in addition to ACB.

Mark Derry's Declaration and report are inadmissible for the reasons stated in the accompanying Objections and in the Reply Brief.

Nearly all of Plaintiffs' evidence relates to isolated instances of unfavorable experiences at Quest PSCs that Plaintiffs speculatively and inaccurately attribute to.  Such isolated incidents do not support either a violation of law or the inadequacy of training. *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017). Indeed, some of Plaintiffs' evidence reflects that blind

23

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | patients were promptly assisted. Claire Stanley, the blind, former ACB advocacy director, testified that she waited between 3-5 minutes on one visit and was helped immediately on another visit. (App. 26 at 1382:1-7; 1387:2-14.) Ardis Bazyn, an ACB member, wrote in response to an open ACB inquiry about problems at Quest, "There has always been an attendant to take info or had to have someone sign name on the list when the attendant was in back." (PL00687, Ex. G to Suppl. Raizman Decl.) Debby Downey wrote that, "[o]n 6/3/20, her friend told her the kiosk wasn't even there and someone outside was checking people in." (*Id.*) Or, Don Moore "had a staff member at the center help him check in for appointments." (Ex. 24 at PA0710.) Even Mark Derry's completely random visits to 24 PSCs yielded instances of patients being greeted immediately. (Ex. 31 at PA0873 ("Large reception room with person behind a desk."); see also App. 27 at 1403:6-14, 1404:24-1405:4, 1409:21-24, 1412:19-1413:1, App. 26 at 1348:16-20, 1349:11-1350:12.) Ex. 10 at 370:3-23 states that a phlebotomist came out to call another patient and Vargas was able to interact with the phlebotomist. | |

48700369_1.docx

| A27. | Quest solicited feedback from three different groups (including focus groups) of blind individuals or individuals who worked with accommodating the blind to understand what blind consumers wanted when interacting with electronic technology.<br><br>App. 1 ¶¶ 3-6. | Disputed that there is admissible record evidence that Quest solicited feedback from three different groups, as this evidence was not produced during discovery. It was produced for the first time in support of this Motion well after the close of fact discovery. In addition, the Quest Rule 30(b)(6) witness designated to testify on three-finger swipe Taylor Carr was repeatedly instructed by Quest's counsel not to answer questions related to three-finger swipe or whether they gave ACB's requests primary consideration on the basis of privilege. |
|---|---|---|
| | | Ex. 35, at PA0999:13-16, PA1000:2-PA1003:23, PA1004:6-12, PA1005:22-1008:21, PA1012:2-PA1014:20. [Carr dep.] |
| | | Ex. 18, at PA0599:7-607:8; 608 [Rachfal dep.]. |
| | | Ex. 10, at PA0382-83 [Vargas dep.] at 133:17-135:24; |
| | | Ex. 31, at PA0858-875 [Derry dec. re: TFS issues in PSCs] |
| | | Ex. 32 [Montgomery dec.] at PA0876-900; |
| | | Ex. 36 at PA1017:13-19, PA1018:9-PA1019:1, PA1020:12-20, PA1021:24-1022:14, PA1023:3-20. [Reilly dep.]. |
| | | Ex. 21, at PA0683, 688 [Magana dep.] at 53:7-18, 71:3-7; |
| | | Ex. 39, at PA1058:8-21, PA1059:16-19, PA1060:6-11, PA1061:22-24. [Additional Magana dep.]. |
| | | See also, the following citations, also included in the evidentiary objections, which directly contradict Defendants' "fact": Ex. 35, at PA0975:11-7, PA0981:4-17, PA0984:13-16, PA0986:15-22, PA0987:9-19, PA0982:1-8, PA0991:3-18, PA0992:15-25, PA0993:2-10, PA0993:24-PA0994:8, PA0994:13-24, PA0995:1-7, PA1007:3-13, |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | | PA1012:2-PA1014:20, PA1009:12-PA1011:3. [Carr dep.] |

A27.  <u>Defendants' Response</u>:  Plaintiffs' assertions about the non-production of documents reflecting Quest's interactions with are demonstrably false.  QUEST 41963-41969 was produced on May 21, 2021, and, indeed, was attached by Plaintiffs as Exhibit 101 to the transcript of the second July 30, 2021 session of Taylor Carr's deposition (taken by Plaintiffs expressly for this purpose).  (*See accompanying* Supplemental Declaration of David Raizman ⁋ 7.)

| A28. | Based on that exploration and interaction with three different groups of blind consumers and their advocates, Quest developed a proposal in advance of the March 2020 mediation that has come to be known as the "Three Finger Swipe" ("TFS") enhancement. Employee assistance with the check-in process, whether through TFS or another mode, remained available.   App. 1 ⁋ 6. | Disputed that these actions were taken in response to ACB's inquiries in 2018. The actions were taken in response to the initial lawsuit in this action filed on September 18, 2019. Even then, ACB was never consulted.   Ex. 35, at PA0999:13-16, PA1000:2-PA1003:23, PA1004:6-12, PA1005:22-1008:21, PA1012:2-PA1014:20. [Carr dep.]   E x. 18, at PA0599:7-607:8; 608 [Rachfal dep.].   Ex. 10, at PA0382-83 [Vargas dep.] at 133:17-135:24;   Ex. 31, at PA0858-875 [Derry dec. re: TFS issues in PSCs]   Ex. 32 [Montgomery dec.] at PA0876-900;   Ex. 36 at PA1017:13-19, PA1018:9-PA1019:1, PA1020:12-20, PA1021:24-1022:14, PA1023:3-20. [Reilly dep.].   Ex. 21, at PA0683, 688 [Magana dep.] at 53:7-18, 71:3-7;   Ex. 39, at PA1058:8-21, PA1059:16-19, PA1060:6-11, PA1061:22-24. [Additional Magana dep.].   See also, the following citations, also included in the evidentiary objections, which directly contradict Defendants' "fact": Ex. 35, at PA0985:17-23, PA0988:8-PA0989:5, PA0990:1-8, PA1007:5-13, PA1012:2-PA1014:20, PA1009:12-PA1011:3. |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | | [Carr dep.] |

A28.  <u>Defendants' Response</u>: None of Plaintiffs' evidence disputes Quest's assertion that its implementation of the Three Finger Swipe was in response to all of the feedback it had received, including ACB's, about the desire for an independently accessible means of checking in. Similarly, Plaintiff has only speculation and no evidence that Quest's work on the Three Finger Swipe was in reaction to the lawsuit and not to its ongoing discussions with ACB.

Vargas' and West's lawsuit in Fall 2019 did change the nature of Quest's consideration of added modes of effective communication and of the complexion of the discussions with ACB that had been taking place at that point.  Any agreement with ACB would not fully or necessarily resolve Quest's legal exposure without consultation with Vargas and West and the putative class counsel who represented them, and any attempt to implement new technology would have to pass legal muster in the now-pending litigation.  As a result, Quest's legal counsel became directly involved in all of these discussions and efforts.  For those reasons, direct questions at deposition about Quest's reactions to specific kinds of technology, properly drew attorney-client, work product objections, which Plaintiffs have not challenged.  There is nothing privileged, however, in saying that Quest considered the feedback it received from all quarters in coming up with the Three Finger Swipe.  In fact, Quest did not claim a privilege as to (and provided both documents and testimony of) its consultations with members of the blind community (including ACB) in the process that led to the development of the Three Finger Swipe. It is baseless speculation for Plaintiffs to claim that Quest's actions were a response to the lawsuit and not to the interaction with the three groups, in addition to ACB.

| A29. | Following the mediation, Quest's then-Director of National Patient Services approved moving forward with implementing the TFS solution, which consists of three complementary steps to permit independent check-in at the Kiosks: (1) Enabling the Kiosks to automatically check in patients who swiped three fingers on the Kiosk screen in any direction, which then provides an audio message that tells the patient that they have been checked in and assigned a generic patient ID number, and that this number would be called when it was their turn to be seen, and further providing notification to Quest phlebotomists at the PSC that an individual with visual impairments had checked in; | Disputed. At deposition, Christopher Grant claimed to know nothing about three finger swipe, testifying "you're asking me questions about the functionality of the device and I really—I can't give you an answer to it. I really can't. I don't know what all went into it, how does it all work . . . I'm just an engineer. I don't understand that stuff." [Grant depo. at 260:22-261:5.]. As such, Grant's Declaration should be stricken under the sham affidavit doctrine. In addition, three finger swipe has not been rolled out across the Quest PSC network and suffers from several serious accessibility issues in its own rite. Finally, Quest does not provide its employees training in how to deal with legally blind customers or in how to give their requested accommodations primary |

27

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | (2) Programming Quest TVs at the PSCs to play, on continuous loop, an audio message that instructs patients who are blind or who have visual impairments on how to check in at the Kiosk with the TFS; and (3) Developing and assigning updated ADA training for PSC employees on the TFS and how to assist the blind and other patients with disabilities to access Quest's services.

App. 2 ⁋ 6; App. 1 ⁋ 6. | consideration.

Ex. 35, at PA0999:13-16, PA1000:2-PA1003:23, PA1004:6-12, PA1005:22-1008:21, PA1012:2-PA1014:20. [Carr dep.]

Ex. 18, at PA0599:7-607:8; 608 [Rachfal dep.].

Ex. 10, at PA0382-83 [Vargas dep.] at 133:17-135:24;

Ex. 31, at PA0858-875 [Derry dec. re: TFS issues in PSCs]

Ex. 32 [Montgomery dec.] at PA0876-900;

Ex. 36 at PA1017:13-19, PA1018:9-PA1019:1, PA1020:12-20, PA1021:24-1022:14, PA1023:3-20. [Reilly dep.].

Ex. 21, at PA0683, 688 [Magana dep.] at 53:7-18, 71:3-7;

Ex. 39, at PA1058:8-21, PA1059:16-19, PA1060:6-11, PA1061:22-24. [Additional Magana dep.].

See also, the following citations, also included in the evidentiary objections, which directly contradict Defendants' "fact": Ex. 35, at PA0985:17-23, PA0988:8-PA0989:5, PA0990:1-8, PA1007:5-13, PA1012:2-PA1014:20, PA1009:12-PA1011:3. [Carr dep.]

Ex. 37 at PA1040:18-25, PA1042:22-PA1043:5, PA1041:6-16, PA1036:20-23, PA1032:8-16, PA1038:22-PA1039:17, PA1035:7-15, PA1034:12-17, PA1038:5-17. [Grant dep.] |

A29.  <u>Defendants' Response</u>:  Plaintiffs' evidence distorts Mr. Grant's specific responses to a vague and solitary question about "how it works" that was sandwiched between other questions about privileged TFS considerations and was not followed up for a response.  Among other things, the question "how it works," assuming it was asking about the Three Finger Swipe, could have been understood as an engineering question of how the gesture activates the functionality, which Mr. Grant properly responded he did not know.  Mr. Grant

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | always understood the basics of TFS as set forth in his declaration, even if he did not understand or remember the engineering of it at the time of his deposition.<br><br>In any event, there is no dispute with the mechanics of how TFS works, as Mr. Vargas was able to make the three-finger-swipe gesture to check in (as was Mr. Derry) and Mr. Vargas also heard the audio messages played by the Kiosk in response to the gesture and on Quest TV.  (Oppo. at 11-12.)<br><br>The Quest training on Three Finger Swipe and accommodating patients' needs (App. 10-11) and other Quest training speaks for itself and is not subject to dispute.  (App. 9-15.) | |
| A30. | The TFS capability was installed in all PSCs in August 2020.  The audio message on the Quest TVs at the PSCs was activated in January 2021, and the enhanced training of PSC employees was rolled out and assigned in March 2021.<br><br>App. 1 ¶ 7. | Disputed. The investigation of experienced accessibility investigator Mark Derry demonstrated that three finger swipe was not rolled out across the Quest PSC network effectively and suffers from many accessibility issues in its own rite. In addition, Quest does not provide its employees training in how to deal with legally blind customers or in how to give their requested accommodations primary consideration.<br><br>See, Ex. 4, ¶¶ 3-4 [Vargas Dec]; Ex. 31 at PA0858-75 [Derry dec.]; Ex. 32 at PA0876-900 [Montgomery dec.]; Ex. 15 at PA0550:24-552:2, PA0553:21-554:8 [Grahmann dep.].<br><br>See also, the following citations, also included in the evidentiary objections, which directly contradict Defendants' "fact": Ex. 35, at PA0987:9-19, PA0982:1-8, PA0988:8-PA0989:5, PA0990:1-8. [Carr dep.]<br><br>[Carr depo. at 179:9-19; 159:1-8; 196:8-197:5; 203:1-8.] |
| A30. | Defendants' Response:  Mark Derry's Declaration and report should be stricken in their entirety for the reasons set forth in the accompanying Objections and Reply Brief.  In any event, it reflects, as does Vargas' experience, that Three Finger Swipe has been implemented in at least some locations.  (Opp. at 12 (Vargas "performed the TFS.")  Plaintiffs' allegations isolated instances of TFS not being operational at certain Quest PSCs does not support either a violation of | |

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | law or Plaintiffs' unfounded assertion of programmatic unavailability of TFS. *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017); 28 C.F.R. § 36.211(b). | |
| A31. | With TFS' implementation, blind patients (or any other patients) at the PSCs can be checked in to receive services simply by applying three fingers to the face of the Kiosk tablet and swiping in any direction. Blind patients are intimately familiar through use of their smartphones with the operation of touchscreens through the application of unique finger gestures on their screens. The TFS uses one of these familiar gestures. <br><br> App. 17 at 86:9-16, 88:4-89:4, 94:3-11; <br> App. 22 at 143:21-24; App. 19 at 97:15-98:15, 99:2-100:20, 102:4-10. | Disputed that three finger swipe allows legally blind patients to independently access ECSS. The investigation of experienced accessibility investigator Mark Derry demonstrated that three finger swipe was not rolled out across the Quest PSC network effectively and suffers from many accessibility issues in its own rite. <br><br> Ex. 4, ¶ 2-4 at PA0018 [Vargas dec.]; Ex. 10, at PA0392:21-394:18, 0406:8-407:3 [Vargas dep. re: three-finger swipe not associated normally with the action it represents on the ECSS kiosk and does not allow blind users access to all services of kiosk]; Ex. 31, at PA0858-75 [Derry dec.]; Ex. 10 at PA0346:3-5, PA0362:5-6, PA0365:9-14, PA0368:15-19; PA0369:2-6; PA0369:7-22; PA0369:23-370:2; PA0370:3-23; Ex. 12, at PA0520:23-521:5, PA0522:10-17, PA0523:4-524:16 [Bazyn dep.]; Ex. 11, at PA0507:4-510:19, PA0511:16-512:5, PA0513:15-514:19 [Black dep.]; Ex. 17, at PA0566:10-568:7, PA0569:6-571:2, PA0571:16-19, PA0574:1-21, PA0575:4-576:5 [Brink dep.]; Ex. 15, at PA0548:21-549:8, PA0550:22-552:4 [Grahmann dep.]; Ex. 14, at PA0537:10-540:9, PA0541:8-542:9, PA0543:9-544:1 [N. Haroyan dep.]; Ex. 13, at PA0529:3-530:23, PA0531:3-532:2 [M. Haroyan dep.]; Ex. 16, at PA0559:15-560:13, PA0561:14-21, PA0562:15-21 [Lyons dep.]; Ex. 22, at PA0695:8-24, PA0696:23-698:1, PA0701:16-21 [Stanley dep.]; Ex. 32, at PA0876-900 [Montgomery dec.]. |

Case No. 2:20-cv-07907 GW (Ex)

48700369_1.docx

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| A31. | **Defendant's Response:** Mark Derry's Declaration and report should be stricken in their entirety for the reasons set forth in the accompanying Objections and Reply Brief.  In any event, it reflects, as does Vargas' experience, that Three Finger Swipe has been implemented in at least some locations. (Opp. at 12 (Vargas "performed the TFS.") Plaintiffs' allegations about isolated instances of TFS not being operational at certain Quest PSCs does not support either a violation of law or Plaintiffs' unfounded assertion of programmatic unavailability of TFS.  *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017); 28 C.F.R. § 211(b). | |
| A32. | The alternative of phlebotomist assistance remains available.<br><br>App. 3 ¶ 7; App. 10. | Disputed. Quest's records demonstrate 1,130 of its 2,152 PSC locations have "1.5" or fewer employees. See, Ex. 27, at PA0749 [QUEST-VARGAS 000042029; QUEST-VARGAS000039512-39653] At these locations, there is no one at all to greet legally blind patients. In addition, Quest's claim that employees "sweep" the waiting area to assist blind customers is simply not true, as the Mark Derry investigation found only one of the 24 investigated locations had a Quest employee present in the waiting room.<br><br>Ex. 4, ¶ 2-4 at PA0018 [Vargas dec.]; Ex. 10, at PA0406:8-407:3 [Vargas dep.]; Ex. 31, at PA0858-75 [Derry dec.]; Ex. 10 at PA0346:3-5, PA0362:5-6, PA0365:9-14, PA0368:15-19; PA0369:2-6; PA0369:7-22; PA0369:23-370:2; PA0370:3-23; Ex. 12, at PA0520:23-521:5, PA0522:10-17, PA0523:4-524:16 [Bazyn dep.]; Ex. 11, at PA0507:4-510:19, PA0511:16-512:5, PA0513:15-514:19 [Black dep.]; Ex. 17, at PA0566:10-568:7, PA0569:6-571:2, PA0571:16-19, PA0574:1-21, PA0575:4-576:5 [Brink dep.]; Ex. 15, at PA0548:21-549:8, PA0550:22-552:4 [Grahmann dep.]; Ex. 14, at PA0537:10-540:9, PA0541:8-542:9, PA0543:9-544:1 [N. Haroyan dep.]; Ex. 13, at PA0529:3-530:23, PA0531:3-532:2 [M. Haroyan dep.]; Ex. 16, |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | | at PA0559:15-560:13, PA0561:14-21, PA0562:15-21 [Lyons dep.]; Ex. 22, at PA0695:8-24, PA0696:23-698:1, PA0701:16-21 [Stanley dep.] |
| | | Ex. 37 at PA1034:12-17. |
| | | See also, the following citations, also included in the evidentiary objections, which directly contradict Defendants' "fact": Ex. 36 at PA1017:13-19, PA1018:9-PA1019:1, PA1020:12-20, PA1021:24-1022:14, PA1023:3-20. [Reilly dep.]. |

A32.  <u>Defendants' Response</u>: None of Plaintiffs' evidence reflects any change in staffing between the period leading up to, and following the Kiosks' rollout. There was no change.  (App. 4 ¶ 10; Ex. 27; New Patient Experience – Deployment CapEx Request, Ex. E to Suppl. Raizman Decl.; Ex. 34 at PA944:1-951:3 (specifically stating that there would not be fewer employees but Quest would keep the same staff). The point of this still-undisputed fact was that Quest had no reason to expect that replacing the paper sign-in process that called for phlebotomist assistance, without any change in staffing, with a Kiosk that may require the same assistance.  From a blind patient's perspective, nothing was changing.

Plaintiffs mistake the significance of the statistical data on which they rely on several fronts.  First, Plaintiffs' reliance on "full time equivalency" (FTE) statistics says nothing about the actual staffing levels at any PSC at any time.  For example, a PSC staffed for 60 FTE hours per week may show as staffed at 1.5 FTE, but could only be open 30 hours per week, as some PSCs are.  A PSC open 30 hours per week with 60 FTE hours would have two PSC representatives during all operational hours.

In addition, the FTE numbers on which Plaintiffs rely refers only to *employee* staffing, which was the sole subject of their discovery inquiries, and does not account for Quest's use of independent contractors to supplement staffing in its PSCs.  Moreover, the mere fact that a given PSC may have only one or two phlebotomists proves nothing about whether patients are waiting longer to be assisted whether or not they were able to check in, and Plaintiffs offer no evidence of that fact.  Since PSC staffing is understandably based on patient demand for that PSC's services, the lower-staffed PSCs experience less patient flow.

Finally, nearly all of Plaintiffs' anecdotal stories relates to isolated instances of unfavorable experiences at Quest PSCs that Plaintiffs speculatively and inaccurately attribute to inadequate training.  Such isolated incidents do not support either a violation of law or the inadequacy of training. *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017). Indeed, some of Plaintiffs' evidence reflects that blind patients were promptly assisted.  Claire Stanley, the blind, former ACB advocacy director, testified that she waited between 3-5 minutes on one visit and was helped immediately on another visit. (App. 26 at 1382:1-7; 1387:2-14.) ████████, an ACB member, wrote in

| | **Defendants' Uncontroverted Facts and Supporting Evidence**[1] | **Plaintiff's Response to Cited Fact and Supporting Evidence** |
|---|---|---|
| | response to an open ACB inquiry about problems at Quest, "There has always been an attendant to take info or had to have someone sign name on the list when the attendant was in back." (PL00687, Ex G to Suppl. Raizman Decl.) ▆▆▆▆ wrote that, "[o]n 6/3/20, her friend told her the kiosk wasn't even there and someone outside was checking people in." (*Id.*) Or, ▆▆▆▆ "had a staff member at the center help him check in for appointments." (Ex. 24 at PA0710.) Even Mark Derry's completely random visits to 24 PSCs yielded instances of patients being greeted immediately. (Ex. 31 at PA0873 ("Large reception room with person behind a desk."); see also App. 27 at 1403:6-14, 1404:24-1405:4, 1409:21-24, 1412:19-1413:1, App. 26 at 1348:16-20, 1349:11-1350:12.) Ex. 10 at 370:3-23 states that a phlebotomist came out to call another patient and Vargas was able to interact with the phlebotomist. This is why Plaintiffs' isolated, anecdotal evidence cannot be used to prove programmatic inaccessibility. *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017); 28 C.F.R. § 36.211(b). | |
| A33. | Quest gave primary consideration to ACB's request for an "independently accessible" technology when it developed the TFS solution, which utilized smartphone "gestures" familiar to the blind. App. 2 ¶¶ 3, 5; App. 17 at 91:2-9, 94-3:1; App. 29; App. 21. | Disputed. When asked whether Quest gave ACB's request primary consideration, Quest repeatedly asserted privilege and instructed its witnesses not to answer. To date, Quest has not produced any evidence that it gave primary consideration to ACB's requests. Quest's purported solution – "three finger swipe" – has not been rolled out across Quest's PSC network and is rife with accessibility issues in its own rite, as detailed in the Derry Investigation and Montgomery Declaration.<br><br>See, Ex. 18, at PA0583:18-598:1; PA0608 [Rachfal dep. re: letter requesting primary consideration for screen readers, which Quest ignored]; Ex. 10, at PA0392:21-394:18, 0406:8-407:3 [Vargas dep. re: three-finger swipe not associated normally with the action it represents on the ECSS kiosk and does not allow blind users access to all services of kiosk];<br><br>Ex. 22, at PA0699:18-700:16 [Stanley dep.]<br><br>See also, the following citations, also included in the evidentiary objections, which directly contradict Defendants' "fact": Ex. |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | | 37 at PA1037:16-24, PA1040:18-25, PA1041:6-16, PA1042:22-PA1043:5, PA1036:20-23, PA1038:5-17. [Grant dep.] |

A33.  Defendants' Response:  None of Plaintiffs' evidence disputes Quest's assertion that its implementation of the Three Finger Swipe was in response to all of the feedback it had received, including ACB's, about the desire for an independently accessible means of checking in. Similarly, Plaintiff has only speculation and no evidence that Quest's work on the Three Finger Swipe was in reaction to the lawsuit and not to its ongoing discussions with ACB.

Vargas' and West's lawsuit in Fall 2019 did change the nature of Quest's consideration of added modes of effective communication and of the complexion of the discussions with ACB that had been taking place at that point.  Any agreement with ACB would not fully or necessarily resolve Quest's legal exposure without consultation with Vargas and West and the putative class counsel who represented them, and any attempt to implement new technology would have to pass legal muster in the now-pending litigation.  As a result, Quest's legal counsel became directly involved in all of these discussions and efforts.  For those reasons, direct questions at deposition about Quest's reactions to specific kinds of technology, properly drew attorney-client, work product objections, which Plaintiffs have not challenged.  There is nothing privileged, however, in saying that Quest considered the feedback it received from all quarters in coming up with the Three Finger Swipe.  In fact, Quest did not claim a privilege as to (and provided both documents and testimony of) its consultations with members of the blind community (including ACB) in the process that led to the development of the Three Finger Swipe. It is baseless speculation for Plaintiffs to claim that Quest's actions were a response to the lawsuit and not to the interaction with the three groups, in addition to ACB.

| A34. | While some putative class members admit to being helped immediately, Vargas and some ACB members claim wait times at the PSCs ranging from one to 90 minutes (most on the short end of this range) before they were assisted.<br><br>App. 5 ¶¶ 12-13; App. 26-27. | Disputed. Multiple legally blind Quest customers testified that they were made to wait for excessive periods of time due to ECSS's inaccessibility. Even when these customers could finally be checked in, they required the assistance of a friend, loved one or unrelated third party.<br><br>See, Ex. 4, at ¶¶2-4 at PA0018 [Vargas dec., re: post-TFS rollout wait and access issues]; Ex. 31, at PA0858-875 [Derry dec. re: TFS issues in PSCs]; Ex. 12, at PA0518-A:7-12 [Bazyn dep.: husband checked her in]; Ex. 17, at PA0570:24-571:12 [Brink dep.: Quest employee asked for Brink's daughter to help]; Ex. 15, at |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

|  | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
|  |  | PA0547A:20-548:1 [Grahmann dep.: relied on another patient, a stranger, to check her in]; Ex. 13, at PA0531:3-532:2, PA0532A:3-532C:15 [M. Haroyan dep.: relied on other patients – strangers – to sign her in twice before, and her father once]; Ex. 14, at PA0543:9-544:1, PA0542A:11-542B:8 [N. Haroyan dep.: relied on another patient, a stranger, to sign her in, as well as her father on other occasions]; Ex. 16, at PA0561:22-561A:5, PA0560:18-21 [Lyons dep.: relied on another patient, a stranger, to check her in, and now has to bring different people to help her check in]; Ex. 23, at PA0705:14-706:3 [Rehder dep.: relied on another patient, a stranger, to check her in]. |

A34.  Underline: Defendants' Response:  Plaintiffs' evidence is actually reflected in Quest's statement of Fact No. 34, so nothing cited disputes the fact as stated.

In any event, none of Plaintiffs' evidence reflects any change in staffing between the period leading up to, and following the Kiosks' rollout.  There was no change.  (CapEx; New Patient Experience – Deployment CapEx Request, Ex. E to Suppl. Raizman Decl.; Ex. 34 at PA0944-951:3 (specifically stating that there would not be fewer employees but Quest would keep the same staff). The point of this still-undisputed fact was that Quest had no reason to expect that replacing the paper sign-in process that called for phlebotomist assistance, without any change in staffing, with a Kiosk that may require the same assistance.  From a blind patient's perspective, nothing was changing.

Nearly all of Plaintiffs' evidence relates to isolated instances of unfavorable experiences at Quest PSCs that Plaintiffs speculatively and inaccurately attribute to inadequate training.  Such isolated incidents do not support either a violation of law or the inadequacy of training.  *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017).  Indeed, some of Plaintiffs' evidence reflects that blind patients were promptly assisted. Claire Stanley, the blind, former ACB advocacy director, testified that she waited between 3-5 minutes on one visit and was helped immediately on another visit.  (App. 26 at 1382:1-7; 1387:2-14.) ▮▮▮▮▮▮▮▮, an ACB member, wrote in response to an open ACB inquiry about problems at Quest, "There has always been an attendant to take info or had to have someone sign name on the list when the attendant was in back."  (PL00687, Ex. G to Suppl. Raizman Decl.) ▮▮▮▮▮▮▮▮ wrote that, "[o]n 6/3/20, her friend told her the kiosk wasn't even there and someone outside was checking people in." (*Id.*)  Or, ▮▮▮▮▮▮ "had a staff member at the center help him check in for appointments."  (Ex. 24 at PA0710.)  Even Mark Derry's completely random visits to 24 PSCs yielded instances of patients being greeted immediately. (Ex. 31 at PA0873 ("Large reception room with person behind a desk."); see also

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | App. 27 at 1403:6-14, 1404:24-1405:4, 1409:21-24, 1412:19-1413:1, App. 26 at 1348:16-20, 1349:11-1350:12.)  Ex. 10 at 370:3-23 states that a phlebotomist came out to call another patient and Vargas was able to interact with the phlebotomist.  This is why Plaintiffs' isolated, anecdotal evidence cannot be used to prove programmatic inaccessibility.  *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017); 28 C.F.R. § 36.211(b). | |
| A35. | None of the deposed patients or others identified by Plaintiffs in discovery claims an inability to access, or denial of, diagnostic testing services.<br><br>App. 5 ¶¶ 12-13; App. 26-27. | Disputed. Plaintiff and each deposed ACB member testified they were denied services Defendants offer.<br><br>See, Ex. 10, at PA0368:15-376:14, PA0467:222-468:17 [Vargas dep. describing his experience]; Ex. 12, at PA0518-A:7-12, PA0520:23-521:5, PA0522:10-17, PA0523:4-524:16 [Bazyn dep.: husband checked her in]; Ex. 17, at PA0566:10-568:7, PA0569:6-571:2, PA0571:16-19, PA0574:1-21, PA0575:4-576:5, PA0570:24-571:12 [Brink dep.: Quest employee asked for Brink's daughter to help]; Ex. 15, at PA0547A:20-548:1, PA0548:21-549:8, PA0550:22-552:4 [Grahmann dep.: relied on another patient, a stranger, to check her in]; Ex. 13, at PA0529:3-530:23, PA0531:3-532:2, PA0531:3-532:2, PA0532A:3-532C:15 [M. Haroyan dep.: relied on other patients – strangers – to sign her in twice before, and her father once]; Ex. 14, at PA0537:10-540:9, PA0541:8-542:9, PA0543:9-544:1, PA0543:9-544:1, PA0542A:11-542B:8 [N. Haroyan dep.: relied on another patient, a stranger, to sign her in, as well as her father on other occasions]; Ex. 16, at PA0559:15-560:13, PA0561:14-21, PA0562:15-21, PA0561:22-561A:5, PA0560:18-21 [Lyons dep.: relied on another patient, a stranger, to check her in, and now has to bring different people to help her check in]; Ex. 23, at PA0705:14-706:3 [Rehder dep.: relied on another patient, a stranger, to check her in]; Ex. 11, |

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | | at PA0507:4-510:19, PA0511:16-512:5, PA0513:15-514:19 [Black dep. describing experience]. |

| A35. Defendants' Response: Quest's Fact No. A35 accurately states that all of the testimony and other evidence reflects that every reporting, putative class member received Quest's diagnostic services. Plaintiffs' evidence instead relates to ancillary aspects of Quest's services. |||

| | | |
|---|---|---|
| A36. | The sheer variety of experiences claimed by the testifying blind deponents demonstrate that their claim of unequal treatment at future visits is purely conjectural or hypothetical.<br><br>App. 5 ¶¶ 12-13; App. 26; App. 27. | Disputed. Plaintiff and each deposed ACB member testified they encountered the same inaccessible kiosk at every PSC.<br><br>See, Ex. 10, at PA0368:15-376:14, PA0467:222-468:17 [Vargas dep. describing his experience]; Ex. 12, at PA0518-A:7-12, PA0520:23-521:5, PA0522:10-17, PA0523:4-524:16 [Bazyn dep.: husband checked her in]; Ex. 17, at PA0566:10-568:7, PA0569:6-571:2, PA0571:16-19, PA0574:1-21, PA0575:4-576:5, PA0570:24-571:12 [Brink dep.: Quest employee asked for Brink's daughter to help]; Ex. 15, at PA0547A:20-548:1, PA0548:21-549:8, PA0550:22-552:4 [Grahmann dep.: relied on another patient, a stranger, to check her in]; Ex. 13, at PA0529:3-530:23, PA0531:3-532:2, PA0531:3-532:2, PA0532A:3-532C:15 [M. Haroyan dep.: relied on other patients – strangers – to sign her in twice before, and her father once]; Ex. 14, at PA0537:10-540:9, PA0541:8-542:9, PA0543:9-544:1, PA0543:9-544:1, PA0542A:11-542B:8 [N. Haroyan dep.: relied on another patient, a stranger, to sign her in, as well as her father on other occasions]; Ex. 16, at PA0559:15-560:13, PA0561:14-21, PA0562:15-21, PA0561:22-561A:5, PA0560:18-21 [Lyons dep.: relied on another patient, a stranger, to check her in, and now has to bring different people to help her check in]; Ex. 23, at PA0705:14-706:3 [Rehder dep.: |

37

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | | relied on another patient, a stranger, to check her in]; Ex. 11, at PA0507:4-510:19, PA0511:16-512:5, PA0513:15-514:19 [Black dep. describing experience]. |

A36.  <u>Defendants' Response</u>:  Plaintiffs' allegations (and all of the other evidence in the action) about actual experiences at the PSCs demonstrate that different things happen to patients on each visit.  As noted above, several witnesses testified to being helped immediately by a Quest phlebotomist, or ACB recorded survey results from members reflecting the same result.  (App. 27 (Vargas: 5-10 minutes, ▓▓▓: no more than a couple minutes and another time immediately; ▓▓▓: five minutes; ▓▓▓▓▓▓: a minute or two and on other visits, it was immediately and "pretty quick"; ▓▓▓: five minutes at most; ▓▓▓: a couple minutes; ▓▓▓: a minute).  Once a blind patient knows how to use the Three Finger Swipe, they will be able to immediately check in on the next visit without any assistance.  (*See* Fact No. A37 below.)

There is simply no prediction or imminence that any given blind person's next visit will result in a denial of *any* services.

| A37. | Once a blind patient uses the TFS, she will be able to check in independently on the next visit without needing to hear the Quest TV message.<br><br>App. 17 at 86:9-16, 88:4-89:4, 94:3-11;<br><br>App. 22 at 143:21-24; App. 19 at 97:15-98:15, 99:2-100:20, 102:4-10. | Disputed. Disputed that three finger swipe allows legally blind patients to independently access ECSS. The investigation of experienced accessibility investigator Mark Derry, for example, demonstrated that three finger swipe was not rolled out across the Quest PSC network effectively and suffers from many accessibility issues in its own rite.<br><br>See, Ex. 4, ¶¶ 3-4 at PA0018 [Vargas Dec.]; Ex. 31 at PA0858-75 [Derry dec.]; Ex. 32 [Montgomery dec.] at PA0876-900; Ex. 15, at PA0550:24-552:2, PA0553:21-554:8 [Grahmann dep.]. |

A37.  <u>Defendants' Response</u>:  None of Plaintiffs' evidence disputes the central thrust of this Fact No. A37, that, once understood, the Three Finger Swipe gesture can be immediately applied without reliance on the instructions on Quest TV.

Plaintiffs' dispute is based strictly on Mark Derry's inadmissible testimony that the Three Finger Swipe is not implemented at all PSCs.  Mark Derry's Declaration and report should be stricken in their entirety for the reasons set forth in the accompanying Objections and Reply Brief.  In any event, his report reflects, as does Vargas' experience, that Three Finger Swipe has been implemented in at least some locations.  Plaintiffs' allegations about isolated instances of TFS not being operational at certain Quest PSCs does not support either a violation of law or Plaintiffs' unfounded assertion of programmatic unavailability of TFS.  *Kirola*

| | Defendants' Uncontroverted Facts and Supporting Evidence[1] | Plaintiff's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| | *v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017). | |

## B.   DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE

Quest objects to Plaintiffs' efforts to bury the record in "Additional Facts" that have no bearing on the issues in the case and place an impossible burden on a responding moving party to undertake all necessary activity on the reply and respond to whatever irrelevant and unnecessary facts, however redundant and repetitive, that Plaintiffs choose to present.  Quest expressly does not waive its dispute as to any of these facts by its responses below or the impossibility and futility of compiling evidence to rebut such facts.

To the extent the Court is interested in disputes of any or all of these facts, Quest respectfully requests additional time to accomplish that task.

| | Plaintiffs' Additional Facts and Supporting Evidence | Defendants' Response to Cited Fact and Supporting Evidence |
|---|---|---|
| B1. | Quest operates 2,152 PSCs nationwide and 419 PSCs in California where patients can obtain many diagnostic services. *See*, Ex. 30, at PA0811-812 [Quest discovery responses]. | Disputed as to the precise number of PSCs, which changes frequently.<br><br>Disputed also because statement is vague and ambiguous as to which of the three defendants (or all three) are referred to by "Quest" in this statement.  Each of the PSCs at issue here are operated by Quest Diagnostics Incorporated or one of its subsidiaries, but no Quest entity operates all of the PSCs. |

48700369_1.docx

| | | | |
|---|---|---|---|
| | B2. | Approximately 250,000 people come through Quest PSCs daily. *See,* Ex. 9, at PA0248:10-14 [Grant dep.]. | Disputed as to the estimate provided, without laying a foundation for personal knowledge, by witness. Fed. R. Evid. 602.<br><br>Quest has provided interrogatory responses with different information about patient annual visits, which Plaintiffs chose to disregard in favor of this foundation-less testimony. |
| | B3. | Quest maintains contact information including email addresses and phone numbers and can match a patient's particular encounter to the PSC he or she visited on a particular date through its internal data service called Quanum. *See,* Ex. 20, at PA0664:13-665:7 [Walsh dep.]. | Disputed insofar as the testimony was given without laying a proper foundation and is subject to question as to its detail and precision and universal applicability.<br><br>Quest provided responses to Requests For Admission with some of this same information, which Plaintiffs chose to disregard in favor of this foundation-less testimony. |
| | B4. | Beginning in 2014, Quest looked for ways to reduce phlebotomists' contacts with patients, which would allow for more patient visits per day at its PSCs, thereby increasing Quest's profitability. *See,* Ex. 20, at PA0636:10-24 [Walsh dep.] | Disputed. As noted in the testimony cited in Ex. 20, Quest's theory at the time was to have patients move through process faster, wait less and have a better experience. For phlebotomists, it would translate to less labor content per encounter. Profitability was purely speculative and was not a |

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | | | |
|---|---|---|---|
| | | | motivation.

See Facts A7 above. |
| | B5. | Quest considered several innovations before ultimately landing on ECSS.
See, Ex. 20, at PA0637:5-15 [Walsh dep.]; Ex. 6, at PA0070:2-5 [Carr dep.]. | Undisputed |
| | B6. | ECSS offers patients several important features including, for example, (1) an automated check in process for any diagnostic services performed at the PSC, (2) the ability to wait safely outside and receive a text message when the patient's turn has arrived (a feature added during the Covid-19 pandemic), (3) specimen drop off and pick up, and (4) knowledge about where a patient stands in the service queue, a feature designed to reduce patient anxiety in the check-in process.

*See,* Ex. 27, at PA0749 [QUEST-VARGAS 000035245 – eCheckin CapEx tab - Summarized Project Description]; Ex. 9, at PA0240:7-241:3 [Grant dep.]. | Disputed.  The Kiosk does not offer specimen drop off and pick up, just an indication that the person is there for that purpose, something that can be communicated directly with a phlebotomist, like all PSC services.

Waiting outside while you wait is also available through other technology and has been used by blind ACB members.  (PA711-712-714.) |
| | B7. | Since 2016 Quest has had firm plans to roll out additional features for ECSS, including identification scanners and credit card payment scanners | Disputed.  None of cited evidence state that there are any plans to implement these features, which are being piloted in a limited number of facilities.  Plaintiffs' |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | | | |
|---|---|---|---|
| | | – all of which will be inaccessible to legally blind customers. These features are already available at certain Quest PSCs.<br>*See,* Ex. 19, at PA0624:12-626:25 [Aronson dep.].) Ex. 20, at PA0660:23-661:1 [Walsh dep.]. | evidence also fails to establish that limited number. |
| | B8. | Quest never performed any analysis of what it would cost to provide its legally blind customers with access to ECSS.<br>See, Ex. 6, at PA0081:4-84:5 [Carr dep.]; Ex. 20, at PA0658:1-19 [Walsh dep.]; Ex. 5, at PA0043:11-44:3 [Yarrison dep.]. | Undisputed. |
| | B9. | The goal of ECSS was to save Quest tens of millions of dollars in "efficiencies."<br>*See,* Ex. 20, at PA0669:25-670:10, PA0668:15-25, PA0676 [Walsh dep. and exhibit]. | Disputed.  See Response to Facts Nos. A7-A8 above.  Also, the CapEx document actually projects no cost reduction as part of the Kiosk reduction.  (Pl. Ex. 27.)  The "business case" document (Ex. 6 to Suppl. Raizman Decl.) more accurately reflects the motivations for the Kiosks and the absence of any reliance on cost reductions or profits. Pl. Ex. 34 specifically states that there would not be fewer employees, and Quest would keep the same staff. (Ex. 34 at PA944-951:3.) |
| | B10. | The ECSS goal is outlined in Quest's internal document which set forth the "business case" for ECSS (the "Cap | Disputed.  See Response to Fact Nos. A7-A8 above. |

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | | | |
|---|---|---|---|
| | | Ex"). In the Cap Ex, the Company stated the "rationale" for the project was "cost savings" and projected a successful rollout across the entire PSC network would save Quest ▅▅▅▅▅ over five years. *See,* Ex. 20, at PA0669:25-670:10, PA0668:15-25, PA0676 [Walsh dep. and exhibit]. | |
| | B11. | The Cap Ex underwent a multilayered review and approval process within Quest and was ultimately approved by the CEO. *See,* Ex. 20, at PA0641:17-642:1 [Walsh dep.] | Undisputed as to layers of review. |
| | B12. | Quest considered several tablet and enclosure vendors for ECSS. One vendor, Habey, asked Quest if it needed audio for the kiosk. See, Ex. 20, at PA0649:24-651:25 [Walsh dep.]. | Disputed.  The cited evidence is hearsay and lacks foundation because Walsh expressly testified that the company itself (Habey) did not ring a bell and that he does not recall ever discussing with Carr whether audio was needed. |
| | B13. | Habey's question led Quest's IT team to question whether Quest should add audio to "service patients with impaired vision," and whether they needed to bring the kiosk into compliance with the ADA to service visually-impaired patients. *See,* Ex. 20, at PA0652:2-654:9 [Walsh dep.] | Disputed.  The cited evidence is hearsay and lacks foundation because Walsh expressly testified that the company itself (Habey) did not ring a bell and that he does not recall ever discussing with Carr whether audio was needed. |
| | B14. | Rather than follow through on these questions, Quest ultimately chose a kiosk that | Disputed.  The cited evidence is hearsay and lacks foundation |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | | | |
|---|---|---|---|
| | | was not independently accessible for its legally blind patients. *See,* Ex. 20, at PA0655:5-25 [Walsh dep.]; Ex. 5, at PA0039:6-40:12, PA0045:3-46:18 [Yarrison dep.]. | because Walsh and Yarrison expressly testified that they didn't remember discussing this option. |
| | B15. | Quest contracted with Lilitab to provide the iPad tablet and enclosure for ECSS. Lilitab offered (and offers) kiosks with accessible features and could have provided the same to Quest if so desired. *See,* Ex. 19, at PA0613:12-19, PA0630:4-18, PA0614:10-615:17, PA0619:10-620:8 [Aronson dep.].) | Disputed because no evidence that Quest had any awareness of what Lilitab offers. |
| | B16. | The accessible features include a headphone jack placed in a Lilitab enclosure to allow a blind user access to audio from the tablet, and specifically, to access the iPad's built-in voiceover technology. See, Ex. 19, at PA0614:10-615:17, PA0619:10-620:8 [Aronson dep.] | Disputed.  See B15. |
| | B17. | This accessible headphone jack cost just $30 per kiosk. *See,* Ex. 19, PA0616, at 31:9-22 [Aronson dep.] | Disputed.  See B15. |
| | B18. | Lilitab also offered (and offers) the option of a tactile keyboard for accessibility for just $95 per enclosure. *See,* Ex. 19, at PA0617:14-618:15, PA0621:11-25 | Disputed.  See B15.  Price not mentioned in Ex. 19. |

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | | [Aronson dep.] | |
|---|---|---|---|
| | B19. | Quest could have purchased an AudioNav keypad for iOS which costs just $309.75 per kiosk.<br>*See* Ex. 32, ¶ 48 at PA0885-886 [Montgomery dec.]. | Disputed.  No evidence offered that Quest was aware of what it could have purchased.  Montgomery statements are repetitions of hearsay statements by out-of-court declarants. |
| | B20 | Accordingly, using Quest's own internal cost saving projections, the Company could have provided at least one independently accessible kiosk option at its 2,152 PSCs for just $935,582 – allowing it to still enjoy a massive cost savings from the ECSS rollout of ▉▉▉▉▉.<br><br>*See,* Ex. 20, at PA0669:25-670:10, PA0668:15-25, PA0676 [Walsh dep. and exhibit]; Ex. 32, ¶ 48 at PA0885-886 [Montgomery dec.].<br>Ex. 19, at PA0617:14-618:15, PA0621:11-25 [Aronson dep.] | Disputed.  See Facts Nos. A7-A8 for lack of foundation for costs savings. |
| | B21. | Quest never inquired about the possibility of having an accessible kiosk for blind customers, despite him expressly informing Quest that Lilitab could outfit the kiosk with an inexpensive headphone jack for accessibility.<br><br>*See,* Ex. 19, at PA0627:12-16, PA628:20-629:6 [Aronson dep.]. | Disputed.  Aronson did not testify that he actually remembered this specific conversation. |
| | B22. | Quest's focus was instead on getting a "low cost" kiosk. | Disputed.  See Facts Nos. A7-A8. |

Case No. 2:20-cv-07907 GW (Ex)
DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | | | |
|---|---|---|---|
| | | *See,* Ex. 19 at PA0622:16-20 [Aronson dep.] | |
| | B23. | The Quest IT team recommended an iPad tablet for the ECSS kiosk with the Lilitab enclosure.<br><br>*See,* Ex. 20, at PA0645:10-646:21 [Walsh dep.]. | Undisputed. |
| | B24. | The IT team was aware the iPad had accessibility features within its iOS suite yet undertook no analysis of whether the ECSS kiosk could utilize the built-in accessibility features.<br><br>*See,* Ex. 20, at PA0656:25-657:19 [Walsh dep.]; Ex. 6, at PA0072:2-75:12 [Carr dep.]; Ex. 5, at PA0041:21-42:3 [Yarrison dep.]. | Disputed.  The cited testimony is completely vague about precisely which accessibility features  were available or known to Quest, such that it declined any of those options. |
| | B25. | This was despite team members highlighting that "ADA compliance is critical," and the current prototype "is not ADA."<br><br>*See,* Ex. 20, at PA0674:4-17 [Walsh dep.]; Ex. 5, at PA0049-64 [Exhibits from Yarrison dep.] | Disputed.  See Fact No. B24. The premise to this fact never occurred.  Indeed, Quest specifically considered and achieved compliance with the express ADA Standards of Accessible Design, which also expressly stated that Interactive Transaction Machines, like the Kiosk, did not need to be made accessible.  See B26 below. |
| | B26. | The IT team also noted ADA-compliant kiosk options, but Quest never followed up on them despite their posing no undue financial burden to the Company.<br><br>*See,* Ex. 20, at PA0674:19-675:20 [Walsh dep.]; Ex. 5, at PA0042:24-43:88, PA0045:4-47:3 [Yarrison dep.] | Disputed.  See B25 above. Quest's undisputed evidence indicates that Yarrison, Quest's 30(b)(6) witness on this issue, and his team considered the explicit design standards applicable to Kiosks, including ADAS 307, a |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | | | |
|---|---|---|---|
| | | | provision expressly directed at cane users. ([App. 4 ¶ 9; Yarrison Depo. at 146:11-21, 189:2-8.) Moreover, those same ADA Standards expressly provide in an Advisory Note 707 that the design standards in ADAS 707 apply to ATMs, but not to interactive transaction machines (ITMs) like the Kiosk.  36 C.F.R. pt. 1191, App. B and D, ADAS 707, Advisory Note.  As a result, Quest properly considered the ADA Standards. |
| | B27. | The working prototype kiosk Quest's IT team developed, which Quest ultimately implemented, had a base, a mount or post, enclosure, and the iPad itself.<br><br>*See,* Ex. 7, at PA0106:13-21 [O'Campo dep.] | Undisputed. |
| | B28. | While the kiosk contained a touchscreen help swipe button a sighted customer could use if he or she was having difficulty with the kiosk, the help button had no audio or other functionality that would allow a blind user to use it independently.<br><br>*See,* Ex. 20, at PA0638:24-640:3 [Walsh dep.] | Disputed.  The help button does not currently have audio functionality. |
| | B29. | At no time during the IT development did Quest delegate anyone to address ADA accessibility issues related to ECSS.<br><br>*See,* Ex. 20, at PA0643:14-644:23, PA0647:24-648:5 [Walsh dep.]; Ex. 6, at PA0076:9-80:3 [Carr dep.] | Disputed.  See Fact B25-B26 above.  Ex. 6 speaks only about utilization of keyboard. |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL
FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | | |
|---|---|---|
| B30. | Quest admits that during the Class Period, ECSS contained no features that would make it independently usable by legally blind people.<br><br>*See,* Ex. 5, at PA0029:17-24 [Yarrison dep.]. | Disputed.  People with visual impairments (including those who are legally blind) may be able to use the Kiosk.  The cited testimony lacks foundation. |
| B31. | Once the IT team developed the working prototype, it sent the prototype to Quest's national patient services team for implementation.<br><br>*See,* Ex. 20, at PA0637A:6-16 [Walsh dep.]. | Undisputed as to National Patient Services handling implementation. IT did not develop the working prototype in isolation, and evidence does not support that. |
| B32. | Quest implemented the ECSS kiosk at all 2,152 PSCs nationwide beginning in 2016.<br><br>*See,* Ex. 20, at PA0640:18-641:1 [Walsh dep.]; Ex. 5, at PA0027:8-13, PA0028:1-8 [Yarrison dep.]; Ex. 19, at PA0623:19-25 [Aronson dep.]. | Disputed only as to number of PSCs, all of which should have at least one Kiosk. |
| B33. | When a sighted patient checks in at the kiosk, Quest places that patient in line by time of check in with a video monitor in the PSC displaying the patient's wait time and place in queue.<br><br>*See,* Ex. 20, at PA0666:12-19, PA0671:9-672:225 [Walsh dep.] | Disputed.  A patient with an appointment may be seen before the patient who checked in at the Kiosk, even if the patient with the appointment arrived later.  Other circumstances, like doctor's orders, accommodating a disabled patient or other emergent circumstances may also influence the order in which Patients are seen. |
| B34. | The ECSS kiosk communicates to the phlebotomist's screen in the back of the PSC when a patient checks in.<br><br>*See,* Ex. 20, at PA0663:9-20 [Walsh dep.] | Undisputed. |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| | | | |
|---|---|---|---|
| 1<br>2<br>3<br>4 | B35. | ECSS's implementation has reduced patient wait time for sighted patients, allowing Quest to enjoy increased productivity.<br><br>*See,* Ex. 20, at PA0673:5-8 [Walsh dep.] | Disputed.  Exh. 20 does not support this conclusion or its specification of improving wait times for for sighted patients only. |
| 5<br>6<br>7<br>8<br>9<br>10 | B36. | After the initial rollout, Quest embarked on a project called ██████████████████████████<br>██████████████████████████<br>██████████████████████████<br>██████████████████████████<br>███████████████████████.<br><br>*See,* Ex. 20, at PA0659:1-24 [Walsh dep.] | Disputed.  Among other things, ██████████████████████████<br>██████████████████████████<br>██████████████████████████<br>███████████████████, which it is not. |
| 11<br>12<br>13<br>14<br>15<br>16 | B37. | Quest has already implemented several of these features, including ███████████ in certain PSCs.<br><br>*See,* Ex. 20, at PA0660:23-662:14 [Walsh dep.] | Disputed.  Evidence does not establish the number of locations where these features are piloted, which is at a limited number of locations.  All services are available to blind patients with phlebotomist assistance. |
| 17<br>18<br>19<br>20<br>21<br>22<br>23<br>24 | B38. | In addition, during the Covid-19 pandemic Quest rolled out a "wait where you want" feature that allows sighted patients to input their phone number into the kiosk and wait outside to avoid close contact with other customers. This is not available to blind users.<br><br>*See,* Ex. 20, at PA0667:1-8 [Walsh dep.]; Ex. 6, at PA0086:11-87:24 [Carr dep.]; Ex. 9, at PA0242:14-243:13 [Grant dep.] | Disputed as to availability to blind users.  Waiting outside while you wait is also available through other technology and has been used by blind ACB members.  (PA711-712-714.)<br><br>In addition, a phlebotomist can assist any blind patient who wants to wait outside. |
| 25<br>26<br>27<br>28 | B39. | Immediately after ECSS's rollout, Quest began receiving complaints from blind customers about its accessibility.<br><br>*See,* Ex. 5, at PA0031:20-38:20, and PA0049-57 | Disputed.  The evidence proffered is hearsay and also demonstrates only a small fraction of the blind patients that Plaintiffs' own statistical expert estimated had |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | | | |
|---|---|---|---|
| | | [Yarrison dep. and exhibit]; Ex. 9, at PA0247:18-24 [Grant dep.] | visited PSCs during the two-year period had seen. |
| | B40. | On May 24, 2017, Quest received a complaint from a customer "about the difficulties she had with signing in with the iPad. No one was at the front desk and she could not read the instruction. A patient from the waiting room helped her sign in, but now the other patient knows personal information."<br><br>*See,* Ex. 6, at PA0092:25-94:5 [Carr dep.] | Disputed.  Lacks foundation.  Hearsay.  Precise nature of complaint is unclear, whether it's about the Kiosk or the that no one was there to immediately help the patient. There was no change in staffing in connection with the rollout of the Kiosks.  See Response to Fact No. A32. |
| | B41. | Another complaint from April 2018 alerted Quest that a low vision patient was told she needed to register at the computer, but she could not see well enough to do that.<br><br>*See,* Ex. 6, at PA0094:16-95:19 [Carr dep.] | Disputed.  Lacks foundation.  Hearsay. |
| B42. | | A complaint from August 2018 alerted Quest that its kiosk violates the ADA and a blind patient could not independently use the kiosk.<br><br>*See,* Ex. 6, at PA0095:20-96:25 [Carr dep.] | Disputed.  Lacks foundation.  Hearsay. |
| | B43. | Quest's own internal records include 45 complaints from blind patients about the inaccessibility of ECSS.<br><br>*See,* Ex. 5, at PA0031:20-38:20, and PA0049-57 [Yarrison dep. and exhibit] | Disputed.  See Reply Brief in Section II.E. |
| | B44. | Well after Plaintiffs initiated this lawsuit, and in an attempt to moot Plaintiffs' claims in this litigation, Quest began to roll out the TFS feature at its PSCs. TFS purportedly would allow legally blind customers to use a 3-finger gesture at the | Disputed.  Cited evidence does not establish connection between the Vargas/West lawsuit and the TFS enhancement.  See Response to Facts No. A26-A27 above.  Also, |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | | | |
|---|---|---|---|
| | | kiosk to enter the queue for service.<br><br>*See,* Ex. 6, at PA0087:25-88:1, PA0097:20-98:7 [Carr dep.] | Exhibit 6 does not establish a date of initiation of TFS consideration. The process was always designed to be iterative and continue to improve Kiosks.  See Response to Facts Nos. A14-A15. |
| | B45. | Quest's executives claimed under oath that TFS has been rolled out throughout its PSC network by August 2020.<br><br>*See,* Ex. 6, at PA0089:2-8, PA099:17-19 [Carr dep]; Ex. 5, at PA0030:10-14 [Yarrison dep.]; Ex. 9, at PA0249:20-23 [Grant dep.] | Disputed.  Neither Mr. Carr nor Mr. Yarrison is an "executive." Mr. Grant testified that he left National Patient Services and responsibility for the Kiosk or TFS after making the decision in the Spring of 2020. |
| | B46. | Quest also claims it implemented an audio loop on a video screen which directs patients to check in at the kiosk and that the audio loop repeats every seven to ten minutes.<br><br>*See,* Ex. 6, at PA0090:8-24, PA0091:8-14 [Carr dep.] | Undisputed except that the loop is designed to be 7-10 minutes.  The actual loop may vary. |
| | B47. | TFS does not provide independent and private access to all kiosk services (e.g., "wait where you want," specimen drop-off, appointment check-in versus walk-in).<br><br>*See,* Ex. 32, at PA0876-900, ¶¶ 10-51 [Montgomery dec.] | Disputed.  ACB members have enjoyed the "wait where you want" functionality through Quest technology.  All patients can arrange "wait where you want" through a phlebotomist. |
| | B48. | Even the service of receiving a patient number for the queue is not accessible because a blind patient would have no accessible instruction for how to do it, with no Braille instruction option or tactile keyboard.<br><br>*See,* Ex. 32, at PA0876-900, ¶¶ | Disputed.  Argumentative.  Not intelligible.  If blind patient can hear instruction, then they have instructoin on how to use TFS. |

Case No. 2:20-cv-07907 GW (Ex)

48700369_1.docx

| | | | |
|---|---|---|---|
| | | 10-51 [Montgomery dec.] | |
| | B49. | In addition, the audio volume of the LCD monitors in the PSC waiting areas regularly interferes with the audio of the kiosk itself.<br><br>*See,* Ex. 32, at PA0876-900, ¶¶ 10-51 [Montgomery dec.] | Disputed.  Plaintiffs' isolated evidence based on isolated observations, including Ms. Montgomery's visit, cannot establish this fact.  *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017).  See also Krock Declaration warning of inability to draw conclusions from limited visits to limited number of facilities. |
| | B50. | The service of knowing where you are in the queue – an important feature according to Quest's own documents – is also inaccessible because the only place it appears is in the LCD monitor, which a blind customer cannot see.<br><br>*See,* Ex. 32, at PA0876-900, ¶¶ 10-51 [Montgomery dec.] | Disputed.  Managing Every Patients Needs training (App. 9-11) instructs phlebotomists to talk to patient who used TFS about where they are in queue. |
| | B51. | TFS does not allow blind customers to make use of the kiosk's features, including the "wait where you want" option available to Quest's sighted customers.<br><br>*See,* Ex. 6, at PA0086:11-87:24. [Carr dep.]. | Disputed.  ACB members have used this feature through Quest technology.  See Fact B6 above.<br><br>Phlebotomists available to assist all guests. |
| | B52. | TFS is itself inaccessible to the legally blind and provides an unequal and lesser experience for legally blind customers.<br><br>*See,* Ex. 4, ¶¶3-4 at PA0018 [Vargas dec.], Ex. 15, at PA0550:24-552:2, PA0553:21-554:8 [Grahmann dep.] | Disputed. Pure argument.  Vargas himself "performed the TFS." Oppo. at 12. |
| | B53. | Not only does TFS fail to provide blind individuals with an opportunity to independently access the ECSS kiosk service, | Disputed.  Derry Declaration is incompetent and inadmissible.  *See* |

| | | | |
|---|---|---|---|
| | | but, contrary to the Company's sworn testimony, it is not even available throughout the Quest PSC network.<br><br>*Compare,* Quest's MSJ (Dkt. 95-1, at 16:9-10, *against* Ex. 31, at ¶ 7, PA0859 [Derry dec.] | Krock Decl.  Plaintiffs' cannot draw programmatic conclusions from such isolated, anecdotal and unscientific evidence.  *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017).  Indeed, some of Plaintiffs' evidence reflects that blind patients were promptly assisted. (Ex. 22 (Stanley depo.).) |
| | B54. | In response to Quest's repeated claims under oath that Quest implemented TFS across the Company's PSC network, Plaintiff's accessibility investigator, Mark Derry, investigated 24 Quest PSC locations and discovered Quest's purported "solution" is riddled with glaring deficiencies at every single one, barring any argument of mootness.<br><br>*See* Ex. 6, at PA0089:2-8 [Carr dep.]; Ex. 5, at PA0030:10-14 [Yarrison dep.]; Ex. 9, at PA0249:20-23 [Grant dep.]; Dkt. 95-1, at 16:9-10; Ex. 31, at PA0858-875 [Derry dec.] | Disputed.  Derry Declaration is incompetent and inadmissible.  *See* Krock Decl.  Plaintiffs' cannot draw programmatic conclusions from such isolated, anecdotal and unscientific evidence.  *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017).  Indeed, some of Plaintiffs' evidence reflects that blind patients were promptly assisted. (Ex. 22 (Stanley depo.).) |
| | B55. | At many Quest locations, Derry found there is no way for blind patients to know TFS even exists.<br><br>*See,* Ex. 31, at PA0858-875 [Derry dec.] | Disputed.  Derry Declaration is incompetent and inadmissible.  See Krock Decl.  Plaintiffs' cannot draw programmatic conclusions from such isolated, anecdotal and unscientific evidence.  Kirola v. City & Cty. of San Francisco, 860 F.3d 1164, 1183 (9th Cir. 2017).  Indeed, some of Plaintiffs' evidence reflects that blind patients were promptly assisted. (Ex. 22 (Stanley depo.).) |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL
FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | | | |
|---|---|---|---|
| 1 2 3 4 5 6 | B56. | To inform blind patients of TFS, Quest relies on a voice message which is supposed play on a loop from an LCD monitor located in the patient service centers.<br><br>*See,* Ex. 6, at PA0090:8-24 [Carr dep.]; Ex. 5, at PA0048:12-19 [Yarrison dep.]; Ex. 9, at PA0246:7-15 [Grant dep.] | Disputed.  Patients who have heard the message once, or otherwise learn about it through other channels, will not need to wait for the message. In addition, Quest PSRs are trained to scan the room and assist patients who need help. (App. 9-11.) |
| 7 8 9 10 11 12 13 14 | B57. | Quest executive Taylor Carr falsely testified this audio loop is present at all locations.<br><br>*See,* Ex. 6, at PA0100:5-7 [Carr dep.] | Disputed.  Witness lacked foundation to speak to all approximately 2100+ locations, as would any individuals.  His testimony signifies that TFS and the audio loop are enabled and operational in all locations. Isolated observations of Derry are not admissible or scientific.  Krock Decl. |
| 15 16 17 18 19 20 21 22 23 | B58. | Derry's investigation showed Quest only plays this "content loop" message every 15 to 20 minutes – if it is played at all.<br><br>*See,* Ex. 31, at PA0858-875 [Derry dec.] | Disputed.  Derry Declaration is incompetent and inadmissible. See Krock Decl.  Plaintiffs' cannot draw programmatic conclusions from such isolated, anecdotal and unscientific evidence.  Kirola v. City & Cty. of San Francisco, 860 F.3d 1164, 1183 (9th Cir. 2017). Indeed, some of Plaintiffs' evidence reflects that blind patients were promptly assisted. (Ex. 22 (Stanley depo.).) |
| 24 25 26 27 28 | B59. | There was no audio loop at 14 of 24 investigated locations.<br><br>*See,* Ex. 31, at PA0858-875 [Derry dec.] | Disputed.  Derry Declaration is incompetent and inadmissible. See Krock Decl.  Plaintiffs' cannot draw programmatic conclusions from such isolated, anecdotal and unscientific evidence.  Kirola v. |

Case No. 2:20-cv-07907 GW (Ex)
DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL
FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | | | |
|---|---|---|---|
| | | | City & Cty. of San Francisco, 860 F.3d 1164, 1183 (9th Cir. 2017). Indeed, some of Plaintiffs' evidence reflects that blind patients were promptly assisted. (Ex. 22 (Stanley depo.).) |
| | B60. | At those 14 locations, blind patients have no way of even knowing TFS is an option for them.<br><br>*See,* Ex. 31, at PA0858-875 [Derry dec.] | Disputed.  Derry Declaration is incompetent and inadmissible.  *See* Krock Decl.  Plaintiffs' cannot draw programmatic conclusions from such isolated, anecdotal and unscientific evidence.  *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017). Indeed, some of Plaintiffs' evidence reflects that blind patients were promptly assisted. (Ex. 22 (Stanley depo.).) |
| | B61. | Quest's claim that employees "sweep" the waiting area to assist blind customers is simply not true, as the investigation found only one of the 24 investigated locations had a Quest employee present in the waiting room.<br><br>*See,* Ex. 31, at PA0858-875 [Derry dec.]; Ex. 5, at PA0026:9-22 [Yarrison dep.]; Ex. 9, at PA0238:25-239:7, PA0244:22-245:7 [Grant dep.] | Disputed.  Derry Declaration is incompetent and inadmissible.  *See* Krock Decl.  Plaintiffs' cannot draw programmatic conclusions from such isolated, anecdotal and unscientific evidence.  *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017). Indeed, some of Plaintiffs' evidence reflects that blind patients were promptly assisted. (Ex. 22 (Stanley depo.).) |
| | B62. | Quest's records demonstrate 1,130 of its 2,152 PSC locations have "1.5" or fewer employees.<br><br>*See,* Ex. 27, at PA0749 [QUEST-VARGAS 000042029; QUEST-VARGAS000039512-39653] | Disputed.  1.5 refers to FTEs, not employees.  It is not a measure of how many people are working at a PSC at a particular time.  It is a measure of how many hours it takes to staff a PSC per week. |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | | | Notably, the PSC may not be open for 40 hours per week.  Also, these numbers are a snapshot in time.  Finally, this evidence disregards available staffing provided by independent contracotrs.<br><br>See Response to Fact A32 above. |
|---|---|---|---|
| | B63. | For blind customers of these locations, there was no independent access to Quest′s services at all during the Class Period unless the one employee on duty − a phlebotomist who is busy taking specimens − happened to sweep the waiting area.<br><br>*See,* Ex. 6, at PA0085:6-17, PA0071:6-12 [Carr dep.] | Disputed.  Purely argumentative.  Evidence does not support this fact.<br><br>In fact, there is ample from just the deposed ACB members, Vargas, and Claire Stanley that they promptly helped upon arrival at a PSC.  See Fact A36 above. |
| | B64. | But as the investigation and the experiences of Plaintiff Vargas and several ACB members make clear, employees do not regularly sweep the waiting room.<br><br>*See,* Ex. 31, at PA0858-75 [Derry dec.: finding that a phlebotomist swept the waiting area at only 1 of 24 investigated locations] | Disputed.  Derry Declaration is incompetent and inadmissible.  See Krock Decl.  Plaintiffs' cannot draw programmatic conclusions from such isolated, anecdotal and unscientific evidence.  Kirola v. City & Cty. of San Francisco, 860 F.3d 1164, 1183 (9th Cir. 2017).  Indeed, some of Plaintiffs' evidence reflects that blind patients were promptly assisted. (Ex. 22 (Stanley depo.).)<br><br>Cf. Fact A36 above. |
| | B65. | TFS is only available at select kiosks within the investigated PSCs: only 13 of the 24 investigated locations had all kiosks outfitted with TFS.<br><br>*See,* Ex. 31, at PA0858-75 [Derry dec.] | Disputed.  Derry Declaration is incompetent and inadmissible.  See Krock Decl.  Plaintiffs' cannot draw programmatic conclusions from such isolated, anecdotal and |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | | | |
|---|---|---|---|
| | | | unscientific evidence.  Kirola v. City & Cty. of San Francisco, 860 F.3d 1164, 1183 (9th Cir. 2017). Indeed, some of Plaintiffs' evidence reflects that blind patients were promptly assisted. (Ex. 22 (Stanley depo.).) |
| | B66. | Only 13 of the 24 investigated locations had an audio message confirming the blind customer had successfully checked in and entered the queue, though the audio is often not loud enough to be heard.<br><br>*See,* Ex. 31, at PA0858-75 [Derry dec.]; *see also,* Ex. 12, at PA0519:22-25 [Bazyn dep.]; Ex. 17, at PA0572:5-6 [Brink dep.]. | Disputed.  Derry Declaration is incompetent and inadmissible. See Krock Decl.  Plaintiffs' cannot draw programmatic conclusions from such isolated, anecdotal and unscientific evidence.  Kirola v. City & Cty. of San Francisco, 860 F.3d 1164, 1183 (9th Cir. 2017). Indeed, some of Plaintiffs' evidence reflects that blind patients were promptly assisted. (Ex. 22 (Stanley depo.).) |
| | B67. | Julian Vargas lives in Van Nuys, California.<br><br>*See,* Ex. 10, at PA0265:23-25 [Vargas dep.] | Undisputed |
| | B68. | He is legally blind and uses a screen reader as an auxiliary aid that allows him to understand the information displayed on a screen.<br><br>*See,* Ex. 10, at PA0299:13-300:24, PA0460:10-14 [Vargas dep.] | Undisputed |
| | B69. | Mr. Vargas works as a consultant providing training and support to individuals on the use of assistance technology.<br><br>*See,* Ex. 10, at PA0273:15-276:24 [Vargas dep.] | Undisputed |
| | B70. | On June 25, 2019, Mr. Vargas took paratransit to a Quest PSC close to his house to obtain lab work. | Undisputed. |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| | | | |
|---|---|---|---|
| | | *See,* Ex. 10, at PA0346:3-5, PA0362:5-6, PA0365:9-14, PA0368:15-19 [Vargas dep.] | |
| | B71. | There was no greeter when Mr. Vargas arrived at the PSC.<br><br>*See,* Ex. 10, at PA0369:2-6 [Vargas dep.] | Disputed only as to ambiguity and use of the term "greeter." Quest lacks knowledge or information as to the circumstances of Mr. Vargas' arrival. |
| | B72. | Mr. Vargas took several minutes to locate a check-in window.<br><br>*See,* Ex. 10, at PA0369:7-22 [Vargas dep.] | Disputed only to the extent the characterization differs from the actual testimony, which speaks for itself. Quest lacks knowledge or information as to the circumstances of Mr. Vargas' arrival. |
| | B73. | Once at the window, Mr. Vargas said "hello" several times without any employee coming out to help.<br><br>*See,* Ex. 10, at PA0369:23-370:2 [Vargas dep.] | Disputed only to the extent the characterization implies that that Mr. Vargas did not receive help. |
| | B74. | After about 10 to 15 minutes of waiting, a phlebotomist came out to call another patient in for lab work.<br><br>*See,* Ex. 10, at PA0370:3-23 [Vargas dep.] | Disputed only to the extent the characterization differs from the actual testimony, which speaks for itself. Quest lacks knowledge or information as to the precise circumstances. |
| | B75. | A sighted individual would not have had to wait, as he or she could have independently used the kiosk to check in.<br><br>*See,* Ex. 10, at PA0461:7-21 [Vargas dep.] | Disputed. This is pure speculation. Vargas may have waited the exact same amount of time had he been able to check in immediately. Vargas did not testify that he heard or observed anyone entered the waiting room while he waited. He may well have been helped and offered diagnostics services at the exact |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | | | |
|---|---|---|---|
| | | | time had he checked in at the Kiosk, namely, when it was his turn. |
| | B76. | The phlebotomist asked Mr. Vargas if he needed help, and Mr. Vargas said he needed to get blood work his doctor ordered.<br><br>*See,* Ex. 10, at PA0372:3-15 [Vargas dep.] | Disputed only to the extent the characterization implies that that Mr. Vargas did not receive help. |
| | B77. | The phlebotomist directed Mr. Vargas to the kiosk and told him, "This is where you check in."<br><br>*See,* Ex. 10, at PA0372:3-15 [Vargas dep.] | Disputed only to the extent the characterization implies that that Mr. Vargas did not receive help. Quest lacks knowledge or information as to the precise circumstances. Mr. Vargas may not have appeared to have been blind to the phlebotomist, so his need for help may not have been apparent. The phlebotomist testified that she did not remember Vargas asking for any help or need for accommodation. (Pl. Ex. 21.) |
| | B78. | Mr. Vargas checked the kiosk for tactile markings, a headphone jack, or a tactile keypad that would allow him to use the kiosk.<br><br>*See,* Ex. 10, at PA0372:25-373:14 [Vargas dep.] | Quest lacks knowledge or information as to the precise circumstances of his actions. |
| | B79. | After not finding any accessibility options, Mr. Vargas told the phlebotomist the kiosk was not accessible to blind people so he would need help signing in.<br><br>*See,* Ex. 10, *at* PA0373:15-22 [Vargas dep.] | Disputed. Phlebotomist testified that she did not remember Vargas asking for any assistance. (Ex. 21.) |
| | B80. | The phlebotomist took the other patient back for lab work, then came back out approximately five minutes later to help Mr. | Quest lacks knowledge or information as to the circumstances of Mr. Vargas' |

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | | | |
|---|---|---|---|
| 1 | | Vargas. | arrival. |
| 2 | | *See,* Ex. 10, at PA0374:3-22 [Vargas dep.] | |
| 3 | B81. | The phlebotomist asked Mr. Vargas for several pieces of personal information. | Undisputed.  Regular patient interaction in the draw room requires exchange of some personal information. |
| 4 | | | |
| 5 | | *See,* Ex. 10, at PA0375:9-376:14 [Vargas dep.] | |
| 6 | | | |
| 7 | B82. | Mr. Vargas suggested that the phlebotomist talk to whoever she needed to in order to ensure the kiosk was accessible to blind people. He further offered to provide his feedback to Quest. | Disputed.  Phlebotomist testified that she did not remember Vargas asking for any assistance.  (Ex. 21.) |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | *See,* Ex. 10, at PA0381:16-382:4, PA0382:13-23 [Vargas dep.] | |
| 12 | | | |
| 13 | B83. | The phlebotomist agreed and said she would speak with her supervisors. | Disputed.  Phlebotomist testified that she did not remember Vargas asking for any assistance.  (Ex. 21.) |
| 14 | | | |
| 15 | | *See,* Ex. 10, at PA0381:16-382:4, PA0382:13-23 [Vargas dep.] | |
| 16 | | | |
| 17 | B84. | To date, however, no one from Quest has ever followed up with Mr. Vargas. | Undisputed.  Vargas has been represented by counsel in this litigation since at least September 2019 and has only returned to Quest once in a pure testing capacity. |
| 18 | | | |
| 19 | | *See,* Ex. 10, at PA0381:16-382:4, PA0382:13-23 [Vargas dep.] | |
| 20 | | | |
| 21 | B85. | The experience left Mr. Vargas feeling embarrassed, humiliated, and like a "third-class citizen of some kind that anybody else can walk in there and not have to undergo the same amount of hassle and waiting." | Disputed as to his receiving third-class services or any different services than had he been sighted and been able to check in immediately at the Kiosk.  Any other conclusion he draws is pure speculation.. |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | | *See,* Ex. 10, at PA0467:22-468:17 [Vargas dep.] | |
| 27 | B86. | After being deposed in this action and informed by | Quest lacks knowledge or |
| 28 | | | |

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| | | | |
|---|---|---|---|
| | | Quest's counsel of the purportedly accessible TFS option, Mr. Vargas returned to a Quest PSC on June 10, 2021.<br><br>*See,* Ex. 4, ¶ 2 [Vargas dec.]; Ex. 10, at PA0406:8-407:3 [Vargas dep.] | information as to these circumstances. |
| | B87. | As he entered the PSC on June 10, 2021, Mr. Vargas heard the tail end of the portion of the audio content loop directed toward blind patients.<br><br>*See,* Ex. 4, ¶ 2 at PA0018 [Vargas dec.] | Quest lacks knowledge or information as to the circumstances of Mr. Vargas' arrival. |
| | B88. | The volume was not adequate for Mr. Vargas to hear the message from his vantage point. While waiting for the content loop to replay, information was given on the "wait where you want" option, available to those who could use the kiosk independently.<br><br>*See,* Ex. 4, ¶ 2 at PA0018 [Vargas dec.] | Disputed.  Vargas' subsequent testimony reveals that he could hear the message. |
| | B89. | After approximately 8 to 10 minutes, the message directed Mr. Vargas to perform a three-finger swipe at the kiosk.<br><br>*See,* Ex. 4, ¶ 3 at PA0018 [Vargas dec.] | Quest lacks knowledge or information as to the particular circumstances, but the message loop could have been 8 to 10 minutes. |
| | B90. | The message did not give directions as to where the kiosk itself was located, so Mr. Vargas had to fumble around to find it.<br><br>*See,* Ex. 4, ¶ 3 at PA0018 [Vargas dec.] | Undisputed as to the content of the message loop. |
| | B91. | The content loop simply said patients should ask a staff member to assist if they had trouble locating the kiosk. | Disputed.  The message content is the best evidence of its content.  No dispute that the message |

| | | | |
|---|---|---|---|
| | | *See*, Ex. 4, ¶ 3 at PA0018 [Vargas dec.] | invited phlebotomist assistance when needed. |
| | B92. | However, at no time during the content loop did any Quest staff member enter the waiting area.<br><br>*See*, Ex. 4, ¶ 3 at PA0018 [Vargas dec.] | Quest lacks knowledge or information as to the specific circumstances, nor does this imply that he waited longer to be helped or seen. |
| | B93. | After locating the kiosk, Mr. Vargas confirmed there was still no headphone jack or tactile keypad.<br><br>*See*, Ex. 4, ¶ 3 [Vargas dec.] | Undisputed that the Kiosk does not have an available headphone jack. |
| | B94. | After Mr. Vargas performed the TFS, an audio message played which stated he was patient "001" and that he would be serviced in three minutes (but he waited 17 minutes).<br><br>*See*, Ex. 4, ¶ 4 at PA0018 [Vargas dec.] | Undisputed as to basic content of the audio message played.  Quest lacks knowledge as to his wait, but again, the Kiosk estimate applies to all guests. |
| | B95. | When the phlebotomist greeted him, Mr. Vargas explained he was there to test the accessibility of the TFS system and asked whether the "wait where you want" option was available to him as a blind user.<br><br>*See*, Ex. 4, ¶ 4 at PA0018 [Vargas dec.] | Quest lacks knowledge of these precise circumstances. |
| | B96. | The phlebotomist told him the "wait where you want" option is only for those who make appointments online and can independently use the kiosk to scan a QR code.<br><br>*See*, Ex. 4, ¶ 4 [Vargas dec.] | Quest lacks knowledge of these precise circumstances. |
| | B97. | Mr. Vargas is serving as a class representative to help remove access barriers to allow himself and other blind people to live as independently as possible, especially in the medical field. | Disputed. |

| | | | |
|---|---|---|---|
| | | *See,* Ex. 10, at PA0442:16-443:9, PA0469:14-471:7 [Vargas dep.] | |
| | B98. | ACB is a national membership organization of thousands of blind and visually impaired persons which seeks to increase the independence, security, equality of opportunity, and quality of life for all legally blind people.<br><br>*See,* Ex. 18, at PA0580:9-14, PA0581:5-20, PA0582:17-21 [Rachfal dep.] | Undisputed. |
| | B99. | Nine ACB members testified that they were not able to independently access ECSS, they waited for extended periods for a phlebotomist to come help them, and they felt a loss of dignity and privacy in having to check in with the phlebotomist instead of the service Quest offers everyone else.<br><br>*See,* Ex. 12, at PA0520:23-521:5, PA0522:10-17, PA0523:4-524:16 [Bazyn dep.]; Ex. 11, at PA0507:4-510:19, PA0511:16-512:5, PA0513:15-514:19 [Black dep.]; Ex. 17, at PA0566:10-568:7, PA0569:6-571:2, PA0571:16-19, PA0574:1-21, PA0575:4-576:5 [Brink dep.]; Ex. 15, at PA0548:21-549:8, PA0550:22-552:4 [Grahmann dep.]; Ex. 14, at PA0537:10-540:9, PA0541:8-542:9, PA0543:9-544:1 [N. Haroyan dep.]; Ex. 13, at PA0529:3-530:23, PA0531:3-532:2 [M. Haroyan dep.]; Ex. 16, at PA0559:15-560:13, PA0561:14-21, PA0562:15-21 [Lyons dep.]; Ex. 22, at PA0695:8-24, PA0696:23-698:1, PA0701:16-21 [Stanley dep.] | Disputed. Cumulative testimony. Several ACB members testified to being helped by a phlebotomist in a tiemly fashion.  See Response to Fact A13 above. |

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL
FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | | |
|---|---|---|
| B100. | Not one ACB member testified that he or she was able to independently access ECSS, and instead had to wait for either an attendant to come to the window (putting sighted individuals ahead of them in line) or rely on a third party to aid their check-in at the kiosk.<br><br>*See,* Ex. 12, at PA0518-A:7-12 [Bazyn dep.: husband checked her in]; Ex. 17, at PA0570:24-571:12 [Brink dep.: Quest employee asked for Brink's daughter to help]; Ex. 15, at PA0547A:20-548:1 [Grahmann dep.: relied on another patient, a stranger, to check her in]; Ex. 13, at PA0531:3-532:2, PA0532A:3-532C:15 [M. Haroyan dep.: relied on other patients −strangers − to sign her in twice before, and her father once]; Ex. 14, at PA0543:9-544:1, PA0542A:11-542B:8 [N. Haroyan dep.: relied on another patient, a stranger, to sign her in, as well as her father on other occasions]; Ex. 16, at PA0561:22-561A:5, PA0560:18-21 [Lyons dep.: relied on another patient, a stranger, to check her in, and now has to bring different people to help her check in]; Ex. 23, at PA0705:14-706:3 [Rehder dep.: relied on another patient, a stranger, to check her in] | Disputed as to ambiguity and to implication that any of these ACB member had visited a PSC after TFS had been enabled. |
| B101. | At least 29 ACB members confirmed they could not also access ECSS independently.<br><br>*See,* Ex. 24, at PA0709-715 [ACB discovery responses]. | Disputed.  Multiple ACB members testified to being helped promptly. See Fact No. A13 above. |
| B102 | Quest has both deficient policies and training materials, both of which fail to ensure Quest gives primary consideration to the requested accommodations of its legally blind patients, as required by the Rehabilitation Act and its | Disputed.  App. 4, 8-15. |

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| | | | |
|---|---|---|---|
| | | implementing regulations. Jody Reilly, Quest's 30(b)(6) designee on topics involving training, testified Quest did not provide any training to its patient service representatives on giving primary consideration to the requests of disabled individuals or to training employees on documenting in writing the reasons it cannot give primary consideration.<br><br>*See,* Ex. 8, at PA0113:11-114:19 [Reilly dep.] | |
| | B103. | While Quest had Affordable Care Act training materials, the materials did not address giving primary consideration.<br><br>*See,* Ex. 8, at PA0113:11-114:19; PA0115:18-117:23; PA0118-231 [Reilly dep.] | Disputed.  App. 4, 8-15. |
| | B104. | The phlebotomist who assisted Mr. Vargas testified she could not remember any occasion where she documented that she could not provide an accommodation to an individual with disabilities who was making an accommodation request, and the reasons why she could not make the requested accommodation.<br><br>*See,* Ex. 21, at PA0688:3-7 [Magana dep.] | Testimony is  that she never remembered being asked by any patient to accommodate a disability. |
| | B105. | Ms. Stanley requested help signing in, and a Quest employee instead responded by leading her into the back.<br><br>*See,* Ex. 22, at PA0699:18-700:16 [Stanley dep.] | Quest lacks knowledge of these precise circumstances. |
| | B106. | Ms. Stanley was not able to use a Quest kiosk or access any of the service features offered by the kiosk.<br><br>*See,* Ex. 22, at PA0701:16-23 [Stanley dep.] | Disputed to the extent Ms. Stanley visited a TFS-enhanced Kiosk. |
| | B107. | ACB raised its members' concerns about the inaccessible | Undisputed. |

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL
FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | | | |
|---|---|---|---|
| 1–6 | | kiosk directly to Quest. In December 2018, ACB sent a letter to Quest outlining concerns about the inaccessible kiosk and requesting a meeting.<br><br>*See,* Ex. 18, at PA0583:18-598:1; PA0608 [Rachfal dep. re: letter requesting primary consideration for screen readers, which Quest ignored]. | |
| 7–10 | B108. | The letter requested primary consideration for screen readers (i.e., audio output) and screen magnification.<br><br>*See,* Ex. 18, at PA0599:7-607:8; 608 [Rachfal dep.]. | Disputed.  Letter speaks for itself and mentions a variety of concerns, including lack of staffing concerns experienced by at least some ACB members. |
| 11–16 | B109. | Quest neither into account this request for primary consideration nor did Quest document its reasons for denying the requested accommodation in writing as required by the Rehabilitation Act.<br><br>*See,* Ex. 18, at PA0599:7-607:8; 608 [Rachfal dep.]. | Disputed.  See Facts A27-A29, A33 above. |
| 17–20 | B110. | The Quest phlebotomist who eventually helped Mr. Vargas check in has no memory of Mr. Vargas.<br><br>*See,* Ex. 21, at PA0680:24-681:5 [Magana dep.] | Undisputed |
| 21–28 | B111. | While the phlebotomist who eventually helped Mr. Vargas thought Quest may have provided training on primary consideration, she could not articulate what primary consideration meant at could not remember any instance where she provided primary consideration to an individual with disabilities' accommodation request.<br><br>*See,* Ex. 21, at PA0684:2-688:7 | Disputed, she testified in and around the cited testimony that she understad the need to help every patient according to hteir needs, even if she did not recognize plaintiffs' counsel's legal jargon ("primary consideration"). |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

48700369_1.docx

| | | [Magana dep.] | |
|---|---|---|---|
| | B112. | Despite the utter lack of training, Quest informs its phlebotomist the kiosk was inaccessible.<br><br>*See,* Ex. 21, at PA0683:19-24 [Magana dep.] | Disputed.  Mischaracterizes testimony that lacked foundation for witness' understanding of any part of this question, as established on redirect examination.  Quest has exemplary training.  App. 4; 8-15. |
| | B113. | Quest itself recognizes that ECSS is an "essential aspect of Defendant's business model and of Defendant's ability to provide a positive, efficient and simple patient experience."<br><br>*See,* Ex. 22 at PA0793 [Quest's responses to Plaintiff Anne West's first set of interrogatories, Response No. 10] | Undisputed. |
| | B114. | Plaintiff's counsel provided Mr. Derry's report to Defendants well in advance of this briefing and asked whether Defendant would continue to argue mootness. In a meet and confer, when asked about the factual basis of Quest's mootness defense, defense counsel stated, "so I don't really have an ability to speak to that as a factual matter because that is news to me."<br><br>*See,* Ex. 36, at PA01054:5-6. | Disputed.  Derry's report was provided just before the discovery cutoff, unduly delayed when there was no opportunity to cross-examine Derry.  The assertion that defense counsel could not speak to at the time was any personal knowledge of a circumstance at 2100+ PSCs.. |
| | B115. | Quest's senior employees unequivocally testified that in implementing ECSS, improving experience was the "ultimate objective" and that "[t]he primary focus was the patient experience."<br><br>*See* Ex. 35, at PA0977:13-18, PA0973:1-PA0974:8, PA0979:23-PA0980-3, PA0996:13-PA0997:3. | Undisputed |
| | B116. | Mr. Carr testified about the patient experience as follows, | Undisputed |

67

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| | | |
|---|---|---|
| | "when I say 'the experience,' it's customers coming to Quest were checking in is an element of that experience."<br><br>*See* Ex. 35, at PA0983:1-7 [Carr dep.]. | |
| B117. | Quest's management explicitly testified that the very purpose of the implementation of ECSS was to improve the customer experience.<br><br>*See* Ex. 34 at PA0943:3-7, PA0958:19-25; Ex. 35, at PA0977:13-18 [Carr dep.] | Undisputed |
| B118. | Quest implemented the option of twenty-six (26) different languages on ECSS.<br><br>*See* Ex. 41 at PA1093-1109 | Undisputed. |
| B119. | Quest stated that the "[t]he intent via the experience was to meet a broad audience of primary language they preferred to use."<br><br>*See* Ex. 35, at PA0998:18-23 [Carr dep.]. | Undisputed |
| B120. | As part of its "iterative process," Quest received complaints about ECSS being inaccessible to non-English speakers, made the necessary changes, and achieved an improved result that made ECSS accessible to primary speakers of 26 languages.<br><br>*See* Ex. 42 at PA1110-PA1113 | Disputed only as to characterization.  Quest received feedback from that Quests' tens of thousands of non-English speakers may experience difficulty using the Kiosk. |
| B121. | There is no dispute that Quest is a recipient of Medicare funding and thus subject to the Rehabilitation Act.<br><br>*See* Ex. 36 at PA1016:7-12. [Reilly dep.]. | Undisputed that Quest is recipient of federal financial assistance. |
| B122. | Plaintiff Vargas is seeking only statutory minimum damages and injunctive relief with respect to his Unruh claim.<br><br>*See,* Ex. 10 at PA0447:7-14 | Undisputed. |

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| | | [Vargas dep.] | |
|---|---|---|---|
| | 123. | Quest's senior executives admitted under oath at deposition that ECSS provided additional advantages beyond just the check-in functionality. *See*, Ex. 34 at PA0960-A:19-PA0960-C:1 [Yarrison dep.]; Ex. 37 at PA1034-A:2-PA1034-B:13; PA1034-C:14-PA1034D:13 [Grant dep.]; Ex. 44 at PA1118:9-13; PA1119:2-PA1124:19; PA1125:18-PA1126:6. [Walsh dep.] | Disputed as to characterization of witnesses as senior executives or that many are even executives. |

Respectfully submitted,

DATED: September 24, 2021

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

By: /s/ David Raizman
David Raizman
Amber L. Roller
J. Nicholas Marfori

Attorneys for Defendants
QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC.; QUEST DIAGNOSTICS HOLDINGS, INC. and QUEST DIAGNOSTICS INCORPORATED

48700369.1

Case No. 2:20-cv-07907 GW (Ex)

DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS