1  OGLETREE, DEAKINS, NASH,
   SMOAK & STEWART, P.C.
2  DAVID RAIZMAN, CA Bar No. 129407
   david.raizman@ogletree.com
3  AMBER L. ROLLER, CA Bar No. 273354
   amber.roller@ogletree.com
4  J. NICHOLAS MARFORI, CA Bar No. 311765
   nicholas.marfori@ogletree.com
5  400 South Hope Street, Suite 1200
   Los Angeles, California 90071
6  Telephone: 213-239-9800
   Facsimile: 213-239-9045
7
   Attorneys for Defendants
8  QUEST DIAGNOSTICS CLINICAL
   LABORATORIES, INC.; QUEST
9  DIAGNOSTICS HOLDINGS, INC. and QUEST
   DIAGNOSTICS INCORPORATED
10

11              **UNITED STATES DISTRICT COURT**

12            **CENTRAL DISTRICT OF CALIFORNIA**

13  JULIAN VARGAS, ANNE WEST and        Case No. 2:19-cv-08108 DMG (MRWx)
    AMERICAN COUNCIL OF THE
14  BLIND, individually on behalf of    **DEFENDANTS' OPPOSITION TO**
    themselves and all others similarly **PLAINTIFF'S MOTION FOR CLASS**
15  situated,                            **CERTIFICATION**

16              Plaintiffs,             [*Filed concurrently with Request for
                                         Judicial Notice; Defendants' Appendix of
17       v.                              Evidence*]

18  QUEST DIAGNOSTICS CLINICAL          Date:       October 29, 2021
    LABORATORIES, INC., QUEST           Time:       9:30 a.m.
19  DIAGNOSTICS HOLDINGS, INC.,         Place:      Courtroom 8C
    QUEST DIAGNOSTICS
20  INCORPORATED; and DOES 1-10,
    inclusive,                          Complaint Filed: September 18, 2019
21                                      Trial Date:      January 11, 2022
                Defendants.             District Judge:  Hon. Dolly M. Gee
22                                                       Courtroom 8C, First St.
                                        Magistrate Judge: Hon. Michael R. Wilner
23                                                        Courtroom 550, Roybal

24

25

26

27

28
                                              Case No. 2:19-cv-08108 DMG (MRWx)

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ................................................................................. 1

II.  FACTUAL AND LEGAL BACKGROUND........................................ 2

    A.   Quest's Patient Service Centers and The Transition From Paper Check-In To The Rollout Of The Kiosks ........................... 2

    B.   Three-Finger Swipe Is Implemented................................................ 4

    C.   Plaintiff Julian Vargas' Alleged Experiences at Quest ................. 5

    D.   Putative Class Members' Successful Visits To PSCs..................... 5

    E.   ACB's Lawsuit Was Prompted By A Single Member Complaint; ACB Never Received Any Other Unsolicited Complaint. ...................................................................................... 7

    F.   No Records of Blind Patients or Level of Impairment ................. 8

    G.   Contrary To Plaintiffs' Contention, Disabled Plaintiffs In California Are Bringing Unruh Act Damages Claims In Ever-Increasing Numbers, Displaying No Reluctance Or Difficulty To Do So........................................................................ 8

III. LEGAL ARGUMENT....................................................................... 9

    A.   With The Advent of TFS, The Putative Class Members Lack Standing To Seek Injunctive Relief ...................................... 9

    B.   Plaintiffs' Failure To Meet the Rule 23(a) Standards Dooms Each of Their Proposed Classes. ................................... 10

        1.   Plaintiffs Fail To Establish Rule 23(a)(1) As The Number of Potential Class Members Is Not Sufficiently Numerous ...................................................... 10

        2.   Plaintiffs Have Not Satisfied Rule 23(a)(2)'s Commonality Requirement. ............................................... 13

        3.   Vargas Claims Are Not Typical Of The Purported Classes............................................................................... 16

        4.   Plaintiff Vargas Cannot Fairly And Adequately Protect the Interests Of The Class...................................... 16

            (a)   Vargas Has A Conflict of Interest Between The Two Classes He Purports to Represent *And Within* The Damages Subclass. ........................ 17

    C.   Plaintiff Cannot Certify a Rule 23(B)(2) Class.......................... 18

D.    Plaintiff Vargas Cannot Certify a Rule 23(B)(3) Unruh Class for Damages..........................................................................19

    1.    Individualized Issues Predominate In the Damages Subclass..............................................................................19

    2.    Class Treatment is Inferior to Other Methods of Adjudication..........................................................................24

Case No. 2:19-cv-08108 DMG (MRWx)

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION

48700831_6.docx

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Andrews v. Plains All Am. Pipeline, L.P.*,
No. CV 15-4113 PSG, 2017 U.S. Dist. LEXIS 225893 (C.D. Cal.
Feb. 28, 2017) .................................................................................. 12, 19

*Antoninetti v. Chipotle Mexican Grill, Inc.*,
643 F.3d 1165 (9th Cir. 2010) ...................................................... 21, 23, 24

*Athanassios Diacakis v. Comcast Corp.*,
No. C 11-3002 SBA, 2013 U.S. Dist. LEXIS 64523 at *14 (N.D.
Cal. May 3, 2013) .......................................................................... 12

*Botosan v. Paul McNally Realty*,
216 F.3d 827 (9th Cir. 2000) ........................................................ 21

*Celano v. Marriott Int'l, Inc.*,
242 F.R.D. 544 (N.D. Cal. 2007) .................................................. 12

*Chapman v. Pier 1 Imps. (U.S.), Inc.*,
631 F.3d 939 (9th Cir. 2011) ........................................................ 10

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ........................................................ 17

*Gen. Tel. Co. of the NW., Inc v. EEOC*,
446 U.S. 318 (1980) ...................................................................... 11

*Gen. Tel. Co. of the Southwest v. Falcon*,
457 U.S. 147 (1982) ...................................................................... 10, 16

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ...................................................... 18

*Kirola v. City & Cty. of San Francisco*,
860 F.3d 1164 (9th Cir. 2017) ...................................................... 9

*Langer v. Wadie P. Deddeh*,
2019 WL 4918084 (S.D. Cal. Oct. 4, 2019) ................................. 25

*Mevorah v. Wells Fargo Home Mortg. (In re Wells Fargo Home
Mortg.)*,
571 F.3d 953 (9th Cir. 2013) ........................................................ 20

*Moeller v. Taco Bell Corp.*,
2012 WL 3070863 (N.D. Cal. July 26, 2012) .............................. 22, 24

*Molski v. Gleich*,
318 F.3d 937 (9th Cir. 2003) ........................................................ 23

iii

Case No. 2:19-cv-08108 DMG (MRWx)

*Molski v. M.J. Cable, Inc.*,
   481 F.3d 724 (9th Cir. 2007) ...................................................................... 23

*Nevarez v. Forty Niners Football Co., LLC*
   326 F.R.D. 562 (N.D. Cal. July 12, 2018) ............................................. 23, 26

*Sandoval v. Cty. of Sonoma*,
   912 F.3d 509 (9th Cir. 2018) ...................................................................... 16

*Shields v. Walt Disney Parks & Resorts US, Inc.*,
   279 F.R.D. 529 (C.D. Cal. 2011) .......................................................... 12, 13

*Siles v. ILGWU Nat'l Ret. Fund*,
   783 F.2d 923 (9th Cir. 1986) ...................................................................... 12

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
   904 F.2d 1301 (9th Cir. 1990) .................................................................... 25

*Sokol v. New United Motor Manuf., Inc.*,
   1999 WL 1136683 (N.D. Cal. Sept. 20, 1999) ........................................... 14

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ........................................................................... 9, 21

*Tria v. Innovation Ventures, LLC*,
   No. CV 11-7135-GW, 2013 U.S. Dist. LEXIS 190664 (C.D. Cal.
   Feb. 25, 2013) ............................................................................................ 18

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442, 136 S. Ct. 1036 (2016) .................................................. 19, 20

*Vinole v. Countrywide Home Loans*,
   571 F.3d 935 (9th Cir. 2009) ...................................................................... 20

*Vondersaar v. Starbucks Corp.*,
   2015 WL 629437 (C.D. Cal. Feb. 12, 2015) ......................................... 23, 24

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ............................................................................*passim*

*Whitaker v. Maher*,
   2020 WL 984840 (C.D. Cal. Jul. 31, 2020) ............................................... 25

*Whitaker v RCP Belmont Shore, LLC*,
   2020 WL 3800449 (C.D. Cal. Mar. 30, 2020) ........................................... 24

*Wright v. Renzenberger, Inc.*,
   656 F. App'x 835 (9th Cir. 2016) ............................................................... 14

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) .................................................................... 25

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION

**California Cases**

*Donald v. Cafe Royale, Inc.*,
    218 Cal.App.3d 168 (1990) ....................................................................23

*Mundy v. Pro-Thro Enters.*,
    192 Cal. App. 4th Supp. 1 (2011) ..................................................21, 23

*Reycraft v. Lee*,
    177 Cal. App. 4th 1211 (2009) ..............................................................21

*Urhausen v. Longs Drug Stores California, Inc.*,
    155 Cal. App. 4th 254 (2007) .........................................................21, 23

**Federal Statutes**

42 U.S.C.
    § 12182(b)(2)(A)(iii) ...............................................................................20

Fed. R. Evid.
    § 803(c) ................................................................................................6, 11

Fed. R. Civ. P. 23(b)(1), (2) .........................................................................18

Fed. R. Civ. P. 65(d) ....................................................................................19

Rule 23 ..........................................................................................................10

<u>Rule 23(a)</u> .....................................................................................10, 16, 18

<u>Rule 23(a)(1)</u> ..............................................................................................11

<u>Rule 23(a)(2)'s</u> ...........................................................................................13

<u>Rule 23(B)(2)</u> .............................................................................................18

<u>Rule 23(B)(3)</u> .......................................................................................19, 25

Rule 65 .........................................................................................................19

**California Statutes**

Cal. Civ. Code
    §§ 52(a), 54.3(a) .....................................................................................17
    § 55.56(b)-(d) ..........................................................................................21§
    52(a) .......................................................................................................22
    § 55.56(b) .....................................................................................2, 22, 23
    § 55.56(b), (h), (i) ...................................................................................22

**Other State Statutes**

N.Y.S. Exec. Law
    §§ 290 *et seq.* ........................................................................................17

Mass. Ann. Stat.
    Ch. 92…………………….....................……………………………………17

**Other Authorities**

20 C.F.R. § 404.1581 ............................................................................ 15

28 C.F.R. § 36.303(c) .......................................................................... 11

28 C.F.R. § 36.303 (c)(1)(ii)....................................................... 1, 13, 18, 20

36 C.F.R. Pt. 1191........................................................................... 3, 4

https://www.afb.org/research-and-initiatives/statistics/key-definitions-
    statistical-terms, Ex. B ............................................................... 15

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION

48700831_6.docx

## I.      **<u>INTRODUCTION</u>**

The "effective communication" regulation on which this lawsuit is premised contains two requirements that make class treatment here completely inappropriate: (1) the requisite mode of auxiliary aid and service inevitably must "vary in accordance with the method of communication used by the individual [and other variables]"; and (2) "a public accommodation should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed."  28 C.F.R. § 36.303 (c)(1)(ii).  The categorical, broad-brush obligations that plaintiffs Julian Vargas and American Council of the Blind ("ACB") (collectively, "Plaintiffs") seek to enforce on a class-wide basis contradict this individualized approach required by law, thereby making certification wholly inappropriate.

Putting aside the legal requirements, the record in the case likewise demonstrates that visually-impaired patients of the Patient Service Centers (PSCs) of defendants Quest Diagnostics Incorporated and its subsidiaries ("Quest") have varying levels of visual impairment, have understandably different preferences for how Quest checks them in and otherwise communicates with them, and have had widely divergent experiences at the PSCs, including fully positive interactions. Although millions of patients pass through Quest's PSCs each year, including blind patients who Plaintiffs speculate visited during the putative class period of 2018-2019, the admissible record on this motion consists only of the non-representative experiences of Vargas and a limited number of ACB members.  This dearth of evidence reflects the overall satisfaction of the putative class with Quest's longstanding policies and procedures of providing phlebotomist assistance in checking in its patients and providing other services at PSCs.  Indeed, aside from Vargas' complaint, ACB has only ever received one *unsolicited* complaint about Quest's Kiosks.  After soliciting thousands of members and affiliates, ACB ended up with the few dozen items of feedback that create this sparse record, which record also reflects multiple instances of patients being promptly and effectively checked in

with phlebotomist assistance upon arrival at the PSCs.

Vargas then seeks to convert these highly individualized circumstances into a class claim for damages under the Unruh Civil Rights Act (the "Unruh Act"). Because Unruh Act damages are available only upon the claimant's showing he "personally encountered the violation on a particular occasion" (Civ. Code § 55.56(b)), a damages class creates a raft of individualized questions. It also undermines Plaintiffs' assertion of "superiority," an assertion that should be viewed with great skepticism given today's indisputable reality of a flood of Unruh Act claimants in California's state and federal courts. There is simply no need for this Court to wade into the jury trial of, according to Plaintiffs' speculation, 6,152 California claimants.

Plaintiffs try to save their motion and skirt past this untold number of individualized questions by asserting that every legally blind patient, during the class period, experienced the same Kiosk that was not "independently accessible." This contention fails for several reasons outlined below, first and foremost, because it cannot be disputed, as a matter of law, that the Department of Justice design standards explicitly exclude "interactive transaction machines" (ITMs), like the Kiosks, from independent accessibility requirements applicable to ATMs and, as the DOJ stated unequivocally, the law does not require "a particular auxiliary aid or service." (ECF No. 108 at 10.) Even if an "independently accessible" device were somehow required, that would not spare the Court the required individualized analysis of Plaintiffs' claims, particularly their Unruh Act damages claims.

For all these reasons, and those laid out below, Plaintiffs cannot meet their burden to certify a class in this action.

## II.   FACTUAL AND LEGAL BACKGROUND

### A.   Quest's Patient Service Centers and The Transition From Paper Check-In To The Rollout Of The Kiosks

Quest and its subsidiaries provide diagnostic information services, which

2

48700831_6.docx

include collecting blood and urine specimens that it then tests in accordance with physician orders.  (Quest Appendix of Evidence ("QA") 25 ¶ 2.)  Quest's process at the 2,100 patient service centers ("PSCs") located throughout the U.S. have been thoroughly briefed to this Court in Quest's motion for summary judgment, incorporated here by reference.  (ECF No. 95-1, Section II.A-C.)  Quest focuses here on those facts specifically relevant to this motion.

Under the paper sign-in system maintained by Quest for many years, the Patient Service Representatives (or phlebotomists) staffing the PSCs were trained in Quest's phlebotomist policies, procedures, and training to scan the waiting room each time they entered to find and assist any individuals who may need assistance, including those who were blind or had other disabilities.  (QA15 ¶ 3-QA21 ¶19, QA56-1156, 1371-1551.) Despite the longstanding use of this sign-in process at Quest PSCs, and the process being completely inaccessible without phlebotomist assistance to at least the totally blind, neither Plaintiff nor ACB is aware of even a single complaint under the ADA or analogous laws about the inaccessibility of this process.  (QA1157-1158; at QA1358:20-1359:5.)  Nor have Plaintiffs offered any evidence in this matter that Vargas, any ACB member, or any other Quest patient, had ever requested a paper sign-in process independently accessible to the blind without phlebotomist assistance.

In April 2016, Quest chose to install, over a two-and-a-half year rollout, one or more electronic, touchscreen tablets ("Kiosks") that patients could use to check in at PSCs.  (QA26 ¶ 7.)  Quest took care to ensure that it satisfied the explicit design standards applicable to the Kiosks in ADA Standards for Accessible Design (36 C.F.R. Pt. 1191, App. B & D, "ADAS"), which explicitly include this "Advisory 707":  "Interactive transaction machines (ITMs), other than ATMs are not covered by Section 707," which mandates standards to permit independent use of ATMs by the blind.

As it had for years, Quest relied on its policies, procedures, and phlebotomists'

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION

training to assist any and all patients, including its disabled patients, with the check-in process.  (*Id.*; QA15-16 ¶¶ 3-4.) Quest's plan and business case for the Kiosk rollout did not include a plan to reduce then-existing PSC staffing or to replace PSC staff with Kiosks.  (QA26-27 ¶ 10.)  Between mid-2016 and the end of 2018, Quest and its subsidiaries installed, activated, and used Kiosks for check-in purposes at 2,161 of their PSCs.  (QA1188-1228.)  On January 1, 2018, the beginning of the class period, Quest had done so at *only 58% of its PSCs.  (Id.)*  Depending on when during 2018 a putative class member visited, there may have been a more than 40% chance that the PSC *did not even have a Kiosk in use*.

## B.   Three-Finger Swipe Is Implemented

The details of what came to be known as the "Three Finger Swipe" ("TFS") enhancement are detailed in Quest's briefing on summary judgment, incorporated here. (ECF No. 95-1, Section II.E.) We focus here on issues relevant to this motion.

The three complementary components of TFS permitted independent check-in at the Kiosks:  (1) automatic check-in of patients who swiped three fingers on the Kiosk screen in any direction, providing an audio message to the patient and further providing notification to Quest phlebotomists; (2) Quest TV audio messages, on continuous loop, on how to check in at the Kiosk with the TFS; and (3) Developing and assigning updated ADA training for PSC phlebotomists.  (QA12 ¶ 6; QA8 ¶ 6.) The TFS capability was installed in all PSCs in August 2020.  (QA8-9 ¶ 7.) The audio message on the Quest TVs at the PSCs was activated in January 2021, and the enhanced training of PSC phlebotomists was rolled out and assigned in March 2021.  (*Id.*) Because blind guests are intimately familiar through use of their smartphones with the operation of touchscreens through the application of unique finger gestures on their screens (QA1354:9-16, 1355:4-1356:4, 1357:3-11; PA0392; QA1330:20-1331:12; 1331:14-1332:4), the TFS enhancement is a reliable means of providing independent check-in access to the blind.  Indeed, Mr. Vargas was able to "perform the TFS." (ECF No. 110-12 at 12.)  The alternative of phlebotomist assistance,

Case No. 2:19-cv-08108 DMG (MRWx)

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION

which Vargas and others admit they received (see Sections II.C and II.D below), remains available.  (QA15-21 ¶¶ 3-19.)

### C.    Plaintiff Julian Vargas' Alleged Experiences at Quest

As told in Plaintiffs' MSJ Opposition (ECF No. 110-12 at 11-12), Vargas made two visits to Quest PSCs.  At the first, in June 2018, he waited 10-15 minutes to be greeted by the phlebotomist, was greeted, and waited another five minutes for the phlebotomist to serve another guest before assisting him.  (*Id.* at 11.)   Omitted from Plaintiffs' account is the undisputed fact that the phlebotomist assisted Vargas with check-in and that Vargas received diagnostic services during this visit. (PA0380:17-25.)  Because Vargas did not observe any other patient arrive while he waited (PA0369:15-19, PA0380:12-16), it is entirely possible that Vargas' wait was entirely the result of the phlebotomist on duty assisting a patient who arrived (or had an appointment) before him, and that the unavailability of the Kiosk had nothing to do with his wait.  In other words, Vargas may have waited *the exact same amount of time* whether or not he had been able to check in at the Kiosk.  During Vargas' June 2021 visit, he waited 8-10 minutes to hear the Quest TV instructions on using TFS (though he presumably knew from following the litigation how to use the TFS), and then successfully "performed the TFS."  (ECF No. 110-12 at 12.)

### D.    Putative Class Members' Successful Visits To PSCs

With their singular and misplaced focus solely on what the initial Kiosks could and could not do, Plaintiffs omit to mention the many putative class members who were quickly and successfully served at Quest.  Plaintiffs cite to records maintained by Quest over the four-year period during and following the Kiosk's rollout that contained any Kiosk-related feedback that Quest's Patient Advocacy team logged from blind patients and inaccurately characterizes the records as " complaints from blind patients about [Kiosk] inaccessibility."  (ECF 110-12 at 8, citing to PA0049-

57.)[1]  Even a brief review of the document makes clear that the ▮ items are: (1) not all "complaints"; and (2) not even about the Kiosk, but mention it in passing and thus were included.  (*Id. passim*.)  For example,



Placed in a statistical perspective, the ▮ items in nearly four years, or the ▮ in the 24 months of the putative class period (2018-2019) constitute a monthly rate of approximately one feedback item from a blind patient per month, out of the average of 1,320 monthly blind visitors that Plaintiffs estimate (ECF No. 106-1 at 20), or approximately ▮% of visits from blind patients resulted in feedback. Viewed from a different statistical perspective, these feedback items represent a scant ▮% of the feedback logged by Patient Advocacy, approximately half of the percentage of legally blind in the overall population, according to Plaintiffs' expert (.33%).  (PA0906 ¶ 15; QA1560 ¶2.) This feedback rate is placed in even starker perspective against the backdrop of more than ▮ million PSC visitors in 2018 and 2019.  (QA1560 ¶ 3.)

The record of visits by ACB members contains many examples of blind patients being immediately assisted.  Indeed, ▮ the blind, ▮, testified that she waited only 3-5 minutes to be served on one visit and was helped immediately by a phlebotomist on another visit.  (QA1287:1-7; 1292:2-14.) ▮, an ACB member, wrote in response to an open ACB inquiry about Quest, "There has always been an attendant to take info or had to have

---

[1] Since the chart records statements made by outside declarants to Quest's patient advocacy representatives, the matters asserted in the chart regarding these patients' visits are plainly hearsay.  Evid. Code § 801(c).

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION

48700831_6.docx

someone sign name on the list when the attendant was in back." (QA1346.) █████ wrote that, on 6/3/20, her friend told her the kiosk "wasn't even there and someone outside was checking people in." (*Id.*) Or, █████ "had a staff member at the center help him check in for appointments." (PA0710:12-13.) Even Mark Derry's alleged visits to 24 PSCs yielded instances of patients being greeted immediately.[2] (PA 0873 ("Large reception room with person behind a desk."); s*ee also* QA1307:6-14, 1308:24-1309:4, 1313:21-24, 1316:19-1317:1, QA1253:16-20, 1254:11-1255:12; 1346 (not required to use Kiosk). Mr. Vargas himself was able to check in using TFS (ECF No. 110-12 at 12), and several others have been able to receive a message on their phones that the phlebotomist was ready to see them. (PA0711:25-712:15.) No class member claims a denial of diagnostic services. (QA1239:13-15, 1252:10-12, 1254:11-1255:12, 1269:4-12, 1271:12-17, 1277:16-21, 1288:22-24, 1291:3-16, 1293:8-21.)

## E. ACB's Lawsuit Was Prompted By A Single Member Complaint; ACB Never Received Any Other Unsolicited Complaint.

The narrowness of the putative concern expressed by the putative class is underscored by how plaintiff ACB, a well-established blind advocacy group with 8,285 members and many affiliates (QA1162; QA1327:7-11), was alerted to the Kiosk issue by a *single member's complaint* in November 2018. (QA1323:22-1324:13.) Prior to that complaint, ACB had received no complaints about either the Kiosk or the paper check-in process, both of which involved PSC phlebotomist assistance. (*Id.* at QA1325:12-1326:21.) After sending out two separate surveys (in November 2018 and June 2020), the second survey to its entire membership and affiliates, ACB received only 29 total responses, 0.35% of ACB's membership.

---

[2] For the reasons set forth more completely in the accompanying Objections and Declaration of Joseph A. Krock (QA29-35) and in Quest's reply brief on summary judgment (ECF No. 121-1, II.G. at 8-9), Quest submits that the unscientific survey undertaken by Mr. Derry should be excluded in its entirety.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION

(ECF No. 106-1 at 18.)  At the time ACB joined the lawsuit, ACB had received only the 15 mixed responses (many reflecting no problems) that are collected in Exhibit 63 to the deposition of ACB's 30(b)(6) designee.  (QA1360:11-1362:13, QA1364.)  Indeed, from November 28, 2018 and June 3, 2020, **ACB received only that one unsolicited complaint about the Kiosks from its membership or any other source**.  (QA1360:11-1362:13.)  The entire admissible record on this action consists of just two unsolicited complaints.  Plaintiffs fabricate from whole cloth a complaint from the putative class, which, in reality, derives from two people.

### F.   No Records of Blind Patients or Level of Impairment

Quest maintains no records of whether any of its PSC patients are blind or the degree of their impairment.  (QA1557 ¶ 3; PA0723:13-28, 724:27-725:14; 726:14-727:1, 730:14-731:1; 732:2-17; 733:20-734:7.)  For the reasons explained in the accompanying the Yarrison Declaration, the use of TFS does not verify or even necessarily indicate that the TFS-user was blind.  (QA1368:17-1369:25.)

### G.   Contrary To Plaintiffs' Contention, Disabled Plaintiffs In California Are Bringing Unruh Act Damages Claims In Ever-Increasing Numbers, Displaying No Reluctance Or Difficulty To Do So.

Against all evidence and what is well-known to any practitioner of Title III law in California, or for that matter anywhere in the United States, Plaintiffs assert that "there is no indication in the record that class members have an interest in individually controlling their own cases, as the cost of litigation would be prohibitive."  (ECF No. 106-1 at 28.)  Nothing could be further from the truth.  If anything, the incentives to bring Unruh Act damages lawsuits are successfully causing an ever-increasing numbers of lawsuits, and that's purely looking at Title III litigation in the federal courts.  (Ex. A to Req. Jud. Notice "ADA Title III Federal Mid-Year Lawsuit Numbers at an All-Time High," (Aug. 18, 2021) (reporting record-breaking pace of 6,304 by June 30 and that "California led the pack with

3,340 filings.").)

## III.   LEGAL ARGUMENT

### A.   With The Advent of TFS, The Putative Class Members Lack Standing To Seek Injunctive Relief

To the extent the Court affirms Quest's standing argument on summary judgment (*see* ECF Nos. 95-1, III.E at 21-24 & 121-1, III.F at 21-24), which Quest incorporates here, the following may be rendered moot.  But there are distinct, class-related reasons for why putative class members lack standing not discussed on summary judgment.  More specifically, many of the putative class members will be unable to establish standing as required by *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2211 (2021). Putative class members must face future risk of harm "that is sufficiently imminent and substantial" (*id.*), and each class member must do so because "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form or relief they seek (for example, injunctive relief and damages)."  *Id.* at 2208.  Plaintiffs seek injunctive relief for a proposed class of Quest patients during a narrow window of January 1, 2018 through December 31, 2019, before implementation of TFS, meaning that putative class members seeking an injunction have not necessarily experienced one of the current means of independently checking in.  Indeed, there is scant evidence from only one putative class member aside from Vargas have attempted TFS, or had difficulty using it; indeed, Vargas was able to check in performing the swipe in June 2021.  (ECF No. 110-12 at 11:27-12:8.)[3]  Now that he knows how to check in with TFS, he can immediately do so next time.  With no injury in fact as to the TFS mode of check-in and only purely speculative "imminent future injury," the putative class

---

[3] Even assuming Derry's submission is admitted into evidence, his sporadic, statistically-insignificant visits to 24 locations does not and cannot show programmatic violations from TFS (or anything else) at the more than 2,100 PSCs at issue. *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017).

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION

cannot establish standing. *Chapman v. Pier 1 Imps. (U.S.), Inc*., 631 F.3d 939, 948 (9th Cir. 2011) (quoting *Fortyune v. Am. Multi-Cinema, Inc.,* 364 F.3d 1075, 1081 (9th Cir. 2004) ("Where, as here, a party seeks injunctive relief, 'past exposure to illegal conduct does not in itself show a present case or controversy.' [Citations omitted]").  The putative class members lack both "injury in fact" as to TFS and any "imminent future injury."

### B.      Plaintiffs' Failure To Meet the Rule 23(a) Standards Dooms Each of Their Proposed Classes.

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only" and for this reason courts must ensure that the class representative "must be part of the class and possess the same interest and suffer the same injury as the class members." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011) (internal quotation marks omitted).  To this end, "Rule 23 does not set forth a mere pleading standard." *Dukes*, *supra*, at 350.  Given this, the Court should not accept allegations made by Plaintiffs and certify a class in a vacuum, ignoring factual and legal issues bearing on the claims and the proposed class.  Rather, "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," and "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160-161 (1982) (internal quotation marks and citations omitted).  "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id.* at 350-351 (internal quotation marks omitted). "[A]ctual, not presumed, conformance with Rule 23(a) remains, however, indispensable." *Falcon*, *supra*, at 160-61.

### 1.      Plaintiffs Fail To Establish Rule 23(a)(1) As The Number of Potential Class Members Is Not Sufficiently Numerous

"The numerosity requirement requires examination of the *specific facts* of each

48700831_6.docx

case and imposes no absolute limitations." *Gen. Tel. Co. of the NW., Inc v. EEOC*, 446 U.S. 318, 330, (1980) (emphasis added).  "A party seeking class certification must affirmatively demonstrate his compliance with the Rule--that is, he must be prepared to prove that there are in fact sufficiently *numerous* parties . . . ." *Dukes*, 564 at 350.  Plaintiffs attempt to establish numerosity by pointing to feedback received by the Quest Patient Advocacy team, complaints from ACB members, and baseless statistical extrapolation from census data.

First, as noted above, some of the 29 ACB members group have testified that they were promptly helped by PSC phlebotomists, and all received services at the PSCs.  (*See* evidence cited in Section II.D above.)  While Plaintiffs contend that all were unable to *independently* use the pre-TFS Kiosk, that is not the legal standard; Quest can provide services through "auxiliary aids and services."  28 C.F.R. § 36.303(c); (*see also* authority cited at ECF No. 95-1, III.B at 10.)  Moreover, because the putative class seeks injunctive relief, the relevant question is whether they were able to use the current TFS to check in.  Other than Vargas, who was able to use TFS, and one solitary class member, there is no evidence that <u>any</u> other putative class member is unable to use TFS or had even tried.  The Patient Advocacy feedback is both inadmissible hearsay to prove difficulties using the Kiosks (Fed. R. Evid. 803) and likewise contains statements from individuals who had not visited the PSC and who had concerns other than those expressed here.  Of the ▮ only ▮ patient feedback items (one per month) were made during the putative class period.  None cover the potential use of TFS.

Falling short with this group, Plaintiffs then seek to establish numerosity using statistical extrapolation.  At most, Plaintiffs' expert guesstimates the number of legally blind patients who may have visited a PSC (based on proportion of the overall population), but inexplicably and baselessly assumes that each such individual was also denied full and equal access to Quest's services.  The sparse record of unsolicited (one) and solicited (29) concerns from ACB's thousands of

11

48700831_6.docx

members and affiliates – out of Plaintiffs' speculative estimate of 31,683 blind patients – demonstrates that it is highly unlikely that any given blind person was actually denied services when they visited Quest.  Yet, Plaintiffs count *all* of the *estimated* blind PSC visitors, even though class membership necessarily requires that each individual: (1) visited a Quest PSC location; (2) used the Kiosk system, even though less than half of the PSCs even had a Kiosk when the class period started (Section II.B above); (3) was not assisted by a Quest employee to check in; (4) was too visually-impaired to use the Kiosk, and (5) as a result, could not access Quest's services.  Plaintiffs' expert assumes away all of these conditions, making his methodology speculative and overbroad. *See Siles v. ILGWU Nat'l Ret. Fund*, 783 F.2d 923, 930 (9th Cir. 1986) (absence of numerosity where plaintiff alleged total number of employees impacted, but provided no evidence to answer questions to determine class membership); *Athanassios Diacakis v. Comcast Corp.*, No. C 11-3002 SBA, 2013 U.S. Dist. LEXIS 64523 at *14 (N.D. Cal. May 3, 2013); *Celano v. Marriott Int'l, Inc*., 242 F.R.D. 544, 549-50 (N.D. Cal. 2007).  Plaintiffs make these assumptions disregarding the tiny fractional number of feedback items received by Quest or ACB and the total absence of any feedback received by Quest or ACB regarding the preceding paper sign-in process.  Had the Kiosks denied all legally blind patients full and equal enjoyment, surely Quest and ACB would have heard about it in much larger numbers.  *Shields v. Walt Disney Parks & Resorts US, Inc.*, 279 F.R.D. 529, 545-546 (C.D. Cal. 2011) (numerosity not met recognizing the visitor complaints were only a "fraction of the number of potential class members affected by that issue.").  Given theh proper and considerable weight it deserves, the lack of a significant number of complaints about the Kiosk belies Plaintiffs' overbroad and grossly speculative statistical data.  Where, as here, "evidence of numerosity is entirely lacking, the Court cannot substitute its imagination – no matter how commonsensical – in place of facts." *Shields*, 279 F.R.D. at 544, 546; *see also Epps*, *supra*, *9-10.

12

## 2. **Plaintiffs Have Not Satisfied Rule 23(a)(2)'s Commonality Requirement.**

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." [citation omitted] This does not mean merely that they have all suffered a violation of the same provision of law." *Dukes*, *supra*, at 349-50 (citation omitted). The common question cannot be *any* question; rather, it

> must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke. What matters to class certification . . . is not the raising of common questions – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.

*Dukes*, *supra*, at 350 (emphasis added, citation and internal quotation marks omitted). Applying these principles, the *Dukes* court concluded that commonality was not established because the plaintiffs failed to offer "significant proof" that the defendant "operated under a general policy of discrimination." *Id*. at 352, 357-59.

As a threshold matter, the legal requirement that Plaintiffs seek to enforce here – "effective communication" – itself requires individualized treatment. "A public accommodation should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication…." 28 C.F.R. § 36.303(c)(1)(ii). As Plaintiffs concede, every person with disabilities has a different level of impairment and different comfort level with technology. (QA1333:14-1334:2.) Indeed, while they carefully avoid mention in these moving papers, Plaintiffs loudly contend elsewhere that the Rehabilitation Act requires "primary consideration" of the requests of individual disabled patients. (ECF No. 110-12, III.D. at 22-25.) "Courts have been cautious to certify disability discrimination claims as class actions due to the individualized determinations required by such claims." *Sokol v. New United Motor Manuf., Inc.*, 1999 WL 1136683 at *4 (N.D. Cal. Sept. 20, 1999), citing *Mantolete v. Bolger*, 767 F.2d 1416, 1425 (9th Cir. 1985).

13

The caselaw recognizes an exception to this rule where the defendant operates under *a common policy or procedure that discriminates*.  Plaintiffs assert that the Kiosk's lack of "independent access" is such a policy.  (ECF No. 107-1 at 21.)  But that contention disregards the fact that the Kiosks comply with the explicit design requirements in the ADA Standards for Accessible Design (ADAS), and no allegation that it failed to do so.  (QA26 ¶ 9, QA1366:11-21, 1367:2-8); ADAS Advisory Note 707 (excusing Kiosk from reach of ATM standards). Quest's actual, longstanding and common policies, procedures, and training consistently instructs its phlebotomists to sweep the waiting room to assist any patients needing help, training that successfully worked for years with paper sign-in sheets, without any complaint identified by Plaintiffs.  (QA56-1156, 1371-1551; QA15-16 ¶¶ 3-6; QA1326:17-21.) Aside from the failure to use the term "primary consideration," which is nowhere required, Plaintiffs do not effectively challenge the policies or training themselves, only their effectiveness in practice, which again raises the precise kind of individualized questions that undermine commonality.  *See, e.g., Wright v. Renzenberger, Inc*., 656 F. App'x 835, 838 (9th Cir. 2016) (individualized determinations predominate where policies were legally compliant).

Putting these threshold issues aside, the evidence also displays a lack of commonality in the class members' experiences.  Plaintiffs' recitation of alleged evidence of putative class members being made to wait for service at a PSC because they could not use the Kiosk sits alongside evidence of prompt service from the same group (*see* Section II.D above), a classic basis for defeating commonality.  Of course, the reasons for the wait will also vary, are subject to speculation and, importantly, can have nothing do with the Kiosks or the adherence to policies and procedures.  (*See* Section II.C above and evidence cited.)  Plaintiffs' attempt to connect PSC staffing levels to wait time, citing alleged evidence that about half of the PSCs only had ███ employees (meaning half have more), is a flawed

48700831_6.docx

1  interpretation of the data,[4] but even if true, also suggests that phlebotomist assistance

2  is more available at about half the PSCs, again undermining commonality.

3       Two factors in the proposed class definition also undermine commonality.

4  First, Plaintiffs use of "legal blindness"[5] as a factor in determining membership in

5  the class raises its own commonality concerns because it is recognized that "[o]ften,

6  people who are diagnosed with legal blindness still have some usable vision."

7  (QA1157-1160 at 1157; Ex. B to RJN (definition of terms).)  Second, Plaintiffs'

8  class definition to include calendar year 2018, a year that started with only ██ % of

9  the PSCs having Kiosks, raises yet another fatal commonality concern.

10       So, even putting aside the threshold problems of class treatment of

11  discrimination and "effective communication" claims, Plaintiffs' evidence and class

12  definition show that putative class members' experiences have varied and that a

13  variety of factors may contribute to that:  (1) whether the PSC had a Kiosk on the

14  date of visit; (2) the degree of visual impairment; (3) the amount of time a putative

15  class member was made to wait and *the reasons for that wait, such as whether they*

16  *had not made an appointment in advance*; (4) any Quest phlebotomist's adherence to

17  policies and training; and (5) (according to Plaintiffs) the staffing at the PSC visited.

18  As a result, questions regarding putative class members' experiences at PSCs cannot

19  simply be answered with a simple determination "that will resolve an issue that is

20  central to the validity of each one of the claims in one stroke."  *Dukes* at 350.  This

---

22  [4] These statistics actually report the "full-time equivalents" (FTEs), not the actual

23  number of employees present at a PSC at a particular time and likewise excludes
independent contractors and other staff occasionally assigned to PSCs to assist with

24  patient volume.  For example, a PSC with ██ FTEs (██ working hours) may have *at least* two phlebotomists at all times if the PSC is one that is only open ██ hours per

25  week.  Moreover, the attempt to connect lower staffing to longer wait times
disregards the obvious business model to match staffing levels to patient volume.

26  [5] Legally blind is defined as having "central visual acuity of less than 20/200 in the

27  better eye with the use of correcting lens."  20 C.F.R. § 404.1581;
https://www.afb.org/research-and-initiatives/statistics/key-definitions-statistical-

28  terms (last visited September 30, 2021), Ex. B to RJN.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION

48700831_6.docx

lack of commonality means that a classwide proceeding will not "be able to generate common answers apt to drive the resolution of the litigation." *Id.* There are simply too many questions of law and fact that must be determined on an individualized basis and destroy the requisite commonality.

### 3. Vargas Claims Are Not Typical Of The Purported Classes.

"The commonality and typicality requirements of Rule 23(a) tend to merge. Both [commonality and typicality] serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 158 n.13. "The test for typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is *not unique to the named plaintiffs*, and whether other class members have been injured by the same course of conduct.'" *Sandoval v. Cty. of Sonoma*, 912 F.3d 509, 518 (9th Cir. 2018) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (emphasis added).   As discussed in the preceding section on commonality, there is far too much variation in putative class members' abilities, preferences and experiences to say that Vargas' claims are typical of the class he seeks to represent.  (See evidence and discussion at II.C-E.)

### 4. Plaintiff Vargas Cannot Fairly And Adequately Protect the Interests Of The Class.

"To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis v. Costco Wholesale Corp.*, 657 F.3d  970, 985 (9th Cir. 2011).

48700831_6.docx

(a)     **Vargas Has A Conflict of Interest Between The Two Classes He Purports to Represent *And Within* The Damages Subclass.**

"Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011), citing *Molski v. Gleich*, 318 F.3d 937, 955 (9th Cir. 2003) (overruled on other grounds by *Dukes v. Wal-Mart Stores*, Inc., 603 F.3d 571, 617 (9th Cir. 2009). Here, there is a conflict of interest between the injunctive relief class and the damages subclasses, and Vargas does not share the interests of both classes equally. This conflict is evidenced by the dual decisions to seek damages only for California residents of the nationwide class, despite the potential availability of alleged damages claims for residents of many other states (see N.Y.S. Exec. Law §§ 290 *et seq.*; Mass. Ann. Laws, ch. 272, § 98), and the decision to seek only minimum statutory damages for a single PSC visit under California law, despite the availability of actual damages, treble damages and damages for multiple visits.  Cal. Civ. Code §§ 52(a), 54.3(a); *see*, *e.g.*, *Ellis*, 657 F.3d at 986 (representative plaintiffs who sought monetary damages only would not adequately protect the class because they "would not share an interest with class members whose primary goal is to obtain injunctive relief").

Plaintiffs once (partially) attempted to address these conflicts by having a second, non-California resident act as representative for the injunctive relief class, but Anne West's claims were long ago dismissed with prejudice.  (ECF No. 78.) Similarly, the decision to limit the damages sought to "minimum statutory damages" ($4,000 (ECF No. 107-1 at 25)), without which class certification would be impossible, forfeits the claims of both non-California residents, who potentially could seek alleged damages under their state statutes or the Rehabilitation Act, as well as the claims of putative California class members who could potentially seek

17

48700831_6.docx

more than $4,000 in alleged Unruh Act damages.  "If a plaintiff is willing to sacrifice aspects of a litigation designed to assist an entire class of individuals in order to favorably affect concerns related only to her, she cannot be an adequate representative."  *Tria v. Innovation Ventures, LLC*, No. CV 11-7135-GW (PJWx), 2013 U.S. Dist. LEXIS 190664, at *25-26 (C.D. Cal. Feb. 25, 2013).  As such, the prioritization of personal interests – either in financial gain or enhancing the chances of maintaining a class litigation at the expense of available remedies – makes Vargas an inadequate representative.

### C.   <u>Plaintiff Cannot Certify a Rule 23(B)(2) Class[6]</u>

 "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to *each* member of the class…. not …when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant."  *Dukes*, 564 U.S. at 360 (emphasis added). Yet, Plaintiffs' proposed injunctive relief – a "fully accessible" Kiosk (ECF No. 107-1 at 7) – will not provide the "common answer" they claim and a (b)(2) class requires.  First, even Plaintiffs acknowledge that some legally blind individuals have differing levels of comfort with technology and would thus prefer the PSC phlebotomist assistance that Quest has provided all along.  (QA1333:18-1338:8; Log 24622 at PA0049, Log 42052 at PA0052, Log 44044 at PA0053, Log 48154 at PA0054, Log 59766 at PA0056.)  Second, the "effective communication" regulation in question requires that Quest "consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed…." 28 C.F.R. § 36.303(c)(1)(ii).  "[I]njunctions simply requiring the defendant to obey the law are too vague to satisfy Rule 65."  *Andrews v. Plains All Am. Pipeline, L.P.*, No. CV 15-4113 PSG (JEMx), 2017 U.S.

---

[6] "In addition to meeting the conditions imposed by Rule 23(a), the parties seeking class certification must also show that the action is maintainable under Fed. R. Civ. P. 23(b)(1), (2) or (3)."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998).

Case No. 2:19-cv-08108 DMG (MRWx)

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION

48700831_6.docx

Dist. LEXIS 225893 at *8 (C.D. Cal. Feb. 28, 2017) (quoting *Shook v. Bd. of Cty. Comm'rs*, 543 F.3d 597, 604 (10th Cir. 2008) (requiring that injunctions sought must "describe in reasonable detail . . . the acts or acts restrained or required."); Fed. R. Civ. P. 65(d).[7]  Plaintiffs' "primary consideration" contention, which Quest rejects, would, according to Plaintiffs, require individualized consideration of, and written response to, each patient request (ECF No. 110-12, III.D. at 23-26), thus placing an even sharper focus on the individualized nature of the injunctive relief sought. Finally, as the Department of Justice wrote in its Statement of Intent (ECF No. 118), "[t]o be clear, the United States does not contend that Quest must provide *a particular auxiliary aid or service*."  (*Id.* at 10 (emphasis added).)  As such, Plaintiffs' proposed (b)(2) class fails to provide a "common answer" and should be rejected.

### D.   Plaintiff Vargas Cannot Certify a Rule 23(B)(3) Unruh Class for Damages.[8]

#### 1.   Individualized Issues Predominate In the Damages Subclass.

"Federal Rule of Civil Procedure 23(b)(3) requires that, before a class is certified under that subsection, a district court must find that 'questions of law or fact common to class members predominate over any questions affecting only individuals members.'"  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 136 S. Ct. 1036, 1045 (2016).  "The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Id.*  (internal quotes omitted), citing *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 623.  "[T]he main concern

---

[7] Attempts to enforce this kind of variable obligation would result in an improper injunction.  "[I]njunctions simply requiring the defendant to obey the law are too vague to satisfy Rule 65." *Andrews v. Plains All Am. Pipeline, L.P.*, No. CV 15-4113 PSG (JEMx), 2017 U.S. Dist. LEXIS 225893 at *8 (C.D. Cal. Feb. 28, 2017) (quoting *Shook v. Bd. of Cty. Comm'rs*, 543 F.3d 597, 604 (10th Cir. 2008) (requiring that injunctions sought must "describe in reasonable detail . . . the acts or acts restrained or required."); Fed. R. Civ. P. 65(d).

[8] See footnote 6 above.

in the predominance inquiry . . . [is] the balance between individual and common issues." *Mevorah v. Wells Fargo Home Mortg. (In re Wells Fargo Home Mortg.),* 571 F.3d 953, 959 (9th Cir. 2013).  Certification must be denied if an "individualized inquiry" must proceed, even if "other issues [are] susceptible to common proof." *Vinole v. Countrywide Home Loans,* 571 F.3d. 935, 944-47 (9th Cir. 2009).  In assessing potential damages here, individualized issues readily predominate over common ones.

Attempting to sweep under the rug the multitude of individualized questions presented by each visually-impaired visitor to a PSC, Plaintiffs try overgeneralize the common injury by arguing that all putative subclass members accrue damages claims whenever the "kiosk .. is *identically-inaccessible* across the company's entire 2,152 PSC network."  (ECF No. 107-1 at 25-26 (original emphasis).)  But, this is an imagined injury because Quest is not obligated to accommodate the putative class with a "particular auxiliary aid or service." (ECF No. 108 at 10.)  If independent access were required to comply with this obligation, the phrase "*auxiliary . . . service*" would be unacceptable and the inclusion of this language would be rendered meaningless.  42 U.S.C. § 12182(b)(2)(A)(iii).  Instead, 28 C.F.R. § 36.303(c)(1)(ii) makes plain that auxiliary "service" is an accepted means of making a service accessible. Independent access  is not required.  Second, even if independent Kiosk access were required, many putative class would be uncomfortable with the technological solution sought by Plaintiffs and are completely satisfied with the phlebotomist assistance option that has been in place since long before the Kiosks were rolled out.  In any event, Quest alone chooses mode.  28 C.F.R. § 36.303(c)(1)(ii).

In addition to these individualized issues that arise from variable legal requirements and variable patient preferences, and *even if an independently accessible Kiosk were somehow required*, a putative class member still does not

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION

48700831_6.docx

accrue Unruh Act damages merely by showing up at a PSC that has such a Kiosk.[9] Rather, each person seeking to recover damages under the Unruh Act must show that he "actually presented himself to a business or public accommodation with the intent of purchasing its products or utilizing its services in the manner in which those products and/or services are typically offered to the public and was actually denied equal access on a particular occasion." *Reycraft v. Lee*, 177 Cal. App. 4th 1211, 1224 (2009); *Antoninetti v. Chipotle Mexican Grill, Inc*., 643 F.3d 1165, 1177 (9th Cir. 2010).  As the California Court of Appeal explained in *Urhausen v. Longs Drug Stores California, Inc*., 155 Cal. App. 4th 254, 265-266 (2007), merely proving a violation of the accessibility standards is insufficient "since any disabled person could sue for statutory damages whenever he or she encountered noncompliant facilities, regardless of whether the lack of compliance actually impaired the plaintiff's access to those facilities."  Rather, a plaintiff or class member can only recover statutory damages if they establish **all of the following**: (1) "the plaintiff personally encountered the violation on a particular occasion" or "was deterred from accessing a place of public accommodation on a particular occasion"; (2) the violation actually "denied the plaintiff full and equal access"; and (3) the plaintiff suffered "difficulty, discomfort, or embarrassment because of the violation."  Cal. Civ. Code § 55.56(b)-(d); *Mundy v. Pro-Thro Enters.*, 192 Cal. App. 4th Supp. 1, 5 (2011).[10]  *See also Botosan v. Paul McNally Realty*, 216 F.3d 827, 835 (9th Cir.

---

[9] Nor would Plaintiffs have Article III standing in this Court merely by entering a PSC with an allegedly inaccessible Kiosk.  *TransUnion*, *supra*, at 2208 ("Every class member must have Article III standing in order to recover individual damages.").

[10] Quest takes Vargas' reference to seeking "only minimum statutory damages on behalf of the Class" (ECF No. 107-1 at 25) to mean each class member would receive the $4,000 minimum for one visit, regardless of how many visits or deterred visits they had.  Either way is problematic for class adjudication. If Vargas seeks only $4,000 for a single visit per class member, he is forfeiting the claims of most Unruh Act plaintiffs who routinely seek potential alleged damages for multiple visits and deterred visits.  Civ. Code § 55.56(b).  If instead he seeks recovery for multiple visits (including deterred visits), he ignores the multiple *additional*, individualized questions involved in such an exercise, including whether a visit was deterred and

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION

48700831_6.docx

2000) (appellee "had to prove he was denied 'equal access'" under Unruh Act).

So, not only must each putative class member individually establish these prerequisites to recovery, individualized proof will be required to establish (1) visual impairment sufficient to prevent use of the Kiosk; (2) a "deterred" visit, as opposed to an actual visit, each of which potentially permits recovery under the statute ((Civ. Code §§ 52(a) ("for each and every offense"), 55.56(b) ("personally encountered the violation on a particular occasion, or the plaintiff was deterred on a particular occasion")); (3) damages despite reasonable mitigation efforts (§ 55.56(i)), which Quest must also be permitted to assert and prove as a defense (*Dukes*, *supra* at 366-67 (Wal-Mart entitled to litigate its statutory defenses)); and (4) the existence of actual denial and "difficulty, discomfort, or embarrassment because of the violation." These damages claims cannot be proven except through individualized adjudication.

These multiple individualized inquiries amply explain why California district courts have routinely refused to certify Unruh Act damages classes. *Moeller v. Taco Bell Corp.*, 2012 WL 3070863 at *5 (N.D. Cal. July 26, 2012) (decertifying a class after *Dukes*) ("because damages for California disability claims are inextricably intertwined with individualized liability questions, . . . it is thus impossible to make an across-the-board conclusion as to the recovery of damages by any class member. An individual class member's claim for damages cannot be adjudicated simply by demonstrating the mere presence of an alleged non-compliant feature.  Each class member must show how she or he was personally affected and was denied full and equal access by the defendant.") (emphasis added); *Antoninetti*, 2012 WL 3762440, at *6 (same); *Vondersaar v. Starbucks Corp.*, 2015 WL 629437, at *4 (C.D. Cal. Feb. 12, 2015) (same).

In the face of this overwhelming authority, Plaintiffs attempt to salvage

---

whether a claimant properly mitigated damages.  Civ. Code § 55.56(b), (h), (i).

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION

48700831_6.docx

predominance arguments and their (b)(3) class with citation to the distinguishable decisions in *Nevarez v. Forty Niners Football Co., LLC* 326 F.R.D. 562 (N.D. Cal. July 12, 2018) and *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 731 (9th Cir. 2007).[11] In *Nevarez*, the Court certified a 23(b)(3) damages class, but explicitly distinguished *Antoninetti* and *Moeller* because "this case is concerned with one building instead of hundreds spread across California." 326 F.R.D. at 586 (223 Taco Bell locations). Needless to say, the 419 Quest locations in California (ECF No. 107-1 at 25) suggest the *Nevarez* court would deny certification here.  Whether correctly decided, *Nevarez* is still not persuasive here for several reasons.  First, liability for damages here remains in dispute.  In contrast, the award of damages in *Nevarez* had been agreed to in settlement and required minimal proof and a simple administrative act.  Each such location has different phlebotomists and supervisors, different staffing levels and wait times, different patient populations and volumes, different physical layouts and may not even have had Kiosks installed during different times in the putative class period. Second, *Nevarez* addressed violations of black-and-white design guidelines, creating simple and common questions of liability for injunctive relief.  *Id.* at 569, 570 ("heavy doors, lack of accessible signage, and lack of accessible counters"). As noted above, liability here hinges on highly-variable questions of each patient's experiences when visiting a PSC.  Lastly, as discussed, the class members had differing levels of impairment, may not have encountered the Kiosks at all, or may have been able to use them without suffering any difficulty, discomfort, or embarrassment.  Consequently, this Court should join the *Moeller*, *Antoninetti*, and

---

[11] *Molski* is not a class case and has no bearing on predominance.  The quoted language ("litigant need not prove that she suffered actual damages") merely states that Plaintiffs need not prove economic loss or other concrete damages for Unruh damages. But *Molski* upheld the need for the "person encounter" with the barrier when the court found that the plaintiff there "unequivocally proved" that he "was denied access to elements of the Defendants' public accommodation due to Defendants' failure to remove barriers."  *Id.* at 734. Section 55.56 and the similar formulation set forth almost 20 years earlier by the California Court of Appeal in *Donald v. Cafe Royale, Inc.,* 218 Cal.App.3d 168 (1990) controls.

48700831_6.docx

*Vondersaar* courts in finding that Plaintiff's Unruh Act claim should not be certified. This result is so self-evident that one can find very few cases, particularly since *Dukes*, even trying to certify an Unruh Act damages class.

## 2.   Class Treatment is Inferior to Other Methods of Adjudication

Courts have likewise denied (b)(3) certification in Unruh Act cases for lack of superiority.  In *Antoninetti*, the Court opined that given the significant statutory damages available for individual claims, and given the individualized inquiries involved in determining whether damages awards were available,

> the Court sees no advantage with respect to judicial economy in certifying the issue of whether putative class members are entitled to statutory damages under the Unruh Act. Nor does the Court find that the availability of a class action is necessary to enforce the Unruh Act in this context.... Accordingly, the Court finds that a class action would not be superior to other available methods for fairly and efficiently adjudicating this controversy, and declines to certify a damages class.

*Id.*, 2012 WL 3762440, at *6–7; *see also Moeller,* 2012 WL 3070863, at *5.

If there were any doubt about the *Antoninetti* court's wisdom in assessing the incentives at the time to enforce the Unruh Act, the availability of resources to prosecute Title III ADA claims has grown exponentially since then. (*See* discussion and evidence cited at II.G (Title III filings have almost quintupled since 2013)); *Whitaker v RCP Belmont Shore, LLC*, 2020 WL 3800449 at *8 (C.D. Cal. Mar. 30, 2020) (Title III cases 24% of all filings in 2019). Plaintiffs' contention that the $4,000 in minimum statutory penalties means the "cost of litigation would be prohibitive" (ECF No. 105 at 28) barely merits rebuttal.[12]

Further, as alluded to during the adequacy discussion, certifying a Rule

---

[12] Indeed, comity concerns alone merit the Court's declining supplemental jurisdiction, even outside the class context.  *Langer v. Wadie P. Deddeh*, 2019 WL 4918084, at *1-2 (S.D. Cal. Oct. 4, 2019); *Whitaker v. Maher*, 2020 WL 984840, at *3 (C.D. Cal. Jul. 31, 2020) (Carney, J.) ("Although the substantive protections of the Unruh Act mirror the ADA, damages must be assessed according to California law. …Considerations of comity suggest that a California court is better situated to assess what damages, if any, should be awarded to [p]laintiff.") (citations omitted)).

48700831_6.docx

23(b)(3) class *solely* for Unruh damages is not superior because it would leave damage claims for non-California class members to be adjudicated later, with even less incentive to do so.  By trying just the Unruh Act claims on a class-wide basis, putative class members in other states are unjustifiable disadvantaged.

Although they omit to mention it in their moving papers, Plaintiffs reiterated their jury trial demand on the Unruh Act claims during the meet and confer on this motion, raising serious manageability concerns.  (PA at 1069:9-1070:25.)  Because this motion fails to mention the jury trial, it also fails to address how the Court will manage a jury trial where there have to be individualized findings of fact as to standing for *each* of 6,152 putative class members that Plaintiffs' expert speculatively estimates exist, as well as findings relating to alleged damages and Quest's individual defenses.  "If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'" *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001); *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1304 (9th Cir. 1990).  Plaintiffs and their expert presume manageability of an estimated 6,152 California claimants based strictly on the incorrect premises that a judgment would predetermine damages based on a finding that the inaccessible Kiosk itself entitles putative class members to damages or that there will be a settlement.  As explained above, Plaintiffs' premises wrong.  Instead, as Plaintiffs seek to enforce their right to a jury, the Court will have to devise a plan to adjudicate by jury trial 6,152 damages claims (according to Plaintiffs' estimates).  Unlike in *Nevarez*, the Court cannot simply look at a list of tickets sold to ADA accessible seating and determine that each class member was denied full access, because the mere existence of a Kiosk does not entitle a putative class member to damages.

**[Signature on next page]**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Respectfully submitted,

DATED: October 1, 2021          OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

By:  /s/ David Raizman
     David Raizman
     Amber L. Roller
     J. Nicholas Marfori

Attorneys for Defendants
QUEST DIAGNOSTICS CLINICAL
LABORATORIES, INC.; QUEST
DIAGNOSTICS HOLDINGS, INC. and
QUEST DIAGNOSTICS INCORPORATED