# EXHIBIT 24

```
                                            Page 1

 1            UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA

 2

         ----------------------------:

 3    JULIAN VARGAS, et al.,          :

                                      :

 4              Plaintiffs,           :

                                      :

 5         vs.                        : Case No.:

                                      : 2:19-cv-08108

 6    QUEST DIAGNOSTICS CLINICAL      : DMG (MRWx)

      LABORATORIES, INC., et al.,     :

 7                                    :

               Defendants.            :

 8       ----------------------------:

 9

10

11       REMOTE VIDEO-TAPED 30(b)(6) DEPOSITION OF

12                 CLARK RACHFAL

13

14    DATE:          June 9, 2020

15    TIME:          10:16 a.m.

16    LOCATION:      Alexandria, Virginia

17    REPORTED BY:   Shari R. Broussard, RPR, CSR
                     Reporter, Notary

18

19

20

21

22    Job No. CS4621386
```

EXHIBIT 24 QA 1353

Page 86

1          A     Again, much like that figure, any trends

2     that I'm aware of are anecdotal.  So I -- I know

3     at ACB we have many active Braille users, but I've

4     heard that Braille literacy, however that is

5     defined, is trending down.

6          Q     Do you understand any reasons why

7     Braille literacy is trending down?

8          A     I do not.

9          Q     Do ACB members use smartphones?

10         A     Yes.

11         Q     And do they use smartphones to assist

12    them with effective communication with the outside

13    world?

14         A     Yes.

15         Q     Is that common?

16         A     Very common.

17         Q     Okay.  Do all members of ACB use

18    smartphones?

19         A     I don't know.

20         Q     Can smartphones provide some level of

21    visual recognition that can be voiced to a user?

22         A     What do you mean by "visual recognition

EXHIBIT 24 QA 1354

Page 88

1    short texts.  Sometimes it picks up the text

2    pretty easily, other times there is, you know,

3    more of a delay or an incomplete reading of text.

4         Q    Are you familiar with the use on,

5    let's -- let's take smartphones, of distinct

6    gestures on the touchscreen of a smartphone to

7    signal or request a certain function on that

8    phone?

9         A    So yes, I'm aware of using a -- a

10   gesture with accessibility settings to access a

11   smartphone.

12        Q    Okay.  And those gestures include

13   swipes?

14        A    Yes.

15        Q    And taps?

16        A    Yes.

17        Q    And swipes and taps with different

18   numbers of fingers, correct?

19        A    For different gestures, yes.

20        Q    And swipes in different directions?

21        A    Yes.

22        Q    In your experience are your members --

EXHIBIT 24 QA 1355

Page 89

1    ACB members adept at using those distinct gestures

2    with use of their smartphone?

3        A    Those who use smartphones are very adept

4    at those gestures.

5        Q    Would you say the vast majority of ACB

6    members use smartphones?

7        A    I -- I couldn't give you a -- an

8    estimate.  I -- I would say that in my experience

9    many of our members competently use smartphones.

10       Q    More than 50 percent?

11       A    I -- I don't know.  Those that use

12   smartphones like their smartphones, those that

13   don't use smartphones like the device that they

14   have chosen to use.

15       Q    Do any of your members prefer to use

16   their own smartphones for their effective

17   communication needs over the devices of third

18   parties like businesses?

19       A    Will you repeat that question, please.

20            MR. RAIZMAN:  Shari, please.

21            THE REPORTER:  Yes.

22            (The reporter read the record

EXHIBIT 24 QA 1356

Page 94

1       BY MR. RAIZMAN:

2            Q     Let's go back to the three-finger swipe.

3                  Do you agree that a three-finger swipe

4       in any direction is a gesture that ACB members who

5       are adept at using smartphones could easily

6       master?

7            A     So yes, I believe that our members could

8       physically perform a three-finger swipe as long as

9       it is effectively communicated to them.  I'd say

10      that that's a -- a common gesture for iOS, you

11      know, Apple operating system devices.

12           Q     Going back to what's been marked as

13      Exhibit 60, there was a question asked about ACB's

14      litigation involving touchscreen devices.  It's

15      number 16.

16                 Do you recall that question and your

17      response to that question?  It appears on pages 27

18      and 28 of Exhibit 60.

19           A     Yes.

20           Q     Okay.  And do you recall that you

21      answered as to only two other touchscreen-related

22      litigation matters other than the instant lawsuit

Page 115

1      your lawyers did as well, so I actually am asking

2      about what Ms. Rehder said to ACB in the first

3      instance about her difficulties at Quest.

4           A    So I did not speak with Ms. Rehder

5      directly.  I believe that was a phone conversation

6      between her and Claire Stanley.  So my

7      understanding of that phone call was that Robin

8      Rehder shared that she was unable to independently

9      avail herself of the check-in service due to the

10     inaccessible kiosk at Quest.

11          Q    Did you ever -- did ACB ever receive any

12     other complaints about access to Quest services

13     before November 2018 and Ms. Rehder's call to

14     Claire Stanley?

15          A    I don't know.

16          Q    Can a blind person -- a person who's

17     totally blind independently use a paper sign-in

18     sheet?

19          A    No.

20          Q    Did you ever receive any complaints

21     about Quest's use of paper sign-in sheets?

22          A    No, because Quest offered an auxiliary

EXHIBIT 24 QA 1358

Page 116

1    service to be able to complete those sign-in

2    sheets.

3        Q    And what was that?

4        A    Having a receptionist available upon

5    entry of the facility.

6        Q    And when did Quest in your knowledge

7    cease offering receptionists to be available?

8        A    I don't know the specific date or if

9    it's the -- the same time frame, you know,

10   nationwide, but we began to hear about it from our

11   members and their experiences in November of 2018.

12       Q    So your information is that Quest made a

13   change to cease providing receptionists in its

14   waiting areas?

15       A    That's my understanding, yes.

16       Q    But that providing receptionists was an

17   adequate auxiliary aid and service?

18       A    It was adequate because it was timely

19   and provided prompt service to the individual.

20       Q    So someone might have to wait for the

21   receptionist to help them sign in if they were

22   blind, correct?

EXHIBIT 24 QA 1359

Page 222

1        Q    In all the time leading up to your

2   learning that Quest had been sued by Julian Vargas

3   and Anne West, had ACB received any feedback from

4   any of its members other than what we've already

5   seen in the documents marked today or otherwise

6   discussed in your testimony?

7        A    Will you -- will you repeat that or have

8   it read back, please.

9        Q    Yeah, let me -- let me try again.  I

10  think I left some things out.

11            In the time period between Robin

12  Rehder's call in November of 2018 to Claire

13  Stanley complaining about Quest's kiosk

14  accessibility and your learning that Julian Vargas

15  and Anne West had filed a lawsuit against Quest

16  for the inaccessibility of the kiosk, did you

17  receive any feedback about the inaccessibility of

18  the Quest kiosk other than what has already been

19  reflected in the documents marked today or that

20  you've otherwise testified to?

21        A    Not that I recall.

22        Q    So as of the time you learned of the

Page 223

1      lawsuit against Quest by Vargas and West, the only

2      feedback you received from ACB members was what

3      was recorded in the spreadsheet that was marked as

4      Exhibit 63, correct?

5          A     Yes, I believe that's accurate.

6          Q     Did a time come when ACB decided to seek

7      further feedback?

8          A     Yes.

9          Q     And was that ultimately attempted in

10     June of 2020?

11         A     Yes.

12         Q     And was that before Quest (sic) formally

13     entered into this litigation?

14             MR. HANDLEY:  I'm sorry, you mean ACB I

15     believe, David, not Quest.

16             MR. RAIZMAN:  There we go again.  Yeah.

17     This is going to get me fired.  I -- I -- I know

18     Amer's there.

19     BY MR. RAIZMAN:

20         Q     Let me ask the question again,

21     Mr. Rachfal.  I apologize.

22             Was the survey that you sent out -- and

EXHIBIT 24 QA 1361

Page 224

1    I'm looking at it, it's dated June 3rd, 2020.  Was

2    that before Quest -- I'm sorry -- ACB formally

3    entered into litigation against Quest?

4         A    I -- I believe that we had already

5    entered formal litiga- -- litigation at that time.

6         Q    Okay.  So the surv- -- did the survey

7    have anything to do with the decision whether or

8    not to enter the litigation?

9         A    No, I believe that, you know, some time

10   had passed and we just wanted to make sure that we

11   still had a clear understanding of the

12   inaccessibility barriers that our members were

13   facing.

14        Q    Okay.  And between your receipt of some

15   responses to the November 28th, 2018 e-mail that

16   Claire Stanley sent and June 3rd, 2020, you still

17   had not received any feedback from any other ACB

18   members about difficulties using Quest kiosks,

19   correct?

20        A    I believe that's accurate.

21        Q    Does ACB make any efforts to log the

22   subject matters of the feedback it receives from

EXHIBIT 24 QA 1362

Page 279

1          CERTIFICATE OF NOTARY PUBLIC

2              I, SHARI R. BROUSSARD, the officer before

3      whom the foregoing deposition was taken, do hereby

4      certify that the witness whose testimony appears

5      in the foregoing deposition was duly sworn by me;

6      that the testimony of said witness was taken by me

7      in stenotype and thereafter reduced to typewriting

8      under my direction; that said deposition is a true

9      record of the testimony given by said witness;

10     that I am neither counsel for, related to, nor

11     employed by any of the parties to the action in

12     which this deposition was taken; and, further,

13     that I am not a relative or employee of any

14     counsel or attorney employed by the parties

15     hereto, nor financially or otherwise interested in

16     the outcome of this action.

17

18                    *Shari R. Broussard*

19                    SHARI R. BROUSSARD

                      Notary Public in and for the

20                    District of Columbia

21

       My commission expires:

22     August 14, 2025

CONFIDENTIAL

| Name | Lab Address | Notes |
|---|---|---|
| Cassandra J. | 1106 Union Rd, Southgate Plaza, West Seneca, NW 14224 | |
| Chris G. | Missouri | |
| Christina L. | | |
| Debbie R. | | |
| Ian F. | | |
| Kathy L. | 2609 Delaware Ave, Buffalo NY | |
| Mary G. | 11212 State Hwy 151, Plaza 1., San Antonio TX | |
| Mary H. | | sent a complaint but has received no response |
| Michael Z. | 1907 Lebanon Church Rd, West Mifflin PA 15122 | |
| Nicki K. | 6006 49th Street North, Suite 300 St. Petersburg FL | |
| Nona H. | | |
| Rachel G. | 247 Third Ave, Suite 303, New York NY 10010 | |
| Roberta M. | 2682 East Grand River,East Lansing MI 48823 | |
| Robin R. | 210 North Boulder Hwy,Henderson NV | |
| Sheila D. | Fort Worth, TX | |

**Exhibit 00063**
6/9/2021
ACB/Rachfal - V1