1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

11
12
13

JULIAN VARGAS and AMERICAN
COUNCIL FOR THE BLIND, individual
and on behalf of themselves and all others
similar situated,

Case No. CV 19-8108-DMG (MRWx)

**ORDER RE DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT [95]**

14

                                    Plaintiffs,

15

                    v.

16
17
18
19

QUEST DIAGNOSTICS CLINICAL
LABORATORIES, INC., QUEST
DIAGNOSTICS HOLDINGS, INC.,
QUEST DIAGNOSTICS
INCORPORATED; and DOES 1-10,
inclusive,

20

                                    Defendants.

21
22
23
24
25
26
27
28

        This matter is before the Court on the Motion for Summary Judgement ("MSJ") of
Defendants Quest Diagnostics Clinal Laboratories, Inc., Quest Diagnostics Holdings, Inc.,
and Quest Diagnostics Incorporated (collectively, "Quest").  [Doc. # 95.]  The motion is
fully briefed.  [Doc. ## 111, 122.]  The Court held a hearing on this matter on October 8,
2021.  For the reasons set forth below, the Court **GRANTS in part and DENIES in part**
Quest's MSJ.

# I.

## FACTUAL BACKGROUND

Quest provides diagnostic services whereby it collects and tests blood and urine samples in accordance with doctors' orders. SUF A1.[1] Quest receives these samples from doctors' offices and hospitals, but also operates a network of more than 2,000 patient service centers ("PSCs") throughout the United States. SUF A2. This case is about how patients—specifically, legally blind patients—check in to receive services at PSCs.

Beginning in spring of 2016, Quest began to install touchscreen tablets at its PSCs to replace paper sign-in sheets. SUF A9, A3. The tablets were enclosed in plastic casings and mounted on posts, which Quest calls "kiosks." Quest intended to allow patients to check in by entering their name, birth date, and phone number at a kiosk. When a patient checked in, the kiosk communicated to the phlebotomist's screen in the back of the PSC. SUF B34. Once patients were checked in, they would be placed in a queue to be seen by a Quest phlebotomist according to whether they had an appointment or when they checked in. SUF B33. The queue, along with estimated wait times, would appear on a screen (a "Quest TV" monitor) in the waiting room. SUF A9. Quest says patients who did not wish to check in using the kiosk could also check in with a phlebotomist. Plaintiffs strongly contest this. *See* SUF A9. Beginning in approximately 2017, the kiosks also included a "help button." SUF B28; Walsh Decl. at PA0638:1-PA0640:3 [Doc. # 110-4]. This was not a physical button; rather, it was a touchscreen button that was only useable for patients who could read the text on the screen. SUF B28.

Quest says it always expected to make changes to the kiosks in response to user feedback. SUF A15; Yarrison Decl., ¶¶ 12-13 [Doc. # 98-1]. Quest did receive feedback from 45 patients who identified as blind, some of which identified issues with using the

---

[1] The Court cites to Defendants' Response to Plaintiffs' Statement of Genuine Disputes of Material Facts and Additional Material Facts ("SUF"), filed in support of Defendants' Reply. [Doc. # 120-3.]

To the extent the Court does not rely on evidence to which an evidentiary objection was interposed, the objections are OVERRULED as moot.

kiosks to check in.  SUF A17.  Quest also engaged in discussions about the kiosks with the American Council for the Blind ("ACB") after ACB sent Quest a letter in December 2018. SUF A18-20.

Quest has made changes to the kiosks since they were first implemented.  Most important here, after Quest's discussions with ACB and the filing of this lawsuit, Quest developed an "enhancement" to the kiosks that was specifically designed to make them independently accessible for blind patients.[2]  SUF A28.  The "enhancement" is known as the Three-Finger Swipe.  As designed, an audio message played on Quest TV monitors instructs visually impaired patients to use three fingers to swipe in any direction on the kiosk's screen.   SUF A29.   The message is designed to be played every seven to ten minutes. SUF B46.  Quest points out that once patients have used the Three-Finger Swipe, they will not need the Quest TV instruction on their next visit.  SUF A37.  The three-finger swipe checks the patient in and generates a generic patient ID number that will be called when it is the patient's turn to be seen.  SUF A29.  The kiosk plays an audio message to inform the patient of the generic ID number.  The swipe also notifies Quest phlebotomists at the PSC that a visually impaired individual has checked in.  Quest also says updated training for phlebotomists was part of the Three-Finger Swipe enhancement, although Plaintiffs dispute this. *See* SUF A29.  The Three-Finger Swipe was rolled out across PSCs in August 2020, the Quest TV message in January 2021, and the new phlebotomist training (the adequacy of which Plaintiffs dispute) in March 2021.  SUF A30.  Quest says phlebotomist assistance remains available, although Plaintiffs dispute this.  SUF A32.

Quest has made other changes to the kiosks since their initial rollout.  At some kiosks, Quest has begun to provide the ability to scan identity and insurance cards.  SUF B36-37.  During the COVID-19 pandemic, Quest has also implemented a feature that allows patients checking in using the kiosks to input a phone number and receive a text

---

[2] Quest presents evidence that Quest developed the Three-Finger Swipe after soliciting feedback from three different groups, including a focus group, of blind individuals or individuals who work with accommodating the blind.  SUF A28; Carr Decl. at ¶ 4 [Doc. # 98-1].  Plaintiffs dispute that Quest developed the Three-Finger Swipe in response to feedback.  *See* SUF A28.

message when it is their turn to be seen.  This "wait where you want" feature allows patients to wait somewhere other than the waiting area.  SUF B38.

The Three-Finger Swipe allows blind patients to check in, but does not allow patients to interact with the kiosks in order to access all the kiosks' features.  The "wait where you want" feature is not available using the Three-Finger Swipe.  SUF B38, B51.  The Three-Finger Swipe also does not allow patients with appointments to check in as such—rather, patients using the Three-Finger Swipe process check in as walk-ins, and wait their turn as walk-ins.  SUF B47.  Blind patients using the Three-Finger Swipe also cannot check where they are in the queue to be seen, because this information is available only on Quest TV monitors.  SUF B51.

Quest does not dispute that these features are not available using the Three-Finger Swipe, but says "wait where you want" is available to blind patients through other technology, and all the services available through the kiosks are accessible for blind patients with assistance from a phlebotomist.  SUF B38, B51.

## II.

## PROCEDURAL BACKGROUND

Plaintiffs Julian Vargas, Anne West,[3] and the American Council for the Blind ("ACB") filed the operative First Amended Complaint in this Court on May 15, 2020 ("FAC").  [Doc. # 41.]  Plaintiffs' FAC asserts claims for violations of (1) the Americans with Disabilities Act ("ADA"), 42 U.S.C. section 12101 *et seq*., (2) California's Unruh Civil Rights Act, Cal. Civ. Code section 51 *et seq*., (3) California's Disabled Persons Act, Cal. Civ. Code sections 54-54.3, and (4) section 504 of the Rehabilitation Act, 29 U.S.C. section 794.  Plaintiffs bring their claims individually and on behalf of a proposed nationwide class (as to claims (1) and (4)) and a proposed California sub-class (as to claims

---

[3] On May 27, 2021, West voluntarily dismissed all her claims with prejudice.  [Doc. # 78.]

(2) and (3)).[4]   Plaintiffs seek declaratory and injunctive relief in addition to statutory damages (on behalf of Vargas and the proposed California sub-class) for the Unruh Act and Disabled Persons Act claims.   Quest filed its Answer on June 5, 2020.   [Doc. # 47.]

Quest filed the instant MSJ on September 3, 2021.   [Doc. # 95.]   Plaintiffs filed their opposition on September 17, 2021.   [Doc. # 111.]   Quest filed its reply on September 24, 2021.   [Doc. # 122.][5]   The Department of Justice also filed a Statement of Interest of the United States of America, articulating the United States' position regarding the application of the ADA to "the use of kiosks in healthcare settings."   [Doc. # 118.]

Quest moves for summary judgment or, in the alternative, for summary adjudication of one or more of 15 issues.   Quest seeks summary judgment against Vargas and ACB on all four of Plaintiffs' claims, as well as the following issues:

(1) whether the obligation to provide "effective communication" under Title III of the ADA permits a place of public accommodation to provide the auxiliary aid or service of its choosing provided that the aid or service provides "effective communication" within the meaning of the ADA and its regulations;

(2) whether the provision of phlebotomist assistance to check in at Quest patient service centers, combined with the provision of the Three-Finger Swipe enhancement, provides "effective communication" within the meaning of 28 C.F.R. § 36.303;

(3) whether section 504 of the Rehabilitation Act extends the "primary consideration" obligation found in 28 C.F.R. § 35.160(b)(2) to recipients of federal financial assistance;

(4) if the Rehabilitation Act does impose the "primary consideration" requirement on recipients of federal financial assistance, whether such requirements apply to Quest's

---

[4] By the parties' stipulation, the Court will hold a hearing on Plaintiffs' Motion for Class Certification on October 29, 2021, after the hearing on the instant MSJ.   [Doc. ## 76, 77.]   Briefing on that motion is ongoing.   [*See* Doc. ## 107, 133.]

[5] Quest filed its Reply after midnight the night of September 24, so it appears from the docket that Quest filed its Reply on September 25.

development of a single enterprise-wide check-in technology for its millions of patients at all its patient service centers;

(5) if the Rehabilitation Act does impose the "primary consideration" requirement on recipients of federal financial assistance, whether it applies to the initial version of Quest's kiosk, given that there is no dispute that Quest did not receive (and could not have received) a request for an auxiliary aid or service related to the kiosks before the kiosks were even deployed;

(6) if the Rehabilitation Act does impose the "primary consideration" requirement on recipients of federal financial assistance, whether Quest satisfied the requirement in its development of the Three-Finger Swipe enhancement based on feedback provided by ACB and by groups of blind individuals and their advocates;

(7) whether Plaintiffs can satisfy the intentional discrimination requirement to prove a violation of section 51(b) of the California Civil Code;

(8) whether Plaintiffs' claims under the Unruh Act and Disabled Persons Act fail to the extent they rely on Plaintiffs' ADA claim;

(9) whether Vargas lacks standing to seek injunctive relief;

(10) whether ACB lacks standing to seek injunctive relief; and

(11) whether Plaintiffs' claims for injunctive relief under each of their four claims for relief should be dismissed with prejudice as moot.

### III.

### LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable to the nonmoving party." *Id.*

**IV.**

**DISCUSSION**

**A.    ADA Claim**

Title III of the ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" in places of public accommodation.   42 U.S.C. § 12182(a). Discrimination includes a public accommodation's failure to take steps necessary to "ensure" that disabled individuals are not "excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." *Id.* at § 12182(b)(2)(A)(iii).[6] Regulations promulgated by the Department of Justice further provide that a public accommodation must provide appropriate auxiliary aids and services necessary "to ensure effective communication with individuals with disabilities."

---

[6] A public accommodation need not provide auxiliary aids and services if it can show that doing so "would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden." *Id.* Quest does not argue that this exemption applies here.

Title III "prohibits anything less than the full and equal enjoyment of places of public accommodation by individuals with disabilities." *Landis v. Washington State Major League Baseball Stadium Pub. Facilities Dist.*, 11 F.4th 1101 (9th Cir. 2021). "Public accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012).

Plaintiffs allege that Quest, by denying Plaintiffs access to the kiosks' check-in functions, failed and continues to fail to provide Plaintiffs with benefits or services equal to those Quest provides to others and fails to ensure effective communication with Plaintiffs. In their MSJ, Quest argues that under the ADA it need not provide Plaintiffs independent access to the kiosks; rather, it need only provide equal access to Quest's *diagnostic* services. For this reason, Quest argues, it need only provide an alternative means of effective communication, and that the availability of phlebotomist assistance satisfies that requirement.

### 1.     Whether The Kiosks Are "Special Goods"

Title III does not require a public accommodation to "alter its inventory to include accessible or special goods that are designed for, or facilitate use by, individuals with disabilities." 28 C.F.R. § 36.307(a). In *Weyer v. Twentieth Century Fox Film Corporation*, the Ninth Circuit reasoned this principle did not require an employer to offer an insurance policy providing the same duration of long-term disability coverage for individuals with mental disabilities as for individuals with physical disabilities:

> The ordinary meaning of [Title III] is that whatever goods or services [a] place provides, it cannot discriminate on the basis of disability in providing enjoyment of those goods and services. This language does not require provision of different goods or services, just nondiscriminatory enjoyment of those that are provided. Thus, a bookstore cannot discriminate against disabled people in granting access, but need not assure that the books are available in Braille as well as print.

-8-

198 F.3d 1104, 1115 (9th Cir. 2000); *accord McNeil v. Time Insurance Company*, 205 F.3d 179 (5th Cir. 2000).  Quest argues this principle excuses Quest from making its kiosks independently accessible to blind individuals.  *Weyer* and the regulation, however, do not control here.

In *Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc.*—to which Quest cites repeatedly—the Ninth Circuit reversed a district court opinion finding a movie theater was not required to offer closed captioning to a disabled moviegoer.  603 F.3d 666, 674 (9th Cir. 2010).  The court in *Goddard* reasoned that to find, based on *Weyer*, that a movie theater that simply offered disabled and non-disabled patrons "equal access" to movies with sound would effectively eliminate the duty to provide auxiliary aids and services, because "[b]y its very definition, an auxiliary aid or service is an additional and different service that establishments must offer the disabled."  *Id.* at 672.

In its Statement of Interest, DOJ calls the "special goods" regulation an "inventory exception."  This understanding allows *Weyer* to be harmonized with *Goddard*.  *Weyer* concerned the provision of insurance policies, and reasoned that the plaintiff's employer "simply gave her the same opportunity that it gave all the rest of its employees—buy into the group policy with the limitation at the cheaper, group price or buy her own individual insurance coverage without the limitation at whatever the market price may be."  *Id*. at 1116.  The *Weyer* court, despite referring to "goods and services," treated the insurance policy in question as a *product* for which special alternatives need not be offered.  This way of thinking about the similarities between books and insurance policies helps explain why the kiosks do not fit into this exception.

Though not articulated quite this way, Quest's argument seems to be that the kiosks are "goods," and that Quest need not provide special goods (i.e., accessible kiosks) to accommodate disabled patients, but only "auxiliary aids and services" (i.e., phlebotomist assistance) to allow patients to access the goods (kiosks) it already provides.  As Quest points out, though, Quest does not manufacture or sell kiosks.  The principle that public accommodations need not provide "special goods" designed to accommodate individuals

-9-

with disabilities does not apply to Quest's use of kiosks to allow patients to check in to receive diagnostic services.  Rather, the kiosks are a part of the service that Quest provides, and it must provide auxiliary aids and services to render them accessible to blind patients.

## 2.     The "Effective Communication" Requirement

Quest provides healthcare services, which include testing blood and urine samples in a lab, but also includes collecting those samples in PSCs around the country.

The primary issue here is whether Quest has provided auxiliary aids and services that ensure "effective communication" with disabled patients as required by the ADA. ADA regulations provide that a public accommodation may choose which auxiliary aids to provide in order to ensure effective communication, so long as the method chosen "results in effective communication."  28 C.F.R. § 36.303(c)(1)(ii).  In weighing what aids or services to provide, "[a] public accommodation should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed."  *Id.* "Effectiveness" will depend on the circumstances:

> The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. . . . In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

*Id.*   The effective communication requirement is fact intensive.  For this reason, "an effective-communication claim often presents questions of fact precluding summary judgment."  *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 836 (11th Cir. 2017) (citing *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334 (11th Cir. 2012)).

Quest appears to concede that its kiosks, as originally developed, did not provide "effective communication" with blind individuals.  Quest argues, however, that phlebotomist assistance was available to provide effective communication, and that this

satisfied the requirements of the ADA.[7]

At the outset, it is important to establish exactly what "communication" the kiosks enabled for sighted patients, since (as the regulations make clear), the effectiveness of the auxiliary aids provided will turn on the nature of the communication. The "communication" effected by the kiosk was not, as Quest would have it, the provision of a patient's name, birth date, and phone number. Rather, it was a patient's communication to a phlebotomist located behind a closed door that the patient had arrived and was ready to be seen. For a patient with an appointment, this included checking in for the appointment; for a patient without an appointment, this included adding her name to the waitlist to be seen at the appropriate time.[8]

Quest analogizes to restaurant menus to argue that phlebotomist assistance, if available, was and is an adequate auxiliary aid under the ADA. Quest cites to several out of circuit cases, as well as a DOJ guidance document on "Effective Communication," which support the idea that restaurants may provide "qualified readers" instead of independently accessible menus for visually-impaired customers. *See Sullivan v. Doctor's Assocs. LLC*, No. 1:19-CV-719-GHW, 2020 WL 2319295, at *4 (S.D.N.Y. May 8, 2020) (finding on a motion to dismiss that under Title III "the ADA does not require, as Plaintiff argues, that Subway restaurants use self-ordering kiosks"); *West v. Moe's Franchisor, LLC*, No. 15CV2846, 2015 WL 8484567, at *3 (S.D.N.Y. Dec. 9, 2015) (finding on a motion to dismiss that "effective assistance from [fast-food restaurant] employees acting as 'qualified readers'" when operating touchscreen soda fountains satisfies the ADA); *see also* U.S. Department of Justice, Civil Rights Division, "ADA Requirements: Effective Communication," available at https://www.ada.gov/effective-comm.htm ("In a lunchroom

---

[7] Quest also argues that the Three-Finger Swipe enhancement moots Plaintiffs' claims. The Court addresses the Three-Finger Swipe in the context of Quest's mootness claims below.

[8] Later iterations of the kiosks include more complex, interactive communications, such as enabling a patient to wait outside during the COVID-19 pandemic and scan insurance or ID cards. The Court will address these more complex communications along with the Three-Finger Swipe when it discusses mootness in a later section.

or restaurant, reading the menu to a person who is blind allows that person to decide what dish to order."); *cf. Boyer v. Five Guys Enterprises, LLC*, No. 15-CV-1417-L-JLB, 2018 WL 4680007, at *7 (S.D. Cal. Sept. 28, 2018) (finding failure to offer employee assistance to operate a touchscreen soda fountain violated the ADA because it did not ensure effective communication).  Plaintiffs, on the other hand, compare Quest's kiosks to ATMs, which must be independently accessible.  *See* 2010 Americans with Disabilities Act Standards for Accessible Design, § 707, available at http://www.ada.gov/regs2010/2010ADAStandards/2010ADAstandards.htm#pgfId–1006537.

Plaintiffs' analogy is not persuasive because the ADA Standards for Accessible Design specify that the requirements that apply to ATMs do not apply to other "interactive transaction machines."  *Id*.  To the extent Quest's restaurant analogy is persuasive, it still requires that employees be available to read the visually-impaired customer the menu.  *See Boyer*, 2018 WL 4680007, at *7.

Controlling Ninth Circuit authority also supports rejection of Quest's restaurant menu analogy.  In *Robles v. Domino's Pizza, LLC*, the Ninth Circuit held that the ADA's mandate to provide auxiliary aids and services to make visual materials available to individuals who are blind applied to the website and app for Domino's Pizza.  913 F.3d 898, 904-06 (9th Cir. 2019).  Despite the fact that phone and in-person ordering were still available, the court reasoned that the website and app were "two of the primary (and heavily advertised) means of ordering Domino's products," and that their alleged inaccessibility impeded access to the goods and services of a place of public accommodation.  *Id*. at 905.

Regardless, the real issue here is not whether phlebotomist assistance was adequate under the ADA.  The major problem with Quest's argument is that using the original iteration of the kiosks, phlebotomist assistance does not appear to have been readily or reliably available.  Plaintiffs have presented evidence that phlebotomists were not always available.  Quest argues that isolated instances of phlebotomist unavailability do not indicate programmatic unavailability, and that the Court should therefore find that

Plaintiffs' evidence does not create a material factual dispute.[9] The Court need not rely on Plaintiffs' evidence to determine whether phlebotomists were always available, however, because phlebotomist unavailability appears to have been part of Quest's plan. Quest's waiting rooms are generally unattended; the kiosk communicates to phlebotomists "in the back" that a patient has arrived, and the phlebotomist comes out of "the back" to invite patients into a draw room. *See* Walsh Dep. at PA0663:9-20 [Doc. # 106-5]; *see also* SUF B34. Phlebotomists come out periodically to invite patients into a draw room, and a patient who could not use the kiosk could speak to a phlebotomist then, but Quest's system was *designed* to make phlebotomists available only sometimes.

Patients may have sometimes had longer or shorter waits—and Quest challenges whether the limited duration of Plaintiffs' waits give Plaintiffs standing at all—but at least using the initial version of the kiosks, Plaintiffs have established a triable issue as to whether phlebotomist assistance was available as a means of effective communication.

Quest fails to show that there is no material issue of fact as to Plaintiffs' *prima facie* case that the original iteration of the kiosks violated the ADA. Quest may be able to show that providing independently accessible kiosks would be unduly burdensome, but it does not make that showing here. The Court thus **DENIES** Quest's MSJ as to Plaintiffs' ADA claim with regard to the original iteration of the kiosks.

**B.    State Law Claims**

Vargas is the only plaintiff who complains under the Unruh Act and California's Disabled Persons Act.

---

[9] Quest cites throughout its papers to *Kirola v. City and County of San Francisco* for the proposition that "anecdotal testimony about barriers to access" does not "establish inaccessibility at a programmatic level." 860 F.3d 1164, 1183 (9th Cir. 2017). *Kirola*, however, is a Title II case, and as discussed below, the ADA imposes different standards on public entities under Title II and places of public accommodation under Title III. "Program access" is a Title II concept, not a Title III concept. Nonetheless, because this is Quest's MSJ, not Plaintiffs', the Court need not decide whether Plaintiffs' evidence establishes inaccessibility across Quest's network, only that Plaintiffs' evidence, when viewed in their favor, establishes a triable issue of fact.

### 1.     Unruh Act Claim

A plaintiff may assert a violation of the Unruh Act in two ways:  either by establishing a direct violation of the Unruh Act, or by establishing a violation of the ADA. *See* Cal. Civ. Code §§ 51(b), (f).   To establish a direct violation of the Unruh Act (independent of a claim under the ADA), a plaintiff must "plead and prove intentional discrimination in public accommodations in violation of the terms of the Act." *Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014) (quoting *Munson v. Del Taco*, 46 Cal. 4th 661, 671 (2009)).  There is no need to prove intentional discrimination, however, if plaintiffs have successfully established a violation of the ADA.  *Munson*, 46 Cal. 4th at 678.

As discussed above, Plaintiffs' ADA claim survives, and therefore Vargas's Unruh Act claim survives.  For this reason, the Court **DENIES** Quest's motion for summary judgment as to Vargas's Unruh Act claim.

Vargas alleges in the FAC, however, that Quest's kiosks constitute intentional discrimination in direct violation of the Unruh Act.  Vargas appears to have abandoned this argument in his opposition to Quest's MSJ.  Thus, the Court **GRANTS** Quest's motion for summary adjudication as to whether Vargas can show intentional discrimination.

### 2.     Disabled Persons Act Claim

Like the Unruh Act, California's Disabled Persons Act ("DPA") incorporates the standards of the ADA.  Cal. Civ. Code § 54.1(a)(3); *see also Cohen v. City of Culver City*, 754 F.3d 690, 701 (9th Cir. 2014) ("A violation of the ADA constitutes a violation of the California DPA.").  As discussed above, Plaintiffs' ADA claim survives, so Vargas's DPA claim survives.

Quest argues that, because Vargas made no arguments in support of his DPA claim in his opposition, the Court should grant summary judgment as to Vargas's DPA claim. This Court will not grant summary judgment as to Vargas's valid DPA claim simply for failure to mention it in his opposition if its survival relies on the viability of the ADA claim.

The FAC asserts Quest violated the DPA by denying Vargas access to the kiosks

and "also" violated the DPA by violating the ADA.  *See* FAC at ¶¶ 82-83.  To the extent Vargas alleges a claim under the DPA *separate* from his ADA claim, he appears to have abandoned it.  Because Vargas's DPA claim under section 54.1(a)(3) survives, however, the Court **DENIES** Quest's MSJ as to Vargas's DPA claim.  The MSJ as to the DPA claim is **GRANTED** to the extent the FAC asserted a violation separate from the ADA claim.

**D.    Rehabilitation Act Claim**

Section 504 of the Rehabilitation Act provides that an "otherwise qualified" person with a disability may not, "solely by reason of his or her disability," "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  A "program or activity" includes a private organization "which is principally engaged in the business of providing . . . health care," any part of which is extended federal financial assistance.  *Id*. at § 794(b)(3)(A)(ii).

To establish a violation of the Rehabilitation Act, a plaintiff must show that (1) he is a "qualified individual with a disability," (2) he was "either excluded from participation in or denied the benefits of" the "services, programs, or activities" of an entity, "or was otherwise discriminated against by the [. . .] entity," (3) the entity that denied him the services received federal financial assistance, and (4) "such exclusion, denial of benefits, or discrimination was by reason of his disability."  *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 737-38 (9th Cir. 2021).

Claims under section 504 of the Rehabilitation Act are generally coextensive with ADA Title II claims.  *See Payan*, 11 F.4th at 737 ("[T]here is no significant difference in the analysis of rights and obligations created by" Title II and the Rehabilitation Act.) (citing *K.M. ex rel. Bright v. Tustin Unified School Dist.*, 725 F.3d 1088, 1099 (9th Cir. 2013)).  Congress used section 504 "as a model when drafting Title II."  *K.M.*, 725 F.3d at 1098.  Title II governs the obligations of public entities not to discriminate on the basis of disability, whereas the Rehabilitation Act governs the obligations of entities receiving federal funds, whether public or not.

-15-

Title II and Title III impose different requirements.  In some ways, Title II is stricter than Title III; in some ways, more lenient.  Relevant here, Title II imposes a different obligation to take into account the wishes of disabled individuals in selecting what auxiliary aid or service to provide in order to ensure effective communication.  When it comes to providing a particular type of auxiliary aid in order to effectuate "effective communication," the ADA imposes less stringent obligations on places of public accommodation than it does on public entities.  The regulations promulgated pursuant to Title III (the regulations relevant to places of public accommodation) provide that "[a] public accommodation should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, but *the ultimate decision as to what measures to take rests with the public accommodation*, provided that the method chosen results in effective communication."  28 C.F.R. § 36.303(c)(1)(ii) (emphasis added).  In contrast, the Title II regulations provide (with respect to public entities) that "[i]n determining what types of auxiliary aids and services are necessary, *a public entity shall give primary consideration to the requests of individuals with disabilities*."  28 C.F.R. § 35.160(b)(2) (emphasis added).  In promulgating these regulations in 1991, DOJ reasoned that "Congress did not intend under title III to impose upon a public accommodation the requirement that it give primary consideration to the request of the individual with a disability."  28 C.F.R. § Pt. 36, App. C.

To the extent the Court can discern Plaintiffs' theory of how Quest violates the Rehabilitation Act, it is that Quest has failed to give primary consideration to Plaintiffs' requests for specific accommodations.  Quest does not contest that the Rehabilitation Act applies to it.  But as Quest says, the Rehabilitation Act does not contain a primary consideration requirement.

To understand why Plaintiffs believe Quest is under an obligation to provide primary consideration to the requests of individuals with disabilities, the Court must explain the relationship between the Rehabilitation Act, the ADA, and the Affordable Care Act ("ACA").  Section 1557 of the ACA incorporates several civil rights statutes, including the

Rehabilitation Act, and provides:

> [A]n individual shall not, on the ground prohibited under . . . section 794 of Title 29 [the Rehabilitation Act], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance . . . The enforcement mechanisms provided for and available under [the Rehabilitation Act] shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116(a). In other words, section 1557 of the ACA "incorporates the anti-discrimination provisions of" the Rehabilitation Act. *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1208-09 (9th Cir. 2020), *cert. granted in part*, 141 S. Ct. 2882 (2021). The ACA also creates a private right of action that is co-extensive with a claim under the Rehabilitation Act. *Id.* at 1210 ("[T]o state a claim for a Section 1557 violation, [plaintiffs] must allege facts adequate to state a claim under Section 504 of the Rehabilitation Act.").

The regulations promulgated pursuant to the ACA borrow Title II's "primary consideration" requirement and apply it to public accommodations that are subject to the ACA. The regulations, which apply to "[a]ny health program or activity, any part of which is receiving Federal financial assistance (including credits, subsidies, or contracts of insurance) provided by the Department [of Health and Human Services]," 45 C.F.R. § 92.3(a)(1), provide that:

> Any entity operating or administering a program or activity under this part shall take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in such programs or activities, *in accordance with the standards found at 28 CFR 35.160 through 35.164*. Where the regulatory provisions referenced in this section use the term 'public entity,' the term 'entity' shall apply in its place."

45 C.F.R. § 92.102(a) (emphasis added). The standards extended to health programs and activities include the primary consideration requirement, which is found at 28 C.F.R. §

35.160(b)(2).  *See also Vega-Ruiz v. Northwell Health*, 992 F.3d 61, 66 (2d Cir. 2021)
("[T]he ACA extends "primary consideration" to individuals seeking services at Title III
public accommodations.").

Quest does not contest that it is subject to the Rehabilitation Act, so it would appear
that these regulations—which extend new obligations under that act—apply to Quest.  As
Quest points out, however, Plaintiffs do not bring a claim under the ACA, which would be
the appropriate procedural vehicle for Plaintiffs' claims.  *See, e.g.*, *Doe*, 982 F.3d at 1208.

If Plaintiffs' FAC alleged facts that added up to a claim under the ACA, Plaintiffs
could still assert that claim, even if they called it a claim under the Rehabilitation Act.  *See
Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008) ("Notice pleading requires the plaintiff
to set forth in his complaint claims for relief, not causes of action, statutes or legal
theories.").[10]  Plaintiffs' FAC did not put Quest on notice, however, that Plaintiffs alleged
a failure to provide primary consideration for Plaintiffs' claims.  The FAC contains no
factual allegations that any individual plaintiff or any ACB member ever made a request
for a specific accommodation, or that such a request was inappropriately addressed by
Quest employees.  *See* FAC at ¶¶ 27-33.[11]  Thus, Quest did not have notice of Plaintiffs'
claim, under the Rehabilitation Act or the ACA.  "[W]here a plaintiff sets forth [one basis
for his claim] in his pleadings and does not move to amend his complaint until summary

---

[10] Plaintiffs point out that in *Gray v. Golden Gate Nat. Recreational Area*, the court ordered
plaintiffs to amend their complaint after class certification to allege with greater specificity the particular
policies and procedures at issue in their claims, which were not identified in the complaint and were only
identified in a report prepared after the litigation was commenced.  866 F. Supp. 2d 1129, 1141 (N.D. Cal.
2011).  In *Gray*, however, the court found that the plaintiffs' complaint made clear that the defendants'
policies and procedures in general were at issue, even though the particular policies and procedures were
not identified until later.  *Id.* at 1139.  That is not the case here:  Plaintiffs' FAC does not contain
allegations regarding any individual's request for a specific accommodation.  The FAC did not put Quest
on notice of Plaintiffs' theory.

[11] Plaintiffs' opposition papers seem to suggest that ACB believes Quest should have given
primary consideration to *ACB*'s request for a PSC-wide specific accommodation.  Plaintiffs do not point
to any case law in which primary consideration has been given (or denied) to the requests of anyone other
than an individual.  Indeed, the idea of primary consideration appears to be focused on the needs and
desires of *individuals* with disabilities.  Regardless, this theory is likewise not apparent from the FAC.

-18-

judgment following the close of discovery, the plaintiff is barred from proceeding on [another] theory." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000).

Any request for amendment of the FAC at this time to assert the ACA claim is untimely as the deadline for amendment of the pleadings expired on April 10, 2020. [Doc. # 27-1.] Since the deadline to amend pleadings has expired, the Court must consider Plaintiffs' request to amend under Federal Rule of Civil Procedure 16(b)'s good cause standard. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608 (9th Cir. 1992). The Rule 16(b) analysis focuses on the diligence of the party requesting leave to amend. *Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002) ("The pretrial schedule may be modified if it cannot reasonably be met despite the diligence of the party seeking the extension.") (internal quotations omitted); *Coleman*, 232 F.3d at 1294. Here, Plaintiffs cannot make a showing of due diligence because, presumably before the FAC was filed, Plaintiffs possessed the facts relating to their "primary consideration" theory and yet failed to assert it in their complaint or to timely seek amendment to assert it. If the moving party was not diligent, the inquiry ends. *Johnson*, 975 F.2d at 609.

For this reason, the Court **GRANTS** Quest's MSJ as to Plaintiffs' Rehabilitation Act claim and **DENIES** Plaintiffs' request to amend the pleadings to assert an ACA claim.

## E.    Jurisdictional Issues

### 1.    Standing

Establishing constitutional standing is a threshold requirement to bringing suit in federal court. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 (1983). To demonstrate standing, plaintiffs must show that: (1) they have suffered an injury in fact; (2) there is a causal connection between the injury and the defendant's conduct; and (3) the court could likely redress the injury through a favorable decision. *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1036 (9th Cir. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The Supreme Court has instructed courts to take "a broad view of constitutional standing in civil rights cases, especially where, as under the ADA, private enforcement suits 'are the primary method of obtaining compliance with the Act.'" *Doran*

1  *v. 7-Eleven, Inc.*, 524 F.3d 1034, 1039 (9th Cir. 2008) (quoting *Trafficante v. Metro. Life*
2  *Ins. Co.*, 409 U.S. 205, 209 (1972)).

3       Quest argues in its motion that Plaintiffs' (relatively) short periods spent waiting for
4  a phlebotomist to assist them with their use of the kiosks do not constitute a cognizable
5  injury in fact.[12]  Quest cites to several cases in which waits of several minutes did not
6  support standing under the ADA.  In *Skaff v. Meridien N. Am. Beverly Hills, LLC*, the Ninth
7  Circuit found a plaintiff did not allege an injury in fact to support standing when a hotel
8  mistakenly assigned a disabled guest to a room with a bathtub rather than a roll-in shower,
9  but moved the plaintiff to another room in approximately an hour.  506 F.3d 832, 838 (9th
10  Cir. 2007).  In *O'Connor v. Scottsdale Healthcare Corp.*, the court found a plaintiff lacked
11  standing where a hospital security guard delayed plaintiff's access to a hospital by about
12  40 minutes because she had her service dog with her.  871 F. Supp. 2d 900 (D. Ariz. 2012),
13  *adhered to on reconsideration*, No. CV11-2264-PHX-JAT, 2012 WL 2106365 (D. Ariz.
14  June 11, 2012), *and aff'd*, 582 F. App'x 695 (9th Cir. 2014).  *Accord Frankeberger v.*
15  *Starwood Hotels & Resorts Worldwide, Inc.*, No. C09-1827RSL, 2010 WL 2217871, at *4
16  (W.D. Wash. June 1, 2010) (finding "a wait of less than sixteen minutes for assistance was
17  neither unreasonable nor reflective of discrimination" where no discriminatory policy or
18  practice caused the delay).

19       The short wait required by visually-impaired individuals using the Three-Finger
20  Swipe would generally not amount to a cognizable injury.  As discussed below, however,
21  because the Court finds a triable issue as to whether the Three-Finger Swipe has in fact
22  been fully implemented across Quest's network, Plaintiffs have standing to pursue their
23  remaining claims.

24       **2.**    **Mootness**
25       Quest argues that the implementation of the Three-Finger Swipe moots Plaintiffs'

---

27      [12] Quest also argues that, because Plaintiffs did not respond to Quest's arguments regarding
28  standing in its opposition papers, Plaintiffs have waived their standing to sue.  Because the Court finds it does have jurisdiction to hear this case, it does not find that Plaintiffs' standing to sue has been waived.

claims, because the kiosks are now independently accessible by blind patients. The Three-Finger Swipe, if effective, may very well address Plaintiffs' claims, but Plaintiffs have presented evidence showing that a triable issue of fact remains as to whether the Three-Finger Swipe has been implemented across Quest's network such that it would moot Plaintiffs' claims. *See* Plaintiffs' Appendix of Evidence, Ex. 31 (Derry Decl., Ex. B) [Doc. # 113-3].[13]  The Court therefore finds that Plaintiffs' claims are not moot.

## V.
## CONCLUSION

For the reasons stated herein, the Court:

1. **DENIES** Quest's MSJ as to Plaintiffs' ADA claim;

2. **DENIES** Quest's MSJ as to Vargas's Unruh Act claim to the extent it relies on the ADA claim, but **GRANTS** it to the extent Vargas purports to assert a claim of intentional discrimination;

3. **DENIES** Quest's MSJ as to Vargas's Disabled Persons Act claim to the extent it relies on the ADA claim, but **GRANTS** it to the extent Vargas purports to assert a separate claim;

4. **GRANTS** Quest's MSJ as to Plaintiffs' Rehabilitation Act claim; and

5. **DENIES** Plaintiffs' request for leave to amend the FAC to add a claim under the ACA.

**IT IS SO ORDERED.**

DATE: October 15, 2021

DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

---

[13] The Court relies on Derry's evidence based on his personal experience at several Quest locations, and does not extrapolate his conclusions across all Quest PSCs or draw statistical conclusions based on Derry's evidence. For this reason, the Court OVERRULES Quest's objections that Derry's evidence is statistically irrelevant. Viewed in the light most favorable to Plaintiffs, that evidence creates a triable issue of fact as to the effective implementation of the Three-Finger Swipe system.