1 Jonathan D. Miller (SBN 220848)
  jonathan@nshmlaw.com
2 Alison M. Bernal (SBN 264629)
  alison@nshmlaw.com
3 NYE, STIRLING, HALE
  & MILLER, LLP
4 33 West Mission Street, Suite 201
  Santa Barbara, CA 93101
5 Telephone: (805) 963-2345

Benjamin J. Sweet
(*Admitted Pro Hac Vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

6
7 Attorneys for Plaintiffs Julian Vargas,
  American Council of the Blind, and the Proposed Class

8 *Additional counsel for Plaintiffs listed on signature page*

9 **UNITED STATES DISTRICT COURT**

10 **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

11                                          **REDACTED**

12 JULIAN VARGAS and AMERICAN          Case No.: 2:19-cv-08108-DMG
   COUNCIL OF THE BLIND, individually
13 on behalf of themselves and all others  **REBUTTAL APPENDIX OF**
   similarly situated,                  **EXHIBITS IN SUPPORT OF**
14                                       **PLAINTIFF'S REPLY TO**
            Plaintiffs,                  **DEFENDANTS' OPPOSITION**
15                                       **TO PLAINTIFF'S MOTION FOR**
        v.                               **CLASS CERTIFICATION**
16
   QUEST DIAGNOSTICS CLINICAL          *{Filed Concurrently With Reply to*
17 LABORATORIES, INC., QUEST           *Opposition to Motion for Class*
   DIAGNOSTICS HOLDINGS, INC.,         *Certification, Objections to*
18 QUEST DIAGNOSTICS                    *Defendants' Evidence and*
   INCORPORATED; and DOES 1-10,        *Declaration of Benjamin J. Sweet}*
19 inclusive,

20                                      Complaint Filed: September 18, 2019
21                                      Discovery Cutoff: August 27, 2021
                                        Pretrial Conf: December 7, 2021
22          Defendants.                 Trial Date: January 11, 2022
23                                      District Judge: Hon. Dolly M. Gee
                                        Magistrate: Hon. Michael M. Wilner
24

25

26

27

28

Plaintiff Julian Vargas, individually and on behalf of all others similarly situated ("Plaintiff"), submits this rebuttal evidentiary appendix in support of his Reply to Defendant's Opposition to Plaintiff's Motion for Class Certification.

## TABLE OF CONTENTS

### *Depositions Transcripts and Exhibits*

| Exhibit | | Page |
|---|---|---|
| Ex. 37: | Relevant portions of the Deposition of Marc Yarrison (appearing as a FRCP, Rule 30(b)(6) witness and employee on behalf of Quest), taken on April 8, 2021 | PA1075-PA1094-C |
| Ex. 38: | Relevant portions of the Deposition of Taylor Carr (appearing as a FRCP, Rule 30(b)(6) witness and employee on behalf of Quest), taken on April 12, 2021, and July 30, 2021 | PA1095-PA1126 |
| Ex. 39: | Relevant portions of the Deposition of Jody Reilly (appearing as a FRCP, Rule 30(b)(6) witness on behalf of Quest), taken on April 16, 2021 | PA1127-PA1142 |
| Ex. 40: | Relevant portions of the Deposition of Christopher Grant (appearing as a FRCP, Rule 30(b)(6) witness and employee on behalf of Quest), taken on April 20, 2021 | PA1143-PA1156 |
| Ex. 41 | Relevant portions of the Deposition of Prudencia Magana (employee of Quest) taken on August 3, 2021 | PA1157-PA1160 |

Dated: October 15, 2021

Respectfully submitted,

NYE, STIRLING, HALE & MILLER, LLP

By: _/s/ Jonathan D. Miller_
Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

AlisoM. Bernal (SBN 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101

Benjamin J. Sweet
(*Admitted Pro Hac Vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

Matther K. Handley
(*Admitted Pro Hac Vice*)
mhandley@hfajustice.com
HANDLEY FARAH &
ANDERSON PLLC
777 6th St NW
Washington, DC 20001
Telephone: (202) 559-2411
Facsimile: (844) 300-1952

*Attorneys for Plaintiffs Julian Vargas,*
*American Council of the Blind, and the*
*Proposed Class*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA  93101

REBUTTAL APPENDIX OF EXHIBITS

# EXHIBIT 37

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JULIAN VARGAS, ANNE     )
     WEST, and AMERICAN      )
 5   COUNCIL OF THE BLIND,   ) Case No. 2:19-cv-8108
     individually on behalf  )
 6   of themselves and all   )
     others similarly        )
 7   situated,               )
                             )
 8              Plaintiffs,  )
                             )
 9        vs.                )
                             )
10   QUEST DIAGNOSTICS       )
     CLINICAL LABORATORIES,  )
11   INC., QUEST DIAGNOSTICS )
     HOLDINGS, INC.,         )
12   QUEST DIAGNOSTICS       )
     INCORPORATED; and       )
13   DOES 1-10, inclusive,   )
                             )
14              Defendants.  )
     _____)
15
16
17          REMOTE DEPOSITION OF MARC YARRISON
18               as a 30(b)(6) Witness
19             (Via Zoom Videoconference)
20              Thursday, April 8, 2021
21
22
23   REPORTED BY:  Michelle Milan Fulmer
                   CSR No. 6942, RPR, CRR, CRC
24
25
```

Page 1

PA1075

```
 1    you to seek clarification from me.  And if you do

 2    not seek clarification to a question I ask, I'm

 3    going to assume that you understand it.

 4           Is that understood?

 5       A   Yes.                                          11:33:53

 6       Q   Finally, we're conducting this deposition

 7    remotely, which is our new normal here during

 8    COVID-19 and, as a result of that, it presents some

 9    difficulties in terms of getting a good and clean

10    transcript.                                          11:34:09

11           So I'm going to do my very best to ask you

12    good questions and not to speak over you throughout

13    the course of today, and I'll just ask that you do

14    not speak over me so that we can have a clear

15    record.                                              11:34:22

16           Is that understood?

17       A   Understood.

18       Q   I understand, sir, that you are testifying

19    on behalf of Quest for a number of topics related

20    to its 30(b)(6) deposition notice; is that correct? 11:34:33

21       A   That is.

22           MR. SWEET:  And if I could ask my

23    colleague, Callum, to call up as Exhibit Number 1

24    the 30(b)(6) deposition notice.

25       Q   And I'll call your attention to Page 5 of    11:34:52
```

Page 11

PA1075-A

```
 1    the notice where the topics are listed.

 2          Now, sir, it's my understanding that you

 3    are testifying on behalf of Quest as to Topics 1, 2,

 4    3, 17, 18, and 40; is that correct?

 5       A    That's correct.                          11:35:21

 6       Q    And with respect to Topic Number 28 -- if

 7    we could pause on that, Callum -- you are going to

 8    be giving partial testimony; is that correct?

 9       A    Yes.

10          MR. SWEET:  Now, I would just note for the   11:35:37

11    record, my team has informed me that counsel did not

12    seek a protective order from the court; and,

13    therefore, it is plaintiffs' position that the

14    objections that were made with regard to the

15    30(b)(6) notice are improper.  It's not an issue     11:35:48

16    that we need to address today, but that is an

17    objection we wanted to note for the record.

18          I also wanted to note that Quest produced

19    documents late last evening that were responsive to

20    document requests that we issued somewhere on the    11:36:03

21    order of 10 months ago; and that, further, Quest

22    also produced documents two nights ago that were

23    responsive to document requests that are now

24    somewhat 10 months old.

25          Accordingly, we would reserve the right to    11:36:19
```

Page 12

RC3297/D

1      Q     It would require fewer employees to service

2  your customers; correct?

3      A     Not fewer employees.   That we would be able

4  to keep the same staff and not need to hire as many

5  additional staff based on the quote forecast at that      12:03:40

6  time.

7      Q     You were able to operate more efficiently?

8      A     Yes.

9      Q     Now, as you put together the business case

10  for the rollout of the e-kiosk, did you work with        12:04:09

11  anyone with an expertise in the special needs of

12  people with disabilities?

13      A     I don't recall specifically, but I -- for

14  sure, we included as part of the rollout process

15  installation instructions around accessibility as        12:04:43

16  the kiosks were installed and we trained all our

17  staff to watch.   And they've always been trained

18  that way, but, you know, we continued to make an

19  emphasis to them that they are to -- every time they

20  are in the waiting area, they are to look out for        12:05:11

21  anybody that needs help.   That would include people

22  with disabilities of all types.

23      Q     Sir, are certain of your PSCs, do they have

24  one employee working at any given time?

25           MR. RAIZMAN:   Objection.   Beyond the scope.   12:05:33

Page 32

PA1076

```
 1              You can answer, if you know.

 2              THE WITNESS:  There are some locations that

 3    are one-employee locations.  I don't know the exact

 4    number.

 5    BY MR. SWEET:                                        12:05:47

 6         Q    And are there also some locations that have

 7    two employees?

 8         A    We have locations with all different

 9    numbers.  Our patient service center spaces are very

10    different and the staffing fits the location.        12:06:08

11         Q    So to return to my question about whether

12    the team you put together had any specialized

13    knowledge in the area of disabilities, was it your

14    testimony that you -- I think you said you couldn't

15    recall whether you worked with anyone with           12:06:30

16    specialized knowledge during that time about

17    disability compliance; is that right?

18              MR. RAIZMAN:  Objection.  Misstates the

19    testimony.

20              You can answer.                             12:06:40

21    BY MR. SWEET:

22         Q    You can answer, sir.

23         A    I think -- I think what I said before was

24    that we worked with a number of different people.  I

25    don't -- I don't remember whether that was a          12:07:00
```

Page 33

PA1077

```
 1    specific -- I don't remember if we did specifically.

 2         Q    And as you sit here today, are there any

 3    documents that you can point to that might help to

 4    refresh your recollection on that point?

 5         A    There may be some.  There's a lot of          12:07:20

 6    documents.  There may be some.  I'm not specifically

 7    able to think of one at the moment.

 8         Q    And am I correct, sir, that the company

 9    began to roll out the eCheck-In kiosks in 2016?

10         A    Yes.                                           12:07:52

11         Q    And how many kiosks did it roll out in

12    2016?

13         A    200.

14         Q    And was that considered another pilot to

15    determine whether the project should expand beyond      12:08:08

16    that or had you already determined that you were

17    going to expand beyond that?

18         A    If you look, I believe, in the business

19    justification or maybe the CapEx, I think it's the

20    business justification, there is a -- there is a        12:08:24

21    note in there about an evaluation at the end of

22    2016 to whether we continue with the project or not.

23    We did continue with the project, as you know.

24         Q    And is it my --

25              It's my understanding that you rolled out     12:08:46
```

Page 34

PA1078

```
 1        Q     Let's go back to my original question.

 2              You testified there were 200 kiosks rolled

 3    out in 2016; correct?

 4        A     Approximately 200.

 5        Q     Approximately 800 in 2017; correct?          12:12:53

 6        A     Correct.

 7        Q     And the remainder in 2018; right?

 8        A     Correct.

 9        Q     You talked about moving from a paper system

10    to an electronic system saved the company some         12:13:15

11    money?

12              MR. RAIZMAN:  I'm having trouble hearing

13    the question.  I apologize.

14              THE WITNESS:  I had trouble.  I had trouble

15    hearing, too.  You were breaking up there.            12:13:24

16              THE COURT REPORTER:  I think there was

17    something shuffling around the mic.  That interrupts

18    the audio.

19              MR. SWEET:  No problem.

20        Q     The move from a manual to an electronic       12:13:34

21    process saved the company money; correct?

22        A     No.  We digitized a manual process saving

23    us some transaction time.  I -- yeah.  It was about

24    customer experience and transaction time savings,

25    which contributes to a better customer experience.     12:14:03
```

Page 39

PA1079

```
 1    first 200 PSCs and 13.6 million for the entire

 2    network."

 3             So one of the benefits --

 4    A     Yes.

 5    Q     I'm sorry.  I was just leading up to my        12:43:25

 6    question.  So --

 7    A     Okay.

 8    Q     -- my question is is that would you agree

 9    with me, sir, that one of the benefits of moving to

10    the automated eCheck-In kiosk was what was projected   12:43:33

11    to be a cost avoidance of 13.6 million?

12    A     One of the benefits is cost avoidance.  I

13    would not say -- yeah.  One of the benefits is cost

14    avoidance.

15    Q     Okay.  And if we return you over to Slide 4    12:43:53

16    into the chart here on the right-hand side where it

17    discusses P & L impact.

18             Do you see that?

19    A     I see that.

20    Q     And here there is a projected P & L impact     12:44:07

21    of the rollout for year one of 3.253 million.

22             Do you see that?

23    A     I do see that.

24    Q     And for year two of 9.760 million; is that

25    correct?                                              12:44:28
```

Page 50

PA1080

1        A     You read that accurately.

2        Q     And does that mean, sir, that by moving to

3    the automated system, the average transaction time

4    will be reduced by a minute per transaction?

5        A     These are all forecasts that were done in        12:45:51

6    2016.

7        Q     Uh-huh.

8        A     The rollout has not taken place at this

9    point.

10        Q     Can you tell me, as you sit here today,        12:46:02

11    whether the rollout of the PSCs did reduce

12    transaction time?

13        A     We -- it did reduce transaction time.

14        Q     And do you know by how much, on average, it

15    reduced transaction time?        12:46:18

16        A     We did a study post-rollout and it was 55

17    seconds.

18        Q     Who was involved in the study you did

19    post-rollout?

20        A     I don't know exactly who was involved.        12:46:36

21    There were several people involved.  But it was --

22    it was jointly done by national patient services and

23    the drive team.

24        Q     And did you separately perform any study of

25    your blind patients to see whether their transaction        12:47:06

Page 52

PA1081

1    between 2016 and 2020?

2        A    Not on the kiosk.

3        Q    What about viewing your test results, can

4    you do that at the kiosk?

5        A    No.                                          14:55:30

6        Q    Let me actually ask the question this way.

7             What can you do at the kiosk?

8        A    You can check in.

9        Q    Is there anything else you can do?

10       A    What time frame?                             14:55:42

11       Q    At any point.

12       A    At any point.  So, there are --

13       Q    From 2016.  Excuse me.  Any point from 2016

14   on.  Let me clarify.

15       A    Any point from 2016 on, anything you can do  14:55:57

16   besides check in?

17       Q    Correct.

18       A    So starting in -- I don't remember the

19   exact year, but you -- starting in 2018 or 2019

20   there was an option added to register while you       14:56:20

21   wait, which is providing some additional demographic

22   information.  It's not done on the kiosk, but the

23   question to initiate it is done on the kiosk.

24       Q    Where is it done?  On the mobile

25   application?                                          14:56:46

                                            Page 102

PA1082

```
 1        A     If you say yes to register while you wait,

 2   you get a -- you get a text or an email and then you

 3   do it on your own device while you're waiting.

 4        Q     Is that done, Mr. Yarrison, on the website

 5   or the app or could it be done on either?            14:57:07

 6        A     It's done on a web page.

 7        Q     Website?

 8        A     Website, yes.

 9        Q     Okay.  Do you know whether the Quest

10   website that it directed patients to was accessible  14:57:19

11   for blind individuals in 2016 and 2017 and 2018?

12             MR. RAIZMAN:  Object to form.  Beyond the

13   scope.

14             Answer if you know.

15             THE WITNESS:  I don't know.             14:57:37

16   BY MR. SWEET:

17        Q     Did you personally take any actions to

18   ensure that the Quest website was made accessible

19   for blind individuals at any point from 2016

20   onward?                                          14:57:50

21        A     I did.  When we were developing a

22   responsive version of the scheduling website, I

23   asked that it be made compliant for, what is it,

24   WA -- I don't know why the acronym is escaping me.

25        Q     WCAG?                                  14:58:23
```

Page 103

```
 1    website was made accessible.

 2           How did you receive that confirmation?

 3           MR. RAIZMAN:  Objection.  Contradicts

 4    testimony.

 5           THE WITNESS:  I would -- I believe in an      15:01:15

 6    email, but I'm not sure.

 7    BY MR. SWEET:

 8      Q    Okay.  So I asked you a moment ago about

 9    the services that one could receive at the kiosk,

10    and you mentioned to me that in addition to checking   15:01:31

11    in, there was this additional functionality that was

12    added I think you said 2018, it might have been

13    2019; is that correct?

14      A    2018, might have been 2019, yes.

15      Q    Okay.  Now, this functionality had to do      15:01:46

16    with information that you could enter, that you

17    could give Quest while you were waiting; correct?

18      A    Correct.

19      Q    Was there any other functionality that was

20    added to the kiosk beyond the two that we just        15:02:02

21    discussed?

22      A    There was functionality added just this

23    year to be able to select an appointment time.

24      Q    Right at the kiosk?

25      A    Right at the kiosk.                            15:02:25
```

Page 106

PA1084

```
 1       Q    And you're not the designated person to

 2   testify about whether the PSC-level personnel are

 3   qualified readers; is that correct?

 4            MR. RAIZMAN:  Object to form.

 5            THE WITNESS:  Can -- can you -- can you      15:17:45

 6   give me the definition of that?

 7   BY MR. SWEET:

 8       Q    Well, I certainly can, sir.  I was just --

 9   the question isn't so much what the definition is.

10            I'm asking you whether you're prepared to    15:18:00

11   testify as to whether any steps were taken to

12   ensure that PSC-level personnel are qualified

13   readers.

14            MR. RAIZMAN:  Object to form.

15            THE WITNESS:  We have a -- we have a          15:18:14

16   witness for -- for the training of the PSRs.  So

17   they're best to answer that.

18   BY MR. SWEET:

19       Q    So it's your testimony that you are not the

20   person to testify as to that; correct?             15:18:24

21       A    That's correct.

22       Q    You mentioned a moment ago a three-finger

23   swipe and I know your counsel has designated another

24   witness to talk about the three-finger swipe; is

25   that right?                                         15:18:52
```

Page 111

PA1085

```
 1        A     That's right.

 2        Q     Okay.  Can you tell me, in very general

 3   terms, what the three-finger swipe is, though?

 4        A     Yes.  In general terms, the three-finger

 5   swipe is a swipe with three fingers any direction on    15:19:05

 6   the kiosk will check somebody in as -- will check

 7   somebody in and the kiosk gives them a message

 8   verbally or audibly to let them know that they're

 9   checked in.

10        Q     And has the company instituted three-finger   15:19:32

11   swipe across the full PSC network?

12        A     Yes.

13        Q     And when did that occur, sir?

14        A     In approximately August of 2020.

15        Q     And it's Quest's position that three-finger    15:19:54

16   swipe is an auxiliary aid and service that can

17   assist independently blind people?

18              MR. RAIZMAN:  Object.  Beyond the scope as

19   to Quest's position.

20              You can certainly give your opinion.           15:20:07

21   BY MR. SWEET:

22        Q     And that was a poorly-asked question.  Let

23   me rephrase that.  That was not a very good

24   question.

25              Is it your understanding that Quest intends    15:20:16
```

Page 112

PA1086

```
 1              THE WITNESS:  That's the date I see on this

 2     report.  I don't know if it occurred that date or

 3     not.

 4     BY MR. SWEET:

 5          Q    And in the description field it              15:53:28

 6     states, "Took my elderly mother to Quest Diagnostics

 7     for her monthly blood draw.  Visually impaired folks

 8     can't use your new iPad check-in.  No paper

 9     option????  Your new iPad check-in is not viable for

10     visually impaired.  No staff to help.  No paper        15:53:48

11     option.  Looks like an ADA violation to me."

12              Do you see that?

13          A    I see that.

14          Q    And in the next box to the right it says,

15     "Sent to M. Yarrison," among others; correct?          15:54:02

16          A    Among others.

17          Q    And that's you; right?

18          A    That's me.

19          Q    Okay.  And just looking through the rest of

20     the entries on this, on this form, and take your       15:54:18

21     time, they all appear to be complaints related to

22     the use of the kiosk by blind or low vision

23     individuals; isn't that correct?

24              MR. RAIZMAN:  Objection to form.

25     ///                                                    15:54:35
```

Page 131

PA1087

1        A    I will.

2        Q    And while you're waiting, Mr. Yarrison, can

3   I ask you in regard to Exhibit 6, do you recall

4   whether you took any specific actions in response to

5   the complaint you received that you referenced at        16:23:38

6   entry number 24622?

7        A    Let me reopen that up again.

8        Q    Sure.

9        A    I was going to prepare for the next one,

10  but let me go back.                                        16:23:59

11           Okay.   The question was?   Can you repeat

12  the question?

13       Q    Certainly.

14           Did you take any affirmative actions in

15  response to receiving this complaint?   Did you take     16:24:34

16  any actions?

17       A    I responded back to the patient advocacy

18  person.   Other than that, I did not.

19       Q    Did you elevate it to upper management?

20       A    They're already on the list.                   16:25:00

21       Q    Did you have any discussions with any other

22  members of management about what to do about the

23  concern raised in this complaint?

24       A    Not that I recall, but I see in here that

25  this is designated as the PSR team should have           16:25:19

                                                Page 138

PA1088

```
 1    assisted the patient.

 2         Q     Was there any change in policy that

 3    occurred within Quest as a result of receiving this

 4    complaint?

 5              MR. RAIZMAN:  Objection.  Beyond the scope.    16:25:38

 6              But please answer if you know.

 7              THE WITNESS:  I don't know.

 8    BY MR. SWEET:

 9         Q     Do you know who might know?

10         A     I do not.                                      16:25:56

11         Q     Okay.  Let's turn to Exhibit 7.

12         A     All right.  I have it here.  Opening it

13    now.

14         Q     And if you wouldn't mind reading from the

15    beginning of the email chain from May 5th, 2016,         16:26:16

16    an email from Harold Winkles to a number of folks,

17    including yourself, I believe.

18         A     Let me see.

19         Q     Actually, you are not a recipient of the

20    original email.  It went to Max Ocampo and others.       16:26:29

21              And this original email refers to the kiosk

22    design; correct?

23         A     I'm not done reading it yet.  Can you --

24    can I have a chance to read the whole thing?

25         Q     Certainly.                                     16:26:54
```

Page 139

PA1089

```
 1        A    Can you -- are you referring to this

 2   specific time frame in 2016?

 3        Q    That's right.

 4             I'm asking if you specifically, you,

 5   Mr. Yarrison, took any affirmative actions in          16:38:12

 6   response to this discussion to ensure that the

 7   kiosks were designed and rolled out with features

 8   that would allow them to be used independently by

 9   blind individuals.

10        A    Not that I recall.                            16:38:26

11        Q    And do you know, sir, whether Ms. Carr --

12             Is it Ms. Carr, by the way, or Mr. Carr?

13        A    Mr.

14        Q    Mr.  Sorry.

15             Do you know whether Mr. Carr took any         16:38:44

16   affirmative steps at this time in response to this

17   discussion to ensure that the kiosks were designed

18   and rolled out with features that would make them

19   independently usable by blind people?

20        A    I don't -- I can't speculate on what         16:39:01

21   Mr. Carr was thinking or doing.

22        Q    Okay.  Let's put that document aside for

23   the moment.

24             I'm going to mark as Exhibit Number 8 a

25   document bearing the Bates stamp 37909 and I'll ask    16:39:18
```

                                                    Page 147

PA1090

```
 1    independently usable for blind people?  Aside from

 2    training, did you take any steps with regard to the

 3    hardware itself?

 4         A    Well, the hardware was installed to make

 5    sure that physical installation met the ADA          16:56:18

 6    requirements.

 7         Q    I'm sorry, sir, we're going to have to keep

 8    going over this because I'm not getting an answer to

 9    my question.

10              Did you affirmatively take any steps, you   16:56:38

11    personally, in response to reading this email that

12    would have ensured that the kiosks were designed

13    and rolled out with features that would make them

14    independently usable by blind people?

15              MR. RAIZMAN:  Since you're commenting        16:56:53

16    frequently, I'm going to comment that you have asked

17    this question and he's answered it.

18              But go ahead.  Answer it.

19              THE WITNESS:  Okay.  So we get lots of

20    feedback.  I do not know whether this specific email   16:57:07

21    resulted in action.

22    BY MR. SWEET:

23         Q    You can't recall?

24         A    I can't recall.

25         Q    Okay.  Are you aware of any documents, as    16:57:20
```

Page 158

PA1091

```
1        Q     Was cost a factor?

2        A     Cost is always a factor when you are -- you

3    know, we had a budget to work with.  So, you know,

4    we had to -- we had to make sure we were staying

5    within budget.                                    17:30:11

6        Q     Did the team that was evaluating the

7    tablets, did it specifically evaluate whether the

8    tablet candidates had features that would make them

9    independently accessible for blind people?

10       A     I don't know.                            17:30:29

11       Q     You can't recall?

12       A     I can't recall.

13       Q     Did you specifically at any point request

14   that that be a feature that was considered?

15       A     I don't know if I specifically requested  17:30:56

16   that.  You know, we were certainly concerned with

17   the physical deployment, the physical ADA compliance

18   and the installation.  You know, we were certainly

19   concern- -- you know, we worked on the training and

20   that our staff would look out for people that needed  17:31:27

21   assistance, and we did user testing and established

22   a feedback loop and iterative build process.

23       Q     But specifically as to blind individuals,

24   at any point did the group that was considering the

25   tablets make accessibility, independent            17:31:49
```

Page 170

PA1092

```
 1    accessibility for blind folks an important factor in

 2    the decision of which tablet to choose?

 3         A    There were many factors.  You know, they

 4    were all important in the decision.

 5         Q    Right.                                    17:32:12

 6              Was that one of them, though, blind

 7    individuals having independent access?

 8         A    I don't recall.

 9         Q    I think you mentioned that accessibility

10    for wheelchair-bound patients was a factor that was  17:32:29

11    considered; correct?

12         A    Yes.

13         Q    And what considerations were given with

14    regard to wheelchair-using patients?

15         A    So we wanted to make sure that the physical  17:32:50

16    installation met all the requirements for ADA access

17    for those individuals.

18         Q    Do you know, Mr. Yarrison, whether any of

19    the tablet candidates that you considered could be

20    independently utilized by blind individuals?         17:33:17

21         A    What features are you referring to on

22    tablets?

23         Q    Did any of them --

24              The features that I discussed earlier with

25    you, but I can go back over them, did any of the     17:33:38
```

Page 171

PA1093

```
1      Q    So even after a person performs the

2  three-finger swipe and, as you say, enters into the

3  queue, don't they still have to input their

4  information at the kiosk?

5      A    They do not.                        18:32:29

6      Q    Where do they input their information?

7      A    In the -- what we would term the draw room.

8      Q    Okay.  Who was involved in the decision to

9  institute three-finger swipe?

10          MR. RAIZMAN:  I'm going to object.  A lot   18:32:45

11  of these three-finger swipe questions are beyond the

12  scope.  I'm fine to let him go with his personal

13  knowledge.  But for that, for sure, I'm going to

14  say it's beyond the scope.

15          If you know, you can answer.         18:33:00

16          THE WITNESS:  I don't know.

17  BY MR. SWEET:

18      Q    Prior to three-finger swipe --

19          Well, scratch that.  Strike that question.

20          Okay.  Let's put Exhibit 11 aside and let's   18:33:22

21  take a quick ten-minute break.  It's 6:33 now

22  East Coast time.  Let's be back at 6:43.

23          MR. RAIZMAN:  Do you have any sense of how

24  much longer you're going to go?  I'm not going to

25  hold you to it.                             18:33:36
```

Page 213

## REDACTED

**PORTIONS OF EX. 37 (PA1094-A TO 1094-C) ARE BEING FILED UNDER SEAL PENDING THE COURT'S RULING ON PLAINTIFF'S APPLICATION TO FILE UNDER SEAL**

# EXHIBIT 38

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3   JULIAN VARGAS, ANNE WEST, and        )

 4   AMERICAN COUNCIL OF THE BLIND,       ) Case No.

 5   individually on behalf of            ) 2:19-cv-8108

 6   themselves and all others similarly  )

 7   situated,                            )

 8                   Plaintiffs,          )

 9   vs.                                  )

10   QUEST DIAGNOSTICS, CLINICAL          )

11   LABORATORIES, INC., QUEST            )

12   DIAGNOSTICS HOLDINGS, INC., QUEST    )

13   DIAGNOSTICS INCORPORATED; and DOES   )

14   1-10, inclusive,                     )

15                   Defendants.          )

16

17

18         30 (B)(1) DEPOSITION OF TAYLOR CARR

19                  April 12, 2021

20

21

22   REPORTED REMOTELY BY:

23   AMBER S. WILLIAMS, C.S.R. No. 1080

24   Notary public

25
```

Page 1

PA1095

| | | |
|---|---|---|
| 1 | Also, if there is anyone present in the room with you | 12:11PM |
| 2 | not on video, please so indicate. | 12:11PM |
| 3 | MR. MILLER:  Thank you very much.  This is | 12:11PM |
| 4 | Jonathan Miller for -- on behalf of the plaintiffs, | 12:11PM |
| 5 | and plaintiffs consent to that arrangement. | 12:11PM |
| 6 | MR. RAIZMAN:  This is David Raizman on behalf | 12:11PM |
| 7 | of defendants.  There is no one in the room with me, | 12:11PM |
| 8 | and we consent to the method of recording the depo. | 12:11PM |
| 9 | TAYLOR CARR, | |
| 10 | first duly sworn to tell the truth relating to said | |
| 11 | cause, testified remotely as follows: | |
| 12 | EXAMINATION | |
| 13 | BY MR. MILLER: | 12:12PM |
| 14 | Q.   Good afternoon, Mr. Carr.  As I've | 12:12PM |
| 15 | already indicated, I represent the plaintiffs in the | 12:12PM |
| 16 | lawsuit that has been filed against defendants | 12:12PM |
| 17 | Quest Diagnostics, and you understand that you're | 12:12PM |
| 18 | here today to have your deposition taken in that | 12:12PM |
| 19 | matter? | 12:12PM |
| 20 | A.   Yes. | 12:12PM |
| 21 | Q.   And you understand that you're here to | 12:12PM |
| 22 | testify to both in your individual capacity and as | 12:12PM |
| 23 | the 30(b)(6) designee by Quest as the person most | 12:12PM |
| 24 | knowledgeable regarding the three-finger swipe at the | 12:12PM |
| 25 | e-Check kiosk; is that true? | 12:12PM |

Page 8

PA1096

| | | |
|---|---|---|
| 1 | A.   I believe so.  I think there's two | 12:12PM |
| 2 | questions there.  I think I'm testifying on behalf of | 12:12PM |
| 3 | myself. | 12:12PM |
| 4 | Q.   Let me break it down for you.  You | 12:12PM |
| 5 | understand you're here to testify both individually | 12:12PM |
| 6 | today, correct? | 12:12PM |
| 7 | A.   I understand I'm here to testify | 12:12PM |
| 8 | individually, correct. | 12:12PM |
| 9 | Q.   And you also understand that you're here | 12:12PM |
| 10 | to testify today as a 30(b)(6) designee by Quest on | 12:13PM |
| 11 | the three-finger swipe at the eCheck kiosk; is that | 12:13PM |
| 12 | true? | 12:13PM |
| 13 | A.   That's correct. | 12:13PM |
| 14 | Q.   Can you please state your full name for | 12:13PM |
| 15 | the record? | 12:13PM |
| 16 | A.   Taylor Carr. | 12:13PM |
| 17 | Q.   Have you ever been known by any other | 12:13PM |
| 18 | names? | 12:13PM |
| 19 | A.   No. | 12:13PM |
| 20 | Q.   Have you ever had your deposition taken | 12:13PM |
| 21 | before? | 12:13PM |
| 22 | A.   No. | 12:13PM |
| 23 | Q.   Have you ever provided testimony in any | 12:13PM |
| 24 | trial or administrative proceeding? | 12:13PM |
| 25 | A.   I have not. | 12:13PM |

Page 9

PA1097

| 1 | A.   Partial, I would say.  I'd have to look | 12:45PM |
| 2 | back. | 12:46PM |
| 3 | Q.   How about 2018? | 12:46PM |
| 4 | A.   I think sure but not primarily.  It was | 12:46PM |
| 5 | primarily 2015 and -- | 12:46PM |
| 6 | Q.   How about -- I'm sorry. | 12:46PM |
| 7 | A.   I said '16. | 12:46PM |
| 8 | Q.   2016.  Do you still work on the | 12:46PM |
| 9 | e-Check-in project in any form? | 12:46PM |
| 10 | A.   Yes. | 12:46PM |
| 11 | Q.   Was there ever a break in time that you | 12:46PM |
| 12 | didn't work on the e-Check-in project for any years | 12:46PM |
| 13 | between 2015 and the present? | 12:46PM |
| 14 | A.   Yes. | 12:46PM |
| 15 | Q.   When was that?  What years did you not | 12:46PM |
| 16 | work on the e-Check-in project? | 12:46PM |
| 17 | A.   Probably -- I think 2019 I think is what | 12:46PM |
| 18 | it was.  Sorry.  I'm having to think back of other | 12:46PM |
| 19 | duties at the time. | 12:46PM |
| 20 | Q.   Did you become re-involved in the | 12:46PM |
| 21 | e-Check-in project in 2020? | 12:46PM |
| 22 | A.   Yes. | 12:47PM |
| 23 | Q.   When? | 12:47PM |
| 24 | A.   With COVID and everything that was | 12:47PM |
| 25 | happening last year, there was a lot of -- a lot of | 12:47PM |

Page 36

PA1098

| | | |
|---|---|---|
| 1 | hats that were being worn across the organization to | 12:47PM |
| 2 | support driving a great experience with our customers | 12:47PM |
| 3 | with the layer of COVID. | 12:47PM |
| 4 | Q.   So it was in response to COVID that you | 12:47PM |
| 5 | became re-involved in the e-Check-in project?  Is | 12:47PM |
| 6 | that -- am I understanding your testimony correctly? | 12:47PM |
| 7 | A.   It rose to prominence, correct. | 12:47PM |
| 8 | Q.   And are you still involved in the | 12:47PM |
| 9 | e-Check-in project as we sit here today?  Do you | 12:47PM |
| 10 | still work on that project in any capacity? | 12:47PM |
| 11 | A.   The only thing I would say is, like, the | 12:47PM |
| 12 | term e-Check-in is -- tends to be internal, so do I | 12:47PM |
| 13 | work on our means of getting customers checked in | 12:47PM |
| 14 | with ease from an experience perspective?  Yes. | 12:47PM |
| 15 | Q.   An e-Check-in project dealt with the | 12:47PM |
| 16 | check-in process at Patient Service Centers that | 12:47PM |
| 17 | Quest operates throughout the United States; is that | 12:48PM |
| 18 | true? | 12:48PM |
| 19 | A.   Say that again.  I'm sorry. | 12:48PM |
| 20 | Q.   Yes.  The e-Check-in project dealt with | 12:48PM |
| 21 | the manner and means which -- with which patients | 12:48PM |
| 22 | check in at Quest Patient Service Centers throughout | 12:48PM |
| 23 | the United States; is that accurate? | 12:48PM |
| 24 | A.   It dealt with one method by which | 12:48PM |
| 25 | customers could check in. | 12:48PM |

Page 37

PA1099

```
 1            MR. RAIZMAN:  -- exclude anything you learned      04:02PM

 2    from counsel.                                              04:02PM

 3            THE WITNESS:  Yeah.  I don't know.                 04:02PM

 4        Q.   (BY MR. MILLER):  Other than counsel,            04:02PM

 5    whose idea was it to implement the three-finger-swipe     04:02PM

 6    method of checking in for blind patients?                 04:02PM

 7        A.   Am I -- are you asking me or on behalf           04:02PM

 8    of Quest?  Like, is this the 30(b)(6) --                  04:02PM

 9        Q.   On behalf of Quest, do you know whose            04:02PM

10    decision it was, other than counsel's, to implement      04:02PM

11    the three-finger swipe?                                   04:02PM

12        A.   I honestly don't know.  Don't know.             04:02PM

13        Q.   Did you come up with the three-finger           04:02PM

14    swipe as the option?                                      04:02PM

15        A.   No.  Going back to what I mentioned my          04:02PM

16    role was in Human-centered design, I helped with         04:02PM

17    framing our understanding of getting to that place.      04:02PM

18            MR. MILLER:  Move to strike everything after     04:02PM

19    "No."                                                     04:02PM

20        Q.   (BY MR. MILLER):  Once a blind                  04:02PM

21    individual does a three-finger swipe on the kiosk, am    04:03PM

22    I correct in understanding that it gives an audio        04:03PM

23    instruction to provide the potential wait time in        04:03PM

24    certain locations?                                        04:03PM

25        A.   Yes.                                             04:03PM
```

Page 155

PA1100

| | | |
|---|---|---|
| 1 | So with -- on behalf of Quest, did you | 04:06PM |
| 2 | assist in any manner in coming up with the audio | 04:06PM |
| 3 | messaging that would be relayed to blind patients | 04:07PM |
| 4 | using the three-finger swipe? | 04:07PM |
| 5 | MR. RAIZMAN:  Same objection.  Same | 04:07PM |
| 6 | instruction not to answer as to communications to or | 04:07PM |
| 7 | from counsel and those considerations. | 04:07PM |
| 8 | THE WITNESS:  Yeah.  I don't know. | 04:07PM |
| 9 | Q.   (BY MR. MILLER):  Do you know what the | 04:07PM |
| 10 | audio messaging says with respect to the three-finger | 04:07PM |
| 11 | swipe and what's provided in response? | 04:07PM |
| 12 | A.   Not word for word. | 04:07PM |
| 13 | Q.   How about just generally, do you know | 04:07PM |
| 14 | what it says? | 04:07PM |
| 15 | A.   Based upon what you instructed me here, | 04:07PM |
| 16 | yes. | 04:07PM |
| 17 | Q.   I want to know what you understand it to | 04:07PM |
| 18 | say, though.  Generally, what do you understand the | 04:07PM |
| 19 | audio messaging to contain? | 04:07PM |
| 20 | A.   Information about checking in. | 04:07PM |
| 21 | Q.   And specifically what information -- as | 04:07PM |
| 22 | Quest 30(b)(6) representative, what information about | 04:07PM |
| 23 | checking in is relayed in the audio messages? | 04:07PM |
| 24 | A.   That they're checked in and one of our | 04:07PM |
| 25 | phlebotomists will come out shortly and serve them, | 04:08PM |

Page 159

PA1101

| | | |
|---|---|---|
| 1 | MR. RAIZMAN:  And here -- this is a yes-or-no | 04:46PM |
| 2 | question because -- | 04:46PM |
| 3 | THE WITNESS:  Yes. | 04:46PM |
| 4 | MR. RAIZMAN:  All right. | 04:46PM |
| 5 | Q.  (BY MR. MILLER):  And did you document | 04:46PM |
| 6 | that in writing? | 04:46PM |
| 7 | THE WITNESS:  Sorry, Dave. | 04:46PM |
| 8 | Sorry. | 04:46PM |
| 9 | Q.  (BY MR. MILLER):  And did you document | 04:46PM |
| 10 | that in writing? | 04:47PM |
| 11 | A.  Yes.  We summarized the findings from -- | 04:47PM |
| 12 | per the Human-centered design process. | 04:47PM |
| 13 | Q.  And what specifically were the takeaways | 04:47PM |
| 14 | that you had from this focus group? | 04:47PM |
| 15 | MR. RAIZMAN:  Objection.  Instruction not to | 04:47PM |
| 16 | answer.  It's privileged. | 04:47PM |
| 17 | Q.  (BY MR. MILLER):  Did you implement any | 04:47PM |
| 18 | of the things that you learned from the focus group | 04:47PM |
| 19 | into the design of the three-finger swipe? | 04:47PM |
| 20 | A.  One of the outputs from the focus group | 04:47PM |
| 21 | was the three-finger swipe.  And I should say that's | 04:47PM |
| 22 | where it originated -- like, that's where it | 04:48PM |
| 23 | originated, and there's a lot of consideration from | 04:48PM |
| 24 | the origination that led eventually to the | 04:48PM |
| 25 | three-finger swipe. | 04:48PM |

Page 171

```
 1          MR. RAIZMAN:  All right.  You need to stop        04:48PM

 2   talking about the consideration.  You can just talk      04:48PM

 3   about what you learned from the focus group              04:48PM

 4   participants.                                            04:48PM

 5          THE WITNESS:  Okay.                               04:48PM

 6          MR. RAIZMAN:  Okay?                               04:48PM

 7          MR. MILLER:  I think -- and correct me if I'm     04:48PM

 8   wrong, Counsel.  I don't want to ask questions that      04:48PM

 9   you deem privileged.  I would like to learn what         04:48PM

10   he -- what he obtained from the focus group              04:48PM

11   participants.  Are you claiming privilege to that        04:48PM

12   information or not?                                      04:48PM

13          MR. RAIZMAN:  I am not.                           04:48PM

14          MR. MILLER:  Okay.                                04:48PM

15          Q.   (BY MR. MILLER):  So -- so -- let me ask     04:48PM

16   a question.                                              04:48PM

17              What did you learn from the focus group       04:48PM

18   participants?                                            04:48PM

19          A.   Yeah.  There was four key elements, and      04:48PM

20   preparation was everything for the visually impaired.    04:48PM

21   Structure is key, use audio, and have employees that     04:48PM

22   are trained to be highly helpful and sensitive to ADA    04:49PM

23   needs.                                                   04:49PM

24          Q.   And what did you understand structure to     04:49PM

25   be in those four takeaways?                              04:49PM
```

Page 172

PA1103

```
 1    own smart devices -- that they had, you know,        04:51PM

 2    elements on their own devices that helped them       04:51PM

 3    navigate their worlds.                               04:51PM

 4         Q.   Independently, as far as you could tell?    04:51PM

 5         A.   Yeah.  Like, one example that a             04:51PM

 6    gentleman shared is he had an app on his phone that  04:51PM

 7    it could see objects in his world and verbally convey 04:51PM

 8    what those objects were.                             04:51PM

 9         Q.   Once the decision was made to implement    04:51PM

10    the three-finger swipe, was there ever any further   04:52PM

11    effort to obtain any feedback from visually impaired 04:52PM

12    individuals as to whether it was an effective means  04:52PM

13    of checking in?                                      04:52PM

14         A.   Personally, not that I was involved in.    04:52PM

15         Q.   How about that you're aware of?            04:52PM

16         A.   Not that I'm aware of.                     04:52PM

17         Q.   Was there any other takeaways that you     04:52PM

18    had -- strike that.                                  04:52PM

19              Was there any other feedback that you      04:52PM

20    received from this user group in Las Vegas in 2020   04:52PM

21    other than what you've already relayed to me that was 04:52PM

22    then used to effect any of Quest products or         04:53PM

23    services?                                            04:53PM

24         A.   No.  What I've summarized is the output.   04:53PM

25         Q.   Was there any effort undertaken as part    04:53PM
```

Page 174

```
 1          A.   After the fact of changing an          04:55PM

 2   experience?  I'm not sure if I understand.         04:55PM

 3          Q.   As part of the decision on whether to  04:55PM

 4   change the experience, I'm asking whether you went 04:55PM

 5   back and saw whether there were any complaints lodged 04:55PM

 6   at Quest and then followed up with those individuals 04:55PM

 7   about their experiences with the e-Check-in kiosk.  04:56PM

 8          A.   I see.  If we continue to get feedback 04:56PM

 9   within a specific area of the experience after we   04:56PM

10   change it, we haven't gotten it right, and we'll    04:56PM

11   continue to iterate and try to make it bitter.      04:56PM

12          Q.   Yeah.  I'm sorry.  I apologize.  You're 04:56PM

13   still not understanding my question, so maybe I'm not 04:56PM

14   being clear.                                        04:56PM

15          What I'm asking is prior to the decision     04:56PM

16   to implement the three-finger swipe, did you ever go 04:56PM

17   back and survey Quest patients who had had          04:56PM

18   difficulty -- or visually impaired and had difficulty 04:56PM

19   accessing the e-Check-in service to see what their  04:56PM

20   experience was like?                                04:56PM

21          A.   Maybe.  I don't know.  I mean, the only 04:56PM

22   reason why I'm -- sorry.  Yeah, I don't know.       04:56PM

23          Q.   I'm just asking what you know.  That's  04:56PM

24   all.                                                04:56PM

25          MR. RAIZMAN:  Exclude anything you know from 04:56PM
```

Page 177

PA1104

```
 1    it's like me personally?  That's not necessarily --     04:58PM

 2             Q.   (Inaudible).                               04:58PM

 3             A.   -- goes back to --                         04:58PM

 4             Q.   Sorry.                                     04:58PM

 5             MR. RAIZMAN:  And I'm going to ask you to       04:58PM

 6    exclude all of the consultation with counsel from       04:58PM

 7    this response.                                           04:58PM

 8             THE WITNESS:  Yeah.                             04:58PM

 9             Q.   (BY MR. MILLER):  I'm asking in your       04:58PM

10    capacity as a 30(b)(6) witness for Quest, in the        04:58PM

11    three-finger swipe, what were the next steps after      04:58PM

12    you obtained this feedback from the group in Las         04:58PM

13    Vegas in 2020 to implement the three-finger swipe?      04:58PM

14             A.   Yeah.  I don't know.  I wasn't involved.   04:58PM

15             Q.   Okay.  Fair enough.  How about in -- in    04:58PM

16    separate and apart from your role in 30(b)(6),          04:58PM

17    individually did you have any participation in the      04:58PM

18    three-finger swipe process after the focus group?       04:59PM

19             A.   No.                                        04:59PM

20             Q.   Who was involved, do you know, in         04:59PM

21    implementing the three-finger swipe at Quest after      04:59PM

22    you -- after the focus group?                           04:59PM

23             A.   I think that's the privileged stuff.  I   04:59PM

24    don't know.                                             04:59PM

25             Q.   You believe that that --                  04:59PM
```

                                                      Page 179

PA1105

| | | |
|---|---|---|
| 1 | actual queue, right?  That's still displayed to | 05:50PM |
| 2 | patients? | 05:50PM |
| 3 | A.   Correct. | 05:50PM |
| 4 | Q.   All right.  And so with respect to the | 05:50PM |
| 5 | audio loop, how long is the audio loop at Patient | 05:50PM |
| 6 | Service Centers that contains this message? | 05:50PM |
| 7 | A.   I don't know. | 05:51PM |
| 8 | Q.   How often does the audio message to use | 05:51PM |
| 9 | a three-finger swipe play? | 05:51PM |
| 10 | A.   Every 7 to 10 minutes. | 05:51PM |
| 11 | Q.   Isn't it true, Mr. Carr, that the audio | 05:51PM |
| 12 | loop differs from Patient Service Center to Patient | 05:51PM |
| 13 | Service Center in terms of its length? | 05:51PM |
| 14 | A.   I don't know. | 05:51PM |
| 15 | Q.   Isn't it true that within the same | 05:51PM |
| 16 | Patient Service Center the audio loop can differ in | 05:51PM |
| 17 | terms of its length and content? | 05:51PM |
| 18 | A.   I don't know. | 05:51PM |
| 19 | Q.   Would it surprise you to learn, | 05:51PM |
| 20 | Mr. Carr, that there are locations -- Patient Service | 05:51PM |
| 21 | Center locations where the message to blind patients | 05:51PM |
| 22 | to check in is as long as 30 minutes before it's | 05:51PM |
| 23 | displayed in a duplicate form? | 05:51PM |
| 24 | A.   I don't know about that. | 05:51PM |
| 25 | Q.   Are you -- would it surprise you to | 05:51PM |

Page 196

PA1106

| | | |
|---|---|---|
| 1 | learn that there are locations within Quest Patient | 05:52PM |
| 2 | Service Centers where blind patients have to wait at | 05:52PM |
| 3 | least 15 minutes before they can actually hear the | 05:52PM |
| 4 | instruction to use the three-finger swipe? | 05:52PM |
| 5 | A.   Yeah.   I don't know about that either. | 05:52PM |
| 6 | Q.   Does Quest still accept walk-ins for | 05:52PM |
| 7 | blind patients -- walk-in appointments? | 05:52PM |
| 8 | A.   Customers can walk in to be served at | 05:52PM |
| 9 | all of our locations across the country. | 05:52PM |
| 10 | Q.   Including blind customers, correct? | 05:52PM |
| 11 | A.   All customers that want to get | 05:52PM |
| 12 | healthcare services from us, and it may not -- | 05:52PM |
| 13 | Q.   -- walk in, right? | 05:52PM |
| 14 | A.   They may not be walking, right?  Maybe | 05:52PM |
| 15 | in a wheelchair, may being pushed by a family member. | 05:52PM |
| 16 | All customers can come in and visit us to be served. | 05:52PM |
| 17 | Q.   Including blind customers, right? | 05:52PM |
| 18 | A.   Yes, all customers. | 05:52PM |
| 19 | Q.   And so if a blind customer comes in as a | 05:52PM |
| 20 | walk-in to Quest, isn't it true that they need to | 05:52PM |
| 21 | wait to hear the audio message on the LCD screen | 05:53PM |
| 22 | before they have any other instruction as to how to | 05:53PM |
| 23 | check in vis-à-vis the three-finger swipe at the | 05:53PM |
| 24 | kiosk? | 05:53PM |
| 25 | MR. RAIZMAN:  Object as to form. | 05:53PM |

Page 197

```
 1                 With respect to all the other methods          05:56PM

 2      that can -- may be used by blind individuals              05:56PM

 3      independently?                                            05:56PM

 4           A.   Yes.                                            05:56PM

 5           Q.   Which ones?                                     05:56PM

 6           A.   I just communicated that:  Scheduling an       05:57PM

 7      appointment with mobile check-in.                         05:57PM

 8           Q.   But you don't know whether the mobile          05:57PM

 9      check-in is accessible or not, do you, sir?              05:57PM

10           MR. RAIZMAN:  Object to form.                        05:57PM

11           THE WITNESS:  I don't know at this moment in         05:57PM

12      time.                                                     05:57PM

13           Q.   (BY MR. MILLER):  You can't definitively       05:57PM

14      say that mobile check-in allows blind users to            05:57PM

15      independently check in at Quest, can you?                 05:57PM

16           MR. RAIZMAN:  Object to form.                        05:57PM

17           THE WITNESS:  I don't know.                          05:57PM

18           Q.   (BY MR. MILLER):  And the help button,         05:57PM

19      that doesn't have any braille function, does it?          05:57PM

20           A.   I'm not sure.                                   05:57PM

21           Q.   How are blind users who can't see               05:57PM

22      supposed to know where a help button is located at a      05:57PM

23      Quest Patient Service Center?                             05:57PM

24           A.   Well, based on my experience with that         05:58PM

25      focus group, there was a segment of them that             05:58PM
```

                                                Page 201

PA1108

```
 1    leveraged some technology that helped them see the      05:58PM
 2    world.   But in our circumstances, I don't know        05:58PM
 3    specifically.                                           05:58PM
 4         Q.   I asked you what Quest provides.   What      05:58PM
 5    does Quest provide to blind patients to tell them       05:58PM
 6    where the help button is?                               05:58PM
 7         A.   I believe we've summarized what we've        05:58PM
 8    provided so far.                                        05:58PM
 9         Q.   No.  No.  No.  I'm asking what does          05:58PM
10    Quest do to tell blind patients where the help button  05:58PM
11    is that you mentioned that they can use to help them    05:58PM
12    check in?                                               05:58PM
13         A.   I don't -- I don't know.                      05:58PM
14         Q.   Am I correct in understanding that the       05:58PM
15    only audio instruction that Quest provides to blind     05:58PM
16    patients when they walk in to use a three-finger        05:58PM
17    swipe comes from the LCD monitor?                       05:59PM
18         A.   No.                                           05:59PM
19         Q.   Where else does it come from?                05:59PM
20         A.   A phone, Appointment Scheduler, or --        05:59PM
21         Q.   What's --                                     05:59PM
22         A.   Or if a visually impaired customer has a     05:59PM
23    screen reader on their own device.  I've not done       05:59PM
24    this, so, I mean -- but I saw it shown to me by a       05:59PM
25    visually impaired when we had that focus group.         05:59PM
```

Page 202

PA1109

```
 1          Q.   I want to talk about what Quest           05:59PM

 2     specifically provided.  When a customer walks in the  05:59PM

 3     waiting room, am I correct that the first instruction 05:59PM

 4     from an audio perspective to a blind patient that     05:59PM

 5     they can use three-finger swipe comes from the audio  05:59PM

 6     loop on the LCD monitor?                              05:59PM

 7          MR. RAIZMAN:  Object as to form.                 05:59PM

 8          THE WITNESS:  I don't know.                      05:59PM

 9          Q.   (BY MR. MILLER):  Two individuals walk      05:59PM

10     into a Quest PSC where three-finger swipe technology  06:00PM

11     is implemented, and there's a video loop that tells   06:00PM

12     the blind user that there's a three-finger swipe      06:00PM

13     option.  With that -- I want you to -- I want you to  06:00PM

14     assume for a moment that that loop plays every        06:00PM

15     15 minutes.  Okay?                                    06:00PM

16               And so a sighted individual and a blind     06:00PM

17     individual both have -- walk in -- they're walk-ins.  06:00PM

18     They haven't preplanned.  They're coming to the       06:00PM

19     Patient Service Center as a walk-in.  They walk in    06:00PM

20     the door at the same time.  Blind user has to wait    06:00PM

21     15 minutes -- isn't it correct? -- to hear the        06:00PM

22     messaging before they know to use the check in,       06:00PM

23     whereas a sighted person can go e-Check-in right      06:00PM

24     away?                                                 06:00PM

25          MR. RAIZMAN:  Object to form.                    06:00PM
```

Page 203

PA1110

| | | |
|---|---|---|
| 1 | three-finger swipe to check in? | 06:04PM |
| 2 | A.   I don't know. | 06:04PM |
| 3 | Q.   Prior to implementing the three-finger | 06:04PM |
| 4 | swipe, did Quest give any consideration on whether it | 06:05PM |
| 5 | could implement speech output at the e-Check-in kiosk | 06:05PM |
| 6 | that would allow a blind user to independently | 06:05PM |
| 7 | navigate through the kiosk workflow and check in | 06:05PM |
| 8 | themselves? | 06:05PM |
| 9 | MR. RAIZMAN:  Object.  Instruct not to answer | 06:05PM |
| 10 | except to the extent that consideration was given by | 06:05PM |
| 11 | a member of the focus group. | 06:05PM |
| 12 | MR. MILLER:  Which portion are you allowing | 06:05PM |
| 13 | him to answer, Counsel? | 06:05PM |
| 14 | MR. RAIZMAN:  He can answer the question if | 06:05PM |
| 15 | it came from a focus group member.  I don't know if | 06:05PM |
| 16 | it did.  But, otherwise, the considerations are | 06:06PM |
| 17 | privileged.  They're all part of a privileged | 06:06PM |
| 18 | process. | 06:06PM |
| 19 | THE WITNESS:  So the only thing -- | 06:06PM |
| 20 | Q.   (BY MR. MILLER):  Go ahead. | 06:06PM |
| 21 | A.   The only thing that came out of the | 06:06PM |
| 22 | focus group is the visually impaired customers had | 06:06PM |
| 23 | their own devices that leveraged their own screen | 06:06PM |
| 24 | readers to navigate the world. | 06:06PM |
| 25 | Q.   Did you ask the focus group whether they | 06:06PM |

Page 208

PA1111

| | | |
|---|---|---|
| 1 | asking -- well, let me ask it more specifically. | 06:08PM |
| 2 | Between 2015 and August of 2020, did Quest ever | 06:09PM |
| 3 | consider whether it could implement an easily | 06:09PM |
| 4 | identified headphone jack on the check-in kiosk so | 06:09PM |
| 5 | that the blind or visually impaired user could | 06:09PM |
| 6 | interact with the kiosk speech output system | |
| 7 | privately and independently? | 06:09PM |
| 8 | MR. RAIZMAN:  I'm going to object.  Instruct | 06:09PM |
| 9 | you not to answer as privilege to anything that was | 06:09PM |
| 10 | considered as part of the three-finger swipe process | 06:09PM |
| 11 | and answering the question except to the extent it | 06:09PM |
| 12 | was discussed with the focus group. | 06:09PM |
| 13 | THE WITNESS:  It did not come up at the focus | 06:09PM |
| 14 | group because they're using their own devices. | 06:09PM |
| 15 | Q.   (BY MR. MILLER):  Did Quest ever | 06:09PM |
| 16 | consider -- prior to the focus group whether it could | 06:09PM |
| 17 | implement an easily identified headphone jack on the | 06:09PM |
| 18 | check-in kiosk so that the blind or visually impaired | 06:09PM |
| 19 | could interact with the kiosk speech output system | 06:09PM |
| 20 | privately and independently? | 06:09PM |
| 21 | MR. RAIZMAN:  Again, just in connection with | 06:09PM |
| 22 | the three-finger swipe, it's all privileged.  So | 06:09PM |
| 23 | exclude that from your response.  Outside of the | 06:09PM |
| 24 | three-finger swipe, did Quest consider the headphone | 06:10PM |
| 25 | jack. | 06:10PM |

Page 211

| | | |
|---|---|---|
| 1 | THE WITNESS:  I don't know. | 06:10PM |
| 2 | Q.  (BY MR. MILLER):  Did Quest ever | 06:10PM |
| 3 | consider whether a braille label could be placed on | 06:10PM |
| 4 | the kiosk to provide instruction to help locate the | 06:10PM |
| 5 | headphone jack as well as instruction of how to start | 06:10PM |
| 6 | speech output? | 06:10PM |
| 7 | MR. RAIZMAN:  Instruct not to answer as | 06:10PM |
| 8 | privileged.  Any considerations given in connection | 06:10PM |
| 9 | with the three-finger swipe except to the extent the | 06:10PM |
| 10 | focus group raised the issue. | 06:10PM |
| 11 | THE WITNESS:  So pertinent to the focus | 06:10PM |
| 12 | group, we asked specifically about braille because we | 06:10PM |
| 13 | cited it's something I don't know how to read.  And | 06:10PM |
| 14 | the visually impaired individuals that were present | 06:10PM |
| 15 | scoffed at braille because it's hard to discover | 06:10PM |
| 16 | where it is at. | 06:10PM |
| 17 | Q.  (BY MR. MILLER):  So the 10 individuals | 06:10PM |
| 18 | that you surveyed to decide what to do here you claim | 06:10PM |
| 19 | scoffed at braille? | 06:10PM |
| 20 | A.  Well, they said it's something they | 06:10PM |
| 21 | don't leverage routinely because they're leveraging | 06:11PM |
| 22 | their device that has all the capabilities they need | 06:11PM |
| 23 | to navigate the world. | 06:11PM |
| 24 | Q.  So my question is a little different, | 06:11PM |
| 25 | though.  I'm going to ask it again.  Prior to the | 06:11PM |

Page 212

```
 1    implementation of the three-finger swipe, did Quest    06:11PM

 2    consider whether a braille label could be placed on    06:11PM

 3    the kiosk to provide instruction to help locate a      06:11PM

 4    headphone jack as well as instructions on how to       06:11PM

 5    start speech output?                                   06:11PM

 6           MR. RAIZMAN:  Objection.  Privileged.           06:11PM

 7    Instruct not to answer as to any considerations given  06:11PM

 8    other than in connection with the focus group.         06:11PM

 9         THE WITNESS:  I think I've summarized the         06:11PM

10    braille with the focus group.  I mean, I don't know    06:11PM

11    if you have any more specific questions with the

12    focus group.                                           06:11PM

13           Q.   (BY MR. MILLER):  Prior to the focus       06:11PM

14    group, did Quest ever consider whether a braille       06:11PM

15    label could be placed on the kiosk to provide          06:11PM

16    instruction to help locate a headphone jack as well    06:11PM

17    as instruction on how to start speech output prior to  06:11PM

18    the focus group?                                       06:11PM

19           MR. RAIZMAN:  Yeah.  I understand.  Same        06:11PM

20    instruction, because there might have been privileged  06:12PM

21    conversations prior to the focus group as well.  So    06:12PM

22    exclude anything having to do with the three-finger    06:12PM

23    swipe except as the focus group.  Outside of that,     06:12PM

24    you can testify whether you considered that.           06:12PM

25         THE WITNESS:  Yeah.  I don't know, Mr.            06:12PM
```

Page 213

PA1114

| | | |
|---|---|---|
| 1 | Q.   (BY MR. MILLER):  In settling in on the | 06:15PM |
| 2 | three-finger swipe, did you take into consideration | 06:16PM |
| 3 | any of the complaints that our clients have in this | 06:16PM |
| 4 | litigation? | 06:16PM |
| 5 | MR. RAIZMAN:  Objection.  Beyond the scope. | 06:16PM |
| 6 | You can answer if you know. | 06:16PM |
| 7 | THE WITNESS:  I don't. | 06:16PM |
| 8 | Q.   (BY MR. MILLER):  Since we're on this | 06:16PM |
| 9 | topic and just trying to finish it out, let's go to | 06:16PM |
| 10 | Exhibit 6 for a moment.  We'll come back to 24 | 06:16PM |
| 11 | briefly here.  I'm going to show you what's been | 06:16PM |
| 12 | marked as Exhibit 6 to Mr. Yarrison's deposition. | |
| 13 | Bear with me. | 06:16PM |
| 14 | Exhibit 6? | 06:16PM |
| 15 | MR. RAIZMAN:  Is that not in his exhibit | 06:16PM |
| 16 | share? | 06:16PM |
| 17 | MR. MILLER:  It may be but I'm just going to | 06:16PM |
| 18 | put it in Mr. Carr's so he can easily see it. | 06:16PM |
| 19 | MR. RAIZMAN:  I am not getting access to | 06:16PM |
| 20 | exhibit share.  Just -- I'll let you know when it | 06:16PM |
| 21 | becomes available.  Exhibit 6 you said? | 06:17PM |
| 22 | MR. MILLER:  Yes.  It should be there. | 06:17PM |
| 23 | MR. RAIZMAN:  Okay.  It's booting up now. | 06:17PM |
| 24 | I'm getting a spinning circle. | 06:17PM |
| 25 | THE WITNESS:  Mine is there. | 06:17PM |

Page 217

PA1115

```
 1                    (A recess was taken from 6:38 p.m. to      06:46PM

 2      6:50 p.m.)                                               06:50PM

 3            THE VIDEOGRAPHER:  On the record at 6:50 p.m.      06:50PM

 4            Q.   (BY MR. MILLER):  Welcome back,               06:50PM

 5      Mr. Carr.                                                06:50PM

 6            A.   Thank you.                                    06:50PM

 7            Q.   And am I correct in understanding that        06:50PM

 8      with the three-finger swipe it actually tracks           06:50PM

 9      whether somebody has checked in as an either low          06:50PM

10      vision -- a visually impaired or blind individual --     06:50PM

11      that's part of how it's tracked with the three-finger    06:50PM

12      swipe internally?                                        06:50PM

13            A.   The data indicates visually impaired.         06:50PM

14            Q.   And that's data that -- that Quest             06:50PM

15      currently keeps in its possession, correct?             06:50PM

16            A.   Yes.                                          06:50PM

17            Q.   Do you review that data in your current       06:50PM

18      position?                                                06:50PM

19            A.   No.                                           06:50PM

20            Q.   Do you have any idea how many                 06:50PM

21      individuals have checked in via -- vis-à-vis the         06:50PM

22      three-finger swipe since implementation?                06:50PM

23            A.   No.                                           06:51PM

24            Q.   But if you wanted access to that data,        06:51PM

25      you could -- you could do that within Quest?  That       06:51PM
```

PA1116

| | | |
|---|---|---|
| 1 | data point is correct? | 06:51PM |
| 2 | A.   Yes. | 06:51PM |
| 3 | Q.   If we could, please, I'd like to go back | 06:51PM |
| 4 | to Exhibit 24.  It's already in the exhibit share. | 06:51PM |
| 5 | It was the CapEx.  And I'd like to focus your | 06:51PM |
| 6 | attention, again, back to tab No. 4 of the e-Check-in | 06:51PM |
| 7 | CapEx. | 06:51PM |
| 8 | A.   It's opening. | 06:51PM |
| 9 | Q.   And specifically, I would turn your | 06:51PM |
| 10 | attention to the summarized project description where | 06:51PM |
| 11 | we had left off.  And once you're there, I will tell | 06:51PM |
| 12 | you exactly where I want to go. | 06:51PM |
| 13 | A.   And just to confirm we're in the right | 06:52PM |
| 14 | place, Exhibit 24, and I'm on the fourth sheet that | 06:52PM |
| 15 | says "e-Check-in CapEx" in the summarized product | 06:52PM |
| 16 | description area? | 06:52PM |
| 17 | Q.   Correct. | 06:52PM |
| 18 | A.   Okay.  I'm there. | 06:52PM |
| 19 | Q.   So under the background section where we | 06:52PM |
| 20 | left off -- I'm on what appears to be the third | 06:52PM |
| 21 | sentence from the end of the first paragraph in the | 06:52PM |
| 22 | background -- the sentence where it says, "Patients | 06:52PM |
| 23 | do not have visibility."  Do you see that? | 06:52PM |
| 24 | A.   Yes. | 06:52PM |
| 25 | Q.   Okay.  So one of the background factors | 06:52PM |

Page 234

PA1117

| | | |
|---|---|---|
| 1 | implemented by Quest? | 14:35:47 |
| 2 | A    I don't recall personally seeing this | 14:35:49 |
| 3 | heading on this document with -- you are sharing | 14:35:53 |
| 4 | with me in this form. | 14:35:57 |
| 5 | Q    Do you know whether Quest ever considered | 14:35:59 |
| 6 | any information that it received from Wright State | 14:36:01 |
| 7 | prior to implementing the three-finger swipe? | 14:36:07 |
| 8 | A    Similar to my previous response, there's a | 14:36:09 |
| 9 | lot of considerations that are made before something | 14:36:12 |
| 10 | is deployed in our customer experience.  And it | 14:36:16 |
| 11 | would be speculative.  It would be -- the answer | 14:36:19 |
| 12 | would be possible.  But again, that's speculative. | 14:36:21 |
| 13 | I don't know. | 14:36:21 |
| 14 | Q    Well, if we go down to the second page, | 14:36:26 |
| 15 | there was a note from the interview that says, | 14:36:29 |
| 16 | "Transportation is a huge deal.  Even | 14:36:32 |
| 17 | when access to public transit -- even | 14:36:34 |
| 18 | with -- when access to public transit, it | 14:36:38 |
| 19 | can be quite expensive.  Project, | 14:36:40 |
| 20 | mobility - RTA public transit, paratransit | 14:36:44 |
| 21 | company, they have rules that you have to | 14:36:46 |
| 22 | be there early.  Because I want to say if | 14:36:51 |
| 23 | you are late for your appointment, we have | 14:36:52 |
| 24 | to reschedule.  So making that a punishment | 14:36:54 |
| 25 | won't work for them.  The bus is not | 14:36:58 |

Page 370

```
 1       A    A step in the human-centered design process    15:15:24

 2   that was part of, say, the previous document, I         15:15:28

 3   recall seeing a page that talks about prototyping as    15:15:31

 4   an element of human-centered design.                    15:15:33

 5       Q    But when you say "prototype", was it a         15:15:38

 6   prototype around how facilities could be modified       15:15:40

 7   based on the feedback that was received from the        15:15:44

 8   focus group?                                            15:15:46

 9       A    It's not a physical facility.  A database      15:15:49

10   is a digital storage location is what the heading       15:15:53

11   references.                                             15:15:54

12       Q    In the right-hand column, it says in the       15:15:59

13   second to last paragraph and into the last             15:16:03

14   paragraph,                                              15:16:04

15             "Visually impaired indicated the            15:16:07

16        description was clear and would help orient        15:16:09

17        them when arriving.  However, it wouldn't          15:16:13

18        help them to know how to interact with the         15:16:16

19        kiosk.  They offered the use of tactile            15:16:18

20        strips on the floor to guide them within a         15:16:22

21        lane."                                             15:16:23

22        Do you know who provided that specific             15:16:26

23   feedback about the tactile strips?                      15:16:28

24       A    Per the document, it would be whomever the     15:16:33

25   team themselves referenced on the previous page had     15:16:38
```

Page 380

PA1119

| | | |
|---|---|---|
| 1 | conversations with to do the empathy, discovery and | 15:16:40 |
| 2 | define. | 15:16:43 |
| 3 | Q     But it would have been some part of the | 15:16:44 |
| 4 | focus group.  Is that your understanding? | 15:16:46 |
| 5 | A     So to make clear, between this document and | 15:16:51 |
| 6 | the other ones, there was three key events that | 15:16:56 |
| 7 | culminated in a multitude of considerations. | 15:16:58 |
| 8 | So the timing was January for the first | 15:17:01 |
| 9 | focus group, which I think that's what you are | 15:17:04 |
| 10 | referencing. | 15:17:04 |
| 11 | Then there was the Wright School visit | 15:17:09 |
| 12 | where more considerations were gathered that have -- | 15:17:10 |
| 13 | like culminated in some additional information and | 15:17:14 |
| 14 | insights that led us to what you are seeing and | 15:17:15 |
| 15 | showing here.  And I think that is the March sprint | 15:17:18 |
| 16 | event. | 15:17:18 |
| 17 | Q     Okay.  Fair enough. | 15:17:21 |
| 18 | Do you know whether Quest ever put tactile | 15:17:25 |
| 19 | strips of the floors of their Patient Service | 15:17:28 |
| 20 | Centers to guide their blind patients to the kiosks? | 15:17:32 |
| 21 | MR. RAIZMAN:  Object.  Beyond the scope. | 15:17:35 |
| 22 | BY MR. MILLER: | 15:17:35 |
| 23 | Q     Do you know, Mr. Carr? | 15:17:42 |
| 24 | A     Do you want me to answer? | 15:17:44 |
| 25 | Q     Yes, please. | 15:17:45 |

Page 381

PA1120

| | | |
|---|---|---|
| 1 | A   As related to the sprint event that this | 15:17:49 |
| 2 | document tries to summarize, I do not specifically | 15:17:54 |
| 3 | recall that happening. | 15:17:55 |
| 4 | Q   In the next slide on -- under "phone tree," | 15:18:03 |
| 5 | there was a -- in the right-hand column, it says, | 15:18:05 |
| 6 | why at the rehabilitation -- | 15:18:06 |
| 7 | "While at the rehabilitation services | 15:18:09 |
| 8 | for the blind, they were clear about their | 15:18:12 |
| 9 | need to speak with a human prior to | 15:18:14 |
| 10 | arrival." | 15:18:15 |
| 11 | Do you know whether Quest made any | 15:18:18 |
| 12 | modifications to its process in response to that | 15:18:22 |
| 13 | comment so that people calling in advance of their | 15:18:25 |
| 14 | appointment could speak with a human? | 15:18:29 |
| 15 | A   I do know, based upon this event and the | 15:18:31 |
| 16 | previous two that I mentioned, with all the | 15:18:33 |
| 17 | considerations, that Quest is constantly in a state | 15:18:36 |
| 18 | of trying to improve their customer experience, with | 15:18:39 |
| 19 | the phone tree being an element with when customers | 15:18:42 |
| 20 | call prior to coming to our locations. | 15:18:45 |
| 21 | Q   But does the phone tree allow customers to | 15:18:47 |
| 22 | interact with a human? | 15:18:50 |
| 23 | A   Yes. | 15:18:52 |
| 24 | Q   If we go to the next page, "Kiosk Update | 15:18:54 |
| 25 | Version 1," there's a second to last paragraph on | 15:19:00 |

Page 382

PA1121

| | | |
|---|---|---|
| 1 | them." | 15:23:44 |
| 2 | Do you know whether, as part of the | 15:23:46 |
| 3 | feedback that was considered, Quest ever considered | 15:23:51 |
| 4 | using the screen reader technology in the iPads that | 15:23:55 |
| 5 | were in the kiosks and concluded that it would | 15:23:58 |
| 6 | otherwise impose undue hardship on the company to do | 15:24:02 |
| 7 | so? | 15:24:02 |
| 8 | MR. RAIZMAN:  I'm going to object that the | 15:24:05 |
| 9 | second part of the question in particular calls for | 15:24:08 |
| 10 | privileged information.  I would let the witness | 15:24:15 |
| 11 | answer with respect to the question of whether that | 15:24:17 |
| 12 | issue was considered.  But not with respect to the | 15:24:23 |
| 13 | undue burden.  So instruct not to answer as to | 15:24:26 |
| 14 | consideration of the undue burden or any other legal | 15:24:30 |
| 15 | significance of the consideration. | 15:24:32 |
| 16 | THE WITNESS:  Mr. Miller, could you ask the | 15:24:38 |
| 17 | question again? | 15:24:39 |
| 18 | MR. MILLER:  Why don't you tell me what part you | 15:24:42 |
| 19 | will let him answer more clearly, Mr. Raizman.  That | 15:24:45 |
| 20 | way I don't have to parse it. | 15:24:46 |
| 21 | MR. RAIZMAN:  Sure. | 15:24:46 |
| 22 | You can answer whether -- well, I don't | 15:24:50 |
| 23 | want -- there was quite a bit of information there. | 15:24:53 |
| 24 | You will tell me if I don't get it right, | 15:24:55 |
| 25 | Mr. Miller. | 15:24:56 |

Page 387

| | | |
|---|---|---|
| 1 | But the information about the iPad | 15:24:59 |
| 2 | functionality of voiceover, whether that was | 15:25:02 |
| 3 | considered. | 15:25:07 |
| 4 | THE WITNESS:  The part that was considered -- | 15:25:09 |
| 5 | I'm going to extend this from the focus group -- is | 15:25:12 |
| 6 | the use of their devices. | 15:25:14 |
| 7 | So when I read that feedback, they are | 15:25:20 |
| 8 | indicating the use of a screen reading technology on | 15:25:22 |
| 9 | their device with a giant screen where the second | 15:25:27 |
| 10 | element from a consideration is, you know, something | 15:25:31 |
| 11 | that they can walk away from as a gift, as it | 15:25:34 |
| 12 | indicates in that last sentence. | 15:25:38 |
| 13 | BY MR. MILLER: | 15:25:39 |
| 14 | Q    Did you ever consider whether the use of | 15:25:41 |
| 15 | voiceover on the existing kiosk could allow blind | 15:25:45 |
| 16 | individuals to independently access the kiosk? | 15:25:47 |
| 17 | A    There's a lot of considerations.  And | 15:25:53 |
| 18 | visually-impaired customers varies where they can | 15:25:58 |
| 19 | interact with our kiosk. | 15:26:00 |
| 20 | (Whereupon the reporter asked for | 15:26:00 |
| 21 | clarification) | 15:26:00 |
| 22 | THE WITNESS:  And they are supported with help | 15:26:02 |
| 23 | with our phlebotomists to help. | 15:26:16 |
| 24 | BY MR. MILLER: | 15:26:16 |
| 25 | Q    My question was just a little more specific | 15:26:18 |

Page 388

PA1123

| | | |
|---|---|---|
| 1 | though, which was did you ever consider whether the | 15:26:22 |
| 2 | use of voiceover technology could be implemented on | 15:26:25 |
| 3 | the iPad to allow visually-impaired customers or | 15:26:30 |
| 4 | legal -- or why don't we say legally-blind customers | 15:26:33 |
| 5 | independently interact with the kiosk?  So I'm | 15:26:37 |
| 6 | asking specifically whether voiceover was | 15:26:38 |
| 7 | considered. | 15:26:40 |
| 8 | MR. RAIZMAN:  This is beyond the scope of the | 15:26:41 |
| 9 | redirect.  It's beyond the scope of the direct too, | 15:26:46 |
| 10 | or your cross, however you want to phrase it.  So | 15:26:51 |
| 11 | I'm going to instruct the witness not to answer the | 15:26:53 |
| 12 | question. | 15:26:55 |
| 13 | MR. MILLER:  Okay.  I think we're done here then | 15:26:59 |
| 14 | based on your instruction.  So I'm presuming you are | 15:27:02 |
| 15 | not going to let him answer any more questions. | 15:27:06 |
| 16 | MR. RAIZMAN:  If it's within the scope of my | 15:27:08 |
| 17 | very limited redirect, I'll let you ask them. | 15:27:13 |
| 18 | MR. MILLER:  Well, it was -- I think this was | 15:27:16 |
| 19 | within the scope, but we'll debate it later.  I | 15:27:20 |
| 20 | think we can move on from here. | 15:27:21 |
| 21 | So thank you very much, Mr. Carr. | 15:27:22 |
| 22 | THE WITNESS:  Thank you. | 15:27:45 |
| 23 | (Whereupon a discussion was held | 15:27:45 |
| 24 | off the record) | 15:27:45 |
| 25 | THE VIDEOGRAPHER:  This concludes the video | 15:27:57 |

Page 389

CERTIFICATE OF TAYLOR CARR

I, TAYLOR CARR, being first duly sworn, depose and say:

That I am the witness named in the foregoing deposition; that I have read said deposition and know the contents thereof; that the questions contained therein were propounded to me; and that the answers contained therein are true and correct, except for any changes that I may have listed on the Errata Sheet attached hereto.

DATED this 21st day of May 20 21.

CHANGED ON ERRATA SHEET   YES X NO___

_____
TAYLOR CARR

SUBSCRIBED AND SWORN to before me this 21st day of MAY 20 21.

PARKER JEROME SWENSEN
NAME OF NOTARY PUBLIC
RESIDING AT PORTLAND
MY COMMISSION EXPIRES 8/15/2023

Page 325



OFFICIAL STAMP
PARKER JEROME SWENSEN
NOTARY PUBLIC · OREGON
COMMISSION NO. 990648
MY COMMISSION EXPIRES AUGUST 15, 2023

Veritext Legal Solutions
866 299-5127

PA1125

**ERRATA SHEET**

| Page:Line | Existing Testimony | Change To: |
|---|---|---|
| 24:10 | Redesigner | Redesign |
| 48:4 | | Add at end:  I'm also aware that customers can check in by mobile check-in. |
| 49:4 | code underline | underlying code |
| 53:15 | long name | long list of names |
| 58:6 | last year sometime | sometime in 2019 |
| 58:8 | Correct. | No, in 2019. |
| 75:12 | which include | which may include |
| 127:23 | privy | Purpose |
| 132:17 | No, I don't believe it's incorrect. | No, I don't believe it's correct. |
| 150:12 | but that doesn't necessarily mean…. | Add to the end:  that that was the only way to learn of one's place in the queue. |
| 155:25 | Yes. | Yes, it is designed to have that functionality. |
| 155:12 | I honestly don't know.  Don't know. | Chris Grant approved the implementation of the three-finger swipe. |
| 156:23 | I don't know. | Not for that particular check-in transaction. |
| 157:2 | I don't know. | No. |
| 157:6 | I don't know. | No. |
| 166:7 | | Add to the beginning of the answer:  In 2020, we were trying to learn |
| 186:12 | Yes. | Yes, some can. |
| 191:7 | it's not in all locations, | it's not in all locations yet, |
| 194:1 | It's not available in all locations yet. | The landmarking feature for visually-impaired customers is not available in all locations yet. |
| 219:5 | insurance | internal |

Signature: _____

Taylor Carr

47214776.1

PA1126

# EXHIBIT 39

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JULIAN VARGAS, ANNE WEST, and  ) NO. 2:19-cv-8108
     AMERICAN COUNCIL OF THE BLIND, )
 5   individually on behalf of      )
     themselves and all others      )
 6   similarly situated,            )
                                    )
 7                   Plaintiffs,    )
                                    )
 8         v.                       )
                                    )
 9   QUEST DIAGNOSTICS CLINICAL     )
     LABORATORIES, INC., QUEST      )
10   DIAGNOSTICS HOLDINGS, INC.,    )
     QUEST DIAGNOSTICS INCORPORATED;)
11   and DOES 1-10, inclusive,      )
                                    )
12                   Defendants.    )
     _____)
13
14
15
16
             REMOTE VIDEOTAPED DEPOSITION OF JODY REILLY
17
                    Overland Park, Kansas
18
                    Friday, April 16, 2021
19
20
21
     Reported by:
22   Heidi Hummel-Grant
     CSR No. 12556
23
24   Pages 1 - 275
25
```

Page 1

PA1127

| | | |
|---|---|---|
| 1 | MR. MILLER: | 10:55 |
| 2 | Q   You -- you mentioned that you had | |
| 3 | compliance training including training on the ADA. | |
| 4 | What specific training have had in that | |
| 5 | regard since you've been a Quest employee? | 10:55 |
| 6 | A   There's always compliance training | |
| 7 | that's done every year around, you know, how to | |
| 8 | handle things with the law, Stark Law, other laws. | |
| 9 | So we have to that every year.  There's training | |
| 10 | around PHI and how to handle that.  There's training | 10:55 |
| 11 | on how to treat people with disabilities. | |
| 12 | There's -- there's lots of training. | |
| 13 | Q   In terms of the annual compliance | |
| 14 | training that you do every year, does it | |
| 15 | specifically cover the ADA? | 10:55 |
| 16 | A   You know -- | |
| 17 | MR. RAIZMAN:  Object as to form. | |
| 18 | THE WITNESS:  -- I don't -- I don't recall. | |
| 19 | I'd have to look at that. | |
| 20 | MR. MILLER: | 10:56 |
| 21 | Q   In your current role are you responsible | |
| 22 | in any capacity for handling the compliance training | |
| 23 | that's done by employees each year? | |
| 24 | A   No.  That's -- that's rolled out by our | |
| 25 | compliance team, I believe. | 10:56 |

Page 39

```
 1    databases that would allow you to confirm whether      11:06
 2    employees in patient service centers have completed
 3    nondiscrimination training on an annual basis at
 4    Quest?
 5            A   I would say that I -- I can probably ask   11:06
 6    for that data to be pulled, but I personally don't
 7    have access to go in and check.  I only have access
 8    to my own people.
 9            Q   To date have you made any requests that
10    that data be pulled or provided to you?               11:07
11            A   I have not in my current role.
12            Q   So as you sit here today can you confirm
13    that all employees at Quest that work at patient
14    services centers have, in fact, completed annual
15    nondiscrimination training that covers the ADA?       11:07
16            A   Can you repeat that one more time?
17            Q   Yeah.  As you sit here today can you
18    tell me affirmatively one way or other whether all
19    employees of Quest who work at patient service
20    centers have completed annual nondiscrimination       11:07
21    training that covers the Americans with Disabilities
22    Act?
23            A   I cannot tell you today that every
24    single person has completed it, no.
25            Our policy is to roll out the -- roll out a    11:07
```

Page 48

PA1129

1    training and require that they do complete it.          11:08

2          Q    And this policy -- this policy that you

3    reference, is what a written policy?

4          MR. RAIZMAN:   I'm going to object --

5          THE WITNESS:   You know --                         11:08

6          MR. RAIZMAN:   -- that it's beyond the scope.

7          But go ahead and answer.

8          THE WITNESS:   Yeah, I -- I believe that it

9    is within our compliance policies to do so.   But

10   I'm not over those policies so I would have to          11:08

11   defer.

12         MR. MILLER:

13         Q    To compliance?

14         A    Yes.

15         MR. RAIZMAN:   Mr. Miller, at a convenient        11:09

16   time that's good for you, I'd appreciate a break in

17   the next ten minutes or so.

18         MR. MILLER:   No problem, Mr. Raizman.   I'll

19   accommodate you now.   Thank you.

20         MR. RAIZMAN:   Thank you.                          11:09

21         THE VIDEOGRAPHER:   Okay.   We're going off

22   the record.   The time is 11:09 a.m.   And this is

23   the end of Media Unit Number 1.

24         (A recess is taken.)

25         THE VIDEOGRAPHER:   Okay.   We're back on the     11:25

Page 49

PA1130

```
 1    and medical review that.                          11:38

 2         Q    And how often -- strike that.

 3         Are you able to access any data that would

 4    tell you one way or the other whether patient

 5    service representatives have completed the Managing  11:38

 6    Every Patient Needs training on an annual basis?

 7         A    Yes, I am able to ask for reports that

 8    would be able to tell me that information.

 9         It is our policy to make sure that it is

10    assigned to all representatives within patient      11:39

11    services, and our policy's that they would take it.

12         Q    Have you -- have you made a request for

13    such data to date to confirm one way or the other

14    whether all patient services representatives at

15    Quest have taken this annual training?              11:39

16         MR. RAIZMAN:  I'm going to object that it's

17     beyond the scope.

18         You can answer.

19         THE WITNESS:  I haven't personally made a --

20     a recommend -- a request for that.                 11:39

21         But understand that the -- the supervisors

22    and managers have the responsibility to ensure that

23    their teams are getting -- it is getting completed.

24         MR. MILLER:  Move to strike everything after

25     I haven't made a request for that.                 11:39
```

Page 59

```
 1            A    Again, I'd have to look.  I -- there's a      11:51

 2    lot of courses, and I would have to re -- review

 3    them to understand which ones specifically had ADA

 4    referenced.  But again, many of them discuss how to

 5    help people with special needs and disabilities.         11:51

 6            MR. RAIZMAN:  Mr. Miller, I'm going to

 7     offer -- excuse me, I'm sorry -- offer help to you.

 8     She has a list of trainings that we'd be glad to

 9     supply with you, and I believe she has it with her.

10     So if you would like that, I'd share it with you.        11:51

11            MR. MILLER:  Has -- ahs it been produced

12     previously, Counsel?

13            MR. RAIZMAN:  No.

14            MR. MILLER:  Okay.

15            Can you -- can you send it over to me and        11:51

16    I'll look at it on a break and we'll try to come

17    back to those areas?

18            MR. RAIZMAN:  Sure.

19            MR. MILLER:  Thank you.  Okay.

20            Q    And just -- and just so I understand,        11:52

21    Ms. Reilly, is this list that you yourself compiled?

22            A    No.  It was provided by counsel.

23            Q    Does Quest maintain a written policy on

24    the Americans with Disabilities Act that is provided

25    to their employees?                                      11:52
```

                                                   Page 68

PA1132

```
1          MR. RAIZMAN:  Object as to form.        11:52
2          THE WITNESS:  I -- I'm -- I'm not aware of a
3    specific policy, written policy.  I'm -- I -- I'm
4    sure there is one, but I -- I don't recall where
5    that might be.                                 11:53
6          MR. MILLER:
7     Q    As you sit here today can you tell me
8    definitively that you've ever seen a written policy
9    from Quest that is regarding the Americans with
10   Disabilities Act?                              11:53
11    A    There's many policies that talks about
12   how we will conform to -- you know, our -- our
13   intent is to conform to all written laws, including
14   ADA.  But specifically I can't -- I can't tell you.
15    Q    In your current role do you provide any    11:53
16   of the employees at the patient service centers with
17   a written policy that specifically addresses the
18   Americans with Disabilities Act?
19    A    There is a notice in every patient
20   service centers that discusses the ADA, and it's   11:54
21   posted in every patient service center, and it
22   outlines that for all to see.
23    Q    Aside from the notice -- aside from the
24   notice, is there any other written policy that is
25   provided to employees at patient service centers    11:54
```

                                                      Page 69

PA1133

```
 1    things to help drive our training curriculum.          01:21
 2           Q    Would you agree, though, that you
 3    specifically receive customer complaints and try to
 4    review those complaints and decide if further
 5    training is needed?                                     01:21
 6           MR. RAIZMAN:   Object as to form.
 7           THE WITNESS:   I would say that we do receive
 8     feedback in variety of ways, and we do, you know,
 9     update our curriculum based on not an individual
10     complaint or feedback but certainly over with          01:22
11     trending of things.
12           MR. MILLER:
13           Q    Does Quest categorize any feedback it
14    receives from customers as complaint as opposed to
15    just feedback?                                          01:22
16           A    There is a group that receives specific
17    feedback from customers.   Sometimes the information
18    may be, you know, feedback, it may be positive, it
19    may be negative, and -- and sometimes there may be,
20    you know, verbiage that would sound like a              01:22
21    complaint, I guess.
22           Q    I -- I'm just asking whether Quest
23    internally qualifies any feedback it receives from
24    customers as, quote, unquote, complaints?
25           A    I -- I don't know that it particularly      01:23
```

Page 94

```
1           Q    And -- and then another method would be    01:24
2    telling the patient services representative; is that
3    right?
4           A    That would be correct.
5           Q    And does all that customer feed -- oh,     01:24
6    strike that.  Go ahead.
7           A    No, no, go ahead, sorry.
8           Q    Does that customer feedback get put into
9    a common portal or channel that can be accessed by
10   individuals such as yourself?                          01:24
11          MR. RAIZMAN:  Object as to form.
12          THE WITNESS:  It's my understanding that
13    some of it does, yes.
14          MR. MILLER:
15          Q    And -- and what -- what portal or          01:25
16   database is that within Quest?  What's it called?
17          A    The patient advocacy team does have a --
18   I believe it is a database where they correlate the
19   information for tracking purposes.  That would come
20   in through the web channel.  That would be one.        01:25
21   The -- the survey is, you know, evaluated and
22   there's data that is available to review trends.
23          Q    Have you ever served in a position where
24   you were working within the patient advocacy team?
25          A    No.                                        01:25
```

Page 96

RC3355/D

```
 1    Patient Needs training; is that correct?              01:48
 2         A    Yes, I believe so.
 3         Q    So as the individual who is in charge of
 4    making sure that the patient service representatives
 5    receive proper training do you know what section of  01:48
 6    the Americans with Disabilities Act patient service
 7    representatives -- strike that.
 8         Do you know what section of the Americans
 9    with Disabilities Act Quest is required to comply
10    with in offering services to the public?             01:49
11         MR. RAIZMAN:  Object.  Beyond the scope.
12     Object to the extent any information you have you
13     learned from counsel and instruct you not to answer
14     as to such information.
15         MR. MILLER:                                      01:49
16         Q    Outside of anything you've learned from
17    counsel do you know what sections of the Americans
18    with Disabilities Act apply to Quest?
19         MR. RAIZMAN:  Object.  Beyond the scope.
20         THE WITNESS:  No.                                01:49
21    MR. MILLER:
22         Q    Do you know whether Quest training
23    encompass Title 3, Americans with Disabilities Act
24    standards?
25         MR. RAIZMAN:  Object.  Form.                     01:49
```

Page 113

PA1134

```
 1   auxillary service that they request?                    02:01

 2        A   Can you reframe that, please?

 3        Q   Yeah.  Have you ever been trained that

 4   Quest is required to give primary consideration to

 5   disabled individual's choice of aid or auxillary       02:02

 6   service that they request?

 7        A   I believe that that -- that we have been

 8   trained to provide services for -- for aid.

 9        Q   But my question was more specific,

10   though.                                                 02:03

11        Have you been trained that under the ADA, as

12   it applies to Quest, the company is required to give

13   primary consideration to the choice of aid or

14   auxillary service requested by the person who has

15   the disability?                                         02:03

16        MR. RAIZMAN:  Object as to form.

17        THE WITNESS:  You know, I think I'm a little

18    confused about the wording of that question.

19        I will say that we are trained to provide

20   services to the blind and -- and give them primary     02:03

21   consideration.  Now, I don't know if that's exactly

22   what you're asking or not.

23        MR. MILLER:

24        Q   So -- so what part of my question was

25   confusing?  Just so I can be helpful.                   02:03
```

                                           Page  123

PA1135

```
 1            A    Primary consideration for aids or        02:03
 2    services.  I think primary is the word that's
 3    catching me up a bit, I think.
 4            Q    Okay.  All right.
 5            So does Quest provide any training to its     02:04
 6    patient service representatives that they have to
 7    first consider the aid or auxillary service that's
 8    being requested by the individual with the
 9    disability before they can offer them a
10    different -- or strike that.                          02:04
11            Does -- does Quest provide any training to
12    its patient service representative they have to
13    first consider the aid or auxillary service being
14    requested by an individual with a disability and
15    whether they can provide it before they offer       02:04
16    alternatives?
17            MR. RAIZMAN:  Object as to form.
18            THE WITNESS:  I -- I would say -- I don't
19     believe there is that -- I don't know.  I don't
20     know.  I'll say that.  I'm unaware of that.         02:04
21            MR. MILLER:
22            Q    So for example -- for example, if a
23    blind patient comes into Quest and says, "I want to
24    review all these documents on a screen reader as
25    opposed to having a patient service representative    02:05
```

Page 124

PA1136

1    read them to me," are patient service                02:05

2    representatives trained to know that they have to

3    first give consideration to trying to put those

4    documents in a format that can be used by the screen

5    reader before they default to just reading them to   02:05

6    the blind patient?

7              A    I would say in your example I -- I do

8    not believe they are trained to do that.

9              Q    Does Quest train its patient service

10   representatives to document in writing the reasons    02:05

11   it cannot give primary consideration to a disabled

12   individual's choice of aid or services if, in fact,

13   it can't accommodate that request?

14             A    Not that I'm aware of.

15             Q    Have you ever been trained that if Quest 02:06

16   cannot accommodate a disabled individual's choice of

17   aid or service, that Quest has an obligation to

18   document in writing the reasons why it cannot do so?

19             A    No, I don't believe so.

20             Q    I'd like to go through some exhibits     02:06

21   with you.  If we could turn our attention here to

22   your exhibit share.

23             A    Okay.

24             MR. MILLER:  I've just uploaded to the

25     exhibit share what would be marked next in order    02:07

                                            Page 125

PA1137

```
 1          MR. RAIZMAN:  Object --                    06:17

 2          MR. MILLER:

 3          Q  -- time frame?

 4          MR. RAIZMAN:  Apologize.

 5          Object as to form.                          06:17

 6          THE WITNESS:  Again, with regard, this is a

 7   piece of feedback.  This is in 2018.  So, you know,

 8   it was -- you know, we -- we do receive pieces of

 9   feedback over time.  But again, considering the

10   overall number of collections that we do, this may   06:17

11   not rise to a level of a trend that -- that would

12   be noted to make any change in our training as we

13   believe we have addressed all ADA and are in

14   compliance with the law with the current training

15   that we have.                                       06:18

16          MR. MILLER:  Let me show you what's marked

17   as Exhibit 51.

18          (Exhibit 51 was marked for identification, a

19   copy of which is attached hereto.)

20          MR. MILLER:  If we could move to Exhibit 51,

21   please?

22          For the record it's a document Bates stamped

23   PL405.

24          Q   Let me -- I want to focus your attention

25   on PL405 through PL406.  That's the specific letter   06:19
```

Page 236

PA1138

```
 1              To adding the file here, Exhibit 1 from        06:26
 2     Mr. Yarrison's deposition.
 3              (Exhibit 1 was referenced as previously
 4     marked, a copy of which is attached hereto.)
 5              MR. MILLER:
 6         Q    Let me know once you've had a chance --
 7         A    Yes.
 8         Q    Let me know when you have a chance to
 9     that document in front of you.
10         A    I'm sorry, which number was it?            06:27
11     Number 1?
12         Q    It's Exhibit Number 1.  Thank you.
13         A    Okay.  Sorry.
14         Q    No, there's no problem.
15         A    All righty.                                06:27
16         Q    Have you seen this document before?
17         A    I don't -- I don't believe so.
18         Q    Okay.
19              Let me take you to Number 12 in the topic
20     area.  If you could make your way there and let me   06:27
21     know once you're at Number 12?
22         A    Um-hum.
23         Q    You've been designated by Quest in
24     response to Topic Number 12, which involves Quest
25     maintenance, management and/or administration        06:28
```

Page 243

```
 1    policies, practices and/or procedures at your          06:28
 2    patient service centers.  And we've spent some time
 3    here today talking about those policies, practices
 4    and procedures as they relate specifically to the
 5    Americans with Disabilities Act.                       06:28
 6          Are there any additional policies beyond
 7    what you've testified here today that Quest relies
 8    upon to complete its ADA training in its patient
 9    service centers?
10          MR. RAIZMAN:  Object as to form.                 06:28
11          THE WITNESS:  I believe that the -- the
12     major policies that you've -- that we've talked
13     about today cover that; although, there are
14     different trainings that are available and for --
15     for our patient service center folks to view to and  06:29
16     to take for retraining purposes.
17          MR. MILLER:
18          Q   Right.  But I want to -- today's my day
19    to complete discovery for my client on this issue,
20    to not be surprised at trial.  So that's the purpose  06:29
21    of this exercise, believe it or not.
22          And so -- and we looked at a long list of --
23    of different documents and videos listed in
24    Exhibit 48.
25          And is there anything outside of that list       06:29
```

Page 244

PA1138-B

```
 1    that is a policy that Quest requires on the ADA that    06:29

 2    is provided -- strike that.

 3          Is there anything else that -- that Quest

 4    requires in terms of a policy on the ADA that is

 5    provided to their patient service representatives      06:29

 6    beyond what we've discussed here today?

 7          MR. RAIZMAN:  Object as to form.

 8          THE WITNESS:  I -- I'm not aware.

 9          MR. MILLER:

10          Q   Any -- any other practices or procedures    06:30

11    involving the ADA compliance at the patient service

12    centers beyond what we've discussed here today?

13          A   I'm not aware.

14          MR. RAIZMAN:  Same objection.  Same

15      objection.                                           06:30

16          THE REPORTER:  I'm sorry, Counsel?

17          MR. MILLER:

18          Q   You've been --

19          MR. RAIZMAN:  Same objection.  Object as to

20      form.                                                06:30

21          MR. MILLER:

22          Q   If we could go down to Topic Number 13?

23    You've also been designated by Quest in response to

24    Topic 13, which is the maintenance, management

25    and/or administration policies, practices and/or      06:30
```

Page 245

PA1138-C

```
 1    procedures of the eCheck-in kiosks.                    06:30
 2           Are you aware of any other policies that
 3    Quest has regarding eCheck-in kiosks other than
 4    those we've discussed today?
 5           MR. RAIZMAN:  Object as to form?             06:31
 6           MR. MILLER:
 7           Q    That are provided to its -- sorry, that
 8    are provided to its patient service representatives.
 9           MR. MILLER:  Apologies, Counsel.
10           MR. RAIZMAN:  No, that's okay.               06:31
11           Object as to form.
12           THE WITNESS:  Not that I'm aware of.
13           MR. MILLER:
14           Q    Any other practices or procedures
15    utilized in the eCheck-in kiosks specifically as it   06:31
16    relates to the ADA and/or blind patients that we
17    haven't covered here today?
18           MR. RAIZMAN:  Object as to form.
19           THE WITNESS:  Not that I'm aware.
20           MR. MILLER:                                  06:31
21           Q    If we can go take a look at Topic 19?
22           You've been designated in response to
23    plaintiff's request for all policies and procedures
24    maintained by you -- and that's Quest -- that
25    address compliance with the ADA at your patient      06:31
```

Page 246

PA1138-D

| | | |
|---|---|---|
| 1 | services centers.  We've certainly spent some time | 06:31 |
| 2 | talking about that today.  Let's take it in | |
| 3 | piecemeal form. | |
| 4 | Are there any other policies that Quest has | |
| 5 | that address compliance with the ADA at the patient | 06:31 |
| 6 | service centers other that what we talked about here | |
| 7 | today? | |
| 8 | MR. RAIZMAN:  Object as to form? | |
| 9 | THE WITNESS:  Not that I'm aware of. | |
| 10 | MR. MILLER:  Okay. | 06:32 |
| 11 | Q   Any other procedures that Quest | |
| 12 | maintains that address compliance with the ADA at | |
| 13 | its patient service centers other than what we've | |
| 14 | discussed here today? | |
| 15 | MR. RAIZMAN:  Same objection. | 06:32 |
| 16 | THE WITNESS:  Not -- not that I'm aware of | |
| 17 | specifically. | |
| 18 | MR. MILLER:  Okay. | |
| 19 | We're -- we're getting -- we're through | |
| 20 | here. | 06:32 |
| 21 | Q   We're going to Topic 20, please. | |
| 22 | It's -- again, you've been produced in | |
| 23 | response to Plaintiff's Topic 20 which is for all | |
| 24 | policies and procedures maintained by Quest that | |
| 25 | address compliance with the Rehab Act at its patient | 06:32 |

Page 247

```
 1    service centers.                                    06:32
 2         Again, are you aware of any other policies
 3    or procedures that Quest maintains regarding
 4    compliance with the Rehab Act other than those we've
 5    discussed today?                                    06:32
 6         MR. RAIZMAN:  Object as to form.
 7         THE WITNESS:  Not that I'm aware of.
 8         MR. MILLER:  Okay.
 9         Q   You've also been designated in response
10    to Topic 21, which is request for all policies or   06:33
11    procedures maintained by Quest to ensure compliance
12    with providing aids and auxilliary services --
13    again, it's defined in 28 of the Code of Federal
14    Regulations at 36.303 -- at the patient service
15    centers from January 1st, 2016, to the present.     06:33
16         And so I'll -- I'll simplify this.  Are you
17    aware of any other policies that relate to Quest
18    ensuring compliance with providing aids or
19    auxilliary services at the PSCs from January 1st,
20    2016, to the present?                               06:33
21         MR. RAIZMAN:  Object to form.
22         MR. MILLER:
23         Q   Other than those we've discussed today,
24    of course.
25         A   Not that I'm aware of.                     06:33
```

Page 248

PA1138-F

1          Q    Any -- any other procedures that Quest          06:33

2    maintains to ensure compliance with providing aids

3    and auxilliary service at its PSCs from January 1st,

4    2016, to the present other than what we've already

5    discussed?                                                  06:34

6               MR. RAIZMAN:  Object as to form.

7               THE WITNESS:  Not that I'm specifically

8     aware of.

9               MR. MILLER:

10         Q    If we go to Topic 22, you've also been          06:34

11   designated in response this topic, which involves

12   all policies or procedures maintained by Quest that

13   demonstrate each way in which Quest ensures

14   effective communication as defined in 28 CFR

15   36.303(c) with visually impaired persons during the       06:34

16   eCheck-in kiosk check-in process at its patient

17   service centers, again from January 1st, 2016, to

18   the present.

19              Are there any other policies other than what

20   we've talked about those -- that we've discussed          06:34

21   today that demonstrate the ways in which Quest

22   ensures effective communication with the visually

23   impaired during the eCheck-in kiosk process at the

24   PSCs?

25              MR. RAIZMAN:  Object as to form.               06:34

                                        Page 249

PA1138-G

```
 1              THE WITNESS:  Not that I'm aware of.        06:35
 2              MR. MILLER:
 3         Q    Moving on to Topic 23, if we could?
 4         You've been designated in response to
 5    Topic 23, which is the training that Quest provides   06:35
 6    its employees and independent contractors relating
 7    with how to communicate effectively with visually
 8    impaired persons during the check-in process at its
 9    patient services center.  We've obviously covered
10    training here today.                                  06:35
11         Is there any additional training outside of
12    what we've covered today that you're aware of that
13    relates to how Quest trains its employees to
14    communicate effectively wit the visually impaired at
15    the PSCs?                                             06:35
16              MR. RAIZMAN:  Object as to form.
17              THE WITNESS:  Not that I'm specifically
18     aware of.  We have a lot of -- a lot of different
19     trainings around communication so I -- I can't be
20     certain on that.  But not that I'm aware of.         06:36
21              MR. MILLER:
22         Q    You've been designated in response to
23    Topic 24, which is:  All complaints Quest has
24    received from January 1st, 2016, to the present from
25    any individual Quest knows to be legally blind        06:36
```

Page 250

PA1138-H

```
 1    alleging difficulty accessing the eCheck-in at the      06:36

 2    patient service center.

 3              And we just gone done -- well, first of all,

 4    we -- we just got done look at Exhibit 6, which was

 5    a series of complaints.                                  06:36

 6              Had you ever seen that list before today?

 7              MR. RAIZMAN:  Object as to form.

 8              THE WITNESS:  I have not.  I had not

 9     received or reviewed the patient efficacy in

10    regards to visually impaired complaints or feedback     06:36

11     before, except to prepare through counsel.

12              MR. MILLER:

13              Q   So is that yes, you had seen Exhibit 6

14    in your -- in your typical role at -- or strike

15    that.                                                    06:37

16              Is -- my -- had you seen Exhibit 6 prior to

17    preparing for your deposition?

18              MR. RAIZMAN:  Object as to form.

19              THE WITNESS:  And just to make sure I

20     understand, Exhibit 6 was the feedback spreadsheet?     06:37

21     Is that Exhibit 6?

22              MR. MILLER:

23              Q   Correct.

24              A   I had not seen that specific feedback

25    document prior to preparation for this deposition.      06:37
```

Page 251

PA1138-I

```
 1           Q   Do you believe that you are the person      06:37

 2    within Quest that has the most knowledge of

 3    complaints that the company has received from

 4    January 1st, 2016, to the present?

 5           MR. RAIZMAN:  Object as to form.  Outside        06:37

 6     the scope.

 7           THE WITNESS:  I would say our complaints

 8     come in in various ways, and there's more than one

 9     channel for complaint gathering.  I would say that

10     our patient advocacy is the team that handles the    06:38

11     complaints or feedback that comes through our

12     patient channel.  So they certainly would be

13     knowledgable.

14           MR. MILLER:

15           Q   Do you -- do you believe that you're        06:38

16    aware, as you sit here today, of the complaints that

17    Quest has received from January 1st, 2016, to the

18    present involving the legally blind alleging

19    difficulty accessing the eCheck-in at its patient at

20    the service centers?  Are you aware of all the        06:38

21    complaints that Quest has received in that regard as

22    you sit here today?

23           MR. RAIZMAN:  Object as to form.

24           THE WITNESS:  I believe I am aware of all

25     the feedback that has been received from patient     06:38
```

                                              Page 252

PA1138-J

```
1      advocacy team, yes.                                06:38

2           MR. MILLER:

3           Q    And so are you able to state with any

4      certainty how many complaints Quest has received

5      from January 1st, 2016, to the present from people  06:39

6      who purport to be legally blind alleging difficulty

7      accessing eCheck-in at the PSCs?

8           MR. RAIZMAN:  Object as to form.

9           THE WITNESS:  It's my understanding based on

10      this -- that exhibit of spreadsheet of feedback,    06:39

11      that I believe there were 45 documented logged data

12      sets of folks providing feedback to our company

13      regards to the iPad type check-in.

14           MR. MILLER:

15           Q    And do you believe that to be the total   06:39

16      number of legally blind individuals who allege

17      difficulty accessing the eCheck-in at the PSCs

18      between January 1st, 2016, to the present?

19           MR. RAIZMAN:  Object as to form.

20           THE WITNESS:  I do not know how many of        06:39

21      those 45 are legally blind.  I can only tell you

22      that we received 45 data sets around -- complaints

23      around our iPad and kiosk.

24           MR. MILLER:  Okay.

25           Q    So -- so just so I'm clear, you -- you     06:40
```

                                                        Page 253

PA1138-K

```
 1    believe that the total number though of -- of          06:40

 2    individuals who have complained to Quest involving

 3    difficulty accessing the eCheck-ion at the PSCs from

 4    January 1st, 2016, to the present?

 5          MR. RAIZMAN:  Object to --                        06:40

 6          MR. MILLER:

 7          Q   45 is rough -- is the number?

 8          MR. RAIZMAN:  Object as to form.

 9          THE WITNESS:  That's what was provided to

10    me.  And I believe that those 45 were logged as an      06:40

11     iPad categorization for that data.  I am not aware,

12     though, if they're particularly complaints, if

13     there -- it was particularly specific in that

14     regard of categorization or if they were legally

15     blind.                                                 06:40

16          MR. MILLER:

17          Q   Do you know the total amount of feedback

18    that Quest has received from complainants from

19    January 1st, 2016, to the present involving its

20    patient service centers?                                06:41

21          MR. RAIZMAN:  Object as to form.

22          THE WITNESS:  I -- I don't have that

23     information.

24          MR. MILLER:

25          Q   Are you able to quantify in any way the       06:41
```

Page 254

PA1138-L

| | | |
|---|---|---|
| 1 | percentage of complaints that these 45 individuals | 06:41 |
| 2 | represent against the total amount of feedback that | |
| 3 | Quest receives? | |
| 4 | MR. RAIZMAN:  Object as to form. | |
| 5 | THE WITNESS:  Because I don't know the | 06:41 |
| 6 | denominator of the feedback that we received, I | |
| 7 | could not be able to quantity that. | |
| 8 | MR. MILLER: | |
| 9 | Q   Do you know whether the feedback | |
| 10 | channels that Quest offers to patients to, again, | 06:41 |
| 11 | lodge complaints or provide feedback, do you know | |
| 12 | whether all those channels are accessible to the | |
| 13 | blind? | |
| 14 | MR. RAIZMAN:  Object as to form. | |
| 15 | THE WITNESS:  I -- I would say that, you | 06:42 |
| 16 | know, there are many channels.  I would say that, | |
| 17 | you know, whether it's discussing with their PSR | |
| 18 | about the difficulty, that would be moved up the | |
| 19 | ladder, or whether it would be filing a -- you | |
| 20 | know, a piece of feedback with the patient advocacy | 06:42 |
| 21 | team, or whether it would be, you know, using | |
| 22 | our -- our phone lines, that's posted, to be able | |
| 23 | to call and lodge a piece of feedback.  Those | |
| 24 | should be available to the blind because we offer | |
| 25 | phone services for that. | 06:42 |

Page 255

PA1138-M

```
 1              MR. MILLER:                               06:42

 2         Q   How about the applicable website?  Do

 3    you know whether the website is an accessible

 4    feedback channel for the blind?  Do you know one way

 5    or the other whether it's accessible?              06:43

 6              MR. RAIZMAN:  Object as to form.  Object.

 7     It's beyond the scope.

 8              THE WITNESS:  Yeah, I -- I'm not an expert

 9     on our web application.  But I do know, you know,

10     that there is the opportunity to call in to our    06:43

11     customer service for complaints.

12              MR. MILLER:  Under -- understood.

13         Q   I'm just asking if you know whether the

14    website's accessible one way or the other for -- as

15    a feedback channel for the blind.                  06:43

16              MR. RAIZMAN:  Object as to form -- I'm

17     sorry, Counsel.

18              Object as to form.  Object that it's beyond

19     the scope.

20              THE WITNESS:  Yeah.  That's not my area of  06:43

21     expertise.  So I guess the answer would be I don't

22     know.

23              MR. MILLER:  Fair enough.  I'll move on.

24         Q   How about with respect to the mobile

25    app?  Do you know whether the mobile application is  06:43
```

                                              Page 256

PA1138-N

```
 1    accessible for the blind to be able to provide        06:43
 2    complaints and feedback to Quest?
 3            MR. RAIZMAN:  Object as to form.  Object.
 4     Beyond the scope.
 5            THE WITNESS:  Again, that is not my           06:43
 6     expertise.  So I -- I can't answer.
 7            MR. MILLER:
 8            Q   Is there any other information you have
 9    beyond what you've already testified to regarding
10    the complaints that Quest has received from          06:44
11    January 1st, 2016, to the present alleging
12    difficulty accessing the eCheck-in at the PSCs?
13            MR. RAIZMAN:  Object as to form.
14            THE WITNESS:  Not that I'm aware of.
15            MR. MILLER:                                   06:44
16            Q   Do you have any other information
17    regarding Quest's response to any of the complaints
18    it's received from January 1st, 2016, to the present
19    from individuals alleging difficulty accessing the
20    eCheck-in at the PSCs?                                06:44
21            MR. RAIZMAN:  Object as to form.
22            THE WITNESS:  Can you repeat the question,
23     please?
24            MR. MILLER:
25            Q   Yeah.  I just want to know if you have    06:44
```

Page 257

PA1138-O

```
 1   any information on how Quest responded to any of the    06:44
 2   complaints it received from January 1st, 2016, to
 3   the present by legally blind alleging difficulty
 4   accessing eCheck-in at its PSCs.
 5        MR. RAIZMAN:  Object as to form.               06:44
 6        THE WITNESS:  That's not within my role or
 7    responsibility.  I -- I do not.
 8        MR. MILLER:  Okay.  Fair -- fair enough.
 9        Q    Going down to Topic 30, you were
10   designated in response to plaintiff's request for a    06:45
11   30(b)(6) witness involving Quest claim and its six
12   affirmative defense that plaintiffs failed to
13   request a reasonable modification of policies,
14   practices or procedures and/or plaintiff failed to
15   exhaust an auxilliary aid or service.              06:45
16        Let's break them down for a moment.
17        Do you have any information in your role as
18   a 30(b)(6) that plaintiffs in this case failed to
19   request a reasonable modification of policies,
20   practices or procedures?                          06:45
21        MR. RAIZMAN:  Object as to form.
22        THE WITNESS:  No, I don't.
23        MR. MILLER:
24        Q    Do you have any information in your
25   capacity as a 30(b)(6) witness that the plaintiffs    06:46
```

Page 258

PA1138-P

```
 1    failed to request an auxillary aid or service?        06:46

 2         MR. RAIZMAN:  Object as to form.

 3         THE WITNESS:  No, I don't.

 4         MR. MILLER:  Okay.

 5         Let's go off the record for a moment.            06:46

 6         THE WITNESS:  Um-hum.

 7         THE VIDEOGRAPHER:  Okay.  We're -- we're

 8     going off the record.  The time is 6:46 p.m.

 9         (A recess is taken.)

10         THE VIDEOGRAPHER:  Okay.  We're back on the       07:04

11     record at 7:04 p.m.

12         Go ahead.

13         MR. MILLER:

14         Q   Welcome back, Ms. Reilly.

15         Are you familiar with the term wait time          07:04

16    calculation sheet as it relates to the patient

17    service centers?

18         MR. RAIZMAN:  Object.  Beyond the scope.

19         THE WITNESS:  I am familiar with wait time

20     as it, you know, corresponds to patient service       07:04

21     centers.

22         MR. MILLER:

23         Q   And am I correct in understanding that

24    at this present time the eCheck-in kiosk process and

25    its interface with Quantum has replaced the wait       07:04
```

Page 259

PA1138-Q

```
 1    percentage of complaints that these 45 individuals      06:41
 2    represent against the total amount of feedback that
 3    Quest receives?
 4          MR. RAIZMAN:  Object as to form.
 5          THE WITNESS:  Because I don't know the           06:41
 6     denominator of the feedback that we received, I
 7     could not be able to quantity that.
 8          MR. MILLER:
 9        Q    Do you know whether the feedback
10    channels that Quest offers to patients to, again,       06:41
11    lodge complaints or provide feedback, do you know
12    whether all those channels are accessible to the
13    blind?
14          MR. RAIZMAN:  Object as to form.
15          THE WITNESS:  I -- I would say that, you          06:42
16     know, there are many channels.  I would say that,
17     you know, whether it's discussing with their PSR
18     about the difficulty, that would be moved up the
19     ladder, or whether it would be filing a -- you
20     know, a piece of feedback with the patient advocacy    06:42
21     team, or whether it would be, you know, using
22     our -- our phone lines, that's posted, to be able
23     to call and lodge a piece of feedback.  Those
24     should be available to the blind because we offer
25     phone services for that.                               06:42
```

Page 255

PA1139

```
 1              MR. MILLER:                              06:42

 2         Q    How about the applicable website?  Do

 3    you know whether the website is an accessible

 4    feedback channel for the blind?  Do you know one way

 5    or the other whether it's accessible?            06:43

 6              MR. RAIZMAN:  Object as to form.  Object.

 7     It's beyond the scope.

 8              THE WITNESS:  Yeah, I -- I'm not an expert

 9     on our web application.  But I do know, you know,

10     that there is the opportunity to call in to our    06:43

11     customer service for complaints.

12              MR. MILLER:  Under -- understood.

13         Q    I'm just asking if you know whether the

14    website's accessible one way or the other for -- as

15    a feedback channel for the blind.                  06:43

16              MR. RAIZMAN:  Object as to form -- I'm

17     sorry, Counsel.

18              Object as to form.  Object that it's beyond

19     the scope.

20              THE WITNESS:  Yeah.  That's not my area of  06:43

21     expertise.  So I guess the answer would be I don't

22     know.

23              MR. MILLER:  Fair enough.  I'll move on.

24         Q    How about with respect to the mobile

25    app?  Do you know whether the mobile application is  06:43
```

Page 256

## REDACTED

## PORTIONS OF EX. 39 (PA01141 to PA1142) ARE BEING FILED UNDER SEAL PENDING THE COURT'S RULING ON PLAINTIFF'S APPLICATION TO FILE UNDER SEAL

# EXHIBIT 40

```
 1                UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JULIAN VARGAS, ANNE      )
     WEST, and AMERICAN       )
 5   COUNCIL OF THE BLIND,    ) Case No. 2:19-cv-8108
     individually on behalf   )
 6   of themselves and all    )
     others similarly         )
 7   situated,                )
                              )
 8              Plaintiffs,   )
                              )
 9      vs.                   )
                              )
10   QUEST DIAGNOSTICS        )
     CLINICAL LABORATORIES,   )
11   INC., QUEST DIAGNOSTICS  )
     HOLDINGS, INC.,          )
12   QUEST DIAGNOSTICS        )
     INCORPORATED; and        )
13   DOES 1-10, inclusive,    )
                              )
14              Defendants.   )
     _____ )
15
16
17        REMOTE DEPOSITION OF CHRISTOPHER GRANT
18               As a 30(b)(6) Witness
19             (Via Zoom Videoconference)
20              Thursday, April 20, 2021
21
22
23   REPORTED BY:  Michelle Milan Fulmer
                   CSR No. 6942, RPR, CRR, CRC
24
25
                                          Page 1
```

PA1143

```
 1              Ben, in the next five minutes or so, I just
 2      need a break whenever it works for you.
 3              MR. SWEET:  Sure.
 4      Q     So you mentioned that there was training,
 5      you may have learned about training for folks with        09:54:08
 6      disabilities, training regarding how to deal with
 7      patients with disabilities at your orientation.
 8              Were you given any training on the ADA in
 9      your orientation?
10      A     Again, like I said, I was -- I speculate            09:54:24
11      that I --
12      Q     I don't want you to speculate.
13      A     -- (inaudible) part of orientation.
14              Yeah.  I can't recall, then.
15      Q     You don't recall receiving training?               09:54:35
16      A     No.
17      Q     Did you at any point have a conversation
18      with Ms. Marallo or anyone else about what training
19      is provided to phlebotomists about dealing with
20      disabled patients?                                        09:54:54
21      A     I don't -- I don't recall any of those
22      conversations.
23      Q     You don't recall ever discussing that issue
24      with Ms. Marallo?
25      A     Again, I just don't recall.                        09:55:06
```

Page 47

PA1144

```
 1   that would have been part of the conversations with

 2   Adria.  But specifically to your question, I don't

 3   recall any.  But I would imagine, in my role, that

 4   would have been part of the conversations.

 5       Q    Did you direct Ms. Marallo to consult with      10:25:47

 6   any accessibility experts prior to developing the

 7   training?

 8           MR. RAIZMAN:  Object as to form.

 9           THE WITNESS:  I don't know.  I don't

10   recall.                                                  10:26:05

11   BY MR. SWEET:

12       Q    Did you, yourself, consult with any

13   accessibility experts prior to the training being

14   put together?

15           MR. RAIZMAN:  Object as to form.                 10:26:13

16           THE WITNESS:  Yeah.  I -- I don't recall

17   that.  I really don't.

18   BY MR. SWEET:

19       Q    Did you direct anyone else at Quest to

20   consult with accessibility experts prior to the         10:26:24

21   development of the curriculum for the training for

22   the phlebotomists on how to deal with folks with

23   disabilities?

24       A    Again, I just don't recall any of those

25   specifics.                                               10:26:38
```

Page 56

PA1145

```
 1        A    I -- I don't.

 2        Q    What were some of the benefits that

 3   customers could enjoy from use of the self-service

 4   kiosk?

 5        A    Can you -- can you be more specific on that    10:44:26

 6   question?  It's pretty broad.

 7        Q    I assume the self-service kiosk had a

 8   number of features; right?

 9        A    Yeah.

10        Q    What were they?                                10:44:38

11        A    So ease of use.  It was a -- again, the

12   platform itself created a solution for us to

13   continuously improve from confirming appointments,

14   being able to notify when you were in the waiting

15   room, being able to inform the PSR who their next       10:45:03

16   patient would be and how to prepare for that.  It

17   eliminated the clipboard and all the challenges

18   associated with that.  And I think the voice of the

19   customer really asked us to put that in to really

20   say, you know, we -- we prefer to engage you through    10:45:29

21   this kind of mechanism on this platform than through

22   a clipboard.

23            So a lot of the solutioning was, you know,

24   as a result of voice of the customer, voice of our

25   employees.  Again, that was our focus is how do we      10:45:46
```

Page 71

PA1145-A

```
 1      create solutions that can help that patient

 2      experience and help the phlebotomists do their job

 3      more effectively.

 4          Q    Was there --

 5               Did checking in at the self-service kiosk     10:46:01

 6      allow you to enter the queue?

 7          A    You -- if you engaged the iPad, yes, you

 8      could be in the queue, but this was not the only

 9      way.  Again, recall that I talked about how our PSRs

10      had been trained previous to that to scan the rooms   10:46:23

11      to be able to come alongside those folks who had

12      disabilities and to be able to accelerate their

13      appointment and accelerate their care at that time.

14          Q    But let's talk about that, that training.

15               When did this training take place to the     10:46:40

16      PSRs about dealing with folks with disabilities?

17          A    I believe that was an ongoing part of the

18      training with phlebotomists as they came on.

19          Q    And how did you gain that understanding?

20          A    That was (inaudible).  I don't know.  I      10:46:58

21      don't recall.

22          Q    So you have an understanding that there was

23      an ongoing training for PSRs that involved sweeping

24      the waiting area for folks with disabilities?

25          A    Yeah.  That situational awareness was        10:47:15
```

Page 72

RC3367/D

1    it's called certification or not, that's your word,

2    not mine.

3        Q    Do you know if the training is updated

4    every year?

5        A    I think training -- I think it was our        10:49:58

6    practice that training was reviewed on a regular

7    basis, but I -- again, people in training could tell

8    you the specifics on that.  I wouldn't know.

9        Q    Who was it reviewed by?

10       A    It would be a lot of stakeholders within      10:50:21

11   Quest and then the regions as well would participate

12   in that.  But, again, people in training would be

13   able to answer these questions better than I.

14       Q    Do you know whether the express check-in

15   self-service allows a patient to wait outside of the   10:50:55

16   PSC and be alerted by text when it's time for their

17   sample to be taken?

18       A    I believe that was a feature that was

19   introduced in -- I think we -- it may have been, if

20   I can recall -- and, again, I'm trying to remember     10:51:15

21   here.  If you have documentation, it makes this a

22   little bit easier.  But if I can recall, I thought

23   that that feature was late 2019 and more of a

24   COVID-19 tool that we could use, that it would allow

25   people a little bit more sense of not being exposed    10:51:37

Page 75

PA1145-C

1   to an environment and try to, you know, again,

2   encourage social distancing.

3          I think that's -- I think that's correct.

4   I could be wrong.  Again, if you've got

5   communications on that, I'd be happy to talk to          10:51:55

6   those.

7      Q    You would agree that's a benefit of using

8   the self-service check-in?

9      A    It's one of the benefits.  Again, remember,

10  the eCheck-In is a platform that allows us to do          10:52:05

11  continuous improvement.  So that could be a

12  continuous improvement because of that platform that

13  may in the past have not been available to us.

14     Q    Do you recall that one of the reasons for

15  the adoption of eCheck-In self-service was to reduce      10:52:23

16  the company's staffing needs?

17     A    I didn't say that.

18     Q    Do you have a recollection of that?

19     A    No.

20     Q    Was one of the reasons to shorten wait          10:52:39

21  times for patients?

22     A    It was to make the experience better based

23  on the voice of the customer.  That was the result.

24     Q    You don't have a recollection that it was

25  about reducing patient wait times?                        10:52:53

Page 76

PA1145-D

```
 1        A    I believe that was one of the benefits that

 2   we could achieve through this based on voice of the

 3   customer, yes.

 4        Q    Do you have a recollection that it improved

 5   each PSC's productivity?                          10:53:06

 6        A    I'd have to see a report on that to answer

 7   that question correctly.

 8        Q    Independent of seeing a report, do you have

 9   an understanding of that, sir?

10        A    Conceptually, yes.                       10:53:23

11        Q    And is it also the case that the rollout of

12   eCheck-In self-service allowed for more patient

13   visits in each PSC per day?

14        A    No, it didn't.

15        Q    It did not?                              10:53:41

16        A    No.

17        Q    Mr. Yarrison told us that it did.  Was he

18   incorrect?

19             MR. RAIZMAN:  Object as to form.

20             THE WITNESS:  I don't know what question  10:54:00

21   you asked him.  So I'm not going to speculate what

22   he was thinking.

23   BY MR. SWEET:

24        Q    But he is incorrect if that was his

25   assertion?                                         10:54:11
```

Page 77

PA1145-E

```
 1    at the kiosk, read that QR code, and then that would

 2    automatically register you at the PSC.

 3        Q    Are you aware of whether there was a

 4    headphone jack available at the self-service kiosks

 5    from 2016 to 2019?                                    11:51:46

 6        A    You know, I don't know.  I don't know.

 7        Q    Do you know what a qualified reader is,

 8    sir?

 9        A    No, I don't.

10        Q    Do you know whether personnel at the        11:52:02

11    company's PSCs were ever trained to be qualified

12    readers in the time frame from 2016 to 2019?

13             MR. RAIZMAN:  Object as to form.

14             THE WITNESS:  I -- I have no idea if they

15    were or they weren't.                                11:52:17

16    BY MR. SWEET:

17        Q    Did you ever order that qualified reader

18    training be given to the personnel at the PSCs?

19             MR. RAIZMAN:  Object as to form.

20             THE WITNESS:  Again, unless I have an email  11:52:27

21    in front of me, I -- it's hard for me to make that

22    recollection.

23    BY MR. SWEET:

24        Q    Do you have any independent memory, aside

25    from looking at a document, whether you ever ordered  11:52:36
```

Page 112

```
 1    the extent of my, you know, guidance to the team is,

 2    you know, let's make sure we're -- you know, we're

 3    looking at all aspects of our patient population.

 4    It's -- you know, a quarter of a million people pass

 5    through the doors every day.  It's kind of hard to      01:52:33

 6    do big, broad-stroke implementations across 2,200

 7    PSCs.

 8            So by having that platform, it got us a

 9    little bit better ability to really look at, you

10    know, what could improve that patient experience.      01:52:43

11       Q    So did you at any point direct your team to

12    make accessibility a priority in its decisions it

13    was making with regard to the eCheck-In self-service

14    project?

15            MR. RAIZMAN:  Object as to form.               01:53:05

16            THE WITNESS:  I think it would have been

17    part of the total solution.

18    BY MR. SWEET:

19       Q    Right.

20            But did you ever give any specific             01:53:13

21    direction to your team on accessibility?

22       A    I don't -- yeah.  I may have.  I don't

23    recall.

24       Q    Now, when -- when eCheck-In self-service

25    was first rolled out, was there at first a pilot       01:53:41
```

                                                Page 165

PA1147

```
 1    button, that you just push that button and you would

 2    be registered and given a number so you didn't have

 3    to go through the whole protocol.

 4        Q    And was that on the kiosk or was that just

 5    an independent help button in the PSC?            02:00:35

 6        A    I believe it was integrated with the kiosk.

 7        Q    So if you couldn't access the kiosk, you

 8    couldn't hit the help button; right?

 9        A    Correct.

10        Q    Were there any --                         02:00:49

11            In the time frame of 2016, 2017, 2018, and

12    2019, that four-year time frame, was there any

13    assistance for blind individuals within the PSC that

14    would alert them to the presence of the kiosk?

15        A    I believe there was video messages that    02:01:14

16    were broadcast on a pretty frequent cycle inside the

17    PSC so they could hear audibly that.

18        Q    And do you know when those video messages

19    began to play?

20        A    I don't.                                    02:01:31

21        Q    Did you have anything to do with the

22    content of the video messages that were playing in

23    the PSCs?

24        A    Only in my role as a sponsor.

25        Q    Did you review the content, for example?    02:01:48
```

Page 171

PA1148

```
 1    aspire them to a solution.  So I would have given

 2    some guidelines, but, again, I would have given

 3    deference to the team that actually know this stuff

 4    and how it works.  I don't.

 5        Q    Do you recall what type of guidance you      02:05:51

 6    gave with regard to the tablet or the enclosure?

 7        A    No, I don't.

 8        Q    Do you recall whether you directed that the

 9    tablet or enclosure be accessible to blind people?

10        A    Again, the eCheck-In platform was an        02:06:05

11    opportunity for us to do continuous improvement and

12    to put together a roadmap of, you know, how can we,

13    through time, you know, continue to iterate and

14    continue to improve on the solution.

15        Q    Right.                                       02:06:26

16             But we discussed earlier today the fact

17    that the kiosk did not have accessible features

18    which would make them independently usable for blind

19    folks, and I'm just wondering if you raised that at

20    any point with decision-makers and put it sort of    02:06:39

21    front and center in terms of importance.

22             MR. RAIZMAN:   Object as to form.

23             THE WITNESS:   Yeah.  I don't recall

24    specific conversations around that.

25    ///                                                   02:06:58
```

Page 175

PA1149

```
 1      A     Okay.  My question was not is there

 2   headphones, but is there a plug?  Can you even use

 3   headphones?

 4          I don't know what your point is.

 5      Q     There was no braille and/or plug-in         02:56:57

 6   headphone for instructions as of November 1, 2019,

 7   at the kiosk in the PSCs, though, was there?

 8      A     Correct.  Correct.

 9      Q     Okay.  Was there, as of November 1, 2019,

10   an ability to bypass all functions and still be     02:57:10

11   placed in the queue?

12      A     And, again, I don't know when the help

13   button went in, but that would have been an

14   auxiliary that would allow you to bypass the

15   functions.                                          02:57:27

16      Q     And as we discussed earlier, you can't

17   access the help function unless you can access the

18   check-in kiosk; correct?

19      A     Yes.

20          MR. RAIZMAN:  Object as to form.             02:57:35

21          MR. SWEET:  Did you get his answer,

22   Madam Court Reporter?

23          THE COURT REPORTER:  I heard the answer,

24   "Yes."

25          THE WITNESS:  That is correct.               02:57:45
```

                                                Page 203

PA1150

```
 1        Q      Prior to April of 2019, it's correct that

 2    Quest did not have any SOPs for dealing with its

 3    blind patients; correct?

 4        A      I don't know if that's correct.

 5        Q      Did the company eventually develop an SOP        03:07:05

 6    for dealing with blind patients?

 7        A      I can't remember off the top of my head if

 8    we did or not.

 9        Q      Did you ever direct that an SOP be created

10    for dealing with blind patients?                            03:07:20

11        A      I may have.  I can't remember.

12        Q      Are you aware of, as you sit here today,

13    sir, whether there are specific instructions that

14    are given to your PSRs throughout the network about

15    how to deal with blind patients specifically?               03:07:40

16        A      There may be.  I can't speak to what's

17    there today.

18        Q      Sir, are you familiar with what's known as

19    the interactive process under Section 1557 of the

20    Affordable Care Act?                                        03:08:04

21        A      No.

22        Q      Have you ever had any training on the

23    interactive process under Section 1557 of the

24    Affordable Care Act?

25        A      No, I haven't.                                   03:08:14
```

Page 211

PA1151

```
 1        Q     Do you know whether Quest provides its
 2   phlebotomists with any training on how to engage in
 3   the interactive process under Section 1557 of the
 4   Affordable Care Act?
 5        A     No, I don't know.                          03:08:26
 6        Q     Did you ever direct any training for
 7   phlebotomists on the interactive process under
 8   Section 1557 of the Affordable Care Act?
 9        A     Not that I'm aware of.
10        Q     And you have not received any training    03:08:37
11   yourself on the interactive process?
12        A     I don't believe so.
13        Q     Does Quest provide any of its personnel at
14   the PSCs, its phlebotomists generally and its PSRs,
15   does it provide them with any training on the        03:08:57
16   Federal Rehabilitation Act of 1973?
17        A     I don't have any knowledge of that.
18        Q     Did you ever direct --
19        A     If it is, I don't know.  It could exist.  I
20   just -- I just don't know.  I can't speak to it.     03:09:10
21        Q     During your tenure as executive director of
22   national patient services, did you ever order that
23   any training be provided to the PSC-level personnel
24   on the Rehabilitation Act of 1973?
25        A     Again, that -- you used the word did I     03:09:28
```

Page 212

```
 1    conversation.  It may have been, but I don't recall

 2    it.

 3         Q    Was it part of the conversation in 2020?

 4              MR. RAIZMAN:  I'm going to object to the

 5    extent it calls for consultations with counsel which   04:26:17

 6    are privileged and I'd instruct you not to answer as

 7    to such consultation.

 8              MR. SWEET:  So, just so I'm clear, is that

 9    an instruction not to answer my question?

10              MR. RAIZMAN:  Instruction as to answer your   04:26:37

11    question to the extent it's based on the

12    considerations led by counsel.

13              MR. SWEET:  All right.

14              MR. RAIZMAN:  I'll simplify it.  It's an

15    instruction not to answer in this particular           04:26:51

16    question the way it's phrased.

17    BY MR. SWEET:

18         Q    From whom did you first hear about

19    three-finger swipe?

20         A    I -- as I said earlier, I don't recall who   04:27:08

21    had authorship of that idea.

22         Q    Okay.  Can you explain to me how it works?

23         A    No.

24         Q    You don't know how it works?

25         A    I don't.  No, I don't know how it works.     04:27:21
```

Page 258

PA1153

```
 1    Again --

 2        Q    Do you know whether --

 3        A    Most of this --

 4        Q    I'm sorry.  I interrupted again.  I'm

 5    sorry.  Go ahead.                                   04:27:27

 6        A    Yeah.  The three-finger swipe was really --

 7    if I remember correctly, I -- I'm just trying to put

 8    that in a time frame and I'm a little bit confused

 9    because of my transition out of national patient

10    services into my new role and I think there may have  04:27:49

11    been an overlay there and I just don't want to speak

12    out of turn on my knowledge.

13            Other than that, I don't know who authored

14    it.  I really don't know how it works and it's been

15    a year and a half, almost two years since some of    04:28:01

16    those conversations.  So it's just not top of mind.

17        Q    When were those conversations, sir?

18        A    Again, I really don't recall when those

19    conversations occurred.

20        Q    You said a moment ago a year and a half or  04:28:15

21    two years ago; is that accurate?

22        A    I think so.  I think that time frame is

23    probably generally correct.  I'm sure if there's

24    something more specific that we can refer to, I

25    think that might help.                               04:28:30
```

Page 259

```
 1        Q     So would that be 2019?

 2        A     Again, I don't know.  I'm sorry to say

 3   that.  Just with the transition and then plus COVID

 4   activity, my placement of events is kind of blurry

 5   on all of that.  There was a lot going on.         04:28:50

 6        Q     Did you email with your colleagues about

 7   the three-finger swipe idea?

 8        A     I very well could have, yeah.

 9        Q     And you produced those emails to your

10   counsel?                                           04:29:04

11        A     They had access to all my emails and all my

12   files.

13        Q     You didn't destroy any emails about

14   three-finger swipe; right?

15        A     No.  No.  I don't destroy emails.       04:29:14

16        Q     And you don't have an understanding of how

17   it works?

18        A     No.  A fundamental understanding, no.

19        Q     Do you know whether use of the three-finger

20   swipe alerts the phlebotomist to the presence of the  04:29:29

21   person who's making the three-finger swipe?

22        A     I guess so.  If you say so.  I don't -- I

23   really -- you're asking me questions about

24   functionality of the device and I really -- I can't

25   give you an answer to it.  I really can't.  I don't  04:29:44
```

Page 260

PA1155

```
 1    know what all went into it, how does it all work.  I

 2    do know it's a way to quickly notify, get

 3    registered.  But beyond that, questions of how it

 4    works, I don't -- I don't know.  I'm just not an

 5    engineer.  I don't understand that stuff.          04:30:01

 6        Q    Understood.

 7             Now, I think we talked a little bit earlier

 8    today about this issue called wait by text.

 9             Do you recall that discussion?

10        A    I do.  I do.                              04:30:13

11        Q    And is it your understanding --

12        A    It was a long time ago.

13        Q    Is it your understanding, Mr. Grant, that

14    during COVID the company deployed a wait by text

15    option?                                           04:30:26

16        A    I thought that was my recollection.  It may

17    have surfaced in 2019 conceptually and they were

18    working on it, but it all sort of got accelerated

19    perhaps by COVID, but -- so, again, it's one of

20    those future functions that we were able to put in.  04:30:47

21    And, you know, my tenure out, COVID, new role, all

22    those kinds of things, I -- so it could have been as

23    early as 2019 and then just got accelerated because

24    of COVID.

25        Q    Regardless of when the wait by text option  04:31:06
```

Page 261

PA1156

# EXHIBIT 41

<pre>
 1               UNITED STATES DISTRICT COURT

 2           FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JULIAN VARGAS, ANNE WEST, and )  Case No. 2:19-cv-8108
     AMERICAN COUNCIL OF THE       )
 5   BLIND, individually on behalf )
     of themselves and all others  )
 6   similarly situated,           )
                                   )
 7             Plaintiffs,         )
                                   )
 8        v.                       )
                                   )
 9   QUEST DIAGNOSTICS CLINICAL    )
     LABORATORIES, INC., QUEST     )
10   DIAGNOSTICS HOLDINGS, INC.,   )
     QUEST DIAGNOSTICS             )
11   INCORPORATED; and DOES 1-10,  )
     inclusive,                    )
12                                 )
               Defendants.         )
13   _____)

14

15

16                    --oOo--

17        VIDEOTAPED DEPOSITION OF PRUDENCIA MAGANA

18            Taken on behalf of the Defendants

19                  August 3, 2021

20          ***TAKEN VIA VIDEOCONFERENCE***

21                    --oOo--

22

23

24

25

                                             Page 1
</pre>

PA1157

1              A.    I think so.

2              Q.    And in what format were they provided to

3      blind customers so that they could be read by

4      individuals who are blind?

5              A.    I don't remember.

6              Q.    Did the -- did the nondiscrimination notice

7      at the patient service center have a 1-800 number that

8      individuals could call if they felt discriminated

9      against?

10             A.    I think so.

11             Q.    And were you ever trained on that

12     nondiscrimination notice by Quest?

13                   MR. RAIZMAN:  Object as to form.

14                   THE WITNESS:  I think so.

15     BY MR. MILLER:  (Continuing)

16             Q.    And the -- and were you trained by Quest

17     that if somebody wanted to report that they were being

18     discriminated against, they could call the 1-800 number?

19             A.    I think so.

20             Q.    Between 2017 and 2020 how was the 1-800

21     number provided to blind patients who wanted to make

22     complaints regarding discrimination?

23                   MR. RAIZMAN:  Object as to form.

24                   THE WITNESS:  I think you would give them

25     the number.

Veritext Legal Solutions
866 299-5127

PA1158

```
 1    BY MR. MILLER:  (Continuing)

 2         Q.   Was it provided in any other format other

 3    than you as an employee of Quest providing them the

 4    number?

 5         A.   I don't remember.

 6         Q.   In terms of the patients that you were

 7    servicing at the 4955 Van Nuys location of Quest were

 8    the majority of those patients walk-ins or did they have

 9    appointments?

10         A.   I think some walk-ins and some

11    appointments.

12         Q.   If you were to try to quantify it, would

13    you say you had more walk-ins than you had patients with

14    appointments between 2017 and 2020?

15              MR. RAIZMAN:  Object as to form.

16              THE WITNESS:  I don't remember.

17    BY MR. MILLER:  (Continuing)

18         Q.   Did you track in any system which patients

19    had appointments versus which ones were walk-ins?

20         A.   I think there's a Quanum -- the kiosk where

21    it says the appointments and walk-ins.

22         Q.   So am I correct in understanding there's a

23    Quest Quanum system that you interface with as the

24    phlebotomist?

25         A.   Yeah.
```

Page 37

PA1159

```
 1    June 25th, 2019, that the eCheck-in kiosk was not
 2    accessible to blind patients?
 3                    MR. RAIZMAN:  Objection.  Lacks foundation.
 4                    THE WITNESS:  I don't remember.
 5    BY MR. MILLER:  (Continuing)
 6            Q.   You can answer.
 7            A.   I don't remember.
 8            Q.   Are you aware of any -- are you aware of
 9    any documents that would refresh your memory?
10            A.   No.
11            Q.   Did you ever make a complaint to Quest on
12    Mr. Vargas' behalf that the eCheck-in kiosk was not
13    accessible on June 25th, 2019?
14                    MR. RAIZMAN:  Object as to --
15                    THE WITNESS:  I don't remember.
16                    MR. RAIZMAN:  Let me make my objections.
17    Okay.  Object as to form.
18    BY MR. MILLER:  (Continuing)
19            Q.   Did you ever document -- strike that.
20                    Does Quest Quanum allow you to document a
21    patient's complaint?
22                    MR. RAIZMAN:  Object as to form.
23    BY MR. MILLER:  (Continuing)
24            Q.   You can answer.
25            A.   I think so.
```

                                                      Page 59

PA1159-A

```
 1              A.    Correct.

 2              Q.    And outside the video monitor that existed

 3    at the 4955 Van Nuys location was there any other way

 4    for a patient in the lobby to know where they were in

 5    the queue?

 6                    MR. RAIZMAN:  Object as to form.

 7    BY MR. MILLER:  (Continuing)

 8              Q.    You can answer.

 9              A.    I don't think so.

10              Q.    Have you ever been provided any training by

11    Quest on how to provide aids or auxiliary services for

12    patients with disabilities?

13                    MR. RAIZMAN:   Object as to form.

14    BY MR. MILLER:  (Continuing)

15              Q.    You can answer.

16              A.    The training.

17              Q.    Which training?

18              A.    On the managing every patient needs.

19              Q.    Any other training that was provided other

20    than that training on the aids or auxiliary services

21    that you would provide to a patient -- I'm sorry -- that

22    you would provide to a patient with disabilities?

23                    MR. RAIZMAN:  Object as to form.

24    BY MR. MILLER:  (Continuing)

25              Q.    You can answer.
```

Page 66