1  Jonathan D. Miller (SBN 220848)
   jonathan@nshmlaw.com
2  Alison M. Bernal (SBN 264629)
   alison@nshmlaw.com
3  NYE, STIRLING, HALE
   & MILLER, LLP
4  33 West Mission Street, Suite 201
   Santa Barbara, CA 93101
5  Telephone: (805) 963-2345

   Benjamin J. Sweet
   (*Admitted Pro Hac Vice*)
   ben@nshmlaw.com
   NYE, STIRLING, HALE
   & MILLER, LLP
   1145 Bower Hill Road, Suite 104
   Pittsburgh, PA 15243
   Telephone: (412) 857-5350

6  *Attorneys for Plaintiffs Julian Vargas,*
   *American Council of the Blind, and the Certified Class*
7
   *Additional counsel for Plaintiff listed on signature page*
8

9           **UNITED STATES DISTRICT COURT**

10      **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

11

12  JULIAN VARGAS and AMERICAN
    COUNCIL OF THE BLIND, individually
13  on behalf of themselves and all others
    similarly situated,
14
            Plaintiffs,
15
        v.
16
    QUEST DIAGNOSTICS CLINICAL
17  LABORATORIES, INC., QUEST
    DIAGNOSTICS HOLDINGS, INC.,
18  QUEST DIAGNOSTICS
    INCORPORATED; and DOES 1-10,
19  inclusive,
20
21
22          Defendants.
23
24
25
26
27
28

Case No.: 2:19-cv-08108-DMG

**MEMORANDUM OF POINTS
AND AUTHORITIES IN
SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY
JUDGMENT**

*[Filed Concurrently with Notice of
Motion, Separate Statement of
Undisputed Material Facts, Appendix
Of Exhibits, And [Proposed] Order]*

**Date:   June 17, 2022
Time:   2:00 p.m.
Crtrm: 8C**

Complaint Filed: September 18, 2019
Discovery Cutoff: August 27, 2021
Pretrial Conf: October 4, 2022
Trial Date: November 1, 2022
District Judge: Hon. Dolly M. Gee
Magistrate: Hon. Michael R. Wilner

**_REDACTED_**

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

# **TABLE OF CONTENTS**

I.    SUMMARY OF ARGUMENT.........................................................................4

II.   STATEMENT OF UNDISPUTED FACTS ...................................................8

    A.    Plaintiffs ..................................................................................................8

    B.    Plaintiffs Encountered An Inaccessible Kiosk During The Class Period .........................................................................................9

    C.    Quest's TFS Does Not Moot Plaintiffs' Claims ..............................11

        1. The Record is Undisputed That Quest Has Not Effectively Rolled Out TFS ...........................................................................11

        2. The Record Facts Establish TFS Does Not Allow Plaintiffs to Access the Services Available At the Kiosk......................................12

        3. Mr. Vargas Could Not Access the Kiosk's Services After Quest Implemented TFS ..............................................................12

    D.    The Record Is Undisputed That Quest's ADA Training Is Deficient..............................................................................................13

IV.   ARGUMENT .................................................................................................14

    A.    Quest Failed to Provide Legally Blind Patients With Effective Communication As Required By The ADA ...................................14

    B.    Plaintiff Vargas Is Entitled To Summary Judgment On His Unruh Civil Rights Claim ....................................................................17

    C.    The Undisputed Record Facts Establish TFS Cannot Moot The Certified National Class's Claims As A Matter of Law .................18

        1. Quest's Post-TFS Effective Communication "Gauntlet" ..............20

        a. Arrival......................................................................................20
        b. Learning the Location of the Kiosk(s) ....................................22
        c. Self-Check for COVID Symptoms..........................................23
        d. Informing Patients They Have Entered the Queue .................23
        e. Phlebotomist Ability to Turn Off Alert Bell ..........................23
        f. Ability to Wait Outside During COVID-19 Pandemic............24
        g. Ability to Scan Insurance or ID Card......................................24

    D.    Providing Effective Communication to the Certified Class Would Not Create an Undue Administrative Burden ........................26

V.    CONCLUSION ..............................................................................................28

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

## **TABLE OF AUTHORITIES**

<u>Cases</u>

*Bragdon v. Abbott, 524 U.S. 624, 646 (1998)* ........................................................15

*Chafin v. Chafin, 568 U.S. 165, 133 S.Ct. 1017, 1023 (2013)* ..................7,18,20,25

*Chapman v. Pier 1 Imports (U.S.) Inc., 631 F.3d 939, 952 (9th Cir. 2011).* ..........26

*Cullen v. Netflix, Inc., 880 F. Supp. 2d 1017, 1023 (N.D. Cal. 2012).* ..................17

*Feldman v. Pro Football, Inc., 579 F. Supp. 2d 697, 707 (D. Md. 2008)*..........19,24

*Fortyune v. Am. Multi-Cinema, Inc., 364 F.3d 1075, 1084 (9th Cir. 2004)* ............8

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*
    *528 U.S. 167, 170 (2000)* ..............................................................................7,18

*Kanne v. Conn. General Life Ins. Co., 867 F.2d 489, 492 n. 4 (9th Cir.1988)*.......27

*K.M. ex rel. Bright v. Tustin Unified Sch. Dist., 725 F.3d 1088*
    *1096 (9th Cir. 2013)* ...........................................................................................8
    *286 F.3d 81, 84 (2d Cir.2001)* .........................................................................10

*Langer v. Pep Boys Manny Moe & Jack of Cal., No. 20-cv-06015-DMR*
    *2021 WL 148237, at \*4 (N.D. Cal. Jan. 15, 2021*........................................26

*PGA Tour, Inc. v. Martin, 532 U.S. 661, 688 (2001)* ..............................................26

*Poway Unified Sch. Dist. v. K.C. ex rel. Cheng, No. 10CV897-GPC (DHB)*
    *2014 WL 129086 at \*7 (S.D. Cal. Jan. 14, 2014).* .......................................15

*Roberge v. Hannah Marine Corp., No. 96–1691, 1997 WL 468330*
    *at \*3 (6th Cir.1997)*..........................................................................................27

*Robles v. Domino's Pizza, LLC, 913 F.3d 898, 904-06 (9th Cir. 2019).* ...............18

*Sengupta v. City of Monrovia, No. CV 09-00795 ABC (SJHx)*
    *2010 WL 11515299 (C.D. Cal., July 28, 2010)*.......................................18,25

*Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1186*
    *(11th Cir. 2007)* ................................................................................................19

*Tyler v. Cuomo, 236 F.3d 1124, 1137 (9th Cir. 2000)*...........................................18

*United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953)*...................................18

<u>Statutes</u>

*28 C.F.R. § 36.104.* ................................................................................................10

*28 C.F.R. § 36.303(c).* .....................................................................................passim

*42 U.S.C. § 12182(a).* ..............................................................................................7

*Cal. Civ. Code §§ 51(f), 54.1(d).* ...........................................................................17

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     SUMMARY OF ARGUMENT

Defendant Quest ("Quest") provides diagnostic services at patient service centers ("PSC") around the country. The certified national class, American Council of the Blind, and Plaintiff Vargas ("Plaintiffs") are legally blind individuals who visited Quest's PSCs between January 1, 2018, and December 31, 2019 ("Class Period"). Since 2016, Quest's PSCs nationwide have utilized touchscreen electronic kiosks to enable sighted patients to communicate with Quest's phlebotomists and, among other things, check in to enter the service queue. Over time, Quest introduced additional communication features to its electronic kiosk service[1] that can be used by sighted patients, but not legally blind patients, including Plaintiffs.

The kiosks are inaccessible to legally blind individuals and are identical across Quest's entire network. (*See* Dkt. 190 at 13.) Quest concedes, and the Court correctly held, that its kiosks, as originally rolled out and during the Class Period, were inaccessible to legally blind patients and were identical across Quest's entire network. (Dkt. 190 at 8 (finding "[t]here is no real question that the kiosks, as implemented during the class period, were not independently accessible to blind customers."); *id.* at 13 ("[T]he record here is uncontroverted that Quest's kiosks were identical—and similarly inaccessible—across Quest's network of patient service centers.").) Quest instead seeks to avoid liability by claiming it discharged its legal obligations under the Americans with Disabilities Act ("ADA") and California's Unruh Act to provide "effective communication" to legally blind

_____

[1] The Court has already held, in accordance with Department of Justice ("DOJ") guidance, that "the kiosks are a part of the service that Quest provides, and it must provide auxiliary aids and services to render them accessible to blind patients." (Dkt. 144; *see also* Dkt. 118 (DOJ Statement of Interest) ("[T]he tasks that Quest has shifted to its self-service kiosks are unquestionably part and parcel of accessing the health care services that Quest provides.").)

1  patients by providing phlebotomist assistance—consistent with Quest's previous

2  practice of using paper sign-in sheets. 28 C.F.R. § 36.303(c) (defining effective

3  communication).

4      This Court has already rejected this defense, stating: "Quest appears to

5  concede that its kiosks, as originally developed, did not provide 'effective

6  communication' with blind individuals." (Dkt. 144 at 10:26-27.) This Court found

7  that Quest phlebotomists "are primarily responsible for collecting patient specimens,

8  not staffing the waiting room…" (Dkt. 190 at 1), and further:

> Quest's waiting rooms are generally unattended; the kiosk
> communicates to phlebotomists "in the back" that a patient has arrived,
> and the phlebotomist comes out of "the back" to invite patients into a
> draw room. *See* Walsh Dep. at PA0663:9-20 [Doc. # 106-5]; *see also*
> SUF B34. Phlebotomists come out periodically to invite patients into a
> draw room, and a patient who could not use the kiosk could speak to a
> phlebotomist then, but Quest's system was designed to make
> phlebotomists available ***only sometimes***."

14  (Dkt. 144 at 13:7-9 [emphasis added]; UF 8-9.[2])

15      For these reasons, this Court concluded it "need not rely on Plaintiffs'

16  evidence [in ruling on Quest's motion for summary judgment] to determine whether

17  phlebotomists were always available, however, because phlebotomist unavailability

18  appears to have been part of Quest's plan." (Dkt. 144 at 13:1-3.) Indeed, this Court

19  noted "[t]he major problem with Quest's argument is that using the original iteration

20  of the kiosks, phlebotomist assistance does not appear to have been readily or

21  reliably available." (Dkt. 144 at 12:23-25.) Quest's internal emails confirm this

22  finding. (*See, e.g.,* UF12 "[t]here are no phlebotomists sitting at front desks

_____

24  [2] All of Plaintiffs' evidence referenced or relied upon in the Court's Order re Quest's
25  MSJ (Dkt. 144) are re-incorporated into Plaintiff's instant Statement of
   Uncontroverted Facts and Conclusions of Law. For ease of reference, the Court
26  cited the following facts in its Order re Quest's MSJ (Dkt. 144): SUF B28, B33,
   B34, B36, B37, B38, B46, B47, and B51. These facts are now UF 81, UF 85, UF 9,
27  UF 101, UF 102, UF 103, UF 77, UF 42, and UF104, respectively.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT

available to help register patients.") Thus, the concern is "that the staff is servicing the patients and cannot always be in front of the 'house' tending to folks that are struggling with registration. You can't have both at the same time." (UF 12.) Quest cannot point to any evidence in the record that phlebotomists are available to provide effective communication.

Further, Quest did not (and does not) offer any other way for legally blind users to effectively communicate at its PSCs – as Quest implemented the kiosk for the express purpose of increasing "efficiencies" by keeping its phlebotomists in the draw room taking samples and away from patients. (*See* Dkt. 144 at 13.) ███████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████ (*See* UF 10.)

Importantly, the Court need not find as a matter of law the ADA imposes a legal requirement on Quest that the kiosk must be "independently" accessible to legally blind users for Plaintiffs to prevail on the instant motion. Rather, this motion is based upon the unassailable legal principle that Quest must provide its legally blind customers with effective communication. The record facts are undisputed that during the Class Period Quest failed to meet this legal duty because it offered no other means of access for legally blind patients. Based on the foregoing, as outlined in more detail below, Plaintiffs are entitled to summary judgment of their ADA claim [and Mr. Vargas is entitled to summary judgment of his individual Unruh Act claim] because the undisputed record facts[3] establish: (1) Plaintiffs have a qualified disability; (2) Quest owns, leases or operates the PSCs as a place of public accommodation;[4] and (3) Quest failed to provide the Plaintiffs

---

[3] "Record facts" as referred to throughout this motion are those which were disclosed in discovery pursuant to Rule 26. Fact discovery closed on August 27, 2021, and expert discovery closed on November 15, 2021. (Dkt. 62.)

[4] Quest concedes Plaintiffs satisfy the first two elements of their ADA claim. (*See*

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1    "effective communication" during the Class Period. 42 U.S.C. § 12182(a); 28 C.F.R.

2    § 36.303(c).

3        And while Quest offers two affirmative defenses in an effort to escape

4    liability: mootness[5] and undue administrative burden, Quest nevertheless fails to

5    satisfy its hefty burden of proof on either defense. First, Quest claims it has mooted

6    Plaintiffs' claims because 11 months after Plaintiffs filed this lawsuit, Quest

7    developed a feature for its kiosks that it claims allows legally blind patients to

8    check-in by swiping the touchscreen using three fingers ("TFS"). Quest alleges that

9    doing so alerts the phlebotomist the patient has arrived and places the patient into

10   the queue. The record facts, however, are undisputed that TFS requires a legally

11   blind patient to traverse a complex gauntlet of steps, each of which fails to provide

12   Plaintiffs effective communication. The extensive field investigation by Plaintiffs'

13   accessibility expert makes clear that TFS fails to deliver effective communication at

14   *each step* of this complex, communication gauntlet—much less to deliver it across

15   the board. Moreover, the undisputed record facts, including Plaintiff Vargas' first-

16   hand account of his post-TFS visit to Quest, phlebotomist Prudencia Magana's

17   testimony regarding the Company's lack of any accessibility training for its PSC

18   staff, and Quest's introduction of new "complex, interactive communication[]"

19   features at the kiosk that are completely inaccessible to the legally blind establish

20   that Quest cannot carry the "heavy" burden to establish mootness. *Chafin v. Chafin*,

21   568 U.S. 165, 133 S.Ct. 1017, 1023 (2013); *see also Friends of the Earth, Inc. v.*

22   *Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 170 (2000) ("[A] defendant

23   claiming that its voluntary compliance moots a case bears a formidable burden.").

24       Second, Quest lacks *any* record facts which might support an "undue

25   _____

26   UF 7; *see also* Dkt. 122-11, #B68.)

27   [5] In the first instance, this Court has already held that "Plaintiffs' claims are not
28   moot." (Dkt. 144 at 21:6.)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT

administrative burden" defense—to the extent such a defense is available to Quest at all.[6] When Plaintiffs questioned Quest's Rule 30(b)(6) witnesses under oath, not one witness could articulate why making the e-check in kiosk accessible created an undue burden for Quest and, in fact, testified that it did not pose an undue burden. (UF 105–06.) Quest thus has no evidence to create a triable issue that providing effective communication would impose any undue administrative burden.

Accordingly, as set forth in more detail below, because Plaintiffs have established each of the elements of their respective ADA and Unruh Act claims, and Quest has not come close to meeting its heavy burden to establish its affirmative defenses, Plaintiffs are entitled to judgment as a matter of law.

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   The Plaintiffs

Julian Vargas lives in Van Nuys, California. (Plaintiffs' Uncontroverted Fact ("UF") 1.) He is legally blind and uses a screen reader as an auxiliary aid that allows him to understand the information displayed on a screen. (UF 2.)

ACB is a national membership organization of thousands of blind and visually impaired persons which seeks to increase the independence, security, equality of opportunity, and quality of life for all legally blind people. (UF 3.)

The certified Class includes: "All legally blind individuals who visited a Quest patient service center in the United States between January 1, 2018 through

---

[6] In the Title II context, a public entity bears the heavy burden to establish a proposed injunction would pose "undue administrative burden." *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1096 (9th Cir. 2013). Plaintiffs are unaware of any federal court in this Circuit that has denied summary judgment in a Title III action based upon a private company's "undue administrative burden" affirmative defense. *See, e.g.*, *Fortyune v. Am. Multi-Cinema, Inc.,* 364 F.3d 1075, 1084 (9th Cir. 2004) (granting summary judgment for Plaintiff against the defendant's claim of undue administrative burden).

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

December 31, 2019 (the 'Class Period'), and were denied full and equal enjoyment of the services, facilities, privileges, advantages, or accommodations due to Quest's failure to make its eCheck-in self-service kiosks independently accessible to legally blind individuals." (Dkt. 190 at. 15.)

**B.      Plaintiffs Encountered An Inaccessible Kiosk During The Class Period**

Beginning in the spring of 2016, Quest began to install touchscreen electronic kiosks at its PSCs to enable patients to self-check in for their appointments. (UF 4.) ██████████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████ (UF 5.) The Court has already held, and Quest concedes, the kiosk available during the Class Period did not provide effective communication. (Dkt. 190 at 8; Dkt. 144 at 10; UF 6.)

The kiosk is the means for patients to communicate to the phlebotomist they have arrived, placing the patient in queue for phlebotomy service once they have checked in at the kiosk. (UF 9.) The very design of the kiosk-based system was to have the phlebotomist remain in the back, servicing more patients, and not to be in the front helping patients with check-in. (UF 10.) For a legally blind customer, this means before they can even be placed in line for service, they must either (1) find a sighted person to help them with the kiosk; or (2) wait for a phlebotomist to come out to get another patient, and ask him or her for help. (UF 13.) While the legally blind individual waits to be checked in, any patient that checks-in on the kiosk will be serviced before them. (*See* DOJ Statement of Interest, Dkt. 118 at 10 ("Relegating patients with disabilities … to the bottom of the walk-in waitlist because of a lack of auxiliary aids and services is treating those patients differently.").)

On June 25, 2019, Mr. Vargas took paratransit to a Quest PSC to obtain lab

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

9

work. (UF 14.) After 10 to 15 minutes, a phlebotomist came out to help another patient. (UF 15.) The phlebotomist directed Mr. Vargas to the kiosk and told him, "this is where you check in." (UF 16.) Mr. Vargas checked the kiosk for tactile markings, a headphone jack, or a tactile keypad that would allow him to use the kiosk. (UF 17.) After not finding any of these accessibility options, Mr. Vargas told the phlebotomist the kiosk was not accessible to legally blind people so he would need help signing in. (UF 18.) The phlebotomist took the other patient back for lab work, then came back out approximately five minutes later to help Mr. Vargas. (UF 19.) The phlebotomist asked Mr. Vargas for several pieces of personal information. (UF 20.) Mr. Vargas suggested to the phlebotomist that she talk to whoever she needed to make sure the kiosk was accessible to blind people, offering to provide his feedback to Quest. (UF 21.) The phlebotomist agreed and said she would speak with her supervisors, but nobody from Quest ever followed up with Mr. Vargas. (UF 22-23.) The experience left Mr. Vargas feeling embarrassed, humiliated, and like a "third class citizen of some kind that anybody else can walk in there and not have to undergo the same amount of hassle and waiting." (UF 24.)

Nine ACB members testified they were similarly not able to independently access the kiosks, they waited for extended periods for a phlebotomist to come help them, and they felt a loss of dignity and privacy in having to check in with the phlebotomist instead of the service Quest offers all other patients. (UF 25.) Not any ACB member testified he or she was able to independently access the kiosk, and instead had to wait for an attendant to come to the window (putting sighted individuals ahead of them in line) or rely on a third party to aid their check-in at the kiosk. (UF 26.)

To defend its discriminatory conduct, Quest identified only one employee under Rule 26 with personal knowledge of what transpires at a Quest PSC. This employee is phlebotomist Prudencia Magana. Ms. Magana was the phlebotomist at the Quest location Mr. Vargas visited on June 25, 2019. (UF 27.) This is the only

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

evidence Quest produced of what is actually occurring at its PSCs—*i.e.*, what Plaintiffs experienced during the Class Period. Ms. Magana confirmed the kiosk was inaccessible to blind customers during the Class Period. (UF 28.)

### C.    Quest's TFS Does Not Moot Plaintiffs' Claims

In August 2020, in response to this litigation, Quest began outfitting the kiosks at some PSCs with TFS. (Dkt. 172-1 at 24:7-13 (Quest's evidence it will use to present its mootness defense, per the PTCO); UF 29.) Because this Court has already concluded that during the Class Period the kiosk itself was inaccessible and phlebotomist assistance was not provided by design, the lone remaining issue for adjudication is whether TFS moots Plaintiffs' "effective communication" claim. On the undisputed factual record before this Court, it manifestly does not.[7]

### 1.    The Record is Undisputed That Quest Has Not Effectively Rolled Out TFS

While Quest has repeatedly claimed under oath the Company implemented TFS across its PSC network (*see* UF 30), the record facts are undisputed that Quest has not effectively rolled out TFS across its network of over 2,100 PSCs to ensure effective communication. (*Id.*) In fact, Quest has wholly failed to provide ***any*** factual substantiation to support its oft-repeated claim.

In stark contrast, accessibility investigator Mark Derry investigated 24 Quest PSC locations and discovered Quest's TFS "solution" featured significant, glaring deficiencies at every single location, barring any finding of mootness. (UF 36.) This factual finding—which stands uncontroverted on the record before this Court—bars

---

[7] Plaintiffs expect Quest to point to its expert, Mr. Steven Sawczyn, to show the effectiveness of TFS. But Mr. Sawczyn did not know whether TFS had been rolled out throughout the PSC network, was himself never assisted with check in by a Quest phlebotomist and admitted under oath that he cannot independently access any of the features of the kiosk. (UF 31-35.)

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

any potential mootness finding. (*Id.*) Even at the investigated locations where TFS was present in some form, Mr. Derry found that at 11 of 24 locations, TFS was not available on every kiosk. (*Id.*) Accordingly, the actual evidence demonstrates Quest has not rolled out TFS effectively across its PSC network. (UF 38.) Without a comprehensive rollout of TFS at every PSC, Quest cannot establish Plaintiffs' claims are mooted, even if TFS solved for all of the kiosk's many communication failures, which it does not. (UF 39.)

### 2.   The Record Facts Establish TFS Does Not Allow Plaintiffs to Access the Services Available At the Kiosk

Even if Quest implemented TFS perfectly—available at all kiosks with clear notice to customers about where the kiosk is and how to utilize it, which it has not—TFS would still not moot Plaintiffs' claims. As explained in detail below, this is because Quest has implemented multiple new services available at the kiosk—wait by text, symptom checkers, information updates, and payment options—none of which are offered to legally blind individuals. (UF 40; *see also* Dkt. 144 at 4:3-4 (TFS "does not allow patients to interact with the kiosks in order to access all the kiosks' features."; Dkt. 118 at 10.).) Where it functions, TFS allows a legally blind user to access only one part of the service—to communicate he or she has arrived—but not to access any of the other parts of the service. (Dkt. 144 at 4:3-4; UF 41.) The kiosk is a service Quest offers its patients yet it offers that service in a way that expressly discriminates against legally blind patients.

### 3.   Mr. Vargas Could Not Access the Kiosk's Services After Quest Implemented TFS

Mr. Vargas returned to a Quest PSC on June 10, 2021. (UF 43.) As he entered the location, he heard the end of the portion of the audio content loop directed toward blind patients, but the volume was not adequate for him to hear the content from his location. (UF 44.) While waiting for the content loop to replay, information was given on the "wait where you want" option, available to those who could use

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

the kiosk independently. (UF 45.) After 8 to 10 minutes, the message directed Mr. Vargas to perform a three-finger swipe at the kiosk. (UF 46.) The message did not give directions as to where the kiosk itself was located within the waiting room, so Mr. Vargas had to fumble around to find it. (UF 47.) The content loop simply said patients should ask a staff member to assist if they had trouble locating the kiosk. (UF 48.) However, there were no Quest staff members in the waiting room. (UF 49.) After locating the kiosk, Mr. Vargas confirmed there was still no headphone jack or tactile keypad. (UF 50.)

Once Mr. Vargas performed the TFS, an audio message stated he was patient "001" and that he would be serviced in three minutes; in reality, he waited 17 minutes. (UF 51.) When the phlebotomist greeted him, Mr. Vargas explained he was there to test the accessibility of the TFS system and asked whether the "wait where you want" option was available to him as a blind user. (UF 52.) The phlebotomist told him the "wait where you want" option is only for those who make appointments online and can independently use the kiosk to scan a QR code, something Quest did not offer to blind users. (UF 53.)

### D.  The Record Is Undisputed That Quest's ADA Training Is Deficient

The factual record is undisputed that Quest failed to adequately train its employees on the ADA requirements on how to provide effective communication to its blind customers. (UF 54.)

First, Quest's own Rule 30(b)(6) witness testified to Quest's deficient ADA annual compliance materials. (UF 55-59.) Even after introducing a training program entitled "Managing Patient Needs," Quest's Rule 30(b)(6) witness was unable to confirm this training covered the ADA. (UF 55.) Nor could Ms. Reilly confirm that all employees completed the "Managing Patient Needs" training. (UF 56.) Ms. Reilly—the Company's Rule 30(b)(6) witness on the topic of training—was further unable to identify the existence of *any* written Quest ADA policy. (UF 57.) Nor could Ms. Reilly identify what portions of the ADA even apply to Quest. (UF 58.)

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

Indeed, of the approximately 500 slides in the "Managing Patient's Needs" presentation, only four reference the ADA, and none address the provision of effective communication to blind patients. (UF 59.) Accordingly, both Quest's training materials and its training are grossly deficient.

Second, Ms. Magana, the phlebotomist who serviced Mr. Vargas in June 2019, confirmed the deficiency of Quest's ADA training. ***Specifically, Ms. Magana testified she was never trained to "scan" the waiting room by Quest.*** (UF 60.) She further confirmed "Managing Patient Needs" was the only training employees received regarding the ADA and, as discussed above, that this training does not include any information regarding the frequency of scanning the waiting room, nor how to provide effective communication. (UF 61.) Further, Ms. Magana testified that Quest informed her the kiosk is not accessible to legally blind individuals. (UF 62.) Quest knew the kiosks failed to comply with the ADA, implemented them regardless, then left its phlebotomists with no training as to how to effectively communicate with the legally blind. These issues all still exist to this day.

## IV.   ARGUMENT

### A.   Quest Failed to Provide Legally Blind Patients With Effective Communication As Required By The ADA

The ADA mandates Quest provide auxiliary aids and services that ensure "effective communication" with disabled patients. 28 C.F.R. § 36.303(c)(1). In weighing what aids or services to provide, "[a] public accommodation should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed." *Id.*

> The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place . . . In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

28 C.F.R. § 36.303(c)(1)(ii).

The Department of Justice promulgates the regulations relating to "effective communication." The DOJ defines "auxiliary aids and services" to include "accessible electronic and information technology" or "other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b)(2).

In the present case, the Court has the benefit of the DOJ's own *Statement of Interest* as to whether Quest provided effective communication. As the DOJ wrote, it is the disparate nature of the communication Quest provides that should be the Court's main focus: "[w]hile Quest is correct that the ADA does not mandate that individuals with disabilities achieve identical results or levels of achievement as those without disabilities, 28 C.F.R. pt. 36, App. C (discussion of section 36.201), the statute explicitly prohibits public accommodations, such as Quest, from treating individuals with disabilities differently because of the absence of auxiliary aids and services.  See 42 U.S.C. section 12182(b)(2)(A)(iii); 28 C.F.R. section 36.303(a). **Relegating patients with disabilities who have scheduled appointments to the bottom of the walk in waitlist because of a lack of auxiliary aids and services is treating those patients differently. And if walk-in patients without disabilities can opt to wait somewhere other than the waiting room, then patients with disabilities must not be denied the opportunity to do so as well**." Dkt. 118, at 10 (emphasis added); *see Bragdon v. Abbott*, 524 U.S. 624, 646 (1998) (holding the DOJ's administrative guidance on ADA compliance is entitled to deference). By creating a service that is inaccessible to the legally blind, without any effective aid or auxiliary service to ensure effective communication, Quest has violated the ADA.

Plaintiffs expect Quest to focus its opposition on the often (but not always) fact-intensive nature of whether a plaintiff is provided appropriate auxiliary aids and services to ensure effective communication. *Poway Unified Sch. Dist. v. K.C. ex rel.*

15

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

*Cheng*, No. 10CV897-GPC (DHB), 2014 WL 129086 at *7 (S.D. Cal. Jan. 14, 2014). However, the cases denying summary judgment based, in part, upon the fact-intensive nature of the effective communication analysis are distinguishable from this dispute because, in each of those cases, the non-moving party could point to record facts which at least arguably contradicted the evidence cited by the moving party. For instance, in *Poway*, the defendant School District put forward facts opposing the counterclaimant K.C.'s facts that the School District failed to ensure effective communication. *Id.* at *2 (the School District proffered **facts** about several individualized education program ("IEP") meetings to discuss K.C.'s transition to a high school educational curriculum). Similarly, in *Kerr v. Heather Gardens Association*, the defendant Association put forward **facts** opposing Ms. Kerr's facts that the Association violated Title III of the ADA by depriving her of the ability to effectively communicate in order to participate in board meetings and events at the Community Center. No. 09-cv-00409-MSK-MJW, 2010 WL 3791484, at *2 (D. Colo. Sept. 22, 2010) (The Association proffered facts that it purchased a portable amplification system and occasionally provided an interpreter). Finally, in *Nix v. Advanced Urology Institute of Georgia, P.C.*, the defendant Institute put forward **record facts** opposing Ms. Nix's facts that the Institute's offered auxiliary aids impaired Nix's ability to effectively communicate. No. 1:18-cv-04656-SDG, 2020 WL 7352559, at *4-5 (N.D. Ga. Dec. 14, 2020) (The Institute proffered facts that one of its employees' abilities to do basic sign language and an exchange of handwritten notes with medical providers was enough to demonstrative effective communication).

Thus, the cases discussing the "fact-intensive" nature of an effective communication analysis all feature some dispute of facts: plaintiffs saying one form of communication is effective, defendants saying another. Here, Quest has not offered **any** record facts to dispute the kiosks lack of any accessible features during the Class Period; to the contrary, the Court, Quest, and Plaintiffs all agree the kiosk

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

16

did not provide effective communication. (Dkt. 190 at 1; Dkt. 144 at 10.) Nor is there any factual dispute that Quest's system was designed to keep phlebotomists in the back. (Dkt. 144 at 13.) The lack of any contrary record facts distinguishes this case from *Poway, Kerr,* and *Nix.*

Further, the Ninth Circuit's recent opinion in *Robles v. Domino's Pizza, LLC,* is instructive on the appropriate analytical framework for the certified Class's claim. There, the Circuit Court held that the ADA's mandate to provide auxiliary aids and services to make visual materials available to individuals who are blind applied to the website and app for Domino's Pizza. 913 F.3d 898, 904-06 (9th Cir. 2019). Despite the fact that phone and in-person ordering were still available for Domino's blind customers, the court reasoned that the website and app were "two of the primary (and heavily advertised) means of ordering Domino's products," and that their alleged inaccessibility impeded access to the goods and services of a place of public accommodation. *Id.* at 905. As in *Robles*, Quest has similarly impeded Plaintiffs' access and thus failed to meet its obligations under the ADA. There are no contrary facts – Quest created a service that is inaccessible to the legally blind, without any effective aid or auxiliary service to ensure effective communication, and thus violated the ADA as a matter of law.

### B.   Plaintiff Vargas Is Entitled To Summary Judgment On His Unruh Civil Rights Claim

Plaintiff Julian Vargas' claim under the Unruh Civil Rights Act is predicated upon a violation of the ADA. "A violation of the ADA is, by statutory definition, a violation of both the Unruh Act and the DPA [Disabled Persons Act]. Cal. Civ. Code §§ 51(f), 54.1(d)." *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017, 1023 (N.D. Cal. 2012). For the reasons explained in section IV(A), *supra*, Mr. Vargas is entitled to summary judgment on his claim for violation of the Unruh Act.

In response to its clear violations of both the ADA and the Unruh Act, Quest offers only self-serving supposition and legal *argument* in service of its affirmative

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA  93101

17

1  mootness and undue burden defenses. This cannot serve to create a genuine issue of

2  material *facts*, however, as there is no conflicting evidence in the record before this

3  Court: the undisputed facts establish Quest has not met its burden of establishing

4  mootness or undue burden.

5  **C.     The Undisputed Record Facts Establish TFS Cannot Moot The**

6  **Certified National Class's Claims As A Matter of Law**

7         A party asserting mootness bears a "formidable burden" to establish the

8  Court can provide no effective relief. *Friends of the Earth,* 528 U.S. at 170. Quest

9  has not come close to meeting this burden. Specifically, to demonstrate mootness in

10 a voluntary cessation context, the defendant must establish "there is no reasonable

11 expectation that the wrong will be repeated," which is a "heavy" burden. *United*

12 *States v. W.T. Grant Co*., 345 U.S. 629, 633 (1953); *see also Friends of the Earth,*

13 528 U.S. at 189 ("a defendant claiming that its voluntary compliance moots a case

14 bears the formidable burden of showing that it is absolutely clear the allegedly

15 wrongful behavior could not reasonably be expected to recur"). If a course of action

16 is mostly completed but "changes can still be made to help alleviate any adverse

17 effects," the case is not moot. *Tyler v. Cuomo*, 236 F.3d 1124, 1137 (9th Cir. 2000).

18 A case becomes moot "only when it is impossible for a court to grant any effectual

19 relief whatever to the prevailing party." *Chafin,* 568 U.S. at 172 (citation omitted).

20        *Sengupta v. City of Monrovia*, No. CV 09-00795 ABC (SJHx), 2010 WL

21 11515299 (C.D. Cal., July 28, 2010) is particularly helpful in addressing the

22 mootness question in the context of an effective communication case. There, a deaf

23 plaintiff argued that a police department violated the ADA when it failed to provide

24 him effective communication when he was arrested. He sought injunctive relief

25 requiring the City to implement a policy and training for providing effective

26 communication to deaf individuals. While the lawsuit was pending, the City passed

27 such a policy, then moved for summary judgment on mootness grounds. *Id.* at *5.

28 Plaintiff presented evidence that the policy, while having some positive attributes,

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

18

had multiple failings. Then-Chief Judge Aubrey Collins concluded that even if the policy were ADA-compliant, the policy did not include training, and even if it did fully address all claims, "the City has not demonstrated that it would not simply revert to its prior policy once the threat of litigation has diminished. The City adopted the Section 370 policy nine months after this lawsuit was filed, suggesting it may have been an effort to moot the lawsuit, not to demonstrate the City's "genuine change of heart." *Id., see also, Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1186 (11th Cir. 2007) (rejecting mootness claim based on new policy adopted nine months after lawsuit filed)." *Id.* at *6; *see also Feldman v. Pro Football, Inc.*, 579 F. Supp. 2d 697, 707 (D. Md. 2008) (finding the case was not mooted when "Defendants can simply stop enabling closed captioning on the concourse level video monitors or cease captioning on the LED ribbon boards; nothing in the record indicates that Defendants actions have resulted in permanent changes.").

The facts at issue here are strikingly similar to those in *Sengupta*; at trial, it would be Quest's heavy burden to establish mootness. But the Court, Plaintiffs, and Quest know the evidence—it is the evidence the parties disclosed in discovery. Quest cannot point to even a single piece of ***record facts*** that will be presented at trial – either documentary or testimonial—that would establish TFS fully complies with the ADA such that it provides all members of the certified class with effective communication, that Quest has provided its phlebotomists with all training the Class requests, and that once the threat of litigation has diminished, Quest would not simply revert to its prior discriminatory practices due to a genuine change of heart. As to the last point, Quest's behavior since this lawsuit was filed indicates that it is likely to revert to its prior discriminatory conduct. Specifically, it has continued to add additional features to the kiosks to better the patient experience—███████,
███████████████████████—yet as it has introduced these new features, it made no effort to make the features accessible to the blind. (UF 101-104.) This goes directly to the question of whether the challenged discrimination is

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

likely to be repeated. Had Quest experienced a "genuine change of heart," then it certainly would have at least attempted to make these new features accessible. If there was a "genuine change of heart," one would not expect that, even today, three years into this litigation, Quest has *still* not implemented a functioning TFS system that provides access to the kiosk's features at all its PSCs.

"Quest argues that the implementation of the Three-Finger Swipe moots Plaintiffs' claims, because the kiosks are now independently accessible by blind patients." (Dkt. 144 at 20:25-21:1.) But this is simply legal argument; there is no *evidence* in the record that might allow the Court to conclude – as a factual matter - that "it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin,* 568 U.S. at 172. Rather, the record facts establish Quest's post-TFS communication "gauntlet" is riddled with accessibility barriers, from the time of arrival until the patient finally sees a phlebotomist and that, as this Court has noted, "Plaintiffs' claims are not moot." (Dkt. 144 at 21:6.)

**1.    Quest's Post-TFS Effective Communication "Gauntlet"**

As this Court explained, TFS requires legally blind patients to traverse a gauntlet of "complex, interactive" steps to receive the same effective communication sighted patients receive uniformly across Quest's PSC network. (Dkt. 144 at 11, fn. 8.) Critically, an evaluation of whether "effective communication" has been provided is driven by an analysis of the nature of the communication provided to non-disabled customers. (Dkt. 144 at 11.) Here, the factual record is undisputed that from the moment a legally blind patient arrives at a Quest PSC, the experience is separate and unequal from those of sighted Quest customers at each step of TFS's communication gauntlet.

**a.    Arrival**

Even after the TFS rollout, the communication provided to a sighted patient and a legally blind patient at Quest is disparate from the moment they step foot into a PSC. Specifically, a sighted patient walks into a Quest PSC and immediately

20

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

views either prominently located kiosks or signage which invite him to check in. (UF 67.) The physical presence of the kiosks—and the video script on the kiosk's screen welcoming sighted patients—is the first communication Quest offers its sighted patients but denies to its legally blind patients. In contrast, according to the detailed field investigation of experienced accessibility investigator Mark Derry— evidence which Quest did not even attempt to refute during discovery in this action through admissible evidence—at 14 out of 24 investigated locations, there was no audio loop playing which might direct legally blind patients to the presence of the kiosk. (UF 69, 73-74.) At the remaining ten locations that did have the audio loop, it was often too faint to be heard in the crowded waiting room. (UF 75.)

In the subset of locations where the audio message could be heard audibly, it is often on a content loop that does not play for up to 30 minutes, and at best, every 7 to 10 minutes, according to the testimony of Quest executive Marc Yarrison and the Mr. Derry. (UF 76-77.) Accordingly, by Quest's own admission, even in the subset of locations where the TFS process is functioning properly, legally blind patients must wait up to 30 minutes to even understand there is a kiosk they must use to check in. This is significant because, in stark contrast, the sighted patient is made immediately aware of the kiosk's presence the moment he or she steps into the PSC by virtue of the prominently-located kiosks displaying welcoming language[8] on their video screens. The certified national Class asks the Court to consider how

---

[8] Quest implemented the option of 26 different languages on ECSS. (UF 78.) Quest stated "[t]he intent via the experience was to meet a broad audience of primary language they preferred to use." (UF 79.) Thus, as part of its self-proclaimed "iterative process," Quest received complaints about ECSS being inaccessible to those whose primary language is not English, made the necessary changes, and achieved an improved result that made ECSS accessible to primary speakers of 26 languages. (UF 80.) Yet Quest deliberately chose (and continues to choose) to exclude the blind community from the ECSS service.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

many sighted patients would wait for 30 minutes before being directed how to even *begin* the check in process. Yet for the lucky few legally blind Quest patients located near a PSC that features the TFS functionality, this is what they must do in order to even attempt to utilize the communication system that is routinely available to sighted patients. At all other locations where TFS is not functioning (14 of 24 investigated locations per Mr. Derry), the legally blind customer is never made aware of the presence of the kiosk and is left to seek help from a third party or to leave the PSC. For these individuals, effective communication is denied from the moment they set foot in a Quest PSC. ***Most relevant to the instant Motion, Quest can point to no record facts to refute these facts or create a disputed issue of fact.***

### b.    *Learning the Location of the Kiosk(s)*

The disparate communication continues even if a legally blind patient is lucky enough to learn that there is a kiosk installed in that PSC. If a legally blind patient hears the audio loop message eventually and learns about the kiosk, he or she still must physically locate the kiosk. This is itself a major challenge since the content loop provides no directions to where the kiosks are physically located. (UF 82.) This is yet another disparate aspect of the experience; sighted patients are visually welcomed to the physical kiosk whereas legally blind patients must fumble around to locate them.

If a legally blind patient manages to locate a kiosk with her hands or a cane, the disparate communication continues. Mr. Derry reveals that at only 13 of 24 investigated locations are *all* kiosks outfitted with TFS capability. (*See* UF 37.) In other words, according to Mr. Derry's findings, there is a nearly 60% chance that a legally blind patient will encounter a kiosk that does not allow her to perform the TFS gesture if he or she is one of the lucky few to make it to this critical step in the communication chain. ***Again, Quest can point to no record facts to refute this factual finding***.

///

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

### c.      Self-Check for COVID Symptoms

If a legally blind patient has (1) visited a PSC location that has both the audio loop and TFS, (2) waited up to 30 mins to hear the audio message, and (3) has physically located the kiosk, they cannot see the script asking them whether they have experienced COVID symptoms and should leave the PSC. (UF 83.) Sighted patients can. This is yet another disparate aspect of the experience. ***Again, Quest can point to no record facts to refute this factual finding.***

### d.      Informing Patients They Have Entered the Queue

The lack of effective communication continues even after a blind patient uses the TFS gesture (assuming he or she has gotten this far). If the legally blind patient has (1) visited a PSC location that has both the audio loop and TFS, (2) waited up to 30 mins to hear the audio message, (3) physically located the kiosk, and (4) successfully performed the TFS gesture, they have finally entered into the queue as a generic number. However, as Mr. Derry's report notes, in many locations Quest never communicates to them that they have entered the queue. (UF 84.) In sharp contrast, Quest immediately communicates to sighted patients as to where they stand in the queue by displaying their name in lights on the TV monitor—a feature designed to reduce patients' anxiety as they wait, a key aim of the E-check-in according to Quest. (UF 86.) This is yet another disparate aspect of the communication. ***Again, Quest can point to no record facts to refute this factual finding***.

### e.      Phlebotomist Ability to Turn Off Alert Bell

In addition, Quest phlebotomists have the ability to turn off the alert which notifies them that a TFS gesture has been performed. (UF 87.) Ms. Magana testified Quest does not have a bell for patients that enter the PSC, and "the first time that you're alerted to an individual's presence in the waiting room is when they sign in at the kiosk," but this bell can be turned off. (UF 88.) Quest can point to no record facts to refute this factual finding. Thus, even if the blind patient gets through each

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA  93101

23

of the above four steps despite the lack of communication from Quest, he or she could still encounter a phlebotomist who turned off the alert bell notifying of the TFS check in. *See Feldman*, 579 F. Supp. 2d at 706–07 (where Defendants have the ability to turn off the purported cure, Defendants' actions have not resulted in permanent changes.) ***Again, Quest can point to no record facts to refute this factual finding.***

### f.     Ability to Wait Outside During COVID-19 Pandemic

Even if the legally blind patient enters the queue successfully and the phlebotomist is alerted, the legally blind patient is not offered the option of waiting outside during COVID. (UF 89.) Again, Quest communicates to the sighted patient via the kiosk that he or she can wait outside to avoid contact with potentially-infected patients and then be called in at his turn. Meanwhile, Quest does not offer this same service to members of the certified national Class. This is yet another disparate aspect of the experience. ***Quest can point to no record facts to refute this factual finding***.

### g.     Ability to Scan Insurance or ID Card

Nor can the legally blind patient scan his or her insurance card at the kiosk like a sighted patient—yet another disparate aspect of the communication. (UF 90.) Again, Quest communicates to sighted patients via the kiosk they can scan their insurance or ID card, but never communicates this to legally blind patients so they can avail themselves of this same service. Quest can point to no record facts to refute this factual finding.

This Court noted the nature of the communication at issue was not, as Quest would have it, simply the provision of a patient's name, birth date and phone number. (Dkt. 144 at 11.) Rather, it is much more "complex, interactive communications" with the phlebotomists in the back, such as enabling a patient to wait outside during COVID and scan insurance or ID cards. (*Id.*, at n. 8.) This is the heart of the TFS solution's legal infirmity—it requires many complicated,

24

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA  93101

interactive steps in the communication process—and the differences in how Quest communicates with its legally blind and sighted patients at every step—illuminates that Quest routinely denies effective communication to certified national Class members. Mr. Derry's report ultimately concluded that ***none*** of the 24 investigated PSCs provided effective communication to legally blind patients at each step of the process. (UF 91.)

Should this case proceed to trial, the witnesses Quest has designated to support its mootness defense are: Taylor Carr, Marc Yarrison, Jody Reilly. (Dkt. 172-1 at 23.) Not one of the witnesses testified that Quest provides legally blind patients with effective communication throughout the process. Rather, at trial they will offer only opinion and supposition regarding the communication offered and the presence of TFS throughout the network during the present day. Put another way, there is nothing "new" the Court will learn at trial beyond what the record facts (i.e., Mr. Derry's report and Mr. Vargas' personal experience) have already established: that Quest cannot possibly meet its heavy burden to prove that it has uniformly rolled out TFS throughout the network – and that, in fact, where Quest has implemented TFS at all, it suffers from fatal flaws at every one of the 24 investigated locations. Put another way, there are no record ***facts*** whatsoever which might suggest TFS is currently providing effective communication to certified national Class members sufficient to moot the certified Class's claim.

The mootness defense requires Quest moot Plaintiffs' entire claim such that it is impossible for the Court to grant Plaintiffs any relief. *Chafin,* 568 U.S. at 172. This is Quest's heavy burden to meet. And even if TFS worked perfectly, which the evidence shows it does not, TFS does not address Plaintiffs' claims for relief relating to training. Again, Quest has not presented evidence that it has mooted the training claim, nor could it. Finally, as in *Sengupta,* Quest has identified no evidence to suggest it would not simply revert to its prior practice when the threat of litigation diminishes; to the contrary, the addition of inaccessible features at the kiosk since

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

TFS was introduced suggests that Quest has no plans to offer effective communication to legally blind customers in the future.[9] Accordingly, the evidence in the record demonstrates there is a live controversy, and the Court is able to grant effectual relief to Plaintiffs. Defendants' affirmative mootness defense fails as a matter of law.

### D. Providing Effective Communication to the Certified Class Would Not Create an Undue Administrative Burden

Providing a kiosk that allows for effective communication would not create an undue administrative burden. See 42 U.S.C. § 12182(b)(2)(A)(iii) ("An entity violates the ADA when it fails to provide a reasonable accommodation unless the entity can demonstrate that such accommodation would create an undue burden or fundamentally alter the nature of the service being offered."); 28 C.F.R. § 36.104 (An "undue burden" is defined as "**significant** difficulty or expense.") (emphasis added); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001) ("The ADA requires

---

[9] Plaintiffs anticipate Quest will argue it mooted Plaintiffs' initial claims related to the kiosk as it existed at the time of the complaint filing (2019). In the first instance, this is factually incorrect, as Quest has not presented evidence it took all necessary steps to change its policies and procedures to ensure the access barriers do not recur nor that their kiosks are in full compliance with the requirements of the ADA. FAC, ¶ 11(a)-(b); *Langer v. Pep Boys Manny Moe & Jack of Cal.*, No. 20-cv-06015-DMR, 2021 WL 148237, at *4 (N.D. Cal. Jan. 15, 2021) ("It is not clear that Pep Boys' attempts at compliance have been effective."). Moreover, Quest's anticipated argument is an inaccurate recitation of the legal standard. A plaintiff seeking to remedy a denial of effective communication does not need to encounter each access barrier in order to seek full redress. *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 952 (9th Cir. 2011). Rather, as the Ninth Circuit held in *Chapman,* the encountered access issue—here the inability to effectively communicate via the kiosk at the time of the lawsuit—allows the plaintiff to seek an injunction to correct the other, albeit unencountered communication failures that will subject a legally blind individual like certified Class Representative Vargas to future discrimination, provided the threat of such discrimination is real and immediate. *Id.*

1  that reasonable accommodations be provided and paid for by the public

2  accommodation unless providing them would be an undue financial and

3  administrative burden or a fundamental alteration of the program.").

4      Quest raised undue burden as its tenth affirmative defense. "An affirmative

5  defense, under the meaning of Federal Rule of Civil Procedure 8(c), is a defense that

6  does not negate the elements of the plaintiff's claim, but instead precludes liability

7  even if all of the elements of the plaintiff's claim are proven." *Roberge v. Hannah*

8  *Marine Corp.,* No. 96–1691, 1997 WL 468330, at *3 (6th Cir.1997). It is a defense

9  on which the defendant has the burden of proof. *See, e.g., Kanne v. Conn. General*

10 *Life Ins. Co.,* 867 F.2d 489, 492 n. 4 (9th Cir.1988). Thus, like its mootness

11 affirmative defense, it is Quest's burden to produce evidence to substantiate the

12 defense by a preponderance of the evidence. Quest has failed to do so.

13     Contrary to supporting an undue burden defense, the record facts establish

14 Quest was well aware of the inaccessibility of the kiosk before this litigation was

15 initiated, there were cost-efficient means of providing effective communication,[10]

16 Quest chose to implement the inaccessible kiosk anyway, and even after

17 implementing multiple additional features to the kiosk, Quest has still failed to

18 provide effective communication to blind users. ████████████████

19 ████████████████████████████████████████

20 ███████████████████████████ (UF 92.) The record

21

22

_____

23 [10] As explained in the declaration from Rachael Montgomery, "The iPad selected for
   these kiosks includes built in speech reader capabilities within its standard
24 accessibility suite. This screen reader provides the speech output needed to interact
   with a kiosk application." (UF 97.) Ms. Montgomery's Declaration further describes
25 how Lilitab provides an option to include a standard headphone jack for
   approximately $30.00 per kiosks, which "would allow Quest to maintain the
26 functionality and utility of its kiosks, while increasing the accessibility for blind
   users." (UF 98.) Other options include an Audionav keypad for iOS, which has
27 tactile navigation keys, as well as a headphone jack, and costs $309.75. (UF 99.)
   Quest thus could have, at minimal expense, provided at least one kiosk at each of its
28 2,152 PSCs that is independently accessible to the legally blind and still saved more
   than $39M. (UF 100.) Quest elected not to do so.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

27

facts establish the kiosk supplier Quest used—Lilitab—provided Quest with many options to make the kiosk accessible, and Quest again ignored these simple solutions. (UF 93–96.) The record facts establish Quest has undertaken the administrative burden of rolling out multiple new services on the kiosks, yet has not even attempted to make one of those services accessible to blind customers. (Dkt. 144 at 4:3-4.) And most importantly, the record facts, including the testimony of Quest executives Carr, Yarrison, Reilly, Walsh, and Grant, demonstrate Quest did not perform an undue hardship analysis when deciding whether to make the kiosk accessible. (UF 105.) When Plaintiffs questioned Quest's Rule 30(b)(6) witnesses under oath not one witness could articulate why making the kiosk accessible created an undue burden to Quest. (UF 106.) This is far from the required showing of "significant difficulty or expense." 28 C.F.R. § 36.104.

Accordingly, Quest cannot point to any record facts—the evidence it could present at trial—that support an undue administrative burden defense. Absent any evidence, Quest's claims of undue burden are insufficient to overcome the conclusion that Quest discriminated against Plaintiffs in violation of the ADA and the Unruh Act.

## IV.   CONCLUSION

For the reasons stated herein, certified Class Representative Julian Vargas, American Council of the Blind, and the certified national Class respectfully request their motion for summary judgment be granted, and that Mr. Vargas be granted summary adjudication of his Unruh Act claim against Quest and Plaintiffs be granted summary adjudication of their ADA claim against Quest. As this would resolve all pending claims between the parties, Plaintiffs therefore request summary judgment.

Dated: May 6, 2022                        Respectfully submitted,

By:   */s/ Jonathan D. Miller*
Jonathan D. Miller (SBN 220848)

1    jonathan@nshmlaw.com
2    Alison M. Bernal (SBN 264629)
     alison@nshmlaw.com
3    NYE, STIRLING, HALE
     & MILLER, LLP
4    33 West Mission Street, Suite 201
5    Santa Barbara, CA 93101

6
7    Benjamin J. Sweet
     (Admitted *Pro Hac Vice*)
     ben@nshmlaw.com
8    NYE, STIRLING, HALE
9    & MILLER, LLP
     1145 Bower Hill Road, Suite 104
10   Pittsburgh, PA 15243
11   Telephone: (412) 857-5350

12   Matthew K. Handley
13   (Admitted *Pro Hac Vice*)
     mhandley@hfajustice.com
14   HANDLEY FARAH &
     ANDERSON PLLC
15   777 6th Street NW
16   Washington, DC 20001
     Telephone: (202) 559-2411
17

18   *Attorneys for Plaintiffs Julian Vargas,*
     *American Council of the Blind, and the*
19   *Certified Class*

20

21

22

23

24

25

26

27

28

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT