1   Jonathan D. Miller (SBN 220848)
    jonathan@nshmlaw.com
2   Alison M. Bernal (SBN 264629)
    alison@nshmlaw.com
3   NYE, STIRLING, HALE
    & MILLER, LLP
4   33 West Mission Street, Suite 201
    Santa Barbara, CA 93101
5   Telephone: (805) 963-2345

    Benjamin J. Sweet
    (*Admitted Pro Hac Vice*)
    ben@nshmlaw.com
    NYE, STIRLING, HALE
    & MILLER, LLP
    1145 Bower Hill Road, Suite 104
    Pittsburgh, PA 15243
    Telephone: (412) 857-5350

6

7   *Attorneys for Plaintiffs Julian Vargas,*
    *American Council of the Blind, and the Certified Class*

8   **Additional counsel for Plaintiff listed on signature page**

9

10              **UNITED STATES DISTRICT COURT**

11          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

12

| | |
|---|---|
| 13  JULIAN VARGAS and AMERICAN COUNCIL OF THE BLIND, individually on behalf of themselves and all others similarly situated, | Case No.: 2:19-cv-08108-DMG |
| 14 | **PLAINTIFFS' APPENDIX OF EXHIBITS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| 15              Plaintiffs, | |
| 16        v. | *[Filed Concurrently with Notice of Motion, Memorandum of Points and Authorities, Separate Statement of Undisputed Material Facts, And [Proposed] Order]* |
| 17  QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, inclusive, | |
| 18 | **Date:   June 17, 2022** |
| 19 | **Time:   2:00 p.m.** |
| 20 | **Crtrm: 8C** |
| 21 | Complaint Filed: September 18, 2019 |
| 22              Defendants. | Discovery Cutoff: August 27, 2021 |
| 23 | Pretrial Conf: October 4, 2022 |
| 24 | Trial Date: November 1, 2022 |
| 25 | District Judge: Hon. Dolly M. Gee |
|  | Magistrate: Hon. Michael R. Wilner |
| 26 | ***REDACTED*** |

27

28

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' APPENDIX OF EXHIBITS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiffs Julian Vargas, individually and as representative of the Certified Class, American Council of the Blind, and the Certified National Class ("Plaintiffs"), submit this evidentiary appendix in support of their Motion for Summary Judgment, consisting of the following:

## **TABLE OF CONTENTS**

### *Declarations*

| Exhibit | | Page |
|---------|--|------|
| Ex. 1: | Declaration of Alison Bernal | PA0002-PA0003 |
| Ex. 2: | Declaration of Jonathan D. Miller | PA0005-PA0009 |
| Ex. 3: | Declaration of Julian Vargas | PA0011-PA0012 |

### *Depositions Transcripts and Exhibits*

| Ex. 4: | Relevant portions of the Deposition of Marc Yarrison (appearing as a FRCP, Rule 30(b)(6) witness and employee on behalf of Quest), taken on April 8, 2021 | PA0014-PA0048 |
| Ex. 5: | Relevant portions of the Deposition of Taylor Carr (appearing as a FRCP, Rule 30(b)(6) witness and employee on behalf of Quest), taken on April 12, 2021, and July 30, 2021 | PA0049-A PA0055 |
| Ex. 6 | Relevant portions of the Deposition of Jody Reilly (appearing as a FRCP, Rule 30(b)(6) witness on behalf of Quest), taken on April 16, 2021 | PA0057-PA0071-A |
| Ex. 7: | Relevant portions of the Deposition of Christopher Grant (appearing as a FRCP, Rule 30(b)(6) witness and employee on behalf of Quest), taken on April 20, | PA0073-PA0084 |

Nye, Stirling, Hale & Miller
33 West Mission Street, Suite 201
Santa Barbara, California 93101

2

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

2021

| Ex. 8: | Transcript of the Deposition of Lead Plaintiff Julian Vargas, taken on April 22, 2021 | PA0086-PA0105 |
| Ex. 9: | Relevant portions of the Deposition of Ralph Black (Member of Plaintiff ACB), taken on April 27, 2021, and August 5, 2021 | PA0107-PA0117 |
| Ex. 10: | Relevant portions of the Deposition of Ardis Bazyn (Member of Plaintiff ACB), taken on April 27, 2021, and August 6, 2021 | PA0119-PA0128 |
| Ex. 11: | Relevant portions of the Deposition of Mary Haroyan (Member of Plaintiff ACB), taken on April 29, 2021 | PA0130-PA0140 |
| Ex. 12: | Relevant portions of the Deposition of Nona Haroyan (Member of Plaintiff ACB), taken on April 29, 2021 | PA0142-PA0154 |
| Ex. 13: | Relevant portions of the Deposition of Donna Grahmann (Member of Plaintiff ACB) taken on May 3, 2021, and August 5, 2021 | PA0156-PA0163 |
| Ex. 14: | Relevant portions of the Deposition of Kathy Lyons (Member of Plaintiff ACB) taken on May 6, 2021 | PA0165-PA0173 |
| Ex. 15: | Relevant portions of the Deposition of Regina Brink (Member of Plaintiff ACB) taken on May 6, 2021 | PA0175-PA0184 |
| Ex. 16: | Relevant portions of the Deposition of Robin Rehder (Member of Plaintiff ACB), taken on May 21, 2021 | PA0186-PA0190 |
| Ex. 17: | Relevant portions of the Deposition of Clark Rachfal (appearing as the corporate witness for Plaintiff ACB, pursuant to Rule 30(b)(6)) taken on June 9, 2021 | PA0192-PA0197 |
| Ex. 18: | Relevant portions of the Deposition of Adam Aronson (appearning as the corporate witness for | PA0199-PA0215 |

PLAINTIFFS' APPENDIX OF EXHIBITS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | | |
|---|---|---|
| | third party Lilitab LLC, pursuant to Rule 30(b)(6), taken on June 29, 2021 | |
| Ex. 19: | Relevant portions of the Deposition of Tom Walsh (employee of Quest) taken on July 1, 2021 | PA0217-PA0244 |
| Ex. 20: | Relevant portions of the Deposition of Prudencia Magana (employee of Quest) taken on August 3, 2021 | PA0246-PA0255 |
| Ex. 21: | Relevant portions of the Deposition of Claire Stanley (Member and former employee of Plaintiff ACB) taken on August 19, 2021 | PA0257-PA0262 |
| Ex. 22: | Relevant portions of the Deposition of Steven Sawczyn | PA0264-PA0275 |

### *Documents from Fact Discovery*

| | | |
|---|---|---|
| Ex. 23 | Relevant portions of Defendants' Document Production | PA0277-PA0292 |

### *Expert Declarations*

| | | |
|---|---|---|
| Ex. 24: | Declaration of Mark Derry | PA0294-PA0311 |
| Ex. 25: | Declaration of Rachael Montgomery | PA0313-PA0337 |

### *Documents Relevant to Meet and Confer (LR 7-3)*

| | | |
|---|---|---|
| Ex. 26: | Transcript of April 25, 2022, meet and confer | PA0339-PA0374 |

### *Additional Documents*

| | | |
|---|---|---|
| Ex. 27: | Defendants' Initial Disclosures | PA0376-PA0384 |

PLAINTIFFS' APPENDIX OF EXHIBITS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Dated: May 6, 2022               Respectfully submitted,

By:   _/s/ Jonathan D. Miller_
        Jonathan D. Miller (SBN 220848)
        jonathan@nshmlaw.com
        Alison M. Bernal (SBN 264629)
        alison@nshmlaw.com
        NYE, STIRLING, HALE
        & MILLER, LLP
        33 West Mission Street, Suite 201
        Santa Barbara, CA 93101

        Benjamin J. Sweet
        (Admitted *Pro Hac Vice*)
        ben@nshmlaw.com
        NYE, STIRLING, HALE
        & MILLER, LLP
        1145 Bower Hill Road, Suite 104
        Pittsburgh, PA 15243
        Telephone: (412) 857-5350

        Matthew K. Handley
        (Admitted *Pro Hac Vice*)
        mhandley@hfajustice.com
        HANDLEY FARAH &
        ANDERSON PLLC
        777 6th Street NW
        Washington, DC 20001
        Telephone: (202) 559-2411

        *Attorneys for Plaintiffs Julian Vargas,*
        *American Council of the Blind, and the*
        *Certified Class*

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' APPENDIX OF EXHIBITS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

# EXHIBIT 1

PA0001

Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com
Alison M. Bernal (SBN 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Telephone: (805) 963-2345

Benjamin J. Sweet
(*Admitted Pro Hac Vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

*Attorneys for Plaintiffs Julian Vargas,*
*American Council of the Blind, and the Certified Class*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIAN VARGAS and AMERICAN COUNCIL OF THE BLIND, individually on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, inclusive,<br><br>Defendants. | Case No.: 2:19-cv-08108-DMG<br><br>**DECLARATION OF ALISON M. BERNAL**<br><br>*[Filed Concurrently with Notice of Motion for Summary Judgment, Memorandum of Points and Authorities, Separate Statement of Undisputed Material Facts, Appendix of Exhibits And [Proposed] Order]*<br><br>**Date:   June 17, 2022**<br>**Time:   2:00 p.m.**<br>**Crtrm: 8C**<br><br>Complaint Filed: September 18, 2019<br>Discovery Cutoff: August 27, 2021<br>Pretrial Conf: October 4, 2022<br>Trial Date: November 1, 2022<br>District Judge: Hon. Dolly M. Gee<br>Magistrate: Hon. Michael R. Wilner |

1   **<u>DECLARATION OF ALISON M. BERNAL</u>**

2   I, ALISON M. BERNAL, declare as follows:

3   1.    I am an attorney at law duly qualified to practice before the Courts of

4   the State of California and before this Court and am a member of the firm Nye,

5   Stirling, Hale & Miller, LLP, attorneys for Plaintiffs Julian Vargas, American

6   Council of the Blind, and the Proposed Class in the above captioned matter. The

7   facts stated herein are stated of my own personal knowledge and, if called and

8   sworn as a witness, I could and would testify competently thereto. This declaration

9   is made in support of Plaintiffs' motion for summary judgment.

10   2.    Pursuant to Local Rule 7-3, I met and conferred with Defendants'

11   counsel David Raizman on April 25, 2022, regarding Plaintiff Vargas' intent to

12   move for summary judgment. My partner Benjamin Sweet also attended. Due to the

13   pandemic, we held this meet and confer telephonically. A court reporter was present

14   for the meet and confer. During our call, we discussed the legal and factual bases for

15   Plaintiffs' motion for summary judgment. The parties did not reach agreement on

16   the issues. A true and correct copy of the transcript from the April 25, 2022, meet

17   and confer is attached as **Exhibit 26** to the Appendix of Exhibits.

18   I declare under penalty of perjury under the laws of the United States of

19   America that the foregoing is true and correct. Signed this 4th day of May 2022, in

20   Santa Barbara, California.

21

22    _/s/  Alison M. Bernal_
      ALISON M. BERNAL, Declarant

23

24

25

26

27

28

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

# EXHIBIT 2

PA0004

Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com
Alison M. Bernal (SBN 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Telephone: (805) 963-2345

Benjamin J. Sweet
(*Admitted Pro Hac Vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

*Attorneys for Plaintiffs Julian Vargas,*
*American Council of the Blind, and the Certified Class*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIAN VARGAS and AMERICAN COUNCIL OF THE BLIND, individually on behalf of themselves and all others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, inclusive,<br><br>　　　　　　　Defendants. | Case No.: 2:19-cv-08108-DMG<br><br>**DECLARATION OF JONATHAN D. MILLER**<br><br>*[Filed Concurrently with Notice of Motion for Summary Judgment, Memorandum of Points and Authorities, Separate Statement of Undisputed Material Facts, Appendix of Exhibits And [Proposed] Order]*<br><br>**Date:　June 17, 2022**<br>**Time:　2:00 p.m.**<br>**Crtrm: 8C**<br><br>Complaint Filed: September 18, 2019<br>Discovery Cutoff: August 27, 2021<br>Pretrial Conf: October 4, 2022<br>Trial Date: November 1, 2022<br>District Judge: Hon. Dolly M. Gee<br>Magistrate: Hon. Michael R. Wilner |

## DECLARATION OF JONATHAN D. MILLER

I, JONATHAN D. MILLER, declare as follows:

1.      I am an attorney at law duly qualified to practice before the Courts of the State of California and before this Court and am the managing partner of the firm Nye, Stirling, Hale & Miller, LLP, attorneys for Plaintiffs Julian Vargas, American Council of the Blind ("ACB"), and the Proposed Class in the above captioned matter. The facts stated herein are stated of my own personal knowledge and, if called and sworn as a witness, I could and would testify competently thereto. This declaration is made in support of Plaintiffs' motion for summary judgment.

2.      Plaintiffs' motion for summary judgment relies on the testimony from several witnesses on behalf of Defendants and Plaintiffs. I have outlined the dates of those depositions below, with reference to the exhibit or exhibits containing true and correct copies of the relevant portion of the deposition testimony.

3.      On April 8, 2021, I took the deposition of Marc Yarrison, an employee of Quest and a designated corporate witness pursuant to FRCP, Rule 30(b)(6). I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 4** to the Appendix of Exhibits.

4.      On April 12, 2021, I took the deposition of Taylor Carr, an employee of Quest and a designated corporate witness pursuant to FRCP, Rule 30(b)(6). The deposition took two sessions, and the second session was on July 30, 2021. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 5** to the Appendix of Exhibits.

5.      On April 16, 2021, I took the deposition of Jody Reilly, an employee of Quest and a designated corporate witness pursuant to FRCP, Rule 30(b)(6). I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 6** to the Appendix of Exhibits.

6.      On April 20, 2021, I took the deposition of Christopher Grant, an employee of Quest and a designated corporate witness pursuant to FRCP, Rule

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

30(b)(6). I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 7** to the Appendix of Exhibits.

7. On April 22, 2021, Defendants took the deposition of proposed Lead Plaintiff Julian Vargas. I defended the deposition. I have produced true and correct copies of relevant portions of Mr. Vargas' deposition transcript as **Exhibit 8** to the Appendix of Exhibits.

8. On April 27, 2021, Defendants took the deposition of ACB member Ralph Black. The deposition lasted two sessions, with the second session on August 5, 2021. My co-counsel, Mr. Handley, defended the deposition. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 9** to the Appendix of Exhibits.

9. On April 27, 2021, Defendants took the deposition of ACB member Ardis Bazyn. The deposition lasted two sessions, with the second session on August 6, 2021. My co-counsel, Mr. Handley, defended the deposition. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 10** to the Appendix of Exhibits.

10. On April 29, 2021, Defendants took the deposition of ACB member Mary Haroyan. My co-counsel, Mr. Handley, defended the deposition. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 11** to the Appendix of Exhibits.

11. On April 29, 2021, Defendants took the deposition of ACB member Nona Haroyan. My co-counsel, Mr. Handley, defended the deposition. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 12** to the Appendix of Exhibits.

12. On May 3, 2021, Defendants took the deposition of ACB member Donna Grahmann. The deposition lasted two sessions, with the second session on August 5, 2021. My co-counsel, Mr. Handley, defended the deposition. I have produced true and correct copies of relevant portions of the deposition transcript as

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

DECLARATION OF JONATHAN D. MILLER

PA0007

**Exhibit 13** to the Appendix of Exhibits.

13.     On May 6, 2021, Defendants took the deposition of ACB member Kathy Lyons. My co-counsel, Mr. Handley, defended the deposition. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 14** to the Appendix of Exhibits.

14.     On May 6, 2021, Defendants took the deposition of ACB member Regina Brink. My co-counsel, Mr. Handley, defended the deposition. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 15** to the Appendix of Exhibits.

15.     On May 21, 2021, Defendants took the deposition of ACB member Robin Rehder. My co-counsel, Mr. Handley, defended the deposition. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 16** to the Appendix of Exhibits.

16.     On June 9, 2021, Defendants took the deposition of ACB's corporate witness pursuant to FRCP, Rule 30(b)(6). Clark Rachfal appeared on behalf of ACB. I have produced true and correct copies of relevant portions of his deposition transcript at **Exhibit 17** to the Appendix of Exhibits.

17.     On June 29, 2021, I took the deposition of third-party Lilitab, LLC's corporate witness pursuant to FRCP, Rule 30(b)(6). The witness who appeared for Lilitab was Adam Aronson. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 18** to the Appendix of Exhibits.

18.     On July 1, 2021, I took the deposition of Quest employee Tom Walsh. I have produced true and correct copies of relevant portions of Mr. Walsh's deposition transcript as **Exhibit 19** to the Appendix of Exhibits.

19.     On August 3, 2021, I took the deposition of Prudencia Magana, an employee of Quest. I have produced true and correct copies of relevant portions of the deposition transcript as **Exhibit 20** to the Appendix of Exhibits.

20.     On August 19, 2021, Defendants took the deposition of ACB member

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

DECLARATION OF JONATHAN D. MILLER

PA0008

1   and former employee, Claire Stanley. I defended the deposition. I have produced

2   relevant portions of Ms. Stanley's deposition transcript as **Exhibit 21** to the

3   Appendix of Exhibits.

4   　　　21.　　On November 14, 2021, I took the deposition of Steven Sawczyn,

5   Defendants' expert witness on the subject of digital accessibility and the

6   functionality of the three finger swipe feature. I have produced true and correct

7   copies of relevant portions of the deposition transcript as **Exhibit 22** to the

8   Appendix of Exhibits.

9   　　　22.　　In addition to the depositions, the parties have exchanged written

10  discovery and documents in response to requests for production of documents. I

11  have produced a true and correct copy of relevant portions of Defendants' document

12  production as **Exhibit 23** to the Appendix of Exhibits.

　　　I declare under penalty of perjury under the laws of the United States of

13  America that the foregoing is true and correct. Signed this 4th day of May 2022, in

14  Santa Barbara, California.

15

16  　　　　　　　　　　　　　　　　_____/s/ Jonathan D. Miller_____
　　　　　　　　　　　　　　　　JONATHAN D. MILLER, Declarant

17

18

19

20

21

22

23

24

25

26

27

28

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA  93101

PA0009

# EXHIBIT 3

PA0010

DocuSign Envelope ID: A88267A8-998A-4254-A5EA-C53B5CF7BBDF

Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com
Alison M. Bernal (SBN 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Telephone: (805) 963-2345
Facsimile: (805) 284-9590

Benjamin J. Sweet
(Admitted *Pro Hac Vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

*Attorneys for Plaintiffs Julian Vargas,*
*American Council of the Blind, and the*
*Proposed Class*

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

JULIAN VARGAS, ANNE WEST, and
AMERICAN COUNCIL OF THE
BLIND, individually on behalf of
themselves and all others similarly
situated,

Plaintiffs,

v.

QUEST DIAGNOSTICS CLINICAL
LABORATORIES, INC., QUEST
DIAGNOSTICS HOLDINGS, INC.,
QUEST DIAGNOSTICS
INCORPORATED; and DOES 1-10,
inclusive,

Defendants.

CASE NO.: 2:19-cv-8108

**DECLARATION OF JULIAN VARGAS IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Complaint Filed: September 18, 2019
Pretrial Conf: December 7, 2021
Trial Date: January 11, 2022
District Judge: Hon. Dolly M. Gee
Magistrate: Hon. Michael M. Wilner

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

## <u>DECLARATION OF JULIAN VARGAS</u>

I, Julian Vargas, hereby declare:

1.     I am one of the Plaintiffs in this matter. The following facts are within my personal knowledge and, if called as a witness, I could and would competently testify to these facts. I make this declaration in support of Plaintiff's Motion for Class Certification.

1

PA0011
PA0017

2. I went to a Quest PSC again on June 10, 2021. I arrived at the PSC at 12:33 p.m. As I entered the location, I heard the tail end of the portion of the content loop directed toward blind patients. However, the volume was not adequate for me to hear the message from my vantage point. I then had to wait an additional 8 to 10 minutes until the content loop played again. During this 8-minute period – but not during the portion of the message directed to blind patients – information was given on the "wait by text" option. The message made clear that it was only available to those who could use the kiosk independently.

3. After approximately 8 to 10 minutes, the message directed me to perform a 3-finger swipe at the kiosk. However, the message did not give directions as to where the kiosk itself was located, so I had to fumble around to find it. The content loop simply said that patients should ask a staff member to assist if they had trouble locating the kiosk. However, at no time while I was waiting for the audio message loop did any Quest staff member enter the waiting area or sweep the waiting area for walk-ins. Once I located the kiosk, I checked and confirmed there was still no headphone jack or tactile keypad.

4. After I performed the swipe by swiping up, an audio message played which stated that I was patient "001" and that I would be serviced in 3 minutes. I then waited 17 minutes to be serviced. When the phlebotomist finally greeted me at 12:58 p.m., I explained that I was there to test the accessibility of the 3-finger swipe system and asked whether the "wait by text" option was available to me as a walk-in blind user. The phlebotomist told me the "wait by text" option is not available for blind users who walk in but only for those who make appointments online and can scan a QR code at the kiosk.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 3rd day of September, 2021, in Van Nuys, California.

DocuSigned by:

4389E04F7499474...

Julian Vargas, Declarant

2

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

DECLARATION OF JULIAN VARGAS

PA0012
PA0018

***REDACTED***

Portions of Exhibit 4 ( Bates Nos. PA0033-48) will be filed under seal pending the Court's Order on Plaintiff's Application for Leave to File Under Seal

# EXHIBIT 4

PA0013

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JULIAN VARGAS, ANNE      )
     WEST, and AMERICAN       )
 5   COUNCIL OF THE BLIND,    ) Case No. 2:19-cv-8108
     individually on behalf   )
 6   of themselves and all    )
     others similarly         )
 7   situated,                )
                              )
 8              Plaintiffs,   )
                              )
 9      vs.                   )
                              )
10   QUEST DIAGNOSTICS        )
     CLINICAL LABORATORIES,   )
11   INC., QUEST DIAGNOSTICS  )
     HOLDINGS, INC.,          )
12   QUEST DIAGNOSTICS        )
     INCORPORATED; and        )
13   DOES 1-10, inclusive,    )
                              )
14              Defendants.   )
     _____ )
15
16
17          REMOTE DEPOSITION OF MARC YARRISON
18              as a 30(b)(6) Witness
19            (Via Zoom Videoconference)
20             Thursday, April 8, 2021
21
22
23   REPORTED BY:  Michelle Milan Fulmer
                   CSR No. 6942, RPR, CRR, CRC
24
25
```

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JULIAN VARGAS, ANNE      )
     WEST, and AMERICAN       )
 5   COUNCIL OF THE BLIND,    ) Case No. 2:19-cv-8108
     individually on behalf   )
 6   of themselves and all    )
     others similarly         )
 7   situated,                )
                              )
 8                Plaintiffs, )
                              )
 9       vs.                  )
                              )
10   QUEST DIAGNOSTICS        )
     CLINICAL LABORATORIES,   )
11   INC., QUEST DIAGNOSTICS  )
     HOLDINGS, INC.,          )
12   QUEST DIAGNOSTICS        )
     INCORPORATED; and        )
13   DOES 1-10, inclusive,    )
                              )
14                Defendants. )
     _____)
15
16
17       Remote deposition of MARC YARRISON, taken
18   before Michelle Milan Fulmer, a Certified Shorthand
19   Reporter for the State of California, with principal
20   office in the County of Orange, commencing at
21   11:30 a.m., Thursday, April 8, 2021.
22
23
24
25
```

Page  2

PA0015

```
1    APPEARANCES OF COUNSEL:
2
3    FOR PLAINTIFFS:
4
          NYE, STIRLING, HALE & MILLER, LLP
5         BY:  Benjamin J. Sweet, Esq.
          1145 Bower Hill Road, Suite 104
6         Pittsburgh, Pennsylvania 15243
          TEL: (412) 857-5350
7         EMAIL:  ben@nshmlaw.com
          (Via Zoom Videoconference)
8
9         NYE, STIRLING, HALE & MILLER, LLP
          BY:  Jonathan D. Miller, Esq.
10             Callum Appleby, Esq.
          33 West Mission Street, Suite 201
11        Santa Barbara, California 93101
          TEL: (805) 963-2345
12        EMAIL:  jonathan@nshmlaw.com
                  callum@nshmlaw.com
13        (Via Zoom Videoconference)
14
          HANDLEY FARAH & ANDERSON, PLLC
15        BY:  Matthew K. Handley, Esq.
          777 6th Street NW, 11th Floor
16        Washington, DC 20001
          EMAIL:  mhandley@hfajustice.com
17        (Via Zoom Videoconference)
18
     FOR DEFENDANTS:
19
          OGLETREE DEAKINS NASH SMOAK & STEWART, PC
20        BY:  David Raizman, Esq.
               Amber L. Roller, Esq.
21        400 South Hope Street, Suite 1200
          Los Angeles California 90071
22        TEL:  (213) 457-5862
          EMAIL:  david.raizman@ogletree.com
23                amber.roller@ogletree.com
          (Via Zoom Videoconference)
24
25
```

Page 3

PA0016

1    THE VIDEOGRAPHER:

2          Ted Hoppe

           (Via Zoom Videoconference)

3

4    ALSO PRESENT:

5          Amer Pharaon

           (Via Zoom Videoconference)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page 4

PA0017

```
 1                    I N D E X
 2   WITNESS                       EXAMINATION
 3   MARC YARRISON
 4                                 PAGE
 5              BY MR. SWEET          10
 6
 7            E X H I B I T S
 8                                 Page
 9   Exhibit     Description      Identified
10   Exhibit 1   Plaintiff Julian Vargas'    11
             Amended Rule 30(b)(6)
11           Deposition Notice to
             Quest Diagnostics,
12           Incorporated
13   Exhibit 2   New Patient Experience     41
             Deployment CapEx Request
14           April 2016
15   Exhibit 3   Email chain Bates stamped   62
             QUEST-VARGAS000035087 -
16           35090
17   Exhibit 4   Inside Patient Services     70
             Issue 4, Fall 2018
18
     Exhibit 5   Patient Services           73
19           Technical Updates
20   Exhibit 6   Report from patient        128
             advocacy
21
     Exhibit 7   Email chain Bates stamped  137
22           QUEST-VARGAS000007361 -
             7363
23
     Exhibit 8   Email chain Bates stamped  147
24           QUEST-VARGAS000037909 -
             37910
25
```

Page 5

```
 1               E X H I B I T S
 2                                         Page
 3    Exhibit          Description         Identified
 4    Exhibit 9        Email chain Bates stamped    183
                       QUEST-VARGAS000037977 -
 5                     37978
 6    Exhibit 10       Email chain Bates stamped    200
                       QUEST-VARGAS000035335 -
 7                     35336
 8    Exhibit 11       Email Bates stamped          205
                       QUEST-VARGAS000036699
 9
      Exhibit 12       Email chain Bates stamped    214
10                     QUEST-VARGAS000028740 -
                       28741
11
      Exhibit 13       Email chain Bates stamped    214
12                     QUEST-VARGAS000028746 -
                       28747
13
      Exhibit 14       Email chain Bates stamped    214
14                     QUEST-VARGAS000030878 -
                       30879
15
      Exhibit 15       Email chain Bates stamped    225
16                     QUEST-VARGAS000038805 -
                       38806
17
      Exhibit 16       Email chain Bates stamped    225
18                     QUEST-VARGAS000037605 -
                       37606
19
      Exhibit 17       Email chain Bates stamped    228
20                     QUEST-VARGAS000037980 -
                       37981
21
      Exhibit 18       Email chain Bates stamped    239
22                     QUEST-VARGAS000036566 -
                       36578
23
      Exhibit 19       Email chain Bates stamped    242
24                     QUEST-VARGAS000036700 -
                       36702
25
```

Page 6

PA0019

```
 1                         E X H I B I T S

 2                                                      Page

 3     Exhibit           Description              Identified

 4     Exhibit 20        Email chain Bates stamped     246
                         QUEST-VARGAS000036947 -
 5                       36954

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page  7
```

PA0020

```
 1    specific -- I don't remember if we did specifically.
 2        Q    And as you sit here today, are there any
 3    documents that you can point to that might help to
 4    refresh your recollection on that point?
 5        A    There may be some.  There's a lot of          12:07:20
 6    documents.  There may be some.  I'm not specifically
 7    able to think of one at the moment.
 8        Q    And am I correct, sir, that the company
 9    began to roll out the eCheck-In kiosks in 2016?
10        A    Yes.                                          12:07:52
11        Q    And how many kiosks did it roll out in
12    2016?
13        A    200.
14        Q    And was that considered another pilot to
15    determine whether the project should expand beyond     12:08:08
16    that or had you already determined that you were
17    going to expand beyond that?
18        A    If you look, I believe, in the business
19    justification or maybe the CapEx, I think it's the
20    business justification, there is a -- there is a       12:08:24
21    note in there about an evaluation at the end of
22    2016 to whether we continue with the project or not.
23    We did continue with the project, as you know.
24        Q    And is it my --
25             It's my understanding that you rolled out     12:08:46
```

                                                          Page 34

PA0021

```
 1      Q     Let's go back to my original question.

 2            You testified there were 200 kiosks rolled

 3   out in 2016; correct?

 4      A     Approximately 200.

 5      Q     Approximately 800 in 2017; correct?        12:12:53

 6      A     Correct.

 7      Q     And the remainder in 2018; right?

 8      A     Correct.

 9      Q     You talked about moving from a paper system

10   to an electronic system saved the company some       12:13:15

11   money?

12            MR. RAIZMAN:  I'm having trouble hearing

13   the question.  I apologize.

14            THE WITNESS:  I had trouble.  I had trouble

15   hearing, too.  You were breaking up there.           12:13:24

16            THE COURT REPORTER:  I think there was

17   something shuffling around the mic.  That interrupts

18   the audio.

19            MR. SWEET:  No problem.

20      Q     The move from a manual to an electronic      12:13:34

21   process saved the company money; correct?

22      A     No.  We digitized a manual process saving

23   us some transaction time.  I -- yeah.  It was about

24   customer experience and transaction time savings,

25   which contributes to a better customer experience.   12:14:03
```

Page 39

```
 1    BY MR. SWEET:

 2        Q    I don't want you to tell me anything that

 3    you discussed with your counsel, Mr. Yarrison, just

 4    to be crystal clear.  That's privileged

 5    communication.                              14:52:33

 6             You can continue your answer.

 7        A    We received lots of feedback.  I don't know

 8    specifically.  There may have been some feedback

 9    about visually impaired.

10        Q    You can't recall any specific situation    14:52:53

11    when you were made aware of accessibility problems

12    for blind folks in 2016 and 2017?

13        A    I -- I do know that in 2017, I believe

14    that's when we made the color contrast changes.  I

15    think that was in response to some feedback from     14:53:20

16    customers with macular degeneration.

17        Q    To return to my question, are there any

18    features that you can list for me today as you sit

19    here as the person we've been told is going to tell

20    us about Quest's ADA compliance in the kiosks, are   14:53:46

21    there any features whatsoever that would have made

22    them independently usable for completely blind

23    people in 2016 or 2017?

24        A    None that I'm aware of.

25        Q    Now, when a patient approaches the          14:54:01
```

Page 100

PA0023

```
 1       A    That's right.

 2       Q    Okay.  Can you tell me, in very general

 3   terms, what the three-finger swipe is, though?

 4       A    Yes.  In general terms, the three-finger

 5   swipe is a swipe with three fingers any direction on   15:19:05

 6   the kiosk will check somebody in as -- will check

 7   somebody in and the kiosk gives them a message

 8   verbally or audibly to let them know that they're

 9   checked in.

10       Q    And has the company instituted three-finger   15:19:32

11   swipe across the full PSC network?

12       A    Yes.

13       Q    And when did that occur, sir?

14       A    In approximately August of 2020.

15       Q    And it's Quest's position that three-finger   15:19:54

16   swipe is an auxiliary aid and service that can

17   assist independently blind people?

18            MR. RAIZMAN:  Object.  Beyond the scope as

19   to Quest's position.

20            You can certainly give your opinion.         15:20:07

21   BY MR. SWEET:

22       Q    And that was a poorly-asked question.  Let

23   me rephrase that.  That was not a very good

24   question.

25            Is it your understanding that Quest intends   15:20:16
```

Page 112

```
 1       Q     Was cost a factor?

 2       A     Cost is always a factor when you are -- you

 3   know, we had a budget to work with.  So, you know,

 4   we had to -- we had to make sure we were staying

 5   within budget.                              17:30:11

 6       Q     Did the team that was evaluating the

 7   tablets, did it specifically evaluate whether the

 8   tablet candidates had features that would make them

 9   independently accessible for blind people?

10       A     I don't know.                     17:30:29

11       Q     You can't recall?

12       A     I can't recall.

13       Q     Did you specifically at any point request

14   that that be a feature that was considered?

15       A     I don't know if I specifically requested  17:30:56

16   that.  You know, we were certainly concerned with

17   the physical deployment, the physical ADA compliance

18   and the installation.  You know, we were certainly

19   concern- -- you know, we worked on the training and

20   that our staff would look out for people that needed  17:31:27

21   assistance, and we did user testing and established

22   a feedback loop and iterative build process.

23       Q     But specifically as to blind individuals,

24   at any point did the group that was considering the

25   tablets make accessibility, independent            17:31:49
```

Page 170

PA0025

1   accessibility for blind folks an important factor in

2   the decision of which tablet to choose?

3       A    There were many factors.  You know, they

4   were all important in the decision.

5       Q    Right.                                    17:32:12

6            Was that one of them, though, blind

7   individuals having independent access?

8       A    I don't recall.

9       Q    I think you mentioned that accessibility

10  for wheelchair-bound patients was a factor that was   17:32:29

11  considered; correct?

12      A    Yes.

13      Q    And what considerations were given with

14  regard to wheelchair-using patients?

15      A    So we wanted to make sure that the physical   17:32:50

16  installation met all the requirements for ADA access

17  for those individuals.

18      Q    Do you know, Mr. Yarrison, whether any of

19  the tablet candidates that you considered could be

20  independently utilized by blind individuals?          17:33:17

21      A    What features are you referring to on

22  tablets?

23      Q    Did any of them --

24           The features that I discussed earlier with

25  you, but I can go back over them, did any of the      17:33:38

                                          Page 171

PA0026

```
 1      A    Yes.

 2      Q    Were those features utilized at the kiosks?

 3      A    I don't believe so.

 4      Q    Was there any analysis performed by your

 5   team at any point about whether using the built-in    17:35:13

 6   accessibility features of iOS through the iPad would

 7   impose an undue hardship on Quest?

 8           MR. RAIZMAN:  Object.  Foundation.

 9           You can -- you can answer if you

10   understand.                                           17:35:32

11           THE WITNESS:  Yeah.  I don't know.  That

12   was an IT -- that would have been an IT decision.

13   So I don't know the answer to that.

14   BY MR. SWEET:

15      Q    You don't recall or you just don't know?     17:35:42

16      A    I just don't know.

17      Q    You didn't perform any analysis of whether

18   the built-in accessibility features would impose an

19   undue hardship, though, did you?

20      A    So I'm not sure what the question is here.    17:35:55

21   Is the question -- can you -- can you be more clear

22   with the question?

23      Q    Why weren't the --

24           Was there any financial burden that would

25   have been endured by Quest by using the built-in      17:36:21
```

                                          Page 173

PA0027

1    accessibility features of the iPad?

2         MR. RAIZMAN:  I'm just going to object to

3    the extent any information you have calls for

4    privileged information.

5         Otherwise, you can communicate anything you    17:36:34

6    know about the subject outside of what you heard

7    from counsel.

8         THE WITNESS:  So no financial hardship that

9    I'm aware of.

10   BY MR. SWEET:                                        17:36:49

11       Q    It didn't cost any money to turn on the

12   accessibility features that were already built in;

13   right?

14       A    I don't know.

15       Q    You don't know if it costs money to turn on  17:36:55

16   an iPad?

17         MR. RAIZMAN:  Objection.  Form.

18         THE WITNESS:  I am not a software designer.

19   I don't know what the options were when they were

20   building the software part of this.                  17:37:14

21   BY MR. SWEET:

22       Q    You are aware that there are built-in

23   accessibility features with iOS as we talked about a

24   moment ago; right?

25       A    I am.                                        17:37:26

                                              Page 174

PA0028

```
 1   mention of audio in there.

 2   BY MR. SWEET:

 3       Q    So did the Habey --

 4            Just so I understand your testimony

 5   clearly, the Habey tablet and kiosk that was        17:45:23

 6   suggested to you as one of the candidates, it did

 7   have a headphone port, is that what you did, usable

 8   for folks using voice-over?

 9            MR. RAIZMAN:  Object to foundation.

10            THE WITNESS:  So, the Habey kiosk had an    17:45:43

11   option to have an audio port.

12   BY MR. SWEET:

13       Q    So you were presented with ADA-compliant

14   options for the tablet?

15            MR. RAIZMAN:  Objection to the extent it    17:46:01

16   calls for a legal conclusion or involves advice from

17   counsel.

18            You can answer if you know.

19            MR. SWEET:  I think he's here to testify to

20   ADA compliance, David.                              17:46:10

21            THE WITNESS:  What I -- what I would say

22   is --

23            Just say the question again so I make sure

24   I heard it right.

25            MR. SWEET:  Madam Court Reporter, can you   17:46:20
```

Page 181

PA0029

```
1    read the question back, please?
2            (Whereupon, the record was read
3            back by the reporter as follows:)
4            "Q    So you were presented with
5            ADA-compliant options for the          17:45:58
6            tablet?"
7            THE WITNESS:  I don't know if it was ADA
8    compliant, but we were presented with the option on
9    the Habey kiosk to have audio.
10   BY MR. SWEET:                                   17:46:56
11       Q    And was there ever any determination done
12   internally at Quest that selecting the Habey kiosk
13   would have imposed an undue burden on the company?
14           MR. RAIZMAN:  Objection to the extent it
15   calls for a legal conclusion.                   17:47:09
16           You can respond if you answer, if you know.
17   I'm sorry.
18           THE WITNESS:  I don't know.
19   BY MR. SWEET:
20       Q    You're not aware of any analysis that would  17:47:17
21   have been performed; right?
22       A    Analysis on what?
23       Q    A determination, was there ever any
24   determination made?  You're not aware of one; right?
25       A    Determination in regards to what?       17:47:37
```

Page 182

PA0030

```
1        Q      About whether the Habey kiosk would have

2     imposed an undue burden, sir.

3        A      Not that I'm aware of.

4        Q      Let's go to Exhibit Number 9.

5               Callum, 37977.                              17:48:05

6               MR. APPLEBY:  Yeah.  The email has just

7     been sent.

8               MR. SWEET:  Thank you.

9        Q      While you're waiting for that, I've got a

10    few other questions for you.                          17:48:21

11              MR. RAIZMAN:  I can't send it and listen

12    and participate, but...

13              MR. APPLEBY:  Would it make it easier for

14    me to send it straight to --

15              MR. SWEET:  No.  I don't think we want to   17:48:38

16    do that.

17              MR. APPLEBY:  Okay.

18    BY MR. SWEET:

19       Q      So, Mr. Yarrison, did you or your team --

20              At any point when the hardware and the      17:48:56

21    software and the kiosks were being determined

22    internal at Quest, did your team ever do anything to

23    ensure that the check-in kiosk had speech output

24    that would provide the information a blind user

25    needs as the user navigates through the kiosk        17:49:14
```

                                          Page 183

PA0031

```
 1    did the three-finger swipe.

 2        Q    They were checked in and immediately put

 3    into the queue?

 4        A    Yes.

 5        Q    As of August of 2020?                     18:29:44

 6        A    Yes.

 7        Q    How would a patient who is blind know that

 8    they were to use the three-finger swipe?

 9        A    So we have added a message to our Quest TV

10    and we are in the process of adding instructions    18:30:10

11    onto our Landmark field of our location listing.

12        Q    So when you say you've added a message to

13    Quest TV, is that an audio message or is that a

14    visual message?

15        A    It's an audio message.                    18:30:35

16        Q    And I assume there's some sort of a content

17    loop within the PSC location with regard to the

18    audio?

19        A    There is.

20        Q    And how long is the content loop, sir?    18:30:46

21             MR. RAIZMAN:  Objection.  Foundation.

22             But you can answer.

23             THE WITNESS:  It varies by location.

24    Approximately 30 minutes.

25    ///                                                 18:30:59
```

Veritext Legal Solutions
866 299-5127

PA0032

# EXHIBIT 5

PA0049

1          UNITED STATES DISTRICT COURT

2        FOR THE CENTRAL DISTRICT OF CALIFORNIA

3    JULIAN VARGAS, ANNE WEST, and        )

4    AMERICAN COUNCIL OF THE BLIND,       ) Case No.

5    individually on behalf of            ) 2:19-cv-8108

6    themselves and all others similarly  )

7    situated,                            )

8                   Plaintiffs,           )

9    vs.                                  )

10   QUEST DIAGNOSTICS, CLINICAL          )

11   LABORATORIES, INC., QUEST            )

12   DIAGNOSTICS HOLDINGS, INC., QUEST    )

13   DIAGNOSTICS INCORPORATED; and DOES   )

14   1-10, inclusive,                     )

15                   Defendants.          )

16

17

18          30 (B)(1) DEPOSITION OF TAYLOR CARR

19                   April 12, 2021

20

21

22   REPORTED REMOTELY BY:

23   AMBER S. WILLIAMS, C.S.R. No. 1080

24   Notary public

25

                                        Page 1

PA0049-A

```
 1              THE 30(B)(1) DEPOSITION OF TAYLOR CARR was
 2    taken on behalf of the plaintiffs via
 3    videoconference, commencing at 12:08 p.m. PST on
 4    April 12, 2021, before Amber S. Williams via
 5    videoconference, Certified Shorthand Reporter and
 6    Notary Public within and for the State of Idaho, in
 7    the above-entitled matter.
 8
 9                        APPEARANCES:
10    For Plaintiffs via videoconference:
11         NYE, STIRLING, HALE & MILLER, LLP
12         BY:  JONATHAN D. MILLER
13         33 West Mission Street, Suite 201
14         Santa Barbara, California  93101
15         jonathan@nshmlaw.com
16    For Defendants via videoconference:
17         OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC
18         BY:  DAVID RAIZMAN
19         400 South Hope Street, Suite 1200
20         Los Angeles, California  90071
21         david.raizman@ogletree.com
22         Also Present via videoconference:
23         Dustin Brown, videographer
24         Callum Appleby
25         Matthew Handley
```

Page 2

PA0049-B

1       Benjamin Sweet

2       Amer Pharaon

3       Margaret Parker

4       Amber Roller

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1                    I N D E X

 2

 3   TESTIMONY OF TAYLOR CARR                    Page

 4      Examination by Mr. Miller...................  8

 5

 6

 7                    EXHIBITS

 8   Exhibit 21.   e-Check in Buy vs. Build........  79

 9                 Meeting Notes, 08/27/15, Bates

10                 Nos. QUEST-VARGAS000040261 –

11                 QUEST-VARGAS000040264

12   Exhibit 22.   e-Check in Options Analysis...... 103

13                 Build vs. Buy Decision,

14                 08/27/15, Bates

15                 Nos. QUEST-VARGAS000040267 –

16                 QUEST-VARGAS000040269

17   Exhibit 23.   e-Check in Buy vs. Build........ 109

18                 Meeting Notes, 09/03/15, Bates

19                 Nos. QUEST-VARGAS000040280 –

20                 QUEST-VARGAS000040284

21   Exhibit 24.   Final CapEx..................... 116

22   Exhibit 25.   E-mail chain, Bates ............ 251

23                 Nos. QUEST-VARGAS000039966 –

24                 QUEST-VARGAS000039967

25
```

Page 4

PA0049-D

```
 1                    Exhibits (Continued)

 2    Exhibit 26.   E-mail chain, Bates ............. 275

 3                  Nos. QUEST-VARGAS000035475 –

 4                  QUEST-VARGAS000035476

 5    Exhibit 27.   New Patient Experience.......... 257

 6                  Deployment CapEx Request, Bates

 7                  Nos. QUEST-VARGAS000000022 –

 8                  QUEST-VARGAS000000041

 9    Exhibit 28.   E-mail chain, Bates ............. 279

10                  Nos. QUEST-VARGAS000004496 –

11                  QUEST-VARGAS000004499

12    Exhibit 30.   Building a Superior Customer..... 294

13                  Experience at Lower Cost

14                  document, Bates

15                  Nos. QUEST-VARGAS000040161 –

16                  QUEST-VARGAS000040166

17    Exhibit 31.   Patient UX Vision PowerPoint..... 299

18

19

20

21

22

23

24

25

                                            Page 5
```

```
 1              Q.   You mentioned that there were other ways     01:02PM

 2    of checking in prior to the implementation of the          01:02PM

 3    e-Check-in project other than that paper system.           01:02PM

 4    What other check-in methods are you aware of?              01:02PM

 5              A.   Verbal.                                      01:02PM

 6              Q.   And when you say that, that would be a       01:02PM

 7    patient going to a phlebotomist or a reception person      01:02PM

 8    and attempting to verbally check in?                       01:02PM

 9              A.   Two pieces there.  I would just say a        01:02PM

10    phlebotomist.  A phlebotomist who is in our wait room      01:02PM

11    or arrival space, and a customer grabs them with a         01:03PM

12    question.                                                  01:03PM

13              Q.   When you were working on e-Check-in          01:03PM

14    project, you were attempting to improve patient            01:03PM

15    experience.  That was one of the objectives; is that       01:03PM

16    right?                                                     01:03PM

17              A.   The ultimate objective.  The experience     01:03PM

18    was everything.                                            01:03PM

19              Q.   And you had to understand what the prior     01:03PM

20    experience was before the implementation of the           01:03PM

21    e-Check-in project to be able to assess that and          01:03PM

22    improve it, right?                                         01:03PM

23              A.   Very -- a key element of framing the        01:03PM

24    experience problems, correct -- to improve.               01:03PM

25              Q.   And so other than the verbal method of      01:03PM
```

Page 45

PA0049-F

| | | |
|---|---|---|
| 1 | Q.   (BY MR. MILLER):  In assessing -- I | 03:55PM |
| 2 | think you said, "Yes, we have."  Is it locations with | 03:55PM |
| 3 | one employee who's a phlebotomist? | 03:55PM |
| 4 | A.   Can you ask your question again and then | 03:55PM |
| 5 | I will respond, if that's okay? | 03:55PM |
| 6 | Q.   Yeah.  I'm asking isn't it true that | 03:55PM |
| 7 | there are Patient Service Centers that only have one | 03:55PM |
| 8 | employee and that employee is a phlebotomist? | 03:55PM |
| 9 | MR. RAIZMAN:  Object to form. | 03:55PM |
| 10 | THE WITNESS:  Yes, Quest has sites with one | 03:55PM |
| 11 | phlebotomist. | 03:55PM |
| 12 | Q.   (BY MR. MILLER):  It also has sites with | 03:55PM |
| 13 | two employees, and both of those employees are | 03:55PM |
| 14 | phlebotomists; isn't that true? | 03:55PM |
| 15 | MR. RAIZMAN:  Object to form. | 03:55PM |
| 16 | THE WITNESS:  Yes, Quest has sites with two | 03:55PM |
| 17 | phlebotomists. | 03:56PM |
| 18 | Q.   (BY MR. MILLER):  In assessing patient | 03:56PM |
| 19 | experience and trying to deliver the e-Check-in | 03:56PM |
| 20 | service, did you ever think to ascertain how long | 03:56PM |
| 21 | patients would have to -- or strike that -- how long | 03:56PM |
| 22 | blinds patients would have to wait to check in once | 03:56PM |
| 23 | e-Check-in service was implemented by Quest? | 03:56PM |
| 24 | A.   So not specific to the segment that | 03:56PM |
| 25 | you're referring.  So going to back to kind of the | 03:56PM |

Page 149

PA0049-G

```
 1    implemented into the e-Check-in service was the      03:57PM

 2    wait-by-text option; isn't that true?               03:57PM

 3          A.   I don't know what that's referring to.    03:57PM

 4          Q.   You've never heard of the wait-by-text    03:57PM

 5    option within the e-Check-in service?                03:58PM

 6          A.   Not -- no.                                03:58PM

 7          Q.   Are you familiar with any screen within   03:58PM

 8    the e-Check-in service that allows you to let the    03:58PM

 9    Quest -- strike that.  I'm going to ask it a better  03:58PM

10    way.                                                 03:58PM

11               Are you -- isn't it true that there is    03:58PM

12    an option within the e-Check-in service that lets you 03:58PM

13    be texted when -- when your time to be served is     03:58PM

14    ready?                                               03:58PM

15          A.   Yes.                                      03:58PM

16          Q.   And what's that called?  What do you      03:58PM

17    refer to that as?                                    03:58PM

18          A.   "Wait Where You Want."                    03:58PM

19          Q.   Okay.  The "Wait Where You Want" option,  03:58PM

20    did you assist in having that implemented within the 03:58PM

21    e-Check-in service?                                  03:58PM

22          A.   Yeah.  Yes.                               03:58PM

23          Q.   And -- and is that to improve patient     03:58PM

24    experience?                                          03:58PM

25          A.   It was part of experience related to      03:58PM
```

Page 151

PA0049-H

```
 1    COVID.                                                03:59PM

 2            Q.   Did it exist prior to COVID?            03:59PM

 3            A.   No.                                     03:59PM

 4            Q.   And how does the "Wait Where You Want"  03:59PM

 5    functionality work?                                  03:59PM

 6            A.   It's a component within e-Check-in.     03:59PM

 7            Q.   Right.  And so once you go and you use  03:59PM

 8    the e-Check-in service, you can -- one of the screens 03:59PM

 9    allows you to put in your information to wait where  03:59PM

10    you want, right?                                     03:59PM

11            A.   Yes.                                    03:59PM

12            Q.   And so that allows you to either wait in 03:59PM

13    the waiting room or some other location, correct?    03:59PM

14            A.   Yes.                                    03:59PM

15            Q.   For example, if you didn't want to be in 03:59PM

16    a crowded waiting room during COVID, you could wait  03:59PM

17    outdoors or in your car?                             03:59PM

18            A.   Yes.                                    03:59PM

19            Q.   And how would you be notified, then,    03:59PM

20    when your -- when your appointment time was called by 03:59PM

21    the phlebotomist?                                    03:59PM

22            A.   A text message.                         03:59PM

23            Q.   Would be sent to your phone?            03:59PM

24            A.   Yes.                                    04:00PM

25            Q.   And we'll talk a little more in detail  04:00PM
```

PA0049-I

```
 1      that opportunity with the visually impaired.        05:43PM

 2              Q.   And so, specifically, when as the      05:43PM

 3      three-finger swipe implemented at all the PSCs by   05:43PM

 4      Quest?                                              05:43PM

 5              A.   August 2020.                           05:43PM

 6              Q.   At that point, it was available at all 05:43PM

 7      the PSCs that had e-Check-in services?              05:43PM

 8              A.   Correct.                               05:43PM

 9              Q.   And so how would the three-finger swipe 05:43PM

10      work?  Walk me through it.                          05:43PM

11              A.   Yeah.  Customers would use their three 05:43PM

12      digits -- any three digits they so desire, and     05:43PM

13      indicate across the screen, and the screen would   05:43PM

14      recognize that and communicate that to the customers 05:43PM

15      that they've been checked in, as I've summarized, and 05:43PM

16      then also to our phlebotomy staff.                 05:43PM

17              Q.   And would it put them in a queue at that 05:43PM

18      point?                                              05:43PM

19              A.   Yes.                                   05:43PM

20              Q.   And into the computerized queue that was 05:44PM

21      available through e-Check-in?                       05:44PM

22              A.   Correct.                               05:44PM

23              Q.   Now, how would blind patients know to  05:44PM

24      use the three fingers to check in?                 05:44PM

25              A.   Yeah.  One of the elements going back  05:44PM
```

Page 190

```
 1            THE WITNESS:  I know of the 12.           05:49PM
 2        Q.  (BY MR. MILLER):  Do you know anything    05:49PM
 3   beyond that number?                                05:49PM
 4        A.   Related to the three-finger swipe        05:49PM
 5   communication via the Appointment Scheduler and the 05:49PM
 6   on -- or and the phone Appointment Scheduler, I only 05:49PM
 7   know of the 12.                                    05:49PM
 8        Q.   Fair enough.  Now, another method by     05:49PM
 9   which Quest conveys to blind patients that they can 05:49PM
10   presently use the three-finger swipe is vis-à-vis the 05:49PM
11   LCD display that is contain in certain Patient      05:49PM
12   Service Centers, correct?                           05:50PM
13        A.   Correct.                                 05:50PM
14        Q.   And is that communication delivered to   05:50PM
15   all Quest Patient Service Centers vis-à-vis the LCD 05:50PM
16   display?                                           05:50PM
17        A.   Correct.                                 05:50PM
18        Q.   And is that via a video loop?            05:50PM
19        A.   It's via an audio loop.  It happens to   05:50PM
20   be on a video screen.                              05:50PM
21        Q.   Correct.  There's both video content and 05:50PM
22   audio content that's in the loop; isn't that true? 05:50PM
23        A.   Yeah.  The audio is what's changing,     05:50PM
24   though.  What's in the video is static.            05:50PM
25        Q.   And on those screens it still shows the  05:50PM
```

Page 195

| | | |
|---|---|---|
| 1 | actual queue, right?  That's still displayed to | 05:50PM |
| 2 | patients? | 05:50PM |
| 3 | A.   Correct. | 05:50PM |
| 4 | Q.   All right.  And so with respect to the | 05:50PM |
| 5 | audio loop, how long is the audio loop at Patient | 05:50PM |
| 6 | Service Centers that contains this message? | 05:50PM |
| 7 | A.   I don't know. | 05:51PM |
| 8 | Q.   How often does the audio message to use | 05:51PM |
| 9 | a three-finger swipe play? | 05:51PM |
| 10 | A.   Every 7 to 10 minutes. | 05:51PM |
| 11 | Q.   Isn't it true, Mr. Carr, that the audio | 05:51PM |
| 12 | loop differs from Patient Service Center to Patient | 05:51PM |
| 13 | Service Center in terms of its length? | 05:51PM |
| 14 | A.   I don't know. | 05:51PM |
| 15 | Q.   Isn't it true that within the same | 05:51PM |
| 16 | Patient Service Center the audio loop can differ in | 05:51PM |
| 17 | terms of its length and content? | 05:51PM |
| 18 | A.   I don't know. | 05:51PM |
| 19 | Q.   Would it surprise you to learn, | 05:51PM |
| 20 | Mr. Carr, that there are locations -- Patient Service | 05:51PM |
| 21 | Center locations where the message to blind patients | 05:51PM |
| 22 | to check in is as long as 30 minutes before it's | 05:51PM |
| 23 | displayed in a duplicate form? | 05:51PM |
| 24 | A.   I don't know about that. | 05:51PM |
| 25 | Q.   Are you -- would it surprise you to | 05:51PM |

Page 196

PA0049-L

```
 1          A.   I don't know.                        08:41PM

 2          Q.   And once -- once that screen was     08:42PM

 3   touched, isn't it true that a slide similar to   08:42PM

 4   Slide 12 came up that provided all different language   08:42PM

 5   options?                                         08:42PM

 6          A.   I don't know if this was ever        08:42PM

 7   implemented.                                     08:42PM

 8          Q.   Is it true that the language options 08:42PM

 9   were, in fact, implemented in 2016 by Quest?     08:42PM

10          MR. RAIZMAN:  Object as to form.          08:42PM

11          Q.   (BY MR. MILLER):  And that you       08:42PM

12   participated in that process?                    08:42PM

13          A.   As part of the patient-user experience,   08:42PM

14   we got feedback about language offerings, and I know   08:42PM

15   language offers were added to check-in.          08:42PM

16          Q.   In the 2016-2017 timeframe, correct? 08:42PM

17          A.   I don't recall the exact timeframe.  08:42PM

18          Q.   And patients could utilize or select 08:42PM

19   their language as part of that offering; isn't that   08:42PM

20   right?  The ones that were offered?              08:42PM

21          A.   The intent via the experience was to 08:42PM

22   meet a broad audience of primary language they   08:43PM

23   preferred to use.                                08:43PM

24          Q.   And if we take a look at Screen 13,  08:43PM

25   there's a question as to how an individual would like   08:43PM
```

Page 304

```
 1              2A is what you are referencing?        14:21:53

 2      Q    Yes.                                       14:21:55

 3           And so after conducting this focus group   14:21:58

 4   and sending this e-mail, how did Quest use audio or 14:22:04

 5   change the way it used audio to convey information  14:22:07

 6   at the Patient Service Centers?                     14:22:09

 7      MR. RAIZMAN:  Object as to form of the question. 14:22:11

 8   Object that it's beyond the scope of the deposition. 14:22:14

 9   BY MR. MILLER:                                      14:22:14

10      Q    You can answer, Mr. Carr.                   14:22:18

11      A    I know that when the three-finger swipe and 14:22:22

12   the help button is used, there's an audio indicator 14:22:27

13   to the customer about what just occurred.           14:22:32

14      Q    And is that audio indicator available at    14:22:35

15   all Quest Diagnostic Patient Service Centers as of  14:22:39

16   today?                                              14:22:41

17      A    From what I know, I feel pretty confident   14:22:44

18   in saying yes, it's available on all locations      14:22:47

19   with --                                             14:22:50

20      MR. RAIZMAN:  Excuse me.  I move to strike as    14:22:53

21   beyond the scope.                                   14:22:54

22   BY MR. MILLER:                                      14:22:54

23      Q    And does that audio indicator -- what does  14:22:57

24   that audio indicator tell a patient who has used the 14:22:59

25   three-finger swipe?                                 14:23:01
```

Page 360

PA0049-N

```
 1        MR. RAIZMAN:  Object.  It's beyond the scope of      14:23:03

 2   the deposition as agreed.                                 14:23:05

 3   BY MR. MILLER:                                            14:23:05

 4        Q    You can answer, Mr. Carr.                       14:23:07

 5        A    I don't recall the exact wording.  But          14:23:09

 6   since it is available in Quest locations, we could        14:23:14

 7   go there and use it and hear it.                          14:23:18

 8        Q    What is your best memory of what the            14:23:20

 9   general audio message is?                                 14:23:23

10        A    I don't feel comfortable saying that            14:23:25

11   because it would be speculative, since we are on the      14:23:27

12   record.                                                   14:23:30

13        MR. RAIZMAN:  I'll object.  Move to strike as        14:23:33

14   beyond the scope.                                         14:23:34

15   BY MR. MILLER:                                            14:23:34

16        Q    As you sit here today, you can't tell me at     14:23:36

17   all what the audio message relays when somebody uses      14:23:40

18   the three-finger swipe, can you?                          14:23:43

19        MR. RAIZMAN:  I'm going to object.  It's beyond      14:23:45

20   the scope of the deposition for which the                 14:23:47

21   plaintiff -- sorry, for which the witness is              14:23:50

22   prepared.                                                 14:23:52

23   BY MR. MILLER:                                            14:23:52

24        Q    You can answer, Mr. Carr.                       14:23:54

25        A    Again, it uses audio.  I don't know the         14:23:56
```

Page 361

PA0049-O

```
 1                UNITED STATES DISTRICT COURT

 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5   JULIAN VARGAS, ANNE WEST, and )

 6   AMERICAN COUNCIL OF THE BLIND,)

 7   individually on behalf of     )

 8   themselves and all others     )

 9   similarly situated,           )

10                  Plaintiffs,    )

11        VS.                      )  NO.  2:19-CV-8108

12   QUEST DIAGNOSTICS CLINICAL    )

13   LABORATORIES, INC., et al.,   )

14                  Defendants.    )

15   _____ )

16

17

18   VIDEOCONFERENCE DEPOSITION OF:

19              TAYLOR CARR, VOLUME II

20              FRIDAY, JULY 30, 2021

21              1:33 P.M.

22

23   REPORTED BY:

24              Sari M. Knudsen

25              CSR No. 13109
```

Page 328

PA0050

```
 1              Videoconference deposition of TAYLOR CARR,

 2              taken on behalf of the PLAINTIFFS, at

 3              Portland, Oregon, on FRIDAY, JULY 30, 2021,

 4              before Sari M. Knudsen, CSR No. 13109.

 5

 6

 7    APPEARANCES OF COUNSEL:

 8

 9    FOR THE PLAINTIFF:

10              NYE, STIRLING, HALE & MILLER, LLP

11              BY:  JONATHAN MILLER, ESQ.

12              33 West Mission Street, Suite 201

13              Santa Barbara, California  93101

14              805-963-2345

15              (VIA VIDEOCONFERENCE)

16                   AND

17              NYE, STIRLING, HALE & MILLER, LLP

18              BY:  BENJAMIN SWEET, ESQ.

19              1145 Bower Hill Road, Suite 104

20              Pittsburgh, Pennsylvania  15243

21              412-857-5350

22              (VIA VIDEOCONFERENCE)

23

24

25
```

Page 329

PA0051

```
 1    APPEARANCES OF COUNSEL:  (CONTINUED)

 2

 3    FOR THE DEFENDANT:

 4            OGLETREE, DEAKINS, NASH,

 5            SMOAK & STEWART, PC

 6            BY:  DAVID RAIZMAN, ESQ.

 7            400 South Hope Street, Suite 1200

 8            Los Angeles, California  90071

 9            213-239-9800

10            (VIA VIDEOCONFERENCE)

11

12    ALSO PRESENT:

13            SCOTT STEWART, VIDEOGRAPHER

14            AMER PHARAON, IN-HOUSE COUNSEL FOR QUEST

15

16

17

18

19

20

21

22

23

24

25

                                          Page 330
```

```
 1                    I N D E X

 2    WITNESS          EXAMINATION          PAGE

 3    TAYLOR CARR      (BY MR. MILLER)   334, 386

 4                     (BY MR. RAIZMAN)      384

 5

 6

 7

 8

 9

10                    E X H I B I T S

11    EXHIBIT NO.    PAGE      DESCRIPTION

12    Exhibit 97     335       e-mail dated 1-7-20 from

13                             Taylor Carr to Lori Kolde

14    Exhibit 98     346       Invoice from Lori Kolde

15                             Research Management

16    Exhibit 99     348       e-mail dated 1-17-20 from

17                             Taylor Carr to various Quest

18                             employees

19    Exhibit 100    364       "Agenda" e-mail for Las

20                             Vegas trip

21    Exhibit 101    367       Wright State disabilities

22                             e-mail

23    Exhibit 102    372       Slide presentation

24    Exhibit 103    375       Slide presentation

25
```

Veritext Legal Solutions
866 299-5127

PA0053

| | | |
|---|---|---|
| 1 | them." | 15:23:44 |
| 2 | Do you know whether, as part of the | 15:23:46 |
| 3 | feedback that was considered, Quest ever considered | 15:23:51 |
| 4 | using the screen reader technology in the iPads that | 15:23:55 |
| 5 | were in the kiosks and concluded that it would | 15:23:58 |
| 6 | otherwise impose undue hardship on the company to do | 15:24:02 |
| 7 | so? | 15:24:02 |
| 8 | MR. RAIZMAN:  I'm going to object that the | 15:24:05 |
| 9 | second part of the question in particular calls for | 15:24:08 |
| 10 | privileged information.  I would let the witness | 15:24:15 |
| 11 | answer with respect to the question of whether that | 15:24:17 |
| 12 | issue was considered.  But not with respect to the | 15:24:23 |
| 13 | undue burden.  So instruct not to answer as to | 15:24:26 |
| 14 | consideration of the undue burden or any other legal | 15:24:30 |
| 15 | significance of the consideration. | 15:24:32 |
| 16 | THE WITNESS:  Mr. Miller, could you ask the | 15:24:38 |
| 17 | question again? | 15:24:39 |
| 18 | MR. MILLER:  Why don't you tell me what part you | 15:24:42 |
| 19 | will let him answer more clearly, Mr. Raizman.  That | 15:24:45 |
| 20 | way I don't have to parse it. | 15:24:46 |
| 21 | MR. RAIZMAN:  Sure. | 15:24:46 |
| 22 | You can answer whether -- well, I don't | 15:24:50 |
| 23 | want -- there was quite a bit of information there. | 15:24:53 |
| 24 | You will tell me if I don't get it right, | 15:24:55 |
| 25 | Mr. Miller. | 15:24:56 |

Page 387

PA0054

| | | |
|---|---|---|
| 1 | But the information about the iPad | 15:24:59 |
| 2 | functionality of voiceover, whether that was | 15:25:02 |
| 3 | considered. | 15:25:07 |
| 4 | THE WITNESS:  The part that was considered -- | 15:25:09 |
| 5 | I'm going to extend this from the focus group -- is | 15:25:12 |
| 6 | the use of their devices. | 15:25:14 |
| 7 | So when I read that feedback, they are | 15:25:20 |
| 8 | indicating the use of a screen reading technology on | 15:25:22 |
| 9 | their device with a giant screen where the second | 15:25:27 |
| 10 | element from a consideration is, you know, something | 15:25:31 |
| 11 | that they can walk away from as a gift, as it | 15:25:34 |
| 12 | indicates in that last sentence. | 15:25:38 |
| 13 | BY MR. MILLER: | 15:25:39 |
| 14 | Q    Did you ever consider whether the use of | 15:25:41 |
| 15 | voiceover on the existing kiosk could allow blind | 15:25:45 |
| 16 | individuals to independently access the kiosk? | 15:25:47 |
| 17 | A    There's a lot of considerations.  And | 15:25:53 |
| 18 | visually-impaired customers varies where they can | 15:25:58 |
| 19 | interact with our kiosk. | 15:26:00 |
| 20 | (Whereupon the reporter asked for | 15:26:00 |
| 21 | clarification) | 15:26:00 |
| 22 | THE WITNESS:  And they are supported with help | 15:26:02 |
| 23 | with our phlebotomists to help. | 15:26:16 |
| 24 | BY MR. MILLER: | 15:26:16 |
| 25 | Q    My question was just a little more specific | 15:26:18 |

Page 388

PA0055

# EXHIBIT 6

PA0056

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JULIAN VARGAS, ANNE WEST, and  ) NO. 2:19-cv-8108
     AMERICAN COUNCIL OF THE BLIND, )
 5   individually on behalf of      )
     themselves and all others      )
 6   similarly situated,            )
                                    )
 7                  Plaintiffs,     )
                                    )
 8        v.                        )
                                    )
 9   QUEST DIAGNOSTICS CLINICAL     )
     LABORATORIES, INC., QUEST      )
10   DIAGNOSTICS HOLDINGS, INC.,    )
     QUEST DIAGNOSTICS INCORPORATED;)
11   and DOES 1-10, inclusive,      )
                                    )
12                  Defendants.     )
     _____)
13
14
15
16
              REMOTE VIDEOTAPED DEPOSITION OF JODY REILLY
17
                     Overland Park, Kansas
18
                     Friday, April 16, 2021
19
20
21
     Reported by:
22   Heidi Hummel-Grant
     CSR No. 12556
23
24   Pages 1 - 275
25
```

                                                    Page 1

PA0057

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JULIAN VARGAS, ANNE WEST, and  ) NO. 2:19-cv-8108
     AMERICAN COUNCIL OF THE BLIND, )
 5   individually on behalf of      )
     themselves and all others      )
 6   similarly situated,            )
                                    )
 7                   Plaintiffs,    )
                                    )
 8        v.                        )
                                    )
 9   QUEST DIAGNOSTICS CLINICAL     )
     LABORATORIES, INC., QUEST      )
10   DIAGNOSTICS HOLDINGS, INC.,    )
     QUEST DIAGNOSTICS INCORPORATED;)
11   and DOES 1-10, inclusive,      )
                                    )
12                   Defendants.    )
     _____)
13
14
15
16
17          Remote videotaped deposition of JODY REILLY,
18   taken on behalf of Plaintiff, at Overland Park,
19   Kansas, beginning at 10:09 a.m. and ending at
20   7:21 p.m., on Friday, April 16, 2021, before
21   Heidi Hummel-Grant, Certified Shorthand Reporter
22   No. 12556.
23
24
25
```

                                              Page 2

```
 1   APPEARANCES:

 2

 3   For Plaintiffs:

 4        NYE, STIRLING, HALE & MILLER, LLP

 5        BY:   JONATHAN D. MILLER

 6              CALLUM APPLEBY

 7        33 West Mission Street

 8        Suite 201

 9        Santa Barbara, California 93101

10        805.963.2345

11        jonathan@nshmlaw.com

12

13   For Defendants:

14        OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

15        BY:   DAVID RAIZMAN

16        400 South Hope Street

17        Suite 1200

18        Los Angeles, California 90071

19        213.239.9800

20        david.raizman@ogletree.com

21

22   Also present:

23        DAVID HALVORSON, VIDEOGRAPHER

24        AMER PHARAON, QUEST DIAGNOSTICS

25
```

Page 3

```
 1                        INDEX
 2   Witness:
 3   JODY REILLY
 4
 5   Examination:                  Page
 6   MR. MILLER                    7, 268
 7   MR. RAIZMAN                   262
 8
 9                      EXHIBITS
             Description                     Page
10
     Exhibit 1    Deposition Notice          243
11                (Previously Marked)
12   Exhibit 6    Spreadsheet                223
                  (Previously Marked)
13
     Exhibit 42  Managing Every Patient's Needs   126
14
     Exhibit 43  Presentation Information    141
15
     Exhibit 44  Patient Services New Hire Training   150
16                Day 2
17   Exhibit 45  Patient Services New Hire Training   161
                  Leader Guide, Day 2
18
     Exhibit 46  Check-In 2.0 Pilot, Patient Services 163
19                Overview
20   Exhibit 47  Patient Services – Managing Every   166
                  Patient's Needs, Due Every 12 Months
21
     Exhibit 48  Training Inventory List     193
22
     Exhibit 49  10/5/2010 Emails            218
23                Subject: FW: Required ADA Retraining
                  Now Here
24
     Exhibit 50  Schedule of Services and     221
25                Deliverables


                                      Page 4
```

PA0060

```
 1    EXHIBITS (Continued):                            Page
 2    Exhibit 51  American Council of the Blind Letter 236
 3    Exhibit 52  Patient Care Gold Standards          269
 4
 5                    ^INSTRUCTED NOT TO ANSWER
                         Page   Line
 6
                           82      4
 7                        149      9
                         160      3
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                Page  5
```

| 1 | MR. MILLER: | 10:55 |

1            MR. MILLER:                               10:55

2         Q   You -- you mentioned that you had

3 compliance training including training on the ADA.

4         What specific training have had in that

5 regard since you've been a Quest employee?     10:55

6         A   There's always compliance training

7 that's done every year around, you know, how to

8 handle things with the law, Stark Law, other laws.

9 So we have to that every year.  There's training

10 around PHI and how to handle that.  There's training   10:55

11 on how to treat people with disabilities.

12 There's -- there's lots of training.

13         Q   In terms of the annual compliance

14 training that you do every year, does it

15 specifically cover the ADA?                 10:55

16         A   You know --

17         MR. RAIZMAN:  Object as to form.

18         THE WITNESS:  -- I don't -- I don't recall.

19  I'd have to look at that.

20         MR. MILLER:                        10:56

21         Q   In your current role are you responsible

22 in any capacity for handling the compliance training

23 that's done by employees each year?

24         A   No.  That's -- that's rolled out by our

25 compliance team, I believe.                 10:56

Page 39

PA0062

```
 1    databases that would allow you to confirm whether      11:06

 2    employees in patient service centers have completed

 3    nondiscrimination training on an annual basis at

 4    Quest?

 5         A   I would say that I -- I can probably ask      11:06

 6    for that data to be pulled, but I personally don't

 7    have access to go in and check.  I only have access

 8    to my own people.

 9         Q   To date have you made any requests that

10    that data be pulled or provided to you?                11:07

11         A   I have not in my current role.

12         Q   So as you sit here today can you confirm

13    that all employees at Quest that work at patient

14    services centers have, in fact, completed annual

15    nondiscrimination training that covers the ADA?        11:07

16         A   Can you repeat that one more time?

17         Q   Yeah.  As you sit here today can you

18    tell me affirmatively one way or other whether all

19    employees of Quest who work at patient service

20    centers have completed annual nondiscrimination        11:07

21    training that covers the Americans with Disabilities

22    Act?

23         A   I cannot tell you today that every

24    single person has completed it, no.

25             Our policy is to roll out the -- roll out a   11:07
```

Page 48

PA0063

```
1    training and require that they do complete it.          11:08

2          Q   And this policy -- this policy that you

3    reference, is what a written policy?

4          MR. RAIZMAN:  I'm going to object --

5          THE WITNESS:  You know --                          11:08

6          MR. RAIZMAN:  -- that it's beyond the scope.

7          But go ahead and answer.

8          THE WITNESS:  Yeah, I -- I believe that it

9    is within our compliance policies to do so.  But

10   I'm not over those policies so I would have to           11:08

11   defer.

12         MR. MILLER:

13         Q   To compliance?

14         A   Yes.

15         MR. RAIZMAN:  Mr. Miller, at a convenient          11:09

16   time that's good for you, I'd appreciate a break in

17   the next ten minutes or so.

18         MR. MILLER:  No problem, Mr. Raizman.  I'll

19   accommodate you now.  Thank you.

20         MR. RAIZMAN:  Thank you.                           11:09

21         THE VIDEOGRAPHER:  Okay.  We're going off

22   the record.  The time is 11:09 a.m.  And this is

23   the end of Media Unit Number 1.

24         (A recess is taken.)

25         THE VIDEOGRAPHER:  Okay.  We're back on the        11:25
```

Page 49

PA0064

```
 1    and medical review that.                              11:38

 2          Q    And how often -- strike that.

 3          Are you able to access any data that would

 4    tell you one way or the other whether patient

 5    service representatives have completed the Managing   11:38

 6    Every Patient Needs training on an annual basis?

 7          A    Yes, I am able to ask for reports that

 8    would be able to tell me that information.

 9          It is our policy to make sure that it is

10    assigned to all representatives within patient         11:39

11    services, and our policy's that they would take it.

12          Q    Have you -- have you made a request for

13    such data to date to confirm one way or the other

14    whether all patient services representatives at

15    Quest have taken this annual training?                 11:39

16          MR. RAIZMAN:  I'm going to object that it's

17     beyond the scope.

18          You can answer.

19          THE WITNESS:  I haven't personally made a --

20     a recommend -- a request for that.                    11:39

21          But understand that the -- the supervisors

22    and managers have the responsibility to ensure that

23    their teams are getting -- it is getting completed.

24          MR. MILLER:  Move to strike everything after

25     I haven't made a request for that.                    11:39
```

Page 59

PA0065

```
 1              A    Again, I'd have to look.  I -- there's a    11:51

 2     lot of courses, and I would have to re -- review

 3     them to understand which ones specifically had ADA

 4     referenced.  But again, many of them discuss how to

 5     help people with special needs and disabilities.      11:51

 6              MR. RAIZMAN:  Mr. Miller, I'm going to

 7      offer -- excuse me, I'm sorry -- offer help to you.

 8      She has a list of trainings that we'd be glad to

 9      supply with you, and I believe she has it with her.

10      So if you would like that, I'd share it with you.     11:51

11              MR. MILLER:  Has -- ahs it been produced

12      previously, Counsel?

13              MR. RAIZMAN:  No.

14              MR. MILLER:  Okay.

15              Can you -- can you send it over to me and      11:51

16     I'll look at it on a break and we'll try to come

17     back to those areas?

18              MR. RAIZMAN:  Sure.

19              MR. MILLER:  Thank you.  Okay.

20              Q    And just -- and just so I understand,     11:52

21     Ms. Reilly, is this list that you yourself compiled?

22              A    No.  It was provided by counsel.

23              Q    Does Quest maintain a written policy on

24     the Americans with Disabilities Act that is provided

25     to their employees?                                    11:52
```

Page 68

```
 1              MR. RAIZMAN:  Object as to form.          11:52

 2              THE WITNESS:  I -- I'm -- I'm not aware of a

 3        specific policy, written policy.  I'm -- I -- I'm

 4        sure there is one, but I -- I don't recall where

 5        that might be.                                  11:53

 6              MR. MILLER:

 7          Q   As you sit here today can you tell me

 8     definitively that you've ever seen a written policy

 9     from Quest that is regarding the Americans with

10     Disabilities Act?                                  11:53

11          A   There's many policies that talks about

12     how we will conform to -- you know, our -- our

13     intent is to conform to all written laws, including

14     ADA.  But specifically I can't -- I can't tell you.

15          Q   In your current role do you provide any   11:53

16     of the employees at the patient service centers with

17     a written policy that specifically addresses the

18     Americans with Disabilities Act?

19          A   There is a notice in every patient

20     service centers that discusses the ADA, and it's    11:54

21     posted in every patient service center, and it

22     outlines that for all to see.

23          Q   Aside from the notice -- aside from the

24     notice, is there any other written policy that is

25     provided to employees at patient service centers    11:54
```

                                              Page 69

PA0067

```
1           A    It has been assigned.                    12:05

2           Q    Has it been completed?

3           MR. RAIZMAN:  Object.  It's beyond the

4      scope.

5           You can answer if you know.                   12:05

6           THE WITNESS:  I think we give them a certain

7      specific time frame to complete it.  I don't know

8      if that is done yet.  Usually it's about -- you

9      know, any -- depending on the -- the course it's,

10     you know, the certain time frame that they have to   12:06

11     complete it.  So I -- I don't know if that time

12     frame is up yet.

13          MR. MILLER:

14          Q    So you can't say one way or the other as

15     you sit here today whether all employees at patient  12:06

16     service centers have completed the updated Managing

17     Every Patient Needs training that was rolled out

18     March, can you?

19          MR. RAIZMAN:  Object.  It's beyond the

20     scope.                                               12:06

21          THE WITNESS:  I can't say definitively that

22     every -- every person has taken it at this time

23     because it was recently rolled out and the -- the

24     due date may not -- may not be completed yet for

25     them.  So --                                         12:06
```

Page 78

PA0068

```
 1    Patient Needs training; is that correct?          01:48
 2         A   Yes, I believe so.
 3         Q   So as the individual who is in charge of
 4    making sure that the patient service representatives
 5    receive proper training do you know what section of   01:48
 6    the Americans with Disabilities Act patient service
 7    representatives -- strike that.
 8         Do you know what section of the Americans
 9    with Disabilities Act Quest is required to comply
10    with in offering services to the public?             01:49
11         MR. RAIZMAN:  Object.  Beyond the scope.
12     Object to the extent any information you have you
13      learned from counsel and instruct you not to answer
14      as to such information.
15         MR. MILLER:                                      01:49
16         Q   Outside of anything you've learned from
17    counsel do you know what sections of the Americans
18    with Disabilities Act apply to Quest?
19         MR. RAIZMAN:  Object.  Beyond the scope.
20         THE WITNESS:  No.                                01:49
21         MR. MILLER:
22         Q   Do you know whether Quest training
23    encompass Title 3, Americans with Disabilities Act
24    standards?
25         MR. RAIZMAN:  Object.  Form.                     01:49
```

Page 113

PA0069

```
 1          A    Primary consideration for aids or        02:03
 2    services.  I think primary is the word that's
 3    catching me up a bit, I think.
 4          Q    Okay.  All right.
 5          So does Quest provide any training to its     02:04
 6    patient service representatives that they have to
 7    first consider the aid or auxillary service that's
 8    being requested by the individual with the
 9    disability before they can offer them a
10    different -- or strike that.                         02:04
11          Does -- does Quest provide any training to
12    its patient service representative they have to
13    first consider the aid or auxillary service being
14    requested by an individual with a disability and
15    whether they can provide it before they offer       02:04
16    alternatives?
17          MR. RAIZMAN:  Object as to form.
18          THE WITNESS:  I -- I would say -- I don't
19     believe there is that -- I don't know.  I don't
20     know.  I'll say that.  I'm unaware of that.        02:04
21          MR. MILLER:
22          Q    So for example -- for example, if a
23    blind patient comes into Quest and says, "I want to
24    review all these documents on a screen reader as
25    opposed to having a patient service representative  02:05
```

Page 124

PA0070

| | | |
|---|---|---|
| 1 | read them to me," are patient service | 02:05 |
| 2 | representatives trained to know that they have to | |
| 3 | first give consideration to trying to put those | |
| 4 | documents in a format that can be used by the screen | |
| 5 | reader before they default to just reading them to | 02:05 |
| 6 | the blind patient? | |
| 7 | A   I would say in your example I -- I do | |
| 8 | not believe they are trained to do that. | |
| 9 | Q   Does Quest train its patient service | |
| 10 | representatives to document in writing the reasons | 02:05 |
| 11 | it cannot give primary consideration to a disabled | |
| 12 | individual's choice of aid or services if, in fact, | |
| 13 | it can't accommodate that request? | |
| 14 | A   Not that I'm aware of. | |
| 15 | Q   Have you ever been trained that if Quest | 02:06 |
| 16 | cannot accommodate a disabled individual's choice of | |
| 17 | aid or service, that Quest has an obligation to | |
| 18 | document in writing the reasons why it cannot do so? | |
| 19 | A   No, I don't believe so. | |
| 20 | Q   I'd like to go through some exhibits | 02:06 |
| 21 | with you.  If we could turn our attention here to | |
| 22 | your exhibit share. | |
| 23 | A   Okay. | |
| 24 | MR. MILLER:  I've just uploaded to the | |
| 25 | exhibit share what would be marked next in order | 02:07 |

Page 125

PA0071

```
 1              MR. MILLER:                                03:32

 2         Q    And does that section then continue on

 3    through page 21 where it's Bates stamped 40992?

 4         A    It does continue on.  I don't know if

 5    anything else --                                   03:33

 6         Q    Through page -- through page 21?

 7              MR. RAIZMAN:  Object as to form.

 8              THE WITNESS:  Well, 21 -- yeah.  21 covers

 9     specifically ADA but then nondiscriminatory range

10     of services continue on.                          03:33

11              MR. MILLER:

12         Q    You would agree with me, would you not,

13    that the ADA is specifically discussed in this

14    document in four of the 114 pages; is that correct?

15              MR. RAIZMAN:  Object as to form.         03:33

16              THE WITNESS:  I would say that the words ADA

17     specifically occurs on those pages, yes.

18              MR. MILLER:

19         Q    And out of the five days of training

20    does each day have a similar number of slides to get  03:34

21    through as part of the training?

22         A    I believe it is a similar type of deck.

23    There may be some places in the -- later in the

24    training that allows for more nesting-type

25    experience.  So I'd have to look at each deck to see  03:34
```

Page 155

PA0071-A

# EXHIBIT 7

PA0072

```
 1            UNITED STATES DISTRICT COURT
 2        FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JULIAN VARGAS, ANNE      )
     WEST, and AMERICAN       )
 5   COUNCIL OF THE BLIND,    ) Case No. 2:19-cv-8108
     individually on behalf   )
 6   of themselves and all    )
     others similarly         )
 7   situated,                )
                              )
 8             Plaintiffs,    )
                              )
 9      vs.                   )
                              )
10   QUEST DIAGNOSTICS        )
     CLINICAL LABORATORIES,   )
11   INC., QUEST DIAGNOSTICS  )
     HOLDINGS, INC.,          )
12   QUEST DIAGNOSTICS        )
     INCORPORATED; and        )
13   DOES 1-10, inclusive,    )
                              )
14             Defendants.    )
     ------------------------)
15
16
17        REMOTE DEPOSITION OF CHRISTOPHER GRANT
18              As a 30(b)(6) Witness
19            (Via Zoom Videoconference)
20             Thursday, April 20, 2021
21
22
23   REPORTED BY:  Michelle Milan Fulmer
                   CSR No. 6942, RPR, CRR, CRC
24
25
                                           Page 1
```

```
1              UNITED STATES DISTRICT COURT
2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
3
4    JULIAN VARGAS, ANNE     )
     WEST, and AMERICAN      )
5    COUNCIL OF THE BLIND,   ) Case No. 2:19-cv-8108
     individually on behalf  )
6    of themselves and all   )
     others similarly        )
7    situated,               )
                             )
8                Plaintiffs, )
                             )
9        vs.                 )
                             )
10   QUEST DIAGNOSTICS       )
     CLINICAL LABORATORIES,  )
11   INC., QUEST DIAGNOSTICS )
     HOLDINGS, INC.,         )
12   QUEST DIAGNOSTICS       )
     INCORPORATED; and       )
13   DOES 1-10, inclusive,   )
                             )
14               Defendants. )
     _____)
15
16
17       Remote deposition of CHRISTOPHER GRANT, taken
18   before Michelle Milan Fulmer, a Certified Shorthand
19   Reporter for the State of California, with principal
20   office in the County of Orange, commencing at
21   11:30 a.m., Thursday, April 20, 2021.
22
23
24
25

                                              Page 2
```

```
1    APPEARANCES OF COUNSEL:

2

3    FOR PLAINTIFFS:

4

          NYE, STIRLING, HALE & MILLER, LLP
5         BY:  Benjamin J. Sweet, Esq.
          1145 Bower Hill Road, Suite 104
6         Pittsburgh, Pennsylvania 15243
          TEL: (412) 857-5350
7         EMAIL:  ben@nshmlaw.com
          (Via Zoom Videoconference)

8

9         NYE, STIRLING, HALE & MILLER, LLP
          BY:  Callum Appleby, Esq.
10        33 West Mission Street, Suite 201
          Santa Barbara, California 93101
11        TEL: (805) 963-2345
          EMAIL:  callum@nshmlaw.com
12        (Via Zoom Videoconference)

13

          HANDLEY FARAH & ANDERSON, PLLC
14        BY:  Matthew K. Handley, Esq.
          777 6th Street NW, 11th Floor
15        Washington, DC 20001
          EMAIL:  mhandley@hfajustice.com
16        (Via Zoom Videoconference)

17

     FOR DEFENDANTS:

18

          OGLETREE DEAKINS NASH SMOAK & STEWART, PC
19        BY:  David Raizman, Esq.
          400 South Hope Street, Suite 1200
20        Los Angeles California 90071
          TEL:  (213) 457-5862
21        EMAIL:  david.raizman@ogletree.com
          (Via Zoom Videoconference)

22

23   THE VIDEOGRAPHER:

24        Dave Halvorson
          (Via Zoom Videoconference)

25
```

Page  3

PA0075

1    ALSO PRESENT:

2         Amer Pharaon

         (Via Zoom Videoconference)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 4

PA0076

```
 1                    I N D E X
 2   WITNESS                         EXAMINATION
 3   CHRISTOPHER GRANT
 4                                        PAGE
 5              BY MR. SWEET               8
 6              BY MR. RAIZMAN           279
 7
 8               E X H I B I T S
 9                                        Page
10   Exhibit        Description        Identified
11   Exhibit 53     Excel spreadsheet, Bates     98
                    range beginning with
12                  QUEST-VARGAS000036266
13   Exhibit 54     Email Bates stamped         113
                    QUEST-VARGAS000036322
14
     Exhibit 55     Email chain Bates stamped   126
15                  QUEST-VARGAS000036276
16   Exhibit 56     Email Bates stamped         153
                    QUEST-VARGAS000036501
17
     Exhibit 57     Email chain Bates stamped   192
18                  QUEST-VARGAS000038939 -
                    38940
19
     Exhibit 58     Email Bates stamped         270
20                  QUEST-VARGAS000037495 -
                    37496
21
22
23
24
25
                                         Page 5
```

```
 1              (Previously marked and attached)
 2
                          E X H I B I T S
 3
                                                    Page
 4     Exhibit          Description              Identified
 5     Exhibit 2        New Patient Experience       140
                        Deployment CapEx Request
 6                      April 2016
 7     Exhibit 7        Email chain Bates stamped    228
                        QUEST-VARGAS000007361 -
 8                      7363
 9     Exhibit 12       Email chain Bates stamped    247
                        QUEST-VARGAS000028740 -
10                      28741
11     Exhibit 13       Email chain Bates stamped    273
                        QUEST-VARGAS000028746 -
12                      28747
13     Exhibit 15       Email chain Bates stamped    208
                        QUEST-VARGAS000038805 -
14                      38806
15     Exhibit 17       Email chain Bates stamped    198
                        QUEST-VARGAS000037980 -
16                      37981
17     Exhibit 21       E-Check In:  Buy vs. Build   269
                        Meeting Notes, Bates stamped
18                      QUEST-VARGAS000040261 -
                        40264
19
       Exhibit 24       CapEx document               129
20
       Exhibit 25       Email chain Bates stamped    158
21                      QUEST-VARGAS000039966 -
                        39967
22
       Exhibit 33       eCheck-In Installation Guide 235
23
24
25
                                                  Page  6
```

PA0078

```
 1        A     I -- I don't.

 2        Q     What were some of the benefits that

 3   customers could enjoy from use of the self-service

 4   kiosk?

 5        A     Can you -- can you be more specific on that    10:44:26

 6   question?  It's pretty broad.

 7        Q     I assume the self-service kiosk had a

 8   number of features; right?

 9        A     Yeah.

10        Q     What were they?                                10:44:38

11        A     So ease of use.  It was a -- again, the

12   platform itself created a solution for us to

13   continuously improve from confirming appointments,

14   being able to notify when you were in the waiting

15   room, being able to inform the PSR who their next         10:45:03

16   patient would be and how to prepare for that.  It

17   eliminated the clipboard and all the challenges

18   associated with that.  And I think the voice of the

19   customer really asked us to put that in to really

20   say, you know, we -- we prefer to engage you through      10:45:29

21   this kind of mechanism on this platform than through

22   a clipboard.

23             So a lot of the solutioning was, you know,

24   as a result of voice of the customer, voice of our

25   employees.  Again, that was our focus is how do we        10:45:46
```

Page 71

PA0079

1    create solutions that can help that patient

2    experience and help the phlebotomists do their job

3    more effectively.

4        Q     Was there --

5              Did checking in at the self-service kiosk     10:46:01

6    allow you to enter the queue?

7        A     You -- if you engaged the iPad, yes, you

8    could be in the queue, but this was not the only

9    way.  Again, recall that I talked about how our PSRs

10   had been trained previous to that to scan the rooms     10:46:23

11   to be able to come alongside those folks who had

12   disabilities and to be able to accelerate their

13   appointment and accelerate their care at that time.

14       Q     But let's talk about that, that training.

15             When did this training take place to the      10:46:40

16   PSRs about dealing with folks with disabilities?

17       A     I believe that was an ongoing part of the

18   training with phlebotomists as they came on.

19       Q     And how did you gain that understanding?

20       A     That was (inaudible).  I don't know.  I       10:46:58

21   don't recall.

22       Q     So you have an understanding that there was

23   an ongoing training for PSRs that involved sweeping

24   the waiting area for folks with disabilities?

25       A     Yeah.  That situational awareness was         10:47:15

                                              Page 72

PA0080

1    it's called certification or not, that's your word,

2    not mine.

3         Q    Do you know if the training is updated

4    every year?

5         A    I think training -- I think it was our          10:49:58

6    practice that training was reviewed on a regular

7    basis, but I -- again, people in training could tell

8    you the specifics on that.  I wouldn't know.

9         Q    Who was it reviewed by?

10        A    It would be a lot of stakeholders within        10:50:21

11   Quest and then the regions as well would participate

12   in that.  But, again, people in training would be

13   able to answer these questions better than I.

14        Q    Do you know whether the express check-in

15   self-service allows a patient to wait outside of the   10:50:55

16   PSC and be alerted by text when it's time for their

17   sample to be taken?

18        A    I believe that was a feature that was

19   introduced in -- I think we -- it may have been, if

20   I can recall -- and, again, I'm trying to remember      10:51:15

21   here.  If you have documentation, it makes this a

22   little bit easier.  But if I can recall, I thought

23   that that feature was late 2019 and more of a

24   COVID-19 tool that we could use, that it would allow

25   people a little bit more sense of not being exposed     10:51:37

Page 75

PA0081

1    to an environment and try to, you know, again,

2    encourage social distancing.

3          I think that's -- I think that's correct.

4    I could be wrong.  Again, if you've got

5    communications on that, I'd be happy to talk to        10:51:55

6    those.

7      Q    You would agree that's a benefit of using

8    the self-service check-in?

9      A    It's one of the benefits.  Again, remember,

10   the eCheck-In is a platform that allows us to do        10:52:05

11   continuous improvement.  So that could be a

12   continuous improvement because of that platform that

13   may in the past have not been available to us.

14     Q    Do you recall that one of the reasons for

15   the adoption of eCheck-In self-service was to reduce    10:52:23

16   the company's staffing needs?

17     A    I didn't say that.

18     Q    Do you have a recollection of that?

19     A    No.

20     Q    Was one of the reasons to shorten wait         10:52:39

21   times for patients?

22     A    It was to make the experience better based

23   on the voice of the customer.  That was the result.

24     Q    You don't have a recollection that it was

25   about reducing patient wait times?                     10:52:53

                                                    Page 76

1      Q     What were they?

2      A     They could see where the kiosk was.  The

3   TVs are closed captioned.  So there were those.

4      Q     And were there any --

5            I'm sorry.  Are you finished?                02:54:47

6      A     Yes.

7      Q     And were there any auxiliary aids and

8   services as of November 1, 2019, that would allow a

9   person to be prompted without seeing anything?

10     A     I'm not sure when the -- this goes back to    02:55:02

11  the video loop and when that was implemented.  That

12  would be my response.  If that video loop was in

13  place, that would be one of the auxiliary of a host

14  of responses we had to address our patients with

15  disabilities.                                          02:55:23

16     Q     Well, sir, we've had testimony in this case

17  that the video loop was put into place in August of

18  2020.

19     A     Okay.

20     Q     Is that accurate?                             02:55:31

21     A     I don't know.

22            MR. RAIZMAN:  Object as to form.

23            THE WITNESS:  I don't know.

24  BY MR. SWEET:

25     Q     You don't know?                               02:55:41

                                              Page 201

PA0083

```
 1    that would be -- that we could possibly implement.

 2        Q    Sir, did anyone on your team, anyone on

 3    your team consult with anyone who specialized in

 4    accessibility with regard to the accessibility of

 5    the kiosk for blind individuals between 2016 --        05:07:55

 6        A    Not --

 7        Q    -- and 2019?

 8        A    Yeah.  Not that I can recall.

 9        Q    Okay.  Did you direct anyone to speak with

10    a specialist in accessibility during that time          05:08:04

11    frame?

12        A    Again, not that I can recall.

13            MR. SWEET:  Okay.  I have no further

14    questions at this time, David.

15            MR. RAIZMAN:  Thanks.  I just have one          05:08:14

16    brief area of questioning.

17

18                      EXAMINATION

19    BY MR. RAIZMAN:

20        Q    Mr. Grant, do you know whether the            05:08:22

21    three-finger swipe solution was implemented at the

22    patient service centers?

23        A    Yes.

24        Q    And do you know whether anyone within Quest

25    approved its implementation?                            05:08:40
```

                                                    Page 279

# EXHIBIT 8

PA0085

```
                                            Page 1

 1                UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JULIAN VARGAS, ANNE WEST and  ) Case No.
     AMERICAN COUNCIL OF THE BLIND ) 2:19-cv-08108 DMG(MRW)x
 5   individually on behalf of     )
     themselves and all others     )
 6   similarly situated,           )
                                   )
 7                   Plaintiffs,   )
                                   )
 8        v.                       )
                                   )
 9   QUEST DIAGNOSTICS CLINICAL    )
     LABORATORIES, INC., QUEST     )
10   DIAGNOSTICS HOLDINGS, INC.,   )
     QUEST DIAGNOSTICS,            )
11   INCORPORATED; and DOES 1-10,  )
     inclusive,                    )
12                                 )
                     Defendants.   )
13   _____)
14
15        REMOTE VIDEOTAPED DEPOSITION OF JULIAN VARGAS
16                  Van Nuys, California
17                 Thursday, April 22, 2021
18
19
20
21   Reported by:
     ANELA SHERADIN, CSR NO. 9128
22
23   JOB NO. 4523491
24
25   PAGES 1 - 255
```

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JULIAN VARGAS, ANNE WEST and  ) Case No.
     AMERICAN COUNCIL OF THE BLIND ) 2:19-cv-08108 DMG(MRW)x
 5   individually on behalf of     )
     themselves and all others     )
 6   similarly situated,           )
                                   )
 7                    Plaintiffs,  )
                                   )
 8        v.                       )
                                   )
 9   QUEST DIAGNOSTICS CLINICAL    )
     LABORATORIES, INC., QUEST     )
10   DIAGNOSTICS HOLDINGS, INC.,   )
     QUEST DIAGNOSTICS,            )
11   INCORPORATED; and DOES 1-10,  )
     inclusive,                    )
12                                 )
                     Defendants.   )
13   _____)
14
15           The videotaped deposition of JULIAN VARGAS
16   is being taken on behalf of Defendants via Veritext
17   Virtual Zoom, and all parties, the witness, court
18   reporter and videographer are appearing remotely.
19   This deposition is taking place on Thursday, April 22,
20   2021, beginning at 10:04 a.m. and ending at 5:50 p.m.,
21   before ANELA SHERADIN, Certified Shorthand Reporter No.
22   9128.
23
24
25
```

```
                                                    Page 3

 1    APPEARANCES:
 2
 3    For Plaintiff:
 4         NYE, STIRLING, HALE & MILLER, LLP
           BY:  JONATHAN D. MILLER, ESQ.
 5         33 West Mission Street, Suite 201
           Santa Barbara, California 93101
 6         805.963.2345
           jonathan@nshmlaw.com
 7
           NYE, STIRLING, HALE & MILLER, LLP
 8         BY:  BENJAMIN J. SWEET, ESQ.
           1145 Bower Hill Road, Suite 104
 9         Pittsburgh, Pennsylvania 15243
           412.857.5350
10         ben@nshmlaw.com
11         -and-
12         HANDLEY FARAH & ANDERSON PLLC
           BY:  MATTHEW K. HANDLEY, ESQ.
13         777 6th Street, NW, 11th Floor
           Washington, DC 20001
14         202.559.2411
           mhandley@hfajustice.com
15
16    For Defendants:
17         OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
           BY:  AMBER L. ROLLER, ESQ.
18         400 South Hope Street, Suite 1200
           Los Angeles, California 90071
19         213.239.9800
           amber.roller@ogletree.com
20
21    Also Present:
22         AMER PHARAON, CORPORATE COUNSEL
23
      The Videographer:
24
           ROBERT FENTON
25
```

Page 4

1                         INDEX

2    WITNESS                              EXAMINATION

3    JULIAN VARGAS

4

5                   BY MS. ROLLER            7, 236

6                   BY MR. MILLER          211, 251

7

8

9

10

11                    EXHIBITS

12                    (None)

13

14

15

16

17

18

19          INSTRUCTION NOT TO ANSWER

20                PAGE        LINE

21                 48          3

22                202          2

23                246         24

24                251          7

25

Page 16

1    How did you originally find them or learn of them?

2        A    They were referred to me by a good friend.

3        Q    Okay.  And when did you first contact them?

4        A    In general or regarding this case?

5        Q    In general.  I'm sorry, I spoke over you.

6        A    That's okay.

7        Q    In general.

8        A    Probably some time around maybe 2014, 2015.

9        Q    Okay.  And then I know there's three gentlemen

10   who are representing you and they seem to be all from

11   different places, so is there a specific person that

12   you -- a specific attorney that you were referred to and

13   then they all became part of your team or was it all

14   three of them collectively that you were referred to?

15       A    No, the specific person originally was

16   Benjamin Sweet.

17       Q    Okay.  So I know you gave us your name at the

18   beginning of the deposition.  Have you gone by any other

19   name than Julian Vargas or Julian Antonio Vargas?

20       A    No, I have not.

21       Q    What's your date of birth, Mr. Vargas?

22       A    February 1st, 1969.

23       Q    And you gave us your address which was 13741

24   Oxnard Street, Apartment 9 in Van Nuys; correct?

25       A    Correct.

```
                                            Page 50

 1    for your annual physical and you believe one time

 2    related to the treatment of your eyes; is that accurate?

 3         A    Well, yeah, and for other reasons as well.

 4         Q    Okay.  How many times have you had your blood

 5    drawn for other reasons?

 6         A    Probably, we'll say, two or three.

 7         Q    Okay.  So for, let's say, the past -- since

 8    about 2002, would you say that it's fair to estimate

 9    that you've had your blood drawn approximately 20 --

10    let's see -- 22 to 23 times?

11         A    Yeah, to my best memory, I would say that's

12    correct.

13         Q    Okay.  I know you had mentioned you use a cane.

14    Do you require any other assistive technology besides a

15    cane -- and I think you discussed the screen reader on

16    your phone -- to assist you in your activities of daily

17    living?

18              MR. MILLER:  It's vague.

19              THE WITNESS:  Yes.

20    BY MS. ROLLER:

21         Q    Okay.  What are those?

22         A    Oh, just about everything.  Traveling, so, for

23    example, I use orientational GPS apps to tell me what

24    streets I'm on, what intersections I'm approaching, what

25    address I'm in front of.
```

Page 51

1          I -- I use it for reading barcodes on things to
2    see what -- what's in that can of soup, which kind it
3    is, that sort of thing.
4          I use OCR -- which stands for optical character
5    recognition -- apps to read mail that I get.  So, you
6    know, all kinds of things like that.  As much help as I
7    can get providing information that is not available to
8    me visually, I try to find technology that gives me
9    access to that same information.
10        Q    Is this all done on your phone?
11        A    Yes.
12        Q    Okay.  Is there any other sort of electronic
13   device that you use to assist you?
14        A    I have a desktop computer as well, a Windows
15   computer using the JAWS screen reader.
16        Q    And I assume you use email; is that correct?
17        A    Correct.
18        Q    So how do you review your emails?
19        A    I primarily do it these days on the iPhone
20   because it's very efficient.  The built-in mail app
21   works very nicely; and with the use of the built-in
22   VoiceOver screen reader in the iPhone, I can pretty much
23   interact with that email app, I can browse through the
24   emails.
25        I get a lot of emails every day.  I mentioned

Page 113

1        A    I believe so.

2        Q    Is this the first time that you had encountered

3    an eCheck-in kiosk at Quest?

4        A    Yes.

5        Q    Why did you go to Quest on that day?

6        A    Because it was the closest lab to where I live,

7    and when I did a search for labs, that was the first one

8    that came up in the listing so I chose to go to that

9    one.

10       Q    Okay.  So let me ask you this and maybe this

11   will help us get something narrowed down.  So you lived

12   at the Van Nuys address since July of 2018?

13       A    Correct.

14       Q    I'm sorry, from -- since July of 2018; correct?

15       A    Yes.

16       Q    And that's your current address?

17       A    Yes.

18       Q    And then you lived in the Reseda location from

19   2013 until, for all intents and purposes, 2017 when you

20   lived with your friend; right?

21       A    In 2003 to 2017.

22       Q    Sorry, from 2003 to 2017.

23            Okay.  So do you know if you would have been

24   living at the Van Nuys location or at the Chatsworth

25   location or the Reseda location when you went to the

Page 116

1      Q   Okay.  Do you recall the cross streets of that

2   location?

3      A   I don't know if it was Houston Street or

4   some- -- I'm not 100 percent sure.

5      Q   Is there any businesses or landmarks that you

6   can tell me that were around that patient service

7   center?

8      A   No.

9      Q   How did you get to the Van Nuys location on

10   June 25th, 2019?

11      A   I took paratransit.

12      Q   And did they drop you off right in front of the

13   building?

14      A   Yes.

15      Q   Is this location, is this patient service

16   center inside a building or is it a stand-alone

17   location?

18      A   I believe it's inside a building.

19      Q   Okay.  And do you recall what floor it's on?

20      A   I do not.

21      Q   Did you call the patient service center in

22   advance of your visit?

23      A   I attempted to do so and had a bit of a

24   difficult time because it doesn't seem that it's --

25   they're set up now where you can call and talk to

Page 121

1   hear anybody.  I said hello a couple of times and nobody

2   was there, so I basically just stood there.

3         Q   Okay.  Did somebody eventually come to the

4   window?

5         A   Well, somebody eventually came out and that was

6   only to admit, I guess, another patient that was in the

7   waiting room who had already checked in earlier --

8         Q   How long --

9         A   -- and that's it.

10        Q   Go ahead.

11        A   So that was the only way I was able to get

12  anybody's attention there, was when that person came out

13  to call in that other patient.

14        Q   How long between the time you stepped in the

15  Quest patient center and the time that that person came

16  out to get the other patient?

17        A   I would say I waited there a good 10 to 15

18  minutes at that window.  It was a long wait.

19        Q   Okay.  And when the -- do you know if the

20  person that came out was a phlebotomist?

21        A   I believe so, but I didn't know it at the time

22  but only because that's the same person that ultimately

23  took my blood.

24        Q   Okay.  When that phlebotomist came out, did

25  you -- did you get the attention of the phlebotomist?

Page 123

1      A   I think normal.  There's nothing in particular

2   outstanding about her voice.  It was normal.

3      Q   Okay.  And so when she came out to get another

4   patient, did you get her attention or did she make

5   con- -- make contact with you?

6      A   She noticed me and I told her, you know, that I

7   was here to get some blood work.

8      Q   Okay.  How do you know that she noticed you?

9      A   Because she addressed me.

10     Q   And what did she say?

11     A   She said something to the effect of hi, sir,

12  can I help you.

13     Q   And what was your response?

14     A   I told her yes, I was here to get some blood

15  work that was prescribed by my doctor.

16     Q   And then what was her response?

17     A   She directed me to the kiosk and said this is

18  where you check in.

19     Q   Okay.  And how did she direct you to the kiosk?

20     A   I'm trying to remember.  I think I was -- I was

21  kind of saying, you know, where is it or, you know, she

22  told me to, you know, turn in a certain direction, but I

23  think ultimately she -- she did just kind of guide me to

24  it.

25     Q   Okay.  Did she guide you, like physically guide

Page 124

1    through your elbow?

2        A    Yeah, I mean, I don't recall exactly the

3    contact that was made when she guided me.

4        Q    Okay.   And so she had called a patient and was

5    having that patient wait while she assisted you; is that

6    correct?

7        A    Yes, she was telling that patient to come in

8    and then she got me over to the kiosk.

9        Q    And then what happened once you reached the

10   kiosk?

11       A    I had looked around for the signs that I look

12   for that a kiosk is accessible such as tactile markings

13   or a headphone jack or a tactile keypad.   I didn't find

14   any such things.

15       Q    And was the phlebotomist waiting there with you

16   while you were searching for the various -- various

17   features of the kiosk?

18       A    Yeah, I think so, because it didn't take long

19   for me to feel for those things.   And then I told her

20   that this machine is not accessible to blind people so

21   that I was going to need her help in signing in because

22   of the lack of accessibility of the kiosk.

23       Q    Okay.   And first of all, when you got to the

24   kiosk, were you able to see the shape of the kiosk and

25   see that it was there?

Page 125

1       A    I think my hand was put on it so I was able to

2    kind of feel it.

3       Q    Okay.  And in response to you saying that you

4    needed assistance checking in, what did the phlebotomist

5    do or say?

6       A    She told me okay, just wait a second while she

7    took that patient in.

8       Q    Okay.  And did she come back for you?

9       A    Yes.

10       Q    And how long between the time she said wait a

11    second and the time she returned?

12       A    Probably about five minutes or so.

13       Q    Was it -- was it your impression that she was

14    completing a service on the patient or that she was just

15    putting the patient in the room so she could come help

16    you?

17            MR. MILLER:  It calls for speculation.

18            Go ahead.

19            THE WITNESS:  Yeah, I'm not sure.  I mean after

20    all was said and done, I believe that was the case

21    because I don't believe that anybody else was working

22    there other than her.

23    BY MS. ROLLER:

24       Q    Okay.  Did you hear -- when she came back out,

25    did you hear the other patient leaving or --

Page 126

1      A    I don't recall.

2      Q    Okay.  And just to be clear, I made an

3  assumption, but I'm assuming that the same phlebotomist

4  who directed you to the kiosk is the one who came back

5  for you; is that true?

6      A    Yes.

7      Q    And then did she assist you in checking in?

8      A    Yes.

9      Q    So tell me how she -- the interaction between

10  you and the phlebotomist when she returned to assist

11  you.

12          MR. MILLER:  Objection.  It calls for a

13  narrative.

14          Go ahead.

15          THE WITNESS:  Well, when she came back, she

16  asked me again what I was there for, so I told her; and

17  I gave her the paperwork from the doctor as well as the

18  insurance cards.

19          And unlike other visits to other labs, she

20  asked for all the other information.  The verification

21  of personal information stuff, I had to provide that

22  there at the window, possibly within earshot of other

23  people.

24  BY MS. ROLLER:

25      Q    Were you at the window or were you at the

Page 132

1       Q    Okay.  While you're there -- while you were

2    there on that visit, either while you were waiting or as

3    you were entering or leaving, did you see anybody else

4    or did you -- did you hear anybody else ask for

5    assistance with check-in?

6            MR. MILLER:  Objection; compound.

7            Go ahead.

8            THE WITNESS:  I did not hear anybody ask for

9    assistance.

10   BY MS. ROLLER:

11      Q    Okay.  While you were there on that visit, did

12   you hear a TV playing in the background?

13      A    You know, honestly, I don't recall, but I know

14   that there usually is a TV; so there probably was one

15   but I -- I wasn't really paying attention.

16      Q    Okay.  At any point during your visit -- oh.

17   So after you got your blood drawn, you left; is that

18   correct?

19      A    Yeah, but I did make a point to mention to her

20   that their kiosk process was inaccessible, and I

21   suggested to her that she talk to whoever she needed to

22   talk to to make sure that blind people are able to use

23   this kiosk, especially since -- especially at that

24   location it's clear that there's not a lot of people

25   working there, and that the only way, apparently, to

1    alert them of your presence is by interacting with that;

2    so I told them that it is important that they make these

3    machines accessible so that blind people can use them

4    just as equally as sighted people.

5         Q   When did you have that conversation with the

6    phlebotomist?

7         A   Probably, you know, when all was said and done

8    when we were -- when I was getting ready to leave.

9         Q   And did you already tell me the extent of what

10   you said to the phlebotomist about the kiosk?

11        MR. MILLER:  Objection.  It calls for a

12   narrative.

13        But go ahead.

14        THE WITNESS:  I'm not sure what you mean by

15   that.

16   BY MS. ROLLER:

17        Q   Sure.  Is there anything else you remember

18   telling the phlebotomist about your feelings on the

19   kiosk?

20        A   Nothing more or less than what I just told you.

21        Q   Okay.  And did she respond?

22        A   She said -- you know, she agreed with me that

23   it needed to be that way, and she said that yes, she

24   would tell her superiors.

25        Q   Okay.  What specifically did she say, if you

Page 135

1          A    Yes, I did.

2          Q    Okay.  And did you leave a phone number?

3          A    I don't think I restated a number.  I just

4     assumed they use my contact information.

5          Q    At any point after your visit, did you reach

6     out to anybody else at Quest regarding your visit on

7     June 25th, 2019?

8          A    I don't think so.

9          Q    Okay.  Did you ever follow up with the

10    phlebotomist or anyone at Quest regarding the discussion

11    you had with the phlebotomist about the kiosk?

12               MR. MILLER:  Objection.  It lacks foundation.

13               Go ahead.

14               THE WITNESS:  No, I certainly couldn't reach

15    that phlebotomist because they don't have it set up

16    where you can call their office; but, no, I -- I did not

17    follow up with any more calls.

18    BY MS. ROLLER:

19         Q    Why not?

20         A    I don't know.  I just assumed that she would

21    pass on my information and that somebody would contact

22    me eventually.

23         Q    And has anybody contacted you?

24         A    No.

25         Q    When you were at the patient service center on

Page 211

1    p.m.

2         (Recess.)

3         THE VIDEOGRAPHER:   We are back on the record at

4    4:41 p.m.

5                        EXAMINATION

6

7    BY MR. MILLER:

8         Q   Mr. Vargas, welcome back.

9         A   Thank you.

10        Q   I want to follow up on some of Miss Roller's

11   questions.   Mr. Vargas, do you have a recognized

12   disability?

13        A   Yes, I do.   I have been legally blind since

14   birth.

15        Q   And on June 25th, 2019, did you attempt to

16   access a lab -- excuse me -- a Quest patient service

17   center?

18        A   Yes, I did.

19        Q   And was that the location at 4849 Van Nuys

20   Boulevard in Sherman Oaks, California?

21        A   Correct.

22        Q   And just for clarity, did you -- was that a

23   walk-in appointment?

24        A   Yes.

25        Q   And when you attempted to walk in the Quest

Page 218

1    how many other individuals were present; correct?

2        A    Correct, I couldn't tell who or how many people

3    might be there.

4        Q    And then even after you identified a Quest

5    employee to assist you, you still had to wait again

6    before she returned to the eCheck-in self-service kiosk

7    to be able to assist you with that device; right?

8        A    Yes, she had to come back out and then take my

9    information and input it.

10       Q    And that was approximately another five

11   minutes?

12       A    Correct.

13       Q    And then even once you were checked in, the

14   phlebotomist did not immediately take you back and

15   render the services; correct?

16       A    Yeah, I had to wait.

17       Q    You had to wait a third time before you could

18   get --

19       A    Yes.

20       Q    -- services; correct?

21       A    Correct.

22       Q    Did that cause you to feel any embarrassment or

23   humiliation?

24       A    Yes.  You know, after a while when you run into

25   situations like this, it is embarrassing, it's

Page 219

1    humiliating.  It makes you feel like you're a
2    third-class citizen of some kind that anybody else can
3    walk in there and not have to undergo the same amount of
4    hassle and waiting and so they offer this service to all
5    of their patients who happen to be able to see without
6    impairment.
7        Q   Did it cause you any frustration or
8    embarrassment to be directed to an eCheck-in
9    self-service kiosk that you could not use?
10       A   Yes, it did.
11       Q   Can you tell me what you -- can you tell me
12   what humiliation or frustration that caused you?
13       A   Well, I feel like it made me look a little
14   foolish to be taken to a machine that I would not be
15   able to use, so here I am looking around trying to
16   interact with this machine looking for things that
17   aren't there.
18       Q   If Quest decides as a result of hearing what
19   you said today that it's going to provide individuals
20   who are legally blind the opportunity to independently
21   access the self-service eCheck-in kiosk, would you
22   return there?
23       A   Yes, absolutely.
24       Q   And do you intend to return there any way for
25   any other reasons?

# EXHIBIT 9

PA0106

```
                                                        Page 1

 1                     UNITED STATES DISTRICT COURT

 2                    CENTRAL DISTRICT OF CALIFORNIA

 3

 4     JULIAN VARGAS, ANNE    )
       WEST and AMERICAN      )
 5     COUNCIL OF THE BLIND,  )
       individually on behalf )  Case No. 2:19-cv-08108 DMG (MRWx)
 6     of themselves and all  )
       others similarly       )
 7     situated,              )
                              )
 8              Plaintiffs,   )
                              )
 9     vs.                    )
                              )
10     QUEST DIAGNOSTICS      )
       CLINICAL LABORATORIES, )
11     INC., QUEST            )
       DIAGNOSTICS HOLDINGS,  )
12     INC., QUEST DIAGNOSTICS)
       INCORPORATED; and DOES )
13     1-10, inclusive,       )
                              )
14              Defendants.   )
       _____)

15

16

17        REMOTE VIDEOTAPED DEPOSITION OF RALPH DANIEL BLACK

18                        April 27, 2021

19

20

21

22

23

24

          Job No. CS4522969
25        Reported by: Maryann Matthews, CSR #737
```

```
                                                             Page 2
 1              REMOTE VIDEOTAPED DEPOSITION OF RALPH DANIEL BLACK

 2

 3          BE IT REMEMBERED that the remote videotaped deposition

 4     of RALPH DANIEL BLACK was taken via videoconference by the

 5     Defendants before Veritext Legal Solutions, Maryann Matthews,

 6     Court Reporter  and Notary Public in and for the County of Ada,

 7     State of Idaho, on Tuesday, the 27th day of April, 2021,

 8     commencing at the hour of 2:07 p.m. Pacific Daylight Time in

 9     the above-entitled matter.

10

11     APPEARANCES (Remotely):

12

       For the Plaintiffs and the Witness:

13

                        HANDLEY FARAH & ANDERSON PLLC

14                      By:  Matthew K. Handley, Esq.

                        777 6th Street NW, 11th Floor

15                      Washington, D.C.  20001

                        Telephone:  (202) 559-2411

16                      Facsimile:  (844) 300-1952

                        mhandley@hfajustice.com

17

18     For the Defendants: OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

                        By:  Amber L. Roller, Esq.

19                      400 South Hope Street, Suite 1200

                        Los Angeles, California  90071

20                      Telephone:  (213) 239-9800

                        Facsimile:  (213) 239-9045

21                      amber.roller@ogletree.com

22

       Videographer:     Gregg Eisman

23

24

25
```

Page 3

1                       I N D E X

2                E X A M I N A T I O N

3

   RALPH DANIEL BLACK                                 PAGE

4

5   By:  Ms. Roller....................................6

6

7                   E X H I B I T S

8                (No exhibits marked.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 26

1       Q.   And how many -- so I want to get a little
2   more information about your actual experience on the
3   day.
4           So when you first walked into the patient
5   service center, what did you do?
6       A.   We started to go up to the window to talk to
7   the receptionist, and there were -- there was a line of
8   people there.
9           And the person behind the desk and some of
10  the customers started saying, "No, no, you have to go
11  over to the kiosk."  But first, before we did that,
12  we -- you know, we attempted to go to a window.
13      Q.   Okay.  Did you -- was there some -- like, a
14  greeter, like, a Quest employee that was kind of helping
15  the flow of traffic when you first arrived?
16      A.   I don't recall that.  There might have been,
17  but I don't remember.
18      Q.   Okay.  And then -- so when you were waiting
19  in line at the window, how long was it before you spoke
20  with the person at the window who told you to go to the
21  kiosk?
22      A.   Well, it wasn't exactly like that.  We --
23  when we went to the line to go to the window, I believe
24  that the person that was at the desk sort of, you know,
25  yelled to us, "No, no, you have to go to the kiosk."

Page 27

1          And some of the other customers also said,

2    "No, no, go over there."  So it wasn't -- you know, we

3    didn't get all the way up to the desk and then get told

4    we had to go to the kiosk.

5          Q.   Okay.  And then what did you do after you

6    were told to go to the kiosk?

7          A.   Well, we went over there, but it quickly

8    became apparent that we weren't going to be able to

9    utilize the kiosk.  So then we went back and tried to --

10   and did go up to the window.

11         Q.   Okay.  Why did it become apparent that you

12   wouldn't be able to utilize the kiosk?

13         A.   Well, you know, I looked at it and, you know,

14   it was just a touch-screen type device that didn't have

15   any accessibility features that I could use.  And as I

16   said, my wife uses a wheelchair.  She has limited manual

17   dexterity and reach range, and the kiosk was up pretty

18   high.

19         She couldn't reach it and, you know, so she

20   couldn't use it and I couldn't use it; and it was, you

21   know -- it might conceivably have been possible for the

22   two of us to have figured out how to do it together.

23         But, you know, everybody was in the line, you

24   know, sort of anxious to get through the process and,

25   you know, we were -- didn't feel like trying to struggle

Page 28

1   in the middle of all of that with doing it with the two

2   of us, so we left and went back to talk to the

3   receptionist.

4           Q.   How long did you wait in line at the kiosk

5   before you actually got up to the front of the kiosk?

6           A.   I don't remember.  It wasn't too long.  Maybe

7   five minutes or something.

8           Q.   Were there a certain number of people that

9   you can recall that were in front of you checking in?

10          A.   No, I don't.

11          Q.   Okay.  Once you realized you couldn't use the

12  kiosk to check in, you went over to the receptionist

13  desk, right?

14          A.   Yes.

15          Q.   And was somebody there?

16          A.   Yes.

17          Q.   And what did you say to them at that point?

18          A.   Well, I explained to her that we couldn't use

19  the kiosk, and she said, "Well, you know, that's the way

20  we do things.  You have to use the kiosk."

21              And so I had to -- you know, went back

22  through it with her again and explained, you know, my

23  wife's limitations and my visual impairment, and between

24  the two of us we couldn't do it.

25              And so then she said, "Oh, well, let me see

1    what we can do about that," or something, and then she

2    went off; and I think she consulted with somebody else,

3    I believe.

4              I don't know if she did it by phone or in

5    person or what, but then she came back and said, "Okay,"

6    you know, "we'll deal with you here at the desk."

7        Q.   Was it your understanding that she wasn't

8    aware that you were physically unable to check in until

9    you actually explained the situation to her?

10       A.   Well, I imagine -- I don't know.

11       Q.   Okay.  And then as soon as you explained to

12   her that you actually couldn't physically check in, then

13   she -- did she check you in?

14       A.   Well, you know, what I tried to explain to

15   her was that we already had our paper lab orders with us

16   which, you know, I ultimately gave to her; and we really

17   didn't need to check in on the kiosk.  But at first, you

18   know, they didn't want to take the paperwork, but she

19   ultimately did.

20       Q.   Okay.  And then did she ask you for any other

21   information besides what was contained in the paperwork

22   to check you in?

23       A.   I don't remember for sure.

24       Q.   Do you recall feeling like you didn't -- you

25   felt uncomfortable providing whatever information she

Page 35

1    the receptionist said to you in response?

2          A.   I don't recall.  I don't think we got much of

3    a response to that.

4          Q.   Okay.  At any point after your visit did you

5    speak with anybody at Quest about your experience on

6    that day?

7          A.   No.

8          Q.   Or communicate with Quest in any way?

9          A.   I don't recall.  You know, sometimes they

10   send one of those follow-up satisfaction things and I

11   might have gotten one of those and responded, but it --

12   but I don't have any recollection about that.

13         Q.   Do you have any recollection of what you

14   might have said in response to that survey?

15         A.   No, I really don't know.

16         Q.   Did you talk to your wife about your visit on

17   that day and your -- I don't remember the word you said,

18   but the fact that you couldn't use the kiosk?

19         A.   Yeah.  We were both pretty frustrated about

20   the whole situation.  And we talked to each other and to

21   friends about, you know, what a screwed-up situation it

22   was and how, you know, frustrating and humiliating it

23   was to have to go through that.

24         Q.   All right.  Who did you speak with aside from

25   your wife?  You said you spoke with some friends?

Page 36

1        A.   I don't recall exactly.  I mean, I know that

2   for a couple weeks after that we were kind of agitated

3   about it and did discuss it.  I think we might have

4   talked to my brother about it.  I don't remember who all

5   else.

6        Q.   Would you go back to Quest?

7        A.   If I could help it.

8        Q.   So that's a "No," if you can help it?

9        A.   Correct.

10        Q.   Okay.  Do you have any plans right now to go

11   back to Quest in the near future?

12        A.   No.

13        Q.   So are you aware that, since your visit,

14   Quest had implemented specific procedures to assist

15   patients who are visually impaired with checking in on

16   that iPad?

17             MR. HANDLEY:  Object as assuming facts not in

18   evidence.

19        Q.   (BY MS. ROLLER) You can answer.

20        A.   No, I'm not aware of it.

21        Q.   Okay.  So if I told you that at this point

22   Quest has enabled the iPad so that if you do a

23   three-finger swipe up the iPad, it immediately checks

24   you in, do you believe that's adequate to permit you to

25   check in at a Quest Diagnostics patient center?

1    A    No.  I've had to devote several hours to

2    dealing with this deposition.

3    Q    Aside from that?

4    A    No.

5    Q    Are you currently employed?                    09:58:56

6    A    No.  I'm retired.

7    Q    When did you retire?

8    A    I retired from full-time work with the

9    State of California in January of 2011.  I did some

10   part-time work for the state for several years after   09:59:20

11   that until, I believe, around July of 2017.  I did

12   some other consulting work on and off between 2011

13   and 2019, but I have not done any paid work since

14   the end of 2019.

15   Q    Do you believe that you have suffered any        09:59:54

16   emotional distress as a result of your visit to

17   Quest in May of 2020?

18   A    Well, yes.  It was emotionally distressing,

19   frustrating.  Whatever word you want to use.

20   Q    Did you seek any health -- treatment from a      10:00:37

21   health care or mental health provider as a result of

22   that?

23   A    No.

24   Q    Do you plan on seeking any treatment with a

25   health care provider as a result of the frustration   10:00:56

Page 72

PA0116

```
 1    you say you suffered as a result of the May 2020

 2    visit?

 3         A    No.

 4         Q    That frustration that you suffered, is

 5    that -- how long did that last?                      10:01:22

 6         A    I don't know.  You know, probably that was

 7    something that was on my mind, knowing me, for a

 8    period of, I don't know, three or four weeks after

 9    the incident -- excuse me -- occurred, of course,

10    and that frustration or irritation has recurred as a   10:01:51

11    result of having to go through this whole process.

12         Q    Is there anything that you didn't do during

13    that time period that you would have otherwise done

14    because of your frustration or irritation, like life

15    activities?                                          10:02:20

16         A    I'm not sure I understand the question.

17    But if you're saying did I -- did it interfere with

18    me doing some activity that I otherwise wanted to

19    do, I think the answer would be no.

20         Q    Okay.  That's exactly what I was asking.    10:02:30

21    So thank you for putting it so eloquently.

22              Okay.  Mr. Black, well, I think I'm done

23    with you.  I just needed to follow up with a few

24    things because I didn't have the opportunity last

25    time due to some time constraints, but that is it     10:02:54
```

Page 73

PA0117

# EXHIBIT 10

PA0118

1             UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4       JULIAN VARGAS, ANNE     )
        WEST and AMERICAN       )
5       COUNCIL OF THE BLIND,   )
        individually on behalf  )  Case No. 2:19-cv-08108 DMG (MRWx)
6       of themselves and all   )
        others similarly        )
7       situated,               )
                                )
8                 Plaintiffs,   )
                                )
9       vs.                     )
                                )
10      QUEST DIAGNOSTICS        )
        CLINICAL LABORATORIES,  )
11      INC., QUEST             )
        DIAGNOSTICS HOLDINGS,   )
12      INC., QUEST DIAGNOSTICS)
        INCORPORATED; and DOES  )
13      1-10, inclusive,        )
                                )
14                Defendants.   )
        _____)

15

16

17         REMOTE VIDEOTAPED DEPOSITION OF ARDIS BAZYN

18                    April 27, 2021

19

20

21

22

23

24

        Job No. CS4522969
25      Reported by: Maryann Matthews, CSR #737

Page 2

1          REMOTE VIDEOTAPED DEPOSITION OF ARDIS BAZYN

2

3          BE IT REMEMBERED that the remote videotaped

4     deposition of ARDIS BAZYN was taken via videoconference

5     by the  Defendants before Veritext Legal Solutions,

6     Maryann Matthews, Court Reporter and Notary Public in

7     and for the County of Ada, State of Idaho, on Tuesday,

8     the 27th day of April, 2021, commencing at the hour of

9     9:07 a.m. Pacific Daylight Time in the above-entitled

10    matter.

11

12    APPEARANCES (Remotely):

13

      For the Plaintiffs and the Witness:

14

                        NYE, STIRLING, HALE & MILLER, LLP
15                      By:  Benjamin J. Sweet, Esq.
                        1145 Bower Hill Road, Suite 104
16                      Pittsburgh, Pennsylvania  15243
                        Telephone:  (412) 857-5350
17                      ben@nshmlaw.com

18

                        HANDLEY FARAH & ANDERSON, PLLC
19                      By:  Matthew K. Handley, Esq.
                        777 6th Street NW, 11th Floor
20                      Washington, D.C.  20001
                        Telephone:  (202) 559-2411
21                      Facsimile:  (844) 300-1952
                        mhandley@hfajustice.com

22

23

24

25

Page 3

1    APPEARANCES (Contd.)

2

     For the Defendants: OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

3                        By:  Amber L. Roller, Esq.

                         400 South Hope Street, Suite 1200

4                        Los Angeles, California  90071

                         Telephone:  (213) 239-9800

5                        Facsimile:  (213) 239-9045

                         amber.roller@ogletree.com

6

7    Videographer:       Gregg Eisman

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                          I N D E X

2                   E X A M I N A T I O N

3

ARDIS BAZYN                                          PAGE

4

5    By:  Ms. Roller....................................6

6

7                     E X H I B I T S

8                  (No exhibits marked.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        Q    Okay.  Have you ever talked to any other          09:33

 2   individuals that have visual impairments about their        09:33

 3   experiences at Quest Diagnostics?                           09:33

 4        A    Just my husband.                                  09:33

 5        Q    And aside -- what did you talk to your            09:33

 6   husband about?                                              09:33

 7        A    Well, I just asked him what he used to sign       09:33

 8   in if he -- you know, if he signed a paper or, you          09:33

 9   know, what he had used.                                     09:33

10        Q    Okay.  And at last deposition, you testified     09:33

11   that you actually weren't sure how he signed you in on      09:33

12   your visits.  And did you -- did you ask him after          09:33

13   your deposition how you guys got signed in?                 09:33

14        A    Yeah.  He told me it was some kind of a          09:34

15   touchscreen thing that he had trouble with because          09:34

16   his -- he's got low vision, so he had to use a              09:34

17   magnifier, and he had trouble with it.                      09:34

18        Q    Okay.  And did he tell you how many times        09:34

19   he's used that kiosk to check you in?                       09:34

20        A    No, he didn't.                                    09:34

21        Q    And did he ultimately check you guys in on       09:34

22   the kiosk, or did he have to wait for assistance from       09:34

23   Quest staff member?                                         09:34

24        A    I think he was -- I'm pretty sure that's what    09:34

25   he did when the two of us went, that he used the            09:34
```

Page 11

PA0123

```
1        Q    Do you believe you have lost any income      09:47

2   associated with your visits to Quest Diagnostics?     09:47

3        A    No.                                           09:47

4        Q    Do you believe you have experienced any     09:47

5   emotional distress associated with your visits to     09:47

6   Quest Diagnostics?                                     09:47

7        A    Not particularly.                            09:47

8        Q    Okay.  What do you mean by that, no          09:47

9   particularly?                                          09:47

10        A    Well, just annoyance, you know, but nothing, 09:47

11   you know.  Nothing major.                              09:47

12        Q    Okay.  Why were you annoyed with respect to  09:47

13   your visits?                                           09:47

14        A    Well, when I'm not sure what I'm doing, you  09:47

15   know, sometimes I get annoyed.                         09:47

16        Q    Is this all visits, or is this only some     09:47

17   visits?                                                09:48

18        A    No.  Just, you know, occasional visits.      09:48

19        Q    Okay.  Of your visits in the last, let's say,09:48

20   five years, how many of those do you think you were -- 09:48

21   you experienced annoyance at?                          09:48

22        A    Just a couple.                               09:48

23        Q    So two to three?                             09:48

24        A    Yeah, I'd say that.                          09:48

25        Q    And specifically what do you mean by you're  09:48
```

Page 20

PA0124

1    not sure what you're doing?                               09:48

2        A   Well, like you come in and there's no one         09:48

3    there to talk to and to deal with, and you're not sure    09:48

4    what, you know, to do at that particular point.           09:48

5        Q   Is that different than what you would             09:48

6    experience at any place that you go to?                   09:48

7        A   Yes.  It's usually helpful if they have a         09:48

8    customer service desk or someone I can go to ask, you     09:48

9    know, where to check in or what -- you know, in that      09:48

10   way.                                                      09:49

11       Q   How often do you encounter the situation          09:49

12   where you go to a place and you're kind of not sure       09:49

13   what to do because there's nobody there waiting to        09:49

14   assist you?                                               09:49

15       A   I'm not really sure.  Most the time there's       09:49

16   someone there at most places I go.                        09:49

17       Q   Has there been any time at -- that you've         09:50

18   gone to Quest where you did not receive your blood        09:50

19   draw?                                                     09:50

20       A   No.                                               09:50

21       Q   Have you ever been to Quest or has there ever     09:50

22   been an instance at Quest where you did not receive       09:50

23   your draw results?                                        09:50

24       A   I generally don't get the results from them.      09:50

25   I usually get the results from my doctor.                 09:50

Page 21

PA0125

Page 29

1           (Unintelligible crosstalk.)

2       Q.   (BY MS. ROLLER) So when you first walked in

3   the door to the Quest patient service center on Alameda,

4   were you encountered by a greeter or somebody that said,

5   "Welcome to Quest.  What can we help you with?"

6       A.   No.

7       Q.   Okay.  What did you do once you first walked

8   in?

9       A.   We went to the counter and my husband signed

10  us in.

11      Q.   Okay.  And how did he sign you in?

12      A.   I'm not sure because he did it.

13      Q.   Was your husband there to get blood work done

14  that day, too?

15      A.   Yes.

16      Q.   And when he went to the counter, did you just

17  sit down in one of the chairs in the waiting room?

18      A.   I waited for him to sign us in, and then he,

19  you know, told us where there were places we could sit.

20      Q.   Okay.  How long did it take for him to sign

21  you guys in?

22      A.   No more than a couple minutes.

23      Q.   And did he go up to the, like, reception desk

24  and speak to somebody, based on your understanding?

25      A.   No.

Page 41

1   there, would you feel satisfied with that method?

2         A.   Like I said before, I would -- I would have

3   to know that it's -- that it knew it was me that's

4   checking in so I'd feel comfortable that I'd be the next

5   person in line called in.

6         Q.   Okay.  And how would you want that to be

7   accomplished?

8              MR. SWEET:  Objection.  Vague.

9              THE WITNESS:  I would need a verbal

10  confirmation that I was the next one in line or that I

11  was all set to go.

12        Q.   (BY MS. ROLLER) Okay.  If the confirmation

13  was that you were patient number one and then you went

14  and sat down and somebody came out and said, "Patient

15  number one," would you feel satisfied with that check-in

16  process?

17        A.   If I was the right person called, yes.

18        Q.   Okay.  Understood.  So as far as you know --

19  or I'm sorry.  Let me rephrase that.

20             You personally have never checked in using

21  the E-check-in kiosk at Quest, correct?

22        A.   Correct.

23        Q.   And the other times that you went to Quest

24  without your husband, like, for example, in 2019, how

25  did you check in on that visit?

Page 42

1      A.   Waited until -- at the counter until someone
2   came out.
3      Q.   And in 2019 during that visit, how long did
4   it take for somebody to come out to the counter to check
5   you in?
6           A.   Oh, I think, you know, five or ten minutes.
7           Q.   Okay.  And then did you go to Quest in 2018?
8           A.   Yes.
9           Q.   And do you recall if you went alone or with
10   your husband on that visit?
11          A.   No, I was alone.  I -- they had an attendant
12   then, so --
13          Q.   Okay.  And how long did it take for you to
14   check in in 2018, at your 2018 visit?
15          A.   I just went right up to the counter and they
16   took my name.
17          Q.   Do you recall what location this was that you
18   went to in 2018?
19          A.   Oh, I think it was the 201 South Buena Vista,
20   but I'm not positive.  But I --
21          Q.   Do you know --
22          A.   That one is easier for me to get to, so I
23   generally try to do that one when I'm by myself.
24          Q.   And when you checked in at the 2018 visit,
25   what information did they ask of you in order to check

# EXHIBIT 11

PA0129

Page 1

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4        JULIAN VARGAS, ANNE      )
         WEST and AMERICAN        )
5        COUNCIL OF THE BLIND,    )
         individually on behalf   )  Case No. 2:19-cv-08108 DMG (MRWx)
6        of themselves and all    )
         others similarly         )
7        situated,                )
                                  )
8                   Plaintiffs,   )
                                  )
9        vs.                      )
                                  )
10       QUEST DIAGNOSTICS        )
         CLINICAL LABORATORIES,   )
11       INC., QUEST              )
         DIAGNOSTICS HOLDINGS,    )
12       INC., QUEST DIAGNOSTICS) )
         INCORPORATED; and DOES   )
13       1-10, inclusive,         )
                                  )
14                  Defendants.   )
         _____  )

15

16

17            REMOTE VIDEOTAPED DEPOSITION OF MARY HAROYAN

18                         April 29, 2021

19

20

21

22

23

24

         Job No. CS4522974
25       Reported by: Maryann Matthews, CSR #737

```
                                              Page 2

  1          REMOTE VIDEOTAPED DEPOSITION OF MARY HAROYAN

  2

  3          BE IT REMEMBERED that the remote videotaped

  4    deposition of MARY HAROYAN was taken via videoconference

  5    by the Defendants before Veritext Legal Solutions,

  6    Maryann  Matthews, Court Reporter and Notary Public in

  7    Maryann  the County of Ada, State of Idaho, on Wednesday,

  8    the 29th day of April, 2021, commencing at the hour of

  9    9:02 a.m. Pacific Daylight Time in the above-entitled

 10    matter.

 11

 12    APPEARANCES (Remotely):

 13

       For the Plaintiffs and the Witness:

 14

                           NYE, STIRLING, HALE & MILLER, LLP
 15                         By:  Benjamin J. Sweet, Esq.
                           1145 Bower Hill Road, Suite 104
 16                         Pittsburgh, Pennsylvania  15243
                           Telephone:  (412) 857-5350
 17                         ben@nshmlaw.com

 18
                           HANDLEY FARAH & ANDERSON, PLLC
 19                         By:  Matthew K. Handley, Esq.
                           777 6th Street NW, 11th Floor
 20                         Washington, D.C.  20001
                           Telephone:  (202) 559-2411
 21                         Facsimile:  (844) 300-1952
                           mhandley@hfajustice.com

 22

 23

 24

 25
```

```
                                                    Page 3

1      APPEARANCES (Contd.)

2

       For the Defendants: OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

3                          By:  Amber L. Roller, Esq.

                           400 South Hope Street, Suite 1200

4                          Los Angeles, California  90071

                           Telephone:  (213) 239-9800

5                          Facsimile:  (213) 239-9045

                           amber.roller@ogletree.com

6

7      Videographer:       Robert Fenton

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

1                          I N D E X

2                  E X A M I N A T I O N

3

MARY HAROYAN                                        PAGE

4

5    By:  Ms. Roller....................................7

6

7                     E X H I B I T S

8                (No exhibits marked.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      Q.   Okay.  So let's talk about your -- the

2  first time you encountered the E-check-in kiosk, which

3  you said would have been at that May 24th, 2017 visit.

4          So on that day do you recall if you were a

5  walk-in appointment or if you had made an appointment

6  in advance for that visit?

7      A.   It was a walk-in appointment.

8      Q.   Okay.  Do you recall about what time of day

9  you went?

10     A.   No.  I mean, could have been late morning

11 or very early afternoon, but I really don't know.

12     Q.   Okay.  And were you there -- you were

13 obviously there to get some sort of sample taken?

14     A.   Yes.

15     Q.   Do you know if you were alone that visit?

16     A.   No.  Actually, my father was with me.

17     Q.   Okay.  And when you first walked -- well,

18 first of all, how long was your total visit at Quest

19 that day from the time you walked into the patient

20 service center on Boylston to the time you left the

21 building?

22     A.   I really don't remember.  I don't think it

23 was that long, I mean, but I really honestly can't

24 remember.

25     Q.   Okay.  And then once you first walked in

1    the door, what happened?

2         A.    My dad and I went over to the tablet.   I

3    assume that's what we must have done -- or we went to

4    the window and were told to go to the tablet.   I

5    really don't remember, but I know that we had to use

6    the -- the tablet to check in.

7         Q.    Is your father sighted?

8         A.    Yes.

9         Q.    Okay.   And when you went to the tablet, did

10   your father check in for you on the tablet?

11        A.    He attempted to.   He's -- he's not -- he's

12   an older gentleman, obviously, and he is not at all

13   adept with technology.

14             So I'm recalling we probably had to ask for

15   some help from somebody there to help with that

16   because I -- you know, he wouldn't have -- it would

17   not have been intuitive to him how to, you know,

18   access the technology.

19        Q.    Okay.   Do you recall one way or the other

20   if you went to the front desk first or if you went

21   straight to the kiosk?

22        A.    I -- I don't remember.   I really don't

23   remember.

24        Q.    Okay.   And then once your father realized

25   he probably wasn't technologically savvy enough to use

1          A.   Well, who would have eventually had it.

2          Q.   Okay.

3          A.   Yeah.  I don't know if it was a Quest Lab

4     employee, but I know in my experience there at Quest

5     Lab I have absolutely had a patient, another patient

6     there, another person waiting, help with the

7     check-in -- help me with the check-in process.

8          Q.   Okay.

9          A.   I'm -- I have absolutely had that

10    experience there.

11         Q.   When did you have that experience?

12         A.   Well, somewhere -- 2017, 2018, 2019, it

13    would have been, you know, when the tablet, you know,

14    became installed and I was there on my own.

15              I did not go with my father, and the

16    phlebotomist was probably in the inner room with a

17    patient, you know.  So it would have been a situation

18    like that.

19         Q.   So there were -- I think you said you

20    believe that since 2017 you had six visits.

21              Of those six visits, how many times do you

22    believe you were assisted with check-in by another

23    patient as opposed to a Quest employee?

24         A.   Probably at least twice.

25         Q.   Okay.  And you don't recall which specific

PA0136

1    visit that was?

2           A.    No.

3           Q.    So I'm going back to the May 21st, 2017

4    visit.  So after you were checked in, were you asked

5    to go ahead and sit down and then wait your turn?

6           A.    Yes.  Well, we knew, once we were checked

7    in, to sit in the waiting room and wait, yes.

8           Q.    Okay.  And then were you called back for

9    your blood draw?

10          A.    Yes.

11          Q.    And how long did you wait between the time

12   that you checked in and the time you were called back

13   for your blood draw?

14          A.    As I said earlier, I don't remember how

15   long I was there waiting because there were other

16   people there.  I don't think it was that long.

17   Perhaps -- you know, 15, 20 minutes perhaps.

18          Q.    Okay.  And then you were taken to the

19   back --

20          A.    Yes.

21          Q.    -- for your draw?

22          A.    Uh-huh.

23          Q.    Did the phlebotomist ask you for any

24   information once you got to the draw room?

25          A.    There's always confirmation, that they want

1    into that, you know, we've been going for an hour.  Do

2    you want a break or do you want to continue to go?

3                   THE WITNESS:  No, I'm fine.  I've --

4                   MS. ROLLER:  Okay.

5                   THE WITNESS:  -- got some water.

6                   MR. HANDLEY:  Are you sure you don't need

7    water or anything to --

8                   THE WITNESS:  Yeah, I've got water with me

9    already.  I'm just going to take the water now, so,

10   yeah, I'm fine.  I can continue.

11                  MS. ROLLER:  Madam Court Reporter, are you

12   okay without a break or do you need a break?

13                  THE REPORTER:  I'm fine, thanks.

14                  MS. ROLLER:  Okay.  Perfect.

15        Q.   (BY MS. ROLLER) Okay.  So let's talk about

16   your January 2020 visit.  Do you remember when that

17   visit was?

18        A.   The day?  No, I don't remember the day in

19   January, but it would have been -- I had an

20   appointment with my primary care doctor, so it would

21   have been following up from that, I assume.

22        Q.   Okay.  Do you know if it was in about

23   September or -- no, it was January 2020, right?

24        A.   January, yeah.

25        Q.   Okay.  And do you know if you were a

Page 62

1    walk-in or an appointment on that visit?

2         A.   I'm pretty sure that would have been an

3    appointment.

4         Q.   Okay.  And would you have completed the

5    pre-registry information before you went so that you

6    had your -- you had the code ready?

7         A.   Yes.

8         Q.   Okay.  Do you recall if your dad went with

9    you on that visit?

10        A.   I would probably say yes.

11        Q.   Okay.  And do you recall if, on that visit,

12   your dad assisted you with the check-in or if you had

13   assistance with the phlebotomist on that visit?

14        A.   I would say that he would have been the

15   first -- first to attempt to finish the check-in with

16   the bar code; and if there was any problem, then he

17   would have asked someone there to help.

18        Q.   Okay.  And then do you know how long you

19   were there for that visit?

20        A.   I'm guessing not very long.

21        Q.   Okay.  Around the same amount of time as

22   the other visits, ten to 15 minutes?

23        A.   I would -- I would think so.  Especially,

24   you know, going at that time of the morning, you know,

25   not much more than 15 minutes, I wouldn't think.

1      Q.   Okay.  Do you recall seeing other patients

2   being called back for their draw between the time you

3   checked in and the time you were taken back?

4      A.   You know, there could have been, you know,

5   maybe one or two people, you know.  Depends on --

6   yeah.

7           I suppose that's -- yes, especially since

8   I -- well, if I had an appointment, I would have

9   gotten there close to the appointment time.  But it's

10  possible somebody could have been called before I went

11  in.

12     Q.   Okay.  But you don't have any specific --

13     A.   No.

14     Q.   -- recollection?

15     A.   No.

16     Q.   And so let me ask you kind of generally

17  about all of your visits.  So for the six visits that

18  we've already discussed from 2017 to 2020, you've

19  mentioned there was somebody at the front on at least

20  one of those visits, like a Quest receptionist at one

21  of those visits.

22          Do you recall a Quest receptionist being at

23  the front at any of the other visits of the other

24  five?

25     A.   Actually, it's not a receptionist.  I don't

# EXHIBIT 12

PA0141

Page 1

<pre>
 1                   UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3

 4      JULIAN VARGAS, ANNE   )
        WEST and AMERICAN     )
 5      COUNCIL OF THE BLIND, )
        individually on behalf )  Case No. 2:19-cv-08108 DMG (MRWx)
 6      of themselves and all )
        others similarly      )
 7      situated,             )
                              )
 8              Plaintiffs,   )
                              )
 9      vs.                   )
                              )
10      QUEST DIAGNOSTICS      )
        CLINICAL LABORATORIES, )
11      INC., QUEST            )
        DIAGNOSTICS HOLDINGS,  )
12      INC., QUEST DIAGNOSTICS)
        INCORPORATED; and DOES )
13      1-10, inclusive,       )
                              )
14              Defendants.   )
        _____)

15

16

17          REMOTE VIDEOTAPED DEPOSITION OF NONA HAROYAN

18                      April 29, 2021

19

20

21

22

23

24

        Job No. CS4522974
25      Reported by: Maryann Matthews, CSR #737
</pre>

Page 2

1                REMOTE DEPOSITION OF NONA HAROYAN

2

3         BE IT REMEMBERED that the remote videotaped

4    deposition of MARY HAROYAN was taken via videoconference

5    by the Defendants before Veritext Legal Solutions,

6    Maryann  Matthews, Court Reporter and Notary Public in

7    Maryann  the County of Ada, State of Idaho, on Wednesday,

8    the 29th day of April, 2021, commencing at the hour of

9    1:01 p.m. Pacific Daylight Time in the above-entitled

10   matter.

11

12   APPEARANCES (Remotely):

13

     For the Plaintiffs and the Witness:

14

                         NYE, STIRLING, HALE & MILLER, LLP

15                       By:  Jordan T. Porter, Esq.

                              Margaret A. Parker, Esq.

16                       33 West Mission Street, Suite 201

                         Santa Barbara, California  93101

17                       Telephone:  (805) 963-2345

                         Facsimile:  (805) 284-9590

18                       jordan@nshmlaw.com

                         meg@nshmlaw.com

19

20                       HANDLEY FARAH & ANDERSON, PLLC

                         By:  Matthew K. Handley, Esq.

21                       777 6th Street NW, 11th Floor

                         Washington, D.C.  20001

22                       Telephone:  (202) 559-2411

                         Facsimile:  (844) 300-1952

23                       mhandley@hfajustice.com

24

25

Page 3

```
 1     APPEARANCES (Contd.)

 2

       For the Defendants: OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
 3                         By:  Amber L. Roller, Esq.
                           400 South Hope Street, Suite 1200
 4                         Los Angeles, California  90071
                           Telephone:  (213) 239-9800
 5                         Facsimile:  (213) 239-9045
                           amber.roller@ogletree.com

 6

 7     Videographer:       Robert Fenton

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

1                          I N D E X

2                  E X A M I N A T I O N

3

   NONA HAROYAN                                        PAGE

4

5   By:  Ms. Roller...................................7

6

7                      E X H I B I T S

8                  (No exhibits marked.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions

Page 36

```
1    went in independently.
2         Q.   Okay.  And you're thinking that he probably
3    wasn't there the September 20th, 2017 visit?
4         A.   Correct.
5         Q.   Okay.  And so for those two visits you
6    probably -- did you drive yourself to that -- I'm sorry.
7              Did you use paratransit to the September 20th
8    visit?
9         A.   Yes.
10        Q.   Okay.  So when is the first time you recall
11   encountering the Quest E-check-in device?
12        A.   I honestly don't know.  I'm -- I don't know
13   if it was 2018 or it was 2017.  I honestly don't
14   remember.
15        Q.   Okay.  Do you remember the visit that you
16   first encountered the E-check-in kiosk?
17        A.   I do.  I don't know the date, but I -- I
18   remember.
19        Q.   Right.  Was it a visit that your father was
20   with you at or were you alone?
21        A.   I -- no.
22        Q.   Was that -- is that no, your father wasn't
23   there or, no, you were not -- you were alone?
24        A.   I don't believe he was with me, no.
25        Q.   Okay.  And so you think that was probably the
```

Page 37

1    September 20th, 2017 visit?

2         A.   Could have been.

3         Q.   Okay.  So when you had that visit, do you

4    recall -- let's start with September 20th, 2017.  It

5    seems like that might be the first time you encountered

6    the kiosk.

7              Is that about right?

8         A.   Could be, yes.

9         Q.   Okay.  Do you recall if you were a walk-in

10   for that or if you had made an appointment?

11        A.   I believe I may have had an appointment in --

12   with my doctor in -- in -- in the building and gone for

13   lab work.  So it was a walk-in.

14        Q.   Okay.  And do you know what time you showed

15   up to that visit on September 20th, 2017?

16        A.   Not at all.

17        Q.   Okay.  So I have records that show you as a

18   walk-in on that visit, and you came in at 7:38 in the

19   morning.

20              So would that lead you to believe that

21   perhaps you didn't see your doctor before then?

22        A.   Obviously -- yeah, obviously not.  That must

23   have been an appointment for an early morning blood --

24   blood work that had to be done before 7:30.  Okay.

25        Q.   Okay.

Page 38

1       A.    Yeah.

2       Q.    So do you think that that -- let me ask you,

3   the first time you encountered the Quest E-check-in

4   kiosk, was it an early morning appointment like that, do

5   you believe?

6       A.    I honestly don't know.  I really don't.

7       Q.    Okay.  So tell me what you do remember from

8   the first time you encountered the E-check-in.  And you

9   know what I'm talking about, right --

10       A.    Yeah.

11       Q.    -- when I say "E-check-in"?

12       A.    Sure.

13       Q.    Yeah.

14       A.    Well, I remember coming into the lab and

15   seeing this, well, tablet there and that prior to that,

16   you know, it was a different system -- there was no

17   system, but -- and thinking, uh-oh, I'm not going to be

18   able to utilize this.  There was no audible component.

19   It's the touch screen, and I couldn't use it.

20       Q.    When you walked into the patient service

21   center, did you immediately notice that there was a sort

22   of E-check-in tablet?

23       A.    Well, I walked in and I noticed that there

24   was something -- you know, it's a very small office

25   where we go to, so I noticed that there was something

Page 39

1      there.

2              And what normally was there was a podium, and

3      that was no longer there and it was this other device.

4      And there was -- I believe there was someone at the --

5      at the kiosk, you know, checking in.

6              And I was -- immediately I went, oh, you

7      know, is this going to be a problem?  I don't know.  And

8      then I realized that there was no -- when it was my turn

9      to go to it, I was like, there's no way I can use this.

10          Q.   So the podium that was usually there, that's

11     normally where you would sign in?

12          A.   Correct.

13          Q.   And would you sign in on a piece of paper?

14          A.   Yeah.  It was a -- it was a paper that was

15     there.

16          Q.   What information would you be requested to

17     provide on that sign-in sheet?

18          A.   Just your name.

19          Q.   Okay.  And what time you arrived?

20          A.   If it required that?  I -- I don't know.  I

21     just put my name.

22          Q.   Okay.  And then you said when you got there,

23     there was somebody there checking in.  Are you talking

24     about another patient?

25          A.   Correct.

Page 42

1        Q.   Okay.  So you were comfortable with giving

2    your name and birth date to her to fill in on the kiosk?

3        A.   Honestly, I was -- this was all new and I was

4    just kind of taken aback, the fact that this was a whole

5    new system; and I -- you know, I wanted to get in and

6    out of there as quickly as possible.  So, you know, I --

7    I did what I had to do at the time.

8        Q.   Are you uncomfortable with people knowing

9    your birth date?

10       A.   I'm uncomfortable with giving my personal

11   information out in a public setting, yes.

12       Q.   Okay.  What personal information are you

13   uncomfortable with providing in a public setting?

14       A.   Well, I could ask the same of you.  I don't

15   think it's anyone's business what my age is, and a

16   sighted person or a person without a disability who was

17   checking in doesn't announce their information to the

18   rest of the room.

19            So, yeah, I -- it's my private business, and

20   I really don't feel like announcing it to everyone in

21   the room.

22       Q.   No, my question was, which part of that

23   information.  So are you comfortable providing your

24   first and last name?

25       A.   My first name --

Page 43

1          Q.    Okay.

2          A.    -- I don't have a problem with.

3          Q.    Okay.   So your last name you're uncomfortable

4     with?

5          A.    I just -- you know, for privacy purposes, I

6     don't feel like announcing my name and my date of birth

7     to -- to strangers in a room.

8          Q.    Okay.

9          A.    And I shouldn't have to.

10         Q.    And just to be clear, when the

11    phlebotomist -- when you went up to the phlebotomist to

12    let her -- I assume it's a she.

13               Was it a she or a he?

14         A.    It was woman.

15         Q.    It was a woman.   Okay.   So when you went up

16    to the female phlebotomist and asked her for assistance,

17    had the other patient already come up and was kind of

18    like waiting there to be taken back to the draw room?

19         A.    She came out of the room and called the other

20    patient already.   And before -- before the patient went

21    into the room, I said, "Excuse me.   I need some

22    assistance."

23         Q.    And then did she lead the patient back, drop

24    the patient back off there, and then come and help you?

25         A.    Yes.   I believe the patient went into the --

Page 46

1          A.   I -- I really do not.

2          Q.   Okay.  Between the time that you checked in

3     and the time that you were called back, did any other

4     patients get called back?

5          A.   I -- I honestly don't know.

6          Q.   Did you see any other Quest employees there

7     during your visit?

8          A.   I think it was just the one phlebotomist

9     there that day, so I think she was the only one.  But,

10    you know, I'm not a hundred percent sure.

11         Q.   Okay.  All right.  So let's talk about your

12    next visit.  And I assume that at -- your next visit I

13    have is December 1st, 2017.

14         A.   Okay.

15         Q.   Do you recall that visit with any

16    specificity?

17         A.   I do not.

18         Q.   Okay.  Do you think your dad went with you to

19    that visit?

20         A.   I'm assuming so, yes.

21         Q.   And why do you say that?

22         A.   Because now I obviously knew about the kiosk,

23    so I -- I'm going to need assistance checking in.

24         Q.   Okay.  And then -- so when you went there

25    that second time that you had already anticipated the

Page 47

1  kiosk was going to be there, do you know if you had an

2  appointment?

3  　　　　A.　I don't know.

4  　　　　Q.　And did your father check in for you on the

5  kiosk?

6  　　　　A.　He could have attempted to, yes.

7  　　　　Q.　Okay.  If he didn't -- if he wasn't

8  successful, how do you believe you got checked in?

9  　　　　A.　There was a time when we also had another

10 patient in the room who assisted us.

11 　　　　Q.　And what did that patient do to assist you?

12 　　　　A.　Actually typed in the information on the

13 screen.  It was -- yeah.

14 　　　　Q.　What information?

15 　　　　A.　My name -- the check-in -- whatever questions

16 are asked in the check-in system.

17 　　　　Q.　And how did that come about, where another

18 patient assisted you?

19 　　　　A.　Because my dad, who was 80 -- well, he was 87

20 at the time, but in his 80's and is so not technology

21 capable -- was having a lot of trouble.

22 　　　　　　And a very -- you know, a kind person wanted

23 to help us because the Quest staff was, you know,

24 drawing blood and had -- the doors were closed.  And

25 they were -- they were busy.  So, again, a very kind

Page 48

1    person wanted to assist us.

2         Q.   And when you came in that day, between -- did

3    you go immediately with your father to the kiosk?

4         A.   When we walked in?

5         Q.   Yeah, when you walked in.

6         A.   Yes.

7         Q.   Okay.  At that point you knew there was a

8    kiosk; you knew that was a way to check in, right?

9         A.   Correct.

10        Q.   Okay.  And how many people do you recall

11   being in the waiting room on that day?

12        A.   Well, there was at least one.  I'm not sure.

13   I think there was at least another person there, too.

14   So there was two other patients at least.

15        Q.   Okay.  And you don't recall if that's the

16   December 1st, 2017 visit or a subsequent visit?

17        A.   I'm not sure.  I just know that at one point

18   we had assistance from a patient, another patient.

19        Q.   Was that only on one visit out of your eight

20   visits?

21        A.   It may have been one other time, but I'm not

22   a hundred percent sure.

23        Q.   Okay.  So maybe I'll do it this way.  Out of

24   your eight visits that you went to, you've told me about

25   one where the phlebotomist checked you in on the kiosk.

# EXHIBIT 13

PA0155

Page 1

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4      JULIAN VARGAS, ANNE    )
       WEST and AMERICAN      )
5      COUNCIL OF THE BLIND,  )
       individually on behalf )  Case No. 2:19-cv-08108 DMG (MRWx)
6      of themselves and all  )
       others similarly       )
7      situated,              )
                              )
8                Plaintiffs,  )
                              )
9      vs.                    )
                              )
10     QUEST DIAGNOSTICS      )
       CLINICAL LABORATORIES, )
11     INC., QUEST            )
       DIAGNOSTICS HOLDINGS,  )
12     INC., QUEST DIAGNOSTICS)
       INCORPORATED; and DOES )
13     1-10, inclusive,       )
                              )
14               Defendants.  )
       _____)

15

16

17          REMOTE VIDEOTAPED DEPOSITION OF DONNA GRAHMANN

18                         May 3, 2021

19

20

21

22

23

24

       Job No. CS4522975
25     Reported by: Maryann Matthews, CSR #737

Page 2

```
 1              REMOTE VIDEOTAPED DEPOSITION OF DONNA GRAHMANN
 2
 3         BE IT REMEMBERED that the remote videotaped
 4    deposition of DONNA GRAHMANN was taken via videoconference
 5    by the Defendants before Veritext Legal Solutions, Maryann
 6    Matthews, Court Reporter and Notary Public in and for the
 7    County of Ada, State of Idaho, on Monday, the 3rd day of May,
 8    2021, commencing at the hour of 8:53 a.m. Pacific Daylight Time
 9    in the above-entitled matter.
10
11
      APPEARANCES (Remotely):
12
13    For the Plaintiffs and the Witness:
14                         HANDLEY FARAH & ANDERSON PLLC
                           By:  Matthew K. Handley, Esq.
15                         777 6th Street, NW - 11th Floor
                           Washington, D.C.  20001
16                         Telephone:  (202) 559-2411
                           Facsimile:  (844) 300-1952
17                         mhandley@hfajustice.com
18
      For the Defendants: OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
19                         By:  Amber L. Roller, Esq.
                           400 South Hope Street, Suite 1200
20                         Los Angeles, California  90071
                           Telephone:  (213) 239-9800
21                         Facsimile:  (213) 239-9045
                           amber.roller@ogletree.com
22
23    Videographer:       Robert Fenton
24
25
```

Page 3

1                        I N D E X

2                  E X A M I N A T I O N

3

DONNA GRAHMANN                                    PAGE

4

5    By:  Ms. Roller......................................5

6

7                      E X H I B I T S

8                 (No exhibits marked.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 34

1    to any other locations besides that Tomball, Texas,

2    location you just gave me the address for?

3           A.   In the last five?  I may have had one blood

4    draw at a different Quest location in my doctor's

5    office, the hospital building there, and I believe it

6    was a Quest as well.

7           Q.   Do you know the address of your doctor's

8    building?

9           A.   I don't know that one right offhand.

10          Q.   Do you recall when that visit would have

11   been?

12          A.   Pardon me?

13          Q.   When was that visit that you think you had

14   visited a Quest Labs in your doctor's office?

15          A.   That may have been two to three years ago

16   when I had to do it there.

17          Q.   So you'd mentioned this Quest tablet that you

18   encountered during at least a visit, right, to check in?

19          A.   Yes.

20          Q.   Do you recall the first time you encountered

21   that check-in tablet?

22          A.   I'm not sure how long that has been there.  I

23   didn't see when they put it in there, so -- I was told

24   by someone I was behind in line that you had to fill in

25   this -- this tablet.  So I wasn't able to do that, and

Page 35

1   the person in line helped me do that.

2       Q.   When was that visit?

3       A.   From the time they first put the tablet in,

4   which I don't know how long that's been there.

5       Q.   Do you remember that first time you

6   encountered the tablet?

7       A.   The very first time, yes, is when I had a

8   lady that was in front of me that had to help me.

9       Q.   Okay.  Was your husband there on that visit?

10      A.   He dropped me off there.

11      Q.   So he didn't come into the actual laboratory?

12      A.   Correct.

13      Q.   I called it a laboratory.  I guess I'll call

14  it a patient service center.  Okay?

15      A.   Huh.

16      Q.   On that visit do you recall -- so you have no

17  recollection of what year that visit was, right?

18      A.   I don't recall because I -- with me going so

19  frequently, I don't recall when they actually put that

20  in.  I know it's been there a while.

21      Q.   Prior to them putting the E-check-in kiosk

22  in, how would you inform staff that you had arrived?

23      A.   Usually they had someone sitting at the

24  little receptionist window and I could just give her my

25  name, and they would automatically have my lab sheet

Page 36

1       because the doctor would send it to them electronically.

2           Q.    And then you believe that process changed

3       when they introduced the E-check-in kiosk?

4           A.    I know that the -- the doctor still sends the

5       info electronically, but the check-in is what has

6       changed.  Because there's not always someone at the

7       counter, and that's when they put that tablet there that

8       is inaccessible to me.

9           Q.    So let's talk about that first visit where

10      you encountered the E-check-in kiosk.  Do you know if

11      you made an appointment that day or if you were a

12      walk-in?

13          A.    Sometimes -- most of the time I'll make an

14      appointment, but not always.  And at that very first one

15      I don't recall if I had an appointment or not.

16          Q.    How do you make appointments?

17          A.    Over the phone.  They have an automated line

18      you can call.

19          Q.    And are you able to successfully make

20      appointments for your visits using that online system --

21      I mean, over-the-phone system?

22          A.    I can.

23          Q.    What information do they take from you during

24      that --

25          A.    They --

```
 1              Do you remember that?
 2       A    I do.
 3       Q    And at your deposition you actually said
 4  that you were scheduled to go to Quest the very next
 5  day.                                            01:36:17
 6       A    I was.
 7       Q    Okay.  Did you go to Quest on that day?
 8       A    I did.
 9       Q    Was that May 4th, 2021?
10       A    It was.                               01:36:26
11       Q    Okay.  So I would like to talk to you about
12  that experience at Quest on May 4th, 2021.
13              Did you make an appointment for that visit?
14       A    Yes.
15       Q    Did you go to that visit alone?        01:36:44
16       A    I was dropped off.
17       Q    Who were you dropped off by?
18       A    My husband.
19       Q    And did he go and run his errands while he
20  dropped you off?                                01:36:58
21       A    He did.
22       Q    When you first walked into the patient
23  service center on May 4th, 2021, what did you do
24  when you got there?
25       A    Walked up toward the counter and I don't  01:37:16
```

Page 88

PA0162

```
1    recall if someone was there or not on the May 4th

2    one, but I knew about testing with the three-finger

3    swipe.  So I tried the three-finger swipe when I got

4    up to the counter and nothing, no voiceover, no

5    nothing.  I felt around the edge of the kiosk.  Did      01:37:45

6    not feel a jack for a headphone.  And when I had no

7    voiceover response, I just had to wait at the

8    counter until someone arrived.

9        Q    And what specifically did you do when you

10   went up to the kiosk?                                    01:38:08

11       A    I did a three-finger swipe up.

12       Q    And nothing happened when you did that?

13       A    Correct.  Well, I don't know.  If something

14   might have happened that didn't involve voiceover,

15   something could have happened, but if it did, I have    01:38:24

16   no way of knowing that.

17       Q    Okay.  You didn't hear any audible, any

18   audible sound coming from the kiosk?

19       A    No.

20       Q    And how many times did you do the             01:38:35

21   three-finger swipe on the kiosk?

22       A    I know at least two.  I don't know if it

23   was more than that, but I know I tried it two times,

24   at least.

25       Q    And how are you able to be sure that you       01:38:56
```

Page 89

PA0163

# EXHIBIT 14

PA0164

Page 1

1                    UNITED STATES DISTRICT COURT
2                    CENTRAL DISTRICT OF CALIFORNIA
3
      JULIAN VARGAS, ANNE WEST AND        )
4     AMERICAN COUNCIL OF THE BLIND,      )
      INDIVIDUALLY ON BEHALF OF           )
5     THEMSELVES AND ALL OTHERS SIMILARLY)  CASE NO.
      SITUATION,                          )
6                                         )  2:19-CV-08108
                     PLAINTIFFS,          ) DMG
7                                         )
           VS.                            )
8                                         )
      QUEST DIAGNOSTICS CLINICAL          )
9     LABORATORIES, INC., QUEST           )
      DIAGNOSTICS HOLDINGS, INC., QUEST   )
10    DIAGNOSTICS INCORPORATED; AND DOES  )
      1-10, INCLUSIVE,                    )
11                                        )
                     DEFENDANTS.          )
12                                        )
      _____)
13
14
15
16
17
18
                  VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF
19
                          KATHLEEN LYONS
20
                     THURSDAY, MAY 6, 2021
21
22
23
24
          JOB NO. 4522978-A
25
          REPORTED BY:  MELIA BASAVAND, CSR NO. 14089

Page 2

1       VIDEOTAPED DEPOSITION OF KATHLEEN LYONS, TAKEN ON BEHALF
2       OF THE DEFENDANTS, AT 12:23 P.M., THURSDAY, MAY 6, 2021,
3       AT BUFFALO, NEW YORK, BEFORE MELIA BASAVAND, CSR NO.
4       14089.
5
6
7
8       APPEARANCES OF COUNSEL:
9
10      FOR THE PLAINTIFFS:
11              HANDLEY FARAH & ANDERSON
                BY:  MATTHEW K. HANDLEY, ESQ.
12              -- VIA VIDEOCONFERENCE --
                777 6TH STREET NW
13              11TH FLOOR
                WASHINGTON, D.C., 20001
14              (202) 559-2411
                MHANDLEY@HFAJUSTICE.COM
15
16              -- AND --
17              NYE STIRLING HALE & MILLER, LLP
                BY:  BENJAMIN J. SWEET, ESQ.
18              -- VIA VIDEOCONFERENCE --
                1145 BOWER HILL ROAD
19              SUITE 104
                PITTSBURGH, PENNSYLVANIA 15243
20              (412) 857-5350
                BEN@NSHMLAW.COM
21
22
23
24
25

1          A P P E A R A N C E S (CONTINUED)

2

      FOR THE DEFENDANT:

3

              OGLETREE, DEAKINS, NASH, SMOAK & STEWART

4             BY:  AMBER L. ROLLER, ESQ.

              -- VIA VIDEOCONFERENCE --

5             400 SOUTH HOPE STREET

              SUITE 1200

6             LOS ANGELES, CALIFORNIA 90071

              (213) 239-9800

7             AMBER.ROLLER@OGLETREE.COM

8

9      ALSO PRESENT:   ROBERT FENTON, VIDEOGRAPHER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                              I N D E X

2       WITNESS                 EXAMINATION                 PAGE

3       KATHLEEN LYONS

4                               BY MS. ROLLER                7

5

6

7

8

9

10

11

12                          E X H I B I T S

13                            (NONE.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 37

1      Q    Can you give me an estimate.

2      A    No.

3      Q    Was it in 2020?

4      A    No.  It was probably before that.

5      Q    Was it 2019?

6      A    I don't know if that was the first time or

7    not.

8      Q    Okay.  Do you remember the first time that

9    you encountered the E check-in kiosk?

10      A    I don't remember when it was, no.

11      Q    But do you remember the visit in your head?

12      A    I just don't remember when I first

13    encountered that electronic device.

14      Q    Okay.  I understand that.  What I'm asking

15    is do you remember -- do you have a memory in your

16    head that oh, I remember encountering this check-in

17    device even though you don't remember the date?

18      A    Yes.

19      Q    Okay.  And so tell me what you recall about

20    that visit.

21      A    When I need to sign in, I have to tell

22    whoever is with me the answers to the questions and

23    that makes me very uncomfortable because it's not

24    very far away from the waiting room.  And then a lot

25    of what they need is personal information.  I'm not

Page 38

1   in the habit of giving out my birth date in public.

2           One time we got signed in for the wrong

3   thing because the person that was with me didn't

4   understand or didn't ask me or something, and he

5   said we were there for a drop off when, in fact, we

6   were there for a diagnostic test.  I just remember

7   being very uncomfortable because I had to give these

8   answers out loud.

9       Q    What --

10      A    I wasn't able to -- I wasn't able to --

11      Q    Go ahead.  I'm sorry, I cut you off.

12      A    I wasn't able to have access to the device

13  itself because it had no speech.

14      Q    So the first time that you encountered the

15  device, did you go with somebody to that visit?

16      A    Yes.

17      Q    Do you recall who it was?

18      A    I've gone with different people at different

19  times for different reasons.  Very frequently it's

20  my friend Arnie, and he's very good about driving me

21  places and helping me out with things like that.

22      Q    And when you went to Quest on that first

23  visit, where you encountered the kiosk, was Arnie

24  with you on that visit?

25      A    I don't remember.

Page 42

1    A    Right.

2    Q    Okay.  And how about your last name?

3    A    Well, they go together.

4    Q    Okay.

5    A    And I don't like people knowing my name.

6    Q    On any of your visits to Quest have you ever

7    seen -- well, let me -- let me rephrase that.

8         How many times do you think that you've been

9    to Quest since they've had this E check-in kiosk?

10   A    Golly, probably ten or so I would guess.

11   Q    And of those ten times have you always had

12   somebody else check you in on the E kiosk?

13   A    Yes.

14   Q    Have you ever gone up to the receptionist or

15   one of the Quest employees and asked them if they

16   could check you in?

17   A    You can't find them.  They're not there at

18   the desk.  And the only other place I would know to

19   look would be where you go in to have your blood

20   drawn, and you're not supposed to go in there until

21   you're called.

22   Q    So that's a yes that you've had somebody

23   check you in all of those approximate ten times that

24   you've been to Quest when they had the E check-in

25   kiosk?

Page 43

1      A     I had somebody that was with me.  Or one

2    time a patient that was waiting volunteered to do

3    it, and there again I had to give her that personal

4    information.  And I didn't know her at all.  That

5    made me very uncomfortable.

6      Q     The people that have been with you

7    typically, you mentioned Arnie?

8      A     Yes.

9      Q     Is there anybody else that you can recall

10   that's gone with you to Quest when you've needed to

11   use the E check-in kiosk?

12     A     Seymour Knox, IV, went with me one time.

13   Gary Szczepankiewicz went with me one time.

14     Q     What was that person's first name?

15     A     Gary.

16     Q     Gary.  Okay.  And the court reporter is

17   definitely going to ask you how to spell those

18   names.

19           So Seymour and Gary and Arnie.  Anybody else

20   that you can recall that's been with you?

21     A     Probably my friend Carla.

22           Carla with a C.

23     Q     Anybody else?

24     A     There might have been, but I don't remember.

25     Q     Do all of those folks know your first and

1      Q    Okay.

2      A    Assuming that the receptionist would put the

3   information into the kiosk.

4      Q    Okay.  What if the receptionist wouldn't put

5   the information into the kiosk and --

6          What if the receptionist wouldn't put the

7   information into the kiosk and instead just checked

8   you in on their computer?

9          MR. SWEET:  Same objection.

10          THE WITNESS:  I don't think that's how it

11   works, but I haven't been able to check in with a

12   receptionist, as I said, in many years because there

13   has not been a receptionist there to do that.

14   BY MS. ROLLER:

15      Q    Okay.  I'm just trying to understand your

16   preference is and if -- if it was possible, what --

17   what you would prefer.  So if there was --

18      A    I would prefer that the kiosk be equipped

19   with speech, such as voiceover on the iPhone, and a

20   head jack place so that you could plug in your

21   earphones and use that system.

22      Q    If you -- if the kiosk had that, would you

23   still have somebody come to the patient service

24   center with you on your visits to Quest?

25          MR. SWEET:  Objection.  Calls for

# EXHIBIT 15

PA0174

Page 1

1              UNITED STATES DISTRICT COURT
2              CENTRAL DISTRICT OF CALIFORNIA
3
     JULIAN VARGAS, ANNE WEST AND        )
4    AMERICAN COUNCIL OF THE BLIND,      )
     INDIVIDUALLY ON BEHALF OF           )
5    THEMSELVES AND ALL OTHERS SIMILARLY)  CASE NO.
     SITUATION,                          )
6                                        )  2:19-CV-08108
                      PLAINTIFFS,        ) DMG
7                                        )
          VS.                            )
8                                        )
     QUEST DIAGNOSTICS CLINICAL          )
9    LABORATORIES, INC., QUEST           )
     DIAGNOSTICS HOLDINGS, INC., QUEST   )
10   DIAGNOSTICS INCORPORATED; AND DOES  )
     1-10, INCLUSIVE,                    )
11                                       )
                      DEFENDANTS.        )
12                                       )
     _____)
13
14
15
16
17
18
               VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF
19
                      REGINA MARIE BRINK
20
                      THURSDAY, MAY 6, 2021
21
22
23
24
         JOB NO. 4522978-B
25
         REPORTED BY:  MELIA BASAVAND, CSR NO. 14089

1    VIDEOTAPED DEPOSITION OF REGINA MARIE BRINK, TAKEN ON

2    BEHALF OF THE DEFENDANTS, AT 2:04 P.M., THURSDAY, MAY 6,

3    2021, AT SACRAMENTO, CALIFORNIA, BEFORE MELIA BASAVAND,

4    CSR NO. 14089.

5

6

7

8    APPEARANCES OF COUNSEL:

9

10   FOR THE PLAINTIFFS:

11           HANDLEY, FARAH & ANDERSON

             BY:  MATTHEW K. HANDLEY, ESQ.

12           -- VIA VIDEOCONFERENCE --

             777 6TH STREET NW

13           11TH FLOOR

             WASHINGTON, D.C., 20001

14           (202) 559-2411

             MHANDLEY@HFAJUSTICE.COM

15

16   FOR THE DEFENDANT:

17           OGLETREE, DEAKINS, NASH, SMOAK & STEWART

             BY:  AMBER L. ROLLER, ESQ.

18           -- VIA VIDEOCONFERENCE --

             400 SOUTH HOPE STREET

19           SUITE 1200

             LOS ANGELES, CALIFORNIA 90071

20           (213) 239-9800

             AMBER.ROLLER@OGLETREE.COM

21

22

23   ALSO PRESENT:   ROBERT FENTON, VIDEOGRAPHER

24

25

Page 3

1                          I N D E X

2    WITNESS                EXAMINATION              PAGE

3    REGINA MARIE BRINK

4                           BY MS. ROLLER            6

5

6

7

8

9

10

11

12                       E X H I B I T S

13                         (NONE.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 41

1      Q    And how long have you been a Quest

2  Diagnostic's patient?

3      A    Since 2012 when I switched to Dignity

4  Health.

5      Q    What location of Quest have you visited

6  since 2012?

7      A    So 3000 Q Street, like the letter Q, where

8  my doctor's office is and then 7248 South Land Park

9  Drive which is near my home.

10     Q    And what makes you decide whether you go to

11  one location or the other?

12     A    Accessibility.

13     Q    What do you mean by that?

14     A    So I was going to Q Street, and at Q Street

15  they have a board that --

16          Well, let me back up.

17          At Q Street you go in, and from what I

18  understand, there is a kiosk.  But I go up to the

19  receptionist.  She takes my name down, and I sit

20  down, and I wait.  And when she has time, she calls

21  me back up because she's checking in a lot of

22  different people.  It's very crowded.  And so I

23  usually have a wait.

24          And then when she has time, she puts my

25  number in for me or my information in and she tells

Page 46

1      A    Yes.

2      Q    Okay.

3      A    I used to just -- you know, if she ordered a

4    blood test, I just walk downstairs and try to do it

5    if I could right there unless I was fasting.

6      Q    Okay.  And so when you first encountered

7    that kiosk, it sounds like your daughter was the one

8    that informed you of that; is that right?

9      A    Yes.

10     Q    So did she tell you?

11     A    She just said there's -- there's a thing you

12   have to check-in, mom.  But I don't think it talks

13   to you.

14          And I said okay, well, where is it?

15          She showed it to me.

16          And I said I just -- you know, I said

17   probably let me ask.  So I said is this successful?

18   Can I turn this on to talk?

19          And she said no.

20          And I said well, can I get some assistance?

21          And I generally don't allow my kids to do

22   those kinds of things for me.  So I insisted on

23   assistance from someone at the counter, the

24   reception area.

25     Q    Was there a receptionist sitting there at

Page 47

1    the counter when you arrived?

2        A    I don't recall.

3        Q    Okay.  How long was it after your daughter

4    informed you that there was a kiosk that you spoke

5    with a receptionist or whoever it was that you spoke

6    with?

7        A    It -- it was a little bit.  It wasn't a

8    quick process.

9        Q    Okay.  So you learned about the kiosk and

10   then did you stand there?  Did you wait for somebody

11   to come out?

12            How did you engage somebody from Quest?

13       A    I think I asked my daughter was there a desk

14   and we went to the desk.  And I think there might

15   have been a line, and I had to wait my turn.  And I

16   don't know if there was someone at that desk that

17   whole time.

18       Q    When is that --

19            Sorry, go ahead.

20       A    So I was -- there was just some time.  I

21   just remember some waiting time before I was

22   actually able to talk to someone at that desk she

23   took me too.

24       Q    And when you spoke with the Quest staff

25   member at the the desk, what did you say?

Page 48

1      A    I said I'm totally blind so I can't operate

2    the kiosk to sign in.

3      Q    And did you ask at that point if it was --

4    if it had speaking capabilities?

5      A    I think I just said I can't operate it.

6      Q    Did you try to operate it?

7      A    No.

8      Q    Okay.  And then what did the Quest staff

9    member say in response?

10     A    She said well, could your daughter help you?

11     Q    And then what did you say?

12     A    I said no.  I'm not comfortable with that.

13     Q    And then what happened after that?

14     A    She said okay.  Well, you have to wait, but

15   I can assist you.

16     Q    Okay.  And then how long after that

17   conversation with a Quest staff member did she

18   assist you?

19     A    It was probably about 10, 15 minutes.

20     Q    How did she assist you?

21     A    I don't know.  She -- she asked for my card

22   and then she started to ask me more involved

23   questions.  But it was in the waiting room, and so I

24   asked her could we go into a private office.  So she

25   had me wait again and then she took me into an

Page 56

1      Q    Okay.  When you would go in during those

2  visits from 2012 to 2018, do you recall how many

3  times there was somebody at the front desk who was

4  able to assist you?

5      A    Almost every time I went up there.  I do

6  remember a couple of times I had to ask somebody,

7  and I would need to go to the -- I'd have to ask a

8  patient, and they would say oh, she'll -- she'll be

9  back -- blah, blah, blah.  And so I'd have to stand

10  there and wait until she got back to the desk.

11     Q    But most of the time would you say that

12  there was somebody waiting at the desk?

13     A    Yes.

14     Q    And how many times do you recall that there

15  was not somebody waiting at the desk where you

16  needed to wait for them?

17     A    Like I said, one or two.

18     Q    Okay.  How -- how long did you need to wait

19  on those one or two occasions for somebody to return

20  to the desk?

21     A    About five minutes maybe.

22     Q    Okay.  And then would the time vary between

23  the time you said you needed assistance and then the

24  time that you were checked in?

25     A    Yes.

Page 84

1      A    Not that I know of.  I just finished my

2   checks and everything came back good, and I finished

3   my eye appointment so...

4      Q    Okay.  Are you satisfied with the procedure

5   that you have in place for the Land Park location

6   where you go to the receptionist and -- assuming

7   that you made an appointment -- they just

8   immediately check you in?

9      A    No.  But I like it better than Q Street.

10     Q    Okay.  And what -- why where you not

11  satisfied with that process?

12     A    I would prefer to be able to use the kiosk

13  myself and not have to ask for assistance.  As I

14  shared with you, independence is very important to

15  me and privacy is extremely important to me.  And

16  although I'm waiting less time, I'm -- it's still

17  not the same experience as the sighted people coming

18  through.

19          And I feel that it's -- it's just my

20  personal preference that I would be able to have the

21  same things accessible to me as everybody else.  I

22  also think that I should have been made aware that

23  there was a texting option.

24          Suppose I did prefer waiting outside.  I had

25  no idea there was a texting option.

Page 85

```
1        Q    And do you know -- do you know how that
2    option is communicated?
3        A    No.  I just found out about it when -- when
4    she mentioned it at that time.
5        Q    Okay.  And what is your understanding of the
6    purpose for checking in when you get to Quest?
7             MR. HANDLEY:  Objection.  Vague.
8             Go ahead, Regina.
9             THE WITNESS:  Oh, that's -- I was just going
10   to say I didn't understand.
11   BY MS. ROLLER:
12       Q    Sure.
13            Why do you think you check-in at Quest?
14   What's the purpose of it?
15            MR. HANDLEY:  Objection.  Vague.
16            Go ahead.
17            THE WITNESS:  So I know you have to do it.
18   BY MS. ROLLER:
19       Q    Okay.  So let me ask maybe a more direct
20   question.  Is it your understanding that the reason
21   that you check-in is to let them know that you're
22   there for your blood draw?
23       A    Well, I would say it's more accurate to say
24   that it's to put -- be put in the queue --
25       Q    Okay.
```

# EXHIBIT 16

PA0185

Page 1

1            UNITED STATES DISTRICT COURT
2            CENTRAL DISTRICT OF CALIFORNIA
3
     JULIAN VARGAS, ANNE WEST AND        )
4    AMERICAN COUNCIL OF THE BLIND,      )
     INDIVIDUALLY ON BEHALF OF           )
5    THEMSELVES AND ALL OTHERS SIMILARLY)  CASE NO.
     SITUATION,                          )
6                                        )  2:19-CV-08108
                    PLAINTIFFS,          ) DMG
7                                        )
          VS.                            )
8                                        )
     QUEST DIAGNOSTICS CLINICAL          )
9    LABORATORIES, INC., QUEST           )
     DIAGNOSTICS HOLDINGS, INC., QUEST   )
10   DIAGNOSTICS INCORPORATED; AND DOES  )
     1-10, INCLUSIVE,                    )
11                                       )
                    DEFENDANTS.          )
12                                       )
     _____)
13
14
15
16
17
18
              VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF
19
                    ROBIN CHARLOTTE REHDER
20
                    FRIDAY, MAY 21, 2021
21
22
23
24
     JOB NO. 4589711
25
     REPORTED BY:  MELIA BASAVAND, CSR NO. 14089

Page 2

1      VIDEOTAPED DEPOSITION OF ROBIN CHARLOTTE REHDER, TAKEN ON

2      BEHALF OF THE DEFENDANTS, AT 10:31 A.M., FRIDAY, MAY 21,

3      2021, AT HENDERSON, NEVADA, BEFORE MELIA BASAVAND, CSR

4      NO. 14089.

5

6

7

8

9      APPEARANCES OF COUNSEL:

10

11     FOR THE PLAINTIFFS:

12            HANDLEY FARAH & ANDERSON
              BY:  MATTHEW K. HANDLEY, ESQ.

13            -- VIA VIDEOCONFERENCE --
              777 6TH STREET NW

14            11TH FLOOR
              WASHINGTON, D.C., 20001

15            (202) 559-2411
              MHANDLEY@HFAJUSTICE.COM

16

17     FOR THE DEFENDANT:

18            OGLETREE, DEAKINS, NASH, SMOAK & STEWART
              BY:  AMBER L. ROLLER, ESQ.

19            -- VIA VIDEOCONFERENCE --
              400 SOUTH HOPE STREET

20            SUITE 1200
              LOS ANGELES, CALIFORNIA 90071

21            (213) 239-9800
              AMBER.ROLLER@OGLETREE.COM

22

23

24     ALSO PRESENT:  ROBERT FENTON, VIDEOGRAPHER

25

Veritext Legal Solutions

Page 3

1                          I N D E X

2

3    WITNESS                  EXAMINATION              PAGE

4    ROBIN CHARLOTTE REHDER

5                            BY MS. ROLLER              6

6

7

8

9

10

11

12

13                        E X H I B I T S

14                          (NONE.)

15

16

17

18

19

20

21

22

23

24

25

1    the first time that you encountered the E check-in

2    device kiosk?

3       A    Yes.

4       Q    So between 2015, your first visit, and

5    approximately August 7th, 2018, you don't recall

6    coming across the E check-in device?

7       A    No, I don't.

8       Q    And for those visits between that time

9    period would you just check-in with a receptionist?

10      A    Yes.

11      Q    All right.  So tell me about your first

12   experience at Quest where they had these E check-in

13   devices.

14      A    When I came in in 2018, there was no one at

15   the desk, and somebody came up to me and offered to

16   help me sign in.

17           And I said what is it?  A touch screen?

18           They said yes.

19           And I could tell they were nervous,

20   embarrassed when they were asking me my name and

21   birthday, but they typed it in.  And it was a

22   patient, and I called and complained about it

23   because it's against the HIPAA law for a patient to

24   sign another patient in.

25           I called the local Quest office and

Page 46

1    explained my situation.  You know, I just didn't

2    feel comfortable, and I could tell that the patient

3    didn't either, and it's not right.

4         But when I went back in 19 -- in '20, there

5    was one at the desk.  And I also --

6    Q    Okay.

7    A    I'm sorry.

8    Q    Go ahead.

9    A    I just felt that that that situation was

10   very uncomfortable, and it shouldn't have happened.

11   And that's why I'm here now too.

12        I know other places, for example, I

13   understand -- and I know this is out of line, and I

14   apologize -- but I understand stores are trying to

15   go complete checkout by yourself and that to me is

16   putting people out of work.  And I have a --

17   (unintelligible) -- working, and I have a job.  It's

18   just losing the human touch, and I don't like it.

19        I realize it's 2021.

20   Q    Like the automated check-in, checkout

21   processes is because you think that it's displacing

22   workers and taking jobs away from people?

23   A    Plus you're losing the human touch, the

24   communication verbal contact.

25   Q    Okay.  So I want to talk about this visit in

# EXHIBIT 17

PA0191

```
 1              UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA
 2

        ------------------------------:
 3   JULIAN VARGAS, et al.,         :
                                    :
 4            Plaintiffs,           :
                                    :
 5         vs.                      : Case No.:
                                    : 2:19-cv-08108
 6   QUEST DIAGNOSTICS CLINICAL     : DMG (MRWx)
     LABORATORIES, INC., et al.,    :
 7                                  :
              Defendants.           :
 8      ------------------------------:
 9

10

11       REMOTE VIDEO-TAPED 30(b)(6) DEPOSITION OF
12                  CLARK RACHFAL
13

14   DATE:           June 9, 2020
15   TIME:           10:16 a.m.
16   LOCATION:       Alexandria, Virginia
17   REPORTED BY:    Shari R. Broussard, RPR, CSR
                     Reporter, Notary
18

19

20

21

22      Job No. CS4621386
```

```
                                              Page 2

  1                 A P P E A R A N C E S
  2      On behalf of Plaintiffs:
  3            MATTHEW K. HANDLEY, ESQUIRE
               Handley Farah & Anderson, PLLC
  4            200 Massachusetts Avenue, Northwest
               7th Floor
  5            Washington, D.C. 20001
               (202) 559-2411
  6            mhandley@hfajustice.com
  7                     - and -
  8            JORDAN T. PORTER, ESQUIRE
               Nye, Stirling, Hale & Miller, LLP
  9            33 West Mission Street, Suite 201
               Santa Barbara, California 93101
 10            (805) 963-2345
               jordan@nshmlaw.com
 11
         On behalf of Defendants:
 12
               DAVID RAIZMAN, ESQUIRE
 13            Ogletree, Deakins, Nash,
                 Smoak & Stewart, P.C.
 14            400 South Hope Street
               Los Angeles, California 90071
 15            (213) 438-1285
               david.raizman@ogletree.com
 16
         ALSO PRESENT:
 17
               Amer Pharaon, Quest Diagnostics
 18            Jeffrey Elam, Video Technician
 19
 20
 21
 22
```

Page 3

1                    C O N T E N T S

2    EXAMINATION BY:                              PAGE
3       Counsel for Defendants                       6
4    DEPOSITION EXHIBITS:    *                    PAGE
5    59 ACB Organizational Chart                    34
6    60 Plaintiff ACB's Third Supplemental
          Response to First Set of Interrogatories   73
7
     61 Verification, 6/8/21                        77
8
     62 e-mails, Bates PL418 to 439                129
9
     63 Document, Bates PL392                      143
10
     64 Dots and Dashes, 12/14/18, Bates PL389
11        to 391                                   143
12   65 Letter from Bridges to Rusckowski,
          Bates PL405 to 406                       162
13
     66 Call Log, Bates PL570 to 573               177
14
     67 Notes, 1/25/19 and e-mails, Bates
15        PL577 to 596                             183
16   68 e-mails Re: Checking In, Bates PL407
          to 414                                   214
17
     69 Letter to ACB Members from Stanley,
18        Bates PL415 to 416                       230
19   70 June 2020 ACB Membership Survey, Bates
          PL393 to 402                             239
20
     71 Quest Diagnostic Outreach Results, Bates
21        PL668 to 672                             260
22   (* Exhibits attached to transcript.)

Page 40

```
 1        Q    And do you or does ACB publish its
 2   advocacy goals for any particular time period?
 3        A    I guess could you please explain what
 4   you mean by "advocacy goals."
 5        Q    Its objectives, its aims, what it's
 6   trying to achieve with its advocacy.
 7        A    Yes, that information is available
 8   publicly on our website.
 9        Q    And what are currently ACB's advocacy
10   goals?
11        A    In broad strokes, it's to increase the
12   security, independence, quality of life and
13   economic opportunity for people who are blind and
14   experiencing vision loss.
15        Q    And are there more specific goals that
16   relate to ways to achieve that?
17        A    We achieve that through legislation,
18   regulation, grassroots advocacy, direct
19   communications with companies and other entities.
20        Q    I'm thinking more of subject matter type
21   of initiatives.
22             Do you have an initiative, for example,
```

Page 78

1         A    Yes.

2         Q    And did you make every effort to ensure

3    that those were accurate and correct?

4         A    Yep.  Yes.  Excuse me.

5         Q    All right.  So going back to Exhibit 60,

6    which are the interrogatory responses themselves,

7    I'm looking at Interrogatory No. 1 and the

8    response.   There's a chart that shows membership

9    from the years 2015 to 2020.

10              Is it accurate to say that you reviewed

11   these numbers and made every effort for them to be

12   accurate in this response?

13        A    Yes, I spoke with, again, I believe it

14   was Nancy Becker, who would have had access to our

15   membership numbers as -- as best we know and asked

16   her to provide them.

17        Q    And so the number of 8285 -- 8,285

18   members in 2020 is accurate to the best of your

19   knowledge?

20        A    Yes.

21        Q    Okay.  Did you ever have occasion to

22   speak with Claire Stanley about the basis of her

Page 79

```
 1      20,000 member estimate?

 2          A    No.

 3          Q    Does ACB have any other forms of

 4      affiliation other than membership?

 5          A    Can you be more specific because I don't

 6      understand your question?

 7          Q    I really can't, but is there a way to

 8      say that I'm a supporter, an affiliate of ACB

 9      without becoming a member of ACB?

10          A    I mean, I -- will you repeat the

11      question, please.  I'm sorry.

12          Q    I'm move on.

13          A    Okay.

14          Q    Do you have to be blind to be a member

15      of ACB?

16          A    You do not.

17          Q    Do you have to have a visual impairment?

18          A    You do not.

19          Q    Do ACB's members have varying levels of

20      visual impairment?

21          A    I believe so.

22          Q    And some members are sighted as far as
```

# EXHIBIT 18

PA0198

```
 1                  UNITED STATES DISTRICT COURT
 2             FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4       JULIAN VARGAS, ANNE WEST, AND )
         AMERICAN COUNCIL OF THE BLIND,)
 5       INDIVIDUALLY ON BEHALF OF     )
         THEMSELVES AND ALL OTHERS     )
 6       SIMILARLY SITUATED,           )
                                       )
 7                                     )
                            PLAINTIFFS,   )
 8                                     )
                                       )
 9       vs.                           )CASE NO. 2:19-CV-8108
                                       )
10                                     )
         QUEST DIAGNOSTICS CLINICAL    )
11       LABORATORIES, INC., QUEST     )
         DIAGNOSTICS HOLDINGS, INC.,   )
12       QUEST DIAGNOSTICS INCORPORATED)
         AND DOES 1-10, INCLUSIVE,     )
13                                     )
                                       )
14                                     )
                            DEFENDANTS.   )
15       _____)
16
17
18        30(b)(6) DEPOSITION OF ADAM ARONSON, PERSON MOST
19               KNOWLEDGEABLE FOR LILITAB, LLC,
20                      JUNE 29, 2021
21
22
23
24       JOB NO:  4667387
25       REPORTER: JESSICA N. NAVARRO, C.S.R. NO. 13512
```

Page 1

```
 1     VIDEOCONFERENCE DEPOSITION OF ADAM ARONSON TAKEN ON

 2     BEHALF OF PLAINTIFFS AT 9:03 A.M., ON TUESDAY,

 3     JUNE 29, 2021, CALIFORNIA, BEFORE JESSICA N.

 4     NAVARRO, C.S.R. NO. 13512, PURSUANT TO NOTICE.

 5

 6     APPEARANCES OF COUNSEL

 7

 8     FOR PLAINTIFF:

 9               NYE, STIRLING, HALE & MILLER, LLP
                 BY JONATHAN D. MILLER, ATTORNEY AT LAW

10               33 WEST MISSION STREET, SUITE 201
                 SANTA BARBARA, CALIFORNIA  93101

11               805.963.2345
                 JONATHAN@NSHMLAW.COM

12

13     FOR DEFENDANTS:

14               OGLETREE, DEAKINS, NASH,
                 SMOAK & STEWART, P.C.

15               BY DAVID RAIZMAN, ATTORNEY AT LAW
                 400 SOUTH HOPE STREET, SUITE 1200

16               LOS ANGELES, CALIFORNIA 90071
                 213.239.9800

17               DAVID.RAIZMAN@OGLETREE.COM

18

19

20     ALSO PRESENT:

21               ANTHONY GALINO, VIDEOGRAPHER

22               AMER PHARAON

23

24

25

                                             Page  2
```

```
 1                         I N D E X

 2

 3    WITNESS              EXAMINATION          PAGE

 4    ADAM ARONSON         BY MR. MILLER         5, 126

 5                         BY MR. RAIZMAN       103

 6

 7

 8                      E X H I B I T S

 9    NO.           PAGE       DESCRIPTION

10    EXHIBIT 72     24        PLAINTIFF JULIAN VARGAS' RULE

                               30(b)(6) DEPOSITION NOTICE TO

11                             LILITAB LLC

12    EXHIBIT 73     25        KIOSK PRODUCT COMPARISON

13    EXHIBIT 74     38        KIOSK PRODUCT COMPARISON

14    EXHIBIT 75     41        KIOSK PRODUCT COMPARISON

15    EXHIBIT 76     42        KIOSK PRODUCT COMPARISON

16    EXHIBIT 77     44        LILITAB ACCESSORIES

17    EXHIBIT 78     59        EMAIL CHAIN

18    EXHIBIT 79     81        EMAIL CHAIN

19    EXHIBIT 80     91        QUEST EMAILS

20    EXHIBIT 81     93        QUEST EMAILS

21    EXHIBIT 82     95        HARDWARE OPTIONS

22

23

24        QUESTIONS INSTRUCTED NOT TO BE ANSWERED

25                         (NONE)

                                            Page 3
```

```
 1    2012 through the present?                        09:20
 2        A    Yes, we have.  Although, as I -- with the
 3    exceptions I mentioned.  There are -- there are a
 4    large subset of accessories that never make it onto
 5    the website, either because they don't have broad    09:20
 6    economic potential or because they're very specific
 7    to a -- very specific use case or customer or client
 8    use.
 9        Q    Some customized feature, for example, that
10    a client might ask for?                           09:20
11        A    That's correct.
12        Q    And your current title at Lilitab, is that
13    the CEO?
14        A    That's correct.
15        Q    And how long have you held that title,      09:21
16    since 2012?
17        A    That's correct.  I mean, theoretically a
18    little bit before that because the company was
19    formed before the website went live, but, yeah.
20        Q    Approximately, how many individuals does    09:21
21    Lilitab presently employee?
22        A    Currently, I think it's 12 employees right
23    now.
24        Q    And then do you -- you farm out the actual
25    manufacturing of your devices?                    09:21
```

Page 21

PA0202

```
 1     was making available for purchase as of the 2015          09:30

 2     time frame?

 3          A     That's correct.

 4          Q     And the accessory option would include a

 5     headphone, for example?                                   09:30

 6          A     That's correct.  Headphone jack, which

 7     means you can plug your own headphones into it.  We

 8     also offer headphones you can hang on the mount

 9     itself.

10          Q     So, let me focus on that just for a            09:30

11     moment.  In 2015, as it indicates here, one of the

12     options that a third party could purchase from your

13     company would be a headphone jack -- a unit that had

14     a headphone jack; is that right?

15          A     That's correct.                                09:31

16          Q     And separately they could also purchase

17     headphones from your company that were wired into

18     the -- to the kiosk; is that right?

19          A     That's also possible.

20          Q     And those units would then have a holder       09:31

21     for the headphones that would hang off the kiosk?

22          A     That's correct.

23          Q     And would those headphones then allow

24     access to sound out of the tablets that are listed

25     in the tablet support?                                    09:31
```

Page 29

PA0203

```
 1        A    Depends upon the tablet, but yes.  So all        09:31
 2    the iPads, probably most of the Android tablets,
 3    yes.
 4             It just depended upon on if there's space
 5    inside the enclosure to fit the headphone jack.  I        09:31
 6    believe all the tablets listed here, yes, but I
 7    couldn't -- I can't say 100 percent unless I went
 8    back and looked at all the configurations.  But I
 9    can tell you that it's true for all the iPads.
10        Q    Okay.  That's where I want to focus my            09:31
11    questions.  I'm going to ask it again just to make a
12    clear record.
13             Am I correct in understanding as of 2015
14    it was possible to add headphones through a Lilitab
15    enclosure that would interface with the iPads?           09:32
16        A    If you added that option to your kiosk,
17    yes.
18        Q    And separately, am I correct in
19    understanding that Lilitab would even sell third
20    party's headphones that could then access the iPad      09:32
21    that are on the computer under tablets --
22        A    No, we didn't -- no, we didn't sell the
23    headphones, we would sell the mount that would hold
24    the headphones and the facility to plug those
25    headphones into the tablet, but we would not provide    09:32
```

Page 30

```
 1    the headphones or resell the headphones ourselves,        09:32

 2    no.

 3         Q    The headphones could be provided from some

 4    other third party vendor; is that --

 5         A    Yeah, we provided a recommendation of a         09:32

 6    couple of different headphones that we thought were

 7    good options for this use, but we didn't actually

 8    procure them and resell them ourselves.

 9         Q    Again, just to make a clear record, as of

10    2015 there were basically two options if you wanted       09:32

11    headphones.  One was to have a headphone jack placed

12    in a Lilitab enclosure; correct?

13         A    That's correct.

14         Q    And that can be purchased for an

15    additional fee; is that true?                             09:32

16         A    That's right.

17         Q    And do you know approximately what it was

18    in 2015?

19         A    I'd have to go back and look, but I think

20    it was $30 per kiosk.                                     09:33

21         Q    Your best estimate would be $30 per kiosk?

22         A    That's correct.

23         Q    And then separately another option in 2015

24    would be to purchase a headphone mount and the

25    wiring capability to add a third party headphone          09:33
```

Page 31

PA0205

```
 1    device?                                          09:33

 2         A    That's right.

 3         Q    And how much would that have cost in

 4    around 2015?

 5         A    Again, I can't remember, but I believe it   09:33

 6    was somewhere around $50.

 7         Q    Best estimate would be approximately $50?

 8         A    That would be my best guess. I could go

 9    back and look for you, but that's my best guess.

10         Q    I'll try and see if I have other documents   09:33

11    that refresh your memory as we go through here

12    today.

13         A    Okay.

14         Q    In addition, am I correct in understanding

15    the one of the accessory options that existed for   09:33

16    the kiosks identified in Exhibit 73 was a keyboard

17    mount?

18         A    That's correct.

19         Q    And what was that accessory for?

20         A    To accept a Bluetooth keyboard,            09:34

21    specifically the Apple wireless keyboard at the

22    time.  So that would allow you to use a keyboard

23    with any tablet that you wanted to for text input.

24         Q    So if the company wanted to have a

25    keyboard that would allow text input into the iPad   09:34
```

Page 32

PA0206

1    device, your company could offer that mount for        09:34

2    sale; is that right?

3         A    That's true.  Of course, you can use a

4    screen for text input.  But if you're doing a lot of

5    text input, then a keyboard is going to be superior,   09:34

6    so...

7         Q    And am I correct in understanding then

8    that the intention would be that the keyboard would

9    interface with the tablet device?

10        A    That's correct.                              09:34

11        Q    Specifically at that time it would

12   interface, from your understanding, with the iPad

13   devices that are identified in the tablet support?

14        A    All of the tablets could use it, including

15   the iPad, that's correct.                              09:34

16        Q    Am I correct that in addition to the Floor

17   Pro, both the Counter Pro and Surface Pro also

18   offered keyboard options, keyboard mounting options?

19        A    The Wall Pro could accept a keyboard.

20   The -- I'm not sure, actually.  This is probably a     09:35

21   better -- what this document here shows is probably

22   better recollection than mine.  If it says it can

23   accept a keyboard mount, then it can.

24             So looking at this document, everything

25   except for that one in the far right, if -- if you     09:35

                                                    Page 33

PA0207

```
 1            A      If someone designed that app          09:39
 2   appropriately, they could use -- they could leverage
 3   all that in conjunction with audio out facility, for
 4   example, headphone jack or headphone mounted on the
 5   kiosk.  That's out of our control though.  That's an   09:39
 6   app design, which we didn't do app design for Quest.
 7            Q      That would be up to the company or who is
 8   ever actually purchasing the tablet themselves?
 9            A      That's correct.
10            Q      But in terms of what Lilitab could      09:39
11   provide, Lilitab could provide a kiosk that had a
12   headphone jack that would allow somebody to access,
13   for example, the voiceover technology in an
14   accessibility suite on an iPad?
15            A      Yes, that's true.                       09:39
16            Q      Lilitab had that ability to provide that
17   type of kiosk back in 2015; correct?
18            A      That's correct.
19            Q      And has that ability to provide a kiosk
20   that could have a headphone jack and interface with    09:39
21   voiceover technology from 2015 to the present; isn't
22   that true?
23            A      That's correct.
24            Q      So that a company seeking to want to
25   utilize a voiceover technology on an iPad could         09:40
```

                                                    Page 37

PA0208

```
1    purchase the Lilitab enclosure that would           09:40
2    accommodate the headphone jack to be able to do that
3    functionality?
4         A    That's correct.
5         Q    And, again, that headphone jack would be   09:40
6    somewhere in the range of 30 extra dollars per unit;
7    is that true?
8         A    Yeah, that's my recollection.
9         Q    I'm going to go through a few more of
10   these just to get your best testimony here.          09:40
11        A    Sure.
12        Q    Let me show you what I'll mark Exhibit 74.
13             (Whereupon, Plaintiff's Exhibit 74 was
14              marked for identification by the court
15              reporter and attached hereto.)            09:40
16   BY MR. MILLER:
17        Q    And it's another printout through The
18   Wayback Machine of Lilitab's website as it would
19   have existed in April of 2016.  And can you take a
20   moment and look at this document and verify whether  09:41
21   that's true?
22        A    I mean, glancing at it, it looks -- it
23   looks like it's right.  This is obviously stripped
24   all the formatting and styling off of it, so it's
25   not exactly what it would have looked like on our    09:41
```

Page 38

| | | |
|---|---|---|
| 1 | inaccuracies in the photos shown here.  And it looks | 09:46 |
| 2 | like the content below maybe accurate.  I'm mainly | |
| 3 | keying that off of the tablet generations that are | |
| 4 | supported which look to be accurate for the year. | |
| 5 | But I can tell you those photos up at -- | 09:47 |
| 6 | the screen shots of the photos are definitely not | |
| 7 | accurate. | |
| 8 | Q    Okay.  We'll pin that down.  Let me ask | |
| 9 | just some foundational questions. | |
| 10 | A    Sure. | 09:47 |
| 11 | Q    In 2018 did Lilitab continue to offer | |
| 12 | kiosks that had headphone jack options? | |
| 13 | A    Oh, yeah. | |
| 14 | Q    And the same is true in 2019, Lilitab | |
| 15 | continued to offer kiosk options that had headphone | 09:47 |
| 16 | jack availability? | |
| 17 | A    Yes, and we can continue to this day. | |
| 18 | Q    All right.  Through the present; correct? | |
| 19 | A    Yes. | |
| 20 | Q    And the same with respect to kiosks that | 09:47 |
| 21 | can hold keyboards, Lilitab offered for sale in 2018 | |
| 22 | to the present kiosk options that could hold | |
| 23 | keyboards if the company chose to purchase those | |
| 24 | options? | |
| 25 | A    Yes, that's correct. | 09:47 |

Page 43

| | | |
|---|---|---|
| 1 | including Quest, but generally speaking, check-in to | 10:07 |
| 2 | Enterprise involves somebody coming to the | |
| 3 | Enterprise that has an appointment, usually | |
| 4 | preexisting, that they need to confirm and check-in | |
| 5 | with.  So that means, you know, hi, I am Adam | 10:07 |
| 6 | Aronson.  I've arrived and I'm here waiting for my | |
| 7 | appointment.  And using a tablet or kiosk to | |
| 8 | moderate that and track that it's typically how a | |
| 9 | check-in process works. | |
| 10 | Q    Yeah.  Did you have any understanding that | 10:07 |
| 11 | Quest was looking to migrate from having a person | |
| 12 | physically check in patients to moving -- to having | |
| 13 | a kiosk perform that function? | |
| 14 | A    We may have discussed that, but I'm not | |
| 15 | 100 percent sure if that's what I remember or not. | 10:08 |
| 16 | I can tell you that often these check-in systems are | |
| 17 | used alongside people, but I can't remember the | |
| 18 | exact discussions we had with Quest. | |
| 19 | Q    Did you have any understanding as to where | |
| 20 | Quest was attempting to implement the kiosks that it | 10:08 |
| 21 | was interested in purchasing? | |
| 22 | A    Yeah, I was aware this was going to go -- | |
| 23 | this was going to be a project that was going to go | |
| 24 | into all their phlebotomy labs across the United | |
| 25 | States. | 10:08 |

Page 53

```
 1    discussed in those conversations?                    10:49

 2         A    I don't specifically.  But one of the

 3    features of the H Head is that the headphone jack

 4    passthrough, I'm sure that would have been

 5    mentioned.  But we would have gone through all the   10:50

 6    features of the H Head.  That's just one of the

 7    features that's available.

 8         Q    That would be your practice to have that

 9    discussion in the 2018 time frame with respect to a

10    call about new products?                             10:50

11         A    That's accurate, yes.

12         Q    So, is it your best testimony that if you

13    had a call with Quest in the 2018 time frame about

14    the new H Head rollout you would have discussed the

15    availability off a headphone jack?                   10:50

16         A    It's highly likely, yes.

17         Q    And if we take a look here at your

18    February 22nd, 2018 email above, it's again

19    timestamped 10:17, it's from you to various

20    individuals, including Mr. Ocampo; is that right?    10:50

21         A    Looks that way, yeah.

22         Q    You say "For the H Head, as long as you

23    choose a face plate that exposes the front facing

24    camera, the ALS will be exposed."

25              Can you explain what you meant by that?    10:51
```

Page 87

```
 1    accessories that a particular customer or client      11:19
 2    would want?
 3         A    That's correct.
 4         Q    Do you know whether Quest acquired any
 5    accessories from Lilitab?                             11:19
 6         A    I don't.  I'd have to go back and look at
 7    the invoices and quotes we prepared for them.  I
 8    would expect that they did because it's rare for us
 9    to make a deployment that doesn't have at least one
10    accessory of some variety or another, but I can't    11:20
11    recall until I go back and look at those invoices.
12         Q    Would you agree that the invoices would be
13    the best evidence of what accessories, if any, Quest
14    acquired from your company?
15         A    As far as Lilitab is concerned, yes,        11:20
16    because we don't ship a product unless we -- unless
17    someone's paid for it.  And we can't -- we can't
18    bill them unless it's a line item on the quote or
19    the invoice, so...
20         Q    To your knowledge, did Quest ever come to   11:20
21    you and raise any issue about whether its kiosks
22    were accessible to the blind community?
23              MR. RAIZMAN:  Object as to form.
24              THE WITNESS:  I don't recall that, no.
25
```

Page 100

PA0213

```
 1   BY MR. MILLER:                                          11:20

 2       Q    To your knowledge, did Quest ever come to

 3   you and ask you to make an enclosure that could be

 4   accessible to blind patients?

 5            MR. RAIZMAN:  Object as to form.              11:21

 6            THE WITNESS:  No, they did not.

 7   BY MR. MILLER:

 8       Q    So am I correct in understanding that from

 9   2016 to the present, Lilitab never engaged in any

10   analysis as to whether it could provide an enclosure   11:21

11   that would have functionality that would make the

12   kiosk independently useable by blind patients?

13            MR. RAIZMAN:  Object as to form.

14            MR. MILLER:  For Quest.

15            THE WITNESS:  Not -- we did not do that --     11:21

16   well, hang on a second.  Can you restate the

17   question, please?

18   BY MR. MILLER:

19       Q    Yeah.  I just want to make sure I'm

20   correct in the statement.                              11:21

21            Is it true that from 2016 to the present,

22   Lilitab was never asked to undertake any analysis by

23   Quest to determine whether it could provide a kiosk

24   enclosure that would allow the kiosk to be

25   independently useable by blind patients?               11:21
```

                                              Page 101

PA0214

1    accessibility?                                        11:26

2          A    Yes, and reach range as well.  So similar

3    to this, although not in as explicit detail.

4          Q    Okay.  And do you have any expertise in

5    ADA compliance?                                       11:26

6          A    Yeah.  I've been designing interactive

7    kiosks my entire 25 plus year career.  I sat on the

8    Kiosk Organization Board -- Advisory Board for ADA

9    compliance when ADA was going through its --

10   updating its recommendations, so I probably know as    11:26

11   much about ADA compliance for kiosks as most anyone

12   out there.

13         Q    Okay.  And that knowledge -- so you say

14   you were on the ADA board.  Was that the access

15   board that you served on, the advisory committee?      11:26

16         A    No.  There is a kiosk group of kiosk

17   manufacturers that maintain their own advisory board

18   to generate advisory input for the ADA process.

19         Q    Okay.  What's that called?

20         A    I can't remember off the top of my head,    11:27

21   I'd have to go back and check, but I can find that

22   for you.  I believe it's KMA, Kiosk Manufacturer

23   Association, but I can find that in more explicit

24   detail for you.

25         Q    Okay.  And is that advisory board           11:27

Page 106

PA0215

## ***REDACTED***

Portions of Exhibit 19 (Bates Nos. PA0230-233 and PA0244) will be filed under seal pending the Court's Order on Plaintiff's Application for Leave to File Under Seal

# **EXHIBIT 19**

```
 1            UNITED STATES DISTRICT COURT
 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4    JULIAN VARGAS, ANNE    )
      WEST, and AMERICAN     )
 5    COUNCIL OF THE BLIND,  ) Case No. 2:19-cv-8108
      individually on behalf )
 6    of themselves and all  )
      others similarly       )
 7    situated,              )
                             )
 8              Plaintiffs,  )
                             )
 9        vs.                )
                             )
10    QUEST DIAGNOSTICS       )
      CLINICAL LABORATORIES, )
11    INC., QUEST DIAGNOSTICS)
      HOLDINGS, INC.,        )
12    QUEST DIAGNOSTICS       )
      INCORPORATED, and      )
13    DOES 1-10, inclusive,  )
                             )
14              Defendants. )
      _____)
15
16
17       REMOTE DEPOSITION OF THOMAS PATRICK WALSH
18              as a 30(b)(6) Witness
19            (Via Zoom Videoconference)
20             Thursday, July 1, 2021
21
22    REPORTED BY:  Michelle Milan Fulmer
               CSR No. 6942, RPR, CRR, CRC
23
24    PAGES 80-91, 122, 151, 153, 156, 166, 168, 170,
      239-250, 256-258 ARE MARKED "CONFIDENTIAL" UNDER THE
25    PROTECTIVE ORDER
```

                                              Page  1

```
 1                UNITED STATES DISTRICT COURT
 2           FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4    JULIAN VARGAS, ANNE      )
      WEST, and AMERICAN       )
 5    COUNCIL OF THE BLIND,    ) Case No. 2:19-cv-8108
      individually on behalf   )
 6    of themselves and all    )
      others similarly         )
 7    situated,                )
                               )
 8              Plaintiffs,    )
                               )
 9       vs.                   )
                               )
10    QUEST DIAGNOSTICS        )
      CLINICAL LABORATORIES,   )
11    INC., QUEST DIAGNOSTICS) 
      HOLDINGS, INC.,          )
12    QUEST DIAGNOSTICS        )
      INCORPORATED, and        )
13    DOES 1-10, inclusive,    )
                               )
14              Defendants.    )
      _____)
15
16
17        Remote deposition of THOMAS PATRICK WALSH,
18    taken before Michelle Milan Fulmer, a Certified
19    Shorthand Reporter for the State of California, with
20    principal office in the County of Orange, commencing
21    at 10:09 a.m., Thursday, July 1, 2021.
22
23
24
25
```

                                                    Page 2

PA0218

```
1     APPEARANCES OF COUNSEL:

2

3     FOR PLAINTIFFS:

4
          NYE, STIRLING, HALE & MILLER, LLP
5         BY:  Jonathan D. Miller, Esq.
          33 West Mission Street, Suite 201
6         Santa Barbara, California 93101
          TEL: (805) 963-2345
7         EMAIL:  jonathan@nshmlaw.com
          (Via Zoom Videoconference)

8

9     FOR DEFENDANTS:

10        OGLETREE DEAKINS NASH SMOAK & STEWART, PC
          BY:  David Raizman, Esq.
11        400 South Hope Street, Suite 1200
          Los Angeles, California 90071
12        TEL:  (213) 457-5862
          EMAIL:  david.raizman@ogletree.com
13        (Via Zoom Videoconference)

14

      THE VIDEOGRAPHER:

15
          John MacDonell
16        (Via Zoom Videoconference)

17

      ALSO PRESENT:

18
          Amer Pharaon
19        Matt Mitchell
          (Via Zoom Videoconference)

20

21

22

23

24

25

                                        Page  3
```

PA0219

```
 1                    I N D E X
 2    WITNESS                         EXAMINATION
 3    THOMAS PATRICK WALSH
 4                                    PAGE
 5                BY MR. MILLER       7, 266
 6                BY MR. RAIZMAN       261
 7
 8                 E X H I B I T S
 9                                    Page
10    Exhibit       Description       Identified
11    Exhibit 83    Spreadsheet Bates stamped    127
                    QUEST-VARGAS000035245
12
      Exhibit 84    Email chain Bates stamped    192
13                  QUEST-VARGAS000007941 -
                    7945
14
      Exhibit 85    Email Bates stamped          204
15                  QUEST-VARGAS000036478
16    Exhibit 86    Email chain Bates stamped    208
                    QUEST-VARGAS000009666 -
17                  9667
18    Exhibit 87    Email chain Bates stamped    212
                    QUEST-VARGAS000036493
19
      Exhibit 88    Email Bates stamped          214
20                  QUEST-VARGAS000029326                   10:43:39
21    Exhibit 89    Email chain Bates stamped    214
                    QUEST-VARGAS000004496 -
22                  4499
23    Exhibit 90    Email chain Bates stamped    228
                    QUEST-VARGAS000015729 -
24                  15730
25
                                              Page  4
```

PA0220

```
 1                    E X H I B I T S
 2                                            Page
 3    Exhibit        Description           Identified
 4    Exhibit 91     Email chain Bates stamped    231
                     QUEST-VARGAS000000865 -
 5                   867
 6    Exhibit 92     Email chain Bates stamped    234
                     QUEST-VARGAS000023072 -
 7                   23075
 8    Exhibit 93     Email chain Bates stamped    237
                     QUEST-VARGAS000029367 -
 9                   29369
10    Exhibit 94     Email Bates stamped          246
                     QUEST-VARGAS000029514
11
      Exhibit 95     Email chain Bates stamped    247
12                   QUEST-VARGAS000030591 -
                     30592
13
      Exhibit 96     Email chain Bates stamped    251
14                   QUEST-VARGAS000029304 -
                     29309
15
16
                     (Previously marked)
17
18                    E X H I B I T S
19                                            Page
20    Exhibit        Description           Identified
21    Exhibit 7      Email chain Bates stamped     61
                     QUEST-VARGAS000007361 -
22                   7363
23    Exhibit 22     E-Check In Options Analysis  217
                     QUEST-VARGAS000040267
24
      Exhibit 27     Presentation Bates stamped   195
25                   QUEST-VARGAS000000022 - 41        12:22:06

                                               Page 5
```

```
 1    reduce?

 2        A    There were a few.

 3             We wanted to -- and we need to be careful

 4    about language here.

 5             We were not looking to reduce cost.  We        07:33:29

 6    were looking to be cost efficient.

 7        Q    What type of --

 8             Let me state it more specifically.

 9        A    Sure.

10        Q    What type of efficiencies were you trying      07:33:43

11    to obtain at the patient service centers as it

12    related to costs?

13        A    Sure.

14             So our theory at the time was that by

15    having patients be able to move through the process     07:33:51

16    faster, that they would have a better experience

17    because they were not waiting around, that we would

18    be able to amortize fixed costs over more patients,

19    and that we would have more -- excuse me -- less

20    labor content per encounter because if the              07:34:10

21    phlebotomist has to do less work, then their job

22    gets better, again they can process more patients;

23    and, therefore, average cost points come down, if

24    not a specific cost point.

25        Q    So if I understand the theory correctly,       07:34:34
```

Page 27

PA0222

```
 1        A    I don't recall the exact dates.  I do know

 2    that having a help swipe was in the earlier part of

 3    the rollout.  If you would ask me for a year, I

 4    believe it was 2017.

 5        Q    Once the help swipe was rolled out, how      07:51:41

 6    were patients informed that they could swipe for

 7    help if they had difficulty accessing the eCheck-In

 8    kiosk?

 9        A    I don't know all the ways that we

10    communicate to patients.  Within the technology of    07:51:53

11    the kiosk itself, there was a display button that

12    would come up to ask for help, but I'm not sure of

13    all the ways that we communicate and provide help to

14    patients in the patient service center.

15        Q    One way that you were aware of was the        07:52:10

16    display button that would pop up at the kiosk if

17    someone needed help; is that right?

18        A    That's correct.

19        Q    And that would pop up on the touch screen?

20        A    Correct.                                      07:52:20

21        Q    And that would be text that would be

22    displayed on the touch screen?

23        A    That's correct.

24        Q    You'd need to be able to read that text in

25    order to press the button to ask for help; correct?   07:52:30
```

Page 41

1          A    Since it was a touch screen, that's the

2     only functionality the kiosk had, that's correct.

3          Q    And aside from the prompt that would reveal

4     itself on the touch screen if someone needed help,

5     are you aware of any other ways that a patient could          07:52:51

6     request help checking in between 2016 and 2020 if

7     they had difficulty accessing the eCheck-In kiosk?

8          A    I don't know that I would have knowledge of

9     that since I'm not familiar with all of our patient

10    service center processes.                                     07:53:13

11         Q    But just in terms of the kiosk itself, are

12    you aware of any other functions or features of the

13    eCheck-In kiosk that would assist patients with

14    alerting a Quest employee that they were having

15    difficulty checking in other than the button that             07:53:28

16    you described?

17              MR. RAIZMAN:   Object as to form.

18              THE WITNESS:   I believe within the kiosk

19    itself, the only mechanism was the help swipe.   We

20    had looked at function -- yeah.   That's the only             07:53:47

21    answer I have.   I think that's the only

22    functionality we had.

23    BY MR. MILLER:

24         Q    Did the help swipe function have any audio

25    connected with it at the time it was -- strike that.          07:54:01

                                                      Page 42

PA0224

1          Did the help button have any audio

2     connected with it between 2016 and 2020?

3          A    Not to my knowledge.

4          Q    In addition to being the cosponsor of the

5     eCheck-In project, what specific roles did you          07:54:34

6     undertake in advancing that project?

7          A    So my roles would have included championing

8     the project internally; socializing, meeting with

9     other leaders to get traction that we were on the

10    right path, that this would provide a better           07:54:56

11    experience, and that it had a cost efficiency

12    benefit; would have been responsible for reviewing

13    progress on the innovation, that we were making

14    progress; and I would have been responsible for

15    synchronizing with my cosponsor to transition from     07:55:15

16    the innovation phases into the production eyes and

17    deployment phases for it.

18         Q    And am I correct in understanding that the

19    eCheck-In project was ultimately implemented by

20    Quest?                                                  07:55:33

21         A    Yes.

22         Q    At its patient service centers?

23         A    Yes.

24         Q    Approximately 2,200 of them around the

25    country?                                                07:55:42

                                                   Page 43

```
 1        A     Yeah.   Approximately 2,200.

 2        Q     And are you aware of whether the eCheck-In

 3   project was successful in achieving the cost

 4   efficiencies that Quest was hoping to achieve when

 5   they started the project?                        07:56:05

 6        A     We believe so.  I believe so.  We were able

 7   to demonstrate the reduced wait time, transaction

 8   time that we were looking for.

 9        Q     Were you also able to realize the reduction

10   in -- for the labor costs to serve more patients?   07:56:24

11        A     I don't know that we have hard evidence of

12   that.  A lot of -- a lot of variables.  I also know

13   that we collected some feedback, I don't think I've

14   got the facts, but I know through patient surveys

15   and so on to measure that experience and the       07:56:45

16   feedback there.

17        Q     Would you agree that the eCheck-In project

18   underwent a multilayered review and approval process

19   before --

20              MR. RAIZMAN:  Object as --             07:57:02

21   BY MR. MILLER:

22        Q     -- implementation?

23              MR. RAIZMAN:  Excuse me.  Object as to

24   form.

25              THE WITNESS:  Yes.  I would agree that  07:57:07
```

                                              Page 44

PA0226

```
 1              THE WITNESS:  I don't know that I can agree

 2    with that only because our scope was around that

 3    initial prototyping.

 4    BY MR. MILLER:

 5        Q    Was the prototype designed in any way that    08:39:20

 6    would permit blind patients to independently check

 7    in at the eCheck-In kiosk?

 8        A    That prototype, as I recall the prototype,

 9    did not have any of that functionality.

10        Q    Did the ultimate product that was put         08:39:37

11    forward for consideration have any features that

12    were designed to permit blind patients to

13    independently check in at the kiosk?

14              MR. RAIZMAN:  Object as to form.

15              THE WITNESS:  Yeah.  I'm not aware if it      08:39:52

16    did or didn't.

17    BY MR. MILLER:

18        Q    Did the prototype have a headphone jack?

19        A    I don't remember.

20        Q    Did the prototype have a tactile keyboard?    08:40:06

21        A    No.  The prototype was touch screen only.

22        Q    Did the prototype have speech output

23    enabled?

24        A    No.  The prototype did not have speech

25    output.                                                08:40:23
```

Page 68

PA0227

```
1        Q     And so, for example, did your team ever

2    inquire of Lilitab what it would cost to put a

3    headphone jack into the kiosk enclosure for the

4    prototype?

5             MR. RAIZMAN:  Object as to form.          09:03:47

6             THE WITNESS:  I don't know if a member of

7    the team made that specific inquiry.

8    BY MR. MILLER:

9        Q     Do you have any information to suggest that

10   any member of your team inquired of Lilitab as to     09:03:56

11   what it would cost to put a headphone jack into the

12   kiosk enclosure?

13       A     I don't recall if a member of the team made

14   that inquiry.

15       Q     Are you aware from any source that it would  09:04:12

16   have cost in 2016 approximately $30 per unit to put

17   a headphone jack into the kiosk, Lilitab kiosk

18   enclosure?

19       A     No.  I am not aware of that.

20       Q     Was there ever any analysis undertaken by    09:04:30

21   your team that the implementation of a headphone

22   jack would have imposed an undue burden on the

23   company for rolling out the eCheck-In kiosk?

24             MR. RAIZMAN:  Object as to form.

25             THE WITNESS:  Yeah.  I'm not aware of any    09:04:46
```

Page 77

 1   effort within my ideation, innovation team to that

 2   effect.

 3   BY MR. MILLER:

 4       Q    Was there ever a decision made, one way or

 5   the other, to either have or not have a headphone     09:04:55

 6   jack on the eCheck-In kiosk?

 7           MR. RAIZMAN:  Object as to form.

 8           THE WITNESS:  I'm not aware of being

 9   involved in that decision.

10   BY MR. MILLER:                                        09:05:11

11       Q    In any innovations that were considered by

12   your team in 2016 to the time you left in 2020, did

13   any of those innovations ever consider whether Quest

14   should employ a headphone jack at the eCheck-In

15   kiosk?                                                09:05:28

16           MR. RAIZMAN:  I'm going to object as to

17   form and instruct the witness not to answer with

18   respect to any consideration process leading up to

19   the three-finger swipe because it's privileged.

20           You can answer.                              09:05:40

21           THE WITNESS:  So within that time period,

22   I'm not aware of any work we did on placing an audio

23   jack on the outside of the device.

24   BY MR. MILLER:

25       Q    Between 2016 and the time you left in 2020,  09:06:05

Page 78

PA0229

1    the device and the phlebotomist?

2        A    What communication?

3             MR. RAIZMAN:  Object as to form.

4             THE WITNESS:  The device communicates to

5    the phlebotomist's what they call our Quanum or          09:18:38

6    eLabs products.  So they -- they (inaudible)

7    interact.

8    BY MR. MILLER:

9        Q    So specifically if a patient comes to a

10   Quest Diagnostics patient service center and             09:18:56

11   manipulates the kiosk, does that then forward any

12   communication to the phlebotomist?

13       A    If the patient checks in at the kiosk, the

14   check-in will appear on the phlebotomist's screen so

15   that she does see the patients that are in queue.        09:19:13

16       Q    So when the patient checks in at the

17   eCheck-In kiosk, it then communicates to the

18   phlebotomist that the patient is there and has

19   checked in?

20       A    Yeah.  Communicates to her tool, yes.           09:19:25

21       Q    Tool.

22             And is that through the Quanum platform or

23   the eLabs platform?

24       A    The terms can be used interchangeably.

25   Quanum is usable as a broad term.                        09:19:37

                                                       Page 95

1    Q    Was there ever any functionality rolled out

2  at the kiosk that would allow somebody who walked in

3  to interface with the kiosk and input their phone

4  number and allow them to be alerted by text when

5  their appointment was near being called or ready to          09:37:49

6  be called?

7    A    We did implement a feature to text when you

8  were ready to be called.

9    Q    And as part of that feature -- or strike

10  that.                                                        09:38:06

11         Could that feature be accessed vis-à-vis

12  the eCheck-In kiosk?

13    A    Let me think for a second how we put that

14  together.

15         I honestly can't recall if we built it          09:38:21

16  solely into the kiosk because it required that we

17  had a cell phone from you and you could use the

18  kiosk without a cell phone.

19    Q    But my question wasn't whether it was

20  solely built into the kiosk.                               09:38:35

21         My question was, could you access the

22  option to be texted through the kiosk?

23    A    I can't remember if we built that into the

24  kiosk.  I apologize.  I don't remember what screen

25  we put that on.  I really do apologize.                    09:38:58

Page 112

```
 1    wait in the waiting room with other patients?
 2         A    That was the idea.
 3         Q    They could potentially wait in their car if
 4    they so chose?
 5         A    That's right.                          09:40:21
 6         Q    Or wait somewhere outside the waiting room?
 7         A    That's right.
 8         Q    Was there ever any analysis as to whether
 9    blind patients could access an option that would
10    allow them to wait somewhere other than the waiting  09:40:32
11    room if they were a walk-in?
12              MR. RAIZMAN:  Object as to form.
13              THE WITNESS:  I'm not aware of any -- I'm
14    broadly not aware of how cell phones and (inaudible)
15    can be adapted for use by the visually impaired.      09:40:50
16    BY MR. MILLER:
17         Q    But was your team involved in coming up
18    with the idea to have an option that would allow a
19    Quest patient to be contacted by text when their
20    appointment was being called so they wouldn't have   09:41:04
21    to necessarily wait in the waiting room?
22         A    Yes.  My team was involved.
23              MR. RAIZMAN:  Object as to form.
24    BY MR. MILLER:
25         Q    And that would include yourself?          09:41:13
```

                                                      Page 114

PA0236

```
1    rationale for implementing the eCheck-In kiosk was

2    cost savings?

3         A    No.  As we discussed before, we were

4    focused on patient experience, phlebotomist

5    experience, and getting a cost efficiency sort of by    09:46:46

6    way of throughput out.

7         Q    Was at least one of the rationales for

8    implementing the eCheck-In kiosk cost savings?

9         A    That's probably --

10             MR. RAIZMAN:  Object as to form.             09:46:59

11             THE WITNESS:  Yeah.  We use that word

12   differently.

13             It was around cost efficiency.

14   BY MR. MILLER:

15        Q    Did you assist in any preparation of a        09:47:09

16   document called a CapEx document around the

17   eCheck-In kiosk project?

18        A    Yes, I did assist in the preparation of a

19   CapEx document.

20        Q    And what did you understand the CapEx         09:47:22

21   document to be as it related to the eCheck-In kiosk

22   project?

23        A    The purpose of the CapEx was to lay out the

24   financials associated with the investment of the

25   technology.                                            09:47:36
```

Page 119

PA0237

```
 1        A    That's right.

 2        Q    I'm going to show you what I'll mark as

 3   Exhibit 83.  It's Bates stamped QUEST-VARGAS 35245,

 4   an Excel spreadsheet, and it's been represented by

 5   Quest that this was the final CapEx that was          10:43:50

 6   ultimately submitted.

 7             And I just want you to take a moment and

 8   review it because I'd like you to confirm for me

 9   that that's also consistent with your understanding.

10        A    It's opening here on Excel Online.  One     10:44:07

11   moment, please.  It's just not fully opening on my

12   end here.

13        Q    If you're having any issues accessing it,

14   you can feel free to download the document to your

15   desktop if it's easier.                               10:45:14

16        A    Actually, it didn't -- let me try it again.

17   It doesn't seem to let me do that.  It just takes a

18   second for the screen to load, but I paged through

19   these here.

20             Okay.  Yeah.  It's backup.  All right.  I   10:45:45

21   think I'm familiarized here.  Okay.

22        Q    So can you view the document, Exhibit 83?

23        A    Yes.  I can see it.  I have it in front of

24   me.

25        Q    And can you confirm for me that this is, in 10:46:12
```

Page 127

PA0238

1    fact, the final CapEx that was submitted for

2    approval of the eCheck-In project?

3       A    It looks -- it looks consistent with the

4    final form.  I think given how much time has passed,

5    I can't tell you that this is the one, but it does        10:46:27

6    look right as I review it.

7       Q    As you sit here today, it appears to be the

8    final CapEx?

9       A    Uh-huh.  Yeah.  I do see the approvals as

10   well.  So it does appear to be the final CapEx.            10:46:39

11      Q    And if we start with the approval tab,

12   TPT Approval, can you tell me what that approval

13   meant?

14      A    Yes.  The TPT was the technology

15   prioritization team.  So that approval meant that          10:46:55

16   the technical committees had reviewed the projects

17   and approved that it was within the sort of

18   technical scope and that the development and so on,

19   the technology investments were understood.

20      Q    And what does it mean to --                        10:47:12

21           What did you understand the technology team

22   had to do to make sure it was in the scope?

23           MR. RAIZMAN:  Object as to form.

24           THE WITNESS:  So I was not part of the TPT.

25   So I don't have quite an understanding of all the          10:47:26

Page 128

PA0239

```
 1    LCD/LED display will show the patient queue in the

 2    order they will be called and has the capability to

 3    show digital messaging including video."

 4          Is that an accurate statement of the

 5    capabilities?                                    10:58:28

 6       A    Yes.  The wait room display would show the

 7    patient queue and could include digital messaging.

 8    That's correct.

 9       Q    So if a patient checked in at the eCheck-In

10    kiosk, it would tell them then on a video monitor    10:58:43

11    approximate wait time; is that right?

12       A    That's right.

13       Q    So that if they could see the monitor, they

14    could understand how long they were going to have to

15    wait approximately?                               10:58:55

16             MR. RAIZMAN:  Object as to form.

17             THE WITNESS:  The video monitor would show

18    the patient queue as well as estimated wait time.

19    BY MR. MILLER:

20       Q    And was that done to improve patient       10:59:10

21    satisfaction with improving wait times?

22       A    We did think part of the --

23             MR. RAIZMAN:  Object as to form.

24             THE WITNESS:  We did think that part of the

25    patient experience would be having some information  10:59:23
```

Page 138

1    that they wanted.

2    BY MR. MILLER:

3        Q    So that a patient would understand how long

4    they might have to wait before they were going to

5    receive further services at Quest?                    10:59:34

6        A    It would give the -- yeah.  It would give

7    the patient some sense of timing, sure.

8        Q    How is Quest going to indicate to blind

9    patients how long they might have to wait for

10   services if they could not use the eCheck-In kiosk    10:59:52

11   after implementation?

12           MR. RAIZMAN:  Object as to form.

13           THE WITNESS:  So I have limited knowledge

14   here since this, again, would have handed off from

15   the innovation side to the deployment and related     11:00:06

16   pieces.

17           So, again, I know there was training

18   involved for phlebotomists to communicate.  I'm not

19   sure what other tools, techniques the team would

20   have put together.                                    11:00:20

21   BY MR. MILLER:

22       Q    Aside from a phlebotomist potentially

23   communicating with a blind patient, were you aware

24   of any other -- any other way that Quest was

25   purporting to communicate to blind patients how long  11:00:32

                                             Page 139

```
 1    that right?

 2        A     That's one of the things Taylor chose to

 3    point to in his email.

 4        Q     And at the end of his bullet points

 5    Mr. Carr communicates that, "ADA compliance is          01:16:52

 6    critical.  The current Cheetah solution is not ADA."

 7    It says, "WHL as an example with the screens on the

 8    top of the counter."

 9            Let me pause there before I read the next

10    portion.                                                 01:17:07

11            Did you agree with Mr. Carr's sentiment

12    that ADA compliance with the eCheck-In kiosk was

13    critical?

14            MR. RAIZMAN:   Object as to form.

15            THE WITNESS:   I agree that ADA compliance       01:17:21

16    for the company in how we serve our patients is

17    critical.

18    BY MR. MILLER:

19        Q     And it goes on to say that, "The eCheck-In

20    10-inch iPad with Lilitab enclosure hardware meet        01:17:31

21    ADA and state and federal requirements."

22            Did you ever follow up with Mr. Carr to ask

23    what he meant by that statement?

24        A     No, I didn't.  As I was starting to say

25    before, I agree the compliance of the company is         01:17:46
```

Page 225

1    critical and there are more, many ways for us to do

2    that.  The kiosk wasn't seen as a catchall for that.

3    That goes back to how it fits into patient services

4    overall, but I can't speak to how or why the Lilitab

5    enclosure met ADA, state, and federal requirements.     01:18:07

6         Q    That was my next question just for clarity

7    of the record.

8              Was there ever any effort to understand

9    whether the Lilitab enclosure with the 10-inch iPad

10   met ADA requirements for blind patients?                01:18:20

11        A    I was not involved in that evaluation.

12        Q    Do you know whether Mr. Carr was?

13        A    I don't know if he did an evaluation or

14   not.

15        Q    Am I correct in understanding that he never  01:18:31

16   came to you with any specific recommendations in

17   regard to whether the 10-inch screen with Lilitab

18   enclosure met ADA requirements for blind patients?

19        A    I don't recall him coming forward with that

20   very specific ask, no.                                  01:18:49

21        Q    One of the bullet points, the, I believe,

22   fifth one down, it says, "If we are worried about

23   font size on the tablet with geriatric patients,

24   newspaper physical print" -- "paper print is

25   must" -- I think he meant much -- "must smaller than   01:19:08

                                          Page 226

The remaining portion of Exhibit 19 (Exhibit 83 to the Deposition of Tom Walsh) will be lodged with the Court due to the size of the Excel file, and pending the Court's ruling on Plaintiffs' Application for Leave to File Under Seal

# EXHIBIT 20

PA0245

```
 1                UNITED STATES DISTRICT COURT

 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4    JULIAN VARGAS, ANNE WEST, and )  Case No. 2:19-cv-8108
      AMERICAN COUNCIL OF THE       )
 5    BLIND, individually on behalf )
      of themselves and all others  )
 6    similarly situated,           )
                                    )
 7              Plaintiffs,         )
                                    )
 8         v.                       )
                                    )
 9    QUEST DIAGNOSTICS CLINICAL    )
      LABORATORIES, INC., QUEST     )
10    DIAGNOSTICS HOLDINGS, INC.,   )
      QUEST DIAGNOSTICS             )
11    INCORPORATED; and DOES 1-10,  )
      inclusive,                    )
12                                  )
                Defendants.         )
13    _____)

14

15

16                      --oOo--

17        VIDEOTAPED DEPOSITION OF PRUDENCIA MAGANA

18            Taken on behalf of the Defendants

19                  August 3, 2021

20           ***TAKEN VIA VIDEOCONFERENCE***

21                      --oOo--

22

23

24

25

                                            Page  1
```

PA0246

```
 1              BE IT REMEMBERED THAT, pursuant to the Federal
 2    Rules of Civil Procedure, the deposition of PRUDENCIA
 3    MAGANA, was taken before Maureen Kelly,
 4    OCSR No. 00-0364, WCSR No. 3401, on Tuesday, August 3,
 5    2021, commencing at the hour of 10:10 a.m., the
 6    proceedings being reported via Zoom videoconference.
 7                          --oOo--
 8
 9
10                      APPEARANCES
11            (ALL APPEARING VIA VIDEOCONFERENCE)
12    Attorney for the Plaintiffs:
              NYE, STIRLING, HALE & MILLER, LLP
13            BY MR. JONATHAN D. MILLER
                 MR. BENJAMIN J. SWEET
14            33 West Mission Street, Suite 201
              Santa Barbara, CA 93101-2455
15            805-963-2345
              jonathan@nshmlaw.com
16            ben@nshmlaw.com
17    Attorney for the Defendants:
              OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC
18            BY DAVID H. RAIZMAN
              400 South Hope Street, Suite 1200
19            Los Angeles, CA 90071-2818
              213-239-9800
20            david.raizman@ogletree.com
21
      Also Present: John MacDonell - Videographer
22                  Amer Pharaon
23                      --oOo--
24
25
                                                Page  2
```

PA0247

```
 1                         INDEX
 2      EXAMINATION BY:                           PAGE
 3      MR. MILLER                               5, 96
        MR. RAIZMAN                                95
 4
                         --oOo--
 5
 6
 7
                         EXHIBITS
 8
        EXHIBIT NO.    ITEM                       PAGE
 9
        Exhibit 104     Photo of Vargas            42
10      Exhibit 105     Photo of Vargas            42
11                       --oOo--
12
13      INSTRUCTION not to Answer:            (None.)
14                       --oOo--
15
16      REQUEST for Production:               (None.)
17                       --oOo--
18
19
20
21
22
23
24
25
                                             Page  3
```

PA0248

```
 1              A.    I don't remember.

 2              Q.    As of June 25th, 2019, were you working at

 3    the 4955 Van Nuys Boulevard location of Quest?

 4              A.    I think so.

 5              Q.    And was anyone else working there on that

 6    date?

 7              A.    I don't remember.

 8              MR. RAIZMAN:  Hey, Jon?

 9              MR. MILLER:  Yes.

10              MR. RAIZMAN:  I'm going to need a break

11    probably in the next 10 minutes, and I -- you may be

12    getting into a new topic.  But you can go for 10 minutes

13    but I do need a break eventually.

14              MR. MILLER:  Why don't we just take the

15    break now?  It's just as easy as any time.

16              MR. RAIZMAN:  Okay.  Thank you very much.

17              MR. MILLER:  Thank you.

18              THE VIDEOGRAPHER:  Okay.  We're off the

19    record.  It's 11:03 a.m.

20                        (A recess was taken.)

21              THE VIDEOGRAPHER:  And we are back on the

22    record.  It's 11:16 a.m.

23    BY MR. MILLER:  (Continuing)

24              Q.    Ms. Magana, did you interact with Julian

25    Vargas on June 25th, 2019, at a Quest patient service
```

Page 41

1              A.   I don't remember.

2              Q.   Do you know of any documents that would

3    refresh your memory on the specific training you

4    received around the kiosk for blind patients?

5              A.   Patient every needs -- managing every

6    patient needs.

7              Q.   Outside of the managing every patient needs

8    training, are you aware -- strike that.

9                   So it's your -- it's your memory that the

10   managing every patient needs training contains training

11   around how blind patients can use the kiosk; is that

12   right?

13             A.   I think so.

14             Q.   Are you aware of any other training other

15   than the managing every patient needs training that was

16   provided to you by Quest that indicated how blind

17   patients could use the kiosk?

18             A.   I don't remember.

19             Q.   Did Quest ever tell you that the kiosk was

20   not independently accessible by blind patients?

21                  MR. RAIZMAN:   Object as to form.

22   BY MR. MILLER:   (Continuing)

23             Q.   You can answer.

24             A.   I think so.

25             Q.   You think Quest informed you that the kiosk

Page 53

PA0250

1            Q.   Go ahead.

2            A.   I don't remember.

3            Q.   Are you aware of any occasion where you

4     ever documented that you couldn't provide an

5     accommodation to an individual with disability who was

6     making an accommodation request?

7            A.   I don't remember.

8            Q.   Let me show you what was previously marked

9     in another deposition -- let me see -- as Exhibit 47.

10    And I'll share my screen for ease of reference.  This is

11    Exhibit 47 to the Jody Reilly deposition.  Can you see

12    the document I'm showing you?

13           A.   Yes.

14           Q.   And it's labeled "Patient Services -

15    Managing Every Patient's Needs due every 12 Months."

16    And I'm going to scroll down through the document, and

17    tell me -- I just want you to generally familiarize

18    yourself with it.  I'll blow it up.

19                MR. RAIZMAN:  I'm going to put it in front

20    of her because it's a large document but it's going to

21    take me --

22                MR. MILLER:  Sure.

23                MR. RAIZMAN:  -- a second to do that.

24                MR. MILLER:  Sure.  Why don't we -- it's

25    already in the -- it's already in the share folder.

Page 71

PA0251

```
 1      it step by step.  When you walk into the Quest location
 2      where you currently work is there a bell that goes off?
 3              A.   Is there what?
 4              Q.   A bell that alerts you that somebody has
 5      walked in the door.
 6              A.   When they sign in.
 7              Q.   No.  When they first come through the door.
 8      When a patient first walks through the door of the Quest
 9      patient service center where you currently work is there
10      a bell that goes off?
11              A.   Just when the patient signs in.
12              Q.   My question is more specific.  When a
13      patient walks through the front door of your current
14      Quest patient service center, before they sign in, is
15      there a bell that alerts you to their presence in the
16      waiting room?
17              A.   No.
18              Q.   At the prior Quest location that you worked
19      at at 4955 Van Nuys, between 2017 and 2020 when a
20      patient walked through the door, prior to sign in was
21      there a bell that alerted you to their presence?
22              A.   I don't think so.
23              Q.   And so the first time that you're alerted
24      to an individual's presence in the waiting room is when
25      they sign in at the kiosk; is that right?
```

Page 80

```
 1           A.   Correct.

 2                MR. RAIZMAN:  Object as to form.

 3    BY MR. MILLER:  (Continuing)

 4           Q.   And that rings a bell for you in the -- in

 5    the back room; is that your testimony?

 6           A.   Yes.

 7           Q.   But you can also disable that bell in Quest

 8    Quanum; isn't that true?

 9           A.   Yes.

10           Q.   And, in fact, you have turned off that bell

11    before when you've been working as a phlebotomist at

12    Quest.  Right?

13           A.   I don't think so.

14           Q.   It's your testimony that you've never

15    turned off the bell while you were working as a

16    phlebotomist at Quest?

17           A.   I don't think so.

18           Q.   Is the bell tone different for somebody who

19    is using the three-finger swipe process as opposed to

20    somebody who is just checking in by themselves?

21           A.   I don't think so.

22           Q.   It's the same bell tone?

23           A.   Yes.

24           Q.   Has there ever been an occasion where you

25    were helping a patient in the draw room and you heard
```

Page 81

PA0253

```
1     collected at 4955 Van Nuys?

2          A.   West Hills.

3          Q.   And then once the samples were tested at

4     the West Hills location, would those results be sent

5     back via Quanum?

6          A.   No.

7          Q.   Would the results be sent from the West

8     Hills location to the doctor via Quanum?

9               MR. RAIZMAN:   Object as to form.

10    BY MR. MILLER:   (Continuing)

11         Q.   You can answer.

12         A.   I think it goes directly to the doctor.   We

13    don't have anything to do with it.

14              MR. RAIZMAN:   Move to strike.

15    BY MR. MILLER:   (Continuing)

16         Q.   Are you able to review a patient's prior

17    test results in Quanum?

18         A.   No.

19         Q.   Were you ever trained by Quest to scan the

20    waiting room for patients requiring assistance?

21         A.   Repeat that again.

22         Q.   Were you ever trained by Quest to scan the

23    waiting room for patients requiring assistance?

24         A.   Not that I remember.

25         Q.   If you're assisting a patient and the bell
```

Page 90

1        Managing Every Patient's Needs.

2              Q.    So the training told you that?

3              A.    Yes.

4              Q.    Have you ever received a complaint from any

5        blind or visually impaired patient of Quest that you

6        know of?

7              A.    No.

8              Q.    If you did receive such complaint, what

9        would you do with it?

10             A.    I would give them my supervisor's phone

11       number and their name, and I will call my supervisor and

12       let her know.

13             Q.    Okay.  Would you ever put such a complaint

14       into Quanum?

15             A.    No.

16             Q.    Okay.  Would you ever put any complaint

17       into Quanum?

18             A.    No.

19             MR. RAIZMAN:  No further questions.

20             MR. MILLER:  Just a few very brief

21       follow-ups.

22       /////

23                         EXAMINATION

24       BY MR. MILLER:

25             Q.    You mentioned that you did receive training

                                          Page 96

PA0255

# EXHIBIT 21

PA0256

```
 1            UNITED STATES DISTRICT COURT
 2        FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4    JULIAN VARGAS, ANNE     )
      WEST, and AMERICAN      )
 5    COUNCIL OF THE BLIND,   ) Case No. 2:19-cv-8108
      individually on behalf  )
 6    of themselves and all   )
      others similarly        )
 7    situated,               )
                              )
 8              Plaintiffs,   )
                              )
 9         vs.                )
                              )
10    QUEST DIAGNOSTICS       )
      CLINICAL LABORATORIES,  )
11    INC., QUEST DIAGNOSTICS )
      HOLDINGS, INC.,         )
12    QUEST DIAGNOSTICS       )
      INCORPORATED, and       )
13    DOES 1-10, inclusive,   )
                              )
14              Defendants.   )
      _____)
15
16
17        REMOTE DEPOSITION OF CLAIRE STANLEY
18            (Via Zoom Videoconference)
19            Thursday, August 19, 2021
20
21    REPORTED BY:  Michelle Milan Fulmer
                    CSR No. 6942, RPR, CRR, CRC
22
23    JOB NO. 4769235
      PAGE 85 THROUGH PAGE 88 IS MARKED "CONFIDENTIAL"
24    UNDER THE PROTECTIVE ORDER AND SEPARATELY BOUND
25    PAGES 1 - 225

                                        Page 1
```

```
 1                UNITED STATES DISTRICT COURT
 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4    JULIAN VARGAS, ANNE      )
      WEST, and AMERICAN       )
 5    COUNCIL OF THE BLIND,    ) Case No. 2:19-cv-8108
      individually on behalf   )
 6    of themselves and all    )
      others similarly         )
 7    situated,                )
                               )
 8              Plaintiffs,    )
                               )
 9        vs.                  )
                               )
10    QUEST DIAGNOSTICS        )
      CLINICAL LABORATORIES,   )
11    INC., QUEST DIAGNOSTICS  )
      HOLDINGS, INC.,          )
12    QUEST DIAGNOSTICS        )
      INCORPORATED, and        )
13    DOES 1-10, inclusive,    )
                               )
14              Defendants.    )
      _____)
15
16
17        Remote deposition of CLAIRE STANLEY, taken
18    before Michelle Milan Fulmer, a Certified Shorthand
19    Reporter for the State of California, with principal
20    office in the County of Orange, commencing at
21    12:06 p.m., Thursday, August 19, 2021.
22
23
24
25
```

                                                    Page  2

```
 1    APPEARANCES OF COUNSEL:
 2
 3    FOR PLAINTIFFS:
 4
           NYE, STIRLING, HALE & MILLER, LLP
 5         BY:  Jonathan D. Miller, Esq.
           33 West Mission Street, Suite 201
 6         Santa Barbara, California 93101
           TEL: (805) 963-2345
 7         EMAIL:  jonathan@nshmlaw.com
           (Via Zoom Videoconference)
 8
 9    FOR DEFENDANTS:
10         OGLETREE DEAKINS NASH SMOAK & STEWART, PC
           BY:  David Raizman, Esq.
11         400 South Hope Street, Suite 1200
           Los Angeles, California 90071
12         TEL:  (213) 457-5862
           EMAIL:  david.raizman@ogletree.com
13         (Via Zoom Videoconference)
14
      THE VIDEOGRAPHER:
15
           Anthony Gulino
16         (Via Zoom Videoconference)
17
      ALSO PRESENT:
18
           Amer Pharaon
19         (Via Zoom Videoconference)
20
21
22
23
24
25
                                         Page  3
```

```
 1                        I N D E X
 2    WITNESS                          EXAMINATION
 3    CLAIRE STANLEY
 4                                       PAGE
 5                   BY MR. RAIZMAN        8, 208
 6                   BY MR. MILLER      196, 218
 7
 8
 9                     E X H I B I T S
10                                          Page
11    Exhibit          Description        Identified
12    Exhibit 106      Declaration of         32
                       Claire Stanley
13
      Exhibit 107      Robin Rehder notes     108
14
      Exhibit 108      Stanley_2018_calls     118
15                     Bates stamped
                       PL00673 - 681
16
      Exhibit 109      Stanley_2018_calls     118
17                     Bates stamped
                       PL00673 - 681
18
      Exhibit 110      Letter from Eric Bridges   133
19                     to Steve Rusckowski, CEO
20    Exhibit 111      Survey Responses,      181
                       Bates stamped
21                     PL00683 - 693
22
23
24
25
                                          Page 4
```

PA0260

```
 1                    (Previously marked)
 2
                          E X H I B I T S
 3
                                                    Page
 4
        Exhibit         Description               Identified
 5
        Exhibit 62      Emails, Bates stamped        119
 6                      PL00418 – 439
 7      Exhibit 63      ACB Chart, Bates stamped     169
                        PL00392
 8
        Exhibit 65      Letter from Eric Bridges     133
 9                      to Steve Rusckowski, CEO
10      Exhibit 66      Call Log, Bates stamped      143
                        PL00570 – 573
11
        Exhibit 67      ACB notes, Bates stamped     143
12                      PL00577 – 596
13      Exhibit 69      ACB June 2020 Survey,        144
                        Bates stamped
14                      PL00415 – 416
15
16
17
18
19
20
21
22
23
24
25
                                                  Page 5
```

```
 1        A    No.

 2        Q    You indicated that you had to wait for some

 3   period of time.  You couldn't tell Mr. Raizman

 4   specifically how long, but do you have a range or

 5   an estimate of how long you waited when you walked    17:44:05

 6   in?

 7        A    It was probably at least three minutes.

 8   Maybe more.

 9        Q    Okay.  Can you give us the best range that

10   you have or the best estimate of time that you have   17:44:13

11   today?

12        A    Perhaps three to five minutes.

13        Q    Before somebody first interfaced with you?

14        A    Correct.

15        Q    Okay.  And then you indicated --             17:44:21

16             At any point in time were you able to use a

17   kiosk, assuming there was one, at the location you

18   visited in Rockville?

19        A    No, I was not.

20        Q    Were you able to access any of the services  17:44:32

21   within a kiosk, assuming there was one at that

22   Rockville location?

23        A    No, I was not.

24        Q    For example, were you -- were you ever

25   offered the opportunity to wait outside the facility   17:44:44
```

                                                  Page 204

PA0262

# EXHIBIT 22

PA0263

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JULIAN VARGAS, ANNE      )
     WEST, and AMERICAN       )
 5   COUNCIL OF THE BLIND,    ) Case No. 2:19-cv-8108
     individually on behalf   )
 6   of themselves and all    )
     others similarly         )
 7   situated,                )
                              )
 8              Plaintiffs,   )
                              )
 9        vs.                 )
                              )
10   QUEST DIAGNOSTICS        )
     CLINICAL LABORATORIES,   )
11   INC., QUEST DIAGNOSTICS  )
     HOLDINGS, INC.,          )
12   QUEST DIAGNOSTICS        )
     INCORPORATED, and        )
13   DOES 1-10, inclusive,    )
                              )
14              Defendants.   )
     _____)
15
16
17         REMOTE DEPOSITION OF STEVEN SAWCZYN
18            (Via Zoom Videoconference)
19             Sunday, November 14, 2021
20
21   REPORTED BY:  Michelle Milan Fulmer
                   CSR No. 6942, RPR, CRR, CRC
22
23
24
25

                                      Page 1
```

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4    JULIAN VARGAS, ANNE     )
      WEST, and AMERICAN      )
 5    COUNCIL OF THE BLIND,   ) Case No. 2:19-cv-8108
      individually on behalf  )
 6    of themselves and all   )
      others similarly        )
 7    situated,               )
                              )
 8              Plaintiffs,   )
                              )
 9        vs.                 )
                              )
10    QUEST DIAGNOSTICS       )
      CLINICAL LABORATORIES,  )
11    INC., QUEST DIAGNOSTICS )
      HOLDINGS, INC.,         )
12    QUEST DIAGNOSTICS       )
      INCORPORATED, and       )
13    DOES 1-10, inclusive,   )
                              )
14              Defendants.   )
      _____)
15
16
17        Remote deposition of STEVEN SAWCZYN, taken
18    before Michelle Milan Fulmer, a Certified Shorthand
19    Reporter for the State of California, with principal
20    office in the County of Orange, commencing at
21    1:06 p.m., Central Time Zone, Sunday, November 14,
22    2021.
23
24
25
```

                                              Page  2

```
 1    APPEARANCES OF COUNSEL:
 2
 3    FOR PLAINTIFFS:
 4         NYE, STIRLING, HALE & MILLER, LLP
           BY:  Jonathan D. Miller, Esq.
 5              Callum Appleby, Esq.
           33 West Mission Street, Suite 201
 6         Santa Barbara, California 93101
           TEL: (805) 963-2345
 7         EMAIL:  jonathan@nshmlaw.com
                   callum@nshmlaw.com
 8         (Via Zoom Videoconference)
 9
      FOR DEFENDANTS:
10
           OGLETREE DEAKINS NASH SMOAK & STEWART, PC
11         BY:  David Raizman, Esq.
           400 South Hope Street, Suite 1200
12         Los Angeles, California 90071
           TEL:  (213) 457-5862
13         EMAIL:  david.raizman@ogletree.com
           (Via Zoom Videoconference)
14
15    THE VIDEOGRAPHER:
16         Drew Dorsey
           (Via Zoom Videoconference)
17
18    ALSO PRESENT:
19         Amer Pharaon
           (Via Zoom Videoconference)
20
21
22
23
24
25
```

Page 3

PA0266

```
 1                    I N D E X
 2    WITNESS                      EXAMINATION
 3    STEVEN SAWCZYN
 4                                      PAGE
 5              BY MR. MILLER        7, 208
 6              BY MR. RAIZMAN         200
 7
 8
 9              E X H I B I T S
10                                     Page
11    Exhibit       Description      Identified
12    Exhibit 158   Quest Disclosure        185
          `
13    Exhibit 159   Time Entry Details for   187
                    January 1st, 2021, through
14                  November 10th, 2021
15    Exhibit 176   Steve Sawczyn            173
                    Curriculum Vitae
16
      Exhibit 177   National Patient Services:  26
17                  Core PSCs spreadsheet
18    Exhibit 178   Expert Report of          16
                    Steve Sawczyn dated
19                  November 1, 2021
20
21
22
23
24
25
                                        Page  4
```

```
 1    although I was asked if I wanted to have some.

 2         Q    Okay.

 3         A    But, no, that was not my intent.

 4         Q    And so when you went to the patient service

 5    center location on October 26th, 2021, you did so      02:42:18

 6    after normal business hours and it was closed;

 7    right?

 8         A    That is correct.

 9         Q    And how did you communicate that you were

10    attempting to get in?  Did you do that at all?         02:42:30

11              MR. RAIZMAN:   I'm going to just object to

12    the extent it calls for privileged communications

13    between him and counsel, which it does.

14    BY MR. MILLER:

15         Q    Well, outside of calling counsel, did you    02:42:40

16    attempt any other method of accessing the patient

17    service center?

18         A    Yes.  I knocked repeatedly on the door, I

19    called loudly to see if anyone was around, and I

20    waited quite a while in case someone had just, you     02:42:54

21    know, stepped out to maybe get some food or

22    something.  So I waited there for a bit of time.

23         Q    Approximately how long did you wait?

24         A    About a half hour.

25         Q    And ultimately you weren't able to get       02:43:11
```

Page 76

PA0268

```
 1    access?

 2        A    That's correct.

 3        Q    And ultimately nobody came to help you?

 4        A    They did not.

 5        Q    Was that frustrating?                        02:43:18

 6        A    Well, these things happen.

 7        Q    That wasn't my question.

 8             Was it frustrating?

 9        A    Only insofar as I had planned to conduct

10    the testing and the --                                02:43:31

11             MR. RAIZMAN:  I'm going to object and move

12    to strike this testimony because it's all based on

13    privileged communications that he's not permitted to

14    share.

15             MR. MILLER:  I'm asking about his            02:43:40

16    experience having to wait a half hour outside the

17    door.

18             MR. RAIZMAN:  Experience is completely

19    irrelevant here and you know it.  And I will

20    represent to you that there was a miscommunication    02:43:48

21    about the appointment time.

22             MR. MILLER:  I'm not -- I'm not asking for

23    your testimony, Mr. Raizman.  I'm asking for the

24    witness.

25             MR. RAIZMAN:  I'm sorry, Jon.  I'm not       02:43:55
```

Page 77

PA0269

```
 1    going to let you get testimony from him that's

 2    completely distorted and invades the privilege.  I'm

 3    telling you --

 4            MR. MILLER:  I'm going to ask the question

 5    and you can instruct as accordingly.              02:44:04

 6            MR. RAIZMAN:  Okay.

 7    BY MR. MILLER:

 8       Q   Was it frustrating for you to have to wait

 9    a half an hour to try to access the facility and

10    find it only to be closed?  Was that frustrating?  02:44:11

11            MR. RAIZMAN:  I'm going to instruct the

12    witness not to answer to the extent the reason for

13    your not getting services was based on privileged

14    information you received.

15            If you can answer otherwise, go ahead and   02:44:25

16    respond.

17            THE WITNESS:  It was not very frustrating.

18    I'm pretty tolerant and I realized that this was

19    being done outside of normal business hours.  So I

20    would -- I would say I'm pretty tolerant.          02:44:42

21    BY MR. MILLER:

22       Q   Let me ask.

23            You go back the next day.  What time do you

24    go to the Quest patient service center on the 27th?

25       A   I'll reference my report.  I believe 4:15.  02:44:52
```

Page 78

PA0270

```
 1        Q    Why was that time picked?

 2             MR. RAIZMAN:  Objection.  Objection to the

 3   extent it calls for privileged information.

 4   BY MR. MILLER:

 5        Q    Let me ask it differently.              02:45:05

 6             Did you select the time or did someone else

 7   select the time?

 8        A    I had asked, if possible, to -- for this to

 9   be outside of normal business hours.

10        Q    Why is that?                            02:45:17

11        A    Well, I wanted to conduct quite a bit of

12   testing and I really did not want to disrupt regular

13   business process for Quest.

14             But also just being in the accessibility

15   field as it pertains to health care, I'm very       02:45:35

16   sensitive at this point in time to the work that is

17   ongoing with regard to the pandemic and such and,

18   frankly, I just didn't want to be in the way of

19   patients that really did need to receive diagnostic

20   services.                                         02:45:53

21        Q    And so when you went to the Quest location

22   on October 27th, was that a time you chose or a time

23   someone else chose?

24        A    It would be I had proposed a number --

25             MR. RAIZMAN:  Same objection on the      02:46:05
```

Page 79

PA0271

```
 1    privileged basis.

 2            You can answer to the extent you don't

 3    reveal privileged information.

 4    BY MR. MILLER:

 5        Q    My question is simple.                    02:46:14

 6            Did you choose the time?

 7        A    It was among times that I had proposed.

 8        Q    Okay.  Fair enough.

 9            So when you got to the Quest patient

10    service center on October 27th, 2021, was it open or   02:46:23

11    closed?

12        A    It was closed to the public.

13        Q    So you didn't experience any other

14    customers attempting to check in at the kiosks

15    either at the same time or before or after you.  Is   02:46:36

16    that right?

17        A    That is correct.

18        Q    But you understood that there was a

19    phlebotomist that was also going to be there at the

20    location; correct?                                  02:46:54

21        A    I was not sure who would or would not be

22    there.

23        Q    Ultimately there was a phlebotomist there.

24    Is that right?

25        A    That is correct.                          02:47:06
```

Page 80

```
 1    network; right?

 2        A    I don't know if they have or haven't.

 3        Q    And so you're not suggesting that Quest is

 4    providing effective communication throughout its

 5    entire network, are you?                         05:22:45

 6            MR. RAIZMAN:  Objection.  Vague and

 7    ambiguous.  Lacks foundation.

 8            THE WITNESS:  I can answer?

 9    BY MR. MILLER:

10        Q    Yes.                                    05:22:59

11            MR. RAIZMAN:  Yes.

12            THE WITNESS:  Okay.  No.

13    BY MR. MILLER:

14        Q    More specifically, you're not able to say,

15    because you don't know whether the monitor has been   05:23:06

16    rolled out everywhere, whether Quest provides

17    effective communication at all the PSCs that were on

18    Exhibit B; correct?

19        A    Well, not for that reason.  Not for that

20    reason.                                          05:23:25

21            Can I elaborate?

22        Q    Well, that -- part of your opinion that you

23    received effective communication in this case is

24    because you got the audio message that told you

25    where to check in at the kiosk; right?           05:23:50
```

PA0273

```
 1        Q     Right.  Which are reflected in the report;

 2    correct?

 3        A     That's correct.

 4        Q     There wasn't anything material that you

 5    observed through your inspection of the Quest kiosk     05:51:52

 6    that you didn't put in your report, is there?

 7              MR. RAIZMAN:  Objection.

 8              THE WITNESS:  No.

 9              MR. RAIZMAN:  Vague and ambiguous.

10              MR. MILLER:  Did you get the answer,          05:52:00

11    Madam Court Reporter?

12              THE COURT REPORTER:  I heard, "No."

13              MR. MILLER:  All right.

14        Q     "While not all functions of the kiosk

15    solution are directly accessible on the device,        05:52:08

16    that type of full functionality is not required

17    even in devices like airline fare machines when

18    covered by specific Department of Transportation

19    regulations."

20              I want to pause there for a second.          05:52:20

21              What specific -- strike that.

22              What functionality was not available?  Is

23    it just the two categories we talked about

24    previously, the wait-by-text and the -- the ability

25    to independently use the wait-by-text function and     05:52:37
```

Page 169

PA0274

```
 1    the ability to announce whether you suspect COVID
 2    symptoms?
 3        A    Those were the two that I was aware of.
 4        Q    Okay.  Are you aware of whether Quest has
 5    ever tried to roll out in any way the ability to        05:52:49
 6    scan your insurance card or ID card at a Quest
 7    kiosk?
 8        A    I am not aware of it unless it was
 9    referenced in the complaint, but I'm -- I'm not
10    aware of it.                                            05:53:11
11        Q    Are you aware of whether Quest has tested
12    or rolled out any payment functionality of their
13    kiosk which allows people to make payments at the
14    kiosk for any services they received at Quest?
15        A    I certainly did not observe any at the        05:53:25
16    Edina location.
17        Q    Are you aware of any from any other source?
18        A    I would have to go through the complaint
19    to see if it's referenced there or in
20    Dr. Bradley Montgomery's report.                       05:53:47
21            But other than those two sources
22    potentially, I'm not aware from any other source
23    beyond those two.
24        Q    When you talk about the fact that the
25    functionality is not required even in devices like     05:53:56
```

Page 170

PA0275

## ***REDACTED***

Portions of Exhibit 23 ( Bates Nos. PA0277-284 and PA0288-292) will be filedunder seal pending the Court's Order on Plaintiff's Application for Leave to File Under Seal

# EXHIBIT 23

| | |
|---|---|
| **From:** | Reid, Mark E |
| **Sent:** | Monday, June 12, 2017 1:24 PM |
| **To:** | Yarrison, Marc A; Ocampo, Max X; Carr, Taylor A |
| **Cc:** | Johnson, Philip D; Bennett, Rick J; Rapperport, David A |
| **Subject:** | FW: eCheck-In - doorbell coming soon! |

Hey guys,

Good feedback on the "doorbell" below, and have heard other positive feedback with users liking the doorbell.
We expected some might hate it – and if so the phleb can simply turn it off with a link that we highlighted with a feature tip.

**From:** McNally, Katherine R
**Sent:** Monday, June 12, 2017 1:20 PM
**To:** Reid, Mark E
**Subject:** Re: eCheck-In - doorbell coming soon!

Hi Mark,
Its working great. I love it! Thank you!!

Kate

Katherine R. McNally ~ Quest Diagnostics ~ Phlebotomist ~ 640 Bolton St. Marlboro, Ma 01752 USA ~ Phone 508-303-3333 ~ Fax 508-303-1995 ~ Katherine.R.McNally@QuestDiagnostics.com

**From:** Reid, Mark E
**Sent:** Monday, June 12, 2017 11:01 AM
**To:** McNally, Katherine R
**Subject:** RE: eCheck-In - doorbell coming soon!

Hi Katherine,

Is your eCheck-In "doorbell" working for you?
(Went live this past weekend).

Mark

**From:** Reid, Mark E
**Sent:** Wednesday, April 26, 2017 4:14 PM
**To:** McNally, Katherine R
**Subject:** eCheck-In - doorbell coming soon!

Hey Katherine,

You drew my blood recently and we discussed eCheck-In (the iPad in the waiting room).

1

QUEST-VARGAS000036700

You suggested we add a "bell" that would automatically ring (on your PC in the back room) whenever a patient checked in.

There was no doubt in my mind how important the bell was to you – as I remember what your check-in area used to look like (hehe!) :



I discussed your great idea with Marc Yarrison (Director of National Patient Services) and he loved it, especially for single phlebotomist PSC's like yours, and so many others.

So my developer and I designed a solution and we got it done.
It is scheduled to go live and into production so you (and so many other phlebotomists) can use it starting on June 11.

PA0286

QUEST-VARGAS000036701

From June 11 on, when a patient checks in on the iPad, your PC will go "ding dong!" (I've attached the ding dong doorbell MP3 audio file so you can hear what it will sound like).

Your eCheck-In Queue (on June 11) will have a yellow "Feature tip" like shown in the screenshot below, reminding you that you can turn the doorbell sound off, or back on, etc. by clicking that blue "Turn doorbell OFF" (or ON) link.

How does this new functionality make you feel? What do you think of the solution? Let me know if you have any questions.



Mark
**Mark E. Reid**
Sr. Manager Software Engineering

**Quest Diagnostics | Action from Insight | Healthcare Technology and Analytics Solutions** | 8 Brenton Wood Rd. | Hudson, MA 01749 USA | **phone** 513.204.1860 | **mobile** 978.500.1114 | Mark.E.Reid@QuestDiagnostics.com | QuestDiagnostics.com

PA0287

QUEST-VARGAS000036702

The remaining portions of Defendant's document production included in Exhibit 23 (Bates Nos. 35245 and 40791) are being lodged with the Court due to the size of the Excel and Power Point files.

# EXHIBIT 24

PA0293

Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com
Alison M. Bernal (SBN 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Telephone: (805) 963-2345
Facsimile: (805) 284-9590

Benjamin J. Sweet
(Admitted *Pro Hac Vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

*Attorneys for Plaintiffs Julian Vargas,*
*American Council of the Blind, and the*
*Proposed Class*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

JULIAN VARGAS, ANNE WEST, and
AMERICAN COUNCIL OF THE
BLIND, individually on behalf of
themselves and all others similarly
situated,

Plaintiffs,

v.

QUEST DIAGNOSTICS CLINICAL
LABORATORIES, INC., QUEST
DIAGNOSTICS HOLDINGS, INC.,
QUEST DIAGNOSTICS
INCORPORATED; and DOES 1-10,
inclusive,

Defendants.

CASE NO.: 2:19-cv-8108

**DECLARATION OF MARK
DERRY IN SUPPORT OF
PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION**

Complaint Filed: September 18, 2019
Pretrial Conf: December 7, 2021
Trial Date: January 11, 2022
District Judge: Hon. Dolly M. Gee
Magistrate: Hon. Michael M. Wilner

## <u>DECLARATION OF MARK DERRY</u>

I, Mark Derry, hereby declare:

1.     I am an Americans with Disabilities Act ("ADA") investigator and President of Eastlake, Derry & Associates, LLC, ADA Accessibility Solutions. I have extensive experience in accessibility, universal design, and ADA consulting and training. The following facts are within my personal knowledge and, if called as a

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

witness, I could and would competently testify to these facts. I make this declaration in support of Plaintiff's Motion for Class Certification.

2.      Attached hereto as **Exhibit A** is a true and correct copy of my curriculum vitae which outlines my experience in investigating and opining on the accessibility of public accommodations.

3.      Plaintiffs' counsel retained me to investigate whether Defendant Quest's eCheck-in kiosks at certain Patient Service Center ("PSC") locations were accessible to blind individuals.

4.      Following my retention, I investigated 24 Quest PSC locations between June 12, 2021, and August 18, 2021.

5.      I personally visited each of the 24 Quest PSC locations detailed in my report.

6.      While at each PSC, I assessed the accessibility of the eCheck-in kiosk. I also took photographs at each location.

7.      I put the results of my investigation into a report, dated August 23, 2021. This report is based on my personal observations during my investigation and my experience in the field of ADA accessibility. A true and correct copy of my report is attached as **Exhibit B**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 4th day of September, 2021, in Morgantown, West Virginia.

_____
Mark Derry, Declarant

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

2
DECLARATION OF MARK DERRY

PA0295

# EXHIBIT A

PA0296

| | | |
|---|---|---|
| **Mark E. Derry** | <u>**Curriculum Vitae**</u> | **737 Powell Ave.** |
| **(304)685-3510** | | **Morgantown, WV 26505** |

## PROFILE:

<     Extensive architectural and communication accessibility design and barrier removal experience

<     Expert in laws relevant to civil rights as well as building codes and standards for accessibility

<     Nationally-known Trainer, with the ability to effectively develop and deliver positive learning outcomes

**<**     **Strong commitment to the Americans with Disabilities Act (ADA), and Independent Living Philosophy**

## EXPERIENCE OUTLINE:

**Eastlake, Derry & Associates, LLC**

737 Powell Avenue, Morgantown, WV 26505

*President,* 6/99 to present

    **Mr. Derry c**urrently provides accessibility & ADA consulting and training services, including accessibility surveys and survey training for State and Local Governments, Public Accommodations, Fair Housing entities, Corporations, and Advocates.  He has provided accessibility surveys as well as plan review services for various architectural firms, and surveyed almost every type of facility since 1999, with his specialties having included Universities, Medical Care Facilities, and Public Accommodations with multiple locations.** In 2001, Mark assessed the Johns Hopkins University Campus, in Baltimore, MD, with more than 60 buildings at 2.6 million square feet over 128 campus acres. In 2004, he completed an accessibility survey of Loyola College of Maryland, and in 2018 Morgan State University in Baltimore, and has provided access survey consulting with Lock Haven University and Kutztown University in PA.  From 2002 thru 2005, Mark provided site surveys and settlement consultations for Access Now v. Triad Hospitals, Inc with over 50 hospital campus facilities in the mid- and southwest, and the following year provided consulting for case settlement with the Department of Justice regarding multiple locations of Valley Radiology imaging centers. From 2007-2015 Mr. Derry worked with Community Health Systems Professional Services Corporation on an accessibility survey and remediation program for over 260 medical care facilities throughout the U.S., as well as due diligence surveys of prospective facility acquisitions, and new construction plan review.  Other satisfied proactive accessibility program development clients have included RadioShack Corporation, Zamias Property Management Services, the American Psychological Association, City of Bowie, MD, the WV Attorney General's Office, Wood County Airport, among many others.

**Mr. Derry Provides presentations on the ADA Titles II & III, the ADA Accessibility Standards and updates, Fair Housing / 504 accessibility, and Accessibility Survey Training.**  Since 2015, Mr. Derry has developed and presented a new training project with the National Council on Independent Living (NCIL), called the ADA Accessibility Survey Academy Project (ADA ASAP) to provide accessibility survey training nationally for staff at Centers for Independent Living.  Other past training customers include the ADA National Network, the U.S. Department of Defense, Tennessee DOT, New Mexico DOT, Cornell University, The Kennedy Center for the Performing Arts, AIA West Virginia, AIA Oklahoma, Oklahoma State University, Arkansas State University, the National Center on Accessibility, Penn State University, Department of Defense, Triad Hospitals, and many (over 100) Centers for Independent Living nationally.

    **Mr. Derry is a past Vice President of NCIL.  He has represented NCIL on the Public Rights of Way Access Advisory Committee for the U.S. Access Board, and more recently on the Medical & Diagnostic Equipment Advisory Committee.  He served as a member of the NCIL Board of Directors from 2000 thru 2016.  As Co-Chair of the NCIL ADA/Civil Rights Subcommittee, he provided written and oral testimony regarding rulemaking on accessibility standards, and several settlement/consent agreements to the U.S. Department of Justice, the U.S. Access Board and in the Congressional Record.   Mark is a past Chair of the West Virginia Statewide Independent Living Council (SILC), Past Chair of the West Virginia ADA Coalition, and 2015 Inductee to the WV Independent Living Hall of Fame.**

1

PA0297

**National ADA Network**
**ADA Center for the Mid-Atlantic Region (Federal Region 3)**
451 Hungerford Drive, Rockville, MD  20850-4151
*Technical Assistance Specialist,* 8/97 to 10/99 (1999 to 2010 contract **Trainer**)
   Provided technical assistance to callers on the national ADA Hotline, and helped develop a tracking system for handling calls. Developed new curriculum directed at architects and building officials and wrote articles for Center Newsletter "ADA in Focus", and articles for training ads and CIL newsletters.
   Continued as a contract Trainer, providing presentations on behalf of the ADA Center within Region III, including a multi-level ADA Standards training utilizing survey techniques to teach the principles of accessibility and Universal Design.

**Action Toward Independence, Inc.**
2927 Route 6, Slate Hill, NY 10973
*Program Manager / Architectural Barrier Consultant / ADA Coordinator,*  3/94 to 7/97
   Responsible for initial setup of full-time Satellite Office, and for the management of Center operations, training and supervision of five full time staff and three volunteers.  Developed architectural consulting services including: commercial site surveys, home evaluations to determine consumers' needs, project planning, and contract administration.  Set up and organized a Resource Library for ADA and Assistive Technology at the Center.  Developed and hosted monthly NPR radio call-in talk show called "Making Waves" to promote awareness and provide information on ADA and other issues effecting people with disabilities.

**Ma-Mar Construction, Inc.,** Sparrowbush, NY
*Owner,* 1983 to 1993
   Owned and operated construction business specializing in residential home improvements and remodeling. Designed and built custom kitchens, bathrooms, and other projects utilizing up to three construction crews while managing marketing, sales, and bookkeeping operations.

**Wright-Way, Inc.,** Garland, TX
*Accessible Van Designer/Builder,* 1981-1983
   Specialized in the design and construction of accessible van conversions.  Installed wheelchair lifts, power doors, power seat systems, hand controls, raised roofs, and complete interiors to enable people with disabilities to drive.

**MILITARY SERVICE:** *United States Air Force,* Honorably Discharged

**EDUCATION and TRAINING:**
   U.S. Air Force, Denver, CO, **Technical Procurement,**  *1976*
   U.S. Air Force, Whiteman AFB, MO, **Contract Administration**  *1977*
   Bergen Community College, Paramus, NJ  **Construction Estimating**  *1986*
   Action Toward Independence, Slate Hill, NY  **ADA/ADAAG Training** (DREDF) *1994*
   NCIL ADA-ILC National Training Project,  **Advanced ADA Training** (M.Golden)  *1996*
   ADA-Ohio Training Project, **EEOC/ADA Title I Advanced Training** (R.Jones)  *1997*
   Department of Justice, **ADA Title II & III Advanced Training**  *1998*
   NCIL/DOJ/DOT**, ADA & Transportation Training**  *1998*
   BOCA International**, Accessibility Codes Training**  *1998*
   Access Board (USATBCB), **Accessibility Guidelines Advanced Training** *1999*
   National Center on Accessibility (NCA), **Recreation Guidelines Training** *2000*

PA0298

**DETAILED EXPERIENCE:**
(Since founding Eastlake, Derry & Associates in 1999)


**2018**
Tabit v. Kroger Stores – ADA Survey (limited) and Deposition for injury case
Advanced Survey Level 3 Training – Wisconsin
American Psychological Association (APA) Convention Sites – Chicago, IL
Carlson Lynch Sweet Kilpela & Carpenter, LLP Pittsburgh – ADA Public Rights of Way Survey Training
Moe's Mini Warehousing, Parkersburg, WV – ADA Survey and Report
Toyota Motor Company, Buffalo, WV Plant – ADA Survey and Report
2018 National ADA Symposium, Pittsburgh, PA – Attendee
Buchanan Ingersoll Rooney, PC - ALDI Stores ADA Surveys and Reports
Maryland Commission on Civil Rights, Baltimore, MD – Access to ADA Surveys Level 1

**2017**
University of Arkansas – ADA Survey Training Level 1 & 2
Morgan State University (MSU) Campus Survey – 50 Campus Building & Associated Walkways
NCIL ASAP Training – Camp Hill, PA
American Psychological Association (APA) Convention Sites – San Francisco
NCIL ASAP Training – LaCrosse, Wisconsin
University of Arkansas – ADA Survey Training Level 1 & 2
WVnet Offices, Morgantown, WV – ADA Survey and Report

**2016**
United Refining Company (374 Kwik Fill Gas Stations and Conv. Stores surveyed for settlement)
Clear Mountain Banks (10 Branches surveyed)
American Psychological Association (APA) Convention Sites – Washington, DC
NCIL ASAP Training – Nitro, West Virginia
Pennsylvania Parks and Forests Survey Training
ACIL, Charleston, WV – Advanced Level 3 ADA Survey Training
Stage AE, Pittsburgh, PA – ADA Consultation and Report for settlement
NCIL ASAP Training – ILRCSF San Francisco
Independence First, Milwaukee, WI (1-on-1 Survey Training with interpreter)
Monmouth County, NJ – (Subcon of UD&C) ADA Accessibility Training

**2015**
CHS Hospitals (Final 4)
Fairfax County, VA: Survey Training(s) for USDOJ settlement remediation surveys
American Psychological Association (APA) Convention Sites – Washington, DC
Pittsburgh Penguins Lemieux Sports Complex – New construction ADA Plan Review
ADA Anniversary Celebration at the White House and Kennedy Center for the Performing Arts
ADA Legacy Bus Tour (May 4-8)
West Virginia Disability Caucus
IRWW Final Session at Penn State
NCIL ASAP Survey Training Project Beta Tested – Eastern Shore CIL

3

**2014**
CHS Hospitals (Multiple Campus)
Carlson Lynch Sweet Kilpela & Carpenter, LLP - Investigator Survey Training
Red Cross – developed NCIL/Red Cross MOU for accessibility surveys at emergency shelters
American Psychological Association (APA) Convention Sites – Toronto
Lehigh Valley, PA CIL Survey Trainings (Level 1 & Level 2)
MD Human Rights Commission – Access to ADA Survey Training Level 1
PA Recreation and Park Society - ADA Accessibility Training
Inclusive Recreation for Wounded Warriors (IRWW) – Penn State/DOD project (typically 4 times per year)

**2013**
CHS Hospitals (Typically one campus per month)
American Psychological Association (APA) Convention Sites – Honolulu, HI
Freedom Valley CIL – ADA Standards Training
Amtrak Survey Training (Subcon of UD&C) – Philadelphia, PA
Produced Minority Report for MDEAAC at U.S. Access Board
Fairfax County, VA – Access to ADA Level 2 Survey Training
Mountain State CIL, Huntington, WV – Access to ADA Level 1Survey Training
Anthracite Region CIL, PA Training – ADA Accessibility Standards Training
CLINCH CIL VA Training – ADA Accessibility Standards
Hampton Inn Charleston, WV – ADA Facility Survey & Report
Progressive Independence, Norman, OK – Access to ADA Surveys Training Level 2
Inclusive Recreation for Wounded Warriors (IRWW) – Penn State/DOD project (typically 4 times per year)

**2012**
CHS Hospitals (Typically one campus per month)
Johns Hopkins Medical Research Campus (Subcon of UD&C) Survey of Wolfe Building
Mainstream Inc., Littlerock, AR - Access to ADA Surveys Level 1 & 2
Fairfax County, VA Level 1 Survey Training
American Psychological Association (APA) Convention Sites – Washington, DC
City of Morgantown, WV – ADA Title II Survey Training Level 1
Progressive Independence, Norman, OK – Access to ADA Surveys Level 1
Virginia Statewide IL Conference – Keynote Speaker
Inclusive Recreation for Wounded Warriors (IRWW) – Penn State/DOD project (typically 4 times per year)

**2011**
CHS Hospitals (Typically one campus per month)
City of Tulsa, OK – AIA and Code Officials – Accessibility Surveys Level 1
Amtrak Stations – Phoenix, Tucson, and Flagstaff – ADA Surveys and Reports (Subcon of UD&C)
American Psychological Association (APA) Convention Sites – Orlando, FL
Amtrak 30th Street Station, Philadelphia, PA – Facility Survey (Subcon of UD&C)
Mainstream Inc., Littlerock, AR - Access to ADA Surveys Level 1 & 2
Kansas Association of CILs – Keynote Address
Amtrak Union Station, Chicago, IL - ADA Survey (Subcon of UD&C)
CHS Hospitals – Matsu Valley Regional Hospital, Palmer, AK
Johns Hopkins Medical Research Campus – (Subcon of UD&C) Multiple Buildings Surveys
Amtrak ASAS Training II – Jacobs Engineering Survey Training (Subcon of UD&C)
Inclusive Recreation for Wounded Warriors (IRWW) – Penn State/DOD project (typically 4 times per year)

**2010**
CHS Hospitals (Typically one campus per month)
UPMC Hospital Plan Reviews (final 10/10 Subcon of ADA Inc.)
Dollar Bank Plan Reviews (multiple as Subcon of ADA Inc.)
Amtrak ASAS Training I – Jacobs Engineering Survey Training (Subcon of UD&C)
Sterling Jewelers Store Surveys - 21 Stores (Subcon of UD&C)
Mid-Atlantic ADA Center - Access to ADAAG Level 2 Training – York, PA
American Psychological Association (APA) Convention Sites

**2009**
CHS Hospitals (Typically one campus per month)
Mainstream Inc., Littlerock, AR - Access to ADA Surveys Level 1 & 2
Inclusive Recreation for Wounded Warriors (IRWW) – Penn State/DOD project (typically 4 times per year)
Lehigh Valley, PA CIL – Music-fest Survey Training
Life and Independence for Today (LIFT) CIL  - Access to ADAAG Survey Training Level 2
Days Inn Arlington, VA – Survey and Report for settlement
Blue Ridge CIL, VA – Access to ADAAG Level 1
American Psychological Association (APA) Convention Sites – Washington, DC
Mid-Atlantic ADA Center - Access to ADAAG Level 1 - Newark, DE
UPMC Hospital Plan Reviews (Subcon of ADA Inc.)
Quik Trip Corp Tech. Assistance – 1-year consulting project re: U.S. DOJ settlement remediation (500 stores)

**2008**
CHS Hospitals (Typically one campus per month)
Inclusive Recreation for Wounded Warriors (IRWW) – Penn State/DOD project (typically 4 times per year)
SWDBTAC Webcast: Accessibility in Medical Care Facilities
Kansas Association of CILs – Keynote Speaker
Liberty Resources, Philadelphia, PA – Access to ADAAG Level 1 & 2
UPMC Hospital Plan Reviews (Subcon of ADA Inc.)
American Psychological Association (APA) Convention Sites – Toronto
Quik Trip Corp Tulsa, OK – Corporate Training – ADA Surveying at Quik Trip Stores
Pipestem and Canaan Valley Resorts, WV – Title II Park Surveys and Reports
Burger King (200 California Stores) Surveys and Reports (Subcon of UD&C)
American Psychological Association (APA) Convention Sites
Loch Haven University, PA – Site Walkthroughs and Reports / limited surveys
Altoona, PA CIL – Access to ADAAG Level 1 Training
DE Department of Transportation – Accessible Public Rights of Way Survey Presentation
Access to ADA Surveys Level 3 Training – ED&A Offices, Morgantown, WV
ADA Amendments Act Negotiation Meetings representing NCIL (several leading up to the 2008 passage)

5

## 2007

CHS Hospitals – Initial meetings to begin ADA Program
Mid-Atlantic ADA Center - Access to ADAAG Level 2 Alexandria, VA
Inclusive Recreation for Wounded Warriors (IRWW) – Penn State/DOD project initial trial training
Ability Resources, Tulsa, OK – Access to ADAAG Level 1
CVS Stores (15) Sandusky and Cleveland, OH – (Subcon of UD&C) Surveys and Reports for settlement
CIL of Central PA – Access to ADAAG Level 1 Training
Federated Stores (Macy's) in MD, VA, and DC – (Subcon of UD&C) Surveys & Reports for settlement
American Psychological Association (APA) Convention Sites
Bohler Engineering, MD – Accessible Public Rights of Way Training
West Virginia Fire Marshall's Office – Access to ADA Surveys Training
Glenarden, MD Title II Consultations re: City Hall
Freedom Center CIL, Frederick, MD – Access to ADAAG Level 2 Training
Williamsport, PA CIL – Access to ADAAG Level 2 Training
Asian American Hotel Owners Association – ADA Consulting re existing properties
AIA West Virginia – Access to ADAAG Update Session / Panel
Barter Theatre, Abingdon, VA – ADA Survey, Consultation and Deposition for ADA case
Kutztown University, PA – ADA Survey and consultation for facility remediation / settlement
Radio Shack Corporate Offices, Fort Worth Texas – ADA Consultation and Design

## 2006

Gould Turner Group - Plan Review – Oro Valley Hospital, Nevada
Life and Independence for Today (LIFT) CIL  - Access to ADAAG Survey Training Level 1
Tri-County Patriots for Independent Living – Access to ADAAG Level 2
City of Charlotte, NC – Title II ADA Accessibility Training
Kanawha County Libraries, West Virginia – Survey and Report for U.S.DOJ settlement
VA IL State Conference – Keynote Speaker
Jonesboro, AR – Access to ADA Title II Accessibility Surveys Level 1
Mainstream Inc., Little Rock, AR - Access to ADA Surveys Level 2
NEPACIL, Scranton, PA – Retreat Keynote Speaker
American Psychological Association (APA) Convention Sites
Lifepoint Hospitals, Logan, WV – ADA Consultation and report
Harbor's Edge Assisted Living Center, Norfolk, VA – Accessibility Survey and Report
Great Lakes Region ADA Center Webinar: Signage for Permanent Rooms and Spaces
Radio Shack Washington, DC Stores – ADA Surveys for settlement
CIL of North Central PA – Access to ADAAG Level 1 Survey Training
GAP Store, Laurel Park Mall, IL – ADA Survey and Report for remediation of barriers
Freedom CIL, Frederick, MD – Access to ADAAG Level 1
Mid-Atlantic ADA Center - Access to ADAAG Level 1 – Morgantown, WV
Radio Shack Corporate, Fort Worth, TX – Tech Assist., consultation re counters & displays
American Health Lawyers Association (AHLA) – Luncheon Presentation
AHLA Webinar: Update on ADA and Healthcare Facilities (co-presented with Minh Vu and John Wodatch)
Triad Hospitals – Final Settlement Meetings
Radio Shack Corporate, Fort Worth, TX – Store Model Reviews for Merchandising Floorplans
Radio Shack Corporate, Fort Worth, TX – ADA Program video and handouts review and comments
Radiologix, Inc. – Survey and Reports for four imaging facilities in San Jose, CA for settlement
Triad Hospitals – Stipulation Review and comments for settlement
West Virginia Code Officials Association – ADA Update Training

**2005**
Triad Hospitals (Typically one or two campus per month)
Radio Shack - ADA Plan Reviews – Model Store Floorplans
Tennessee DOT – Access to ADAAG Survey Training Level 1 & 2
Advanced Radiology, Baltimore, MD – ADA Surveys and reports for settlement
APRIL Conference, Honolulu, HI - Attendee
Radio Shack – Tech Assist. on Nextel and Verizon Displays
City of Morgantown – ADA Title II Training
American Psychological Association (APA) Convention Sites
Access to ADAAG Level 1 & 2 – ED&A Offices, Morgantown, WV
15th Annual ADA Celebration, Charleston, WV – Keynote Speaker
Triad Hospitals – Testimony at Fairness Hearing for Settlement
WVU Hospitals – ADA Facilities Seminar
AIA West Virginia – Access to ADAAG Update Session / Panel
Mainstream Inc., Little Rock, AR - Access to ADA Surveys Level 1 & 2

**2004**
Triad Hospitals (Typically one or two campus per month)
Safeway Grocery Stores (300 stores in CA, MD, VA, PA, and NJ (Subcon of UD&C) ADA Surveys
Walmart Wyomissing, PA Store - ADA Survey for settlement
Ingersoll-Rand Corporation – ADA Consulting re: proposed Disability Awareness Campaign
Mid-Atlantic ADA Center - Access to ADAAG Level 1 - Bowie, MD
Kennedy Center for the Performing Arts LEAD Conference – ADA Surveys Basics
City of Jonesboro, AR – Access to ADAAG Title II Survey Training
American Psychological Association (APA) Convention Sites
Loyola University of Maryland – ADA Campus Survey (20 buildings) and Report / Tech Asst.
Gould Turner Group, Nashville, TN – ADA Plan Review – hospitals
Mid-Atlantic ADA Center - Access to ADAAG Level 2 - Bowie, MD

**2003**
Triad Hospitals (Typically one or two campus per month)
"Good Access is Good Business" – T24 CALDAG Training, Sacramento, CA
University of Arkansas – ADA Title II Training
City of Wheeling, WV – ADA Title II Training
AIA West Virginia – Access to ADAAG Update Session / Panel
Gould Turner Group, Nashville, TN – ADA Plan Review – hospitals
Fairmont State College, Fairmont, WV – ADA Surveys (limited) and consultation on remediation
National Council on Independent Living (NCIL) ADA Survey Training – Oklahoma City, OK
ADA Anniversary Gala, Washington, DC – Guest
Lifepoint Hospitals, Logan, WV – ADA Due-diligence Walkthrough
WV ADA Coalition – Access to ADAAG Level 1 – Flatwoods, WV
Mid-Atlantic ADA Center - Access to ADAAG Basic - Bowie, MD
National Center on Accessibility (NCA) – Staff Training – ADA Accessibility Surveys
Montgomery County, NJ – (Subcon of UD&C) ADA Title II Accessibility Training
American Psychological Association (APA) Convention Sites
CJ Maggie's Restaurants – ADA Survey and Report - Morgantown, WV Store
ADA Compliance Services Company, Park Ridge, NJ – Staff Accessibility Survey Training
Triad Hospitals – ADA Settlement Negotiations Meetings, Miami, FL

PA0303

**2002**
Triad Hospitals (Typically one or two campus per month)
Jacksonville CIL, Jacksonville, FL – Access to ADAAG Survey Training
Williamsport, PA CIL – Access to ADAAG Level 1 Training
York CIL, York, PA – Access to ADAAG and ANSI Training
Life and Independence for Today (LIFT) CIL  - Access to ADAAG and ANSI Training
Mainstream Inc., Little Rock, AR - Access to ADA Surveys
Mid-Atlantic ADA Center - Access to ADAAG Level 2 - Bowie, MD
WV Bed & Breakfast Owners Association – ADA Presentation, Lakeview C.C.
The Westin Diplomat Resort Hotel, Hollywood, FL – ADA Site Survey
Justin Dart Memorial / ADA Gala – Guest
American Psychological Association (APA) Convention Sites
Tampa CIL, Tampa FL – Access to ADAAG Survey Training
Ability Resources, Tulsa, OK – Access to ADAAG Survey Training
Penn State University and the PA ADA Coalition – Access to ADAAG Survey Training
Bastian & Harris, AIA Charleston, WV – ADA Consultation and Plan Review re: Marshall University

**2001**
Mid-Atlantic ADA Center - Access to ADAAG Level 1 - Bowie, MD
Triad Hospitals – Initial ADA Remediation Project Presentation – Dallas, TX
Lehigh Valley CIL – Mid-Atlantic ADA Center Resource Library Training
WV Commission on the Arts, Accessibility Advisory Committee – ADA Access Presentation
PA ADA Coalition Retreat – ADA Surveys for Advocacy
Manassis CIL, VA – Access to ADAAG Level 1 Training
Lehigh Valley CIL, PA - Access to ADAAG Level 1 Training
Bovis Lend/Lease Corp., Nashville, TN – Access to ADA Basic Training
American Psychological Association (APA) Convention Sites
Johns Hopkins University, Homewood Campus – ADA Survey and Report – 56 Buildings/128 acres
U.S. Access Board PROWAAC Meeting, Atlanta, GA – Member representing NCIL
Triad Hospitals – River Region Medical Center – 1st ADA Survey and Report of 50-hospital case
Mainstream Inc., Little Rock, AR - Access to ADA Surveys
Mid-Atlantic ADA Center - Access to ADAAG Level 1 – Charleston, WV
Kansas Association of CILs – Access to ADAAG Survey Training Level 1
Kansas City CIL - Access to ADAAG Survey Training Level 1
CJ Maggie's Restaurants, Buchannon and Elkins, WV – ADA Surveys and Reports
Hawaii ADA Coalition, Honolulu, Hawaii – Access to ADAAG Survey Training Level 1
Westin Diplomat Resort Hotel, Hollywood, FL – New Construction Project 2nd Plan Reviews
AIA West Virginia – Access to ADAAG Update Session / Panel

**2000**
Westin Diplomat Resort Hotel, Hollywood, FL – New Construction Project 1st Plan Reviews
Stewart v. Kanawha County Mediation – ADA consultation regarding curb ramp remediation
Naval Surface Warfare Center, MD – Accessibility Training – Accessible Facilities for Employees
Herald Dispatch Newspaper, Huntington, WV – ADA Consultation and design for Main Entrance
U.S. Access Board PROWAAC Meeting DC – Member representing NCIL
New Mexico State Department of Highways and Transportation – ADA Survey Program Trainings (2)
Federated Department Stores, Atlanta, GA – (Subcon of UD&C) ADA Surveys of 18 Stores
WV Supreme Court – ADA Title II Facilities Training

**2000 (continued)**
U.S. Access Board PROWAAC Meeting San Francisco – Member representing NCIL
City of Bowie, MD – ADA Consultations for DOJ Project Civic Access Settlement
Wood County Airport, Wood County, WV – ADA Survey and Report
Mainstream Inc., Little Rock, AR - Access to ADA Surveys
U.S. Access Board PROWAAC Meeting DC – Member representing NCIL
WV Interior Designers Conference – ADA Accessibility Presentation
Hertz Rental Car Corporate Office, Park Ridge, NJ – "Good Access is Good Business" presentation
DMW Landscape Architects, Towson, MD – ADA Access in the Public Rights-of-Way
PCCD Conference, Harrisburg, PA – Keynote Speaker/Facilitator
Bristol CIL, Bristol, VA – Access to ADAAG Basic Training
American Psychological Association (APA) Convention Sites
SWDBTAC – Access to ADAAG Survey Training, Biloxi, MS
Burns & McDonnell, AIA, Kansas City, KS – ADA Accessibility Surveys for Hertz Rental Car Properties
NCIL National Teleconference – "Providing ADA Surveys at Your Centers"

**1999**
Zamias Properties – ADA Surveys of 15 Shopping Malls
All Federal Region 3 CILs - Mid-Atlantic ADA Center Resource Library Training onsite
American Psychological Association (APA) – ADA Surveys (limited) of Convention Sites

9

# EXHIBIT B

PA0306



**737 Powell Avenue, Morgantown, WV  26505**

■ **304-685-3510**

**www.adaderry.net** ■ **adamarkd@gmail.com**

**August 23,2021**

**Outline of Issues for Mark Derry to Investigate:**

1) When you walk into Quest, does the location have a bell or device to announce your presence? **No, very few locations had an entrance bell or device to announce your presence.**

2) When you walk into Quest, is there a patient service representative available in the waiting room to assist patients with check in? **No. There may sometimes be a window, but the window was never staffed. You have to catch a staff member when they pop their head out the treatment area door to call the next person in the cue, as they rarely ask if anyone needs assistance.**

3) When you walk into Quest, how are individuals directed to the e-Check In Kiosk?

Is there signage? **Yes. Usually printed, sometimes handwritten on paper.**
How are blind patients directed? **They are not directed until/unless the message plays on the LCD Monitor. Then they would have to find the kiosk. Not all kiosks were set up for the three finger swipe. Many times it would be just one out of three kiosks would accept the three finger swipe, at some other locations none would take the swipe.**
Is there an audio message that plays on the LCD monitor? **Sometimes. Softly.** If so, how frequently does the message play? **Inconsistently at 15 to 20 minutes at some locations**. Is it audible? **Yes, if you are near the monitor.** What does the message say? **To proceed to a kiosk and do a three finger swipe, and you will be placed in the que to be called by staff. If you need assistance you should ask a staff member…(but they only appear in the doorway to call the next person by name, and then they are gone. They never asked if anyone needed additional assistance, with very few exceptions.)**

4) Wait time – how long does one have to wait to hear the audio message instructing someone to check in? **15 to 20 minutes if it is playing at all.**

5) When attempting to utilize the three finger swipe, are you able to access independently any of the other features on the Kiosk? **No.** Edit personal information? **No.** Wait by text option? **No.**

PA0307

6) Does the Kiosk have a help button? **Yes, but only to sighted individuals using the touch screen.** Is that button available only on the touch screen or in an area independent of the touch screen? **Only on the touch screen when you can see and you tap it. It is <u>not made available</u> <u>at all</u> on the three finger swipe screens.**

7) Once you three finger swipe, is there a confirming audio message that instructs you that you are checked in? **Sometimes.** Does that audio message tell you an estimated wait time? **If it comes on, Yes.**

8) Once checked in via three finger swipe, does your entry appear in the video LCD monitor wait time que? **Yes.** Are there any aids or auxiliary services to let blind patients know where they are in the cue? **No.** How long is the wait for a Quest employee to come out of the back room once three finger swipe occurs? **Wait time varies by how many people are in the cue – which if you are blind, you don't necessarily know. Staff calls people in the order they came in at most locations. Staff do not come out based on the three finger swipe immediately.**

9) Do you observe Quest employees regularly "sweeping" the waiting room to see if anyone needs help? **Almost never.**

10) How many Quest employees are you observing from the public waiting room in each location? **Usually two to three.**



| | | Tracking Sheet - Quest Patient Se | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Investigator:** Mark Derry
**Contact:** 304-685-3510
**Trip Date:** 6/12/21-6/14/21;   8/12/21 - 8/18/21
**Report Date:** 8/23/2021

Eastlake, Derry & Associates, LLC
ADA Accessibility Solutions

| | Date | Address / Office Location | State | Approach | | Accessible Kiosk Features | | | | | | | | Comments | Photos |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Audible Entrance Bell or Device? | Staffed Waiting Room? | Audible Direc-tions to Kiosk? | Audible Message on LCD Monitor? | Audio Instruc-tions Wait Time | Three Finger Swipe on all kiosks? | Confirm-ing Message Provided? | Appears on LCD with wait time and Positon | Staff Regulary Sweeping to offer help? | | |
| 1 | 6/12/2021 | 7789 Foothill Blvd, Tujunga | CA | No | No | No | No | N/A | N/A | N/A | N/A | No | Located in a Von's Supermarket Pharmacy. No kiosk is provided. | Quest1 |
| 2 | 6/12/2021 | 8501 Wilshire Blvd, Suite 305, Beverly Hills | CA | No | No | No | No | N/A | Yes (1) | No | Yes | Yes | Un-staffed window. Staff explained they were closing for the day. | Quest2 |
| 3 | 6/14/2021 | 201 S. Buena Vista St.,   Suite 225,         Burbank | CA | No | No | No | No | N/A | Yes (1) | No | Yes | No | Three finger swipe worked, then staff member came out to ask if I needed assistance. | Quest3 |
| 4 | | 2701 W Alameda Ave,   Suite 406,         Burbank | CA | No | No | No | No | N/A | No | N/A | N/A | No | No Three finger swipe, but staff came out when she was helping someone else. | Quest4 |
| 5 | | 2601 W. Alameda Ave Suite 114         Burbank | CA | No | No | No | No | N/A | No | No | N/A | Yes | Three finger sweep did not work. Large reception room with person behind a desk. | Quest5 |
| 6 | | 18370 Burbank Blvd,   Suite 108         Tarzana | CA | No | No | No | No | N/A | Yes | Yes | Yes | No | This was a different model kiosk than the usual. Had voice output. No input available following swipe. | Quest6 |
| 7 | | 5525 Etiwanda Ave, Suite 307 Tarzana | CA | No | No | No | No | N/A | No | N/A | N/A | No | Three finger swipe did not work. | Quest7 |
| 8 | | 14624 Sherman Way,   Suite 101         Van Nuys | CA | No | No | No | No | N/A | Yes | No | Yes | No | Swipe worked but there was no audible confirmation | Quest8 |
| 9 | | 4849 Van Nuys Blvd., Suite 208 Sherman Oaks | CA | | | | **Location Closed at time of Site Visit** | | | | | | Location Closed Temporarily | Quest9 |
| 10 | 6/14/2021 | 4955 Van Nuys Blvd., Suite 611 Sherman Oaks | CA | No | No | No | No | N/A | Yes | Yes | Yes | No | | Quest10 |

PA0309

| # | Date | Address | State | | | | | | | | | | Notes | Quest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | 8/12/2021 | 1779 Walden Ave Suite 300 Cheektowaga | NY | No | No | No | Yes | N/A | Yes | Yes | Yes | Yes | "Not taking walk-ins right now" | Quest11 |
| 12 | | 1317 Jefferson Ave, Buffalo | NY | Yes | No | No | Yes | 15 Min | No | No | No | No | Three finger swipe just brought up tap screen for sighted. | Quest12 |
| 13 | | 455 Delaware Ave Buffalo | NY | Yes | No | No | Yes | 15 Min. | Not all - 1 of 2 | Yes | Yes | No | Kiosk did not provide any options as it does for sighted patients | Quest13 |
| 14 | | 3842 Harlem Rd., Cheektowaga | NY | No | No | No | Yes | 15 Min. | No | N/A | N/A | No | Very crowded waiting room. | Quest14 |
| 15 | | 264 Center Rd., West Seneca | NY | Yes | No | No | No | N/A | Yes | Yes | Yes | No | This had different touch screen kiosk. No other features available | Quest15 |
| 16 | 8/12/2021 | 1106 Union Rd, Southgate Plz, West Seneca | NY | No | No | No | No | N/A | 1 of 3 | Yes | Yes | No | They took Ashley before me, she had a 4 minute wait and I had a 1 minute wait. | Quest16 |
| 17 | 8/13/2021 | 3500 Main St., University Plz Amherst | NY | Location Closed at time of Site Visit | | | | | | | | | Sign says "Closed until further Notice" | Quest17 |
| 18 | | 3620 Sheridan Dr., Suite 100 Amherst | NY | No | No | No | No | N/A | 2 of 3 | Yes | Yes | No | Swipe only on 2 of 3 kiosks | Quest18 |
| 19 | | 2350 Maple Rd., Amherst | NY | No | No | No | No | N/A | 1 of 2 | Yes | Yes | No | Closed 2pm, went back next day. | Quest22 Quest19 |
| 20 | 8/13/2021 | 3950 E. Robinson Rd., Suite 105 Amherst | NY | Yes | No | No | Yes | 15 Min. | Yes | Yes | Yes | No | Could not access any other features or help button from three finger swipe | Quest20 |
| 21 | | 4181 Transit Rd., Transit Town Plz Amherst | NY | No | No | No | Yes | Not in 30 min there | No 0 of 3 | N/A | N/A | No | Very busy location. | Quest21 |
| 22 | 8/18/2021 | 233 Broad St Milford | CT | No | No | No | Yes | 17 Min. | Yes | Yes | Yes | No | Message for blind consumers played 17 minutes after I arrived | Quest23 |
| 23 | | 2890 Main St Stratford | CT | No | No | No | Yes | 8 Min after arrival | Yes | Yes | Yes | No | Message tells you you are number but doesn't say how many others are in the que | Quest24 |
| 24 | 8/18/2021 | 1825 Barnum Ave Stratford | CT | Location Closed at time of Site Visit | | | | | | | | | Note on door says location closed as of July 16th | Quest25 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25 | 8/18/2021 | 555 Lordship Blvd Stratford | CT | No | Yes | No | N/A | N/A | Yes | Yes | Yes | Yes | "tell her to knock on the door and someone will come out and help" | Quest26 |
| 26 | | 970 E. Main St, Bridgeport | CT | No | No | No | Yes | 10 Min. after arrival | Yes | Yes | Yes | No | | Quest27 |
| 27 | | 1450 Barnum Ave Bridgeport | CT | Location Closed at time of Site Visit | | | | | | | | | Note on door reads "No Appointments" "Closed early" | Quest28 |
| 28 | | 1677 E. Main St Bridgeport | CT | Location Closed at time of Site Visit | | | | | | | | | Note on door reads Closed please visit other locations | Quest29 |
| 29 | 8/18/2021 | 3180 Main St. Beechmont Ave Bldg., 1st Fl Bridgeport | CT | No | No | No | Yes | 15 Min. | Yes | Yes | Yes | No | You have to yell at them when they stick their head thru the door so they stop. | Quest30 |

# EXHIBIT 25

PA0312

Jonathan D. Miller (Bar No. 220848)
jonathan@nshmlaw.com
Alison M. Bernal (Bar No. 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE & MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, California 93101
Telephone: (805) 963-2345
Facsimile: (805) 563-5385

Attorneys for Plaintiffs Julian Vargas,
American Council of the Blind, and the
Proposed Class

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

JULIAN VARGAS, and AMERICAN COUNCIL OF THE BLIND, individually and on behalf of all others similarly situated,

        Plaintiffs,

    v.

QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, inclusive,

        Defendants.

CASE NO.: 2:19-cv-8108

**DECLARATION OF RACHAEL BRADLEY MONTGOMERY IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**Hearing Date:** **October 29, 2021**
**Time:** **10:00 am**
**Courtroom:** **8C**

Complaint Filed: September 18, 2019
Pretrial Conf: December 7, 2021
Trial Date: January 11, 2022
District Judge: Hon. Dolly M. Gee
Magistrate: Hon. Michael M. Wilner

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

DocuSign Envelope ID: d91E79C4-ACE7-4734-A9EF-98F6E14FEBDE

DocuSign Envelope ID: 491E79C4-ACE7-4734-A9E7-98F6E14FEBDE

I, Rachael Bradley Montgomery, declare as follows:

1. I make this declaration based on my personal knowledge. If called to testify, I could and would competently testify as to the matters set forth herein. This declaration is submitted in support of plaintiffs' motion for class certification and opposition to defendants' motion for summary judgement.

## I.    QUALIFICATIONS

**Professional and Educational Background**

2. I have over 20 years of experience in usability, disability-related education, and accessibility. I currently work as an Accessibility Specialist at the Library of Congress, though this report is not being done in my capacity as an employee of the Library of Congress.  Prior to July 2021, I consulted on the accessibility of kiosks, web sites, software applications, and overall organizations for several years. As a consultant, I regularly evaluated kiosks, web sites, and mobile applications for clients.  I have written and implemented kiosk and web standards, procurement guidelines, testing methodologies, and training programs for a number of organizations. I co-chair the W3C Accessibility Guidelines Working Group and am executive director of a charity that helps small organizations remove accessibility barriers.

3. I have a Master's in Information Studies focused on usability of emerging technology from University of Illinois Urbana-Champaign. I have a PhD in Information Science focused on usability and accessibility from University of Maryland, College Park. I periodically teach courses in usability, user experience, and accessibility at both institutions, as well as speak about these topics at various events. A copy of my CV is attached as **Exhibit A**.

4. During the previous 4 years I have been deposed once in relation to kiosk accessibility, in the civil action styled Davis, et al. v. Laboratory Corporation of America Holdings, 20-cv-00893 (C.D. Cal.).

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

DECLARATION OF RACHAEL BRADLEY MONTGOMERY

## II.   ASSIGNMENT

5. I have been retained by counsel for Plaintiffs to offer my expert opinion on:

- Whether the services provided by Quest's kiosks are independently and privately accessible to blind users, and

- Whether providing kiosks that are independently and privately accessible to blind users would be readily achievable, and would not result in an undue financial burden or fundamentally alter the essential nature of the goods and services offered by Quest.

6. **Exhibit B** includes a list of all documents and data that I considered for my assignment.

7. I reserve the right to amend or supplement this declaration if additional relevant documents or information become available.

8. I am being compensated at a rate of $125 per hour for my time spent on this matter except for time spent preparing for and testifying at deposition, for which I am being compensated $200 per hour for my time.

9. My compensation is not contingent on the nature of my findings or the outcome of this case.

## III.   OPINIONS

**A.   The services provided by the Quest kiosks are not independently and privately accessible to blind users.**

10. **Exhibit C** presents the standards from the Americans with Disabilities Act (ADA), Section 508 of the Rehabilitation Act of 1973 (508), and Web Content Accessibility Guidelines that support blind users. Some key requirements to ensure independent access from these standards are:

DECLARATION OF RACHAEL BRADLEY MONTGOMERY

PA0315

DocuSign Envelope ID: d991E79C4-AC87-473A-A9E7-98F6E1AFEBDE

- Speech output either publicly through speakers or privately through headphones (ADA 707.5, 508 402.2). If the kiosk output includes personal information, output through headphones would be expected to provide comparable privacy to visual output (508 405.1).  Speech output allows blind users to interact with the kiosks and complete their tasks using the kiosk (508 302.1).

- Braille instructions to indicate how to start speech output (ADA 707.8, 508 402.2.5).

- Tactile controls which make using the kiosk much easier for low vision and blind users (ADA 707.6.1, 508 407.3.1). and

- Volume control and the ability to repeat speech (ADA 707.5.1, 508 402.3.1, 402.2.4)

a)     **Kiosk prior to addition of help button or three finger swipe**

11. I was unable to personally assess the version of the kiosk that existed prior to the addition of the help button or three finger swipe; however, it is described in Adam Aronson's deposition transcript of 6/29/21, Julian Vargas' deposition transcript of 04/22/21, Tom Walsh's deposition transcript of 07/01/21, Marc Yarrison's deposition transcript of 4/8/21, Exhibit #2 to the transcripts (Quest-Vargas000036494) and Exhibit #7 to the transcripts (Quest-Vargas000007361-7363).

12. Based on these descriptions, the kiosks did not have a headphone jack (Aronson p. 57), provide speech output (Walsh p. 43, 63), braille instructions (Vargas p. 124, Yarrison p. 116-117) or a tactile navigation keypad (Vargas p. 124).

13. Without speech output and tactile controls, there is no way for a blind user, who relies on tactile and audio alternatives, to independently and privately access any services provided by the kiosk, including any check in services.

14. This version of the kiosk also allowed sighted users to interact with it using a non-English language, and view wait time and place in queue (Exhibit #2 to the

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

3

PA0316

DocuSign Envelope ID: 491E79C4-AC57-473A-A9E5-99F6E1AEEBDE

transcripts p. 2), none of which would be independently and privately accessible to a blind user. The television, as designed to work with this version of the kiosk, also displayed name, visit details, and wait time.

**b)** **Kiosk with help button prior to addition of three finger swipe**

15. I inspected the version of the Kiosk that included the help button but did not yet include three finger swipe functionality on July 30, 2021.

16. The help button on the kiosk I inspected threw an error message (see Figure 1).

17. My understanding is that pressing the help button, which was located on the screen and not tactilely discernable, was designed to provide an audio message to assist the user. Even if this is the case, the kiosk is not independently or privately accessible because it does not include any braille instructions on how to start the speech output.



Figure 1: Error on Kiosk Inspected July 30



Figure 2: Check in Options on Kiosk Inspected July 30



Figure 3: Check in Complete on Kiosk Inspected July 30

18. This kiosk also lacks tactilely discernable controls. 407.3.1 in Section 508 states "Input controls shall be operable by touch and tactilely discernible without activation." 707.6.1 in the ADA states, "At least one tactilely discernible input control shall be provided for each function." If the only speech output provided in this version is triggered by the help button, a blind user should be able to identify

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

DECLARATION OF RACHAEL BRADLEY MONTGOMERY

PA0317

the help button by touch, without activating it. In this design, the kiosk has no tactile indication of where the help button is located or that it even exists.  The button is located in the upper right of the screen, but not in the corner, so even with directions, it could be missed by the blind user.

19. Finally, this kiosk design does not allow the user to control the volume or repeat the speech output. The ability to control the volume output and repeat speech is important in a public setting where it may be difficult to hear or a user may be distracted.

20. I also attempted a three finger swipe on this version of the kiosk, but the three finger swipe did not work and returned an error message.

21. The services provided by this kiosk are not independently or privately accessible because the kiosk does not include any braille instructions on how to start the speech output, the help button cannot be located tactilely, and the user is unable to control volume and speech output.

### c)     Kiosk with help button and three finger swipe

22. I inspected the version of the kiosk with the help button and three finger swipe functionality during two visits to Quest labs.

23. The first visit was to the lab at 21785 Filigree Ct, Unit 204, Ashburn, VA 20147, United States on July 29, 2021.

24. The second visit was the to the lab at 521 E Market St, Leesburg, VA 20176 on August 30, 2021.

25. In both cases a three finger swipe led to audio output.

26. During the first visit, I was visiting for a lab appointment and was unable to fully understand what was said in the audio output.

27. In the second visit, I was able to confirm the audio output provided a patient number, wait time, and told me to take a seat.

28. Both locations had a television providing information on place in queue and approximate wait time.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

5

PA0318

29. In the first visit, the audio from the television was barely audible and I never heard instructions on kiosk use within the 4 minutes I was in the waiting room.

30. In the second visit, the television was audible and played the instructions on how to use the three finger swipe after about 7 minutes in the waiting room.

31. The three finger swipe used for adding an individual to queue does not meet accessibility standards as it lacks:

- Braille instructions to initiate the speech output;
- Tactilely discernable controls; and
- Volume control and the ability to repeat speech

32. Unless a phlebotomist is present in the waiting room to explain how to use the kiosk, an individual who does not know about the three finger swipe option in advance has no way to find out how to interact with the kiosk without the television, due to the lack of braille instructions and tactile controls. The primary way to know about the three finger swipe is through the television.

33. The lack of volume control and inability to repeat speech presents a major hurdle in this attempted three finger swipe solution.

34. The television must be on with adequate volume to tell the user about the three finger swipe but the user cannot interrupt or pause the television (ADA 707.5.1, 508 402.2.4).

35. The television audio makes it more difficult to hear the speech output on the kiosk and the user has no way to find out what was said if they miss it without using a three finger swipe a second time.

36. In the version of the kiosk with the help button and the three finger swipe, the only feature of the kiosk possibly available to the blind user is the ability to be added to the queue and wait in the waiting room.

37. The only way to monitor one's place in the queue while waiting is through the display on the television screen.

38. The kiosks I inspected offered several additional services, including:

DECLARATION OF RACHAEL BRADLEY MONTGOMERY

PA0319

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

- Languages other than English,
- Checking in with an appointment, which are given priority,
- Picking up an empty collection container,
- Delivering a prepared specimen, and
- Choosing to wait somewhere other than the waiting room.

39. These additional features are captured in figures 4, 5 and 6 which were taken during my August 30th visit.





*Figure 4: What can we help you with screen*

*Figure 5: What can we help you with screen*

*Figure 6: Where will you wait screen*

40. In addition to the missing services, the delay in waiting for the instructions on how to use the kiosk potentially places the blind patient behind other patients who arrive while the blind patient is waiting to hear what to do or get assistance.

41. The queueing order by the kiosk is: Appointments, Healthcare Professional Drop Off or Pick Up, Patient Drop Off or Pick Up, all others (Quanum Release Notes December 2017 QUEST-VARGAS000039496 p. 9). Patients using the smart help are given a number as a walk-in, which falls under "all others" (New ECheckin Requirements QUEST-VARGAS000035545, #13.5.2.3.3).

42. This queuing delay occurred during my second inspection visit. No staff was present when I entered, so I waited to sign in until I heard the audio instructions on

DocuSign Envelope ID: 491E79C4-ACE7-4734-A9EF-98F6E1AFEBDE

the three finger swipe. This took a little over 7 minutes. By the time the instructions played on the television, two other patients had entered and used the kiosk before me and my announced wait time was over 30 minutes. As a sighted individual, I could tell my position in queue from the television, but a blind individual would have no way to tell this.

43. In addition to adding a patient to queue, the three finger swipe is also intended to notify a phlebotomist that a visually impaired patient is in the waiting room through an alert bell (Yarrison Transcript p. 244) and in Quanum (Exhibit #47 to the transcripts p. 45). Per Exhibit #47 (Quest-Vargas000034803-34941)  "[a]fter the patient identified as "Visually impaired" appears in your queue, you should promptly go to the waiting room, call the patient by their numerical ID (e.g., Patient 01), greet the patient, and ask them whether they have an appointment." (p. 46). Phlebotomists have the option of turning off the audio signal (Yarrison Transcript, p. 245). This could lead to a longer wait time before the blind patient gets assistance. In my first visit, the phlebotomist came out in 2 minutes 50 seconds. While I cannot be certain that the audio signal was turned off in my second visit, the phlebotomist did not come out to assist me after I used the three finger swipe. Someone came out and brought another patient back 6 minutes after the three finger swipe, but did not ask about a visually impaired patient.

44. Based on my observations and review of documents, the services available through the Quest kiosks are not independently and privately accessible to blind users. If the kiosk services provided are expanded, such as ID and insurance card recognition and payment (see Tom Walsh's deposition transcript of 07/01/21 p. 86-89) these would also not be accessible to blind users.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

DECLARATION OF RACHAEL BRADLEY MONTGOMERY

PA0321

**B.      Providing kiosks at Quest labs that are independently and privately accessible to blind users is readily achievable and would not create an undue financial burden or fundamentally alter the essential nature of the goods and services offered by Quest.**

45. Readily achievable solutions exist for providing an independently accessible kiosk for blind users. The iPad selected for these kiosks includes built in speech reader capabilities within its standard accessibility suite. This screen reader provides the speech output needed to interact with a kiosk application.

46. Lilitab, the kiosk vendor from which Quest purchased the kiosk shells, provided an option to include a standard headphone jack for approximately $30 per kiosk (Adam Aronson's deposition transcript of 6/29/21 p. 38).  The H and M units offered by Lilitab also allow for optional volume control access (Adam Aronson's deposition transcript of 6/29/21 p. 4). The custom software could use common accessibility practices to integrate with iOS' built in screenreader.  This approach would have ensured all kiosk services were accessible to blind users. iOS software can also be coded to start the screen reader when personal headphones are inserted into the headphone jack. Creating accessible software that works with a screen reader is a common solution that provides kiosk accessibility for blind individuals and private listening that would provide the privacy needed for health information.

47. This solution outlined in paragraph 46 would allow Quest to maintain the functionality and utility of its kiosks, while increasing the accessibility for blind users.

48. Other options also exist, including the AudioNav keypad for iOS which costs $309.75 (Exhibit D p.1) and has tactile navigation keys and a headphone jack. This kit includes the firmware, adapter, cables, and power supply for the keypad. The iPad adapter allows multiple USB cables to be used so that the kiosk can receive power and work with devices.  An additional cost would be required to mount the keypad. The advantage of using the AudioNav or a comparable keypad is that it uses

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

9

PA0322

DocuSign Envelope ID: d991E79C4-AC87-473A-A9E7r98F6E1AFEBDE

an external headphone jack, rather than the headphone jack of the actual iPad. This lowers maintenance costs if the tactile keypad needs to be replaced due to wear.

49. Using iOS' native screenreader along with accessible software, allowing speech output through a headphone jack, and providing an tactile keypad for navigation would allow all current and future services provided by the kiosk to be independently and privately accessible to blind users.

50. Based on the information presented above, it is my opinion to a reasonable degree of certainty that the services provided by the Quest kiosk are not privately and independently accessible to blind users. None of the versions, including the most recent, meet accessibility standards. Even if a blind user was able to perform a three finger swipe on the kiosk, the kiosk does not provide the same set of services to blind users as it provides to sighted kiosk users.

51. Based on the information presented above, it is also my opinion to a reasonable degree of certainty that providing kiosks accessible to blind users is readily achievable, and would not create an undue financial burden, or fundamentally alter the essential nature of the goods and services offered by Quest.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Signed this 9th day of September 2021, in Paeonian Springs, VA.

/s/   *Rachael Bradley Montgomery*

RACHAEL BRADLEY MONTGOMERY, Declarant

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

DECLARATION OF RACHAEL BRADLEY MONTGOMERY

PA0323

# Exhibit A

DocuSign Envelope ID: d991E79C4-ACE7-473A-A9E4-98F6E1AEEBDE

# Rachael Bradley Montgomery, PhD

16766 Clarkes Gap Road; Paeonian Springs, VA 20129
ta11y.accessibility@gmail.com
410-591-9202

## Skills Summary

- 20 years of experience in disability-related education, accessibility, and human computer interaction
- Experience evaluating and remediating kiosks, websites, mobile and desktop applications, and facilities
- Seven years of experience setting up large-scale accessibility programs at 3 separate organizations
  - Working with corporate leadership and across departments and locations to effect change
  - Establishing and growing disability related employee resource groups integrated into a larger diversity program
- Four years of experience applying ADA and Section 508, as well as other accessibility and universal design best practices to kiosk evaluation and procurement
- Five years of program and department management experience, managing between 30 and 60 fulltime equivalents across multiple projects
- Experience with WCAG and applying WCAG 2.0 and 2.1 to specific organization's needs
- Experience designing and adapting accessibility and usability courses to serve the needs of students with a wide range of technical and domain experience
  - Created three courses on accessibility and usability for professional students. Instructed over 1,500 developers, testers, program managers, designers and usability engineers
  - Nine years of experience teaching online and in-person in both university and professional settings

## Professional Experience

| | |
|---|---|
| **Library of Congress** | **Jul 2021-Present** |
| - Accessibility Specialist | |
| **Ta11y Consulting** | **May 2019 - Present** |
| - Accessibility and usability consulting | |
| **MITRE, McLean, VA** | **Mar 2004 - May 2019** |
| - Usability and Accessibility, Principle Engineer | |
| - Accessibility Council Lead | |
| - Associate Department Head and Project Manager | |
| **Hood College, Frederick, Maryland** | **Oct 2002 - Feb 2004** |
| **Enoch Pratt Free Library, Baltimore, Maryland** | **May 2002 - Sep 2002** |
| **Woodruff Library, Emory University, Atlanta, Georgia** | **Jun 2000 - Mar 2002** |

## Service

| | |
|---|---|
| **Accessible Community, Paeonian Springs, VA** | **2017 - Present** |

- Director of 501c3 Charity dedicated to helping small businesses, libraries, religious organizations, and other community organizations better engage with people with disabilities
- Providing seminars on physical and technical accessibility

| | |
|---|---|
| **Web Accessibility Working Group (W3C)** | **2016 - Present** |

- Co-chair Accessibility Guidelines Working Group (March, 2020-Present)

DocuSign Envelope ID: d991E79C4-ACE7-473A-A9E7-98F6E14EEBDE

- Co-facilitator Cognitive and Learning Disabilities Task Force (August 2019-Present)
- Contributor WCAG 2.1 and related documents
- Editor on WCAG 2.2, WCAG 3.0 and Making Content Usable

## Teaching Experience

**Adjunct Lecturer**  College of Information Studies, University of Maryland, College Park
Fall 2021-Present  Trace Center Faculty Affiliate – Universal Kiosk Standards
Fall 2019-Present  Information User Needs and Assessment, User Centered Design
Spring 2010-2013  Introduction to Information Technology

**Adjunct Lecturer**  School of Information Science, University of Illinois, Urbana Champaign
2019-Present  Usability Engineering

**Instructor**  Professional Settings
2012-Present  Accessibility for Developers, Testers, and Usability Engineers

## Education

**PhD in information Studies**  **December 2009**
University of Maryland, College Park, MD

**MS in Information Science**  **August 2003**
University of Illinois, Champaign, IL

**BA in Art History and Historic Preservation (Phi Beta Kappa)**  **May 1998**
Goucher College, Towson, MD

**ADA Coordinator Certification** (In Process)

**Certificates in Universal Design** (Human Performance, Public Accommodations, Interior Environments)
Center for Inclusive Design and Environmental Access, University of Buffalo

## Select Publications and Presentation

Bradley Montgomery, R., and Boniello Miller, L (2021). Most Common Kiosk Mistakes. CSUN Assistive Technology Conference. Virtual.

Spellman, J., Montgomery, R., Lauriat, S. and Cooper, M. editors (2021). W3C Accessibility Guidelines (WCAG) 3.0 W3C Editor's Draft 20 January 2021. Latest at https://w3c.github.io/silver/guidelines/

Seeman, L., Bradley Montgomery, R., Lee, S. and Ran, R. editors. Making content usable for people with cognitive and learning disabilities W3C Working Draft 11 December 2020. Latest at https://www.w3.org/TR/coga-usable/

Adams, C., Campbell, A. Montgomery, R., Cooper, M. and Kirkpatrick, A. editors. Web Content Accessibility Guidelines (WCAG) 2.2 W3C Working Draft 11 August 2020. Latest at https://www.w3.org/TR/WCAG22/

Bradley Montgomery, R. (2020). Creating a Usable Kiosk Experience for Customers with Disabilities. The Paciello Group Development Blog.

Boniello Miller, L. and Bradley Montgomery, R. (2020) Kiosk Accessibility: Understanding the Kiosk User Experience. *CSUN Assistive Technology Conference*. San Diego, CA.

Bradley Montgomery, R. (2020). Creating an Accessible Escape Room. *CSUN Assistive Technology Conference*. San Diego, CA.

Bostic, T., Bradley Montgomery, R., Brunelle, J., Chudnov, D., Higgins, J., and Stanley, J. (2019). Exploring the Intersections of Web Science and Accessibility. *International Conference on Human Systems Engineering and Design*. Munich, Germany.

Bradley Montgomery, R. (2018). Beyond Standards. Taking a Holistic Approach to Accessibility Evaluation. *CSUN Assistive Technology Conference*. San Diego, CA.

Weiss, M. and Bradley Montgomery, R. (2017).  Using Personas and Other Usability Techniques to Improve Accessibility. *CSUN Assistive Technology Conference*. San Diego, CA.

Bradley Montgomery, R. and Weiss, M. (2016). Comparing Custom Accessibility Checklists. *CSUN Assistive Technology Conference*. San Diego, CA.

## Exhibit B
## Documents Considered

- Quest-Vargas000036494
- Quest-Vargas000035087-35090
- Quest-Vargas000035119-35176
- Quest-Vargas000034658-34666
- Quest-Vargas000007361-7363
- Quest-Vargas000037909-37910
- Quest-Vargas000037977-37978
- Quest-Vargas000036699
- Quest-Vargas000028740-28741
- Quest-Vargas000035335-35336
- Quest-Vargas000028746-28747
- Quest-Vargas000030878-30879
- Quest-Vargas000037605-37606
- Quest-Vargas000037980-37981
- Quest-Vargas000036566-36578
- Quest-Vargas000036700-36702
- Quest-Vargas000036947-36954
- Quest-Vargas000040261-40264
- Quest-Vargas000040267-40269
- Quest-Vargas000040280-40284
- Quest-Vargas000039990
- Quest-Vargas000039966-39967
- Quest-Vargas000035475-35476
- Quest-Vargas000000022-41
- Quest-Vargas000004496-4499
- Quest-Vargas000040161-40166
- Quest-Vargas000040791
- Quest-Vargas000000583-637
- Quest-Vargas000036677-36681
- Quest-Vargas000030691
- Quest-Vargas000034803-34941
- Quest-Vargas000036266
- Quest-Vargas000036322
- Quest-Vargas000005723-5731
- Quest-Vargas000007941-7945
- Quest-Vargas000004496-4499
- Quest-Vargas000023072-23075
- Quest-Vargas000029367-29369
- Quest-Vargas000030591-30592
- Quest-Vargas000029304-29309

DocuSign Envelope ID: 491E79C4-ACE7-4734-A9EF-98F6E14EEBDE

- Quest-Vargas000041970-41971
- Quest-Vargas000041962
- Quest-Vargas000041949-41952
- Quest-Vargas000041972-41976
- Quest-Vargas000041963-41969
- Quest-Vargas000041953-41961
- Quest-Vargas000041938-41948
- Quest-Vargas000028016-28017
- Quest-Vargas000009816-9819
- Quest-Vargas000005703
- Quest-Vargas000038770-38771
- Quest-Vargas000035545-35549
- Quest-Vargas000038755-38775
- Quest-Vargas000039488-39511
- Transcript of 6-29-21 Deposition of Adam Aronson
- Transcript of 4-22-21 Deposition of Julian Vargas
- Transcript of 7-1-21 Deposition of Tom Walsh
- Transcript of 4-8-21 Deposition of Marc Yarrison
- Transcript of 4-12-21 Deposition of Taylor Carr
- Transcript of 7-30-21 Deposition of Taylor Carr
- Email exchanges between Lilitab and Quest discussing QR Code Reader Tray
- Email exchanges regarding Quest migrating from the "K head" to the new "H head" unit––describes "forward looking" functionality
- Final "CapEx" submitted for eCheck-In project
- The website lilitab.com

DocuSign Envelope ID: d91E79C4-ACE7-4734-A9EF-99F6E14FEBDE

# Exhibit C: Referenced Standards

## ADA Standards that Support Blind Users

Abbreviated. Full standards including exceptions at:
https://www.ada.gov/regs2010/2010ADAStandards/2010ADAstandards.htm

**307.2 Protrusion Limits:** Objects with leading edges more than 27 inches (685 mm) and not more than 80 inches (2030 mm) above the finish floor or ground shall protrude 4 inches (100 mm) maximum horizontally into the circulation path.

**707.5 Speech Output:** Machines shall be speech enabled. Operating instructions and orientation, visible transaction prompts, user input verification, error messages, and all displayed information for full use shall be accessible to and independently usable by individuals with vision impairments. Speech shall be delivered through a mechanism that is readily available to all users, including but not limited to, an industry standard connector or a telephone handset. Speech shall be recorded or digitized human, or synthesized.

**707.5.1 User Control:** Speech shall be capable of being repeated or interrupted. Volume control shall be provided for the speech function.

**707.5.2 Receipts**: Where receipts are provided, speech output devices shall provide audible balance inquiry information, error messages, and all other information on the printed receipt necessary to complete or verify the transaction.

**707.6.1 Input Controls:** At least one tactilely discernible input control shall be provided for each function. Where provided, key surfaces not on active areas of display screens, shall be raised above surrounding surfaces. Where membrane keys are the only method of input, each shall be tactilely discernable from surrounding surfaces and adjacent keys.

**707.6.2 Numeric Keys:** Numeric keys shall be arranged in a 12-key ascending or descending telephone keypad layout. The number five key shall be tactilely distinct from the other keys.

**707.6.3.2 Tactile Symbols**: Function key surfaces shall have tactile symbols as follows: Enter or Proceed key: raised circle; Clear or Correct key: raised left arrow; Cancel key: raised letter ex; Add Value key: raised plus sign; Decrease Value key: raised minus sign.

**707.8 Braille Instructions:** Braille instructions for initiating the speech mode shall be provided.

1

DocuSign Envelope ID: 491E79C4-AC57-4734-A9EF-98F6E14FEBDE

## Section 508 Kiosk Standards that Support Blind Users

Abbreviated. Full standards including exceptions at:  https://www.access-board.gov/ict/#508

**C205.2 WCAG Conformance:** User interface components, as well as the content of platforms and applications shall conform to Level A and Level AA Success Criteria and Conformance Requirements in WCAG 2.0 (incorporated by reference, see 702.10.1).

**302.1 Without Vision:** Where a visual mode of operation is provided, ICT shall provide at least one mode of operation that does not require user vision.

**402.2 Speech-Output Enabled:** ICT with a display screen shall be speech-output enabled for full and independent use by individuals with vision impairments.

**402.2.1 Information Displayed On-Screen:** Speech output shall be provided for all information displayed on-screen.

**402.2.2 Transactional Outputs:** Where transactional outputs are provided, the speech output shall audibly provide all information necessary to verify a transaction.

**402.2.3 Speech Delivery Type and Coordination:** Speech output shall be delivered through a mechanism that is readily available to all users, including, but not limited to, an industry standard connector or a telephone handset. Speech shall be recorded or digitized human, or synthesized. Speech output shall be coordinated with information displayed on the screen.

**402.2.4 User Control:** Speech output for any single function shall be automatically interrupted when a transaction is selected. Speech output shall be capable of being repeated and paused.

**402.2.5 Braille Instructions:** Where speech output is required by 402.2, braille instructions for initiating the speech mode of operation shall be provided. Braille shall be contracted and shall conform to 36 CFR part 1191, Appendix D, Section 703.3.1.

**402.3 Volume:** ICT that delivers sound, including speech output required by 402.2, shall provide volume control and output amplification conforming to 402.3.

**402.3.1 Private Listening:** Where ICT provides private listening, it shall provide a mode of operation for controlling the volume. Where ICT delivers output by an audio transducer typically held up to the ear, a means for effective magnetic wireless coupling to hearing technologies shall be provided.

**402.3.2 Non-private Listening:** Where ICT provides non-private listening, incremental volume control shall be provided with output amplification up to a level of at least 65 dB. A function shall be provided to automatically reset the volume to the default level after every use.

**405.1 Privacy, General:** The same degree of privacy of input and output shall be provided to all individuals. When speech output required by 402.2 is enabled, the screen shall not blank automatically.

**406.1 Standard Connections, General:** Where data connections used for input and output are provided, at least one of each type of connection shall conform to industry standard non-proprietary formats.

**407.3.1 Tactilely Discernible:** Input controls shall be operable by touch and tactilely discernible without activation.

2

DocuSign Envelope ID: 491E79C4-ACE7-4734-A9EF-98F6E14FEBDE

**407.3.2 Alphabetic Keys:** Where provided, individual alphabetic keys shall be arranged in a QWERTY-based keyboard layout and the "F" and "J" keys shall be tactilely distinct from the other keys.

**407.3.3 Numeric Keys:** Where provided, numeric keys shall be arranged in a 12-key ascending or descending keypad layout. The number five key shall be tactilely distinct from the other keys. Where the ICT provides an alphabetic overlay on numeric keys, the relationships between letters and digits shall conform to ITU-T Recommendation E.161 (incorporated by reference, see 702.7.1).

**407.7 Tickets, Fare Cards, and Keycards:** Where tickets, fare cards, or keycards are provided, they shall have an orientation that is tactilely discernible if orientation is important to further use of the ticket, fare card, or keycard.

**410.1 General:** Where provided, color coding shall not be used as the only means of conveying information, indicating an action, prompting a response, or distinguishing a visual element.

3

## WCAG 2.1 A and AA Criteria that Support Blind Users

Abbreviated. Full standards including exceptions at:  https://www.w3.org/TR/WCAG21/

**1.1.1 Non-text Content**: All non-text content that is presented to the user has a text alternative that serves the equivalent purpose, except for the situations listed below: Controls, Inputs; Time-Based Media; Test; Sensory; CAPTCHA, and Decoration, Formatting, Invisible.

**1.2.1 Audio Only and Video Only**: For prerecorded audio-only and prerecorded video-only media, the following are true, except when the audio or video is a media alternative for text and is clearly labeled.

**1.2.3 Audio Description or Media Alternative (Prerecorded)**: An alternative for time-based media or audio description of the prerecorded video content is provided for synchronized media, except when the media is a media alternative for text and is clearly labeled as such.

**1.2.5 Audio Description (Prerecorded)**: Audio description is provided for all prerecorded video content in synchronized media.

**1.3.1 Info and Relationships**: Information, structure, and relationships conveyed through presentation can be programmatically determined or are available in text.

**1.3.2 Meaningful Sequence**: When the sequence in which content is presented affects its meaning, a correct reading sequence can be programmatically determined.

**1.3.3 Sensory Characteristics**: Instructions provided for understanding and operating content do not rely solely on sensory characteristics of components such as shape, color, size, visual location, orientation, or sound.

**1.3.4 Orientation**: Content does not restrict its view and operation to a single display orientation, such as portrait or landscape, unless a specific display orientation is essential.

**1.4.1 Use of Color**: Color is not used as the only visual means of conveying information, indicating an action, prompting a response, or distinguishing a visual element.

**1.4.2 Audio Control**: If any audio on a Web page plays automatically for more than 3 seconds, either a mechanism is available to pause or stop the audio, or a mechanism is available to control audio volume independently from the overall system volume level.

**1.4.13 Content on Hover or Focus**: Where receiving and then removing pointer hover or keyboard focus triggers additional content to become visible and then hidden, the following are true. Dismissable, Hoverable, Persistent

**2.1.1 Keyboard**: All functionality of the content is operable through a keyboard interface without requiring specific timings for individual keystrokes, except where the underlying function requires input that depends on the path of the user's movement and not just the endpoints.

**2.1.2 No Keyboard Trap**: If keyboard focus can be moved to a component of the page using a keyboard interface, then focus can be moved away from that component using only a keyboard interface, and, if it requires more than unmodified arrow or tab keys or other standard exit methods, the user is advised of the method for moving focus away.

4

DocuSign Envelope ID: d91E79C4-ACE7-4734-A9E7-98F6E1AEEBDE

**2.2.1 Timing Adjustable (Level A)**: For each time limit that is set by the content, at least one of the following is true: Turn off, Adjust, Extend, Real-time Exception, Essential Exception, 20 Hour Exception

**2.2.2 Pause, Stop, Hide**: For moving, blinking, scrolling, or auto-updating information, all of the following are true

**2.4.1 Bypass Blocks**: A mechanism is available to bypass blocks of content that are repeated on multiple Web pages.

**2.4.2 Page Titled**: Web pages have titles that describe topic or purpose.

**2.4.3 Focus Order**: If a Web page can be navigated sequentially and the navigation sequences affect meaning or operation, focusable components receive focus in an order that preserves meaning and operability.

**2.4.4 Link Purpose (In Context)**: The purpose of each link can be determined from the link text alone or from the link text together with its programmatically determined link context, except where the purpose of the link would be ambiguous to users in general.

**2.4.5 Multiple Ways**: More than one way is available to locate a Web page within a set of Web pages except where the Web Page is the result of, or a step in, a process.

**2.4.6 Headings and Labels**: Headings and labels describe topic or purpose.

**3.1.1 Language of Page**: The default human language of each Web page can be programmatically determined.

**3.1.2 Language of Parts**: The human language of each passage or phrase in the content can be programmatically determined except for proper names, technical terms, words of indeterminate language, and words or phrases that have become part of the vernacular of the immediately surrounding text.

**3.2.1 On Focus**: When any user interface component receives focus, it does not initiate a change of context.

**3.2.2 On Input**: Changing the setting of any user interface component does not automatically cause a change of context unless the user has been advised of the behavior before using the component.

**3.2.3 Consistent Navigation**: Navigational mechanisms that are repeated on multiple Web pages within a set of Web pages occur in the same relative order each time they are repeated, unless a change is initiated by the user.

**3.2.4 Consistent Identification**: Components that have the same functionality within a set of Web pages are identified consistently.

**3.3.1 Error Identification**: If an input error is automatically detected, the item that is in error is identified and the error is described to the user in text.

**3.3.2 Labels or Instruction**: Labels or instructions are provided when content requires user input.

5

DocuSign Envelope ID: 491E79C4-ACE7-4734-A9EF-98F6E14EEBDE

**3.3.3 Error Suggestion**: If an input error is automatically detected and suggestions for correction are known, then the suggestions are provided to the user, unless it would jeopardize the security or purpose of the content.

**3.3.4 Error Prevention (Legal, Financial, Data)**: For Web pages that cause legal commitments or financial transactions for the user to occur, that modify or delete user-controllable data in data storage systems, or that submit user test responses, at least one of the following is true: Reversible, Checked, Confirmed

**4.1.2 Name, Role, Value**: For all user interface components (including but not limited to: form elements, links and components generated by scripts), the name and role can be programmatically determined; states, properties, and values that can be set by the user can be programmatically set; and notification of changes to these items is available to user agents, including assistive technologies.

**4.1.3 Status Messages**: In content implemented using markup languages, status messages can be programmatically determined through role or properties such that they can be presented to the user by assistive technologies without receiving focus.

6

# Exhibit D

DocuSign Envelope ID: 891E79C4-ACE7-4734-A9E5-68F6E14EEBDE

DocuSign Envelope ID: 891E79C4-ACE7-4734-A9E5-68F6E14EEBDE

# AudioNav Keypad for iOS – Screenshot 9 Sept 2021



AudioNav Website

**Storm** Interface
Interface Specialists since 1986

Home   About   Products ˅   Manufacturing   News ˅   Downloads   Contact   Search ⚲

Lisa Seeman

🌐 +44 (0)1895 431421   📞 +1 480 534 3516   🛒 ⚲

Part Number : N9781-01      Range: ATP

## AudioNav™ Developer Kit for iOS

PRICE EACH  **$309.75**  excl VAT

Qty
[ 1 ]

**Add to Cart**

For ordered quantities of up to 20 pieces these products are usually despatched within 10 working days. Please contact us for a despatch schedule for deliveries of more than 20 pieces.

DESCRIPTION

The AudioNav was developed primarily for use in applications where the host PC is a Windows PC. However, it is also possible to use this ADA compliant assistive USB interface with an iOS device.

Please note, the AudioNav must have iOS specific firmware in order for it to work with an iOS device. Some other interface products are also required.

This developer kit contains everything needed for connecting an AudioNav to an iOS device, including the AudioNav itself (with iOS specific firmware).

The kit contains:

- AudioNav with iOS specific firmware (please note, the kit is supplied with a panel mounted version of the AudioNav with green LEDs)
- iPad adaptor (with 3 USB sockets)
- Cable USB A to mini USB (Qty 2)
- Lightning to USB Camera Adaptor
- Power Supply (2 port) with USA adaptor
- Cable USB A to Lightning
- Cable USB A to micro USB



KMA

PA0337

# EXHIBIT 26

PA0338

```
 1                UNITED STATES DISTRICT COURT

 2           FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3    _____

 4    JULIAN VARGAS, ANNE WEST and  )
      AMERICAN COUNCIL OF THE       )
 5    BLIND, individually and on    )
      behalf of themselves and all  )
 6    others similarly situated,    )
                                    )
 7            Plaintiff,            )
          vs.                       ) Case No. 2:19-cv-8108
 8                                  )
      QUEST DIAGNOSTICS CLINICAL    )
 9    LABORATORIES, INC., et al.,   )
                                    )
10            Defendants.           )
      _____)

11

12

13

14

15                 REPORTER'S VIDEOCONFERENCE

16                TRANSCRIPT OF PROCEEDINGS

17                   MEET AND CONFER

18                Monday, April 25, 2022

19

20

21    Reported by:
      JOANNA BROADWELL
22    CSR No. 10959

23    Job No. 5203809

24

25    PAGES 1 - 28
```

Page 1

```
 1                UNITED STATES DISTRICT COURT

 2           FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3     _____

 4     JULIAN VARGAS, ANNE WEST and )
       AMERICAN COUNCIL OF THE      )
 5     BLIND, individually and on   )
       behalf of themselves and all )
 6     others similarly situated,   )
                                    )
 7             Plaintiff,           )
           vs.                      ) Case No. 2:19-cv-8108
 8                                  )
       QUEST DIAGNOSTICS CLINICAL   )
 9     LABORATORIES, INC., et al.,  )
                                    )
10             Defendants.          )
       _____)

11

12

13

14

15

16

17

18

19             Reporter's Videoconference Transcript of

20     Proceedings taken remotely at 11:02 a.m. and ending at

21     11:39 a.m. on Monday, April 25, 2022, before JOANNA

22     BROADWELL, Certified Shorthand Reporter No. 10959.

23

24

25
```

Page  2

PA0340

```
 1                      APPEARANCES

 2    For the Plaintiffs American Council of the Blind, Julian

 3    Vargas, Anne West, and the Proposed Class:

 4    NYE STIRLING HALE & MILLER LLP

 5    Alison Bernal, Esq.

 6    Benjamin Sweet, Esq.

 7    33 West Mission Street, Suite 201

 8    Santa Barbara, CA 93101

 9    (805) 963-2345

10    alison@nshmlaw.com

11

12    For the Defendants Quest Diagnostics:

13    OGLETREE DEAKINS NASH SMOAK & STEWART PC

14    David Raizman, Esq.

15    400 S Hope St, Suite 1200

16    Los Angeles, CA 90071

17    (213) 239-9800

18    david.raizman@ogletree.com

19

20

21

22

23

24

25

                                                    Page  3
```

```
 1                     Monday, April 25, 2022

 2                         11:02 a.m.

 3      REPORTER'S VIDEOCONFERENCE TRANSCRIPT OF PROCEEDINGS

 4           MS. BERNAL:  So for the benefit of the court

 5      reporter this is a meet and confer conference pursuant

 6      to Local Rule 7-3.  We're going to start with the meet

 7      and confer on Plaintiff's anticipated motion for summary

 8      judgment for Rule 56.

 9           And David, if it is okay with you I will just get

10      started on the anticipated issues that Plaintiff would

11      raise in the Rule 56 motion.  Is that okay?

12           MR. RAIZMAN:  Yeah.

13           MS. BERNAL:  Okay.  So I think what we would look

14      at as we look at whether there has been a violation of

15      the EPA for the ADRA Act are the three elements the

16      Court has identified already, number one, whether a

17      certified class representative has a qualified

18      disability, number two, whether Quest Diagnostics owns,

19      leases or operates a place of public accommodation, and,

20      number three, whether Quest has failed to provide the

21      certified class effective communication during the

22      certified class period.

23           So I think on this meet and confer call, David,

24      would you agree that it's already been determined that

25      the certified class representative has a qualified
```

Page 4

PA0342

```
 1    disability?  I believe Quest has already answered

 2    undisputed to that fact, but I just wanted to confirm

 3    with you.

 4         MR. RAIZMAN:  Yes.  I believe that is our

 5    position.

 6         MS. BERNAL:  Okay.  And then for the second

 7    element, whether Quest owns, leases or operates a place

 8    of public accommodation, I believe that has also been

 9    already jointly agreed.  Do you agree?

10         MR. RAIZMAN:  No.  I think we set out our

11    position in the pretrial conference on this point.  It's

12    a little more complicated than that.  But I don't think

13    that this is an issue that we're going to effectively

14    dispute.  It's just that none of the three defendants

15    operates or owns all of them.  They all sort of cover

16    different things or cover nothing at all.  I think one

17    of the defendants does not own or operate any of them.

18         MS. BERNAL:  Then can we address this in the

19    pretrial conference order with the agreed statement that

20    the portions of the PSCs that are open to the public and

21    relevant to this lawsuit are places of public

22    accommodation within the meeting of the ADA?  So would

23    you agree with that part of the statement?

24         MR. RAIZMAN:  Yes.  That is right.  It is a place

25    of public accommodation, yeah.
```

Page 5

| | |
|---|---|
| 1 | MS. BERNAL:  So then I think really the dispute, |
| 2 | for purposes of this motion, would be whether Quest |
| 3 | failed to provide the certified class effective |
| 4 | communication during the certified class period.  And so |
| 5 | Plaintiffs' argument would be that the undisputed record |
| 6 | evidence establishes that there was a denial of |
| 7 | effective communication. |
| 8 | So what we would point to for that period -- |
| 9 | again, we're looking at the certified class period, so |
| 10 | January 1st, 2018 through the end of 2019.  And so first |
| 11 | we would look at what this Court has already noted. |
| 12 | This is in Docket 144, Page 10, Lines 26 to 27 where the |
| 13 | Court noted Quest appeared to concede that its kiosks, |
| 14 | as originally developed, did not provide effective |
| 15 | communication with blind individuals.  So the first |
| 16 | argument would then be that the kiosks, as they were |
| 17 | during the class period, did not provide effective |
| 18 | communication. |
| 19 | And so then I think we would look at whether |
| 20 | there was any other way that Quest was effectively |
| 21 | communicating with the blind individuals during the |
| 22 | class period.  And so for that, Quest's prior argument |
| 23 | that it was the original iteration, there was |
| 24 | phlebotomist assistance that has already been determined |
| 25 | by the Court.  And this is, again, at Docket 144.  You |

Page 6

PA0344

```
1    will get the Westlaw cite which is 2021, Westlaw 5989961

2    at Page 6 where the Court noted that the major problem

3    with Quest's argument, the argument being there is

4    phlebotomist assistance, is that the original iteration

5    of the kiosk phlebotomist assistance does not appear to

6    have been readily available.

7         And that was, I think as the Court noted in that

8    same order later, that the design of the kiosk was to

9    increase efficiencies with having the phlebotomist in

10   the back.  So we would argue that based on this record

11   evidence that the national class that's been certified

12   who visited the Quest PSCs during the class period were

13   denied full and equal enjoyment of the services,

14   facilities, privileges, advantages or accommodations due

15   to Quest's failure to make each check-in self-service

16   kiosk independently accessible to legally blind

17   individuals denying them effective communication.

18        And I think one of the things we would want to

19   highlight is that we're not arguing that there is a

20   legal requirement on Quest that there be

21   independently-accessible kiosks but rather that Quest

22   must provide its legally blind customers with effective

23   communication.  And we believe the record facts are

24   undisputed, that that was denied during the class

25   period.  And then we recognize that Quest will raise two
```

Veritext Legal Solutions
866 299-5127

PA0345

1  affirmative defenses, both mootness and undue

2  administrative burden.

3       So as to mootness, I think we point to the pretty

4  long line of Ninth Circuit and Supreme Court cases

5  looking at mootness and what the burden is on a

6  defendant who raises the mootness argument.  And I think

7  in particular we look at the prayer for relief and then

8  look at the law around mootness.

9       You would have to find that it is impossible for

10  courts to grant any effectual relief whatsoever to

11  prevailing parties.  And we believe that the record

12  evidence shows that that is not the case, that the

13  evidence in the record shows that there are still slight

14  controversies.

15       I think the first way to show that would be the

16  daily report, which is the only actual evidence as to

17  how the three-finger swipe is functioning in the PSCs.

18  And that record evidence establishes that the

19  three-finger swipe has not mooted the communication

20  issue, that there continues to be a denial of effective

21  communications for blind individuals whether that be by

22  not hearing an audio loop directing them to a kiosk or

23  not having any audio loop whatsoever, whether that be by

24  showing up at a kiosk and having that kiosk not have the

25  three-finger swipe implemented and whether that

PA0346

1    three-finger swipe is not including the functionality of

2    the entire kiosk and how the kiosk communicates.  At

3    best the three-finger swipe remedies some but not all of

4    the issues, so that we do not believe moots the case as

5    a matter of law.

6           And when I say at best that would be if the

7    three-finger swipe were functioning perfectly at all

8    PSCs, which the record establishes that it is not.  So

9    that is in a nutshell why we believe the case would not

10   be mooted by a three-finger swipe even if it was

11   functioning perfectly.

12          As to undue administrative burden, each of the 30

13   (b)(6)witnesses who were designated on these topics were

14   questioned about this, and not one witness could

15   articulate why making the e-check-in kiosk accessible

16   created an undue burden for Quest.  So I don't think --

17   I mean, you could argue it, but there won't be the

18   actual record evidence to support that argument.  So

19   that's why we believe Quest could not demonstrate the

20   significant difficulty or expense of making the kiosk

21   accessible.

22          So those are the arguments that the plaintiffs

23   would anticipate raising.  Ben, do you have anything to

24   add to those arguments?

25          MR. SWEET:  None.  I don't think so, not at this

PA0347

1    time.

2         THE COURT:  Okay.  And Mr. Raizman, I anticipate

3    Quest will dispute some of those arguments, but I would

4    love to hear your points on them.

5         MR. RAIZMAN:  Yeah.  Well, starting with your

6    assertion that the only issue then is whether effective

7    communication was provided, I would disagree.  We're

8    agreeing on the place of public accommodation.  We're

9    not agreeing on the only operating point.

10        As to the effective communication, the only

11   record evidence you cited was the Court's observation,

12   which is I think incorrect and contrary to the record

13   evidence.  I don't think that works out.  I don't think

14   you have shown any evidence that would support a

15   class-wide finding of difficulties with providing

16   effective communication.  Your evidence is sporadic at

17   best and not sufficient to establish any broader

18   systemic practice to support a class-wide finding.

19        We also don't agree that the way the class has

20   been defined we believe is a key issue, and this spills

21   into our motion which I think is also well understood

22   here, that the way you define the class, the way the

23   Court has specifically certified the class, is by people

24   who fail to enjoy goods or services as a result of the

25   lack of an independently accessible device.  So that to

                                              Page 10

PA0348

1    us has to be the threshold question as opposed to the

2    way you framed the effective communication question.

3          As to the mootness argument, we disagree with

4    your -- well, you didn't provide any legal cites, but

5    the one you provided in the past I believe in the

6    motions in limine we've made our point as to why we

7    think those are inapplicable here.  We also don't think

8    the functionality that was added after the class period

9    is relevant to whether the claims in this case by the

10   class during the class period have been mooted.

11         We also don't think that you have assembled any

12   admissible evidence let alone class-wide admissible

13   evidence about your purported claims about the failure

14   of the three-finger swipe.

15         As to the undue administrative burden, I mean, I

16   would have to look at the specific questions that were

17   asked, and, you know, in my view it was a long time ago,

18   and we were talking about several depositions.  So I

19   don't know the specific testimony.  But to my

20   recollection these were all asked as legal questions,

21   what is the undue administrative burden.  They weren't

22   charged with understanding those kinds of questions.

23         And the administrative burden is quite obvious.

24   We had already ruled something out, and so the

25   administrative burden is to replace that with the

Page 11

```
 1    device.  For example, the class has asked for the device
 2    and capability that the class has asked for.  So that is
 3    a summary of our response to what you laid out.
 4         MS. BERNAL:  Perfect.  And I did not cite any of
 5    the mootness cases.  Would you like me to cite a few for
 6    you for the record?  They are similar to what's probably
 7    been asserted in the motion in limine.
 8         But in particular this is actually a case with
 9    Judge Collins that I am not even going to say it, so I
10    will spell it for court reporter.  S-e-n-g-u-p-t-a
11    versus the City of Monrovia.  And that is 2010 Westlaw
12    11515299.  Again, that is a Central District case with
13    Judge Collins where it was a similar issue that was
14    dealing with a plaintiff who was deaf.  And it was the
15    denial of effective communication in an arrest setting.
16    And similarly the City of Monrovia argued that they had
17    mooted this because they had implemented new policies
18    related to ASL interpreters during an arrest.
19         And Judge Collins denied the mootness claim
20    arguing many things, number one, even if the policies
21    had some positive attributes they still had multiple
22    failings.  We would say that that is similar to the
23    three-finger swipe.  Even if there is some positive
24    attributes there are some multiple failings.
25         And then additionally even if the policy was ADA
```

Page 12

PA0350

```
 1    compliant, so even if the three-finger swipe was ADA
 2    compliant in this case there is still training issues
 3    which have been identified and not remediated.
 4         Similarly, I think this really highlights how
 5    difficult the mootness burden is.  There has been this
 6    case in front of Judge Collins, similar to this where
 7    they adopted the new purported fix after the lawsuit was
 8    filed, suggesting it may have been an effort to moot the
 9    lawsuit not to demonstrate the City's genuine change of
10    heart, and that there was no evidence in the record that
11    the City would not simply revert to its prior policy
12    once the threat of litigation had diminished.
13         So that, I think, really goes to show how the
14    Central District in particular views mootness claims and
15    the difficult burden.  There is a few Ninth Circuit
16    cases, but I believe those are that's been cited in the
17    motion in limine.  Other than that I would say in
18    response to your arguments we disagree as to what the
19    record evidence would be and, as I said in our separate
20    statement.
21         Ben, do you have anything else to add?
22         MR. SWEET:  No.  I think that generally covers
23    it.
24         MS. BERNAL:  So I think that would be our
25    response to those arguments there.
```

Page 13

PA0351

```
1            And, David, do you have anything else that you
2       want to add on the plaintiff's anticipated Rule 56
3       motion?
4            MR. RAIZMAN:  No, I don't.
5            MS. BERNAL:  Okay.  Can we agree that we
6       sufficiently met and conferred on Plaintiff's Rule 56
7       motion?
8            MR. RAIZMAN:  Yes.
9            MS. BERNAL:  Okay.  Thank you, David.  And then
10      do you want to meet and confer on your anticipated
11      motion as well?
12           MR. RAIZMAN:  Yeah.  I mean, I think I already
13      covered it, honestly, and it's certainly been discussed
14      at length before in the pretrial conference and motion
15      in limine.  But I will just summarize again that the way
16      the class has been defined, the Court's identified the
17      critical issue as whether class members were denied
18      goods and services as a result of the lack of an
19      independently-accessible device.
20           We think as a matter of law there is no
21      requirement that there be an independently-accessible
22      device, so it essentially answers the question that the
23      class definition asks.  It answers it in the negative
24      thus negating the classes claim.  And buried in there is
25      this false choice that if effective communication does
```

Page 14

PA0352

1    not exist on a particular occasion that means there must

2    be an independently-accessible device.

3         We think that is implicit in the way the class

4    has been defined, and that is just wrong.  That is wrong

5    as a matter of law.  The law makes clear that the place

6    of public accommodation has a multitude of ways in which

7    it can provide effective communication.  And the ways it

8    does it or the ways it may do it do not necessarily

9    involve an independently-accessible device.  We never

10   get to the premise of the class definition that there

11   needs to be an independently-accessible device.

12        That's our motion.  We have a related motion that

13   is based on a conservative reading of the amended

14   schedule of pretrial and trial dates, Document 195-1,

15   which we believe permits new dispositive motions to be

16   filed or the Court would not have entered it this way.

17   But in excess of caution we would like to seek your

18   agreement that given the close overlap with an argument

19   we're going to make in response to your motion and then

20   again in our motion which I just outlined, that we

21   stipulate that we be allowed to make a dispositive

22   motion notwithstanding the fact that we made a previous

23   dispositive motion.

24        And this is based on a lot of things, not the

25   least of which was the colloquy at the pretrial

PA0353

1    conference where the Court expressed an interest in

2    seeing the arguments that I have outlined.

3         MR. SWEET:  David, this is Ben.  I am just going

4    to respond.  So just to kind of walk through what I

5    think you are proposing, it is two motions.  And I see a

6    few problems with the proposed motion that you are

7    seeking to bring.  And I will just kind of give you our

8    two cents on it for the record.

9         For starters your Local Rule 7-3 letter does not

10   state which rule or rules you seek to move under.

11   Subsequently I e-mailed you asking you to identify the

12   rule or rules.  We had a few emails actually from our

13   side before we heard back from you.  You responded that

14   you were bringing the motion under, quote, Rule 56, end

15   quote, without any further elaboration.

16        Rule 56 does not permit you to bring a motion in

17   light of Judge Gee's standing order entered in this

18   action which states that one party is entitled to bring

19   just one summary judgment motion.  And so I think as we

20   sit here now we're simply seeking to understand for the

21   first time which rule you will be bringing this motion

22   under.  Can you identify that rule for us?

23        MR. RAIZMAN:  I did.  Rule 56.  That is the

24   summary judgment rule.

25        MR. SWEET:  Right.  And you would agree that

PA0354

```
 1   Quest has already brought and had denied its motion for
 2   summary judgment.  So we're just trying to understand on
 3   what authority you believe that Quest could bring a
 4   second summary judgment motion.
 5       MR. RAIZMAN:  I just told you that we were
 6   seeking -- first of all, we read the amended order to
 7   permit that by setting a new date for setting
 8   dispositive motions after we had already brought a
 9   motion.  It doesn't say last hearing date for
10   dispositive motion.  It doesn't say last hearing date
11   for Plaintiffs' dispositive motion.  I think the Court
12   contemplated it was discussed in the pretrial
13   conference.
14       Secondly, in excess of caution we're asking for
15   your agreement to that.  The Court is capable
16   notwithstanding its standing order which of course you
17   understand, to grant leave to bring a second motion.
18   And that is what we would prepare to do if you did not
19   stipulate and the Court did not agree with our reading
20   of its amended scheduling order.
21       MR. SWEET:  We do not agree.  The class is not
22   agreeing with that interpretation.  We don't think there
23   is any basis to believe the Court has vacated its prior
24   scheduling order and --
25       MR. RAIZMAN:  I didn't say it has vacated it.  I
```

Page 17

PA0355

```
 1    said there is good cause.  I mean, that is an argument
 2    we're making, not vacated it, but it superseded it with
 3    this new scheduling order.  In any event, we are seeking
 4    your agreement that there is good cause to bring it.
 5    And I suppose the answer is going to be the same, but we
 6    have not vacated it.
 7         MR. SWEET:  So what you are seeking to do, then,
 8    is to file essentially a motion to amend the existing
 9    scheduling order under Rule 16 that would allow you to
10    file a subsequent Rule 56 motion, correct?
11         MR. RAIZMAN:  Yeah.
12         MR. SWEET:  Okay.  And when you say, David, that
13    there is good cause, I am trying to understand what has
14    occurred since the pretrial conference that would lead
15    you to believe there is now good cause to bring such a
16    motion.
17         MR. RAIZMAN:  Not since the pretrial conference,
18    since the Court ruled on our summary judgment motion.
19    So what's happened since then is the Court granted the
20    class cert and defined the class in the way it defined
21    it, in the way you asked it to be defined.  And then we
22    had a colloquy at the pretrial conference in which the
23    specific issue was discussed.  And the Court said it was
24    interested in hearing it.
25         MR. SWEET:  I'm sorry.  Can you call -- can you
```

Veritext Legal Solutions
866 299-5127

PA0356

```
 1   cite exactly where in the pretrial conference transcript

 2   you find support for that notion?

 3        MR. RAIZMAN:  I can't cite you a page but I will

 4   by the time I bring this motion.  It's towards the end,

 5   and it is part of the discussion related to motion in

 6   limine No. 5, I believe.

 7        MR. SWEET:  Let me pull what I think might be the

 8   passage in question, Page 17, Lines 18 through 25.  And

 9   it reads as follows.  Judge Gee stated:

10                "Well, I think that part of the reason

11                why -- I mean, obviously" --

12        And let me back up, David.  This is in relation

13   to your argument about the class definition which I will

14   address in a moment.  Judge Gee states:

15                "Well, I think that part of the reason

16                why -- I mean, obviously I would be more

17                than happy to decide the legal issue if

18                it was truly susceptible to a motion for

19                summary judgment type of situation which

20                you obviously tried.  But I found there

21                were triable issues that affected that

22                particular legal issue.  And so I don't

23                think it's worthwhile to have you try

24                that again and have me only reach the

25                same conclusion again."
```

Page 19

PA0357

```
 1            MR. RAIZMAN:  And what page are you reading from,
 2    Ben?
 3            MR. SWEET:  That is Page 17.
 4            MR. RAIZMAN:  That is not the passage I was
 5    referring to.  I think it goes on.  I don't expect -- I
 6    clearly don't expect you at this point to agree, but
 7    since we're going to be making this argument in
 8    opposition to your motion, do you really just want to be
 9    opposing that it be made at all?
10            MR. SWEET:  We just don't think it is permitted
11    by the rule, David, and we don't think there is any
12    basis to make it.  I also wanted to address your comment
13    this notion of an independent legal duty for Quest to
14    make the kiosk independently accessible.  And I think
15    this is about the fourth or fifth time that Quest has
16    attempted to miscast our legal theory.  So I just want
17    to state it very clearly for the record so there is no
18    confusion.
19            Our case is about the effective communication.
20    Quest has known that it's been about effective
21    communication from the outset.  Your own class cert
22    opposition stated, quote, "The effective communication
23    regulation on which this lawsuit is premised," end
24    quote.  So our theory is therefore not about some
25    independent legal obligation to make the kiosk
```

Page 20

PA0358

 1   independently accessible.

 2        The reason the word "independently" appears in

 3   the class definition at all is because facts matter.

 4   And in this case the certified class made a factual

 5   showing, and the Court accepted that factual showing

 6   that phlebotomists were not available to assist blind

 7   customers at the kiosk, and that this was Quest's

 8   business plan from the outset.

 9        Because that is true factually in this case the

10   only way left here for blind customers to communicate

11   effectively with Quest was through the kiosk.  That is

12   what the facts of this case demonstrated.  So, yes, on

13   the facts of this case where phlebotomist assistance was

14   not available, in order for effective communication to

15   be achieved the kiosk had to be independently

16   accessible.  That is our theory.

17        And I believe that there is plenty of support for

18   the idea that Judge Gee sees things the same way

19   including the motion for summary judgment order, her

20   comments at the summary judgment hearing, her comments

21   at the pretrial conference, and her statements in the

22   class certification order all point in that direction.

23        To the extent you are taking issue with the

24   Court's tentative ruling on motion in limine five or its

25   comments at the hearing, do you have any legal authority

Page 21

PA0359

1    to support the idea that you can directly address a

2    tentative opinion?

3         MR. RAIZMAN:  I'm not addressing a tentative

4    opinion.  We're making a dispositive motion.

5         MR. SWEET:  I think you mentioned there was a

6    colloquy around motion in limine No. 5.  So the class is

7    trying to understand what exactly it is that you are

8    directing this motion at.  Is it a ruling of the Court?

9    Is it -- what specifically is the contemplated

10   dispositive motion taking aim at?

11        MR. RAIZMAN:  Taking aim at the class definition,

12   the way the class has been designed.  In light of the

13   class definition we don't think there is a claim.  So

14   there is no obligation to have an

15   independently-accessible device.  We're just going to

16   have to agree to disagree on this, Ben.  You know,

17   sometimes, probably very rarely, you can talk another

18   side out of a position but, you know, I know you think

19   you are done with this issue.  We don't think so, and

20   we're going to ask the Court to rule on it.  So I am not

21   sure what we're driving at here today.  But if you like

22   I will pull up the transcript which I am in the process

23   of doing.

24        The part that you quoted on 17, her finding was

25   not that the class had experienced, this is from the

Page 22

```
 1   entire motion, not that the class had experienced
 2   difficulties, but there is a triable issue of fact that
 3   some people had experienced difficulties with effective
 4   communication.  That is a long ways away from having
 5   to -- what you need to prove in this case.
 6          MR. SWEET:  Were you going to point to the part
 7   of the --
 8          MR. RAIZMAN:  Yeah.  I'm reviewing it now, Ben.
 9   I am in the neighborhood, I believe.  Page 20, so after
10   the part you quoted there is three or two pages of
11   colloquy on the subject where I did not accept the
12   Court's response as dispositive of the issue.  And the
13   Court said:
14              "All right.  I'm going to have to
15              contemplated that."
16              "Understood Your Honor."
17          I say.  The Court says:
18              "You are going to have a chance to
19              contemplate that too, because, as you
20              will see, you are not going to trial in
21              the next month."
22          MR. SWEET:  Okay.  So the top of looks like Page
23   20?
24          MR. RAIZMAN:  Yes.
25          MR. SWEET:  Okay.  So on the basis of this
```

Page 23

PA0361

```
 1    exchange you will be making a motion.  And the motion
 2    that you intend to make, so we understand as to the
 3    class definition, will be a dispositive motion because
 4    you believe the class as constituted and as certified
 5    can't possibly lead to relief as a matter of law?
 6              MR. RAIZMAN:  Correct.
 7              MR. SWEET:  Okay.  I appreciate that
 8    clarification.  I don't think I have anything else to
 9    add, David, as you said, we are not going to agree.  But
10    I will agree that as to your Rule 16 motion we at least
11    satisfied the Local Rule 7-3.  Okay?
12              MR. RAIZMAN:  But you are not agreeing as to the
13    summary judgment motion?
14              MR. SWEET:  No.
15              MR. RAIZMAN:  The reasons I stated previously.  I
16    am not expecting you to agree to our motion.  Do you
17    agree that we've met and conferred?  By the way, I don't
18    see it as a requirement of Rule 7-3, but in any event,
19    since I was asked that question I am going to ask you
20    guys the question.  Have we met --
21              MR. SWEET:  As to both motions.
22              MR. RAISMAN:  Well, we believe you need to seek a
23    leave of court to file a Rule 56 motion, just to be
24    clear.
25              MR. RAIZMAN:  Yeah, which we said we're going to
```

Page 24

PA0362

```
 1   do.
 2         MR. SWEET:  Yes, assuming the Court grants your
 3   Rule 16 motion, we will stipulate that we have conducted
 4   the 7-3.
 5         MR. RAISMAN:  All right.  I don't know if you
 6   guys want to talk about briefing schedules at some
 7   point.  You know, for now let's just talk about yours.
 8   Do you have -- I assume you will file by May 6th, but
 9   did you have a date when you were going to seek to have
10   this motion heard in mind?
11         MR. SWEET:  Alison?
12         MS. BERNAL:  Yes.  There weren't many options for
13   dates in that timeframe.  I apologize.  Let me pull this
14   up.  So, yes, we anticipate to file on or before May 6th
15   which puts the hearing date at -- I am just trying to
16   find what the date was before that June 17th.
17         MR. RAIZMAN:  I thought it was May 30th, if
18   memory serves me.
19         MS. BERNAL:  No, I think you had a bit more time
20   than that.  Let my pull it up.  The last date for
21   hearing was June 17th, which actually -- no, you are
22   right.  Sorry, David.  It was May 30th that was the date
23   that would be set for the hearing.  I think I might have
24   bungled that.
25         MR. RAIZMAN:  May 30th?  Are you sure?
```

Page 25

PA0363

1          MS. BERNAL:  No.  I think I might have bungled

2     that.  Just give me one second.

3          MR. RAIZMAN:  Let me ask you this.  Are you open

4     to an agreed-upon briefing schedule, or are you just

5     going to try to jam this through?

6          MS. BERNAL:  Give me a second on the date.  One

7     second.  Okay.  Looks like she has Friday at 9:30.  So

8     if we file by next week we could have it set for hearing

9     on May 30th.  But if it is later in the week we would

10    have it set the week after.  And as for a briefing

11    schedule, we will listen to your proposal for that.  It

12    is something that we would want to set with our team as

13    well.

14         MR. RAIZMAN:  Okay.  I guess I would ask for some

15    courtesy, I imagine, because you are going to serve a

16    very important and potentially dispositive motion.  We

17    need to have a fair chance to respond to what I think

18    will amount to a week if I am reading it correctly.  So

19    that just seems like something that we would need to go

20    to the Court to get relief for.  I hope you guys are

21    open to an agreed-upon briefing schedule, particularly

22    if we have cross-motions.

23         MS. BERNAL:  Well, why don't we do this, David,

24    why don't you send us your proposal on that, and we can

25    discuss it with the team on that.

                                             Page 26

PA0364

```
 1          MR. RAIZMAN:  Okay.  I will do that.  You have

 2   not reserved the date as of now?

 3          MS. BERNAL:  I don't believe -- I would have to

 4   check with our paralegal on that.  I don't know the

 5   answer to that for certain.

 6          MR. RAIZMAN:  Okay.  All right.  Thank you guys

 7   for your time.  Have a great week.

 8

 9               (TIME NOTED: 11:39 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 27

PA0365

```
1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4              That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were administered an oath; that

8     a record of the proceedings was made by me using

9     machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12             Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [ ] was [ ] was not requested.

16             I further certify I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or any party to this action.

19             IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21

22    Dated: 4/27/22

23                         _____

24                         JOANNA BROADWELL

25                         CSR No. 10959
```

Page 28

PA0366

**[& - asked]**

| & | | | |
|---|---|---|---|
| **&**   3:4,13 | | | |

**1**

**1**  1:25
**10**  6:12
**10959**  1:22 2:22 28:25
**11515299**  12:12
**11811**  28:23
**11:02**  2:20 4:2
**11:39**  2:21 27:9
**1200**  3:15
**144**  6:12,25
**16**  18:9 24:10 25:3
**17**  19:8 20:3 22:24
**17th**  25:16,21
**18**  19:8
**195-1**  15:14
**1st**  6:10

**2**

**20**  23:9,23
**201**  3:7
**2010**  12:11
**2018**  6:10
**2019**  6:10
**2021**  7:1
**2022**  1:18 2:21 4:1
**213**  3:17
**239-9800**  3:17
**25**  1:18 2:21 4:1 19:8
**26**  6:12
**27**  6:12
**28**  1:25
**2:19**  1:7 2:7

**3**

**30**  9:12
**30th**  25:17,22,25 26:9

**33**  3:7

**4**

**4/27/22**  28:22
**400**  3:15

**5**

**5**  19:6 22:6
**5203809**  1:23
**56**  4:8,11 14:2,6 16:14,16,23 18:10 24:23
**5989961**  7:1

**6**

**6**  7:2 9:13
**6th**  25:8,14

**7**

**7-3**  4:6 16:9 24:11 24:18 25:4

**8**

**805**  3:9
**8108**  1:7 2:7

**9**

**90071**  3:16
**93101**  3:8
**963-2345**  3:9
**9:30**  26:7

**a**

**a.m.**  2:20,21 4:2 27:9
**accept**  23:11
**accepted**  21:5
**accessible**  7:16,21 9:15,21 10:25 14:19,21 15:2,9,11 20:14 21:1,16 22:15
**accommodation**  4:19 5:8,22,25 10:8 15:6

**accommodations**  7:14
**achieved**  21:15
**act**  4:15
**action**  16:18 28:17 28:18
**actual**  8:16 9:18
**ada**  5:22 12:25 13:1
**add**  9:24 13:21 14:2 24:9
**added**  11:8
**additionally**  12:25
**address**  5:18 19:14 20:12 22:1
**addressing**  22:3
**administered**  28:7
**administrative**  8:2 9:12 11:15,21,23 11:25
**admissible**  11:12 11:12
**adopted**  13:7
**adra**  4:15
**advantages**  7:14
**affirmative**  8:1
**ago**  11:17
**agree**  4:24 5:9,23 10:19 14:5 16:25 17:19,21 20:6 22:16 24:9,10,16 24:17
**agreed**  5:9,19 26:4 26:21
**agreeing**  10:8,9 17:22 24:12
**agreement**  15:18 17:15 18:4
**aim**  22:10,11
**al**  1:9 2:9

**alison**  3:5,10 25:11
**allow**  18:9
**allowed**  15:21
**amend**  18:8
**amended**  15:13 17:6,20
**american**  1:4 2:4 3:2
**amount**  26:18
**angeles**  3:16
**anne**  1:4 2:4 3:3
**answer**  18:5 27:5
**answered**  5:1
**answers**  14:22,23
**anticipate**  9:23 10:2 25:14
**anticipated**  4:7,10 14:2,10
**apologize**  25:13
**appear**  7:5
**appearances**  3:1
**appeared**  6:13
**appears**  21:2
**appreciate**  24:7
**april**  1:18 2:21 4:1
**argue**  7:10 9:17
**argued**  12:16
**arguing**  7:19 12:20
**argument**  6:5,16 6:22 7:3,3 8:6 9:18 11:3 15:18 18:1 19:13 20:7
**arguments**  9:22 9:24 10:3 13:18 13:25 16:2
**arrest**  12:15,18
**articulate**  9:15
**asked**  11:17,20 12:1,2 18:21 24:19

[asking - confer]

| | | | |
|---|---|---|---|
| **asking**  16:11 17:14 | **benefit**  4:4 | **cases**  8:4 12:5 13:16 | 11:8,10,10,12 12:1 12:2 14:16,17,23 |
| **asks**  14:23 | **benjamin**  3:6 | **cause**  18:1,4,13,15 | 15:3,10 17:21 |
| **asl**  12:18 | **bernal**  3:5 4:4,13 5:6,18 6:1 12:4 | **caution**  15:17 17:14 | 18:20,20 19:13 20:21 21:3,4,22 |
| **assembled**  11:11 | 13:24 14:5,9 | **central**  1:2 2:2 | 22:6,11,12,13,25 |
| **asserted**  12:7 | 25:12,19 26:1,6,23 | 12:12 13:14 | 23:1 24:3,4 |
| **assertion**  10:6 | 27:3 | **cents**  16:8 | **classes**  14:24 |
| **assist**  21:6 | **best**  9:3,6 10:17 | **cert**  18:20 20:21 | **clear**  15:5 24:24 |
| **assistance**  6:24 7:4 7:5 21:13 | **bit**  25:19 | **certain**  27:5 | **clearly**  20:6,17 |
| **assume**  25:8 | **blind**  1:5 2:5 3:2 6:15,21 7:16,22 | **certainly**  14:13 | **clinical**  1:8 2:8 |
| **assuming**  25:2 | 8:21 21:6,10 | **certification**  21:22 | **close**  15:18 |
| **attempted**  20:16 | **briefing**  25:6 26:4 | **certified**  2:22 4:17 | **collins**  12:9,13,19 13:6 |
| **attorney**  28:18 | 26:10,21 | 4:21,22,25 6:3,4,9 7:11 10:23 21:4 | **colloquy**  15:25 |
| **attributes**  12:21 12:24 | **bring**  16:7,16,18 17:3,17 18:4,15 | 24:4 28:1 | 18:22 22:6 23:11 |
| **audio**  8:22,23 | 19:4 | **certify**  28:3,16 | **comment**  20:12 |
| **authority**  17:3 21:25 | **bringing**  16:14,21 | **chance**  23:18 26:17 | **comments**  21:20 21:20,25 |
| **available**  7:6 21:6 21:14 | **broader**  10:17 | **change**  13:9 | **communicate**  21:10 |
| | **broadwell**  1:21 2:22 28:24 | **charged**  11:22 | **communicates**  9:2 |
| **b** | **brought**  17:1,8 | **check**  7:15 9:15 27:4 | **communicating**  6:21 |
| **b**  9:13 | **bungled**  25:24 26:1 | **choice**  14:25 | **communication** |
| **back**  7:10 16:13 19:12 | **burden**  8:2,5 9:12 9:16 11:15,21,23 | **circuit**  8:4 13:15 | 4:21 6:4,7,15,18 7:17,23 8:19 10:7 |
| **barbara**  3:8 | 11:25 13:5,15 | **cite**  7:1 12:4,5 19:1,3 | 10:10,16 11:2 12:15 14:25 15:7 |
| **based**  7:10 15:13 15:24 | **buried**  14:24 | **cited**  10:11 13:16 | 20:19,21,22 21:14 23:4 |
| **basis**  17:23 20:12 23:25 | **business**  21:8 | **cites**  11:4 | **communications**  8:21 |
| **behalf**  1:5 2:5 | **c** | **city**  12:11,16 13:11 | **completion**  28:14 |
| **believe**  5:1,4,8 7:23 8:11 9:4,9,19 | **ca**  3:8,16 | **city's**  13:9 | **compliant**  13:1,2 |
| 10:20 11:5 13:16 | **california**  1:2 2:2 28:2 | **claim**  12:19 14:24 22:13 | **complicated**  5:12 |
| 15:15 17:3,23 18:15 19:6 21:17 | **call**  4:23 18:25 | **claims**  11:9,13 13:14 | **concede**  6:13 |
| 23:9 24:4,22 27:3 | **capability**  12:2 | **clarification**  24:8 | **conclusion**  19:25 |
| **ben**  9:23 13:21 16:3 20:2 22:16 | **capable**  17:15 | **class**  3:3 4:17,21 4:22,25 6:3,4,9,17 | **conducted**  25:3 |
| 23:8 | **case**  1:7 2:7 8:12 9:4,9 11:9 12:8,12 | 6:22 7:11,12,24 10:15,18,19,22,23 | **confer**  1:17 4:5,7 4:23 14:10 |
| | 13:2,6 20:19 21:4 21:9,12,13 23:5 28:14 | | |

PA0368

[conference - event]

| | | | |
|---|---|---|---|
| **conference** 4:5 5:11,19 14:14 16:1 17:13 18:14 18:17,22 19:1 21:21 | **csr** 1:22 28:25 **customers** 7:22 21:7,10 **cv** 1:7 2:7 | **denying** 7:17 **deposition** 28:13 **depositions** 11:18 **design** 7:8 | **docket** 6:12,25 **document** 15:14 **doing** 22:23 **driving** 22:21 **due** 7:14 |
| **conferred** 14:6 24:17 | **d** | **designated** 9:13 **designed** 22:12 | **duty** 20:13 |
| **confirm** 5:2 | **daily** 8:16 | **determined** 4:24 6:24 | **e** |
| **confusion** 20:18 | **date** 17:7,9,10 25:9,15,16,20,22 | **developed** 6:14 | **e** 9:15 12:10 16:11 **effective** 4:21 6:3 6:7,14,17 7:17,22 8:20 10:6,10,16 11:2 12:15 14:25 15:7 20:19,20,22 21:14 23:3 |
| **conservative** 15:13 | 26:6 27:2 28:19 | **device** 10:25 12:1 12:1 14:19,22 15:2,9,11 22:15 | |
| **constituted** 24:4 | **dated** 28:22 | | |
| **contemplate** 23:19 | **dates** 15:14 25:13 | **diagnostics** 1:8 2:8 3:12 4:18 | |
| **contemplated** 17:12 22:9 23:15 | **david** 3:14 4:9,23 14:1,9 16:3 18:12 19:12 20:11 24:9 25:22 26:23 | **different** 5:16 | **effectively** 5:13 6:20 21:11 |
| **continues** 8:20 | | **difficult** 13:5,15 | **effectual** 8:10 |
| **contrary** 10:12 | **david.raizman** 3:18 | **difficulties** 10:15 23:2,3 | **efficiencies** 7:9 |
| **controversies** 8:14 | | **difficulty** 9:20 | **effort** 13:8 |
| **correct** 18:10 24:6 | **deaf** 12:14 | **diminished** 13:12 | **elaboration** 16:15 |
| **correctly** 26:18 | **deakins** 3:13 | **directing** 8:22 22:8 | **element** 5:7 |
| **council** 1:4 2:4 3:2 | **dealing** 12:14 | | **elements** 4:15 |
| **course** 17:16 | **decide** 19:17 | **direction** 21:22 28:10 | **emails** 16:12 |
| **court** 1:1 2:1 4:4 4:16 6:11,13,25 7:2,7 8:4 10:2,23 12:10 15:16 16:1 17:11,15,19,23 18:18,19,23 21:5 22:8,20 23:13,17 24:23 25:2 26:20 | **defendant** 8:6 | **directly** 22:1 | **employee** 28:17 |
| | **defendants** 1:10 2:10 3:12 5:14,17 | **disability** 4:18 5:1 | **enjoy** 10:24 |
| | **defenses** 8:1 | **disagree** 10:7 11:3 13:18 22:16 | **enjoyment** 7:13 |
| | **define** 10:22 | | **entered** 15:16 16:17 |
| | **defined** 10:20 14:16 15:4 18:20 18:20,21 | **discuss** 26:25 | |
| | | **discussed** 14:13 17:12 18:23 | **entire** 9:2 23:1 |
| **court's** 10:11 14:16 21:24 23:12 | **definition** 14:23 15:10 19:13 21:3 22:11,13 24:3 | **discussion** 19:5 | **entitled** 16:18 |
| **courtesy** 26:15 | | **dispositive** 15:15 15:21,23 17:8,10 17:11 22:4,10 23:12 24:3 26:16 | **epa** 4:15 |
| **courts** 8:10 | **demonstrate** 9:19 13:9 | | **equal** 7:13 |
| **cover** 5:15,16 | | **dispute** 5:14 6:1 10:3 | **esq** 3:5,6,14 |
| **covered** 14:13 | **demonstrated** 21:12 | | **essentially** 14:22 18:8 |
| **covers** 13:22 | **denial** 6:6 8:20 12:15 | **district** 1:1,2 2:1,2 12:12 13:14 | **establish** 10:17 |
| **created** 9:16 | | | **establishes** 6:6 8:18 9:8 |
| **critical** 14:17 | **denied** 7:13,24 12:19 14:17 17:1 | | **et** 1:9 2:9 |
| **cross** 26:22 | | | **event** 18:3 24:18 |

[evidence - julian]

**evidence** 6:6 7:11 8:12,13,16,18 9:18 10:11,13,14,16 11:12,13 13:10,19
**exactly** 19:1 22:7
**example** 12:1
**excess** 15:17 17:14
**exchange** 24:1
**exist** 15:1
**existing** 18:8
**expect** 20:5,6
**expecting** 24:16
**expense** 9:20
**experienced** 22:25 23:1,3
**expressed** 16:1
**extent** 21:23

**f**

**facilities** 7:14
**fact** 5:2 15:22 23:2
**facts** 7:23 21:3,12 21:13
**factual** 21:4,5
**factually** 21:9
**fail** 10:24
**failed** 4:20 6:3
**failings** 12:22,24
**failure** 7:15 11:13
**fair** 26:17
**false** 14:25
**federal** 28:13
**fifth** 20:15
**file** 18:8,10 24:23 25:8,14 26:8
**filed** 13:8 15:16
**financially** 28:16
**find** 8:9 19:2 25:16
**finding** 10:15,18 22:24
**finger** 8:17,19,25 9:1,3,7,10 11:14

12:23 13:1
**first** 6:10,15 8:15 16:21 17:6
**five** 21:24
**fix** 13:7
**follows** 19:9
**foregoing** 28:4,6 28:10,12
**forth** 28:5
**found** 19:20
**fourth** 20:15
**framed** 11:2
**friday** 26:7
**front** 13:6
**full** 7:13
**functionality** 9:1 11:8
**functioning** 8:17 9:7,11
**further** 16:15 28:12,16

**g**

**g** 12:10
**gee** 19:9,14 21:18
**gee's** 16:17
**generally** 13:22
**genuine** 13:9
**give** 16:7 26:2,6
**given** 15:18 28:11
**go** 26:19
**goes** 13:13 20:5
**going** 4:6 5:13 12:9 15:19 16:3 18:5 20:7 22:15 22:20 23:6,14,18 23:20 24:9,19,25 25:9 26:5,15
**good** 18:1,4,13,15
**goods** 10:24 14:18
**grant** 8:10 17:17

**granted** 18:19
**grants** 25:2
**great** 27:7
**guess** 26:14
**guys** 24:20 25:6 26:20 27:6

**h**

**hale** 3:4
**happened** 18:19
**happy** 19:17
**hear** 10:4
**heard** 16:13 25:10
**hearing** 8:22 17:9 17:10 18:24 21:20 21:25 25:15,21,23 26:8
**heart** 13:10
**highlight** 7:19
**highlights** 13:4
**honestly** 14:13
**honor** 23:16
**hope** 3:15 26:20

**i**

**idea** 21:18 22:1
**identified** 4:16 13:3 14:16
**identify** 16:11,22
**imagine** 26:15
**implemented** 8:25 12:17
**implicit** 15:3
**important** 26:16
**impossible** 8:9
**inapplicable** 11:7
**including** 9:1 21:19
**incorrect** 10:12
**increase** 7:9
**independent** 20:13 20:25

**independently** 7:16,21 10:25 14:19,21 15:2,9,11 20:14 21:1,2,15 22:15
**individually** 1:5 2:5
**individuals** 6:15 6:21 7:17 8:21
**intend** 24:2
**interest** 16:1
**interested** 18:24 28:17
**interpretation** 17:22
**interpreters** 12:18
**involve** 15:9
**issue** 5:13 8:20 10:6,20 12:13 14:17 18:23 19:17 19:22 21:23 22:19 23:2,12
**issues** 4:10 9:4 13:2 19:21
**iteration** 6:23 7:4

**j**

**jam** 26:5
**january** 6:10
**joanna** 1:21 2:21 28:24
**job** 1:23
**jointly** 5:9
**judge** 12:9,13,19 13:6 16:17 19:9 19:14 21:18
**judgment** 4:8 16:19,24 17:2,4 18:18 19:19 21:19 21:20 24:13
**julian** 1:4 2:4 3:2

[june - operate]

**june** 25:16,21

**k**

**key** 10:20
**kind** 16:4,7
**kinds** 11:22
**kiosk** 7:5,8,16
 8:22,24,24 9:2,2
 9:15,20 20:14,25
 21:7,11,15
**kiosks** 6:13,16
 7:21
**know** 11:17,19
 22:16,18,18 25:5,7
 27:4
**known** 20:20

**l**

**laboratories** 1:9
 2:9
**lack** 10:25 14:18
**laid** 12:3
**law** 8:8 9:5 14:20
 15:5,5 24:5
**lawsuit** 5:21 13:7
 13:9 20:23
**lead** 18:14 24:5
**leases** 4:19 5:7
**leave** 17:17 24:23
**left** 21:10
**legal** 7:20 11:4,20
 19:17,22 20:13,16
 20:25 21:25
**legally** 7:16,22
**length** 14:14
**letter** 16:9
**light** 16:17 22:12
**limine** 11:6 12:7
 13:17 14:15 19:6
 21:24 22:6
**line** 8:4

**lines** 6:12 19:8
**listen** 26:11
**litigation** 13:12
**little** 5:12
**llp** 3:4
**local** 4:6 16:9
 24:11
**long** 8:4 11:17
 23:4
**look** 4:13,14 6:11
 6:19 8:7,8 11:16
**looking** 6:9 8:5
**looks** 23:22 26:7
**loop** 8:22,23
**los** 3:16
**lot** 15:24
**love** 10:4

**m**

**machine** 28:9
**mailed** 16:11
**major** 7:2
**making** 9:15,20
 18:2 20:7 22:4
 24:1
**matter** 9:5 14:20
 15:5 21:3 24:5
**mean** 9:17 11:15
 14:12 18:1 19:11
 19:16
**means** 15:1
**meet** 1:17 4:5,6,23
 14:10
**meeting** 5:22
**members** 14:17
**memory** 25:18
**mentioned** 22:5
**met** 14:6 24:17,20
**miller** 3:4
**mind** 25:10
**miscast** 20:16

**mission** 3:7
**moment** 19:14
**monday** 1:18 2:21
 4:1
**monrovia** 12:11
 12:16
**month** 23:21
**moot** 13:8
**mooted** 8:19 9:10
 11:10 12:17
**mootness** 8:1,3,5,6
 8:8 11:3 12:5,19
 13:5,14
**moots** 9:4
**motion** 4:7,11 6:2
 10:21 12:7 13:17
 14:3,7,11,14 15:12
 15:12,19,20,22,23
 16:6,14,16,19,21
 17:1,4,9,10,11,17
 18:8,10,16,18 19:4
 19:5,18 20:8
 21:19,24 22:4,6,8
 22:10 23:1 24:1,1
 24:3,10,13,16,23
 25:3,10 26:16
**motions** 11:6
 15:15 16:5 17:8
 24:21 26:22
**move** 16:10
**multiple** 12:21,24
**multitude** 15:6

**n**

**n** 12:10
**name** 28:20
**nash** 3:13
**national** 7:11
**necessarily** 15:8
**need** 23:5 24:22
 26:17,19

**needs** 15:11
**negating** 14:24
**negative** 14:23
**neighborhood**
 23:9
**neither** 28:16
**never** 15:9
**new** 12:17 13:7
 15:15 17:7 18:3
**ninth** 8:4 13:15
**noted** 6:11,13 7:2
 7:7 27:9
**notion** 19:2 20:13
**notwithstanding**
 15:22 17:16
**nshmlaw.com**
 3:10
**number** 4:16,18
 4:20 12:20
**nutshell** 9:9
**nye** 3:4

**o**

**oath** 28:7
**obligation** 20:25
 22:14
**observation** 10:11
**obvious** 11:23
**obviously** 19:11
 19:16,20
**occasion** 15:1
**occurred** 18:14
**ogletree** 3:13
**ogletree.com** 3:18
**okay** 4:9,11,13 5:6
 10:2 14:5,9 18:12
 23:22,25 24:7,11
 26:7,14 27:1,6
**once** 13:12
**open** 5:20 26:3,21
**operate** 5:17

[operates - read]

| | | | |
|---|---|---|---|
| **operates** 4:19 5:7 5:15 | **perfectly** 9:7,11 | **pretrial** 5:11,19 14:14 15:14,25 | **q** |
| **operating** 10:9 | **period** 4:22 6:4,8 6:9,17,22 7:12,25 11:8,10 | 17:12 18:14,17,22 19:1 21:21 | **qualified** 4:17,25 |
| **opinion** 22:2,4 | **permit** 16:16 17:7 | **pretty** 8:3 | **quest** 1:8 2:8 3:12 4:18,20 5:1,7 6:2 6:13,20 7:12,20,21 7:25 9:16,19 10:3 17:1,3 20:13,15,20 21:11 |
| **opposed** 11:1 | **permits** 15:15 | **prevailing** 8:11 | |
| **opposing** 20:9 | **permitted** 20:10 | **previous** 15:22 | |
| **opposition** 20:8,22 | **pertains** 28:12 | **previously** 24:15 | |
| **options** 25:12 | **phlebotomist** 6:24 7:4,5,9 21:13 | **prior** 6:22 13:11 17:23 28:7 | |
| **order** 5:19 7:8 16:17 17:6,16,20 17:24 18:3,9 21:14,19,22 | **phlebotomists** 21:6 | **privileges** 7:14 | **quest's** 6:22 7:3,15 21:7 |
| | **place** 4:19 5:7,24 10:8 15:5 28:5 | **probably** 12:6 22:17 | **question** 11:1,2 14:22 19:8 24:19 24:20 |
| **original** 6:23 7:4 28:13 | **places** 5:21 | **problem** 7:2 | |
| **originally** 6:14 | **plaintiff** 1:7 2:7 4:10 12:14 | **problems** 16:6 | |
| **outlined** 15:20 16:2 | **plaintiff's** 4:7 14:2 14:6 | **proceedings** 1:16 2:20 4:3 28:4,6,8 28:14 | **questioned** 9:14 |
| **outset** 20:21 21:8 | **plaintiffs** 3:2 6:5 9:22 17:11 | **process** 22:22 | **questions** 11:16,20 11:22 |
| **overlap** 15:18 | **plan** 21:8 | **proposal** 26:11,24 | **quite** 11:23 |
| **owns** 4:18 5:7,15 | **plenty** 21:17 | **proposed** 3:3 16:6 | **quote** 16:14,15 20:22,24 |
| **p** | **point** 5:11 6:8 8:3 10:9 11:6 20:6 21:22 23:6 25:7 | **proposing** 16:5 | **quoted** 22:24 23:10 |
| **p** 12:10 | **points** 10:4 | **prove** 23:5 | **r** |
| **page** 6:12 7:2 19:3 19:8 20:1,3 23:9 23:22 | **policies** 12:17,20 | **provide** 4:20 6:3 6:14,17 7:22 11:4 15:7 | **raise** 4:11 7:25 |
| | **policy** 12:25 13:11 | **provided** 10:7 11:5 | **raises** 8:6 |
| **pages** 1:25 23:10 | **portions** 5:20 | | **raising** 9:23 |
| **paralegal** 27:4 | **position** 5:5,11 22:18 | **providing** 10:15 | **raisman** 24:22 25:5 |
| **part** 5:23 19:5,10 19:15 22:24 23:6 23:10 | **positive** 12:21,23 | **pscs** 5:20 7:12 8:17 9:8 | **raizman** 3:14 4:12 5:4,10,24 10:2,5 14:4,8,12 16:23 17:5,25 18:11,17 19:3 20:1,4 22:3 22:11 23:8,24 24:6,12,15,25 25:17,25 26:3,14 27:1,6 |
| | **possibly** 24:5 | **public** 4:19 5:8,20 5:21,25 10:8 15:6 | |
| **particular** 8:7 12:8 13:14 15:1 19:22 | **potentially** 26:16 | **pull** 19:7 22:22 25:13,20 | |
| | **practice** 10:18 | **purported** 11:13 13:7 | |
| **particularly** 26:21 | **prayer** 8:7 | **purposes** 6:2 | |
| **parties** 8:11 | **premise** 15:10 | **pursuant** 4:5 | **rarely** 22:17 |
| **party** 16:18 28:18 | **premised** 20:23 | **puts** 25:15 | **reach** 19:24 |
| **passage** 19:8 20:4 | **prepare** 17:18 | | **read** 17:6 |
| **pc** 3:13 | | | |
| **people** 10:23 23:3 | | | |
| **perfect** 12:4 | | | |

Page 6

PA0372

[readily - summary]

**readily** 7:6
**reading** 15:13
  17:19 20:1 26:18
**reads** 19:9
**really** 6:1 13:4,13
  20:8
**reason** 19:10,15
  21:2
**reasons** 24:15
**recognize** 7:25
**recollection** 11:20
**record** 6:5 7:10,23
  8:11,13,18 9:8,18
  10:11,12 12:6
  13:10,19 16:8
  20:17 28:8,11
**referring** 20:5
**regulation** 20:23
**related** 12:18
  15:12 19:5
**relation** 19:12
**relative** 28:17
**relevant** 5:21 11:9
**relief** 8:7,10 24:5
  26:20
**remediated** 13:3
**remedies** 9:3
**remotely** 2:20
**replace** 11:25
**report** 8:16
**reported** 1:21
**reporter** 2:22 4:5
  12:10 28:2
**reporter's** 1:15
  2:19 4:3
**representative**
  4:17,25
**requested** 28:15
**requirement** 7:20
  14:21 24:18

**reserved** 27:2
**respond** 16:4
  26:17
**responded** 16:13
**response** 12:3
  13:18,25 15:19
  23:12
**result** 10:24 14:18
**revert** 13:11
**review** 28:14
**reviewing** 23:8
**right** 5:24 16:25
  23:14 25:5,22
  27:6
**rule** 4:6,8,11 14:2
  14:6 16:9,10,12,14
  16:16,21,22,23,24
  18:9,10 20:11
  22:20 24:10,11,18
  24:23 25:3
**ruled** 11:24 18:18
**rules** 16:10,12
**ruling** 21:24 22:8

**s**

**s** 3:15 12:10
**santa** 3:8
**satisfied** 24:11
**says** 23:17
**schedule** 15:14
  26:4,11,21
**schedules** 25:6
**scheduling** 17:20
  17:24 18:3,9
**second** 5:6 17:4,17
  26:2,6,7
**secondly** 17:14
**see** 16:5 23:20
  24:18
**seeing** 16:2
**seek** 15:17 16:10
  24:22 25:9

**seeking** 16:7,20
  17:6 18:3,7
**sees** 21:18
**self** 7:15
**send** 26:24
**separate** 13:19
**serve** 26:15
**serves** 25:18
**service** 7:15
**services** 7:13
  10:24 14:18
**set** 5:10 25:23 26:8
  26:10,12 28:5
**setting** 12:15 17:7
  17:7
**shorthand** 2:22
  28:1,9
**show** 8:15 13:13
**showing** 8:24 21:5
  21:5
**shown** 10:14
**shows** 8:12,13
**side** 16:13 22:18
**signature** 28:23
**significant** 9:20
**similar** 12:6,13,22
  13:6
**similarly** 1:6 2:6
  12:16 13:4
**simply** 13:11
  16:20
**sit** 16:20
**situated** 1:6 2:6
**situation** 19:19
**slight** 8:13
**smoak** 3:13
**sorry** 18:25 25:22
**sort** 5:15
**specific** 11:16,19
  18:23

**specifically** 10:23
  22:9
**spell** 12:10
**spills** 10:20
**sporadic** 10:16
**st** 3:15
**standing** 16:17
  17:16
**start** 4:6
**started** 4:10
**starters** 16:9
**starting** 10:5
**state** 16:10 20:17
  28:2
**stated** 19:9 20:22
  24:15
**statement** 5:19,23
  13:20
**statements** 21:21
**states** 1:1 2:1
  16:18 19:14
**stewart** 3:13
**stipulate** 15:21
  17:19 25:3
**stirling** 3:4
**stirling** 3:4
**street** 3:7
**subject** 23:11
**subscribed** 28:20
**subsequent** 18:10
**subsequently**
  16:11
**sufficient** 10:17
**sufficiently** 14:6
**suggesting** 13:8
**suite** 3:7,15
**summarize** 14:15
**summary** 4:7 12:3
  16:19,24 17:2,4
  18:18 19:19 21:19
  21:20 24:13

Page 7

[superseded - yeah]

superseded  18:2
support  9:18
    10:14,18 19:2
    21:17 22:1
suppose  18:5
supreme  8:4
sure  22:21 25:25
susceptible  19:18
sweet  3:6 9:25
    13:22 16:3,25
    17:21 18:7,12,25
    19:7 20:3,10 22:5
    23:6,22,25 24:7,14
    24:21 25:2,11
swipe  8:17,19,25
    9:1,3,7,10 11:14
    12:23 13:1
systemic  10:18

**t**

t  12:10
taken  2:20 28:4
talk  22:17 25:6,7
talking  11:18
team  26:12,25
tentative  21:24
    22:2,3
testifying  28:7
testimony  11:19
    28:11
thank  14:9 27:6
theory  20:16,24
    21:16
things  5:16 7:18
    12:20 15:24 21:18
think  4:13,23 5:10
    5:12,16 6:1,19 7:7
    7:18 8:3,6,15 9:16
    9:25 10:12,13,13
    10:21 11:7,7,11
    13:4,13,22,24
    14:12,20 15:3

16:5,19 17:11,22
    19:7,10,15,23 20:5
    20:10,11,14 22:5
    22:13,18,19 24:8
    25:19,23 26:1,17
thought  25:17
threat  13:12
three  4:15,20 5:14
    8:17,19,25 9:1,3,7
    9:10 11:14 12:23
    13:1 23:10
threshold  11:1
time  10:1 11:17
    16:21 19:4 20:15
    25:19 27:7,9 28:5
timeframe  25:13
today  22:21
told  17:5
top  23:22
topics  9:13
training  13:2
transcribed  28:9
transcript  1:16
    2:19 4:3 19:1
    22:22 28:10,13,15
triable  19:21 23:2
trial  15:14 23:20
tried  19:20
true  21:9 28:11
truly  19:18
try  19:23 26:5
trying  17:2 18:13
    22:7 25:15
two  4:18 7:25 16:5
    16:8 23:10
type  19:19

**u**

u  12:10
undersigned  28:1
understand  16:20
    17:2,17 18:13

22:7 24:2
understanding
    11:22
understood  10:21
    23:16
undisputed  5:2
    6:5 7:24
undue  8:1 9:12,16
    11:15,21
united  1:1 2:1

**v**

vacated  17:23,25
    18:2,6
vargas  1:4 2:4 3:3
versus  12:11
videoconference
    1:15 2:19 4:3
view  11:17
views  13:14
violation  4:14
visited  7:12
vs  1:7 2:7

**w**

walk  16:4
want  7:18 14:2,10
    20:8,16 25:6
    26:12
wanted  5:2 20:12
way  6:20 8:15
    10:19,22,22 11:2
    14:15 15:3,16
    18:20,21 21:10,18
    22:12 24:17
ways  15:6,7,8 23:4
we've  11:6 24:17
week  26:8,9,10,18
    27:7
west  1:4 2:4 3:3,7
westlaw  7:1,1
    12:11

whatsoever  8:10
    8:23
whereof  28:19
wide  10:15,18
    11:12
witness  9:14 28:19
witnesses  9:13
    28:6
word  21:2
works  10:13
worthwhile  19:23
wrong  15:4,4

**y**

yeah  4:12 5:25
    10:5 14:12 18:11
    23:8 24:25

Veritext Legal Solutions
866 299-5127

# EXHIBIT 27

PA0375

1   OGLETREE, DEAKINS, NASH,
    SMOAK & STEWART, P.C.
2   DAVID RAIZMAN, CA Bar No. 129407
    david.raizman@ogletree.com
3   AMBER L. ROLLER, CA Bar No. 273354
    amber.roller@ogletree.com
4   J. NICHOLAS MARFORI, CA Bar No. 311765
    nicholas.marfori@ogletree.com
5   400 South Hope Street, Suite 1200
    Los Angeles, California 90071
6   Telephone: 213-239-9800
    Facsimile: 213-239-9045
7
    Attorneys for Defendants
8   QUEST DIAGNOSTICS CLINICAL
    LABORATORIES, INC., QUEST
9   DIAGNOSTICS HOLDINGS, INC., and
    QUEST DIAGNOSTICS INCORPORATED
10

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13   JULIAN VARGAS and ANNE WEST,      Case No. 2:19-cv-08108 DMG(MRWx)
     individually on behalf of themselves
14   and all others similarly situated,   **DEFENDANTS' INITIAL
                                           DISCLOSURES PURSUANT TO
15              Plaintiffs,               FEDERAL RULE OF CIVIL
                                          PROCEDURE 26(a)(1)**
16        v.

17   QUEST DIAGNOSTICS CLINICAL
18   LABORATORIES, INC., QUEST         Complaint Filed: September 18, 2019
     DIAGNOSTICS HOLDINGS, INC.,        Removal Filed:   Date
19   QUEST DIAGNOSTICS               Trial Date:      None
     INCORPORATED; and DOES 1-10,       District Judge:  Hon. Dolly M. Gee
20   inclusive,                                          Courtroom 8C, First St.
                                        Magistrate Judge: Hon. Michael R. Wilner
21              Defendants.                                Courtroom 550, Roybal

22

23

24

25

26

27

28
                                        Case No. 2:19-cv-08108 DMG(MRWx)

Pursuant to Federal Rule of Civil Procedure 26(a)(1), defendants Quest Diagnostics Clinical Laboratories, Inc., Quest Diagnostics Holdings, Inc., and Quest Diagnostics Incorporated (collectively, "Defendants") submit these Initial Disclosures.

## **PRELIMINARY STATEMENT**

Defendants have not fully completed discovery or preparation of their case. Therefore, the information provided below is given without prejudice to Defendants' right to rely on additional witnesses, evidence or documents, or to alter, amend or modify their initial disclosures.  Defendants reserve the right to offer into evidence in the proceedings before this Court or at trial, documents not currently identified in this disclosure but which, after further discovery, may be deemed relevant. Defendants further reserve the right to call witnesses to provide testimony in any proceedings before this Court or at trial who are not currently identified in this disclosure if, after further discovery, testimony from such witnesses may be necessary.  Documents covered by proprietary, confidential, trade secret or privacy interests will be produced only subject to a protective order.

Defendants make these initial disclosures subject to and without waiving: (1) any objections regarding prior and/or further discovery of the matters identified in this litigation; and (2) any objections to the admissibility of these matters in support of any motion by plaintiff or at trial or with respect to any other evidentiary proceeding, including but not limited to, the attorney-client privilege, the work product doctrine, and/or relevancy.

## **INITIAL DISCLOSURES**

**I.** **Rule 26(a)(1)(A)(i)**

Defendants believe that these individuals may have discoverable information:

### **1.** **Julian Vargas**

Plaintiff Julian Vargas has general knowledge of the issues in this action, including, without limitation, as reflected in his deposition testimony in this action.

1

Mr. Vargas also has knowledge of his alleged June 2021 visit to a Quest Diagnostics patient service center ("PSC").

### 2. **Anne West**

Plaintiff Anne West has general knowledge of the issues in this action, including without limitation, about her alleged disability and the resulting limitations, auxiliary aids and services used and/or needed by her, and the circumstances surrounding her alleged inability to fully and equally access the services offered at the PSCs located at 365 Queen Street, Unit C, Southington, Connecticut (the "Southington PSC") and 183 North Mountain Road, New Britain, Connecticut (the "New Britain PSC"). Ms. West will also have information regarding the identification of other witnesses and her damages.

### 3. **Donna Grahmann**

Donna Grahmann has general knowledge of the issues in this action, including, without limitation, as reflected in her deposition testimony in this action.

### 4. **Ralph Black**

Ralph Black has general knowledge of the issues in this action, including, without limitation, as reflected in his deposition testimony in this action.

### 5. **Ardis Bazyn**

Ardis Bazyn has general knowledge of the issues in this action, including, without limitation, as reflected in her deposition testimony in this action.

### 6. **Regina Brink**

Regina Brink has general knowledge of the issues in this action, including, without limitation, as reflected in her deposition testimony in this action.

### 7. **Mary Haroyan**

Mary Haroyan has general knowledge of the issues in this action, including, without limitation, as reflected in her deposition testimony in this action.

### 8. **Nona Haroyan**

Nona Haroyan has general knowledge of the issues in this action, including,

2

without limitation, as reflected in her deposition testimony in this action.

### 9.   Kathy Lyons

Kathy Lyons has general knowledge of the issues in this action, including, without limitation, as reflected in her deposition testimony in this action.

### 10.   Clark Rachfal

Clark Rachfal has general knowledge of the issues in this action, including, without limitation, as reflected in his deposition testimony in this action.  Without limitation, on information and belief, Rachfal has knowledge of ACB's decision to investigate the experiences of certain individuals with disabilities of the PSCs, various pre-litigation meetings and communications between representatives of ACB and Quest, ACB's decision to sue Quest, Quest's three-finger swipe proposal and ACB's approval of the three-finger swipe proposal, and related matters.

### 11.   Claire Stanley

Claire Stanley was an employee of American Council of the Blind ("ACB") and has knowledge of the alleged experiences of certain individuals with visual impairments at the PSCs (including her own), ACB's decision to investigate the experiences of certain individuals with disabilities of the PSCs, various pre-litigation meetings and communications between representatives of ACB and Quest and related matters.  Defendants are unaware of Ms. Stanley's address or contact information and none has been provided by Plaintiffs despite multiple requests for that information.

### 12.   Eric Bridges

Eric Bridges is the Executive Director of plaintiff American Council of the Blind ("ACB") and has knowledge of ACB's decision to investigate the experiences of certain individuals with disabilities of the PSCs, various pre-litigation meetings and communications between representatives of ACB and Quest, ACB's decision to sue Quest, Quest's three-finger swipe proposal and ACB's approval of the three-

3

DEFENDANTS' INITIAL DISCLOSURES PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(A)(1)

PA0379

finger swipe proposal, and related matters.

### 13. <u>Prudencia Magana</u>

Prudencia Magana has general knowledge of the policies and practices of the PSC that Mr. Vargas visited in June 2019 and the auxiliary aids and services provided to patients with disabilities. Ms. Magana may be contacted solely through Defendants' counsel of record in this action.

### 14. <u>Christopher Grant</u>

Christopher Grant served as the Executive Director, National Patient Services for Quest Diagnostics during the period of his co-sponsoring the Kiosk project and its implementation, and has knowledge regarding his co-sponsorship and the implementation of the Kiosk rollout. Mr. Grant also has knowledge of: discussions with representatives of the American Council of the Blind that are recorded and reflected in documents produced by Plaintiffs in this action; the decision he made to approve the implementation of the three-finger swipe and the largely privileged process giving rise to that approval; the matters reflected in his extensive deposition testimony in this action. Mr. Grant may be contacted solely through Defendants' counsel of record in this action.

### 15. <u>Taylor Carr</u>

Taylor Carr served as a Director in Business Process Redesign during a portion of the time that the Kiosks were proposed, approved, rolled out and iterated and has general knowledge of all of those matters. Mr. Carr also has general knowledge of the largely privileged process by which the three-finger swipe was considered and approved (including the unprivileged meetings with various persons with visual impairments that are reflected in documents produced by Quest in the action) and of the matters about which he gave extensive testimony at his deposition. Mr. Carr may be contacted solely through Defendants' counsel of record in this action.

DEFENDANTS' INITIAL DISCLOSURES PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(A)(1)

### 16.   Max Ocampo

Max Ocampo, who serves as the Senior Program Manager for Quest Diagnostics in National Patient Services, has general knowledge regarding the rollout, functionality, maintenance and management of the Kiosks used in all PSC locations during the relevant period and of the matters about which he testified at length at his deposition in this action.  Mr. Ocampo may be contacted solely through Defendants' counsel of record in this action.

### 17.   Marc Yarrison

Marc Yarrison, who serves as a Director, National Patient Services, Technology, and Support for Quest Diagnostics, has general knowledge regarding the rollout, functionality, maintenance and management of the Kiosks used in all PSC locations during the relevant period and of the matters about which he testified at length at his deposition in this action.  Mr. Yarrison may be contacted solely through Defendants' counsel of record in this action.

### 18.   Jody Reilly

Jody Reilly, who serves as a Director of National Patient Services, Medical and Quality, Technical Excellence for Quest Diagnostics, has general knowledge of: the policies and procedures and training in effect at the PSCs that are relevant to the issues concerning patients who are blind or have visual impairments; the various methods by which patients provide feedback or complaints to Quest about their experiences at the PSCs; and the matters about which she testified at length at her deposition.  Ms. Reilly may be contacted solely through Defendants' counsel of record in this action.

### 19.   Expert Witnesses

Defendants anticipate the potential need to designate an accessibility expert pursuant to the Federal Rules of Civil Procedure.  Defendants reserve the right to designate additional experts on the ground that investigation and discovery are ongoing.  Defendants anticipate that they will also designate experts to rebut the

QUEST.Vargas
Defendants' Initial

testimony offered by Plaintiffs' designated experts.

**II.**     **Rule 26(a)(1)(a)(ii)**

Without waiving their right to supplement this list, Defendants provide a list of non-privileged documents or things within their possession, custody or control they may rely upon to support their defenses.  Although the nature of the documents or things is described below, Defendants do not concede that all documents or things within the described category are discoverable, relevant and/or admissible.

Defendants identify the following category of non-privileged documents or things without waiver of any position they assert (including those set forth in their Answer to Plaintiffs' Complaint, in discovery responses, in memoranda filed with the Court, and elsewhere) and without waiver of any objections (including but not limited to privilege):

1.     The Kiosks rolled out as part of the 2016 Kiosk project and now in use at the PSCs;

2.     Relevant, non-privileged documents related to the date of Defendants' deployment of Kiosks as part of the 2016 Kiosk project;

3.     Relevant, non-privileged documents showing the date of Defendants' deployment of the three-finger swipe solution and the associated training and Quest TV segment;

4.     Documents reflecting the business justification for the original 2016 deployment of the Kiosks and the cost of doing so;

5.     Capital Expenditure Request for the 2016 Kiosk project;

6.     "Greet Patient Etiquette" Policy;

7.     "Managing Every Patients Needs" Training;

8.     Various other training documents, policies, procedures and guidelines produced in this action;

9.     Quest TV Segment;

10.    Documents evidencing the cost and/or difficulty of replacing or

6                      Case No. 2:19-cv-08108 DMG(MRWx)

modifying the Kiosks at all PSCs; and

11.    Records evidencing the visit of Mr. Vargas to a Quest PSC in June 2019.

12.    Records produced in the action reflecting patient satisfaction with the Kiosks.

13.    Records produced by Plaintiffs and Defendants in the action reflecting patient satisfaction with the "auxiliary aids and services" provided by Quest PSC employees in assisting patients to check in at the PSCs.

14.    Any one or more of the thousands of documents produced by Defendants in the action.

## III.    Rule 26(a)(1)(A)(iii)

This rule is not applicable to Defendants, who claim no damages in this action. Defendants also contend that Plaintiffs have not been damaged by Defendants' actions or omissions.

## IV.    Rule 26(a)(1)(A)(iv)

Defendants have not identified any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in this action or to indemnify or reimburse for payments made to satisfy the judgment.


DATED: July 12, 2021                          OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.



By: _____
         David Raizman
         Amber L. Roller
         J. Nicholas Marfori

Attorneys for Defendants
QUEST DIAGNOSTICS CLINICAL
LABORATORIES, INC., QUEST
DIAGNOSTICS HOLDINGS, INC., and
QUEST DIAGNOSTICS INCORPORATED

QUEST.Vargas
Defendants' Initial

PA0383

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8

DEFENDANTS' INITIAL DISCLOSURES PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(A)(1)

QUEST.Vargas
Defendants' Initial