Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com
Alison M. Bernal (SBN 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Telephone: (805) 963-2345

Benjamin J. Sweet
(*Admitted Pro Hac Vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

*Attorneys for Plaintiffs Julian Vargas,*
*American Council of the Blind, and the Certified Class*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

JULIAN VARGAS, ANNE WEST, and
AMERICAN COUNCIL OF THE
BLIND, individually on behalf of
themselves and all others similarly
situated,

Plaintiffs,

v.

QUEST DIAGNOSTICS CLINICAL
LABORATORIES, INC., QUEST
DIAGNOSTICS HOLDINGS, INC.,
QUEST DIAGNOSTICS
INCORPORATED; and DOES 1-10,
inclusive,

Defendants.

Case No.: 2:19-cv-08108-DMG

**DECLARATION OF ALISON M.
BERNAL IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO
DEFENDANTS' *EX PARTE*
APPLICATION TO AMEND
SCHEDULING ORDER**

*{Filed Concurrently with Plaintiffs'*
*Opposition to Defendants' Ex Parte*
*Application to Amend Scheduling*
*Order}*

Complaint Filed: September 18, 2019
Discovery Cutoff: August 27, 2021
Pretrial Conf: October 4, 2022
Trial Date: November 1, 2022
District Judge: Hon. Dolly M. Gee
Magistrate: Hon. Michael M. Wilner

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1

## DECLARATION OF ALISON M. BERNAL

I, ALISON M. BERNAL, declare as follows:

1.      I am an attorney at law duly qualified to practice before the Courts of the State of California and before this Court and am a Partner of the firm Nye, Stirling, Hale & Miller, LLP, attorneys for Plaintiffs Julian Vargas, American Council of the Blind, and the Certified Class in the above captioned matter. The facts stated herein are stated of my own personal knowledge and, if called and sworn as a witness, I could and would testify competently thereto. This declaration is made in support of Plaintiffs' opposition to Defendants' *ex parte* application to amend the scheduling order.

2.      On April 18, 2022, my office sent Defendants' counsel a request for a Local Rule 7-3 meet and confer conference on Plaintiffs' anticipated motion for summary judgment. A true copy of the letter and email is attached as **Exhibit A.**

3.      I did not receive a response from defense counsel initially, so on April 20, 2022, at 3:58 p.m., I emailed defense counsel with a follow up request for a meet and confer, proposing several available dates. A true copy of the email is attached as **Exhibit B.**

4.      On April 20, 2022, at 4:22 p.m., I received an email from defense counsel with a letter requesting a meet and confer on *Defendants*' "motion for leave to file a dispositive motion based on the class definition, and (b) dispositive motion." The letter does not reference an *ex parte*. A true copy of the letter and email is attached as **Exhibit C.**

5.      On April 21, 2022, my partner Benjamin Sweet emailed defense counsel requesting clarification on what Rule Defendants intended to bring their motion under. Defense counsel did not initially respond, so Mr. Sweet sent a follow up communication on April 22, 2022 (one business day before the scheduled meet and confer conference). Defense counsel responded on April 22, 2022, that they

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

intend to move under Rule 56. Again, there was no reference to an *ex parte*. A true copy of this email exchange is attached as **Exhibit D.**

6.      On April 25, 2022, the parties met and conferred on Plaintiffs' motion for summary judgment, as well as Defendants' purported noticed motion under Rule 56. There was a court reporter present. A true copy of the transcript is attached as **Exhibit E**. During this conference, Defendants stated they now intended to move under Rule 16, again via a noticed motion, for leave to file a second summary judgment motion. Defendants did not reference an *ex parte* application.

7.      On May 4, 5, and 6, I exchanged correspondence with defense counsel relating to the hearing date on Plaintiffs' motion for summary judgment. Plaintiffs initially intended to set the hearing for June 3, 2022, due to scheduling conflicts. In response to this, defense counsel stated they would file an *ex parte* to move the hearing date to June 17, 2022. To avoid burdening the Court with unnecessary motions, Plaintiffs rearranged their calendars to accommodate Defendants' requested hearing date. A true copy of this email exchange is attached as **Exhibit F.**

8.      The correspondence relating to the hearing date is the *only* reference to an *ex parte* application in the three weeks between notice of Plaintiffs' intended motion for summary judgment and the filing of the motion.

9.      On May 6, 2022, at 5:49 p.m., my office learned for the first time that Defendants are seeking *ex parte* relief, rather than a noticed Rule 16 motion, when Defendants file their *ex parte* application. Thus, Defendants filed their motion on a Friday evening, necessitating a response on the Saturday of Mother's Day weekend, without any prior notice.

10.      Prior to Defendants filing their *ex parte* application, and through the time of writing this Declaration, Defendants did not provide *ex parte* notice, did not advice our office of the 24 hours in which to respond, and did not otherwise comply with the Local Rules governing *ex parte* applications.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

3

DECLARATION OF ALISON M. BERNAL

11.    The parties also met and conferred months ago on prior motions that are relevant to Defendants' instant request for relief. Specifically, on August 26, 2021, the parties met and conferred telephonically, with a court reporter present, regarding Defendants' first motion for summary judgment and Plaintiffs' motion for class certification. A true copy of the transcript from that meet and confer session is attached as **Exhibit G.**

12.    Additionally, the transcripts from prior hearings are relevant to the requested relief Defendants seek, as they demonstrate Defendants have raised the same arguments multiple times in the past. I am attaching true copies of the transcript from the October 8, 2021, hearing on Defendants' motion for summary judgment as **Exhibit H**, and a true copy of the transcript of the December 7, 2021, hearing on the pretrial conference as **Exhibit I.**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Signed this 7th day of May, 2022, in Santa Barbara, California.

_/s/ Alison M. Bernal_
ALISON M. BERNAL, Declarant

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

4

DECLARATION OF ALISON M. BERNAL

# EXHIBIT A

**From:** Chloe Lucado <chloe@nshmlaw.com>
**Sent:** Monday, April 18, 2022 4:03 PM
**To:** Raizman, David <david.raizman@ogletree.com>; Roller, Amber L. <Amber.Roller@ogletreedeakins.com>
**Cc:** Jonathan Miller <jonathan@nshmlaw.com>; Benjamin Sweet <ben@nshmlaw.com>; Jordan Porter <jordan@nshmlaw.com>; Alison Bernal <alison@nshmlaw.com>; Matthew Handley <mhandley@hfajustice.com>; Lindsey LeBlanc <lindsey@nshmlaw.com>
**Subject:** Vargas, et al. v. Quest, et al.

Dear Counsel:

Please see the attached meet and confer letter.

Kind regards,

**Chloe Lucado** | Legal Assistant | Nye, Stirling, Hale & Miller, LLP
33 West Mission Street, Suite 201 | Santa Barbara, CA 93101
T: 805.963.2345 | F: 805.284.9590  W:  www.nshmlaw.com

CONFIDENTIALITY NOTICE:  This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential information that is legally privileged.  If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED.  If you have received this transmission in error, please notify the sender immediately.  Please destroy the original transmission and its attachments, if any, without reading or saving in any manner.  Thank you.



ALISON M. BERNAL
Partner
T (805) 963-2345
F (805) 284-9590
E alison@nshmlaw.com

April 18, 2022

**VIA E-MAIL**

David Raizman, Esquire
david.raizman@ogletree.com
Amber Roller, Esquire
amber.roller@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, California 90071

       Re:    *Vargas et al. v. Quest, et al.*

Dear David and Amber,

    We write pursuant to Local Rule 7-3 to meet and confer on Plaintiffs' and the certified Class's anticipated motion for summary judgment. Specifically, Plaintiffs and the certified Class anticipate moving for summary adjudication of at least the following issues: (1) that there is no dispute of material fact that the Americans with Disabilities Act ("ADA") requires Quest to provide legally blind patients with effective communication; (2) that there is no dispute of material fact that Quest has not provided effective communication to Plaintiffs and the certified Class members; (3) that there is no dispute of material fact that Quest did not provide certified Class Representative Julian Vargas effective communication; (4) that there is no dispute of material fact that Quest violated the ADA because it did not provide effective communication to Plaintiffs and the certified Class members; (5) that there is no dispute of material fact that Quest's Three-Finger-Swipe does not moot the ADA violation; (6) that there is no dispute of material fact that a violation of the ADA is a violation of California's Unruh Act, and (7) that there is no dispute of material fact that Quest violated the Unruh Act by failing to provide certified Class Representative Julian Vargas effective communication.

    In their Motion, Plaintiffs and the certified Class anticipate citing to the evidence before the Court via the pretrial conference report, and arguing that the evidence is undisputed that Quest has failed to provide certified national Class members and members of ACB with effective communication. Plaintiffs and the certified Class further anticipate arguing that the record

evidence already before the Court establishes conclusively that Quest's three-finger swipe ("TFS") feature cannot legally moot its claims, as Quest has presented no record evidence that TFS was uniformly rolled out or that it addressed each of the demonstrated failures in the multi-step "complex, interactive" effective communication process.

It should be noted the arguments set forth above are not an exhaustive list of all points Plaintiffs and the certified Class may raise in their motion for summary judgment. Rather, they are an outline of the arguments Plaintiffs and the certified Class reasonably anticipate advancing based on an initial review of the record. Plaintiff and the certified Class reserve their right to add or augment additional arguments as appropriate.

We look forward to discussing Plaintiffs' anticipated Rule 56 motion with you in more detail. To that end, please let us know your availability over the next week for a telephonic or Zoom meet and confer conference.

Very truly yours,

NYE, STIRLING, HALE & MILLER, LLP

ALISON M. BERNAL

# EXHIBIT B

**From:** Alison Bernal
**Sent:** Wednesday, April 20, 2022 3:58 PM
**To:** Raizman, David <david.raizman@ogletree.com>; Roller, Amber L. <Amber.Roller@ogletreedeakins.com>
**Cc:** Lindsey LeBlanc <lindsey@nshmlaw.com>; Jonathan Miller <jonathan@nshmlaw.com>; Benjamin Sweet <ben@nshmlaw.com>; Jordan Porter <jordan@nshmlaw.com>; mhandley@hfajustice.com; Meg Parker <meg@nshmlaw.com>; Callum Appleby <Callum@nshmlaw.com>
**Subject:** RE: Vargas, et al. v. Quest, et al.

David,

I wanted to follow up on the our request for a Local Rule 7-3 meet and confer conference. We propose we meet telephonically with a court reporter present on one of the following dates and times. Please let us know which time works for you, and we will send around a calendar invitation:

Friday, April 22, 2022, at 11:00 a.m.
Monday, April 25, 2022, at 11:00 a.m.
Tuesday, April 26, 2022, at 9:00 a.m.
Wednesday, April 27, 2022, at 10:00 a.m.

It will take some time to schedule the court reporter, so please let us know your availability soon.

**From:** Chloe Lucado <chloe@nshmlaw.com>
**Date:** Monday, April 18, 2022 at 7:02 PM
**To:** "Raizman, David" <david.raizman@ogletree.com>, "Roller, Amber L." <Amber.Roller@ogletreedeakins.com>
**Cc:** Jonathan Miller <jonathan@nshmlaw.com>, "Benjamin J. Sweet" <ben@nshmlaw.com>, Jordan Porter <jordan@nshmlaw.com>, Alison Bernal <alison@nshmlaw.com>, Matthew Handley <mhandley@hfajustice.com>, Lindsey LeBlanc <lindsey@nshmlaw.com>
**Subject:** Vargas, et al. v. Quest, et al.

Dear Counsel:

Please see the attached meet and confer letter.

# EXHIBIT C

**From:** Moretti, Marilyn J. <marilyn.moretti@ogletree.com>

**Sent:** Wednesday, April 20, 2022 4:22 PM

**To:** Jonathan Miller <jonathan@nshmlaw.com>; Alison Bernal <alison@nshmlaw.com>; Benjamin Sweet <ben@nshmlaw.com>

**Cc:** mhandley@hfajustice.com; Raizman, David <david.raizman@ogletreedeakins.com>; Roller, Amber L. <Amber.Roller@ogletreedeakins.com>; Marfori, Nicholas <nicholas.marfori@ogletreedeakins.com>

**Subject:** Vargas, Anne West, et al. v. Quest Diagnostics Clinical Laboratories, et al.

Counsel,

Please see the attached letter on sent on behalf of David Raizman regarding the above-entitled action.

Thank you.

**Marilyn J. Moretti, LTC4 Technology Certified | Practice Assistant | Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
400 South Hope Street, Suite 1200 | Los Angeles, CA 90071 | Telephone: 213-457-0475
marilyn.moretti@ogletree.com | www.ogletree.com

*This transmission is intended only for the proper recipient(s). It is confidential and may contain attorney-client privileged information. If you are not the proper recipient, please notify the sender immediately and delete this message. Any unauthorized review, copying, or use of this message is prohibited.*



**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**

*Attorneys at Law*

400 South Hope Street, Suite 1200
Los Angeles, California 90071
Telephone:  213-239-9800
Facsimile:  213-239-9045
www.ogletree.com

David Raizman
213-438-1285
David.raizman@ogletree.com

April 20, 2022

**BY ELECTRONIC MAIL AND U.S MAIL**

Jonathan D. Miller, Esq.
Alison Bernal, Esq.
Benjamin Sweet, Esq.
NYE, STIRLING, HALE & MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, California  93101
*jonathan@nshmlaw.com*
*alison@nshmlaw.com*
*ben@nshmlaw.com*

RE:   *Julian Vargas, Anne West, American Council of the Blind, et al. v. Quest Diagnostics Clinical Laboratories, Inc., et al.*
       USDC, Central District of California, Case No. 2:19-cv-08108-DMG-MRW

Dear Counsel:

   We write, in part, to address your request for a meet and confer session pursuant to Local Rule 7-3 for your prospective motion for summary judgment and, in part, to request that plaintiffs meet and confer pursuant to Local Rule 7-3 on the Quest defendants' (a) motion for leave to file a dispositive motion based on the class definition, and (b)  dispositive motion and/or cross-motion based upon the class definition.

   The basis for Quest's motion is familiar to the Court and the parties and was framed by the Court first in its definition of the class (Docket No. 190 at 4-5) and revisited again at the Pre-Trial Conference during argument on the Quest defendants' Motion *In Limine* No. 5.  ("MIL No. 5" -- Docket No. 169.)  Essentially, the motion will argue that the class claims should be dismissed because the class is defined as those individuals denied access to the Patient Service Centers "*because of Quest's failure to make its e-check-in self-service kiosks [the "Kiosks"] independently accessible,*" and because there is, as a matter of law, no requirement that the Kiosks be independently accessible. (Docket No. 190 at 4 (original emphasis).)

   The attendant motion for leave will be based on, among other things, the Court's expressed interest in further considering the matters raised through MIL No. 5 and the importance of resolving,

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Greenville ▪ Houston
Indianapolis ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis ▪ Montréal (Canada) ▪ Morristown
Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland, ME ▪ Portland, OR ▪ Raleigh ▪ Richmond
St. Louis ▪ St. Thomas ▪ Sacramento ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Tucson ▪ Washington

Counsel
April 20, 2022
Page 2

or at least clarifying the Court's view on, this issue before the Court and the parties engage in extended proof at trial that may be irrelevant and/or unncessary.

We can make ourselves available to meet to discuss both sets of motions in the afternoon on Friday, April 22.  Please advise as to your availability that day or if we need to look at further available dates and times to meet.

Sincerely,

*David Raizman*

David Raizman

cc:    Matthew K. Handley, Esq.

# EXHIBIT D

**From:** "Raizman, David" <david.raizman@ogletree.com>
**Date:** April 22, 2022 at 3:47:49 PM EDT
**To:** Benjamin Sweet <ben@nshmlaw.com>
**Subject: RE: Vargas, Anne West, et al. v. Quest Diagnostics Clinical Laboratories, et al. [ODNSS-OGL.018770.000085]**

Rule 56.

**David Raizman | Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
400 South Hope Street, Suite 1200 | Los Angeles, CA 90071 | Telephone: 213-438-1285
david.raizman@ogletree.com | www.ogletree.com | Bio

---

**From:** Benjamin Sweet <ben@nshmlaw.com>
**Sent:** Friday, April 22, 2022 12:39 PM
**To:** Raizman, David <david.raizman@ogletreedeakins.com>
**Cc:** Jonathan Miller <jonathan@nshmlaw.com>; Alison Bernal <alison@nshmlaw.com>
**Subject:** Re: Vargas, Anne West, et al. v. Quest Diagnostics Clinical Laboratories, et al.

*[Caution: Email received from external source]*

---

1

David,

You have not responded to my email of yesterday.  I would appreciate an answer to my question by the close of business today so that we can effectively prepare for Monday's meet and confer on your proposed dispositive motion.

Best regards,
-Benjamin Sweet

**Benjamin J. Sweet**  | Partner| Nye, Stirling, Hale & Miller, LLP
1145 Bower Hill Road, Suite 104, Pittsburgh, Pennsylvania 15243
T: 412.857.5352|
E: ben@nshmlaw.com |W: www.nshmlaw.com

---

**From:** "Benjamin J. Sweet" <ben@nshmlaw.com>
**Date:** Thursday, April 21, 2022 at 12:43 PM
**To:** "Moretti, Marilyn J." <marilyn.moretti@ogletree.com>, Jonathan Miller <jonathan@nshmlaw.com>, Alison Bernal <alison@nshmlaw.com>
**Cc:** "mhandley@hfajustice.com" <mhandley@hfajustice.com>, David Raizman <david.raizman@ogletreedeakins.com>, "Roller, Amber L." <Amber.Roller@ogletreedeakins.com>, "Marfori, Nicholas" <nicholas.marfori@ogletreedeakins.com>
**Subject:** Re: Vargas, Anne West, et al. v. Quest Diagnostics Clinical Laboratories, et al.

David,

Please provide Plaintiffs with the Federal Rule of Civil Procedure under which you will be seeking to make your "dispositive" motion.

Thanks,
-Benjamin Sweet

**Benjamin J. Sweet**  | Partner| Nye, Stirling, Hale & Miller, LLP
1145 Bower Hill Road, Suite 104, Pittsburgh, Pennsylvania 15243
T: 412.857.5352|
E: ben@nshmlaw.com |W: www.nshmlaw.com

---

**From:** "Moretti, Marilyn J." <marilyn.moretti@ogletree.com>
**Date:** Wednesday, April 20, 2022 at 7:22 PM
**To:** Jonathan Miller <jonathan@nshmlaw.com>, Alison Bernal <alison@nshmlaw.com>, "Benjamin J. Sweet" <ben@nshmlaw.com>
**Cc:** "mhandley@hfajustice.com" <mhandley@hfajustice.com>, David Raizman <david.raizman@ogletreedeakins.com>, "Roller, Amber L."

<Amber.Roller@ogletreedeakins.com>, "Marfori, Nicholas"
<nicholas.marfori@ogletreedeakins.com>
**Subject:** Vargas, Anne West, et al. v. Quest Diagnostics Clinical Laboratories, et al.

Counsel,
Please see the attached letter on sent on behalf of David Raizman regarding the above-entitled action.

Thank you.


**Marilyn J. Moretti, LTC4 Technology Certified | Practice Assistant | Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
400 South Hope Street, Suite 1200 | Los Angeles, CA 90071 | Telephone: 213-457-0475
marilyn.moretti@ogletree.com | www.ogletree.com


*This transmission is intended only for the proper recipient(s). It is confidential and may contain attorney-client privileged information. If you are not the proper recipient, please notify the sender immediately and delete this message. Any unauthorized review, copying, or use of this message is prohibited.*

*This transmission is intended only for the proper recipient(s). It is confidential and may contain attorney-client privileged information. If you are not the proper recipient, please notify the sender immediately and delete this message. Any unauthorized review, copying, or use of this message is prohibited.*

# EXHIBIT E

1              UNITED STATES DISTRICT COURT

2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

3    _____

4    JULIAN VARGAS, ANNE WEST and  )

     AMERICAN COUNCIL OF THE       )

5    BLIND, individually and on    )

     behalf of themselves and all  )

6    others similarly situated,    )

                                   )

7           Plaintiff,             )

        vs.                        ) Case No. 2:19-cv-8108

8                                  )

     QUEST DIAGNOSTICS CLINICAL    )

9    LABORATORIES, INC., et al.,   )

                                   )

10          Defendants.            )

     _____)

11

12

13

14

15            REPORTER'S VIDEOCONFERENCE

16            TRANSCRIPT OF PROCEEDINGS

17                 MEET AND CONFER

18              Monday, April 25, 2022

19

20

21   Reported by:

     JOANNA BROADWELL

22   CSR No. 10959

23   Job No. 5203809

24

25   PAGES 1 - 28

                                              Page 1

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3    _____

 4    JULIAN VARGAS, ANNE WEST and )
      AMERICAN COUNCIL OF THE      )
 5    BLIND, individually and on   )
      behalf of themselves and all )
 6    others similarly situated,   )
                                   )
 7             Plaintiff,          )
          vs.                      ) Case No. 2:19-cv-8108
 8                                 )
      QUEST DIAGNOSTICS CLINICAL   )
 9    LABORATORIES, INC., et al.,  )
                                   )
10             Defendants.         )
      _____)

11

12

13

14

15

16

17

18

19             Reporter's Videoconference Transcript of

20    Proceedings taken remotely at 11:02 a.m. and ending at

21    11:39 a.m. on Monday, April 25, 2022, before JOANNA

22    BROADWELL, Certified Shorthand Reporter No. 10959.

23

24

25

                                              Page  2
```

```
 1                       APPEARANCES

 2   For the Plaintiffs American Council of the Blind, Julian

 3   Vargas, Anne West, and the Proposed Class:

 4   NYE STIRLING HALE & MILLER LLP

 5   Alison Bernal, Esq.

 6   Benjamin Sweet, Esq.

 7   33 West Mission Street, Suite 201

 8   Santa Barbara, CA 93101

 9   (805) 963-2345

10   alison@nshmlaw.com

11

12   For the Defendants Quest Diagnostics:

13   OGLETREE DEAKINS NASH SMOAK & STEWART PC

14   David Raizman, Esq.

15   400 S Hope St, Suite 1200

16   Los Angeles, CA 90071

17   (213) 239-9800

18   david.raizman@ogletree.com

19

20

21

22

23

24

25
```

Page  3

```
 1                    Monday, April 25, 2022

 2                       11:02 a.m.

 3     REPORTER'S VIDEOCONFERENCE TRANSCRIPT OF PROCEEDINGS

 4          MS. BERNAL:  So for the benefit of the court

 5     reporter this is a meet and confer conference pursuant

 6     to Local Rule 7-3.  We're going to start with the meet

 7     and confer on Plaintiff's anticipated motion for summary

 8     judgment for Rule 56.

 9          And David, if it is okay with you I will just get

10     started on the anticipated issues that Plaintiff would

11     raise in the Rule 56 motion.  Is that okay?

12          MR. RAIZMAN:  Yeah.

13          MS. BERNAL:  Okay.  So I think what we would look

14     at as we look at whether there has been a violation of

15     the EPA for the ADRA Act are the three elements the

16     Court has identified already, number one, whether a

17     certified class representative has a qualified

18     disability, number two, whether Quest Diagnostics owns,

19     leases or operates a place of public accommodation, and,

20     number three, whether Quest has failed to provide the

21     certified class effective communication during the

22     certified class period.

23          So I think on this meet and confer call, David,

24     would you agree that it's already been determined that

25     the certified class representative has a qualified
```

Page  4

```
 1    disability?  I believe Quest has already answered
 2    undisputed to that fact, but I just wanted to confirm
 3    with you.
 4         MR. RAIZMAN:  Yes.  I believe that is our
 5    position.
 6         MS. BERNAL:  Okay.  And then for the second
 7    element, whether Quest owns, leases or operates a place
 8    of public accommodation, I believe that has also been
 9    already jointly agreed.  Do you agree?
10         MR. RAIZMAN:  No.  I think we set out our
11    position in the pretrial conference on this point.  It's
12    a little more complicated than that.  But I don't think
13    that this is an issue that we're going to effectively
14    dispute.  It's just that none of the three defendants
15    operates or owns all of them.  They all sort of cover
16    different things or cover nothing at all.  I think one
17    of the defendants does not own or operate any of them.
18         MS. BERNAL:  Then can we address this in the
19    pretrial conference order with the agreed statement that
20    the portions of the PSCs that are open to the public and
21    relevant to this lawsuit are places of public
22    accommodation within the meeting of the ADA?  So would
23    you agree with that part of the statement?
24         MR. RAIZMAN:  Yes.  That is right.  It is a place
25    of public accommodation, yeah.
```

```
 1          MS. BERNAL:  So then I think really the dispute,

 2   for purposes of this motion, would be whether Quest

 3   failed to provide the certified class effective

 4   communication during the certified class period.  And so

 5   Plaintiffs' argument would be that the undisputed record

 6   evidence establishes that there was a denial of

 7   effective communication.

 8          So what we would point to for that period --

 9   again, we're looking at the certified class period, so

10   January 1st, 2018 through the end of 2019.  And so first

11   we would look at what this Court has already noted.

12   This is in Docket 144, Page 10, Lines 26 to 27 where the

13   Court noted Quest appeared to concede that its kiosks,

14   as originally developed, did not provide effective

15   communication with blind individuals.  So the first

16   argument would then be that the kiosks, as they were

17   during the class period, did not provide effective

18   communication.

19          And so then I think we would look at whether

20   there was any other way that Quest was effectively

21   communicating with the blind individuals during the

22   class period.  And so for that, Quest's prior argument

23   that it was the original iteration, there was

24   phlebotomist assistance that has already been determined

25   by the Court.  And this is, again, at Docket 144.  You
```

Page 6

1   will get the Westlaw cite which is 2021, Westlaw 5989961

2   at Page 6 where the Court noted that the major problem

3   with Quest's argument, the argument being there is

4   phlebotomist assistance, is that the original iteration

5   of the kiosk phlebotomist assistance does not appear to

6   have been readily available.

7          And that was, I think as the Court noted in that

8   same order later, that the design of the kiosk was to

9   increase efficiencies with having the phlebotomist in

10  the back.  So we would argue that based on this record

11  evidence that the national class that's been certified

12  who visited the Quest PSCs during the class period were

13  denied full and equal enjoyment of the services,

14  facilities, privileges, advantages or accommodations due

15  to Quest's failure to make each check-in self-service

16  kiosk independently accessible to legally blind

17  individuals denying them effective communication.

18          And I think one of the things we would want to

19  highlight is that we're not arguing that there is a

20  legal requirement on Quest that there be

21  independently-accessible kiosks but rather that Quest

22  must provide its legally blind customers with effective

23  communication.  And we believe the record facts are

24  undisputed, that that was denied during the class

25  period.  And then we recognize that Quest will raise two

Page 7

1   affirmative defenses, both mootness and undue

2   administrative burden.

3        So as to mootness, I think we point to the pretty

4   long line of Ninth Circuit and Supreme Court cases

5   looking at mootness and what the burden is on a

6   defendant who raises the mootness argument.  And I think

7   in particular we look at the prayer for relief and then

8   look at the law around mootness.

9        You would have to find that it is impossible for

10  courts to grant any effectual relief whatsoever to

11  prevailing parties.  And we believe that the record

12  evidence shows that that is not the case, that the

13  evidence in the record shows that there are still slight

14  controversies.

15       I think the first way to show that would be the

16  daily report, which is the only actual evidence as to

17  how the three-finger swipe is functioning in the PSCs.

18  And that record evidence establishes that the

19  three-finger swipe has not mooted the communication

20  issue, that there continues to be a denial of effective

21  communications for blind individuals whether that be by

22  not hearing an audio loop directing them to a kiosk or

23  not having any audio loop whatsoever, whether that be by

24  showing up at a kiosk and having that kiosk not have the

25  three-finger swipe implemented and whether that

```
 1    three-finger swipe is not including the functionality of
 2    the entire kiosk and how the kiosk communicates.  At
 3    best the three-finger swipe remedies some but not all of
 4    the issues, so that we do not believe moots the case as
 5    a matter of law.
 6         And when I say at best that would be if the
 7    three-finger swipe were functioning perfectly at all
 8    PSCs, which the record establishes that it is not.  So
 9    that is in a nutshell why we believe the case would not
10    be mooted by a three-finger swipe even if it was
11    functioning perfectly.
12         As to undue administrative burden, each of the 30
13    (b)(6)witnesses who were designated on these topics were
14    questioned about this, and not one witness could
15    articulate why making the e-check-in kiosk accessible
16    created an undue burden for Quest.  So I don't think --
17    I mean, you could argue it, but there won't be the
18    actual record evidence to support that argument.  So
19    that's why we believe Quest could not demonstrate the
20    significant difficulty or expense of making the kiosk
21    accessible.
22         So those are the arguments that the plaintiffs
23    would anticipate raising.  Ben, do you have anything to
24    add to those arguments?
25         MR. SWEET:  None.  I don't think so, not at this
```

1    time.

2         THE COURT:  Okay.  And Mr. Raizman, I anticipate

3    Quest will dispute some of those arguments, but I would

4    love to hear your points on them.

5         MR. RAIZMAN:  Yeah.  Well, starting with your

6    assertion that the only issue then is whether effective

7    communication was provided, I would disagree.  We're

8    agreeing on the place of public accommodation.  We're

9    not agreeing on the only operating point.

10        As to the effective communication, the only

11   record evidence you cited was the Court's observation,

12   which is I think incorrect and contrary to the record

13   evidence.  I don't think that works out.  I don't think

14   you have shown any evidence that would support a

15   class-wide finding of difficulties with providing

16   effective communication.  Your evidence is sporadic at

17   best and not sufficient to establish any broader

18   systemic practice to support a class-wide finding.

19        We also don't agree that the way the class has

20   been defined we believe is a key issue, and this spills

21   into our motion which I think is also well understood

22   here, that the way you define the class, the way the

23   Court has specifically certified the class, is by people

24   who fail to enjoy goods or services as a result of the

25   lack of an independently accessible device.  So that to

                                                    Page 10

1    us has to be the threshold question as opposed to the

2    way you framed the effective communication question.

3         As to the mootness argument, we disagree with

4    your -- well, you didn't provide any legal cites, but

5    the one you provided in the past I believe in the

6    motions in limine we've made our point as to why we

7    think those are inapplicable here.  We also don't think

8    the functionality that was added after the class period

9    is relevant to whether the claims in this case by the

10   class during the class period have been mooted.

11        We also don't think that you have assembled any

12   admissible evidence let alone class-wide admissible

13   evidence about your purported claims about the failure

14   of the three-finger swipe.

15        As to the undue administrative burden, I mean, I

16   would have to look at the specific questions that were

17   asked, and, you know, in my view it was a long time ago,

18   and we were talking about several depositions.  So I

19   don't know the specific testimony.  But to my

20   recollection these were all asked as legal questions,

21   what is the undue administrative burden.  They weren't

22   charged with understanding those kinds of questions.

23        And the administrative burden is quite obvious.

24   We had already ruled something out, and so the

25   administrative burden is to replace that with the

Page 11

```
1    device.  For example, the class has asked for the device
2    and capability that the class has asked for.  So that is
3    a summary of our response to what you laid out.
4         MS. BERNAL:  Perfect.  And I did not cite any of
5    the mootness cases.  Would you like me to cite a few for
6    you for the record?  They are similar to what's probably
7    been asserted in the motion in limine.
8         But in particular this is actually a case with
9    Judge Collins that I am not even going to say it, so I
10   will spell it for court reporter.  S-e-n-g-u-p-t-a
11   versus the City of Monrovia.  And that is 2010 Westlaw
12   11515299.  Again, that is a Central District case with
13   Judge Collins where it was a similar issue that was
14   dealing with a plaintiff who was deaf.  And it was the
15   denial of effective communication in an arrest setting.
16   And similarly the City of Monrovia argued that they had
17   mooted this because they had implemented new policies
18   related to ASL interpreters during an arrest.
19        And Judge Collins denied the mootness claim
20   arguing many things, number one, even if the policies
21   had some positive attributes they still had multiple
22   failings.  We would say that that is similar to the
23   three-finger swipe.  Even if there is some positive
24   attributes there are some multiple failings.
25        And then additionally even if the policy was ADA
```

Page 12

```
 1    compliant, so even if the three-finger swipe was ADA
 2    compliant in this case there is still training issues
 3    which have been identified and not remediated.
 4         Similarly, I think this really highlights how
 5    difficult the mootness burden is.  There has been this
 6    case in front of Judge Collins, similar to this where
 7    they adopted the new purported fix after the lawsuit was
 8    filed, suggesting it may have been an effort to moot the
 9    lawsuit not to demonstrate the City's genuine change of
10    heart, and that there was no evidence in the record that
11    the City would not simply revert to its prior policy
12    once the threat of litigation had diminished.
13         So that, I think, really goes to show how the
14    Central District in particular views mootness claims and
15    the difficult burden.  There is a few Ninth Circuit
16    cases, but I believe those are that's been cited in the
17    motion in limine.  Other than that I would say in
18    response to your arguments we disagree as to what the
19    record evidence would be and, as I said in our separate
20    statement.
21         Ben, do you have anything else to add?
22         MR. SWEET:  No.  I think that generally covers
23    it.
24         MS. BERNAL:  So I think that would be our
25    response to those arguments there.
```

Veritext Legal Solutions
866 299-5127

1              And, David, do you have anything else that you

2      want to add on the plaintiff's anticipated Rule 56

3      motion?

4              MR. RAIZMAN:  No, I don't.

5              MS. BERNAL:  Okay.  Can we agree that we

6      sufficiently met and conferred on Plaintiff's Rule 56

7      motion?

8              MR. RAIZMAN:  Yes.

9              MS. BERNAL:  Okay.  Thank you, David.  And then

10     do you want to meet and confer on your anticipated

11     motion as well?

12             MR. RAIZMAN:  Yeah.  I mean, I think I already

13     covered it, honestly, and it's certainly been discussed

14     at length before in the pretrial conference and motion

15     in limine.  But I will just summarize again that the way

16     the class has been defined, the Court's identified the

17     critical issue as whether class members were denied

18     goods and services as a result of the lack of an

19     independently-accessible device.

20             We think as a matter of law there is no

21     requirement that there be an independently-accessible

22     device, so it essentially answers the question that the

23     class definition asks.  It answers it in the negative

24     thus negating the classes claim.  And buried in there is

25     this false choice that if effective communication does

                                              Page 14

```
 1    not exist on a particular occasion that means there must
 2    be an independently-accessible device.
 3          We think that is implicit in the way the class
 4    has been defined, and that is just wrong.  That is wrong
 5    as a matter of law.  The law makes clear that the place
 6    of public accommodation has a multitude of ways in which
 7    it can provide effective communication.  And the ways it
 8    does it or the ways it may do it do not necessarily
 9    involve an independently-accessible device.  We never
10    get to the premise of the class definition that there
11    needs to be an independently-accessible device.
12          That's our motion.  We have a related motion that
13    is based on a conservative reading of the amended
14    schedule of pretrial and trial dates, Document 195-1,
15    which we believe permits new dispositive motions to be
16    filed or the Court would not have entered it this way.
17    But in excess of caution we would like to seek your
18    agreement that given the close overlap with an argument
19    we're going to make in response to your motion and then
20    again in our motion which I just outlined, that we
21    stipulate that we be allowed to make a dispositive
22    motion notwithstanding the fact that we made a previous
23    dispositive motion.
24          And this is based on a lot of things, not the
25    least of which was the colloquy at the pretrial
```

Page 15

1   conference where the Court expressed an interest in

2   seeing the arguments that I have outlined.

3        MR. SWEET:  David, this is Ben.  I am just going

4   to respond.  So just to kind of walk through what I

5   think you are proposing, it is two motions.  And I see a

6   few problems with the proposed motion that you are

7   seeking to bring.  And I will just kind of give you our

8   two cents on it for the record.

9        For starters your Local Rule 7-3 letter does not

10  state which rule or rules you seek to move under.

11  Subsequently I e-mailed you asking you to identify the

12  rule or rules.  We had a few emails actually from our

13  side before we heard back from you.  You responded that

14  you were bringing the motion under, quote, Rule 56, end

15  quote, without any further elaboration.

16       Rule 56 does not permit you to bring a motion in

17  light of Judge Gee's standing order entered in this

18  action which states that one party is entitled to bring

19  just one summary judgment motion.  And so I think as we

20  sit here now we're simply seeking to understand for the

21  first time which rule you will be bringing this motion

22  under.  Can you identify that rule for us?

23       MR. RAIZMAN:  I did.  Rule 56.  That is the

24  summary judgment rule.

25       MR. SWEET:  Right.  And you would agree that

```
 1   Quest has already brought and had denied its motion for

 2   summary judgment.  So we're just trying to understand on

 3   what authority you believe that Quest could bring a

 4   second summary judgment motion.

 5        MR. RAIZMAN:  I just told you that we were

 6   seeking -- first of all, we read the amended order to

 7   permit that by setting a new date for setting

 8   dispositive motions after we had already brought a

 9   motion.  It doesn't say last hearing date for

10   dispositive motion.  It doesn't say last hearing date

11   for Plaintiffs' dispositive motion.  I think the Court

12   contemplated it was discussed in the pretrial

13   conference.

14        Secondly, in excess of caution we're asking for

15   your agreement to that.  The Court is capable

16   notwithstanding its standing order which of course you

17   understand, to grant leave to bring a second motion.

18   And that is what we would prepare to do if you did not

19   stipulate and the Court did not agree with our reading

20   of its amended scheduling order.

21        MR. SWEET:  We do not agree.  The class is not

22   agreeing with that interpretation.  We don't think there

23   is any basis to believe the Court has vacated its prior

24   scheduling order and --

25        MR. RAIZMAN:  I didn't say it has vacated it.  I
```

                                              Page 17

```
 1    said there is good cause.  I mean, that is an argument
 2    we're making, not vacated it, but it superseded it with
 3    this new scheduling order.  In any event, we are seeking
 4    your agreement that there is good cause to bring it.
 5    And I suppose the answer is going to be the same, but we
 6    have not vacated it.
 7         MR. SWEET:  So what you are seeking to do, then,
 8    is to file essentially a motion to amend the existing
 9    scheduling order under Rule 16 that would allow you to
10    file a subsequent Rule 56 motion, correct?
11         MR. RAIZMAN:  Yeah.
12         MR. SWEET:  Okay.  And when you say, David, that
13    there is good cause, I am trying to understand what has
14    occurred since the pretrial conference that would lead
15    you to believe there is now good cause to bring such a
16    motion.
17         MR. RAIZMAN:  Not since the pretrial conference,
18    since the Court ruled on our summary judgment motion.
19    So what's happened since then is the Court granted the
20    class cert and defined the class in the way it defined
21    it, in the way you asked it to be defined.  And then we
22    had a colloquy at the pretrial conference in which the
23    specific issue was discussed.  And the Court said it was
24    interested in hearing it.
25         MR. SWEET:  I'm sorry.  Can you call -- can you
```

Page 18

1   cite exactly where in the pretrial conference transcript

2   you find support for that notion?

3        MR. RAIZMAN:  I can't cite you a page but I will

4   by the time I bring this motion.  It's towards the end,

5   and it is part of the discussion related to motion in

6   limine No. 5, I believe.

7        MR. SWEET:  Let me pull what I think might be the

8   passage in question, Page 17, Lines 18 through 25.  And

9   it reads as follows.  Judge Gee stated:

10                  "Well, I think that part of the reason

11                  why -- I mean, obviously" --

12       And let me back up, David.  This is in relation

13   to your argument about the class definition which I will

14   address in a moment.  Judge Gee states:

15                  "Well, I think that part of the reason

16                  why -- I mean, obviously I would be more

17                  than happy to decide the legal issue if

18                  it was truly susceptible to a motion for

19                  summary judgment type of situation which

20                  you obviously tried.  But I found there

21                  were triable issues that affected that

22                  particular legal issue.  And so I don't

23                  think it's worthwhile to have you try

24                  that again and have me only reach the

25                  same conclusion again."

                                              Page 19

1          MR. RAIZMAN:  And what page are you reading from,

2     Ben?

3          MR. SWEET:  That is Page 17.

4          MR. RAIZMAN:  That is not the passage I was

5     referring to.  I think it goes on.  I don't expect -- I

6     clearly don't expect you at this point to agree, but

7     since we're going to be making this argument in

8     opposition to your motion, do you really just want to be

9     opposing that it be made at all?

10          MR. SWEET:  We just don't think it is permitted

11     by the rule, David, and we don't think there is any

12     basis to make it.  I also wanted to address your comment

13     this notion of an independent legal duty for Quest to

14     make the kiosk independently accessible.  And I think

15     this is about the fourth or fifth time that Quest has

16     attempted to miscast our legal theory.  So I just want

17     to state it very clearly for the record so there is no

18     confusion.

19          Our case is about the effective communication.

20     Quest has known that it's been about effective

21     communication from the outset.  Your own class cert

22     opposition stated, quote, "The effective communication

23     regulation on which this lawsuit is premised," end

24     quote.  So our theory is therefore not about some

25     independent legal obligation to make the kiosk

                                                   Page 20

1    independently accessible.

2        The reason the word "independently" appears in

3    the class definition at all is because facts matter.

4    And in this case the certified class made a factual

5    showing, and the Court accepted that factual showing

6    that phlebotomists were not available to assist blind

7    customers at the kiosk, and that this was Quest's

8    business plan from the outset.

9        Because that is true factually in this case the

10   only way left here for blind customers to communicate

11   effectively with Quest was through the kiosk.  That is

12   what the facts of this case demonstrated.  So, yes, on

13   the facts of this case where phlebotomist assistance was

14   not available, in order for effective communication to

15   be achieved the kiosk had to be independently

16   accessible.  That is our theory.

17       And I believe that there is plenty of support for

18   the idea that Judge Gee sees things the same way

19   including the motion for summary judgment order, her

20   comments at the summary judgment hearing, her comments

21   at the pretrial conference, and her statements in the

22   class certification order all point in that direction.

23       To the extent you are taking issue with the

24   Court's tentative ruling on motion in limine five or its

25   comments at the hearing, do you have any legal authority

Page 21

1    to support the idea that you can directly address a

2    tentative opinion?

3          MR. RAIZMAN:  I'm not addressing a tentative

4    opinion.  We're making a dispositive motion.

5          MR. SWEET:  I think you mentioned there was a

6    colloquy around motion in limine No. 5.  So the class is

7    trying to understand what exactly it is that you are

8    directing this motion at.  Is it a ruling of the Court?

9    Is it -- what specifically is the contemplated

10   dispositive motion taking aim at?

11         MR. RAIZMAN:  Taking aim at the class definition,

12   the way the class has been designed.  In light of the

13   class definition we don't think there is a claim.  So

14   there is no obligation to have an

15   independently-accessible device.  We're just going to

16   have to agree to disagree on this, Ben.  You know,

17   sometimes, probably very rarely, you can talk another

18   side out of a position but, you know, I know you think

19   you are done with this issue.  We don't think so, and

20   we're going to ask the Court to rule on it.  So I am not

21   sure what we're driving at here today.  But if you like

22   I will pull up the transcript which I am in the process

23   of doing.

24         The part that you quoted on 17, her finding was

25   not that the class had experienced, this is from the

Page 22

```
1   entire motion, not that the class had experienced
2   difficulties, but there is a triable issue of fact that
3   some people had experienced difficulties with effective
4   communication.  That is a long ways away from having
5   to -- what you need to prove in this case.
6          MR. SWEET:  Were you going to point to the part
7   of the --
8          MR. RAIZMAN:  Yeah.  I'm reviewing it now, Ben.
9   I am in the neighborhood, I believe.  Page 20, so after
10  the part you quoted there is three or two pages of
11  colloquy on the subject where I did not accept the
12  Court's response as dispositive of the issue.  And the
13  Court said:
14              "All right.  I'm going to have to
15              contemplated that."
16              "Understood Your Honor."
17      I say.  The Court says:
18              "You are going to have a chance to
19              contemplate that too, because, as you
20              will see, you are not going to trial in
21              the next month."
22      MR. SWEET:  Okay.  So the top of looks like Page
23  20?
24      MR. RAIZMAN:  Yes.
25      MR. SWEET:  Okay.  So on the basis of this
```

Page 23

```
 1    exchange you will be making a motion.  And the motion

 2    that you intend to make, so we understand as to the

 3    class definition, will be a dispositive motion because

 4    you believe the class as constituted and as certified

 5    can't possibly lead to relief as a matter of law?

 6              MR. RAIZMAN:  Correct.

 7              MR. SWEET:  Okay.  I appreciate that

 8    clarification.  I don't think I have anything else to

 9    add, David, as you said, we are not going to agree.  But

10    I will agree that as to your Rule 16 motion we at least

11    satisfied the Local Rule 7-3.  Okay?

12              MR. RAIZMAN:  But you are not agreeing as to the

13    summary judgment motion?

14              MR. SWEET:  No.

15              MR. RAIZMAN:  The reasons I stated previously.  I

16    am not expecting you to agree to our motion.  Do you

17    agree that we've met and conferred?  By the way, I don't

18    see it as a requirement of Rule 7-3, but in any event,

19    since I was asked that question I am going to ask you

20    guys the question.  Have we met --

21              MR. SWEET:  As to both motions.

22              MR. RAISMAN:  Well, we believe you need to seek a

23    leave of court to file a Rule 56 motion, just to be

24    clear.

25              MR. RAIZMAN:  Yeah, which we said we're going to
```

Page 24

```
 1   do.

 2         MR. SWEET:  Yes, assuming the Court grants your

 3   Rule 16 motion, we will stipulate that we have conducted

 4   the 7-3.

 5         MR. RAISMAN:  All right.  I don't know if you

 6   guys want to talk about briefing schedules at some

 7   point.  You know, for now let's just talk about yours.

 8   Do you have -- I assume you will file by May 6th, but

 9   did you have a date when you were going to seek to have

10   this motion heard in mind?

11         MR. SWEET:  Alison?

12         MS. BERNAL:  Yes.  There weren't many options for

13   dates in that timeframe.  I apologize.  Let me pull this

14   up.  So, yes, we anticipate to file on or before May 6th

15   which puts the hearing date at -- I am just trying to

16   find what the date was before that June 17th.

17         MR. RAIZMAN:  I thought it was May 30th, if

18   memory serves me.

19         MS. BERNAL:  No, I think you had a bit more time

20   than that.  Let my pull it up.  The last date for

21   hearing was June 17th, which actually -- no, you are

22   right.  Sorry, David.  It was May 30th that was the date

23   that would be set for the hearing.  I think I might have

24   bungled that.

25         MR. RAIZMAN:  May 30th?  Are you sure?
```

Page 25

1              MS. BERNAL:  No.  I think I might have bungled

2    that.  Just give me one second.

3              MR. RAIZMAN:  Let me ask you this.  Are you open

4    to an agreed-upon briefing schedule, or are you just

5    going to try to jam this through?

6              MS. BERNAL:  Give me a second on the date.  One

7    second.  Okay.  Looks like she has Friday at 9:30.  So

8    if we file by next week we could have it set for hearing

9    on May 30th.  But if it is later in the week we would

10   have it set the week after.  And as for a briefing

11   schedule, we will listen to your proposal for that.  It

12   is something that we would want to set with our team as

13   well.

14             MR. RAIZMAN:  Okay.  I guess I would ask for some

15   courtesy, I imagine, because you are going to serve a

16   very important and potentially dispositive motion.  We

17   need to have a fair chance to respond to what I think

18   will amount to a week if I am reading it correctly.  So

19   that just seems like something that we would need to go

20   to the Court to get relief for.  I hope you guys are

21   open to an agreed-upon briefing schedule, particularly

22   if we have cross-motions.

23             MS. BERNAL:  Well, why don't we do this, David,

24   why don't you send us your proposal on that, and we can

25   discuss it with the team on that.

                                                   Page 26

1           MR. RAIZMAN:  Okay.  I will do that.  You have

2     not reserved the date as of now?

3           MS. BERNAL:  I don't believe -- I would have to

4     check with our paralegal on that.  I don't know the

5     answer to that for certain.

6           MR. RAIZMAN:  Okay.  All right.  Thank you guys

7     for your time.  Have a great week.

8

9                 (TIME NOTED: 11:39 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page  27

```
 1          I, the undersigned, a Certified Shorthand
 2     Reporter of the State of California, do hereby
 3     certify:
 4             That the foregoing proceedings were taken
 5     before me at the time and place herein set forth;
 6     that any witnesses in the foregoing proceedings,
 7     prior to testifying, were administered an oath; that
 8     a record of the proceedings was made by me using
 9      machine shorthand which was thereafter transcribed
10     under my direction; that the foregoing transcript is
11     a true record of the testimony given.
12             Further, that if the foregoing pertains to
13     the original transcript of a deposition in a Federal
14     Case, before completion of the proceedings, review
15     of the transcript [ ] was [ ] was not requested.
16             I further certify I am neither financially
17     interested in the action nor a relative or employee
18     of any attorney or any party to this action.
19             IN WITNESS WHEREOF, I have this date
20     subscribed my name.
21
22     Dated: 4/27/22
23                          _____
24                          JOANNA BROADWELL
25                          CSR No. 10959
```

Page 28

# EXHIBIT F

**From:** Raizman, David <david.raizman@ogletree.com>
**Sent:** Friday, May 6, 2022 1:34 PM
**To:** Alison Bernal <alison@nshmlaw.com>
**Cc:** Roller, Amber L. <Amber.Roller@ogletreedeakins.com>; Marfori, Nicholas <nicholas.marfori@ogletreedeakins.com>; Benjamin Sweet <ben@nshmlaw.com>; Jonathan Miller <jonathan@nshmlaw.com>; Jordan Porter <jordan@nshmlaw.com>; mhandley@hfajustice.com; Meg Parker <meg@nshmlaw.com>; Callum Appleby <Callum@nshmlaw.com>; Lindsey LeBlanc <lindsey@nshmlaw.com>
**Subject:** Re: Vargas v. Quest -- Crossing Motions For Summary Judgment [ODNSS-OGL.018770.000085]

Thanks.

Best, David

> On May 6, 2022, at 1:27 PM, Alison Bernal <alison@nshmlaw.com> wrote:

*[Caution: Email received from external source]*

May 24 for opposition, and June 3 for replies works. Thanks, David.

**From:** Raizman, David <david.raizman@ogletree.com>
**Sent:** Friday, May 6, 2022 12:18 PM
**To:** Alison Bernal <alison@nshmlaw.com>
**Cc:** Roller, Amber L. <Amber.Roller@ogletreedeakins.com>; Marfori, Nicholas <nicholas.marfori@ogletreedeakins.com>; Benjamin Sweet <ben@nshmlaw.com>; Jonathan Miller <jonathan@nshmlaw.com>; Jordan Porter <jordan@nshmlaw.com>; mhandley@hfajustice.com; Meg Parker <meg@nshmlaw.com>; Callum Appleby <Callum@nshmlaw.com>; Lindsey LeBlanc <lindsey@nshmlaw.com>
**Subject:** Re: Vargas v. Quest -- Crossing Motions For Summary Judgment [ODNSS-OGL.018770.000085]

Alison, thanks for pointing that out about the three-day weekend. Because the Opposition papers require a lot more work than the reply (pastficularly on SJ), we would suggest a compromise of 2.5 weeks on the opposition and 1.5 on the reply.

So, opposition papers would be due May 24 (and replies June 3).

That work?

Thanks again.

Best, David


On May 6, 2022, at 8:53 AM, Alison Bernal <alison@nshmlaw.com> wrote:


*[Caution: Email received from external source]*


Hi David,

When looking at the briefing schedule Defendant proposed, we saw that would give one week for the reply, with that week falling over Memorial day. We would propose two weeks for the opposition, and two weeks for the reply. The motion due today (May 6), the opposition due May 20, and the reply due June 3. This still accommodates the request for additional time and later hearing date. Please let me know if you agree. Thanks,

Alison

**From:** Raizman, David <david.raizman@ogletree.com>
**Sent:** Thursday, May 5, 2022 5:33 PM
**To:** Alison Bernal <alison@nshmlaw.com>
**Cc:** Roller, Amber L. <Amber.Roller@ogletreedeakins.com>; Marfori, Nicholas <nicholas.marfori@ogletreedeakins.com>; Benjamin Sweet <ben@nshmlaw.com>; Jonathan Miller <jonathan@nshmlaw.com>; Jordan Porter <jordan@nshmlaw.com>; mhandley@hfajustice.com; Meg Parker <meg@nshmlaw.com>; Callum Appleby <Callum@nshmlaw.com>; Lindsey LeBlanc <lindsey@nshmlaw.com>
**Subject:** RE: Vargas v. Quest -- Crossing Motions For Summary Judgment [ODNSS-OGL.018770.000085]

Thank you for your courtesy in this matter.

Best regards,

David


**David Raizman | Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
400 South Hope Street, Suite 1200 | Los Angeles, CA 90071 | Telephone: 213-438-1285
david.raizman@ogletree.com | www.ogletree.com | Bio


**From:** Alison Bernal <alison@nshmlaw.com>
**Sent:** Thursday, May 05, 2022 5:19 PM
**To:** Raizman, David <david.raizman@ogletreedeakins.com>

**Cc:** Roller, Amber L. <Amber.Roller@ogletreedeakins.com>; Marfori, Nicholas <nicholas.marfori@ogletreedeakins.com>; Benjamin Sweet <ben@nshmlaw.com>; Jonathan Miller <jonathan@nshmlaw.com>; Jordan Porter <jordan@nshmlaw.com>; mhandley@hfajustice.com; Meg Parker <meg@nshmlaw.com>; Callum Appleby <Callum@nshmlaw.com>; Lindsey LeBlanc <lindsey@nshmlaw.com>
**Subject:** RE: Vargas v. Quest -- Crossing Motions For Summary Judgment [ODNSS-OGL.018770.000085]

**[Caution: Email received from external source]**

David,

While we disagree that the proposed hearing date ran counter to the Standing Order, since it would comply with all local rules, we nevertheless rearranged client conflicts in other cases to accommodate Defendants' requested calendar accommodation. We can agree to the June 17 hearing date with Defendants' Opposition due May 27 and the reply due June 3. We will notice the motion accordingly. Thanks,

Alison

**From:** Raizman, David <david.raizman@ogletree.com>
**Sent:** Thursday, May 5, 2022 3:28 PM
**To:** Alison Bernal <alison@nshmlaw.com>
**Cc:** Roller, Amber L. <Amber.Roller@ogletreedeakins.com>; Marfori, Nicholas <nicholas.marfori@ogletreedeakins.com>; Benjamin Sweet <ben@nshmlaw.com>; Jonathan Miller <jonathan@nshmlaw.com>; Jordan Porter <jordan@nshmlaw.com>; mhandley@hfajustice.com; Meg Parker <meg@nshmlaw.com>; Callum Appleby <Callum@nshmlaw.com>; Lindsey LeBlanc <lindsey@nshmlaw.com>
**Subject:** RE: Vargas v. Quest -- Crossing Motions For Summary Judgment [ODNSS-OGL.018770.000085]

Please be advised that this runs counter to Judge Gee's Initial Standing Order on the recommended notice period for MSJ's and will prompt an ex parte application from us for additional time in which to prepare the opposition.  it also disregards the scheduling concerns of defense counsel.

Another route may be to agree to stipulate to an extension of the June 17 hearing date deadline.  Please advise on your position promptly so that we can seek the necessary ex parte relief.

Best, David

**David Raizman | Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
400 South Hope Street, Suite 1200 | Los Angeles, CA 90071 | Telephone: 213-438-1285
david.raizman@ogletree.com | www.ogletree.com | Bio

3

**From:** Alison Bernal <alison@nshmlaw.com>
**Sent:** Thursday, May 05, 2022 3:20 PM
**To:** Raizman, David <david.raizman@ogletreedeakins.com>
**Cc:** Roller, Amber L. <Amber.Roller@ogletreedeakins.com>; Marfori, Nicholas <nicholas.marfori@ogletreedeakins.com>; Benjamin Sweet <ben@nshmlaw.com>; Jonathan Miller <jonathan@nshmlaw.com>; Jordan Porter <jordan@nshmlaw.com>; mhandley@hfajustice.com; Meg Parker <meg@nshmlaw.com>; Callum Appleby <Callum@nshmlaw.com>; Lindsey LeBlanc <lindsey@nshmlaw.com>
**Subject:** RE: Vargas v. Quest -- Crossing Motions For Summary Judgment [ODNSS-OGL.018770.000085]

**[Caution: Email received from external source]**

---

David,

Thank you for the email. We have spent some time looking at our calendars, and because of existing client and other commitments that we cannot change, June 3 is the only hearing date for plaintiffs' motion for summary judgment that is within the window Judge Gee provided and also works for our office. Thus, plaintiffs cannot enter into an extended briefing schedule on their motion.

Alison

**From:** Raizman, David <david.raizman@ogletree.com>
**Sent:** Wednesday, May 4, 2022 11:30 AM
**To:** Alison Bernal <alison@nshmlaw.com>; Benjamin Sweet <ben@nshmlaw.com>
**Cc:** Roller, Amber L. <Amber.Roller@ogletreedeakins.com>; Marfori, Nicholas <nicholas.marfori@ogletreedeakins.com>
**Subject:** Vargas v. Quest -- Crossing Motions For Summary Judgment [ODNSS-OGL.018770.000085]

Alison, Ben:

I didn't hear back from you after our meet and confer on when you plan to notice plaintiffs' motion for summary judgment.  (You mentioned May 30 as a possibility, but said you were not sure.)

Without that date, it's a bit abstract for us to deliver the proposed briefing schedule, but in the absence of a hearing date, we would suggest the following briefing schedule:

Hearing Date:     June 17
Moving Papers:   May 6
Opposing Papers:  May 27

Reply Papers:     June 3

This schedule meets the Court's requirements, does not require the Court's permission and allows the parties three weeks to formulate the opposition papers, certainly the most onerous task in the process.

Please advise on your thoughts or any countering proposal.

Best, David

**David Raizman | Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
400 South Hope Street, Suite 1200 | Los Angeles, CA 90071 | Telephone: 213-438-1285
david.raizman@ogletree.com | www.ogletree.com | Bio

*This transmission is intended only for the proper recipient(s). It is confidential and may contain attorney-client privileged information. If you are not the proper recipient, please notify the sender immediately and delete this message. Any unauthorized review, copying, or use of this message is prohibited.*

*This transmission is intended only for the proper recipient(s). It is confidential and may contain attorney-client privileged information. If you are not the proper recipient, please notify the sender immediately and delete this message. Any unauthorized review, copying, or use of this message is prohibited.*

*This transmission is intended only for the proper recipient(s). It is confidential and may contain attorney-client privileged information. If you are not the proper recipient, please notify the sender immediately and delete this message. Any unauthorized review, copying, or use of this message is prohibited.*

*This transmission is intended only for the proper recipient(s). It is confidential and may contain attorney-client privileged information. If you are not the proper recipient, please notify the sender immediately and delete this message. Any unauthorized review, copying, or use of this message is prohibited.*

*This transmission is intended only for the proper recipient(s). It is confidential and may contain attorney-client privileged information. If you are not the proper recipient, please notify the sender immediately and delete this message. Any unauthorized review, copying, or use of this message is prohibited.*

# EXHIBIT G

```
 1                UNITED STATES DISTRICT COURT
 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3      _____
                                      )
 4      JULIAN VARGAS, ANNE WEST,     )
        and AMERICAN COUNCIL OF       )
 5      THE BLIND, individually       )
        on behalf of themselves and   )
 6      all others similarly situated,)
                                      )
 7           Plaintiffs,              )
                                      )
 8         v.                         ) Case No.: 19CV01953
                                      )
 9      QUEST DIAGNOSTICS CLINICAL    )
        LABORATORIES, INC., QUEST     )
10      DIAGNOSTICS HOLDINGS, INC.,   )
        QUEST DIAGNOSTICS             )
11      INCORPORATED; and DOES 1-10,  )
        inclusive,                    )
12                                    )
             Defendants.              )
13                                    )
             CASE NO.: 2:19-cv-8108   )
14      _____)
15
16
17
18        REPORTER'S TELEPHONIC TRANSCRIPT OF PROCEEDINGS
19                     MEET AND CONFER
20                 Thursday, August 26, 2021
21
22      Reported by:
        JOANNA BROADWELL
23      CSR No. 10959
24      Job No. 4780142
25      PAGES 1 - 41
```

                                                    Page 1

```
 1                 UNITED STATES DISTRICT COURT
 2              FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3     _____
                                       )
 4     JULIAN VARGAS, ANNE WEST,       )
       and AMERICAN COUNCIL OF         )
 5     THE BLIND, individually         )
       on behalf of themselves and     )
 6     all others similarly situated,)
                                       )
 7          Plaintiffs,                )
                                       )
 8        v.                           ) Case No.: 19CV01953
                                       )
 9     QUEST DIAGNOSTICS CLINICAL      )
       LABORATORIES, INC., QUEST       )
10     DIAGNOSTICS HOLDINGS, INC.,     )
       QUEST DIAGNOSTICS               )
11     INCORPORATED; and DOES 1-10,    )
       inclusive,                      )
12                                     )
            Defendants.                )
13                                     )
            CASE NO.: 2:19-cv-8108     )
14     _____)
15
16
17
18
19
20            Reporter's telephonic Transcript of
21     Proceedings taken remotely beginning at 10:02 a.m. and
22     ending at 11:04 a.m. on Thursday, August 26, 2021,
23     before JOANNA BROADWELL, Certified Shorthand Reporter
24     No. 10959.
25
```

                                                      Page  2

1

2

3    APPEARANCES:

4

5    For Plaintiffs:

6    OGLETREE DEAKINS NASH SMOAK & STEWART PC

7    David Raizman, Esq.

8    400 S. Hope St, Suite 1200,

9    Los Angeles, CA 90071

10   (213) 239-9800

11   david.raizman@ogletree.com

12

13   For the Defendants:

14   NYE STIRLING HALE & MILLER LLP

15   Alison Bernal, Esq.

16   33 West Mission Street Suite 201

17   Santa Barbara, CA 93101

18   (805) 963-2345

19   alison@nshmlaw.com

20

21

22

23

24

25

1            Thursday, August 26, 2021

2                    10:02 a.m.

3        REPORTER'S TRANSCRIPT OF TELEPHONIC PROCEEDINGS

4            MR. RAIZMAN:  I guess one of my motions is

5     dependent on your guy's willingness -- it's somewhat

6     besides the meet and confer but it is important, I think

7     for the meet and confer -- is whether you guys are

8     willing to come up with a new briefing schedule on class

9     certification that would have that motion decided

10    earlier.

11            You probably have a view on that.  I just would

12    like to hear that.  Then we'll know.

13            MR. PORTER:  I think what we want to do, David --

14    and Madam Court Reporter, this is Jordan Porter -- is I

15    think we should align our hearing dates for the motion

16    for class cert with the summary judgment motion.

17            MR. RAIZMAN:  So just have them all heard at the

18    same time and schedule?

19            MR. PORTER:  That's right.  And that is also

20    based in part on the judge's comments when we modified

21    the briefing schedule the last time and kind of where we

22    wound up here.

23            MR. RAIZMAN:  Yeah.  So take me through that,

24    Jordan.  When would the motion be -- you guys would make

25    the motion, then, on September the 3rd; is that right?

                                                   Page  4

1          MR. PORTER:  We would make the motion on

2     September 10th.  We just need to have the hearing dates

3     align.  That is all.

4          MR. RAIZMAN:  Well, the last date for hearing

5     summary judgment is October.

6          MS. BERNAL:  8th, probably.

7          MR. RAIZMAN:  8th.

8          MS. BERNAL:  That is correct.  I know they are

9     one week apart here.

10          MR. RAIZMAN:  Yeah.  So, I mean, you guys, I am

11     just going to state the obvious.  You guys have written

12     this motion before with Labcor.  You have been working

13     on it, I am sure.  I don't know why you can't try to

14     make that motion on September 3rd and we could have some

15     semblance of not having crossing motions.  And our

16     oppositions, we'd each be working on something instead

17     of working on two briefs if we were on the same

18     schedule.

19          If you could move it up to September 3rd;

20     otherwise we're going back to the Court and asking for a

21     different briefing schedule which I think might work.

22     Let me hear your proposal, Jordan.  What were you guys

23     thinking?  You want them on the same day.  I don't have

24     a problem with that in theory or practice, but what

25     would those -- what would the briefing schedule look

Page 5

```
 1    like?
 2         MR. PORTER:  Just bear with me for a second,
 3    David, while I pull up -- when I get to the last
 4    briefing schedule that actually has all of your dates in
 5    it as well.
 6         MS. BERNAL:  I think it is Document 62, right?
 7         MR. PORTER:  Is that the one?
 8         MS. BERNAL:  Yeah.  The last have the class cert
 9    dates.
10         MR. PORTER:  Last date for hearing.  I think we
11    would because at the last date for the class cert motion
12    hearing date is the 29th, right?
13         MR. RAIZMAN:  Right.
14         MR. PORTER:  Wouldn't we try to find a date
15    somewhere between those dates and per the stipulation
16    presented to the Court have it all there at once,
17    tracked together?
18         MR. RAIZMAN:  So that is certainly something
19    that -- you know, I think it's -- it is certainly
20    something I can talk about with my client.  So I think
21    it makes sense.  But what date were you thinking of,
22    like the 15th?
23         MR. PORTER:  I was thinking -- let's see here.
24    What are the Judge's hearing dates, actually?  Let's see
25    here.
```

Page 6

```
 1          MR. RAIZMAN:  Good question.  I think since we've
 2   been all focused on Fridays we just assumed.  But it is
 3   worth checking to make sure it is correct.
 4          MR. PORTER:  Fridays at 9:30.  Let's see if she
 5   is dark at all on any of these.  Looks like her closed
 6   motion dates are the 26th, 24th -- the days before and
 7   after holidays.
 8          MR. RAIZMAN:  Right.  Okay.  So I think it makes
 9   sense for all of us to have these hearings on the same
10   day on a sort of parallel briefing track.  Our motion,
11   your motion, and then we do -- you oppose ours, we're
12   opposing yours at the same time, and then we switch to
13   replies.  I would like to coordinate that.  I would also
14   like this decided as soon as possible.  I mean, I know
15   my client's strong interest and one of the attractions
16   in having a summary judgment heard on October 8th was to
17   have those issues decided.
18          And as you will hear, we're moving in
19   alternative.  I am not sure if that was clear from my
20   earliest request for the motion, but I am pretty sure I
21   put in there that we would be moving for partial summary
22   judgment in the alternative.  Just to have issues
23   narrowed is also critically important in a case of this
24   magnitude and scope.  So I thought -- I mean, tell me
25   whether you guys can live with October 15th or whether
```

Page 7

```
 1   you will need to go back and check that with your

 2   people.  I know I will need to check anything different

 3   with my people, but I am certainly willing to do that.

 4        MR. PORTER:  Let's check both the 15th and the

 5   22nd, David.  There are some calendar issues that I

 6   think I need to have a better understanding of how that

 7   may affect that.  So I am not prepared to actually say

 8   the 15th or the 22nd.  I am trying to figure out what is

 9   going on and where we will be on those as I work

10   backwards from those dates.  I can have that resolved by

11   tomorrow.

12        MR. RAIZMAN:  Okay.  Just keep this in mind,

13   Jordan.  I don't know how my client is going to react.

14   He likes the idea of having the summary judgment motion

15   heard first, and he would like it decided sooner.  So

16   the farther back we get from October 8th the less likely

17   we're going to be able to coordinate these things.

18        MR. PORTER:  Understood.

19        MR. RAIZMAN:  So I hope that you guys can make

20   this happen on the 15th, because I think that is going

21   to make it more likely to get an agreement.

22        MS. BERNAL:  So that I understand, I am just

23   trying to take notes because some of this requires us to

24   go back and really look at our calendars better, with

25   the proposal for the 15th hearing date, what is the
```

Page 8

```
 1    briefing schedule you had proposed for that?

 2         MR. RAIZMAN:  We don't have any choice on our

 3    motion.  It's got to be due September 3rd because there

 4    is a cutoff, right?  I guess we could try to modify that

 5    and see if the judge would go for that.  But I --

 6         MR. PORTER:  I don't know that I would try that,

 7    actually.

 8         MR. RAIZMAN:  Right and I don't know if I can sit

 9    here and wait for it, right?  Because I am writing a

10    motion, as you guys probably are, for a week later.  I

11    feel like we should both try to file on the 3rd and give

12    ourselves extra time.  These are important issues.  To

13    some degree they are novel issues.  I would like to, you

14    know, allow the briefing to happen, especially on the

15    opposition side so that each side gets, you know, a fair

16    opportunity and not be squeezed by the ordinary motion

17    calendar.  So that is helped by us both moving on the

18    3rd if that's possible.  And that also allows --

19         MR. PORTER:  Yeah.  We're not going to be --

20    we're not going to be in the position to do it on the

21    3rd.

22         MR. RAIZMAN:  All right.  That is good to know.

23    The problem with that, of course, is that -- as I work

24    this out in my head, if we move on the 3rd, which we're

25    going to assume we have to do unless the Court gives us
```

```
 1   relief -- the math problem, right -- if we move on the
 2   3rd you would have until -- under the current
 3   circumstances you would have until the 17th.
 4        So you would be trying to oppose my motion for
 5   summary judgment while you are trying to finish your
 6   class cert.  You would file your class cert on the 10th.
 7   I don't know.  You would give me two weeks, until the
 8   24th, I assume, to do it, to do my opposition which is
 9   my proposal, and then you would have your reply on the
10   1st.  And then we would have the 15th would be the
11   hearing date.  I think that is what makes the most
12   sense.
13        And that would require, you know, you giving us
14   two weeks on the opposition and one week on the reply on
15   your motion, and we'll have given you two weeks on the
16   opposition and one week on the reply for ours.
17        MR. PORTER:  Okay.
18        MR. RAIZMAN:  You will be writing a motion and
19   doing an opposition, and then I'll be doing an
20   opposition and doing a reply as well.  So that's the
21   problem with it.  But, you know, that's the way to get
22   these on for the same date and get them on for the 15th,
23   which I think is probably the only way my client is
24   going to work.
25        And just going back to what you said, you know,
```

Page 10

```
 1    the Court gave us a stern warning about the 29th.  I am
 2    not sure the 22nd won't just -- you know, seven more
 3    days -- save us, right?  And I know my client is
 4    concerned about that.  And somewhere in the back of this
 5    there is a mediation cutoff date of some kind, right?
 6    That mediation is never going to be successful without
 7    some resolution of these two motions, or let's just say
 8    it is less likely to be successful.
 9         And so I think it really behooves us -- and I
10    know you can't commit to this on this call -- you
11    already said that -- but I don't think the 22nd changes
12    the equation enough from the Judge's warning to really
13    help.
14         And that's why I wrote back in July to you guys
15    and said, hey, let's move this -- let's move the
16    briefing schedule up because we're no longer in trial.
17    And that trial had sort of driven the calendaring that
18    we did to these later dates.
19         MR. PORTER:  Yeah.  David, I appreciate it is a
20    dynamic situation and we have the same dynamics working
21    in the other direction in the interim.  As you know, the
22    state courts have reopened and created new pressures.
23    Yeah.  So settlement conference completion date is
24    November 8th.
25         MR. RAIZMAN:  Right.  So a week.  Yeah.
```

Page 11

```
 1        MR. PORTER:  Alison, maybe you can jump in here.
 2   But the scheduling proposal, I think we agree, there is
 3   something happening for somebody every week between the
 4   3rd and the 15th.
 5        MS. BERNAL:  So this is the -- and I understand
 6   this is the kind of the warning we got in the last
 7   request to the Court, but if we phrase this as we don't
 8   want the Court working us up twice on the same fact
 9   pattern, obviously a different request, either summary
10   judgment or class cert, but it is really the same
11   underlying facts.  We don't want the Court having to
12   look at this twice.
13        So if we can get a stipulated briefing schedule
14   with the hearing on the same date, and you know, whether
15   that summary judgment being filed at the same time as
16   the class cert following the class cert briefing
17   schedule or what, I think the Court would appreciate
18   that in spite of the earlier comments.  I don't know
19   that, and maybe there is not enough time to make that
20   request, but it is just a thought.
21        MR. RAIZMAN:  Yeah.  Alison, I am in favor of
22   trying that.  And if you are suggesting we both move on
23   a parallel track so we move on September 10th --
24        MS. BERNAL:  Basically the class cert dates.
25        MR. RAIZMAN:  Yes.  Well, the class cert dates
```

Page 12

1   based on an earlier hearing date, though.

2       MS. BERNAL:  If we can, yeah.  We just have to be

3   mindful that the Court won't want that reply filed any

4   closer to the hearing date normally.

5       MR. RAIZMAN:  Right, especially if it's got two

6   major motions to decide.  That may be a disincentive for

7   the Court here that we need to be sensitive to.

8       MS. BERNAL:  Yeah.

9       MR. RAIZMAN:  So maybe it makes sense to keep on

10  this dual track having them heard on the same day, but I

11  am all in favor of trying to track it, but we would

12  obviously need -- we would need something quickly from

13  the Court on that.

14      MS. BERNAL:  Yeah.

15      MR. RAIZMAN:  But whatever.  We're moving ahead

16  as if we have to file next Friday, and that's just the

17  way it is.  But if there is a way to get a ruling in the

18  meantime, hopefully soon, then I think we should try to

19  get something to the Court sooner than later.

20      MS. BERNAL:  Maybe if we move forward, I mean,

21  you are drafting your motion, but get something on file,

22  and we can talk about which dates work best.  So, you

23  know, you are protecting your client's interest by

24  getting it on file, and then if you get a ruling from

25  the Court in the interim then great, you don't have to

Page 13

1   file so quickly.  Ideally that really would come from

2   the Court as to the hearing date soon in the next week

3   or two.

4         MR. RAIZMAN:  Right.  Well, ideally the ruling

5   would come before that, but, yeah.  I guess what I ask

6   is that you guys look hard to see if you could do 15th,

7   because I think without that we might not have a

8   stipulation on all of these things that we otherwise

9   agree on.  Because I just don't think it moves the ball

10  enough to change the Court's view of this.

11        And you notice the one thing I am not doing is

12  asking the Court to move any other dates which is the

13  other option here.  Because part of what is creating

14  this crunch is her not giving us leeway on the pretrial

15  conference and all that.

16        MS. BERNAL:  Yeah.  I think that would not be met

17  very well based on her prior orders.

18        MR. RAIZMAN:  I think that is probably true, but

19  at least this tees that up for her implicitly without

20  her even asking about it.  But that is probably right.

21  So I would ask us to look at the 15th, get back to me,

22  and then either propose a briefing schedule for the two

23  motions or not.  But I am good if we can agree on the

24  15th.

25        And so -- by the way, I mean, that is the last to

Page 14

1    be heard, but we can agree between us today that you are

2    going to file on the 10th, we'll oppose it on the 24th,

3    and you will do your reply on the 1st.  We had a longer

4    briefing schedule before.

5         MS. BERNAL:  We did.  I was just looking at that

6    and see if that was the way to --

7         MR. RAIZMAN:  I have taken a week away from each

8    of our oppo's and our replies, is what I've done.  And

9    that allows us to move the hearing date up by two weeks.

10   So if you guys are agreeable to the briefing schedule we

11   don't need her permission to have your motion heard on

12   the 15th.

13        MS. BERNAL:  No.

14        MR. RAIZMAN:  And that would be a favorable

15   result.  But we have an agreement, and I will stick to

16   it, to do it otherwise.  But if we do it otherwise we're

17   going to make our motion for decertification and try to

18   have it heard first.  I don't -- trust me, I am not like

19   dying to do that, but I can't not try to knock out the

20   damages class or not have a ruling on knocking out the

21   damages class and going to a mediation that is going to

22   be meaningful in any way.  I would think you guys would

23   feel the same, but I don't know.

24        It just doesn't make logical sense to -- you

25   know, once we're all staring at the results of these two

                                          Page 15

```
 1    rulings the case is probably going to look different.
 2    It is either going to look really good for you or really
 3    good for us or it is going to be some mix.  But it is
 4    going to be different.
 5         MS. BERNAL:  Okay.  So I think we have got the
 6    proposal here.  We will look hard at what we can do as
 7    far as that proposal.  And you know, 9-10, 9-24, 10-1
 8    for briefing on class cert, which is a good time to set
 9    it for the 10-15 hearing.  So we'll look at that part.
10         And do you want to get to the substance here of
11    the meet and confer?
12         MR. RAIZMAN:  Sure.  So on our summary judgment
13    motion, I think we have a basic disagreement on what the
14    statute regulations require.  And I think it's a
15    disagreement that is going to have to be resolved by the
16    Court.  But here we are.  We're meeting and conferring.
17         So I think, you know, point one through three --
18    I am going to leave primary consideration aside for the
19    moment, and let's just deal with the ADA claim and the
20    Unruh Act's incorporation of the ADA claim.  So we just
21    have a different view than you about what is required.
22    And our view is that what is required is effective
23    communication and that it need not be a prescribed path.
24    And that is sort of one basic difference that we have
25    and that we also challenge this notion of absolute
```

Page 16

1    equality of the communication.

2         So we think communication can be made through

3    alternative means for -- so that just because we develop

4    a technology doesn't mean that that technology needs to

5    be accessible.  It's what that technology is designed to

6    deliver just needs to go accessible and in an effective

7    way.

8         So that's the fundamental difference.  And I

9    don't know that we -- I know that we don't bridge that

10   gap, but it is a legal question that we would like the

11   Court to address because it will dictate, I think, sort

12   of the result, because I actually think in many ways

13   there is not a tremendous amount of factual difference

14   as to, you know, what the device can or can't do and

15   what a blind or visually-impaired patient needs to do

16   when they come.

17        So that's -- we think, these issues that are

18   identified in one through three of my email yesterday

19   are really the crux of understanding whether we're

20   fulfilling the obligation or not.  When it comes to

21   primary consideration, I believe I understand your

22   argument.  It wasn't in the complaint.  So I don't know

23   that it's ever been fully or articulated in the way I am

24   sure you will in your opposition.

25        But as I understand it, it is based on the Rehab

```
 1    act.  The Rehab Act regulations of course have no such

 2    regulation.  We don't think you can regulate by website.

 3    We don't think primary consideration is directed to

 4    circumstances like these where you are developing a

 5    technology for literally hundreds of thousands of

 6    people.

 7         We don't think you can give primary consideration

 8    to every request when you have hundreds of thousands of

 9    people who might each request something and

10    theoretically be entitled as a primary consideration.

11    We don't think primary consideration, putting aside the

12    fact that it is not in the regulations so it is

13    extra-regulatory is even consistent with the Rehab Act

14    obligation of program access.

15         So we think if the DOJ did issue such a

16    regulation we think it is contrary to the program -- it

17    is directly contrary to the notion of program access

18    which was actually intended to be a much more liberal

19    compliance standard viewing in its entirety

20    accessibility of goods and services.

21         So whatever primary consideration means we think

22    we meet well the Rehabilitation Act standard that's been

23    in place for -- don't make me do the math -- 38 years

24    before primary consideration came up.  Everyone

25    understood what the Rehab Act meant and how it was
```

Page 18

```
 1   different from Title III, for example, the permit

 2   program access.  And we think that the primary

 3   consideration regulations, to the extent it is out

 4   there, is directly inconsistent with all of that law and

 5   all of the ways in which the Rehab Act has been

 6   interpreted.

 7        Finally on primary consideration we believe that

 8   we gave that primary consideration.  There is a long

 9   record of our engaging in discussions with ACB.  And

10   there is -- it's documented.  And we met with focus

11   groups, three different focus groups.  Focus group is

12   not always the right word, but I am using that as a

13   shorthand -- three different groups of individuals with

14   blindness.  So we did give consideration to the blind

15   community when we came up with the three-finger swipe.

16   So that is that argument.

17        The standing arguments are twofold.  We argue

18   that there has to be an injury.  In fact, there is case

19   law in similar context that, you know, having to wait a

20   little bit longer to be helped is not injury, in fact.

21   We also think that there is no imminent threat of future

22   harm in part because of the three-finger swipe, and the

23   fact that once it is used people will know how to use

24   it.  So the next time, whether they had to wait, for

25   example, for Quest to tell them, they won't have to wait
```

Page 19

1    the second time because they will understand how to

2    check in.

3          And then finally on the Unruh Act claim, if the

4    ADA Act fails, which of course does not rely on primary

5    consideration, then the -- you are going to need to

6    prove intentional discrimination.  And I don't think

7    that that can be done under the circumstances.

8          MR. PORTER:  Okay.  So just to clarify then, your

9    motion is not going to be moving on mootness grounds; is

10   that correct, David?

11         MR. RAIZMAN:  Well, no, that is not correct.

12   That is the imminent threat of future harm, no imminent

13   threat of future harm.  I think mootness -- I mean,

14   mootness is also a standing principle.  And it is

15   closely related here.  We might sort of cite to some of

16   the mootness case law as well as an alternative.

17         So I think that, Jordan, is an argument that

18   we're looking at developing.  But there is still this

19   imminent threat requirement whether or not something is

20   moot or not.  But you could, I think, as a factual

21   matter sort of see them in the same light.

22         MR. PORTER:  And I guess the problem with that,

23   know, that argument, as we set forth the other day in

24   our supplemental disclosures is the three-finger swipe

25   isn't university rolled out.  Quest T.V. has not

Page 20

```
 1    universally rolled it out despite testimony to the
 2    contrary.
 3         MR. RAIZMAN:  I know that is the evidence that
 4    you guys have, and I obviously got this yesterday,
 5    effectively.  So I don't have an ability to really speak
 6    to that as a factual matter because that is news to me.
 7         MR. PORTER:  Okay.  And one of the concerns that
 8    it, of course, raises for us is before some of the Quest
 9    executives testified about that to the extent of this
10    rollout under oath I think at least three times.  What
11    sort of investigation did they do to determine if it is
12    actually rolled out.  It appears that it is not rolled
13    out in many, many, many locations, certainly nowhere
14    near 2200 locations.
15         MR. RAIZMAN:  And that is based on Mr. Derry's
16    going to 29 locations?
17         MR. PORTER:  Well, it is also based on the ACB
18    members' subsequent experience there.  So, yeah, that is
19    right, I mean the subsequent experience there.
20         MR. RAIZMAN:  Yeah.  Again, I am not in a
21    position to address it.  The actions were taken to roll
22    it out in all locations.  And, Jordan, I got this -- I
23    think it was sent to me after midnight yesterday or
24    yesterday morning after midnight.  So I didn't have a
25    chance to look at it until yesterday afternoon.  And so
```

Page 21

```
 1    needless to say I don't have a response back on the

 2    factual part of that.

 3          But that may impact our moving on that particular

 4    basis.  And I understand what you are saying, is that

 5    you are going to try to generate a factual issue on

 6    that, right.  So that may be enough of a factual dispute

 7    for us to not move on that basis.

 8          But obviously we need to look at that, and we're

 9    going to look at whether the steps were taken.  You

10    know, isolated instances, which might be what is being

11    experienced with a system this large is we don't think a

12    violation of the ADA.  And there is a regulation to that

13    effect.  And so I can't really speak to, you know, how

14    we may approach that issue, depending on what our own

15    review of facts looks like.

16          MR. PORTER:  Okay.

17          MS. BERNAL:  David, just kind of going back to

18    the earlier argument, I think we have a different view

19    of what the ADA requires, but, you know, that would be

20    for the judge to decide here.  And then on the remainder

21    we're going to agree to disagree as to whether the

22    primary consideration regs are applicable and whether

23    Quest complied with those.

24          Is there anything left on the MSJ to meet and

25    confer on?
```

Veritext Legal Solutions
866 299-5127

```
 1          MR. RAIZMAN:  I don't think so, Alison.  I think
 2     those are our primary arguments that you guys stated in
 3     your motion.  There are sub-arguments.  I have tried to
 4     reference as many of them as possible in talking about
 5     them, but they all fall under these categories.
 6          MS. BERNAL:  Yes.  Okay.  Do you want to meet and
 7     confer on the class cert?
 8          MR. RAIZMAN:  Go ahead.
 9          MS. BERNAL:  So we laid this out in our letter,
10     and I am sure you are well-versed in the Ninth Circuit
11     law on it, but for purposes of the meet and confer I am
12     just going to go through it.  And then you can let me
13     know.  I am guessing we'll agree to disagree on these as
14     well.
15          But we would move both for the nationwide and the
16     California damages sub-class for numerosity.  We would
17     argue that Quest's own records in their interrogatory
18     responses as well Mr. Grant's deposition testimony,
19     would provide the factual basis to argue that there is a
20     class so numerous that joinder of all class members is
21     impracticable for the Rule 23(a) requirement.
22          Generally you just have to show greater than 41,
23     which there is complaints from at least that many people
24     as well as the survey responses from ACB members and
25     their testimony.
```

Page 23

```
 1              I believe in the interrogatory responses as well
 2     as the deposition testimony from Mr. Grant you provided
 3     the annual number of visits both nationally and in
 4     California over the relevant class period.  And then in
 5     the Ninth Circuit you can use statistical evidence so
 6     that a numerosity expert would provide that statistical
 7     analysis based on census data.  So that's what we would
 8     contend would meet the numerosity requirements.
 9          Did you want to go on each element, or you want
10     me to just roll through all of our elements, David?
11          MR. RAIZMAN:  What is your preference, Alison?
12          MS. BERNAL:  Why don't I just go through it.  Is
13     that okay with you?
14          MR. RAIZMAN:  Sure.
15          MS. BERNAL:  For adequacy, Rule 23(a)(4), the
16     representative party would have to fairly and adequately
17     protect the interest of the class which is for both the
18     named plaintiffs and their counsel, whether there is
19     conflicts of interest with other class members and
20     whether the named plaintiff and the counsel can
21     prosecute the action vigorously on behalf of the class.
22          On this Mr. Vargas testified at his deposition
23     regarding the steps he has taken to be a good class rep
24     including supervising the litigation, responding to
25     document requests, consulting with counsel dozens of
```

Page 24

```
 1   times, approving filings, preparing and sitting for his
 2   deposition.  He has knowledge of the key facts including
 3   the jurisdiction, the judge, and the causes of action.
 4   And I think this would meet the fairly low threshold
 5   that is required in the Ninth Circuit and the Central
 6   District to be a class rep.
 7        And then we would further submit declarations on
 8   behalf of our firm and our co-counsel, Mr. Handley's
 9   firm setting forth the class counsel's adequacy of
10   representation which I think would also meet the
11   23(a)(4) requirements.
12        For typicalities, the claims just have to be
13   typical of the class.  So if they arise in the same
14   course of events and they make similar legal arguments
15   to prove the defendant's liability, so this again would
16   look to Mr. Vargas's testimony regarding his visits to
17   Quest and the fact that he encountered a kiosk that was
18   not independently accessible.  This is consistent with
19   the sworn testimony from ACB members as well.
20        On typicality, Mr. Vargas testified that he is
21   seeking the minimum statutory damages, not compensatory
22   damages, so this goes to show typicality would be met if
23   he is not an individual seeking compensatory damages
24   that would otherwise be available under Unruh, and that
25   further ensures his claims are not atypical from the
```

Page 25

1    class as a whole.

2         Commonality, 23(a)(2), members of the class may

3    sue or be sued as representative parties on behalf of

4    all members if there are common questions of law or fact

5    to that class.  So here we have the witnesses admitting

6    the kiosks are not accessible.  I think this would kind

7    of tie in to what you had earlier said more of the

8    undisputed facts of summary judgment, you know, the

9    common questions of facts are the accessible of the

10   kiosks, whether legally-blind individuals may use those

11   kiosks.

12        We would guess here those kiosks were rolled out

13   across the 2200 PSC network.  There wasn't training on

14   how to assist blind individuals with use of the kiosk.

15   I think that is Yarrison, Reilly and Carr who testified

16   as to that.  And then for the commonality as well,

17   just -- sorry.  I lost my train of thought completely.

18   I got an email that completely distracted me.  So that's

19   what we would get to on commonality.

20        Now I think where more of the cite maybe is a

21   23(b)(2) requirement.  I am sorry, the 23(b)(2) would be

22   for the nationwide class.  So that is whether Quest has

23   acted or refused to act on grounds generally applicable

24   to the class.  Here we would cite to the admission,

25   again, that the kiosks were not independently accessible

1   throughout the class period for blind individuals across

2   the nationwide network, the testimony of the 48 ACB

3   members and Mr. Vargas, that they were identically

4   harmed by the lack of an independently accessible kiosk.

5        And then for 23(b)(3), that we need to show the

6   predominance over individual questions, and so here we

7   have the common interest that predominates because all

8   legally blind individuals were injured in exactly the

9   same way.  The kiosk was rolled out the same across

10  every PSC in California.  That is the Yarrison and Carr

11  depositions.  None of the kiosks were accessible for

12  blind patients, which is Yarrison's deposition.

13       The individual issues that California and

14  sub-class members would have do not predominate, and

15  again, this is because Mr. Vargas testified clearly, and

16  the complaint is clear that it is seeking minimum

17  statutory damages which do not require individual proof

18  of intent.  I think that is the Target.com case that

19  clarifies intentional discrimination is not required for

20  an Unruh Act claim predicated on an ADA claim.

21       So with that in mind we just need to prove

22  through statistical census data that the number -- show

23  the number of visits by each claimant during the class

24  period, which is information Quest itself has within its

25  custody and control so it would be capable of easy

Page 27

```
 1   calculation and then some verifiable proof of legal
 2   blindness.
 3        This can be accomplished, as other courts have
 4   allowed, through a variety of means, SSDI registration
 5   based on legally-blind status, government issued I.D.
 6   cards identifying the claimant's blindness, note from a
 7   physician diagnosing blindness.  There is a variety of
 8   ways that courts have allowed this.  And this is
 9   something that a claims administrator is fully capable
10   of accepting or rejecting claims that are submitted to
11   them, so it is not a barrier to calculation.
12        So I think those would be our main arguments
13   there.  I mean, I don't want to go into every case cite
14   or anything like that.  But do you have any specific
15   questions on that?  Oh, I think I missed superiority.
16   Apologies for that.
17        So additionally, under 23(b)(3) we would argue
18   that the class action is a superior method to resolving
19   this than individual adjudication.  This is because --
20   hold on one second.  Sorry about that.  So for
21   superiority under 23(b)(3) there is no indication
22   anywhere in the records that class members have an
23   interest in individually controlling their own cases.
24   The cost of litigating individual matters is
25   prohibitive.  There haven't been any corollary lawsuits
```

Page 28

1    against Quest for this.  There is really no unique

2    difficulties in managing this class action.  It is

3    really the most efficient way to address the legal and

4    factual issues to determine if these class members are

5    entitled to relief.  So those would be our arguments on

6    class certification.

7          MR. RAIZMAN:  Okay.  I think we have broad

8    differences of opinion that I know we are not going to

9    bridge in this call, but let me just ask a couple of

10   questions.  You said you have numbers for the annual

11   number of visits.  I think you are talking about the

12   annual number of total visits, right, not class member

13   or putative class member visits?

14         MS. BERNAL:  Correct.  So from that -- and I

15   believe these are both -- and I don't have the exact

16   numbers.  I think Mr. Grant testified something like

17   250,000 patients a day visit Quest nationwide.  And then

18   in the interrogatory responses there is the annual

19   number of visits in California and nationwide.  So

20   through that it would then be a statistical analysis

21   which the Ninth Circuit has allowed.

22         MR. RAIZMAN:  That's what I thought.  I just

23   wanted to know whether you had -- were claiming

24   something about class members' numbers.

25         MS. BERNAL:  No.  Individual class numbers I

Page 29

```
 1    think you can get above 41 for at least the nationwide
 2    one based on the complaint and the ACB members'
 3    testimony.
 4          MR. RAIZMAN:  So on the adequacy, how does it
 5    work between ACB and Mr. Vargas with respect to
 6    determining what is best for the class?
 7          MS. BERNAL:  So the class -- and I will
 8    double-check on this, but my understanding is we are
 9    moving for certification on behalf of Mr. Vargas.  And
10    he would be the class representative.
11          MR. RAIZMAN:  Okay.  So ACB is playing no role in
12    that?
13          MS. BERNAL:  Yeah.
14          MR. RAIZMAN:  Are its members members of the
15    class?
16          MS. BERNAL:  Well, they would be putative class
17    members.  They are not representative class members.
18          MR. RAIZMAN:  Right.  So they are represented by
19    ACB and by Mr. Vargas?
20          MS. BERNAL:  I don't think the associational
21    representation is the same as the representation for
22    purposes of adequacy.  They are members of ACB, and they
23    agreed to testify as they had made complaints in
24    declarations, but there is a difference there as far
25    as -- you know, there is not really two levels of
```

Page 30

1    representation for purposes of this class certification.

2          And, David, I do just want to clarify.  I am

3    double-checking, but I believe that class cert will be

4    brought on behalf of Mr. Vargas as the class

5    representative.  I want to double-check that.

6          MR. RAIZMAN:  That's always been the allegation.

7    I didn't think that -- I think Matt has probably said

8    elsewhere that ACB is not the class rep.

9          MS. BERNAL:  Yeah.  I don't think that is proper

10   to bring them as a class rep either on some of these

11   claims.

12         MR. RAIZMAN:  Okay.  We're clearly going to

13   disagree on typicality.  I think everybody has

14   experience, but I don't -- you know, I don't what to say

15   about that.  So you went through these factors as they

16   related to the first kiosk.  My question is do they also

17   relate to the experiences with the current kiosk, the

18   one that has the three-finger swipe in it?

19         MS. BERNAL:  Most of the factual evidence that we

20   have is based on the, you know, pre-complaint kiosk that

21   did not have the three-finger swipe.  And as the

22   investigation showed and the individuals' experiences

23   showed, they did not all get to encounter that

24   three-finger swipe on subsequent visits.  So I believe

25   the factual -- you know, both through discovery and

Page 31

```
 1    depositions and everything, that, you know, we get

 2    through this case was based on the prior kiosk.

 3           MR. RAIZMAN:  So are you challenging the current

 4    kiosk in any of the claims, or are you just saying that

 5    in response to an argument that we'll make that it is

 6    moot?

 7           MS. BERNAL:  Well, it would --

 8           MR. RAIZMAN:  Sorry.  Go ahead.

 9           MS. BERNAL:  Sorry.  I completely cut you off

10    there if you wanted to finish.  I thought you were

11    finished.

12           MR. RAIZMAN:  I think you probably understood my

13    question.  So I am okay.

14           MS. BERNAL:  Yeah.  So we would use that to both

15    challenge a mootness argument on the three-finger swipe,

16    so that's, you know, to the extent I don't know if

17    mootness would come up in the class cert, but certainly

18    in responding to the MSJ that would be the main purpose

19    of that, you know, saying that this fix is not actually

20    the fix that is needed.

21           I don't -- and I think through that argument it

22    would necessarily probably tie back into the class cert

23    because to the extent, you know, our class period goes

24    into the time after the three-finger swipe, we would

25    have to show that even with the three-finger swipe it is
```

Page 32

```
1    still accessible to the blind individual.  And I think
2    there is that testimony and that evidence through the
3    investigation.
4         MR. RAIZMAN:  You just preliminary sort of
5    answered one of my questions.  It is what is the class
6    period.
7         MS. BERNAL:  So we don't have it -- let me check
8    my notes on this, David, to make sure I am not speaking
9    out of turn.  Bear with me for one second.  You know,
10   David, I don't have the exact class period right now.  I
11   am going to write in that my notes to get that back to
12   you.  That is not something we decided on finally yet.
13        MR. RAIZMAN:  Okay.  I think that is relevant to
14   a lot of what we might oppose.  And what is your -- I
15   think you suggested it.  So you would not have
16   individual adjudication of people's damages claims?
17   They would just submit that they visited and that they
18   are probably of status to be a member of the class.  And
19   that's the way you would attempt to prove entitlement to
20   damages?
21        MS. BERNAL:  Yeah.  And I think that is something
22   that not necessarily has to be decided on class cert,
23   but that is something that if a class is certified the
24   claims administrator is capable of undertaking questions
25   to determine whether that person visited Quest, and then
```

Page 33

```
 1    that person can certify through a variety of means,
 2    through government, medical, note or something that they
 3    are legally blind.  It is something that the claims
 4    administrator could decide and doesn't have a barrier,
 5    doesn't make the class unmanageable.
 6          So, yes, statutory, statutory damages only, so
 7    they are not submitting proof of, you know, their
 8    general damages.  It would just be a statutory analysis.
 9          MR. RAIZMAN:  And no analysis of what happened to
10    them on their visit?
11          MS. BERNAL:  Just that they had visited that
12    Quest location during the class period and they are
13    legally bland, yes.
14          MR. RAIZMAN:  No analysis, for example, that they
15    walked in and got served right away because a
16    phlebotomist greeted them when they walked in right away
17    and they got helped right away, served right away, that
18    you would still allow a claim under that circumstance?
19          MS. BERNAL:  I don't think it needs an individual
20    inquiry on that, no, when it is a universal across the
21    board implementation of the kiosk.  Because there is
22    still a service that PSC has that was inaccessible to
23    the class member who visited it.
24          MR. RAIZMAN:  Right.  This is why you don't have
25    a lot of damages, Unruh Act damages to point to, at
```

Page 34

```
 1    least not since Dukes?  Because we don't think that is
 2    right at all.  We do think we're entitled to defend each
 3    claim.  You don't just -- you don't just cha-ching an
 4    Unruh Act claim.  You have got to prove up.
 5         I also strongly challenge the idea that this is
 6    superior or that the cost prohibitiveness of bringing
 7    individual claims is some factor here, because I think
 8    we all understand just how prevalent these are.  And
 9    Judge Gee will know, any judge that is sitting in the
10    Central District will know that the idea that these
11    class members are somehow unwilling to bring claims
12    simply doesn't hold water.  And so I don't quite
13    understand how you can assert with a straight face that
14    the cost of litigating individual lawsuits is
15    prohibitive.
16         So I think we have strong differences on
17    superiority and what is required in managing the claims.
18    But I am interested to hear that you are not -- you are
19    not proposing any actual adjudication of the -- you
20    know, before a court or jury, for that matter, of the
21    Unruh Acts damages.
22         MS. BERNAL:  Correct in that we're just seeking
23    the minimum statutory not compensatory.
24         MR. RAIZMAN:  Do you guys know offhand -- I don't
25    remember whether you had a jury trial demand.
```

Page 35

```
 1          MS. BERNAL:  I would think we did, but I think it
 2   would also depend on what claims are left at the end of
 3   obviously injunctive relief when we get there.  Let me
 4   get back to the pleadings.
 5          MR. RAIZMAN:  That is okay.  You either did or
 6   you didn't.  I guess that is the part that I assumed you
 7   did, and I have been operating under the assumption that
 8   you did.
 9          MS. BERNAL:  I assume as well.  Let me check.
10   Yeah, jury trial demanded, yeah.
11          MR. RAIZMAN:  You are obviously seeking to
12   adjudicate these claims without a jury.
13          MS. BERNAL:  No.  I don't think that is correct.
14   I mean, if we get -- if we get the certified -- and then
15   it is for the jury to decide whether there were
16   violations of the law, and they can do the math on it.
17          MR. RAIZMAN:  Wait a minute.  I thought you said
18   you were going to manage this by having people submit
19   their government-issued I.D. card or their SSDI status
20   and the number of visits they had.
21          MS. BERNAL:  Yes.  So that would be, though, at
22   the end.  So a jury would determine the liability, and
23   then in order to get the damages administered to the
24   class, that's how they would go.
25          MR. RAIZMAN:  The jury would determine liability
```

Page 36

```
1    as a class.  The amount of damages or entitled to
2    damages is sort of a yes, no, the $4,000?  It is sort of
3    in the claims administrator's hands?
4             MS. BERNAL:  Do you have anything further on the
5    class certification motion?
6             MR. RAIZMAN:  That is a question.
7             MS. BERNAL:  That was a question?
8             MR. RAIZMAN:  Yes.
9             MS. BERNAL:  Oh, sorry.  I thought that was a --
10            MR. RAIZMAN:  I want to understand.  You are
11   proposing a way to adjudicate these damages claims,
12   right, the (b)(c) part.  And my question for you is it
13   seems to be unfolding in front of me, no fault of yours.
14   We're trying to do this as efficiently as possible.  I
15   just want to understand.  You are proposing that a jury
16   will decide liability as to the entire class, and then a
17   class administrator of some sort will then give a
18   determination, yes, no, as to $4,000 only based on
19   whether someone can prove they're legally blind or
20   sufficiently blind and then that they, in fact, visited.
21   Is that how you are proposing to adjudicate the damages
22   claim?
23            MS. BERNAL:  You know, I haven't thought through
24   the trial strategy at this point.  I was focusing just
25   more on the predominant factors for class certification.
```

Page 37

```
 1    But I think for purposes of class certification, setting
 2    out the claims administrator is more than capable of
 3    handling this, whether it is after trial or after a
 4    class action settlement, it is sufficient to meet the
 5    predominance.
 6          MR. RAIZMAN:  I am talking about superiority.  I
 7    am talking about, in your own words, unique issues in
 8    managing the class.  And I am talking about the (b)(3)
 9    class.  You don't have a proposal at this time for how
10    that is going to happen?
11          MS. BERNAL:  For the 23(b)(3) superiority?  I'm
12    sorry.  I thought you were talking about predominance.
13    So I don't think that really impacts superiority.  Are
14    you talking about the difficulties in managing the class
15    action?
16          MR. RAIZMAN:  Yeah.  What is your plan for how
17    that is going to happen?
18          MS. BERNAL:  Yeah.  So if there is liability,
19    whether that is decided by the Court or a jury, there
20    will then -- with a liability determination, you can
21    create a pool for class members to submit to.  They
22    would submit that to a claims administrator, get through
23    the process we set forth above, and that would say
24    either you are entitled to that or you are not entitled
25    to that.  I think that presents no greater difficulties
```

Page 38

```
 1    than any other sort of class action.  And it is, in
 2    fact, easier than a lot of consumer-type class actions
 3    in managing it.
 4         MR. RAIZMAN:  Okay.  All right.  So if I can
 5    suggest that our most urgent task is to try to reach
 6    agreement on these two briefing schedules.  Will you try
 7    to get back to me as soon as possible, sort of first in
 8    concept on the 15th, and then working back from there we
 9    can talk about briefing schedule?
10         MS. BERNAL:  Yes.
11         MR. PORTER:  Yes.  We will have that to you no
12    later than tomorrow morning, probably this afternoon.
13         MR. RAIZMAN:  Yes.  I mean, I think we really
14    need to know that.  I understand, and I have to talk to
15    my client too.  So I am not saying for you to do what
16    you can't do.  But whatever you can do will certainly
17    answer our ability to brief it.
18         MR. PORTER:  Right.  I would say I will get back
19    to you this afternoon, but I don't know that I could be.
20    I will get back to you tomorrow morning.  If we get
21    there this afternoon we'll certainly let you know right
22    away.  I am sensitive to the issues.
23         MR. RAIZMAN:  Okay.  Awesome.  I am running late
24    for another call.  I appreciate your time this morning,
25    and hopefully we'll be in touch had afternoon.
```

Page 39

1

2                    (TIME NOTED: 11:04 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 40

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4             That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were administered an oath; that

8     a record of the proceedings was made by me using

9     machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12            Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [ ] was [ ] was not requested.

16          I further certify I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or any party to this action.

19           IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21

22    Dated: August 30, 2021

23

                    _____

24                  JOANNA BROADWELL

25                  CSR No. 10959

Page 41

# EXHIBIT H

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               WESTERN DIVISION

4                    -oOo-

5     HONORABLE DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

6

7   JULIAN VARGAS, ANNE WEST, and
    AMERICAN COUNCIL OF THE BLIND,
8   individually on behalf of
    themselves and all others
9   similarly situated,

10                    Plaintiffs,

11        v.                          No. 2:19-cv-08108-DMG

12  QUEST DIAGNOSTICS CLINICAL
    LABORATORIES, INC., QUEST
13  DIAGNOSTICS HOLDINGS, INC.,
    QUEST DIAGNOSTICS INCORPORATED;
14  and DOES 1-10, inclusive,

15                    Defendants.

16

17          REPORTER'S TRANSCRIPT OF MOTION HEARING

18              LOS ANGELES, CALIFORNIA

19                OCTOBER 8, 2021

20   _____

21

22              SUZANNE M. McKENNON, CRR, RMR
                UNITED STATES COURT REPORTER
23
                UNITED STATES COURTHOUSE
24              350 W 1st STREET, ROOM 3411
                LOS ANGELES, CALIFORNIA 90012
25                  (213) 894-3913
                 suzanne@ears2hands.com

```
 1    APPEARANCES:

 2    On Behalf of the Plaintiffs:

 3          JONATHAN D. MILLER, Attorney at Law
               Nye, Stirling, Hale & Miller, LLP
 4             33 W Mission Street, Suite 201
               Santa Barbara, California 93101
 5

 6

 7    On Behalf of the Defendants:

 8          DAVID H. RAIZMAN, Attorney at Law
               Ogletree Deakins Nash Smoak and Stewart PC
 9             400 S Hope Street, Suite 1200
               Los Angeles, California 90071
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                (Proceedings commencing at 5:01 p.m.)
 2           THE COURTROOM DEPUTY:  Please remain seated and come
 3   to order.  Calling Item Number 2, CV 19-8108-DMG,
 4   Julian Vargas, et al., versus Quest Diagnostics Clinical
 5   Laboratories, Inc., et al.
 6        For the plaintiffs we have?
 7           MR. MILLER:  Thank you, Your Honor.  Jonathan Miller
 8   for the plaintiff.
 9           THE COURTROOM DEPUTY:  And for defense we have?
10           MR. RAIZMAN:  Good afternoon, Your Honor.  David
11   Raizman.
12           THE COURT:  Good afternoon, Counsel.  I assume that
13   you've had a chance to review the Court's tentative ruling.
14           MR. RAIZMAN:  Yes, Your Honor.
15           MR. MILLER:  Yes, Your Honor.
16           THE COURT:  Who would like to address the tentative?
17           MR. RAIZMAN:  I would briefly, Your Honor.
18           THE COURT:  All right.  Please stand at the lectern.
19           MR. RAIZMAN:  Will do.
20        Given the hour and the careful consideration the Court has
21   already given, I will try to be brief.  The Court has
22   focused -- Quest would argue -- improperly on services that
23   have been added after the complaint was filed.  And there is no
24   disputed issue of fact with respect to that.  Those issues
25   should not be a part of this complaint.
```

```
 1        Quest, like any place of accommodation, is an evolving
 2    business.  It's going to change.  The COVID crisis is yet
 3    another example of that.  That all happened after the complaint
 4    was filed and shouldn't be considered.
 5        Secondarily, while we're talking about those ancillary
 6    services, Your Honor, I think we can distinguish them -- and we
 7    tried to in our reply brief -- from the Bowman decision,
 8    Landis, and the other decisions cited both in the tentative and
 9    in plaintiff's opposition in a very important way.
10        All of those cases drove to the heart of the services that
11    were being provided by the place of a public accommodation.  In
12    Bowman, it was a means of transportation to spend an entire
13    day -- I want to say Disneyland.  It believe it was Disneyland;
14    it might have been another park.
15            THE COURT:  Disney World.
16            MR. RAIZMAN:  Disney World.  Okay.
17        In Landis, he was sitting and enjoying the game in
18    appropriate seats of the baseball game, the Seattle Mariner's
19    baseball game.
20        This is one aspect -- and even the justice department has
21    admitted both in its regulations and its statement of intent
22    here that you only have to provide like experiences.
23        In those other cases, including Goddard, the Harkins case,
24    involving captioning, that is at the very heart of the
25    movie-going experience, whether it's going to be captioned.
```

1      This is a means of checking in, as alleged in the
2  complaint.  And I think that really distinguishes those cases.
3  Because if the Court is going to extend the principle of
4  equality to every aspect of every service, it would impose an
5  impossibility on places of public accommodation.
6         THE COURT:  I disagree with you that I focused on
7  other aspects of the auxiliary aid or services.  I don't think
8  I spend much time talking about them, although I didn't, I
9  think, identify them.
10     I think the concern was more focused on the evidence that
11  the three-finger swipe system was not, at least according to
12  some of the evidence, not systematically implemented
13  throughout.  And that as a result, there was no communication,
14  much less effective communication, by those who are legally
15  blind or those who are sight impaired to indicate to the
16  phlebotomist sitting in the back room that they were there.
17         MR. RAIZMAN:  Respectfully, Your Honor, this system
18  is no different than the system that had been in place at Quest
19  for years with respect to signup as experienced by blind
20  patients of Quest.
21     Moreover, the fact is the phlebotomist's assistant was
22  available.  In plaintiff's evidence, there are a number of
23  examples of that.  I'll spare the Court reading that.
24         THE COURT:  NO.  I can assure you that we have dived
25  into the weeds, and there were a lot of weeds.

```
 1              MR. RAIZMAN:  Yeah.
 2              THE COURT:  But I think that, on a motion for summary
 3    judgment, there is a standard wherein I must view the evidence
 4    in the light most favorable to the nonmoving party.  And there
 5    is evidence presented that, when those who are sight impaired
 6    arrived, sometimes they didn't know where to go, and there was
 7    no phlebotomist or anyone else present in the waiting room to
 8    be able to assist them.
 9         And if that's the case, then there is no communication at
10    all, let alone effective communication.  I think the -- I think
11    that -- I seem to recall having had you present at a scheduling
12    conference or some conference in the past where I said, "Can't
13    you just have a bell at the front desk?  People can ring it,
14    and let them know that someone is present."
15         And I think that the three-finger swipe is kind of the
16    equivalent of a bell from a digital point of view.  And if it
17    works and if it's effectively implemented, it may very well
18    address the problem.  But the evidence here is that it isn't
19    effectively implemented everywhere, and there is no one present
20    to help when it isn't.
21              MR. RAIZMAN:  Your Honor, I would disagree with that
22    evidence because the evidence shows that this is how Quest has
23    operated for all of these years and has yielded a very low
24    level of complaints.  Even taking all of their evidence as
25    true, there was issues.  There are instances of prompt service,
```

1    and there were some where someone was made to wait.

2          But I want to get sort of past that issue because the

3    issue that we are disregarding, that I think would be a very

4    important one to rule on for trial, is whether the Court

5    believes that there is some obligation to make, to create an

6    independently accessible device.

7          THE COURT:  I didn't say that there is.  I think I

8    said that, if you have a device that actually works and is

9    fully implemented, that's one thing.  You've actually already

10   then created perhaps an independent device.  But to the extent

11   that it's not working, there is evidence that there is no one

12   there to help.

13          MR. RAIZMAN:  Your Honor, well, we think we're going

14   to prove that it works and it works very well.  And Mr. Vargas,

15   in fact, gave testimony that he -- yes, gave written testimony

16   in this case now that he was able to use it.

17          But putting that aside, Your Honor, the mere existence of

18   the requirement of an independently accessible device is

19   nowhere.  And make no mistake, that's the framing that the

20   plaintiffs give to this case in this complaint.  It's in

21   paragraph 3, independently accessible device.

22          THE COURT:  I know that that is their position.  And

23   I'm explaining to you I'm not necessarily finding that there is

24   such a request -- I mean, such a requirement, except that it

25   would have allowed you to have summary judgment if, in fact,

     1    there was such a device that was effectively implemented.  But
     2    the evidence is that it's not.
     3         And so, therefore, if it's not effectively implemented,
     4    then you do need to have someone who is available to
     5    communicate with the person.
     6              MR. RAIZMAN:  Yes, Your Honor.  And we believe the
     7    evidence will show that we do -- and we don't believe their
     8    evidence has shown that we don't.  In fact, we believe their
     9    evidence has shown that we do.  And, again, the challenge that
    10    they're making is not to a specific instance or isolated
    11    instance or series of instances.  It's to the mode of
    12    communication that Quest has taken.  I believe the Court can
    13    rule that the mode of communication -- either that the mode of
    14    communication that Quest has chosen is lawful -- in other
    15    words, it can provide effective communication through
    16    phlebotomist assistants.  And Your Honor may find a factual
    17    dispute about that.
    18         Or if your Honor found conversely, that there is no
    19    requirement that there be an independently accessible device,
    20    which is actually absent authority from any authority we see
    21    anywhere and is contrary to the statute's use of the word
    22    "auxiliary services," either of those would change the
    23    complexion of a trial on this issue, Your Honor, because
    24    otherwise, we will spend time on the possibly necessary issue
    25    of whether independent access is required.

```
1            THE COURT:  I think I have already stated now, the
2   third time, I don't think there is necessarily a requirement
3   for independent access.  But if you actually had it, then all
4   to the good.  But if you don't have it, then there has to be
5   some other kind of access.
6            MR. RAIZMAN:  Understood, Your Honor.  I'll stop on
7   that.
8        I hoped that the Court could give us some more guidance
9   with respect to the 51(b) claim, Your Honor, under Unruh.  I
10  believe I understand it, but as written in the tentative, I'm
11  hoping we can gain some clarity.  On the 51(f) claim, the claim
12  that incorporates the ADA claim, the Court has ruled that,
13  because the ADA claims survives, the 51(f) claim survives, and
14  I understand that.
15       But I want to understand that the claim that requires
16  intent to be proven under 51(b), what I'll call the principle
17  nondiscrimination provision in Unruh, that that claim --
18  summary judgment is being granted as to that claim; is that
19  correct?
20           THE COURT:  I believe that it is.  I don't remember
21  exactly where, but I think that I ruled that there was no
22  showing of intentional discrimination.
23           MR. RAIZMAN:  Yes, Your Honor did write that.  It's
24  in the conclusion part that -- well, if your Honor would be
25  willing to just clarify that the 51(b) claim --
```

```
1              THE COURT:  It's at page 14, line 7.
2              MR. RAIZMAN:  Right.
3              THE COURT:  "Thus the Court grants Quest's motion for
4    summary adjudication as to whether Vargas can show intentional
5    discrimination."  That means they can't.
6              MR. RAIZMAN:  Understood, Your Honor.  Finally, a
7    word about standing, because it is critical, Your Honor, and
8    it's going to come up again in a couple of weeks when we're
9    back.
10         The plaintiff's variable evidence of experiences,
11   including those reported in Mr. Derry's report, evidences that
12   showing up at a Quest could yield you any kind of experience,
13   even accepting all plaintiff's experiences as true.
14         That makes any threat of future injury speculative, as
15   does the fact that Mr. Vargas was able to use the three-finger
16   swipe.  By the way, that's the only individual -- I'm sorry,
17   there were one other individual.  There were only two people
18   total who even tried to use the three-finger swipe in their
19   evidence.  So one of them was able to use it; one of them
20   wasn't.
21         This does not permit standing for them to challenge either
22   the three-finger swipe or any injunctive relief that comes
23   because, if they're completely unable to prove that their
24   injury in the future is imminent.
25         And with that, Your Honor, we would submit.
```

1          THE COURT:  All right.  I will cross that bridge when
2     I get to it.
3          MR. MILLER:  Might I respond briefly, Your Honor?
4          THE COURT:  I'm sorry?
5          MR. MILLER:  I would like to respond very briefly.
6          THE COURT:  Yes, that's fine.
7          MR. MILLER:  Thank you, Your Honor, for your detailed
8     tentative.  I would just like to respond to a few points that
9     Counsel raised and then very briefly just address one or two
10    final issues.
11         With respect to what was in effect at the time that the
12    class period has been alleged, it's been stated that it's only
13    the check-in service; that that's all that existed at the kiosk
14    at that time.  But I would also like to point out in the record
15    that, in addition to that, the bell that you referenced, Your
16    Honor, a help button, the only way to access that, at the time
17    during the class period, to request somebody to come and assist
18    with check-in, was on the touch screen itself, a touch screen
19    that Quest admitted was inaccessible.  And I would just direct
20    the Court to Plaintiff's Fact 28 as well as Plaintiff's
21    Appendix 638 starting at line 1, which is the testimony of
22    Quest's own representative on the fact that the help button was
23    ruled out in 2017, Your Honor.
24         And Mr. Vargas went to Quest for the first time in 2018.
25    So that by the time he went there, his ability to even summon

1    someone to the waiting room to even ask for the most basic of
2    service, customer service, and help with the check-in process
3    was nonexistent because he couldn't actually access the device.
4    And he was left to stand in the front of the room wondering
5    what to do and waiting.

6        And so I think that is material in terms of the injury in
7    fact that he sustained.  And the fact that there were
8    additional components beyond just the, quote/unquote,
9    "check-in" that were available to sighted people who came and
10   wanted help in the waiting room.

11            THE COURT:  Well, doesn't that sort of link up with
12   the issue of having to wait?

13            MR. MILLER:  I think "wait" by itself is a cabin view
14   of all that the kiosk does and all that it provides either as a
15   service or access to service.  And so to say it only allowed
16   you to check in -- it also allowed you to summon someone to the
17   front to assist you, as somebody waiting.  And so it actually
18   had the ability to reduce wait for anyone sighted and having
19   difficulty.

20       Blind people couldn't access it.  The most basic,
21   fundamental asked for help.  There was no way, when they walked
22   into a Quest, to even have somebody to request effective
23   communication or assistance with effective communication, and I
24   think that is material to plaintiff's claims in this case.

25       I would also just add, Your Honor, there was some

1   statements around the three-finger swipe, but I think it's

2   important to clarify so that, when we go forward and as we go

3   forward and try to get to an effective solution in this case,

4   that Quest concedes that it has added additional services to

5   this kiosk, including, as Your Honor stated, the wait by text

6   option.

7        But important in Your Honor's ruling is Quest suggests

8   that some other methods of technology are available to access

9   that, but that is only with patients who have appointments.

10  And the record evidence is over 70 percent of the patients at

11  Quest are walk-ins.

12       And the further record evidence is that many individuals

13  with disabilities, including Mr. Vargas, rely on paratransport

14  to get to a Quest, and so they don't have the ability to make

15  an appointment, because paratransport is unreliable.

16       And for those individuals, Your Honor, services like being

17  able to wait outside at this time during COVID are just not

18  available to individuals like that at all through any other

19  means because they're Walk-ins.  So they don't have that

20  ability to utilize those services.

21       And I think that is important as we consider whether there

22  is still Article 3 because whether there is still a further

23  injury by the addition of these additional services and whether

24  there is still injury, in fact, that is occurring or likely to

25  occur, a particularized threat.

1     And I think the addition of things that people who are

2   sighted can avail themselves of when they walk into a Quest

3   that blind people can't, I think, is material to whether there

4   has been discrimination in this case.

5     I would clarify one other element that, I think, is

6   important, and then I just will turn to one last legal point.

7     There was a discussion in Quest's papers about the

8   45 complaints it received and the fact that many of those

9   complaints were, quote/unquote, "hearsay."  And I would just

10  like to note, Your Honor, that Quest concedes in the record

11  that those complaints are business records, and I think that is

12  important, and I'll explain why it's important for a second.

13     But just for the record, Exhibit 28 in Plaintiff's

14  Appendix are Defendant's Responses to Requests for Admission.

15  Request Number 4 asked them to admit that those complaints are

16  business records, and they concede that they are.

17     Why is that important?  Two reasons.  One, the evidence in

18  the record establishes that the ability to make a complaint at

19  a Quest, like Mr. Vargas did, was never recorded in these

20  complaints.  So Mr. Vargas testified that he made a complaint.

21  Quest's witness was not able to admit or deny that they had

22  made a complaint.  It never ended up in any of these complaints

23  that were received.

24     Moreover, there was no other ability to make a complaint

25  or to suggest there was difficulty.  So the number of

complaints here, as we have, is likely not reflective of the
actual number of people who have experienced these issues over
time.  And I think that is important to know in terms of what
has transpired here in the significance of it.  So I would
simply highlight that.  Under 803 -- Federal Rule of Evidence
8036, they concede it's a business record.  And so I think, as
a moving-forward basis, I just wanted to clarify that piece
very briefly.

     And then, finally, Your Honor, as it relates to the
Rehabilitation Act, I understand the Court's ruling on that
claim.  I would just note and highlight that I believe this
case is akin to Gray versus Golden Gate National Recreation
Area, 866 F.Supp.2d 1129 at 1141, Northern District of
California 2011 case.  In that case, leave to amend was given
to conform to proof, and the Court looked at whether there was
enough similarity in the record and whether the other party was
on some reasonable notice to establish that this was a theory
that was being pursued.

     And the record evidence before this Court is repeatedly in
discovery, in all the depositions through requests that were
made in written discovery.  Questions were asked of Quest about
primary consideration with the understanding that it was being
pursued under a Rehabilitation Act theory as it went forward.

     And in this instance, whether the Court deems it a
Rehabilitation Act or Affordable Care Act, Quest had an

obligation to comply with the law.  Whether they say it's the

Affordable Care Act or the Rehabilitation Act, they have that

obligation to comply.

      And I would suggest to the Court that the record evidence

is that they have not complied.  Even their training materials,

that have been now ruled out, make no reference to providing

primary consideration to individuals with disabilities, which

at a minimum, the ACA requires and was not done and still is

not done.  And so I don't think that Quest should be able to

not comply with the law and not provide individuals with

primary consideration who have disabilities merely because of a

pleading defect that could be corrected by Rule 15.

      And with that, Your Honor, we would submit and thank you

for your time.

            THE COURT:  Mr. Raizman, do you want to address that?

            MR. RAIZMAN:  The primary consideration?

            THE COURT:  Yes, the primary consideration issue.

            MR. RAIZMAN:  Which part, Your Honor?

            THE COURT:  I usually am lenient with amendments, as

I am required to be, under the rules.  The problem is that I

didn't see anything in your First Amendment -- First Amended

Complaint that had any factual link to that particular claim.

      If there had just been some factual elements alleged in

that complaint, I would have applied the Ninth Circuit's

Alvarez versus Hill case, which is that it's the facts that

1   count and not the legal theories and regularly do allow

2   plaintiffs to amend even at the MSJ stage if they've alleged

3   facts that give rise to a claim, even if they didn't have the

4   proper legal theory attached to it.

5        Here, though, I didn't see any factual allegations in the

6   complaint.  But it may be empiric victory if, in fact, they

7   decide to pursue it elsewhere in another complaint.

8        So is this something that you just want to deal with in

9   one fell swoop or just want to have another lawsuit filed that

10  alleges an ACA claim?

11           MR. RAIZMAN:  Is the answer that it's above my pay

12  grade acceptable, Your Honor?

13           THE COURT:  The answer is, I probably want neither of

14  those.

15           MR. RAIZMAN:  I certainly would like to discuss that

16  with my client as to its preferences, but it is also why we

17  laid out a number of reasons, at least one of which appeared to

18  be acknowledged in the tentative, why primary consideration

19  doesn't apply here.

20       But Your Honor is correct.  There are no allegations

21  whatsoever.  It's important to point out in this respect that

22  the rehab act claim was only in the First Amended Complaint, so

23  it wasn't even in the initial complaint here.

24       About seven months later, if my math is right, eight,

25  maybe nine now -- nine months later, when they amended with the

1    First Amended Complaint, they added rehab act.  No mention of

2    primary consideration.

3        It was about a year later, buried in a meet-and-confer

4    letter, 20-page meet-and-confer letter, that they were trying

5    to get some evidence out of us that we were claiming was

6    privileged, and they said it was relevant to their primary

7    consideration argument, and we had never heard of it.

8        So I would not tell the Court that it didn't come up,

9    because it did come up.  But it didn't come up as a factual

10   allegation.  It came up as an assertion.  And by the way, that

11   happened approximately in March or maybe February.  And there

12   has been no attempt to amend or to do anything else since then.

13       So, Your Honor, we would stand firm on that and also stand

14   on the other arguments we make, which we think are compelling,

15   as to why primary consideration, even if it exists under the

16   rehab act, without regulatory authority applies in these

17   circumstances.  I don't know how it would apply in these

18   circumstances.

19            THE COURT:  All right.  It's my understanding that

20   both sides have already gone to mediation in this case; is that

21   right?

22            MR. MILLER:  Yes, Your Honor.

23            THE COURT:  All right.  It just seems to me that this

24   is a case that cries out for being mediated and resolved.  And

25   I know you're going to go forward with the motion for class

1  certification and spend all kinds of money and time dealing
2  with that.
3       And I know it's decidedly very low tech, but wouldn't
4  putting a bell on the desk in the waiting room solve all of
5  these problems?  If the laptop -- or if the machine is not
6  working or the audio loop is not playing, wouldn't it just be
7  easier to have a bell that somebody could push at the front
8  desk if they need someone to come in and assist them?
9            MR. RAIZMAN:  Your Honor, just to reassure you, we
10  are going to mediation, as the Court ordered, one more time on
11  November 8th, and it's my hope that this ruling and perhaps the
12  class certification ruling by then will be helpful to helping
13  resolve that case.  I'm, otherwise, barred from saying much
14  more.  But I do think this is a case that should be resolved in
15  mediation.
16            THE COURT:  All right.  I'm always pushing for that,
17  if I can.  And as you can see from the fact that we're all
18  wearing masks in here, having a trial under these circumstances
19  is not the most fun.  And I'm already in a three-month trial
20  doing it.  So I can tell you, from firsthand experience, this
21  is not how you want to spend your time.
22            MR. RAIZMAN:  Understood, Your Honor.  We'll do
23  whatever we can in good faith on November 8th to try to resolve
24  it.  I've come up empty several times.  And so I hesitate to
25  say it -- this exactly why we wanted to bring a motion for

1   decertification that could have been heard today.

2          THE COURT:  Well, you can't decertify because there

3   hasn't been a class certified yet.

4          MR. RAIZMAN:  Rule 23 does permit it, Your Honor, and

5   there is case law so establishing it, so we were going to seek

6   that ruling.  We held in abeyance to not do it because we

7   thought their motion was going to be heard next Friday.

8       In any event, we'll wait until the 29th.  But that ruling,

9   combined with this ruling when it's finalized, could be very

10  helpful at mediation.

11         THE COURT:  All right.  Well, I urge you to, if you

12  can, see if you can't resolve it even before the motion for

13  class certification hearing.

14         MR. RAIZMAN:  We'll talk.

15         MR. MILLER:  Thank you very much, Your Honor.

16         THE COURT:  All right.  Thank you.  We are adjourned.

17  The matter is submitted.

18      (Adjourned at 5:28 p.m.)

19                          -oOo-

20

21

22

23

24

25

1                        REPORTER'S CERTIFICATE

2

3

4

5        I certify that the foregoing is a correct transcript of

6   proceedings in the above-entitled matter.

7

8   /s/ Suzanne M. McKennon, CSR, CRR, RMR
                                          Date:   11/08/2021
9   ───────────────────────────────
    United States Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT I

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

-oOo-

HONORABLE DOLLY M. GEE, UNITED STATES DISTRICT JUDGE


JULIAN VARGAS, ANNE WEST, and
AMERICAN COUNCIL OF THE BLIND,
individually on behalf of
themselves and all others
similarly situated,

                    Plaintiffs,

     v.                              No. 2:19-cv-08108-DMG

QUEST DIAGNOSTICS CLINICAL
LABORATORIES, INC., QUEST
DIAGNOSTICS HOLDINGS, INC.,
QUEST DIAGNOSTICS INCORPORATED;
and DOES 1-10, inclusive,

                    Defendants.


REPORTER'S TRANSCRIPT OF MOTION HEARING

LOS ANGELES, CALIFORNIA

DECEMBER 7, 2021

_____


                    SUZANNE M. MCKENNON, CRR, RMR
                    UNITED STATES COURT REPORTER

                    UNITED STATES COURTHOUSE
                    350 W 1st STREET, ROOM 3411
                    LOS ANGELES, CALIFORNIA 90012
                         (213) 894-3913
                    suzanne@ears2hands.com

```
1   APPEARANCES:

2   On Behalf of the Plaintiffs:

3        JONATHAN D. MILLER, Attorney at Law
         ALISON M. BERNAL, Attorney at Law
4             Nye, Stirling, Hale & Miller, LLP
              33 W Mission Street, Suite 201
5             Santa Barbara, California 93101

6

7   On Behalf of the Defendants:

8        DAVID H. RAIZMAN, Attorney at Law
              Ogletree Deakins Nash Smoak and Stewart PC
9             400 S Hope Street, Suite 1200
              Los Angeles, California 90071

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              (Proceedings commencing at 4:34 p.m.)
2              THE COURTROOM DEPUTY:  Please remain seated and come
3    to order.  Calling Item Number 4, CV 19-8108-DMG, Julian
4    Vargas, et al., versus Quest Diagnostics Clinical Laboratories,
5    Inc., et al.
6        Appearances for plaintiffs first.
7              MR. MILLER:  Yes.  Good afternoon, Your Honor.
8    Jonathan Miller for the plaintiffs.
9              MS. BERNAL:  And good afternoon, Your Honor, Alison
10   Bernal for the plaintiffs.
11             MR. RAIZMAN:  Good afternoon.  David Raizman for the
12   defendants.
13             THE COURT:  Good afternoon, Counsel.
14       I assume you've had a chance to review the Court's
15   tentative on the motions in limine.
16             MR. MILLER:  We have, Your Honor.  Thank you.
17             THE COURT:  Would anyone like to address the
18   tentative?
19             MR. MILLER:  From the plaintiffs' side, Your Honor.
20   I'm sorry.
21             THE COURTROOM DEPUTY:  Please take the lectern.
22             MR. MILLER:  Thank you very much, Your Honor.  From
23   the plaintiffs' side, we seek only clarification on motion in
24   limine number 4 from Quest.  Specifically it appears that the
25   Court is inclined not to allow any other evidence that features
```

may have been introduced after the class period.  And, again,
it says that that evidence, however, could become relevant if
Quest's asserts a mootness defense if they took subsequent
action after the class period to moot the claims.

You know, it is plaintiffs' position that there are new
features available on the kiosk, for example, the wait by text
during COVID, the inquiry about whether you're experiencing
COVID symptoms, and several other similar type of inquiries
that -- again, we're not in the class period.  But if Quest
contends that they've taken action to effectively allow
communication so that, when you walk into a Quest and you say,
"I would like to wait outside," or "I'm experiencing COVID
symptoms," we believe those type of things would become
relevant if Quest says that they are now offering effective
communication and blind people still can't identify whether
they're experiencing COVID symptoms or have the ability to wait
outside by text.

We just want to be clear that we would have that ability
to introduce that type of evidence if Quest indeed asserts a
subsequent mootness defense after the class period.

THE COURT:  Yes.  Why don't we ask Mr. Raizman now?

MR. RAIZMAN:  Your Honor, if the question is whether
Quest intends to assert a mootness defense, the answer is
absolutely.

THE COURT:  Based on those changes that were made

1    after the class period?

2            MR. RAIZMAN:  Correct, Your Honor.

3            THE COURT:  Okay.  Then that means that you will be

4    able to introduce the evidence.

5            MR. RAIZMAN:  Your Honor, respectfully, I don't think

6    it equates with that, if I could be heard on that point.

7            THE COURT:  All right.  You may be heard.

8            MR. RAIZMAN:  Your Honor, the mootness defense is as

9    to the claims made by the plaintiff in their First Amended

10   Complaint and specifically, in this case, with respect to the

11   class definition, with respect to the conditions that were in

12   existence during the class period.

13       So Quest's assertion of the mootness defense isn't that it

14   moots everything that may ever happen with respect to the

15   claims or with respect to the kiosk but what happened during

16   that period that is put at issue by the First Amended Complaint

17   and/or by the defined class period that plaintiffs themselves

18   selected.

19       If we don't do that, Your Honor, we will have a

20   never-ending moving target as to whatever mootness would mean

21   as well as anything that Quest would ever do with respect to

22   the kiosk.  I wouldn't expect Your Honor's injunction, for

23   example, in this case -- is that Quest -- whatever Quest ever

24   does with the kiosk has to be independently accessible, for

25   example, or has to meet some other accessibility standard.

```
1         The Court respectfully must set -- must draw a line around
2    plaintiffs' claims so that the defendants can attack those
3    claims and defend against them.  We think the plaintiffs have
4    made clear repeatedly throughout this case that their claims
5    are about the independent accessibility of the kiosk.
6         They have secondarily defined the class period as 2016
7    through 2018.  So using either of those, Your Honor, we think
8    we have two standards by which we should be able to exclude any
9    new developments that come up or might come up after that class
10   period or, frankly, that don't involve the independent
11   accessibility of the check-in process.
12        But I understand Your Honor may have a different view on
13   the latter part.
14             THE COURT:  I guess I'm not -- I'm confused.  You
15   asked for a categorical exclusion of some of these features
16   that were added after the class period.
17        Are there any of these features that were added that
18   wouldn't be relevant to the question of effective
19   communication?
20             MR. RAIZMAN:  Your Honor, I'm sorry if I appear to be
21   evading your question.  I just --
22             THE COURT:  I guess what I'm saying is, if you are
23   going to raise a defense that these new features, or whatever
24   they may be, moot the claim, why wouldn't they be able to meet
25   that?
```

```
 1            MR. RAIZMAN:  They can, Your Honor.  But the claim
 2  has to be defined.  And that's all we're asking.  The claim has
 3  been defined about the independent ability to check in.  If you
 4  take another view, which is broader -- we don't accept it, but
 5  for purpose of compromise, I'd suggest that it is another way
 6  to look at it.  They've defined the class period as 2016 to
 7  2018.
 8        If Quest were to rollout on January 1 some new trial thing
 9  and one or two different PSCs, would that then become an issue
10  in the case and question the mootness?
11            THE COURT:  Only if you raise it.
12            MR. RAIZMAN:  Well, your Honor, all we're raising is
13  that we've mooted plaintiffs' claims.  And plaintiffs' claims
14  are defined, and they're fixed first by the First Amended
15  Complaint and then the joint pretrial conference order.  But
16  also plaintiffs have said that they're fixing their claims with
17  respect to the period 2016 to 2018.
18            THE COURT:  Okay.  What other -- maybe this is for
19  plaintiff to answer, but what other aspect of this case is
20  there other than independent accessibility?  In other words,
21  why do you need to exclude this information?  Is there some
22  other aspect of this claim that I don't know about that is
23  lurking out there.
24            MR. RAIZMAN:  No, Your Honor.  I think each of our
25  motions in limine were designed to save this Court and the
```

1    parties significant time litigating issues that we do not

2    believe exist in this case and certainly not after the Court

3    has certified the class with the class definition that exists.

4            THE COURT:  And I appreciate that.  But I guess I'm

5    just not understanding what other issues are there besides

6    independent accessibility and effective communication?

7            MR. RAIZMAN:  Well, Your Honor, if you define the

8    issue as independent accessibility, that would allow -- every

9    new feature, no matter how broadly used or if it's used in one

10   particular patient service center out of 2,100, would all of a

11   sudden become a challenge to mootness.

12       This is a class claim, Your Honor, as the Court has

13   defined it.  We are looking on a systemic basis as to whether

14   the three-finger swipe moots the claims that the class made,

15   the class, those individuals who were there between 2016 and

16   2018.

17       They cannot have complained, for example, about the

18   wait-outside feature.  And they -- because the wait-outside

19   feature was instituted in 2020 during COVID.

20       More things may come up as the COVID pandemic continues to

21   roll on.  Any number of different features may be added or

22   changed to the kiosk as time goes on.  Where does it stop?

23       Our motion attempts to draw a line.  We've offered two

24   places -- accessible check-in and the class period.  The class

25   period gives us a really clear idea and definition, and I

1   propose that that be used as a compromise here so that we at
2   least know what issues may come up.
3           THE COURT:  Well, let me hear from Mr. Miller then.
4   What other than accessible check-in are you talking about such
5   that you would need to introduce this information?
6           MR. MILLER:  Thank you very much, Your Honor.  This
7   Court noted in its summary judgment ruling that this case is
8   about effective communication and the ability to communicate
9   with the phlebotomist who is behind the close the door.
10      And what -- the issues with the kiosk is partially around
11  the check-in process, but the kiosk also now subsequently
12  allows the individual to communicate with the phlebotomist who
13  is behind the closed doors to whether they're experiencing
14  COVID symptoms and whether they want to wait outside and be
15  notified by text.
16      And to the extent that Quest is saying, "Well, hey, look,
17  we've introduced this three-finger swipe, and you get to
18  communicate now about one small feature and that should be
19  enough to moot the claim," they've introduced these other
20  features that are all about effective communication with the
21  phlebotomist behind the door.  The same theory plaintiff
22  asserts, to talk to them about whether you have COVID symptoms
23  and whether you want to wait outside so you don't have to be
24  exposed to potential --
25          THE COURT:  Well, how do you respond to Mr. Raizman's

1   point that this is a moving target if we have every new feature

2   becoming the subject of the dispute?

3           MR. MILLER:  I respond with the Supreme Court's

4   holding in Friends of the Earth, which examined the issue of

5   the mootness doctrine.  And it said very clearly that, where

6   you have additional things that get introduced -- additional

7   potential harms capable of abating review, you're introducing

8   new components to the very same device you are contending now

9   offers effective communication.

10      These are new.  Same issues in the same effective

11  communication piece, and you're introducing new pieces to this,

12  and you are now trying to narrow it down to just this one

13  feature that was in the class period.  You are doing exactly

14  what the Supreme Court rejected in Friends of the Earth that

15  you're -- there's new harms that are being imposed on the

16  plaintiffs that they can't effectively communicate about.  They

17  can't use the kiosk, so they can't tell the phlebotomist if

18  they have COVID symptoms.  They can't ask the phlebotomist to

19  wait outside.

20      And so you are allowing Quest to create new harms that

21  evade review, and that is exactly what the Supreme Court

22  rejected in Friends of the Earth.

23          THE COURT:  Well, I guess I'm -- I misunderstood this

24  motion, because I thought that it was basically addressing the

25  issue of new features that are being introduced by Quest that

1  would moot your claims, meaning that they are features that

2  would improve the situation so that you don't need injunctive

3  relief anymore.

4      What you are talking about seems to be that there are

5  other features that are harmful to your class that need to be

6  litigated?

7          MR. MILLER:  What I am suggesting, Your Honor, we're

8  comfortable with the class period.  But what Quest is

9  contending is that, in the class period, check-in was one of

10  the issues at the kiosk that you couldn't effectively

11  communicate to the phlebotomist in the back around check-in,

12  one of the items, through the communication system.

13      And they are saying they fixed that by subsequent conduct

14  that allows now a three-finger swipe at that device.  And what

15  we're saying is "Yes, however, among other things, that has not

16  been ruled out properly, and it doesn't work at all the

17  locations, as Mr. Derry had indicated.  You also have added

18  additional features that the three-finger swipe does not allow

19  you to access, i.e., announcing you have COVID symptoms or

20  wanting to wait outside by text.

21      And so they have not only implemented a new feature of

22  three-finger swipe but they added additional pieces around that

23  the three-finger does not address.  It creates new harms, i.e.,

24  relative all to the same theory of effective communication yet

25  evading review if that evidence is not permitted in

1   contravention of the Supreme Court's holding.

2          THE COURT:  I see.  All right.

3          MR. RAIZMAN:  Your Honor, may I be heard on that?

4          THE COURT:  Yes.

5          MR. RAIZMAN:  Thank you very much, Your Honor.  I'm

6   glad he mentioned the capable -- capable of repetition yet

7   evading review standard, because it has no application here,

8   and that's clear.

9      I'd invite the Court's attention to

10  Protectmarriage.com/Yes on 8 versus Bowen, 752 F.3d 827, at

11  page 836.  It's a Ninth Circuit decision in 2014.  It talks

12  exactly about the evading review standard, Your Honor.

13      And it is quite clear that it does not apply here and does

14  not apply to any new features or functionality that Quest

15  develops over time.  In fact, in the Court's language, it

16  applies only in exceptional situations justifying the rules of

17  application.  Because even if a particular controversy evades

18  review, there is no risk that future repetitions of the

19  controversy will necessarily evade review as well.  And that is

20  at 837 of the opinion.

21      The Court points out there is two critical factors that

22  have to be present to apply this in these exceptional

23  circumstances that the Court requires.  First, the challenged

24  action is in its duration too short to be fully litigated prior

25  to cessation or expiration; and, two, there is a reasonable

1   expectation that the same complaining party would be subject to
2   the same action again.
3       So with respect to that first factor -- and that is why we
4   have the traditional case of pregnancy.  Pregnancy is of a
5   duration of nine months, approximately you know what its length
6   is.  And it's not possible to litigate a matter in that
7   nine-month period.
8       We have no such bar here.  The plaintiffs, or class
9   members, are free to challenge a new harm, as Mr. Miller called
10  it, that might develop, a new injury.  And just because it
11  falls under this umbrella, what is evading review here is what
12  is at issue here in this case.  And we would suggest that it
13  requires some cabining so we understand and are not made to
14  respond to a moving target.
15      The mootness defense applies to plaintiffs' claims here.
16  And a convenient standard may be the class period, if
17  Mr. Miller is indeed willing to use that period.  So any
18  features that were developed or unfolded either at the initial
19  rollout or during the class period but nothing afterwards.
20          THE COURT:  All right.  I understand better now.  I
21  am going to take that particular ruling under submission.
22      Anything else?
23          MR. RAIZMAN:  Anything else more broadly, Your Honor?
24          THE COURT:  Yes.  The other parts of the tentative.
25          MR. RAIZMAN:  Yes.  Your Honor, I'd suggest that

```
1   Quest has a very different view of the impact of Your Honor's
2   order on class certification and how it affects what is
3   relevant in this case.  And that sort of trails through a lot
4   of the other rulings that the Court has made here.  I don't
5   want to impose my thoughts or my opinions on the Court's agenda
6   at this pretrial conference, so I would respectfully ask for an
7   opportunity to address that issue as a threshold matter.
8           THE COURT:  Why don't you give me a hint of what
9   you're thinking about?
10          MR. RAIZMAN:  Well, Your Honor, if the class is
11  defined as it's defined, where the Court, you know, ruled --
12  and I found seven different times in Your Honor's order --
13  sorry, six different times in Your Honor's order where the
14  Court said something like the issues here were the mootness and
15  whether the kiosk must be independently accessible or define
16  the class.
17      Vargas seeks to certify a class which was denied equal
18  access to Quest's services because of the absence of
19  independently accessible self-service kiosks.  And the Court
20  emphasized in its order, Your Honor, that that is the very
21  definition that was picked by the plaintiffs, and they're so
22  limited by that.
23      In the companion case against Lab Corp, Your Honor, it's
24  very interesting that their class definition -- and that is the
25  case of 2:20-CV-893-FMO-KS.  And I am looking at the joint
```

1   motion that Judge Olguin requires on his motions.  Document

2   66-1 at page 30 contains plaintiffs' iteration of what the

3   class definition is.

4       It's functionally identical to the definition here except

5   it leaves out the word "independently accessible" -- I'm sorry,

6   it leaves out the word "independently."  So it just says, "Due

7   to Lab Corp's failure to make its eCheck-in kiosk accessible to

8   legally blind individuals."

9       This was not a mistake.  This is how plaintiffs themselves

10  had defined this case in terms of independently accessible.

11  Your Honor has recognized it, but I'm afraid is abandoning it

12  in permitting the evidence that is allowed here because the

13  Court should decide that issue and decide it first about

14  whether the kiosks need to be independently accessible.

15      There is this misconception, I believe, that is operating

16  here that plaintiffs had perpetuated.  But you have two

17  choices:  Either the auxiliary aids and services provide

18  effective communication or you have to have an independently

19  accessible device.  I would challenge anyone to find any legal

20  principle that supports that idea.

21      The cure for not providing effective communication through

22  auxiliary aids and services is to provide auxiliary aids and

23  services that provide effective communication.  The result is

24  not like a toggle switch.  Oh, then you must have an

25  independently accessible device.  And that appears to be the

1    dichotomy, which I would suggest is a false one, Your Honor,
2    that is operating in this case and is going to trickle through
3    all of the evidence and frankly what needs to be tried in this
4    case.
5        Plaintiffs can't have it both ways.  They've defined the
6    class.  They've defined it quite intentionally with respect to
7    independent accessibility and that notion is not an accident.
8    It was in their First Amended Complaint, and it's throughout
9    their papers.  Your Honor has recognized it.  And that notion
10   is what allows the class to be certified because, otherwise, we
11   have a variety of circumstances with respect to class members
12   experiencing different auxiliary aids and services at 2,100
13   different PSCs that are differently staffed, have different
14   levels of congestion and popularity with patients, and so on
15   and so forth.
16       So we're just getting ourselves back into the problem of a
17   lot of independent evidence.  One of the things that comes up
18   in the Derry context is we're going to have a bunch of
19   anecdotes from ACB members, from Mr. Vargas and, I suppose,
20   from Mr. Derry if your Honor upholds the tentative on that
21   motion, that is going to show that a very statistically
22   insignificant number of individuals on a very statistically
23   insignificant number of occasions had trouble at Quest.  And
24   that is not going to prove anything systemically with respect
25   to whether Quest's auxiliary aids and services work.

1      So I would ask Your Honor, just as a threshold matter, to

2  adhere to its class certification order and put to the parties,

3  perhaps, to brief the legal issue, just from the outset, about

4  whether the device itself needs to be independently accessible.

5  That's -- I apologize -- that's in a nutshell the threshold

6  issue I would like the Court to address.

7         THE COURT:  All right.  Well, it would have been

8  helpful if you had directed me to which motion in limine you

9  were addressing.  I thought you were talking about the ones

10  that had to do with the damages subclass.  You are talking

11  about the Derry report.

12         MR. RAIZMAN:  The Derry report.  Number 5 --

13  number -- you know, number 5 is on the experiences that people

14  had at Quest which goes directly to the notion of are those

15  experiences such as they may be relevant if the class is

16  defined as a class that was denied services because of the

17  absence of an independently accessible device.

18         THE COURT:  Well, I think that part of the reason

19  why -- I mean, obviously, I would be more than happy to decide

20  the legal issue if it was purely susceptible to a motion for

21  summary judgment type of situation, which you obviously tried.

22      But I found that there were triable issues that affected

23  that particular legal issue.  And so I don't think that it's

24  worthwhile to have you try that again and have me only to reach

25  that same conclusion again.

1      MR. RAIZMAN:  Well, Your Honor, there is this gap

2 here, and Your Honor can obviously -- your disagreement is

3 going to be a profound one for how this case gets tried.

4      But in my view we appear to disagree with the Court that

5 there is this toggle switch between whether the auxiliary aids

6 and services provide effective communication, and if they

7 don't, then you have to have an independently accessible legal

8 device.  That doesn't exist.  We didn't have the opportunity to

9 brief that, Your Honor --

10      THE COURT:  I don't think I've ever said that you

11 have to have an independent device.  I think the whole reason

12 that arose is because, if you did have an independently

13 accessible device, then that would resolve the question of

14 whether the auxiliary services are necessary.

15      MR. RAIZMAN:  It would, Your Honor.  And we think the

16 three-finger swipe does that and moots those questions.

17      But they still have to prove their case in chief first

18 before we get to our mootness defense.  And as they've defined

19 the class and as Your Honor has entered and certified that

20 class definition, it's based on individuals who have been

21 deprived legal services because of the absence --

22      THE COURT:  You mean lab services?

23      MR. RAIZMAN:  Been denied -- I'm sorry.

24      THE COURT:  You said, "Legal services."

25      MR. RAIZMAN:  I meant services.  I am not sure.

1    Okay.

2              THE COURT:  I don't think this case is about legal

3    services.

4              MR. RAIZMAN:  It is not, Your Honor.  I apologize.

5              THE COURT:  That is one thing I will cabin.

6              MR. RAIZMAN:  We can all agree on that, Your Honor.

7         The denial services because of the absence of an

8    independently accessible device.  And, again, that is not a

9    mistake in wording.  They didn't drop that word independently

10   in there by accident.  They knew what they were doing, and

11   that's the way the class has been certified.

12             THE COURT:  How do you envision this to be subject to

13   a legal determination?  How would you set that up?

14             MR. RAIZMAN:  Well, Your Honor, I believe it's a

15   purely legal question.  Plaintiffs can disagree with me.  They

16   can disagree with my assertion that there is no toggle switch

17   here.

18        But to me it's a legal determination about whether the

19   device needs to be independently accessible.  And to us, I

20   think, the answer is clear.  We say it's clear that it does not

21   have to be.

22        I think Your Honor's ruling on that alone would be helpful

23   however the trial proceeds.  But in any event, we think it

24   disposes of the need for trial because of the way the class has

25   been defined.  It disposes of the need for trial unless Your

1    Honor says, "You need to have an independently legal device."
2    If your Honor ruled that way, we would attempt to prove that
3    the three-finger swipe does provide an independently accessible
4    device.
5             THE COURT:  All right.  I am going to have to
6    contemplate that.
7             MR. RAIZMAN:  Understood, Your Honor.
8             THE COURT:  You're going to have a chance to
9    contemplate that, too, because, as you will see, you're not
10   going to trial next month.
11       Is there anything else about the tentative ruling that
12   anyone wants to address?
13            MR. MILLER:  Your Honor, I would say, if you're
14   inclined to contemplate it, I would at least like to be heard.
15            THE COURT:  Yes, please.
16            MR. RAIZMAN:  And there are a few more smaller items
17   on the motions in limine we would like to address, Your Honor.
18            MR. MILLER:  Just very briefly, Your Honor.  This
19   Court correctly, in ruling on summary judgment, recognized that
20   this is an effective communication case.  That is at the
21   fundamental heart of plaintiffs' theory.  It always has been
22   since we put this forth, and the class definition doesn't
23   modify it.  That is just an effort to relitigate the class
24   issues again.
25       But having other witnesses testify to support what we

believe is the evidence here and for the class about how did Quest communicate to a blind individual, when they walked into a patient service center during the class period, how to check-in?  How did Quest -- this is now -- there is now a kiosk.  How did they communicate how to ask for help if they were having difficulty and couldn't access that kiosk?

These are common issues.  They're right there, all ineffective communication.  And Mr. Raizman's attempting to just singularly focus it and say, "You have to rule as a matter of law.  It has to be independent."

The Court got this correct.  It's looked at this case as an effective communication case such that under Robles we look at whether the kiosk and the implementation of keeping phlebotomists in the back is an impediment to access to be able to communicate to that person behind the door, and that is the issue.  It's whether that provided effective communication.

And so I agree with the Court's analysis.  I disagree with Mr. Raizman about the toggle switch.  Somehow some way they had to do this, and we think we can prove that they put an impediment into place that affected everyone.  And the class members' testimony on those issues is going to be truncated, several by deposition but a few in person, and it's going to illuminate that there were these common issues; that they all had those same experiences.

There was no communication when you walked in about how

1    you checked in.  There was no communication about how you

2    requested help.  Those were only available to sighted people

3    who could see and use the kiosk and communicate with that

4    phlebotomist behind the door.

5        So I just wanted to be heard on that point.  I think the

6    safer path, as we've articulated on these issues and any others

7    that the Court is looking at, you know, citing the Coppi versus

8    City of Dana Point case, which is page 7 of our opposition to

9    motion number 4, it's a bench trial.  There is no prejudice

10   here.  We're not dealing with a jury.  We think that the

11   evidence should come in.  It's going to be short in nature and

12   duration, and then you can decide what weight to give it on the

13   mootness issues or on any of the other issues.  This is not

14   going to involve a multitude of additional witnesses or time

15   savings.

16       These are going to be the same witnesses.  If they get up

17   and say they did a three-finger swipe, we're going to ask them

18   the same questions about "Does that allow you to do this?  Does

19   that allow you to do that on the kiosk?  Does that moot the

20   issue sufficiently?"

21       And so I think that you just hearing the evidence and

22   deciding what weight to give it at the end is the right

23   approach here.  Thank you, Your Honor.

24           THE COURT:  All right.  What other small issues did

25   you want to raise, Mr. Raizman?

```
1           MR. RAIZMAN:  Thank you, Your Honor.  I'll try to do
2    this quickly, because again the Court has clearly given thought
3    to these issues in its tentative, or as reflected in its
4    tentative.
5           With respect to Dr. Montgomery, Your Honor, this is
6    really -- there is simply nothing in her report that suggests
7    she's doing anything other than offering legal opinions based
8    on legal standards that don't apply here to fatal wrongs here.
9    The Court seems to recognize that in a couple of different
10   places.
11          But with respect particularly as to fundamental
12   alteration, while she uses the word in one place in her
13   opinion, she never offers any opinion whatsoever with respect
14   to fundamental alteration.  Your Honor, we recognize, of
15   course, that this is a bench trial, but Daubert still applies
16   in bench trials.  And with respect to her testimony she has
17   clearly failed to meet the Daubert standard of relying on
18   anything.
19          In her testimony at deposition at pages 134 to 136, she
20   goes on extended -- I'll only read a part of it.  They haven't
21   gone -- she's talking about the kiosk standards that she's
22   advocating.  They haven't gone through the peer review process
23   that a set of standards or legal standards have gone through.
24          She says later, in the standard creation process, it
25   consolidates a lot of different best practices.  It
```

1   consolidates a great deal of research from across industry,

2   often worldwide, and then it brings solutions to a table where

3   people reach consensus about what an acceptable solution is.

4       She's taking a group of standards that actually say they

5   don't apply here and is trying to apply it here even though she

6   says they haven't gone through the standard review process.

7   That respectfully suggests, when you apply Daubert to that, it

8   fails by her own deposition testimony.

9       THE COURT:  Well, Daubert can be applied in many

10  different ways under different circumstances.  This is not

11  necessarily a case about lasers or anything.  It's the use of

12  an analogy.

13      I am not going to find that the ATM standards are binding,

14  but if they want to draw some sort of analogy on some examples

15  of how these technologies are used in other ways, that would be

16  permissible.  And it is a Court trial, so I think I can make

17  the distinction between what is a legal conclusion and what is

18  merely factual inferences.

19      MR. RAIZMAN:  Yes, Your Honor.  And, again,

20  permitting the testimony, it will take the Court time and the

21  parties time.  And I don't think, if you look at the entirety

22  of her report, she's offered anything but legal opinions based

23  on incorrect legal standards.  And the one area where she just

24  offers a legal opinion is nowhere supported, the fundamental

25  alteration.  So I will rest with that.

```
1          THE COURT:  I think you will make an objection at an

2   appropriate time when she makes a legal conclusion, and I will

3   probably sustain that objection.

4          MR. RAIZMAN:  All right.  Thank you, Your Honor, for

5   allowing me to be heard on that.

6      With respect to Greene, there are numerous problems with

7   his testimony that have been pointed out.  Your Honor appears

8   to recognize or say that Quest asserts -- or Quest's only

9   argument that is relevant to this issue is that it has an

10  unacceptably large error rate.

11     That's not the only one.  There are several referenced in

12  our motion.  We think this -- it appears that the Court just

13  wants to consider this with respect to numerosity.  But that's

14  the very place where it completely lacks any science, as

15  pointed out by Dr. Krock in his testimony, that we tried to

16  summarize in our motion.

17         THE COURT:  Well, that goes to weight, not

18  admissibility.

19         THE COURT:  Well, Your Honor, I would say again that,

20  particularly when focused on numerosity, this lacks the

21  necessary scientific basis; that it's a standard that's

22  recognized in a statistical world that you have to have an

23  error rate.  And he simply doesn't create one.

24         THE COURT:  I can't even believe that there is an

25  argument about numerosity in this case.  Do you know how often
```

1   numerosity ever becomes an issue in a class certification

2   motion?  Nil.  It mean, this minimum to have numerosity in this

3   circuit is 39, I think.  You don't think that they make that

4   below threshold?

5           MR. RAIZMAN:  Is Your Honor suggesting, if we

6   conceded numerosity, that Mr. Greene would not be a witness in

7   this case?

8           THE COURT:  Probably, yeah.

9           MR. RAIZMAN:  And that would probably save us

10  Dr. Krock from having to testify to attack that.

11          THE COURT:  Yes.

12          MR. RAIZMAN:  Your Honor, we will definitely consider

13  that pending the Court's ruling.

14      With respect to number 3, Your Honor, I think the issue

15  here with respect to the finances, I think Your Honor has

16  recognized it.  And the idea of the motivations, I just would

17  like it to be clear that the motivations are precisely what's

18  attempting to being proven here.

19      And all of this financial information is irrelevant

20  because Quest has committed, in the joint pretrial conference

21  order, in its memo of contentions, and I'm doing it here again

22  today, to never argue that finances came into consideration

23  with respect to any action or omission it undertook up until

24  this date.  So we think that anything with respect to the

25  finances should be completely excluded.  And we think it's

1    clear.  And the Court has recognized that there -- that what

2    plaintiffs are attempting to do here.  And the problem, Your

3    Honor --

4            THE COURT:  I thought you won that one.

5            MR. RAIZMAN:  Well, it's denied in part.

6            THE COURT:  It's denied in part only for the limited

7    purpose if they seek to use it for that purpose that that is

8    some kind of reasonable inference that saving money was part of

9    the reason why they wanted to keep the phlebotomists behind the

10   scenes and not have them sitting at the front desk.

11           MR. RAIZMAN:  You're saying, Your Honor, that it's

12   denied if they try to prove that?

13       Well, Your Honor, that is the exact thing that is

14   completely irrelevant.  And the problem is it's false.  The

15   assertion -- and Your Honor has adopted it in different

16   places -- it couldn't be more wrong.  Quest did not do anything

17   to change staffing whatsoever with respect to the rollout of

18   the kiosk.

19           THE COURT:  Well, that is the assertion.  Obviously

20   that is a disputed issue of fact, and you will be able to meet

21   that presumably.

22           MR. RAIZMAN:  Your Honor, we will spend time and a

23   significant amount of time on that question, if we have to, and

24   that's the problem because it's also irrelevant.  In an

25   effective communication case, in fact, in nearly every

1   Title III case I can imagine -- but I should limit because I
2   can't imagine them all right here as I'm standing --
3   motivations, how you got there, why you got there, completely
4   irrelevant.  It's whether you got there.
5          THE COURT:  I'm not saying that is a motivation
6   issue.  I am saying that could be some evidence that the whole
7   point of the exercise was to keep the costs down by having
8   phlebotomists not have to sit at the front desk all the time.
9       If that doesn't happen to be the case, why then I think
10  that should be an easy issue to meet.
11         MR. RAIZMAN:  I don't see why that's relevant to a
12  Title III case, but in any event you are going to have to spend
13  a lot of time on that, because that is completely false.
14      That is all I have, Your Honor.
15         THE COURT:  All right.
16         MR. RAIZMAN:  I should just say on number 5, number 5
17  raises the threshold issue that I tried to identify before we
18  got into the specific motions.  It talks about all of that
19  experiential evidence and its admissibility, because of our
20  view of how the class definition impacts proof in this case.
21         THE COURT:  All right.  Let's move to the final
22  pretrial conference quickly.  My staff has been in trial all
23  day so I want to try to get them to be able to get home.
24      Let me just first confirm that you both believe that this
25  will be a Court trial and not a jury trial.

```
 1            MR. MILLER:  We do agree from the plaintiffs, Your
 2    Honor.  Thank you.
 3            THE COURT:  And both sides waive jury trial on the
 4    record?
 5            MR. RAIZMAN:  We do, Your Honor.
 6            THE COURT:  Because jury trial was invoked at the
 7    beginning, and I issued a case management order for jury trial.
 8            MR. MILLER:  We believe, based on the way the Court
 9    ruled in summary judgment, we don't get an opportunity to
10    waive.  We just think it results in a bench trial, the way that
11    the Court has ruled.
12            THE COURT:  All right.  So that means I will have to
13    issue a new case management order for Court trial.  It is my
14    practice not to have direct testimony that is live.  It will be
15    by declaration or deposition, and it will only be
16    Cross-examination and Redirect that will be live.  And that
17    will be spelled out in the case management order that I will
18    issue for Court trial.
19        Let me just say that your -- as I intimated, your
20    January 18, 2022, trial date is going to be preempted by a
21    criminal jury trial that I have to do on that date.  And so
22    you're going to have to meet and confer and see if you can come
23    up with a new proposed trial date and run it by my Court Clerk
24    to see if that date is reasonably available, although I have to
25    tell you that, because of the pandemic, our Court has been very
```

1    backlogged with criminal jury trials.  And as you may know,
2    criminal jury trials always take precedence over the civil
3    trials because of the Speedy Trial Act.
4        And so the only solution, if you want to really have a
5    firm date, is to consent to a magistrate judge to conduct the
6    Court trial because magistrate judges do not have to do
7    criminal jury trials, and they don't have the constraints of
8    time that district judges usually do.
9        I will usually impose a very strict time line for the
10   trial as well as time limits for both sides, and magistrate
11   judges don't tend to have to have such strict limits.  So there
12   are some great advantages to having a magistrate judge try the
13   case.
14       We have a deep bench of magistrate judges who are very
15   knowledgeable and well-qualified.  And there is a list of them
16   who are willing to do trials on the website.  So I will provide
17   that to you, and you can meet and confer and see if you can
18   agree to have the case tried by a magistrate judge.
19       If you don't, then I will just tell you that, whatever
20   date you choose, that this can happen again, as it has to a
21   number of civil cases that I've had.  And it doesn't make me
22   feel about good about it, but unfortunately that is the nature
23   of the beast.  We have a lot of criminal trials that we have to
24   go forward on.
25       So in order not to waste this particular hearing in case

 1   you decide not to go to a magistrate judge, let me just go over

 2   a few things that are pertinent to cases before me, and that

 3   is -- and I think I mentioned already that you're going to be

 4   filing declarations for the direct testimony of each of your

 5   witnesses.

 6        Can you tell me what your estimate for the length of the

 7   trial is considering that it is now streamlined somewhat?

 8            MR. MILLER:  From the plaintiffs, Your Honor, the

 9   estimate was originally seven days.  My expectation is we can

10   certainly take a day off of that estimate from the plaintiffs'

11   perspective and do this in six days, maybe less, particularly

12   if we're going to submit some of the testimony via deposition

13   and declaration.

14            THE COURT:  Mr. Raizman, what is your estimate?

15            MR. RAIZMAN:  Well, Your Honor, if the Court

16   adopts --

17            THE COURT:  Can you move the microphone closer to

18   you, please?

19            MR. RAIZMAN:  Yes, I will.

20        If the Court adopts my suggestion on that threshold issue,

21   there does not need to be a trial in this case.  If it doesn't,

22   I think five days would probably be adequate, but I wouldn't

23   violently disagree with six.  I think we're mostly going to be

24   hearing plaintiffs' witnesses in this case.  So if Mr. Miller

25   believes six days is necessary, we don't disagree too strongly

 1   with that.

 2              THE COURT:  All right.  Well, for a case of this

 3   nature, especially given that I have already seen a lot of the

 4   evidence through the motions for summary judgment, I am going

 5   to allocate four days and six hours per side.

 6       And have the parties already exhausted their mediation

 7   efforts in this case?

 8              MR. MILLER:  Your Honor, for the plaintiffs, we had

 9   gone to Judge Wagner.  We're open to Judge LaMothe and went to

10   Mr. Herman at Quest's request, and we remain in discussions

11   with him and remain open to other options as well.

12       Thank you, Your Honor.

13              THE COURT:  All right.  Well, under the

14   circumstances, I would suggest that you have plenty of time to

15   try to make that happen since I won't be able to go to trial on

16   your case anytime soon.

17       Do you have an estimate as to how much time you would need

18   for opening statements?

19              MR. MILLER:  Thirty minutes maximum, Your Honor, from

20   the plaintiffs' side.

21              THE COURT:  Mr. Raizman?

22              MR. RAIZMAN:  Same, Your Honor.

23              THE COURT:  All right.  Each side will have up to

24   thirty minutes.

25       And I haven't had a chance to review your pretrial exhibit

1   stipulation.  But given the time limits that I would impose, I

2   would suggest that you try to agree on as many exhibits as

3   possible and to have as few arguments about authentication

4   issues and other admissibility issues as possible because that

5   will all eat into your time.  Your time limits apply to both

6   Direct and Cross-examination.  It does not apply to opening or

7   closing arguments.

8        Please cooperate with each other in the presentation of

9   witnesses, try to avoid any gaps in calling them so that we

10  don't have to wait around for witnesses to appear.  If there

11  are professionals or other people who are witnesses who need to

12  have accommodations, I would expect that both sides will work

13  to accommodate their schedules, take witnesses out of order if

14  necessary.

15       And the Court trial time is usually from 9:30 to

16  4:00 o'clock.

17       And if you haven't had a trial in this courthouse since

18  we've been here, I would highly recommend that you contact our

19  IT department and ask them to give you a demonstration of how

20  the equipment works and I would ask that both sides make an

21  appointment to have that demonstration at the same time so that

22  the IT department doesn't have to do more than one presentation

23  for this case.

24       Are there any questions?

25            MR. MILLER:  Very briefly from the plaintiffs' side,

1   Your Honor.  Thank you for your advisements.  We'll consider
2   your thoughts on the magistrate as well.
3        To the extent that we would have to pick another date with
4   you and recognizing that you have quite a few trials and
5   criminal trials, is there a time frame we realistically could
6   target as part of the meet and confer effort that would at
7   least be an initially acceptable time frame to look out for the
8   Court or how far out we should look.
9              THE COURT:  I would suggest at the end of the --
10  towards the end of the year, next year.
11             MR. MILLER:  Thank you, Your Honor.
12             THE COURT:  This trial that I am in right now is a
13  three-month trial.  So keep in mind that, when I have -- when I
14  say I have a criminal trial, it doesn't necessarily mean it
15  will be over quickly.
16       All right.  Any other questions?
17             MR. RAIZMAN:  No, Your Honor.
18             MR. MILLER:  No, Your Honor.  Thank you very much.
19             THE COURT:  All right.  Well, I had hoped that, with
20  my last ruling, that it would give the parties a basis to find
21  some way to resolve this matter.  It's basically injunctive
22  relief that is left.  So I hope that you will, both sides,
23  consider the wisdom of trying to resolve this so that you can
24  have a remedy that both sides can live with rather than having
25  a decision imposed either by me or some other judge that

1  doesn't recognize the nuances of this business.  So I leave you

2  with that.

3          MR. MILLER:  Thank you very much, Your Honor.

4          MS. BERNAL:  Thank you, Your Honor.

5          MR. RAIZMAN:  Thank you, Your Honor.

6          THE COURT:  We are adjourned.

7      (Adjourned at 5:22 p.m.)

8                          -oOo-

9

10

11

12

13

14

15                  REPORTER'S CERTIFICATE

16

17

18      I certify that the foregoing is a correct transcript of

19  proceedings in the above-entitled matter.

20

21  /s/ Suzanne M. McKennon, CSR, CRR, RMR
                                    Date:  01/18/2022
22  United States Court Reporter

23

24

25