# EXHIBIT 5

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              WESTERN DIVISION

4                  -oOo-

5     HONORABLE DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

6

7    JULIAN VARGAS, ANNE WEST, and
     AMERICAN COUNCIL OF THE BLIND,
8    individually on behalf of
     themselves and all others
9    similarly situated,

10                    Plaintiffs,

11        v.                        No. 2:19-cv-08108-DMG

12   QUEST DIAGNOSTICS CLINICAL
     LABORATORIES, INC., QUEST
13   DIAGNOSTICS HOLDINGS, INC.,
     QUEST DIAGNOSTICS INCORPORATED;
14   and DOES 1-10, inclusive,

15                    Defendants.

16

17          REPORTER'S TRANSCRIPT OF MOTION HEARING

18              LOS ANGELES, CALIFORNIA

19                OCTOBER 29, 2021

20   _____

21

22            SUZANNE M. MCKENNON, CRR, RMR
              UNITED STATES COURT REPORTER
23
             UNITED STATES COURTHOUSE
24           350 W 1st STREET, ROOM 3411
             LOS ANGELES, CALIFORNIA 90012
25                (213) 894-3913
               suzanne@ears2hands.com

```
1    APPEARANCES:

2    On Behalf of the Plaintiffs:

3
         BENJAMIN J. SWEET, Attorney at Law
4            Nye, Stirling, Hale & Miller, LLP
             1145 Bower Hill Road, Suite 104
5            Pittsburgh, Pennsylvania 15243

6        ALISON M. BERNAL, Attorney at Law
             Nye, Stirling, Hale & Miller, LLP
7            33 W Mission Street, Suite 201
             Santa Barbara, California 93101
8

9
     On Behalf of the Defendants:
10
         DAVID H. RAIZMAN, Attorney at Law
11           Ogletree Deakins Nash Smoak and Stewart PC
             400 S Hope Street, Suite 1200
12           Los Angeles, California 90071

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| 1 | (Proceedings commencing at 2:18 p.m.) |
| 2 | THE COURTROOM DEPUTY:  Please remain seated and come |
| 3 | to order.  Calling Item Number 2, CV 19-8108-DMG, United States |
| 4 | of America versus Julian Vargas, et al., versus Quest |
| 5 | Diagnostics Clinical Laboratories, Inc., et al. |
| 6 | For plaintiffs we have? |
| 7 | MR. SWEET:  Benjamin Sweet from Nye, Stirling, Hale |
| 8 | and Miller, on behalf Plaintiff Julian Vargas, who is joining |
| 9 | us here today, and the American Counsel of the Blind. |
| 10 | MS. BERNAL:  And Alison Bernal, also on behalf of |
| 11 | plaintiffs, Julian Vargas and American Counsel of the Blind. |
| 12 | THE COURTROOM DEPUTY:  On behalf of the defendants? |
| 13 | MR. RAIZMAN:  Good afternoon, Your Honor.  David |
| 14 | Raizman, Ogletree Deakins, for the defendants. |
| 15 | THE COURT:  Good afternoon, Counsel and parties. |
| 16 | Who would like -- I'm assuming both sides have had a |
| 17 | chance to review the Court's tentative ruling? |
| 18 | MR. RAIZMAN:  Yes, we have, Your Honor. |
| 19 | MR. SWEET:  Yes, Your Honor. |
| 20 | THE COURT:  And I assume, Mr. Raizman, you would like |
| 21 | to address the tentative ruling? |
| 22 | MR. RAIZMAN:  If I may, Your Honor. |
| 23 | THE COURT:  Yes.  Please stand at the lectern. |
| 24 | MR. RAIZMAN:  I thought I had this all arranged to |
| 25 | save us time, Your Honor, and somehow I messed it up.  There we |

1  go.  I apologize.

2       Your Honor, the theory announced in the tentative to

3  permit this fail-safe class action to go forward, as an action,

4  class action, where the plaintiff's statement and definition of

5  the class involves the injury that he would need to show, in my

6  view, involves, respectfully, derogation of this Court's duties

7  under Dukes in at least two ways.

8       The first is that Dukes requires -- and I quote --

9  "significant proof that the defendant operated under general

10  policy of discrimination."  So this isn't a common question to

11  be decided later.  It actually needs to find that at the time

12  of certification, there is such proof.

13       But punting on the question of whether an independent

14  kiosk is required at all, which the Court has recognized as

15  plaintiff's theory of the case, which it is, the Court's

16  missing its duty to decide whether or not that precise duty --

17  whether that policy involves discrimination.

18       Secondly, and just as importantly, Your Honor, because

19  this was one of the central thrust of Dukes, was that, while

20  the Court has identified common questions because the

21  commonality has been drawn out by this narrow definition of the

22  class, it doesn't resolve any issues.

23       And Dukes instructs us, quite clearly, that you can

24  have -- in the colorful language of Justice Scalia, you can

25  have common questions in droves, but that is not adequate for

1    class certification.  I think that precise problem is here.

2    Because just deciding whether or not a kiosk needs to be

3    independently accessible will not resolve anything in this

4    litigation.  It literally won't, and I'm going to endeavor to

5    demonstrate that in two different respects, rather than all of

6    them, out of respect for the time the Court has already spent

7    on this and the Court's familiarity from the summary judgment

8    motion and decision.

9        I think the principal way this comes up is in the damages

10    context.  And I think there has been a -- how should I put it?

11    There's been a distortion of the law of California in the reply

12    brief, and I'm going to endeavor to unravel that.  There has

13    also been a distortion in terms of making it defendant's

14    choice, which it never was, to assert that these were

15    construction-related accessibility claims subject to Civil Code

16    55.56.

17        Let's be 100 percent clear.  Quest didn't do that.  That

18    was plaintiff, and it was in their opposition to summary

19    judgment, page 29 of the ECF Document Number 111, lines 25 to

20    26 on that page.  And it was plaintiffs who cited to and quoted

21    from Civil Code 55.56 as providing the standard in this case.

22        And I don't think it was careless, Your Honor.  I think

23    what we have now is expediency.  They want to argue out of both

24    sides of their mouths because they want to preserve class

25    certification, but this is pure expediency.

1      If you look at their expert's declaration, and, here, I'm

2   referring to Dr. Montgomery, it's Exhibit 42 -- I'm sorry, I

3   misspoke.  Exhibit 32.  And it starts at PA 876 -- Plaintiff's

4   Appendix 876.  She expressly relies on the accessibility

5   standards that constitute a construction-related accessibility

6   claim under the definition of the statute, which I'll get to in

7   a second.

8      But, first, if I may point the Court to the several places

9   where she does that.  In paragraph 10, which starts on PA 878

10  and proceeds to 879, she cites to the Americans with Disability

11  Act standards and section 508 of the Rehabilitation Act

12  standards.  Those are regulations promulgated under section 508

13  of the rehab act that she's asserting apply here.

14      On the next page, on the next bullet, on the very top of

15  879, she says, "Speech output, either publicly through speakers

16  or privately through headphones," and she cites ADA standards

17  7.5 and 508 standard 402.2.  And then she proceeds throughout

18  this -- the ensuing passages on this page to do it.  And she

19  comes back to it again, throughout this brief again in

20  paragraph 34, at 882.

21      And with respect to the bases on which she rests her

22  opinion, she has an entire exhibit -- I believe it's Exhibit C

23  to this report -- which talks about the reference standards.

24      If you go to her conclusion, which I'm flipping to at

25  PA 886 -- I'm sorry, Your Honor, I'm very familiar with her

1   expert report, which is in a slightly different format than the

2   declaration she provided.  So I apologize.

3            THE COURT:  Well, be that as it may, this is not a

4   construction barrier, is it?  I mean, even if they --

5            MR. RAIZMAN:  Your Honor, we don't think so.

6            THE COURT:  -- even if they mistakenly cited to the

7   statute?

8            MR. RAIZMAN:  We don't think it is.  We think it's an

9   effective communication case.  In a minute, I'm going to tell

10  why it doesn't matter, because the Unruh Act still requires

11  exactly the same things that 55.56 requires, but that's their

12  assertion.

13       Your Honor is permitting them to move forward on a class

14  basis with significant impact.  We know the numbers here based

15  on their theory of the case.  And if their theory of the case,

16  as stated by their expert, asserts an accessibility violation

17  of the accessibility standards, then you should honor that

18  choice as well.  And I don't think the Court has a choice but

19  to do so.

20       And if you look at Civil Code -- just so the Court can

21  trace this.  It's a little bit crazy -- the statute in this

22  place.  But Civil Code 55.3(a)(2) defines what a

23  construction-related accessibility claim is.  That's covered by

24  55.56, and it incorporates the definition of

25  construction-related accessibility standard in Civil Code

1   55.52(a)(6), which explicitly includes, you know, all

2   regulations under the ADA and under California law but

3   explicitly includes the ADA accessibility guidelines, the

4   predecessor to the ADA standards that Dr. Montgomery is relying

5   on.

6       So, again, plaintiffs assert the affability of 55.56, not

7   Quest.  Perhaps more important than that, as the Court points

8   out, so they made a mistake, the Court doesn't agree with them,

9   they're wrong, well, the Unruh Act still requires this

10   individualized proof.  And I'm unfortunately going to ask the

11   Court's indulgence to walk through some of the cases, including

12   some of the cases they cite.

13       Each of the cases we cited for this proposition, Reycraft,

14   Antoninetti, Urhausen, Mundy, and Botosan, which is a 2000

15   decision before 55.56 was passed, all articulate the same

16   standard without citation to 55.56.

17         THE COURT:  All of those cases are construction

18   barrier cases.

19         MR. RAIZMAN:  But, Your Honor, the principle of what

20   was required by the Unruh Act was developed independently of

21   55.56.  I've read the legislative history of the provision.  It

22   was there to clarify things, not to alter the law.  And so it

23   didn't change what needed to be proven.

24       In particular, the requirement that there needs to be an

25   encounter with a barrier, an actual encounter, an actual

1   prevention.  We have lots of evidence of this.  I didn't think

2   it needed to be briefed.

3          THE COURT:  Is there any question here in this case

4   that there wasn't an encounter?  These are people who you have

5   records of who came to your facility.

6          MR. RAIZMAN:  But encountered difficulty, Your Honor,

7   not just encountered some theoretical problem.  Your Honor,

8   they cite to the Jones versus Wells Fargo Bank case, so the

9   California appellate court case.  Respectfully, I think we

10  should respect the California courts rulings on what the Unruh

11  Act means.  That case did allow class certification to go

12  forward, but the trial judge said the following, which the

13  appellate court acknowledged in recognition of the damages

14  standard.  It said, "At" -- this is at Star 5, Note 4.

15         THE COURT:  Which case are you talking about now?

16         MR. RAIZMAN:  Jones versus Wells Fargo Bank, 2015

17  Westlaw 661757, February 17, 2015.  "I've got some real

18  questions about whether this is a class, but I'll let this go

19  further as a class, but I have grave concerns about the number

20  of people in this class who may not experience any monetary

21  loss whatsoever."

22      So the mere existence of some illegal condition is not

23  adequate.  You have to show damages.  I'm not done.  I've got a

24  list as long as it can go.  And if the Court is inclined to

25  rule in this way, I would beg the Court for an opportunity to

1    brief this issue, because I think this is just clearer error of

2    law.

3            THE COURT:  I can tell you that I have tons,

4    literally tons, of construction-related ADA cases in this

5    Court.

6            MR. RAIZMAN:  I know you do.

7            THE COURT:  And they all want the $4,000 statutory

8    damage under the Unruh Act.  None of them show that they have

9    had damage, except that they did encounter the barrier.  Some

10   even just say they were deterred from going to a place because

11   of the barrier.

12           MR. RAIZMAN:  Yes.

13           THE COURT:  The statutory damages for $4,000 is not

14   dependent upon a showing of actual damages.

15           MR. RAIZMAN:  Not actual damages, Your Honor, but

16   actual encounter.

17           THE COURT:  Well, I think I'm responding to what you

18   just said, which is they have to show damages.

19           MR. RAIZMAN:  This is a false distinction that

20   plaintiffs created in the reply brief between

21   construction-related cases and others.  Again, they chose that

22   route.  We followed them there.

23       And now in their reply brief, without an opportunity for

24   us to respond to all of this other case law, I would like to

25   clarify that the Unruh Act absolutely requires these things.

1    White versus Square, California Supreme Court, it's a

2  standing case, but standing damages walk hand in hand here,

3  because plaintiff's putative class members are also going to

4  have to show standing to recover damages.  White versus Square

5  is 7 Cal.5th 1019 -- it's a 2019 decision.  It's not -- it's an

6  Unruh Act case, but it's not a disability case.  It involves

7  use of a website by someone who wanted to -- who wasn't yet a

8  customer, and the defendant argued, challenging the face of the

9  pleadings, that the web -- that this person didn't have

10  standing because they weren't a previous customer of Square and

11  weren't likely to be one.

12    And the Court announced the standard, which, I think, is

13  important:  In general, a person suffers discrimination under

14  the act, that is, the Unruh Act, when the person presents

15  himself or herself to a person -- to a business with an intent

16  to use its services but encounters an exclusionary policy to

17  practice that prevents him from or her from using those

18  services.

19    That's White versus Square.  It was recently followed in

20  Thurston.  I don't think it's been assigned a case number yet.

21  But I can apply the authority to the Court.  It has been

22  applied to the case of Thurston versus Omni Hotels, I believe,

23  at the end of September, in which the Court upheld summary

24  judgment on behalf of Omni Hotels because they had failed to

25  show that actual prevention.

1        The Futterman versus Kaiser Foundation Health Plan Case,

2   2020 Westlaw 3958259 Cal. Court -- Cal. Court of Appeal case

3   from July 13, 2020, the Court upheld denial of certification of

4   an Unruh Act damages subclass because common factual questions

5   did not predominate.  In so ruling, it quoted the California

6   Supreme Court's decision in Angelucci at 41 Cal.4th 160 at

7   page 175, "An individual plaintiff has standing under the Unruh

8   Act if he or she had been the victim of the defendant's

9   discriminatory act.  The focus of the standing inquiry is on

10   the plaintiff, not on the issues that he or she seeks to have

11   determined."

12        So we think it's clear.  We have lots of other cases.

13   Most recently, Judge Fisher decided, in Core versus Casino

14   Center, 221 Westlaw 3148875, at asterisk -- at Star 2,

15   March 22, 2021, Judge Fisher held that the common law also

16   establishes a general duty to mitigate damages; the Unruh Act

17   does not alter this duty.

18        I skipped a step here, Your Honor.  There is also

19   questions of mitigation that will come and be individualized

20   here.  I understand 55.56 provides that, in subsection (h), but

21   (h) actually says that the statute does not alter any legal

22   obligation of a party to mitigate damages.  In other words, the

23   mitigation obligation exists under California common law, and I

24   have a case for that as well, Green versus Smith,

25   261 Cal.App.2d 392 to 396, 1968.  And Judge Fisher cites to

1    that case in ruling that the Unruh Act permits -- under the

2    common law of the State of California, the Unruh Act, including

3    55.56, has not altered the duty to do this.

4         This is an unfortunate consequence, Your Honor.  I realize

5    I'm throwing a lot of authority at you.  This happens to be the

6    area --

7              THE COURT:  Mr. Raizman, I'm actually familiar with

8    the authority, and I think that this is a common

9    misunderstanding, I'll say, that a lot of defendants have.  And

10   that is that they equate class certification with a merits

11   ruling.  Class certification can often be a benefit to the

12   defendant because, if you prevail on the law, you will have a

13   judgment that will be applied to the entire class as opposed to

14   an individual plaintiff.  We have not gotten to the merits yet.

15             MR. RAIZMAN:  Your Honor, I assure you that I

16   understand that, and I assure you that I also understand why

17   this is brought as a class action, despite the sheer

18   impossibility of actually ever litigating those damages claims,

19   because each of them need to be litigated individually.  And I

20   have not gotten to ascertainability or manageability yet, but

21   there are very serious concerns there as well.

22        On their moving papers, they submitted a pretty empty

23   declaration from Mr. Simmons who just said that it's

24   manageable.  I can do it.  I can do a class.

25             THE COURT:  Why would it be unmanageable or involve

1   individualized issues if the class that has been defined

2   centers around whether the kiosk prevents the class from having

3   full and fair access, if your position is that the law requires

4   them to prove that they were denied access services --

5           MR. RAIZMAN:  Because --

6           THE COURT:  -- as opposed to the inability to use the

7   auxiliary aid itself?

8           MR. RAIZMAN:  Your Honor, the reason -- if I could

9   just use an example that I hope will illustrate the answer, is

10  that, if -- even if it was required that the kiosk needs to be

11  independently accessible, that would not entitle plaintiff to

12  Unruh Act damages or, for that matter, standing under Unruh

13  Act, not to mention our ability to prove mitigation of damages

14  if there is a second or third visit or fourth.  All of those

15  issues are individualized questions that still need to be

16  determined even if plaintiff's theory is right.  And that's the

17  core problem here, particularly with respect to the damages

18  subclass.

19      You know, I'll maintain my concern under Dukes with

20  respect to a fail-safe definition class, but, Your Honor, I

21  have not had the opportunity to brief that.  I would like the

22  opportunity to do so.  But this raises novel questions.  And,

23  frankly, Your Honor, all of these questions under California

24  law and the Unruh Act, I know this Court experiences them in

25  very high volumes -- that was our point in our brief.  But most

1    of those cases, because I have lots of lawyers who work on

2    those cases, never get litigated very seriously or earnestly.

3    Many of them get settled very quickly or eventually.

4        And these kinds of issues may not come up quite so

5    clearly.  But a case like Thurston versus Omni Hotels that got

6    tried, and these issues got thoroughly reviewed.  And there are

7    lots of other Unruh Act cases that have nothing to do with

8    disability access and have nothing to do with

9    construction-related accessibility standards.  And all of those

10   cases require an encounter and some actual injury, concrete and

11   particularized injury, resulting from that.

12       So that if an individual walked into -- as some of them,

13   we have evidence that some have in this case, walked into a

14   patient service center, encountered an inaccessible kiosk but

15   were immediately helped by someone, they would not have

16   suffered any injury because they got the services they came

17   there to get.

18           THE COURT:  And that would be a damages issue, which

19   case law indicates that some individualized determination of

20   damages does not preclude class certification.  In fact,  I

21   think there is a sizeable number of the people who visited the

22   facilities in California where the kiosk had not been ruled out

23   yet.  If that's the fact, then they only could have been

24   assisted by someone in person at the counter.

25           MR. RAIZMAN:  That's another individualized --

1   THE COURT:  That is not an individualized

2 determination that precludes class certification.  It is a

3 damages issue.  Those people in those facilities would not

4 receive any damages.

5   MR. RAIZMAN:  There is no proposal here by anyone in

6 the papers or by the manageability expert -- and we got to

7 depose him this week.  It was our first opportunity to do so.

8 Finally deposed him on Tuesday.  And he has no plan.  He has no

9 plan for notice.  He's never given notice to a blind class.

10 He's never given notice to a class this big.

11  I have a collection of testimony here from both him and

12 Dr. Montgomery that were given just this week, the first dates

13 they were made available to us, to demonstrate that there is no

14 plan for how we're going to determine damages with respect to

15 each individual class member.  And we're dealing with a

16 potentially massive class.

17  So when the Court certifies this damages subclass, there's

18 got to be some approach to how these individualized issues are

19 going to be determined.  They --

20   THE COURT:  From the record, it's my understanding

21 that the defendant has records of those who have visited its

22 facilities and including whether or not they have used the

23 kiosk or not and whether they are legally blind.

24   MR. RAIZMAN:  Your Honor, the record will show that

25 approximately 70 million check-ins occurred during the two-year

1   class period.  The records will show there's no evidence of

2   who's blind.  Of course not.  We don't do inquiries of people

3   with respect to their disabilities.  We're just there to take

4   their specimens and service their needs.  We don't quiz them on

5   their medical background or record it anywhere.

6        Plaintiffs, I think dishonestly, tried to assert that

7   these three-finger swipe reflects blind patients, and they

8   misread the Taylor Carr deposition testimony for that

9   proposition.  Taylor car was asked:  "Did you -- does Quest

10  maintain data as to who's visually impaired when people swipe?"

11       And he acknowledged that the message that comes across is

12  that a visually impaired person checked in.  That does not

13  establish that that is a visually impaired person.  In fact, in

14  the record also, that plaintiffs cite to, is our interrogatory

15  response which starts out by saying that we are unable to

16  determine from the swipes whether or not the swiping party is

17  disabled at all or has -- is vision impaired, and we have no

18  way of knowing that.

19       And so they selectively distort certain deposition

20  testimony that doesn't say what they say it says, and they

21  ignore other testimony that they nonetheless put before the

22  Court that actually says that the swipe data cannot be used to

23  identify whether someone is blind.

24           THE COURT:  Well, that is still some indication, and

25  I will tell you that there are many a class action where there

1   is less ascertainability than that.

2         MR. RAIZMAN:  I'm not -- I'm not -- Your Honor, the

3   patients who go to Quest are ascertainable.  The records are

4   kept as to each person who is served and for whom a requisition

5   is provided for a specimen.  That will get preserved in some

6   record of reaching them, but we're talking about potentially

7   70 million people during a two-year period.

8         THE COURT:  Well, I don't think that the notification

9   needs to go to 70 million people.  It needs to go to those that

10  the plaintiff has asserted are likely to be sight impaired.

11        MR. RAIZMAN:  Well, those --

12        THE COURT:  That subgroup are the people who actually

13  use the three-finger swipe or who, according to them,

14  identified -- that came to the California facilities, which I

15  think the number was something like 6,000, if I'm not mistaken.

16        MR. RAIZMAN:  That is an estimate based on an

17  extrapolation.  I heard that testimony.

18        THE COURT:  Well, you should be happy with that

19  estimate that it's not 70 million.

20        MR. RAIZMAN:  Your Honor, respectfully, that same

21  expert who gave that number estimated $170 million in statutory

22  damages.  There is nothing that Quest is happy about here.

23  Nothing.

24      With respect to manageability, let's hear what Richard

25  Simmons says, because, Your Honor, it's proposing we don't have

1   to notify everyone.  And who are we going to notify?  Just the

2   people who three-finger swiped in 2020, in the limited period

3   when three-finger swipe was in place -- I'm sorry, in 2021 --

4   well, some in 2020 and some in '21.  Those don't even overlap

5   with class -- the defined class members.

6       Here's what Mr. Simmons, among the shortfalls in his

7   manageability -- and this is another overarching issue with

8   respect to all of the class certification, someone who is

9   legally blind is not necessarily going to be prevented from

10  using the kiosk or necessarily want to use the kiosk.  That is

11  at page 24 of his testimony.  And I'm happy to hand up excerpts

12  of his depo, which I brought with me, and I have copies for

13  Counsel.

14      Whether a specific class member has capacity to use

15  enhanced text or color to see a screen versus having no visual

16  capacity to see the material is another thing he didn't

17  consider, page 77.  Plaintiff's notice and claims

18  administration expert readily admits, despite extensive with

19  notice claims procedures generally, he has no experience, zero,

20  undertaking a notice or claims campaign for class population

21  that is comprised entirely of legally blind persons.  And I

22  could go on.

23      His testimony was as empty as his declaration.  I can do

24  this because I've done it for a long time, and I have no doubt

25  that he is a very qualified claims administrator, but this is a

1   much different kind of a task.

2       And respectfully, Your Honor has a duty to probe these

3   superiority issues, which include these manageability

4   questions, and I didn't see that in the tentative.

5       And then a lot of these same issues come back to standing

6   and can't be escaped, Your Honor, either under the ADA claim or

7   under Unruh Act standing, which I told you the two leading and

8   most recent cases now are the White versus Square case and,

9   this more recent, Thurston versus Omni Hotels case.  I

10  apologize.  I don't have that cite.

11      But in the federal context, it's quite clear that we need

12  concrete and particularized injury.  And so the same thing I've

13  been telling you about Unruh Act damages applies in that

14  context as well.  And there is plenty of case law that's gone

15  to the Supreme Court and has articulated this standard, much

16  more clearly than we ever had.

17      TransUnion is just the latest one, which, by the way,

18  reminds us that each class member has to have standing, and we

19  need to know whether each class member has suffered a concrete

20  and particularized injury.  So merely showing up at a PSC and

21  not having the opportunity to use independently accessible

22  kiosk, even assuming that is unlawful, does not create standing

23  not to mention the difficulty of imminent injury in the future.

24      So if someone is able to use a three-finger swipe, maybe

25  they are able to independently use certain features of the

1  kiosk.  And so none of these issues are addressed in Your

2  Honor's tentative explicitly, but I do believe that they are a

3  tremendous number of individualized issues that do not get

4  resolved by the Court's proposal to decide this one legal

5  question, and that is whether the kiosk needs to be

6  independently accessible.  It will leave us with the entire

7  remainder of the case without resolving anything at all.

8      And I thank you, Your Honor.  You've been very patient

9  listening to me.

10          THE COURT:  All right.  Mr. Sweet?

11          MR. SWEET:  Thank you, Your Honor.

12          THE COURT:  Or Ms. Bernal?

13          MS. BERNAL:  Mr. Sweet.

14          MR. SWEET:  Good afternoon, Your Honor.

15          THE COURT:  Good afternoon.  Perhaps you can start

16  with addressing Mr. Raizman's argument that you have no way of

17  cabining the number of people who need to be notified about the

18  class action?

19          MR. SWEET:  Right.  Well, there is a lot in what

20  Mr. Raizman said, and I'm going to try to unwind some of the

21  factual inaccuracies that -- there was a lot thrown out, but to

22  address Your Honor's question, I think the record evidence in

23  this case shows that there is a very easily -- very easy, very

24  efficient way to contact all of the class members that would be

25  potentially part of the class in this case.  And that's through

1    a couple of sources.

2        Number one, as Your Honor pointed out, Quest keeps a

3    record of every single patient visit for every PSC in

4    California during the class period.  They know when they went.

5    They know what service they experienced.  All of that is

6    recorded.

7        And to hear Counsel tell it, there is a distortion that

8    we're making with regard to their 30(b)(6) witness on that

9    issue, and that's just not correct, Your Honor.  The 30(b)(6)

10   witness testified very clearly that Quest keeps a record of

11   each three-finger swipe, and they assign it to the folks who

12   made the swipe, and they have a designation in their database

13   that they are visually impaired.

14       So right there, we have really some of the best data that

15   you'll get from a notice perspective.  And, you know, they then

16   later came in and tried to put a sham affidavit in from an

17   executive of Quest, who was instructed not to answer questions

18   about the three-finger swipe at his deposition.  And I know

19   that, because I took the deposition.  So it's just for the

20   Court to credit that in any way here, I think, would be a big

21   problem.

22       Moving on to some of Mr. Raizman's other points -- and I

23   don't know if I'm going to hit them all, but I'll do my very

24   best.  On the issue of fail-safe class, we agree with the

25   Court's tentative.  We think it's not clear at all in the Ninth

1    Circuit whether there even is a requirement regarding fail-safe

2    class.  To the extent the Court is concerned about that issue,

3    we would want a chance to address it, for sure.

4          But to the heart of the matter, the section 51 analysis

5    versus section 55.56, in defendant's opposition brief on class

6    certification, the first paragraph says this is an effective

7    communication case.  We agree.  The Department of Justice

8    agrees.  This Court agrees.  No one is confused about whether

9    it's a effective communication case.

10         Now, Mr. Raizman is claiming somehow, because there was a

11   citation to a section 55.56 case in one of the briefs, that

12   somehow we've transformed this effective communication case

13   into a section 51 case, and I think that is wrong.  And then he

14   cites to Dr. Rochelle Montgomery's report and says that Dr.

15   Montgomery was relying on construction standards.  This is just

16   not correct, Your Honor.

17         What Dr. Montgomery clearly testified to earlier this

18   week -- and I defended that deposition -- and we do not have a

19   final transcript of it, by the way.  That is why I am not here

20   to hand you excerpts of it because it's not properly before the

21   Court.

22         I don't know what transcript Mr. Raizman has of the

23   Simmons deposition, but it is not a final transcript, and I can

24   assure you it does not say the things he is claiming it says.

25         But as to Dr. Montgomery, what she said was that, in the

1  absence of regulations that speak to kiosks -- and I am not

2  talking about kiosks like an ATM machine.  I am talking about

3  kiosks that would be used in the medical field, in a healthcare

4  context, we have to look to other like standards to figure out

5  what the rules require.  And she looks to 508, and she looks to

6  707 to do that.  It provides guidance.  She's not saying

7  they're compulsory on Quest.  She saying they're helpful

8  guidance.  It's an important distinction.

9       With regard to the Unruh Act statute, Mr. Raizman

10 strenuously objects and says that somehow 55.56 applies to this

11 effective communication case, that is a pure matter of

12 statutory interpretation.  And I'm happy to walk the Court

13 through that statutory interpretation, but I don't want to

14 burden the Court with too much argument in that direction.

15      But I will just say, if the Court will indulge, that the

16 section that controls is the definition section, section 55.52.

17 It defines what a construction-related accessibility claim is,

18 and it -- from strictly a standpoint of statutory

19 interpretation.

20      You know, if the California legislature wanted to enact

21 the 2008 amendment, was interested in encompassing all of the

22 accessibility claims that were at issue, it would have done so.

23 It said construction-related accessibility claims.  So

24 for those words to have any meaning at all under statute, they

25 have to have some significance.

1        What the legislature did say was that it encompasses a
2    number of different regulations, and that includes section
3    19955.5 of the Health and Safety Code, the California Standards
4    Building Code, and, yes, also, the Federal ADA Accessibility
5    Guidelines.
6        And Mr. Raizman is claiming that accessibility guidelines
7    somehow include the effective communication regulations.  That
8    is just not correct.  That is not correct, Your Honor.  And I
9    invite the Court to take a look at that.  If you look at
10   section 19955.5, they include no effective communication
11   regulations.  If you look at the California Building Standards
12   Code, it includes no effective communication regulations and
13   the ADA guidelines also do not.
14       Where I think some of the confusion might lie, to the
15   extent there is any, is that, when the statute was written, the
16   amendment was written in 2008, they were applying the 2000 ADA
17   standards, the 2000 guidelines.  And the 2000 guidelines have
18   the standards for construction and alterations in Appendix A.
19       And then later, when the 2010 guidelines are adopted and
20   they are codified in U. S. Code on March 15 of 2011, they get
21   flipped out, and they become Appendix D.
22       And so if there is some suggestion that, you know, somehow
23   that was magically transforming those regulations into
24   effective communication regulations, it did not; it did not.
25   So that is just not correct.  I would invite the Court to

1    perform that analysis itself, as it already has.

2        With regard to the cases that Mr. Raizman is citing

3    Reycraft, Antoninetti -- we dealt with all of those cases in

4    our briefing.  We're fine to stand on the papers and the

5    Court's tentative on those.

6        With respect to Jones versus Wells Fargo, Mr. Raizman is

7    saying there might be some damages questions, in that

8    section 51 Unruh case that was certified and then upheld by the

9    California appellate court.

10        After the Briseno case came forward in 2017 and then

11   Melgar came out and then Walker came out, it's very, very clear

12   that there should be no denial of certification at this stage

13   of a litigation on the basis of plaintiff identification

14   concerns and that those are issues that are best left for the

15   damages stage.  This is exactly that situation that he raises

16   in the Jones case.

17        Further, I didn't completely follow the argument on

18   mitigation, but I do know, from doing class action work for

19   20 years, that mitigation is not a class action concept.  It

20   sounds a lot to my ears like a damages question that would be

21   dealt with, for example, on a claims form situation.

22        With regard to the class being unmanageable, again,

23   Briseno controls -- Briseno and its progeny control.  And there

24   are no -- there have -- defendant hasn't even raised any

25   manageability concerns that could possibly rise to the level of

1    defeating certification in a case like this.

2          I'm going to point out two other things, Judge, that I

3    think are really important.  In 2019, Quest had a data breach.

4    And the Court can take judicial notice of this because they

5    filed an SCC filing on this question, I believe it was June 4,

6    2019.  In that data breach, Quest had 11.9 million of its

7    customers' data breached out and was made public.

8          That data included name, phone number, e-mail address,

9    Social Security number, details of their private health

10   information.  All of that is what's kept within Quest's Quanum

11   database, and now they're standing up here saying there is no

12   way to notify class members in California.  It's just -- it's a

13   ridiculous assertion, Your Honor, and I say that very

14   respectfully.

15          THE COURT:  I presume that it would not be all

16   customers in California but those who you can identify as being

17   visually impaired.  If that is the case, how do you propose to

18   contact those who might be visually impaired if the

19   three-finger swipe was not implemented yet during the class

20   period?

21          MR. SWEET:  Well, that is a question for a claims

22   administrator.  We have not posed that question to a claims

23   administrator in terms of what a notice program might like.

24   There are many ways, you know, to effect notice.

25          The 2018 amendments to the federal rules, Rule 23, talks

1   about electronic notice now being a preferred form of notice.

2   And so it's possible -- in almost every notice campaign, you

3   are going to have overnotice.  But what are the contours of the

4   exact notice campaign?  That is something we're going to have

5   to work with a claims administrator on.  We want to make it as

6   targeted as possible always.  That's always the goal with class

7   notice.  And it's more art than science at times, Your Honor.

8       The question is:  Is there a way to identify who the class

9   members are, and is there a way to efficiently contact them?

10  And the answer is here is:  Absolutely, yes.  I mean, they are

11  self-identifying classes that have been certified in courts all

12  through the Ninth Circuit over and over and over again.  That

13  is not what we have here.  We have some indication of a visual

14  impairment, and we have contact information that makes

15  electronic notice cost efficient and effective.

16      As to the ascertainability arguments, not a requirement;

17  no longer a requirement; not an independent requirement.  And

18  Ninth Circuit has followed the Sixth Circuit and other circuits

19  in saying that ascertainability is not a free-standing

20  requirement.  It is folded into the manageability discussion,

21  and it can't be a reason to deny certification.

22      And finally, as to the unverified -- I know I discussed

23  this momentarily, the unverified transcript of Mr. Simmons --

24  Mr. Simmons offered a very limited opinion.  His opinion was

25  not, "Here is a notice program, and here is a claims

1 administration program that we should use in this case."  He

2 answered the very simple question of, "Is there a process that

3 could be put together?  Is there a process that could be

4 managed?"  And his answer was, "Yes."  It was a very

5 uncontroversial opinion.

6      In fact, he said, based on his 31 years of experience,

7 that this is a garden variety application of what he does, and

8 there are no unique issues whatsoever that would pose any

9 problems in terms of notice and in terms of claims

10 administration.  So that is just a misinterpretation or a

11 misstatement of what was said in that deposition.  And an

12 unverified transcript, I don't think is going to save that from

13 being the case.

14      Finally, with respect to standing, that issue was dealt

15 with in the summary judgment briefing and in the Court's

16 opinion on summary judgment.

17           THE COURT:  All right.  Final word, Mr. Raizman,

18 briefly.

19           MR. RAIZMAN:  I'll be brief, Your Honor.

20      It is a very limited opinion, and it disregards that the

21 plaintiff bears the burden of establishing each of the factors

22 including superiority, which includes the notice, the

23 manageability requirements, and the predominance.  And they

24 haven't done that.  And Simmons certainly hasn't done it, and I

25 don't hear him arguing that it is, because it is, in fact, a

1   very limited opinion with very real problems here.

2        He did not answer Your Honor's question about how they're

3   going to identify the blind members.  Your Honor pointedly

4   asked, "Are you going to send it to everybody?"

5        And he said, "No."

6        And that's forgetting the time gap problem of the class

7   being 2018 and 2019, and the swipes all being in 2021 mostly

8   and some of 2020.  So no answer for that whatsoever.

9             THE COURT:  Except that he is correct that I am bound

10  by the Ninth Circuit's ruling that those types of questions

11  don't need to preclude class certification.

12            MR. RAIZMAN:  And, Your Honor, that is a strawman

13  argument that they made.  We never argued that ascertainability

14  alone or manageability alone was going -- was -- I think I've

15  argued a lot of different things here, including all of the

16  individualized questions.

17       But these are really serious notice questions that

18  apparently the expert they retained hasn't even stopped to

19  think about.  I just want to read the other thing they cite.

20  It's PA 832, 833.  When I was up here before, I couldn't find

21  it quickly, and so I abandoned it in the interest of time.

22       So they cite the Taylor Carr testimony, which I invite the

23  Court to read because they're reading quite a bit into it,

24  PA 1116.  But it sits alongside this in their own citations,

25  Your Honor.  The question is -- they are asking us for customer

1  demographics, including the number of visually impaired persons

2  who patronize patient service centers.

3      And this is the response they put in -- it's our response,

4  but it's the response they put into the record.  The number --

5  and by the way, if I told you this in a casual conversation

6  over dinner, you would be like, "Yeah, of course, this is

7  true."  Here it is.  "The number of times a three-finger swipe

8  has been applied to the kiosk at the patient service centers

9  does not provide responsive information," pausing for a second,

10 not quoting, that is responsive information to who the visually

11 impaired patients are, "because among other things, anyone

12 regardless of visual impairment can apply the three-finger

13 swipe, and the three-finger swipe can be applied either

14 intentionally or inadvertently by patients, defendant's staff,

15 or any other individuals."

16     "For example, the three-finger swipe was inadvertently

17 applied numerous times by defendant's staff when cleaning the

18 kiosks during the COVID-19 pandemic.  Notwithstanding the

19 inability to correlate three-finger swipe data with the number

20 of patients with visual impairments who visit patient service

21 centers" -- and we go ahead, and we provide the numbers in this

22 response of how many swipes there were.

23     By the way these numbers are much larger.  These are

24 monthly numbers that range between almost 18,000 on the low end

25 to 31,409 on the high end.  These are monthly numbers.

1           THE COURT:  Of what?

2           MR. RAIZMAN:  Of notice.  And that's just if we say

3     the swipe is actually some evidence of who is visually

4     impaired.

5         So I think it's -- I think it's important to recognize

6     that and to recognize that Briseno is being used as some

7     landmark decision like Quest -- I'm sorry, like Dukes in the

8     sense that there is pre- and post-Briseno decision.

9         And I am not saying Briseno didn't pronounce law in this

10    circuit; it certainly did.  But it doesn't serve to distinguish

11    all of those cases that we've cited that find individualized

12    questions exist with respect to determining Unruh Act damages.

13    Briseno says nothing about all of that.  It is really limited

14    to the idea of that ascertainability alone can't cause class

15    certification.  So it is the strawman's strawman, Your Honor.

16    It really has no applicability in this case.

17          THE COURT:  All right.  Thank you.  This matter will

18    stand submitted.

19          MR. SWEET:  Thank you, Your Honor.

20          MR. RAIZMAN:  Thank you, Your Honor.

21          MS. BERNAL:  Thank you, Your Honor.

22          THE COURTROOM DEPUTY:  This court is adjourned.

23        (Adjourned at 3:05 p.m.)

24                         -oOo-

25

1                         REPORTER'S CERTIFICATE

2

3

4       I certify that the foregoing is a correct transcript of

5  proceedings in the above-entitled matter.

6

7  /s/ Suzanne M. McKennon, CSR, CRR, RMR
   _____      Date:  11/08/2021
8  United States Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25