Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com
Alison M. Bernal (SBN 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Telephone: (805) 963-2345

Benjamin J. Sweet
(*Admitted Pro Hac Vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

*Attorneys for Plaintiffs Julian Vargas,*
*American Council of the Blind, and the Certified Class*

**Additional counsel for Plaintiff listed on signature page**

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

JULIAN VARGAS and AMERICAN
COUNCIL OF THE BLIND, individually
on behalf of themselves and all others
similarly situated,

        Plaintiffs,

    v.

QUEST DIAGNOSTICS CLINICAL
LABORATORIES, INC., QUEST
DIAGNOSTICS HOLDINGS, INC.,
QUEST DIAGNOSTICS
INCORPORATED; and DOES 1-10,
inclusive,

        Defendants.

Case No.: 2:19-cv-08108-DMG-MRW

**PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE**

*[Filed concurrently with Plaintiffs' Reply to Quest's Opposition to MSJ, Declaration of Jonathan D. Miller, Request for Judicial Notice and Objections to Quest's Evidence]*

**Date:** **August 5, 2022**
**Time:** **3:00 p.m.**
**Crtrm: 8C**

Complaint Filed: September 18, 2019
Pretrial Conf: October 4, 2022
Trial Date: November 1, 2022
District Judge: Hon. Dolly M. Gee
Magistrate: Hon. Michael R. Wilner

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1

**TO DEFENDANTS QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC.; QUEST DIAGNOSTICS HOLDINGS, INC. AND QUEST DIAGNOSTICS INCORPORATED (COLLECTIVELY, "DEFENDANTS") AND THEIR ATTORNEYS OF RECORD:**

Pursuant to Central District of California Local Rule 56-1, Plaintiffs Julian Vargas and American Council of the Blind (collectively, "Plaintiffs") hereby submit their Response to Defendants' Quest Diagnostics Clinical Laboratories, Inc.; Quest Diagnostics Holdings, Inc. and Quest Diagnostics Incorporated (collectively, "Defendants" or "Quest") Response to Plaintiffs' Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment (Dkt. 236-3) and Defendants' Statement of Additional Uncontroverted Facts and Conclusions of Law in Support of Quest's Opposition to the Plaintiffs' Motion for Summary Judgment (Dkt. 236-1).

Defendants' Response to Plaintiffs' Statement (Dkt. 236-3) and Statement of Additional Facts (Dkt. 236-1) have been modified solely in the number designations to distinguish between references to Facts 1 through 106 in Plaintiffs' Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment (addressed by Defendants in Dkt. 263-3), which will have an "A" placed in front of them versus Facts 1 through 41 in Defendants' Statement of Additional Uncontroverted Facts in Support of Opposition to Motion for Summary Judgment (Dkt. 236-1) which will have a "B" placed in front of them.

<u>**GENERAL OBJECTIONS**</u>

Plaintiffs generally object to—and fully incorporate their Objections to Evidence, filed concurrently—Quest's use of sham affidavits to oppose the facts below. As detailed further in Plaintiffs Objections to Evidence, Quest's Exhibit 1, 2, 3, 4, 5, and 6 are all sham affidavits.

Nye, Stirling, Hale & Miller
33 West Mission Street, Suite 201
Santa Barbara, California 93101

2

Quest attempts to dispute at least fifty-nine (59) facts below with sham affidavits which contradict sworn deposition testimony and must be stricken. The affiants relied on evidence that is not in the record and was not attached to the affidavits. *See Medina v. Multaler, Inc*., CV0600107MMMAJWX, 2007 WL 5124009, at \*8 (C.D. Cal. Feb. 7, 2007) *citing School Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc.*, 5 F.3d 1255, 1261 (9th Cir.1993) ("Rule 56(e) requires that documents relied upon in an affidavit presented in a summary judgment motion or opposition thereto be attached to the affidavit"). Thus, the affidavits are inadmissible at trial and should not be considered. *See* § 2738 Affidavits in Support of or in Opposition to Summary Judgment, 10B Fed. Prac. & Proc. Civ. § 2738 (4th ed.) (stating that upon a Rule 56 motion "the judge should consider any material that would be admissible at trial"). Under Rule 37(c), a party that fails to comply with Rule 26(e) "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Quest offers no explanation as to why the affiants failed to supplement their testimony in a timely manner and the affidavits must be excluded. *See Carlson Produce, LLC v. Clapper*, 2021 WL 292031, at \*5 (N.D. Cal. Jan. 28, 2021).

**<u>PLAINTIFFS' RESPONSE TO DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| A1. | Julian Vargas lives in Van Nuys, California.<br><br>Plaintiffs' Appendix of Evidence ("Ps' App.") Exhibit "Ex." 8 at PA0090:23-25 [Vargas dep.] | Undisputed. |
| A2. | Julian Vargas is legally blind and uses a screen reader as an auxiliary aid that allows him to understand the information displayed on a screen.<br><br>Ps' App. Ex. 8 at PA0091:13-PA0092:24, PA0103:10-14 [Vargas dep.] | Undisputed. |
| A3. | ACB is a national membership organization of thousands of blind and visually impaired persons which seeks to increase the independence, security, equality of opportunity, and quality of life for all legally blind people.<br><br>Ps' App. Ex. 17 at PA0195:9-14, PA0196:5- | Undisputed. |

4

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | 20, PA0197:17-21 [Rachfal dep.] | |
| A4. | Beginning in the spring of 2016, Quest began to install touchscreen electronic kiosks at its PSCs to enable patients to self-check in for their appointments.<br><br>Ps' App. Ex. 4 at PA0021:8-13, PA0022:1-8 [Yarrison dep.]; Ex. 19 at PA0225:18-PA0226:1 [Walsh dep.]; Ex. 18 at PA0211:19-25 [Aronson dep.] | Undisputed. |
| A5. | Internal documents disclose that Quest was aware the kiosks would not be accessible to legally blind individuals, but purposefully chose to implement the inaccessible kiosks without any available aid or auxiliary service to allow legally blind users to access the service.<br><br>Ps' App. Ex. 19 at PA0227:5-25 [Walsh dep.]; Ex. 4 at | Disputed.  First, Plaintiffs' cited evidence fails to support the purported fact, especially that Quest was "aware" that the touchscreen tablets ("Kiosks") would not be accessible to legally blind individuals.  Instead, Plaintiffs' evidence demonstrates that Quest's Kiosk prototype did not include an audio jack and was not designed in a way to allow a totally blind patient to independently check in on the Kiosk.<br><br>Ps' App. Ex. 4 at PA0042 [Exhibits from Yarrison dep.] ("What would we have done with the paper sign in sheet for hearing impaired or visually impaired?") |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

5

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|
| PA0023:17-24, PA0025:6-PA0026:12, PA0029:2-PA0030:18 [Yarrison dep.]; Ex. 4 at PA0042-PA0048 [Exhibits from Yarrison dep.]; Ex. 18 at PA0212:12-16, PA213:20-PA0214:6 [Aronson dep.] (inquiry into whether features were available). | Second, Quest did not have reason to believe that a Kiosk that was not independently accessible to legally blind patients would present an issue in providing its patients with services.  Prior to the Kiosk roll out, visitors to Quest PSCs would indicate their arrival, or check in, by entering their name on a paper sign-in sheet maintained in the waiting room.  Quest PSRs staffing the PSCs would enter the PSC waiting room, review the sign-in sheet and call the next patient back for specimen collection, bring that patient back to the draw room where blood and other specimens were collected, and then return to the waiting room to call the next patient.  Quest was replacing an existing system of signing in on a paper sheet, which blind patients had successfully used for years (sometimes with the assistance of Quest PSRs) with another, digital system of signing in that was similarly accessible with the assistance of Quest phlebotomists.  As it had for years, Quest was relying on its business model, approach to patient service, and policies, procedures and training that, collectively, require PSRs to assist patients at PSCs, including providing assistance to persons with disabilities to ensure they had access to Quest's services.  During the roll-out, Quest received feedback from a very small number of individuals who indicated that people who were completely blind would have difficulty using the Kiosk without assistance.  Since Quest had received very |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | little such feedback, and it was a very small fraction of the overall feedback we had received, and because Quest knew that the PSRs remained available to assist with use of the Kiosks and more generally check-in, we endeavored to address this concern in a future iteration of the Kiosk.  This occurred with the advent of the TFS. |
| | | Quest Appendix ("QA") Exhibit ("Ex.") 4 ¶¶ 4, 5, 10, 16; QA Ex. 5 ¶ 9; QA Ex. 1 ¶¶ 16, 19-2; QA1173:25-1174:9; QA1710 :20-1711:21; PL MSJ PA 42; QA Ex. 3 ¶¶ 7-23 (summary of training provided by Quest to phlebotomists/ patient service representatives); *see* QA Ex. 6 ¶ 3. |
| | | Third, in implementing its Kiosks, Quest and its vendors undertook efforts to ensure that Quest satisfied the explicit design standards applicable to the Kiosks in the ADA Standards for Accessible Design (36 C.F.R. Pt. 1191, App. B & D, "ADAS"), including design standards that all of the operable parts of the Kiosk were within "reach range" of someone using a wheelchair (ADAS 308, 309) and that the freestanding Kiosks were detectable by blind cane users (ADAS 307). |
| | | QA Ex. 4 ¶ 9; QA1605:2-15 (Quest undertook efforts to ensure the Kiosks are "mounted and installed in an ADA-compliant way" and made changes to "improve increased text size, button size, and contrast."), QA1606:25-QA1607:7 (Quest implemented ADA |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

7

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | installation guidelines for the Kiosks), QA1588: 9-22. |

**Plaintiffs' Response:** Defendants do not dispute the fact, only that Quest did not have reason to believe that the kiosk should be accessible to legally blind individuals. Plaintiffs' evidence shows that Quest ignored its own internal emails, external complaints, and its vendor, telling Quest about the inacceessibility of the kiosk to the legally blind.

Defendant's adherence to mobility-impaired ADA standards is wholly irrelevant to Plaintiffs' claims and do not dispute, or address, any of Plaintiffs' evidence in support of the fact. Quest never considered visually-impaired patrons when installing the kiosks in its PSCs as the community did not make up a large enough group to affect Quest's bottom-line. Quest's reliance on its past paper sign-in method is immaterial and irrelevant to Plaintiffs' claims.

| A6. | The Court has already held, and Quest concedes, that the kiosk available during the Class Period did not provide effective communication.<br><br>Ps' App. Ex. 4 at PA0023:17-24 [Yarrison dep.] | Disputed.  Plaintiffs' cited evidence fails to support the purported fact and attempt to mischaracterize the testimony.  Quest conceded that the kiosk was not *independently accessible* to blind individuals.<br><br>Ps' App. Ex. 4 at PA0023:17-24 [Yarrison dep.] (Q: To return to my question, are there any features that you can list for me today as you sit here as the person we've been told is going to tell us about Quest's ADA compliance in the kiosks, are there any features whatsoever that would have made them ***independently usable*** for completely blind people in 2016 or 2017? A: None that I'm aware of.") (emphasis added) |

8

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|
| **Plaintiffs' Response:** Plaintiffs note this Court's prior Order on Quest's First Motion for Summary Judgment (Dkt. 144) – "Quest appears to concede that its kiosks, as originally developed, did not provide 'effective communication' with blind individuals." Quest offers nothing that would alter this conclusion. Defendants do not dispute the fact. Quest chose to communicate its services through the kiosk and failed to make the kiosk accessible to the visually-impaired. In failing to provide an accessible kiosk, Quest failed to provide effective communication. ||

| | | |
|---|---|---|
| A7. | Quest concedes that Plaintiffs satisfy the first two elements of their ADA claim. Ps' App. Ex. 26 at 4:23-5:25 [Transcript of April 25, 2022 Meet and Confer] (stating it is Quest does not dispute certified Class Representative Vargas' disability and Quest is a place of public accommodation.) | Disputed.  Quest concedes that (1) that class representative Julian Vargas is an individual with a disability and (2) *portions* of some of Quest's patient service centers ("PSCs") are places of public accommodation. (Ps' App. Ex. 26 at 5:18-5:25 [Transcript of April 25, 2022 Meet and Confer] (Ms. Bernal: Then can we address this in the pretrial conference order with the agreed statement *that the portions of the PSCs that are open to the public* and relevant to this lawsuit are places of public accommodation within the meaning of the ADA? So would you agree with that part of the statement? Mr. Raizman: Yes.  That is right.  It is a place of public accommodation, yeah.) |

| | | |
|---|---|---|
| **Plaintiffs' Response:** Defendants do not dispute that the portions of the PSCs relevant to this lawsuit are places of public accommodation. Defendants only dispute private areas, which are irrelevant to Plaintiffs' claims, and are otherwise immaterial. |||

| A8. | The iteration of the kiosk | Disputed.  Plaintiffs' cited evidence fails to |
|---|---|---|

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

|  | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
|  | during the class period was the means for patients to communicate to phlebotomist that they had arrived, placing the patient in queue for the phlebotomy service.<br><br>Ps' App. Ex. 19 at PA0234:9-20 [Walsh dep.]. | support the purported fact that the kiosk was *the* means for patients to communicate to phlebotomists and other patient service representatives (collectively, "PSR" or "PSRs") that they had arrived.  Instead, the evidence demonstrates that the kiosk was *one of many means* for patients to communicate to a PSR that they had arrived.<br><br>Ps' App. Ex. 19 at PA0234:13-15 [Walsh dep.] ("If the patient checks in at the kiosk, the check-in will appear on the phlebotomist's screen so that she does see the patients that are in queue.")<br><br>In fact, multiple class members were helped nearly *immediately* upon arriving at a Quest PSC, were effectively served at the PSCs, and successfully obtained diagnostic testing services at the PSCs.<br><br>QA1698 (Debbie Downey) (someone outside was checking people in); QA1666:1-7; QA1687:2-14; QA1698 ("There has always been an attendant to take info [or] had to have someone sign name on the list when the attendant was in back."); QA1164:1213 (ACB member "had a staff member at the center help him check in for appointments."); QA1793:24-QA1794:4 (PSR was aware "very quickly" that she was there); QA1761:1-17 (PSR was waiting at the reception desk "almost every time. |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | Some PSCs have greeters and/or receptionists, allowing patients with visual impairments to communicate their arrival without the use of the Kiosks. *See* Plaintiffs' Uncontroverted Fact No. 64, Ps' App. Ex. 23 at PA0281-0282; QA1596:15-QA1597:1 ("There are – there are locations that have staff located at the front when people come in."); QA1578:17-21. Moreover, PSRs are trained to scan the waiting room for patients, another means of communicating the patient's arrival to the PSC.  QA1588:9-22, QA1594:18-QA1595:7, QA1605:16-QA1606:4; QA Ex. 3 ¶¶ 7-23; QA Ex. 10 at QA744 ("When going to the waiting room to call back a patient, pay attention to other patients and their needs and behaviors, so you can identify any patients with visual impairments who may need assistance," "Make yourself available to assist such patients as necessary, including assisting with navigating the waiting room and locating and using the kiosk to check-in."), QA0747 ("Like any other patient, if you see a patient with visual impairments who is having difficulty locating or using the kiosk or checking in at the kiosk, you should assist them with checking in using the above process."); *see* QA Ex. 6 ¶ 3. |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|

**Plaintiffs' Response:** Defendants' project description states that the kiosk was intended to replace the sign-in sheet and become the primary method of checking in. *See*, Ex. 23, at PA0292[QUEST-VARGAS 000035245 – eCheckin CapEx tab - Summarized Project Description]. Vargas' experience show that the intent was for Quest to point the patients to check-in at the kioks. *See also* Plaintiffs' concurrently-filed Request for Judicial Notice re Quest's appointment schedule FAQ webpage ("How do I check in when I arrive? Sign in using the Check-in kiosk, or if not available, sign the clipboard at the front desk.")

Quest's cited testimony does not support its position and mischaracterizes the testimony cited. Ms. Downey "had to yell for someone to come and assist [her]." QA1698. Ms. Haroyan did not remember whether it was a third person or phlebotomist that checked her in. QA1791:2-5. She also testified that she relied on other patients – strangers – to sign her in, as well as her dad who comes to every appointment with her. Ex. 11 at PA0136:3-PA0137:2, PA0138:15-PA0139:3 [M. Haroyan dep.] QA1164 states that Mr. Moore has never been able to use the kiosks to check-in for appointments. Ms. Brink's statement that the PSR was waiting at the reception desk was regarding her visits prior to the implementation of the kiosk and before the class period, and is therefore irrelevant.  QA1761:1-17.

Plaintiff's SUF # 54-62 (Dkt. 206-5) ("internal Quest emails confirm that "[w]ith or without eCheck-in we know from patient feedback patients would like greeters. Most sites do not have greeters and there are no plans to introduce greeters as part of eCheck-in.")

The only phlebotomist in this action unequivocally testified that she was not trained to scan the waiting room. Ps' App. Ex. 20 at 90:22-24 [Magana dep.] "Q. Were you ever trained by Quest to scan the waiting room for patients requiring assistance? A. Not that I remember." Any belated attempt to change her testimony to create a dispute must be stricken as she did not correct her testimony timely, did not ask for clarification of the question, and did not state she misunderstood the question during the deposition. The training similarly fails. Nowhere in the training does it state how often the PSRs are to scan the waiting room. Indeed, the very intent of the kiosk was to keep phlebotomists in the back. *See* Dkt. 144.

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

|   | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| Quest's system was designed to make phlebotomists available only sometimes. | | |
| A9. | The ECSS kiosk communicates to the phlebotomist's screen in the back of the PSC when a patient checks in.<br><br>Ps' App. Ex. 19 at PA0234:9-20 [Walsh dep.]. | Undisputed. |
| A10. | Quest has rolled out (and plans to continue rolling out) new features, none of which are, or ever have been, accessible to legally blind users.<br><br>Ps' App. Ex. 19 at PA0231:23-PA0233:14 [Walsh dep.]. | Disputed and not material.  First, any functionality that was added to the Kiosks after the class period, and not put at issue by the operative Complaint, is irrelevant to the merits determination of Plaintiffs' case.<br><br>*See* ECF 41; QA Ex. 4 ¶ 19; QA Ex. 5 ¶ 7.<br><br>Second, the term "legal blindness" covers a wide range of circumstances because it is recognized that "[o]ften, people who are diagnosed with legal blindness still have some usable vision."  In fact, a number of sources indicate that the definition of "legally blind" does not address an individual's ability to perform daily tasks, including reading and mobility.  Vision Aware, an outreach center for the American Printing House for the Blind, states that legal blindness is "not a functional low vision definition and doesn't tell us very much at all about what a person can and cannot see."  Thus, while some of the new features on the Kiosks are not accessible to |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | completely blind users, they are accessible to some "legally blind" users.  Quest Request for Judicial Notice ¶¶ 2-3, QA Ex. 16; QA Ex. 20 ¶¶ 14-18; *see* QA Ex. 1 ¶ 14; QA1685-1:14-17 ("People who are blind are always blind at different levels, yes."). |
| | | From time to time, Quest has thought of new functionalities or features that could be added to the Kiosk, and other functionalities and features have been removed.  Most of these functionalities and features were not contemplated when the Kiosk was first developed as many were developed as part of the iterative process in reaction to patient feedback or significant events.  Quest today cannot anticipate many, let alone all, of the different functionality or features that it may add to, or remove from, the Kiosk, as it is likely to continue to evolve over time. |
| | | QA Ex. 5 ¶¶ 7-8; QA Ex. 4 ¶¶ 18-19. |

**Plaintiffs' Response:** Defendant does not dispute the fact, nor could it. The functions of the kiosk are not "irrelevant" as Quest states, as the term is quoted in the certified class definition. *See* Dkt. 228. Indeed, Quest continues to roll out new features, all inaccessible to the legally blind. Further, and as detailed in the concurrently filed memorandum, the continuous roll-out of inaccessible functions on the kiosk show Quest has not met its burden on mootness as it cannot show a "change of heart," even if the TFS was accessible, which it is not.

Quest offers no evidence for its brazen assertion that legally blind individuals could access some of the features on the kiosk. In fact, the record suggests the opposite. Indeed, Quest's own expert was unable to use the functions of the kiosk. Plaintiffs' SUF A35. This argument has been raised and rejected by this Court in

14

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT
OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING
EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

|  | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
|  | its class certification hearing. *See* Dkt. 190. Ms. Montgomery's report stating that the legally blind individual could not access the features of the kiosk stands unrebutted in the record. | |
| A11. | The design of the e-check-in kiosk system was to have the phlebotomist remain in the back, servicing more patients, and not to be in the front helping patients with check-in.<br><br>*See* PA0277-PA0280 ("[t]here are no phlebotomists sitting at front desks available to help register patients.").<br><br>PA0283-PA0284 (the concern is "that the staff is servicing the patients and cannot always be in front of the "house" tending to folks that are struggling with registration.  You can't have both at the same time.").<br><br>Ps' App. Ex. 19 at PA0222:10-24, PA0238:25-PA029:10, PA0244 [Walsh dep. and exhibit establishing the | Disputed.  Plaintiffs' cited evidence fails to support the purported fact, and Plaintiffs attempt to mischaracterize the evidence.<br><br>While the Kiosks may have resulted in PSRs servicing more patients, the evidence demonstrates that the Kiosk project was not designed to reduce the amount of time that PSRs spend in the waiting room.  Specifically, in deciding whether to implement the Kiosks, Quest's *sole* goal was an improved customer and employee experience.  Potential financial benefits played no role in the reasons or motivations for this Kiosk project.  Quest anticipated that moving to an electronic system from a paper system would result in the average transaction time of check in being reduced by one minute per transaction.  This time savings would only increase the amount of time that PSRs would spend with patients, including the amount of time PSRs could spend in the waiting rooms assisting patients.  Quest's plan and business case for the Kiosk rollout did not include a plan to reduce then-existing PSC staff or to replace PSC staff with Kiosks.  While Quest employees may not be in the waiting rooms at all PSCs at all times (which would vary based on a variety of factors), performance of their duties requires them to regularly visit the waiting room and |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|
| ECSS was projected to save over $40 million in costs through "efficiencies" earned by reducing phlebotomist contact with patients.] | provide assistance where needed. QA Ex. 4 ¶¶ 6, 10, 11, QA Ex. 2 ¶¶ 3-5, QA Ex. 5 ¶¶ 3-5; QA Ex. 1 ¶¶ 3-5; QA1587:3-QA1588:8, QA1589:20-25, QA1590:6-15, QA1591:7-15, QA1592:23-QA1593:6. Moreover, PSRs were trained to scan the waiting room for patients that needed assistance with anything, including checking in. QA1588:9-22, QA1594:18-QA1595:7, QA1605:16-QA1606:4; QA Ex. 3 ¶¶ 7-23 QA Ex. 10 at QA0744 ("When going to the waiting room to call back a patient, pay attention to other patients and their needs and behaviors, so you can identify any patients with visual impairments who may need assistance," "Make yourself available to assist such patients as necessary, including assisting with navigating the waiting room and locating and using the kiosk to check-in."), QA0747 ("Like any other patient, if you see a patient with visual impairments who is having difficulty locating or using the kiosk or checking in at the kiosk, you should assist them with checking in using the above process."); *see* QA Ex. 6 ¶ 3. PA0277-PA0280 is an email from a Quest Executive Assistant who was not involved in the design or implementation of the e-check-in system and was making a statement based on personal experiences with visiting one PSC. |

16

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | PA0283-PA0284 is an email stating an obvious fact that a phlebotomist cannot be at two places at once.  While Plaintiffs' evidence may demonstrate the result of the Kiosk rollout (i.e., that PSRs are not sitting at the front desk waiting for patients), neither piece of evidence upon which Plaintiffs rely supports the *intention* behind Quest's design of the Kiosk.<br><br>Finally, multiple ACB members were assisted by PSRs *immediately* upon their arrival to the PSC and therefore did not wait at all.<br><br>QA1698 (Debbie Downey) (someone outside was checking people in); QA1666:1-7; QA1687:2-14; QA1698 ("There has always been an attendant to take info [or] had to have someone sign name on the list when the attendant was in back."); QA1164:1213 (ACB member "had a staff member at the center help him check in for appointments."); QA1793:24-QA1794:4 (PSR was aware "very quickly" that she was there); QA1761:1-17 (PSR was waiting at the reception desk "almost every time") |

**Plaintiffs' Response:** Quest's cited testimony does not support its position and mischaracterizes the testimony cited. Ms. Downey "had to yell for someone to come and assist [her]." QA1698. Ms. Haroyan did not remember whether it was a third person or phlebotomist that checked her in. QA1791:2-5. She also testified that she relied on other patients – strangers – to sign her in, as well as her Dad who comes to every appointment with her. Ex. 11 at PA0136:3-PA0137:2, PA0138:15-PA0139:3 [M. Haroyan dep.] QA1164 states that Mr. Moore has never been able to use the kiosks to check in for appointments. Ms. Brink's statement that the PSR

17

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | was waiting at the reception desk was regarding her visits prior to the implementation of the kiosk and before the class period, and is therefore irrelevant. QA1761:1-17. | |
| | The only phlebotomist in this action unequivocally testified that she was not trained to scan the waiting room. Ps' App. Ex. 20 at 90:22-24 [Magana dep.] "Q. Were you ever trained by Quest to scan the waiting room for patients requiring assistance? A. Not that I remember." Any belated attempt to change her testimony to create a dispute must be struck as she did not correct her testimony timely, did not ask for clarification of the question, and did not state she misunderstood the question during the deposition. The training similarly fails. Nowhere in the training does it state how often the PSRs are to scan the waiting room. Indeed, the very intent of the kiosk was to keep phlebotomists in the back. See Dkt. 144. Quest's system was designed to make phlebotomists available only sometimes. | |
| A12. | Quest internal emails confirm that using the original iteration of the kiosks, phlebotomist assistance was not readily or reliably available.<br><br>See PA0277-PA0280 ("[t]here are no phlebotomists sitting at front desks available to help register patients.").<br><br>PA0283-PA0284 (the concern is "that the staff is servicing the patients and cannot always be in front of the "house" tending to folks that are struggling with | Disputed. See Defendants' Response to Disputed Facts and Supporting Evidence to No. 11. |

18

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | registration. You can't have both at the same time."). | |

**Plaintiffs' Response:** Quest's cited testimony does not support its position and mischaracterizes the testimony cited. Ms. Downey "had to yell for someone to come and assist [her]." QA1698. Ms. Haroyan did not remember whether it was a third person or phlebotomist that checked her in. QA1791:2-5. She also testified that she relied on other patients – strangers – to sign her in, as well as her dad who comes to every appointment with her. Ex. 11 at PA0136:3-PA0137:2, PA0138:15-PA0139:3 [M. Haroyan dep.] QA1164 states that Mr. Moore has never been able to use the kiosks to check in for appointments. Ms. Brink's statement that the PSR was waiting at the reception desk was regarding her visits prior to the implementation of the kiosk and before the class period, and is therefore irrelevant. QA1761:1-17.

The only phlebotomist in this action unequivocally testified that she was not trained to scan the waiting room. Ps' App. Ex. 20 at 90:22-24 [Magana dep.] "Q. Were you ever trained by Quest to scan the waiting room for patients requiring assistance? A. Not that I remember." Any belated attempt to change her testimony to create a dispute must be struck as she did not correct her testimony timely, did not ask for clarification of the question, and did not state she misunderstood the question during the deposition. The training similarly fails. Nowhere in the training does it state how often the PSRs are to scan the waiting room. Indeed, the very intent of the kiosk was to keep phlebotomists in the back. See Dkt. 144. Quest's system was designed to make phlebotomists available only sometimes.

| A13. | For a blind customer, this means that before they can even be placed in line for service, they must either (1) find a sighted person to help them with the kiosk; or (2) wait for a phlebotomist to come | Disputed and not material. First, the term "legal blindness" covers a wide range of circumstances because it is recognized that "[o]ften, people who are diagnosed with legal blindness still have some usable vision." In fact, a number of sources indicate that the definition of "legally blind" does not address an individual's ability to perform daily tasks, |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | out to get another patient, and ask him or her for help.<br><br>*See* Ex. 24, at PA0294-PA0311 [Derry dec.: finding that a phlebotomist swept the waiting area at only 1 of 24 investigated locations]<br><br>*See* Ps' App. Ex. 10 at PA0126:7-12 [Bazyn dep.: husband checked her in]; Ex. 15 at PA0180:24-PA0181:12 [Brink dep.: Quest employee asked Brink's daughter to help]; Ex. 13 at PA0159:20-PA0160:1 [Grahmann dep.]: relied on another patient, a stranger, to check her in]; Ex. 11 at PA0136:3-PA0137:2, PA0138:15-PA0139:3 [M. Haroyan dep.: relied on other patients – strangers – to sign her in twice before, and her father once]; Ex. 12 at PA0152:11-PA0154:1, PA0153 [ N. Haroyan dep.: relied on another patient, a | including reading and mobility.  Vision Aware, an outreach center for the American Printing House for the Blind, states that legal blindness is "not a functional low vision definition and doesn't tell us very much at all about what a person can and cannot see." Thus, while some of the features on the Kiosks are not independently accessible to completely blind users, they are independently accessible to some "legally blind" users.<br><br>Quest Request for Judicial Notice ¶ 1, QA Ex. 16; QA Ex. 20 ¶¶ 14-18; *see* QA Ex. 1 ¶ 14; QA1685-1:14-17 ("People who are blind are always blind at different levels, yes.")<br><br>Second, some PSCs have greeters and/or receptionists.<br><br>*See* Plaintiffs' Uncontroverted Fact No. 64; Ps' App. Ex. 23 at PA0281-0282; QA1596:15-QA1597:1 ("There are – there are locations that have staff located at the front when people come in."); QA1578:17-21 (some PSCs have receptionists).<br><br>Third, even totally blind individuals are capable of independently using the Kiosks to check-in using the TFS.  Mr. Vargas, who provides technology training to blind individuals, testified that the finger swipe gesture is common in the use of accessibility features on Iphones and Ipads.  Mr. Vargas further testified that it is easy for individuals to master the finger swipe gesture and transfer its |

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|
| stranger, to sign her in, as well as her father on other occasions]; Ex. 14 at PA0171:22-PA0172:5, PA0170:18-23 [Lyons dep.: relied on another patient, a stranger, to check her in, and now has to bring different people to help her check in]; Ex. 16 at PA0189:14-PA0190:3 [Rehder dep.: relied on another patient, a stranger, to check her in]. | use to other electronic platforms. QA1633:6-QA1635:18, QA1636:11-13, QA1637:19-24, QA1638:5-21. Fourth, multiple ACB members were assisted by PSRs *immediately* upon their arrival to the PSC and therefore did not "wait for a PSR to come out to get another patient" during their visits. QA1698 (Debbie Downey) (someone outside was checking people in); QA1666:1-7; QA1687:2-14; QA1698 ("There has always been an attendant to take info [or] had to have someone sign my name on the list when the attendant was in back."); QA1164:1213 (ACB member "had a staff member at the center help him check in for appointments."); QA1793:24-QA1794:4 (PSR was aware "very quickly" that she was there); QA1761:1-17 (PSR was waiting at the reception desk "almost every time") |

**Plaintiffs' Response:** Quest's cited testimony does not support its position and mischaracterizes the testimony cited. Ms. Downey "had to yell for someone to come and assist [her]." QA1698. Ms. Haroyan did not remember whether it was a third person or phlebotomist that checked her in. QA1791:2-5. She also testifie that she relied on other patients – strangers – to sign her in, as well as her dad who comes to every appointment with her. Ex. 11 at PA0136:3-PA0137:2, PA0138:15-PA0139:3 [M. Haroyan dep.] QA1164 states that Mr. Moore has never been able to use the kiosks to check in for appointments. Ms. Brink's statement that the PSR was waiting at the reception desk was regarding her visits prior to the implementation of the kiosk and before the class period, and is therefore irrelevant.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

21

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | QA1761:1-17.<br><br>Plaintiff's SUF # 54-62 (Dkt. 206-5) ("internal Quest emails confirm that "[w]ith or without eCheck-in we know from patient feedback patients would like greeters. Most sites do not have greeters and there are no plans to introduce greeters as part of eCheck-in.")<br><br>Defendant offers no evidence for its brazen assertion that legally blind individuals could access some of the features on the kiosk. In fact, the record suggests the opposite. Indeed, Quest's own expert was unable to use the functions of the kiosk. Plaintiffs' SUF A35.This argument has been raised and rejected by this Court in its class certification hearing. See Dkt. 190. Ms. Montgomery's report stating that the legally blind individual could not access the features of the kiosk stands unrebutted in the record. | |
| A14. | On June 25, 2019, Mr. Vargas took paratransit to a Quest PSC close to his house to obtain lab work.<br><br>Ps' App. Ex. 8 at PA0093:5-6, PA0094:9-14 [Vargas dep.] | Undisputed, but not material. |
| A15. | After 10 to 15 minutes, a phlebotomist came out to help another patient.<br><br>Ps' App. Ex. 8 at PA0095-3-23 [Vargas dep.] | Undisputed. |
| A16. | The phlebotomist directed Mr. Vargas to the kiosk and told him, "this is | Disputed.  Prudencia Magana, the phlebotomist who assisted Mr. Vargas on his June 25, 2019 visit, does not remember |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT
OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING
EVIDENCE

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|
| where you check in." Ps' App. Ex. 8 at PA0096:3-18. [Vargas dep.] | directing Mr. Vargas to check in at the kiosk. QA1621:9-17; QA1623:5-9; QA1624:7-9; QA Ex. 6 ¶ 7. |

**Plaintiffs' Response:** Defendant does not dispute the fact; Ms. Magana claims to not remember Mr. Vargas.

| | | |
|---|---|---|
| A17. | Mr. Vargas checked the kiosk for tactile markings, a headphone jack, or a tactile keypad that would allow him to use the kiosk. Ps' App. Ex. 8 at PA0096:25-PA0097:14 [Vargas dep.] | Undisputed. |
| A18. | After not finding any accessibility options, Mr. Vargas told the phlebotomist the kiosk was not accessible to legally blind people so he would need help signing in. Ps' App. Ex. 8 at PA0097:15-22 [Vargas dep.] | Disputed.  Ms. Magana does not recall receiving a complaint from Mr. Vargas that the Kiosk was not accessible to legally blind people.  Ms. Magana also does not recall Mr. Vargas stating that he would need assistance signing in.  Ms. Magana is trained to inform her supervisor of any patient complaint she receives, and she has always done that.  Therefore, if Mr. Vargas would have voiced a complaint to Ms. Magana regarding the accessibility of the Kiosk, she would have provided him with her supervisor's contact information and also passed the complaint on to her supervisor.  Ms. Magana has no record that she informed |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

|  | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
|  |  | her supervisor about any complaint by Mr. Vargas.<br><br>QA1619:24-QA1620:22, QA1621:9-17; QA1623:5-9; QA1624:7-9; QA Ex. 6 ¶ 7. |

**Plaintiffs' Response:** Quest's attempt to dispute this fact comes from a sham affidavit (see Plaintiffs' Objections to Evidence) from Ms. Magana that contradicts her sworn testimony. Any belated attempt to change her testimony to create a dispute must be stricken as she did not correct her testimony timely.

| A19. | The phlebotomist took the other patient back for lab work, then came back out approximately five minutes later to help Mr. Vargas.<br><br>Ps' App. Ex. 8 at PA0098:3-22. [Vargas dep.] | Undisputed, but not material. Specifically, Plaintiffs' fact does not demonstrate that Mr. Vargas waited longer for his service than he otherwise would have waited if Ms. Magana had checked him in immediately. In fact, there is no evidence to suggest that any other patients checked in between the time Mr. Vargas requested phlebotomist assistance to check-in and the time Mr. Vargas actually got checked in.<br><br>QA1647:15-23; *see also* QA Ex. 4 ¶ 8 ("Once [a patient] had checked in, the Kiosk would automatically place them in queue to be served, assuming they had not made an appointment time, which Quest would endeavor to honor without regard to the queue.")<br><br>Ms. Magana does not remember taking another patient back for lab work, then coming back five minutes later to help Mr. Vargas. |

24

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | QA1621:9-17; QA1623:5-9; QA1624:7-9; QA Ex. 6 ¶ 7.

Moreover, there are many factors that influence the order in which patients are served at the PSCs that have absolutely nothing to do with the order in which patients check in.  Scheduled appointment times, an increasingly popular choice within Quest, always take priority and are honored without regard to when any of the patients (those with and without appointments) checked in.  Thus, a completely blind person with an appointment who experiences difficulty with check in will be serviced at her or his appointment time, regardless of when she or he checks in.  Further, Quest PSRs are trained to use their discretion to address situations where a patient may have arrived earlier than other patients but checked in after those patients due to the need for assistance.  For example, anyone experiencing difficulty in using the Kiosk, particularly if they share that difficulty and their arrival time at the PSC with the phlebotomist, could be taken ahead of others who were able to check in while that patient waited.

QA Ex. 1 ¶ 23; QA1597:13-QA1598:14; QA Ex. 4 ¶ 23. |

**Plaintiffs' Response:** Though Quest does not actually dispute the fact, Quest's attempt to contextualize this fact comes from sham affidavits (*see* Plaintiffs' Objections to Evidence) from Mr. Carr, Mr. Yarrison, and Ms. Magana that contradict their respective sworn testimony.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

25

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| A20. | The phlebotomist asked Mr. Vargas for several pieces of personal information.<br><br>Ps' App. Ex. 8 at PA0099:9-23. [Vargas dep.] | Undisputed that PSRs, including Ms. Magana, request and verify a patient's personal identifying information in the draw room, not in the waiting room.  Moreover, the only "personal information" needed for Kiosk check-in is the patient's name, birthday, and telephone number.<br><br>QA1624:22-QA1625:1; QA Ex. 4 ¶ 8. |
| A21. | Mr. Vargas suggested that the phlebotomist talk to whoever she needed to in order to ensure the kiosk was accessible to blind people. He further offered to provide his feedback to Quest.<br><br>Ps' App. Ex. 8 at PA100:16-PA101:4 [Vargas dep.] | Disputed.  Ms. Magana does not recall receiving a complaint from Mr. Vargas that the Kiosk was not accessible to legally blind people.  Ms. Magana is trained to inform her supervisor of any patient complaint she receives, and she has always done that.  Therefore, if Mr. Vargas would have voiced a complaint to Ms. Magana, she would have provided him with her supervisor's contact information and also passed the complaint on to her supervisor.  Ms. Magana has no record that she informed her supervisor about any complaint by Mr. Vargas.<br><br>QA1619:24-QA1620:22, QA1621:9-17; QA1623:5-9; QA1624:7-9; QA Ex. 6 ¶ 7. |
| **Plaintiffs' Response:** Quest's attempt to dispute this fact comes from a sham affidavit (see Plaintiffs' Objections to Evidence) from Ms. Magana that contradicts her sworn testimony. Any belated attempt to change her testimony to create a dispute must be stricken as she did not correct her testimony timely. | | |
| A22. | The phlebotomist agreed and said she would speak with her supervisors. | Disputed.  Ms. Magana does not recall receiving a complaint from Mr. Vargas that the Kiosk was not accessible to legally blind |

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|
| Ps' App. Ex. 8 at PA101:17-24 [Vargas dep.] | people.  Ms. Magana is trained to inform her supervisor of any patient complaint she receives, and she has always done that. Therefore, if Mr. Vargas would have voiced a complaint to Ms. Magana, she would have provided him with her supervisor's contact information and also passed the complaint on to her supervisor.  Ms. Magana has no record that she informed her supervisor about any complaint by Mr. Vargas.<br><br>QA1619:24-QA1620:22, QA1621:9-17; QA1623:5-9; QA1624:7-9; QA Ex. 6 ¶ 7. |

**Plaintiffs' Response:** Quest's attempt to dispute this fact comes from a sham affidavit (see Plaintiffs' Objections to Evidence) from Ms. Magana that contradicts her sworn testimony. Any belated attempt to change her testimony to create a dispute must be struck as she did not correct her testimony timely, did not ask for clarification of the question, and did not state she misunderstood the question during the deposition.

| | | |
|---|---|---|
| A23. | To date, however, no one from Quest has ever followed up with Mr. Vargas.<br><br>Ps' App. Ex. 8 at PA101:23-24 [Vargas dep.] | Disputed.  Quest and its legal counsel have been in regular contact with Mr. Vargas' counsel.<br><br>*See, generally,* docket of Case No. 2:19-cv-08108 DMG (MRWx); QA1681:22-QA1682:8, QA1683:7-QA1684:5; QA1685:4-22, QA1689:14-QA1692:5; QA Ex. 44 ¶¶ 3-4, QA Exs. 25-27. |

**Plaintiffs' Response:** Quest does not actually refute Plaintiffs' fact, as being in "regular contact" is not the same as following up on a specific complaint or inquiry.

| | | |
|---|---|---|
| A24. | The experience left Mr. | Undisputed. |

27

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | Vargas feeling embarrassed, humiliated, and like a "third-class citizen of some kind that anybody else can walk in there and not have to undergo the same amount of hassle and waiting."<br><br>Ps' App. Ex. 8 at PA0104:22-PA0105:17 [Vargas dep.] | |
| A25. | Nine ACB members testified that they were not able to independently access ECSS, they waited for extended periods for a phlebotomist to come help them, and they felt a loss of dignity and privacy in having to check in with the phlebotomist instead of the service Quest offers everyone else.<br><br>*See* Ps' App. Ex. 10 at PA0127:23-PA0128:5, PA0123:10-17, PA0124:4-PA0125:16 [Bazyn dep.]; Ex. 9 at PA0110:4-PA0113:19, PA0114:16-PA0115:5, PA0116:15-PA0117:19 | Disputed in part and compound.<br><br>Undisputed that a totally blind individual could not *independently* access the Kiosk prior to the implementation of the TFS.<br><br>Some of the nine ACB members identified waited for check in assistance for as little as one minute, disputing that they waited "extended" periods of time.<br><br>QA1640:12-16 ("maybe 5-10 minutes" between setting foot in PSC and leaving after blood draw); QA1641:7-12 ("probably about 5 to 10 minutes" between entering the PSC and speaking with receptionist); QA1728:16-22("no more than a couple minutes" to get signed in); QA1745:11-16 (phlebotomist was waiting at reception desk when Mr. Black sought assistance.); QA1791:6-14 ("it was pretty quick…A minute or two probably" to |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

28

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|
| [Black dep.]; Ex. 15 at PA0178:10-PA0180:7, PA0179-PA0181:2, PA0181:16-19, PA182:1-PA0184:4 [Brink dep.]; Ex. 13 at PA0160:21-PA0162:8, PA0162:22-PA0164:4 [Grahmann dep.]; Ex. 12 at PA0146:10-PA0149:9, PA0150:8-PA0151:8, PA0153:9-PA0154:1 [N. Haroyan dep.]; Ex. 11 at PA0134:1-PA135:23, PA0136:3-PA0137:2 [M. Haroyan dep.]; Ex. 14 at PA0169:14-PA0170:13, PA0171:14-21, PA0173:15-21 [Lyons dep.]; Ex. 21 at PA0262:16-23 [Stanley dep.] | get assistance checking in); QA1802:21-24 (waited "five minutes at the most" before phlebotomist came into the waiting room); QA1814:19-QA1815:1 (waited "a couple minutes" for assistance with check in.); QA1666:1-7 (waited for possibly one minute for a phlebotomist.); QA1701("stood there for a few moments" before being assisted by phlebotomist) |
| | Importantly, multiple ACB members were assisted *immediately* upon their arrival to the PSC and therefore did not wait at all. |
| | QA1793:24-QA1794:4 (PSR was aware "very quickly" that she was there); QA1698 (Debbie Downey), QA1666:1-7; QA1687:2-14 ("There has always been an attendant to take info or had to have someone sign name on the list when the attendant was in back."); (QA1164:12-13.) ACB member "had a staff member at the center help him check in for appointments."; QA1761:1-17 (PSR was waiting at the reception desk "almost every time") |

**Plaintiffs' Response:** Quest's cited testimony does not support its position and mischaracterizes the testimony cited. Ms. Downey "had to yell for someone to come and assist [her]." QA1698. Ms. Haroyan did not remember whether it was a third person or phlebotomist that checked her in. QA1791:2-5. She also testified that she relied on other patients – strangers – to sign her in, as well as her dad who comes to every appointment with her. Ex. 11 at PA0136:3-PA0137:2, PA0138:15-PA0139:3 [M. Haroyan dep.] QA1164 states that Mr. Moore has never been able to use the kiosks to check in for appointments. Ms. Brink's statement that the PSR was waiting at the reception desk was regarding her visits prior to the

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | implementation of the kiosk and before the class period, and is therefore irrelevant. QA1761:1-17. | |
| A26. | Not one ACB member testified that he or she was able to independently access ECSS, and instead had to wait for either an attendant to come to the window (putting sighted individuals ahead of them in line) or rely on a third party to aid their check-in at the kiosk.<br><br>*See* Ps' App. Ex. 10 at PA0126:7-12 [Bazyn dep.: husband checked her in]; Ex. 15 at PA0180:24-PA0181:12 [Brink dep.: Quest employee asked Brink's daughter to help]; Ex. 13 at PA0159:20-PA0160:1 [Grahmann dep.]: relied on another patient, a stranger, to check her in]; Ex. 11 at PA0136:3-PA0137:2, PA0138:15-PA0139:3 [M. Haroyan dep.: relied on other patients – strangers – to sign her in twice before, and her father once]; Ex. | Disputed.  First, Plaintiffs do not and cannot provide evidence to demonstrate that the ACB members waited longer for their service than they otherwise would have waited had they checked in themselves. That is because there are many factors that influence the order in which patients are served at the PSCs that have absolutely nothing to do with the order in which patients check in.  Scheduled appointment times, an increasingly popular choice within Quest, always take priority and are honored without regard to when any of the patients (those with and without appointments) checked in.  Thus, a completely blind person with an appointment who experiences difficulty with check in will be serviced at her or his appointment time, regardless of when she or he checks in.  Further, Quest PSRs are trained to use their discretion to address situations where a patient may have arrived earlier than other patients but checked in after those patients due to the need for assistance. For example, anyone experiencing difficulty in using the Kiosk, particularly if they share that difficulty and their arrival time at the PSC with the phlebotomist, could be taken ahead of others who were able to check in while that patient waited.<br><br>QA Ex. 1 ¶ 23; QA1597:13-QA1598:14; QA Ex. 4 ¶ 8. |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | 12 at PA0152:11-PA0154:1, PA0153 [ N. Haroyan dep.: relied on another patient, a stranger, to sign her in, as well as her father on other occasions]; Ex. 14 at PA0171:22-PA0172:5, PA0170:18-23 [Lyons dep.: relied on another patient, a stranger, to check her in, and now has to bring different people to help her check in]; Ex. 16 at PA0189:14-PA0190:3 [Rehder dep.: relied on another patient, a stranger, to check her in]. | Second, multiple ACB members were assisted by PSRs *immediately* upon their arrival to the PSC and therefore did not wait at all.

QA1666:1-7; QA1687:2-14; QA1698 (Debbie Downey) (someone outside was checking people in); QA1666:1-7; QA1687:2-14; QA1698 ("There has always been an attendant to take info [or] had to have someone sign name on the list when the attendant was in back."); QA1164:1213 - ACB member "had a staff member at the center help him check in for appointments."; QA1793:24-QA1794:4 (PSR was aware "very quickly" that she was there); QA1761:1-17 (PSR was waiting at the reception desk "almost every time");

Third, the Kiosks allow for any patient to check in independently using a TFS.

QA Ex. 1 ¶ 10; QA Ex. 4 ¶ 17.

Mr. Vargas, who provides technology training to blind individuals, testified that the finger swipe gesture is common in the use of accessibility features on Iphones and Ipads. Mr. Vargas further testified that it is easy for individuals to master the finger swipe gesture and transfer its use to other electronic platforms.  QA1633:6-QA1635:18, QA1636:11-13, QA1637:19-24, QA1638:5-21. |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | Consistent with Mr. Vargas' testimony, many ACB members testified that they are physically capable of using the three finger swipe gesture.  Clark Rachfal, ACB's 30(b)(6) witness, also acknowledged that ACB members "could physically perform a three-finger swipe." |
| | | QA1725:3-12 (admitting to regular use of the swipe gestures), QA1749:8-14 (admitting the ability to perform a three finger swipe gesture), QA1768 90:9-14 (same); QA1772:17-QA1773:5, 62:25-63:9 (same), QA1798:6-12 ("I can certainly do a three-finger swipe up."), QA1805:2-15 ("I can physically do the three-finger swipe up."); QA1811:6-20 (admitting the ability to perform a three finger swipe gesture); QA1818:12-17 (same); QA1709:2-11 (ACB members "could physically perform a three-finger swipe."). |
| | | In fact, Mr. Vargas confirmed that he was able to successfully use the TFS to check in at a PSC. |
| | | QA1180:22-1181:18 |
| | | Finally, two ABC members expressed a preference to rely on a third party to aid their check-in rather than being able to independently check in on the Kiosk. |
| | | QA1750:2-22 ("Well, my objective in going to the lab is to get my tests done in the least complicated and time-consuming way; and in |

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | my mind, the best way to do that is to talk to somebody, give them my lab slip and have them check me in.  So, you know, I really think that using the kiosk is certainly a step backwards in terms of, you know, customer service and convenience in using the system."); QA1731:24-QA1732:20 (Q: If you have this option, that you can check in using this iPad or you can just go up and wait for somebody to check you in, like, a Quest person to check you in, which method would you prefer to check in? A: I'd prefer an attendant.") |

**Plaintiffs' Response:** Quest's cited testimony does not support its position and mischaracterizes the testimony cited. Ms. Downey "had to yell for someone to come and assist [her]." QA1698. Ms. Haroyan did not remember whether it was a third person or phlebotomist that checked her in. QA1791:2-5. She also testified that she relied on other patients – strangers – to sign her in, as well as her dad who comes to every appointment with her. Ex. 11 at PA0136:3-PA0137:2, PA0138:15-PA0139:3 [M. Haroyan dep.] QA1164 states that Mr. Moore has never been able to use the kiosks to check in for appointments. Ms. Brink's statement that the PSR was waiting at the reception desk was regarding her visits prior to the implementation of the kiosk and before the class period, and is therefore irrelevant. QA1761:1-17.

| A27. | To defend its discriminatory conduct, Quest identified a single phlebotomist in its Rule 26 disclosures—Prudencia Magana. Ms. Magana was the phlebotomist at the Quest | Disputed in part and not material.<br><br>Undisputed that Quest identified Ms. Magana in its Rule 26 disclosures.  Undisputed that Quest Ms. Magana was a phlebotomist at the Quest location Mr. Vargas visited on June 25, 2019. |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST STIRLING STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | location Mr. Vargas visited on June 25, 2019.<br><br>Ps' App. Ex. 20 at PA049:2-4 [Magana dep.]<br><br>INITIAL DISCLOSURES. | Disputed that Quest engaged in discriminatory conduct.  The purported fact is a legal conclusion. |
| Plaintiffs' Response: Quest does not dispute that it identified a single phlebotomist in its Rule 26 disclsoures – Prudencia Magana. | | |
| A28. | Ms. Magana confirmed the kiosk was inaccessible during the Class Period.<br><br>Ps' App. Ex. 20 at PA0250:19-24 [Magana dep.] | Disputed.  First, in the deposition testimony Plaintiffs cite, Plaintiffs' counsel asked Ms. Magana whether Quest ever informed her that the Kiosks were not "independently accessible" by blind patients.  However, Ms. Magana was, and still is, unclear on exactly what counsel meant by "independently accessible," despite answering "I think so" to the question at deposition.  Ms. Magana provided that response because the Quest training instructs PSRs to help all patients (including blind patients) if they are having trouble with anything, including using the Kiosk.  She thought that "probably the Quest training was telling us that information because some people, including some blind people, may need help using the Kiosks." QA Ex. 6 ¶ 9.<br><br>Second, the term "legal blindness" covers a wide range of circumstances because it is recognized that "[o]ften, people who are diagnosed with legal blindness still have some |

34

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | usable vision." In fact, a number of sources indicate that the definition of "legally blind" does not address an individual's ability to perform daily tasks, including reading and mobility. Vision Aware, an outreach center for the American Printing House for the Blind, states that legal blindness is "not a functional low vision definition and doesn't tell us very much at all about what a person can and cannot see." Thus, while some of the features on the Kiosks are not accessible to completely blind users, they are accessible to some "legally blind" users. |
| | | Quest Request for Judicial Notice ¶ 1; QA Ex. 16 ; QA Ex. 20 ¶¶ 14-18; see QA Ex. 1 ¶ 14; QA Ex. 1 ¶ 14; QA1685-1:14-17 ("People who are blind are always blind at different levels, yes.") |
| | | Third, PSRs are trained to assist patients with, among other things, checking in for services. |
| | | QA Ex. 3 ¶¶ 7-23; QA Ex. 43 ¶¶ 7-18 (summary of training provided by Quest to PSRs); QA Ex. 4 ¶ 11, QA Ex. 1 ¶ 20. |

**Plaintiffs' Response:** Defendant offers no evidence for its brazen assertion that legally blind individuals could access some of the features of the kiosk. In fact, the record suggests the opposite. Indeed, Quest's own expert was unable to use the functions of the kiosk. Plaintiffs' SUF A35. This argument has been raised and rejected by this Court in its class certification hearing. See Dkt. 190. Ms. Montgomery's report stating that the legally blind individual could not access the

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|

features of the kiosk stands unrebutted in the record.

The only phlebotomist in this action unequivocally testified that she was not trained to scan the waiting room. Ps' App. Ex. 20 at 90:22-24 [Magana dep.] "Q. Were you ever trained by Quest to scan the waiting room for patients requiring assistance? A. Not that I remember." Any belated attempt to change her testimony to create a dispute must be struck as she did not make any request or effort to timely correct her testimony, did not ask for clarification of the question, and did not state she misunderstood the question during the deposition. The training similarly fails. No where in the training does it state how often the PSRs are to scan the waiting room. Indeed, the very intent of the kiosk was to keep phlebotomists in the back. See Dkt. 144. Quest's system was designed to make phlebotomists available only sometimes.

| A29. | In August 2020, in response to this litigation, Quest began outfitting the kiosks at some PSCs with TFS.<br><br>Ps' App. Ex. 5 at PA0049-J:2-8. [Carr dep.]; Ex. 4 at PA0024:10-14 [Yarrison dep.]; Ex. 7 at PA0084:20-23 [Grant dep.]<br><br>*See also* Dkt. 95-1, at 16:9-10, Dkt. 133, at 4 | Disputed in part.  The deposition evidence upon which Plaintiffs rely merely demonstrates that the TFS was implemented beginning in August 2020, which is undisputed.  The cited evidence fails to establish that the TFS was implemented *in response to litigation*, which is disputed.<br><br>Instead, the initial implementation of the Kiosk was always contemplated to be an "iterative" process.  Namely, Quest knew that it would continue to study the actual experience of Kiosk users and address any problems or challenges through future changes, modifications and alterations (*i.e.*, iterations) to the Kiosk or the processes associated with the Kiosks' usage.  Quest expected to gather information about Kiosk user experience by among other things (1) studying usage at some early rollout PSCs, (2) monitoring patient feedback, including |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | feedback provided to patient service representatives at PSCs and through the surveys it routinely conducts from PSC visitors, and (3) its ongoing system of receiving and responding to patient concerns and complaints, including through its Patient Advocacy team. |
| | | During the rollout, and as part of the iterative process, Quest received a very heavy volume of feedback regarding Quest's patients' use of and interaction with the Kiosks. Quest reviewed this feedback and attempted to address the areas that attracted the most attention and concern. Quest also increased the font size on the Kiosk for users who had visual impairments. |
| | | During the roll-out, Quest received feedback from a very small number of individuals who indicated that people who were completely blind would have difficulty using the Kiosk without assistance. Since Quest had received very little such feedback, and it was a very small fraction of the overall feedback Quest had received, and because Quest knew that its phlebotomists remained available to assist with use of the Kiosks and more generally check-in, Quest endeavored to address this concern in a future iteration of the Kiosk. Based on that exploration, interaction with, and feedback provided by blind consumers and their advocates, Quest developed a proposal in advance of the March 2020 |

Nye, Stirling, Hale & Miller
33 West Mission Street, Suite 201
Santa Barbara, California 93101

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | mediation in the instant case that has come to be known as the TFS.  Therefore, in August 2020, Quest began enabling Kiosks to use TFS at all PSCs. |
| | | QA Ex. 4 ¶¶ 13-17; QA Ex. 1 ¶¶ 16, 19-21; Ps' App. Ex. 5 at PA0049-J:2-8. [Carr dep.] (establishing that the TFS was implemented in August 2020); Ex. 4 at PA0024:10-14 [Yarrison dep.] (same); Ex. 7 at PA0084:20-23 [Grant dep.] (confirming that the TFS was implemented at PSCs); |

**Plaintiffs' Response:** Quest's attempt to dispute this fact comes from sham affidavits (*see* Plaintiffs' Objections to Evidence) from Mr. Carr and Mr. Yarrison that contradict their respective sworn testimony. As noted further in Plaintiffs' objections to Quest's additional facts, Mr. Carr was instructed not to answer "what specifically were the takeaways that you had from this [Las Vegas 2020] focus group" on grounds of privilege. Ex. 5: Carr Dep., 171:13-16. Mr. Carr was instructed not to answer whether Quest gave "any consideration on whether it could implement speech output at the e-check-in kiosk that would allow a blind user to independently navigate through the kiosk workflow and check in themselves," on grounds of privilege. Ex. 5: Carr Dep., 208:3-18. Mr. Carr was instructed not to answer when asked whether Quest considered the feedback of the focus group as it related to screen-reader technology and voiceover capabilities. Ex. 5: Carr Dep., 387:2-389:20.

| A30. | While Quest has repeatedly and falsely claimed under oath that the Company implemented TFS across the Company's PSC network [ ] the record facts are undisputed that | Disputed.  First, the purported fact itself generates a genuine issue of fact, as Plaintiffs assert Quest's evidence is contradicted by Plaintiffs' evidence.

Second, the evidence is untimely, prejudicial, duplicative, and incompetent.  In sum, the declaration/report of Mr. Derry was disclosed |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

38

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | Quest has not effectively rolled out TFS across its network of over 2,100 PSCs.<br><br>Ps' App. Ex. 5 at PA0049-J:2-8. [Carr dep.]; Ex. 4 at PA0024:10-14 [Yarrison dep.]; Ex. 7 at PA0084:20-23 [Grant dep.]<br><br>Compare with<br><br>Ex. 24 at PA0294-PA0311 [Derry dec.].<br><br>*See also* Dkt. 95-1, at 16:9-10, Dkt. 133, at 4. | three days before the discovery cutoff with no resulting opportunity for Quest's cross-examination, he makes conclusions based on surveys of a statistically insignificant sample of PSCs not chosen at random in violation of basic statistical principles, and his observations are qualitative, not quantitative, and are irrelevant to the issues of the instant case. *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment.<br><br>Third, Plaintiffs' cited evidence fails to support the purported fact. Instead, Plaintiffs rely on observations based on a single visit to a statistically insignificant number of PSCs (24 PSCs or 1% of the PSCs) to support the conclusory statement that Quest has not effectively rolled out TFS across its network. A statistically significant sample would require surveying at least 100 to 400 locations.<br><br>QA Ex. 20 ¶¶ 11-14.<br><br>Third, the evidence demonstrates that Quest completed a company-wide roll-out and activation of all three components of the TFS system by mid-2021: (i) the TFS-enabling software was installed at Kiosks in all PSCs in August 2020; (ii) the audio message on the Quest TVs at the PSCs instructing those at the PSCs how to use the TFS was activated in January 2021; and (iii) the enhanced training of PSC employees on how to assist patients in |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | using the TFS was rolled out and assigned in March 2021.<br><br>QA Ex. 1 ¶ 7; QA Ex. 4 ¶ 18.<br><br>Fourth, Quest's TFS records demonstrate that (1) TFS is active and in use at all of Quest's PSCs, (2) there have been almost 62,000 recorded instances of the TFS being used at PSCs, approximately a thousand times per month, or approximately five instances of the TFS per PSC each month, and (3) TFS has been used at 2,168 distinct PSCs.<br><br>QA Ex. 1 ¶¶ 11-12; QA Ex. 22. |
| **Plaintiffs' Response:** Quest's dispute offers nothing that would change this Court's prior consideration of the sufficiency of Mr. Derry's declaration as evidence. Quest's cited evidence further does not create a material dispute of fact regarding Mr. Derry's finding. Quest's attempt to dispute this fact comes from sham affidavits (*see* Plaintiffs' Objections to Evidence) from Mr. Carr and Mr. Yarrison that contradict their respective sworn testimony. | | |
| A31. | Quest's expert, Mr. Sawczyn, did not form an opinion on effective communication throughout Quest's network and is unaware of it three-finger-swipe has been rolled out.<br><br>Ps' App. Ex. 22 at PA0273:3-20 [Sawczyn dep.] | Disputed and unintelligible.  Mr. Sawczyn opined that "the kiosks are accessible by blind users for the purposes of checking in for Quest services and this offers 'effective communication' as that terms is used and understood in 28 C.F.R. § 36.303(c) of the ADA regulations."<br><br>Moreover, Plaintiffs rely on testimony that is incomplete and taken out of context.  While Mr. Sawczyn acknowledged that he does not *personally* know whether Quest provides an audio message related to the TFS at all |

40

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | locations, Mr. Sawczyn testified that he had learned through testimony from the deposition of at least one Quest employee that the audio message related to the TFS has been rolled out to all locations. Mr. Sawczyn further testified that the audio message is only a portion of the effective communication Quest provides. QA1612:14-QA1614:17, QA1615:14-21. |
| **Plaintiffs' Response:** Quest's cited evidence does not dispute Plaintiffs' fact. | | |
| A32. | Quest's expert, Mr. Sawczyn, visited Quest locations outside of business hours on both occasions—the first of which, Mr. Sawczyn was left waiting outside, unable to enter the facility. Ps' App. Ex. 22 at PA0268:4-PA0270:20 [Sawczyn dep.] | Undisputed and not material. |
| A33. | Quest hand-picked the time for its expert, Mr. Sawczyn, to visit the facility, so as to not "disrupt regular business." Ps' App. Ex. 22 at PA0270:23-PA0272:25 | Undisputed and not material. |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | [Sawczyn dep.] | |
| A34. | Despite having hand-picked the time for Mr. Sawczyn to visit a Quest facility, the phlebotomist was not available to help check-in.<br><br>Ps' App. Ex. 22 at PA0272:4-16 [Sawczyn dep.] | Disputed.  Plaintiffs' cited evidence fails to support the purported fact.  The testimony cited only supports the fact that the PSC was closed to the public during Mr. Sawczyn's October 27, 2021 visit.  However, Mr. Sawczyn's further testimony and expert report demonstrates that a PSR was, in fact, present to assist Mr. Sawczyn in response to his numerous check-ins. QA1611:10-14, QA1228.<br><br>Further, even Mr. Derry noted the PSRs were available to assist with check-in at multiple locations.<br><br>Ps' App. Ex. 24 at PA0309 [Derry dec.] ("staff member came out to ask if I needed assistance," "staff came out when she was helping someone else," "Large reception room with person behind a desk") |
| **Plaintiffs' Response:** Quest's cited evidence does not dispute Plaintiffs' fact. | | |
| A35. | Mr. Sawczyn admits that he is unable to independently access any of the features of the kiosk.<br><br>Ps' App. Ex. 22 at PA0274:14-PA0276:3 [Sawczyn dep.] | Disputed.  Mr. Sawczyn was able to independently access the check-in function of the Kiosk using the TFS.  Specifically, he opined that "a blind person can, independently, privately, and successfully avail themselves of the Quest kiosk to check in for the purposes of making their presence at the PSC known to the Quest team member so that they can be served according to their appointment time, or, if they are a walk in, to be served in accordance with their place in the |

42

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | queue…"  Mr. Sawczyn further testified that, contrary to Plaintiffs' assertions, "full functionality is not required even in devices like airline fare machines when covered by specific Department of Transportation regulations."<br><br>QA1231 (conclusion); QA1616:11-22. |
| **Plaintiffs' Response:** Quest's cited evidence does not dispute Plaintiffs' fact. | | |
| A36. | In stark contrast, Mr. Derry investigated 24 Quest PSC locations and discovered Quest's TFS "solution" featured significant deficiencies at every single location, barring any finding of mootness.<br><br>Ps' App. Ex. 24 at PA0294-PA0311 [Derry dec.]. | Disputed.  First, the evidence is untimely, prejudicial, duplicative, and incompetent.  In sum, the declaration/report of Mr. Derry was disclosed three days before the discovery cutoff with no resulting opportunity for Quest's cross-examination, he makes conclusions based on surveys of a statistically insignificant sample of PSCs not chosen at random in violation of basic statistical principles, and his observations are qualitative, not quantitative, and are irrelevant to the issues of the instant case.  *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment.<br><br>Second, Plaintiffs' cited evidence fails to support the purported fact.  Instead, Plaintiffs rely on observations based on a single visit to a statistically insignificant number of PSCs (24 PSCs or 1% of the PSCs) to support the conclusory statement that Quest has not effectively rolled out TFS across its network.  A statistically significant sample would |

43

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

Nye, Stirling, Hale & Miller
33 West Mission Street, Suite 201
Santa Barbara, California 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | require surveying at least 100 to 400 locations. |
| | | QA Ex. 20 ¶¶ 11-14. |
| | | Third, notwithstanding the issues with Mr. Derry's survey, Mr. Derry acknowledged that the TFS worked at the majority of the 24 locations that he visited. |
| | | Ps' App. Ex. 24 at PA309-311 (confirming TFS on Kiosks at 17 out of 23 locations with Kiosks), PA309 ("Three finger swipe worked, then staff member came out to ask if I needed assistance", "Swipe worked") |
| | | Fourth, Ms. Montgomery acknowledged that the TFS worked at both locations that she visited. |
| | | Ps' App. Ex. 25 ¶ 35 [Montgomery dec.] |
| | | Fifth, Mr. Sawczyn conducted no fewer than 30 TFS tests divided roughly equally between two kiosks in use to establish the reliability of the TFS and to account for differences in swipe speed, direction, and finger placement. The TFS check in was successful in all but two of his tests.  Doing so allowed him to definitively establish that "Quest's three-finger swipe enhancement is effective" and that his "review of Quest records of three-finger swipe usage at all Quest PSCs confirmed for me that this solution is, in fact, scalable throughout their kiosk environment."  In conclusion, Mr. Sawczyn wrote "it is my opinion that the |

44

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

|  | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
|  |  | [TFS-enabled] device meets the issues complained of by Plaintiffs in their First Amended Complaint.  Namely, a blind person can, independently, privately and successfully avail themselves of the Quest kiosk to check in for the purposes of making their presence at the PSC known to the Quest team member so that they can be served…." "establish[ed] that Quest's three-finger swipe enhancement is effective" and that his "review of Quest records of three-finger swipe usage at all Quest PSCs confirmed for me that this solution is, in fact, scalable throughout their kiosk environment." |
|  |  | QA Ex. 21 at QA1231. |
|  |  | Sixth, Quest's TFS records demonstrate that (1) TFS is active and in use at all of Quest's PSCs, (2) there have been almost 62,000 recorded instances of the TFS being used at PSCs, approximately a thousand times per month, or approximately five instances of the TFS per PSC each month, and (3) TFS has been used at 2,168 distinct PSCs. |
|  |  | QA Ex. 1 ¶¶ 11-12; QA Ex. 22. |
|  |  | Seventh, Mr. Vargas confirmed that he was able to successfully use the TFS to check in at a PSC. |
|  |  | QA1180:22-QA1181:18. |
| **Plaintiffs' Response:** Quest's dispute offers nothing that would change this | | |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

|  | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
|  | Court's prior consideration of the sufficiency of Mr. Derry's declaration as evidence. Quest's cited evidence further does not create a material dispute of fact regarding Mr. Derry's finding. Quest's attempt to dispute this fact comes from a sham affidavit (*see* Plaintiffs' Objections to Evidence) from Mr. Carr that contradicts his sworn testimony. | |
| A37. | Even at the investigated locations where TFS was present in some form, Mr. Derry found that at 11 of 24 locations, TFS was not available on every kiosk.<br><br>Ps' App. Ex. 24 at PA0294-PA0311 [Derry dec.]. | Disputed and not material.  First, the evidence is untimely, prejudicial, duplicative, and incompetent.  In sum, the declaration/report of Mr. Derry was disclosed three days before the discovery cutoff with no resulting opportunity for Quest's cross-examination, he makes conclusions based on surveys of a statistically insignificant sample of PSCs not chosen at random in violation of basic statistical principles, and his observations are qualitative, not quantitative, and are irrelevant to the issues of the instant case.  *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment.<br><br>Second, some PSCs have multiple Kiosks.  At least one Kiosk at every PSC is capable of accepting the TFS.<br><br>QA Ex. 1 ¶¶ 10-11; QA Ex. 22.<br><br>Moreover, Quest's TFS records demonstrate that (1) TFS is active and in use at all of Quest's PSCs, (2) there have been almost 62,000 recorded instances of the TFS being used at PSCs, approximately a thousand times per month, or approximately five instances of the TFS per PSC each month, and (3) TFS has |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT
OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING
EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | been used at 2,168 distinct PSCs. QA Ex. 1 ¶¶ 11-12; QA Ex. 22. |

**Plaintiffs' Response:** Quest's dispute offers nothing that would change this Court's prior consideration of the sufficiency of Mr. Derry's declaration as evidence. Quest's cited evidence further does not create a material dispute of fact regarding Mr. Derry's finding. Quest's attempt to dispute this fact comes from a sham affidavit (*see* Plaintiffs' Objections to Evidence) from Mr. Carr that contradicts his sworn testimony.

| A38. | Thus, the actual evidence demonstrates Quest has not rolled out TFS effectively across its network. Ps' App. Ex. 24 at PA0294-PA0311 [Derry dec.]. *See also*, MSJ Tr. – p 6. | Disputed.  First, the purported fact itself generates a genuine issue of fact, as Plaintiffs assert Quest's evidence is contradicted by Plaintiffs' evidence. *See also* Plaintiffs' Uncontroverted Fact No. 30. Second, the evidence is untimely, prejudicial, duplicative, and incompetent.  In sum, the declaration/report of Mr. Derry was disclosed three days before the discovery cutoff with no resulting opportunity for Quest's cross-examination, he makes conclusions based on surveys of a statistically insignificant sample of PSCs not chosen at random in violation of basic statistical principles, and his observations are qualitative, not quantitative, and are irrelevant to the issues of the instant case.  *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment. |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

47

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | Third, Plaintiffs' cited evidence fails to support the purported fact.  Instead, Plaintiffs rely on observations based on a single visit to a statistically insignificant number of PSCs (24 PSCs or 1% of the PSCs) to support the conclusory statement that Quest has not effectively rolled out TFS across its network. A statistically significant sample would require surveying at least 100 to 400 locations.  QA Ex. 20 ¶¶ 11-14.  Third, the evidence demonstrates that Quest completed a company-wide roll-out and activation of all three components of the TFS system by mid-2021:  (i) the TFS-enabling software was installed at Kiosks in all PSCs in August 2020; (ii) the audio message on the Quest TVs at the PSCs instructing those at the PSCs how to use the TFS was activated in January 2021; and (iii) the enhanced training of PSC employees on how to assist patients in using the TFS was rolled out and assigned in March 2021.  QA Ex. 1 ¶ 7; QA Ex. 4 ¶ 18; QA1228-1231.  Fourth, Quest's TFS records demonstrate that (1) TFS is active and in use at all of Quest's PSCs, (2) there have been almost 62,000 recorded instances of the TFS being used at PSCs, approximately a thousand times per month, or approximately five instances of the TFS per PSC each month, and (3) TFS has |

48

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT
OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING
EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | been used at 2,168 distinct PSCs. |
| | | QA Ex. 1 ¶¶ 11-12; QA Ex. 22. |
| | | Fifth, Mr. Vargas confirmed that he was able to successfully use the TFS to check in at a PSC. |
| | | QA1180:22-1181:18. |

**Plaintiffs' Response:** Quest's dispute offers nothing that would change this Court's prior consideration of the sufficiency of Mr. Derry's declaration as evidence. Quest's cited evidence further does not create a material dispute of fact regarding Mr. Derry's finding. Quest's attempt to dispute this fact comes from a sham affidavit (*see* Plaintiffs' Objections to Evidence) from Mr. Carr and Mr. Yarrison that contradict their respective sworn testimony.

| A39. | Without a comprehensive rollout of TFS at every PSC, Quest cannot establish that Plaintiffs' claims are mooted, even if TFS solved for all of the kiosk's communication failures, which it does not.<br><br>Ps' App. Ex. 24 at PA0294-PA0311 [Derry dec.]. | Disputed. Plaintiff does not provide a fact asserted with evidence, but instead provides a legal argument. |

**Plaintiffs' Response:** Quest's response does nothing to refute Plaintiffs' fact and supporting evidence derived from Mr. Derry's declaration.

| A40. | Quest has implemented multiple new services | Disputed and not material. First, the functionality that was added to the Kiosks |

49

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|
| available at the kiosk, such as (1) the ability to wait safely outside and receive a text message when the patient's turn has arrived (a feature added during the COVID-19 pandemic); (2) specimen drop off and pick up; and (3) knowledge about where a patient stands in the service queue, a feature designed to reduce patient anxiety in the check-in process. none of which it offers to legally blind individuals.<br><br>Ps' App. Ex. 5 at PA0049-H:11- PA0049-I:24 [Carr dep.]; Ex. 7 at PA0079:7-PA0080:3 [Grant dep.]; Ex. 25 at ¶¶ 10-51 [Montgomery dec.].<br><br>Ex. 22 at PA0274:14-PA0276:3 [Sawczyn dep.]<br><br>*See*, Ex. 23, at PA0292[QUEST-VARGAS 000035245 – eCheckin CapEx tab - | after the class period, and not put at issue by the operative Complaint, is irrelevant to the merits determination of Plaintiffs' case.<br><br>*See* ECF 41; QA Ex. 4 ¶19; QA Ex. 5 ¶ 7.<br><br>Second, all patients, including blind patients, can check in and utilize nearly all of the features and functionalities of the Kiosks on the internet, which they can access with their phones. All patients who make online appointments can select the "wait where you want" function when making appointments.<br><br>QA Ex. 1 ¶ 24.<br><br>Third, PSRs are available to assist patients in using the "wait where you want" function. In fact, PSRs often help patients use the "wait where you want" function. When a patient uses a TFS, the Kiosk provides a wait time if the PSC accepts walk-in appointments. Patients can also obtain wait time estimates from PSRs.<br><br>QA Ex. 4 ¶ 19; QA Ex. 6 ¶ 5. |

50

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT
OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING
EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | Summarized Project Description]. | |

Plaintiffs' Response: Defendant does not dispute the fact, nor could it. The functions of the kiosk are not "irrelevant" as Quest states, as the term is quoted in the certified class definition. See Dkt. 228. Indeed Quest continues to roll out new features, all inaccessible to the legally blind. Further, and as detailed in the concurrently filed memorandum, the continuous roll-out of inaccessible functions on the kiosk shows Quest has not met its burden on mootness as it cannot show a "change of heart," even if the TFS was accessible, which it is not.

Quest's attempt to dispute this fact comes from a sham affidavit (see Plaintiffs' Objections to Evidence) from Mr. Carr that contradicts Mr. Carr's sworn testimony about the "wait where you want" feature. Plaintiffs further dispute that the "wait where you want feature" is available when making online appointments (*see* Plaintiffs' concurrently-filed Request for Judicial Notice). Next, even presuming legally blind patients could access the "wait where you want function" online, it does not change the fact that TFS does not provide independent and private access to all kiosk services, and thus relegates Plaintiffs to an unequal and inferior experience. "Public accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012).

The only phlebotomist in this action unequivocally testified that she was not trained to scan the waiting room. Ps' App. Ex. 20 at 90:22-24 [Magana dep.] "Q. Were you ever trained by Quest to scan the waiting room for patients requiring assistance? A. Not that I remember." Any belated attempt to change her testimony to create a dispute must be stricken as she did not correct her testimony timely, did not ask for clarification of the question, and did not state she misunderstood the question during the deposition. The training similarly fails. Nowhere in the training does it state how often the PSRs are to scan the waiting room. Indeed, the very intent of the kiosk was to keep phlebotomists in the back. *See* Dkt. 144. Quest's system was designed to make phlebotomists available only sometimes.

51

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| A41. | Where it functions, TFS allows a legally blind user to access only one part of the service—to communicate he or she has arrived—but not to access any of the other parts of the service.<br><br>Ps' App. Ex. 25 at ¶¶ 10-51 [Montgomery dec.]; Ex. 5 at PA0049-H:11-PA0049-I:24 [Carr dep.]; Ex. 7 at PA0079:7-PA0080:3 [Grant dep.];<br><br>Ex. 22 at PA0274:14-PA0276:3 [Sawczyn dep.]<br><br>*See,* Ex. 23, at PA0292[QUEST-VARGAS 000035245 – eCheckin CapEx tab - Summarized Project Description]. | Disputed.  When a patient uses a TFS, it sends a notification to the PSRs that a patient with visual impairments has checked in.  The PSRs are trained to come out to the waiting room upon receipt of that notification to assist the patient with visual impairments regarding any service needs.  PSRs are available to assist patients in all functions of the Kiosk, or to otherwise provide the services available through the Kiosk.<br><br>QA Ex. 3 ¶¶; QA Ex. 10 at QA0748 (Slide 5.27) ("In all PSCs, once a patient with visual impairments has checked in on the kiosk using the three-finger swipe procedure, they will appear in your Check-In Queue in Quanum with the phrase 'Visually Impaired' under the numerical ID assigned to the patient.  This notification enables you to be aware that a patient with a visual impairment has checked in at the PSC."); QA Ex. 10 at QA0749 (Slide 5.28) ("After the patient identified as 'visually impaired' appears in your queue, you should promptly go to the waiting room, call the patient by their numerical ID (e.g., Patient 01), greet the patient…"); QA Ex. 4 ¶ 20; QA Ex. 6 ¶¶ 4-5. |

**Plaintiffs' Response:** Quest's attempt to dispute this fact comes from sham affidavits (*see* Plaintiffs' Objections to Evidence) from Mr. Yarrison, Ms. Magana, and Ms. Reilly that contradict their respective sworn testimony.

Next, even presuming TFS did function as Quest claims it does—it does not—TFS does not provide independent and private access to all kiosk services, and thus relegates Plaintiffs to an unequal and inferior experience. "Public

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012). As one example, the purpose of the "wait where you want" feature is to allow patients to wait somewhere other than the waiting area in light of COVID-19 exposure concerns. This purpose is negated if a legally blind patient must wait in the waiting area for phlebotomist assistance with a feature designed to *avoid* waiting in the waiting area. | |
| A42. | TFS does not provide independent and private access to all kiosk services<br><br>(e.g., "wait where you want," specimen drop-off, appointment check-in versus walk-in).<br><br>Ps' App. Ex. 25 at ¶¶ 10-51 [Montgomery dec.]. | Disputed.  First, all patients, including blind patients, can check in and utilize nearly all of the features and functionalities of the Kiosks on the internet, which they can access with their phones.  All patients who make online appointments can select the "wait where you want" function when making appointments.<br><br>QA Ex. 1 ¶ 24.<br><br>Second, the Kiosks are enabled to allow for blind users to independently check in using a TFS.  Mr. Sawczyn specifically opined that "a blind person can, independently, privately, and successfully avail themselves of the Quest kiosk to check in for the purposes of making their presence at the PSC known to the Quest team member so that they can be served according to their appointment time, or, if they are a walk in, to be served in accordance with their place in the queue…"  Moreover, Mr. Sawczyn further testified that, contrary to Plaintiffs' assertions, "full functionality is not required even in devices like airline fare |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | machines when covered by specific Department of Transportation regulations." |
| | | QA1231 (conclusion); QA1616:11-22; QA Ex. 1 ¶ 10; QA Ex. 4 ¶ 17; QA1616:11-22, Ps' App. Ex. 25 ("In both cases a three finger swipe led to audio output."); Ps' App. Ex. 24 (confirming that three finger swipe lead to being added to the queue.); QA Ex. 4 ¶ 17 ("[TFS] enhancement enabled patients who are blind to check in at Quest PSCs independently and without assistance of a Quest phlebotomist—and supplemented Quest's longstanding policies, procedures, and trainings under which Quest phlebotomists provide assistance to patients with disabilities at PSC (including assistance with the check-in process) to ensure they can access Quest's services.") |
| | | In fact, Mr. Vargas confirmed that he was able to successfully use the TFS to check in at a PSC. |
| | | QA1180:22-1181:18 |

**Plaintiffs' Response:** Plaintiffs note that A42 is the same fact as submitted in their previous separate statement in opposition to Quest's First MSJ (Dkt. 110-13) as "B47." Fact B47 was also referenced in this Court's Order on Quest's First MSJ (Dkt. 144 at 4:8.) Quest's attempt to dispute this fact comes from a sham affidavit (*see* Plaintiffs' Objections to Evidence) from Mr. Carr that contradicts Mr. Carr's sworn testimony about the "wait where you want" feature. Plaintiffs further dispute that the "wait where you want feature" is available when making online appointments (*see* Plaintiffs' concurrently-filed Request for Judicial Notice). Next, even presuming legally blind patients could access the "wait where you want

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

|  | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
|  | function" online, it does not change the fact that *TFS* does not provide independent and private access to all kiosk services, and thus relegates Plaintiffs to an unequal and inferior experience. "Public accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012). | |
| A43. | Mr. Vargas returned to a Quest PSC on June 10, 2021.<br><br>Ps' App. Ex. 3 at ¶ 2 [Vargas dec.]. | Undisputed, but prejudicial. Plaintiffs disclosed Mr. Vargas' June 10, 2021 visit to an unidentified PSC on August 24, 2021—almost two months after the visit, but only three days before the discovery cutoff. As a result, Quest has not been afforded the opportunity to cross-examine Mr. Vargas on his alleged visit. *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment.<br><br>QA1180:22-1181:18; ECF 62. |
| A44. | As he entered the location, he heard the end of the portion of the audio content loop directed toward blind patients, but the volume was not adequate for him to hear the content from his location.<br><br>Ps' App. Ex. 3 at ¶ 2 [Vargas dec.]. | Disputed, prejudicial, and not material. First, Plaintiffs disclosed Mr. Vargas' June 10, 2021 visit to an unidentified PSC on August 24, 2021—almost two months after the visit, but only three days before the discovery cutoff. As a result, Quest has not been afforded the opportunity to cross-examine Mr. Vargas on his alleged visit. *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment.<br><br>QA1180:22-1181:18; ECF 62.<br><br>Second, whether Mr. Vargas heard the audio message instructing patients on the TFS is |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | immaterial. Mr. Vargas was aware of the contents of the audio message, specifically that the Kiosk would automatically check in a patient who used a TFS gesture. |
| | | QA1654:9-QA1655:17 (Mr. Vargas acknowledging in April 2021 that he would be able to accomplish a TFS on a subsequent visit to Quest), QA1658:23-QA1659:2 (same). |

**Plaintiffs' Response:** Quest's dispute offers nothing that would change this Court's prior consideration of the sufficiency of Mr. Vargas' declaration as evidence. Quest's cited evidence further does not create a material dispute of fact regarding Mr. Vargas' experience.

| A45. | While waiting for the content loop to replay, information was given on the "wait where you want" option, available to those who could use the kiosk independently. <br><br> Ps' App. Ex. 3 at ¶ 2 [Vargas dec.]. | Disputed and prejudicial. *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment. First, Plaintiffs disclosed Mr. Vargas' June 10, 2021 visit to an unidentified PSC on August 24, 2021—almost two months after the visit, but only three days before the discovery cutoff. As a result, Quest has not been afforded the opportunity to question Mr. Vargas on his alleged visit. <br><br> QA1180:22-1181:18; ECF 62. <br><br> Second, Plaintiffs improperly rely on Mr. Vargas' speculation that "the message made clear that ["wait by text"] was only available to those who could use the kiosk independently." *See Shakur v. Schriro*, 514 F.3d 878, 889 (9th Cir. 2008) (rejecting affidavit submitted in connection with |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | summary judgment that failed to "affirmatively show personal knowledge of specific facts") |
| | | To the contrary, all patients, including blind patients, can check in and utilize nearly all of the features and functionalities of the Kiosks on the internet, which they can access with their phones.  Moreover, all patients who make online appointments can select the "wait where you want" function when making appointments. |
| | | QA Ex. 1 ¶ 24. |
| | | Moreover, Quest PSRs are available to assist patients in using the "wait where you want" option. |
| | | QA Ex. 4 ¶ 19; QA1569:22-QA1570:4 (testifying that a PSC employee can assist totally blind patients in signing up for the "wait where you want" option.); QA Ex. 3 ¶ 26. |

**Plaintiffs' Response:** The only phlebotomist in this action unequivocally testified that she was not trained to scan the waiting room. Ps' App. Ex. 20 at 90:22-24 [Magana dep.] "Q. Were you ever trained by Quest to scan the waiting room for patients requiring assistance? A. Not that I remember." Any belated attempt to change her testimony to create a dispute must be struck as she did not correct her testimony timely, did not ask for clarification of the question, and did not state she misunderstood the question during the deposition. The training similarly fails. Nowhere in the training does it state how often the PSRs are to scan the waiting room. Indeed, the very intent of the kiosk was to keep phlebotomists in the back. See Dkt. 144. Quest's system was designed to make phlebotomists available only

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT
OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING
EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | sometimes. | |
| | Quest's attempt to dispute this fact comes from a sham affidavit (see Plaintiffs' Objections to Evidence) from Mr. Carr that contradicts Mr. Carr's sworn testimony about the "wait where you want" feature. Plaintiffs further dispute that the "wait where you want feature" is available when making online appointments (see Plaintiffs' concurrently-filed Request for Judicial Notice). Next, even presuming legally blind patients could access the "wait where you want function" online, it does not change the fact that TFS does not provide independent and private access to all kiosk services, and thus relegates Plaintiffs to an unequal and inferior experience. "Public accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012). | |
| A46. | After 8 to 10 minutes, the message directed Mr. Vargas to perform a three-finger swipe at the kiosk.<br><br>Ps' App. Ex. 3 at ¶ 3 [Vargas dec.]. | Disputed and prejudicial. *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment. First, Plaintiffs disclosed Mr. Vargas' June 10, 2021 visit to an unidentified PSC on August 24, 2021—almost two months after the visit, but only three days before the discovery cutoff. As a result, Quest has not been afforded the opportunity to question Mr. Vargas on his alleged visit.<br><br>QA1180:22-1181:18; ECF 62.<br><br>Second, whether Mr. Vargas heard the audio message instructing patients on the TFS is immaterial. Mr. Vargas was aware of the contents of the audio message, specifically that the Kiosk would automatically check in a patient who used a TFS gesture. |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | QA1654:9-QA1655:17 (Mr. Vargas acknowledging in April 2021 that he would be able to accomplish a TFS on a subsequent visit to Quest), QA1658:23-QA1659:2 (same). |
| **Plaintiffs' Response:** Quest's dispute offers nothing that would change this Court's prior consideration of the sufficiency of Mr. Vargas' declaration as evidence. Quest's cited evidence further does not create a material dispute of fact regarding Mr. Vargas' experience. | | |
| A47. | The message did not give directions as to where the kiosk itself was located within the waiting room, so Mr. Vargas had to fumble around to find it.<br><br>Ps' App. Ex. 3 at ¶ 3 [Vargas dec.]. | Disputed and prejudicial.  First, Plaintiffs disclosed Mr. Vargas' June 10, 2021 visit to an unidentified PSC on August 24, 2021—almost two months after the visit, but only three days before the discovery cutoff.  As a result, Quest has not been afforded the opportunity to cross-examine Mr. Vargas on his alleged visit.  *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment.<br><br>QA1180:22-1181:18; ECF 62.<br><br>Second, Mr. Vargas testified that, as of April 2021, he knew where the Kiosk at his local PSC is located, knew where the screen was, and would be able to perform the TFS on the Kiosk.<br><br>QA1654:9-QA1655:17 (Mr. Vargas acknowledging in April 2021 that he would be able to accomplish a TFS on a subsequent visit to Quest), QA1658:23-QA1659:2 (same); (*See* Ps' App. Ex. 3 ¶ 2 [Vargas dec.] ("I went to a Quest PSC *again* on June 10, 2021") |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | (emphasis added). |

**Plaintiffs' Response:** Quest's dispute offers nothing that would change this Court's prior consideration of the sufficiency of Mr. Vargas' declaration as evidence. Quest's cited evidence further does not create a material dispute of fact regarding Mr. Vargas' experience.

| | | |
|---|---|---|
| A48. | The content loop simply said patients should ask a staff member to assist if they had trouble locating the kiosk.<br><br>Ps' App. Ex. 3 at ¶ 3 [Vargas dec.]. | Disputed.  First, Plaintiffs disclosed Mr. Vargas' June 10, 2021 visit to an unidentified PSC on August 24, 2021—almost two months after the visit, but only three days before the discovery cutoff.  As a result, Quest has not been afforded the opportunity to cross-examine Mr. Vargas on his alleged visit.  *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment.<br><br>QA1180:22-1181:18; ECF 62.<br><br>Second, Quest TV plays an audio message that informs patients of the TFS option. Specifically, the audio message says "Welcome to Quest Diagnostics.  If you are a patient who is blind or visually impaired, you can automatically check in by swiping or dragging three fingers in any direction across the screen of our check-in kiosk without providing any additional information.  Once you have successfully done so, the kiosk will play a short audio message informing you that you have checked in and assigning you a patient ID.  Please take a seat and your patient ID will be verbally called by a Quest team member.  The Quest team member may collect |

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | additional information from you at that time. If you need assistance with locating, using, or checking in at the Kiosk, our Quest team member will be happy to assist you.  If you don't have an appointment, or would like to make one, please call 888-277-8772.  Thank you for choosing Quest Diagnostics."  QA1229; QA Ex. 4 ¶ 18. |
| **Plaintiffs' Response:** Quest's dispute offers nothing that would change this Court's prior consideration of the sufficiency of Mr. Vargas' declaration as evidence. Quest's cited evidence further does not create a material dispute of fact regarding Mr. Vargas' experience.  Quest's attempt to dispute this fact comes from a sham affidavit (*see* Plaintiffs' Objections to Evidence) from Mr. Yarrison that contradicts his sworn testimony. | | |
| A49. | However, there were no Quest staff members in the waiting room.  Ps' App. Ex. 3 at ¶ 3 [Vargas dec.]. | Undisputed, but prejudicial.  Plaintiffs disclosed Mr. Vargas' June 10, 2021 visit to an unidentified PSC on August 24, 2021—almost two months after the visit, but only three days before the discovery cutoff.  As a result, Quest has not been afforded the opportunity to cross-examine Mr. Vargas on his alleged visit. *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment.  QA1180:22-1181:18; ECF 62. |
| A50. | After locating the kiosk, Mr. Vargas confirmed there was still no headphone jack or tactile keypad. | Undisputed, but prejudicial.  Plaintiffs disclosed Mr. Vargas' June 10, 2021 visit to an unidentified PSC on August 24, 2021—almost two months after the visit, but only three days before the discovery cutoff.  As a result, Quest has not been afforded the |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT
OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING
EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | Ps' App. Ex. 3 at ¶ 3 [Vargas dec.]. | opportunity to cross-examine Mr. Vargas on his alleged visit.  *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment.<br><br>QA1180:22-1181:18; ECF 62. |
| A51. | Once Mr. Vargas performed the TFS, an audio message stated he was patient "001" and that he would be serviced in three minutes; in reality, he waited 17 minutes.<br><br>Ps' App. Ex. 3 at ¶ 4 [Vargas dec.]. | Disputed and prejudicial.  Plaintiffs disclosed Mr. Vargas' June 10, 2021 visit to an unidentified PSC on August 24, 2021—almost two months after the visit, but only three days before the discovery cutoff.  As a result, Quest has not been afforded the opportunity to cross-examine Mr. Vargas on his alleged visit.  *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment.<br><br>QA1180:22-1181:18; ECF 62.<br><br>Quest also disputes that Mr. Vargas went to the PSC for services. QA1660:3-17. |

**Plaintiffs' Response:** Quest's dispute offers nothing that would change this Court's prior consideration of the sufficiency of Mr. Vargas' declaration as evidence. Quest's cited evidence further does not create a material dispute of fact regarding Mr. Vargas' experience.

| | | |
|---|---|---|
| A52. | When the phlebotomist greeted him, Mr. Vargas explained he was there to test the accessibility of the TFS system and asked whether the "wait where you want" option was | Not material and prejudicial.  First, Plaintiffs disclosed Mr. Vargas' June 10, 2021 visit to an unidentified PSC on August 24, 2021—almost two months after the visit, but only three days before the discovery cutoff.  As a result, Quest has not been afforded the opportunity to cross-examine Mr. Vargas on |

62

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

|  | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
|  | available to him as a blind user.<br><br>Ps' App. Ex. 3 at ¶ 4 [Vargas dec.]. | his alleged visit. *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment.<br><br>QA1180:22-QA1181:18; ECF 62.<br><br>Second, all patients, including blind patients, can check in and utilize nearly all of the features and functionalities of the Kiosks on the internet, which they can access with their phones. All patients who make online appointments can select the "wait where you want" function when making appointments.<br><br>QA Ex. 1 ¶ 24.<br><br>Third, PSRs are available to assist patients in using the "wait where you want" function. In fact, PSRs often help patients use the "wait where you want" function.<br><br>QA Ex. 4 ¶ 19; QA Ex. 6 ¶ 5; QA1569:22-QA1570:4 (testifying that a PSC employee can assist totally blind patients in signing up for the "wait where you want" option.); QA Ex. 3 ¶ 26. |

**Plaintiffs' Response:** The only phlebotomist in this action unequivocally testified that she was not trained to scan the waiting room. Ps' App. Ex. 20 at 90:22-24 [Magana dep.] "Q. Were you ever trained by Quest to scan the waiting room for patients requiring assistance? A. Not that I remember." Any belated attempt to change her testimony to create a dispute must be stricken as she did not correct her testimony timely, did not ask for clarification of the question, and did not state she misunderstood the question during the deposition. The training similarly fails. Nowhere in the training does it state how often the PSRs are to scan the waiting

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | room. Indeed, the very intent of the kiosk was to keep phlebotomists in the back. See Dkt. 144. Quest's system was designed to make phlebotomists available only sometimes. Quest's attempt to dispute this fact comes from a sham affidavit (see Plaintiffs' Objections to Evidence) from Mr. Carr that contradicts Mr. Carr's sworn testimony about the "wait where you want" feature. Plaintiffs further dispute that the "wait where you want feature" is available when making online appointments (see Plaintiffs' concurrently-filed Request for Judicial Notice). Next, even presuming legally blind patients could access the "wait where you want function" online, it does not change the fact that TFS does not provide independent and private access to all kiosk services, and thus relegates Plaintiffs to an unequal and inferior experience. "Public accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman v. Walt Disney World Co*., 685 F.3d 1131, 1135 (9th Cir. 2012). | |
| A53. | The phlebotomist told him the "wait where you want" option is only for those who make appointments online and can independently use the kiosk to scan a QR code.

Ps' App. Ex. 3 at ¶ 4 [Vargas dec.]. | Disputed and prejudicial.  Plaintiffs disclosed Mr. Vargas' June 10, 2021 visit to an unidentified PSC on August 24, 2021—almost two months after the visit, but only three days before the discovery cutoff.  As a result, Quest has not been afforded the opportunity to cross-examine Mr. Vargas on his alleged visit.  *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment.

Moreover, Quest PSRs are available to assist patients in using the "wait where you want" option.  In fact, PSRs do help patients use the "wait where you want" function.

QA Ex. 4 ¶ 19; QA1569:22-QA1570:4 (testifying that a PSC employee can assist |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
| --- | --- |
| | totally blind patients in signing up for the "wait where you want" option.); QA Ex. 6 ¶ 5; QA Ex. 3 ¶ 26. |

**Plaintiffs' Response:** Quest's dispute offers nothing that would change this Court's prior consideration of the sufficiency of Mr. Vargas' declaration as evidence. Quest's cited evidence further does not create a material dispute of fact regarding Mr. Vargas' experience. Quest's attempt to dispute this fact comes from sham affidavits (*see* Plaintiffs' Objections to Evidence) from Mr. Yarrison, Ms. Reilly, and Ms. Magana that contradict their respective sworn testimony. Finally, the purpose of the "wait where you want" feature is to allow patients to wait somewhere other than the waiting area in light of COVID-19 exposure concerns. This purpose is negated if a legally blind patient must wait in the waiting area for phlebotomist assistance with a feature designed to *avoid* waiting in the waiting area. "Public accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012).

| | | |
| --- | --- | --- |
| A54. | The factual record is undisputed that Quest failed to adequately train its employees on the ADA requirements on how to provide effective communication to its blind customers.<br><br>Ps' App. Ex. 6 at PA0062:13-19, PA0070:11-PA0071:19 [Reilly dep.]; Ex. 20 at PA0251:3-7 [Magana dep.] | Disputed.  Plaintiffs first cite testimony of instances where a lay witness testifies that she is unaware whether Quest's training specifically addresses the "ADA," or the provision of "aids or auxiliary services." However, the absence in the training or the training materials themselves of specific references to the ADA or the legal jargon related to the obligations under the ADA does not render the training inadequate.  It is clear from the subject testimony as a whole and Quest's training materials that Quest provides adequate training to its PSC employees on the concepts covering the obligations under the ADA and how to provide effective communication to its patients who are visually |

65

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | impaired. Specifically, Quest's training material repeatedly reiterated and emphasized the importance of meeting the needs of every Quest patient, including materials on meeting the potential needs of patients with different kinds of disabilities.

Prior to the Kiosk roll-out, phlebotomists at the PSCs were trained to provide assistance to patients, including assistance and accommodations to persons with disabilities to ensure they can access Quest's services. This included training and requiring PSC employees to scan the waiting room each time they enter to find any individuals (whether patients with disabilities or otherwise) who may need assistance, including assistance with the check-in process.

Beginning in 2009, Quest launched "Managing Every Patient's Needs" training modules and/or videos, which were specifically designed to train phlebotomists on their obligation to provide assistance and accommodations to PSC patients with disabilities. The current "Managing Every Patient's Needs" training, which was updated in March 2021, instructs phlebotomists among other things that the "The ADA entitles patients with special needs certain rights when using public spaces such as our PSCs, including access to facilities, the right to have service animals accompany them, the right to reasonable modifications of policies, practices, |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT
OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING
EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | and procedures, and the right to auxiliary aids and services, such as the use of specialized equipment that ensures their safety and facilitates their ability to move about."  The training also instructs Quest phlebotomists "When going to the waiting room to call back a patient, pay attention to other patients and their needs and behaviors, so you can identify any patients with visual impairments who may need assistance" and "Make yourself available to assist such patients as necessary, including assisting with navigating the waiting room and locating and using the kiosk to check in."  The training also provides instruction to Quest phlebotomists about the TFS.  PSC employees are required to complete this training as part of new-hire training; they are also required to complete this training on an annual basis as a refresher training.

Between 2006 and 2014, Quest had in place Patient Care Gold Standards for its Quest phlebotomists at the PSCs, which standards were designed to ensure that Quest phlebotomists consistently provided a positive patient experience.  These standards required that employees "immediately acknowledge approaching patients", "provide assurances that someone will provide assistance momentarily", "explain the "registration / sign-in process and set an expectation for wait."

Beginning in 2015, Quest replaced the Patient |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | Care Gold Standards for its Quest phlebotomists at PSCs with Everyday Excellence standards which, among other things, emphasized the importance of "respectfully assist[ing] patients when they need help with the sign-in and patient registration process and keep[ing] them informed of what will happen next." |
| | | In June 2015, Quest launched a video training entitled "I am Helpful" for its Quest phlebotomists at PSCs—which was based on the Everyday Excellence principles.  Among other things, the training instructed Quest phlebotomists to "respectfully assist patients when they need help with the sign-in and patient registration process and keep them informed of what will happen next.  This means that if you're near the waiting area and you see a patient standing at the sign-in sheet ask yourself, 'What can I do to help?'  Then stop and actually ask the patient: 'May I help you?'  Just asking if you can help is helpful.  It tells our patients that they're on your radar, they're not faceless – that you want them to have a superior experience.  There's no reason for a patient to struggle when you can help easily." |
| | | In June 2015, Quest launched another video training entitled "I Connect with Patients" for its Quest phlebotomists at PSCs—which was based on the Everyday Excellence principles.  Among other things, the training instructed |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

68

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | Quest phlebotomists at PSCs "When you come to the waiting area, make eye contact, smile, and greet waiting patients.  Ask patients if they've had a chance to sign in.  And tell them you'll be with them shortly." |
| | | As early as at least 2018, Day 1 of the new-hire training for Quest phlebotomists instructed phlebotomists that—with respect to the eCheck-in process—they should "help confused patients", "scan the waiting room", "be present when you call a new patient back for service", and "identify patients who were not able to check in."  The Leader Guide for the training also provided "When you call a new patient back for service, ask the waiting room if everyone has had a chance to sign in.  Talking to waiting patients is a HUGE part of their experience and they clearly tell us when they feel they have been ignored.  The patient experience doesn't begin when you take the patient to the draw room." |
| | | In April 2018, Quest launched another video training entitled "Patient-Focused Change" for its Quest phlebotomists at PSCs.  Among other things, the training instructed Quest phlebotomists at PSCs "And don't forget, when you call a patient back for service, look around the waiting room—make sure everyone has checked in—and let our patients now that you see them."  The training further provided "We know that technology can be a challenge for some patients so, if you see a |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | patient who is struggling, offer assistance." |
| | | In April 2018, supervisors at Quest PSCs were provided with a "Frontline Communication" entitled "Be Mindful and Be Helpful" that was to be provided to Quest phlebotomists at PSCs. The communication instructed Quest phlebotomists: "Our patients come from all age groups and from every walk of life. Some are skilled using technology while others may not be comfortable with anything to do with a computer. Each time you call a patient back for service, meet them in the waiting room and do not call them from the back of the hallway. Instead, step into the waiting to call your patient and check in with other waiting patients to make sure everyone has signed in. If someone is struggling with eCheck-in, be helpful and provide as much assistance as they need to get checked in." |
| | | Quest also currently has in place a standard operating procedure for Quest phlebotomists at PSCs entitled "Greet Patient Etiquette", which requires Quest phlebotomists among other things to "greet patients promptly and make them feel welcome" and to "greet the entire waiting room and verify everyone has checked into the kiosk prior to calling the next patient." |
| | | QA Ex. 3 ¶¶ 7- 21; QA Exs. 7, 8, 10, 12, 13, 15; QA Ex. 10 at QA708, 724, 725-730, 757, 746-748 and 766; QA1577:6-11 ("Look, our – our stance and our [patient service |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

70

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT
OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING
EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | representatives] are instructed and trained to help ever patient, assist them in every way, regardless of you know, whatever it is.  So, you know, whether there's a kiosk or not, they're instructed to help the patient and assist them in any way.", QA1577:15-23 (Q: I'm specifically asking you whether you're aware of any training that Quest has provided to its patient services representatives indicating that the e-check-in kiosk is not independently accessible to blind patients. [Objection omitted] A: The training indicates that they may require help with checking in, and we are to assist them."), QA1579:21-23 ("Our training is to ask folks if they need help at the very first opportunity, to acknowledge them, and ascertain if they need any help."); QA Ex. 6 ¶ 3 ("One of the things that the Quest training has emphasized is that we should always help every patient who needs help with any service they are looking for from Quest at the PSCs.") <br><br> Then, Plaintiffs attempt to support the purported fact with irrelevant testimony from a phlebotomist who did not recall whether she ever documented that she could not provide an accommodation to an individual with a disability who was making an accommodation. Yet, testimony on whether the need ever arose for a Quest phlebotomist to document an accommodation request has no bearing on whether Quest provided adequate training on how to effectively communicate with patients. |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|

**Plaintiffs' Response:** The only phlebotomist in this action unequivocally testified that she was not trained to scan the waiting room. Ps' App. Ex. 20 at 90:22-24 [Magana dep.] "Q. Were you ever trained by Quest to scan the waiting room for patients requiring assistance? A. Not that I remember." Any belated attempt to change her testimony to create a dispute must be stricken as she did not correct her testimony timely, did not ask for clarification of the question, and did not state she misunderstood the question during the deposition. The training similarly fails. Nowhere in the training does it state how often the PSRs are to scan the waiting room. Indeed, the very intent of the kiosk was to keep phlebotomists in the back. See Dkt. 144. Quest's system was designed to make phlebotomists available only sometimes.

Quest's attempt to dispute this fact comes from a sham affidavit (see Plaintiffs' Objections to Evidence) from Mr. Carr that contradicts Mr. Carr's sworn testimony about the "wait where you want" feature. Plaintiffs further dispute that the "wait where you want feature" is available when making online appointments (see Plaintiffs' concurrently-filed Request for Judicial Notice). Next, even presuming legally blind patients could access the "wait where you want function" online, it does not change the fact that TFS does not provide independent and private access to all kiosk services, and thus relegates Plaintiffs to an unequal and inferior experience. "Public accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012).

| A55. | Even after introducing a training program entitled "Managing Patient Needs," Quest's Rule 30(b)(6) witness was unable to confirm this training covered the ADA. | Disputed. Plaintiffs' purported fact is not supported by cited evidence. Specifically, Plaintiffs cite testimony regarding *how many* Quest employees received annual nondiscrimination training, not whether the "Managing Every Patient's Needs" covered the ADA. Moreover, the "Managing Every Patient's Needs" training materials, which includes ten slides that specifically reference |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|
| Ps' App. Ex. 6 at PA0063:12-PA0064:1, PA0065:12-20 [Reilly dep.]; | the "ADA," speak for themselves. QA Ex. 10. |

**Plaintiffs' Response:** Quest's attempt to dispute this fact comes from a sham affidavit (*see* Plaintiffs' Objections to Evidence) from Ms. Reilly that contradicts her sworn testimony. Any belated attempt to change her testimony to create a dispute must be struck as she did not correct her testimony timely.

| | | |
|---|---|---|
| A56. | Ms. Reilly could not confirm that all employees completed the "Managing Patient Needs" training.<br><br>Ps' App. Ex. 6 at PA0068:14-25 [Reilly dep.]; | Undisputed.  At the time of her deposition, Jody Reilly had not reviewed this data to permit her to give accurate testimony under oath on the subject at her deposition.  Of the 12,032 PSC employees to whom the "Managing Every Patient's Needs" updated training had been assigned either as new hires or as part of their refresher training cycle, 96% of active PSRs to whom training was assigned in 2021 had completed the training.  It is Quest policy that all PSC employees take the training at the time of hire and again during annual refresher training.<br><br>QA Ex. 3 ¶ 9; QA1575:3-11. |
| A57. | Ms. Reilly – the Company's Rule 30(b)(6) witness on the topic of training – was further unable to identify the existence of any written Quest ADA policy.<br><br>Ps' App. Ex. 6 at | Disputed.  Ms. Reilly testified to a number of Quest ADA policies and trainings, including written policies.<br><br>QA1576:11-14, ("There's many policies that talks about how we will conform to – you know, our—our intent is to confirm to all written laws, including ADA."); QA1576:19-22 ("There is a notice in every patient service |

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | PA0066:23-PA0067:14 [Reilly dep.]; | centers that discussed the ADA, and it's posted in every patient service center, and it outlines that for all to see."); QA1573 ("For our team, for the national patient services, there is a training that's in Empower that does cover the ADA requirements."), QA1574:11-25 (identifying "Managing Every Patient's Needs" as one of the ADA trainings provided to Quest employees); QA Ex. 3 ¶ 8 (explaining that the "Managing Every Patient's Needs" training instructs phlebotomists among other things that the "The ADA entitles patients with special needs certain rights when using public spaces such as our PSCs, including access to facilities, the right to have service animals accompany them, the right to reasonable modifications of policies, practices, and procedures, and the right to auxiliary aids and services, such as the use of specialized equipment that ensures their safety and facilitates their ability to move about."); |
| **Plaintiffs' Response:** Quest's attempt to dispute this fact comes from a sham affidavit declarations (*see* Plaintiffs' Objections to Evidence) from Ms. Reilly that contradicts her sworn testimony. Any belated attempt to change her testimony to create a dispute must be struck as she did not correct her testimony timely. | | |
| A58. | Nor could Ms. Reilly identify what portions of the ADA even apply to Quest.<br><br>Ps' App. Ex. 6 at PA0069:3-20 [Reilly | Disputed and not material. Specifically, the ability of a lay witness with no legal training such as Ms. Reilly to identify the precise section of the ADA that applies to Quest is not material. Ms. Reilly testified throughout her deposition regarding Quest's ADA policies and the trainings Quest provides to it |

74

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | dep.]; | employees to ensure Quest complies with the ADA. Moreover, Ms. Reilly could identify relevant portions of the ADA, if provided a copy of the statute. For example, she is familiar with the language in both the "auxiliary aids and services" requirement in the statute and the "effective communication" requirement in the ADA regulations, which provisions are at the heart of the dispute in this case.

QA Ex. 3 ¶ 22; QA1576:11-14 ("There's many policies that talks about how we will conform to – you know, our—our intent is to confirm to all written laws, including ADA."); QA1576:19-22 ("There is a notice in every patient service centers that discussed the ADA, and it's posted in every patient service center, and it outlines that for all to see."); QA1573:17-23 ("For our team, for the national patient services, there is a training that's in Empower that does cover the ADA requirements."), QA1574:11-25 (identifying "Managing Every Patient's Needs" as one of the ADA trainings provided to Quest employees); QA Ex. 3 ¶ 8 (explaining that the "Managing Every Patient's Needs" training instructs phlebotomists among other things that the "The ADA entitles patients with special needs certain rights when using public spaces such as our PSCs, including access to facilities, the right to have service animals accompany them, the right to reasonable modifications of policies, practices, and |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT
OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING
EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | procedures, and the right to auxiliary aids and services, such as the use of specialized equipment that ensures their safety and facilitates their ability to move about."); QA Ex. 10 at QA0793). |

**Plaintiffs' Response:** Quest's attempt to dispute this fact comes from a sham affidavit (*see* Plaintiffs' Objections to Evidence) from Ms. Reilly that contradicts her sworn testimony. Any belated attempt to change her testimony to create a dispute must be struck as she did not correct her testimony timely.

| A59. | Indeed, of "Managing Patient's Needs" approximately 500 slides, only four reference the ADA, and none address the provision of effective communication to blind patients. Ps' App. Ex. 6 at PA0071A:12-25 [Reilly dep.]; | Disputed. At least ten slides specifically reference the "ADA." Many more slides contain instruction and guidance to employees on how to apply ADA principles, including specific guidance on how to assist visually impaired patients and/or engage in effective communication. QA Ex. 3 ¶ 7; *see generally*, QA Ex. 10 at QA 792-827; QA 793 ("The ADA entitles patients with special needs certain rights when using public spaces such as our PSCs, including access to facilities, the right to have service animals accompany them, the right to reasonable modifications of policies, practices, and procedures, and the right to auxiliary aids and services, such as the use of specialized equipment that ensures their safety and facilitates their ability to move about."); QA Ex. 10at QA 805/slide 5.10 ("Make yourself available to assist [patients with visual impairment] as necessary, including assisting with navigating the waiting room and locating |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT
OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING
EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | and using the kiosk to check in."); QA Ex. 10 at 808 ("Like any other patient, if you see a patient with visual impairments who is having difficulty locating or using the kiosk or checking in at the kiosk, you should assist them with the checking in using the above process."; Slide 5.21 (instructions to read aloud to blind and visually-impaired patients) |

**Plaintiffs' Response:** Quest's attempt to dispute this fact comes from a sham affidavit  (*see* Plaintiffs' Objections to Evidence) from Ms. Reilly that contradicts her sworn testimony. Any belated attempt to change her testimony to create a dispute must be struck as she did not correct her testimony timely.

| A60. | Ms. Magana unequivocally testified that she was never trained to "scan" the waiting room by Quest.<br><br>Ps' App. Ex. 20 at 90:22-24 [Magana dep.] | Disputed.  Plaintiffs' evidence is intentionally misleading.  While Ms. Magana originally testified that she did not receive training to "scan" the waiting room, she later explained in her deposition that she misunderstood the question to relate to the scanning function of the kiosk.  Ms. Magana went on to clarify that she did, in fact, receive training through the "Managing Every Patient's Needs" to look in the waiting room to see if any patients need help when she goes into the waiting room.<br><br>QA1628:3-18. (Q: Just a few minutes ago you gave testimony in response to a question from Mr. Miller that you did not receive training to scan the waiting room when you go out to the waiting room.  What did you understand Mr. Miller to be asking you about? A. Scanning -- patients have a bar code and scan it on the kiosk. Q. Okay.  So my question is did you ever receive training to look in the waiting |

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | room to see if any patients need help when you go into the waiting room? A. Yes. Q. And what training is that? A. The Quest. Q. Which Quest training? A. Managing Every Patient's Needs.); QA Ex. 6 ¶ 8; QA Ex. 3 ¶ 9 (confirming Ms. Magana completed the "Managing Every Patient's Needs" training) |

**Plaintiffs' Response:** The only phlebotomist in this action unequivocally testified that she was not trained to scan the waiting room. Ps' App. Ex. 20 at 90:22-24 [Magana dep.] "Q. Were you ever trained by Quest to scan the waiting room for patients requiring assistance? A. Not that I remember." Any belated attempt to change her testimony to create a dispute must be stricken as she did not correct her testimony timely, did not ask for clarification of the question, and did not state she misunderstood the question during the deposition. The training similarly fails. Nowhere in the training does it state how often the PSRs are to scan the waiting room. Indeed, the very intent of the kiosk was to keep phlebotomists in the back. *See* Dkt. 144. Quest's system was designed to make phlebotomists available only sometimes.

| | | |
|---|---|---|
| A61. | Ms. Magana further confirmed that "Managing Patient Needs" was the only training employees received regarding the ADA and, as discussed above, this training does not include any information regarding the frequency of scanning the waiting room, nor how to provide effective communication. | Disputed.  The evidence demonstrates that Quest trains its PSRs to scan the waiting room every time they go to the waiting room and to provide patients with as much assistance as they need.

Ms. Magana testified that she received the "Managing Every Patient's Needs" training, which among other things, trains PSRs to look in the waiting room to see if any patients need help whenever they go into the waiting room.

QA1628:3-18, QA1629:25-QA1630:16; QA Ex. 6 ¶ 8; QA Ex. 3 ¶ 9 (confirming Ms. Magana completed the "Managing Every |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | Ps' App. Ex. 20 at PA0250:2-18 [Magana dep.] | Patient's Needs" training) |

Specifically, the "Managing Every Patient's Needs" training instructs Quest PSRs "[w]hen going to the waiting room to call back a patient, pay attention to other patients and their needs and behaviors, so you can identify any patients with visual impairments who may need assistance" and "Make yourself available to assist such patients as necessary, including assisting with navigating the waiting room and locating and using the kiosk to check in."

The video training entitled "I Connect with Patients" instructed Quest PSRs, "[w]hen you come to the waiting area, make eye contact, smile, and greet waiting patients.  Ask patients if they've had a chance to sign in.  And tell them you'll be with them shortly."

The PSR new hire training instructed that "[w]hen you call a new patient back for service, ask the waiting room if everyone has had a chance to sign in."

The "Patient-Focused Change" video training instructed Quest PSRs on the following: "And don't forget, when you call a patient back for service, look around the waiting room—make sure everyone has checked in—and let our patients now that you see them."

The "Frontline Communication" entitled "Be Mindful and Be Helpful" instructed Quest phlebotomists to, among other things, "step

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | into the waiting to call your patient and check in with other waiting patients to make sure everyone has signed in.  If someone is struggling with eCheck-in, be helpful and provide as much assistance as they need to get checked in." |
| | | Quest's "Greet Patient Etiquette" standard operating procedure for Quest PSRs requires phlebotomists to "greet the entire waiting room and verify everyone has checked into the kiosk *prior to calling the next patient*." |
| | | QA Ex. 3 ¶¶ 8, 16, 17, 15, 18, QA Exs. 10, 14; *see* QA Ex. 6 ¶ 3. |

**Plaintiffs' Response:** The only phlebotomist in this action unequivocally testified that she was not trained to scan the waiting room. Ps' App. Ex. 20 at 90:22-24 [Magana dep.] "Q. Were you ever trained by Quest to scan the waiting room for patients requiring assistance? A. Not that I remember." Any belated attempt to change her testimony to create a dispute must be stricken as she did not correct her testimony timely, did not ask for clarification of the question, and did not state she misunderstood the question during the deposition. The training similarly fails. Nowhere in the training does it state how often the PSRs are to scan the waiting room. Indeed, the very intent of the kiosk was to keep phlebotomists in the back. See Dkt. 144. Quest's system was designed to make phlebotomists available only sometimes.

| | | |
|---|---|---|
| A62. | Further, Ms. Magana testified that Quest informed her the kiosk is not accessible to legally blind individuals.<br><br>Ps' App. Ex. 20 at | Disputed.  In the deposition testimony Plaintiffs cite, Plaintiffs' counsel asked Ms. Magana whether Quest ever informed her that the Kiosks were not "independently accessible" by blind patients.  Despite answering, "I think so" to the question at deposition, Ms. Magana was, and still is, |

80

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | PA0250:19-24 [Magana dep.] | unclear on exactly what counsel meant by "independently accessible." Ms. Magana provided that response because the Quest training instructs PSRs to help all patients (including blind patients) if they are having trouble with anything, including using the Kiosk. She thought that "probably the Quest training was telling us that information because some people, including some blind people, may need help using the Kiosks."<br><br>QA Ex. 6 ¶ 9. |

**Plaintiffs' Response:** Quest's attempt to dispute this fact comes from a sham affidavit (see Plaintiffs' Objections to Evidence) from Ms. Magana that contradicts her sworn testimony. Any belated attempt to change her testimony to create a dispute must be struck as she did not correct her testimony timely, did not ask for clarification of the question, and did not state she misunderstood the question during the deposition.

| A63. | It is therefore no surprise that ACB members reported markedly similar experiences in that each encountered (1) an inaccessible kiosk, and (2) untrained staff.<br><br>*See* Ps' App. Ex. 10 at PA0126:7-12 [Bazyn dep.: husband checked her in]; Ex. 15 at PA0180:24-PA0181:12 [Brink dep.: Quest employee asked | Disputed. Plaintiffs' cited evidence fails to support the purported facts, especially that Quest's staff was untrained. It is clear from Quest's training materials that Quest provides adequate training to its PSC employees on the obligations under the ADA and how to provide effective communication to its blind patients. Specifically, Quest's training material repeatedly reiterated and emphasized the importance of meeting the needs of every Quest patient, including materials on meeting the potential needs of patients with different kinds of disabilities. |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT
OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING
EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|
| Brink's daughter to help]; Ex. 13 at PA0159:20-PA0160:1 [Grahmann dep.]: relied on another patient, a stranger, to check her in]; Ex. 11 at PA0136:3-PA0137:2, PA0138:15-PA0139:3 [M. Haroyan dep.: relied on other patients – strangers – to sign her in twice before, and her father once]; Ex. 12 at PA0152:11-PA0154:1, PA0153 [ N. Haroyan dep.: relied on another patient, a stranger, to sign her in, as well as her father on other occasions]; Ex. 14 at PA0171:22-PA0172:5, PA0170:18-23 [Lyons dep.: relied on another patient, a stranger, to check her in, and now has to bring different people to help her check in]; Ex. 16 at PA0189:14-PA0190:3 [Rehder dep.: relied on another patient, a stranger, to check her in]. | QA Ex. 3 ¶¶ 3-20; QA Exs. 7, 8, 10, 12, 13, 15; QA Ex. 6 ¶ 3.<br><br>Consistent with this training, most ACB members were assisted by PSRs within a few minutes of their arrival to the PSC, and some were assisted immediately upon their arrival to the PSC.<br><br>Bazyn, QA1728:16-22("no more than a couple minutes" to get signed in); Black, QA1745:11-16 (phlebotomist was waiting at reception desk when Mr. Black sought assistance.); M. Haroyan QA1791:6-14 ("it was pretty quick…A minute or two probably" to get assistance checking in); M. Haroyan, QA1793:24-QA1794:4 (PSR was aware "very quickly" that she was there);(N. Haroyan, QA1802:21-24 (waited "five minutes at the most" before phlebotomist came into the waiting room); Rehder (waited "a couple minutes" for assistance with check in. QA1814:19-QA1815:1); Stanley, QA1666:1-7 (waited for possibly one minute for a phlebotomist.), QA1687:2-14; QA1701 ("stood there for a few moments" before being assisted by phlebotomist); QA1698 (Debbie Downey); QA1698 (Ardis Bazyn) ("There has always been an attendant to take info or had to have someone sign name on the list when the attendant was in back."); (PA0710:12-13. (ACB member "had a staff member at the center help him check in for appointments.") Brink,  QA1761:1-17 (PSR was waiting at the |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | reception desk "almost every time") |
| | | Moreover, Mr. Vargas and every ACB member deposed were able to access and complete their diagnostic testing at Quest. |
| | | (Vargas, QA1648:20-22; Bazyn, QA1730:10-15, Black, QA1748:16-21; Brink, QA1769:21-23; Grahman, QA1775:1-4; M. Haroyan, QA1793:4-12, QA1795:12-17, N. Haroyan, QA1804:13-15, Lyons, QA1810:8-13; Rehder, QA1816:23-25; Stanley, QA1667:22-24). |

**Plaintiffs' Response:** Quest's cited testimony does not support its position and mischaracterizes the testimony cited. Ms. Downey "had to yell for someone to come and assist [her]." QA1698. Ms. Haroyan did not remember whether it was a third person or phlebotomist that checked her in. QA1791:2-5. She also testified that she relied on other patients – strangers – to sign her in, as well as her dad who comes to every appointment with her. Ex. 11 at PA0136:3-PA0137:2, PA0138:15-PA0139:3 [M. Haroyan dep.] QA1164 states that Mr. Moore has never been able to use the kiosks to check in for appointments. Ms. Brink's statement that the PSR was waiting at the reception desk was regarding her visits prior to the implementation of the kiosk and before the class period, and is therefore irrelevant. QA1761:1-17.

| | | |
|---|---|---|
| A64. | Indeed, internal Quest emails confirm that "[w]ith or without eCheck-in we know from patient feedback patients would like greeters. Most sites do not have greeters and there are no plans to introduce greeters as part | Undisputed. Notably, this fact acknowledges that there are phlebotomists assigned to the greeting function at some PSCs.<br><br>QA1596:15-QA1597:1 ("There are – there are locations that have staff located at the front when people come in.") |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | of eCheck-in." Ps' App. Ex. 23 at PA0281-0282. | |
| A65. | Quest has not offered any record facts to dispute the kiosks lack of any accessible features during the Class Period; to the contrary, the Court, Quest, and Plaintiffs all agree that the kiosk did not provide effective communication. Ps' App. Ex. 25. [Montgomery dec.]; Ex. 24 at PA0294-PA0311 [Derry dec.]; Ex. 4 at PA0023:17-23 [Yarrison dep.]. | Disputed. Plaintiffs' cited evidence fails to support the purported facts, specifically that the kiosks lack "any" accessible features. Plaintiffs cite Montgomery's report in which she opines that the kiosks are not "independently accessible." However, Ms. Montgomery does not opine on any of the *physical* features of the kiosks that make them accessible. In fact, in implementing its Kiosks, Quest and its vendors undertook efforts to ensure that Quest satisfied the explicit design standards applicable to the Kiosks in the ADA Standards for Accessible Design (36 C.F.R. Pt. 1191, App. B & D, "ADAS"), including design standards that all of the operable parts of the Kiosk were within "reach range" of someone using a wheelchair (ADAS 308, 309) and that the freestanding Kiosks were detectable by blind cane users (ADAS 307). QA1605:2-15 (Quest undertook efforts to ensure the Kiosks are "mounted and installed in an ADA-compliant way" and made changes to "improve increased text size, button size, and contrast."), QA1606:25-QA1607:7 (Quest implemented ADA installation guidelines for the Kiosks), QA1588:9-22; QA Ex. 4 ¶ 9. |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | Second, the ADAS expressly states that the ATM standards and other independent use standards did not apply to Interactive Transaction Machines, like the Kiosk.<br><br>2010 Standards for Accessible Design § 707, Advisory 707, 36 C.F.R. Pt. 1191, App. B and D.<br><br>Third, Mr. Sawczyn was able to independently access the check-in function of the Kiosk. Specifically, he opined that "the kiosks are accessible by blind users for the purposes of checking in for Quest services and this offers 'effective communication' as that terms is used and understood in 28 C.F.R. § 36.303(c) of the ADA regulations."  Mr. Sawczyn further testified that, contrary to Plaintiffs' assertions, "full functionality is not required even in devices like airline fare machines when covered by specific Department of Transportation regulations."<br><br>QA1231; QA1616:11-22.<br><br>Fourth, Mr. Vargas confirmed that he was able to successfully use the TFS to check in at a PSC.<br><br>QA1180:22-QA1181:18.<br><br>Fifth, the Access Board, which authored the 1991 and 2010 Standards for Accessible Design, has announced its intention to regulate with respect to self-service transaction |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

85

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | machines like the Kiosk, demonstrating, first, that there is no existing requirement to design the Kiosk as Plaintiffs have asked the Court to order, and, second, that Quest should not have been required to respond to Plaintiffs' lawsuit with the Kiosk configuration sought by the Plaintiffs and the Court should not impose one, pending the Congressionally-mandated enforcement agency's (DOJ's) anticipated regulation in this area.  "U.S. Access Board – Self-service Transaction Machines," available at https://www.access-board.gov/sstms/ (last visited July 11, 2022); Access Board Kiosk Regulatory Agenda (June 29, 2022), available at https://www.reginfo.gov/public/do/ eAgendaViewRule?pubId=202204&RIN=3014-AA44&operation=OPERATION_PRINT_RULE (last visited July 11, 2022). |

**Plaintiffs' Response: Plaintiffs' Response:** Defendant's adherence to mobility-impaired ADA standards is wholly irrelevant to Plaintiffs' claims and do not dispute, or address, any of Plaintiffs' evidence in support of the fact. Quest never considered visually-impaired patrons when installing the kiosks in its PSCs as the community did not make up a large enough group to affect Quest's bottom-line. *See* Plaintiffs' SUF # A92.

| A66. | There is no factual dispute that Quest's system was designed to keep phlebotomists in the back.<br><br>*See* PA0277-PA0280 ("[t]here are no | Disputed.  First, Plaintiffs' cited evidence fails to support the purported fact, and Plaintiffs attempt to mischaracterize the evidence.  While the Kiosks may have resulted in PSRs servicing more patients, the evidence demonstrates that the Kiosk project was not designed to reduce the amount of time that |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

|  | **Plaintiffs' Uncontroverted Facts and Supporting Evidence** | **Defendants' Disputed Facts and Supporting Evidence** |
|---|---|---|
|  | phlebotomists sitting at front desks available to help register patients."). <br><br> PA0283-PA0284 (the concern is "that the staff is servicing the patients and cannot always be in front of the "house" tending to folks that are struggling with registration. You can't have both at the same time."). <br><br> Ps' App. Ex. 19 at PA0222:10-24, PA0238:25-PA029:10, PA0244 [Walsh dep. and exhibit establishing the ECSS was projected to save over $40 million in costs through "efficiencies" earned by reducing phlebotomist contact with patients]); | PSRs spend in the waiting room.  Specifically, in deciding whether to implement the Kiosks, Quest's *sole* goal was an improved customer and employee experience.  Potential financial benefits played no role in the reasons or motivations for this Kiosk project.  Quest anticipated that moving to an electronic system from a paper system would result in the average transaction time of check in being reduced by one minute per transaction.  This time savings would only increase the amount of time that PSRs would spend with patients, including the amount of time PSRs could spend in the waiting rooms assisting patients.  Quest's plan and business case for the Kiosk rollout did not include a plan to reduce then-existing PSC staff or to replace PSC staff with Kiosks.  While Quest employees may not be in the waiting rooms at all PSCs at all times (which would vary based on a variety of factors), performance of their duties requires them to regularly visit the waiting room and provide assistance where needed. <br><br> QA Ex. 4 ¶¶ 6, 10, 11, QA Ex. 2 ¶¶ 3-5, QA Ex. 5 ¶¶ 3-5; QA1587:3-1588:8, QA1589:20-25, QA1590:6-15, QA1591:7-15, QA1592:23-QA1593:6. <br><br> Second, PSRs were trained to scan the waiting room for patients that needed assistance with anything, including checking in. |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | QA1588:9-22, QA1594:18-QA1595:7, QA1605:16-QA1606:4; QA Ex. 3 ¶¶ 7-23; QA Ex. 10 at QA0744 ("When going to the waiting room to call back a patient, pay attention to other patients and their needs and behaviors, so you can identify any patients with visual impairments who may need assistance," "Make yourself available to assist such patients as necessary, including assisting with navigating the waiting room and locating and using the kiosk to check-in."), QA0747 ("Like any other patient, if you see a patient with visual impairments who is having difficulty locating or using the kiosk or checking in at the kiosk, you should assist them with checking in using the above process."); see QA Ex. 6 ¶ 3.<br><br>PA0277-PA0280 is an email from a Quest Executive Assistant who was not involved in the design or implementation of the e-check-in system and was making a statement based on personal experiences with visiting one PSC. PA0283-PA0284 is an email stating an obvious fact that a phlebotomist cannot be at two places at once.  While Plaintiffs' evidence may demonstrate the result of the Kiosk rollout (i.e., that PSRs are not sitting at the front desk waiting for patients), neither piece of evidence upon which Plaintiffs rely supports the *intention* behind Quest's design of the Kiosk. |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | Multiple ACB members were assisted by phlebotomists *immediately* upon their arrival to the PSC and therefore did not wait at all.<br><br>QA1793:24-QA1794:4 (PSR was aware "very quickly" that she was there); QA1698 (Debbie Downey), QA1666:1-7; QA1687:2-14 ("There has always been an attendant to take info or had to have someone sign name on the list when the attendant was in back."); (QA1164:12-13.) ACB member "had a staff member at the center help him check in for appointments."; QA1761:1-17 (PSR was waiting at the reception desk "almost every time") QA1793:24-QA1794:4 (PSR was aware "very quickly" that she was there) |

**Plaintiffs' Response:** Quest's cited testimony does not support its position and mischaracterizes the testimony cited. Ms. Downey "had to yell for someone to come and assist [her]." QA1698. Ms. Haroyan did not remember whether it was a third person or phlebotomist that checked her in. QA1791:2-5. She also testified that she relied on other patients – strangers – to sign her in, as well as her dad who comes to every appointment with her. Ex. 11 at PA0136:3-PA0137:2, PA0138:15-PA0139:3 [M. Haroyan dep.] QA1164 states that Mr. Moore has never been able to use the kiosks to check in for appointments. Ms. Brink's statement that the PSR was waiting at the reception desk was regarding her visits prior to the implementation of the kiosk and before the class period, and is therefore irrelevant. QA1761:1-17.

The only phlebotomist in this action unequivocally testified that she was not trained to scan the waiting room. Ps' App. Ex. 20 at 90:22-24 [Magana dep.] "Q. Were you ever trained by Quest to scan the waiting room for patients requiring assistance? A. Not that I remember." Any belated attempt to change her testimony to create a dispute must be stricken as she did not correct her testimony timely, did

Nye, Stirling, Hale & Miller
33 West Mission Street, Suite 201
Santa Barbara, California 93101

89

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | not ask for clarification of the question, and did not state she misunderstood the question during the deposition. The training similarly fails. Nowhere in the training does it state how often the PSRs are to scan the waiting room. Indeed, the very intent of the kiosk was to keep phlebotomists in the back. See Dkt. 144. Quest's system was designed to make phlebotomists available only sometimes. | |
| A67. | Even following the TFS rollout, a sighted patient walks into a Quest PSC and immediately views either prominently located kiosks or signage which invite him to check in.<br><br>Ps' App. Ex. 24 at PA0294-PA0311 [Derry dec.]. | Disputed.  First, the evidence is untimely, prejudicial, duplicative, and incompetent.  In sum, the declaration/report of Mr. Derry was disclosed three days before the discovery cutoff with no resulting opportunity for Quest's cross-examination, he makes conclusions based on surveys of a statistically insignificant sample of PSCs not chosen at random in violation of basic statistical principles, and his observations are qualitative, not quantitative, and are irrelevant to the issues of the instant case.  *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment.<br><br>Second, Plaintiffs' cited evidence fails to support the purported fact.  Instead, Plaintiffs rely on observations based on a single visit to a statistically insignificant number of PSCs (24 PSCs or 1% of the PSCs) and speculation to support their statement.<br><br>Third, the location of the Kiosks and signage at each PSC vary.<br><br>QA Ex. 3 ¶ 6. |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|
| **Plaintiffs' Response:** Quest's dispute offers nothing that would change this Court's prior consideration of the sufficiency of Mr. Derry's declaration as evidence. Quest's cited evidence further does not create a material dispute of fact regarding Mr. Derry's finding. Quest's attempt to dispute this fact comes from a sham affidavit (*see* Plaintiffs' Objections to Evidence) from Ms. Reilley that contradicts her sworn testimony. | |

| A68. | In response to Quest's repeated claims under oath that Quest implemented TFS across the Company's PSC network, Plaintiffs' accessibility investigator, Mark Derry, investigated 24 Quest PSC locations and discovered Quest's purported "solution", TFS, was riddled with glaring deficiencies at every single location, barring any finding of mootness.<br><br>Ps' App. Ex. 5 at PA0049-J:2-8 [Carr dep.]; Ex. 4 at PA0024:10-14 [Yarrison dep.]; Ex. 7 at PA0084:20-23 [Grant dep.]; Ex. 24 at X.<br><br>Ps' App. Ex. 24 at PA0294-PA0311 [Derry dec.]. | Disputed. First, the purported fact itself generates a genuine issue of fact, as Plaintiffs assert Quest's evidence is contradicted by their evidence.<br><br>Second, the evidence is untimely, prejudicial, duplicative, and incompetent. In sum, the declaration/report of Mr. Derry was disclosed three days before the discovery cutoff with no resulting opportunity for Quest's cross-examination, he makes conclusions based on surveys of a statistically insignificant sample of PSCs not chosen at random in violation of basic statistical principles, and his observations are qualitative, not quantitative, and are irrelevant to the issues of the instant case. *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment.<br><br>Third, Plaintiffs' cited evidence fails to support the purported fact. Instead, Plaintiffs rely on observations based on a single visit to a statistically insignificant number of PSCs (24 PSCs or 1% of the PSCs) and speculation to support their statement. |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | *See also* Dkt. 95-1, at 16:9-10. | |

**Plaintiffs' Response:** Quest's dispute offers nothing that would change this Court's prior consideration of the sufficiency of Mr. Derry's declaration as evidence. Quest's cited evidence further does not create a material dispute of fact regarding Mr. Derry's finding.

| A69. | At many Quest locations, Mr. Derry found there is no way for legally blind patients to know TFS even exists.

Ps' App. Ex. 24 at PA0294-PA0311 [Derry dec.]. | Disputed. First, the evidence is untimely, prejudicial, duplicative, and incompetent. In sum, the declaration/report of Mr. Derry was disclosed three days before the discovery cutoff with no resulting opportunity for Quest's cross-examination, he makes conclusions based on surveys of a statistically insignificant sample of PSCs not chosen at random in violation of basic statistical principles, and his observations are qualitative, not quantitative, and are irrelevant to the issues of the instant case. *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment.

Second, the term "legal blindness" covers a wide range of circumstances because it is recognized that "[o]ften, people who are diagnosed with legal blindness still have some usable vision." In fact, a number of sources indicate that the definition of "legally blind" does not address an individual's ability to perform daily tasks, including reading and mobility. Vision Aware, an outreach center for the American Printing House for the Blind, states that legal blindness is "not a functional |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

92

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | low vision definition and doesn't tell us very much at all about what a person can and cannot see." Thus, while completely blind users may not be able to see the Kiosks, they are visible to some "legally blind" users.

Quest Request for Judicial Notice ¶ 1; QA Ex. 16 ; QA Ex. 20 ¶¶ 14-18; see QA Ex. 1 ¶ 14; *see* QA Ex. 1 ¶ 14; QA1685-1:14-17 ("People who are blind are always blind at different levels, yes.")

Third, Quest TV plays an audio message that informs patients of the TFS option. Specifically, the message says "Welcome to Quest Diagnostics.  If you are a patient who is blind or visually impaired, you can automatically check in by swiping or dragging three fingers in any direction across the screen of our check-in kiosk without providing any additional information.  Once you have successfully done so, the kiosk will play a short audio message informing you that you have checked in and assigning you a patient ID.  Please take a seat and your patient ID will be verbally called by a Quest team member.  The Quest team member may collect additional information from you at that time.  If you need assistance with locating, using, or checking in at the Kiosk, our Quest team member will be happy to assist you.  If you don't have an appointment, or would like to make one, please call 888-277-8772.  Thank you for choosing Quest Diagnostics." |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

|  | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
|  |  | QA Ex. 21 at QA1229; QA Ex. 4 ¶ 18. Fourth, patients who have previously been to Quest will already be aware of the TFS option on the Kiosks. *See* QA1654:9-QA1655:17 (Mr. Vargas acknowledging in April 2021 that he would be able to accomplish a TFS on a subsequent visit to Quest), QA1658:23-QA1659:2 (same). |

**Plaintiffs' Response:** Defendant offers no evidence for its brazen assertion that legally blind individuals could access some of the features on the kiosk. In fact, the record suggests the opposite. Indeed, Quest's own expert was unable to use the functions of the kiosk. Plaintiffs' SUF A35. This argument has been raised and rejected by this Court in its class certification hearing. *See* Dkt. 190. Ms. Montgomery's report stating that the legally blind individual could not access the features of the kiosk stands unrebutted in the record.

| A70. | To inform blind patients of TFS, Quest relies on a voice message which is supposed play on a loop from an LCD monitor located in the patient service centers. Ps' App. Ex. 5 at PA0049-K:8-24 [Carr dep.]; Ex. 4 at PA0032:12-19 [Yarrison dep.]; Ex. 7 at PA0083:7-15 [Grant dep.] | Disputed.  While Quest TV plays an audio message, PSRs are trained to scan the waiting room for patients that needed assistance with anything, including checking in.  The PSRs can also inform patients about the TFS option. QA1588:9-22, QA1594:18-QA1595:7, QA1605:16-QA1606:4; QA Ex. 3 ¶¶ 7-23; QA Ex. 10 at QA0744 ("When going to the waiting room to call back a patient, pay attention to other patients and their needs and behaviors, so you can identify any patients with visual impairments who may need assistance," "Make yourself available to assist such patients as necessary, including assisting with navigating the waiting room and locating |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | and using the kiosk to check-in."), QA0747 ("Like any other patient, if you see a patient with visual impairments who is having difficulty locating or using the kiosk or checking in at the kiosk, you should assist them with checking in using the above process.");<br><br>Additionally, some PSCs have greeters and/or receptionists at the PSCs.  The PSRs can also inform patients about the TFS option.<br><br>*See* Plaintiffs' Uncontroverted Fact No. 64, Ps' App. Ex. 23 at PA0281-0282. QA1596:15-QA1597:1 ("There are – there are locations that have staff located at the front when people come in."); QA1578:17-21 (some PSCs have receptionists). |

**Plaintiffs' Response:** Plaintiff's SUF # 54-62 (Dkt. 206-5) ("internal Quest emails confirm that "[w]ith or without eCheck-in we know from patient feedback patients would like greeters. Most sites do not have greeters and there are no plans to introduce greeters as part of eCheck-in.")

The only phlebotomist in this action unequivocally testified that she was not trained to scan the waiting room. Ps' App. Ex. 20 at 90:22-24 [Magana dep.] "Q. Were you ever trained by Quest to scan the waiting room for patients requiring assistance? A. Not that I remember." Any belated attempt to change her testimony to create a dispute must be stricken as she did not correct her testimony timely, did not ask for clarification of the question, and did not state she misunderstood the question during the deposition. The training similarly fails. Nowhere in the training does it state how often the PSRs are to scan the waiting room. Indeed, the very intent of the kiosk was to keep phlebotomists in the back. See Dkt. 144. Quest's system was designed to make phlebotomists available only sometimes.

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

95

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| A71. | Quest executive Taylor Carr falsely testified this audio loop is present at all locations. Ps' App. Ex. 5 at PA0049-N:14-PA0049-O:12 [Carr dep.]; | Disputed.  First, the purported fact itself generates a genuine issue of fact, as Plaintiffs assert Quest's evidence is contradicted by their evidence. Second, Plaintiffs' cite testimony related to an "audio indicator to the customer" following use of a TFS, not the "audio loop" or audio message that is played on Quest TV: A: I know that when the three-finger swipe and the help button is sued, there's an audio indicator to the customer about what just occurred. Q: And is that audio indicator available at all Quest Diagnostic Patient Service Centers as of today? A: From what I know, I feel pretty confident in saying yes, it's available on all locations with -- Ps' App. Ex. 5 at PA0049-N:11-19 [Carr dep.] |
| | **Plaintiffs' Response:** Quest's cited evidence does not dispute Plaintiffs' cited fact. | |
| A72. | Mr. Derry's investigation demonstrated that Quest only plays this "content loop" message every 15 to | Disputed.  First, the evidence is untimely, prejudicial, duplicative, and incompetent.  In sum, the declaration/report of Mr. Derry was disclosed three days before the discovery |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT
OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING
EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|
| 20 minutes – where it is played at all.<br><br>Ps' App. Ex. 24 at PA0294-PA0311 [Derry dec.]. | cutoff with no resulting opportunity for Quest's cross-examination, he makes conclusions based on observations of a statistically insignificant sample of PSCs not chosen at random in violation of basic statistical principles, and his observations are qualitative, not quantitative, and are irrelevant to the issues of the instant case. *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment.<br><br>Second, Plaintiffs' purported fact is vague as to the term "content loop." Assuming Plaintiffs are referring to the Quest TV audio message that informs patients about the TFS option, that audio message plays every seven to ten minutes.<br><br>QA1562:4-7; QA1229 (audio message played approximately every eight minutes) |
| **Plaintiffs' Response:** Quest's dispute offers nothing that would change this Court's prior consideration of the sufficiency of Mr. Derry's declaration as evidence. Quest's cited evidence further does not create a material dispute of fact regarding Mr. Derry's finding. | |
| A73. There was no audio loop at 14 of 24 investigated locations.<br><br>Ps' App. Ex. 24 at PA0294-PA0311 [Derry dec.]. | Disputed. First, the evidence is untimely, prejudicial, duplicative, and incompetent. In sum, the declaration/report of Mr. Derry was disclosed three days before the discovery cutoff with no resulting opportunity for Quest's cross-examination, he makes conclusions based on observations of a statistically insignificant sample of PSCs not chosen at random in violation of basic |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | statistical principles, and his observations are qualitative, not quantitative, and are irrelevant to the issues of the instant case. *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment.<br><br>Second, Plaintiffs' purported fact is vague as to the term "content loop."  Assuming Plaintiffs are referring to the Quest TV audio message that informs patients about the TFS option, that audio message plays every seven to ten minutes.<br><br>QA1562:4-7; QA1229 (audio message played approximately every eight minutes) |
| **Plaintiffs' Response:** Quest's dispute offers nothing that would change this Court's prior consideration of the sufficiency of Mr. Derry's declaration as evidence. Quest's cited evidence further does not create a material dispute of fact regarding Mr. Derry's finding. | | |
| A74. | At those 14 locations, legally blind patients have no way of even knowing TFS is an option for them.<br><br>Ps' App. Ex. 24 at PA0294-PA0311 [Derry dec.]. | Disputed.  First, the evidence is untimely, prejudicial, duplicative, and incompetent.  In sum, the declaration/report of Mr. Derry was disclosed three days before the discovery cutoff with no resulting opportunity for Quest's cross-examination, he makes conclusions based on observations of a statistically insignificant sample of PSCs not chosen at random in violation of basic statistical principles, and his observations are qualitative, not quantitative, and are irrelevant to the issues of the instant case.  *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | Judgment. |
| | | Second, Plaintiffs' purported fact is vague as to the term "content loop." Assuming Plaintiffs are referring to the Quest TV audio message that informs patients about the TFS option, that audio message plays every seven to ten minutes. |
| | | QA1562:4-7; QA1229 (audio message played approximately every eight minutes) |

**Plaintiffs' Response:** Quest's dispute offers nothing that would change this Court's prior consideration of the sufficiency of Mr. Derry's declaration as evidence. Quest's cited evidence further does not create a material dispute of fact regarding Mr. Derry's finding.

| A75. | At the remaining ten (10) locations that did have the audio loop, it was often too faint to be heard in the crowded waiting room | Disputed. Disputed. First, the evidence is untimely, prejudicial, duplicative, and incompetent. In sum, the declaration/report of Mr. Derry was disclosed three days before the discovery cutoff with no resulting opportunity for Quest's cross-examination, he makes conclusions based on observations of a statistically insignificant sample of PSCs not chosen at random in violation of basic statistical principles, and his observations are qualitative, not quantitative, and are irrelevant to the issues of the instant case. *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment. |
| | Ps' App. Ex. 3 at ¶ 2 [Vargas dec.]. | |
| | Ps' App. Ex. 24 at PA0294-PA0311 [Derry dec.]. | |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

99

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| **Plaintiffs' Response:** Quest's dispute offers nothing that would change this Court's prior consideration of the sufficiency of Mr. Derry's declaration as evidence. Quest's cited evidence further does not create a material dispute of fact regarding Mr. Derry's finding. | | |
| A76. | In the subset of locations where the audio message could be heard audibly, it is often on a content loop that does not play for up to 30 minutes, and at best, every 7-10 minutes, according to the testimony of Quest executive Marc Yarrison and the Derry Report.<br><br>Ps' App. Ex. 24 at PA0294-PA0311 [Derry dec.]; Ex. 4 at PA0032:12-24 [Yarrison dep.]. | Disputed.  First, the evidence is untimely, prejudicial, duplicative, and incompetent.  In sum, the declaration/report of Mr. Derry was disclosed three days before the discovery cutoff with no resulting opportunity for Quest's cross-examination, he makes conclusions based on observations of a statistically insignificant sample of PSCs not chosen at random in violation of basic statistical principles, and his observations are qualitative, not quantitative, and are irrelevant to the issues of the instant case.  *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment.<br><br>Second, Plaintiffs' purported fact is vague as to the term "content loop."  Plaintiffs cite testimony regarding the implementation of the Quest TV audio message that informs patients about the TFS option.  That audio message plays every seven to ten minutes.<br><br>QA1562:4-7; QA1229 (audio message played approximately every eight minutes) |
| **Plaintiffs' Response:** Quest's dispute offers nothing that would change this | | |

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | **Plaintiffs' Uncontroverted Facts and Supporting Evidence** | **Defendants' Disputed Facts and Supporting Evidence** |
|---|---|---|
| | Court's prior consideration of the sufficiency of Mr. Derry's declaration as evidence. Quest's cited evidence further does not create a material dispute of fact regarding Mr. Derry's finding. | |
| A77. | Quest claims it implemented an audio loop on a video screen which directs patients to check in at the kiosk and that the audio loop repeats every seven to ten minutes.<br><br>Ps' App. Ex. 5 at PA0049-K:8-24, PA0049-L:8-14 [Carr dep.]. | Undisputed. |
| A78. | Quest implemented the option of twenty-six (26) different languages on ECSS.<br><br>Ps' App. Ex. 23 at PA0292, PA0288-PA0291, PA0292 (40791);. | Undisputed. |
| A79. | Regarding the different languages, Quest stated that the "[t]he intent via the experience was to meet a broad audience of primary language they preferred to use." | Undisputed. |

101

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | Ps' App. Ex. 5 at PA0049-M:18-23, [Carr dep.]. | |
| A80. | Thus, as part of its alleged "iterative process," Quest received complaints about ECSS being inaccessible to those whose primary language is not English, made the necessary changes, and achieved an improved result that made ECSS accessible to primary speakers of twenty-six (26) languages.<br><br>Ps' App. Ex. 23 at PA0288-PA0291, PA0292 (40791); Ex. 5 at PA0049-M:18-23 [Carr dep.]. | Undisputed. |
| A81. | The only way for a legally blind individual to seek help from a phlebotomist is through a wholly inaccessible "touchscreen button that was only useable for patients who could read the text on the screen." Dkt. 144 at 2:19-21 | Disputed.  First, the term "legal blindness" covers a wide range of circumstances because it is recognized that "[o]ften, people who are diagnosed with legal blindness still have some usable vision."  In fact, a number of sources indicate that the definition of "legally blind" does not address an individual's ability to perform daily tasks, including reading and mobility.  Vision Aware, an outreach center for the American Printing House for the Blind, |

102

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | Ps' App. Ex. 19 at PA0223:24-PA225:3 [Walsh dep.]; | states that legal blindness is "not a functional low vision definition and doesn't tell us very much at all about what a person can and cannot see." Thus, while some of the features on the Kiosks are not independently accessible to completely blind users, they are independently accessible to some "legally blind" users.

Quest Request for Judicial Notice ¶ 1; QA Ex. 16; QA Ex. 20 ¶¶ 14-18; *see* QA Ex. 1 ¶ 14; QA1685:14-17 ("People who are blind are always blind at different levels, yes.")

Second, some PSCs have greeters and/or greeters at the PSCs and therefore a patient would not need to use the Kiosk to request assistance.

*See* Plaintiffs' Uncontroverted Fact No. 64, Ps' App. Ex. 23 at PA0281-0282; QA1596:15-QA1597:1 ("There are – there are locations that have staff located at the front when people come in."); QA1578:17-21 (some PSCs have receptionists).

Third, PSRs are trained to scan the waiting room for patients, another means for a patient to request assistance without the need to use the Kiosk.

QA1588:9-22, QA1594:18-QA1595:7, QA1605:16-QA1606:4; QA Ex. 3 ¶¶ 7-23; QA Ex. 10 at QA0744 ("When going to the waiting room to call back a patient, pay |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | attention to other patients and their needs and behaviors, so you can identify any patients with visual impairments who may need assistance," "Make yourself available to assist such patients as necessary, including assisting with navigating the waiting room and locating and using the kiosk to check-in."), QA0747 ("Like any other patient, if you see a patient with visual impairments who is having difficulty locating or using the kiosk or checking in at the kiosk, you should assist them with checking in using the above process.").<br><br>Fourth, multiple ACB members were assisted by PSRs *immediately* upon their arrival to the PSC and therefore did not need to use the Kiosk to request assistance.<br><br>QA1666:1-7; QA1687:2-14; QA1698 ("There has always been an attendant to take info or had to have someone sign name on the list when the attendant was in back."); QA1164:12-13 ACB member "had a staff member at the center help him check in for appointments."); QA1793:24-QA1794:4 (PSR was aware "very quickly" that she was there); Brink 56:1-56:17 (PSR was waiting at the reception desk "almost every time")<br><br>QA1698 (Debbie Downey) (someone outside was checking people in), |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | Fifth, the Court's finding that there was a genuine issue of fact in opinion on defense motion for summary judgment is not a finding for all purposes in the case. |

**Plaintiffs' Response:** Plaintiffs note that A81 is the same fact as submitted in their previous separate statement in opposition to Quest's First MSJ (Dkt. 110-13) as "B28." Fact B28 was also referenced in this Court's Order on Quest's First MSJ (Dkt. 144 at 2:19-21.) Quest's attempt to create a dispute of fact about the degree of legal blindness is unavailing as ultimately, the touchscreen button was only usable for pateints who could read the text on the screen. Quest's additional evidence about greeters, scan-the-waiting-room training, etc. does not create a dispute of fact that the ability of a legal blind patient to *seek* help, not merely rely on luck or chance of a third-party to assist them.

Quest's cited testimony does not support its position and mischaracterizes the testimony cited. Ms. Downey "had to yell for someone to come and assist [her]." QA1698. Ms. Haroyan did not remember whether it was a third person or phlebotomist that checked her in. QA1791:2-5. She also testified that she relied on other patients – strangers – to sign her in, as well as her dad who comes to every appointment with her. Ex. 11 at PA0136:3-PA0137:2, PA0138:15-PA0139:3 [M. Haroyan dep.] QA1164 states that Mr. Moore has never been able to use the kiosks to check in for appointments. Ms. Brink's statement that the PSR was waiting at the reception desk was regarding her visits prior to the implementation of the kiosk and before the class period, and is therefore irrelevant.  QA1761:1-17.

Plaintiff's SUF # 54-62 (Dkt. 206-5) ("internal Quest emails confirm that "[w]ith or without eCheck-in we know from patient feedback patients would like greeters. Most sites do not have greeters and there are no plans to introduce greeters as part of eCheck-in.")

The only phlebotomist in this action unequivocally testified that she was not trained to scan the waiting room. Ps' App. Ex. 20 at 90:22-24 [Magana dep.] "Q. Were you ever trained by Quest to scan the waiting room for patients requiring

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|
| assistance? A. Not that I remember." Any belated attempt to change her testimony to create a dispute must be stricken as she did not correct her testimony timely, did not ask for clarification of the question, and did not state she misunderstood the question during the deposition. The training similarly fails. Nowhere in the training does it state how often the PSRs are to scan the waiting room. Indeed, the very intent of the kiosk was to keep phlebotomists in the back. See Dkt. 144. Quest's system was designed to make phlebotomists available only sometimes. Defendant offers no evidence for its brazen assertion that legally blind individuals could access some of the features on the kiosk. In fact, the record suggests the opposite. Indeed, Quest's own expert was unable to use the functions of the kiosk. Plaintiffs' SUF A35. This argument has been raised and rejected by this Court in its class certification hearing. See Dkt. 190. Ms. Montgomery's report stating that the legally blind individual could not access the features of the kiosk stands unrebutted in the record. | |
| **A82.** If a legally blind patient hears the audio loop message eventually and learns about the kiosk, he or she still must physically locate the kiosk; this is itself a major challenge since the content loop provides no directions to where the kiosks are located. Ps' App. Ex. 3 at ¶ 4 [Vargas dec.]; Ps' App. Ex. 24 at PA0294-PA0311 [Derry dec.]. | Disputed that locating the Kiosks is a "major" challenge.  Similar to a check-in window or a sign-in sheet, an individual who is visually impaired would need to locate the Kiosk in order to use it. *See* QA1654:9-QA1655:17 (Mr. Vargas acknowledging in April 2021 that he would be able to find the screen and accomplish a TFS on a subsequent visit to Quest), QA1658:23-QA1659:2 (same). Moreover, the term "legal blindness" covers a wide range of circumstances because it is recognized that "[o]ften, people who are diagnosed with legal blindness still have some usable vision."  In fact, a number of sources indicate that the definition of "legally blind" does not address an individual's ability to |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | perform daily tasks, including reading and mobility. Vision Aware, an outreach center for the American Printing House for the Blind, states that legal blindness is "not a functional low vision definition and doesn't tell us very much at all about what a person can and cannot see." Thus, while completely blind users may have trouble locating the Kiosk for the first time without assistance, other "legally blind" users will not.<br><br>*see* Quest Request for Judicial Notice ¶ 1; QA Ex. 16 ; QA Ex. 20 ¶¶ 14-18; see QA Ex. 1 ¶ 14; QA Ex. 1 ¶ 14; QA1685-1:14-17 ("People who are blind are always blind at different levels, yes.") |

**Plaintiffs' Response:** Defendant offers no evidence for its brazen assertion that legally blind individuals could access some of the features on the kiosk. In fact, the record suggests the opposite. Indeed, Quest's own expert was unable to use the functions of the kiosk. Plaintiffs' SUF A35. This argument has been raised and rejected by this Court in its class certification hearing. *See* Dkt. 190. Ms. Montgomery's report stating that the legally blind individual could not access the features of the kiosk stands unrebutted in the record.

| | | |
|---|---|---|
| A83. | If a legally blind patient has (1) visited a PSC location that has both the audio loop and TFS, (2) waited up to 30 mins to hear the audio message, and (3) has physically located the kiosk, they cannot see the script | Disputed. First, the term "legal blindness" covers a wide range of circumstances because it is recognized that "[o]ften, people who are diagnosed with legal blindness still have some usable vision." In fact, a number of sources indicate that the definition of "legally blind" does not address an individual's ability to perform daily tasks, including reading and mobility. Vision Aware, an outreach center |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | asking them whether they have experienced COVID symptoms and should leave the PSC.<br><br>Ps' App. Ex. 25 at ¶ 38 [Montgomery dec.]; Ex. 7 at PA0079:7-PA0080:3 [Grant dep.]; Ex. 19 at PA0231:23-PA0232:1, PA0244 [Walsh dep. and Exhibit]. | for the American Printing House for the Blind, states that legal blindness is "not a functional low vision definition and doesn't tell us very much at all about what a person can and cannot see." Thus, while some of the new features on the Kiosks are not accessible to completely blind users, they are accessible to some "legally blind" users.<br><br>Quest Request for Judicial Notice ¶ 1; QA Ex. 16 ; QA Ex. 20 ¶¶ 14-18; see QA Ex. 1 ¶ 14; *see* QA Ex. 1 ¶ 14; QA1685-1:14-17 ("People who are blind are always blind at different levels, yes.")<br><br>Second, the evidence demonstrates that Quest completed a company-wide roll-out and activation of all three components of the TFS system by mid-2021: (i) the TFS-enabling software was installed at Kiosks in all PSCs in August 2020; (ii) the audio message on the Quest TVs at the PSCs instructing those at the PSCs how to use the TFS was activated in January 2021; and (iii) the enhanced training of PSC employees on how to assist patients in using the TFS was rolled out and assigned in March 2021.<br><br>QA Ex. 1 ¶ 7, QA Ex. 22; QA Ex. 4 ¶ 18.<br><br>Third, the Quest TV audio message that informs patients about the TFS option plays every seven to ten minutes.<br><br>QA1562:4-7; QA1229 (audio message played |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | approximately every eight minutes) |
| | | Fourth, the feature asking a patient whether they have experienced COVID symptoms is no longer present on Quest's Kiosks. |
| | | QA Ex. 1 ¶ 14. |
| | | Fifth, PSRs are trained to assist patients who are visually impaired with the check in process, and a totally blind patient could have responded to a PSR's question about whether they have experienced COVID symptoms. |
| | | QA Ex. 3 ¶¶ 7-23; QA Ex. 10 at QA0744 ("When going to the waiting room to call back a patient, pay attention to other patients and their needs and behaviors, so you can identify any patients with visual impairments who may need assistance," "Make yourself available to assist such patients as necessary, including assisting with navigating the waiting room and locating and using the kiosk to check-in."), QA0746 ("Like any other patient, if you see a patient with visual impairments who is having difficulty locating or using the kiosk or checking in at the kiosk, you should assist them with checking in using the above process.") |

**Plaintiffs' Response:** Defendant offers no evidence for its brazen assertion that legally blind individuals could access some of the features on the kiosk. In fact, the record suggests the opposite. Indeed, Quest's own expert was unable to use the functions of the kiosk. Plaintiffs' SUF A35. This argument has been raised and rejected by this Court in its class certification hearing. *See* Dkt. 190. Ms.

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|
| Montgomery's report stating that the legally blind individual could not access the features of the kiosk stands unrebutted in the record. The only phlebotomist in this action unequivocally testified that she was not trained to scan the waiting room. Ps' App. Ex. 20 at 90:22-24 [Magana dep.] "Q. Were you ever trained by Quest to scan the waiting room for patients requiring assistance? A. Not that I remember." Any belated attempt to change her testimony to create a dispute must be stricken as she did not correct her testimony timely, did not ask for clarification of the question, and did not state she misunderstood the question during the deposition. The training similarly fails. Nowhere in the training does it state how often the PSRs are to scan the waiting room. Indeed, the very intent of the kiosk was to keep phlebotomists in the back. See Dkt. 144. Quest's system was designed to make phlebotomists available only sometimes. | |
| A84. | As the Mr. Derry's report notes, in many locations Quest never communicates to a theoretical legally blind patient that he or she has entered the queue after having used TFS. Ps' App. Ex. 24 at PA0294-PA0311 [Derry dec.] (finding that in 3 of 13 locations with TFS installed, there is no confirmation message after use of TFS). | Disputed.  First, the evidence is untimely, prejudicial, duplicative, and incompetent.  In sum, the declaration/report of Mr. Derry was disclosed three days before the discovery cutoff with no resulting opportunity for Quest's cross-examination, he makes conclusions based on observations of a statistically insignificant sample of PSCs not chosen at random in violation of basic statistical principles, and his observations are qualitative, not quantitative, and are irrelevant to the issues of the instant case.  See Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary Judgment. Second, when a patient uses a TFS, the Kiosk provides an audible message providing a patient number and wait time, and instructing the patient to sit down. |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | QA1599:2-9; Ps' App. Ex. 25 ¶¶ 25, 27 ("In both cases a three finger swipe led to audio output."). |
| **Plaintiffs' Response:** Quest's dispute offers nothing that would change this Court's prior consideration of the sufficiency of Mr. Derry's declaration as evidence. Quest's cited evidence further does not create a material dispute of fact regarding Mr. Derry's finding. | | |
| A85. | When a sighted patient checks in at the kiosk, Quest places that patient in line by time of check in with a video monitor in the PSC displaying the patient's wait time and place in queue. Ps' App. Ex. 19 at PA0236:12-19, PA0240:9-PA0241:25 [Walsh dep.]. | Undisputed. |
| A86. | In sharp contrast, Quest immediately communicates to sighted patients as to where they stand in the queue by displaying their name in lights on the TV monitor—a feature designed to reduce patients' anxiety as they wait, a key aim of the E- | Disputed.  First, Plaintiffs' cited evidence fails to support the purported fact, and Plaintiffs attempt to mischaracterize the evidence.  The testimony confirms that Quest believed being able to provide patients with an estimated wait time would improve the patient experience. Second, when a patient uses a TFS, the Kiosk provides an audible message providing a patient number (and wait time if the PSC accepts walk-in appointments), and instructing the patient to sit down.  Patients can also |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

111

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|
| check-in according to Quest.<br><br>Ps' App. Ex. 19 at PA0236:12-19, PA0240:9-PA0241:25, PA0244 [Walsh dep. and exhibit]. | obtain wait time estimates from PSRs.<br><br>QA1599:2-9; QA0747 at 5.26 ("The audio message will also provide an estimated number of minutes by when they will be called."); QA0749 at 5.28 ("Provide the patient with the estimated about of time (according to Quanum) when it will be their turn to be services as a walk-in patient."); Ps' App. Ex. 25 ¶¶ 25, 27. ("In both cases a three finger swipe led to audio output."); |

**Plaintiffs' Response:** Quest's response does not actually dispute the fact, but rather gives self-serving context in an attempt to "spin" the fact. Even presuming the evidence showed that TFS functions in practice as Quest says it does—it does not—this does not change the fact that TFS does not provide independent and private access to all kiosk services, and thus relegates Plaintiffs to an unequal and inferior experience. "Public accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012).

| A87. | Quest phlebotomists have the ability to turn off the alert which notifies them that a TFS gesture has been performed.<br><br>Ps' App. Ex. 23 at PA0285-PA0287 ("Good feedback on the [check-in] doorbell below and have heard other positive feedback with users liking the doorbell. We expected | Undisputed that PSRs have the physical ability to turn off the alert that notifies them that a TSF has been performed.  However, PSRs want to leave the alert audible so they know when a patient has checked in.<br><br>QA Ex. 6 ¶ 4. |

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

|  | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
|  | some might hate it - and if so the phleb can simply turn it off with link that we highlighted with feature tip.")).<br><br>Ex. 20 at PA0252:4-PA0253:1, PA0253:7-9 [Magana dep.] |  |

Plaintiffs' Response: Quest's attempt to dispute this fact comes from a sham affidavit (see Plaintiffs' Objections to Evidence) from Ms. Magana that contradicts her sworn testimony. As Quest notes in its response to SUF # A88 below, Ms. Magana testified that the PSCs at which Ms. Magana has worked do not/did not have a bell that notifies the PSRs when a patient walks through the door.

| A88. | Prudencia Magana testified Quest does not have a bell for patients that enter the PSC, and "the first time that you're alerted to an individual's presence in the waiting room is when they sign in at the kiosk," but this bell can be turned off.<br><br>Ps' App. Ex. 20 at PA0252:4-PA0253:1, PA0253:7-9 [Magana dep.] | Disputed.  Plaintiffs' cited evidence fails to support the purported fact.  Ms. Magana testified that the PSCs *at which Ms. Magana has worked* do not/did not have a bell that notifies the PSRs when a patient walks through the door.  Instead, those locations have/had a bell that alerts the PSRs when a patient signs in.  Some PSCs have these bells and others do not.<br><br>QA1608:5-20; QA1560:19-QA1561:9.<br><br>Second, Ms. Magana testified that PSRs are notified by a bell that a patient has signed in and that, although PSRs *can* turn off the bell, she has never done so because she wants to be notified of the patients' arrival.<br><br>QA1626:23-QA1627:17; QA Ex. 6 ¶ 4. |

113

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

|   | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
|   |   | Importantly, the purported fact is disputed by Plaintiffs' own evidence.  Mr. Derry, who was retained by Plaintiffs, noted that at four of the locations that he visited, there was an "audible entrance bell or device." Ps' App. Ex. 24 at PA0309-PA0311. |

Plaintiffs' Response: Quest's attempt to dispute this fact comes from a sham affidavit (see Plaintiffs' Objections to Evidence) from Ms. Magana that contradicts her sworn testimony.

| A89. | Even if a blind patient enters the queue successfully and the phlebotomist is alerted, the legally blind patient is not offered the option of waiting outside during COVID. Ps' App. Ex. 25 at ¶ 38 [Montgomery dec.]; Ex. 7 at PA0079:7-PA0080:3 [Grant dep.]; Ex. 19 at PA0231:23-PA0232:1, PA0244 [Walsh dep. and Exhibit]; | Disputed and not material.  First, the "wait where you want" functionality that was added to the Kiosks after the class period, and not put at issue by the operative Complaint, is irrelevant to the merits determination of Plaintiffs' case.  *See* ECF 41; QA Ex. 4 ¶ 19; QA Ex. 5 ¶ 7. Second, all patients, including blind patients, can check in and utilize nearly all of the features and functionalities of the Kiosks on the internet, which they can access with their phones.  All patients who make online appointments can select the "wait where you want" function when making appointments. QA Ex. 1 ¶ 24. Third, Quest PSRs are available to assist patients in using the "wait where you want" option.  In fact, PSRs do help patients use the "wait where you want" function.  Patients who |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT
OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING
EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | make appointments are also provided the option to independently elect the "wait where you want" option on their mobile devices.<br><br>QA Ex. 4 ¶ 19; QA Ex. 6 ¶ 5 ("Over the years that I have been at Quest, I have helped many PSC patients with different things, including helping them use the Kiosk to check in, and helping them use the "wait where you want" function on the Kiosk, and helping them use the scanner to scan in insurance cards or driver's licenses."); QA Ex. 1 ¶ 24; QA Ex. 3. ¶¶ 23, 26. |

**Plaintiffs' Response:** Defendant does not dispute the fact, nor could it. The functions of the kiosk are not "irrelevant" as Quest states, as the term is quoted in the certified class definition. *See* Dkt. 228. Indeed Quest continues to roll out new features, all inaccessible to the legally blind. Further, and as detailed in the concurrently filed memorandum, the continuous roll-out of inaccessible functions on the kiosk show Quest has not met their burden on mootness as they cannot show a "change of heart," even if the TFS was accessible, which it is not.

Quest's attempt to dispute this fact comes from a sham affidavit (see Plaintiffs' Objections to Evidence) from Mr. Carr that contradicts Mr. Carr's sworn testimony about the "wait where you want" feature. Plaintiffs further dispute that the "wait where you want feature" is available when making online appointments (see Plaintiffs' concurrently-filed Request for Judicial Notice). Next, even presuming legally blind patients could access the "wait where you want function" online, it does not change the fact that TFS does not provide independent and private access to all kiosk services, and thus relegates Plaintiffs to an unequal and inferior experience. "Public accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012).

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | The only phlebotomist in this action unequivocally testified that she was not trained to scan the waiting room. Ps' App. Ex. 20 at 90:22-24 [Magana dep.] "Q. Were you ever trained by Quest to scan the waiting room for patients requiring assistance? A. Not that I remember." Any belated attempt to change her testimony to create a dispute must be stricken as she did not correct her testimony timely, did not ask for clarification of the question, and did not state she misunderstood the question during the deposition. The training similarly fails. Nowhere in the training does it state how often the PSRs are to scan the waiting room. Indeed, the very intent of the kiosk was to keep phlebotomists in the back. See Dkt. 144. Quest's system was designed to make phlebotomists available only sometimes. | |
| A90. | A legally blind patient cannot scan his or her insurance card at the kiosk like a sighted patient—yet another disparate aspect of the communication<br><br>Ps' App. Ex. 25 at ¶ 38 [Montgomery dec.]; Ex. 7 at PA0079:7-PA0080:3 [Grant dep.]; Ex. 19 at PA0231:23-PA0232:1, PA0244 [Walsh dep. and Exhibit]. | Disputed and not material.  First, the scanning functionality that was added to the Kiosks after the class period, and not put at issue by the operative Complaint, is irrelevant to the merits determination of Plaintiffs' case.<br><br>*See* ECF 41; QA Ex. 4 ¶ 19; QA Ex. 5 ¶ 7.<br><br>Second, the term "legal blindness" covers a wide range of circumstances because it is recognized that "[o]ften, people who are diagnosed with legal blindness still have some usable vision."  In fact, a number of sources indicate that the definition of "legally blind" does not address an individual's ability to perform daily tasks, including reading and mobility.  Vision Aware, an outreach center for the American Printing House for the Blind, states that legal blindness is "not a functional low vision definition and doesn't tell us very much at all about what a person can and cannot see."  Thus, while some of the features on the Kiosks are not independently accessible |

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | to completely blind users, they are independently accessible to some "legally blind" users.

Quest Request for Judicial Notice ¶ 1; QA Ex. 16 ; QA Ex. 20 ¶¶ 14-18; see QA Ex. 1 ¶ 14; QA Ex. 1 ¶ 14; QA1685-1:14-17 ("People who are blind are always blind at different levels, yes.")

Third, PSRs are available to, and often do, assist patients in using the scanning functions of the Kiosk, or to otherwise provide the services available through the Kiosk.

QA Ex. 4 ¶ 19; QA Ex. 10 at 808 ("Like any other patient, if you see a patient with visual impairments who is having difficulty locating or using the kiosk or checking in at the kiosk, you should assist them with checking in using the above process."); QA Ex. 10 at 805 ("Make yourself available to assist [patients with visual impairment] as necessary, including assisting with navigating the waiting room and locating and using the kiosk to check in."); QA Ex. 10 pat 808 ("Like any other patient, if you see a patient with visual impairments who is having difficulty locating or using the kiosk or checking in at the kiosk, you should assist them with the checking in using the above process."); QA Ex. 3 ¶¶ 3-20; QA Exs. 8, 10, 12, 13, 15 ; Reilly depo 102:6-11 ("Look, our – our stance and our [patient service representatives] are instructed and |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | trained to help ever patient, assist them in every way, regardless of you know, whatever it is. So, you know, whether there's a kiosk or not, they're instructed to help the patient and assist them in any way.", QA1577:15-23 (Q: I'm specifically asking you whether you're aware of any training that Quest has provided to its patient services representatives indicating that the e-check-in kiosk is not independently accessible to blind patients. [Objection omitted] A: The training indicates that they may require help with checking in, and we are to assist them."), QA1579:21-23 ("Our training is to ask folks if they need help at the very first opportunity, to acknowledge them, and ascertain if they need any help."; QA Ex. 6 ¶ 5 ("Over the years that I have been at Quest, I have helped many PSC patients with different things, including helping them use the Kiosk to check in, and helping them use the "wait where you want" function on the Kiosk, and helping them use the scanner to scan in insurance cards or driver's licenses.")<br><br>Finally, two ABC members expressed a preference to rely on a third party to aid their check-in rather than being able to independently check in on the Kiosk.<br><br>QA1750:2-22 ("Well, my objective in going to the lab is to get my tests done in the least complicated and time-consuming way; and in my mind, the best way to do that is to talk to somebody, give them my lab slip and have |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | them check me in. So, you know, I really think that using the kiosk is certainly a step backwards in terms of, you know, customer service and convenience in using the system."); QA1731:24-QA1732:20 (Q: If you have this option, that you can check in using this iPad or you can just go up and wait for somebody to check you in, like, a Quest person to check you in, which method would you prefer to check in? A: I'd prefer an attendant.") |

**Plaintiffs' Response:** Defendant offers no evidence for its brazen assertion that legally blind individuals could access some of the features on the kiosk. In fact, the record suggests the opposite. Indeed, Quest's own expert was unable to use the functions of the kiosk. Plaintiffs' SUF A35. This argument has been raised and rejected by this Court in its class certification hearing. *See* Dkt. 190. Ms. Montgomery's report stating that the legally blind individual could not access the features of the kiosk stands unrebutted in the record.

The only phlebotomist in this action unequivocally testified that she was not trained to scan the waiting room. Ps' App. Ex. 20 at 90:22-24 [Magana dep.] "Q. Were you ever trained by Quest to scan the waiting room for patients requiring assistance? A. Not that I remember." Any belated attempt to change her testimony to create a dispute must be stricken as she did not correct her testimony timely, did not ask for clarification of the question, and did not state she misunderstood the question during the deposition. The training similarly fails. Nowhere in the training does it state how often the PSRs are to scan the waiting room. Indeed, the very intent of the kiosk was to keep phlebotomists in the back. See Dkt. 144. Quest's system was designed to make phlebotomists available only sometimes.

| A91. | Mr. Derry's report concluded that at ***none*** of the 24 investigated PSC | Disputed and prejudicial. *See* Quest's Objections To Plaintiffs' Evidence Submitted In Support of Their Motion For Summary |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | locations was effective communication provided to legally blind patients at each step of the process.<br><br>Ps' App. Ex. 24 at PA0294-PA0311 [Derry dec.] | Judgment.  Moreover, as Mr. Derry was not designated as an expert witness, the cited evidence presents legal opinion from a lay witness.<br><br>QA Ex. 43.<br><br>Mr. Sawczyn opined that "the kiosks are accessible by blind users for the purposes of checking in for Quest services and this offers 'effective communication' as that terms is used and understood in 28 C.F.R. § 36.303(c) of the ADA regulations."<br><br>QA1228. |
|  | **Plaintiffs' Response:**  Mr. Sawczyn admits that he is unable to independently access any of the features of the kiosk and did not form an opinion on effective communication throughout Quest's network.  Plaintiffs' SUF # A31, A35. | |
| A92. | As early as 2015, well before implementing even one kiosk, internal Quest emails suggest blind customers would not be able to use the kiosk, and Quest simply ignored this.<br><br>Ps' App. Ex. 4 at PA0042-PA0048 [Exhibits to Yarrison dep.]; Ex. 19 at PA0242:4-PA0243:20 [Walsh dep.]; Ex. 4 at PA0029:3-PA0031:3 | Disputed.  Plaintiffs' cited evidence fails to support the purported fact and misrepresent the evidence.<br><br>Quest did not have reason to believe that a Kiosk that was not independently accessible to legally blind patients would present an issue in providing its patients with services.  Prior to the Kiosk roll out, visitors to Quest PSCs would indicate their arrival at Quest PSCs, or check in, by entering their name on a paper sign-in sheet maintained in the waiting room. Quest PSRs staffing the PSCs would enter the PSC waiting room, review the sign-in sheet and call the next patient back for specimen collection, bring that patient back to the draw |

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | [Yarrison dep.] | room where blood and other specimens were collected, and then return to the waiting room to call the next patient. Quest was replacing an existing system of signing in on a paper sheet, which blind patients had successfully used for years (sometimes with the assistance of Quest PSRs) with another, digital system of signing in that was similarly accessible with the assistance of Quest phlebotomists.  As it had for years, Quest was relying on its business model, approach to patient service, and policies, procedures and training that, collectively, require PSRs to assist patients at PSCs, including providing assistance to persons with disabilities to ensure they had access to Quest's services.  Instead of simply relying on assumptions about how the Kiosks would work once rolled out, Quest planned to identify problems that any of its patients may be experiencing with the Kiosk through its extensive methods for soliciting and receiving patient complaints and feedback and the "iterative" process that is an inherent part of the rollout of any electronic or other technology.  During the roll-out, Quest received feedback from a very small number of individuals who indicated that people who were completely blind would have difficulty using the Kiosk without assistance.  Since Quest had received very little such feedback, and it was a very small fraction of the overall feedback we had |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | received, and because we knew that Quest PSRs remained available to assist with use of the Kiosks and more generally check-in, we endeavored to address this concern in a future iteration of the Kiosk. This occurred with the advent of the TFS.<br><br>QA Ex. 4 ¶¶ 10-16; QA Ex. 5 ¶ 9; QA Ex. 1 ¶¶ 16, 19-21.<br><br>PA0042-PA0044, from May 2016, fails to support the purported fact. Instead, it demonstrates that Quest considered auxiliary aids and services to assist totally blind patients with check-in as they had done with the paper sign-in sheet. PA0045-PA0046, emails from February 2019, similarly fails to support the purported fact. Instead, it relates to mounting the Kiosks and potential architectural barriers related to the Kiosks. PA0047-PA0048, emails from November 2019, demonstrate that Quest endeavored to address patient feedback regarding patients' use of and interaction with the Kiosks in a future iteration of the Kiosk. The testimony upon which Plaintiffs rely also fails to support the purported fact. Both sets of testimony again relate to general accessibility concerns related to the Kiosks and the features of a specific kiosk device. |

**Plaintiffs' Response:** Quest's attempt to dispute this fact comes from sham affidavits (*see* Plaintiffs' Objections to Evidence) from Mr. Carr, Mr. Yarrison, and Mr. Walsh that contradict their respective sworn testimony. Quest's response does not actually dispute the fact, but rather gives self-serving context derived from sham affidavits in an attempt to "spin" the fact.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

|  | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| A93. | Quest contracted with Lilitab to provide the iPad tablet and enclosure for ECSS. Lilitab offered (and offers) kiosks with accessible features and could have provided the same to Quest if so desired.<br><br>Ps' App. Ex. 18 at PA0202:12-19, PA0215:4-18, PA0203:10-PA0204:17, PA0208:10-PA0209:8 [Aronson dep.] | Undisputed, but not material. |
| A94. | The accessible features include a headphone jack placed in a Lilitab enclosure to allow a blind user access to audio from the tablet, and specifically, to access the iPad's built-in voiceover technology.<br><br>Ps' App. Ex. 18 at PA0203:10-PA0204:17, PA0208:10-PA0209:8 [Aronson dep.] | Disputed. Plaintiffs' cited evidence fails to support the purported fact. Instead, the testimony demonstrates that it was possible to add headphones through a Lilitab enclosure that could allow audio from the tablet. However, including a headphone jack alone would not allow a patient who is visually impaired to access Quest software audio from the tablet. As noted by Plaintiffs' own expert, the devices would still need to be properly coded. There would also be several other significant (undue) administrative burdens associated with this means of communication.<br><br>Ps' App. Ex. 25 ¶ 46 [Montgomery dec.]; QA Ex. 5 ¶ 6; QA Ex. 1 ¶ 13. |

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

123

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

|  | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| **Plaintiffs' Response:** Quest's attempt to dispute this fact comes from sham affidavits (*see* Plaintiffs' Objections to Evidence) from Mr. Carr and Mr. Walsh that contradict their respective sworn testimony. Quest's cited evidence on undue administrative burdens comes from sham affidavits contrary to Quest's 30(b)(6) deponent testimony (see SUF # A106-107.) |||
| A95. | This accessible headphone jack cost just $30 per kiosk.<br><br>Ps' App. Ex. 18 at PA0205:9-22 [Aronson dep.] | Undisputed. |
| A96. | Lilitab also offered (and offers) the option of a tactile keyboard for accessibility for just $95 per enclosure.<br><br>Ps' App. Ex. 18 at PA0206:14-PA0207:15, PA0210:11-25 [Aronson dep.] | Undisputed. |
| A97. | As explained in the declaration from Rachael Montgomery, "The iPad selected for these kiosks includes built in speech reader capabilities within its standard accessibility suite. This screen reader provides the speech output needed to interact | Disputed.  Built in speech readers alone do not provide speech output needed to permit all of the functions of the Kiosks to be independently accessible to individuals who are blind.  As noted by Ms. Montgomery, the devices would still need to be coded using custom software.  There would also be several other significant (undue) administrative burdens associated with this means of communication. |

124

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | with a kiosk application." Ps' App. Ex. 25 at ¶ 45 [Montgomery dec.]. | Ps' App. Ex. 25 ¶ 46 [Montgomery dec.]; QA Ex. 5 ¶ 6; QA Ex. 1 ¶ 13. |

**Plaintiffs' Response:** Quest's attempt to dispute this fact comes from sham affidavits (*see* Plaintiffs' Objections to Evidence) from Mr. Carr and Mr. Walsh that contradict their respective sworn testimony. Quest's cited evidence on undue administrative burdens comes from sham affidavits contrary to Quest's 30(b)(6) deponent testimony (see SUF # A106-107.)

| A98. | Ms. Montgomery's Declaration further describes how Lilitab provides an option to include a standard headphone jack for approximately $30.00 per kiosks, which "would allow Quest to maintain the functionality and utility of its kiosks, while increasing the accessibility for blind users." Ps' App. Ex. 25 at ¶ 47 [Montgomery dec.]. | Undisputed, but not material. |
| A99. | Quest could have purchased an AudioNav keypad for iOS which costs just $309.75 per | Undisputed, but not material. |

Nye, Stirling, Hale & Miller
33 West Mission Street, Suite 201
Santa Barbara, California 93101

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | kiosk.<br><br>Ps' App. Ex. 25 at ¶ 48 [Montgomery dec.]. | |
| A100. | Accordingly, using Quest's own internal cost saving projections, the Company could have provided at least one independently accessible kiosk option at its 2,152 PSCs for just $935,582 — allowing it to still enjoy a massive cost savings from the ECSS rollout of $39,188,863.<br><br>Ps' App. Ex. 19 at PA0238:25-PA0239:10, PA0237:15-25, PA0244 [Walsh dep. and exhibit]; Ex. 25 at ¶ 48 [Montgomery dec.]. | Disputed.  Plaintiffs' cited evidence fails to support the purported fact, including the implication that Quest implemented the Kiosks as a cost saving measure.  In deciding whether to implement the Kiosks, Quest's *sole* goal was an improved customer and employee experience.  Potential financial benefits played no role in the reasons or motivations for this Kiosk project.  Rather than result in a "cost saving" of millions of dollars or the reduction in phlebotomist staffing, Quest *projected* that there would be *cost avoidance* in that amount.  There would also be several other significant (undue) administrative burdens associated with this means of communication.<br><br>Ps' App. Ex. 25 ¶ 46 [Montgomery dec.].<br><br>QA Ex. 5 ¶¶  4, 6; QA Ex. 1 ¶ 13; QA1587:3-QA1588:8, QA1589:20-25, QA1590:6-15, QA1591:7-15, QA1592:23-QA1593:6. |

**Plaintiffs' Response:** Quest's attempt to dispute this fact comes from sham affidavits (*see* Plaintiffs' Objections to Evidence) from Mr. Carr and Mr. Walsh that contradict their respective sworn testimony. Mr. Walsh in particular testified that reducing costs was part of his "mandate" for the e-check-in project. Ex. 10 to Miller Decl., Walsh Dep. at 25:18-23; 26:16-23 ("Q: So it's twofold. Both improve experience and reduce costs, is that right? That was your mandate? A: That's correct.") Quest's differentiation between "cost savings" and "cost avoidance" boils down to semantic argument that does not create a material

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|
| dispute of fact. Quest's cited evidence on undue administrative burdens comes from sham affidavits contrary to Quest's 30(b)(6) deponent testimony (see SUF # A106-107.) | |

| | | |
|---|---|---|
| A101. | After the initial kiosk rollout, Quest embarked on a project called Red October, which looked at next-generation kiosks with additional functionality, including payment, scanning identity and insurance cards, and point of sale transaction.<br><br>Ps' App. Ex. 19 at PA0230:1-24 [Walsh dep.]; | Disputed.  Quest has, from time to time, thought of new functionalities or features that could be added to the Kiosk, and other functionalities and features have been removed.  Most of these functionalities and features were not contemplated when the Kiosk was first developed as many were developed as part of the iterative process in reaction to patient feedback or significant events.<br><br>Quest has implemented prototypes of kiosks that offer a scanning function at certain PSCs, but concluded that a payment function on the Kiosks is not the best next steps and abandoned that ideation.<br><br>Ps' App. Ex. 19 at PA0230:1-231:1 (depo 87:1-88:1) [Walsh dep.]; QA Ex. 4 ¶ 20; QA Ex. 5 ¶ 7. |

**Plaintiffs' Response:** Plaintiffs note that A101 is the same fact as submitted in their previous separate statement in opposition to Quest's First MSJ (Dkt. 110-13) as "B36." Fact B36 was also referenced in this Court's Order on Quest's First MSJ (Dkt. 144 at 3:24.) Quest's explanation does not dispute the fact but rather simply provides more detail about the fact.

| | | |
|---|---|---|
| A102. | Quest has already implemented several of these features, including card scanners in certain | Disputed.  Quest has implemented prototypes of kiosks that offer a scanning function at certain PSCs, but concluded that a payment function on the Kiosks is not the best next steps and abandoned that ideation.  All |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
| --- | --- |
| PSCs.<br><br>Ps' App. Ex. 19 at PA0231:23-PA0232:14 [Walsh dep.]; | patients, including blind patients, can check in and utilize nearly all of the features and functionalities of the Kiosks on the internet, which they can access with their phones.<br><br>QA Ex. 1 ¶ 24.<br><br>Moreover, Quest has, from time to time, thought of new functionalities or features that could be added to the Kiosk, and other functionalities and features have been removed.  Most of these functionalities and features were not contemplated when the Kiosk was first developed as many were developed as part of the iterative process in reaction to patient feedback or significant events.<br><br>Ps' App. Ex. 19 at PA0230:1-231:1 (depo 87:1-88:1) [Walsh dep.]; QA Ex. 4 ¶ 19; QA Ex. 5 ¶ 7. |

**Plaintiffs' Response:** Plaintiffs note that A102 is the same fact as submitted in their previous separate statement in opposition to Quest's First MSJ (Dkt. 110-13) as "B37." Fact B37 was also referenced in this Court's Order on Quest's First MSJ (Dkt. 144 at 3:24.) Quest's attempt to dispute this fact comes from a sham affidavit (*see* Plaintiffs' Objections to Evidence) from Mr. Carr that contradicts Mr. Carr's sworn testimony about the "wait where you want" feature. Plaintiffs further dispute that the "wait where you want feature" is available when making online appointments (*see* Plaintiffs' concurrently-filed Request for Judicial Notice). Next, even presuming legally blind patients could access the "wait where you want function" online, it does not change the fact that the legally blind are not afforded independent and private access to all kiosk services, and thus relegating Plaintiffs to an unequal and inferior experience. "Public accommodations must start by considering how their facilities are used by non-disabled guests and then take

128

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | reasonable steps to provide disabled guests with a like experience." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012). |
| A103. | In addition, during the COVID-19 pandemic Quest rolled out a "wait where you want" feature that allows sighted patients to input their phone number into the kiosk and wait outside to avoid close contact with other customers.  This feature is not available to legally blind users.<br><br>Ps' App. Ex. 19 at PA0235:1-8 [Walsh dep.]; Ex. 5 at PA0049-H:11- PA0049-I:24 [Carr dep.]; Ex. 7 at PA0081:14-PA0082:13 [Grant dep.] | Disputed and not material.  First, the "wait where you want" option was added to the Kiosks after the class period, and not put at issue by the operative Complaint, is irrelevant to the merits determination of Plaintiffs' case.<br><br>*See* ECF 41; QA Ex. 4 ¶19; QA Ex. 5 ¶ 7.<br><br>Second, all patients, including blind patients, can check in and utilize nearly all of the features and functionalities of the Kiosks on the internet, which they can access with their phones.  All patients who make online appointments can select the "wait where you want" function when making appointments.<br><br>QA Ex. 1 ¶ 24.<br><br>Third, the term "legal blindness" covers a wide range of circumstances because it is recognized that "[o]ften, people who are diagnosed with legal blindness still have some usable vision."  In fact, a number of sources indicate that the definition of "legally blind" does not address an individual's ability to perform daily tasks, including reading and mobility.  Vision Aware, an outreach center for the American Printing House for the Blind, states that legal blindness is "not a functional low vision definition and doesn't tell us very much at all about what a person can and cannot see."  Thus, while the "wait where you |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | want" feature offered on the Kiosks is not independently accessible to completely blind users, it is independently accessible to some "legally blind" users. |
| | | Quest Request for Judicial Notice ¶ 1; QA Ex. 16 ; QA Ex. 20 ¶¶ 14-18; see QA Ex. 1 ¶ 14; QA Ex. 1 ¶ 14; QA1685-1:14-17 ("People who are blind are always blind at different levels, yes.") |
| | | Fourth, PSRs are available to, and do, assist patients in using the "wait where you want" option, or to otherwise provide the services available through the Kiosk. |
| | | QA Ex. 4 ¶ 19; QA Ex. 10 at QA 808 ("Like any other patient, if you see a patient with visual impairments who is having difficulty locating or using the kiosk or checking in at the kiosk, you should assist them with checking in using the above process."); QA Ex. 10 at QA 805 ("Make yourself available to assist [patients with visual impairment] as necessary, including assisting with navigating the waiting room and locating and using the kiosk to check in."); QA Ex. 10 at QA 808 ("Like any other patient, if you see a patient with visual impairments who is having difficulty locating or using the kiosk or checking in at the kiosk, you should assist them with the checking in using the above process."); QA Ex. 3 ¶¶ 3-20; QA Exs. 8, 10, 12, 13, 15.  QA1577:6-11 ("Look, our – our stance and our [patient service representatives] |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

130

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | are instructed and trained to help ever patient, assist them in every way, regardless of you know, whatever it is. So, you know, whether there's a kiosk or not, they're instructed to help the patient and assist them in any way.", QA1577:15-23 (Q: I'm specifically asking you whether you're aware of any training that Quest has provided to its patient services representatives indicating that the e-check-in kiosk is not independently accessible to blind patients. [Objection omitted] A: The training indicates that they may require help with checking in, and we are to assist them."), QA1579:21-23 ("Our training is to ask folks if they need help at the very first opportunity, to acknowledge them, and ascertain if they need any help."; QA Ex. 6 ¶ 5.<br><br>Finally, two ABC members expressed a preference to rely on a third party to aid their check-in rather than being able to independently check in on the Kiosk.<br><br>QA1750:2-22 ("Well, my objective in going to the lab is to get my tests done in the least complicated and time-consuming way; and in my mind, the best way to do that is to talk to somebody, give them my lab slip and have them check me in. So, you know, I really think that using the kiosk is certainly a step backwards in terms of, you know, customer service and convenience in using the system."); QA1731:24-QA1732:20 (Q: If you have this option, that you can check in using |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

131

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | this iPad or you can just go up and wait for somebody to check you in, like, a Quest person to check you in, which method would you prefer to check in? A: I'd prefer an attendant.") |

**Plaintiffs' Response:** Plaintiffs note that A103 is the same fact as submitted in their previous separate statement in opposition to Quest's First MSJ (Dkt. 110-13) as "B38." Fact B38 was also referenced in this Court's Order on Quest's First MSJ (Dkt. 144 at 4:2, 4:5, and 4:14.) Quest's attempt to dispute this fact comes from sham affidavits (*see* Plaintiffs' Objections to Evidence) from, among others, Mr. Carr wherein Mr. Carr contradicts his sworn testimony about the "wait where you want" feature. Plaintiffs further dispute that the "wait where you want feature" is available when making online appointments (*see* Plaintiffs' concurrently-filed Request for Judicial Notice). Next, even presuming legally blind patients could access the "wait where you want function" online, it does not change the fact that the legally blind are not afforded independent and private access to all kiosk services, and thus relegating Plaintiffs to an unequal and inferior experience. "Public accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012).

Defendant offers no evidence for its brazen assertion that legally blind individuals could access some of the features on the kiosk. In fact, the record suggests the opposite. Indeed, Quest's own expert was unable to use the functions of the kiosk. Plaintiffs' SUF A35. This argument has been raised and rejected by this Court in its class certification hearing. *See* Dkt. 190. Ms. Montgomery's report stating that the legally blind individual could not access the features of the kiosk stands unrebutted in the record.

| A104. | TFS does not allow blind customers to make use of the kiosk's features, including the "wait where | Disputed.  First, the scanning functionality that was added to the Kiosks after the class period, and not put at issue by the operative Complaint, is irrelevant to the merits |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | you want" option available to Quest's sighted customers.<br><br>Ps' App. Ex. 5 at PA0049-H:11- PA0049-I:24 [Carr dep.]; | determination of Plaintiffs' case.<br><br>ECF 41; QA Ex. 4 ¶ 19.<br><br>Second, all patients, including blind patients, can check in and utilize nearly all of the features and functionalities of the Kiosks on the internet, which they can access with their phones.  All patients who make online appointments can select the "wait where you want" function when making appointments.<br><br>QA Ex. 1 ¶ 24.<br><br>Third, PSRs are available to assist patients in using the "wait where you want" option, or to otherwise provide the services available through the Kiosk.<br><br>QA Ex. 4 ¶ 19; QA Ex. 10 at QA0808 ("Like any other patient, if you see a patient with visual impairments who is having difficulty locating or using the kiosk or checking in at the kiosk, you should assist them with checking in using the above process."); QA Ex. 10 at QA0805 ("Make yourself available to assist [patients with visual impairment] as necessary, including assisting with navigating the waiting room and locating and using the kiosk to check in."); QA Ex. 10at QA0808 ("Like any other patient, if you see a patient with visual impairments who is having difficulty locating or using the kiosk or checking in at the kiosk, you should assist them with the checking in using the above |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | process."); QA Ex. 3 ¶¶ 3-20; QA Exs. 8, 10, 12, 13, 15 ;  QA1577:6-11 ("Look, our – our stance and our [patient service representatives] are instructed and trained to help ever patient, assist them in every way, regardless of you know, whatever it is.  So, you know, whether there's a kiosk or not, they're instructed to help the patient and assist them in any way.", QA1577:15-23 (Q: I'm specifically asking you whether you're aware of any training that Quest has provided to its patient services representatives indicating that the e-check-in kiosk is not independently accessible to blind patients. [Objection omitted] A: The training indicates that they may require help with checking in, and we are to assist them."), QA1579:21-23 ("Our training is to ask folks if they need help at the very first opportunity, to acknowledge them, and ascertain if they need any help." <br><br> Finally, two ABC members expressed a preference to rely on a third party to aid their check-in rather than being able to independently check in on the Kiosk. <br><br> QA1750:2-22 ("Well, my objective in going to the lab is to get my tests done in the least complicated and time-consuming way; and in my mind, the best way to do that is to talk to somebody, give them my lab slip and have them check me in.  So, you know, I really think that using the kiosk is certainly a step backwards in terms of, you know, customer |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|
| | service and convenience in using the system."); QA1731:24-QA1732:20 (Q: If you have this option, that you can check in using this iPad or you can just go up and wait for somebody to check you in, like, a Quest person to check you in, which method would you prefer to check in? A: I'd prefer an attendant.") |

**Plaintiffs' Response:** Plaintiffs note that A104 is the same fact as submitted in their previous separate statement in opposition to Quest's First MSJ (Dkt. 110-13) as "B51." Fact B51 was also referenced in this Court's Order on Quest's First MSJ (Dkt. 144 at 4:2, 4:5, and 4:14.) Quest's attempt to dispute this fact comes from sham affidavits (*see* Plaintiffs' Objections to Evidence) from, among others, Mr. Carr that contradicts Mr. Carr's sworn testimony about the "wait where you want" feature. Plaintiffs further dispute that the "wait where you want feature" is available when making online appointments (*see* Plaintiffs' concurrently-filed Request for Judicial Notice). Next, even presuming legally blind patients could access the "wait where you want function" online, it does not change the fact that *TFS* does not provide independent and private access to all kiosk services, and thus relegates Plaintiffs to an unequal and inferior experience. "Public accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012). Finally, the purpose of the "wait where you want" feature is to allow patients to wait somewhere other than the waiting area in light of COVID-19 exposure concerns. This purpose is negated if a legally blind patient must wait in the waiting area for phlebotomist assistance with a feature designed to *avoid* waiting in the waiting area.

| A105. | The record facts, including the testimony of Quest executives Carr, Yarrison, Reilly, Walsh, | Disputed.  Plaintiffs' cited evidence fails to support the purported fact and is misleading. The testimony Plaintiffs cite relates to a claim of undue burden *at the time of the initial Kiosk* |
|---|---|---|

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | and Grant, demonstrates that Quest did not perform an undue hardship analysis when deciding whether to make the kiosk accessible.<br><br>Ps' App. Ex. 4 at PA0027:4-PA0028:9, PA0030:11-PA0031:3 [Yarrison dep.]; Ex. 19 at PA0228:20-PA0229:2 [Walsh dep.]; Ex. 5 at PA0054:2-PA0055:12 [Carr dep.]. | *roll out.*<br><br>Ps' App. Ex. 4 at PA0027:4-PA0028:9, PA0030:11-PA0031:3 [Yarrison] (plus 183:19-184 (testimony regarding undue burden considerations made at the time of kiosk rollout); QA1601:21-QA1602168:4 (Habey was considered for the kiosk hardware during initial rollout); QA1602:11-18 (Q: And was there ever any determination done internally at Quest that selecting the Habey kiosk would have imposed an undue burden on the company? [Objection omitted] A: I don't know.); Ps' App.Ex. 19 at PA0228:20-PA0229:2 (77:20-78:2)[Walsh dep.] (Q: Was there ever any analysis undertaken by your team that the implementation of a headphone jack would have imposed an undue burden on the company for *rolling out the eCheck-In kiosk*? [Objection omitted] A: Yeah. I'm not aware of any effort within my ideation, innovation team to that effect."); P's App. Ex. 5 at PA0054:2-PA0055:12 (confirmation that in 2020, Quest considered whether to use voiceover on its Kiosks).<br><br>However, the "undue administrative burden" that Quest asserts derives instead from *switching the means of effective communication* used after already rolling out the existing Kiosks to more than 2,100 PSCs. The totality of evidence demonstrates that the timing of ACB's contacts with Quest (and Mr. Vargas' alleged request for a different device |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | than the kiosk during a 2019 visit) occurred substantially after Quest had made the decision to deploy the initial Kiosk. Implementing the alternative means of check in that Plaintiffs suggest would have required a fundamentally different technological approach, with different equipment and different supporting software, new installation and training (for installation, monitoring, and use), which would result in a multi-year project. Further, through meetings with blind consumers and other representatives of the blind community, Quest understood that the blind strongly and increasingly preferred to use their own devices (namely, their smartphones) to interact with businesses than to use the devices designed and provided by businesses. If Quest went to the significant effort to deploy the extra equipment requested by Plaintiffs, it may be in vain as the target audience may not be able to locate and/or want to use the equipment. In light of all of these factors, implementing the alternative means of check in that Plaintiffs suggest would have resulted in a substantial administrative burden to Quest. Instead, Quest implemented the TFS.<br><br>QA Ex. 5 ¶ 6; QA Ex. 1 ¶ 13. |

**Plaintiffs' Response:** Quest's attempt to dispute this fact comes from sham affidavits (*see* Plaintiffs' Objections to Evidence) from Mr. Carr and Mr. Walsh that contradict sworn testimony from Mr. Carr, Ms. Reilly, Mr. Walsh, and Mr. Grant on the lack of undue hardship analysis. Mr. Carr's declaration should be

137

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|
| disregarded on the sham affidavit doctrine regarding information obtained from "meetings with blind consumers and other representatives of the blind community" given Mr. Carr's sworn testimony wherein he would not answer questions on such topics. Quest's attempted differentiation between the initial rollout of the kiosks and subsequent versions of the kiosk through Quest's "iterative" process is meaningless, unsupported by the cited evidence, and does not change that no Quest 30(b)(6) witness testified on an undue hardship analysis despite being questioned thereon. ||

| | | |
|---|---|---|
| A106. | When Plaintiffs questioned Quest's Rule 30(b)(6) witnesses under oath not one witness could articulate why making the kiosk accessible created an undue burden to Quest.<br><br>Ps' App. Ex. 4 at PA0027:4-PA0028:9, PA0030:11-PA0031:3 [Yarrison dep.]; Ex. 19 at PA0228:20-PA0229:2 [Walsh dep.]; Ex. 5 at PA0054:2-PA0055:12 [Carr dep.]. | Disputed. Plaintiffs' cited evidence fails to support the purported fact and is misleading. The testimony Plaintiffs cite relates to a claim of undue burden *at the time of the initial Kiosk roll out*.<br><br>Ps' App. Ex. 4 at PA0027:4-PA0028:9, PA0030:11-PA0031:3 [Yarrison] (plus 183:19-184 (testimony regarding undue burden considerations made at the time of kiosk rollout); QA1600:21-QA1601:4 (Habey was considered for the kiosk hardware during initial rollout); QA1602:11-18 (Q: And was there ever any determination done internally at Quest that selecting the Habey kiosk would have imposed an undue burden on the company? [Objection omitted] A: I don't know.); Ps' App. Ex. 19 at PA0228:20-PA0229:2 (77:20-78:2)[Walsh dep.] (Q: Was there ever any analysis undertaken by your team that the implementation of a headphone jack would have imposed an undue burden on the company for *rolling out the eCheck-In kiosk*? [Objection omitted] A: Yeah. I'm not aware of any effort within my ideation, |

138

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | innovation team to that effect."); P's App. Ex. 5 at PA0054:2-PA0055:12 (confirmation that in 2020, Quest considered whether to use voiceover on its Kiosks). |

However, the "undue administrative burden" that Quest asserts derives instead from *switching the means of effective communication* used after already rolling out the existing Kiosks to more than 2,100 PSCs. The totality of evidence demonstrates that the timing of ACB's contacts with Quest (and Mr. Vargas' alleged request for a different device than the kiosk during a 2019 visit) occurred substantially after Quest had made the decision to deploy the initial Kiosk. Implementing the alternative means of check in that Plaintiffs suggest would have required a fundamentally different technological approach, with different equipment and different supporting software, new installation and training (for installation, monitoring, and use), which would result in a multi-year project. Further, through meetings with blind consumers and other representatives of the blind community, Quest understood that the blind strongly and increasingly preferred to use their own devices (namely, their smartphones) to interact with businesses than to use the devices designed and provided by businesses. If Quest went to the significant effort to deploy the extra equipment requested by Plaintiffs, it may be in vain as the target audience may not be able to locate and/or want

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence |
|---|---|---|
| | | to use the equipment.  In light of all of these factors, implementing the alternative means of check in that Plaintiffs suggest would have resulted in a substantial administrative burden to Quest.  Instead, Quest implemented the TFS.<br><br>QA Ex. 5 ¶ 6; QA Ex. 1 ¶ 13. |

**Plaintiffs' Response:** Quest's attempt to dispute this fact comes from sham affidavits (*see* Plaintiffs' Objections to Evidence) from Mr. Carr and Mr. Walsh that contradict sworn testimony from Mr. Carr, Mr. Walsh, and Mr. Yarrison on the lack of undue burden. Mr. Carr's declaration should be disregarded on the sham affidavit doctrine regarding information obtained from "meetings with blind consumers and other representatives of the blind community" given Mr. Carr's sworn testimony wherein he would not answer questions on such topics. Quest's attempted differentiation between the initial rollout of the kiosks and subsequent versions of the kiosk through Quest's "iterative" process is meaningless, unsupported by the cited evidence, and does not change that no Quest 30(b)(6) witness testified on undue burden despite being questioned thereon.

**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

| | Defendants' Additional Uncontroverted Facts and Supporting Evidence | Plaintiffs' Disputed Facts and Supported Evidence |
|---|---|---|
| B1. | Defendants' Additional Uncontroverted Facts and Supporting Evidence | Plaintiffs' Disputed Facts and Supported Evidence |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| B2. | The check-in system that preceded the touchscreen tablets (the "Kiosk" or "Kiosks") – paper and pen sign-in sheets – relied on the assistance of the PSRs staffing the PSCs.<br><br>Quest Appendix ("QA") Exhibit ("Ex.) 1 ¶ 21; QA Ex. 5 ¶ 9. | Disputed.<br><br>*See Plaintiffs' Evidentiary Objection No. 62 (re: sham affidavit conflicting with deposition testimony).*<br><br>Mr. Walsh testified that testified that he did not know how, prior to implementation of the echeck-in kiosk, a patient would signal that they needed help checking in. ("Q: Prior to the implementation of the eCheck-in kiosk, how would a patient signal that they needed help checking in? A: I'm not certain how a patient would have done that.")<br><br>Miller Dec. at Ex. 9: Walsh Dep., 59:17-22 ("Q: Prior to the implementation of the eCheck-in kiosk, how would a patient signal that they needed help checking in? A: I'm not certain how a patient would have done that.") |
| --- | --- | --- |
| B3. | Quest phlebotomists/patient service representatives ("PSRs") generally receive five days of training upon being hired as employees.  Quest PSRs then receive additional training, including refresher training, during the course of the employment.<br><br>QA Ex. 3 ¶ 7. | Disputed insofar as the "training" covers the ADA, information regarding scanning the waiting room, or providing effective communication.<br><br>Plaintiffs' SUF # A54-62 (Dkt. 206-5)<br><br>Miller Dec. at Ex. 6: Reilly |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | | | Dep., at 270:7-272:1: patient care gold standards does not address the ADA, give any training to the ADA, nor even mentions the ADA. *See also Plaintiffs' Evidentiary Objection No. 36 (re: sham affidavit conflicting with deposition testimony).* |
|---|---|---|---|
| B4. | Beginning in 2009, Quest launched "Managing Every Patient's Needs" training modules and/or videos, which were specifically designed to train phlebotomists on their obligation to provide assistance and accommodations to PSC patients with disabilities. QA Ex. 3 ¶ 8. | | Disputed. Plaintiffs' SUF # A54-62 (Dkt. 206-5) Miller Dec. at Ex. 6: Reilly Dep., 213:15-214:22: does not know if the video has been updated, and employees are not currently required to review these materials. Miller Dec. at Ex. 6: Reilly Dep., 270:7-272:1: video is also a part of the "patient care gold standards" which does not address the ADA, give any training to the ADA, nor even mentions the ADA. *See also Plaintiffs' Evidentiary Objection No. 31 (re: sham affidavit conflicting with deposition testimony).* |

142

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| B5. | The current "Managing Every Patient's Needs" training, which was updated in March 2021, instructs phlebotomists among other things that the "The ADA entitles patients with special needs certain rights when using public spaces such as our PSCs, including access to facilities, the right to have service animals accompany them, the right to reasonable modifications of policies, practices, and procedures, and the right to auxiliary aids and services, such as the use of specialized equipment that ensures their safety and facilitates their ability to move about."<br><br>(QA Ex. 42 ¶¶ 7-8, QA Ex. 3 ¶¶ 8, 10, 11; QA Ex. 10-11;<br><br>QA708, 724, 725-730, 757, 746-748 and 766. | Disputed.<br><br>Plaintiffs' SUF # A54-62 (Dkt. 206-5)<br><br>*See also Plaintiffs' Evidentiary Objectio No. 31 (re: sham affidavit conflicting with deposition testimony).* |
|---|---|---|
| B6. | Over 96% of the PSC employees assigned the "Managing Every Patient's Needs" training in 2021 completed the training.<br><br>QA Ex. 3. | Disputed.<br><br>Plaintiffs' SUF # A56 (Dkt. 206-5)<br><br>*See also Plaintiffs' Evidentiary Objection No. 32 (re: sham affidavit conflicting with deposition testimony).* |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| B7. | In implementing its Kiosks, Quest was relying on its business model, approach to patient service, and policies, procedures and training that, collectively, require PSRs to assist patients at PSCs, including providing assistance to persons with disabilities to ensure they had access to Quest's services.<br><br>QA Ex. 1 ¶ 20; QA Ex. 5 ¶ 9; QA Ex. 4 ¶ 10. | Disputed.<br><br>Plaintiffs' SUF # A5, A9; A11-12; A54-62 (Dkt. 206-5);<br><br>Quest's IT development team was aware of ADA accessibility problems with the kiosks prior to Quest's nationwide rollout of ECSS. The IT team elevated these issues to project management yet Quest nonetheless elected to proceed with the rollout of a cheaper, totally inaccessible kiosk.<br><br>*See* Miller Dec. at Ex. 9, Walsh Dep. at 68:5-25; Miller Dec. at Ex. 4, Yarrison Dep. at 100:17-24; 170:6-25; 181:3-182:18.<br><br>*See also Plaintiffs' Evidentiary Objection No. 51(re: sham affidavit conflicting with deposition testimony).* |
| B8. | In implementing its Kiosks, there was no plan to reduce then-existing PSC staffing, or to replace PSC staff with Kiosks.<br><br>QA Ex. 1 ¶ 3; QA Ex. 5 ¶¶ 3-5; QA Ex. 4 ¶10. | Disputed. The evidence establishes that Quest planned to realize millions of dollars in savings through "efficiencies" saved on additional labor costs to serve more patients. Thus, kiosks *did* replace staff in that new staff were not hired though Quest vastly increased the quantity of patients seen.<br><br>Mr. Walsh testified that Quest believed "increased throughput would allow us to see more |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT
OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING
EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101



patients." Miller Dec. at Ex. 9, Walsh Dep. at 160:15-19.

Mr. Walsh testified that Quest could save on additional labor costs that it would otherwise expend to serve more patients. Miller Dec. at Ex. 9, Walsh Dep. at 27:25-28:23 ("Q: [B]y implementing certain efficiencies at the patient service centers, Quest could, number one, serve more patients, is that true? A: Yes . . .  Q: And Quest could save on additional labor cost that it would, otherwise, cost to serve more patients? A: That's right.")

Mr. Walsh testified that that reducing costs was part of his "mandate" for the e-check-in project. Miller Dec. at Ex. 9: Walsh Dep., 25:18-23; 26:16-23 ("Q: So it's twofold. Both improve experience and reduce costs, is that right? That was your mandate? A: That's correct.")

*See* QA Ex. 5, ¶  (Dkt. 236-10, Walsh Decl.) ("[T]he same number of phlebotomists would be able to serve this growing population. New hiring would not be required.")

*See also Plaintiffs' Evidentiary Objections Nos. 1, 25, and 61*

145

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | | |
|---|---|---|
| | | *(re: sham affidavit conflicting with deposition testimony).* |
| B9. | The Kiosk project was not designed to reduce the amount of time that PSRs spend in the waiting rooms (or in order to "keep them in back"). In fact, Quest projected that use of the Kiosks would result in PSRs spending more time in the waiting room and assisting patients, not less.<br><br>QA Ex. 1 ¶¶ 3, 5; QA Ex. 5 ¶ 5. | Disputed. The evidence establishes that the design of the e-check-in kiosk system was to have the phlebotomist remain in the back, servicing more patients.<br><br>Plaintiffs' SUF # A9, A11-12; A25, A66 (Dkt. 206-5);<br><br>*See also Plaintiffs' Evidentiary Objections Nos. 3, 26, 27, 61, 62, and 64 (re: sham affidavit conflicting with deposition testimony).* |
| B10. | In implementing its Kiosks, Quest and its vendors undertook efforts to ensure that Quest satisfied the explicit design standards applicable to the Kiosks in the ADA Standards for Accessible Design (36 C.F.R. Pt. 1191, App. B & D, "ADAS"), including design standards that all of the operable parts of the Kiosk were within "reach range" of someone using a wheelchair (ADAS 308, 309) and that the freestanding Kiosks were detectable by blind cane users (ADAS 307).<br><br>QA Ex. 4 ¶ 9; QA1605:2-15 (Quest | Disputed in part. Undisputed that Quest considered ADA standards related to wheelchair users. Disputed that Quest considered accessibility needs of its blind customers, as Quest's own executives repeatedly testified that blind users were never considered.<br><br>*See* Miller Dec. at Ex. 9, Walsh Dep. at 65:2-67:9, 225:4-226:20; |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | | | |
|---|---|---|---|
| | | undertook efforts to ensure the Kiosks are "mounted and installed in an ADA-compliant way" and made changes to "improve increased text size, button size, and contrast."), QA1606:25-QA1607:7 (Quest implemented ADA installation guidelines for the Kiosks), QA158832: 9-22. | Miller Dec. at Ex. 4, Yarrison Dep. at 101:4-103:3, Miller Dec. a Ex. 11, QUEST-VARGAS000034658; Plaintiffs' SUF A5 [Aronson dep.] (inquiry into whether features were available). *See also Plaintiffs' Evidentiary Objection No. 50 (re: sham affidavit conflicting with deposition testimony).* |
| | B11. | During the roll-out, Quest received feedback from a small number of individuals who indicated that people who were completely blind would have difficulty using the Kiosk without assistance. QA Ex. 1 ¶¶ 15-21; QA Ex. 5 ¶ 7; QA Ex. 4 ¶¶12-13. | Disputed. *See also Plaintiffs' Evidentiary Objection No. 56 (re: sham affidavit conflicting with deposition testimony).* The record evidence establishes Defendants ignored multiple complaints from legally blind customers over several years to make the ECSS kiosks independently accessible. Miller Dec. at Ex. 4: Yarrison Dep., 129:20-136:20, Miller Dec. a Ex. 11, QUEST-VARGAS000034658; see also, Miller Dec. at Ex. 9: Walsh Dep. at 41:24-43:3; 225:4-17 (help button not accessible to blind users and company knew ADA compliance was critical but ignored accessible options); Miller Dec. at Ex. 5: Carr dep. 223:25-227:25; Miller Dec. at Ex. 13: Vargas Dep. at 132:16- |

147

| | | 133:23, offering to provide suggestions for how to make kiosk accessible];; [Miller Dec. at Ex. 8: Rachfal Dep., 160:18-175:1, and Letter to Quest from ACB re: letter requesting primary consideration for screen readers, which Quest ignored]. See also Evidentiary Objections (re: sham affidavit conflicting with deposition testimony). |
|---|---|---|
| B12. | Since Quest had received very little feedback that people who were completely blind would have difficulty using the Kiosk without assistance, and it was a very small fraction of the overall feedback Quest had received, and because Quest knew that the PSRs remained available to assist with use of the Kiosks and more generally check-in, Quest endeavored to address this concern in a future iteration of the Kiosk.<br><br>QA Ex. 1 ¶ 19; QA Ex. 5 ¶ 9; QA Ex. 4 ¶ 16. | Disputed.<br><br>The record evidence establishes Defendants ignored multiple complaints from legally blind customers over several years to make the ECSS kiosks independently accessible.<br><br>Miller Dec. at Ex. 4: Yarrison Dep., 129:20-136:20, Miller Dec. at Ex. 11, QUEST-VARGAS000034658; see also, Miller Dec. at Ex. 9: Walsh Dep. at 41:24-43:3; 225:4-17 (help button not accessible to blind users and company knew ADA compliance was critical but ignored accessible options); Miller Dec. at Ex. 5: Carr dep. 223:25-227:25; Miller Dec. at Ex. 13: Vargas Dep. at 132:16-133:23, offering to provide suggestions for how to make kiosk accessible];; [Miller Dec. at Ex. 8: Rachfal Dep., 160:18-175:1, and Letter to Quest from ACB re: letter requesting |

148

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | | | |
|---|---|---|---|
| | | | primary consideration for screen readers, which Quest ignored]. See also Evidentiary Objections (re: sham affidavit conflicting with deposition testimony).<br><br>*See also Plaintiffs' Evidentiary Objection No. 56 (re: sham affidavit conflicting with deposition testimony).* |
| B13. | Quest always contemplated Kiosk implementation to be an "iterative" process and planned to identify problems that any of its patients may be experiencing with the Kiosk through its extensive methods for soliciting and receiving patient complaints and feedback.<br><br>QA Ex. 1 ¶¶ 16-21, QA Ex. 4 ¶ 13. | | Disputed. The record evidence establishes Defendants ignored multiple complaints from legally blind customers over several years to make the ECSS kiosks independently accessible.<br><br>Miller Dec. at Ex. 4: Yarrison Dep., 129:20-136:20, Miller Dec. at Ex. 11: QUEST-VARGAS000034658; see also, Miller Dec. at Ex. 9: Walsh Dep. at 41:24-43:3; 225:4-17 (help button not accessible to blind users and company knew ADA compliance was critical but ignored accessible options); Miller Dec. at Ex. 5: Carr dep. 223:25-227:25; Miller Dec. at Ex. 13: Vargas Dep. at 132:16-133:23, offering to provide suggestions for how to make kiosk accessible];; [Miller Dec. at Ex. 8: Rachfal Dep., 160:18-175:1, and Letter to Quest from ACB re: letter requesting primary consideration for screen readers, which Quest ignored]. See also Evidentiary Objections |

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

149

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

|  |  | (re: sham affidavit conflicting with deposition testimony). |
| --- | --- | --- |
|  |  | *See also Plaintiffs' Evidentiary Objection No. 54 (re: sham affidavit conflicting with deposition testimony).* |
| B14. | Some PSCs have greeters and/or receptionists.  *See* Plaintiffs' Uncontroverted Fact No. 64, Ps' App. Ex. 23 at PA0281-0282; QA1596:15-1597:1 ("There are – there are locations that have staff located at the front when people come in."); QA1578:17-21. | Disputed.  Cited evidence does not support the purported fact.  Plaintiffs' SUF # A54-62 (Dkt. 206-5) ("internal Quest emails confirm that "[w]ith or without eCheck-in we know from patient feedback patients would like greeters. Most sites do not have greeters and there are no plans to introduce greeters as part of eCheck-in.") |
| B15. | The experiences of the ten ACB members varied in how long it took to get checked in at the PSC.  (See, e.g., QA1728:16-22 ("no more than a couple minutes" to get signed in); QA1791:6-14 ("it was pretty quick…A minute or two probably" to get assistance checking in); QA1802:21- 24 (waited "five minutes at the most" before phlebotomist came into the waiting room); QA1814:19-QA1815:1 (waited "a couple minutes" for | Undisputed. |

150

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | | | |
|---|---|---|---|
| | | assistance with check in.); QA1666:1-7 (waited for possibly one minute for a phlebotomist.); QA1552 ("stood there for a few moments" before being assisted by phlebotomist).) | |
| | B16. | The experiences of the ten ACB members varied in whether they went to the PSC alone or with a companion.<br><br>Some individuals went to the PSCs alone (QA1643:20-23; (Bazyn (QA1736:16-18) Grahmann (QA1774:9-12) whereas others went with a friend or family member (Bazyn (QA1727:10-12), Black (QA1744:16-18), M. Haroyan (QA1790:15-16) Brink (QA1753:14-24). | Undisputed. |
| | B17. | The experiences of the ten ACB members varied in whether they had appointments or were walk-ins.<br><br>Some of the individuals had appointments (Bazyn (QA1726:7-12), Black v. 1 (QA1744:12-15), Grahmann (QA1774:21-23), Rehder (QA1817:3-6) whereas others were walk-ins (QA1639:11-14, QA1753:18-QA1754:2, M.<br>Haroyan QA1790:1-7, N. Haroyan QA1801:3-13, QA1808:11-15.) | Undisputed. |

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

151

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | | |
|---|---|---|
| B18. | The experiences of the ten ACB members varied in whether they were assisted with check-in by a PSR or someone else.<br><br>Some individuals were assisted by the PSRs with check-in (Grahmann survey results QA1696-1697; Bazyn QA1737:22- QA1738:1; some were assisted by family members (Bazyn survey results QA1698; and others were assisted by other patients (Grahmann survey results QA1696-1697). | Undisputed. |
| B19. | The experiences of the ten ACB members varied in whether a PSR was at the reception desk/in the waiting room when they arrived.<br><br>(Black [phlebotomist was waiting at reception desk when Mr. Black sought assistance (QA1745:11-16).] In other instances, the ACB members waited for a PSR to come from the back area. (Bazyn (QA1733:23-QA1734:2) Brink (QA1755:25- QA1756:23). | Undisputed. |
| B20. | The experiences of the ten ACB members varied in the information they were asked to verbally provide during the check in process. (Bazyn [name (QA1734:24-QA1735:16)]; Black [only recalls giving paperwork (QA1746:20-QA1747:7)]; Brink [sometimes just hand paperwork, other times provide birthdate, type of test, reason for test, and address (QA1757:20-QA1758:1, QA1762:11- | Undisputed. |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT
OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING
EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | | |
|---|---|---|
| | :21, QA1763:19- QA1764:10, QA1764:20-24)]; Grahmann [name address birthdate (QA1775:23-QA1776:4)]; M. Haroyan [name, date of birth, maybe phone number (QA1791:24-QA1792:7)]; Vargas [full name, address, type of test (QA1646:25- QA1647:14)].) | |
| B21. | None of the ACB members has encountered or attempted to use the Three Finger Swipe enhancement. ECF 110-12 at 12 (Vargas is the only individual on the record who attempted to use the TFS option on the Kiosk, and he was successful in executing the swipe). | Disputed. Plaintiffs' SUF # A50-53 |
| B22. | Multiple ACB members were assisted by PSRs immediately upon their arrival to the PSC and therefore did not wait at all. M. Haroyan QA1793:24-QA1794:4; QA1698 (Debbie Downey), QA1666:1-7; QA1687:2-14; QA1698 (Ardis Bazyn "There has always been an attendant to take info or had to have someone sign name on the list when the attendant was in back."); (PA0710:12-13.) ACB member "had a staff member at the center help him check in for appointments." | Disputed. Cited testimony does not support fact. Citation PA0710:12-13 does not exist in Plaintiffs' appendix. Ms. Haroyan did not remember whether it was a third person or phlebotomist that checked her in. QA1791:2-5. Ms. Downey "had to yell for someone to come and assist [her]." QA1698. *See also* Plaintiffs' SUF 25-26, 63. |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| B23. | Quest solicited feedback from three different groups (including focus groups) of blind individuals or individuals who worked with accommodating the blind to understand what these blind consumers wanted when interacting with electronic technology. Quest used this feedback in developing the TFS.<br><br>QA Ex. 1 ¶ 7. | Disputed.<br><br>*See Plaintiffs' Evidentiary Objection No. 5 (re: sham affidavit conflicting with deposition testimony).*<br><br>In addition, the Quest Rule 30(b)(6) witness designated to testify on three-finger swipe, Taylor Carr, was repeatedly instructed by Quest's counsel not to answer questions related to three-finger swipe or whether they gave ACB's requests primary consideration on the basis of privilege. Dec. Miller, ¶¶ 8-9.<br><br>Mr. Carr was instructed not to answer "what specifically were the takeaways that you had from this [Las Vegas 2020] focus group" on grounds of privilege. Dec. Miller at Ex. 5: Carr Dep., 171:13-16.<br><br>Mr. Carr was instructed not to answer whether Quest gave "any consideration on whether it could implement speech output at the e-check-in kiosk that would allow a blind user to independently navigate through the kiosk workflow and check in themselves," on grounds of privilege. Dec. Miller at Ex. 5: Carr Dep., 208:3-18. |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101



Mr. Carr was instructed multiple times not to answer questions whether Quest considered anything "as part of the three-finger swipe process" other than in connection with the Las Vegas 2020 focus group. Dec. Miller at Ex. 5: Carr Dep., 211:8-12; 211:15-25; 212:2-10; 212:24-213:8; 213:13-24

Once Quest made the decision to implement the three-finger swipe, Mr. Carr was not involved in nor was aware of any further effort to obtain feedback from visually impaired individuals as to whether it was an effective means of checking in. Dec. Miller at Ex. 5: Carr Dep., 174:9-16.

Dec. Miller at Ex. 5: 217:1-7: Mr. Carr did not know if, in settling on the three-finger swipe options, Quest took into consideration the complaints of Plaintiffs in this litigation.

Mr. Carr testified that he did not know whose idea it was to implement the three-finger swipe and that he did not come up with the three-finger swipe as an option. Dec. Miller at Ex. 5: Carr Dep., 155:4-17.

Mr. Carr testified that he did not know if, prior to the decision to

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

155

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

implement the three-finger swipe, Quest ever went back and surveyed visually impaired Quest patients who had difficulty accessing the e-check-in service to see what their experiences were like. Dec. Miller at Ex. 5: Carr Dep., 177:15-22.

Dec. Miller at Ex. 5: Carr Dep., 179:9-19: Mr. Carr wasn't involved in the next steps in implementing the three-finger swipe after he obtained feedback from the Las Vegas 2020 focus group and that he didn't have any participation in the three-finger swipe after the focus group.

Dec. Miller at Ex. 5: Carr Dep., 159:1-8: Mr. Carr did not know if he assisted in any manner in coming up with the audio messaging that would be relayed to blind patients using the three-finger swipe.

Dec. Miller at Ex. 5: Carr Dep., 370:5-13: Mr. Carr did not know whether Quest considered any information gathered from "Wright State" when implementing three-finger swipe. (Wright State was one of the focus groups from whom Quest purportedly obtained feedback).

156

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | | |
|---|---|---|
| | | Mr. Carr was instructed not to answer when asked whether Quest considered the feedback of the focus group as it related to screen-reader technology and voiceover capabilities. Dec. Miller at Ex. 5: Carr Dep., 387:2-389:20<br><br>Mr. Carr did not recall tactile strips being implemented on the floors of their PSCs after receiving feedback from the focus group. Dec. Miller at Ex. 5: Carr. Dep., 380:12-382:3.<br><br>Mr. Carr testified there was no other feedback he learned from the focus group in 2020 other than already testified to. Mr. Carr said nothing about the familiarity of finger-swiping gestures despite being directly asked about what was learned from the focus group. Dec. Miller at Ex. 5: Carr Dep., 174:19-24. |
| B24. | Quest learned from meeting with the three groups that it was the preference of blind consumers to use their own devices, as opposed to devices supplied by the businesses they patronized.<br><br>QA Ex. 1 ¶¶ 7-8. | Disputed.<br><br>*See Plaintiffs' Evidentiary Objection No. 5 (re: sham affidavit conflicting with deposition testimony).*<br><br>In addition, the Quest Rule 30(b)(6) witness designated to testify on three-finger swipe, |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE



Taylor Carr, was repeatedly instructed by Quest's counsel not to answer questions related to three-finger swipe or whether they gave ACB's requests primary consideration on the basis of privilege. Dec. Miller, ¶¶ 8-9.

Mr. Carr was instructed not to answer "what specifically were the takeaways that you had from this [Las Vegas 2020] focus group" on grounds of privilege. Dec. Miller at Ex. 5: Carr Dep., 171:13-16.

Dec. Miller at Ex. 5: Carr Dep., 208:3-18: instructed not to answer whether Quest gave "any consideration on whether it could implement speech output at the e-check-in kiosk that would allow a blind user to independently navigate through the kiosk workflow and check in themselves," on grounds of privilege.

Dec. Miller at Ex. 5: Carr Dep., 211:8-12; 211:15-25; 212:2-10; 212:24-213:8; 213:13-24: instructed multiple times not to answer questions whether Quest considered anything "as part of the three-finger swipe process" other than in connection with the Las Vegas 2020 focus group.

158

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101



Once Quest made the decision to implement the three-finger swipe, Mr. Carr was not involved in nor was aware of any further effort to obtain feedback from visually impaired individuals as to whether it was an effective means of checking in. Dec. Miller at Ex. 5: Carr Dep., 174:9-16.

Mr. Carr did not know if, in settling on the three-finger swipe options, Quest took into consideration the complaints of Plaintiffs in this litigation. Dec. Miller at Ex. 5: 217:1-7.

Mr. Carr testified that he did not know whose idea it was to implement the three-finger swipe and that he did not come up with the three-finger swipe as an option. Dec. Miller at Ex. 5: Carr Dep., 155:4-17.

Dec. Miller at Ex. 5: Carr Dep., 177:15-22: Mr. Carr did not know if, prior to the decision to implement the three-finger swipe, Quest ever went back and surveyed visually impaired Quest patients who had difficulty accessing the e-check-in service to see what their experiences were like.

Dec. Miller at Ex. 5: Carr Dep.,

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101



179:9-19: Mr. Carr wasn't involved in the next steps in implementing the three-finger swipe after he obtained feedback from the Las Vegas 2020 focus group and that he didn't have any participation in the three-finger swipe after the focus group.

Dec. Miller at Ex. 5: Carr Dep., 159:1-8: Mr. Carr did not know if he assisted in any manner in coming up with the audio messaging that would be relayed to blind patients using the three-finger swipe.

Mr. Carr did not know whether Quest considered any information gathered from "Wright State" when implementing three-finger swipe. Dec. Miller at Ex. 5: Carr Dep., 370:5-13. (Wright State was one of the focus groups from whom Quest purportedly obtained feedback).

Mr. Carr was instructed not to answer when asked whether Quest considered the feedback of the focus group as it related to screen-reader technology and voiceover capabilities. Dec. Miller at Ex. 5: Carr Dep., 387:2-389:20

Mr. Carr did not recall tactile

160

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | | | |
|---|---|---|---|
| | | | strips being implemented on the floors of their PSCs after receiving feedback from the focus group. Dec. Miller at Ex. 5: Carr. Dep., 380:12-382:3<br><br>Mr. Carr testified there was no other feedback he learned from the focus group in 2020 other than already testified to. Mr. Carr said nothing about the familiarity of finger-swiping gestures despite being directly asked about what was learned from the focus group. Dec. Miller at Ex. 5: Carr Dep., 174:19-24. |
| B25. | Quest completed a company-wide roll-out and activation of all three components of the TFS system by mid-2021: (i) the TFS-enabling software was installed at Kiosks in all PSCs in August 2020; (ii) the audio message on the Quest TVs at the PSCs instructing those at the PSCs how to use the TFS was activated in January 2021; and (iii) the enhanced training of PSC employees on how to assist patients in using the TFS was rolled out and assigned in March 2021.<br><br>QA Ex. 1 ¶ 7; QA Ex. 4 ¶ 18. | | Disputed.<br><br>Cited testimony does not support fact. Further, the investigation of experienced accessibility investigator Mark Derry demonstrated that three finger swipe was not rolled out across the Quest PSC network effectively and suffers from many accessibility issues in its own rite.   In addition, Quest does not provide its employees training in how to deal with legally blind customers or in how to give their requested accommodations primary consideration.<br><br>Plaintiffs' SUF # A54-62 (Dkt. |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | | |
|---|---|---|
| | | 206-5)<br><br>*See also Plaintiffs' Evidentiary Objection No. 8 (re: sham affidavit conflicting with deposition testimony).* |
| B26. | Once a TFS is applied to the Kiosk, a message appears on the phlebotomist's device indicating that a patient who is "Visually Impaired" has checked in.<br><br>QA Ex. 3 ¶ 8, QA0748. | Disputed.<br><br>Plaintiffs' SUF # A54-62 (Dkt. 206-5)<br><br>Ms. Magana testified that it is the same bell tone for all check-ins, including TFS check-ins. Magana Dep., Ex. 20 to Appendix of Exhibits (Dkt. 207-2) at PA0253:18-23<br>Ms. Magana testified that she does not remember if she has ever received a notification for TFS. Dec. Miller at Ex. 10: Magana Dep., 85:11-14.<br><br>*See also Plaintiffs' Evidentiary Objections Nos. 31 and 74. (re: sham affidavit conflicting with deposition testimony).* |
| B27. | There have been almost 62,000 recorded instances of the TFS being used at PSCs, approximately a thousand times per month, or approximately five instances of the TFS per PSC each month.<br><br>QA Ex. 1 ¶ 11. | Disputed. Cited evidence does not support fact. Conflicting evidence presented.<br><br>Mr. Carr testified at deposition he was not involved in implementing the TFS after the focus group (Dec. Miller at Ex. 5: Carr Dep., 179:9-19), and |

162

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | | | |
|---|---|---|---|
| | | | thus he lacks any personal knowledge to authenticate document produced after the close of discovery, in violations of Rule 26 and 37.<br><br>*See also Plaintiffs' Evidentiary Objection No. 9 (re: sham affidavit conflicting with deposition testimony).* |
| B28. | | Many ACB members are physically capable of using the three finger swipe gesture.<br>QA1725:3-12 (admitting to regular use of the swipe gestures), QA1749:8-14 (admitting the ability to perform a three finger swipe gesture), QA1768 90:9-14 (same); QA1772:17- QA1773:5, 62:25-63:9 (same), QA1798:6-12 ("I can certainly do a three-finger swipe up."), QA1805:2-15 ("I can physically do the three-finger swipe up."); QA1811:6-20 (admitting the ability to perform a three finger swipe gesture); QA1818:12- 17 (same); QA1709:2-11 (ACB members "could physically perform a three-finger swipe."). | Undisputed. |
| B29. | | At least two ABC members prefer to rely on a third party to aid their check-in at Quest rather than being able to independently check in on the Kiosk.<br><br>QA1750:2-22 ("Well, my objective in going to the lab is to get my tests done in the least complicated and time-consuming way; and in my mind, the best way to do that is to talk to | Disputed.<br>Plaintiffs' SUF A11-A12. |

163

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | | | |
|---|---|---|---|
| | | somebody, give them my lab slip and have them check me in.  So, you know, I really think that using the kiosk is certainly a step backwards in terms of, you know, customer service and convenience in using the system."); QA1731:24- QA1732:20 (Q: If you have this option, that you can check in using this iPad or you can just go up and wait for somebody to check you in, like, a Quest person to check you in, which method would you prefer to check in? A: I'd prefer an attendant."). | |
| | B30. | The Kiosk functionality that provides patients the ability to wait outside or notice about patients staying away if they experienced Covid symptoms – was developed in 2020.<br><br>QA Ex. 5 ¶ 7. | Undisputed. |
| | B31. | All patients who make online appointments can select the "wait where you want" function when making appointments.<br><br>QA Ex. 1 ¶ 24. | Disputed.<br><br>Plaintiffs' SUF # A10 (Dkt. 206-5);<br><br>Mr. Carr testified that the "Wait Where You Want" functionality was a component within e-Check-in that can be used.  ("Q: Once you go and you use the e-Check-in service, you can—one of the those screens allows you to put in your information to wait where you want, right? A: Yes.") Dec. Miller at Ex. 5: Carr Dep. 152:4-11. |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| | | | |
|---|---|---|---|
| | | | *See also Plaintiffs' Evidentiary Objection No. 24 (re: sham affidavit conflicting with deposition testimony).*<br><br>*See also* Plaintiffs' concurrently filed RFJN—Despite Mr. Carr's sworn declaration that "wait where you want" feature is available on its website while making an appointment, it is not present anywhere on Quest's website. |
| B32. | Some of the features on the Kiosks are independently accessible to some "legally blind" users.<br><br>Quest Request for Judicial Notice ¶ 1; QA Ex. 16 ; QA Ex. 20 ¶¶ 14-18; *see* QA Ex. 1 ¶ 14; QA1180:22-1181:18 (Vargas successfully used TFS). | | Disputed.<br><br>Plaintiffs' SUF # A10, A40-42, A65, A102-104 (Dkt. 206-5);<br><br>Mr. Carr was instructed not to answer "what specifically were the takeaways that you had from this [Las Vegas 2020] focus group" on grounds of privilege. Dec. Miller at Ex. 5: Carr Dep., 171:13-16<br><br>Mr. Carr was instructed not to answer whether Quest gave "any consideration on whether it could implement speech output at the e-check-in kiosk that would allow a blind user to independently navigate through the kiosk workflow and check in themselves," on grounds of privilege. Dec. Miller at Ex. 5: Carr Dep., 208:3-18.<br><br>Mr. Carr was instructed not to |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT
OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING
EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | | | |
|---|---|---|---|
| | | | answer when asked whether Quest considered the feedback of the focus group as it related to screen-reader technology and voiceover capabilities. Dec. Miller at Ex. 5: Carr Dep., 387:2-389:20 <br><br> *See also Plaintiffs' Evidentiary Objections Nos 55-58 (re: sham affidavit conflicting with deposition testimony).* |
| B33. | | All patients, including blind patients, can check in and utilize nearly all of the features and functionalities of the Kiosks on the internet, which they can access with their phones. <br><br> QA Ex. 1 ¶ 24. | Disputed. <br><br> Plaintiffs' SUF # A10 (Dkt. 206-5); <br><br> *See also Plaintiffs' Evidentiary Objections 24 and 48 (re: sham affidavit conflicting with deposition testimony).* <br><br> *See also* Plaintiffs' concurrently filed RFJN—Despite Mr. Carr's sworn declaration that "wait where you want" feature is available on its website while making an appointment, it is not present anywhere on Quest's website. |
| B34. | | There are many factors that influence the order in which patients are served at the PSCs that have absolutely nothing to do with the order in which patients check in. Scheduled appointment times, an increasingly popular choice within Quest, always take priority and are honored without regard to when any of | Disputed. <br><br> Plaintiffs' SUF # A8, A40, A85-86 (Dkt. 206-5) <br><br> Mr. Carr testified that the process of determining who was in the queue, factoring in who |

166

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT
OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING
EVIDENCE

| | | |
|---|---|---|
| | the patients (those with and without appointments) checked in.<br><br>QA Ex. 1 ¶ 23. | made appointments versus who walked in to decide in what order they should be served, became an automated function with the kiosks instead of requiring the phlebotomist to figure it out. Dec. Miller at Ex. 5: Carr Dep., 138:23-139:14.<br><br>Mr. Carr also testified that a benefit of moving forward with e-Check-in service was for patients to better know where they were in the queue. Dec. Miller at Ex. 5: Carr Dep., 237:14-21.<br><br>*See also Plaintiffs' Evidentiary Objections 23 and 47 (re: sham affidavit conflicting with deposition testimony)* |
| B35. | Phlebotomists/patient service representatives exercise complete discretion in taking patients out of order for any number of reasons.<br><br>QA Ex. 1 ¶ 23; QA1597:13-1598:14; QA Ex. 4 ¶ 8. | Disputed.<br><br>Plaintiffs' SUF # A8, A40, A85-86 (Dkt. 206-5)<br><br>Mr. Carr testified that the process of determining who was in the queue,  factoring in who made appointments versus who walked in to decide in what order they should be served, became an automated function with the kiosks instead of requiring the phlebotomist to figure it out. Dec. Miller at Ex. 5: Carr Dep., 138:23-139:14.<br><br>Mr. Carr also testified that a |

167

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT
OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING
EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | | | |
|---|---|---|---|
| | | | benefit of moving forward with e-Check-in service was for patients to better know where they were in the queue. Dec. Miller at Ex. 5: Carr Dep., 237:14-21. <br><br> *See also Plaintiffs' Evidentiary Objections 23 and 47 (re: sham affidavit conflicting with deposition testimony)* |
| B36. | | Mr. Sawczyn opined that "the [Kiosk with TFS function] meets the issues complaint of by Plaintiffs in their First Amended Complaint. Namely, "a blind person can, independently, privately, and successfully avail themselves of the Quest kiosk to check in for the purposes of making their presence at the PSC known to the Quest team member so that they can be served according to their appointment time, or, if they are a walk in, to be served in accordance with their place in the queue…" <br><br> QA1231; QA1616:11-22. | Disputed. Mr. Sawczyn admits that he is unable to independently access any of the features of the kiosk. <br><br> Plaintiffs' SUF # A35. <br><br> Mr. Sawczyn testified to not knowing what effective communication entailed. Dec. Miller at Ex. 12, Sawczyn Dep. at 29:13-19; 38:4-13. |
| B37. | | Mr. Sawczyn opined that "full functionality is not required even in devices like airline fare machines when covered by specific Department of Transportation regulations." <br><br> QA1231. | Disputed. The next sentence of the quoted material reads: "As long as those non-core services are otherwise provided through "effective communication."" QA1231. <br><br> Mr. Sawczyn admitted to being unable to use these functions. <br><br> Plaintiffs' SUF # A35. |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| B38. | There would have been an administrative burden on Quest if required to switch the means of effective communication related to its check in process after already rolling out the existing Kiosk to more than 2,100 PSCs based on the following factors:<br><br>    a.    The Kiosks and all component parts of the Kiosks would be collectively exposed to the tens of millions of patients that Quest hosts at its PSCs every year, year after year. There is a general operating principle in the development of technology to reduce the number of breakable parts. Plaintiffs' proposal added at least a keyboard and headphones as potential breakable parts that would have to be maintained and/or replaced. Unlike the tablet itself, which is firmly housed in a set casing, it would be much more difficult to secure the keyboard and headphones.<br><br>    b.    By the time Plaintiffs made their proposal for a different device than the kiosk Mr. Vargas encountered during a 2019 visit (the "Proposal"), Quest was already considering plans to use the headphone jack on the iPad tablet to provide a data port for the camera in its proposed scanning device to scan in insurance cards and drivers' licenses. Keeping the headphone jack for the occasional (and statistically infrequent) blind customer who wanted to hear private, verbal information from the Kiosk would foreclose use of the | Disputed.<br><br>Plaintiffs' SUF # A106 (Dkt. 206-5);<br><br>Dec. Miller at Ex. 5: Carr Dep., 100:19-25: testified he did not know if the utilization of the headphone jack would impose an undue burden.<br><br>Dec. Miller at Ex. 5: Carr Dep., 102:12-103:5: testified he did not know if that analysis was ever undertaken as to whether adding the headphone jack would impose an undue financial burden on Quest; also testified there were no documents that would refresh his recollection on this point.<br><br>*See also Plaintiffs' Evidentiary Objections 6, 12, 13, 14, 15, 16, 17, 18, 19, 66, 67, 69, and 70 (re: sham affidavit conflicting with deposition testimony).* |
| --- | --- | --- |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

169

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28

headphone jack for the scanning of insurance cards and drivers' licenses for all patients.

c. By the time Plaintiffs made the Proposal, Quest was also made aware that Apple and other devices were planning to phase out their headphone jacks over time in favor of wireless connection to the device. Thus, over time, the headphone jack proposal was not likely sustainable over any extended period of time.

d. The rollout of this new equipment for each of the Kiosks in over 2,100 PSCs would involve a massive effort of a team of technicians, who would need to be trained in the installation and use of the new equipment. New documentation would also need to be generated and rolled out. New training would also be required for local PSC staff.

e. The installation of new equipment in each of the more than 2,100 PSCs would also be a multi-year project. In contrast, the Three Finger Swipe ("TFS") capabilities could be accomplished by download from a central location to all existing Kiosks at one time.

f. During any such phased rollout, Quest would necessarily be monitoring and maintaining two different systems, with two different systems of operation, compelling those responsible for monitoring and maintaining to learn, understand, and

170

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

operate both monitoring and maintenance functions under two different systems.

g.      During Quest's meetings with blind consumers and other representatives of the blind community, it was made emphatically clear to Quest that the blind (like most other consumers) strongly and increasingly preferred to use their own devices (namely, their smartphones) to interact with businesses than to use the devices designed and provided by businesses.

h.      Among the reasons that blind consumers expressed a preference to use their own phones was familiarity with their own devices and how they worked and also the difficulty experienced locating the devices deployed by businesses and the different component parts of those devices, like the keyboard and headphones that Plaintiffs seek. If Quest went to the significant effort to deploy this extra equipment, it may be in vain as the target audience may not be able to locate and/or want to use the equipment.

i.      The United States Architectural and Transportation Barriers Compliance Board (the "Access Board") has announced its intent to issue regulations regarding self-service transaction machines like the Kiosks with an Advanced Notice of Proposed Rulemaking expected in August 2022. It would have been an undue administrative burden in the past,

171

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | | |
|---|---|---|
| | and would be in the future, for Quest to have met Plaintiffs' demand, or this Court's order, for a particular Kiosk configuration when government regulators will soon announce their own standards with which Quest will be forced to comply.<br><br>QA Ex. 1 ¶ 13; QA Ex. 5 ¶ 6; June 29, 2022 U.S. Architecture and Transportation Barriers Compliance Board announcement of intent to regulate, found at https://www.access-board.gov/sstms/; and at https://www.adatitleiii.com/wp-content/uploads/sites/121/2022/06/reg_agenda_spring_2022- self-service_3014-AA44.pdf. | |
| B39. | Vargas visited a Quest PSC prior to the implementation of the Kiosks, when Quest used the paper and pen sign-in sheets.<br><br>QA1642:9-12. | Undisputed. |
| B40. | Vargas obtained assistance from a PSR to sign in.<br><br>QA1642:9-12. | Disputed.<br><br>The evidence cited references Mr. Vargas having visited a Quest PSC prior to the implementation of the kiosks, undisputed. |

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| B41. | Vargas has never complained to Quest about requiring PSR assistance for paper sign-in (before the Kiosks were rolled out), including as part of the lawsuit.<br><br>ECF 41; QA1642:9-12; QA1173:25-1174:9; QA1710:20- QA1711:5. | Undisputed. |
|------|------|------|

Dated: July 22, 2022                     Respectfully submitted,

By: *s/ Jonathan D. Miller*
      Jonathan D. Miller (SBN 220848)
      jonathan@nshmlaw.com
      Alison M. Bernal (SBN 264629)
      alison@nshmlaw.com
      NYE, STIRLING, HALE
      & MILLER, LLP
      33 West Mission Street, Suite 201
      Santa Barbara, CA 93101
      Telephone: (805) 963-2345

      Benjamin J. Sweet
      (Admitted *Pro Hac Vice*)
      ben@nshmlaw.com
      NYE, STIRLING, HALE
      & MILLER, LLP
      1145 Bower Hill Road, Suite 104
      Pittsburgh, PA 15243
      Telephone: (412) 857-5350

      *Signatures continued below.*

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

173

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Matthew K. Handley
(Admitted *Pro Hac Vice*)
mhandley@hfajustice.com
HANDLEY FARAH &
ANDERSON PLLC
777 6th Street NW
Washington, DC 20001
Telephone: (202) 559-2411

*Attorneys for Plaintiffs Julian Vargas,
American Council of the Blind, and the
Certified Class*

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

174

PLAINTIFFS' RESPONSE TO QUEST'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED FACTS AND QUEST'S STATEMENT
OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING
EVIDENCE