1  Jonathan D. Miller (SBN 220848)
   jonathan@nshmlaw.com
2  Alison M. Bernal (SBN 264629)
3  alison@nshmlaw.com
   NYE, STIRLING, HALE
4  & MILLER, LLP
   33 West Mission Street, Suite 201
5  Santa Barbara, CA 93101
6  Telephone: (805) 963-2345

   Benjamin J. Sweet
   (*Admitted Pro Hac Vice*)
   ben@nshmlaw.com
   NYE, STIRLING, HALE
   & MILLER, LLP
   1145 Bower Hill Road, Suite 104
   Pittsburgh, PA 15243
   Telephone: (412) 857-5350

7

8  *Attorneys for Plaintiffs Julian Vargas,*
   *American Council of the Blind, and the Certified Class*
9

10 **Additional counsel for Plaintiff listed on signature page**

11

12 **UNITED STATES DISTRICT COURT**
   **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

13

14 JULIAN VARGAS and AMERICAN
   COUNCIL OF THE BLIND, individually
15 on behalf of themselves and all others
   similarly situated,
16
            Plaintiffs,
17
        v.
18
   QUEST DIAGNOSTICS CLINICAL
19 LABORATORIES, INC., QUEST
   DIAGNOSTICS HOLDINGS, INC.,
20 QUEST DIAGNOSTICS
   INCORPORATED; and DOES 1-10,
21 inclusive,
22
            Defendants.
23

Case No.: 2:19-cv-08108-DMG-MRW

**PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE SUBMITTED IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

*[Filed concurrently with Plaintiffs' Reply to Quest's Opposition to MSJ; Response to Statement of Facts, Request for Judicial Notice & Declaration of Jonathan D. Miller]*

**Date:   August 5, 2022**
**Time:   3:00 p.m.**
**Crtrm:  8C**

Complaint Filed: September 18, 2019
Discovery Cutoff: August 27, 2021
Pretrial Conf: October 4, 2022
Trial Date: November 1, 2022
District Judge: Hon. Dolly M. Gee
Magistrate: Hon. Michael R. Wilner

24
25
26
27
28

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

Pursuant to Federal Rules of Civil Procedure Rule 56 *et seq.,* Local Rule 56, *et seq.*, and this Court's Initial Standing Order (Dkt. 13), Plaintiffs Julian Vargas, American Council of the Blind, and the Certified Class ("Plaintiffs") object to evidence submitted by Defendants Quest Diagnostics Clinical Laboratories, Inc., Quest Diagnostics Holdings, Inc., and Quest Diagnostics Incorporated ("Quest" or "Defendants") in opposition to Plaintiffs' Motion for Summary Judgment, or Alternatively, Partial Summary Judgment, in large part on the grounds they are sham declarations.

The general theme throughout these objections, and as stated in the specific objections in the chart below, is that Quest has supported its opposition to Plaintiffs' summary judgment through the use of declarations which contradict its witnesses' prior sworn testimony; i.e., sham affidavits. A party cannot establish an undisputed material fact through a declaration contradicting its own deposition testimony. *See Cleveland v. Policy Mgmt. Systems Corp.*, 526 U.S. 795, 806 (1999); *also Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012); *United States v. TRW Rifle 7.2x51mm Caliber*, 447 F.3d 686 692, n.10 (9th Cir. 2006); *Hennighan v. Insphere Insurance Solutions, Inc.*, No. 13-cv-00638, 2014 WL 1600034, *7; *Mann v. West Contra Cost Unified School District*, No. C 99- 2833, 2001 WL 764481, *2 (N.D. Cal. June 18, 2001) (same). The Carr, Grant, Reilly, Magana, Walsh, and Yarrison declarations submitted in support of Defendants' opposition to Plaintiffs' summary judgment motion impermissibly contradict their sworn deposition testimony. For the Court's ease of reference in evaluating the sham affidavit doctrine's application to the declarations at issue, Plaintiffs have attached the relevant portions of the declarants' deposition testimonies to the concurrently-filed Declaration of Jonathan D. Miller, and summarized the contradictory testimony in the objections below. This, and the other legal bases for objections to specific portions of the declarations, are set forth in the charts below:

## OBJECTIONS TO THE DECLARATION OF TAYLOR CARR

### Dkt. 236-6 (Ex. 1 to Quest's Opposition)

Mr. Carr is a Quest executive. He testified as Quest's Rule 30(b)(6) person most knowledgeable about the three-finger swipe. [Carr depo. At 8:21-9:13.] He was deposed on April 21 and July 30, 2021.

| EVIDENCE OBJECTED TO: | GROUNDS FOR OBJECTION: |
|---|---|
| 1. Carr Decl., Paragraph 3 (1:25-2:1):<br><br>"[T]here was no plan to reduce then-existing PSC staffing, or to replace PSC staff with Kiosks, or to move PSC staff away from the waiting rooms. Indeed, none of the documents I drafted or worked on in connection with the Kiosk project, including the documents I have seen Plaintiffs refer to, contained any plan to reduce PSC staffing or to replace PSC staff with Kiosks." | Law of the case doctrine (*U.S. v. Lummi Indian Tribe,* 235 F.3d 443, 452 (9th Cir. 2000). Hearsay not within any exception (Fed. R. Evid. 805). Best evidence rule, Fed. R. Evid. 1002.<br><br>This Court has already ruled: "[P]hlebotomist unavailability appears to have been part of Quest's plan. Quest's waiting rooms are generally unattended; the kiosk communicates to phlebotomists "in the back" that a patient has arrived, and the phlebotomist comes out of "the back" to invite patients into a draw room. See Walsh Dep. at PA0663:9-20 [Doc. # 106-5]; see also SUF B34. Phlebotomists come out periodically to invite patients into a draw room, and a patient who could not use the kiosk could speak to a phlebotomist then, but Quest's system was designed to make phlebotomists available only sometimes." (Dkt. 144, at 13:3-6.)<br><br>This is an impermissible attempt at reconsideration of the Court's prior ruling that does not meet the requirements of Local Rule 7-18. |
| 2. Carr Decl., Paragraph 4 (4:13-14): | Sham Declaration (*Cleveland v. Policy Mgmt. Systems Corp.*, 526 U.S. 795, 806 (1999); *Van Asdale v.* |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| "Potential financial benefits played no role in the reasons or motivations for this Kiosk project." | *International Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009)). Lack of Personal Knowledge. (F.R.E. 602) Hearsay. (F.R.E. 801-804)<br><br>Mr. Carr's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:<br><br>Miller Dec. at Ex. 5: Carr Dep., 247:3-11:<br>Q. But I'm asking, these cost items were factored into this CapEx; isn't that true?<br>A. This is an appendix that potentially not every line item went into the final CapEx.<br>Q. Understood. But these were things that were being considered by the team, right? -- these cost items in preparing the CapEx, right?<br>A. There was a lot of considerations with some of these probably being many of them.<br><br>*See also,* Miller Dec. at. Ex. 5: Carr Dep., 261:20-263:2 (stating that he does not know the financial considerations or whether there were discussions about internal rate of return, responding "you would have to ask somebody in finance.").<br><br>Carr did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in |

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | violation of the sham affidavit doctrine. |
| 3.  <u>Carr Decl., Paragraph 5 (4:19-27):</u><br><br>"Contrary to the suggestion I have seen from Plaintiffs that the Kiosk project was designed to reduce the amount of time that PSRs spend in the waiting rooms (or in order to "keep them in back"), the opposite is true. First, the time PSRs previously spent on paperwork and data entry was now available for patient interactions in both the specimen draw rooms and in the waiting rooms. Second, the mere fact that Quest projected that it could see more patients as a result of this time savings, and assuming that projection bore out, would only mean that the PSRs were in the waiting room to retrieve patients more frequently to assist patients, not less." | Law of the case doctrine (*Lummi Indian Tribe,* 235 F.3d at 452. Hearsay not within any exception (Fed. R. Evid. 805). Best evidence rule, Fed. R. Evid. 1002.<br><br>This Court has already ruled: "[P]hlebotomist unavailability appears to have been part of Quest's plan. Quest's waiting rooms are generally unattended; the kiosk communicates to phlebotomists "in the back" that a patient has arrived, and the phlebotomist comes out of "the back" to invite patients into a draw room. *See* Walsh Dep. at PA0663:9-20 [Doc. # 106-5]; see also SUF B34. Phlebotomists come out periodically to invite patients into a draw room, and a patient who could not use the kiosk could speak to a phlebotomist then, but Quest's system was designed to make phlebotomists available only sometimes." (Dkt. 144, at 13:3-6.)<br><br>This is an impermissible attempt at reconsideration of the Court's prior ruling that does not meet the requirements of Local Rule 7-18. |
| 4.  <u>Carr Decl., Paragraph 6 (5:2-5):</u><br><br>"In late 2019 and early 2020, I helped oversee an extensive, months-long exploration at Quest of methods it could use to make its check-in processes at PSCs independently accessible to the blind, even in the absence of assistance by Quest phlebotomists." | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Mr. Carr's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

contradicts his sworn deposition testimony as follows:

Miller Dec. at. Ex. 5: Carr Dep., 36:11-37:7: Mr. Carr did not work on the e-Check-in project in 2019 and became re-involved in the e-check-in project when COVID-19 rose to prominence.

Miller Dec. at. Ex. 5: Carr Dep., 155:4-17: Mr. Carr did not know whose idea it was to implement the three-finger swipe and that he did not come up with the three-finger swipe as an option.

Miller Dec. at. Ex. 5: Carr Dep., 177:15-22: Mr. Carr did not know if, prior to the decision to implement the three-finger swipe, Quest ever went back and surveyed visually impaired Quest patients who had difficulty accessing the e-check-in service to see what their experiences were like.

Miller Dec. at. Ex. 5: Carr Dep., 179:9-19: Mr. Carr wasn't involved in the next steps in implementing the three-finger swipe after he obtained feedback from the Las Vegas 2020 focus group and that he didn't have any participation in the three-finger swipe after the focus group.

Miller Dec. at. Ex. 5: Carr Dep., 159:1-8: Mr. Carr did not know if he assisted in any manner in coming up with the audio messaging that would be relayed to blind patients using the three-finger swipe.

6

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | Carr did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 5.  <u>Carr Decl., Paragraph 7 (5:6-10):</u><br><br>"Quest solicited feedback from three different groups (including focus groups) of blind individuals or individuals who worked with accommodating the blind to understand what these blind consumers wanted when interacting with electronic technology. Quest used this feedback in developing the Three Finger Swipe enhancement." | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Mr. Carr's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:<br><br>Miller Dec. at Ex. 5: Carr Dep., 171:13-16: Mr. Carr was instructed not to answer "what specifically were the takeaways that you had from this [Las Vegas 2020] focus group" on grounds of privilege.<br><br>Miller Dec. at Ex. 5: Carr Dep., 208:3-18: Mr. Carr was instructed not to answer whether Quest gave "any consideration on whether it could implement speech output at the e-check-in kiosk that would allow a blind user to independently navigate through the kiosk workflow and check in themselves," on grounds of privilege.<br><br>Miller Dec. at Ex. 5: Carr Dep., 211:8-12; 211:15-25; 212:2-10; |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

| | |
|---|---|
| | 212:24-213:8; 213:13-24: Mr. Carr was instructed multiple times not to answer questions whether Quest considered anything "as part of the three-finger swipe process" other than in connection with the Las Vegas 2020 focus group. |
| | Miller Dec. at. Ex. 5: Carr Dep., 174:9-16: Once Quest made the decision to implement the three-finger swipe, Mr. Carr was not involved in nor was aware of any further effort to obtain feedback from visually impaired individuals as to whether it was an effective means of checking in. |
| | Miller Dec. at. Ex. 5: 217:1-7: Mr. Carr did not know if, in settling on the three-finger swipe options, Quest took into consideration the complaints of Plaintiffs in this litigation. |
| | Miller Dec. at. Ex. 5: Carr Dep., 370:5-13: Mr. Carr did not know whether Quest considered any information gathered from "Wright State" when implementing three-finger swipe. (Wright State was one of the focus groups from whom Quest purportedly obtained feedback). |
| | Miller Dec. at. Ex. 5: Carr Dep., 387:2-389:20: Mr. Carr was instructed not to answer when asked whether Quest considered the feedback of the focus group as it related to screen-reader technology and voiceover capabilities. |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | Miller Dec. at. Ex. 5: Carr. Dep., 380:12-382:3: Mr. Carr did not recall tactile strips being implemented on the floors of their PSCs after receiving feedback from the focus group.<br><br>Carr did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
|---|---|
| 6.  Carr Decl., Paragraph 8 (5:11-16):<br><br>"For example, the Three Finger Swipe enhancement utilized finger swiping "gestures" that we had learned from these meetings were familiar to the blind from their use of iPhones and other smartphones and similar touchscreen technology. In addition, and critical to our thinking about the options available to us, we learned from these meetings that it was the preference of blind consumers to use their own devices, as opposed to devices supplied by the businesses they patronized." | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Mr. Carr's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:<br><br>Miller Dec. at. Ex. 5: Carr Dep., 172:17-23: When asked what he learned from the focus group participants, Mr. Carr testified "there was four key elements, and preparation was everything for the visually impaired. Structure is key, use audio, and have employees that are trained to be highly helpful and sensitive to ADA needs."<br><br>Miller Dec. at. Ex. 5: Carr Dep., 174:19-24: Mr. Carr testified there was no other feedback he learned from the focus group in 2020 other than |

9

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | already testified to. Mr. Carr said nothing about the familiarity of finger-swiping gestures despite being directly asked about what was learned from the focus group.

Miller Dec. at. Ex. 5: Carr Dep., 370:5-13: Mr. Carr did not know whether Quest considered any information gathered from "Wright State" when implementing three-finger swipe. (Wright State was one of the focus groups from whom Quest purportedly obtained feedback).

Miller Dec. at. Ex. 5: Carr Dep., 387:2-389:20: Mr. Carr was instructed not to answer when asked whether Quest considered the feedback of the focus group as it related to screen-reader technology and voiceover capabilities.

Miller Dec. at. Ex. 5: Carr Dep., 380:12-382:3: Mr. Carr did not recall tactile strips being implemented on the floors of their PSCs after receiving feedback from the focus group.

Carr did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 7.  Carr Decl., Paragraph 9 (5:17-6:3):

"Based on feedback from these different groups and their advocates, the Three | Sham Declaration (*Cleveland*, 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

Finger Swipe enhancement was designed to be independently accessible to blind patients at PSCs, with or without the assistance of Quest phlebotomists. In summary, the Three Finger Swipe enhancement consisted of three components: (1) enabling the Kiosks to automatically check in patients who applied three fingers to the screen of the Kiosk and "swiped" in any direction, and to then provide an audio message that the patient had been assigned a generic patient number and would be called back to the specimen draw room when it was their turn to be seen—and further providing an electronic notification to the Quest phlebotomist at the PSC that an individual with visual impairments had checked in at the PSC: (2) an audio message playing on loop on the Quest TVs in the PSC waiting rooms that instructed patients how to apply the Three Finger Swipe to the Kiosks; and (3) enhanced training of PSC staff to train them on the Three Finger Swipe methodology and reinforce longstanding training on assisting patients, including patients with disabilities, who need assistance at PSCs."

(F.R.E. 602); Hearsay (F.R.E. 801-804).

Mr. Carr's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:

Miller Dec. at. Ex. 5: Carr Dep., 172:17-23: When asked what he learned from the focus group participants, Mr. Carr testified "there was four key elements, and preparation was everything for the visually impaired. Structure is key, use audio, and have employees that are trained to be highly helpful and sensitive to ADA needs."

Miller Dec. at. Ex. 5: Carr Dep., 174:19-24: Mr. Carr testified there was no other feedback he learned from the focus group in 2020 other than already testified to. Mr. Carr said nothing about the familiarity of finger-swiping gestures despite being directly asked about what was learned from the focus group.

Miller Dec. at. Ex. 5: Carr Dep., 196:8-197:5: Mr. Carr did not know if the audio loop differed from PSC to PSC in terms of its length, or whether the audio loop differed in terms of its length or content, or whether there were locations where audio loop can take as long as 30 minutes before it is repeated.

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | Miller Dec. at. Ex. 5: Carr Dep., 203:1-8: Mr. Carr did not know whether, when a customer walks in the waiting room, if the first audio instruction they hear is from the audio loop on the LCD monitor. |
| | Miller Dec. at. Ex. 5: Carr Dep., 370:5-13: Mr. Carr did not know whether Quest considered any information gathered from "Wright State" when implementing three-finger swipe. (Wright State was one of the focus groups from whom Quest purportedly obtained feedback). |
| | Miller Dec. at. Ex. 5: Carr Dep., 387:2-389:20: Mr. Carr was instructed not to answer when asked whether Quest considered the feedback of the focus group as it related to screen-reader technology and voiceover capabilities. |
| | Miller Dec. at. Ex. 5: Carr Dep., 380:12-382:3: Mr. Carr did not recall tactile strips being implemented on the floors of their PSCs after receiving feedback from the focus group. |
| | Carr did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 8.  Carr Decl., Paragraph 10 (6:4-7): "The TFS capability was installed on all PSC Kiosks as of August 2020. The audio message on the Quest TVs at all PSCs | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

| | |
|---|---|
| was activated in January 2021, and the enhanced training was rolled out and assigned to all PSC employees in March 2021." | Mr. Carr's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:

Miller Dec. at. Ex. 5: Carr Dep., 179:9-19: Mr. Carr wasn't involved in implementing the three-finger swipe after he obtained feedback from the Las Vegas 2020 focus group, and he didn't have any participation in the three-finger swipe after the focus group.

Miller Dec. at. Ex. 5: Carr Dep., 159:1-8: Mr. Carr "did not know" if he assisted in any manner in coming up with the audio messaging that would be relayed to blind patients using the three-finger swipe.

Miller Dec. at. Ex. 5: Carr Dep., 196:8-197:5: Mr. Carr did not know if the audio loop differed from PSC to PSC in terms of its length, or whether the audio loop differed in terms of its length or content, or whether there were locations where audio loop can take as long as 30 minutes before it is repeated.

Miller Dec. at. Ex. 5: Carr Dep., 203:1-8: Mr. Carr did not know whether, when a customer walks in the waiting room, if the first audio instruction they hear is from the audio loop on the LCD monitor. |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | Carr did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 9. <u>Carr Decl., Paragraph 11 (6:8-18)</u>:<br><br>"Moreover, the TFS capability remains active and in use at all of our PSCs. Last week, one of our Software Engineering Managers was asked to generate a spreadsheet containing all of the three finger swipes recorded at all of the PSCs in the prior six months. Attached as Exhibit 22 to the Defendants' Appendix of Evidence is a true and correct copy of excerpts of that very large spreadsheet. Listed in Column A of the spreadsheet is the three-character code that identifies the PSC at which each TFS was made. Listed in Column B is the date and time of each swipe at that particular PSC. As noted in that spreadsheet, there have been almost 62,000 recorded instances of the Three Finger Swipe being used at PSCs, approximately a thousand times per month, or approximately five instances of the TFS per PSC each month." | Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Mr. Carr testified at deposition he was not involved in implementing the TFS after the focus group (Miller Dec. at. Ex. 5: Carr Dep., 179:9-19), and thus he lacks any personal knowledge to authenticate the hearsay document produced after the close of discovery, in violations of Rule 26 and 37. |
| 10. <u>Carr Decl., Paragraph 12 (6:19-25)</u>:<br><br>"While that is powerful evidence of the viability and active use of the Three Finger Swipe, I wanted to see if the data could help us determine how broadly TFS is being used, namely, at how many different PSCs. So, we applied a formula to the data in the spreadsheet to identify the number of unique PSCs listed in the spreadsheet. When we applied that | Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Mr. Carr testified at deposition he was not involved in implementing the TFS after the focus group (Miller Dec. at. Ex. 5: Carr Dep., 179:9-19), and thus he lacks any personal knowledge to authenticate the hearsay document or purported discussions with |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| formula, which can be found in Cell F3 of an attached excerpt from the spreadsheet, we were able to determine that the TFS has been used at 2,168 distinct PSCs." | undisclosed other persons produced after the close of discovery, in violations of Rule 26 and 37. |
| 11. Carr Decl., Paragraph 13 (6:27-7:9):<br><br>"As noted above, Quest was not motivated by financial concerns in designing the Kiosk. Nor did it consider the alternative means of check-in Plaintiffs later pressed for in this litigation (tactile keyboard, voice-over functionality, headphone jack for private communication and implicitly headphones for the patients to use) until after the commencement of this litigation. The "undue administrative burden" that Quest asserts derives instead from switching the means of effective communication used after already rolling out the existing Kiosks to more than 2,100 PSCs. In contrast, the Three Finger Swipe solution that Quest implemented worked well within the framework and infrastructure that we had already built." | Sham Declaration (*Cleveland*, 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Mr. Carr's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:<br>Miller Dec. at. Ex. 5: Carr Dep., 100:19-25: testified he did not know if the utilization of the headphone jack would impose an undue burden.<br><br>Miller Dec. at. Ex. 5: Carr Dep., 102:12-103:5: testified he did not know if that analysis was ever undertaken as to whether adding the headphone jack would impose an undue financial burden on Quest; also testified there were no documents that would refresh his recollection on this point.<br><br>Carr did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 12. Carr Decl., Paragraph 13(a) (7:10-18): | Sham Declaration (*Cleveland*, 526 U.S. at 806; *Van Asdale*, 577 F.3d at |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| "The Kiosks and all component parts of the Kiosks would be collectively exposed to the tens of millions of patients that Quest hosts at its PSCs every year, year after year. There is a general operating principle in the development of technology to reduce the number of breakable parts. Plaintiffs' proposal added at least a keyboard and headphones as potential breakable parts that would have to be maintained and/or replaced. Unlike the tablet itself, which is firmly housed in a set casing, it would be much more difficult to secure the keyboard and headphones." | 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). <br><br> Mr. Carr's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows: <br><br> Miller Dec. at. Ex. 5: Carr Dep., 100:19-25: testified he did not know if the utilization of the headphone jack would impose an undue burden. <br><br> Miller Dec. at. Ex. 5: Carr Dep., 102:12-103:5: testified he did not know if that analysis was ever undertaken as to whether adding the headphone jack would impose an undue financial burden on Quest; also testified there were no documents that would refresh his recollection on this point. <br><br> Carr did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 13. Carr Decl., Paragraph 13(b) (7:19-25): <br><br> "By the time Plaintiffs made their proposal, Quest was already considering plans to use the headphone jack on the iPad tablet to provide a data port for the camera in its proposed scanning device to scan in insurance cards and drivers' | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). <br><br> Mr. Carr's declaration submitted in opposition to Plaintiffs' summary |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| licenses. Keeping the headphone jack for the occasional (and statistically infrequent) blind customer who wanted to hear private, verbal information from the Kiosk would foreclose use of the headphone jack for the scanning of insurance cards and drivers' licenses for all patients." | judgment motion impermissibly contradicts his sworn deposition testimony as follows:<br><br>Miller Dec. at. Ex. 5: Carr Dep., 100:19-25: testified he did not know if the utilization of the headphone jack would impose an undue burden.<br><br>Miller Dec. at. Ex. 5: Carr Dep., 102:12-103:5: testified he did not know if that analysis was ever undertaken as to whether adding the headphone jack would impose an undue financial burden on Quest; also testified there were no documents that would refresh his recollection on this point.<br><br>Carr did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 14. Carr Decl., Paragraph 13(c) (7:26-8:2):<br><br>"By the time Plaintiffs made their proposal, Quest was also made aware that Apple and other devices were planning to phase out their headphone jacks over time in favor of wireless connection to the device. Thus, over time, the headphone jack proposal was not likely sustainable over any extended period of time." | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Mr. Carr's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:<br><br>Miller Dec. at. Ex. 5: Carr Dep., 100:19-25: testified he did not know if |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | the utilization of the headphone jack would impose an undue burden. |
| | Miller Dec. at Ex. 5: Carr Dep., 102:12-103:5: testified he did not know if that analysis was ever undertaken as to whether adding the headphone jack would impose an undue financial burden on Quest; also testified there were no documents that would refresh his recollection on this point. |
| | Carr did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 15. Carr Decl., Paragraph 13(d) (8:3-7): "The rollout of this new equipment for each of the Kiosks in over 2,100 PSCs would involve a massive effort of a team of technicians, who would need to be trained in the installation and use of the new equipment. New documentation would also need to be generated and rolled out. New training would also be required for local PSC staff." | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). Mr. Carr's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows: Miller Dec. at Ex. 5: Carr Dep., 100:19-25: testified he did not know if the utilization of the headphone jack would impose an undue burden. Miller Dec. at Ex. 5: Carr Dep., 102:12-103:5: testified he did not know if that analysis was ever undertaken as to whether adding the |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | headphone jack would impose an undue financial burden on Quest; also testified there were no documents that would refresh his recollection on this point.<br><br>Carr did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 16.Carr Decl., Paragraph 13(e) (8:8-12):<br><br>"The installation of new equipment in each of the more than 2,100 PSCs would also be a multi-year project. In contrast, the Three Finger Swipe capabilities could be accomplished by download from a central location to all existing Kiosks at one time." | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br>Mr. Carr's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:<br><br>Miller Dec. at. Ex. 5: Carr Dep., 100:19-25: testified he did not know if the utilization of the headphone jack would impose an undue burden.<br><br>Miller Dec. at. Ex. 5: Carr Dep., 102:12-103:5: testified he did not know if that analysis was ever undertaken as to whether adding the headphone jack would impose an undue financial burden on Quest; also testified there were no documents that would refresh his recollection on this point. |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

| | Miller Dec. at Ex. 5: Carr Dep., 179:9-19: testified at deposition he was not involved in implementing the TFS after the focus group.<br><br>Carr did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 17. Carr Decl., Paragraph 13(f) (8:13-17):<br><br>"During any such phased rollout, Quest would necessarily be monitoring and maintaining two different systems, with two different systems of operation, compelling those responsible for monitoring and maintaining to learn, understand, and operate both monitoring and maintenance functions under two different systems." | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Mr. Carr's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:<br><br>Miller Dec. at Ex. 5: Carr Dep., 100:19-25: testified he did not know if the utilization of the headphone jack would impose an undue burden.<br><br>Miller Dec. at Ex. 5: Carr Dep., 102:12-103:5: testified he did not know if that analysis was ever undertaken as to whether adding the headphone jack would impose an undue financial burden on Quest; also testified there were no documents that would refresh his recollection on this point. |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | Carr did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 18. Carr Decl., Paragraph 13(g) (8:18-22): <br><br> "During my meetings with blind consumers and other representatives of the blind community, it was made emphatically clear to me that the blind (like most other consumers) strongly and increasingly preferred to use their own devices (namely, their smartphones) to interact with businesses than to use the devices designed and provided by businesses." | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). <br><br> Mr. Carr's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows: <br><br> Miller Dec. at. Ex. 5: Carr Dep., 171:13-16: instructed not to answer "what specifically were the takeaways that you had from this [Las Vegas 2020] focus group" on grounds of privilege. <br><br> Miller Dec. at. Ex. 5: Carr Dep., 208:3-18: instructed not to answer whether Quest gave "any consideration on whether it could implement speech output at the e-check-in kiosk that would allow a blind user to independently navigate through the kiosk workflow and check in themselves," on grounds of privilege. <br><br> Miller Dec. at. Ex. 5: Carr Dep., 211:8-12; 211:15-25; 212:2-10; 212:24-213:8; 213:13-24: instructed |

N̲ʏᴇ, S̲ᴛɪʀʟɪɴɢ, H̲ᴀʟᴇ & M̲ɪʟʟᴇʀ<br>33 Wᴇsᴛ Mɪssɪᴏɴ Sᴛʀᴇᴇᴛ, Sᴜɪᴛᴇ 201<br>Sᴀɴᴛᴀ Bᴀʀʙᴀʀᴀ, Cᴀʟɪғᴏʀɴɪᴀ  93101

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | multiple times not to answer questions whether Quest considered anything "as part of the three-finger swipe process" other than in connection with the Las Vegas 2020 focus group.<br><br>Miller Dec. at. Ex. 5: Carr Dep., 387:2-389:20: instructed not to answer when asked whether Quest considered the feedback of the focus group as it related to screen-reader technology and voiceover capabilities.<br><br>Carr did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 19. Carr Decl., Paragraph 13(h) (8:23-9:1):<br><br>"Among the reasons that blind consumers expressed a preference to use their own phones was familiarity with their own devices and how they worked and also the difficulty experienced locating the devices deployed by businesses and the different component parts of those devices, like the keyboard and headphones that Plaintiffs seek. If Quest went to the significant effort to deploy this extra equipment, it may be in vain as the target audience may not be able to locate and/or want to use the equipment." | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Mr. Carr's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:<br><br>Miller Dec. at. Ex. 5: Carr Dep., 171:13-16: instructed not to answer "what specifically were the takeaways that you had from this [Las Vegas 2020] focus group" on grounds of privilege. |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | Miller Dec. at. Ex. 5: Carr Dep., 208:3-18: instructed not to answer whether Quest gave "any consideration on whether it could implement speech output at the e-check-in kiosk that would allow a blind user to independently navigate through the kiosk workflow and check in themselves," on grounds of privilege. |
| | Miller Dec. at. Ex. 5: Carr Dep., 387:2-389:20: instructed not to answer when asked whether Quest considered the feedback of the focus group as it related to screen-reader technology and voiceover capabilities. |
| | Carr did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 20. Carr Decl., Paragraph 14 (9:3-9): <br><br> "It is my understanding that Plaintiffs have complained that certain features or functionalities of the Kiosk are not independently accessible to the legally blind. In meeting with blind consumers and representatives of the blind community, I met an individual who was legally blind because his field of vision was limited, but he could see within that field of visions. That individual said that he was able to use touchscreen technology. Others attending corroborated this individual's experience applied to others who are legally blind." | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). <br><br> Mr. Carr's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows: <br><br> Miller Dec. at. Ex. 5: Carr Dep., 171:13-16: instructed not to answer "what specifically were the takeaways that you had from this [Las Vegas |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | [2020] focus group" on grounds of privilege. |
| | Miller Dec. at. Ex. 5: Carr Dep., 208:3-18: instructed not to answer whether Quest gave "any consideration on whether it could implement speech output at the e-check-in kiosk that would allow a blind user to independently navigate through the kiosk workflow and check in themselves," on grounds of privilege. |
| | Miller Dec. at. Ex. 5: Carr Dep., 387:2-389:20: instructed not to answer when asked whether Quest considered the feedback of the focus group as it related to screen-reader technology and voiceover capabilities. |
| | Carr did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 21. Carr Decl., Paragraph 15 (9:11-16): "It is my further understanding that Plaintiffs have complained that the Kiosk asks patients if they are experiencing Covid symptoms and that that functionality or feature is not independently accessible to the blind. That functionality or feature is no longer present on Quest's Kiosks, which are in a regular state of change, with new features and functionalities considered, evaluated | Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). Mr. Carr testified at deposition he was not involved in implementing the TFS after the focus group (Miller Dec. at. Ex. 5: Carr Dep., 179:9-19), and thus he lacks any personal knowledge to make a declaration as to this new information produced after the close of discovery, in violations of Rule 26 and 37. |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST STIRLING STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| and sometimes added and others removed." | |
| 22. Carr Decl., Paragraph 21 (11:3-10):<br><br>"The check-in system that preceded the Kiosks – paper and pen sign-in sheets – relied on the assistance of the PSRs staffing the PSCs. We have always expected that we would have patients who could not, or did not want to use, the Kiosks to check in. For example, we have non-disabled patients who cannot read, and we expected our PSRs (and phlebotomists) to continue to make themselves available to assist these patients with check-in and all other functionalities at the Kiosks and/or take them in the back and check them in there and offer any functionalities available at the Kiosks in the draw rooms." | Law of the case doctrine (*U.S. v. Lummi Indian Tribe,* 235 F.3d 443, 452 (9th Cir. 2000). Hearsay not within any exception (Fed. R. Evid. 805). Best evidence rule, Fed. R. Evid. 1002.<br><br>This Court has already ruled: "[P]hlebotomist unavailability appears to have been part of Quest's plan. Quest's waiting rooms are generally unattended; the kiosk communicates to phlebotomists "in the back" that a patient has arrived, and the phlebotomist comes out of "the back" to invite patients into a draw room. See Walsh Dep. at PA0663:9-20 [Doc. # 106-5]; see also SUF B34. Phlebotomists come out periodically to invite patients into a draw room, and a patient who could not use the kiosk could speak to a phlebotomist then, but Quest's system was designed to make phlebotomists available only sometimes." (Dkt. 144, at 13:3-6.)<br><br>This is an impermissible attempt at reconsideration of the Court's prior ruling that does not meet the requirements of Local Rule 7-18. |
| 23. Carr Decl., Paragraph 23 (11:17-12:2):<br><br>"First, there are many factors that influence the order in which patients are served at the PSCs that has absolutely nothing to do with the order in which patients check in. Scheduled | Law of the case doctrine (*U.S. v. Lummi Indian Tribe,* 235 F.3d 443, 452 (9th Cir. 2000). Hearsay not within any exception (Fed. R. Evid. 805). Best evidence rule, Fed. R. Evid. 1002. |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

appointments, an increasingly popular choice within Quest, always take priority and are honored without regard to when any of the patients (those with and without appointments) checked in. Thus, a completely blind person with an appointment who experiences difficulty with check in will be serviced at her or his appointment time, regardless of when she or he checks in. In addition, phlebotomists exercise complete discretion in taking patients out of order for any number of reasons. For example, anyone experiencing difficulty in using the Kiosk, particularly if they share that difficulty and their arrival time at the PSC with the phlebotomist, could be taken ahead of others who were able to check in while that patient waited. Furthermore, phlebotomists have the discretion to take patients out of order in the case of medical emergencies, patients experiencing high levels of distress or other urgent circumstances."

This Court has already ruled: "[P]hlebotomist unavailability appears to have been part of Quest's plan. Quest's waiting rooms are generally unattended; the kiosk communicates to phlebotomists "in the back" that a patient has arrived, and the phlebotomist comes out of "the back" to invite patients into a draw room. See Walsh Dep. at PA0663:9-20 [Doc. # 106-5]; see also SUF B34. Phlebotomists come out periodically to invite patients into a draw room, and a patient who could not use the kiosk could speak to a phlebotomist then, but Quest's system was designed to make phlebotomists available only sometimes." (Dkt. 144, at 13:3-6.)

This is an impermissible attempt at reconsideration of the Court's prior ruling that does not meet the requirements of Local Rule 7-18.

Further, contradicts his prior sworn testimony (sham affidavit doctrine) which never stated scheduled appointments take priority, but rather, phlebotomists make the decisions on who got served next based on the circumstances. (Miller Dec. at Ex. 5: Carr Dep., 44:18-25.)

Further contradictions in his prior testimony:
Miller Dec. at Ex. 5: Carr Dep., 138:23-139:14: testified that the process of determining who was in the queue was to factor in who made appointments versus who walked in in terms of deciding what order they

| | |
|---|---|
| | should be served became an automated function with the kiosks instead of requiring the phlebotomist to figure it out.<br><br>Miller Dec. at. Ex. 5: Carr Dep., 237:14-21: testified that a benefit of moving forward with e-Check-in service was for patients to better know where they were in the queue.<br><br>Carr did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 24. <u>Carr Decl., Paragraph 24 (12:3-8):</u><br><br>"All patients, including blind patients, can check in and utilize nearly all of the features of the Kiosks on the internet, which they can access with their phones. Among other things, all patients who make online appointments can select the "wait where you want" function when making appointments. Quest phlebotomists and PSRs are available to assist patients at the PSCs to use all features and functionalities of the Kiosks." | Sham Declaration (*Cleveland*, 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Mr. Carr's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:<br>Carr Dep., Miller Dec. at. Ex. 5 to Appendix of Exhibits (Dkt. 207-2), at PA0049-I: testified that the "Wait Where You Want" functionality was a component within e-Check-in that can be used. "Q: Once you go and you use the e-Check-in service, you can – one of the those screens allows you to put in your information to wait where you want, right? A: Yes." |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

Nye, Stirling, Hale & Miller
33 West Mission Street, Suite 201
Santa Barbara, California 93101

|  |  |
|---|---|
| Carr did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |

## OBJECTIONS TO THE DECLARATION OF CHRISTOPHER GRANT

### Dkt. 236-7 (Ex. 2 to Quest's Opposition)

Mr. Grant is a Quest executive. He testified in his individual capacity and was deposed on April 20, 2021.

| EVIDENCE OBJECTED TO: | GROUNDS FOR OBJECTION: |
|---|---|
| 25. Grant Decl., Paragraph 3 (3:20-26).<br><br>"Among other things, there was no plan to reduce then-existing PSC staff or to replace PSC staff with Kiosks. None of the documents that I authored or co-authored or approved in connection with the Kiosk project, include the 'business case,' contained any plan to reduce PSC staff or to replace PSC staff with Kiosks." | Law of the case doctrine (*U.S. v. Lummi Indian Tribe,* 235 F.3d 443, 452 (9th Cir. 2000). Hearsay not within any exception (Fed. R. Evid. 805). Best evidence rule, Fed. R. Evid. 1002.<br><br>This Court has already ruled: "[P]hlebotomist unavailability appears to have been part of Quest's plan. Quest's waiting rooms are generally unattended; the kiosk communicates to phlebotomists "in the back" that a patient has arrived, and the phlebotomist comes out of "the back" to invite patients into a draw room. See Walsh Dep. at PA0663:9-20 [Doc. # 106-5]; see also SUF B34. Phlebotomists come out periodically to invite patients into a draw room, and a patient who could not use the kiosk could speak to a phlebotomist then, but Quest's system was designed to make phlebotomists available only sometimes." (Dkt. 144, at 13:3-6.) |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | This is an impermissible attempt at reconsideration of the Court's prior ruling that does not meet the requirements of Local Rule 7-18. |
| 26. Grant Decl., ¶ 4 (3:27-4:5).<br><br>"At the time the Kiosk project was proposed, we expected that the move away from paper check-in to electronic check-in would result in a reduction of the amount of time that Patient Service Representatives ("PSRs") would have to spend on the paperwork made necessary by the prior, paper check-in system. This time saving would only *increase* the amount of time that PSRs (which include phlebotomists) would spend with patients, including the amount of time PSRs could spend in the waiting rooms assisting patients." | Law of the case doctrine (*U.S. v. Lummi Indian Tribe,* 235 F.3d 443, 452 (9th Cir. 2000). Hearsay not within any exception (Fed. R. Evid. 805). Best evidence rule, Fed. R. Evid. 1002.<br><br>This Court has already ruled: "[P]hlebotomist unavailability appears to have been part of Quest's plan. Quest's waiting rooms are generally unattended; the kiosk communicates to phlebotomists "in the back" that a patient has arrived, and the phlebotomist comes out of "the back" to invite patients into a draw room. See Walsh Dep. at PA0663:9-20 [Doc. # 106-5]; see also SUF B34. Phlebotomists come out periodically to invite patients into a draw room, and a patient who could not use the kiosk could speak to a phlebotomist then, but Quest's system was designed to make phlebotomists available only sometimes." (Dkt. 144, at 13:3-6.)<br><br>This is an impermissible attempt at reconsideration of the Court's prior ruling that does not meet the requirements of Local Rule 7-18.<br><br>This also violates the sham affidavit doctrine (*Cleveland,* 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998), as Grant previously testified he did not know the reasons for moving from paper |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | sign-in to electronic. (Q: And if you can remember, sir, what were the reasons for moving from the paper sign-in to the express check-in? A: You know, I'd have to have a document in front of me to be accurate in my answer to you. Q: You can't remember one of the reasons? A: Off the top of my head, I'd be speculating.") Miller Dec. at. Ex. 7: Grant Dep., 57:7-14. |
| | Grant did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 27. Grant Decl., ¶ 5 (4:6-13). "Any suggestion that the Kiosk project was designed to reduce the amount of time that PSRs spend in the waiting rooms (or in order to 'keep them in the back') lacks both logic and factual support. The opposition is true. First, the time PSRs previously spent on paperwork was now available for patient interactions in both the specimen draw rooms and in the waiting rooms. Second, the mere fact that Quest *projected* that it could see more patients as a result of this time savings, and assuming that projection bore out, would only mean that the PSRs were in the waiting room to retrieve patients more *frequently*." | Law of the case doctrine (*U.S. v. Lummi Indian Tribe,* 235 F.3d 443, 452 (9th Cir. 2000). Hearsay not within any exception (Fed. R. Evid. 805). Best evidence rule, Fed. R. Evid. 1002. This Court has already ruled: "[P]hlebotomist unavailability appears to have been part of Quest's plan. Quest's waiting rooms are generally unattended; the kiosk communicates to phlebotomists "in the back" that a patient has arrived, and the phlebotomist comes out of "the back" to invite patients into a draw room. See Walsh Dep. at PA0663:9-20 [Doc. # 106-5]; see also SUF B34. Phlebotomists come out periodically to invite patients into a draw room, and a patient who could not use the |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

kiosk could speak to a phlebotomist then, but Quest's system was designed to make phlebotomists available only sometimes." (Dkt. 144, at 13:3-6.)

This is an impermissible attempt at reconsideration of the Court's prior ruling that does not meet the requirements of Local Rule 7-18.

This also violates the sham affidavit doctrine (*Cleveland,* 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998), as Grant previously testified he was not involved in creating any curriculum for training re: sweeping the waiting room for people with disabilities (Miller Dec. at Ex. 7: Grant Dep., at 73:2-9), and he was did not know any of the reasons for moving from paper sign-in to electronic. (Miller Dec. at Ex. 7: Grant Dep., 57:7-14).

Grant did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine.

## OBJECTIONS TO THE DECLARATION OF JODY REILLY

### Dkt. 236-8 (Ex. 3 to Quest's Opposition)

Ms. Reilly is a Quest executive. She testified as Defendants' Rule 30(b)(6) person most knowledgeable on the following topics:

- ***Topic 12***: [Quest's] maintenance, management, and/or administration policies, practices and/or procedures at [Quest's] PATIENT SERVICE CENTERS. [Reilly depo at 243:12-259:3.]

- ***Topic 13***: The maintenance, management, and/or administration policies,

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

practices and/or procedures of the E-CHECK-IN KIOSKS. [Reilly depo at 243:12-259:3.]

- ***Topic 19***: All policies or procedures maintain by [Quest] that address compliance with the ADA at YOUR PATIENT SERVICE CENTERS. [Reilly depo at 243:12-259:3.]

- ***Topic 20***: All policies or procedures maintain by [Quest] that address compliance with the REHAB ACT at [Quest's] PATIENT SERVICE CENTERS. [Reilly depo at 243:12-259:3.]

- ***Topic 21***: All policies or procedures maintained by [Quest] to ensure compliance with providing aids and auxiliary services, as defined in 28 C.F.R. 36.303 at PATIENT SERVICE CENTERS from January 1, 2016, to present. [Reilly depo at 243:12-259:3.]

- ***Topic 22***: All policies or procedures maintained by [Quest] that demonstrate each way in which [Quest] ensured effective communication, as defined in 28 C.F.R. 36.303(c),with visually impaired PERSONS during the E-CHECK-IN KIOSK check-in process, at [Quest's] PATIENT SERVICE CENTERS from January 1, 2016, to present. [Reilly depo at 243:12-259:3.]

- ***Topic 23***: The training [Quest] provide to [Quest's] employees and independent contractors RELATING to how to communicate effectively with visually impaired PERSONS during the check-in process at [Quest's] PATIENT SERVICE CENTERS. [Reilly depo at 243:12-259:3.]

- ***Topic 24***: All complaints [Quest] have received from January 1, 2016, to the present from many individual [Quest] know to be legally blind alleging difficulty accessing the E-CHECK-IN at [Quest's] PATIENT SERVICE CENTERS. [Reilly depo at 243:12-259:3.]

- ***Topic 30***: [Quest's] claim, in your Sixth Affirmative Defense, that Plaintiffs failed to request a reasonable modification of policies, practices or procedures and/or Plaintiffs failed to request an auxiliary aid or service.  [Reilly depo at

243:12-259:3.]

Ms. Reilly was deposed on April 20, 2021.

| EVIDENCE OBJECTED TO: | GROUNDS FOR OBJECTION: |
|---|---|
| 28. Reilly Decl. ¶ 3 (1:27-2:7).<br><br>"A cornerstone of Quest's training, policies, guidelines, and procedures for PSCs has been to teach, train, and require PSC employees to provide assistance to patients, including assistance and accommodations to persons with disabilities to ensure they can access Quest's services. This includes training and requiring PSC employees to scan the waiting room each time they enter to find any individuals (whether patients with disabilities or otherwise) who may need assistance, including assistance with the check-in process. Attached as Exhibit 8 to the accompanying Appendix of Evidence are true and correct copies of relevant, representative Quest training materials, standards, standard operating procedures and policies." | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Ms. Reilly's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows:<br><br>Reilly Dep., Ex. 6 to Appendix of Exhibits (Dkt. 207-2), at PA0068:14-25: could not confirm that all employees completed the "Managing Patient Needs" training.<br><br>Reilly Dep., Ex. 6 to Appendix of Exhibits (Dkt. 207-2), at PA0066:23-PA0067:14: no written ADA policy<br><br>Miller Dec. at. Ex. 6: Reilly Dep., at 270:7-272:1: patient care gold standards does not address the ADA, give any training to the ADA, nor even mentions the ADA.<br><br>Reilly did not revise this testimony in her errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements she now makes to this Court, in violation of the sham affidavit doctrine. |

N<small>YE</small>, S<small>TIRLING</small>, H<small>ALE</small> & M<small>ILLER</small><br>33 W<small>EST</small> M<small>ISSION</small> S<small>TREET</small>, S<small>UITE</small> 201<br>S<small>ANTA</small> B<small>ARBARA</small>, C<small>ALIFORNIA</small>  93101

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| 29. <u>Reilly Decl., ¶ 5 (2:12-17).</u><br><br>"I have checked with others at Quest who have informed me that the initial version of the Kiosk rolled out in 2016 and was intended to be an electronic version of the paper sign-in sheet, coupled with existing policies, procedures, standards and training requiring phlebotomists to assist with the check-in process that had worked successfully for Quest for many years before the deployment of the Kiosks." | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Ms. Reilly's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows:<br><br>Reilly Dep., Ex. 6, to Appendix of Exhibits (Dkt. 207-2) at PA0068:14-25:  could not confirm that all employees completed the "Managing Patient Needs" training.<br><br>Reilly Dep., Ex. 6, to Appendix of Exhibits (Dkt. 207-2) at PA0066:23-PA0067:14: no written ADA policy<br><br>Miller Dec. at. Ex. 6: Reilly Dep., 270:7-272:1: patient care gold standards does not address the ADA, give any training to the ADA, nor even mentions the ADA.<br><br>Reilly did not revise this testimony in her errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements she now makes to this Court, in violation of the sham affidavit doctrine. |
| 30. <u>Reilly Decl., ¶ 6 (2:21-23).</u><br><br>"Certain PSCs employ front-end employees whose primary function is to receive patients and assist with check-in, | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). |

| while others rely on the circulating phlebotomists to perform this function." | Ms. Reilly's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts previously submitted evidence: |
|---|---|
| | Ex. 23 to Appendix of Exhibits (Dkt. 207-2), at PA0281-0282: "Greeters - was a thought to have a greeter at our morning hours or busiest time to assist in check-in? With or without eCheck-in we know from patient feedback patients would like greeters. Most sites do not have greeters and there are no plans to introduce greeters as part of eCheck-in." |
| | Ex. 23 to Appendix of Exhibits (Dkt. 207-2), at PA0277-PA0280:"[t]here are no phlebotomists sitting at front desks available to help register patients." |
| | Ex. 23 to Appendix of Exhibits (Dkt. 207-2), at PA0283-PA0284: the concern is "that the staff is servicing the patients and cannot always be in front of the "house" tending to folks that are struggling with registration. You can't have both at the same time." |
| | Appendix of Exhibits (Dkt. 207-2), at QUEST-VARGAS000009816 - "There are no phlebotomists sitting at front desks available to help register patients." – internal Quest employee. |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

| | |
|---|---|
| | Suggestion was a help button "as long as it doesn't hold up the line & impede others from registering"<br><br>Reilly did not revise this testimony in her errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements she now makes to this Court, in violation of the sham affidavit doctrine. |
| 31. Reilly Decl., ¶ 8 (3:8-4:2).<br><br>"Beginning in 2009, Quest launched a "Managing Every Patient's Needs" training modules and/or videos, which were specifically designed to train phlebotomists on their obligation to provide assistance and accommodations to PSC patients with disabilities, a true and correct copy of which is attached as Exhibit 10 to the accompanying Appendix. The current, attached version was updated and rolled out for training to PSC employees in March 2021. The training instructs phlebotomists among other things that the "The ADA entitles patients with special needs certain rights when using public spaces such as our PSCs, including access to facilities, the right to have service animals accompany them, the right to reasonable modifications of policies, practices, and procedures, and the right to auxiliary aids and services, such as the use of specialized equipment that ensures their safety and facilitates their ability to move about." The training also instructs Quest phlebotomists "When going to the waiting room to call back a patient, pay | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Ms. Reilly's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows:<br>Reilly Dep., Ex. 6, to Appendix of Exhibits (Dkt. 207-2) at PA0068:14-25: could not confirm that all employees completed the "Managing Patient Needs" training.<br><br>*See also,* Magana Dep., Ex. 20 to Appendix of Exhibits (Dkt. 207-2) at PA0253:18-23 – Magana confirms it is the same bell tone for all check-ins, including TFS check-ins; Ex. 10: Magana Dep., 85:11-14 – does not remember if she has ever received a notification or training for TFS.<br><br>Reilly did not revise this testimony in her errata, and thereafter signed the deposition under penalty of perjury, |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| attention to other patients and their needs and behaviors, so you can identify any patients with visual impairments who may need assistance" and "Make yourself available to assist such patients as necessary, including assisting with navigating the waiting room and locating and using the kiosk to check in." The training also instructs phlebotomists that they may have to read aloud from forms and other textual materials and to discuss private members only in the private draw rooms. The training also provides instruction to Quest phlebotomists about an enhancement to the Kiosks at PSCs that enables blind patients to automatically check in on the kiosks using a three finger swipe gesture, without any assistance from a Quest phlebotomist. But, given the possibility that the patient may want or need assistance, the application of the TFS automatically sends a message to the phlebotomist's device, in red letters, that a "Visually Impaired" patient has checked in. All PSC employees are required to complete this training as part of new-hire training; they are also required to complete this training on an annual basis as a refresher training." | directly contradicting the statements she now makes to this Court, in violation of the sham affidavit doctrine. |
| 32. <u>Reilly Decl., ¶ 9 (4:3-111).</u><br><br>"I understand that Plaintiffs have said that I did not know at my deposition whether all PSC employees had completed the "Managing Every Patients' Needs" training. I was not prepared at that time to accurately answer that question under oath. In preparing this declaration, I checked recent training records for the | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>A deponent cannot be asked a direct question at deposition then have her counsel prepare a declaration to the contrary in order to defeat summary |

| | |
|---|---|
| 12,032 PSC employees to whom the updated training had been assigned either as new hires or as part of their refresher training cycle. Based on those records, 96% of active PSC employees to whom the training was assigned in 2021 had completed that training, including Prudencia Magana, who completed the training on March 29, 2021." | judgment. Ms. Reilly's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows: |
| | Reilly Dep., Ex. 6, to Appendix of Exhibits (Dkt. 207-2) at PA0068:14-25: could not confirm that all employees completed the "Managing Patient Needs" training. |
| | Reilly did not revise this testimony in her errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements she now makes to this Court, in violation of the sham affidavit doctrine. |
| | Additionally, the hearsay documents referenced in this paragraph were never produced in discovery, in violation of Rules 26 and 37. |
| 33. Reilly Decl., ¶ 10 (4:12-22).<br><br>"I further understand that Plaintiffs have criticized the "Managing" training for failing to mention the ADA by name. In Quest's experience and the experience of the training consultants Quest employs, it does not enhance the effectiveness of the training to expend time and trainee attention span mentioning the name of laws or regulations that the trainees do not need to know. In fact, as noted below, earlier versions of the training mentioned the ADA by name, but we removed those references in the updated training. Furthermore, while the ADA is not | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Ms. Reilly's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows:<br><br>Reilly Dep., Ex. 6, to Appendix of Exhibits (Dkt. 207-2) at PA0068:14-25: could not confirm that all |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| mentioned by name, the Affordable Care Act, a law with the same "auxiliary aids and services" requirements as the ADA, is expressly mentioned in the training, for example, on Slides 3.2 and 3.3 and in various questions in the quiz that trainees must take as part of the training." | employees completed the "Managing Patient Needs" training.<br><br>Reilly Dep., Ex. 6, to Appendix of Exhibits (Dkt. 207-2) at PA0066:23-PA0067:14: no written ADA policy<br><br>Quest's Exhibit 10 - 3.2 & 3.3 does not mention ADA. Does not mention visually impaired at all.<br>Reilly did not revise this testimony in her errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements she now makes to this Court, in violation of the sham affidavit doctrine.<br><br>Additionally, the hearsay documents referenced in this paragraph were never produced in discovery, in violation of Rules 26 and 37. |
| 34. Reilly Decl., ¶ 11 (4:23-27).<br><br>Most crucially, the training is filled with reference to ADA (and ACA) concepts covering the obligation to provide "auxiliary aids and services," including Slides 2.3, 4.5, 4.6, 4.7, 4.8, 5.21, 5.24, 5.26, 5.27 and 5.39. Several of these slides offer specific examples of how to engage in "effective communication," including instructions to read aloud to blind and visually-impaired patients. | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804); Best Evidence Rule (Fed. R. Evid. 1002).<br><br>Ms. Reilly's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows:<br><br>Reilly Dep., Ex. 6 to Appendix of Exhibits (Dkt. 207-2), at PA0066:23-PA0067:14: no written ADA policy<br><br>Reilly did not revise this testimony in her errata, and thereafter signed the |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | deposition under penalty of perjury, directly contradicting the statements she now makes to this Court, in violation of the sham affidavit doctrine.<br><br>As to the best evidence rule, the referenced slides (even if they had been produced in discovery) contain no mention of what Reilly refers to in her declaration:<br><br>2.3 does not mention ADA (2.2 does) and states only that rights of the disabled are covered by the ADA and ACA.<br>4.5 is about age – no reference to the ADA at all.<br>4.6 is about "dimensions of diversity" and there is no reference to the ADA at all.<br>4.7 is about fear and anxiety in adolescents and there is no reference to the ADA at all.<br>4.8 is about seniors – no reference to the ADA at all.<br>5.21 – assisting the patient with their signature – no reference to the ADA at all.<br>5.27 – what the phlebotomist will see in Quanum<br>5.39 – does not exist. |
| 35. Reilly Decl., ¶ 12 (4:28-5:11).<br><br>"Earlier versions of the Managing Every Patients Needs training instructed Quest phlebotomists that the "Americans with Disabilities Act gives disabled patients the right to equal service" and that "When you know and understand what is | Irrelevant (immaterial), Fed. R. Evid. 401 and 402. Hearsay, Fed. R. Evid. 802. Hearsay within hearsay, Fed. R. Evid. 805. Lack of authentication, Fed. R. Evid. 901. |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| expected of you, you can confidently provide the assistance that ADA, Quest Diagnostics, and the patient expects of you." With respect to visually impaired patients, the training instructed among other things: "Because of their vision impairment, blind and visually impaired people rely on their other senses, such as hearing, touch and smell. The more you describe things and explain procedures, the better. Be prepared to read or provide other assistance in completing forms. If you are asked to read aloud to a patient, be sensitive about privacy, do so only in a private room or area." Attached as Exhibit 11 is a sample of an earlier version of the Managing Every Patients Needs training." | |
| 36. Reilly Decl., ¶ 13 (5:12-18).<br><br>"Between 2006 and 2014, Quest had in place Patient Care Gold Standards for its Quest phlebotomists at the PSCs, which standards were designed to ensure that Quest phlebotomists consistently provided a positive patient experience. These standards required that employees "immediately acknowledge approaching patients", "provide assurances that someone will provide assistance momentarily", "explain the "registration / sign-in process and set an expectation for wait." Attached as Exhibit 12 is a copy of those Patient Care Gold Standards." | Sham Declaration (*Cleveland*, 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804); Irrelevant (immaterial), Fed. R. Evid. 401 and 402.<br><br>Ms. Reilly's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows:<br><br>Miller Dec. at. Ex. 6: Reilly Dep., 270:7-272:1: patient care gold standards does not address the ADA, give any training to the ADA, nor even mentions the ADA.<br><br>Reilly did not revise this testimony in her errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | she now makes to this Court, in violation of the sham affidavit doctrine. |
| 37. <u>Reilly Decl., ¶ 14 (5:19-24).</u><br><br>"Beginning in 2015, Quest replaced the Patient Care Gold Standards for its Quest phlebotomists at PSCs with Everyday Excellence standards which, among other things, emphasized the importance of "respectfully assist[ing] patients when they need help with the sign-in and patient registration process and keep[ing] them informed of what will happen next." Attached as Exhibit 13 is a copy of those Everyday Excellence Standards." | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Ms. Reilly's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows:<br><br>Miller Dec. at. Ex. 6: Reilly Dep., 271:14-272:1: Everyday Excellence does not address the ADA, give any training to the ADA, nor even mentions the ADA.<br><br>Reilly did not revise this testimony in her errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements she now makes to this Court, in violation of the sham affidavit doctrine. |
| 38. <u>Reilly Decl., ¶ 15 (5:25-6:6).</u><br><br>"In June 2015, Quest launched a video training entitled "I am Helpful" for its Quest phlebotomists at PSCs—which was based on the Everyday Excellence principles. Among other things, the training instructed Quest phlebotomists to "respectfully assist patients when they need help with the sign-in and patient registration process and keep them informed of what will happen next. This | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Ms. Reilly's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows: |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| means that if you're near the waiting area and you see a patient standing at the sign-in sheet ask yourself, 'What can I do to help?' Then stop and actually ask the patient: 'May I help you?' Just asking if you can help is helpful. It tells our patients that they're on your radar, they're not faceless – that you want them to have a superior experience. There's no reason for a patient to struggle when you can help easily." | Miller Dec. at Ex. 6: Reilly Dep., 212:17-213:13: never reviewed these materials, does not know if they have recently been updated, and employees are not currently required to review these materials.<br><br>Miller Dec. at Ex. 6: Reilly Dep., 270:7-272:1: video is also a part of the "patient care gold standards" which does not address the ADA, give any training to the ADA, nor even mentions the ADA. |
| 39. Reilly Decl., ¶ 16 (6:7-12).<br><br>"In June 2015, Quest launched another video training entitled "I Connect with Patients" for its Quest phlebotomists at PSCs—which was based on the Everyday Excellence principles. Among other things, the training instructed Quest phlebotomists at PSCs "When you come to the waiting area, make eye contact, smile, and greet waiting patients. Ask patients if they've had a chance to sign in. And tell them you'll be with them shortly." | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Ms. Reilly's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows:<br><br>Miller Dec. at Ex. 6: Reilly Dep., 212:17-213:13: never reviewed these materials, does not know if they have recently been updated, and employees are not currently required to review these materials.<br><br>Miller Dec. at Ex. 6: Reilly Dep., 270:7-272:1: video is also a part of the "patient care gold standards" which does not address the ADA, give any training to the ADA, nor even mentions the ADA.<br><br>Reilly did not revise this testimony in her errata, and thereafter signed the |

43

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | deposition under penalty of perjury, directly contradicting the statements she now makes to this Court, in violation of the sham affidavit doctrine. |
| 40. Reilly Decl., ¶ 18 (6:24-7:2).<br><br>"In April 2018, Quest launched another video training entitled "Patient-Focused Change" for its Quest phlebotomists at PSCs. Among other things, the training instructed Quest phlebotomists at PSCs "And don't forget, when you call a patient back for service, look around the waiting room—make sure everyone has checked in—and let our patients now that you see them." The training further provided "We know that technology can be a challenge for some patients so, if you see a patient who is struggling, offer assistance." | Sham Declaration (*Cleveland*, 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Ms. Reilly's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows:<br><br>Miller Dec. at. Ex. 6: Reilly Dep., 213:15-214:22: does not know if the video has been updated, and employees are not currently required to review these materials.<br><br>Miller Dec. at. Ex. 6: Reilly Dep., 270:7-272:1: video is also a part of the "patient care gold standards" which does not address the ADA, give any training to the ADA, nor even mentions the ADA.<br><br>Reilly did not revise this testimony in her errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements she now makes to this Court, in violation of the sham affidavit doctrine. |
| 41. Reilly Decl., ¶ 19 (7:3-12). | Sham Declaration (*Cleveland*, 526 U.S. at 806; *Van Asdale*, 577 F.3d at |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

| | |
|---|---|
| "In April 2018, supervisors at Quest PSCs were provided with a "Frontline Communication" entitled "Be Mindful and Be Helpful" that was to be provided to Quest phlebotomists at PSCs. The communication instructed Quest phlebotomists: "Our patients come from all age groups and from every walk of life. Some are skilled using technology while others may not be comfortable with anything to do with a computer. Each time you call a patient back for service, meet them in the waiting room and do not call them from the back of the hallway. Instead, step into the waiting to call your patient and check in with other waiting patients to make sure everyone has signed in. If someone is struggling with eCheck-in, be helpful and provide as much assistance as they need to get checked in."" | 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Ms. Reilly's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows:<br><br>Miller Dec. at. Ex. 6: Reilly Dep., 213:15-214:22: does not know if the video has been updated, and employees are not currently required to review these materials.<br><br>Miller Dec. at. Ex. 6: Reilly Dep., 270:7-272:1: video is also a part of the "patient care gold standards" which does not address the ADA, give any training to the ADA, nor even mentions the ADA.<br><br>Reilly did not revise this testimony in her errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements she now makes to this Court, in violation of the sham affidavit doctrine. |
| 42. Reilly Decl., ¶ 20 (7:13-19).<br><br>"In July 2018, Quest launched another video training entitled "Invite the Patient for Service" for its Quest phlebotomists at PSCs. Among other things, the training instructed Quest phlebotomists at PSCs "We also know that when patients observe you assisting other patients with eCheck-In, they pick up on your helpfulness—which to them says a lot | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Ms. Reilly's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows: |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

45

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

| | |
|---|---|
| about how you twill treat them. Keeping our patient at the center of everything we do as we evolve begins with remembering that." | Miller Dec. at. Ex. 6: Reilly Dep., 214:23-216:11: does not know if the video has been updated, and employees are not currently required to review these materials.<br><br>Miller Dec. at. Ex. 6: Reilly Dep., 270:7-272:1: video is also a part of the "patient care gold standards" which does not address the ADA, give any training to the ADA, nor even mentions the ADA.<br><br>Reilly did not revise this testimony in her errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements she now makes to this Court, in violation of the sham affidavit doctrine. |
| 43. Reilly Decl., ¶ 22 (7:26-8:8).<br><br>"Quest also has policies that address Quest's non-discrimination obligations under the partially overlapping provisions of the ADA and the Affordable Care Act. Attached as Exhibit 7 to the Appendix is a true and correct copy of Quest's Non-Discrimination Notice. I understand that Plaintiffs have criticized me for not being able to identify relevant provisions of the ADA, from memory, while sitting at the deposition. Even though I am not a lawyer and have not received legal training, I could identify relevant portions of the ADA, if provided a copy of the statute. For example, I am familiar with the language in both the "auxiliary aids and services" requirement in the statute | Sham Declaration (*Cleveland*, 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Ms. Reilly's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows:<br>Reilly Dep., Ex. 6 to Appendix of Exhibits (Dkt. 207-2), at PA0068:14-25: could not confirm that all employees completed the "Managing Patient Needs" training.<br><br>Reilly Dep., Ex. 6 to Appendix of Exhibits (Dkt. 207-2), at PA0069:3- |

46

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| and the "effective communication" requirement in the ADA regulations, which provisions are at the heart of the dispute in this case." | 20: Reilly cannot identify what portions of the ADA apply to Quest.<br><br>Reilly did not revise this testimony in her errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements she now makes to this Court, in violation of the sham affidavit doctrine. |
| 44. Reilly Decl., ¶ 25 (8:25-9:5).<br><br>"Quest staffing varies among the various PSCs. For example, certain PSCs employ front-end employees whose primary function is to receive patients and assist with check-in, while others rely on the circulating phlebotomists to perform this function. In certain areas, for example, where there is a higher percentage of elderly patients at the PSCs, we have observed that there is also a higher percentage of patients who are uncomfortable using technology, regardless of their physical capacity to do so. In those locations, Quest tends to staff more of these front-end employees." | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Ms. Reilly's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts previously submitted evidence:<br><br>Ex. 23 to Appendix of Exhibits (Dkt. 207-2), at PA0281-0282: "Greeters - was a thought to have a greeter at our morning hours or busiest time to assist in check-in? With or without eCheck-in we know from patient feedback patients would like greeters. Most sites do not have greeters and there are no plans to introduce greeters as part of eCheck-in."<br><br>Ex. 23 to Appendix of Exhibits (Dkt. 207-2), at PA0277-PA0280:"[t]here are no phlebotomists sitting at front desks available to help register patients." |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | Ex. 23 to Appendix of Exhibits (Dkt. 207-2), at PA0283-PA0284: the concern is "that the staff is servicing the patients and cannot always be in front of the "house" tending to folks that are struggling with registration. You can't have both at the same time." |
| | Reilly did not revise this testimony in her errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements she now makes to this Court, in violation of the sham affidavit doctrine. |
| | Appendix of Exhibits (Dkt. 207-2), at QUEST-VARGAS000009816 – "There are no phlebotomists sitting at front desks available to help register patients." – internal Quest employee. Suggestion was a help button "as long as it doesn't hold up the line & impede others from registering" |
| 45. Reilly Decl., ¶ 26 (9:7-12).<br><br>"Whether or not there are front-end employees assisting guests with check-in, all phlebotomists are trained to assist all patients with check-in, including all of the features and functionalities of the Kiosk. For example, phlebotomists are trained to assist with the Three Finger Swipe function on the Kiosk, or they will take patients into the draw rooms and check them in there. Phlebotomists could | Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| also assist patients with using the Kiosk's "wait where you want" function." | |
| 46. Reilly Decl., ¶ 27 (9:13-23). "Some (but not all) PSCs have Kiosks that can scan in a patient's driver's license (or other state-issued identification) and/or insurance information. Phlebotomists' training would also require them to assist with scanning in images containing this information at those PSCs whose Kiosks have that functionality. Whether or not a patient has scanned in their insurance or driving license (or other identification) information, phlebotomists are trained to check patients' drivers' licenses (or other identification) in the draw room so as to confirm that they are drawing specimens from the correct individual and to confirm insurance information as well. So, whether or not a patient has used the scanning function on some of the Kiosks in some of the PSCs, patients will be asked to provide that same information in the draw room." | Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). |
| 47. Reilly Decl., ¶ 31 (10:13-26). "First, there are many factors that influence the order in which patients are served at the PSCs that has absolutely nothing to do with the order in which patients check in. Scheduled appointment times always take priority and are honored without regard to when any of the patients (those with and without appointments) are checked in. Thus, a completely blind person with an appointment who experiences difficulty with check-in will still be serviced at her or his appointment time, regardless of | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804); Best Evidence Rule (FRE 1002). Ms. Reilly's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows: Miller Dec. at Ex. 6: Reilly Dep.,189:8-17: nothing in the training |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| when she or he checks in. In addition, phlebotomists exercise complete discretion in taking patients out of order for any number of reasons. For example, anyone experiencing difficulty in using the Kiosk, particularly if they share that difficulty and their arrival time at the PSC with the phlebotomist, could be taken ahead of others who were able to check in while that patient waited. Furthermore, phlebotomists have the discretion to take patients out of order in the case of medical emergencies, patients experiencing high levels of distress or other urgent circumstances." | specifically advises the PSR to adjust the queue.<br><br>Quest's Ex. 10 – training material: "If the patient does not have an appointment, advise them that you will service them when it is their turn to be seen as a walk-in patient, according to the queue in Quanum." Thus, nothing in the training materials, for which Reilly was the 30(b)(6) witness, suggests a timing for "scanning the waiting room"; but rather, only "When going to the waiting room to call back a patient, pay attention to other patients and their needs"<br><br>Reilly did not revise this testimony in her errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements she now makes to this Court, in violation of the sham affidavit doctrine. |
| 48. Reilly Decl., ¶ 32 (10:27-11:3).<br><br>"All patients, including blind patients, can check in and utilize nearly all of the features and functionalities of the Kiosks on the internet, which they can access with their phones. Phlebotomists and PSRs are trained to assist all patients experiencing difficulty at the Kiosks with accessing all of the features and functionalities of the Kiosks." | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804); Best Evidence Rule (FRE 1002).<br><br>Ms. Reilly's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows:<br><br>Reilly Dep., Ex. 6 to Appendix of Exhibits (Dkt. 207-2), at PA0068:14- |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | 25: could not confirm that all employees completed the "Managing Patient Needs" training.<br><br>Miller Dec. at. Ex. 6: Reilly Dep., at 256:13-22: does not know if the website is accessible.<br><br>Reilly did not revise this testimony in her errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements she now makes to this Court, in violation of the sham affidavit doctrine.<br><br>*See also,* Miller Dec. at. Ex. 4: Yarrison Dep., at 103:9-15: does not know if the website is accessible. |
|---|---|

## **OBJECTIONS TO THE DECLARATION OF MARC YARRISON**

### **Dkt. 236-9 (Ex. 4 to Quest's Opposition)**

Mr. Yarrison is a Quest executive. He testified as Defendants' Rule 30(b)(6) person most knowledgeable on the following topics:

- ***Topic 1***: "[Quest's] decision to outfit [Quest's] PATIENT SERVICE CENTERS with E-CHECK-IN KIOSKS." [Yarrison depo. at 11:18-12:9]

- ***Topic 2***: "The reasons why [Quest] decided to outfit [Quest's] PATIENT SERVICECENTERS with E-CHECK-IN KIOSKS." [Yarrison depo. at 11:18-12:9]

- ***Topic 3***: "The amount of business operating costs [Quest] saved by switching [Quest's] PATIENT SERVICE CENTERS to E-CHECK-IN KIOSKS from live-person check-in procedures." [Yarrison depo. at 11:18-12:9]

- ***Topic 17***: "All actions taken by [Quest] to ensure the E-CHECK-IN KIOSKS at [Quest's] PATIENT SERVICE CENTERS are compliant with the ADA."

51

[Yarrison depo. at 11:18-12:9]

- ***Topic 18***: "All actions taken by [Quest] to ensure the E-CHECK-IN KIOSKS at [Quest's] PATIENT SERVICE CENTERS are compliant with the REHAB ACT."

- ***Topic 28*** (partial testimony): "All efforts [Quest] made between January 1, 2016, to the present, to make the E-CHECK-IN KIOSKS accessible and independently usable by visually impaired PERSONS." [Yarrison depo. at 11:18-12:9]

- ***Topic 40***: "How patient data is recorded by [Quest]." [Yarrison depo. at 11:18-12:9]

Mr. Yarrison was deposed on April 8, 2021.

| EVIDENCE OBJECTED TO: | GROUNDS FOR OBJECTION: |
|---|---|
| 49. Yarrison Decl., ¶ 6 (2:1-3).<br><br>"In 2015, to improve the experience of its patients and employees at PSCs through digitization, Quest began to explore ways to modify its check-in practices at its PSCs, along with other aspects of its patient service. | Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804); Best Evidence Rule (FRE 1002).<br><br>The internal Quest document setting forth the business case for ECSS – referred to internally at Quest as the Cap Ex – the stated "rationale" for moving to a kiosk-based check-in system was "cost savings." "<br><br>Plaintiffs' SUF # A11 (Dkt. 206-5), Underlying evidence from Appendix of Exhibits (Dkt. 207-2): Ex. 19 at PA0222:10-24, PA0238:25-PA029:10, PA0244 [Walsh dep. and exhibit establishing the ECSS was projected to save over $40 million in costs through "efficiencies" earned by reducing phlebotomist contact with patients]). |
| 50. Yarrison Decl., ¶ 9 (2:13-18). | Sham Declaration (*Cleveland*, 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Hearsay (F.R.E. 801-804). |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| "In deploying the Kiosks, Quest and its vendors undertook to ensure that Quest satisfied the explicit design standards applicable to the Kiosks in the ADA Standards for Accessible Design (36 C.F.R. Pt. 1191, App. B & D, "ADAS"), including design standards that all of the operable parts of the Kiosk were within "reach range" of someone using a wheelchair (ADAS 308, 309) and that the freestanding Kiosks were detectable by blind cane users (ADAS 307)." | Mr. Yarrison's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows: <br><br> Plaintiffs' SUF # A5 (Dkt. 206-5) Underlying evidence from Appendix of Exhibits (Dkt. 207-2): Yarrison Dep., Ex. 4 at PA0023:17-24, PA0025:6-PA0026:12, PA0029:2-PA0030:18; Ex. 4 at PA0042-PA0048 [Exhibits from Yarrison dep.]: Yarrison testified that blind users were never considered. *See also,* Ex. 18 from Appendix of Exhibits (Dkt. 207-2), at PA0212:12-16, PA213:20-PA0214:6 [Aronson dep.] (inquiry into whether features were available). <br><br> Yarrison did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 51. Yarrison Decl., ¶ 10 (2:19-3:4). <br><br> "In designing the Kiosk, Quest could not anticipate or predict the future requests by persons with disabilities for "auxiliary aids and services" (42 U.S.C. § 12182(b)(2)(a)(iii)) or for "reasonable modification of policies, practices and procedures" (42 U.S.C. § 12182(b)(2)(a)(ii)) that the ADA requires to be considered when made. Quest was replacing an existing system of signing in | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). <br><br> Mr. Yarrison's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows: |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| on a paper sheet, which blind patients had successfully used for years (sometimes with the assistance of Quest phlebotomists) with another, digital system of signing in that was similarly accessible with the assistance of Quest phlebotomists. As it had for years, Quest was relying on its business model, approach to patient service, and policies, procedures and training that, collectively, require phlebotomists at PSCs to assist patients at PSCs, including providing assistance to persons with disabilities to ensure they had access to Quest's services Quest's plan and business case for the Kiosk rollout did not include a plan to reduce then-existing PSC staffing or to replace PSC staff with Kiosks." | Defendants' IT development team, including Yarrison, testified they were aware of ADA accessibility problems as those relate to blind users with the kiosks prior to Quest's nationwide rollout of ECSS. The IT team elevated these issues to project management yet Quest nonetheless elected to proceed with the rollout of a cheaper, totally inaccessible kiosk.<br><br>Plaintiffs' SUF # A5 (Dkt. 206-5), Underlying evidence from Appendix of Exhibits (Dkt. 207-2):  Yarrison Dep., Ex. 4 at PA0023:17-24, PA0025:6-PA0026:12, PA0029:2-PA0030:18; *see also,* Ps' App.Ex. 19 at PA0227:5-25 [Walsh dep.]; Ex. 4 at PA0042-PA0048 [Exhibits from Yarrison dep.]; Ex. 18 at PA0212:12-16, PA213:20-PA0214:6 [Aronson dep.] (inquiry into whether features were available).<br><br>Yarrison did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 52. Yarrison Decl., ¶ 11 (3:5-12).<br><br>"Moreover, because electronic check-in and other improvements were expected to reduce transaction time for each patient, it was expected that phlebotomists would have additional time, among other things, | Law of the case doctrine (*U.S. v. Lummi Indian Tribe,* 235 F.3d 443, 452 (9th Cir. 2000). Hearsay not within any exception (Fed. R. Evid. 805). Best evidence rule, Fed. R. Evid. 1002. |

| | |
|---|---|
| to continue to address the needs of persons requiring assistance, including persons with disabilities. While Patient Service Representatives may not be in the waiting rooms at all PSCs at all times (which would vary based on a variety of factors), performance of their duties requires them to regularly visit the waiting room and provide assistance where needed." | This Court has already ruled: "[P]hlebotomist unavailability appears to have been part of Quest's plan. Quest's waiting rooms are generally unattended; the kiosk communicates to phlebotomists "in the back" that a patient has arrived, and the phlebotomist comes out of "the back" to invite patients into a draw room. See Walsh Dep. at PA0663:9-20 [Doc. # 106-5]; see also SUF B34. Phlebotomists come out periodically to invite patients into a draw room, and a patient who could not use the kiosk could speak to a phlebotomist then, but Quest's system was designed to make phlebotomists available only sometimes." (Dkt. 144, at 13:3-6.)<br><br>This is an impermissible attempt at reconsideration of the Court's prior ruling that does not meet the requirements of Local Rule 7-18. |
| 53. Yarrison Decl., ¶ 12 (3:13-17).<br><br>"But, instead of simply relying on these assumptions about how the Kiosks would work once rolled out, Quest also planned to identify problems that any of its patients may be experiencing with the Kiosk through its extensive methods for soliciting and receiving patient complaints and feedback and the "iterative" process that is an inherent part of the rollout of any electronic or other technology." | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Mr. Yarrison's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:<br><br>The record evidence establishes Defendants ignored multiple complaints from legally blind customers over several years to make the ECSS kiosks independently accessible. |

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | Miller Dec. at. Ex. 4: Yarrison Dep., 129:20-136:20, QUEST-VARGAS000034658; see also, Miller Dec. at. Ex. 9: Walsh Dep. at 41:24-43:3; 225:4-17 (help button not accessible to blind users and company knew ADA compliance was critical but ignored accessible options); Miller Dec. at. Ex. 5: Carr dep. 223:25-227:25; Miller Dec. at Ex. 13: Vargas Dep. at 132:16-133:23, offering to provide suggestions for how to make kiosk accessible]; [Ex. 8: Rachfal Dep., 160:18-175:1, + Letter to Quest from ACB re: letter requesting primary consideration for screen readers, which Quest ignored].<br><br>Yarrison did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine.<br><br>This is also irrelevant (immaterial), Fed. R. Evid. 401 and 402. Purportedly applicable policies, trainings, standards, or procedures not produced in discovery in violation of Rule 26 and 37 cannot create a dispute of material fact where not properly produced in litigation. |
| 54. Yarrison Decl., ¶ 13 (3:18-23).<br><br>"As with the rollout of almost any technology on this large a scale, the implementation of the Kiosk was always | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

| | |
|---|---|
| contemplated to be an "iterative" process. Namely, Quest knew that it would continue to study the actual experience of Kiosk users and address any problems or challenges through future changes, modifications and alterations (i.e., iterations) to the Kiosk or the processes associated with the Kiosks' usage." | Mr. Yarrison's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:<br><br>The record evidence establishes Defendants ignored multiple complaints from legally blind customers over several years to make the ECSS kiosks independently accessible.<br><br>Miller Dec. at. Ex. 4: Yarrison Dep., 129:20-136:20, QUEST-VARGAS000034658; see also, Miller Dec. at. Ex. 9: Walsh dep. at 41:24-43:3; 225:4-17 (help button not accessible to blind users and company knew ADA compliance was critical but ignored accessible options); Miller Dec. at Ex. 5: Carr dep. 223:25-227:25; Miller Dec. at Ex. 13: Vargas dep. at 132:16-133:23, offering to provide suggestions for how to make kiosk accessible]; [Miller Dec. at. Ex. 8: Rachfal Dep., 160:18-175:1, + Letter to Quest from ACB re: letter requesting primary consideration for screen readers, which Quest ignored]. Yarrison did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 55. Yarrison Decl., ¶ 14 (3:24-4:1). | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at |

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| "Quest expected to gather information about Kiosk user experience by among other things (1) studying usage at some early rollout PSCs, (2) monitoring patient feedback, including feedback provided to patient service representatives at PSCs and through the surveys it routinely conducts from PSC visitors, and (3) its ongoing system of receiving and responding to patient concerns and complaints, including through its Patient Advocacy team." | 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Mr. Yarrison's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:<br><br>The record evidence establishes Defendants ignored multiple complaints from legally blind customers over several years to make the ECSS kiosks independently accessible.<br><br>Miller Dec. at Ex. 4: Yarrison Dep., 129:20-136:20, QUEST-VARGAS000034658; see also, Miller Dec. at Ex. 9: Walsh dep. at 41:24-43:3; 225:4-17 (help button not accessible to blind users and company knew ADA compliance was critical but ignored accessible options); Miller Dec. at Ex. 5: Carr dep. 223:25-227:25; Miller Dec. at Ex. 13: Vargas dep. at 132:16-133:23, offering to provide suggestions for how to make kiosk accessible]; [Miller Dec. at Ex. Ex. 8: Rachfal Dep., 160:18-175:1, + Letter to Quest from ACB re: letter requesting primary consideration for screen readers, which Quest ignored].<br><br>Yarrison did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in |

Nye, Stirling, Hale & Miller
33 West Mission Street, Suite 201
Santa Barbara, California 93101

| | |
|---|---|
| | violation of the sham affidavit doctrine. |
| 56. Yarrison Decl., ¶ 16 (4:8-15).<br><br>"During the roll-out, my team received feedback from a very small number of individuals who indicated that people who were completely blind would have difficulty using the Kiosk without assistance. Since we had received very little such feedback, and it was a very small fraction of the overall feedback we had received, and because we knew that Quest phlebotomists remained available to assist with use of the Kiosks and more generally check-in, we endeavored to address this concern in a future iteration of the Kiosk. This occurred with the advent of the Three Finger Swipe, which is discussed below." | Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). |
| 57. Yarrison Decl., ¶ 17 (4:16-24).<br><br>Based on that exploration, interaction with, and feedback provided by blind consumers and their advocates, Quest developed a proposal in advance of the March 2020 mediation in this case that has come to be known as the "Three Finger Swipe" enhancement. This enhancement enabled patients who are blind to check in at Quest PSCs independently and without assistance of a Quest phlebotomist—and supplemented Quest's longstanding policies, procedures, and trainings under which Quest phlebotomists provide assistance to | Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). |

59

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| patients with disabilities at PSC (including assistance with the check-in process) to ensure they can access Quest's services." | |
| 58. Yarrison Decl., ¶ 18 (4:25-5:4). "Three Finger Swipe was implemented in stages. The ability of the Kiosks to recognize and act on the Three Finger Swipe was downloaded to all Kiosks at all Quest PSCs in August 2020. An aural message instructing those at the PSCs how to use the Three Finger Swipe was downloaded to the "Quest TVs" playing at all Quest PSCs in January 2021. Training designed to instruct Quest personnel on how to assist patients in using the Three Finger Swipe was assigned to all Patient Service Representatives (including phlebotomists) at all PSCs in March 2021." | Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). |
| 59. Yarrison Decl., ¶ 19 (5:5-9). "Quest continues to explore and occasionally add other functionality to the Kiosks. The ability to wait outside the PSC was added in direct response to the COVID-19 crisis in July 2020. Patient Service Representatives are available to assist patients in using this and all other functions of the Kiosk, or to otherwise provide the services available through the Kiosk." | Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). Law of the case doctrine (*U.S. v. Lummi Indian Tribe,* 235 F.3d 443, 452 (9th Cir. 2000). This Court has already ruled: "[P]hlebotomist unavailability appears to have been part of Quest's plan. Quest's waiting rooms are generally unattended; the kiosk communicates to phlebotomists "in the back" that a patient has arrived, and the phlebotomist comes out of "the back" to invite patients into a draw room. See Walsh Dep. at PA0663:9-20 [Doc. # 106-5]; see also SUF B34. |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

| | |
|---|---|
| | Phlebotomists come out periodically to invite patients into a draw room, and a patient who could not use the kiosk could speak to a phlebotomist then, but Quest's system was designed to make phlebotomists available only sometimes." (Dkt. 144, at 13:3-6.)<br><br>This is an impermissible attempt at reconsideration of the Court's prior ruling that does not meet the requirements of Local Rule 7-18. |
| 60. Yarrison Decl., ¶ 20 (5:10-16).<br><br>"Quest is currently rolling out functionality at the Kiosks that is known within Quest as "Enhanced Check-In," which will enable patients to scan their insurance cards and driver licenses into the Quest system at the Kiosk. The rollout of Enhanced Check-In is not complete. Patient Service Representatives are available to assist patients in using the scanning function at the Kiosk, or to otherwise accept patients' insurance and driver license information if they do not want to, or cannot, use the Kiosk scanning function." | Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). Law of the case doctrine (*U.S. v. Lummi Indian Tribe,* 235 F.3d 443, 452 (9th Cir. 2000).<br><br>This Court has already ruled: "[P]hlebotomist unavailability appears to have been part of Quest's plan. Quest's waiting rooms are generally unattended; the kiosk communicates to phlebotomists "in the back" that a patient has arrived, and the phlebotomist comes out of "the back" to invite patients into a draw room. See Walsh Dep. at PA0663:9-20 [Doc. # 106-5]; see also SUF B34. Phlebotomists come out periodically to invite patients into a draw room, and a patient who could not use the kiosk could speak to a phlebotomist then, but Quest's system was designed to make phlebotomists available only sometimes." (Dkt. 144, at 13:3-6.)<br><br>This is an impermissible attempt at reconsideration of the Court's prior |

NYE, STIRLING, HALE & MILLER<br>33 WEST MISSION STREET, SUITE 201<br>SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | ruling that does not meet the requirements of Local Rule 7-18. |

## OBJECTIONS TO THE DECLARATION OF THOMAS WALSH

### Dkt. 236-10 (Ex. 5 to Quest's Opposition)

Mr. Walsh is a Quest executive. He testified as one of Defendants' Rule 30(b)(1) witnesses on July 1, 2021.

| EVIDENCE OBJECTED TO: | GROUNDS FOR OBJECTION: |
|---|---|
| 61. Walsh Decl., ¶ 3 (2:1-6).<br><br>"Among other things, there was no plan to reduce then-existing PSC staffing, or to replace PSC staff with Kiosks, or to move PSC staff away from the waiting rooms. Indeed, none of the documents that I authored, co-authored or approved in connection with the Kiosk project, including the documents I have seen Plaintiffs refer to, contained any plan to reduce PSC staff or to replace PSC staff with Kiosks." | Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). *See the immediately preceding paragraph attesting to lack of personal knowledge (Dkt. 236-10, 1: 21-26);*<br><br>Law of the case doctrine (*U.S. v. Lummi Indian Tribe,* 235 F.3d 443, 452 (9th Cir. 2000). Hearsay not within any exception (Fed. R. Evid. 805).<br><br>This Court has already ruled: "[P]hlebotomist unavailability appears to have been part of Quest's plan. Quest's waiting rooms are generally unattended; the kiosk communicates to phlebotomists "in the back" that a patient has arrived, and the phlebotomist comes out of "the back" to invite patients into a draw room. See Walsh Dep. at PA0663:9-20 [Doc. # 106-5]; see also SUF B34. Phlebotomists come out periodically to invite patients into a draw room, and a patient who could not use the kiosk could speak to a phlebotomist then, but Quest's system was designed |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | to make phlebotomists available only sometimes." (Dkt. 144, at 13:3-6.)<br><br>This is an impermissible attempt at reconsideration of the Court's prior ruling that does not meet the requirements of Local Rule 7-18. |
| 62. Walsh Decl., ¶ 4 (2:7-25).<br><br>"At the time the Kiosk project was proposed, we expected that the move away from paper check-in to electronic check-in would result in a slight reduction of the amount of time that Patient Service Representatives ("PSRs") would have to spend on the paperwork associated with checking the paper sign-in sheet and the data entry of basic patient information. Eliminating this extra work outside of the patients' presence would have many beneficial results on improving the relationship between the PSRs and the patients, including increasing the amount of meaningful interaction (or "face time") that PSRs can have with patients, both in the waiting rooms and in the draw rooms. Indeed, offering our patients this electronic form of check-in was solely designed to improve both the experience of our patients and the PSRs experience at work in interacting with our patients, something we had learned was a primary source of job satisfaction for our phlebotomists. Potential financial benefits played no role in the reasons or motivations for this Kiosk project. (Nor | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Mr. Walsh's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:<br><br>• Walsh testified that reducing costs was part of his "mandate" Miller Dec. at Ex. 9: Walsh Dep., 25:18-23; 26:16-23 ("Q: So it's twofold. Both improve experience and reduce costs, is that right? That was your mandate? A: That's correct.")<br><br>• Quest's Ex. 34, at QA1582:25-QA1583:12 – "Q: [B]y implementing certain efficiencies at the patient service centers, Quest could, number one, serve more patients, is that true? A: Yes . . . And Quest could save on additional labor cost that it would, otherwise, cost to serve more patients? A: That's right.<br><br>• Quest's Ex. 34, at QA1582:10-24– efficiencies to be obtained: less labor content per encounter because if |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

were the financial costs of providing what Plaintiffs identified in this litigation to be their preferred method of using the Kiosks considered at that time. The "undue administrative burden" that Quest asserts in this litigation is addressed further below, but is grounded in the burden that would have resulted from changing the method of communication with our blind guests after we had already rolled out Kiosks to more than 2,100 PSCs.)"

the phlebotomist has to do less work, then their job gets better, again they can process more patients, and therefore, average cost points come down

Testimony against the "cost avoidance played no role in decision" statement:

Miller Dec. at Ex. 9: Walsh Dep., 134:13-17 (specifically testified that the project rational was cost savings) ("Q: And am I correct in understanding that the project rationale that's listed here is cost savings? A: Project rationale. The project of – the project rationale in the CapEx was cost savings.")

Walsh did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine.

---

63. Walsh Decl., ¶ 5 (2:26-3:20).

"Despite the financial analysis playing no part in the recommendation install the Kiosks, the Kiosk project was expected to impose hard costs of several millions of dollars over a multi-year period. As a result of that cost level, Quest financial policies and practices required the co-sponsors of the project to complete certain financial forms and templates that, among other things, asked us (the co-

Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).

Mr. Walsh's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:

Miller Dec. at Ex. 9: Walsh Dep., 134:13-17 (specifically testified that

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

sponsors) to identify any areas where the Kiosk project may result in a financial gain, despite the absence of a financial motive for the project. As the co-sponsors, we searched for ways in which this project may one day yield some financial benefit and identified the projected, fractional time saving in each patient's visit that would result from the reduced paperwork and data entry. Multiplied over the many patients that each phlebotomist would see in a day, we logically inferred that the cumulative fractional extra time saved with each patient could result in each phlebotomist seeing more patients on each shift. Once we made that inference, we assumed that, as Quest's patient encounters (visits to the PSCs) gradually continued to grow at the general rate of growth, the same number of phlebotomists would be able to serve this growing population. New hiring would not be required. Rather than result in a "cost saving" of millions of dollars or the reduction in phlebotomist staffing, as I have seen Plaintiffs assert, we projected that there would be *cost avoidance* in that amount. There would be no reduction in the number of phlebotomists and no reduced staffing at the PSCs. Kiosks would not replace staff. More importantly, the substantive part of the patient interaction would remain the same and intact. This projected cost avoidance and any financial consequence played no

the project rational was cost savings) ("Q: And am I correct in understanding that the project rationale that's listed here is cost savings? A: Project rationale. The project of – the project rationale in the CapEx was cost savings.")

Walsh did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

| | |
|---|---|
| role in our decision to co- sponsor the Kiosk project." | |
| 64. <u>Walsh Decl., ¶ 5.2 (3:21-4:1).</u><br><br>"As made clear above, the suggestion I have seen from Plaintiffs that the Kiosk project was designed to reduce the amount of time that PSRs spend in the waiting rooms (or in order to "keep them in back") lacks both logic and factual support. The opposite is true. First, the time PSRs previously spent on paperwork and data entry was now available for patient interactions in both the specimen draw rooms and in the waiting rooms. Second, the mere fact that Quest projected that it could see more patients as a result of this time savings, and assuming that projection bore out, would only mean that the PSRs were in the waiting room to retrieve patients more frequently to assist patients, not less." | Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). *See paragraph 2 attesting to lack of personal knowledge (Dkt. 236-10, 1: 21-26);*<br><br>Law of the case doctrine (*U.S. v. Lummi Indian Tribe,* 235 F.3d 443, 452 (9th Cir. 2000). Hearsay not within any exception (Fed. R. Evid. 805).<br><br>This Court has already ruled: "[P]hlebotomist unavailability appears to have been part of Quest's plan. Quest's waiting rooms are generally unattended; the kiosk communicates to phlebotomists "in the back" that a patient has arrived, and the phlebotomist comes out of "the back" to invite patients into a draw room. See Walsh Dep. at PA0663:9-20 [Doc. # 106-5]; see also SUF B34. Phlebotomists come out periodically to invite patients into a draw room, and a patient who could not use the kiosk could speak to a phlebotomist then, but Quest's system was designed to make phlebotomists available only sometimes." (Dkt. 144, at 13:3-6.)<br><br>This is an impermissible attempt at reconsideration of the Court's prior ruling that does not meet the requirements of Local Rule 7-18. |
| 65. <u>Walsh Decl., ¶ 6 (4:3-13).</u> | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge |

Nye, Stirling, Hale & Miller<br>33 West Mission Street, Suite 201<br>Santa Barbara, California 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

"As noted above, Quest was not motivated by financial concerns in designing the Kiosk. Nor did it consider the alternative means of check-in Plaintiffs later pressed for in this litigation (tactile keyboard, voice-over functionality, headphone jack for private communication and implicitly headphones for the patients to use) until after the commencement of this litigation. The "undue administrative burden" that Quest asserts derives instead from switching the means of effective communication used after already rolling out the existing Kiosks to more than 2,100 PSCs. In contrast, the Three Finger Swipe solution that Quest implemented worked well within the framework and infrastructure that we had already built."

(F.R.E. 602); Hearsay (F.R.E. 801-804).

Mr. Walsh's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:

Walsh dep., Ex. 19 to Appendix of Exhibits (Dkt. 207-2), at PA0228:20-PA0229:2– testified that was not aware of any effort within his team to analyze whether implementing a headphone jack would have imposed an undue burden. ("Q: Was there ever any analysis undertaken by your team that the implementation of a headphone jack would have imposed an undue burden on the company for rolling out the eCheck-in kiosk? A: Yeah. I'm not aware of any effort within my ideation, innovation team to that effect.")

Mr. Walsh testified that he was not aware Quest has attempted to implement a three-finger-swipe and that the first he heard of it was through counsel. Miller Dec. at Ex. 9: Walsh Dep., 219:6-24

Miller Dec. at Ex. 9: Walsh Dep., 220:8-14 ("Q: So, just to be clear, you're not going to be offering any testimony in this case about the three-finger swipe option that Quest has; is that true? A: That's true. I don't – was not involved in that work and only made aware of it under this situation.")

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | Walsh testified he was not involved in any decision surrounding the headphone jack. Quest's Ex. 34, at QA1583:4-9 ("Q: Was there ever a decision made, one way or the other, to either have or not have a headphone jack on the eCheck-in kiosk? A: I'm not aware of being involved in that decision."); Quest's Ex. 34, at QA1583:11-23 ("I'm not aware of any work we did on placing an audio jack on the outside of the device.")<br><br>Miller Dec. at Ex. 9: Walsh Dep., 89:8-16: Walsh testified that he di dnot recall his team undertaking a detailed analysis of if the headphone jack could be split to accomplish both OCR scanning and access to audio headphones.<br><br>Miller Dec. at Ex. 9: Walsh Dep., 228:2-12: testified he was not aware of any analysis on whether the Lilitab enclosure could accommodate a headphone jack or whether the iPad could accommodate voice output. ("A: Yeah. Again, I was not involved. I don't recall looking at that specifically.")<br><br>Walsh did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 66. Walsh Decl., ¶ 6(a) (4:14-20). | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

"The Kiosks and all component parts of the Kiosks would be collectively exposed to the tens of millions of patients that Quest hosts at its PSCs every year, year after year. There is a general operating principle in the development of technology to reduce the number of breakable parts. Plaintiffs' proposal added at least a keyboard and headphones as potential breakable parts that would have to be maintained and/or replaced. Unlike the tablet itself, which is firmly housed in a set casing, it would be much more difficult to secure the keyboard and headphones."

998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).

Mr. Walsh's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:

Walsh dep., Ex. 19 to Appendix of Exhibits, at PA0228:20-PA0229:2– testified that was not aware of any effort within his team to analyze whether implementing a headphone jack would have imposed an undue burden. ("Q: Was there ever any analysis undertaken by your team that the implementation of a headphone jack would have imposed an undue burden on the company for rolling out the eCheck-in kiosk? A: Yeah. I'm not aware of any effort within my ideation, innovation team to that effect.")

Walsh testified he was not involved in any decision surrounding the headphone jack. Quest's Ex. 34, at QA1583:4-9 ("Q: Was there ever a decision made, one way or the other, to either have or not have a headphone jack on the eCheck-in kiosk? A: I'm not aware of being involved in that decision."); Quest's Ex. 34, at QA1583:11-23 ("I'm not aware of any work we did on placing an audio jack on the outside of the device.")

Miller Dec. at Ex. 9: Walsh Dep., 89:8-16: Walsh testified that he did

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

| | |
|---|---|
| | not recall his team undertaking a detailed analysis of if the headphone jack could be split to accomplish both OCR scanning and access to audio headphones.<br><br>Miller Dec. at Ex. 9: Walsh Dep., 228:2-12: testified he was not aware of any analysis on whether the Lilitab enclosure could accommodate a headphone jack or whether the iPad could accommodate voice output. ("A: Yeah. Again, I was not involved. I don't recall looking at that specifically.")<br><br>Walsh did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 67. Walsh Decl., ¶ 6(b) (4:21-27).<br><br>"By the time Plaintiffs made their proposal, Quest was already considering plans to use the headphone jack on the iPad tablet to provide a data port for the camera in its proposed scanning device to scan in insurance cards and drivers' licenses. Keeping the headphone jack for the occasional (and statistically infrequent) blind customer who wanted to hear private, verbal information from the Kiosk would foreclose use of the headphone jack for the scanning of | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Mr. Walsh's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:<br><br>Walsh dep., Ex. 19 to Appendix of Exhibits, at PA0228:20-PA0229:2– testified that was not aware of any effort within his team to analyze whether implementing a headphone |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

| insurance cards and drivers' licenses for all patients." | jack would have imposed an undue burden. ("Q: Was there ever any analysis undertaken by your team that the implementation of a headphone jack would have imposed an undue burden on the company for rolling out the eCheck-in kiosk? A: Yeah. I'm not aware of any effort within my ideation, innovation team to that effect.")

Walsh testified he was not involved in any decision surrounding the headphone jack. Quest's Ex. 34, at QA1583:4-9 ("Q: Was there ever a decision made, one way or the other, to either have or not have a headphone jack on the eCheck-in kiosk? A: I'm not aware of being involved in that decision."); Quest's Ex. 34, at QA1583:11-23 ("I'm not aware of any work we did on placing an audio jack on the outside of the device.")

Miller Dec. at Ex. 9: Walsh Dep., 89:8-16: Walsh testified that he did not recall his team undertaking a detailed analysis of if the headphone jack could be split to accomplish both OCR scanning and access to audio headphones.

Miller Dec. at Ex. 9: Walsh Dep., 228:2-12: Walsh testified he was not aware of any analysis on whether the Lilitab enclosure could accommodate a headphone jack or whether the iPad could accommodate voice output. ("A: Yeah. Again, I was not involved. I don't recall looking at that specifically.") |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

| | | |
|---|---|---|
| | | Walsh did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| | 68. Walsh Decl., ¶ 6(c) (4:28-5:4).<br><br>"By the time Plaintiffs made their proposal, Quest was also made aware that Apple and other devices were planning to phase out their headphone jacks over time in favor of wireless connection to the device. Thus, over time, the headphone jack proposal was not likely sustainable over any extended period of time." | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Mr. Walsh's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:<br><br>Walsh dep., Ex. 19 to Appendix of Exhibits (Dkt. 207-2), at PA0228:20-PA0229:2 – testified that was not aware of any effort within his team to analyze whether implementing a headphone jack would have imposed an undue burden. ("Q: Was there ever any analysis undertaken by your team that the implementation of a headphone jack would have imposed an undue burden on the company for rolling out the eCheck-in kiosk? A: Yeah. I'm not aware of any effort within my ideation, innovation team to that effect.")<br><br>Walsh testified he was not involved in any decision surrounding the headphone jack. Quest's Ex. 34, at QA1583:4-9 ("Q: Was there ever a |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | decision made, one way or the other, to either have or not have a headphone jack on the eCheck-in kiosk? A: I'm not aware of being involved in that decision."); Quest's Ex. 34, at QA1583:11-23 ("I'm not aware of any work we did on placing an audio jack on the outside of the device.")<br><br>Miller Dec. at Ex. 9: Walsh Dep., 89:8-16: Walsh testified that he did not recall his team undertaking a detailed analysis of if the headphone jack could be split to accomplish both OCR scanning and access to audio headphones.<br><br>Miller Dec. at Ex. 9: Walsh Dep., 228:2-12: testified he was not aware of any analysis on whether the Lilitab enclosure could accommodate a headphone jack or whether the iPad could accommodate voice output. ("A: Yeah. Again, I was not involved. I don't recall looking at that specifically.")<br><br>Walsh did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 69. Walsh Decl., ¶ 6(d) (5:5-9).<br><br>"The rollout of this new equipment for each of the Kiosks in over 2,100 PSCs would involve a massive effort of a team | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| of technicians, who would need to be trained in the installation and use of the new equipment. New documentation would also need to be generated and rolled out. New training would also be required for local PSC staff." | Mr. Walsh's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:<br><br>Walsh dep., Ex. 19 to Appendix of Exhibits, at PA0228:20-PA0229:2 – testified that was not aware of any effort within his team to analyze whether implementing a headphone jack would have imposed an undue burden. ("Q: Was there ever any analysis undertaken by your team that the implementation of a headphone jack would have imposed an undue burden on the company for rolling out the eCheck-in kiosk? A: Yeah. I'm not aware of any effort within my ideation, innovation team to that effect.")<br><br>Walsh testified he was not involved in any decision surrounding the headphone jack. Quest's Ex. 34, at QA1583:4-9 ("Q: Was there ever a decision made, one way or the other, to either have or not have a headphone jack on the eCheck-in kiosk? A: I'm not aware of being involved in that decision."); Quest's Ex. 34, at QA1583:11-23 ("I'm not aware of any work we did on placing an audio jack on the outside of the device.")<br><br>Miller Dec. at Ex. 9: Walsh Dep., 89:8-16: Walsh testified that he di dnot recall his team undertaking a detailed analysis of if the headphone jack could be split to accomplish both |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | OCR scanning and access to audio headphones.<br><br>Miller Dec. at Ex. 9: Walsh Dep., 228:2-12: testified he was not aware of any analysis on whether the Lilitab enclosure could accommodate a headphone jack or whether the iPad could accommodate voice output. ("A: Yeah. Again, I was not involved. I don't recall looking at that specifically.")<br><br>Walsh did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 70. <u>Walsh Decl., ¶ 6(e) (5:10-13).</u><br><br>"The installation of new equipment in each of the more than 2,100 PSCs would also be a multi-year project. In contrast, the Three Finger Swipe capabilities could be accomplished by download from a central location to all existing Kiosks at one time." | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Mr. Walsh's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:<br><br>Walsh dep., Ex. 19 to Appendix of Exhibits, at PA0228:20-PA0229:2 – testified that was not aware of any effort within his team to analyze whether implementing a headphone jack would have imposed an undue burden. ("Q: Was there ever any analysis undertaken by your team that |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | the implementation of a headphone jack would have imposed an undue burden on the company for rolling out the eCheck-in kiosk? A: Yeah. I'm not aware of any effort within my ideation, innovation team to that effect.")

Quest's Ex. 34, at QA1583:11-20 (counsel instructed Mr. Walsh "not to answer with respect to any consideration process leading up to the three-finger-swipe because it's privileged.") Ex. 9: Walsh Dep., 79:17-20 [now seeking to introduce exactly that information, consideration process leading up to the TFS]

Walsh did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 71. Walsh Decl., ¶ 6(f) (5:14-18).

"During any such phased rollout, Quest would necessarily be monitoring and maintaining two different systems, with two different systems of operation, compelling those responsible for monitoring and maintaining to learn, understand, and operate both monitoring and maintenance functions under two different systems." | Sham Declaration (*Cleveland*, 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).

Mr. Walsh's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:

Walsh dep., Ex. 19 to Appendix of Exhibits (Dkt. 207-2), at PA0228:20-PA0229:2 – testified that was not |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

| | |
|---|---|
| | aware of any effort within his team to analyze whether implementing a headphone jack would have imposed an undue burden. ("Q: Was there ever any analysis undertaken by your team that the implementation of a headphone jack would have imposed an undue burden on the company for rolling out the eCheck-in kiosk? A: Yeah. I'm not aware of any effort within my ideation, innovation team to that effect.")<br><br>Walsh did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |
| 72. Walsh Decl., ¶ 9 (6:6-13).<br><br>"The check-in system that preceded the Kiosks -paper and pen sign-in sheets - relied on the assistance of the PSRs staffing the PSCs. We have always expected that we would have patients who could not, or did not want to use, the Kiosks to check in. For example, we have non-disabled patients who cannot read, and we expected our PSRs (and phlebotomists) to continue to make themselves available to assist these patients with check-in and all other functionalities at the Kiosks and/or take them in the back and check them in there | Sham Declaration (*Cleveland*, 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Mr. Walsh's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts his sworn deposition testimony as follows:<br><br>Walsh testified that he did not know how, prior to implementation of the echeck-in kiosk, a patient would signal that they needed help checking in.<br><br>Miller Dec. at Ex. 9: Walsh Dep., 59:17-22 ("Q: Prior to the implementation of the eCheck-in |

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

| | |
|---|---|
| and offer any functionalities available at the Kiosks in the draw rooms." | kiosk, how would a patient signal that they needed help checking in? A: I'm not certain how a patient would have done that.")<br><br>Miller Dec. at Ex. 9: Walsh Dep., 66:24-67:9 (testified that he didn't recall if he inquired what would be done with the paper sign-in sheet for hearing impaired or visually impaired after the eCheck-in kiosk was rolled out)<br><br>Walsh did not revise this testimony in his errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements he now makes to this Court, in violation of the sham affidavit doctrine. |

## OBJECTIONS TO THE DECLARATION OF PRUDENCIA MAGANA

### Dkt. 236-11 (Ex. 6 to Quest's Opposition)

Ms. Magana was the phlebotomist who serviced Plaintiff Vargas. She testified in her individual capacity and was deposed on August 3, 2021.

| EVIDENCE OBJECTED TO: | GROUNDS FOR OBJECTION: |
|---|---|
| 73. Magana Decl., ¶ 3 (1:13-22).<br><br>"As a Quest Phlebotomist, I have received extensive training, both on hire and on a repeated basis throughout my employment. One of the things that the Quest training has emphasized is that we should always help every patient who needs help with any service they are looking for from Quest at the PSCs. For example, whenever we phlebotomists go to call a patient from the PSC waiting | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804).<br><br>Ms. Magana's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows: |

| | |
|---|---|
| room to draw a specimen, we are trained to look at **all** of the people in the waiting room to see if anyone needs assistance and to provide that assistance. In fact, the device that I use in the back (in the rooms where we take the blood and other specimens) to record patient information regularly reminds me to go check in the front to see if anyone needs assistance. I think that reminder gets sent every 15 minutes." | Ex. 20 to Appendix of Exhibits (Dkt. 207-2) at PA0250:2-18 [Magana dep.]: Managing Patient Needs is the only training she received even slightly related to the ADA<br><br>Ex. 20 to Appendix of Exhibits (Dkt. 207-2), at PA0252:4-PA0253:1, PA0253:7-9 [Magana dep.]: Phlebotomists have the ability to turn off the bell in the back<br><br>Magana did not revise this testimony in her errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements she now makes to this Court, in violation of the sham affidavit doctrine. |
| 74. Magana Decl., ¶ 4 (1:23-27).<br><br>"In addition, when a patient checks in on the Kiosk, including if they use the three-finger swipe to check in, the device I use in the back makes a noise, and I get a notice on my screen that someone has checked in. I do not know how you could turn that noise off on my device, but I don't do that because I want to know when a patient has checked in." | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Hearsay (F.R.E. 801-804).<br><br>Ms. Magana's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows:<br><br>Ex. 20 to Appendix of Exhibits (Dkt. 207-2), at PA0252:4-PA0253:1, PA0253:7-9 [Magana dep.]: Phlebotomists have the ability to turn off the bell in the back<br><br>Magana did not revise this testimony in her errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements she now makes to this Court, in |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

| | |
|---|---|
| | violation of the sham affidavit doctrine. |
| 75. Magana Decl., ¶ 7 (2:11-14). "[W]hat I do know is that, if he had, we are trained to inform our supervisor of any patient complaint we receive, and I have always done that. I see no record that I told my supervisor about any complaint by Mr. Vargas." | Sham Declaration (*Cleveland*, 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). Ms. Magana's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows: Ex. 20 to Appendix of Exhibits (Dkt. 207-2), at PA0251:3-7 [Magana dep.] – Did not remember ever documenting an individual making an accommodation request. Magana did not revise this testimony in her errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements she now makes to this Court, in violation of the sham affidavit doctrine. |
| 76. Magana Decl., ¶ 8 (2:15-19). "My lawyer, who is also Quest's lawyer, showed me my deposition testimony where I was asked whether I was trained on "scanning" the waiting room. I thought the lawyer asking the question was referring to the scanning function on the Kiosk, like to scan in a QR Code. So, I answered that I had not been trained on how to use the scanner because I have not been." | Sham Declaration (*Cleveland*, 526 U.S. at 806; *Van Asdale*, 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). Ms. Magana's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows: |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

| | |
|---|---|
| | Miller Dec. at Ex. 10: Magana Dep., 90:22-24: Not trained to scan the waiting room. Q. Were you ever trained by Quest to scan the waiting room for patients requiring assistance? A. Not that I remember. Further, Ms. Magana was admonished not to answer any question she did not understand, and to ask for clarity if she did not understand: Miller Dec. at Ex. 10: Magana Dep., 6:21-25: agrees to ask the questioner to rephrase the question if she does not understand it. Magana did not revise this testimony in her errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements she now makes to this Court, in violation of the sham affidavit doctrine. |
| 77. Magana Decl., ¶ 9 (2:20-3:1). "My lawyer also showed me my deposition testimony where I was asked if anyone at Quest told me that the Kiosks were not independently accessible. I was and still am unclear on exactly what the lawyer meant by "independently accessible," bit I did answer that I "thought so." The reason I said that answer was because the Quest training tells us to help all patients (including blind patients) if they are having trouble with anything, including using the Kiosk. I thought that probably the Quest training was telling us that information because | Sham Declaration (*Cleveland,* 526 U.S. at 806; *Van Asdale,* 577 F.3d at 998); Lack of Personal Knowledge (F.R.E. 602); Hearsay (F.R.E. 801-804). Ms. Magana's declaration submitted in opposition to Plaintiffs' summary judgment motion impermissibly contradicts her sworn deposition testimony as follows: Ex. 20 to Appendix of Exhibits (Dkt. 207-2), at PA0250:19-24 [Magana dep.] – Kiosk is inaccessible. |

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

| | |
|---|---|
| some people, including some blind people, may need help using the Kiosks. In my experience, many people, not just blind people, need help using the Kiosks, and I am always happy to provide that help, just like I was trained to do." | Miller Dec. at Ex. 10: Magana Dep., 95:19-96:3 – training told her that the kiosks were not independently accessible.<br><br>Further, Ms. Magana was admonished not to answer any question she did not understand, and to ask for clarity if she did not understand:<br><br>Miller Dec. at Ex. 10: Magana Dep., 6:21-25: agrees to ask the questioner to rephrase the question if she does not understand it.<br><br>Magana did not revise this testimony in her errata, and thereafter signed the deposition under penalty of perjury, directly contradicting the statements she now makes to this Court, in violation of the sham affidavit doctrine. |

Dated: July 22, 2022          Respectfully submitted,

By:   */s/ Jonathan D. Miller*

Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com
Alison M. Bernal (SBN 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101

*Signatures continued below*

PLAINTIFFS' OBJECTIONS TO QUEST'S EVIDENCE

Benjamin J. Sweet
(Admitted *Pro Hac Vice*)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

Matthew K. Handley
(Admitted *Pro Hac Vice*)
mhandley@hfajustice.com
HANDLEY FARAH &
ANDERSON PLLC
777 6th Street NW
Washington, DC 20001
Telephone: (202) 559-2411

*Attorneys for Plaintiffs Julian Vargas,*
*American Council of the Blind, and the*
*Certified Class*

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

83