1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   JULIAN VARGAS and AMERICAN          )   Case No. CV 19-8108-DMG (MRWx)
     COUNCIL FOR THE BLIND, individual   )
12   and on behalf of themselves and all others )   **ORDER RE MOTIONS FOR**
     similar situated,                   )   **SUMMARY JUDGMENT [207] [212]**
13                                        )
                      Plaintiffs,         )
14                                        )
             v.                           )
15                                        )
     QUEST DIAGNOSTICS CLINICAL           )
16   LABORATORIES, INC., QUEST            )
     DIAGNOSTICS HOLDINGS, INC.,          )
17   QUEST DIAGNOSTICS                    )
     INCORPORATED; and DOES 1-10,         )
18   inclusive,                           )
                                          )
19                                        )
                      Defendants.         )
20                                        )

21

22          This matter is before the Court on a Motion for Summary Judgment brought by

23   Plaintiffs Julian Vargas, the American Council for the Blind ("ACB"), and the certified

24   Class ("PMSJ") [Doc. # 207] and Defendants Quest Diagnostics Clinical Laboratories,

25   Inc., Quest Diagnostics Holdings, Inc., and Quest Diagnostics Incorporated's ("Quest")

26   Motion for Partial Summary Judgment ("DMSJ") [Doc. # 233].[1]  Both motions are fully

27   ────────────────────
28        [1] Quest's MSJ was initially filed on May 12, 2022, but was amended after the Court issued its order changing the class definition.  [Doc. # 212.]  The Court refers to the amended filing herein.

briefed.  [Doc. ## 236 ("PMSJ Opp."), 239 ("DMSJ Opp."), 241 ("DMSJ Reply"), 242 ("PMSJ Reply").]  The Court held a hearing on August 5, 2022.  Having duly considered the parties' arguments, the Court **GRANTS in part** and **DENIES in part** Quest's MSJ and **DENIES** Plaintiffs' MSJ.

# I.

# PROCEDURAL BACKGROUND

The Court has already resolved a previous motion for summary judgment, filed by Quest.  Order re Defendants' Motion for Summary Judgment ("First MSJ Order") [Doc. # 144].[2]  Since the Court issued the First MSJ Order, the Court certified a class, appointing Vargas the Class Representative, and subsequently revised the class definition.  *See* Order re Plaintiff's Motion for Class Certification [Doc. # 190], Order Modifying Class Definition [Doc. # 228].  Plaintiffs' remaining claims are (a) a claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, asserted by all Plaintiffs, including the Class; and (b) derivative claims under California's Unruh Civil Rights Act ("Unruh Act"), Cal. Civ. Code § 51 *et seq.*, and California's Disabled Persons Act ("DPA"), Cal. Civ. Code §§ 54-54.3, asserted only by Vargas individually.

The Class is defined as follows:

> All legally blind individuals who visited a Quest patient service center in the United States between January 1, 2018 through December 31, 2019 (the "Class Period") at which the e-check-in self-service kiosk was the primary method for check-in and who, due to their disability, could not use all the functions of the kiosks.

Plaintiffs move for summary judgment on the ground that there is no dispute of material fact that (1) Quest failed to provide Plaintiffs with effective communication in violation of the ADA during the Class Period, (2) Quest failed to provide Vargas with

---

[2] The Court granted Quest leave to file a second motion for partial summary judgment in order to resolve an issue that the Court did not need to reach in its First MSJ Order, but which the Court concluded could help to narrow the issues for trial.  [*See* Doc. # 211.]

effective communication in violation of the Unruh Act and the DPA, (3) Quest's implementation of the "three-finger swipe" ("TFS") did not moot Plaintiffs' claims, and (4) Quest cannot support an undue administrative burden affirmative defense. *See* PMSJ at 2-3.[3]

Quest moves for summary adjudication on 10 discrete "conclusions" regarding the scope and the requirements of the ADA. Quest's tenth proposed "conclusion" is a request to strike Plaintiffs' prayer for relief for an independently accessible self-service check-in kiosk. *See* DMSJ at 3-4.

## II.

## FACTUAL BACKGROUND

The Court described the factual background of this case in its First MSJ Order, and incorporates that description herein. Much of the evidence is identical to that presented in support of and opposition to the First MSJ Order. The Court will address the parties' evidence as relevant to the instant motions.

### A.   Kiosks

This action concerns Quest's use of touchscreen tablets mounted on posts ("kiosks") to permit patients to check in at patient service centers ("PSCs") operated by Quest throughout the country. Use of the touchscreens requires the ability to see text on the screen, which makes it impossible for blind users to navigate the tablets.[4] Some PSCs have receptionists or attendants present at check-in. Pursuant to the current class definition, locations with check-in attendants or receptionists are not locations "at which the e-check-

---

[3] Page citations herein refer to the page numbers inserted by the CM/ECF system.

[4] The parties dispute whether Quest knew at the time it rolled out the kiosks that they would be inaccessible to blind patients. *See* PSUF A5. Quest's intent is not legally relevant under the ADA, so the Court does not address this evidence.

Quest also offers evidence that "legally blind" users have a wide range of visual ability. Because there is no dispute that completely blind users are unable to use the kiosks, however, this evidence is irrelevant.

in self-service kiosk was the primary method for check-in" and are not at issue in this litigation.[5]

Before the kiosks were introduced at PSCs, Quest used a paper sign-in sheet for check-in. *See* Reilly Decl. ¶ 4 [Doc. # 236-8]. When the kiosks were first introduced in 2016, there was no way for blind patients to use the kiosks to indicate that they had arrived at the PSC. Beginning in August 2020, however, Quest pushed out a change to its kiosks: the "three-finger swipe" ("TFS").[6] An audio loop plays at PSCs to inform patients that they should use TFS if they are unable to use the kiosk.[7] TFS permits users to swipe the screen with three fingers, which will place the patient on the list to be seen by a phlebotomist and announce the patient's number (much like taking a number to order in a bakery). TFS also notifies the phlebotomist that a visually impaired patient has arrived.

Quest's Rule 30(b)(6) witness, Marc Yarrison, testified that during the rollout process, Quest "trained all our staff to watch" for individuals with disabilities. Yarrison Depo. at 4:16-17 [Doc. # 236-31]. This training was introduced in March 2021. Yarrison continued that "they've always been trained that way, but, you know, we continued to make an emphasis to them that they are to—every time they are in the waiting area, they are to

---

[5] At the hearing on these motions, Quest argued that the "primary method for check-in" for blind patients is never a kiosk, even where the primary method for check-in for sighted patients *is* a kiosk. In referring to locations at which the "primary method for check-in" is a kiosk, the Court is referring to locations at which the primary method for sighted patients to check in is a kiosk. In other words, the Court is referring to locations without a permanent receptionist or attendant.

[6] The parties dispute whether TFS was implemented in response to this litigation, but Quest's motivation is irrelevant for purposes of this motion.

[7] The audio message says "Welcome to Quest Diagnostics. If you are a patient who is blind or visually impaired, you can automatically check in by swiping or dragging three fingers in any direction across the screen of our check-in Kiosk without providing any additional information. Once you have successfully done so, the Kiosk will play a short audio message informing you that you have checked in and assigning you a patient ID. Please take a seat and your patient ID will be verbally called by a Quest team member. The Quest team member may collect additional information from you at that time. If you need assistance with locating, using or checking in at the Kiosk, our Quest team member will be happy to assist you. If you don't have an appointment or would like to make one, please call 888-277-8772. Thank you for choosing Quest Diagnostics." Sawczyn Report at 6 [Doc. # 236-18]. This message began to be played in January 2021.

look out for anybody that needs help.  That would include people with disabilities of all types." *Id*. at 4:17-22; *accord id*. at 11:3-7 ("our staff is trained to always look for anybody in the waiting area that needs help and to help them"); *id*. at 21:20-23 ("our staff was trained to watch for people that needed help and, if they couldn't check in, to provide that help to them").

Quest's Director of Technical Excellence for National Patient Services, Jody Reilly, testifies that Quest staff member training instructs phlebotomists to pay attention to who is in the waiting room in order to identify patients, including those with visual impairments, who may need assistance, and to make themselves available to such patients.  *See* Reilly Decl. ¶¶ 7-8; *see also* Managing Every Patient's Needs (revised March 4, 2021) at 42, 45 [Doc. # 235-3 (under seal)].  A Quest phlebotomist, Prudencia Magana, testified that phlebotomists are trained to "always help every patient who needs help with any service they are looking for from Quest at the PSCs," and that whenever they go to the waiting room, they are supposed to look at all the people in the waiting room to see if anyone needs assistance.  Magana Decl. ¶ 3 [Doc. # 236-11].[8]

A pre-TFS version of Quest's ADA training module, Managing Every Patient's Needs, emphasized that phlebotomists should "always demonstrate sensitivity and understanding" when working with disabled patients.  *See* 2010 Managing Every Patient's Needs at 8 [Doc. # 94-11 (under seal)].  The training instructs phlebotomists that they can "avoid awkward situations by always being prepared for the arrival of a disabled person." *Id*. at 9.  The training provides that phlebotomists should "assist [legally blind patients] to the collection room," "maintain a steady stream of verbal communication with the patient to put him or her at least," and "always tell them what you are doing and describe what you are about to do before you do it."  *Id*. at 10.  The training instructs that the ADA "gives

---

[8] Plaintiffs adduce evidence showing that Quest projected that the kiosks would save Quest money by reducing the amount of time phlebotomists spend on check in.  Quest argues in opposition that the evidence shows that phlebotomists would spend less time on check in, allowing them to spend *more* time on patients.  Quest does not provide, however, any evidence that was the actual effect of the change. Quest's argument is not evidence, and Plaintiffs' evidence is only marginally relevant.

disabled patients the right to equal service." *Id*. at 12. Quest staff were trained that "the biggest frustrations for many disabled persons occur with ordinary tasks such as entering buildings and offices and using restroom facilities. . . . the efforts and attitude of our staff are what really make the difference. Always be sensitive to any difficulty a person with a disability may encounter in the facility." *Id*. at 15. Staff were specifically instructed to offer assistance to visually impaired patients who seemed unsure where to go. *See id*. at 15. Later, staff were instructed to "be prepared to read or provide other assistance in completing forms," and to be sensitive to privacy concerns if asked to read aloud to a patient. *Id*. at 19. The training included extensive information about service animals. *Id*. at 20-27.

The record before the Court shows the experiences of blind Quest patients varied widely during the pre-TFS period. Claire Stanley, a Quest patient, apparently waited only a few minutes before a phlebotomist came out to assist her. *See* Stanley Depo. at 28:2-14 [Doc. # 236-35]. Mary Haroyan, another Quest patient, testified that on one occasion, when she arrived shortly after the PSC opened, the phlebotomist was "made aware very quickly that [she] was there, and [she] asked [the phlebotomist] for help to check in." Haroyan Depo. at 72:12-14 [Doc. # 236-37]. Regina Brink testified that on her visits between 2012 and 2018, there was no one at the front desk, but she needed to wait only about five minutes for someone to return. Brink Depo. at 39:1-21 [Doc. # 236-37].[9] Other ACB members indicated that Quest staff members helped them check in. *See* ACB Interrogatory Responses at 5 [Doc. # 236-14] (patients waited for a staff member to come to get another patient, then asked the staff member to help them check in)[10]; Stanley Depo.,

_____

[9] It is not clear from the deposition excerpt cited whether this is relevant, since it appears to cover a period starting long before the kiosks were rolled out. Plaintiffs assert that this answer concerned only pre-kiosk visits. Plaintiffs do not point to a record citation for this assertion, however, so the Court accepts Quest's evidence for the limited proposition that for at last some of the period when the kiosk was available, Ms. Brink did not wait more than about five minutes to be assisted.

[10] This evidence appears to be hearsay. Although neither party objects to its use (and both sides rely on it), the Court notes that "at summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible

Ex. 111 at 39 (on one occasion, the kiosk "wasn't even there and someone outside was checking people in"; on another occasion, patient "had to yell for someone to come and assist me which they [the staff member] didn't mind and it was an employee so I let them do it").   A number of other ACB members indicated that they brought family members along to their appointments to help them check in, or asked for help from other patients. *See, e.g.*, Brink Depo. at 185-86 (patient who was unable to use the kiosk, who was accompanied by her daughter, spoke to a Quest employee who asked if her daughter could help her); Grahmann Depo. at 164-65 (patient who was unable to use the kiosk asked another person in line to help her); Haroyan Depo. at 141 (has had another patient assist with check-in); *id*. at 144, 157 (had her father help with check-in).

In addition to TFS, Quest has implemented new features since the kiosks were first introduced.   These have included a "wait where you want" feature, rolled out during the pandemic to allow patients to wait outside the waiting room, and a COVID-19 symptom checker, which notified patients with COVID symptoms to leave the PSC. *See* Walsh Decl. ¶ 7 [Doc. # 236-10].   The symptom checker has apparently been removed. *Id*.; *see also* Yarrison Decl. ¶¶ 18-19 [Doc. # 236-9] (stating the features of the kiosk are likely to change over time).   Quest asserts that "nearly all" of the kiosk's features can be used on the internet.   Carr Decl. ¶ 24 [Doc. # 236-6].[11]

An investigator hired by Plaintiffs visited 24 PSCs from June to August 2021 and found that not all of the kiosks were set up with TFS. *See* Derry Report at 296, 298-300

---

form at trial, such as by live testimony." *JL Beverage Co., LLC v. Jim Beam Brands Co*., 828 F.3d 1098, 1110 (9th Cir. 2016).   The patients whose statements are identified by name could testify at trial.

[11] Plaintiffs contend that the "wait where you want" feature is not available on Quest's website. *See* Request for Judicial Notice ¶ 1, Ex. 1 [Doc. # 243].   The Court **GRANTS** Plaintiffs' Request for Judicial Notice, which contains screenshots from Quest's website.   It is not clear how a patient could sign up for the "wait where you want" feature, but it is likewise not obvious that such a feature would be available on the appointment scheduling page.

[Doc. # 207-2].[12]  The audio message instructing visitors to use the TFS did not play at some locations, and played only every 15 minutes at others.  *Id*. at 296.  Quest presents contrary evidence that, as of May 23, 2022, TFS has been used tens of thousands of times, at 2,168 PSCs.  Carr Decl. ¶¶ 11-12.[13]

Taylor Carr, Quest's Director of Experience and Innovation, provided a declaration explaining the administrative difficulty of adding a headphone jack and other tactile functions, Plaintiffs' preferred method of communication, to all the kiosks.  Carr asserts that providing a headphone jack and tactile functions would increase the wear and tear on the tablets.  Carr Decl. ¶ 13.a.  Carr also asserts that the existing tablets have only a single headphone jack, which Quest prefers to use as a data port to plug in the camera needed to scan insurance cards and driver's licenses using the kiosks, rather than preserving it for use by visually impaired customers who need to plug in headphones.  *Id*. at ¶ 13.b.  Quest understands Apple and Android intend to phase out headphone jacks over time, and Quest uses an Apple tablet for its kiosks.  *Id*. at ¶ 13.c.  In addition, rolling out new kiosks across all PSCs (more than 2,100) would require substantial staff time, logistical planning, and new training.  *Id*. at ¶ 13.d-f.

**B.   Vargas's Experience**

Vargas is legally blind, and uses a screen reader to help him understand information displayed on screens.  SUF A2.[14]  Vargas testified in his deposition that he has some vision,

---

[12] Quest objects to the Derry Report on the basis that it was produced only three days before the discovery deadline.  Three days before the discovery deadline is *before* the discovery deadline.  The Court **DENIES** Quest's request to exclude this evidence as untimely.

[13] There is no evidence in the record to show if these swipes were performed by visually impaired people.  The evidence does support Quest's contention that TFS is widely available at Quest PSCs.

[14] The Court cites to Plaintiffs' Statement of Undisputed Facts ("SUF") submitted in support of their Reply.  [Doc. # 242-1.]  To the extent the parties' purportedly disputed facts are not in fact controverted by any cited evidence, the Court treats them as uncontroverted facts.

The Court has reviewed the parties' evidentiary objections.  To the extent the Court does not address any of them, it is because the Court did not rely on the objected-to evidence in reaching its ruling.  Any objections to such evidence are **OVERRULED** as moot.

-8-

and can sometimes make out shapes and colors.  Vargas Depo. at 55:17-56:4 [Doc. # 113-2].[15]  His vision has decreased with time.  For example, although he had the ability to read large print when he was young, that has become increasingly difficult.  *Id*. at 75:13-22.  He uses various assistive technologies, including a cane to navigate physical spaces, a screen reader on his iPhone, GPS to orient himself when traveling, and optical character recognition technology to read his mail.  *Id*. at 70:13-71:10.

On June 15, 2019, Vargas took paratransit to a Quest PSC near his home.  SUF A14. He did not have an appointment.  Vargas Depo. at 132:25-133:1.  There was no greeter or receptionist.  *Id*. at 140:2-6.  He found a window and said hello a couple of times, but nobody responded.  *Id*. at 140:7-141:2.  After 10 to 15 minutes, Prudencia Magana, a phlebotomist, came out to help another patient.  *Id*. at 141:3-23.  Magana said something like "hi, sir, can I help you?"  *Id*. at 143:3-12.  Vargas told her he was there to have blood work done.  *Id*. at 143:14-15.  He was holding a white cane in his hand, but he did not tell her he was blind.  *Id*. at 260:10-18.  Vargas says Magana directed him to the kiosk, guiding him by his elbow, and told him, "this is where you check in."  *Id*. at 143:16-144:3.  Magana does not recall meeting Vargas, and does not remember saying this, or anything about the visit.  Magana Decl. ¶ 7; *see also* Magana Depo. at 3:24-4:22 (repeatedly stating "I don't remember" when asked if she helped Vargas that day), 5:9-17 (she does not remember directing Vargas to the kiosk), 8:7-9 (she remembers nothing at all regarding Vargas or his visit).

Vargas checked the kiosk for tactile markings, a headphone jack, or a tactile keyboard, all features that signal to him that a device is accessible.  Vargas Depo. at 144:11-14.[16]  Finding none, he told Magana the kiosk was not accessible to blind people so he

---

[15] Citations to the Vargas Deposition refer to the page numbers of the full Vargas deposition, which was submitted in support of Plaintiffs' opposition to Quest's First MSJ, rather than to the excerpts submitted in support of Plaintiffs' MSJ.

[16] Elsewhere in his deposition, Vargas described how he uses accessibility features on other touchscreen devices.  For example, he explained that at voting booths in Los Angeles County, he is able to plug in his headphones and the touchscreen device "instantly recognizes that accessibility is going to be used."  A voice speaks through the headphones, describing how to use the accessibility features and

would need help signing in.  Vargas Depo. at 144:11-22.  He later testified that he "was not able to do any kind of transacting via that kiosk because it required a sighted person to operate it." *Id*. at 237:8-10.  Vargas testified that Magana took another patient back for lab work, then came back approximately five minutes later to take Vargas back to the draw room.  Vargas Depo. at 145:3-22.  She took his information at the window in the waiting room.  *Id*. at 147:2-148:10.  Vargas testified that after being checked in, he waited about five more minutes before Magana came back out and took him in for the blood draw.  *Id*. at 150:25-151:5.  Vargas says he made a point to mention to Magana that the kiosk was inaccessible, and suggested she talk to someone about making the kiosks accessible.  *Id*. at 152:19-153:4.  Vargas testified that he "believe[s]" he asked to be contacted by someone from Quest about the kiosk.  *Id*. at 154:13-23.

Magana testified that she "thinks" she is trained to document patient complaints by informing her supervisor, but that she cannot remember having documented or reviewed any complaints she recorded regarding Vargas's June 25, 2019 visit.  Magana Depo. at 6:4-7:4; *see also* Magana Decl. ¶ 7 (asserting she does not remember if Vargas ever complained, but that if he had, she would have reported the complaint to her supervisor, and she sees no record that she reported such a complaint).  Vargas testified that "being told that [he] had to use a kiosk to check in only to find that it's inaccessible" was a "frustrating experience."  Vargas Depo. at 226:17-19.  He said the experience was embarrassing, humiliating, and made him feel like a "third-class citizen of some kind." *Id*. at 238:24-239:6.  He also felt foolish trying to interact with the machine.  *Id*. at 239:13-17.

Vargas returned to a Quest PSC on June 10, 2021.  SUF A43.[17]  He heard the tail end of the audio announcement describing how to use TFS.  SUF A44.  Next, he heard an

---

how to use gestures (such as taps and swipes) to vote.  *See* Vargas Depo. at 84:4-18.  He described encountering similar features on a touchscreen used to order and pay at a restaurant.  *See id*. at 87:9-89:23.

[17] Quest objects to Vargas's evidence of this visit on the basis that it was not disclosed until three days before the discovery cutoff.  The Court declines to exclude as untimely discovery which was produced before the cutoff.

announcement about the "wait where you want" option.  SUF A45.  About 8-10 minutes later, he heard the full announcement describing how to use TFS.  SUF A46.  The announcement did not tell Vargas where the kiosk was located, but instructed patients to ask a Quest team member for help if needed; no staff members were, however, in the waiting room.  SUF A47-49.  The kiosk told Vargas he would wait three minutes, but in reality, he waited 17 minutes.  SUF A51.

### III.

### EVIDENTIARY ISSUES

Plaintiffs seek to strike several of Quest's declarations as sham affidavits.  The sham affidavit rule provides that a party cannot simply avoid summary judgment by submitting an affidavit that directly contradicts his own prior deposition testimony.  *See Yaeger v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact [at summary judgment] by an affidavit contradicting his prior deposition testimony.").  The rule should be "applied with caution," and the inconsistency between prior testimony and the declaration "must be clear and unambiguous to justify striking the affidavit."  *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 999 (9th Cir. 2009).  "[T]he district court must make a factual determination that the contradiction was actually 'sham.'"  *Id.* (citation omitted).  The rule may not apply if the affiant provides a "reasonable explanation" for the discrepancy.  *See Yeager*, 693 F.3d at 1081.

Plaintiffs seek to strike affiant Prudencia Magana's statement that she was trained to scan the waiting room for patients who might need assistance, on the basis that the statement contradicts her prior deposition testimony.  At her deposition, Magana was asked:  "Were you ever trained by Quest to scan the waiting room for patients requiring assistance?"  Magana Depo. at 255:19-20 [Doc. # 207-2].  Magana asked Plaintiffs' counsel to repeat the question.  After he did, Magana answered "not that I remember."  *Id.* at 255:24.  Plaintiffs also seek to strike Magana's statement that if Vargas had complained,

she would have notified her supervisor, because she testified at her deposition that she did not remember.

In her declaration submitted in support of Quest's opposition to Plaintiffs' MSJ, Magana asserts that she misunderstood the question.   Magana Decl. ¶ 8 (stating she "thought the lawyer asking the question was referring to the scanning function on the Kiosk, like to scan in a QR Code.  So, I answered that I had not been trained on how to use the scanner because I have not been.").  From the limited context of Magana's deposition available to the Court, it appears plausible that Magana misunderstood the question: Plaintiffs' counsel's previous question was about a phlebotomist's ability to view patients' prior test results in Quanum, a Quest program used by phlebotomists; given this context, the question regarding "scanning" was worded in such a way that Magana could have misunderstood what Plaintiffs' counsel was asking.  The Court therefore declines to strike the declaration on this basis, and concludes that the apparent contradiction would instead be a proper subject for impeachment at trial.  Likewise, Magana's statement that she does not remember assisting Vargas does not contradict her statement in her declaration that she would have reported Vargas's complaint had he made one.  Indeed, the statement in her declaration is consistent with her deposition testimony regarding customer complaints. The Court thus declines to strike her declaration on this basis as well.

Plaintiffs ask the Court to strike much of the Carr Declaration as a sham affidavit. The Court relies only on several paragraphs of the Carr Declaration.   The deposition testimony that purportedly contradicts paragraph 9 and 10, regarding use of TFS in recent months, shows that Carr testified he was not involved with implementing TFS after 2020. Plaintiffs contend that Carr thus cannot have personal knowledge of how TFS has been used since then.  This contention is meritless:  Carr testifies in his declaration that he asked for information in 2022 about the use of TFS.  There is no contradiction between this statement and his prior testimony that he was not involved in implementing TFS after a certain point.  Likewise, there is no contradiction between paragraph 24, stating that many kiosk features are also available online, and Carr's deposition testimony, which states that

the "wait where you want" feature is available on the kiosk.[18]   Similarly, although Carr repeatedly testified at his deposition that he did not know whether the addition of a headphone jack and tactile features would impose an undue financial burden on Quest, this testimony does not contradict his statements in his declaration regarding the *administrative burden* these features would impose.  The Court declines to strike the declaration on these bases.

Plaintiffs ask to exclude the declaration of Jody Reilly regarding Quest training, on the basis (in relevant part) that she was unable to confirm at her deposition whether all Quest staff members complete the "Managing Every Patient's Needs" training.  This is not a direct contradiction, but rather a subject for cross-examination, and the Court declines to strike the declaration on this basis.

## IV.

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  Material facts are those that may affect the outcome of the case.  *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a

---

[18] Plaintiffs separately dispute that Carr's declaration is accurate.

genuine issue for trial.'"  *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)).  "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  "Rather, it draws all inferences in the light most favorable to the nonmoving party."  *Id.*

# V.
## DISCUSSION

### A.    Quest's MSJ

Quest seeks summary judgment on the question of whether the ADA contains an independent requirement that its self-service check-in kiosks be independently accessible to blind users.[19]

Applicable ADA regulations require that Quest provide "appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities."  28 C.F.R. § 36.303(c).  The same regulations further provide that:

> The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place.  A public accommodation should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, but the ultimate decision as to what measures to take rests with the public accommodation, provided that the method chosen results in effective communication.  In order to be effective,

---

[19] "Independent accessibility" is not a term of art under the ADA, and neither party explains exactly what they mean by it.  The Court understands Plaintiffs to be primarily referring to the use of headphone jacks, tactile markings, and tactile keyboards that would make the kiosks usable for individuals using a screen reader, including a screen reader built into the kiosk.  The Court uses the term to refer to the ability for a blind user to access all the features of the kiosk without the assistance of a phlebotomist or receptionist.

auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

*Id*. at § 36.303(c)(1)(ii). The Ninth Circuit has reiterated that, while a public accommodation should consult with a disabled individual to identify the auxiliary aid or service that would provide effective communication, "the public accommodation itself is independently responsible for making the ultimate decision as to what measures to take." *Tauscher v. Phoenix Bd. of Realtors, Inc.*, 931 F.3d 959, 964 (9th Cir. 2019) (citing 28 C.F.R. § 36.303(c)). As the Ninth Circuit's formulation makes clear, the public accommodation has both the latitude and the responsibility to ensure that whatever services it provides ensure effective communication for customers. Thus, the touchstone is "effective communication."

Plaintiffs do not argue in their opposition to Quest's MSJ that the failure to provide independently accessible kiosks is in itself an ADA violation. Indeed, Plaintiffs appear to have abandoned this theory of Quest's *liability*, and instead focus on Quest's alleged failure to actually provide phlebotomist assistance. Since the Court redefined the class definition, the question of whether the ADA requires independently-accessible kiosks is also less central to the case. The Court thus assumes for purposes of this action that Quest's failure to make its kiosks independently accessible is not in itself an ADA violation, provided it is not the primary method for check-in. In some ways, Quest's motion for summary judgment on this issue is a straw man. The class definition, as currently formulated, focuses the ultimate inquiry on whether the kiosks are the primary method of check-in and, if so, whether it provides effective communication.

Quest also seeks, however, to strike Plaintiffs' request for an injunction requiring Quest to provide independently accessible kiosks as an equitable remedy. The question of remedy is separate from the question of liability. *See, e.g.*, *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 907 (9th Cir. 2019) ("we agree" with plaintiff's argument that, if liability was established, a district court could order compliance with private industry standards for

website compliance as a remedy in an ADA case, even though failure to comply with those standards would not necessarily serve as an independent basis for liability).[20]   The Ninth Circuit has previously emphasized that public accommodations need only make "reasonable" accommodations, not "any and all possible accommodations that would provide full and equal access to disabled patrons."   Still, public accommodations "must also take into account evolving technology that might make it cheaper and easier to ameliorate the plight of the disabled."  *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012).   The court of appeals has also rejected the argument that offering the auxiliary aids and services identified in the ADA and associated regulations will *per se* satisfy the ADA, reasoning that "assistive technology is not frozen in time:  as technology advances, [. . .] accommodations should advance as well."  *Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).   This case law makes clear that mere compliance with the minimum standards established in ADA regulations will not necessarily satisfy the statute where rapidly-evolving technology may have advanced beyond what was contemplated at the time the regulations were promulgated.   Therefore, even if Quest's failure to provide an independently accessible kiosk cannot serve as a stand-alone basis for liability, that fact would not preclude this Court from ordering provision of an "independently accessible" kiosk (however that may be defined technologically) as an equitable remedy if Plaintiffs can establish a basis for liability.   The Court concludes that the available equitable remedies remaining to Plaintiffs include, among others, the

---

[20] Quest attempts to distinguish *Robles* on the ground that DOJ's posture toward websites is different than its posture toward "interactive transaction machines" like the kiosk.  Quest argues that DOJ has previously indicated that the ADA *applies* to websites, but has not promulgated rules governing the *standards* that websites must follow.  On the other hand, DOJ *has* promulgated standards that apply to certain interactive transaction machines:  ATMs.  DOJ has stated, however, that these standards do not apply to any other interactive transaction machines.  *See* DMSJ Reply at 13; *see also* 2010 Americans with Disabilities Act Standards for Accessible Design, § 707, available at http://www.ada.gov/regs2010/ 2010ADAStandards/2010ADAstandards.htm#pgfId–1006537.   For purposes of this motion, this is a distinction without a difference:  *Robles*, *Baughman*, and *Enyart* all make clear that the fact that ADA regulations do not specifically require a particular technology in *all* circumstances does not prevent courts from requiring them in *specific* circumstances.

provision of headphone jacks and/or tactile keyboards or markings if Plaintiffs can establish liability at trial.

The Court **GRANTS** Quest's MSJ as to Plaintiffs' freestanding "independent accessibility" theory of liability, where the kiosk is not the primary method for check-in.[21] To the extent Quest also seeks summary judgment, however, on the scope of the injunctive relief available to the Class (should the Class prevail at trial), Quest's MSJ is **DENIED**.[22]

## B.    Plaintiffs' MSJ

### 1.    Vargas's Individual Claims

Vargas moves for summary judgment on his individual Unruh Act and DPA claims. A plaintiff may establish a violation of the Unruh Act by establishing a violation of the ADA. *See* Cal. Civ. Code  51(f).  Like the Unruh Act, California's DPA incorporates the standards of the ADA.  Cal. Civ. Code § 54.1(a)(3); *see also Cohen v. City of Culver City*, 754 F.3d 690, 701 (9th Cir. 2014) ("A violation of the ADA constitutes a violation of the California DPA.")

When pursuing claims under Title III of the ADA, a plaintiff must prove "(1) [he] is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied accommodation by the defendant because of his disability." *Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc.*, 603 F.3d 666, 670 (9th Cir. 2011) (citing *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. 2007)).

---

[21] The Court rejects Plaintiffs' assertion that Quest's MSJ is procedurally improper.  Quest moved for summary judgment on a "part" of Plaintiffs' claim.  *See* Fed. R. Civ. P. 56(a) (permitting motion for summary judgment on "part of [a] claim or defense").  Although it was a part of Plaintiffs' legal theory at the inception of this litigation, that theory has evolved away from that position.  Nonetheless, Quest is entitled to lay that claim to rest even if it is not case dispositive.

[22] The Court likewise denies as premature Quest's preemptive request to stay implementation of a theoretical injunction requiring independently accessible kiosks pursuant to the doctrine of primary jurisdiction.  A DOJ rulemaking regarding this issue appears to be imminent, but a final rule is not imminent.  To the extent the rulemaking appears likely to impact the scope of Quest's obligations under the ADA, the Court will revisit Quest's request as necessary at a later date.

It is undisputed here that Vargas is disabled and that Quest operates a place of public accommodation. The question here is whether Vargas was denied accommodation by Quest because of his disability upon his first visit to a Quest PSC, on June 15, 2019. It is uncontroverted that Vargas visited a Quest PSC without an attendant; a kiosk was present; when Magana visited the waiting room, she directed Vargas to the kiosk; he discovered that the kiosk lacked accessibility features; Magana helped him check in approximately five minutes later.[23] It is apparent from these facts that Vargas did, eventually, receive assistance with checking in. The question is whether that assistance constituted "effective communication."

The Ninth Circuit instructs that, in contemplating how to comply with the ADA, "[p]ublic accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman*, 685 F.3d at 1135. In *Baughman*, the court concluded that Disney was required to permit a disabled individual to use a Segway, a standing motorized scooter, to navigate the park, even where she could potentially have used a wheelchair (which was permitted under Disney policy). The court reasoned that "if [the defendant] can make [the plaintiff's] experience less onerous and more akin to that enjoyed by its able-bodied patrons, it must take reasonable steps to do so." *Id*. at 1136.

Still, a number of other district courts around the country have concluded that the provision of employee assistance satisfies the ADA's effective communication requirement in the context of a retail transaction. In *National Federation of the Blind, Inc. v. Wal-Mart Associates, Inc.*, a district court joined several other district courts in concluding that "[s]taff assistance is sufficient to provide effective communication in a

---

[23] Vargas did not testify at his deposition that he was actually unable to use the kiosk because of his blindness. It is reasonable to infer from his other testimony, however, that he was unable to use the kiosk: he testified, for example, that he was unable to see Magana well enough to discern her height, and he testified that he was able to read large-print type when he was younger, but that his ability to do so has diminished with age. Still, drawing all inferences in the light most favorable to Quest, as the Court must on Plaintiffs' motion, the Court concludes that this remains a triable issue of material fact.

retail transaction," and rejecting the plaintiffs' contention that touchscreen retail checkout stations must be independently accessible.  *See Nat'l Fed'n of the Blind, Inc. v. Wal-Mart Assocs., Inc.*, 566 F. Supp. 3d 383, 399 (D. Md. 2021); *see also West v. Moe's Franchisor, LLC*, No. 15CV2846, 2015 WL 8484567, at *3 (S.D.N.Y. Dec. 9, 2015) (dismissing plaintiffs' complaint asserting that fast-food restaurant's use of touchscreen soda fountain violated the ADA, and rejecting plaintiffs' contention that, because the restaurant had "voluntarily entered the digital platform," the restaurant must make the soda fountain independently accessible); *West v. Five Guys Enterprises, LLC*, No. 15-CV-2845 (JPO), 2016 WL 482981, at *2 (S.D.N.Y. Feb. 5, 2016) (dismissing complaint alleging denial of assistance by fast-food restaurant's employees in operating touchscreen soda fountain, because denial of assistance on a single occasion is insufficient to state a claim, but noting that "[i]f Plaintiffs alleged that they were denied assistance repeatedly at [the restaurant's] locations, they would state an ADA claim").  The only district court in this circuit to have considered the issue found that a restaurant's failure to *affirmatively* offer assistance with operating a touchscreen soda fountain violates the ADA.  *See Boyer v. Five Guys Enterprises, LLC*, No. 15-CV-1417-L-JLB, 2018 WL 4680007, at *1 (S.D. Cal. Sept. 28, 2018) (granting plaintiff's motion for summary judgment where the plaintiff, who used a white cane and whose disability was thus apparent, received a cup from an employee but was not offered assistance with using the soda fountain, and did not request such assistance).

The district court in *Boyer* did not analyze whether employee assistance would satisfy the ADA.  Instead, it assumed for purposes of Boyer's summary judgment motion that it would.  Other courts have concluded that, where heightened privacy concerns were implicated, employee assistance might be insufficient.  *See, e.g., National Federation of the Blind*, 566 F. Supp. 3d 383 at 400 (noting that "in circumstances with heightened expectations of privacy, assistance from a qualified reader may not be sufficient" and distinguishing cases finding that touchscreen voting machines must be independently accessible); *see also California Council of the Blind v. Cnty. of Alameda*, 985 F. Supp. 2d

1229, 1245 (N.D. Cal. 2013) (denying motion to dismiss claim that county's failure to reliably provide independently accessible voting machines violated Title II of the ADA). As discussed above, Plaintiffs here no longer contend that the ADA requires "independently accessible" kiosks in this context.

There are sufficient facts in the record before the Court for a reasonable trier of fact to conclude that Vargas was offered assistance with checking in, and thus that Vargas received effective communication.  Vargas testified that, when Magana came out to help another patient, she asked him "can I help you?"  Vargas Depo. at 143:3-12.  While Magana's declaration is not entirely clear, she appears to assert that if Vargas had told her the kiosk was not accessible, she would have informed her supervisor.  *See* Magana Decl. ¶ 7 ("I don't remember if Mr. Vargas complained about the Kiosk during the visit, but what I do know if that, if he had, we are trained to inform our supervisor of **any** patient complaint we receive, and I have always done that.").  It is uncontroverted that Magana did check Vargas in.  There is also evidence in the record before the Court that, even before the implementation of TFS, Quest trained its staff to offer extra assistance to patients with disabilities, including visually impaired patients.  Drawing all inferences in the light most favorable to Quest, as the Court must, the Court concludes that a triable issue of fact remains as to whether Magana offered, or Vargas requested, assistance with check-in.

In addition, assuming that personal assistance was available, a question remains whether a 17-minute wait for assistance violates the ADA under the circumstances of this case.  *See, e.g., Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 840 (9th Cir. 2007) (an hour-long delay in correcting the accidental assignment of a disabled patron to an inaccessible hotel room did not support standing); *O'Connor v. Scottsdale Healthcare Corp.*, 871 F. Supp. 2d 900, 904 (D. Ariz. 2012), *adhered to on reconsideration*, No. CV11-2264-PHX-JAT, 2012 WL 2106365 (D. Ariz. June 11, 2012), and *aff'd*, 582 F. App'x 695 (9th Cir. 2014) (dismissing for lack of standing a claim that hospital security guard's refusal to allow visitor to enter with her service dog violated the ADA, where after a 40-minute delay, the guard's supervisor allowed the visitor to enter with her dog); *Frankeberger v.*

*Starwood Hotels & Resorts Worldwide, Inc.*, No. C09-1827RSL, 2010 WL 2217871, at *4 (W.D. Wash. June 1, 2010) ("a wait of less than sixteen minutes for assistance was neither unreasonable nor reflective of discrimination" where the plaintiffs, who were legally blind and one of whom used a wheelchair, were unable to read the instructions to operate a wheelchair lift at a secondary entrance to a hotel and needed to ask for assistance with the lift). The Court thus **DENIES** Plaintiffs' MSJ as to Vargas's individual claim.

### 2.      Plaintiffs' and Class ADA Claims

The Court also finds that a triable issue of fact remains as to whether Quest provided effective communication to the Class during the Class Period. Plaintiffs assert that the Court previously held that Quest's kiosks, as originally rolled out, failed to provide effective communication to blind individuals. The Court previously determined that, although the original version of the kiosks did not *themselves* satisfy the ADA, a genuine factual dispute remained regarding whether Quest had satisfied the ADA through its provision of phlebotomist assistance, and denied Quest's MSJ as to this issue. *See* First MSJ Order at 13. Plaintiffs now move themselves for summary judgment on this issue.

There is no question that, as a Quest staff member put it in an internal email, "the staff is servicing the patients and cannot always be in front of the 'house' tending to folks that are struggling with registration." *See* [Doc. # 206-3 at 8]. Still, the Court concludes that, viewing the evidence in the light most favorable to Quest, a reasonable trier of fact could find that Quest's provision of phlebotomist assistance provided effective communication to blind class members during the Class Period. Quest has training materials that could lead a reasonable factfinder to conclude that Quest trained its staff to watch for, and proactively provide assistance to, visually impaired patients. *See* Part II, *supra* (describing pre-TFS training materials). Vargas's own experience indicates that he was eventually assisted with check in by a staff member. Members of Plaintiff ACB had a range of experiences, with many blind patients indicating that they were assisted relatively quickly. This evidence creates a triable issue of fact as to the effectiveness of Quest's provision of staff assistance. The Court thus **DENIES** Plaintiffs' MSJ as to

1    effective communication during the Class Period.

2    **C.    Mootness**

3         Plaintiffs also move for summary judgment, seeking an order that TFS does not moot

4    Plaintiffs' ADA claims.  Quest asserts TFS allows blind patients to check in for their visits

5    independently, and thus contends (and has contended throughout this action) that Plaintiffs'

6    ADA claim is moot.

7         To have standing to seek an injunction—the only form of relief available under the

8    ADA—there must be a chance that the plaintiff will face the complained-of conduct in the

9    future.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105–106 (1983).  In the ADA

10   context, if the plaintiff has already received everything to which he would be entitled, then

11   his claims are moot unless there is evidence the plaintiff will be subjected to the same

12   wrongful conduct by the same defendant.  *Parr v. L&L Drive-Inn Rest*., 96 F. Supp. 2d

13   1065, 1087 (D. Haw. 2000); *Johnson v. Oishi*, 362 F. Supp. 3d 843, 848 (E.D. Cal. 2019)

14   ("[B]ecause a plaintiff can only obtain injunctive relief under the ADA, the defendant's

15   voluntary cessation of an ADA violation may effectively moot a plaintiff's ADA claim.")

16   (internal citation omitted).  In such cases, defendants bear the burden to show that "the

17   challenged conduct cannot be reasonably expected to recur."  *Oishi*, 362 F. Supp. 3d at

18   848.

19        Triable issues of material fact remain as to whether TFS moots Plaintiffs' claim for

20   injunctive relief.  TFS creates a method for giving notice to phlebotomists located behind

21   a closed door that a visually impaired individual has arrived.  New training, implemented

22   in association with TFS, instructs staff members to identify patients who might need

23   additional assistance, and to make themselves available to assist such patients.[24]    A

---

24   [24] Plaintiffs contend that, even if TFS does address Plaintiffs' claim that check-in was inaccessible,
25   Quest has added additional features that TFS does not render independently accessible.  Since "effective
     communication" and not "independent accessibility" is the touchstone of this action, this argument is, to
26   some degree, beside the point.  Still, Quest argues in opposition that Plaintiffs did not plead these
     "additional" barriers to access in their First Amended Complaint ("FAC"), and that failure to do so places
27   them outside the scope of this action.  The Court disagrees.  Plaintiffs' FAC broadly alleges that Quest
28   violated the ADA by failing to make its "check-in system" accessible to blind users.  *See* FAC ¶¶ 4-7.
     The new functions of which Plaintiffs complain—in particular, the "wait where you want feature," added

reasonable trier of fact could conclude, based on this evidence, that when coupled with Quest staff assistance, TFS does provide effective communication for blind patients in compliance with the ADA.  The Court thus **DENIES** Plaintiffs' MSJ as to mootness.

**D.    Undue Burden**

Plaintiffs move for summary judgment on the ground that Quest has not proven that implementing independently accessible kiosks would be an undue administrative burden. Quest contends that replacing the existing kiosks with new kiosks, outfitted with different accessibility hardware, would constitute an undue administrative burden.[25]  Quest presents evidence that providing this hardware would increase the wear and tear on the kiosks, limit Quest's ability to offer other functions through the kiosks, and potentially require Quest to find a different source for its tablets at some point in the future.  *See* Carr Decl. ¶ 13.  Quest also presents evidence that switching out the existing kiosks for new ones would involve additional staff time, logistical planning, and new training.  *Id.*  This evidence creates a triable issue of fact as to whether provision of these features would impose an undue burden on Quest.  The Court thus **DENIES** Plaintiffs' MSJ as to Quest's undue burden affirmative defense.

**VI.**
**CONCLUSION**

For the reasons stated herein, the Court:

1. **GRANTS** Quest's MSJ as to Plaintiffs' freestanding "independent accessibility" theory of liability;

2. **DENIES** Quest's MSJ to the extent it seeks to preemptively limit the scope of potential injunctive relief; and

---

during the COVID-19 pandemic after Plaintiffs filed their FAC—are obviously part of Quest's "check-in system."  To the extent Quest contends that such a reading of Plaintiffs' FAC creates a moving target for Quest, the Court is unpersuaded.  Quest itself has moved the target, by adding new check-in features to the kiosks.

[25] Quest does not argue that it would constitute an undue financial burden.

3.  **DENIES** Plaintiffs' MSJ.

**IT IS SO ORDERED.**

DATED:  August 12, 2022

                                              DOLLY M. GEE
                                  UNITED STATES DISTRICT JUDGE