1
2
3
4
5
6
7

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
DAVID RAIZMAN, CA Bar No. 129407
david.raizman@ogletree.com
AMBER L. ROLLER, CA Bar No. 273354
amber.roller@ogletree.com
J. NICHOLAS MARFORI, CA Bar No. 311765
nicholas.marfori@ogletree.com
400 South Hope Street, Suite 1200
Los Angeles, California 90071
Telephone: 213-239-9800
Facsimile: 213-239-9045

8

[*Additional Counsel Listed on Next Page*]

9
10
11

Attorneys for Defendants
QUEST DIAGNOSTICS CLINICAL LABORATORIES,
INC.; QUEST DIAGNOSTICS HOLDINGS, INC. and
QUEST DIAGNOSTICS INCORPORATED

12

## UNITED STATES DISTRICT COURT

13

## CENTRAL DISTRICT OF CALIFORNIA

14
15
16

JULIAN VARGAS, ANNE WEST, and
AMERICAN COUNCIL OF THE
BLIND, individually on behalf of
themselves and all others similarly
situated,

17

Plaintiffs,

18

v.

19
20
21
22
23

QUEST DIAGNOSTICS CLINICAL
LABORATORIES, INC., QUEST
DIAGNOSTICS HOLDINGS, INC.,
QUEST DIAGNOSTICS
INCORPORATED; and DOES 1-10,
inclusive,

Defendants.

Case No. 2:19-cv-08108 DMG (MRWx)

## DEFENDANTS' TRIAL BRIEF

Date:          November 1, 2022
Time:          9:30 a.m.
Place:         Courtroom 8C

Complaint Filed: September 18, 2019
Trial Date:       November 1, 2022
District Judge:   Hon. Dolly M. Gee
                  Courtroom 8C, First St.
Magistrate Judge: Hon. Michael R. Wilner
                  Courtroom 550, Roybal

24
25
26
27
28

GIBBONS P.C.
MARK S. SIDOTI (Admitted *Pro Hac Vice*)
msidoti@gibbonslaw.com
DANIEL S. WEINBERGER (Admitted *Pro Hac Vice*)
dweinberger@gibbonslaw.com
One Pennsylvania Plaza, 37th floor
New York, New York 10119
Telephone:  212-613-2000
Facsimile:  212-554-9660

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................... 1

II.     KEY LEGAL ISSUES .............................................................................. 3

    A.      Plaintiffs Fail to Establish Class-Wide Proof of a Discriminatory Policy Resulting in an ADA Violation. ................ 5

    B.      Plaintiffs Cannot Establish That Quest Violated the ADA as to Plaintiff Vargas. ....................................................................... 8

    C.      Even if Plaintiffs Could Establish an ADA Violation, Plaintiffs' Claims are Moot as a Result of the Three Finger Swipe and Extensive Employee Training. ........................ 10

    D.      Judgment Must Be Entered Against Plaintiffs On Their Newly-Trumpeted "Reasonable Modification" Claim. ............... 13

        1.      Plaintiffs' Newly-Articulated Legal Theory Is, Read Most Charitably, Still A Request For An Auxiliary Aid Or Service" ................................................. 13

        2.      Plaintiffs Cannot Meet Their Burden To Establish That Quest Failed To Provide A Reasonable Modification Of Policies, Practices Or Procedures. .......... 16

III.    CONCLUSION .......................................................................................... 19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Allen v. Ollie's Bargain Outlet, Inc.*,
No. 21-2121, 2022 WL 2284654 (3d Cir. June 24, 2022) ................................. 5, 6

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2019) ................................................................................ 10

*Anderson v. Ross Stores, Inc.*,
No. C99-4056 CRB, 2000 WL 1585269 (N.D. Cal. October 20, 2000) ................................................................................................ 9

*Bax v. Drs. Med. Ctr. of Modesto, Inc.*,
No. 21-16532, 2022 WL 10227441 (9th Cir. Oct. 18, 2022) ....................... 4, 8, 12

*Bell v. Lockheed Martin Corp.*,
No. CIV. 08-6292 RBK/AMD, 2011 WL 6256978, at *7 (D.N.J. Dec. 14, 2011) ...................................................................................... 6

*Betancourt v. Federated Dep't Stores*,
732 F. Supp. 2d 693 (W.D. Tex. 2010) ............................................... 15

*Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*,
765 F.3d 1205 (10th Cir. 2014) .......................................................... 18

*Doran v. 7-Eleven, Inc.*,
524 F.3d 1034 (9th Cir. 2008) ............................................................ 12

*Doud v. Yellow Cab of Reno, Inc.*,
No. 3:13-CV-00664-WGC, 2015 WL 895077 (D. Nev. Mar. 3, 2015) ............... 13

*Equal Rights Center v. Hilton Hotels Corp.*,
2009 WL 6067336 (D.D.C. Mar. 25, 2009) ........................................... 6

*Fortyune v. Am. Multi-Cinema, Inc.*,
364 F.3d 1075 (9th Cir. 2004) ............................................................ 18

*Frankeberger v. Starwood Hotels & Resorts Worldwide, Inc.*,
No. C09-1827RSL 2010 WL 2217871 (W.D. Wash. June 1, 2010) .................... 10

*Frilando v. Bordentown Driver Training Sch., LLC*,
No. 2:15-CV-02917-KM-JBC, 2017 WL 3191512 (D.N.J. July 27, 2017) ................................................................................................ 13

*Gator.com Corp. v. L.L. Bean, Inc.*,
398 F.3d 1125 (9th Cir. 2005) ............................................................ 10

*Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc.*,
603 F.3d 666 (9th Cir. 2011) ......................................................... 3, 8

*Holmes v. Godinez*,
311 F.R.D. 177 (N.D. Ill. 2015) .......................................................... 6

*Johnson v. Oishi*,
  362 F. Supp. 3d 843 (E.D. Cal. 2019) .................................................. 11

*Karczewski v. DCH Mission Valley LLC*,
  862 F.3d 1006 (9th Cir. 2017) ....................................................... 17, 18

*Kohler v. Bed, Bath & Beyond of Cali., LLC*,
  778 F.3d 827 (9th Cir. 2015) .............................................................. 17

*MacClymonds v. IMI Investments, Inc.*,
  2007 WL 1306803 (S.D. Tex. 2007) ................................................... 15

*Martin v. PGA Tour, Inc.*,
  994 F. Supp. 1242 (D. Or. 1998), *aff'd*, 204 F.3d 994 (9th Cir. 2000),
  *aff'd*, 532 U.S. 661, 121 S. Ct. 1879, 149 L. Ed. 2d 904 (2001) ........................ 17

*Namisnak v. Uber Techs., Inc.*,
  444 F. Supp. 3d 1136 (N.D. Cal. 2020) ............................................... 18

*O'Campo v. Chico Crossroads*,
  2011 WL 5241351 (E.D. Cal. Oct. 31, 2011) ...................................... 12

*O'Connor v. Scottsdale Healthcare Corp.*,
  871 F. Supp. 2d 900 (D. Ariz. 2012), *aff'd*, 582 Fed. Appx. 695 (9th
  Cir. 2014) ...................................................................................... 9

*Oliver v. Ralphs Grocery Co.*,
  654 F.3d 903 (9th Cir. 2011) .............................................................. 10

*Paulick v. Starwood Hotels & Resorts Worldwide, Inc.*,
  2012 WL 2990760 (N.D. Cal. July 20, 2012) ...................................... 12

*Skaff v. Meridien N. Am. Beverly Hills, LLC*,
  506 F.3d 832 (9th Cir. 2007) .............................................................. 9

*Tauscher v. Phoenix Bd. of Realtors, Inc.*,
  931 F.3d 959 (9th Cir. 2019) .............................................................. 4

*Timoneri v. Speedway, LLC*,
  186 F. Supp. 3d 756 (N.D. Ohio 2016) ............................................... 6

*Wal-Mart Stores, Inc. v. Dukes*
  564 U.S. 338 (2011) ......................................................................... 5

*West v. Moe's Franchisor, LLC*,
  No. 115-cv-2846, 2015 WL 8484567 (S.D.N.Y. Dec. 9, 2015) ........................ 18

**Federal Statutes**

42 U.S.C.
  § 12182(a) ...................................................................................... 3
  § 12182(b)(2)(A)(ii) ............................................................. 13, 16, 17
  § 12182(b)(2)(A)(iii) ...................................................................... 13

## California Statutes

Cal. Civ. Code
§ 51(f) .................................................................................................. 3

## Other Authorities

28 C.F.R. § 36.302 ............................................................................... 13

28 C.F.R. § 36.303 .......................................................................... 13, 14

28 C.F.R. § 36.303(b) ......................................................................... 14

28 C.F.R. § 36.303(b)(3) .............................................................. 15, 17

28 C.F.R. § 36.303(c)(1) ...................................................................... 4

28 C.F.R. § 36.303(c)(1)(ii) ................................................................. 4

36 C.F.R. Pt. 1191, Appendix B and D ............................................. 18

Central District Local Rule 16-10 ....................................................... 1

Fed. R. Civ. P. 23(c)(1)(C) ................................................................. 8

Pursuant to Central District Local Rule 16-10, Defendants Quest Diagnostics Clinical Laboratories, Inc., Quest Diagnostics Holdings, Inc., and Quest Diagnostics Incorporated (collectively, "Quest") respectfully submit this Trial Brief seeking judgment in favor of Quest and against Plaintiffs Julian Vargas and American Council of the Blind ("ACB") (collectively, "Plaintiffs").  Pursuant to Local Rule 16-10, Quest restricts its arguments here to new legal developments since their filing of their Memorandum of Contentions Of Fact and Law (ECF 263) and to replying to certain points raised in Plaintiffs' Memorandum of Contentions (ECF 276).

## I.   **INTRODUCTION**

Quest is a leading provider of diagnostic information services, including collecting blood and urine specimens from patients at more than 2,100 Patient Service Centers ("PSCs") located in 48 States throughout the country.  Beginning in 2015, to improve the experience of its patients and employees, Quest began to explore ways to modify its check-in practices at its PSCs—that is, Quest explored ways to move from the traditional, paper sign-in sheets to a digital check-in process.  Accordingly, in April 2016, Quest chose to install, over a two-and-a-half year rollout, between May 2016 and December 2018, one or more electronic, touchscreen tablets that patients could use to check in at each of its PSCs.  These tablets, when placed in plastic casings and mounted on posts, came to be known as "Kiosks."  While these Kiosks provided an option for electronic check-in, and replaced paper sign-in sheets, Quest Patient Service Representatives ("PSRs"), such as phlebotomists and other staff, ***continued,*** as they had been with check in using paper sign-in sheets, to be available to provide live assistance with the check-in process.  And, the electronic check in process has continued to be improved both with new features, including a three finger swipe procedure allowing check in independently by the visually impaired, and updated training of all representatives working at Quest's PSCs.

In this nationwide class action lawsuit, Plaintiffs, legally blind individuals who visited Quest's PSCs between January 1, 2018 and December 31, 2019 (the "Class

Period"), allege that Quest violated the Americans with Disabilities Act ("ADA") by discriminating against Plaintiffs because of their disabilities and failing to provide effective communication regarding their check-in process at certain PSCs.  Pursuant to this Court's rulings on class certification and summary judgment, only two claims remain for trial: (1) alleged violation of Title III of the ADA, with regard to Plaintiff Vargas and the certified nationwide class; and (2) alleged violation of the California Unruh Act, with regard to Plaintiff Vargas, only.  Thus, at trial, the Court is left to resolve two narrow questions: (i) did Quest discriminate against Vargas during his 2019 visit to a California PSC by failing to provide him with effective communication during his check-in at that PSC? and (ii) have Plaintiffs and the Class carried their burden to demonstrate that, during the Class Period, Quest had a common discriminatory policy or practice throughout its PSCs nationwide, that resulted in a systemic and class-wide failure to provide "effective communication" during its check-in process?

The evidence will show that the answer to both questions is resoundingly, no. Vargas was provided effective communication by Quest because he was assisted by Quest personnel within minutes of his arrival at a PSC, resulting in Vargas being checked in and receiving diagnostic services from Quest.  Vargas was not discriminated against because of his disability.  Any wait he experienced was the result of the wait for the availability of the phlebotomist on duty for his walk-in visit.

Also, contrary to Plaintiffs' allegations and anecdotal evidence, Plaintiffs and the Class will not present any evidence that Quest had a discriminatory policy or practice throughout its PSCs nationwide that resulted in class members being denied "effective communication" during its check-in process.  Quite to the contrary, the only evidence of a policy or practice is that Quest had a long-standing practice of having its PSC staff members assist with check in, dating back through the many years that check-in was done through paper sign-in sheets.  During the Class Period (2018-2019), nationwide, the check-in process involved assistance being provided by Quest

personnel as needed to ensure like experiences by all patients.  And, the check-in process has continued to improve both electronically and through individualized attention to patients in need by Quest personnel to ensure that Quest acted reasonably to accommodate all patients with disabilities.

Further, even if Plaintiffs could prove an ADA violation during the Class Period, which they cannot, Plaintiffs' claims are now moot because Quest's check-in process is considerably improved by the implementation of the "Three-Finger Swipe" ("TFS") enhancement to its Kiosks across its PSC network.  The TFS acts as a "digital doorbell" to alert PSRs to a patient's arrival, while simultaneously independently and privately checking in patients and placing them on a patient queue.  Thus, patients with visual impairments can now independently use the Kiosks to check in, and the assistance of Quest's PSC staff and phlebotomists are still available to assist when needed.  The claims for injunctive relief are moot, and accordingly, the evidence will require the entry of judgment in favor of Quest.

## II.   KEY LEGAL ISSUES

Title III of the ADA provides, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation…." 42 U.S.C. § 12182(a).  To prevail on their discrimination claims, Plaintiffs must prove the following: (1) Plaintiffs have disabilities within the meaning of the ADA; (2) Quest is a private entity that owns, leases, or operates a place of public accommodation; and (3) Plaintiffs were denied public accommodations by the defendant because of their disability.  *See Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc.*, 603 F.3d 666, 670 (9th Cir. 2011) (citing *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. 2007)); *see also* Cal. Civ. Code § 51(f) (making a violation of the ADA a violation of the Unruh Act).

The federal regulations implementing Title III of the ADA provide that "[a] public accommodation shall furnish appropriate auxiliary aids and services where

necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulations further provide that Quest "should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, but the ultimate decision … rests with [Quest], provided that the method chosen results in effective communication." 28 C.F.R. § 36.303(c)(1)(ii). However, "[t]he regulations do not require [Quest] to provide the specific aid or service requested by [Plaintiffs]; the regulations make clear that 'the ultimate decision as to what measures to take rests with the public accommodation,' so long as the measures provide effective communication." *Tauscher v. Phoenix Bd. of Realtors, Inc.*, 931 F.3d 959, 963 (9th Cir. 2019). Effectiveness will depend on the circumstances: "The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 36.303(c)(1)(ii).

Indeed, the Ninth Circuit recently reaffirmed its position that it does "not apply categorical rules to determine which auxiliary aids are required to achieve effective communication." *Bax v. Drs. Med. Ctr. of Modesto, Inc.*, No. 21-16532, 2022 WL 10227441 at *9 (9th Cir. Oct. 18, 2022). In *Bax*, where the plaintiffs, a deaf couple, alleged the defendant-hospital violated the ADA by failing to afford effective communication regarding their medical care, the Circuit Court stated that "whether written notes constitute an appropriate accommodation must be evaluated under the ***totality of the circumstances***, and on a ***case-by-case basis***." *Id.* at *9 (emphasis added) (citing *Updike v. Multnomah County*, 870 F.3d 939, 956, 958 (9th Cir. 2017)). The Ninth Circuit further noted the "governing legal standard" under the ADA and Unruh Act: "To avoid discriminating against persons with disabilities, covered entities must ensure meaningful access to their services," and, "the touchstone of the accessibility analysis is whether the entity provided auxiliary aids sufficient to ensure 'effective

communication' with [disabled] patients." *Id.*

## A. Plaintiffs Fail to Establish Class-Wide Proof of a Discriminatory Policy Resulting in an ADA Violation.

Even if Vargas could prove that he did not receive effective communication, evidence that one individual was discriminated against at one PSC in California does not establish that over 2,100 PSCs throughout the United States discriminated against anyone, nor does it establish that Quest had a nationwide policy or practice that would result in class members being denied effective communication at check in.  Plaintiffs cannot proffer any *class-wide* proof that Quest has a discriminatory policy that has resulted in discrimination against blind patients related to Quest's check-in process across its more than 2,100 PSCs in approximately 48 States nationwide.  Plaintiffs have not even come close to satisfying this burden.

In *Wal-Mart Stores, Inc. v. Dukes*, the Supreme Court instructed that in a class action seeking injunctive relief, a claim of discrimination requires "[s]ignificant proof" that defendant "'operated under *a general policy of discrimination*.'"  564 U.S. 338, 353 (2011) (emphasis added) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 159 n. 15 (1982)).  Indeed, in *Dukes*, the Court held that in a nationwide class action alleging discrimination against a defendant operating businesses in multiple locations, the evidence must show that the defendant's corporate policies, procedures, or practices in fact cause discrimination by stores nationwide, *i.e.*, that "discrimination was the company's standard operating procedure[,] the regular rather than the unusual practice.'"  *Id.* at 352 n.7 (quoting *Teamsters v. United States,* 431 U.S. 324, 336 (1977)); *see also Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890, 901 (3d Cir. 2022) ("[T]he District Court must answer the very question it asked: whether plaintiffs have significant proof that [defendant's] corporate policies, procedures, or practices *in fact* cause discrimination by stores nationwide.") (emphasis in original).

Moreover, there must be *evidence* of a systemic or common *discriminatory* policy.  *See, e.g., Holmes v. Godinez*, 311 F.R.D. 177, 220 (N.D. Ill. 2015). Mere

allegations of a policy or practice will not suffice. *See, e.g.*, *Timoneri v. Speedway, LLC*, 186 F. Supp. 3d 756, 761-62 (N.D. Ohio 2016) ("The Court finds that this conclusory allegation of a policy, which would encompass any type of ADA violation regarding individuals with . . . disabilities, is insufficient to confer standing to sue on behalf of a potentially nationwide class."); *Equal Rights Center v. Hilton Hotels Corp.*, 2009 WL 6067336 at *7 (D.D.C. Mar. 25, 2009) (concluding that plaintiffs' "somewhat oblique[]" allegations that "their injuries arise from Hilton's practices at a corporate level" were "insufficient to confer nationwide class standing").

Significantly, anecdotal evidence, which is the only evidence that Plaintiffs here rely on to support their class claims, is insufficient to establish an ADA violation based on a discriminatory common practice or policy. Indeed, "*Dukes* rejected 'anecdotal evidence' as 'too weak' to support a common practice." *Allen*, 37 F.4th at 902 (quoting *Dukes*, 564 U.S. at 358)). In *Dukes*, the plaintiffs provided 120 employee affidavits, signed under penalty of perjury, sharing stories of employment discrimination by Wal-Mart supervisors. *Dukes*, 564 U.S. at 358. "The Supreme Court said these affidavits proved nothing: 'More than half of these reports are concentrated in only 6 States (Alabama, California, Florida, Missouri, Texas, and Wisconsin); half of all States have only one or two anecdotes; and 14 States have no anecdotes about Wal-Mart's operations at all.'" *Allen*, 37 F. 4th at 902 (quoting *Dukes*, 564 U.S. at 358)). Similarly, in *Allen*, the Third Circuit found that "anecdotal evidence" was insufficient to prove the existence of a discriminatory policy: "The anecdotal evidence here is far weaker than in *Dukes*. Less than a dozen email anecdotes over four years, from a corporation with over four hundred stores in twenty-nine states and thousands of employees exercising discretion, 'prove nothing at all.'" *Id.* (quoting *Dukes*, 564 U.S. at 358 n.9); *see also Bell v. Lockheed Martin Corp.*, No. CIV. 08-6292 RBK/AMD, 2011 WL 6256978, at *7 (D.N.J. Dec. 14, 2011) (finding plaintiffs proposed "statistical and anecdotal proofs" were insufficient to establish a discriminatory policy).

Here, Plaintiffs have utterly failed to present the "significant proof" required to establish that Quest operates under a general policy of discrimination. *Dukes*, 564 U.S. at 353. Plaintiffs erroneously attempt to establish *class-wide* liability by asserting that *Vargas* was discriminated against. (*See* ECF No. 314 at 38 ¶ 12). Plaintiffs do not present evidence of a *discriminatory* corporate policy or practice; but rather, Plaintiffs try to rely on Vargas's and several other anecdotal experiences of blind patients to establish Quest's liability as to a *nationwide class*. But that simply does not cut it. The anecdotal evidence presented here, experiences from ACB members and Vargas, is far less than the 120 employee affidavits produced in *Dukes*, which was "too weak" to support a common practice. *Dukes*, 564 U.S. at 358. It cannot be seriously contended then that Plaintiffs' proposed anecdotal evidence can support Plaintiffs' burden of proving a discriminatory corporate policy of Quest, across its more than 2,100 PSCs in 48 States. And, further, the Court already recognized that the anecdotal evidence demonstrates "a range of experiences, with many blind patients indicating that they were assisted relatively quickly." (ECF No. 258 at 21.) The evidence at trial will demonstrate even more instances of prompt assistance and available phlebotomists. Thus, not only is Plaintiffs' evidence insufficient because it is solely anecdotal, and as such, it is too weak to support a common discriminatory policy, but their evidence actually demonstrates that class members had different experiences, with many of them being assisted with check-in by phlebotomists "relatively quickly." *Id.*

The Supreme Court in *Dukes* was clear that in order to hold a defendant, with multiple locations around the country, liable for discrimination, there must be a corporate practice or policy that *in fact* causes discrimination. There is no such proof here, and for good reason, because Quest does *not* operate under a general policy of discrimination—in fact, the opposite is true. Since at least 2010, Quest has continued to operate under a policy and train its employees to operate under such a policy that requires Quest employees to provide assistance and accommodations to patients with

disabilities.  (*See* Reilly Trial Decl. ¶ 10 ("Beginning in approximately 2010, Quest launched 'Managing Every Patient's Needs' training modules and/or videos, which were specifically designed to train phlebotomists on their obligation to provide assistance and accommodations to PSC patients with disabilities.").)   Because Plaintiffs have not presented evidence of a common corporate policy of discrimination, judgment should be entered in Quest's favor.[1]

### B.   Plaintiffs Cannot Establish That Quest Violated the ADA as to Plaintiff Vargas.

When the Court engages in the required "thorough" analysis, evaluating the "totality of the circumstances" on a "case-by-case basis," as required by Ninth Circuit precedent, it is clear that Plaintiff Vargas has failed to prove that Quest discriminated against him on account of his disability.  *Id.* at *9.  Indeed, when Vargas visited a PSC on June 15, 2019, a Quest phlebotomist helped him check in.  He then received Quest's diagnostic services.  That Vargas had to wait like other patients does not prove discrimination.  Quest afforded Vargas effective communication during his check-in for diagnostic testing because a Quest phlebotomist assisted him.  Thus, Vargas cannot establish, by a preponderance of the evidence, that Quest failed to provide him with appropriate auxiliary aids sufficient to ensure effective communication. *See Bax*, 2022 WL 10227441 at *3; *see also Goddard*, 603 F.3d at 670.  Instead, the evidence demonstrates that Vargas was offered assistance with checking in, through the phlebotomist present at the PSC and Vargas did in fact, check in and receive diagnostic services.  Under the circumstances, Quest's phlebotomist assistance was an effective "auxiliary aid or service," more specifically, auxiliary to the electronic kiosk, to provide Vargas with the ability to communicate his arrival and readiness to be seen. (*See* ECF No. 144 at 11 ("At the outset, it is important to establish exactly what 'communication' the kiosks enabled for sighted patients, since (as the regulations

---

[1]     Of course, these same arguments and case law establish that the class should be decertified under Rule 23(c)(1)(C).

make clear), the effectiveness of the auxiliary aids provided will turn on the nature of the communication . . . it was a patient's communication to a phlebotomist located behind a closed door that the patient had arrived and was ready to be seen."). Therefore, Vargas received effective communication.

Moreover, the Court concluded on summary judgment that "[t]here are sufficient facts in the record before the Court for a reasonable trier of fact to conclude that Vargas was offered assistance with checking in, and thus that Vargas received effective communication." (*See* ECF No. 144 at 20.) Thus, since "a reasonable trier of fact [could] conclude that Vargas . . . received effective communication, that same reasonable trier of fact **could not conclude** that Plaintiff Vargas has proven, by a preponderance of the evidence, that he did not receive effective communication.  The evidence unequivocally shows that when Vargas visited the PSC, he was assisted with checking in by a phlebotomist, he was in fact checked in, and he received diagnostic testing services.

The fact that Vargas allegedly had to wait for phlebotomist assistance to check in during his visit at a PSC in June 2019 also fails to establish an ADA violation. Indeed, under Title III of the ADA, a delay in an accommodation does not constitute a denial of access to services.  *O'Connor v. Scottsdale Healthcare Corp.*, 871 F. Supp. 2d 900, 903 (D. Ariz. 2012), *aff'd*, 582 Fed. Appx. 695 (9th Cir.2014) ("Although Plaintiff obviously found her interaction with the security guard very unpleasant, the short delay caused by the encounter was too minor an injury to confer standing under the ADA."); *Anderson v. Ross Stores, Inc.*, No. C99-4056 CRB, 2000 WL 1585269 (N.D. Cal. October 20, 2000) (" . . . [T]he undisputed evidence shows that the Ross Stores employees were attempting to resolve Ms. Anderson's request for accommodation during the delay . . . the defendant's employees did not act unreasonably. . . ."); *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 839-41 (9th Cir. 2007) ("We agree that the initial mistake in assigning a room to Skaff with a bathtub rather than a roll-in shower caused no cognizable damage because it was

immediately corrected by reassignment to a room with a roll-in shower as had been requested."); *Frankeberger v. Starwood Hotels & Resorts Worldwide, Inc.*, No. C09-1827RSL 2010 WL 2217871, at *4 (W.D. Wash. June 1, 2010) (". . . a wait of less than sixteen minutes for assistance was neither unreasonable nor reflective of discrimination.").  Even if the length of the wait alone did make his visit actionable, despite getting assistance checking in and receiving diagnostic services, Vargas cannot establish that the wait resulted from his alleged delay in checking in or simply the availability of the phlebotomist to accommodate Vargas' walk-in visit to the PSC.

**C.**  **Even if Plaintiffs Could Establish an ADA Violation, Plaintiffs' Claims are Moot as a Result of the Three Finger Swipe and Extensive Employee Training.**

"Article III [of the U.S. Constitution] requires that a live controversy persist throughout all stages of the litigation."  *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1128-29 (9th Cir. 2005) (citing *Steffel v. Thompson*, 415 U.S. 452, 459 n. 10 (1974) ("an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed")). "Where this condition is not met, the case has become moot, and its resolution is no longer within our constitutional purview."  *Id.* at 1129 (citing *Foster v. Carson*, 347 F.3d 742, 747 (9th Cir. 2003) ("We do not have the constitutional authority to decide moot cases.").  "A claim becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2019) (some internal quotation marks omitted).

"Because a private plaintiff can sue only for injunctive relief (i.e., for removal of the barrier) under the ADA, a defendant's voluntary removal of alleged barriers prior to trial can have the effect of mooting a plaintiff's ADA claim."  *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 905 (9th Cir. 2011) (citing *Hubbard v. 7–Eleven, Inc.*, 433 F. Supp. 2d 1134, 1145 (S.D. Cal. 2006)) (additional internal citations omitted); *see*

*also Johnson v. Oishi*, 362 F. Supp. 3d 843, 848 (E.D. Cal. 2019) ("[B]ecause a plaintiff can only obtain injunctive relief under the ADA, the defendant's voluntary cessation of an ADA violation may effectively moot a plaintiff's ADA claim."). Then, the defendant bears the burden to show that "the challenged conduct cannot be reasonably expected to recur." *Oishi*, 362 F. Supp. 3d at 848.

Here, assuming that Plaintiffs demonstrated an ADA violation during the class period—which as discussed above, they cannot—Plaintiffs' claims have been mooted by the implementation of the TFS enhancement on the Kiosks throughout Quest's more than 2,100 PSCs by March 2021. The TFS enhancement enables visually impaired patients to check in to Quest PSCs independently and preserve their spot in the queue without assistance. Performing the simple TFS gesture also automatically and immediately triggers a written and audible notification on the PSR's device that a visually-impaired patient has arrived who may need assistance with checking in. Thus, now, Plaintiffs can effectively check in to a Quest PSC via a Kiosk and without assistance from a PSR. Additionally, Quest's training accompanying the TFS enhancement further instructs Quest's phlebotomists and PSRs to promptly provide assistance to any person who utilizes the TFS or otherwise seeks assistance when visiting the PSCs.

Moreover, the challenged conduct—blind patients' inability to check in using a Kiosk—cannot reasonably be expected to recur. *See Oishi*, 362 F. Supp. 3d at 848. Quest expended time and money to consult with individuals with visual impairments and their advocates to learn and explore the ways they prefer to access services, and from the benefit of those discussions, implemented the TFS across all of its PSC locations. Thus, since those with visual impairments can check in independently with the TFS and in any event will have access to auxiliary services in the form of Quest PSC personnel assistance, it would be unreasonable to suggest that the challenged conduct would recur.[2]

_____

[2] Plaintiffs appear intent on arguing that certain new functionalities of the Kiosks

Case No. 2:19-cv-08108 DMG (MRWx)

DEFENDANTS' TRIAL BRIEF

Lastly, Plaintiffs' attempt to rebut Quest's evidence of mootness by introducing testimony from their witness Mark Derry about purported instances of the TFS not working as intended at 24 PSCs does not establish a policy or practice of discrimination or rebut the conclusions that (a) Quest's implementation of the TFS along with enhanced training for phlebotomist assistance has remedied any purported policy or practice of discrimination, and (b) Quest has demonstrated, through its implementation of the TFS and associated enhancements, along with enhanced training for phlebotomist assistance, that there is no reasonable expectation that the ADA violation alleged in this case will be repeated.  Indeed, the Ninth Circuit recently unambiguously "reject[ed] the notion that isolated technical glitches necessarily establish ineffective communication."  *Bax*, 2022 WL 10227441, at *9 (citing *Siegel v. Dignity Health*, No. CV-14-02561, 2019 WL 11720205, at *3 (D. Ariz. Mar. 26, 2019); *Juech v. Child.'s Hosp. & Health Sys., Inc.*, 353 F. Supp. 3d 772, 780 (E.D. Wis. 2018)).  Thus, the alleged technical glitches in the TFS enhancement allegedly experienced by Derry at 24 PSCs in a few states out of the more than 2,100 PSCs located throughout the country, do not demonstrate, as a matter of law, ineffective

---

that were recently added (or temporarily piloted) after the Class Period are inaccessible to blind individuals and, therefore, derail Quest's mootness defense.  The Court should reject this argument for several reasons.  First, purported barriers not alleged in the FAC—particularly concerning features or functionalities that did not even exist at the time the FAC was filed (so they could not have been encountered and identified)—are not properly before this Court and should not be considered. *Paulick v. Starwood Hotels & Resorts Worldwide, Inc.*, 2012 WL 2990760 at *13 (N.D. Cal. July 20, 2012) (holding that "[c]learly, there must be a point at which a defendant facing claims under the ADA can be certain that all of the barriers at issue in the case have been identified.  The requirement . . . that all barriers upon which a plaintiff wishes to proceed must be identified in the complaint supports the conclusion that that point is the deadline for amending the complaint."); *O'Campo v. Chico Crossroads*, 2011 WL 5241351, at *2-3 (E.D. Cal. Oct. 31, 2011) (barriers identified only in an expert report outside scope of the complaint).  Plaintiffs' ADA claim must be based on barriers that existed, at the latest, at the time their FAC was filed.  *See Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1043-44 (9th Cir. 2008).  None of the recent functionalities existed at the time of Plaintiffs' encounter or at the time the FAC was filed (or, in fact, until well after the Class Period), so they are irrelevant to Plaintiffs' claims and cannot be invoked to attempt to defeat Quest's mootness defense.  Finally, even if these features were relevant to Plaintiffs' claims, which they are not, these features do not pose any challenge to Quest's mootness defense because the evidence demonstrates that Quest phlebotomists are available and trained to assist patients, including visually impaired patients, with all of the services that these features provide.

communication.

### D. Judgment Must Be Entered Against Plaintiffs On Their Newly-Trumpeted "Reasonable Modification" Claim.

#### 1. Plaintiffs' Newly-Articulated Legal Theory Is, Read Most Charitably, Still A Request For An Auxiliary Aid Or Service"

Plaintiffs have, for transparent (but ill-conceived) reasons,[3] newly championed a theory under 42 U.S.C. § 12182(b)(2)(A)(ii) that Quest failed to provide a "reasonable modification of its policies, practices and procedures." There is no reference to that statutory provision, nor its enforcing regulation (28 C.F.R. § 36.302) anywhere in Plaintiffs' First Amended Complaint (ECF 41) or in its motion for summary judgment or reply (ECF 207-1, 242), or *as an affirmative claim* in its first Memorandum of Contentions (ECF 175).[4] Instead, the FAC is filled with references to the "auxiliary aids and services" statute (§ 12182(b)(2)(A)(iii)) and its enforcing regulation, 28 C.F.R. § 36.303; (*see*, *e.g.*, FAC (ECF 41) "Violation of the ADA, Title III" ¶¶ 52-70.) Indeed, Plaintiffs actually contend that they are **not** seeking a change

---

[3]   Plaintiffs presumably grew attracted to the "reasonable modification" claim when they realized that Section 12182(b)(2)(A)(ii), unlike Section 12182(b)(2)(A)(iii), does not have an "undue burden" defense. But Plaintiffs' miscalculation here fails to account for the requirement that any "modification" must be "reasonable," thus *a fortiori* disqualifying any claim that would also impose an "undue burden." *Doud v. Yellow Cab of Reno, Inc.*, No. 3:13-CV-00664-WGC, 2015 WL 895077, at *16 (D. Nev. Mar. 3, 2015) ("An accommodation is unreasonable if it imposes "undue financial and administrative burdens."); *Frilando v. Bordentown Driver Training Sch., LLC*, No. 2:15-CV-02917-KM-JBC, 2017 WL 3191512, at *20 (D.N.J. July 27, 2017) ("[The defendant] makes a compelling logical point: 'Because an accommodation that creates an undue burden is never a reasonable accommodation, the ADA and [New Jersey corollary law] would not require [the defendant] to provide any unduly burdensome accommodation irrespective of the outcome of this litigation.").

[4]   Plaintiffs *reference* the statute in that Memorandum of Contentions *only*: (1) in listing and describing Quest's Eleventh Affirmative Defense, which Quest maintained in case Plaintiffs were pressing this claim (ECF 175 at 14, 18, 26); and (2) generically stating what the statute provides. (*Id.* at 29.) Nowhere do they identify what "reasonable modification" they requested. (*Id. passim*.) As in all of their other pleadings in this case, the only "requests" for anything from Quest are for modifications not of "policies, practices and procedures," but of the equipment provided so as to provide "auxiliary aids and services" and "effective communication" under 42 U.S.C. § 12182(b)(2)(A)(iii) and its enforcing regulation, 28 C.F.R. § 36.303.

in procedure in the FAC's ADA claim, contending that changes to the kiosk to make it independently accessible "*does not change the* content of Defendant's electronic check-in *procedure or result in making* the electronic check-in *procedure different*…." (*Id.* ¶ 68 (emphasis added).) All of this evidence from Plaintiffs' own filings is, of course, consistent with Plaintiffs' many vigorous pronouncements "that this case is an effective communication case.  That is at the fundamental heart of [P]laintiffs' theory.  It always has been since we put this forth…."  (Mr. Miller at Dec. 7, 2021 (first) Final Pretrial Conference, Tr. at 20:19-22.)

As Plaintiffs assert in their opposition to Quest's second motion for summary judgment, "[t]his Court's Order on Quest's first MSJ makes clear that it understands both the theory upon which this action is based (*i.e.*, effective communication) and the Ninth Circuit law upon which it is based…."  (ECF 237-1 at 17.)  And, then, in describing what Plaintiffs "are requesting," they say: "access to the functions of the kiosk…." (*Id.* at 18; *see also* Prayer for Relief b (seeking "the specific injunctive relief requested by Plaintiffs . . . described more fully in paragraph 11 above"), ¶ 11 ("Defendants take all steps necessary to bring their Check-in system into full compliance . . . so that [sic] so that blind and visually impaired patients of Quest may check in independently . . . and that Quest's e-Check-in touchscreen kiosks are fully accessible to, and independently usable by individuals with disabilities, through the implementation of necessary technology….").)  In other words, and as corroborated by a review of the FAC and Plaintiffs' other pleadings, the only "reasonable modification" that Plaintiffs sought and seek is to the Kiosk equipment and configuration that Quest has deployed.  As a matter of logic and regulatory definitions, that request is not for a modification of a "*policy, practice or procedure*." 28 C.F.R. § 36.303(b) (listing examples of "auxiliary aids and services").  Notably, the example provided in Section 303(b)(3) is precisely what Plaintiffs seek here:

(3)  **Acquisition or modification of equipment or devices**; …

28 C.F.R. § 36.303(b)(3) (emphasis added).  Whatever weak or passing references to

"reasonable modifications" Plaintiffs have made in their many pleadings and other statements must be understood as derivative of this "auxiliary aids and services" obligation, and the "effective communication" obligation derived from that provision. Indeed, the evidence proffered to date in Plaintiffs' Trial Declarations do not contain evidence of any request for a new policy, practice or procedure, nor do they identify any such requested policy, practice or procedure.  Rather, and over Quest's vigorous objection to its validity, the evidence speaks only to a request for acquisition or modification of equipment or devices that fits squarely within the "[a]cquisition or modification of devices" definition in 28 C.F.R. § 36.303(b)(3).  (Rachfal (ACB 30(b)(6) designee) Trial Declaration ¶ 22 ("On behalf of ACB, I and Ms. [sic] Stanely reiterated the need for Quest to make a modification to have screen reader with voice over functionality enabled so the kiosks could be independently accessible"); Stanley (ACB) Trial Declaration  ¶ 21 (same); Vargas Trial Declaration ¶ 27 ("Before leaving the Quest patient service center, I told the Quest phlebotomist that she should talk to whoever she needed to at Quest to make sure the kiosk was modified. . . .")  Even Plaintiffs' self-serving characterization of the evidence in their Proposed Findings is again a request for "acquisition or modification of devices."  (ECF 314 Proposed Fact 62 at 18 (ACB), 87 at 23 ("Vargas told the Quest phlebotomist . . . to make sure the kiosk was modified").)  Plaintiffs cannot make their request for a modification to Quest's kiosk device a request for a new "policy."  *See*, *e.g.*, *MacClymonds v. IMI Investments, Inc.*, 2007 WL 1306803, at *3 (S.D. Tex. 2007) (cannot convert a physical barrier claim into a policy claim); *Betancourt v. Federated Dep't Stores*, 732 F. Supp. 2d 693, 711 n.7 (W.D. Tex. 2010) ("Nor has [plaintiff] alleged the existence of a policy, that she requested modification of such policy, that the requested modification was reasonable, or that it was denied. If a policy is simply not to make required architectural modifications, that would fall under [42 U.S.C.] § 12182(b)(2)(A)(iv). . . . Accordingly, Plaintiff fails to state a claim with regard to these violations.").

Plaintiffs' attempt to paint "reasonable modification" lipstick on this "auxiliary aids and services" pig does not change the fact that this is still the same pig that Plaintiffs have complained about from the outset of this action, the lack of independent accessibility of the initial Kiosk device.  Nevertheless, as shown below, if Plaintiffs' "reasonable modification" claim is permitted to proceed, it will fail for the same reasons (and others) as their request for "auxiliary aids and services."

> **2.**     **Plaintiffs Cannot Meet Their Burden To Establish That Quest Failed To Provide A Reasonable Modification Of Policies, Practices Or Procedures.**

As shown above, Plaintiffs' evidence fails to prove: (i) that Quest did not provide Vargas with effective communication during his June 15, 2019 visit; and (ii) that Quest had a nationwide common discriminatory policy resulting in Class Members being denied effective communication at check-in.   Thus, Plaintiffs belatedly urge that "a secondary path to liability" applies. (*See* ECF No. 314 Proposed Conclusion ¶ 13 at 38.)  Plaintiffs assert that ACB, in December 2018, and Vargas made a request that Quest modify its "policy, practice, or procedure of deploying inaccessible kiosks to its PSCs." (*Id.* Proposed Conclusion ¶ 15 at 19.)  Since Quest denied this request, Plaintiffs contend Quest is liable for violating the ADA's "Reasonable Modification" provision, 42 U.S.C. § 12182(b)(2)(A)(ii), which provides that discrimination includes "a failure to make *reasonable modifications in policies, practices, or procedures*, when such modifications are necessary to afford such . . . accommodations to individuals with disabilities unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such . . . or accommodations."  42 U.S.C. § 12182(b)(2)(A)(ii).  (*See* ECF No. 314 at ¶ 13.)

To prevail on a claim under this statutory provision, a plaintiff must establish:

> (1) he is disabled as that term is defined by the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; (3) the ***defendant employed a discriminatory policy or practice***; and (4) the defendant discriminated against the plaintiff based upon the plaintiff's disability by (a) failing to make a requested reasonable modification that was (b) necessary to accommodate the

16

plaintiff's disability.

*Karczewski v. DCH Mission Valley LLC,* 862 F.3d 1006, 1010 (9th Cir. 2017) (emphasis added). The law is clear that Plaintiffs bear the burden of establishing that the requested modification is "reasonable." *Martin v. PGA Tour, Inc.*, 994 F. Supp. 1242, 1248 (D. Or. 1998), *aff'd*, 204 F.3d 994 (9th Cir. 2000), aff'd, 532 U.S. 661, 121 S. Ct. 1879, 149 L. Ed. 2d 904 (2001).

The claim does not fit the facts of this case and fails as a matter of fact and law because Plaintiffs cannot establish the fundamental requirements of the "reasonable modification" provision. *First*, Plaintiffs did not request a modification of Quest's "*policies, practices, or procedures*," 42 U.S.C. § 12182(b)(2)(A)(ii), but rather, they requested modification of Quest's kiosk technology to ensure that the Kiosks were independently accessible to the legally blind. *Cf.* 28 C.F.R. § 36.303(b)(3). Further, these modifications were not "necessary to afford such . . . accommodations to individuals with disabilities," 42 U.S.C. § 12182(b)(2)(A)(ii), because Quest already provided accommodations by affording auxiliary aids and services in the form of Quest personnel assistance with check-in.

*Second*, Plaintiffs cannot establish that Quest "employed a discriminatory policy or practice" within the meaning of 42 U.S.C. § 12182(b)(2)(A)(ii). *See Karczewski,* 862 F.3d at 1010. For the same reasons explained already, Plaintiffs' evidence fails to prove that Quest had a nationwide common discriminatory policy resulting in Class Members being denied effective communication at check-in. Moreover, the deployment of the Kiosks cannot themselves be a "discriminatory policy or practice" because, as this Court has ruled, there was no freestanding requirement for the Kiosks to be independently accessible. (ECF 258 at 17.) Moreover, the Ninth Circuit has made clear that a place of public accommodation complies with the ADA when it meets the requirements of the ADA Standards. *Kohler v. Bed, Bath & Beyond of Cali., LLC*, 778 F.3d 827, 832-33 (9th Cir. 2015); *Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1221 (10th Cir.

2014) (same) ("[O]therwise, an entity's decision to follow the standard and build an 'accessible' facility would have little meaning."); *West v. Moe's Franchisor, LLC*, No. 115-cv-2846, 2015 WL 8484567, at *4 (S.D.N.Y. Dec. 9, 2015) ("[G]iven the labyrinth of city, state, and federal regulations, it is not appropriate for this Court to announce new ones.").  As has been well-established here, the ADA Standards explicitly exempt Quest's Kiosk from any of the independent accessibility mandates applicable to ATMs or airline kiosks.  Advisory 707, ADA Standards, 36 C.F.R. Pt. 1191, App. B and D.

*Third*, Plaintiffs must demonstrate both that they requested modifications, and that those requests were reasonable. *Karczewski*, 862 F.3d at 1011; *see also Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1083 (9th Cir. 2004); *Namisnak v. Uber Techs., Inc.,* 444 F. Supp. 3d 1136, 1142 (N.D. Cal. 2020).  The Ninth Circuit noted that "[w]hether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Karczewski,* 862 F.3d at 1011 (quoting *Fortyune*, 364 F.3d at 1083).  Plaintiffs offer no such proofs.  Further, the modifications were not reasonable because there is no freestanding legal requirement in the ADA or its implementing regulations for an independently accessible kiosk. (ECF 258 at 17.)

*Fourth*, Plaintiffs cannot establish that the proposed modification was "necessary to accommodate the plaintiff's disability." *Karczewski,* 862 F.3d at 1010. The evidence demonstrates that Quest's policy was to ensure that Quest staff members provide assistance with check-in to anyone who needed assistance and to continually make observations to ensure that all patients were afforded appropriate auxiliary aids and services to ensure they could check in and receive diagnostic services.  Thus, since Quest afforded auxiliary aids and services to ensure effective communication, the independently accessible kiosk modification was not necessary.

*Finally*, Plaintiffs' independently accessible kiosk theory was abandoned with the modification of the Class definition, focusing instead on whether Quest's phlebotomists provide assistance sufficient to ensure effective communication. (ECF 258 at 15.)  Plaintiffs have consistently urged this Court that the issue in this case is whether Quest provides effective communication regarding its check-in process to the legally blind.  The fact that Plaintiffs have pursued the "effective communication" theory simply underscores that there is no merit to the reasonable modification theory, as that theory does not fit the facts of this case.  (*See* ECF No. 274 at 14 ("The theory of Plaintiff's case, as stated in the final pretrial conference order lodged in November 2021, is that 'Defendants provided them less than the full and equal enjoyment of Defendants' places of public accommodation because Defendants did not provide aids and auxiliary services that resulted in effective communication as required by the ADA.'") (citing Dkt. 172-1, 5:12-16.)); *id.* at 24 ("Plaintiffs have been waiting since December 2018 to obtain effective communication from Quest.").[5]

III.  **CONCLUSION**

At trial, Plaintiffs will simply be unable to meet their burden of proof.  Plaintiffs have failed to prove, *on a class-wide basis*, that there is a lack of effective communication.  Instead, the evidence will establish that Quest met its obligations under the ADA and that Plaintiffs were able to effectively communicate regarding the check-in process at Quest's PSCs.  And, even if Plaintiffs could establish a violation under the ADA, which they cannot, Plaintiffs' claims are now moot because Quest has implemented the TFS enhancement, which allows Plaintiffs to independently check in

---

[5]      This Court has also acknowledged, multiple times, that this case is about "effective communication."  *See, e.g.,* ECF No. 144 at 10 ("The *primary issue* here is whether Quest has provided auxiliary aids and services that ensure 'effective communication' with disabled patients as required by the ADA."); ECF No. 258 at 15 ("The class definition, as currently formulated, focuses the ultimate inquiry on whether the kiosks are the primary method of check-in and, if so, whether it provides effective communication.").  Indeed, even at the final pretrial conference, the Court noted that it appeared Plaintiffs were asserting a claim for reasonable modification, which the Court was not previously aware of.  (October 11, 2022 Tr. at 29:2-5 ("THE COURT: … The other question I had is with regard to what looks like a claim for reasonable modification.  I've not been aware that that was a claim in this case.").)

using the Kiosks.  As such, the Court should enter judgment in favor of Quest and against Plaintiffs.

Dated: October 25, 2022       Respectfully submitted,

By:  */s/ David Raizman*

David Raizman
david.raizman@ogletree.com
Amber L. Roller
amber.roller@ogletree.com
J. Nicholas Marfori
nicholas.marfori@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, California 90071
Telephone: 213-239-9800

Mark S. Sidoti
msidoti@gibbonslaw.com
Daniel S. Weinberge
dweinberger@gibbonslaw.com
One Pennsylvania Plaza, 37th floor
New York, New York 10119
Telephone:  212-613-2000
Facsimile:  212-554-9660

*Attorneys for Defendants*
*Quest Diagnostics Clinical Laboratories, Inc.,*
*Quest Diagnostics Holdings, Inc. and Quest*
*Diagnostics Incorporated*

Case No. 2:19-cv-08108 DMG (MRWx)

Local Rule 5-4.3.4 Certification: I hereby attest that all other signatories listed, on whose behalf this filing is submitted, concur in the filing's content and have authorized this filing.

*Amber L. Roller          /*
Amber. L. Roller

DEFENDANTS' TRIAL BRIEF