**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JULIAN VARGAS and AMERICAN COUNCIL FOR THE BLIND, individual and on behalf of themselves and all others similar situated,<br><br>                  Plaintiffs,<br><br>       v.<br><br>QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., and QUEST DIAGNOSTICS INCORPORATED,<br><br>                 Defendants. | Case No. CV 19-8108-DMG (MRWx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

This matter is before the Court following a four-day bench trial that began on November 1, 2022.  Jonathan D. Miller, Benjamin J. Sweet, Callum T. Appleby, and Jordan T. Porter appeared on behalf of Plaintiffs Julian Vargas and American Council for the Blind, and the Plaintiff Class.  David H. Raizman, Mark S. Sidoti, Betsy Johnson, Daniel S. Weinberger, Michael R. McDonald, and Jan N. Marfori appeared on behalf of Defendants Quest Diagnostics Clinical Laboratories, Inc., Quest Diagnostics Holdings, Inc., and Quest Diagnostics Incorporated (collectively "Quest").

Having carefully reviewed the evidence and the arguments of counsel, as presented at trial and in their written submissions, the Court issues the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

# I.
## FINDINGS OF FACT[1]

**A.   Plaintiffs**

This is a class action consisting of the following Class Members:

> All legally blind individuals who visited a Quest patient service center in the United States between January 1, 2018 through December 31, 2019 (the "Class Period") at which the e-check-in self-service kiosk was the primary method for check-in and who, due to their disability, could not use all the functions of the kiosks.

Vargas is a legally blind individual who lives in Van Nuys, California.  FPTCO ¶¶ 5(j), 5(i).  American Council of the Blind ("ACB") is a membership organization that advocates on behalf of the blind and those with visual impairments.  Rachfal Trial Decl. ¶¶ 6–7.

**B.   Defendants**

Quest is in the business of providing diagnostic information services, which includes collecting blood and urine specimens from patients that it then tests in accordance with physician orders.  Final Pretrial Conference Order ("FPTCO") ¶ 5(a) [Doc. # 295].  Quest Diagnostics and its subsidiaries receive the specimens for testing from hospitals and medical practices, but also collect specimens for testing through patient service centers ("PSCs") located throughout the United States.  *Id*. at ¶ 5(b).

There is no standard configuration or size for Quest PSCs.  Day 1 Tr. at 181:18–19; Reilly Decl. ¶ 8.  PSCs are staffed by one or more Patient Service Representatives ("PSRs"

---

[1] To the extent any of the Court's findings of fact may be considered conclusions of law or vice versa, they are so deemed.

or "phlebotomists"), who are trained to collect blood and other samples from patients, and other staff. Yarrison Decl. ¶ 5. Some PSCs, for instance, have employees whose primary role is to assist patients with check-in. *See* Reilly Decl. ¶ 8. But Thomas Walsh, Vice President of Strategy and Digital Transformation, testified that generally Quest "does not have a role of a receptionist or attendant within a waiting room . . . . That was not part of the model." Day 2 Tr. at 28:15–29:10. Instead, the role of assisting patients in the waiting room is usually filled by phlebotomists, who come into the waiting room after finishing with each patient to call the next patient back. *Id*. at 29:4–22; *see also* Reilly Decl. ¶ 42, Yarrison Decl. ¶ 5.

## C.   Kiosks

In the past, patients at PSCs would indicate their arrival, or check in, by entering their names on a paper sign-in sheet maintained in the waiting room. FPTCO ¶ 6(a). But in 2014 or 2015, Quest began to explore ways to modify PSC check-in practices. FPTCO ¶ 5(d). Quest looked for ways to improve both phlebotomist and customer experience. Day 1 Tr. at 188:12–15. Quest hoped to improve the phlebotomist experience by reducing paperwork and data entry tasks. Carr Decl. ¶ 2; Grant Decl. ¶ 4. Quest also hoped it would reduce wait time for patients. Day 1 Tr. at 121:11–12, 193:2–3. Quest likewise wanted to address privacy concerns patients had raised regarding the paper sign-in sheets, and help reduce patient anxiety and dissatisfaction by informing them where they were in the queue. Day 1 Tr. at 119:20–25, 120:1–3, 121:20–24. In April 2016, Quest chose to install one or more electronic, touchscreen tablets to allow patients to check in at PSCs. FPTCO ¶ 5(e). The tablets, which were Apple iPads, when placed in plastic casings (provided by a corporation called Lilitab) and mounted on posts, were known as "Kiosks." FPTCO ¶ 5(e). The Kiosks were intended to replace the existing paper sign-in sheets. Day 1 Tr. at 191:3–6.

## D.   Original Kiosk

The first Kiosk that was deployed to the PSCs during the 2016–2019 time period (the "Original Kiosk") contained no tactile markings and had no text-to-speech output. FPTCO ¶ 5(f). Users were prompted to check in by entering a first and last name, birthday,

and phone number.  Yarrison Decl. ¶ 8.  PSC staff endeavored to honor appointment times, regardless of what time the patient checked in, but patients without appointments were placed in a queue to be served.  *Id.*  The Kiosk also had a help button, although it was a touchscreen help button that was not useable by blind patients.  Day 2 Tr. at 121:5–10.  The help button set off a "doorbell" for phlebotomists, although phlebotomists could (and still can) turn it off if they did not like it.  Day 1 Tr. at 85:5–10.

Quest worked to ensure that the Kiosks satisfied physical design standards for self-service kiosks, including ensuring all operable parts were within "reach range" of a person using a wheelchair and that the Kiosks could be detected by blind individuals using canes. Yarrison Decl. ¶ 9; *see also* Day 1 Tr. at 165:4–8.  Quest was offered versions of the Kiosk that included audio capabilities, and one member of the design team raised the possibility that audio capabilities might help with accessibility for visually impaired patients, but Quest did not select a Kiosk with a headphone jack.  Ex. 7; Day 1 Tr. at 61:1–6.  The parties agree that the Original Kiosks could not be used by blind patients without phlebotomist assistance.

### 1.    Phlebotomist Assistance

Yarrison testified that Quest "always knew that people would need help checking in, just like they did with the paper sign-in, and [Quest's] phlebotomists helped them and assisted them with that."  Day 1 Tr. at 77:14–17.  The leaders of the project design team, Christopher Grant and Taylor Carr, testified that Quest expected the reduction in paperwork to increase the amount of time phlebotomists spent with patients, including the amount of time they spent in waiting rooms.  Grant Decl. ¶¶ 4–5; Carr Decl. ¶ 2; Day 2 Tr. at 118:20–22; *see also* Yarrison Decl. ¶ 12.  In fact, the Kiosks did reduce transaction time for each patient.  *See* Day 1 Tr. at 193:8–10.  The Kiosks were also intended to allow Quest to increase the number of patients it saw each year without hiring more phlebotomists.  Day 1 Tr. at 127:13–22.  Quest says seeing more patients would mean phlebotomists were in the waiting room more frequently, not less frequently.  *See* Carr Decl. ¶ 6; Grant Decl. ¶ 5.

The project rollout did not call for a reduction in staffing at PSCs.  Day 1 Tr. at 136:6; 163:7–10.[2]

Quest has long trained phlebotomists in the requirements of the Americans with Disabilities Act ("ADA") and the general need to be sensitive to the particular needs, including disabilities, of Quest patients.  *See, e.g.*, Ex. 163 (pre-Kiosk mandatory annual training providing general ADA information); *see also id*. at 9 (instructing that phlebotomists should "assist [blind] individuals to the collection room," "maintain a steady stream of verbal communication with the patient," and "always tell them what you are doing and describe what you are about to do before you do it").  Phlebotomists are trained to greet patients warmly and to assist them as needed, including with sign-in.  *See, e.g.*, Trial Exs. 164 (warmly greeting patients is a basic tenet of Quest's "Patient Care Standards"), 235 at 1:20 (2015 training video instructing phlebotomists to assist with sign-in), 236 at 1:37 (2015 training video instructing phlebotomists to greet waiting patients and ask if they have had a chance to sign in), 243 at 2:18 (2018 training video reminding that "[w]hen you call a patient back for service, look around the waiting room, and let our patients know that you see them.  We know that technology can be a challenge for some patients, so if you see a patient who is struggling, offer assistance.").  Quest endeavors to provide a positive customer-service experience for patients.  As discussed below, it also appears that many patients (including Class Members) had positive experiences at Quest, including after the rollout of the Kiosks.

E. **Accessibility Complaints**

Nevertheless, Quest received a range of complaints regarding the original iteration of the Kiosks.  For example, it received complaints from non-native English speakers, who were unable to use the Kiosks.  Yarrison Decl. ¶ 17.  In response, Quest added 22 languages

---

[2] Quest's Capital Expenditure Request for the project ("CapEx") states that the rationale for the project was cost savings.  *See* Trial Ex. 83.  But Quest demonstrated that "cost savings" was selected from a drop-down menu with a limited range of options.  *See* Day 1 Tr. at 118:8–12, Day 2 Tr. at 33:1–34:16.  For this reason, the Court rejects Plaintiffs' argument that the selection of "cost savings" in the CapEx conclusively proves that cost savings was the rationale for the project.

to the Kiosks within six months, and has since added seven more. *Id*. Quest also increased the font size and the size of buttons in response to complaints that the font was too small. *Id*. at ¶ 18. Quest received negative or mixed feedback from approximately 45 blind or visually impaired patients, as well as 50 blind respondents to a survey reporting difficulty accessing the Kiosks. Reilly Decl. ¶ 40. Quest received additional complaints that were not logged. *See, e.g.*, Day 1 Tr. at 95:16–21 (acknowledging that a particular complaint was not logged).

Blind or visually impaired Class Members generally testified that they were helped by phlebotomists within a relatively short time. *See, e.g.*, Mary Haroyan Depo. at 44:4–45:4 (in and out within approximately 11 minutes);[3] Second Grahmann Depo. at 90:8–14 (patient waited "probably five minutes" in 2021). Some patients reported positive experiences with the phlebotomists. But at other times, patients had to ask other patients for assistance, rather than a phlebotomist. *See, e.g.*, Haroyan Depo. at 73:21–24 (remembers two times another patient checked her in); First Grahmann Depo. at 39:22–40:1.[4] In a 2017 email, Yarrison acknowledged that, in a PSC with only one or two phlebotomists, a blind patient who could not use the Kiosk might have to wait 10 or 15 minutes before a PSR was available to assist, because "you can't leave a needle in someone's arm and walk away to help someone sign in." Ex. 9. But this was, as Yarrison clarified at trial, "a worse-case scenario," based on Quest data showing that in 2017, the average transaction time was 12 minutes. Day 1 Tr. at 75:21–23, 165:24–166:1. Yarrison testified that a patient who was able to use the Kiosks might also have to wait that long under similar circumstances. Day 1 Tr. at 166:24–167:4.

---

[3] Plaintiffs' authentication and personal knowledge foundation objections to this testimony are **OVERRULED**, because Quest relies not on its own records indicating that Mary Haroyan was finished within 11 minutes, but on her own testimony that this "sound[s] about accurate."

[4] Quest's speculation and personal knowledge objections are **OVERRULED**; Haroyan testified as to her memory.

### 1. ACB Requests For Modifications

On December 13, 2018, ACB wrote Quest a letter regarding the accessibility issues its members had identified. Ex. 65. The letter identified accessibility features that ACB believed the Kiosks lacked, including the option to turn on a screen reader or increase the font size. *Id*. In 2019, Yarrison reviewed options in preparation for a meeting with ACB. In an email, he acknowledged that "the best solution according to [American Foundation for the Blind] seems to be having a person available to ask if the person needs help, although we know that is not a reality for our locations." Ex. 13. At a meeting, ACB asked Quest officials to implement (1) a bell or accessible help button for blind patients, and (2) to enable screen reader technology and enable voice over technology. Ex. 67. ACB reiterated its request for screen reading and voice over technology in a subsequent call. Day 2 Tr. at 215:7–20.

### 2. Vargas' Experience at Quest in 2019

Vargas was diagnosed at birth with a condition called Leber's congenital amaurosis, that has left him legally blind. Vargas Decl. ¶ 4. In June 2019, his doctor placed an order for Vargas to have blood drawn, so on June 25, 2019, Vargas visited one of three Quest PSCs in his area, located at 4849 Van Nuys Boulevard in Sherman Oaks, California. *Id*. at ¶¶ 6–7. Vargas cannot drive, so he frequently uses paratransit to transport him on errands. For this reason, he often visits businesses that do not require appointments, so he does not need to worry about missing appointments. *Id*. at ¶¶ 8–10. That was part of the reason he visited Quest. *Id*. at ¶ 10.

When Vargas visited a Quest PSC in Sherman Oaks on June 25, he was wearing dark glasses and carrying a white cane, which helped him navigate and also identified that he was blind. Vargas Decl. ¶ 12. He determined that no greeter or receptionist was available, and felt his way around the waiting room, searching for a check-in window or bell. *Id*. at ¶ 14. He found this embarrassing and humiliating. *Id*.

Vargas eventually found the check-in window, and said "hello" a number of times, with no response. Vargas Decl. ¶ 16. After 10–15 minutes, a Quest phlebotomist, Prudencia Magana, emerged and directed him to the Kiosk to check in. *Id*. at ¶ 19. She

told a waiting patient to go into the draw room, then directed Vargas to the Kiosk and said "this is where you check in." *Id*. When he asked for directions, she guided him to the Kiosk. *Id*. After he discovered that it did not have tactile markings or other features that would allow him to use it, he told Magana that he would need additional assistance. She asked him to wait while she took care of the other patient. *Id*. at ¶ 22. Magana returned to the waiting room after about five minutes, and asked Vargas to provide his personal information to log on the Kiosk, including his name, address, the type of testing, and his insurance information. *Id*. at ¶ 24. Magana asked him to wait again, and he waited about five more minutes before she took him into the draw room to draw his blood. *Id*. at ¶ 25.

Before leaving, Vargas told Magana that the Kiosk should be modified to make it accessible for blind people, and that she should talk to whoever she needed to talk to in order to make that happen. Vargas Decl. ¶ 27. Magana agreed, but no one at Quest ever contacted Vargas to discuss his complaint. *Id*. at ¶¶ 27–28.[5]

**F.    Implementation of the Three Finger Swipe**

After hearing from ACB, and in preparation for a mediation relating to this case, Quest began to explore methods of making the Kiosks accessible for blind patients even without phlebotomist assistance. Grant Decl. ¶ 8. In a November 2019 email, a member of Quest's Kiosk design team suggested that "braille and/or plug-in headphones for instructions," among other accessibility features, was something Quest hoped to implement. *See* Ex. 17. Quest conducted a focus group and solicited feedback from community advocates regarding the best way to permit blind patients to use the Kiosks. Carr Decl. ¶¶ 8–10.

In response to the feedback Quest received, Quest proposed (and ultimately implemented) a modification called the "Three Finger Swipe" ("TFS"). Grant Decl. ¶ 9.

---

[5] Magana does not remember Vargas, and does not remember whether he complained. Magana Decl. ¶ 9. She does say, however, that if he had complained, she would have reported the complaint to her supervisor, and she has no record that she did so. *Id*. The Court found Vargas more credible at trial. Based on these witnesses' conflicting testimony, the Court concludes that Vargas likely did tell Magana that he believed the Kiosk should be made accessible.

Quest hoped TFS would make the Kiosks independently accessible for blind patients, even without phlebotomist assistance. *Id.* at ¶ 10.  To use TFS, patients swipe the Kiosk's screen with three fingers in any direction.  Carr Decl. ¶ 13.[6]  When a patient performs this gesture, the Kiosk will check the patient in, using a generic patient number rather than the patient's name, and transmit an electronic notification to the Quest phlebotomist that an individual with visual impairments has checked in.  Carr Decl. ¶ 13.  The Kiosk provides an audio message to the patient, relaying the generic patient number and informing the patient that they will be called back into the draw room when it is their turn to be seen.  *Id.*

To inform visually impaired patients about TFS, the Quest TVs in the PSC waiting rooms play an audio message on loop, instructing patients how to use TFS.  Carr Decl. ¶ 13.  The audio message has varied somewhat since TFS was rolled out, as has the frequency with which it is played.  Since October 2022, the audio message has been as follows:

> If you are blind or visually impaired, you can automatically check in by swiping three fingers in any direction across the screen of our check-in Kiosk. The Kiosk will play a short audio message to confirm you have successfully checked in and assign you a patient number.  The swipe will also notify a Quest team member that someone with a visual impairment has checked in and they'll be with you shortly.  For help locating or using our Kiosk, a Patient Service Representative will be with you as soon as they are able.  If you arrived without an appointment, you can make one by calling 888-277-8772.

Yarrison Decl. ¶ 23.  Since September 6, 2022, the audio message has played on loop every five minutes.  Yarrison Decl. ¶ 22.  Quest also provided additional training to PSC staff regarding TFS.  Carr Decl. ¶ 13.  The device phlebotomists use to manage patients and

---

[6] Common accessibility suites, including on iPhones, use gestures similar to TFS.  For example, these accessibility suites commonly use gestures like a double tap, a two-finger swipe, and a three-finger swipe.  *See* First Grahmann Depo. at 24:17–25:5; Haroyan Depo. at 24:14–21.

record information, called a Quanum device, now sends a reminder to phlebotomists to check the waiting room for patients approximately every 15 minutes.  Magana Decl. ¶ 5.

Quest purported to install TFS capability on all Kiosks as of August 2020.  Carr Decl. ¶ 14.  The audio message was activated on all Quest TVs in January 2021.  *Id.*  The enhanced training was assigned to all PSC staff in March 2021.  *Id.*  As already noted, the details of how TFS has been implemented (other than the actual swipe) have changed since the program was rolled out.  Implementation also was spotty as many PSC locations did not have a fully functional TFS system.  *See* Section II.B.5, *infra*.

Currently, as contemplated, the "doorbell" will ring to notify a phlebotomist that (1) a patient has checked in using the Kiosk, (2) a patient has used the help button on the Kiosk, (3) a patient has used TFS, or (4) a patient has checked in using his or her own device.  Day 1 Tr. at 180:8–12; Day 2 Tr. at 155:15–23.  Phlebotomists may turn off the bell if they do not like it.  Day 1 Tr. at 86:4–15; *but see* Magana Decl. ¶ 6 (phlebotomist stating that she does not know how to turn the doorbell off, but she would not turn it off even if she did know).[7]  Phlebotomists are trained to check the waiting room for patients who need help when they hear the doorbell or see the visual notification that a visually impaired person has arrived.  Day 2 Tr. at 190:17–19.  The fact that the patient checked in using TFS is also denoted in the phlebotomist's Quanum queue.  Day 2 Tr. at 156:2–8.  Patients using TFS are always second in priority at the top of the queue, after healthcare workers but before other patients who check in using the Kiosks.  Day 2 Tr. at 156:5–17.  The phlebotomist may adjust the queue within their discretion, or may simply select which patient to serve next.  Day 2 Tr. at 160:24–161:6.

---

[7] The Court does not give full credence to Magana's testimony on this issue. Some of the inconsistencies Plaintiffs have highlighted in the past between her deposition testimony and earlier declarations may have been due to the fact that Magana is not a native English speaker, rather than a lack of candor.  Magana did decline, however, to acknowledge at trial that her desire to help patients as thoroughly as possible might conflict with performance incentives offered by Quest, which prioritize seeing as many patients as possible, or even to acknowledge that such incentives exist. *Cf.* Day 4 Tr. at 20:1–21:14 (testimony from former Quest phlebotomist describing quotas and performance incentives for increasing the number of patients seen per hour); *id.* at 39:18–40:14.  Magana's refusal to address how those incentives might impact her work rendered her testimony on this issue less credible.

### 1.     Other Check-In Methods

Blind patients may also check in with the assistance of a phlebotomist.  The current training instructs phlebotomists that, when they visit the waiting room to call back a patient, they should "pay attention to other patients and their needs and behaviors," in order to identify patients who might have particular needs, including visual impairments.  Reilly Decl. ¶ 10; Ex. 47 at 41.  Phlebotomists are told to offer assistance to visually impaired patients, including by offering to read things aloud.  *See* Ex. 47 at 41, 33.  The current training also includes information about how the TFS works, and instructions to assist patients with the Kiosks.  *Id*. at 43–47.  The current "Everyday Excellence" training instructs phlebotomists to "scan the waiting room," "be present when you call a new patient back for service," and "identify patients who were not able to use [the Kiosk]."  Ex. 166 at 3238.

Patients with appointments can also check in using their mobile devices.  Day 2 Tr. at 153:4–15.  Although in March 2020 approximately 75% of patients arrived at PSCs without an appointment, that number has now changed.  Day 2 Tr. at 152:6 – 13; *see also* Trial Ex. 103.  Quest's Director of Experience and Innovation, Taylor Carr, testified that a recent report showed that 77% of patients had arrived with an appointment in that particular week.  Day 2 Tr. at 152:21–24.  About 40% of people with appointments check in on their cell phones.  Day 4 Tr. at 54:16–55:6.

### 2.     Vargas' Experience at Quest in 2021

On June 10, 2021, Vargas returned to the Quest PSC in Sherman Oaks to test the new features of the Kiosk.  Vargas Decl. ¶ 30.  As he entered, he heard the tail end of the instruction regarding how to use TFS, but because the volume was low, he had to move closer to the source of the audio to hear the message clearly.  *Id*.  He waited approximately eight or ten minutes before he heard the loop again.  *Id*.  While he was waiting, he heard an announcement about a "wait by text" option available through the Kiosk, which was available at that time due to the COVID-19 pandemic.  *Id*.

After he heard the TFS instruction, he found the Kiosk and swiped the screen. Vargas Decl. ¶ 30A.[8]  An audio message informed him that he was patient "001" and that he would wait approximately three minutes.  *Id*. at ¶ 33.  The wait was actually about 17 minutes.  *Id*.  When he was greeted by a phlebotomist (the first staff member he heard enter the waiting room during his visit), he asked the phlebotomist if the wait-by-text option was available, and the phlebotomist said the wait-by-text option was "not available for blind users who walk-in but only for those who make appointments online and can scan a QR code at the kiosk."  *Id*.

Vargas says that, despite the challenges he has encountered at Quest, he will continue to return to Quest locations as a tester and to obtain services prescribed by his doctor. Vargas Decl. ¶ 41.

## G.    Future Plans for the Kiosks

Quest continues to explore, and sometimes to add, new functions for the Kiosks. Yarrison Decl. ¶ 25.  For example, a new feature permits users to scan their insurance cards and driver's licenses at the Kiosks, using a camera plugged into the sole data port on the Kiosks.  *Id*. at ¶ 26.

## H.    Injunctive Relief Requested

Plaintiffs seek a permanent injunction requiring Quest to modify the Kiosks to include (a) screen reader capability, (b) screen magnification capability, (c) tactile controls, (d) speech output privately available through headphones, (e) volume control, (f) the ability to repeat speech, and (g) Braille instructions indicating how to start speech.

The iPad currently used in the Kiosks includes built-in speech reader capabilities within its standard accessibility suite.  Montgomery Decl. ¶ 59.  At the time that Quest purchased the enclosures it uses for its Kiosks, it could have purchased enclosures from the same vendor that included a hole for a headphone jack and access to the volume control buttons.  *Id*. at ¶ 60. Dr. Rachael Montgomery, Plaintiffs' accessibility expert, testified that

---

[8] The Vargas Declaration has two paragraphs numbered "30."  The Court refers to the second paragraph 30 as paragraph 30A.

an approach that integrated common accessibility practices with iOS's built-in screen reader would have ensured that Kiosk services were fully accessible to blind users.[9]  *Id.* For example, the software could have been coded to start the screen reader when personal headphones were inserted into the headphone jack.  *Id.*

In the alternative, Dr. Montgomery recommends a tactile keypad that could be attached to the iPad using an adaptor.  Montgomery Decl. ¶ 62.  The particular model discussed by Dr. Montgomery costs $309.75 per unit, and has both tactile navigation keys and an external headphone jack.  *Id.*  Dr. Montgomery indicates that a device like this could lower maintenance costs, because an external headphone jack would be easier to replace than the iPad's internal headphone jack.  *Id.*

Quest identified several potential logistical obstacles to Dr. Montgomery's recommendations.  For example, Dr. Montgomery testified that a hole could be manually drilled into the existing enclosure to allow for access to the iPad's headphone jack.  Day 3 Tr. at 118:1–3.  But Walsh testified that doing so would void Quest's warranty for the product.  Day 4 Tr. at 57:20–24.  Walsh also testified that adding a keyboard and potentially headphones would necessarily add new, breakable parts, which, unlike the iPad, would not be securely housed in an enclosure.  Walsh Decl. ¶ 7(a).  Moreover, the existing Kiosks have only one data port, and Quest needs that port to attach the camera needed to scan insurance cards.  *Id.* at ¶ 7(b).  Quest does not expect to be able to continue to use the internal headphone jack because of its understanding that both Apple and Android expect to phase out their headphone jacks over time.  *Id.* at ¶ 7(c).

Finally, Quest emphasizes the high administrative burden of installing new physical equipment to the Kiosks.  This would require training technicians in the installation and use of the equipment, and would necessitate new training for PSC staff.  Walsh Decl. ¶ 7(d).  Because the rollout would take years to effectuate, Quest staff would be required to

---

[9] Dr. Montgomery has extensive education and experience in the field of accessibility of emerging technology.  *See* Montgomery Decl. ¶¶ 3–13.  She is currently an Accessibility Specialist at the Library of Congress.  *Id.* at ¶ 14.  The Court finds her well-qualified to opine about accessible technologies, and finds her testimony reliable and helpful.

monitor and maintain two parallel systems until the rollout was completed.  *Id*. at ¶ 7(f). Quest would have to rewrite its software as well as update hardware.  Day 2 Tr. at 47:15–53:21.

## I.      Forthcoming Regulations

The Department of Justice ("DOJ") has issued an Advance Notice of Proposed Rulemaking ("ANPRM") seeking comments on a proposal to promulgate regulations regarding accessibility of self-service kiosks.  *See* Self-Service Transaction Machines and Self-Service Kiosks, 87 Fed. Reg. 57662 (proposed Sep. 7, 2022).  In the ANPRM, the DOJ indicates that it intends to supplement the existing ADA Guidelines to require self-service kiosks to meet requirements currently applicable only to ATMs and fare machines. *Id*. at 57663.  DOJ indicates that it will evaluate a number of potential questions, including what kiosks the new rule should cover, what technical requirements should be incorporated, and how many accessible kiosks a location should be required to provide. *Id*.

## II.
## CONCLUSIONS OF LAW

### A.      Class Claim

1.    Plaintiffs and the Class assert a claim under Title III of the Americans with Disabilities Act ("ADA").

2.    Title III prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" in places of public accommodation.  42 U.S.C. § 12182(a).

3.    To establish a claim under Title III of the ADA, a plaintiff must prove "(1) [he] is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied accommodation by the defendant because of his disability."  *Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc*., 603 F.3d 666, 670 (9th Cir. 2011) (citing *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. 2007)).

4.  Vargas and the Class are disabled with the meaning of the ADA.  *See* FPTCO at ¶ 5(j).

5.  Quest's PSCs are places of public accommodation.  FPTCO ¶ 5(c).

6.  As relevant to this case, discrimination includes failure to (a) make reasonable modifications to a policy or practice, as necessary to provide a disabled person with access to the public accommodation's services, or (b) take necessary steps to ensure that "no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." 42 U.S.C. §§ 12182(b)(2)(A)(ii)–(iii).  "Auxiliary aids and services" includes "qualified readers . . . or other effective methods of making visually delivered materials available to individuals with visual impairments," including the use of screen readers, as well as "acquisition or modification of equipment or devices." *Id*. at §§ 12103(1)(B)–(C); *see also* 28 C.F.R. §§ 36.303(b)(2)–(3).  But a defendant may avoid liability under either prong if it can show that either the modification sought or the auxiliary aids requested would fundamentally alter the nature of the services provided.  42 U.S.C. § 12182(b)(2)(A).  A defendant may also avoid liability for failure to provide auxiliary aids and services if provision of the requested aids would result in an undue burden to the defendant.  *Id*. at § 12182(b)(2)(A)(iii).

7.  The fact that Plaintiffs have not adduced evidence that a blind or visually impaired individual was actually denied the ability to use Quest's phlebotomist services is not dispositive.  Ninth Circuit precedent makes clear that bare access to a public accommodation's goods and services is insufficient to satisfy the ADA.  Instead, "[p]ublic accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012).  The Original Kiosks were designed to be used privately and independently by Quest patients. *See, e.g.*, Day 1 Tr. at 119:20–25, 120:1–3, 121:20–24 (Kiosks designed to address privacy concerns and help reduce patient anxiety and dissatisfaction by informing them where they were in

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the queue); Yarrison Decl. ¶ 17 (additional languages added to enable patients who could not speak English to use the Kiosks without assistance).

8.    The Ninth Circuit has held that "necessary" modifications may include modifications required to ensure enjoyment or minimize discomfort, rather than merely those required to ensure access.  For example, in *Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075 (9th Cir. 2004), the plaintiff, who used a wheelchair, arrived at a movie theater for a sold-out showing with his wife approximately 20 minutes before showtime. The theater had four wheelchair spaces, each of which adjoined a companion seat that was marked for use by companions of disabled patrons.  364 F.3d at 1078–79.  When the plaintiff and his wife arrived, two of the four companion seats were occupied by a father and his son, neither of whom appeared to be disabled or accompanying a disabled patron. The plaintiff's wife asked the father and his son to change seats, but they refused.  When the plaintiff's wife sought the assistance of a manager, the manager informed her that, pursuant to company policy, he could not require the man and his son to change seats because the showing was sold out.  *Id*. at 1079.[10]  The plaintiff sued under the ADA, and the district court granted his motion for summary judgment and entered a permanent injunction requiring the theater to modify its policies to ensure that companions of disabled patrons receive priority use of companion seats, as long as they arrive at least ten minutes before showtime.  *Id*.

On appeal, the Ninth Circuit affirmed the district court's ruling.  The court held that the presence of the plaintiff's wife was "a condition precedent to [the plaintiff's] 'enjoyment of the goods, services, facilities, privileges, advantages, [and] accommodations of [the movie theater],'" and therefore that the theater's policy had a discriminatory effect.

---

[10] The policy provided that:

In situations in which the auditorium is legitimately "sold out," companions of guests using wheelchairs will be exposed to the same risk of less desirable seating as non-disabled couples who are sold "single" seats.  In a sold out situation, everyone shares the same risk of being unable to sit together.

*Id*. at 1079 n.2.

-16-

364 F.3d at 1082. The court also concluded that the modification of the theater's policies requested by the plaintiff was necessary to the plaintiff's attendance and enjoyment of movies at the theater; was reasonable; and would not result in a fundamental alteration of the theater's goods and services. *Id*. at 1083–84.

The Ninth Circuit has repeatedly reached similar conclusions. In *Oregon Paralyzed Veterans of America v. Regal Cinemas, Inc.*, 339 F.3d 1126 (9th Cir. 2003), the Ninth Circuit found it "simply inconceivable" that locating wheelchair-accessible seats only in the first few rows of a stadium-style movie theater "could constitute 'full and equal enjoyment' of movie theater services by disabled patrons." 339 F.3d at 1133 (reversing and remanding to the district court and holding that the DOJ reasonably interpreted the ADA as requiring movie theaters to provide disabled seating with lines of sight comparable to those of non-disabled patrons). And in *Baughman*, the Ninth Circuit held that Disneyland violated the ADA by refusing to accommodate the plaintiff's request to use a Segway, a motorized scooter that can be used while standing, to visit the park. The *Baughman* plaintiff had a form of muscular dystrophy that made it difficult for her to walk or stand from a seated position, and therefore sought permission to use a Segway rather than a wheelchair during her visit to Disneyland, even though the park's policy was to allow only wheelchairs or motorized scooters. 685 F.3d at 1132–33. The plaintiff had asserted in previous lawsuits that she used a wheelchair or power scooter for mobility, and so was estopped from arguing that she was unable to access the park using a wheelchair or scooter. *Id*. at 1133. But the court nevertheless concluded that her request to use a Segway was necessary. The court emphasized two advantages of using a Segway. First, a Segway would reduce the plaintiff's physical pain from standing and sitting throughout the course of her visit. *See id*. at 1136. Second, the court emphasized the plaintiff's claim that using a Segway would allow her to be at eye-level with other patrons and staff, and therefore would enhance her comfort and dignity. *Id*. The court concluded that "[i]f [Disney] can make [the plaintiff]'s experience less onerous and more akin to that enjoyed by its able-bodied patrons, it must take reasonable steps to do so." *Id*. Although the court certainly

considered the plaintiff's ability to access the park without pain, the court concluded that the ADA required more than mere access.

9.   At the same time, brief, unintentional delays in the provision of an accommodation that is otherwise available do not constitute denial of such an accommodation under the ADA.  *See, e.g., Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 840 (9th Cir. 2007) (an hour-long delay in correcting the accidental assignment of a disabled patron to an inaccessible hotel room did not support standing); *O'Connor v. Scottsdale Healthcare Corp*., 871 F. Supp. 2d 900, 904 (D. Ariz. 2012), *adhered to on reconsideration*, No. CV11-2264-PHX-JAT, 2012 WL 2106365 (D. Ariz. June 11, 2012), and *aff'd*, 582 F. App'x 695 (9th Cir. 2014) (dismissing for lack of standing a claim that hospital security guard's refusal to allow visitor to enter with her service dog violated the ADA, where after a 40-minute delay, the guard's supervisor allowed the visitor to enter with her dog pursuant to policy); *Frankeberger v. Starwood Hotels & Resorts Worldwide, Inc.*, No. C09-1827RSL, 2010 WL 2217871, at *4 (W.D. Wash. June 1, 2010) ("a wait of less than sixteen minutes for assistance was neither unreasonable nor reflective of discrimination" where the plaintiffs, who were legally blind and one of whom used a wheelchair, were unable to read the instructions to operate a wheelchair lift at a secondary entrance to a hotel and needed to ask for assistance with the lift).

10.  There is no dispute that Vargas and the Class could not use the Original Kiosks at the Quest PSCs without assistance.  Phlebotomist assistance—which Quest contends was the "auxiliary service" offered to make the Original Kiosks accessible—was not readily available to Class Members to enable them to have  an experience like that of sighted patients.  It is undisputed that Quest generally does not have a receptionist or attendant in the waiting room.  *See, e.g.*, Trial Ex. 13 (acknowledging that having a person available to ask for help was "not a reality for our locations"); Day 2 Tr. at 28:15–29:10. Instead, staff members come into the waiting room only between patients.  *Id*. at 29:4–22; *see also* Reilly Decl. ¶ 42, Yarrison Decl. ¶ 5.  Phlebotomists are reminded to periodically check the waiting room for patients, *see* Magana Decl. ¶ 5, because Quest's business model is not designed for phlebotomists to wait in the reception area for patients to arrive.  Vargas'

experience is representative.  When Vargas arrived at Quest, he attempted to call out to Magana, but was unable to do so.  Whereas sighted patients could have checked in immediately using the Kiosk, Vargas was unable to do so.  Indeed, he had no way of communicating to Magana that he had arrived at all.  The uncertainty Vargas experienced while waiting for Magana was a dignitary injury that he incurred solely because he was unable to see well enough to use the Kiosks.

Nor were the delays experienced by Vargas and Class Members waiting for phlebotomists accidental departures from Quest's plan—waits to check in, albeit short ones, were expected for patients who could not use the Kiosks.  *See, e.g.*, Trial Ex. 9 (acknowledging that blind patients would have to wait for a phlebotomist to arrive).  Given that Vargas could not access the Original Kiosk, the fact that Vargas waited only 10–15 minutes for Magana to assist him on his first visit does not render the difference between his experience and that of sighted patients *de minimis*.

Quest's design for the experience of blind and visually impaired patients thus differed significantly from Quest's design for the experience of sighted patients, for whom check in was possible virtually immediately via the Original Kiosks.[11]  Sighted patients could immediately signal to a phlebotomist at a Quanum device behind a closed door that the patient had arrived, and blind and visually impaired patients could not.  Moreover, sighted patients received several advantages, including information about their place in the queue and their expected wait times and the ability to share their personal information privately, that Class Members did not receive.

Vargas found his experience with the Original Kiosk embarrassing and humiliating. Vargas Decl. ¶ 14.  This type of dignitary harm is among the types of injuries that ADA requires places of public accommodation to seek to minimize, if they can do so without

---

[11] It is immaterial that certain other patients might also be unable or prefer not to use the Kiosks. Although Quest argues that this proves that it ensured its phlebotomists were available, the Court does not find this argument persuasive.  While it appears that Quest did provide its phlebotomists with training about how to assist blind and disabled patients, the level of assistance required by the ADA—phlebotomist assistance available *to the same degree* as the Kiosk—was simply not compatible with Quest's model.

fundamentally altering their goods or services or without incurring an undue burden. *See Baughman*, 685 F.3d at 1136. Accordingly, the Court concludes that Quest's failure to provide an accessible Kiosk, or phlebotomist assistance as an auxiliary service to make the Original Kiosk accessible, amounted to a failure to make a necessary modification or to provide a necessary auxiliary service under the ADA.[12]

**B.   TFS and Mootness**

1.   Quest contends, however, that the implementation of TFS renders Plaintiffs' claim for injunctive relief (the only claim available under the ADA) moot. If the barriers discussed above have been remediated, then no present live controversy remains. *Oliver v. Ralph's Grocery Co*., 654 F.3d 903, 905 (9th Cir. 2011).

2. TFS did not moot Vargas and the Class's claims.

3.   TFS takes several important steps toward remedying the deficiencies identified above. First and foremost, TFS functions like a bell, informing phlebotomists that a blind or visually impaired patient has arrived. Second, TFS theoretically permits a blind or visually-impaired Class Member to check in without phlebotomist assistance. But the potential advantages of TFS have not been fully realized.

---

[12] Quest argues that Plaintiffs failed to request the modification they now seek before filing suit, and therefore that Quest has no obligation to make it. Quest relies on *dicta* in *Lopez v. Catalina Channel Express, Inc.*, 974 F.3d 1030 (9th Cir. 2020), for the proposition that a modification must be specifically requested before it can be required. *See id*. at 1036 ("In *Lentini v. California Center for the Arts*, [370 F.3d 837 (9th Cir. 2004),] we endorsed the Fifth Circuit's holding that, under subsection (ii), the plaintiff must initially prove that a modification was requested and that the requested modification was reasonable.") (citing *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997) ("The plaintiff has the burden of proving that a modification was requested and that the requested modification is reasonable."). But neither *Lopez*, *Lentini*, nor *Johnson* turned on whether a modification had been requested—all three cases concerned the burden of proof for showing the requested modification was reasonable—and the Court is not persuaded that how a modification was requested is determinative under these circumstances. Indeed, the Ninth Circuit has more recently rejected the theory that a request is dispositive, holding that "[i]t is axiomatic that an entity's duty to look into and provide a reasonable accommodation may be triggered when the need for accommodation is obvious, even if no request has been made." *Bax v. Doctors Medical Center of Modesto, Inc.*, 52 F.4th 858, 869 (9th Cir. 2022) (citations omitted). The request "performs a signaling function," *id*., putting public accommodations on notice that an accommodation or modification is necessary. Here, Quest was aware, or should have been aware, that the Original Kiosks were not accessible to blind users.

-20-

4.  Phlebotomists may turn off the "bell" function of TFS.  This amendment is therefore not entirely effective.

5.  Plaintiffs also presented credible anecdotal evidence that TFS has not been completely rolled out across all locations.  For example, when Class Member Donna Grahmann visited a Quest PSC on May 4, 2021, and attempted to use TFS, "nothing" happened.  *See* Second Grahmann Depo. at 88:9–10; 89:3–8.  Plaintiffs' investigator, Mark Derry, visited a number of Quest locations in California, New York, and Connecticut in 2021, and observed a number of deficiencies with its operation.  For example, on June 12, 2021, Derry (who is not blind) used TFS at a Beverly Hills Quest location.  Although he did see his patient ID number appear on a monitor in the waiting room, he did not hear any audible confirmation that he had checked in, nor did he hear the audio message explaining how to use TFS play during his visit to the PSC.  Derry Decl. ¶ 16.  He observed the same on June 14, 2021 visits to three Burbank PSCs and a Van Nuys PSC, and on an August 14, 2021 visit to a West Seneca PSC.  *Id.* at ¶¶ 17–19, 22, 29.  At a visit to a Tarzana PSC, he observed that the kiosk appeared not to have TFS functionality, and at an August 12, 2021 visit to a Buffalo PSC, using a three-fingered swipe did not check him in.  *Id.* at ¶¶ 21, 26.  At several other PSCs, he observed that he could perform TFS, and that the Kiosk played an audio message informing him that he had successfully checked in, but he did not hear the audio loop explaining how to use TFS.  *See id.* at ¶¶ 20, 24, 25, 30, 32, 33, 39.  At an August 12, 2021 visit to a Cheektowaga PSC, he heard the audio loop explaining how to use TFS, but TFS did not check him in.  *Id.* at ¶ 28.  TFS did function as intended at some locations, including at most open locations in Connecticut.  *Id.* at ¶¶ 36, 38, 40, 43.  Plaintiffs' anecdotal evidence indicates that TFS, as implemented, is a spotty fix.

6.  Finally, Quest has made changes to the Kiosk since the rollout of TFS that indicate that the question of mootness is not a stationary target.  Quest has made several improvements and changes to TFS since its arrival.  These include shortening the duration of the audio announcement and increasing the frequency with which it plays.  Quest has also changed the nature of the services offered through the Kiosks.  For example, in the early stages of the COVID-19 pandemic, Quest offered a "wait by text" option that was

not available to patients who could not use the Kiosks. Quest has now discontinued that function. Likewise, Quest has discontinued the feature of the Kiosks that provided patients with an estimate of their wait time. Plaintiffs' arguments regarding inaccessibility of those features are now moot, because those features no longer exist for anyone. At the same time, Quest has made plans to add new features, such as an insurance card scanner, that have in fact already been implemented at certain locations. Those new features are not accessible to patients who cannot use the Kiosks. Because Quest's use of the Kiosks has changed since the rollout of TFS, and because certain new features remain inaccessible to Class Members, the Court cannot say that TFS has mooted Plaintiffs' claims.

**C.    Equivalent Facilitation**

1.    Quest asserts an affirmative defense based on section 103 of the ADA Standards for Accessible Design ("ADAS"), which provides that "[n]othing in [the ADAS] prevents the use of designs, products, or technologies as alternatives to those prescribed, provided they result in substantially equivalent or greater accessibility and usability." *See* 2010 ADA Standards for Accessible Design § 103. Plaintiffs do not object to this affirmative defense. But Quest has not cited to any authority for the idea that section 103—which qualifies the standards laid out in the ADAS—constitutes a defense to an ADA violation that is not itself based on violation of a standard laid out in the ADAS. There is no question that Plaintiffs here have not identified a section of the ADAS that is violated by the Kiosks, so the "equivalent facilitation" standard does not apply here.

**D.    Fundamental Alteration and Undue Burden**

1.    As discussed *supra*, Plaintiffs seek specific technological changes to the Kiosks to make them accessible for Class Members. *See* Section II.H. Quest contends that, even if the Kiosks violate the ADA, making the changes requested by Plaintiffs would fundamentally alter the nature of the services provided by Quest. *See* 42 U.S.C. § 12182(b)(2)(A)(ii)). A fundamental alteration is one that would change the "essence" or "nature" of Quest's services. *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 690 (2001).

2.    Quest also contends that providing these technological changes would result in an undue administrative burden on Quest. 42 U.S.C. § 12182(b)(2)(A)(iii), 28 C.F.R. §

36.104.[13]  An "undue burden" means "a significant difficulty or expense." *Tauscher v. Phoenix Board of Realtors, Inc.*, 931 F.3d 959, 965 (9th Cir. 2019).

3.  Making the changes requested by Plaintiffs would require Quest to forgo certain changes it has or intends to make to the Kiosks, because Quest wishes to use the single headphone jack in the existing Kiosks to connect a device that can be used to scan insurance cards.  Indeed, Quest already does use the headphone jack for that purpose at many of its PSCs.  Moreover, the changes requested would require Quest to reprogram its Kiosks and to revamp the physical Kiosks at each of its locations.  Finally, although Quest does not emphasize this factor, DOJ's ANPRM indicates that regulations that would require modifications similar to those requested by Plaintiffs are forthcoming from DOJ.  As a practical matter, if the Court ordered the modifications sought by Plaintiffs, Quest may be required to revamp its Kiosks twice:  first to comply with this Court's injunction, and then a second time, to comply with the DOJ's regulations.

4.  Under the particular circumstances of this case, the Court concludes that requiring the modifications requested by Plaintiffs at this time would impose an undue administrative burden on Quest.  In particular, given the proposed rulemaking currently pending, requiring Quest to revamp its Kiosks twice in a relatively short period would constitute an undue administrative burden, given the time and energy required to roll out the Kiosks and to make the modifications that have been made in the intervening years.  Similarly, requiring the modifications requested by Plaintiffs would require Quest to fundamentally alter its Kiosk program.  Quest would be required to either forgo its scanning function, or to obtain entirely new kiosks to accommodate Plaintiffs' requested modifications.

5.  Moreover, under the existing regulations, kiosks with the modifications Plaintiffs propose are not required.   The ADA specifies that "qualified readers" satisfy the requirement to provide auxiliary aids and services necessary to ensure effective communication with blind and visually impaired individuals. *See* 42 U.S.C. § 12103(1)(B).  Other courts have found that, where a place of public accommodation affirmatively offers

---

[13] Quest does not assert an undue financial burden defense. *See* FPTCO at 8.

assistance from a sales associate, independently accessible touchscreens are not required. *See National Federation of the Blind, Inc. v. Wal-Mart Associates, Inc.*, 566 F. Supp. 3d 383 (D. Md. 2021). Here, the Court has found that phlebotomists were not immediately available to affirmatively offer assistance to blind or visually impaired patients. But the Court concludes that a reliable method of quickly and easily summoning a phlebotomist to provide assistance would satisfy this requirement. Because such a method was not available during the Class Period, Plaintiffs have established a violation of the ADA. Furthermore, because TFS as implemented did not reliably perform the function it was intended to perform, TFS did not moot Plaintiffs' claims. But, as laid out below, the Court will order Quest only to make modifications to TFS to satisfy the ADA's requirements, and will not require Quest to adopt an entirely new Kiosk program.

6. Vargas' second visit in 2021, when he successfully used TFS to check in, did not constitute an ADA violation. The fact that he did not hear the entire message explaining how to use TFS is irrelevant for purposes of Vargas' individual claim, because he already knew how to use TFS. He used TFS and received a patient ID number. He was designated patient "001" and informed of a wait time of three minutes. Although he waited approximately 14 minutes longer than he expected to, Plaintiffs presented no evidence that this delay was the result of his disability. Without such evidence, the discrepancy between his expected wait time as provided by the Kiosk and his actual wait time is precisely the kind of brief and accidental delay that the Ninth Circuit has found to be a *de minimis* injury that will not support standing. *See Skaff*, 506 F.3d at 840. Because Vargas was able to check in using TFS, he did not suffer an injury sufficient to support an ADA violation on that visit.

**E.    Vargas' Unruh Act Claim**

1. A violation of the ADA is a violation of California's Unruh Civil Rights Act. Cal. Civ. Code ¶ 51(f). The Court has concluded that Vargas' first visit, and his use of the Original Kiosk, violated the ADA. *See* Section II.A, *supra*. Accordingly, Vargas has established a violation of the Unruh Act as to that visit.

2.  The Court has concluded that Vargas' second visit, when he successfully checked in using TFS, did not violate the ADA.  *See* Section II.E, *supra*.  Accordingly, Vargas has not established a violation of the Unruh Act as to that visit.[14]

### III.
### REMEDIES

**A.    ADA Claim**

1.  <u>Declaratory Judgment</u>:  The Court declares that, during the Class Period starting on January 1, 2018 and continuing thereafter, Quest violated Title III of the ADA in that Quest failed to provide Vargas and the Certified Class with full and equal enjoyment of Quest's services and facilities because of their disability to the extent they were unable to use the functions of the e-check-in self-service kiosks which were the primary method for check in because the TFS had not been implemented or had not been installed properly.

2.  <u>Permanent Injunction</u>:  Pursuant to 42 U.S.C. section 12188(a)(2), the Court grants Plaintiffs permanent injunctive relief as follows:

a.  Quest shall make reasonable efforts to ensure that TFS is available on all Kiosks in Quest PSCs where the Kiosk is the primary method of check-in.  All such Kiosks should provide any necessary audio notifications at a reasonably audible volume.

b.  Quest shall ensure its PSC staff are trained that, where a patient who uses TFS is not seen as soon as a phlebotomist is available, staff should make affirmative offers of reassurance and assistance as early as practicable to patients who have used TFS.  Quest shall ensure its PSC staff are trained that personal information that would otherwise be entered using the Kiosk should not be requested in the waiting room in front of other patients.

---

[14] Because the Court concludes that Vargas did not suffer an ADA violation on his second visit, Quest's "failure to mitigate" defense as to that visit is moot.

c.   Quest shall make reasonable efforts to ensure that the audio message describing how to use TFS plays no less than every five minutes, at a reasonably audible volume, in each Quest PSC where the Kiosk is the primary method of check-in.  Quest shall provide reasonably prominent instructions describing how to use the Kiosks and TFS on its website, in a manner that is accessible to blind and visually impaired individuals using screen reading technology.  Quest shall, where possible, provide braille instructions regarding how to use TFS at each of its PSCs.

d.  Until Quest has implemented modifications such as screen readers or other technology that would make the Kiosks independently accessible to Class Members, Quest shall revise its policies and software such that the "bell" audio notification to PSC staff cannot be turned off.

e.  Plaintiffs' representatives may monitor Quest PSCs to ensure the injunctive relief ordered has been implemented and will remain in place for a period of two years.  In the event any potential violation is identified, Plaintiffs' representatives shall contact a designated Quest representative, and the parties shall meet and confer to attempt to identify an appropriate solution.  Only if the parties cannot agree on an appropriate resolution should any issues be raised to the Court.

f.  The Court shall retain jurisdiction for a period of three years to ensure that Quest has complied with the remedies ordered herein.

**B.    Unruh Act**

1. Vargas shall be awarded $4,000 in statutory damages on his Unruh Act claim as to his 2019 visit to the Quest PSC.  Cal. Civ. Code § 52(a).

## IV.
## CONCLUSION

In light of the foregoing, the Court finds in favor of Plaintiffs and against Quest on Plaintiffs' ADA claim.  The Court finds in favor of Vargas and against Quest on Vargas' Unruh Act claim as to Vargas' first visit, and in favor of Quest and against Vargas as to his second visit.

Plaintiffs shall file their motion for attorneys' fees and costs and for a class representative award for Vargas within 21 days of the date of this Order.

**IT IS SO ORDERED.**

DATED:  September 29, 2023

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE